IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| ROBERT WHARTON, | : | |
| Petitioner, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DONALD T. VAUGHN, | : | No. 01-6049 |
| Respondent. | : | |
| | : | |

**Goldberg, J.**                                                  **August 16, 2012**

## <u>MEMORANDUM OPINION</u>

On July 2, 1985, Petitioner, Robert Wharton, was convicted of two counts of first degree murder for the brutal killing of Bradley and Ferne Hart. Petitioner was subsequently sentenced to death and his conviction and sentence were affirmed by the Pennsylvania Supreme Court.

Petitioner has filed a petition for the issuance of a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254, seeking relief from his convictions and death sentence. He brings twenty-three claims for relief, challenging the constitutionality of his trial and sentencing hearings. For the reasons set forth below, and after careful consideration of his petition, we conclude that Petitioner's claims are untimely, procedurally defaulted and/or without merit.

## Table of Contents

I.      Factual & Procedural History ................................................................4

II.     Legal Standards ......................................................................................8

        A.      Timeliness of a Federal Habeas Petition ..................................8

        B.      Exhaustion of State Remedies; Procedural Default ................9

        C.      Standard for Issuance of the Writ ........................................10

III.    Analysis of Procedural Issues & Standard of Review ......................11

        A.      Timeliness of Claims Raised ..................................................12

        B.      Exhaustion, Procedural Default & AEDPA Deference ........16

IV.     Development of the Factual Record in Federal Court ......................24

        A.      Standards Governing Requests for an Evidentiary Hearing & Discovery ..........25

        B.      Petitioner's Requests for an Evidentiary Hearing & Discovery ..........................27

IV.     Analysis of the Merits ..........................................................................33

        A.      Claim I – Did the Prosecution use Peremptory Strikes in a Racially
                Discriminatory Manner? ........................................................33

        B.      Claim II – Was Petitioner's Trial Counsel Ineffective for Failing to Discover
                and Utilize Available Evidence to Demonstrate his Confession was
                Involuntary? ............................................................................34

        C.      Claim III – Was Petitioner's Confession Admitted Against him in Violation
                of the Fifth, Sixth and Fourteenth Amendments? ...........................71

        D.      Claim XVIII – Was Trial Counsel Ineffective for Failing to Impeach the
                Testimony of Robert Hart? ....................................................81

        E.      Claim VI – Did the Admission of the Confession of Petitioner's Co-defendant
                Violate the Sixth Amendment's Confrontation Clause? ......................82

**F.      Claim XIV – Did The Trial Court's Reasonable Doubt Instruction Violate Due Process?**.................................................................................................**97**

**G.      Claim XV – Did the Prosecution Suppress Exculpatory Evidence at Petitioner's First Penalty Hearing and his Trial in Violation of Due Process?**..............................................................................................**98**

**H.      Claim VII – Did Petitioner's Second Penalty Hearing Violate the Double Jeopardy Clause?**................................................................................**102**

**I.      Claim IV – Was Petitioner's Counsel Ineffective at his Second Penalty Hearing for Failing to Offer Available Mitigation Evidence?**...........................................**104**

**J.      Claim XII – Did Admission of "Victim Impact" Evidence and Other "Prejudicial" Evidence During Petitioner's Guilt Phase and Second Penalty Hearing Violate Due Process?**.................................................................**112**

**K.      Claim XVI – Did the Court's Refusal to Allow Testimony Regarding Petitioner's Religious Beliefs and his Co-defendant's Life Sentence During the Second Penalty Hearing Violate Due Process?**.....................................................**126**

**L.      Claim VIII – Did the Prosecutor's Conduct During Petitioner's Second Penalty Hearing Violate Due Process?**....................................................................**130**

**M.      Claim X – Did The Court's Refusal to Allow Petitioner's Counsel to Argue that the Jury's Verdict would be "Basically Irreversible" During the Second Death Penalty Hearing Violate Due Process?**..................................................**136**

**N.      Claim XI – Did the Court Violate Petitioner's Due Process Rights During the Second Penalty Hearing by Failing to Instruct the Jury that, if Sentenced to Life, Petitioner would Never be Eligible for Parole?**...........................................**137**

**O.      Claim XIII – Did the Pennsylvania Supreme Court's Review of Petitioner's Death Sentence Violate Due Process?**...............................................................**144**

**P.      Claim V – Does Petitioner's Death Sentence Violate the** <u>**Ex**</u> <u>**Post**</u> <u>**Facto**</u> **Clause or Due Process?**.................................................................................................**148**

**Q.      Cumulative Effect of All Errors**..................................................................**155**

**VI.   Conclusion**..............................................................................................................**156**

## I.    FACTUAL & PROCEDURAL HISTORY

The facts supporting Petitioner's convictions for first degree murder were described by the

Pennsylvania Supreme Court as follows:

> The murders of Bradley Hart and his wife Fern[e] were the culmination of a series of crimes committed by Petitioner and his cohorts against the Hart family in retribution for a dispute over the quality of home improvement work Petitioner performed in the summer of 1983 at the Harts' residence and at a radio station owned by Hart's father, the Reverend Samuel Hart. When Hart refused to pay Petitioner's employer for the work, Petitioner complained bitterly and blamed Bradley Hart for his lost wages. He vowed to make the Hart family pay.
>
> Petitioner began victimizing the Harts by burglarizing their home with Larue Owens on Sunday, August 14, 1983, at a time when Petitioner and Owens knew the Harts would be at church. Petitioner returned the following week with Owens and Eric Mason, and stole additional property. This time they also vandalized the Harts' home by slashing furniture; ransacking closets; mutilating family photographs; pouring different liquids such as bleach, paint, and oil throughout the house; and, defecating and urinating on the floors. On September 4, 1983, Petitioner burglarized Reverend Hart's church, stole cash and computer equipment, and pinned a photograph of Bradley Hart to a wall with a letter opener. Then, in early January of 1984, Petitioner, Mason and Thomas Nixon went to the Harts' home intending to rob them. The men abandoned their plan when they discovered the Harts had another person visiting in the house.
>
> Finally, in the late evening of January 30, 1984, while Bradley and Fern[e] Hart were home alone with their seven-month-old daughter, Petitioner and Mason came to the Harts' home. When Bradley Hart answered the door, Petitioner and Mason forced their way in at knifepoint. Initially, they coerced Bradley Hart into writing Petitioner a check for nine hundred and thirty four dollars as settlement for the debt Petitioner felt was owed to him. Next, the two men tied up the Harts on a couch holding them captive, while the intruders watched television and talked for several hours. Eventually, they decided to separate the couple. Petitioner took Fern[e] Hart upstairs where he bound her hands and legs; covered her eyes, nose, and mouth with duct tape; strangled her with a necktie; and ultimately drowned her in a bathtub. Meanwhile, Mason took Bradley Hart to the basement where Mason forced Bradley Hart to lie with his face in a pan of water; placed his foot on Bradley Hart's back; and strangled him to death with an electrical cord. Petitioner and Mason fled, but not before they turned off the heat in the house and abandoned the Harts' infant child on a bed in an upstairs bedroom.
>
> On February 2, 1984, concerned that he had not heard from his son or daughter-in-law, Reverend Hart went to the home and discovered their bodies. When he found the infant, she was suffering from dehydration and neglect. She was

immediately transported to a hospital where she experienced respiratory arrest brought on by shock and hypothermia.  She eventually recovered.

An investigation immediately led police to suspect Petitioner.  When police executed search warrants on his girlfriend's house, they discovered items belonging to the Harts and obtained a warrant for Petitioner's arrest.  When he was taken into custody on February 7, 1984, he confessed and named Eric Mason as his accomplice in the murders.[1]

Commonwealth v. Wharton (Wharton V), 886 A.2d 1120, 1121-22 (Pa. 2005).

On July 2, 1985, a jury sitting before the Honorable Francis Biunno convicted Petitioner and his co-defendant, Eric Mason, of two counts of murder in the first degree and related offenses. Following a penalty hearing on July 5, 1985, the jury returned a verdict of death against Petitioner for each count of murder.[2]  On September 24, 1986, the trial court officially imposed the sentences of death against Petitioner.

Petitioner filed a direct appeal to the Pennsylvania Supreme Court, challenging his convictions and sentence.  On April 28, 1992, the Supreme Court affirmed his convictions, but reversed the death sentences and remanded the case for a second penalty hearing.  See Wharton I, 607 A.2d 710, 721-24 (Pa. 1992) (holding that the trial court's failure to properly instruct the jury on torture during the penalty hearing was prejudicially deficient and remanding for a second penalty hearing).

The trial court held a second penalty hearing beginning on November 30, 1992.  The jury returned its verdict on December 23, 1992, again determining that Petitioner should be sentenced

---

[1] The Pennsylvania Supreme Court provided a more complete version of evidence in its November 28, 2005 Opinion, addressing Petitioner's initial direct appeal.  Commonwealth v. Wharton (Wharton I), 607 A.2d 710 (Pa. 1992).

[2] Mason was also convicted of two counts of first degree murder, but the jury returned sentences of life imprisonment.

to death on both counts of murder.[3]  Petitioner's motions to set aside the verdict were argued before

the trial court and ultimately denied.  On August 18, 1993, the trial court again formally sentenced

Petitioner to death.  On September 29, 1995, the Supreme Court of Pennsylvania affirmed the

judgment of sentence, Commonwealth v. Wharton (Wharton II), 665 A.2d 458 (Pa. 1995), and the

United States Supreme Court denied certiorari on June 10, 1996.  See Wharton v. Pennsylvania, 517

U.S. 1247 (1996).

On June 28, 1996, Petitioner file a pro se petition under the Pennsylvania Post-Conviction

Relief Act  ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  Counsel entered his appearance on behalf of

Petitioner and filed an amended PCRA petition on January 21, 1997.  On June 10, 1997, the

Honorable Gary S. Glazer of the Court of Common Pleas of Philadelphia County ("PCRA court")

issued a notice of intent to dismiss the amended petition without a hearing, and on June 23, 1997,

the PCRA court denied relief.  On PCRA appeal, the Pennsylvania Supreme Court remanded the

case to the PCRA court with instructions to file a more substantial opinion, as its initial opinion

simply "adopt[ed] the reasoning of the Commonwealth."  After the PCRA court issued its opinion

on November 25, 2002, the Supreme Court affirmed denial of Petitioner's PCRA petition.

Commonwealth v. Wharton (Wharton III), 811 A.2d 978 (Pa. 2002).

On December 16, 2002, Pennsylvania Governor Mark S. Schweiker signed a death warrant,

---

[3] The jury found two aggravating circumstances – that the killing was done during the
perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and, that Petitioner had been convicted of
another federal or state offense, committed either before or at the time of the offense at issue, for
which a sentence of life imprisonment or death was imposable, 42 Pa.C.S. § 9711(d)(10).  The
jury also found one mitigating circumstance, determining that other evidence of mitigation
existed concerning the character and record of Petitioner and the circumstances of his offense, 42
Pa.C.S. § 9711(e)(8).  The jury found the aggravating circumstances outweighed the mitigating
circumstance and sentenced Petitioner to death for each murder.

scheduling Petitioner's execution for February 13, 2003.[4]  On January 15, 2003, Petitioner filed an

unopposed stay of execution with this Court, and on January 21, 2003, the Honorable James T. Giles

stayed the warrant of execution, pending the duration of the federal proceeding.  (Doc. No. 12.)  On

October 7, 2003, Petitioner filed a Petition for Writ of Habeas Corpus and Consolidated

Memorandum of Law, pursuant to 28 U.S.C. § 2254.  (Doc. No. 22 (hereinafter "Pet.").)  On August

2, 2004, Petitioner filed an "Amendment to Petition For a Writ of Habeas Corpus."  (Doc. No. 33

(hereinafter "Am. Pet.").)  Judge Giles held oral argument on the petition on October 10, 2006.[5]

On November 13, 2008, this case was reassigned to the undersigned, and on January 5, 2009,

a status conference was held.  On February 17, 2009, Petitioner filed a motion to amend Claim I in

his petition, which was granted on June 2, 2009.  Oral argument on the amendment to the petition

---

[4] On January 13, 2003, Petitioner filed a second PCRA petition.  On January 22, 2003, the PCRA court issued a notice of intent to dismiss, and on February 11, 2003, the PCRA court dismissed the petition as premature, noting that Petitioner had an "appeal pending" in federal court, which had not yet been litigated.  The only pending federal litigation at the time of the PCRA court's decision, however, was the unopposed stay of execution before Judge Giles. See Wharton V, 886 A.2d at 1123 n.5.  Petitioner appealed and the Supreme Court of Pennsylvania vacated the PCRA court's order on November 19, 2003, and remanded the matter to the PCRA court for further consideration.  See Commonwealth v. Wharton (Wharton IV), 835 A.2d 1273 (Pa. 2003).

On November 25, 2003, the PCRA court again provided Petitioner with a notice of its intent to dismiss, this time on the grounds that the petition was untimely and failed to assert an exception to the one-year statute of limitations.  When Petitioner did not amend his petition within the twenty days he was given for that purpose, the PCRA court dismissed the petition on December 15, 2003, as untimely.  Petitioner appealed to the Supreme Court of Pennsylvania, which also denied his petition as untimely.  Wharton V, 886 A.2d at 1127.

[5] We note that Petitioner filed a pro se "Ex Parte Petition for New Counsel" on October 15, 2007 (Doc. No. 75), which was denied by Judge Giles.  (Doc. No. 76.)  Petitioner took an appeal, which was denied for lack of appellate jurisdiction.  (Doc. No. 79.)

was scheduled for September 18, 2009, but on the request of Petitioner, argument was cancelled.[6]

On February 16, 2010, Petitioner filed a motion for discovery in support of his petition. On October 12, 2011, we held oral argument on Petitioner's motion as well as his request for an evidentiary hearing on Claims II and III in his petition. We granted Petitioner's motion for discovery in part, but left the scope of the discovery exchanged up to the attorneys, and granted his request for an evidentiary hearing on Claims II and III. The evidentiary hearing was held on February 8 and 10, 2012. On February 13, 2012, we entered a supplemental briefing schedule. The petition, and the amendments thereto, are now fully briefed and ready for disposition.

## II.    LEGAL STANDARDS

### A.    Timeliness of a Federal Habeas Petition

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year period of limitations for filing an application for the issuance of a writ. See 28 U.S.C. § 2244(d)(1). The statute provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
>
> (C) the date on which the constitutional right asserted was initially

___

[6] Specifically, counsel for the Petitioner informed the Court that recent cases out of the United States Court of Appeals for the Third Circuit undermined the claim upon which the amendment was based and made argument unnecessary. (Doc. No. 95.)

> recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

The statute of limitations for filing a federal habeas petition is tolled during the time when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. 2244(d)(2). In addition, the limitation period may be equitably tolled in capital cases where a petitioner: (1) has been diligent in asserting his claims; and (2) rigid application of the statute would be unfair. Baker v. Horn, 383 F.Supp.2d 720, 744-45 (E.D.Pa. 2005) (citing Fahy v. Horn, 240 F.3d 239, 244 (3d Cir. 2001)).

## B.    Exhaustion of State Remedies; Procedural Default

Under AEDPA, a prerequisite to the issuance of a writ of habeas corpus on behalf of a person in state custody pursuant to a state court judgment is that the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In order to satisfy this requirement, a petitioner must have "fairly presented" the merits of his federal claims during "one complete round of the established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). A federal claim is fairly presented to the state courts where the petitioner has raised "the same factual and legal basis for the claim to the state courts." See Nara v. Frank, 488 F.3d 188, 198-99 (3d Cir. 2007).

If a petitioner fairly presents a claim to the state courts, but it was denied on a state-law ground that is "independent of the federal question and adequate to support the judgment," the claim

is procedurally defaulted.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  A claim is also procedurally defaulted if the petitioner failed to present it in state court and would now be barred from doing so under state procedural rules.  McCandless v. Vaughn,  172 F.3d 255, 261 (3d Cir. 1999).  Where a claim is procedurally defaulted, it cannot provide a basis for federal habeas relief unless the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

###   C.   Standard for Issuance of the Writ

Where the federal court reviews a claim that has been adjudicated on the merits by the state court, § 2254(d) permits the federal court to grant a petition for habeas corpus only if: (1) the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); see Parker v. Matthews, 132 S.Ct. 2148, 2151-53 (2012) (reiterating that the standard under 2254(d)(1) is highly deferential to state court decisions, and overturning Sixth Circuit decision granting habeas relief because the state courts decision denying relief was not objectively unreasonable).  Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)); Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (same).

Interpreting this statutory language, the Supreme Court explained that "[u]nder the 'contrary

to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite

to that reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams

v. Taylor, 529 U.S. 362, 412-13 (2000).  With respect to "the 'unreasonable application' clause, a

federal habeas court may grant the writ if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts

of the prisoner's case." Id. at 413.  The "unreasonable application" inquiry thus requires the habeas

court to "ask whether the state court's application of clearly established federal law was objectively

unreasonable." Id. at 409.  As the Third Circuit has noted, "an unreasonable application of federal

law is different from an incorrect application of such law and a federal habeas court may not grant

relief unless that court determines that a state court's incorrect or erroneous application of clearly

established federal law was also unreasonable." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)

(citing Williams, 529 U.S. at 411).

Where the state court decision does not constitute an "adjudication on the merits," but the

petitioner's claim is ripe for habeas review, § 2254 does not apply and instead the federal court

applies the pre-AEDPA standard, reviewing pure legal questions and mixed question of law and fact

de novo.  See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  The state court's factual

determinations, however, are still presumed correct pursuant to § 2254(e)(1).

## III.    ANALYSIS OF PROCEDURAL ISSUES & STANDARD OF REVIEW

Before addressing the merits of Petitioner's claims or his requests for an evidentiary hearing

and discovery, we must first determine whether Petitioner's claims were timely filed and properly

exhausted.  In addition, as to the claims subject to review on the merits, we must determine whether

11

the standard of review set forth in 28 U.S.C. § 2254 applies.

### A.    Timeliness of Claims Raised

Petitioner's conviction became "final," pursuant to § 2244(d)(1)(A), on June 10, 1996, the date his petition for writ of <u>certiorari</u> to the United States Supreme Court was denied.  <u>Wharton v. Pennsylvania</u>, 517 U.S. 1247 (1996).  On June 18, 1996, Petitioner initiated a <u>pro se</u> PCRA action, tolling the limitation period until the Pennsylvania Supreme Court affirmed the PCRA court's denial of his petition on December 16, 2002.[7]  <u>See</u> 28 U.S.C. § 2244(d)(2) (providing that the limitations period for filing a federal habeas petition is tolled during the time when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending").  Petitioner then filed a timely federal habeas petition on October 6, 2003, approximately 312 days into his one-year limitations period.

On August 2, 2004, Petitioner filed an amended federal habeas petition, which added eight "new" claims,[8] approximately six months after his limitations period expired under § 2244(d).  (Am. Pet. at 1.)  Petitioner filed this amended petition prior to Respondent's response to his initial petition, and therefore, did not require leave of court to do so.  Respondent contends that Petitioner's "new"

---

[7] On January 13, 2003, Petitioner filed a second PCRA petition.  (Pet. at 6); <u>see</u> (Doc. No. 36 at 8 (hereinafter "Resp.").)  This petition does not toll his federal limitations period under § 2244(d)(2), however, because it was dismissed as untimely by the state courts.  <u>Wharton III</u>, 886 A.2d 1120, 1123-25 (Pa. 2005); <u>see</u> <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 417 (2005) (holding that a PCRA petition that the state courts deny as untimely does not toll limitations period under 2244(d)(2)); <u>Fahy v. Horn</u>, 240 F.3d 239, 243-46 (3d Cir. 2001) (holding that an untimely PCRA petition does not statutorily toll the federal limitation period, even where the Pennsylvania Supreme Court's timeliness decision was based upon application of a state statute of limitations that was applied inconsistently in death penalty cases).

[8] This includes Claims XVII, XVIII, XIX, XX, XXI, XXII, XXIII and XXIV.  The amended petition also withdrew Claim IX from the original petition.  (Am. Pet. at 4, 6-11.)

claims are time-barred under § 2244(d).  While Petitioner's amended petition was clearly filed beyond the limitations period, we may still review the "new" claims contained therein if they "relate back" to a claim contained in his original petition or are subject to equitable tolling.  See Henderson v. DiGuglielmo, 138 Fed.Appx. 463, 465-67 & n.5 (3d Cir. 2005) (considering timeliness question in light of whether the amended petition included claims that "related back" to the original petition or were subject to "equitable tolling").

Federal Rule of Civil Procedure 15 applies to federal habeas petitions pursuant to 28 U.S.C. § 2242, and allows petitioners to file amendments that "relate back to the date of the original pleading[.]"  See Mayle v. Felix, 545 U.S. 644, 655 (2005).  Therefore, a claim in an amended petition that is filed outside of the statute of limitations is considered timely if it "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading."  FED. R. CIV. P. 15 (c); see id.  In Mayle, the United States Supreme Court directed that, under this standard, relation back is appropriate "[s]o long as the original and amended petitions state claims that are tied to a common core of operative fact[.]"  Id. at 664 & n.7 (articulating standard and pointing to cases from circuit courts that determined an amended petition "related back" to an original petition where the amendment included claims arising from the same facts, but stated a different legal theory).

In light of this standard, we conclude that four of the "new" claims contained in Petitioner's amendment relate back to his original petition.  Claims XVII and XIX each pertain to facts underlying Petitioner's arrest and confession, specifically the testimony of police officers regarding the manner in which he was apprehended and questioned on February 7, 1984.  These operative facts are subject to Claims II and III of Petitioner's original petition.  Similarly, Claim XX challenges the performance of Petitioner's trial counsel for failing to utilize a mental health professional and for

failing to call Petitioner during his suppression hearing to advance his theory that his confession was psychologically coerced.  These underlying facts are also related to Claims II and III.  Compare (Am. Pet. at 6-7) with (Pet. at 40-53.)

Lastly, in Claim XXII, Petitioner alleges that his appellate counsel was ineffective for failing to "request re-argument from the Pennsylvania Supreme Court's denial of relief in the severance and Bruton claims raised on direct appeal." (Am. Pet. at 9.)  This claim is predicated upon the factual and legal issues he raised in Claim VI of his original petition, which deals with whether Petitioner's rights under the Sixth Amendment were violated when the confession of his co-defendant was presented at their joint trial.  See (Pet. at 86-93.)

However, the other "new" claims raised in Petitioner's amendment do not relate back to his original petition.  Specifically, in Claim XVIII, Petitioner alleged that his trial counsel was ineffective for failing to impeach the testimony of Robert Hart, brother of Bradley Hart.  By way of background, Robert Hart testified that, prior to the murders of Bradley and Ferne Hart, Petitioner told him he was "going to get" Bradley if he did not satisfy an alleged debt.  (N.T., 6/18/85, p. 77.)  Petitioner claims that this testimony "conflicted with his police statement," in which he did not disclose this information.  (Am. Pet. at 6-7.)  Neither Robert Hart's testimony nor his statement to police, however, are subject to a claim in Petitioner's original petition.

Similarly, in Claim XXI, Petitioner alleges that the prosecution improperly suppressed evidence of a "size eleven shoe print" found in the Harts' backyard until his 1992 penalty hearing.  Petitioner claims that this "shoe print" could not have belonged to him or his co-defendant and would have provided him with a basis to assert that he was not one of "the actual killers."  He further states that these facts, if disclosed, "could have supported his argument that his alleged confession

to the killings was not true and was in fact, coerced." (Am. Pet. at 8-9.)  The facts that form the basis of this argument, however, are not mentioned in Petitioner's original petition and are not subject to any claim contained therein.

Lastly, Petitioner contends that his trial attorney was deficient in failing to challenge the "affidavit of probable cause" for the issuance of a search warrant on his home and the sufficiency of the evidence for his conviction of burglary and conspiracy to burglarize the "Germantown Christian Assembly."  (Am. Pet. at 10-11.)  These two new claims, labeled XXIII and XXIV, respectively, raise factual issues that are outside of those presented in Petitioner's original petition. Indeed, Petitioner raised no allegations or legal argument addressing the facts underlying the issuance of the search warrant on his home or any of his burglary and conspiracy convictions.

Therefore, Claims XVIII, XXI, XXIII and XXIV are untimely and cannot provide the basis for federal habeas relief, unless Petitioner is entitled to equitable tolling of the limitations period. Equitable tolling is appropriate where a petitioner: (1) has been diligent in asserting his claims; and (2) rigid application of the statute would be unfair.   Baker v. Horn, 383 F.Supp.2d 720, 744-45 (E.D.Pa. 2005) (citing Fahy v. Horn, 240 F.3d 239, 244 (3d Cir. 2001)).  Given the procedural history of this case, we are unable to conclude that Petitioner has been diligent in asserting these claims.  Petitioner filed his amended petition one year and eight months after the Pennsylvania Supreme Court affirmed the PCRA court's denial of his state petition and ten months after he filed his original federal petition.  The "new claims" he included are based upon factual and legal theories that were previously available, but not raised within the federal limitations period.  Further, Petitioner never submitted a memorandum or brief in support of his amended petition, although Respondent challenged each of these claims as untimely.

15

Moreover, even if Petitioner was entitled to equitable tolling, Claims XVIII, XXI, XXIII and XXIV are procedurally defaulted and/or without merit.  For the sake of completeness, we will also consider these claims in connection with our full analysis of procedural default and the merits of the original petition.

**B.      Exhaustion, Procedural Default & AEDPA Deference**

Petitioner raises twenty-three claims for relief, four of which are subject to review on the merits under 28 U.S.C. § 2254, because these claims were presented to the Pennsylvania Supreme Court on direct or collateral appeal and disposed of on the merits.[9]  The parties disagree on several levels, however, as to whether we can reach the merits of Petitioner's remaining claims, and if so, whether our review should be governed by the principles of AEDPA deference set out in 28 U.S.C. § 2254.

First, Respondent contends that eleven of Petitioner's claims are procedurally defaulted because they were dismissed by the Pennsylvania Supreme Court on "independent and adequate" state waiver grounds.[10]  Petitioner contends, however, that the Supreme Court's rejection of these claims rested upon inadequate state waiver grounds.  (Resp. at 13-14; Pet'r's Reply at 3-6.)

Second, Respondent asserts that, even if we were to reach the merits of these eleven claims,

---

[9] These include Claims IV, V, VI and XIII.  Respondent, however, contends that certain aspects of Claim V are procedurally defaulted.  We address this argument below.

[10] This includes portions of Claims I and II, and all of Claims III, VII, VIII, X, XI, XII, XIV, XV, and XVI.  <u>See</u> (Pet'r's Reply at 1 n.1, 20-21, 23-24.)   We note that this aspect of Respondent's argument does not specifically address Claim XVIII, which was first raised in Petitioner's Amended Petition of August 2, 2006. (Am. Pet. at 8-9); <u>see</u> (Doc. No. 72 at 8-9 (hereinafter "Resp. to Am. Pet.").)  This claim, however, was also denied on waiver grounds by the Pennsylvania Supreme Court and will be considered in connection with our analysis.  <u>See</u> <u>Wharton III</u>, 811 A.2d at 987.

we would be required to apply AEDPA deference to the opinion of the PCRA court, which denied

each of these claims on the merits.  Petitioner responds that he is entitled to <u>de novo</u> review of these

claims.  (Resp. at 13-14; Pet'r's Reply at 3-6.)

Third, Respondent asserts that Petitioner's remaining claims are also defaulted because he

never "fairly presented them to the state courts and would be procedurally barred from doing so

now."  (Resp. at 11-12; Resp. to Am. Pet. at 6-7, 10-11, 13, 16-20.)  Petitioner contends that he

satisfied the "fair presentation" requirement with respect to one of these claims (Claim V), and that

the claims he did not "present to the state courts" are automatically exhausted by operation of 42

Pa.C.S. § 9711(h)(3)(1), which requires the Pennsylvania Supreme Court to determine whether a

sentence of death was the product of passion, prejudice or another improper factor.  (Pet. at 5-6;

Pet'r's Reply at 3-6.)

We address each of these issues in turn.

### 1. Are the Eleven Claims Dismissed by the Pennsylvania Supreme Court on Waiver Grounds Procedurally Defaulted?

On collateral review, the Pennsylvania Supreme Court determined that nine of Petitioner's

current claims were "defaulted under the PCRA waiver provision, 42  Pa.C.S. § 9544(b)," because

Petitioner failed to present them on direct appeal.[11]  <u>Wharton III</u>, 811 A.2d 978, 984-85, 989-90 (Pa.

2002).  The Court also determined that two other claims were waived pursuant to Pa.R.A.P. 302(a),

because Petitioner failed to present them in his PCRA petition.[12]  <u>Id.</u> at 987.  These eleven claims

---

[11] This includes a portion of Claim I, and all of Claims VII, VIII, X, XI, XII, XIV, XV, and XVI.  (Pet'r's Reply at 1 n.1, 23-24); <u>see</u> <u>Wharton III</u>, 811 A.2d at 989-90.

[12] This includes portions of Claim I and II, and all of Claim III. <u>See</u> <u>Wharton III</u>, 811 A.2d at 987-90; (Pet'r's Reply at 20-21.)  We note that Claim XVIII, which was raised in Petitioner's Amended Petition, was also denied on this basis.  <u>See</u> (Am. Pet. at 6-7; Resp. to Am. Pet. at 8-9.)

are procedurally defaulted, therefore, provided that the procedural rules the Supreme Court relied upon are "independent" of federal law and an "adequate" basis for its determination.  See Coleman v. Thompson, 501 U.S. 722, 729, 730-31 (1991) (directing that the independent and adequate state grounds doctrine is "jurisdictional," and can bar federal review of claims denied on the basis of state procedural rules).  Because these state procedural rules are clearly independent of federal law, we turn to whether they are "adequate."

A state procedural rule is adequate when it is "firmly established and regularly followed" at the time of the alleged procedural default.  Ford v. Georgia, 498 U.S. 411, 424 (1991).  From 1978 until 1998, the Pennsylvania Supreme Court applied the "relaxed waiver" rule in capital cases on PCRA appeal, whereby it reached the merits of claims in PCRA petitions "regardless of the failure of the petition to meet the appropriate procedural criteria."  Banks v. Horn, 126 F.3d 206, 214 (3d Cir. 1997); see Jacobs v. Horn, 395 F.3d 92, 118 (3d Cir. 2005).  Applying this doctrine, the Pennsylvania Supreme Court did not consistently apply 42 Pa.C.S. § 9544(b) or Pa.R.A.P. 302(a), in capital cases prior to 1998.[13]  We conclude, therefore, that these procedural rules are inadequate to bar our review, as each of Petitioner's eleven claims were allegedly defaulted when the relaxed waiver rule was still in effect.[14]  See Wharton III, 811 A.2d at 981-82 (reflecting that Petitioner's

---

[13] See Lewis v. Horn, 581 F.3d 92, 105-06 (3d Cir. 2009) (discussing irregular application of 42 Pa.C.S. § 9544(b), and concluding it is inadequate to bar federal habeas review if the alleged default under this provision occurred before 1998); Baker v. Horn, 383 F.Supp.2d 720, 757-58 (E.D.Pa. 2005) (discussing irregular application of Pa.R.A.P. 302(a)). Further, to the extent the Pennsylvania Supreme Court relied upon Pa.R.C.P. 902(B), Wharton III, 811 A.2d 978, 987 (Pa. 2002), this Rule was also applied inconsistently during the relevant period and does not constitute an adequate procedural bar.  Wilson v. Beard, 589, 658-59 (3d Cir. 2009).

[14] This conclusion also applies to Claim XVIII, which was denied based upon Pa.R.A.P. 302(a).  See Wharton III, 811 A.2d at 987.

direct appeal was disposed of in 1992, and that his state post-conviction petition was filed in 1996 and amended in 1997.)

###        2.        Are these Eleven Claims Subject to <u>De Novo</u> Review, or must we Defer to the Opinion of the PCRA Court?

Pursuant to 28 U.S.C. § 2254(d), we may only grant habeas relief on claims "adjudicated on the merits in State court proceedings," if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law or "based on an unreasonable determination of the facts" in light of evidence presented in state court.  Respondent contends that we should apply this deferential standard to our consideration of these eleven claims, because the PCRA court's opinion of January 6, 2000, disposing of these claims on substantive grounds, constitutes an "adjudication on the merits" under § 2254(d).

A PCRA court's opinion, however, is only subject to AEDPA deference if it "finally resolves" a petitioner's claim, such that it has preclusive effect.  <u>Thomas v. Horn</u>, 570 F.3d 105, 115 (3d Cir. 2009).  Such a decision is "stripped" of preclusive effect where the Pennsylvania Supreme Court ultimately disposes of the claim on purely procedural grounds.  <u>Id.</u>  Therefore, because the Supreme Court ultimately denied each of Petitioner's eleven claims on procedural grounds, the PCRA court's decision is not subject to AEDPA deference.  Accordingly, as to these claims, we must review legal questions and mixed questions of law and fact <u>de novo</u>.  We still, however, must presume the correctness of any factual conclusions made by the state courts.[15]  <u>See id.</u> at 115-17.

---

[15] Petitioner also included allegations of ineffective assistance of counsel regarding the constitutional errors underlying Claims VII, VIII, X, XI, XII, XIV, XV and XVI.  The Pennsylvania Supreme Court denied each of these ineffective assistance claims on the merits because his arguments were "undeveloped" and "insufficient to prove an entitlement to relief."  <u>Wharton III</u>, 811 A.2d at 984-87.  At oral argument before Judge Giles on October 10, 2006, Petitioner's counsel asserted that these ineffectiveness claims were plead to avoid a waiver

### 3.    Was Petitioner Required to "Fairly Present" his Remaining Claims to the State Courts, and if so, did he Satisfy this Requirement?

Petitioner claims that all of his remaining claims are "record-based claims" that were automatically exhausted by virtue of the Pennsylvania Supreme Court's mandatory review procedure in capital cases.  Under 42 Pa.C.S. § 9711(h)(3)(i), the Supreme Court is required to review the record in death penalty cases to determine whether "the sentence of death was the product of passion, prejudice or any other arbitrary factor[.]"  Petitioner claims that this provision made it unnecessary for him to fairly present any of his "record-based claims" to the state courts, as is generally required under the exhaustion requirement set out in 28 U.S.C. § 2254(b)(1)(A).

Petitioner's argument, however, was rejected by the Third Circuit in Bronshtein v. Horn, which held that § 9711(h)(3)(i) does not circumvent the exhaustion requirement.  404 F.3d 700, 726-28 (3d Cir. 2005).  In Bronshtein, the Court determined that a rule of "automatic exhaustion" of "record-based claim" in capital cases would be inconsistent with Pennsylvania's scheme of post-conviction review and the federal habeas scheme.  Id.  Indeed, if all "record-based claims" were effectively exhausted in capital cases, petitioners would be entitled to federal review of all possible constitutional claims supported in the record, regardless of whether or not the state court was even aware of these claims.  Petitioner's argument, therefore, is without merit and we will proceed to consider whether he has satisfied the exhaustion requirement, or is otherwise entitled to review of his remaining claims.

---

finding, and were not free-standing Sixth Amendment claims.  Counsel further stated that these claims are "moot" and "irrelevant," because the underlying merits are before the Court.  (Tr. Or. Arg., 10/10/06, pp. 7-13, 24-27.)  Because Petitioner is not pressing these ineffective assistance claims, we will concentrate our analysis on the underlying merits.  Further, our ruling on the merits of the underlying claims effectively disposes of the derivative ineffectiveness claims.

Initially, Respondent urges that Petitioner has failed to exhaust a portion of Claim V in which he asserts that the imposition of a death sentence after his second penalty hearing violated the Due Process Clause of the Fourteenth Amendment.   (Pet. at 74-86.)   This claim pertains to Pennsylvania's death penalty statute, 42 Pa.C.S. § 9711(h)(2), which until 1988, required the Pennsylvania Supreme Court to "either affirm [a] sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence."   In 1988, however, this provision was amended such that the Court could remand a defendant's case for a second sentencing hearing, which could ultimately result in another death sentence.   See Commonwealth v. Young, 637 A.2d 1313, 1316 (Pa. 1993).   Petitioner claims that the Supreme Court intentionally refused to issue an opinion remanding his case until the amendment passed, so that the effect of vacating his sentence would not foreclose the imposition of the death penalty.   He claims the Court's reluctance to issue an opinion violated "fundamental notices of due process."   (Pet. at 83-85.)

Respondent asserts that Petitioner never "fairly presented" this claim to the state courts. (Reply at 30.)   Petitioner disagrees, pointing to the brief he submitted to the Pennsylvania Supreme Court on his initial PCRA appeal, which identified the Supreme Court's "delay" in deciding his direct appeal as a basis for a "due process" violation.   See (Pet. at 74-86; Pet'r's Reply at 30; Tr. Or. Arg., 10/10/06, pp. 128-31.)

To fairly present a claim, a "petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."   McCandless v. Vauhgn, 172 F.3d 255, 261 (3d Cir. 1999). In Evans, the Third Circuit held that a petitioner could alert a state court of the presence of a federal claim,  without "citing

21

chapter and verse of the constitution," by:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Evans v. Court of Common Pleas, Del. Cty., Pa., 959 F.2d 1227, 1232 (3d Cir. 1992); see also Johnson v. Mechling, 541 F.Supp.2d 651, 659-61 (M.D.Pa. 2008) (providing a detailed review of Third Circuit and Supreme Court cases interpreting the "fair presentation" requirement).

In his PCRA petition and his submission to the Pennsylvania Supreme Court on PCRA appeal, Petitioner included a "due process" claim alleging that the Supreme Court purposely delayed resolution of his claim in anticipation of the pending amendment to § 9711(h)(2).[16]   As such, we conclude that Petitioner presented the factual outline of a federal claim, which "call[ed] to mind a specific right protected by the Constitution" and placed the state courts on notice that he was asserting a constitutional violation.  Cf. Nara v. Frank, 488 F.3d 188, 198-99 (3d Cir. 2007) (holding that petitioner "consistently presented the factual outline of a federal claim" and that the "Pennsylvania courts were not required to search beyond the pleading for a federal issue").  Because this claim was never addressed by the Pennsylvania courts on either substantive or procedural grounds, we must reach the merits of this claim and our review of all "legal questions and mixed

---

[16] See  (Am. PCRA Pet., Jan. 21, 1997, at 119-21) ("The Pennsylvania Supreme Court's decision to put off deciding Mr. Wharton's case under these circumstances, pending the legislative consideration of the amendment to the statute, violated fundamental fairness and deprived Mr. Wharton of due process of law"); (Initial Br. of Appellant to Pa. Sup. Ct., Jun. 29, 1998, at 98-99) ("This Court's delay in deciding Appellant's first appeal, pending legislative consideration of the amendment of the statute, which affected only a small class of litigants, was an unconstitutional Bill of Attainder and violated fundamental fairness and deprived Appellant of due process of law").

questions of law and fact" is <u>de novo</u>.  <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001).

Respondent also contends that Claims XX, XXI, XXII, XXIII, and XXIV were not presented to the state courts and are now procedurally defaulted.  Petitioner does not contest this argument and our review of the record reflects that he did not present these claims at any level of the state review process.  Because Petitioner is now "clearly foreclosed" from exhausting these claims by the PCRA statute of limitations, <u>see</u> 42 Pa.C.S. § 9545(b), the claims are procedurally defaulted.  <u>See</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 726-28 (3d Cir. 2005) (citing <u>Whitney v. Horn</u>, 280 F.3d 240, 250-52 (3d Cir. 2002)).  This default remains unless Petitioner demonstrates "cause and prejudice" for the default or that a "fundamental miscarriage of justice" will result if the claims are not reviewed on the merits.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).  Petitioner did not, however, submit a brief in support of his amended petition and has not provided any basis for the Court to conclude that this standard is satisfied.  These claims are therefore procedurally defaulted and may not give rise to habeas relief.[17]

Respondent asserts that the same conclusion is warranted with respect to: (1) an ineffective assistance of counsel claim included in Claim V; (2) an aspect of Claim I, in which Petitioner asserts that the prosecution used its peremptory strikes in a discriminatory manner prior to his second penalty hearing; (3) Claim XIX, which alleges that "counsel was ineffective in the guilt phase and penalty hearings for his abject failure to conduct any investigation;" and (4) Claim XVII, which

---

[17] We also note that rather than resting our decision on procedural default grounds, we may deny the claims on the merits.  <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")  Petitioner has not developed these claims in any meaningful way, and therefore, would not be entitled to relief on these claims even if it were appropriate to reach the merits.

alleges that the prosecution failed to correct false testimony during Petitioner's suppression hearing and trial.  (Resp. at 30; Resp. to Am. Pet. at 6-7, 9-10, 16-17.)  For the reasons stated infra, these claims are without merit and, thus, we need not address Respondent's procedural challenges.

To summarize our procedural rulings, of Petitioner's twenty-three claims: (1) Claims XVIII, XXI, XXIII and XXIV are untimely;[18] (2) Claims XX, XXI, XXII, XXIII, and XXIV are procedurally defaulted; (3) Claims IV, V,[19] VI and XIII are timely, properly exhausted and subject to AEDPA deference, because the Pennsylvania Supreme Court denied these claims on the merits; (3) an aspect of Claim I and all of Claims II, III, VII, VIII, X, XI, XII, XIV, XV, and XVI are timely, properly exhausted and subject to de novo review, because the Pennsylvania Supreme Court denied them on "inadequate" state procedural grounds; and (4) aspects of Claims I and V, and all of Claims XIX and XVII are likely defaulted, but will be considered in connection with our merits review.

## IV.  DEVELOPMENT OF THE FACTUAL RECORD IN FEDERAL COURT

Before examining the substantive grounds raised in the petition, we address Petitioner's requests for an evidentiary hearing and discovery.  Petitioner requested an evidentiary hearing to develop the factual record in support of certain aspects of Claims II, III, IV, and V,[20] (Tr. Or. Arg., 10/10/06, p. 16), and filed a motion for discovery regarding Claims II, III, IV, V, XV, XVIII, XXI

---

[18] Although Claim XVIII is untimely, it was properly exhausted and will be considered in our discussion of the merits.

[19] However, as reflected above, the "due process" aspect of Claim V is subject to de novo review, because it was "fairly presented" in Petitioner's PCRA petition, but not addressed by the state courts.

[20] Petitioner also requested an evidentiary hearing and discovery on Claim I.  However, as explained infra, Section V, this claim is without merit and would not benefit from an evidentiary hearing or discovery.

and XXII.  (Doc. No. 97.)  After oral argument, and for the reasons set out below, we granted

Petitioner an evidentiary hearing and discovery as to Claims II and III, exclusively, and denied his

motion for discovery in all other respects.  See (Doc. Nos. 103, 106, 109.)

### A.      Standards Governing Requests for an Evidentiary Hearing & Discovery

A petitioner's request for an evidentiary hearing in a federal habeas proceeding is generally

governed by 28 U.S.C. § 2254(e)(2).  This provision provides that "[i]f the [petitioner] has failed to

develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary

hearing on the claim," unless certain conditions are satisfied.[21]  Where there is a deficiency in the

factual record that is not attributable to the petitioner or petitioner's counsel, however, the

requirements of § 2254(e)(2) do not apply and a federal court may hold an evidentiary hearing.

Section 2254(e)(2), therefore, generally precludes federal courts from holding an evidentiary hearing

where the factual record is undeveloped as a result of "a lack of due diligence, or some greater fault,

---

[21] Specifically, if the petitioner "has failed to develop the basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows" that:

(A) the claim relies on-

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

attributable to the prisoner or the prisoner's counsel." See Williams v. Taylor, 529 U.S. 420, 432 (2000). Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.]" Id. at 435. Typically, this standard requires Petitioner to "request an evidentiary hearing in state court as required by state law." Id.

Where a petitioner has pursued a claim with diligence in state court, a district court has discretion to hold an evidentiary hearing. In exercising this discretion, the court "must consider whether such a hearing could enable an applicant to prove [his or her] factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). This requires a petitioner to make a prima facie showing, which if proven, "would enable the petitioner to prevail on the merits of the asserted claim." Palmer v. Hendricks, 592 F.3d 386, 393 (3d Cir. 2010). If the "record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." See Schriro, 550 U.S. at 474.

A petitioner's request for discovery invokes Rule 6 of the Rules Governing Section 2254 cases. Understanding that a habeas petitioner, "unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course[,]" Bracy v. Gramley, 520 U.S. 899, 904 (1997), the Rule provides that:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

28 U.S.C. § 2254 Rule 6(a). Good cause can be established only where a petitioner sets forth

26

"specific allegations" that lead the Court to believe that, if the facts where fully developed, he may be entitled to relief. Marshall v. Beard, 2004 WL 1925141 at *1 (E.D.Pa. Aug. 27, 2004). This standard requires that a petitioner provide more than "bald assertions" or "conclusory allegations" in support of a discovery request. Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991). Once good cause is shown, the scope and extent of discovery is left to the discretion of the district court. Bracy, 520 U.S. at 909.

### B.   Petitioner's Requests for an Evidentiary Hearing & Discovery

#### 1.   Claims II & III

Petitioner requested an evidentiary hearing to develop the facts surrounding his arrest and statement to police, and claimed that: (1) his trial counsel was constitutionally ineffective for failing to call available witnesses and present impeachment evidence to demonstrate that his "confession" was the product of physical coercion (Claim II);[22] and (2) his "confession" was improperly admitted against him, in violation of the Fifth, Sixth and Fourteenth Amendments (Claim III). (Pet'r's Reply at 9-18; Tr. Or. Arg., 10/10/06, p. 16.) As a preliminary matter, to be eligible for a federal hearing, Petitioner must have exercised "due diligence" in developing the factual basis for these claims in state court, pursuant to § 2254(e)(2). See Williams, 529 U.S. at 432, 435.

Petitioner did not raise these claims in his initial or amended PCRA petition. Rather, these claims were raised for the first time in a "Motion to Reargue," following the PCRA court's order dismissing his petition, in which Petitioner asserted he was entitled to relief, or in the alternative, an evidentiary hearing. Petitioner reasserted these claims in his "Initial Brief" to the Pennsylvania

_____

[22] This claim relates to trial counsel's performance at the pre-trial suppression hearing and at trial, where one of the defense theories was that Petitioner's confession was involuntary. (Pet. at 44-46.)

Supreme Court and requested remand for an evidentiary hearing.  (Initial Br. of Appellant to Pa. Sup.

Ct., Jun. 29, 1998, at 100 & Exs. 9, 10.)

The Pennsylvania Supreme Court ultimately denied these claims, concluding that they were

waived under Pa.R.A.P. 302(a) and Pa.R.C.P. 902(B).  See Wharton III, 811 A.2d 978, 982-983 (Pa.

2002).  As noted previously, these procedural rules were applied inconsistently at the time of

Petitioner's alleged "waiver" and are not adequate to support a procedural default.  Although

"procedural default" and the "due diligence" requirement are distinct concepts, the Third Circuit has

held that a district court is not precluded from holding an evidentiary hearing under § 2254(e)(2) "for

lack of diligence where the only reason a state court gives for denying an evidentiary hearing is . .

. [an inadequate] state procedural rule."  Lark v. Sec'y Pennsylvania Dept. of Corr., 645 F.3d 596,

614-17 (3d Cir. 2011).

Other than the Supreme Court's waiver ruling, there is no indication as to why Petitioner was

denied an evidentiary hearing on these claims.  We, therefore, concluded that § 2254(e)(2) did not

bar an evidentiary hearing.[23]  Further, Petitioner raised allegations in his petition that, if proven,

"would entitle the applicant to federal habeas relief" on these claims.  Schriro v. Landrigan, 550 U.S.

465, 474 (2007).  Therefore, an evidentiary hearing was held on February 8 and 10, 2012 (discussed

infra).  We also concluded that Petitioner had established "good cause" in support of his discovery

---

[23] We note that the Third Circuit recognized an exception to this rule in Taylor v. Horn, 504 F.3d 416, 436-37 (3d Cir. 2007).  In Taylor, the petitioner presented a claim to the state court in an initial PCRA petition, which the court addressed on the merits after conducting an evidentiary hearing.  The petitioner than brought a second PCRA petition, which purported to "present new evidence" in support of the claim.  The state court denied him relief based upon an "inadequate" procedural rule.  The Third Circuit held that petitioner was not "diligent" in this instance, as he was provided an opportunity to develop the claim, but failed to do so, prior to the state court's application of the "inadequate" procedural rule.  Taylor, 504 F.3d at 435-37.  This exception is not applicable here.

requests as to these claims, and directed the parties to meet and confer to determine the appropriate scope of discovery.[24] (Doc. No. 106.)

### 2. Claim IV

Petitioner also requested an evidentiary hearing to develop his claim that his Sixth Amendment right to counsel was violated during the second penalty hearing in 1992, when his attorney failed to obtain and introduce mitigating evidence contained in his prison files for the seven years following his 1985 conviction. (Pet. at 54-74.) The Pennsylvania Supreme Court denied this claim on the merits, holding that Petitioner had failed to demonstrate that his counsel's performance was deficient or that he was prejudiced by his performance. Wharton III, 811 A.2d 978, 988-89 (Pa. 2002). Regardless of whether Petitioner was diligent in presenting this claim to the state courts, an evidentiary hearing on this claim is not warranted.

In Cullen v. Pinholster, the United States Supreme Court held that "[i]f a claim is adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record before that state court." 131 S.Ct. 1388, 1400 (2011). In light of this decision, "district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d)." Brown v. Wenerowicz, 663 F.3d 619, 629 (3d Cir. 2011). Therefore, a petitioner is not entitled to an evidentiary hearing on claims that were "adjudicated on the merits" in state court and disposed of in a manner that satisfies the deferential standards set forth in § 2254(d)(1).

As reflected in our discussion of the merits of this claim, Petitioner has not demonstrated that

---

[24] Petitioner also requested discovery as to Claim XVII, which is predicated upon the same facts as Claims II and III. Thus, as a practical matter, our ruling as to Claims II and III also provided Petitioner discovery regarding Claim XVII.

the state court's conclusion resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)(1).   His request for an evidentiary hearing on this claim is therefore denied.  Further, even viewing Petitioner's allegations in his favor, he has not put forth a prima facie showing, which if proven, would enable him to prevail on the merits of this claim.[25]

### 3.    Claim V

Petitioner claims he is entitled to an evidentiary hearing on Claim V, where he alleges a due process violation based upon the Pennsylvania Supreme Court's "delayed" resolution of his direct appeal in anticipation of an amendment to the Pennsylvania Death Penalty statute.[26]  Petitioner also asserts that the application of the amendment to his case violated the Ex Post Facto Clause.  (Pet. at 74-85.)

Although Petitioner fairly presented this claim to the state courts, and requested an evidentiary hearing as to "all claims" in his state petition, he did not specifically request a hearing

---

[25] We note that Petitioner claims he was improperly denied an evidentiary hearing to develop this claim in state court, due to procedural deficiencies that he should have had an opportunity to correct.  (Pet. at 66-71.)  While these allegations, if true, may demonstrate that Petitioner exercised "due diligence" in seeking to develop the facts in state court, thereby making him eligible for a federal evidentiary hearing under 28 U.S.C. § 2254(e)(2), it is unclear whether Petitioner's diligence matters in light of Cullen.  In any event, even if Cullen is inapplicable or somehow limited because of the state court's failure to provide him a hearing in this case, we would nevertheless deny his request, due to his failure to make a prima facie showing of a constitutional violation.

[26] Petitioner also argues that the Court's determination had the "appearance" of being improperly delayed, which in and of itself, is a violation of due process.  (Pet. at 84-85.)  We are unable to decipher how this aspect of his claim could be furthered by discovery or a hearing, and therefore, omit it from our discussion.

on this claim or identify a material fact issue that had to be resolved.[27]   We seriously question,

therefore, whether Petitioner has exercised the due diligence required to be eligible for a federal

evidentiary hearing.  We further deny Petitioner's request for an evidentiary hearing because he has

not indicated how such a hearing could advance his claim, which is based upon the alleged delay of

the Pennsylvania Supreme Court in issuing a decision in his case.  See  Schriro v. Landrigan, 550

U.S. 465, 474 (2007) (holding that in deciding to grant an evidentiary hearing, the court "must

consider whether such a hearing could enable an applicant to prove the petitioner's factual

allegations, which, if true, would entitle the applicant to federal habeas relief.").

Petitioner also filed a motion for discovery, requesting "draft opinions, internal memoranda

and bench notes maintained by the Administrative Office of Pennsylvania Courts[,]" which were

"generated by the Pennsylvania Supreme Court related to Petitioner's 1992 direct appeal" or which

"relat[e] to the 1988 amendment of Pennsylvania's death penalty statute[.]"  (Doc. No. 97 at 16-17.)

Petitioner has failed to demonstrate "good cause" to warrant such discovery.

To demonstrate "good cause," a petitioner must set forth "specific allegations" that would

lead the Court to believe that, if the facts where fully developed, he may be entitled to relief.  Bracy

v. Gramley, 520 U.S. 899, 908-09 (1997).  A petitioner may not engage in a "fishing expedition,"

and "bald and conclusory allegations do not provide sufficient ground to warrant requiring a state

to respond to discovery."  Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994).

Here, Petitioner alleges that "the Court" was "reluctant" to resolve his appeal, based upon

the procedural history of his case, as well as the "tone" of Pennsylvania Supreme Court opinions

---

[27] See  (Am. PCRA Pet., Jan. 21, 1997, at 119-21, 122-25; Initial Br. of Appellant to Pa.
Sup. Ct., Jun. 29, 1998, at 98-100.)

decided while the previous version of the death penalty statute was in place.  See (Pet. at 84; Tr. Or. Arg., 10/10/06, p. 121.)  These generalized allegations do not provide sufficient grounds to justify discovery of the internal documents of the Pennsylvania Supreme Court, particularly considering that "[o]rdinarily, we presume that public officials have 'properly discharged their duties.'"  Bracy, 520 U.S. at 909 (citation omitted) (noting that in cases where it is possible to "indulge" in the "presumption" that a judge properly discharged his or her duty, petitioner's claim "may be too speculative to warrant discovery").

In Bracy, the United States Supreme Court held that a petitioner had established good cause for discovery on a due process claim based upon judicial bias.  520 U.S. at 901, 908-09.  In reaching this conclusion, the Court explained that the petitioner had "supported his discovery request by not only pointing to [the judge's] conviction for bribe taking in other cases, but also to additional evidence . . . that lends support to his claim that [the judge] was actually biased *in petitioner's own case*[, including]  'specific allegations' that his trial attorney" may have agreed to take his capital case to trial quickly to quiet suspicion over two "rigged" cases the judge had recently presided over.  520 U.S. at 908-09.  Here, there are no allegations or evidence even approaching the situation described in Bracy, and we thus find that Petitioner has failed to demonstrate "good cause" to justify his discovery request.

### 4.    Claim XV

Petitioner also requests discovery on Claim XV, in which he alleges that the prosecution failed to produce medical records regarding the infant daughter of Bradley and Ferne Hart, in violation of Brady v. Maryland, 373 U.S. 83 (1963) and due process.  (Pet. at 157-60; Am. Pet. at 5-6.)  Petitioner has not established good cause for discovery on this claim.  As discussed in our

consideration of the merits, Petitioner has not provided any allegations that lead the Court to believe that, if the facts where fully developed, he may be entitled to relief.[28]

## V.    ANALYSIS OF THE MERITS

As previously detailed, we must reach the merits of eighteen of Petitioner's twenty-three claims.  Rather than discuss these claims in numerical order, we will first review the claims that relate to the guilt phase of the trial and then proceed to consider the claims that deal exclusively with the penalty hearings and the Pennsylvania Supreme Court's review of Petitioner's death sentence.

### A.    Claim I – Did the Prosecution Use Peremptory Strikes in a Racially Discriminatory Manner?

Petitioner contends that the prosecution used its peremptory strikes in a racially discriminatory manner during jury selection prior to his 1985 trial and prior to his 1992 penalty hearing, in violation of Batson v. Kentucky, 479 U.S. 79 (1986).  (Pet'r's Reply at 44-45.)  In a letter to the Court, however, Petitioner acknowledged that Third Circuit precedent precludes his Batson claims, because there is no evidence that counsel objected to the jury selection process at the time of his 1985 trial or his 1992 penalty hearing.[29]  (Doc. No. 95) (citing Lewis v. Horn, 581 F.3d 92, 102 (3d Cir. 2009) (requiring a contemporaneous objection "as a prerequisite to raising a Batson challenge").  Further, Petitioner does not allege that such an objection was made at either of these

---

[28] Petitioner also requests discovery on Claims XXI and XXIII, (Doc. No. 97 at 9, 12), which as described above, are procedurally defaulted.  Petitioner has also not filed any submission with the Court developing these claims.  Petitioner's requests, therefore, do not pertain to a constitutional claim that is properly before the Court, and must be denied.

[29] We note that Petitioner's counsel stated that he wishes to "reserve[] the right to seek further appellate review" on this issue.

proceedings.  (Pet. at 11-40.)  This claim will therefore be denied.[30]

**B.      Claim II  –  Was Petitioner's Trial Counsel Ineffective for Failing to Discover and Utilize Available Evidence to Demonstrate his Confession was Involuntary?**

**1.      General Background Regarding Ineffective Assistance Claims and Pertinent Facts**

Petitioner claims that his trial counsel was ineffective for failing to present evidence to demonstrate that his confession and the waiver of his Miranda rights were the product of physical coercion.  In support of this claim, Petitioner primarily focuses on injuries he sustained to his head and neck.  These injuries were described in a medical report, dated February 7, 1984, as a "[s]mall laceration on scalp [without] gaping, [without] bleeding," and "[a]brasions on right side of neck[.]" (Resp't's Evid. Hearing Ex. 4); see (N.T., 6/28/85, pp. 32-33.)  Petitioner urges that his trial counsel failed to utilize available evidence to undermine the prosecution's contention that he sustained the injuries during his arrest – a position that was based primarily upon the testimony of the assigned detective, Charles Brown.  (Pet. at 40-42; N.T., 6/28/85, pp. 176-77, 180.)  Before fully addressing this allegation, we will provide the necessary factual background on this issue.

On February 7, 1984, Detective Brown participated in the execution of an arrest warrant for Petitioner.  At Petitioner's trial and pre-trial suppression hearing, Brown testified that he approached the front door of Petitioner's home at approximately 1:15 a.m. with his partner, Detective Frank Miller, and a uniformed officer, while other officers either went to the back of the residence or remained in front.  Brown stated that he "knocked several times" on the door, until he saw Petitioner descend the staircase from the second floor and say "who is it[.]" Brown testified that when he

---

[30] Petitioner's request for an evidentiary hearing and discovery to further this claim is also denied as moot.

announced it was the police, Petitioner "turned and started running back up the steps."  Brown then

"kicked the door in" and chased Petitioner up the stairs to a second floor hallway, where he was able

to "grab[] him by the back of his neck" and "tackle[]" him.  Brown then led Petitioner up to his third

floor bedroom, where his girlfriend, Tywana Wilson-Carter,[31] was in bed.  Brown testified that he

then noticed that Petitioner had a "bruise or slight abrasion" on the "top portion of his head." (N.T.,

6/21/85, pp. 72-73, 82-91; N.T., 6/24/85, pp. 101-15); see (N.T., 5/23/85, pp. 54-58, 60-61, 94-103.)

Brown further testified that the police took Petitioner into custody, and brought him to the

Police Administration Building for questioning.  Petitioner ultimately waived his Miranda rights and

provided a detailed confession, which Brown read to the jury.[32]  Brown denied using any physical

force, threats or promises to obtain the statement.  After providing the statement, Brown explained

that Petitioner asked to see Wilson-Carter and the two spent "several moments" alone together in

the interrogation room.  Brown testified that he then escorted Petitioner to "Arraignment Court,"

where he was arraigned on charges of "murder; two counts, robbery, burglary, criminal conspiracy."

---

[31] Wilson-Carter's first name is spelled in a variety of ways throughout the record in this case.  We will use the above spelling, which was used in the transcript of the evidentiary hearing before this Court.  We also note that Wilson-Carter is sometimes referred to as Petitioner's fiancee in the record.  See (N.T., 2/8/12, p. 41) (reflecting that Wilson Carter testified Petitioner was her "boyfriend/fiance[e]" during the relevant period).

[32] Petitioner's signed statement reflects that he forcibly entered the Hart home by pulling a knife on Bradley Hart, and then "let [co-defendant, Eric Mason] in."  Petitioner stated that, after Bradely Hart "wrote [him] out a check" to satisfy an alleged debt, they "tied [Ferne and Bradley Hart] up and made them sit back down on the couch," while he and Mason "sat around, messing around, looking at TV."  Petitioner asserted that they eventually "put Bradley in the basement, and . . . took Ferne upstairs[,]" and put the "stuff [they had taken from the house] into Brad's car."  Upon their return to the house, Petitioner stated that they "put tape around [Bradley Hart's] face and neck," and then he went upstairs and drowned Ferne in a bathroom tub, after he attempted to strangle her with a neck tie.  Petitioner stated that he then brought "stuff" out to Bradley's car and drove home, ultimately leaving the car with Mason.  (N.T., 6/21/85, pp. 88-90, 93-100; N.T., 6/24/85, pp. 35-50.)

At trial, Brown indicated that Petitioner was then "photographed and fingerprinted[.]"  Three of these photographs were entered into evidence at trial, including two depicting Petitioner's face and profile, and another depicting the "length of the [Petitioner] from his knees up[.]"  (N.T., 6/21/85, pp. 88-90, 93-100; N.T., 6/24/85, pp. 50, 66-68, 72-74); see (N.T., 5/23/85, pp. 61-84, 104-33.)

Petitioner's trial counsel, William T. Cannon, challenged the voluntariness of the confession at the suppression hearing and at trial.  At an evidentiary hearing held before this Court on February 10, 2012, trial counsel confirmed that he filed a motion to suppress, asserting that Petitioner did not voluntarily waive his Miranda rights and that his statement was coerced by police.  At the close of the suppression hearing, however, trial counsel decided to concede that Petitioner's statement was voluntary because he believed that he did not have sufficient evidence to support his motion and "it was pretty obvious to [him] . . . that [the trial judge] was going to deny the motion to suppress." (N.T., 2/10/12, pp. 81-83, 108); see (N.T., 5/23/85, pp. 146-47) (reflecting that, at the close of the suppression hearing, trial counsel stated that "[t]here is no basis for this court for making any conclusion other than those statements were obtained in a voluntary manner so I'm not going to address myself any further on the issue of the admissibility of the statements.").   Following the suppression hearing, and based on Brown's testimony, the trial court determined that Petitioner's statement was admissible and found that "no physical force was used by the police to obtain [the] statement."  (Resp., Ex. A at 24.)

Trial counsel did, however, argue before the jury that Petitioner's confession was involuntary because "there was really no other defense."  (N.T., 2/10/12, pp. 80, 109.)  Counsel urged the jury to discredit Brown's testimony about the manner of Petitioner's arrest and the timing of his injuries, and asserted that Petitioner was "struck in that interrogation room" and that his statement "flow[ed]

36

. . . from physical coercion." (N.T., 6/28/85, pp. 125, 133, 138, 142.)  At the close of Petitioner's trial, the court instructed the jury that it was required to disregard Petitioner's statement in evaluating his guilt if it determined that the statement was involuntary under the totality of circumstances. (N.T., 7/1/85, pp. 27-28.)

In an attempt to impeach Detective Brown's account at trial, Petitioner's counsel offered the testimony of Petitioner's eighteen-year-old sister, Beverly Young Tyler (Young).  Young testified that on the night of Petitioner's arrest, she was on the phone in her second floor bedroom when she "heard a loud banging on [the] front door[,]" about "five knocks," and then a "loud boom," signifying that the front door had been forced open.  Young explained that a "minute or two" after she first heard knocking, she "hung up the phone," opened her bedroom door, and saw police officers "coming up the first floor staircase[,]" including Brown.  She claimed that, before Brown proceeded to the third floor, she asked him "what was going on" and he said "We come to arrest Robert Wharton."  Contrary to Brown's version of events, Young testified that she never saw a "scuffle" in the second floor hallway.  (N.T., 6/28/85, pp. 19, 23-24, 27-28.)

During Young's testimony, it was revealed that she was present in the courtroom during the first day of Brown's trial testimony.  Young testified that she approached trial counsel following Brown's testimony and informed him "that what [Brown] testified to was not true about scuffling my brother Robert Wharton on the second floor by the back of his neck [sic]."  This was the first time she spoke to trial counsel about this issue, and he was not planning to offer her as a witness. Trial counsel, therefore, did not "sequester" her in accordance with a court order.  Although the court permitted Young to testify, the jury was instructed that witnesses were not supposed to hear the testimony of others, and that they should "take that factor in consideration in evaluating [Young's]

37

credibility[.]"  (N.T., 6/28/85, pp. 24, 29-30.)

### 2.    Analysis of Specific Ineffective Assistance of Counsel Claims

Petitioner asserts that his counsel was constitutionally deficient for failing to discover and utilize "documentary evidence" and "eyewitness testimony" to impeach Detective Brown's testimony at the suppression hearing and at trial.[33]

Regarding the "documentary evidence," Petitioner first points to three police forms which his trial counsel did not utilize at either the suppression hearing or at trial.  These forms include: (1) a "75-48 Form" filled out by Philadelphia Police Officer, Thomas Duffy, immediately following Petitioner's arrest, which did not include a notation for "Injury;" (2) a "75-229 Form" filled out by Sergeant Fred Westerman upon Petitioner's arrival at the homicide division on the night of his arrest, which did not include a notation under sections regarding "physical characteristics" or "Other Remarks;" and (3) a "75-49/52 Form," which is a seventy-six page document signed by Detective Brown and two of his superiors, which includes a page where Brown described Petitioner's "Arrest" as follows: "Defendant Wharton was arrested in a maroon colored, multi-length leather zipper jacket" and "did not appear to be under the influence of alcohol or narcotics and had no apparent injuries."  (Doc. No. 119 at 11-24 (hereinafter "Pet'r's Post-Hearing Br.").)

Petitioner also points to medical records that reflect he was prescribed "Darvocet," a

---

[33] In Claim XIX, Petitioner asserts that his trial counsel was ineffective at the suppression hearing and at trial for failing to interview any "Commonwealth witnesses[,]" the police and detectives involved in his arrest and interrogation, the "nurse and medical professional who treated [his] wound following his arrest[,]" and "any of Petitioner's family or friends."  (Am. Pet. at 7.)  To the extent that this claim relates to trial counsel's failure to interview the "eyewitnesses" discussed below, it is denied for the reasons stated herein.  The remaining aspects of this claim are also denied, because Petitioner has not provided argument or made any allegations to suggest that he is entitled to relief, due to his counsel's failure to interview these individuals, most of whom Petitioner does not even identify.

narcotic pain reliever, which he asserts his trial counsel could have used to rebut the Government's

contention that his injury was "underwhelming."  In addition, Petitioner contends that trial counsel

could have offered a "chronology report," which detailed Petitioner's "every movement" during his

interrogation, to undermine the relevance of photographs that the prosecution presented at trial.  The

photographs, according to Brown's testimony, were taken after Petitioner's interrogation, and reveal

no evidence of physical abuse.  These photographs, however, were not referenced in the "chronology

report."  Petitioner claims that trial counsel could have used the "chronology" to argue that the

photographs were taken prior to the interrogation, and were therefore of little relevance.  (Pet'r's

Post-Hearing Br. at 4-5, 11-14; N.T., 2/8/12, pp. 64-66.)

　　Regarding "eyewitness testimony," Petitioner contends that trial counsel was ineffective for

failing to call Young at the suppression hearing.[34]  He also points to counsel's failure to call his

mother, Margaret Wharton, and his former girlfriend, Tywana Wilson-Carter, at the suppression

hearing and at trial.  Both Wharton and Wilson-Carter were in Petitioner's home on the night of the

arrest and submitted declarations in 1998,[35] approximately thirteen years after his trial, which reflect

that they did not see a scuffle between police and Petitioner, or observe any injuries to his head and

neck immediately following his arrest.  Wilson-Carter further declared that she observed physical

---

[34] Petitioner also argues that trial counsel was ineffective for failing to interview Young prior
to trial so she could have been sequestered and testified, without a cautionary instruction
from the trial court.  (Pet'r's Post-Hearing Br. at 11-24); see (N.T., 2/10/12, pp. 103-04.) This
appears to be a new allegation that was never raised in state court and is, therefore, unexhausted.
Further, because Petitioner would now be barred from raising this claim in state court, the claim
is procedurally defaulted.

[35] Our review of Petitioner's state court submissions reflects that the undated declarations
were first produced in connection with his "Initial Brief of Appellant," which was filed with the
Pennsylvania Supreme Court on June 29, 1998.  These declarations are discussed in more detail
below.  See  (Initial Br. of Appellant to Pa. Sup. Ct., Jun. 29, 1998, at 100 & Exs. 9, 10.)

changes to Petitioner, including injuries to his head and neck, when she visited with him in the

interrogation room at the police station. Each of these witnesses testified at the federal evidentiary

hearing on February 8, 2012. (Pet. at 40-49; Pet'r's Post-Hearing Br. at 11-24.)

### 3.    Petitioner's Claim of Ineffective Assistance at the Suppression Hearing

Petitioner claims that his counsel's performance was constitutionally deficient at the

suppression hearing, because he failed to utilize the documents and potential testimony described

above to impeach Detective Brown's testimony.[36]   Initially, Petitioner's allegations of ineffectiveness

based upon counsel's failure to utilize the "documentary evidence" described above are likely barred

from federal review, as they were presented, for the first time, approximately nine years after the one

year statute of limitations set forth in 28 U.S.C. § 2244(d)(2).   See supra, pp. 8-9, 12.   These

---

[36] Respondent first asserts that this claim is not properly before the Court, because Petitioner "abandoned" it "years ago." (Doc. No. 125 at 16 (hereinafter "Resp't's Post-Hearing Br.").)  We note that in his reply brief filed in April 2005, Petitioner specifically stated that he was not alleging that counsel was ineffective at the suppression hearing for failing to impeach Brown's testimony. (Reply at 40 & n.40.)  Later, at the oral argument before Judge Giles on October 10, 2006, Petitioner's federal counsel described this claim as one of ineffectiveness at trial and stated "the only claim before Your Honor is the ineffective assistance at trial, not at the suppression hearing." (N.T., 10/10/06, pp. 61, 68.)  At the oral argument before the undersigned on October 12, 2011, Petitioner's counsel again stated that he was pressing the claim as one of "ineffectiveness at trial . . . not at the suppression hearing." (Tr. Or. Arg., 10/12/12, pp. 41-42.)

On February 7, 2012, however, Petitioner's federal counsel sent correspondence to Respondent and the Court, asserting that he was indeed pursuing a claim of ineffectiveness at the suppression hearing. Counsel explained that he and previous counsel misstated their position, as evidenced by a "Notice Correcting Statement of Counsel," which former counsel sent to Judge Giles in 2007. This "Notice" provided that Petitioner was asserting a claim of ineffectiveness at the suppression hearing, although he had clearly indicated otherwise at oral argument in October 2006. (N.T., 2/8/12, pp. 6-8; Doc. No. 74.)  Respondent's argument, therefore, is understandable, particularly as it relates to Petitioner's express abandonment of this claim in his 2006 reply. This concession shifted the way this claim was briefed and argued before Judge Giles and the undersigned.   While we believe it would be appropriate for the Court to preclude Petitioner from resurrecting his claim now, in an abundance of caution and considering what is at stake in this matter, we will consider this claim.

allegations were also never mentioned in his post-conviction submissions to the PCRA Court or the Pennsylvania Supreme Court, and Petitioner does not allege that the standard police documentation underlying his claims were unavailable at the time of his state post-conviction review.  See (Am. PCRA Pet., Jan. 21, 1997, at 7-124; Pet'r's Resp. to Dismissal Notice of PCRA Ct., Jun. 20, 1997, at 1-18; Pet.'s Mot. to Reargue, Jul. 3,1997, at 7-16; Initial Br. of Appellant to Pa. Sup. Ct., Jun. 29, 1998, at 29-41; Appellant's Reply Br. to Pa. Sup. Ct., Aug. 13, 1999, at 1-25); see (N.T., 2/10/12, p. 87) (reflecting that his trial counsel "did not think there was . . . any discovery that was withheld from [him]" before the suppression hearing or trial.)

        To be entitled to federal review, Petitioner must have "fairly presented" the merits of his federal claims during "one complete round of the established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  A federal claim is fairly presented to the state courts where the petitioner has raised "the same factual and legal basis for the claim to the state courts."  See Nara v. Frank, 488 F.3d 188, 198-99 (3d Cir. 2007).  Thus, to the extent Petitioner's claims of ineffective assistance are based upon factual allegations that he never pressed in state court, they are unexhausted.  In addition, because it appears that Petitioner would now be barred from raising these specific allegations of ineffectiveness in state court, these claims are also procedurally defaulted.[37] See 42 Pa.C.S. § 9545(b)(1); Whiney v. Horn, 280 F.3d 240, 251 (3d Cir.2002) (stating that PCRA limitations period is "a jurisdictional rule that precludes consideration of the merits of any untimely PCRA petition, and is strictly enforced in all cases").

---

        [37] The PCRA statute of limitations provides for certain exceptions to the one-year limitations period, but "any petition invoking an exception . . . shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(1)(i)-(iii), (b)(2). Petitioner does not raise an argument to suggest that any of these exceptions apply, and would now be barred from presenting any such argument in state court.

41

Where a claim is procedurally defaulted, it cannot provide a basis for federal habeas relief unless the petitioner shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Even accepting that Petitioner can overcome these substantial hurdles, he has nevertheless failed to establish a Sixth Amendment violation under Strickland, for the reasons set forth below. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.")

### a.   Strickland's Performance Prong

In order to establish his counsel's performance was deficient, a petitioner must demonstrate that the specific actions or omissions by counsel were "not within the range of competence demanded of attorneys in a criminal case[.]" Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In considering the alleged deficiencies in counsel's performance, the court must make "every effort . . . to eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance." Id. at 689. Therefore, to establish a deficient performance, the petitioner must first "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. This presumption may be rebutted by showing that the attorney's challenged conduct "was not, in fact, part of a strategy, or by showing that the strategy employed was unsound." Thomas v. Varner, 428 F.3d 491, 499-500 (3d Cir. 2005) (footnote omitted).

Petitioner asserts that his trial counsel had no strategic or tactical basis for failing to utilize the 75-48, 75-229 and 75-49/52 Forms or for failing to call Officer Thomas Duffy, Young, Wharton

and Wilson-Carter at the suppression hearing.  (Pet'r's Post-Hearing Br. at 21-22.)  In support of this contention, Petitioner points to trial counsel's testimony at the evidentiary hearing before this Court, where counsel testified that this evidence would have been helpful, or at least "arguably" helpful, and that he had no strategic reason for failing to develop and utilize the evidence.  (N.T., 2/10/12, pp. 84-94, 96-99, 100-01, 106.)  In addition, trial counsel acknowledged that, if he had "investigated and developed" this evidence, he "likely" would have pressed the argument that Petitioner's confession was physically coerced at the suppression hearing. (N.T., 2/10/12, pp. 104-06.)

       Given counsel's testimony at the evidentiary hearing, we conclude that Petitioner has overcome the presumption that his counsel's alleged errors were part of a sound strategy.  See Thomas, 428 F.3d at 499-500 ("Here, Thomas rebutted the weak presumption that counsel's actions might have been strategic by offering testimony from counsel that his 'actions,' in failing to move to suppress or object, were not in fact part of a strategy.").  However, although he may have overcome the "strategic presumption," Petitioner must also demonstrate that, in light of all of the surrounding circumstances, trial counsel's performance "fell below objective standards of attorney conduct."  Id.  Rather than undertake this further analysis, we will assume that trial counsel's failure to develop and present this evidence was objectively unreasonable, and proceed to consider Strickland's prejudice prong

### b.    Strickland's Prejudice Prong - The Suppression Hearing

       To establish prejudice, a petitioner must demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687-88.  With regard to the prejudice requirement, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Id. at 694.  The "reasonable probability" standard does not require a petitioner to show that "the attorney's deficient performance more likely than not altered the outcome[,]" but only requires him or her to show that counsel's errors were so serious as to undermine the court's confidence in the outcome.  Nix v. Whiteside, 475 U.S. 157, 175 (1986).

To establish prejudice in connection with his claim of ineffectiveness at the suppression hearing, Petitioner must show that, absent counsel's alleged errors, "he would likely have prevailed on the suppression motion and that, having prevailed, there is a reasonable probability that he would not have been convicted."  Thomas, 428 F.3d at 502; see Morrison v. Kimmelman, 752 F.2d 918, 922-23 (3d Cir. 1985) (directing that the prejudice of a counsel's errors in litigating a motion to suppress is "a two step process," which requires petitioner to prove a likelihood of success on the merits of the motion and that, absent the evidence at issue, there is a reasonable probability the outcome of trial would have been different).

Petitioner, therefore, must first demonstrate that, absent his counsel's alleged errors, the court would have likely suppressed his confession as "involuntary" under the Fourteenth Amendment or as the product of an involuntary waiver of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[38]  The Fourteenth Amendment Due Process Clause ensures that "only voluntary confessions are admitted at the trial of guilt or innocence."  Lego v. Twomey, 404 U.S. 477, 479 (1972) (citing Jackson v. Denno, 378 U.S. 368 (1964)).  A voluntary confession is the "product of

---

[38] The Third Circuit's articulation of the prejudice standard signifies that the burden of proof at the initial step of the prejudice analysis ("likely have prevailed") is different from the burden at the second step ("reasonable probability" that the outcome of trial would be different). Thomas, 428 F.3d at 502.  We note, however, for the reasons stated below, that it is immaterial whether the first step of the prejudice analysis is considered under a "likelihood" or "reasonable probability" standard.  Under either standard, Petitioner has failed to satisfy his burden.

an essentially free and unconstrained choice by the maker." Culombe v. Connecticut, 367 U.S. 568,

602 (1961).  In evaluating this question, courts must consider the totality of circumstances, including

"the crucial element of police coercion[.]"  Withrow v. Williams, 507 U.S. 680, 693 (1993).

In Miranda, the United States Supreme Court articulated an additional protection that may

render a defendant's confession inadmissible, holding that the Fifth Amendment privilege against

self-incrimination prohibits the admission of statements given by a suspect during "custodial

interrogation," without a prior warning regarding his or her right to remain silent and right to an

attorney.  See 384 U.S. at 444.  After receiving Miranda warnings, a suspect may "knowingly and

intelligently" waive their rights and provide an admissible statement. Id. at 479.  The waiver, viewed

under the "totality of circumstances[,]" must be "voluntary in the sense that it was the product of a

free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full

awareness of both the nature of the right being abandoned and the consequence of the decision to

abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).

On a motion to suppress a confession under these standards, the government must prove by

a preponderance of evidence that a defendant's confession is voluntary and is the product of a

voluntary Miranda waiver.  Lego v. Twomey, 404 U.S. 477, 489 (1972); Commonwealth v. Nestor,

709 A.2d 879, 882 (Pa. 1998); Commonwealth v. Manning, 435 A.2d 1207, 1210 (Pa. 1981).  In

light of these standards, Petitioner claims that the trial court would have likely suppressed his

confession in two respects.  First, he contends that the available evidence demonstrates that "the

police obtained [his] statement by beating him during his interrogation," which, in and of itself,

establishes that his confession and his <u>Miranda</u> waiver were involuntary.[39]   Second, Petitioner

contends that the police's use of both physical violence and certain psychologically coercive tactics,[40]

combined to overbear his will and render his statement and <u>Miranda</u> waiver involuntary.  (Pet'r's

Post-Hearing Br. at 25-28.)

Each of Petitioner's arguments, therefore, depend upon the same underlying finding—that,

in light of the available evidence, the trial court would have likely determined that his confession

was accompanied by physical coercion.  For the following reasons, we conclude that Petitioner has

failed to make such a showing.[41]

---

[39] (Pet'r's Post-Hearing Br. at 26) (citing <u>United States v. Thompson</u>, 2010 WL 4641663 at *10 (W.D.Pa. Nov. 8, 2010) (noting that, although "voluntariness" is based upon a totality of the circumstances, "[w]hen an interrogation is accompanied by physical violence, a *per se* rule of involuntariness applies.")

[40] Petitioner's allegations of "psychological" coercion are considered in Claim III.  <u>See</u> <u>infra</u>, pp. 73-81.

[41] Respondent argues that Petitioner's prejudice argument can be disposed of under 28 U.S.C. § 2254(e)(1), which provides that the factual determination of a state court "must be presumed to be correct," unless the Petitioner can rebut the "presumption of correctness by clear and convincing evidence."  <u>See</u> <u>Nara v. Frank</u>, 488 F.3d 187, 200-01 (3d Cir. 2007).  After Petitioner's suppression hearing, the trial court issued an opinion finding that "no physical force was used by the police to obtain [Petitioner's] statement."  (Resp., Ex. A at 24.)  On this basis, Respondent contends that Petitioner's <u>Strickland</u> claims are foreclosed, unless he can rebut the trial court's factual finding by clear and convincing evidence.  (Resp't's Post-Hearing Br. at 6-7.)
Respondent's argument is based upon <u>Weeks v. Snyder</u>, where the Third Circuit held that a state court's credibility determination following an evidentiary hearing on a petitioner's ineffective assistance claim was subject to deference under 28 U.S.C. § 2254(e)(1).  219 F.3d 245, 258-60 (3d Cir. 2000).  In this case, however, the state court did not hold an evidentiary hearing on Petitioner's ineffective assistance claims and the factual finding at issue is not a subsidiary finding made by the trial court in connection with a <u>Strickland</u> ruling.  We consider this distinction to be material, particularly considering that Petitioner's <u>Strickland</u> claim challenges his counsel's performance and the prejudice of his alleged errors, not the accuracy of the trial court's ruling at the suppression hearing.  Cf. <u>Strickland</u>, 466 U.S. at 698 ("Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to deference under § 2254(d) . . . both the performance and prejudice components of the

First, the "documentary evidence" Petitioner relies upon does not constitute direct evidence that he was subject to physical coercion. Rather, the crux of Petitioner's argument is that the absence of a notation as to when he might have sustained a "[s]mall laceration on scalp [without] gaping, [without] bleeding," and "[a]brasions on right side of neck[,]" "impeaches" Brown's testimony, and thereby suggests that Petitioner was beaten in the interrogation room. See supra, p. 34. In support of this argument, Petitioner first points to the "75-48 Form" filled out by Detective Thomas Duffy, an officer in the "wagon crew" tasked with transporting Petitioner from his home to the homicide division on the night of his arrest. (N.T., 2/8/12, p. 14.)

At the evidentiary hearing before this Court, Duffy testified that the "75-48" Form has a box to denote "injury," which he would generally "fill[] out" if he observed or was notified that a suspect had an "injury." Duffy further testified that, in certain circumstances, the suspect would be taken to the hospital pursuant to Philadelphia police directives, particularly where the suspect had "an obvious" or "visible injury." Duffy did not check off the "injury" box in connection with Petitioner's arrest or take him to the hospital. (N.T., 2/8/12, pp. 14-16.)

Duffy explained that, "[l]ooking at [the 75-48 Form he filled out on the night of Petitioner's arrest], that tells me that we as a wagon crew did not observe any injuries on the [Petitioner] and that we took him right to homicide, just from [his house] to homicide." While Duffy acknowledged that he would "thoroughly search" people he was transporting, when he was asked if it was his "practice to examine people who have been arrested recently to see if they had any injuries that weren't immediately apparent," he responded "No." (N.T., 2/8/12, pp. 16, 19-21.) Given the minimal nature

---

ineffectiveness inquiry are mixed questions of law and fact."). Indeed, the factual finding at issue is the product of the alleged Strickland violation, not the subject of Petitioner's challenge. We, therefore, do not consider § 2254(e)(1) to be implicated in this aspect of our analysis.

of Petitioner's injury and Duffy's testimony, the absence of an "Injury" notation on the 75-48 Form is unsurprising and would be of little impeachment value. This is particularly the case in light of the Prison "Medical Intake Questionnaire," which reflects that the "interviewer" who evaluated Petitioner after his interrogation noted that he had no "indication of injury, [or] bleeding[.]" (Resp't's Evid. Hearing Ex. 4.)

Petitioner also points to the "75-229 Form" filled out by Sergeant Fred Westerman upon Petitioner's arrival at the homicide division on the night of his arrest. That form does not include any notation under a section regarding "physical characteristics," such as "scars, marks or deformities" or under "Other Remarks[.]" At the hearing before this Court, trial counsel testified that, in his experience, "injuries" would sometimes be noted on these sections of the 75-229 Form. (N.T., 2/10/12, p. 91.) The 75-229 Form, however, does not specifically request information about whether a suspect is injured, and other than trial counsel's comments, there is no indication that minor injuries such as Petitioner's would be included on this form. Further, even after the evidentiary hearing, the record still remains silent as to whether Sergeant Westerman inspected Petitioner for injuries upon his arrival to the homicide division, or would generally inspect incoming suspects for injuries, in completing this form.

Petitioner also points to the "75-49/52 Form," which includes a page where Brown described the "Arrest" as follows: "Defendant Wharton was arrested in a maroon colored, multi-length leather zipper jacket" and "did not appear to be under the influence of alcohol or narcotics and had no apparent injuries." (Pet'r's Post-Hearing Br. at 11-24.) While the 75-49/52 Form may have provided trial counsel a basis to cross examine Brown, it is not inconsistent with his testimony and does little to detract from his lengthy and detailed account. At the suppression hearing, Petitioner's

48

trial counsel and Brown engaged in the following exchange:

Q. Detective, you said in response to [the Assistant District Attorney's] question with regard to any injuries that you observed upon the person of [Petitioner] that in fact you had noticed an injury upon the person of [Petitioner.] You noticed a cut or bruises on the back of his head. When did you make that observation?

A. That observation was made once we arrived up on the third floor in the front bedroom. To clarify that answer, counselor, the actual apprehension was made on the second floor landing. That second floor landing was not lit. There were accumulated things in the hallway. Even now I cannot describe what they were, whether it was furniture or what. Defendant fell and I fell on top of him and I kept hold of him. I held on to him by the back of his neck and directed him up to the third floor and told him to sit down -- was instructed to sit on the bed. There [sic] was before he was told to get dressed or anything of that nature and he was holding his head and it was in back of that area and when you say bruises, it wasn't bruises.

Q. I'm not saying bruises. I'm just quoting what you said before. You were asked you said --

A. I don't think I made it plural.

Q. All right.

A. But there was a marking, a bruise or laceration somewhere in the back area of the head there.

Q. Other [sic] laceration is a cut; is that right?

A. Yes, scratch, deep scratch, doesn't have to be a cut.

Q. Was he bleeding?

A. I saw redness. Now, when I say redness, the same way you might scratch your hand, not an open type wound that you are bleeding but there is redness indicating a scratch or an abrasion of some type. That's what I saw.

Q. And you are saying that there was sustained -- this injury as best you could see was sustained there on the second floor landing.

A. Somewhere on the second floor landing.

. . . .

Q.    Later on when you were down at the police administration building, did you notice that the injury has resulted in a swelling in the back of his head?

A.    In all fairness, counselor, I don't think I -- I don't think I was concerned with that cut or laceration or whatever. It never entered my mind after that.

Q.    For your own protection did you have [Petitioner] photographed, that is in the area of the injury?

A.    Area -- I recall color photographs requested but I don't think in the area of the injury. As I said, I don't -- after that moment of seeing that injury, that was the last time I ever thought of it.

(N.T., 5/23/85, pp. 97-100.)

Brown's testimony, which was credited by the trial court at the suppression hearing, remained consistent throughout Petitioner's trial in all material respects. At trial, Brown testified that he noticed the injury, which appeared to be "recent," while Petitioner was seated on the bed in the third floor bedroom of the Wharton home, but Brown acknowledged that he could not be sure that the injury occurred when he apprehended him on the second floor. (N.T., 6/24/85, pp. 142-43.) Consistently, however, Brown testified that he noticed "redness," as he observed Petitioner sitting on his bed and never thought of the injury again. (N.T., 5/23/85, p. 100; N.T., 6/24/85, pp. 142-43.)

At the federal hearing before this Court, Brown was questioned regarding each of the police forms at issue and his testimony did not waiver. Specifically, Petitioner's federal counsel elicited testimony from Brown regarding Petitioner's injury. Brown recalled his original testimony and addressed whether police protocol required the arresting officers to take particular action when a suspect was injured during an arrest:

Q.    Now, at the time, if a prisoner is injured during an arrest or an apprehension, there was a protocol for both the transporting officers and any officers dealing with that person with how they were to treat them. Is

that correct?

A.   I'm thinking of how to respond to that when you say there's a protocol. Obviously, if an individual is injured to the point that they're incapacitated -- they can't walk, can't function, they're taken to some medical facility. If there's bleeding to the extent that a paper towel can't stop it, they're treated. But that's why I'm -- you know, I'm kind of perplexed when you say protocol.

Q.   So your recollection -- and I'm just asking you from your experience --

A.   Yes.

Q.   -- of -- both as a homicide detective and as an officer before. Your recollection is that it would have to be a serious injury, bleeding of some type, that would re -- or unable to walk that would require being looked at by a medical professional?

A.   Some type of injury that required medical attention. That's the best way to answer that.

(N.T., 2/10/12, pp. 17-18.)

Petitioner's counsel then asked Brown about Philadelphia Police "Directive 82," which stated: "Any prisoner brought into the police detention unit [with an] apparent recent injury or otherwise in need of medical treatment will be accompanied by a separate complaint or incident report 75[-]48 showing that the prisoner was treated at a hospital. In the absence of a 75[-]48, the wagon crew will be directed to transport the prisoner to the nearest hospital." Brown acknowledged that the 75-48 Form authored by Officer Duffy did not include a notation for "injury" and that Petitioner was not taken to a medical facility following his arrest. Brown, however, did not recognize "Directive 82" and was unsure whether it applied to Petitioner's arrest.[42] (N.T., 2/10/12,

_____

[42] Specifically, when Brown was asked whether "Directive 82" required police to take Petitioner for treatment "at a medical facility or . . . . [receive] authoriz[ation] that he did not need to go[,]" he testified:

Again, I'd have -- to answer you, I don't understand your question, because

pp. 19-20, 22, 24-25.)

Petitioner's counsel then asked Brown, setting aside "Directive 82," whether "at the time you were a detective, you . . . understood that, as you've acknowledged, that when you take someone into custody, you not only search them for your protection, but you also document any injury that you might notice in the event that the person comes back and says you did this or whatever.  The timing of those injuries are important to these patrol officers transporting the prisoner?"   Brown testified that:

> [M]y recollection at the time -- when I say that time, during that era, in the '80s, injuries would have been noted by the -- once the individual was processed . . . . [t]he intake officers who were correctional officers, if I recall, would have made some type of notation there.
> But as I testified in my notes of testimony, once that individual -- this individual was dressed, he was turned over to the Mercy patrol wagon for transportation.  I thought no more about that laceration or bruise or whatever it might have been.

(N.T., 2/10/12, pp. 26-27.)  When Brown was asked by counsel for the Respondent whether, "as a practical matter, [it] was your practice or the practice of officers you worked with to bring any prisoner to a hospital who had any recent injury, including a bruise or a scrape," he said "[t]o my recollection, no, that wasn't a practice. No."  (N.T., 2/10/12, pp. 62-63.)

Petitioner's federal counsel also questioned Brown as to the 75-229 and the 75-49/52 Forms.  Brown acknowledged that the 75-229 Form did not include a notation under "physical characteristics" or "other remarks."  Brown also testified that he filled out the 75-49/52 Form at

---

> again I'm referring back to this directive that you handed to me.  I go back to the transportation of the prisoners; the Section A.  It says "Before removing prisoners from district/unit." [Petitioner] was taken into custody at a residence.

(N.T., 2/10/12, p. 25.)

some point "prior to the litigation of the case" and confirmed that he wrote the note reflecting that Petitioner had "no apparent injuries" at the time of his arrest. (N.T., 2/10/12, pp. 30-33.)

Brown's account, therefore, has remained consistent and he reaffirmed his previous testimony that Petitioner may have sustained a minor injury during his arrest but did not sustain any injuries after he was taken into police custody prior to interrogation. (N.T., 2/10/12, p. 12.) We are thus unable to conclude that the trial court would have likely suppressed Petitioner's confession as the product of physical coercion, had trial counsel attempted to impeach Brown with these documents.[43]

We reach the same conclusion with respect to Petitioner's assertion that he suffered prejudice when his counsel failed to elicit testimony at the suppression hearing from Young, Wharton and Wilson-Carter. Petitioner contends that his counsel should have offered these witnesses to impeach Brown's testimony that Petitioner may have sustained the injuries when he "tackled" him in the second floor hallway of the Wharton home.

At the evidentiary hearing before this Court, Young testified that on the night of Petitioner's arrest she heard a loud "banging" and exited her room to find "policemen coming around the second floor landing[.]" She could not recall whether she noticed officers on the third floor steps, and unlike her trial testimony, she indicated that some police officers had already "passed" her by the time she

---

[43] Petitioner also argues that his counsel was ineffective for failing to utilize his prescription for Darvocet on the night of his arrest and interrogation to challenge the prosecution's contention that his injury was "underwhelming." (Pet'r's Post-Hearing Br. at 14.) Along with being untimely and procedurally defaulted, this allegation is without merit. Trial counsel was not objectively unreasonable for failing to highlight this prescription, which was provided after Petitioner complained of a "headache" and which was documented on a form that also noted he had "no indication of injury[.]" (Resp't's Evid. Hearing Ex. 4.) Further, counsel's alleged error did not result in prejudice, as the prescription does not undermine Detective Brown's credibility, or otherwise support a finding that the trial court would have likely suppressed Petitioner's confession in light of all of the other evidence of record.

opened the door.  She again testified that she did not see a "scuffle" in the second floor hallway.  See

supra, p. 37.  She did not, however, mention speaking to Detective Brown in the second floor

hallway, which marks a significant departure from her trial testimony where she stated that she

briefly spoke to Detective Brown before he passed her bedroom and proceeded to the third floor.

Compare (N.T., 2/8/12, pp. 72-86) with (N.T., 6/28/85, pp. 18-28.)  That aside, even if Young's

testimony was credited, it is of limited impeachment value, particularly considering Brown's detailed

and consistent account as to his manner of Petitioner's arrest, wherein he relayed that he "tackled"

Petitioner in the second floor hallway and noticed "redness" on his scalp after leading him to the

third floor.

     Petitioner also points to his counsel's failure to call his mother, Margaret Wharton.  This

claim is predicated upon an undated declaration provided by Ms. Wharton, approximately thirteen

years after Petitioner's trial, which provides:

> 1.     I recall the events of the night that Robert was arrested for the killings of Ferne and Bradley Hart.  The arrest took place in the early morning hours of February 7, 1984.  My husband and I were asleep.  My daughter Beverly was also asleep in the house.  I believed that Robert and his girlfriend, [Tywana Wilson-Carter], were upstairs.
>
> 2.     I woke up to banging on the front door followed very quickly by a loud crashing.  The loud crash occurred so quickly after the banging, that neither I nor my husband had the chance to get out of bed to answer the door.  When I did get out of bed, I saw some police running through the doorway and up the stairs.  I saw them run past the second floor and directly toward the third floor.  After I lost sight of them on the second floor I heard them continue running up to the third floor.  Still other police stayed on the first floor.  They told me to stay back.  I then saw that my front door was broken in.  Although I would have gladly done so had I been given the chance, I did not open the front door for the police on that night.  Except for when the police were taking Robert from the house, at no time did I see Robert on the second floor landing.  I did not observe the police wrestling with Robert on the second floor or on the landing, or anywhere else.  Shortly after the police ran up the stairs, I saw them leading Robert and [Wilson-Carter] out of the house in handcuffs and watched as they were placed in separate police vehicles.

      3.     I had not observed any injury on Robert prior to retiring for the evening on the night of February 6, 1984.  I did not observe any injury on his head or neck as the police took him from the house to the police vehicle.

      4.     I told all of this to Robert's lawyer at the time of his trial.  I would have been willing to testify to this, but I was never asked.

(Pet. at 44-46; Pet., Ex. 3.)

Ms. Wharton testified at the evidentiary hearing before this Court regarding the events she described in her declaration.  She stated that she was "suddenly awakened by a loud crashing," and after "maybe a minute or a half minute," she opened her bedroom door to see "streams" of police officers coming up the first floor staircase and running past her bedroom toward the third floor.  She also asserted that she did not notice any injuries to Petitioner's head or neck as police walked him by her bedroom on the way out of the house.  (N.T., 2/8/12, pp. 25-29, 33, 38.)

Ms. Wharton also expanded upon her declaration, asserting that "when she originally opened [her] bedroom door . . . [she] recall[ed] seeing [Petitioner] peek down the [third floor] stairs and just disappear back into his room."  With this testimony, Ms. Wharton placed Petitioner on the third floor steps, before his apprehension, contrary to Brown's account of the arrest.  We find that this self-serving addition to her account – made over twenty-five years after Petitioner's arrest – is simply not credible.  Further, given the minor nature of the injuries on Petitioner's scalp and neck, the fact that she did not "notice" an injury is unremarkable and does not support a prejudice finding.  (N.T., 2/8/12, pp. 26-27, 33.)

Petitioner also asserts that trial counsel was ineffective for failing to interview Petitioner's girlfriend, Wilson-Carter.  In an undated declaration, first produced in connection with Petitioner's second direct appeal to the Pennsylvania Supreme Court in 1998, Wilson-Carter stated that she "would have been willing to testify" that she and Petitioner were "in bed in his room when the cops

came in" on the night of his arrest, and that there was "no struggle" or "any force" used during the course of the arrest.  In addition, she declared that "[p]rior to the time that police came to [Petitioner's] bedroom . . . he had no injuries on his head or neck."  (Pet., Ex. 4.)

 At the evidentiary hearing before this Court, Wilson-Carter testified that she "wasn't awake when police officers came into the room[,]" and that Petitioner was restrained by police and "facing down into a sofa that was in the room[,]" when she awoke.  Because Wilson-Carter acknowledged she was asleep when Petitioner was first apprehended, her testimony does little, if anything, to undermine Brown's testimony as to his encounter with Petitioner in the second floor hallway.  Further, while Wilson-Carter testified that she did not notice any injuries to Petitioner at the Wharton home, her testimony on this issue is of minimal impeachment value, given the minor nature of the injuries and the circumstances of the arrest.  Wilson-Carter testified that after she and Petitioner were asked to dress, they were led out of the house and transported separately to the police station.  As with Ms. Wharton's testimony, the fact that Wilson-Carter did not "notice" the minor injuries noted in Prison Health Services records during this period is unremarkable and insufficient to support a prejudice finding.  (N.T., 2/8/12, pp. 42-43, 49, 52.)

Wilson-Carter's declaration also reflected that she would have testified regarding her time with Petitioner in the interrogation room.  (Pet. at 45; Pet., Ex. 5.)  Specifically, Wilson-Carter declared:

> I was taken to the police station and was placed in what I later learned was called an interrogation room.  Altogether I was there for about six hours.  I was taken to see Robert three times during those six hours.  The first time I was taken to see him, I was placed outside of another interrogation room.  I was told to look into the room.  I was crying and upset at that point, and the police made me stand there, looking inside, for about 30 seconds.  I could see Robert and I could tell that he was able to see me.  Upon seeing Robert, I burst into tears and cried uncontrollably.  I

56

could see that he was handcuffed to a chair and he was bleeding from his head.

  The second time that they took me to see Robert, I was actually able to talk to him briefly. During that time I observed a cut on Robert's head, and abrasions and fingernail marks on his neck. I distinctly remember that his ears were purple. It made such an impression in my mind because Robert is dark skinned and I remember thinking that he would have to be beaten quite severely in order for his ears to be a dark purple color. He also had footprints on his clothing. I asked him how he got injured and how the footprints got on his clothing. He told me that the police hit and stomped him while he was in the interrogation room. At the time, Robert and I both thought I was pregnant. He told me [he] was worried about the effects of all of this on my pregnancy and was also concerned about the police beating me the way they had beaten him and did not want anything to happen to our baby as a result. I pleaded with Robert at this time to sign anything they wanted him to sign so that I could go home.

. . . .

  A couple of hours later I was permitted to actually visit with Robert. I was placed in his interrogation room for about one half hour. He told me that he signed a statement which he believed indicated that he committed the Hart killings. He also told me that he signed it because the police had beaten him, threatened to beat him more severely, and also indicated to him that they would charge me with involvement in the homicides if he did not confess. He also explained that he took the threat to charge me seriously when he saw how upset I was when he saw me standing outside of the interrogation room earlier in the night.

(Pet., Ex. 4.)

  At the hearing before this Court, however, Wilson-Carter testified differently in several ways. First, she testified that she actually went into the interrogation room to see Petitioner on three occasions, rather than the two times described in the declaration. She stated that when she first saw Petitioner, he was handcuffed to a chair and that she "hugged" him and noticed "smudges" or "dirt marks" on the "thighs" of his pants and discoloration to his ears. She did not recall seeing any scratches or marks on his head or neck as she described in the declaration. She explained that the second time she saw Petitioner, she noted that he "had been crying" and appeared "disheveled." She also noticed that he had a "scrape" or "scratch" around his neck. She was unable to remember whether she noticed a cut or an abrasion on his head. On her third visit with Petitioner, Wilson-

57

Carter stated that he told her he had signed a confession, but that he did so with his non-dominant hand.  She further testified that they "didn't get into" whether the confession was accurate or fabricated by police.  (N.T., 2/8/12, pp. 47-50, 53, 56-58, 60-62.)

Petitioner contends that the differences between Wilson-Carter's declaration and her testimony before this Court "should not undermine her credibility respecting the details she does remember," given the length of time that has passed since Petitioner's arrest.  (Pet'r's Post-Hearing Br. at 8 n.6.)  Although we recognize the limits of memory and the protracted nature of this case, we cannot ignore the differences between Wilson-Carter's accounts in assessing Petitioner's claim. Wilson-Carter now claims that she visited the interrogation room three times and twice before Petitioner signed the confession, during which she saw his emotional and physical condition progressively worsen.  Specifically, Wilson-Carter testified that Petitioner appeared "disheveled" and had a "scratch" on his neck during a second visit, which she did not notice when she "hugged" him during an initial visit.  This stands in stark contrast to her declaration, which provides that she first saw Petitioner "bleeding from his head" through an interrogation room window, and then subsequently observed marks on his pants, discoloration to his ears, scratches on his neck and an abrasion on his head during her first visit into the interrogation room.  Compare (N.T., 2/8/12, pp. 47-50, 53, 56-58, 60-62) with (Pet., Ex. 4.)

Aside from these inconsistencies, Wilson-Carter's testimony is at odds with objective evidence of record.  A "Chronology of Interrogation" prepared by police on the night Petitioner's arrest indicates that he was placed in an interrogation room at the Police Administration Building at 1:55 a.m. on February 7, 1984, and provided his statement from 3:30 a.m. to 5:20 a.m.  Detectives Westerman and Brown made eight entries on the Chronology during this period, none of which

58

indicated that Petitioner was visited by or spoke with Wilson-Carter. A subsequent entry by Brown reflects that Petitioner was "Alone with Girlfriend [Wilson-Carter]" from 5:55 a.m. until 6:28 a.m. There is no other reference to Wilson-Carter in the Chronology. This document flatly contradicts Wilson-Carter's testimony that she visited the interrogation room twice before Petitioner signed his statement, and three times in all, and corroborates Brown's testimony that there was only one visit between them, after the confession. (Resp't's Evid. Hearing Ex. 3.)

Two photographs taken of Petitioner on the night of his arrest and carefully examined by this Court also undermine Wilson-Carter's account.[44] While the area of Petitioner's head abrasion is not specifically depicted, the photographs nevertheless show no signs of physical injury or trauma on his face and ears, or "smudges" on his pants. Although the "Chronology of Interrogation" does not indicate when the photographs were taken, Brown's trial testimony reflects that they were taken after Petitioner was interrogated. (N.T., 6/24/85, pp. 72-74.) Brown again confirmed this during the hearing before this Court, asserting that if the photographs were taken before the interrogation, "he would have noted it."[45] (N.T., 2/10/12, p. 66.)

---

[44] The photographs were described at his trial as (1) "a length [color photograph] of the defendant from his knees up . . .[with] a sign board along the wall which says date processed . . . 2/7/84 . . . crime, murder. Underneath it, in a preprinted sign, wilful killing[,]" and (2) a "mug shot" with "both a profile view and a chest-high view in the usual police legend[,]" which included the date, "2/7/84," and "crime, murder/robbery/burglary[.]" (N.T., 6/24/85, p. 72); see (Resp't's Evid. Hearing Exs. 1, 2.)

[45] At the hearing before this Court, Brown testified that the photographs "would have been taken" prior to Petitioner's arraignment. (N.T., 2/10/12, p. 71.) This is different than his trial testimony, where he specifically indicated that the photographs were taken after Petitioner was arraigned. (N.T., 6/23/85, pp. 68-74.) His trial testimony is bolstered by the fact that the placards in the photographs include information regarding the charges against Petitioner, which suggest that they were taken after his arraignment. In any event, Brown has consistently indicated that the photographs were taken after the interrogation.

Lastly, the "Intake Medical Questionnaire" from Prison Health Services reflects that Petitioner complained of a "[h]eadache" and the "interviewer" reported that Petitioner had no "indication of injury, bleeding, loss of consciousness or severe mental confusion." In the "Record of Medical Care[,]" the injury itself is described as a "small laceration on scalp, [without] gaping, [without] bleeding" and "abrasions on right side of neck[.]" (Resp't's Evid. Hearing Ex. 4.) Considering this objective evidence, Wilson-Carter's inconsistent accounts, and our assessment of her credibility, we are unable to conclude that her testimony supports a prejudice finding.

In light of all of the evidence Petitioner has presented before this Court, we conclude that he has failed to demonstrate that the trial court would have likely suppressed his confession or found that his Miranda waiver was the product of physical coercion. Even if Petitioner could make such a showing, he would only be entitled to relief if he could demonstrate that, had his confession been suppressed, there is a reasonable likelihood that the outcome of his trial would have been different.

Petitioner does not specifically address this aspect of the Strickland prejudice analysis, but instead appears to assume that this standard is satisfied. See (Pet'r's Post-Hearing Br. at 23-24.) Although confessions are powerful evidence of guilt, attorney incompetence that results in the admission of an inculpatory statement does not automatically satisfy Strickland's prejudice prong. Cf. Saranchak v. Beard, 616 F.3d 292, 298, 306-07 (3d Cir. 2010) (assuming counsel could have filed a successful motion to suppress a "detail[ed]" confession under the Fifth Amendment, but holding that petitioner suffered no prejudice as a result of counsel's error, due to the overwhelming evidence of his guilt). Instead, the impact of the confession must be viewed in the context of all of the other evidence presented at trial, which in this case was comprised of significantly more than

Petitioner's confession.[46]

For instance, Petitioner provided another statement to police, which is not subject to challenge, that reflects he burglarized and vandalized the Hart home twice in August 1983. The trial evidence also established that Petitioner burglarized and vandalized Bradley Hart's place of employment in September 1983. Petitioner believed that Bradley Hart owed him and a co-worker $907 for construction work that ended on October 31, 1983, and intended to recover what he was owed or he would "get" Bradley Hart. (N.T. 6/18/85, pp. 75, 77) (reflecting that Robert Hart, Bradley's brother, testified that Petitioner told him "Bradley was not paying [Petitioner's employer], so that [Petitioner's employer] couldn't pay us, and that if Bradley didn't pay him he was going to get him"); see (N.T., 6/17/85, pp. 74, 79-80, 82-90; N.T., 6/19/85, pp. 19-20, 28-30, 36; N.T., 6/27/85, pp. 65-67.)

Shortly after Bradley and Ferne Hart were murdered, property belonging to them was seized from the homes of Petitioner and Wilson-Carter, including a check written by Bradley Hart to Petitioner in the amount of $935 dollars, dated January 30, 1984, Ferne Hart's "wallet," and other items that were identified as being in the Harts' possession after the burglaries of August 1983. See (N.T., 6/19/85, pp. 7-8; N.T., 6/21/85, pp. 48, 51-55, 56-63; N.T., 6/27/85, pp. 65-67.)

As noted previously, after the murders, the Harts' infant daughter was left in the Hart home. Thomas Nixon, an accomplice of Petitioner in an attempted burglary of the Hart home in January 1984, testified that he called Petitioner following the Hart murders and said "that if [you] were going to kill the mother and the father, [you] should have killed the baby also," and that Petitioner

---

[46] This evidence is detailed in connection with our discussion of Claim IV. See infra, pp. 87-92.

responded, "We couldn't do it."  (N.T., 6/26/85, pp. 107-12, 128.)

In light of this significant circumstantial evidence, we also conclude that Petitioner has failed to establish a reasonable probability that, but for the admission of his confession, the result of the proceeding would have been different.[47]

### 4.    Petitioner's Claim of Ineffective Assistance at Trial

Petitioner's claim of ineffectiveness at trial largely mirrors his claim of ineffectiveness at the suppression hearing.  Petitioner contends that his counsel's performance was deficient because he failed to investigate and present "documentary evidence" and "eyewitness testimony" on the issue of "physical coercion" in the interrogation room.  Petitioner urges that had his trial counsel pursued this course of action, "there is a reasonable probability that the jurors would have had a reasonable doubt about the statement and thus about Petitioner's guilt of first degree murder."  (Pet'r's Post-Hearing Br. at 20-24.)  In addition to these allegations, Petitioner asserts that his trial counsel was ineffective for failing to impeach Brown with testimony elicited at the suppression hearing.

These claims of ineffectiveness, like those disposed of above, are governed by Strickland,

_____

[47] Petitioner also contends that his trial counsel was ineffective for failing to call him to testify at the suppression hearing.  (Am. Pet. at 3.)  Even assuming that this claim is properly exhausted, it is without merit.  First, trial counsel testified at the evidentiary hearing that he "would never have called [Petitioner] or recommended that he testify at a pre-trial motion when he was facing a capital murder trial for fear he would make statements that would be injurious to him at the trial."  (N.T., 2/10/12, p. 109.)  Petitioner has not offered argument or evidence to rebut this strategic reason.  In addition, Petitioner has not offered a declaration, or any other information, to demonstrate what he would have asserted on the stand at the suppression hearing.  Without such information, he cannot support a Strickland claim.  See Palmer v. Hendricks, 592 F.3d 386, 394 (3d Cir. 2010) (rejecting petitioner's claim that his attorney was ineffective for interfering with his right to testify where the petitioner did not inform the court of any of the facts to which he would have testified, but merely stated "that he would have taken the stand to testify on [his] own behalf to explain [his] side of what really happened if [he had been] allowed to do so") (alterations in original) (internal quotation omitted).

and as such, Petitioner must demonstrate that his counsel's performance "fell below objective standards of attorney conduct[,]" in light of all the circumstances, and that his counsel's errors prejudiced him at trial.  Id. at 501; see Jacobs v. Horn, 395 F.3d 92, 106-07 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 690).

Regarding Petitioner's statement, the court instructed the jury that:

> [Y]ou may not consider [Petitioner's statement] as evidence against [him] unless you find that he made the statement voluntarily.
> The word voluntary has a special meaning which I shall now explain.
> The basic test of voluntariness is this: to be voluntary a statement must be the product of a rational mind and a free will.  The defendant must have a mind capable of reasoning about whether to make a statement or say nothing, and he must be allowed to use it.
> The defendant must have sufficient will power to decide for himself whether or not to make a statement, and he must be allowed to make that decision freely.
> Now, this does not mean that a statement is involuntary merely because a defendant made a hasty or poor choice and might have been wiser to say nothing, nor does it mean that a statement is involuntary merely because it was made in response to searching questions, or merely because he was told what evidence the Commonwealth had.
> It does mean, however, that if the defendant's mind and will are confused or burdened by promises of advantages or advantages, threats, physical or psychological abuse or other improper influence, any statements which he then makes is involuntary.

(N.T., 7/1/85, pp. 27-28.)  The trial court also instructed the jury that, "[i]n deciding whether the statement was voluntary, you should weigh all of the facts and circumstances surrounding the alleged making of the statement," including the "ability of [the defendant] to knowingly and intelligently waive" his Miranda rights.  See (N.T., 7/1/85, pp. 28-29.)  Therefore, to establish prejudice, Petitioner must demonstrate that, in light of the evidence at issue, there is a "reasonable probability" that the jury: (1) would have disregarded Petitioner's statement as involuntary under the court's instruction; and (2) would have had a reasonable doubt as to his guilt, absent consideration of

Petitioner's confession.  (Pet'r's Post-Hearing Br. at 24.)  Cf. Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005).

As detailed extensively above, in considering the ineffectiveness claim at the suppression hearing, we have concluded that Petitioner has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different if the trial court had suppressed his confession.  For the same reasons, we also conclude that Petitioner is unable to establish prejudice as to this claim.  Rather than exclusively resting our decision on this finding, we will separately review each aspect of Petitioner's claim.

### a.    Documentary Evidence

Petitioner's allegations regarding the documentary evidence are likely defaulted, and therefore, not subject to federal habeas review.  Even if we were to look past this apparent default, Petitioner has nevertheless failed to establish Strickland prejudice.  For the reasons stated in our analysis of Petitioner's claim of ineffectiveness at the suppression hearing, he has also failed to demonstrate that there is a reasonable probability that the jury would have disregarded Petitioner's confession as involuntary in light of the documentary evidence.  See supra, pp. 47-53.

### b.    "Eyewitness Testimony"

Petitioner has also failed to demonstrate that his counsel was constitutionally deficient for failing to properly present the testimony of Young, Wharton and Wilson-Carter at trial.  Unlike his decision not to press the coercion issue at the suppression hearing, at trial, counsel argued that Petitioner's confession was coerced.  (N.T., 6/13/85, pp. 61-62; N.T., 6/28/85 pp. 124-25, 133, 138, 142.)  In support of this argument, trial counsel offered testimony from Young, who contradicted Brown's account as to the manner of Petitioner's arrest, and therefore, provided some support for

the theory that Brown fabricated the "scuffle" in the Wharton house to conceal the fact that Petitioner was "struck in the interrogation room."  (N.T., 6/28/85, p. 124.)

Petitioner, however, contends that trial counsel was ineffective for failing to interview Young prior to trial.  He claims that, had trial counsel done this, he would have known Young was going to testify and would have ensured she was sequestered at trial.  Petitioner notes that trial counsel's failure to sequester Young resulted in a cautionary instruction from the court, which informed the jury that a "sequestration order" was in effect to prevent witnesses from hearing the testimony of others, and that Young was in the courtroom during the first day of Brown's testimony.  The court further instructed that the jury should "take that factor in consideration in evaluating [Young's] credibility[.]"  (N.T., 6/28/85, pp. 24, 29-30.)  While trial counsel's performance may have been deficient in failing to interview Young prior to trial and thereafter ensuring she was sequestered, we are unable to conclude that there is a reasonable probability that the outcome of Petitioner's trial would have been different.  The jury was permitted to hear Young's testimony and evaluate her credibility at trial.  While the jury's credibility determination could have been impacted by the court's "sequestration" instruction, this brief instruction did not "deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687-88.

Petitioner next asserts that trial counsel was deficient for failing to call Ms. Wharton at trial.  Her testimony, even if credited, is largely cumulative of Young's testimony as to the manner of Petitioner's arrest.  Further, her testimony is of minimal impeachment value, particularly in light of her inconsistent account at the evidentiary hearing before this Court.  Compare (Pet., Ex. 3) with (N.T., 2/8/12, pp. 23-38.)

Lastly, Petitioner contends that his trial counsel was deficient for failing to call Wilson-Carter

at trial.  Wilson-Carter was in possession of property from the home of Bradley and Ferne Hart, including items taken during the burglaries of August 14 and 22, 1983, and a camera and camera bag that Petitioner acknowledged giving to her after the murders.  In light of Wilson-Carter's connection to Petitioner and this incriminating evidence, we seriously question whether trial counsel was objectively unreasonable for failing to present her testimony.  Indeed, at the hearing before this Court, trial counsel acknowledged that Wilson-Carter was "obviously . . . a biased witness" and that it would not have helped his case to further highlight physical evidence connecting Petitioner to the burglaries and murders.  (N.T., 6/19/85, pp. 19-20, 28-30; N.T., 6/20/85, pp. 19-20; N.T., 6/24/85, p. 40; N.T., 6/27/85, pp. 65-67); see (N.T., 2/10/12, pp. 112-13, 124.)

Even assuming that trial counsel was constitutionally deficient for failing to offer Wilson-Carter's testimony, Petitioner has failed to demonstrate prejudice.  As discussed above, her testimony at the hearing before this Court was not credible, as it was inconsistent with the declaration she offered in support of this claim and the objective evidence of record.  Considering these factors, we cannot conclude that, in light of her testimony, there is a reasonable probability that the jury would have disregarded Petitioner's statement as involuntary.  Petitioner, therefore, has failed to demonstrate that trial counsel was ineffective for failing to present Wilson-Carter's testimony.[48]

---

[48] We also note that Respondent contends that Petitioner's trial counsel was not ineffective in this respect because Wilson-Carter's "proposed testimony, in large measure," would be inadmissible hearsay.  (Resp. at 52.)  Petitioner does not contest that portions of Wilson-Carter's declaration are hearsay, but asserts that she would have been permitted to testify as to his claims of physical abuse under the "excited utterance" or "existing mental, emotional, or physical condition" exceptions.  (Reply at 52) (citing Pa.R.E. 803(2), (3)); see Commonwealth v. Green, 409 A.2d 371, 374 (1979).  Wilson-Carter's testimony at the federal evidentiary hearing did not include any reference to the hearsay statements included in her declaration.  Therefore, to the extent Petitioner is still pressing this issue, Wilson-Carter's hearsay statements remain unsubstantiated even after Petitioner has had an opportunity to develop the factual record in support of his claim.

### c.   Failure to Utilize Testimony Elicited at the Suppression Hearing

Lastly, Petitioner claims that his trial counsel failed to impeach Brown regarding the manner of arrest using the suppression hearing testimony of two other detectives who were at the arrest scene – Francis Ansel and James Alexander.   Detective Ansel testified at the suppression hearing that "myself and several other detectives went to the front door" and someone "knocked" on the door. He further testified that "[s]omeone I believe it was a female, possibly the mother of Mr. Wharton opened the door."   Ansel did not "recall" if it was necessary to use force to gain entry and he had no recollection of the front door being broken.   (N.T., 5/22/85, pp. 113-15.)   At Petitioner's trial, however, Ansel testified that he was situated at the "side of the building" when officer's gained entry into the home, and the "door was opened by the time [he] came around to the front."   He indicated that he was not part of the team of officers that forced the door open and did not participate in the physical arrest of Petitioner.   (N.T., 6/21/85, pp. 69-72.)

Petitioner claims that his trial counsel was constitutionally ineffective for failing to impeach Brown's account using Ansel's pre-trial testimony.   Specifically, Petitioner asserts that counsel could have introduced Ansel's pre-trial statement as evidence of "bias, bad character for truth and honesty, or defects in memory," or called Ansel as a defense witness "to show that the arrest happened in the way that Ansel indicated in the pre-trial hearing."[49]   (Pet'r's Reply at 50) (quoting Commonwealth v. Baez, 431 A.2d 909, 912 (1981)).   Respondents contend that trial counsel was not ineffective in

---

[49] In Baez, the Pennsylvania Supreme Court directed that the credibility of a witness may be impeached: (1) by a prior inconsistent statement "made or adopted" by the challenged witness; (2) by "competent evidence of bias, bad character for truth and honesty, or defects in memory, perception or capacity" or (3) by "competent contradictory evidence of other witnesses whose version of the facts differs from that of the witness being impeached."   431 A.2d at 912 (citing Commonwealth v. Hamm, 378 A.2d 1219 (1976)).

this respect because Brown's testimony regarding how he gained entry into Petitioner's home was a "collateral matter."  Respondent asserts, therefore, that trial counsel would have been unable to introduce "extrinsic evidence," such as Ansel's testimony, to impeach Brown as to this issue. (Resp. at 13-14.)

Even assuming that trial counsel would have been permitted to use Ansel's testimony to impeach Brown regarding his manner of entry, his failure to do so did not rise to the level of a constitutional violation.  Brown consistently testified that he entered Petitioner's home by force, even when Petitioner's counsel confronted him at the suppression hearing with the fact that "there had been testimony before this court during these hearings that the front door was opened by a negro female later identified as Ms. Wharton."  (N.T., 5/23/85, p. 95.)   Further, as noted previously, defense witness and Petitioner's sister, Beverly Young, testified that Brown "knocked on the door about five knocks, hard knocks.  Then I heard a loud boom, and he broke the lock off the door." Young's testimony, therefore, was consistent with Brown's testimony as to his mode of entry. Moreover, evidence Petitioner presented at the hearing before this Court included the declaration and testimony of Ms. Wharton, which also reflected that the front door was forced open. (Pet., Ex. 3; N.T., 6/28/85, pp. 23-24, 27-28.)  Trial counsel's failure to utilize Ansel's testimony to "impeach" Brown on this issue does not constitute objectively unreasonable performance or establish prejudice, particularly because, in doing so, counsel would also be undermining Young's favorable testimony.

Regarding Detective Alexander, he testified at the suppression hearing that, on the night of Petitioner's arrest, "[w]e knocked on the door.  If I remember correctly a negro female opened the door and she was shown a copy of the warrant and we were admitted to the house."  (N.T., 5/22/85, p. 66.)  Upon questioning from the trial judge, however, Alexander clarified that he was unable to

see the front of the house when Brown gained entry.  Alexander further stated that he "heard" a

knock and "assume[d]" that Brown was permitted to enter by Petitioner's mother, because she was

standing in the doorway when he (Alexander) ran around to the front of the house.  Alexander

specifically asserted that he would be unable to testify that he actually saw or heard anyone knock

on the door.  (N.T., 5/22/85, pp. 99-102.)

Alexander's testimony does not create a reasonable probability that the outcome of the trial

would have been different.  While some of his testimony regarding entry to the house may have been

different than that of Brown, Alexander stated to the trial judge that he was not in a position to

observe how entry to the house was made.  Moreover, Petitioner's sister confirmed that forced entry

occurred.  In light of this corroboration regarding forced entry, the substantial evidence of guilt, and

given that entry to the home was one small piece of the facts of this case, Petitioner's claim of

prejudice on this issue fails.

Lastly, Petitioner claims that trial counsel was ineffective for failing to "exploit"

inconsistencies in Brown's testimony as to whether Petitioner "was in handcuffs during the

interrogation."  (Am. Pet. at 2.)  At the suppression hearing, Brown testified that when he first saw

Petitioner after his arrest, one of his hands was "handcuffed to the arm of a chair" in an interrogation

room within the homicide division and that in another location, Wilson-Carter was held in the same

manner, "with the only exception of not being handcuffed."  (N.T., 5/23/85, pp. 61, 106.)   Brown

further testified that "I recall when I first saw him in the interview room he was handcuffed.  Now,

whether – I believe he was handcuffed at that point prior to even being advised of his rights I

unhandcuffed him."  (N.T., 5/23/85, p. 124.)  At trial, relying upon a "Chronology" documenting the

actions taken with respect to Petitioner on the night of his interrogation and his own "recollection,"

Brown testified that Petitioner "was not handcuffed" when he first saw him or at any point during the interrogation process.[50]   (N.T., 6/24/85, pp. 119-21; N.T. 6/25/85, pp. 59, 92) (reflecting he was "not bolted to the chair not handcuffed" during interrogation and that he was "not handcuffed" at any point he observed him).

Therefore, while Petitioner may at some point have been handcuffed in the interrogation room, Brown consistently testified that Petitioner was not handcuffed during his interrogation. Brown's testimony was only inconsistent as to whether Petitioner was handcuffed to the chair when he first observed him within the homicide division.  We are unable to conclude that trial counsel's performance was constitutionally deficient for failure to highlight this immaterial inconsistency.  Had trial counsel explored this inconsistency during his cross examination of Brown, there is no reasonable probability that the outcome of Petitioner's trial would have been different.[51]

_____

[50] Petitioner also claims that his trial counsel should have impeached Brown's testimony that Petitioner was "never bleeding" during the interrogation "with the testimony of the nurse who treated him at the emergency room and/or with the available medical records showing that Petitioner sustained a scalp laceration."  (Am. Pet. at 2-3.)  This claim is without merit. Petitioner has not identified the nurse who allegedly treated him or submitted an affidavit or declaration reflecting the he or she would have testified that Petitioner was bleeding or would have been willing and available to provide such testimony.  Further, Petitioner's medical records, which were introduced at trial, provide that Petitioner had a "[s]mall laceration on scalp w/o gaping, w/o bleeding[.]"  (N.T., 6/28/85, pp. 32-33.)  These records, therefore, do not contradict Brown's testimony.  This claim is also likely defaulted, as it was not presented to the state courts.

[51] In Claim XVII, Petitioner asserts that the Commonwealth failed to correct the false testimony of Detectives Brown, Ansel and Alexander in violation of the Fourteenth Amendment. Under the Fourteenth Amendment, the failure of the prosecution to correct false testimony, which it knew or should have known to be false, requires reversal of a conviction if there is a "reasonable likelihood that the false testimony could have affected the jury's verdict."  Giglio v. United States, 405 U.S. 150 (1972); Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004). See (Pet. at 44 n.30; Am. Pet. at 4.)  Outside of Brown's trial testimony that Petitioner was never handcuffed in the interrogation room, Petitioner has not identified any inconsistencies in his testimony, let alone "perjured" testimony that warrants reversal of his conviction.  As to Ansel and Alexander, there is no reasonable likelihood that their inconsistent testimony as to the

### C.     Claim III – Was Petitioner's Confession Admitted Against him in Violation of the Fifth, Sixth and Fourteenth Amendments?

Petitioner next claims that his confession was improperly admitted at trial in violation of the Fifth, Sixth and Fourteenth Amendments.  Specifically, he contends that the waiver of his <u>Miranda</u> rights and his ultimate confession was the product of physical and psychological coercion by the police in violation of the Fourteenth Amendment Due Process Clause and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  (Pet. at 49-50.)

The Fourteenth Amendment Due Process Clause ensures that "only voluntary confessions are admitted at the trial of guilt or innocence."  <u>Lego v. Twomey</u>, 404 U.S. 477, 479 (1972) (citing <u>Jackson v. Denno</u>, 378 U.S. 368 (1964)).  A voluntary confession is the "product of an essentially free and unconstrained choice by the maker."  <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961). Where, considering the totality of the circumstances, a suspect's will was "overborne" during interrogation,  his or her confession may not be admitted into evidence without violating due process. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973).   In undertaking this analysis, courts should consider "the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health." <u>Withrow v. Williams</u>, 507 U.S. 680, 693 (1993).  Although it is generally the government's burden to prove a confession is voluntary, on collateral review, the petitioner must "prove involuntariness by a preponderance of the evidence."  <u>Miller v. Fenton</u>, 796 F.2d 598, 604 (3d Cir. 1986).

The rights articulated by the United States Supreme Court in <u>Miranda v. Arizona</u> provide a related, but distinct, protection, which can preclude the admission of a defendant's confession at his

<hr>

manner in which police entered Petitioner's home could have affected the jury's verdict, for the reasons stated above.

or her trial.  See Brown v. Cuyler, 669 F.2d 155, 159 (3d Cir. 1982) ("Although there is a conceptual overlap between a claim that, under the totality of circumstances, a confession was voluntarily made, and a claim that a confession was the product of an invalid waiver of the privilege against self-incrimination, we believe the issues are distinct.").  In Miranda, the Court held that the Fifth Amendment privilege against self-incrimination prohibits the admission of statements given by a suspect during "custodial interrogation," without a prior warning regarding his or her right to remain silent and right to an attorney.  See 384 U.S. 436, 444 (1966).

After Miranda warnings are provided, a suspect may "knowingly and intelligently" waive their rights and provide a statement that may be admitted at trial.  Id. at 479. The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).  Indeed, only if the totality of circumstances "reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." Id.  The standard of whether a Miranda waiver is "voluntary," therefore, is essentially the same as the Fourteenth Amendment standard for determining whether a confession is voluntary. Cf. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986); Schneckloth, 412 U.S. at 223-27.

We will address Petitioner's allegations of physical and psychological coercion in light of these standards.

### 1.    Petitioner's Allegations of Physical Coercion

Petitioner first asserts that he was subjected to "physical coercion which resulted in his confessing to the offenses." (Pet. at 49, 52.)  Following the suppression hearing, the trial court found

that "no physical force was used by the police to obtain [Petitioner's] statement." (Resp., Ex. A at 24.) Under 28 U.S.C. § 2254(e)(1), the trial court's factual determination, which was never rejected by a state appellate court, "must be presumed to be correct," unless the Petitioner can rebut the "presumption of correctness by clear and convincing evidence."[52]  For the reasons stated in our denial of Petitioner's claim of ineffectiveness at the suppression hearing, we find that he has failed to present "clear and convincing" evidence to rebut the state court's factual finding.  Thus, we must presume that Petitioner was not subject to physical force in connection with his interrogation.  Cf. Miller v. Fenton, 474 U.S. 104, 112 (1985) (directing that a state court's factual findings in support of a voluntariness determination, such as whether the police engaged in improper coercive tactics, are subject to a presumption of correctness under an earlier version of federal habeas statute).

### 2.      Petitioner's Allegations of Psychological Coercion

Petitioner's allegations of psychological coercion are based upon Detective Brown's testimony at the suppression hearing regarding the manner in which he questioned Petitioner, following his arrest in the early morning hours of February 7, 1984.   Petitioner was taken into custody at approximately 1:20 a.m., and placed in an interrogation room at approximately 1:55 a.m. Brown testified that he first visited with Petitioner in the interrogation room at 2:30 a.m., where one of his hands was handcuffed to a chair.   Brown testified that before providing Miranda warnings, he gave Petitioner a copy of the arrest warrant and the affidavit of probable cause for his arrest and

---

[52] See Nara v. Frank, 488 F.3d 187, 200-01 (3d Cir. 2007) (determining that the "presumption of correctness" applies, regardless of whether there has been an "adjudication on the merits" under § 2254(d)); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996) (acknowledging that § 2254 "draws no distinction between state and appellate court factual determinations," but where there "are conflicting determinations," the reviewing court should "accept the version reached by the higher court").

told him:

> [W]hat I knew about him and his activities.  That . . . when he came to my attention that it [sic] learned that he was possibly involved in a crime -- I didn't say crime, I said robbery in South Philly.[53]  I also knew that he and another person had been arrested together for a particular crime in Germantown.[54]  I also displayed a camera, Minolta 35 millimeter camera which I placed on the table, a burgundy camera bag and the 35 millimeter data back which I recovered from his room.  They were placed on the table and I explained to him that I can prove that those items had been taken during the course of Bradley and Ferne Hart's murder.  That was the extent of my conversation at that point.

(N.T., 5/23/85, p. 63.)  Brown also testified that he told Petitioner that he "knew he had threatened Bradley Hart[.]"  Brown explained that, "[i]n essence, . . . I told him I was going to prove he did it and I wasn't even there."  When Brown was asked why he gave this "speech" or "orientation[,]" Brown responded that he wanted to "reduce [Petitioner's] resistance and educate him into how I was conducting an investigation, what I knew about him, his activities."  (N.T., 5/23/83, pp. 56, 61, 111-14); see (Resp't's Evid. Hearing Ex. 3.)

Brown also testified that he told Petitioner that he "had an opportunity to tell of his involvement in these murders and if that girl[, Wilson-Carter, who was also in custody,] wasn't involved, that was part of his obligation to tell me because she was in possession of items taken from the Hart Residence. So I let him think about that."  Brown explained that he "made him aware that things had been recovered from [Wilson-Carter's] bedroom that had been taken during the course

---

[53] This alleged robbery was not at issue at Petitioner's trial.  Brown explained that he told Petitioner that he "knew he had robbed Tracy and Mitchell Pravado[,]" and then "begged them not to press charges[.]  (N.T., 5/23/85, p. 113.)

[54] Later in his testimony, Brown explained that he was referring to a previous burglary, unrelated to the Hart murder, for which Petitioner and Mason were convicted and served jail time.  (N.T., 5/23/85, p. 113.)

of those murders[,]" but did not "recall specifically saying hey, I'm locking her up for murder."

When asked about his motivation for mentioning Wilson-Carter and the items recovered in her

bedroom, Brown acknowledged that he wanted to "make [Petitioner] aware that hey, we got the

stuff.  You know where it came from.  So if you want to say I'm playing on his mind, I'm playing

on his mind, but to say hey, you better tell me something or I'm locking her up, no.  That never came

out of my mouth."  Brown also acknowledged that he left the "implication with [Petitioner]"  that

"absence of an explanation for [Wilson-Carter's] possession of these items she stood a chance of

being in trouble."  (N.T., 5/23/83, pp. 107-109, 119.)

Brown testified that, following these initial communications, he read Petitioner his <u>Miranda</u>

rights from a "standard police interrogation card."  (N.T., 5/23/83, p. 64.)  Brown asserted that

Petitioner then answered questions regarding his rights, which were recorded.   Brown read

Petitioner's responses into the record at the suppression hearing, which reflected that Petitioner

understood his <u>Miranda</u> rights, but chose not to invoke his right to remain silent and right to an

attorney, saying "Naw, its over now anyway" and "Naw, you got me[.]"   Petitioner also

acknowledged that he was willing to answer questions on his own free will, without any threats or

promises having been made to him.  (N.T., 6/23/83, pp. 64-68.)  The "Chronology of Interrogation"

reflects that Petitioner was advised of his <u>Miranda</u> rights at 3:00 a.m., and he initialed and signed the

forms indicating that he was apprised of his rights and would answer questions regarding the Hart

murders between 3:10 and 3:30 a.m.  (Resp't's Evid. Hearing Ex. 3.)

Brown testified that he then took a statement from Petitioner, which was transcribed by his

partner, Detective Frank Miller.  Brown explained that he elicited the statement from Petitioner

between 3:30 a.m. and 5:20 a.m., with the only interruption being when Petitioner was asked to

identify a document in connection with his statement.  Petitioner signed each page of the transcribed statement after it was completed.  (N.T., 5/23/83, pp. 68-70, 82, 120-22.)  Based upon this testimony, Petitioner asserts that Detective Brown "overbore his will" by using an "educational speech" designed to illicit a waiver of his Miranda rights prior to administering Miranda warnings.

In support of this claim, Petitioner relies upon Brewer v. Williams, 430 U.S. 387 (1977), where the defendant was suspected of abducting a ten-year-old girl in Des Moines, Iowa, after he escaped from a mental institution.  The defendant's abandoned car was found 160 miles away in Davenport, Iowa, where he turned himself into authorities.  The defendant was arraigned and given Miranda warnings.  Over the phone, defendant's attorney explained that police officers were going to pick him up in Davenport, but they were not going to interrogate him and that he should remain silent on the trip back to Des Moines.  Another attorney, who represented defendant during his arraignment, reiterated these instructions to the defendant and to the detective and officer from the Des Moines police department, before they left Davenport.  Id. at 390-91.

During the drive to Des Moines, the detective delivered the following speech to the defendant:

> I want to give you something to think about while we're traveling down the road.  . . . Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas (E)ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.

Id. at 392-93.  In response to a question from the defendant, the detective responded that he "knew" they would be passing the body, but that "I do not want you to answer me.  I don't want to discuss it any further.  Just think about it as we're riding down the road."  Id. at 393.  Shortly thereafter, the defendant lead police to the girl's body.  Id.

Over the objection of his attorney, the defendant's statements and the resulting evidence were admitted at trial.  The United States Supreme Court affirmed the Sixth Circuit's grant of federal habeas relief, holding that "judicial proceedings" had been initiated against defendant before his ride with police, and that he therefore had a "right to legal representation when the government interrogate[d] him" under the Sixth and Fourteenth Amendments.  The Court further concluded that the detective's "Christian burial speech" was "deliberately and designedly set out to elicit information from [defendant] just as surely as and perhaps more effectively than if he had formally interrogated him."  Therefore, because defendant was effectively interrogated absent his counsel's presence or a waiver of his rights, the evidence elicited could not be used against him at trial.  Id. at 398-401, 405.

Petitioner contends that Brown's "educational speech," like the "Christian burial speech," improperly "encumbered his will to make a voluntary waiver of his right to remain silent[]" under the Fifth Amendment.  Although Petitioner acknowledges that, unlike the defendant in Brewer, his Sixth Amendment right to counsel was not implicated at the time of his confession, he asserts that the "coercive impact" of Brown's speech and the "Christian burial speech" was the same – to elicit a waiver of a constitutional right.  (Pet. at 52-53.)

The Brewer Court's primary focus was whether the "Christian burial speech" amounted to "interrogation," absent a waiver of his Sixth Amendment rights, not whether it was psychologically

77

"coercive" or rendered the waiver of his constitutional rights involuntary.[55]   Indeed, the Court

specifically determined that there was no basis to conclude that the defendant ever waived his Sixth

Amendment rights, and therefore was not presented with the question of whether defendant's waiver

was rendered involuntary by the "Christian burial speech."  Brewer, 430 U.S. at 404-05.  Brewer,

therefore, dealt with different constitutional questions than those at issue here.  This difference is

material.

Miranda does not require police to obtain a waiver before beginning an interrogation.  See

Berghuis v. Thompkins, 130 S.Ct. 2250, 2264 (2010).  Therefore, even if Brown's "educational

speech" constituted "interrogation" under Miranda, it was not constitutionally improper.  Indeed,

Brown delivered his "educational speech," apprised Petitioner of his Miranda rights and then asked

him if he wished to invoke these rights.  Petitioner then indicated that he wished to waive his right

to remain silent and provided a statement.  This is entirely different from Brewer, where the

defendant expressly and implicitly invoked his right to counsel, but was nevertheless interrogated

by a detective who did not "preface [his] efforts by telling [defendant] that he had the right to the

presence of a lawyer, and made no effort at all to ascertain whether [he] wished to relinquish that

---

[55] We note that "interrogation" under Miranda is "express questioning [and] . . . any
words or actions on the part of the police (other than those normally attendant to arrest and
custody) that the police should know are reasonably likely to elicit an incriminating response."
Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  This is somewhat different than the
standard described by the Brewer Court, which defined interrogation in the Sixth Amendment
context as "deliberately . . . elicit[ing]" an incriminating statement from the defendant.  Brewer,
430 U.S. at 400; see Innis 446 U.S. at 300 n.4 ("The definitions of 'interrogation' under the Fifth
and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment
context, are not necessarily interchangeable, since the polices underlying the two constitutional
protections are quite distinct.").

right." 430 U.S. at 404-05.  Brewer, therefore, does not provide Petitioner a basis for relief.[56]

Petitioner also contends that Brown "overbore his will" when he "threatened" that his girlfriend, Wilson-Carter, could be charged as an accomplice in the murders.  (Pet. at 49-53.)  In support of this argument, Petitioner relies upon United States v. Johnson, 351 F.3d 254, 262 (6th Cir. 2003), which provides that baseless threats to prosecute a defendant's family members may be coercive and render a confession involuntary.  (Pet'r's Post-Hearing Br. at 26-27.)   The Johnson Court held, however, that the police's threat to arrest the defendant's "sister-in law" if he did not confess to drug possession, was not coercive because "there existed a sufficient factual basis for the police officers to have probable cause to arrest [his sister-in-law.]"  Id. at 257, 262.

Petitioner's reliance on Johnson is of no assistance for two reasons.   First, Brown's statements had an undisputed factual basis, in that stolen property taken from the Harts' home was found in Wilson-Carter's home.  Thus, sufficient probable cause for Wilson-Carter's arrest existed.  Second, Petitioner's argument is based upon a mis-characterization of Brown's testimony.  Brown acknowledged that he told Petitioner he "had an opportunity to tell of his involvement in these murders and if . . . [Wilson-Carter] wasn't involved, that was part of his obligation to tell me because she was in possession of items taken from the Hart Residence."  While Brown admitted to implying that she "stood a chance of being in trouble," he did not testify that he threatened Petitioner that

---

[56] We note that even if the "Christian burial speech" was somehow relevant to our evaluation of the alleged "coercive" nature of Brown's "educational speech[,]" we would still reject Petitioner's claim.  The defendant in Brewer had escaped from a mental institution and was "deeply religious[,]" and the police appeared to "capitalize on [his] unusual susceptibility to a religious appeal."  Flamer v. State of Del., 68 F.3d 710, 720 (3d Cir. 1995).  Here, there is nothing to suggest that Petitioner has a susceptibility or history of mental illness, which was taken advantage of by Brown in his "educational speech."

Wilson-Carter would be charged as an accomplice in the Hart murders if he did not confess.[57]

Petitioner does not make any other specific allegation in support of his claim that his confession was psychologically coerced, but generally asserts that the totality of circumstances combined to overbear his will, such that his confession and <u>Miranda</u> waiver were involuntary. We disagree, and for the following reasons, conclude that the cumulative impact of the alleged "coercive" tactics employed during his interrogation do not support a finding that Petitioner's confession or <u>Miranda</u> waiver was involuntary.

On February 7, 1984, the date of the interrogation, Petitioner was five days shy of his 21st birthday. He had attended "the 12th grade," was able to read and write and was not under the influence of any narcotic drug or alcoholic substance. He also declined treatment at any medical facility for any illnesses or ailments. (N.T., 5/23/84, pp. 81-82.) Petitioner's statement was taken during the early morning hours and the record reflects that he was placed in the interrogation room at approximately 1:55 a.m. and was permitted to "Rest[] alone" from 2:15 a.m. until 2:30 a.m., when Brown "educated" him as to the investigation. His statement was completed and signed by approximately 5:40 a.m. Brown testified that Petitioner did not make any requests while his statement was being taken. Following his interrogation and arraignment, Petitioner was taken before medical personnel with a "small laceration" on his scalp, without "gaping" or "bleeding," and "abrasions" on the right side of his neck. He complained of a "headache," and was prescribed Darvocet, a narcotic pain medication. (Resp't's Post-Hearing Exs. 3, 4); (N.T., 5/23/83, pp. 56, 61,

---

[57] <u>See</u> (N.T., 5/23/84, p. 108) (reflecting Brown's testimony that he wanted to "make [Petitioner] aware that hey, we got the stuff. You know where it came from. So if you want to say I'm playing on his mind, I'm playing on his mind, but to say hey, you better tell me something or I'm locking her up, no. That never came out of my mouth."); (N.T., 5/23/83, pp. 107-109, 119.)

107-09, 111-14, 120.)

Considering these factors and the surrounding circumstances, we cannot conclude that Brown's "educational speech" or his references to Wilson-Carter "overborne" Petitioner's will, such that his statement was involuntary and admitted against him in violation of due process.  See Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973).  In addition, the record reflects that Petitioner comprehended the nature of his Miranda rights and the consequences of the decision to abandon them.  See Moran v. Burbine, 475 U.S. 412, 421 (1986).  We, therefore, conclude that the record reflects that Petitioner's waiver of his Miranda rights was the product of a free and deliberate choice, rather than intimidation, coercion, or deception.

### D.     Claim XVIII – Was Trial Counsel Ineffective for Failing to Impeach the Testimony of Robert Hart?

Bradley Hart's brother, Robert Hart, who had worked with Petitioner in construction between July and October 1983, testified at the guilt phase of Petitioner's trial.  Robert Hart recalled that, starting in "the middle" of August and "into the beginning of September[,]" Petitioner "said that Bradley [Hart] wasn't paying [Mr. Owens, their employer,] so that Mr. Owens couldn't pay us, and that if Bradley didn't pay him he was going to get him."  (N.T., 6/18/85, pp. 75-78.)  Petitioner claims that his trial counsel was ineffective for failing to impeach Hart's testimony, using "his police statement made on February 2, 1984[.]"  This statement is not attached to the petition or the amendments thereto, but according to Petitioner, it reflects that "when [Hart] was asked if he had any 'idea' about how the offense occurred, he did not mention the alleged threat that he testified to at trial."  (Am. Pet. at 6-7); see (Resp. to Am. Pet. at 8) (reflecting that Respondent accepts Petitioner's description of the police statement.)

To the extent that the "police statement" was a written summary of Hart's account, under Pennsylvania law, it could not be used to "impeach" Hart.[58]   Moreover, "omissions in prior statements, even when the statements are the verbatim words of the [witness], do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness's testimony to be admissible as prior inconsistent statements."  Commonwealth v. Bailey, 469 A.2d 604, 611 (Pa. Super. 1983).  Even if Petitioner's trial counsel were permitted to "impeach" Hart with his prior statement, Petitioner cannot sustain a Strickland claim.  Indeed, it was reasonable for trial counsel to avoid highlighting Petitioner's threat on cross examination, particularly because the impeachment value of the police statement would be minimal, at best.  In any event, Petitioner has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different, had counsel pursued this strategy.[59]

**E.    Claim VI – Did Admission of the Confession of Petitioner's Co-defendant Violate the Sixth Amendment's Confrontation Clause?**

Petitioner claims that his Sixth Amendment right to "confront witnesses against him" was violated when the confession of his co-defendant, Eric Mason, was introduced at trial.[60]   This confession was redacted so that any reference to his name was replaced with the term "the other

---

[58] See Commonwealth v. Simmons, 662 A.2d 621, 638 (Pa. 1995) ("A written report which is only a summary of the words of the victim and not verbatim notes from the victim cannot be used to impeach the witness on cross-examination since it would be unfair to allow a witness to be impeached on a police officer's interpretation of what was said rather than the witnesses' verbatim words.").

[59] Petitioner's derivative claim that the "prosecutor also violated due process of law when he failed to correct" the alleged discrepancy between Hart's testimony and his police statement is denied for the same reason.  (Am. Pet. at 7.)

[60] The Sixth Amendment Confrontation Clause applies to the states through the Fourteenth Amendment's Due Process Clause.  See Dutton v. Evans, 400 U.S. 74, 80 (1970).

guy," and the trial judge instructed the jury to consider the confession only as it related to Mason. Petitioner claims that the admission of Mason's confession was extremely prejudicial and warrants reversal of his convictions.  He presented this claim to the Pennsylvania Supreme Court, which denied it on the merits.  Before addressing the Pennsylvania Supreme Court's decision, we review the applicable federal law implicated by Petitioner's claim.

The Sixth Amendment secures the right of a criminal defendant to confront and cross examine "the witnesses against him[.]"  See Pointer v. Texas, 380 U.S. 400, 404 (1965).  Generally, this protection only applies when a witness's statement "is admitted as part of the body of evidence that the jury may consider in assessing [the defendant's] guilt."  Cruz v. New York, 481 U.S. 186, 190 (1987).  Thus, a trial court's instruction directing the jury to disregard the witness's statement in assessing the defendant's guilt is generally sufficient to avoid a constitutional problem under the Sixth Amendment.  Id.

In Bruton v. United States, the United States Supreme Court articulated a narrow exception to this rule.  391 U.S. 123, 126 (1968).  The Court held that a defendant's Sixth Amendment rights are violated when the incriminating confession of a non-testifying co-defendant is introduced at their joint trial, regardless of whether the trial judge provides a limiting instruction.  Id. at 126, 135-36. The Court determined that the risk that the jury would disregard a limiting instruction "cannot be ignored" where "the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial."  Id. at 135-36.

In Richardson v. Marsh, the Court clarified its holding in Bruton and determined that the concerns addressed in Bruton are alleviated where a co-defendant's confession is "redacted to

83

eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. 200, 211 (1987). The Court concluded that, if such precautions are taken, an appropriate limiting instruction is sufficient to protect the defendant's rights under the Sixth Amendment. Id.

A determination that a defendant's rights under Bruton were violated does not end the analysis. A Bruton violation will not constitute reversible error, if the reviewing court determines that the admission of a co-defendant's confession was "harmless beyond a reasonable doubt." Harrington v. California, 395 U.S. 250, 254-55 (1969). Indeed, "unless there is a reasonable probability that the improperly admitted evidence contributed to the conviction, reversal is not required." Schneble v. Florida, 405 U.S. 427, 432 (1972) (citing Chapman v. California, 386 U.S. 18, 24 (1967)). In Schneble, the United States Supreme Court applied this standard and determined that "in some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." 405 U.S. 427, 430 (1972). The burden to prove that the error is harmless rests with the state. Chapman, 386 U.S. at 24.

Here, the Pennsylvania Supreme Court found that although the confession of co-defendant, Mason, was redacted to remove Petitioner's name, "under the circumstances of the case . . . Eric Mason's redacted confession did imply that his 'other guy' accomplice was [Petitioner]." Wharton I, 607 A.2d 710, 718 (Pa. 1992). The Court, therefore, "assum[ed]" that the admission of Mason's confession at Petitioner's trial violated the Bruton rule. However, the Court held that "any such error was harmless and did not prejudice [Petitioner]." Wharton I, 607 A.2d at 718. Specifically, the Court concluded that the "evidence overwhelmingly implicated [Petitioner] as the perpetrator of the

84

murder-robbery of Ferne and Bradley Hart" and that this evidence was "of such overwhelming quality that [any violation of the Bruton rule] pales in comparison."[61]  Id.  The Court also pointed to the trial court's limiting instruction, which "cautioned the jury in the strongest possible terms that the statement, the alleged statement, of Eric Mason may only be considered as evidence against Eric Mason and no one else."   Id. (internal quotation marks omitted).

Petitioner first asserts that the Pennsylvania Supreme Court's harmless error analysis was "contrary to" clearly established federal law, pursuant to 28 U.S.C. § 2254(d). (Pet'r's Reply at 76-77, 80-83).  Petitioner contends that the Court improperly focused on whether the "other" evidence of his guilt was "overwhelming," rather than on whether the "evidence was so overwhelming that . . . the violation of Bruton was harmless beyond a reasonable doubt." (Pet'r's Reply at 81) (quoting Harrington v. California, 395 U.S. 250, 254 (1969).  Essentially, Petitioner claims that the Court applied a sufficiency of evidence review, rather than considering whether, in light of the evidence of Petitioner's guilt, the prejudicial effect of the Bruton error was harmless.  Petitioner also asserts that the Supreme Court improperly considered the strength of the trial court's limiting instruction in evaluating the harmfulness of the alleged Bruton error.  (Pet'r's Reply at 82.)

Based on our careful review of the record, we conclude that the Pennsylvania Supreme Court did not apply a harmless error standard that was "contrary to" clearly established federal law. Rather, the Court applied the principle set out in Schneble, which directs that, in engaging in

---

[61] Petitioner contends that the Supreme Court determined that there was a Bruton violation, and in doing so, reasonably applied the appropriate federal standard.  Respondent asserts that the Court merely assumed Bruton error, but to the extent that it found such an error, its decision was contrary to and an unreasonable application of federal law.  (Resp. at 32-34; Pet'r's Reply at 78-80.)   Both parties agree, however, that the Court's decision ultimately rested upon its harmless error analysis.  We, therefore, will consider whether the Court's harmless error determination satisfied the requirements of § 2254(d).

harmless error review, a court may consider the properly admitted evidence of a defendant's guilt in relation to the "prejudicial effect of the codefendant's admission."  405 U.S. at 430.  As in Schneble, the Pennsylvania Supreme Court concluded that the evidence of Petitioner's guilt was so "overwhelming" and the admission of Mason's confession so "insignificant" in comparison, that any Bruton error was harmless.  Wharton I, 607 A.2d at 718.

The fact that the Pennsylvania Supreme Court also considered the trial court's "strong[]" limiting instruction as one factor in its evaluation of the harmfulness of the Bruton error does not render its decision contrary to clearly established federal law.  Petitioner urges that this aspect of the Court's decision was "flawed" and a "quintessential example of a misapplication of United States Supreme Court precedent."  Petitioner relies entirely upon a passage from Bruton, which states "[w]e hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [the co-defendant's] confession violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."  (Pet'r's Reply at 82) (emphasis omitted).

Petitioner misconstrues the holding of Bruton.  Although the Bruton Court held that the Sixth Amendment is violated even where a limiting instruction is provided, it did not hold that consideration of whether a Sixth Amendment violation is harmless forbids any mention or evaluation of the trial court's limiting instruction.  Indeed, we are unable to locate any subsequent case that suggests such a practice is contrary to a holding of the United States Supreme Court.

Because the Pennsylvania Supreme Court's analysis was not "contrary to" the Bruton standard, Petitioner's claim may not give rise to federal habeas relief under § 2254(d)(1), unless the Pennsylvania Supreme Court's harmless error analysis represents an "unreasonable

86

application" of clearly established federal law.  Petitioner contends that the Court's analysis was unreasonable under this standard, because the Court: (1) unreasonably determined that the evidence "overwhelmingly" implicated Petitioner in the murders of Bradley and Ferne Hart; and (2) failed to appreciate the prejudice that resulted from the admission of Mason's confession.  See (Pet. at 86-93; Pet'r's Reply at 81-83.)

In assessing the reasonableness of the Pennsylvania Supreme Court's opinion, we first review the Court's finding that the properly admitted evidence at Petitioner's trial "overwhelmingly" implicated him in the murders of Ferne and Bradley Hart.  Wharton I, 607 A.2d at 718.  As described below, the evidence presented at trial reflected that Petitioner engaged in a campaign of terror against Bradley Hart and his family, whom he first came into contact with while performing a construction job on their home in June 1983.  The testimony of Petitioner's employer and his co-workers reflect that Bradley Hart was dissatisfied with the work performed on his home, and complained "[e]very other day[,]" throughout the job to Petitioner and his employer.  Petitioner told others that Bradley Hart was "too picky" and was "always on his back[,]" and was eventually removed from the job because Bradley "was not pleased with his attitude."  (N.T., 6/17/85, pp. 74, 76-77; N.T., 6/18/85, pp. 9-10, 77; N.T., 12/15/92, p. 12.)

Petitioner subsequently committed two burglaries of the Hart home.  Specifically, Petitioner confessed that he participated in burglaries of the Hart home on August 14, 1983 and August 22, 1983.[62]  (N.T., 6/25/85, pp. 135-40.)  Property stolen during each of the burglaries was later found

---

[62]  Petitioner confessed to these burglaries on May 1,1984, approximately three months after he was arrested on first degree murder charges, in a statement recorded by Detective Thomas Perks which is not subject to challenge in this matter.  (N.T., 6/25/85, pp. 126, 128, 135-40.)

in Petitioner's home after the murders.  (N.T., 6/27/85, pp. 66-74.)  During the August 22, 1983 burglary, the Harts' furniture was "slashed," a "knife was sticking out of the sofa," paint, food and bleach were thrown on the furniture and walls, and "[s]omeone . . . defecated on the floor" of the bathroom.  (N.T., 6/13/85, pp. 104-05, 115-16; N.T., 6/19/85, pp. 40-41.)  Two family pictures sitting upright on the mantel were covered with yellow paint, such that the "faces" of each family member were covered.  (N.T., 6/13/85, pp. 109-11.)  A note was also left in the house, which said "Thanks Bradley G.I. Hart, You Have Got to Go Better Than This To Keep Us Out. Clean Up Good, Didn't We. Thank You, Ha Ha Ha."  (N.T., 6/19/85, pp. 41-42.)

On September 4 or 5, 1983, a burglary occurred at the Germantown Christian Assembly Church, where Bradley Hart was a deacon.  After the burglary, one of the Church's elders discovered that a picture of Bradley Hart, which appeared to be "burned," was pinned to the wall with a letter opener.  (N.T., 6/13/85, pp. 189-92.)  The trial evidence reflected that Petitioner also participated in this burglary.  Larue Owens, a participant in the burglaries of the Hart home and a co-worker of Petitioner, testified that Petitioner told him he was involved in the burglary.  (N.T., 6/18/85, p. 24.)  Further testimony established that the keyboard from the computer that was stolen from the Church was recovered in Petitioner's home.  See (N.T., 6/22/85, p. 73.)

On September 7, 1983, Petitioner began working on a different construction job at a radio station affiliated with the Germantown Christian Assembly Church, where Bradley Hart was the business manager and in charge of finances.  The project lasted until October 31, 1983.  Petitioner's employer, Norman Owens, testified that the Church did not pay the entire balance owed on the radio station project, which prevented him from paying Petitioner his entire salary.  Owens testified that he told Petitioner that he would pay him once Bradley Hart paid him for the project, and asserted that

he spoke to Petitioner about the money approximately "every other day."  Owens further testified

that, on "several occasions[,]"  Petitioner went with him to the radio station to meet with Bradley.

As of January 11, 1984, Owens claimed that he still owed Petitioner $536 and one of Petitioner's

co-workers $371.  (N.T., 6/17/85, pp. 74, 79-80, 82-90; N.T., 6/19/85, p. 36.)

    At trial, Samuel Galetar, a co-worker of Petitioner and the father-in-law of Bradley Hart's

brother, Robert Hart, testified that Petitioner told him that Owens owed him money for the radio

station project and that he was going to get the money from Bradley Hart.  (N.T., 6/17/85, pp. 117-

18, 128.)  Robert Hart, who also worked with Petitioner, testified that Petitioner told him that

"Bradley was not paying Mr. Owens, so that Mr. Owens couldn't pay us, and that if Bradley didn't

pay him he was going to get him."  (N.T., 6/18/85, pp. 75, 77) (reflecting that Hart testified that

Petitioner repeated this threat in conversations that "started about the middle of October -- August

and they went into the beginning of September" of 1983.)

    On or about January 30, 1984, Bradley and Ferne Hart were murdered in their home.  Their

seven-month-old daughter, Lisa Hart, was found alive in the house on February 2, 1984, although

the heat had been lowered to "51 or 52 degrees."  Detective Frank Miller, who was assigned to

investigate the murders, testified that the body of Ferne Hart was discovered in an upstairs bathroom.

He testified that her hands were "tied behind her back, feet tied together, her [outer] pants . . . pulled

down around her ankles, . . . [and her] face was submerged in approximately five inches of water."

Detective Miller testified that "duct tape" was placed over her face and that a necktie was around her

neck and another was used to tie her feet.  (N.T., 6/19/85, pp. 44-50; N.T., 6/20/85, pp. 61-62, 71-74,

76-79.)

    Detective Miller also testified that Bradley Hart's body was discovered in the basement of

the house.  He testified that Bradley Hart was "laying on the floor face down, his face taped with the same type silver duct tape, his hands were behind his back, tied tightly, [and] his feet were tied together[.]" Detective Miller explained that Bradley Hart's face was "submerged in a pan of water" and that "electrical wire" was wrapped around his neck.  (N.T., 6/20/85, pp. 84-88.)

On February 7, 1984, Petitioner signed a written confession admitting that he was involved in the murders of the Harts.  The details of this confession closely mirrored the crime scene and other surrounding evidence.  In this statement, Petitioner admitted to the following: On January 30, 1984, he forcibly entered the Hart home by pulling a knife on Bradley Hart.  He then "let [co-defendant, Eric Mason] in."  After Bradley Hart "wrote [him] out a check" for money he was owed, he and Mason "tied [Ferne and Bradley Hart] up and made them sit back down on the couch."  Petitioner stated that he used neckties to bind Ferne's hands and feet.  After he and Mason "sat around, messing around, looking at TV" for a period of time, they "put Bradley in the basement," and took Ferne and "the baby" to an upstairs bedroom.  They then put "stuff [they had taken from the house] into Brad's car[,]" including a "camera and bag," "silverware from the cabinet in the dining room" and the Harts' "wallets."  (N.T., 6/24/85, pp. 35-39.)

Upon returning to the house, Petitioner stated that they "went down to the basement and put tape around [Bradley's] face and neck[.]"  (N.T., 6/24/85, pp. 35-39.)  Petitioner claimed that he then went upstairs and "dragged" Ferne from the bedroom to the bathroom, causing her pants to slide down.  He then "taped her face from her eyebrows down to her chin" with duct tape, and after trying to strangle her with a necktie, "held her head" in a bathtub of water "until the bubbles stopped after a while."  Thereafter, Petitioner and Mason left the house in Bradley Hart's car.  He stated that Lisa Hart was "[a]sleep on the bed" when they left.   Lastly, Petitioner asserted that, while in the car,

Mason told him that "he got some water from the kitchen and put it in a bucket and put Brad's head in it."  (N.T., 6/24/85, pp. 38-48.)

The Commonwealth also offered physical evidence that corroborated Petitioner's confession and connected him to the Hart home at the time of the murders.  Detective Edward Hughes, a homicide detective assigned to the case, testified that property was seized from Petitioner's home on February 7, 1984, including: (1) a "checkbook" in the name of Bradley Hart, which included a check "made payable to Bob Wharton in the amount of $935 dated 1-30-84 and signed by Bradley G.I. Hart;" (2) a "ladies wallet . . . containing credit cards and other pieces of identification and photographs of Bradley and Ferne Hart;" and (3) four boxes of "silverware," which were identified as the silverware stored in the "china cabinet" in the Harts' dining room and which were seen in the Hart home after it was burglarized in August 1983.  (N.T., 6/19/85, pp. 7-8; N.T., 6/21/85, pp. 48, 61-62.)

In addition, a camera and camera case were seized from the home of Petitioner's girlfriend, Tywana Wilson-Carter.  The evidence presented at trial established that the camera and case belonged to the Harts and were in their possession as of December 1983.  Further, Wilson-Carter's mother, Nancy Moye, testified that Petitioner gave her daughter the camera and camera case on February 2, 1984.  In Petitioner's confession to police, he acknowledged that "got the camera and bag" from the Hart home at the time of the murders and then "lent" them "to [his] woman 'cause she was going to North Carolina."  (N.T., 6/19/85, pp. 19-20, 28-30; N.T., 6/20/85, pp. 19-20; N.T., 6/24/85, p. 40; N.T., 6/27/85, pp. 65-67.)

Lastly, the Commonwealth offered the testimony of Thomas Nixon.  Nixon testified that he was called by Mason a few weeks prior to the murders to help him and Petitioner burglarize the Hart

91

home.  Nixon testified that he attempted to help Petitioner and Eric Mason gain access into the Hart home in January 1984, but decided not to go forward with the burglary.[63]  He claimed that he heard of the Hart murders approximately two weeks later, when he read about it in the newspaper.  Nixon asserted that he called Petitioner to ask if he and Mason killed the Harts, and Petitioner responded that they "didn't have anything to do with it."  Nixon testified, however, that when he went on to tell Petitioner "that if [you] were going to kill the mother and the father, [you] should have killed the baby also," Petitioner responded "We couldn't do it."  (N.T., 6/26/85, pp. 99-100, 107-12, 128.)

In light of these facts, the Pennsylvania Supreme Court's conclusion that the "evidence overwhelmingly implicated [Petitioner] as the perpetrator of the murder-robbery of Ferne and Bradley Hart" is clearly supported by the record and entirely reasonable.  Wharton I, 607 A.2d at 718.  "[O]verwhelming" evidence of a defendant's guilt, however, does not, in and of itself, render a Bruton error harmless.  The "prejudicial effect of the codefendant's admission must be so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."  Schneble v. Florida, 405 U.S. 427, 430 (1972).  On this point, the Pennsylvania Supreme Court determined that any Bruton error that resulted from admission of the Mason's redacted confession  "pales in comparison" to the evidence of Petitioner's guilt, and was "harmless and did not prejudice" Petitioner.  Wharton I, 607 A.2d at 718-19.

---

[63] Specifically, Nixon testified that he attempted to help Petitioner and Eric Mason gain access into the Hart home in January 1984, by knocking on their door and asking if he could use the phone.  Nixon testified that he entered the home and was planning on "pull[ing a] gun" on Bradley Hart, but decided against it because their was another man in the house.  He further asserted that he went to the door a second time, but apparently did not get in because he showed Bradley Hart the gun he was carrying through the window in an attempt to alert him that something was wrong.  He did not reveal this "detail" regarding his second visit to the Harts' door during his interview with police.  (N.T., 6/26/85, pp. 121, 149-50, 159.)

Petitioner challenges the reasonableness of this aspect of the Court's opinion, asserting that the Court failed to appreciate how both the similarities and the differences between his confession and Mason's confession prejudiced him at trial. Petitioner initially contends that Mason's confession undermined Petitioner's primary defense – that his own confession was inaccurate and involuntary. Specifically, he contends that the admission of Mason's confession into evidence corroborated his own confession "on many facts," thereby undermining any argument that his confession was "false and coerced." (Pet. at 89-90.) For instance, similar to Petitioner's statement, Mason's statement reflected that: (1) Petitioner entered the Hart house on the night of the murders shortly before Mason entered; (2) Bradley was placed in the "cellar" and Ferne was placed "upstairs;" (4) Petitioner and Mason "sat around and just watched TV" at some point during the night; (5) Mason took Lisa Hart's "crib apart;" (6) Mason took a "long black coat" from the house and Petitioner took a "camera;" and (7) Petitioner personally killed Ferne Hart. The confessions, however, differed regarding who killed Bradley Hart—each implicated the other as the killer. Compare (N.T., 6/24/85, pp. 35-48) (Petitioner's confession) with (N.T., 6/26/85, pp. 62-71) (Mason's confession).

Whether the confession of a co-defendant corroborates or "interlocks" with a petitioner's confession "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless." Cruz v. New York, 481 U.S. 186, 194 (1987). Indeed, the prejudice to a petitioner may turn upon whether the defendant's own confession was admitted into evidence and "recited essentially the same facts" contained in the co-defendant's confession.[64] See Cruz v. New York, 481

---

[64] In Cruz, the United States Supreme Court noted that:

A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects,

U.S. 186, 190-92, 194 (1987) (holding that <u>Bruton</u> bars admission of a non-testifying co-defendant's confession implicating the defendant, even where the defendant's own confession is admitted into evidence and recites essentially the same facts, but noting that the "interlocking" nature of the confessions may bear upon whether the error is harmless). Even in light of <u>Cruz</u>, we are unable to conclude, however, that the similarities in Petitioner and Mason's confessions render the Pennsylvania Supreme Court's harmless error analysis unreasonable.

<u>Schneble v. Florida</u> is instructive on this issue. There, the United States Supreme Court held that a <u>Bruton</u> error was harmless where the statements of a petitioner and his co-defendant were admitted into evidence at their joint trial on charges that they murdered a woman while on a road trip. 405 U.S. 427, 429-30 (1972). The petitioner initially told police that his co-defendant shot the woman "while he was away from the car taking a walk," but later admitted that he "had strangled the [victim]," before his co-defendant "shot her in the head while she lay dying." <u>Id.</u> at 429. The statement of the co-defendant "undermined petitioner's initial (but later abandoned) claim that he had left [the co-defendant] alone during the time at which the murder occurred," and "placed petitioner in the position in the car from which the victim could more easily be strangled." <u>Id.</u>

The <u>Schneble</u> Court concluded that the admission of the co-defendant's statement was harmless, as the overwhelming independent evidence consisted of petitioner's own confession,

---

the defendant's alleged confession. It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to *avoid* his confession–on grounds that it was not accurately reported, or that it was not really true when made.

<u>Id.</u> at 191-92.

which "recounted the commission of the crime in minute and grisly detail" and identified the "precise location" of the body.  In light of this evidence and the nature of the improperly admitted confession, the Court directed that it "must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the mind of an average jury,' . . . whether [the co-defendant's] admissions were sufficiently prejudicial to petitioner to require reversal." Id. at 432 (quoting Harrington v. California, 395 U.S. 250, 254 (1969)).  Applying this standard, the Court held that "an average jury" would not have "found the State's case significantly less persuasive had the testimony as to [the co-defendant's admission] been excluded." Id.

Here, Petitioner's confession was detailed and consistent with a great deal of the objective evidence.  His confession recounts the night of the murders, including the precise manner in which he killed Ferne Hart and the manner in which Bradley Hart was restrained and placed in the basement.  The crime scene evidence corroborated his account, particularly with respect to the placement of the bodies and the manner in which each victim was restrained.  In addition, items Petitioner admitted taking from the Hart home on the night of the murders were located at his home and the home of his girlfriend.  In light of this evidence, as well as Petitioner's history of crimes against the Harts, the "probable impact . . . on the minds of an average jury" of Mason's redacted statement is insignificant, both as its evaluation of the Commonwealth's case and Petitioner's defense that his confession was "false" or "inaccurate." See Schneble, 405 U.S. at 432 (quoting Harrington, 395 U.S. at 254).

We also reject Petitioner's argument that the similarities between Mason's confession and his own impacted the jury's consideration of whether his confession was coerced by police.  Although the similarities between the confessions suggest that Petitioner's confession might be

factually accurate, it is unclear how the substance of Mason's confession has any bearing upon whether Petitioner's confession was the product of police coercion—that is, whether his statement was the result of force at the hands of the police.

Petitioner also asserts that the Pennsylvania Supreme Court's decision was unreasonable, because it failed to appreciate how the differences between the two confessions caused him prejudice.  Specifically, Petitioner points to the fact that Mason implicated him as the killer of Bradley Hart and stated that it was Petitioner's "idea" to kill the Harts.  See (N.T., 6/26/85, pp. 67-69.)  Consistent with Mason's statement, however, Petitioner indicated that he and Mason murdered the Harts "[c]ause they knew [him] and would turn [him and Mason] in."  Compare (N.T., 6/24/85, p. 45) with (N.T., 6/26/85, pp. 67-69.)  Further, the overwhelming evidence of record reflects that Petitioner was the driving force behind the murders of Bradley and Ferne Hart and a participant in each murder.  See supra, pp. 87-92.  The fact that Mason blamed Petitioner for committing the act of killing Bradley Hart in his redacted confession had little, if any, "probable impact" on the jury's consideration of the Commonwealth's case against Petitioner.

Moreover, Petitioner and Mason were convicted of conspiracy to "commit robbery and/or murder on or about February 2, 1984," which, as reflected in the trial court's instruction, "imposes upon each conspirator, whatever his role in the conspiracy, full responsibility for the natural and probable consequences of acts committed by him and his fellow conspirator or conspirators, if such acts are done in pursuance of the common plan."  (N.T., 7/1/85, pp. 32-36; N.T., 7/2/85, pp. 13-17, 54-55.)  Although the jury heard no evidence implicating Mason as the one who personally killed Ferne Hart, Mason was convicted of first degree murder of both victims.  There is, therefore, no reasonable basis to conclude that the dispute as to who actually killed Bradley Hart had any bearing

96

upon the jury's conviction of Petitioner.  See Schneble, 405 U.S. at 431 ("Judicious application of the harmless-error rule does not require that we indulge in assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face.").

For the foregoing reasons, we conclude that the Pennsylvania Supreme Court's harmless error ruling represented a reasonable application of clearly established federal law, which forecloses federal habeas relief on this claim.

### F.   Claim XIV – Did the Trial Court's Reasonable Doubt Instruction Violate Due Process?

Petitioner claims that the trial court's reasonable doubt instruction "improperly diminished the Commonwealth's burden of proof and infringed upon the presumption of innocence."  (Pet. at 154.)  The trial court instructed the jury that a reasonable doubt "must be an honest doubt, arising out of the evidence itself or lack of evidence, the kind of doubt that would restrain a reasonable man or woman from acting in a matter of importance to himself or herself."  (N.T., 7/1/85, p. 10) (emphasis added).  Petitioner claims that this articulation significantly lessened the Commonwealth's burden from the "constitutionally approved" standard provided in the Pennsylvania Standard Jury Instructions, which provides that "a reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs." PA. STANDARD JURY INSTRUCTIONS: CRIMINAL SECTION, § 7.01(3) (1979) (emphasis added).

The Fourteenth Amendment Due Process Clause protects the "accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Although trial courts must instruct

97

the jury "on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Victor v. Nebraska, 511 U.S. 1, 5 (1994).  The instruction must, "taken as a whole, correctly convey[ ] the concept of reasonable doubt to the jury." Holland v. United States, 345 U.S. 121, 140 (1954).

In Thomas v. Horn, the Third Circuit held that the "restrain from acting" formulation of "a reasonable doubt" satisfies the Fourteenth Amendment's requirement, even though, when compared to the "hesitate from acting" instruction, it "decreases, to some extent," the prosecution's burden of proof.  570 F.3d 105, 118 (3d Cir. 2009).  The Court determined that use of the word "restrain," although not ideal, does not "'suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.'" Id. at 119-20 (quoting Cage v. Louisiana, 498 U.S. 39, 41 (1990). In light of Thomas, the trial court's reasonable doubt instruction in Petitioner's case was not constitutionally deficient and Petitioner, therefore, is not entitled to relief on this basis.[65]

### G.    Claim XV – Did the Prosecution Suppress Exculpatory Evidence at Petitioner's First Penalty Hearing and his Trial in Violation of Due Process?

At Petitioner's first penalty hearing in 1985, the Commonwealth sought to establish four aggravating circumstances, including that Petitioner "knowingly created a grave risk of death" to Lisa Hart, the seven-month-old daughter of Bradley and Ferne Hart, when he left her alone in the Hart home following the murders.  Petitioner asserts that, prior to the first penalty hearing, the

---

[65] Petitioner also contends that the trial court's use of the "restrain from acting" instruction during the 1992 sentencing phase violated due process.  This claim fails for the reasons articulated above.  Further, because counsel cannot be ineffective for failing to pursue meritless claims, United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999), Petitioner's derivative ineffective assistance of counsel claims are also without merit.  See (Pet. at 155-56.)

Commonwealth failed to produce hospital records that described Lisa Hart's medical condition on February 3, 1984, the day after she was discovered. The records reflect that she was "lethargic but otherwise had good eye contact and physical responsiveness[,]" and that she was "treated with an IV therapy to correct dehydration, and was medically cleared on February 3, 1984." (N.T., 12/15/92, p. 34.)

Petitioner contends that Lisa Hart's medical records undermine the Commonwealth's argument on the "grave risk of death" aggravating circumstance, which was based primarily on the trial testimony of Dr. Jeffery C. Bado, who is a family friend of the Harts and a doctor of osteopathic medicine. On the day Lisa Hart was discovered, Dr. Bado accompanied her to the hospital with police. He testified that she was taken to the hospital "for monitoring and possible resuscitation" and that he was of the opinion that she was in a "pre shock state." Dr. Bado also testified that she had a "respiratory arrest" during the trip and was "extremely dehydrated and hypothermic" when she arrived at the hospital. (N.T., 6/20/85, pp. 51-53; N.T., 7/3/85, p. 49; N.T., 7/5/85, pp. 48-49.) Based upon this evidence, the first penalty hearing jury found that Petitioner created a "grave risk of death" to Lisa Hart. The jury also determined that this aggravating circumstance, along with two others, outweighed the mitigating circumstances.[66] Wharton I, 607 A.2d 710, 715, 722 (Pa. 1992).

At Petitioner's second penalty hearing in 1992, however, Lisa Hart's medical records were admitted into evidence and utilized by Petitioner's counsel to cross examine Dr. Bado as to the

---

[66] Specifically, the first penalty hearing jury found three aggravating circumstances, including: (1) that Petitioner committed a killing while in the perpetration of a felony; (2) that Petitioner knowingly created a grave risk of death to Lisa Hart; and that (3) the offense was committed by means of "torture." The jury found three mitigating circumstances relating to Petitioner's absence of a significant prior criminal history, his age and "the character and record of the defendant and the circumstances of his offense." Wharton I, 607 A.2d 710, 715, 722 (Pa. 1992).

seriousness of her condition.  (N.T., 12/15/92, pp. 48-57.)  Although the second penalty hearing jury

also returned a death sentence on each count of murder, it did not find the "grave risk of danger"

aggravating circumstance to be present.[67]  Petitioner contends that the alternative jury determinations

on the "grave risk of danger" issue highlight the "exculpatory" value of the medical records and

demonstrate that the Commonwealth's suppression of this evidence constitutes a violation of Brady

v. Maryland, 373 U.S. 83 (1963).

         In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable

to an accused upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  To

establish a Brady violation, the Petitioner must demonstrate that: (1) evidence suppressed by the

state, either wilfully or inadvertently; (2) is favorable to the accused, either because it is exculpatory

or impeaching; and (3) material to the outcome of the case.  Stickler v. Greene, 527 U.S. 263, 281-82

(1999).  Petitioner's Brady claim fails for several reasons.

         Initially, even if we were to conclude that the medical records are Brady materials that the

Commonwealth "suppressed," Petitioner's remedy would be another penalty hearing with the

benefits of these records.  Petitioner received these benefits when he was granted a second penalty

hearing and an opportunity to cross examine Dr. Bado using Lisa Hart's medical records.

         In any event, Petitioner's claim fails under the Brady standard, because the prosecution will

not be found to have suppressed evidence that the defendant could have obtained in the exercise of

---

[67] The second penalty hearing jury found two aggravating circumstances, including that
the murders were committed in the perpetration of a felony and that Petitioner had been
convicted of another offense punishable by life imprisonment or death, and one mitigating
circumstance concerning "[Petitioner's] character and record and the circumstances of the crime
he committed."   Wharton II, 665 A.2d 458, 459 n.1 (Pa. 1995).

reasonable diligence or which is not in the actual or constructive possession of the prosecution.  See United States v. Risha, 445 F.3d 298, 302 (3d Cir. 2006).  Petitioner does not allege that this information was in the actual or constructive possession of the Commonwealth during his initial penalty hearing, nor did he articulate why he could not have obtained the medical records on his own.  See Government of Virgin Islands v. Gumbs, 426 Fed.Appx. 90, 93 (3d Cir. 2011) ("Gumbs also challenges the prosecution's failure to produce the victim's medical records, but this information was equally available to Gumbs and the Government, so his Brady challenge must fail as well.").

Further, the medical records at issue were not material.  The materiality standard is satisfied when, reasonably considered, the evidence places the "whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 434-35 (1995).  This standard is satisfied "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would be different." Stickler, 527 U.S. at 281-82.  The medical records were offered by the Commonwealth during Petitioner's second penalty hearing in support of their claim that Petitioner had created a grave risk of death to Lisa Hart.  (N.T., 12/15/92, pp. 39-40.)  Although the second penalty phase jury rejected the "grave risk of death aggravating circumstance," it still returned a death sentence on each count of murder.  In this light, we are unable to conclude that there is a reasonable probability that the first penalty hearing jury would have returned a life sentence if faced with Lisa Hart's medical records, particularly considering all of the other evidence of record.

In his amended petition, Petitioner also asserts that he is entitled to a new trial because the Commonwealth failed to produce Lisa Hart's medical records prior to trial.  (Am. Pet. at 5-6.)  Petitioner has not developed this claim and it is nevertheless without merit.  The trial court

determined that Dr. Bado's testimony was relevant to "the quality of malice, if any, the perpetrators of the crime had by visiting whatever damage or injury or condition upon a child of such a tender age." (N.T., 6/20/85, pp. 43-44.) Any alleged "inconsistency" between Dr. Bado's testimony and the medical records is immaterial in light of the overwhelming evidence of Petitioner's malice in connection with the murders of Bradley and Ferne Hart.

Lastly, Petitioner asserts that the Commonwealth failed to correct the "false testimony" of Dr. Bado, in light of the medical records. (Am. Pet. at 5-6.) Under the Fourteenth Amendment, the failure of the prosecution to correct false testimony, which it knew or should have known was false, requires reversal of a conviction if there is a reasonable likelihood that the false testimony could have affected the jury's verdict. See Giglio v. United States, 405 U.S. 150 (1972); Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004). Initially, it is unclear what portion of Dr. Bado's testimony is false in light of the medical records, or whether the prosecution "knew," or should have known, his testimony was false. More importantly, however, there is no reasonable likelihood that Dr. Bado's testimony affected the verdict in this case.[68]

### H.    Claim VII – Did Petitioner's Second Penalty Hearing Violate the Double Jeopardy Clause?

During the Petitioner's first penalty hearing in 1985, the Commonwealth argued that four aggravating circumstances were present, including: (1) that the killings were committed during the perpetration of a felony; (2) that Petitioner knowingly created a grave risk of death to another person in addition to the murder victim; (3) that the murders were committed by means of torture; and (4) that Petitioner was convicted of another offense punishable by life imprisonment or death. The jury

---

[68] For the reasons stated above, we also reject Petitioner's derivative ineffective assistance claims.

determined that the first three aggravating circumstances were present and sentenced Petitioner to death.[69] In 1992, the Pennsylvania Supreme Court vacated Petitioner's death sentence and remanded the case for a new sentencing hearing.[70]

During the second penalty hearing, the Commonwealth presented the four aggravating circumstances it raised during the first hearing. The jury found two aggravating circumstances, including the fourth aggravating circumstance, which was rejected by the first penalty hearing jury, and sentenced Petitioner to death. Petitioner claims that "double jeopardy and the doctrine of constitutional collateral estoppel" were violated when his second penalty hearing jury was permitted to consider and find the aggravating circumstance that was rejected by the jury in his first penalty hearing. (Pet. at 97.)

The Double Jeopardy Clause of the Fifth Amendment "protects against a second prosecution for the same offense after acquittal." North Carolina v. Pearce, 395 U.S. 711, 717 (1969). This protection applies in the death penalty context, such that a jury's decision to sentence a defendant to life imprisonment after a conviction is an "acquittal" of the death penalty under the Double Jeopardy Clause. See Poland v. Arizona, 476 U.S. 147, 153-56 (1986). However, a "capital sentencer's failure to find a particular aggravating circumstance" does not constitute an "acquittal" unless the "sentencer or reviewing court has 'decided that the prosecution has not proved its case' *that the death penalty is appropriate.*" Id. at 155-56.

Here, the jury at Petitioner's first penalty hearing determined that the death penalty was

---

[69] See 42 Pa.C.S. §§ 9711(d)(6), (d)(7), (d)(8), (d)(10); (N.T., 7/5/85, pp. 60-61, 75-77).

[70] See Wharton I, 607 A.2d 710, 724 (Pa. 1992) (reflecting that the Pennsylvania Supreme Court remanded for a second penalty hearing because the trial court's instruction as to the "torture" aggravating circumstance was deficient).

appropriate.  On direct appeal, the Pennsylvania Supreme Court remanded for a second penalty

hearing.  The Pennsylvania Supreme Court did not, however, find that the jury's imposition of the

death penalty was unsupported by the record or otherwise inappropriate.  Indeed, the Court found

that the evidence of record supported two of the three aggravating circumstances found by the jury.

See Wharton I, 607 A.2d at 723-24.  Thus, because neither the first penalty hearing jury nor the

reviewing court determined that the prosecution "failed to prove its case" in support of the death

penalty, the aggravating circumstance rejected by the first penalty hearing jury was not an

"acquittal."  The second penalty hearing jury, therefore, was properly permitted to consider that

aggravating circumstance.

We further conclude that the decision of the first penalty hearing jury was not entitled to

preclusive effect pursuant to constitutional principles of collateral estoppel.  The doctrine of

collateral estoppel is embodied in the Double Jeopardy Clause, and means "that when an issue of

ultimate fact has once been determined by a valid and final judgment, the issue cannot again be

litigated between the same parties in any future lawsuit."  Ashe v. Swenson, 397 U.S. 436, 444-45

(1970).  The determination of the first penalty hearing jury, however, was vacated by the

Pennsylvania Supreme Court and therefore does not constitute a valid and final judgment subject to

preclusive effect.  See RESTATEMENT (SECOND) OF JUDGEMENTS § 13, cmt. f.  Therefore, the second

penalty hearing jury did not weigh an "invalid aggravating factor" in reaching its decision.

### I.   Claim IV – Was Petitioner's Counsel Ineffective at his Second Penalty Hearing for Failing to Offer Available Mitigation Evidence?

Petitioner asserts that his Sixth Amendment right to counsel was violated during the second

penalty hearing of his trial in 1992, when his counsel failed to obtain and introduce mitigating

evidence contained in his prison files from the seven years following his 1985 conviction. Specifically, he claims that these files provided counsel with a "rich vein of mitigating circumstances" to explore and present to the jury as evidence that he "made a positive adjustment to prison life; is not a future danger should he remain incarcerated for life; and is amenable to rehabilitation." (Pet. at 55.)  In support of this argument, Petitioner attaches the declaration of forensic psychologist, Dr. Harry Krop, who reviewed these files, conducted a clinical interview of Petitioner, and offered an opinion in support of his petition. (Pet., Ex. 6; Pet. at 54-74.)

The Pennsylvania Supreme Court denied this claim on the merits, concluding that "[w]hile certain aspects of [Petitioner's prison] records indicated a positive adjustment to prison life, other aspects were indeed not nearly so positive." Wharton III, 811 A.2d 978, 988-89 (Pa. 2002). Given that the evidence of Petitioner's "adjustment to prison life cuts both ways," the Court held that his counsel was not "constitutionally incompetent for failing to produce it." Id. 988-89.  The Pennsylvania Supreme Court also held that Petitioner failed to demonstrate "that he was prejudiced by his counsel's failure to introduce this equivocal prison record evidence as additional proof" under the "catch-all" mitigating circumstance, which the jury "in fact found in [his] second penalty hearing." Id. at 989.  In reaching this conclusion, the Court noted that Petitioner failed to discuss "why the course counsel is faulted for failing to pursue" would have offered him a "greater prospect for success than the course counsel actually pursued." Id.

Because the Pennsylvania Supreme Court resolved this ineffective assistance claim on the merits, our review is governed by principles of AEDPA deference.  In applying these principles, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Williams v. Beard, 637 F.3d 195, 227-28 (3d Cir. 2011) (quoting Harrington v.

Richter, 131 S.Ct. 770, 785 (2011)).    Under Strickland, Petitioner must demonstrate that his counsel's performance was objectively unreasonable and resulted in prejudice. 466 U.S. 668, 687-88 (1984).  To satisfy this standard, Petitioner "'must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance[;]' to prevail, the petitioner must demonstrate that the state court 'applied Strickland to the facts of his case in an objectively unreasonable manner.'"  Williams, 637 F.3d at 227 (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

We concentrate our review upon Strickland's prejudice prong.  To establish prejudice, the Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A "reasonable probability" is one "sufficient to undermine confidence in the outcome."  Id.  In capital cases arising from the Pennsylvania state courts, prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty."  Bond v. Barbo, 177 F.3d 149, 154 (1999).

In considering prejudice in this context, the Court must review the evidence before the sentencing jury, the mitigating evidence that counsel failed to present and "the anti-mitigation evidence that the Commonwealth would have presented to rebut" that evidence.  Williams, 637 F.3d at 227.  Once the record is "reconstructed," the Court must "reweigh the evidence in aggravation against the totality of available mitigation evidence" and determine whether there is a reasonable probability that the outcome of the proceeding would have been different, but for counsel's error. Id.  (internal quotations omitted).  Even if Petitioner can make such a showing, however, he is not entitled to habeas relief on this claim unless he can also show that "the Pennsylvania Supreme

Court's contrary holding was unreasonable." Id. at 233.

In light of this prejudice standard, Petitioner's ineffective assistance of counsel claim fails. During Petitioner's 1992 sentencing hearing, the Commonwealth presented evidence of the history between Petitioner and the Hart family, including his participation in burglaries of the Hart home on August 14 and 22, 1983 and a September 6, 1983 burglary of the Germantown Christian Assembly Church, where Bradley Hart worked. See (N.T., 12/14/92, p. 102; N.T., 12/15/92, pp. 16-18; N.T., 12/16/92, pp. 91-101.) The jury also heard the grisly evidence regarding Petitioner's involvement in the murders of Bradley and Ferne Hart on January 30, 1984. See (N.T., 12/17/92, pp. 7-20.) As described by the Pennsylvania Supreme Court:

> On January 30, 1984, [Petitioner] and Eric Mason gained entrance to the Hart residence at knife point. [Petitioner] forced Mr. Hart to write him a check for work over which [Petitioner] and Hart had disputed. After tying up Mr. Hart and Mrs. Hart, [Petitioner] and Mason took Mrs. Hart upstairs. They covered her eyes, nose and mouth with duct tape, tied her hands and feet with neckties, strangled her using a necktie, and held her head under water in the bathtub until she stopped breathing. Mr. Hart was taken to the basement where he was forced to lie down with his face in a pan of water while either [Petitioner] or Mason held his foot on Hart's back and pulled on a electrical cord around Hart's neck causing his death. [Petitioner] and Mason also abandoned the Hart's infant daughter in a bedroom after turning off the heat in the house.

Wharton II, 665 A.2d 458, 459-60 (Pa. 1995).

In support of life imprisonment, Petitioner offered evidence of his character from his family members, including the testimony of his mother, brother, sister, aunt, cousin and brother-in-law. They testified that Petitioner is a good family member and community member. They also testified that he is kind, humble, athletic, loving, loveable, "good with his hands" and that he has accepted religion into his life. (N.T., 12/18/92, pp. 74-76, 84, 89-91, 97-99, 106-07, 109, 114-15; N.T., 12/21/92, pp. 11-12, 16-17, 19, 22, 26, 36.)

Based upon this evidence, the jury found two aggravating circumstances, including that Petitioner committed a killing while perpetrating a felony, 42 Pa.C.S. § 9711(d)(6), and had been convicted of another offense punishable by life imprisonment or death, 42 Pa.C.S. § 9711(d)(10). The jury also found certain mitigating circumstances under the "catch-all" provision, 42 Pa.C.S. § 9711(e)(8), including that Petitioner "did not murder Lisa Hart," was a good family member and cooperated with police. Ultimately, the jury concluded that the aggravating circumstances outweighed the mitigating circumstances and set the penalty at death. (N.T., 12/23/92, pp. 5-7); see Wharton II, 665 A.2d at 459 n.1.

In support of his ineffective assistance claim, Petitioner points to his prison records, which include reports from the "Department of Corrections' Program Review Committee" from 1986 to 1992. These records, which were essentially generated on a monthly basis, reflect that Petitioner had "no adjustment problems" in November 1986; had "no problems to discuss with the counselor" in January 1987; had no "misconducts on record" and his adjustment was described as "routine and uneventful" as of March 1987; was "doing well" in May 1987; could be "processed routinely," according to the prison's mental health coordinator, as of September 1987; maintained a "problem-free adjustment" in October 1987; "maintain[ed] a realistic attitude and [was] in relatively good spirits" in February 1988; had another "month of trouble-free adjustment" in June 1988; was described as "pleasant and talkative" and had "a successful review period" in March 1989;  was "polite and cooperative during contacts" and raised "no problems or concerns" in June 1990; was "adjusting properly" in October 1990; and made a "satisfactory" adjustment in December 1990 and March and April 1991. (Pet. at 58-61; Pet., Ex. 5.)

Petitioner also offers the report of forensic psychologist, Dr. Harry Krop, who after

108

reviewing all of the prison files and interviewing Petitioner, opined that he "made a positive adjustment to prison life," would be a "prime candidate for constructive rehabilitation," and would not pose "a future danger to the prison community" if he were to receive a life sentence.  His opinion was based on the reports of the prison mental health personnel and correctional counselors and the "large number of grievances" he filed regarding his conditions of confinement, which in Dr. Krop's opinion, demonstrate "a relative acceptance of responsibility."   Dr. Krop further opined that Petitioner did not meet the criteria for anti-social personally disorder, and that the charges for which he is sentenced are "out-of-character."  (Pet., Ex. 6; Pet. at 62-63.)

Although the records that form the basis to Dr. Krop's opinion reflect that Petitioner made a positive adjustment to prison in certain respects, as noted by the Pennsylvania Supreme Court:

> [T]he records [also] revealed that [Petitioner] had been cited for misconduct on several occasions, at least some were deemed "very serious misconducts;" he had been subject to "disciplinary time" for approximately five months in 1989; on one occasion, he was "less than truthful with [the Program Review Committee] and denied having anything to do with [a] confiscated weapon or handcuff key;" he was denied television and radio privileges due to "past misconducts for abusing/modifying his antennas;" and, on another occasion, "refused to even discuss why he had pieces of aerial and two lengths of antenna" indicating that he "did the time" and did not have to discuss the infraction.

Wharton III, 811 A.2d 978, 988 (2002).  In addition, Petitioner's prison file reflects that he filed multiple grievances regarding his experience in prison, including complaints that a corrections officer's morning wake-up call was too loud; that he did not receive jelly with his toast; that corrections officers were "whistling . . . early in the morning[;]" and that he did not receive his "daily newspaper" on two occasions.  (Pet'r's Resp. to Dismissal Notice of PCRA Ct., Jun. 20, 1997, Ex. F.)

Given all of the evidence presented at the sentencing hearing and Petitioner's proposed mitigation evidence, we are unable to conclude that the Pennsylvania Supreme Court decision to deny his claim was objectively unreasonable.  The brutal nature of Petitioner's offenses in this case and the aggravating circumstances found by the jury are significant.  In light of the evidence in aggravation, as compared to the weight of the mitigation evidence adduced at the second penalty hearing, the "equivocal" prison records, and Dr. Krop's declaration, Petitioner's Strickland claim fails.  It was Petitioner's burden to demonstrate that, in light of the mitigation that his counsel did not present, there is a reasonable probability that "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty."  Bond v. Barbo, 177 F.3d 149, 154 (1999). Strickland, 466 U.S. at 694.[71]  The Pennsylvania Supreme Court's determination that he failed to sustain this burden was not unreasonable, and his claim must be denied.

In reaching this conclusion, we find this case to be distinguishable from Wiggins v. Smith, 539 U.S. 510 (2003) and Williams v. Taylor, 529 U.S. 362 (2000), cases relied upon by Petitioner. In Wiggins, the Supreme Court held that the petitioner had demonstrated that his counsel's failure to present mitigation evidence at his sentencing prejudiced him.  The mitigation evidence at issue was "powerful," reflecting that the petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother . . . . [and] suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care."  Wiggins,

---

[71] Petitioner also argues that it was inappropriate for the Supreme Court to "note[]" that he failed to "discuss the penalty presentation actually made by counsel," and suggest that the evidence of his positive adjustment to prison was "cumulative" of other mitigation evidence offered under the "catch-all" provision of the Pennsylvania death penalty statute.  We do not consider the Court's mention of these issues to undermine the reasonableness of its decision or to reflect that it applied a standard contrary to clearly established federal law.

539 U.S. at 535.  The evidence also reflected that he was homeless for a period of time and had a "diminished mental capacity[.]"  Id.

Similarly, in Williams, the Court determined that the counsel's failure to present mitigation evidence resulted in prejudice to petitioner, where the sentencing jury would have learned he had a "nightmarish childhood[.]"  Williams, 529 U.S. at 395.  Specifically, the evidence reflected that the petitioner's "parents had been imprisoned for the criminal neglect of [him] and his siblings, that [he] was severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody."  Id.  The petitioner's counsel also failed to present evidence that he was "borderline mentally retarded" and was "thriv[ing]" in a structured prison environment.  Although all of the proposed evidence was not favorable to petitioner, the Supreme Court determined that the state court "failed to accord the appropriate weight to the body of mitigation evidence available to trial counsel."  Id. at 398.

The mitigation evidence at issue in this case, which includes notations regarding Petitioner's prison adjustment and the declaration of Dr. Krop, are not of the variety considered in Wiggins and Williams.  Petitioner's prison records and Dr. Krop's opinion are insufficient to render the Pennsylvania Supreme Court's decision unreasonable when considered in their entirety and in relation to the evidence offered at the sentencing hearing.  Further, with respect to Williams, the Court did not apply AEDPA deference to the question of prejudice, and therefore that case offers "no

guidance with respect to whether a state court *unreasonably* determined that prejudice is lacking."[72]

Cullen v. Pinholster, 131 S.Ct. 1388, 1410-11 (2011).

> **J.    Claim XII – Did Admission of "Victim Impact" Evidence and Other "Prejudicial" Evidence During Petitioner's Guilt Phase and Second Penalty Hearing Violate Due Process?**

Petitioner claims that "victim impact" evidence was admitted during the guilt phase of his trial and his second penalty hearing in violation of due process.  Specifically, Petitioner asserts that at the time of these proceedings, Pennsylvania's capital sentencing regime prohibited victim impact evidence and created a federally protected "liberty interest" in having victim impact evidence excluded in capital cases.  He claims, therefore, that the prosecution's introduction of such evidence at his trial and second penalty hearing violated Pennsylvania's death penalty statute and the corresponding "liberty interest" that this statute created.  See (Pet. at 130-31) (citing Hicks v. Oklahoma, 447 U.S. 343, 346-47 (1980)).  Petitioner further asserts that his due process rights were violated when the prosecution introduced certain "irrelevant, inflammatory, and prejudicial" evidence during the guilt phase and made "inflammatory comments" during the second penalty hearing.[73]   (Pet. at 133-36.)

---

[72] We also reject Petitioner's argument that Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) controls this case.  The Skipper Court considered whether the trial court erred in excluding mitigating evidence that petitioner was a well-behaved and well-adjusted prisoner, not whether the petitioner's counsel was constitutionally ineffective.  Further, applying Skipper to the prejudice prong of Strickland, as Petitioner urges, would mean that prejudice is automatically established in any case where an attorney fails to present "positive adjustment" evidence during the penalty hearing.  Given the application of Strickland in subsequent death penalty cases involving mitigation evidence, this is clearly not the case. See e.g., Cullen v. Pinholster, 131 S.Ct. 1388, 1410-11 (2011) (holding that state court could have reasonably rejected Strickland claim in death penalty case, where counsel failed to present mitigation evidence).

[73] Petitioner's trial counsel did not object to the admission of the evidence he is challenging in connection with these claims, with the exception of a picture of Lisa Hart that was

We will first address Petitioner's claims of error at his trial, and then proceed to consider those that relate to his second penalty hearing.

### 1.    Trial

At the outset, we note that, at the time of Petitioner's trial, the Pennsylvania death penalty statute precluded "victim impact" evidence at the penalty hearing of trial.  See Commonwealth v. Tedford, 960 A.2d 1, 42 (Pa. 2009).  However, because this statute pertained only to sentencing, it had no bearing upon the guilt phase of trial and does not provide a basis for a federal due process challenge.  In reality, Petitioner's claims regarding the introduction of victim impact evidence amount to evidentiary challenges at trial, which generally raise issues of state law that are not subject to federal habeas review.  Wilson v. Vaughn, 533 F.3d 208, 214 (3d Cir. 2008).  Evidentiary errors "are not considered to be of constitutional proportion, cognizable in federal habeas proceedings, unless the error deprives a defendant of fundamental fairness in the criminal trial."[74]  Accordingly, a federal habeas court "must examine the relative probative and prejudicial value of evidence to determine whether its admission violated [the  defendant's] right to a fair trial."  Lesko, 881 F.2d at

---

admitted at trial and his second penalty hearing.  The Pennsylvania Supreme Court held that the claims unaccompanied by an objection by counsel were waived under 42 Pa.C.S. § 9544(b).  Wharton III, 811 A.2d 978, 984-85 (Pa. 2002).  Generally, therefore, Petitioner's underlying due process claims would be procedurally defaulted and his only recourse would be to raise an ineffective assistance of counsel claim, based upon counsel's failure to raise a timely objection.  However, because 42 Pa.C.S. § 9544(b) was inadequate to support a procedural default we will review the merits of his due process claims.

[74] Bisaccia v. Attorney General of State of N.J., 623 F.2d 307, 312 (3d Cir. 1980); see Albrecht v. Horn, 485 F.3d 103, 128 (3d Cir. 2007) ("The inflammatory nature of the evidence in [defendant's] case clearly did not exceed its evidentiary value so as to violate due process"); Lesko v. Owens, 881 F.2d 44, 51 (3d Cir. 1989) (acknowledging that "erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation.)

51.  We will examine Petitioner's claims and the evidence presented at trial under these standards.

Petitioner first claims that the Commonwealth elicited evidence to "implicitly tell[] the jury that the crime was somehow worse, because the victims were happily married and religious." Specifically, Petitioner claims that the jury was improperly permitted to hear testimony that Bradley Hart regularly attended church services,[75] and played an active role at the Germantown Christian Assembly Church, including in the music program.[76]  Petitioner further asserts that the jury improperly "learned that Ferne Hart was a 'meticulous housekeeper,' and the name of the [silverware] that she had registered for as part of her bridal registry."  (Pet. at 133-35.)

This evidence was probative of issues presented at trial and necessary to provide the jury a contextual understanding of the case.  The prosecution sought to demonstrate that Petitioner had a personal vendetta against Bradley and Ferne Hart, as demonstrated by his involvement in two burglaries of their home and a burglary of the church where they both "worshiped" and played an "integral part in the operations."[77]  Further, Larue Owens, who participated in the burglaries of the

---

[75] See (N.T., 6/17/85, p. 39) (reflecting the testimony of Bradley Hart's father, Dr. Samuel Hart, who stated that his son regularly attended services at Germantown Christian Assembly Church, where he was a "member").

[76] (N.T., 6/17/85, p. 39) (reflecting testimony of Bradley Hart's uncle, Dr. Charles Hart, stating his nephew was a "deacon" at the church, was responsible for "physical maintenance" and "could look after financial matters"); (N.T., 6/19/85, p. 13) (reflecting testimony of Aldien Brown, a friend of Bradley Hart, stating that Hart rehearsed on a piano for the Germantown Christian Assembly, and was the "leader" of the Germantown Christian Fellowship Trio); (N.T., 6/19/85, pp. 43-44) (reflecting testimony of Bradley Hart's father, Dr. Samuel Hart, stating his son "grew up" at the church, was the "youngest deacon" and was "either Sunday School Superintendent or Assistant Sunday School Superintendent and Director of the Choir, involved in the music program").

[77] (N.T., 6/13/85, pp. 46-47; N.T., 6/28/85, p. 188); see (N.T., 6/25/85, p. 65) (testimony offered to demonstrate that, in connection with the burglary of Germantown Christian Academy Church, a photograph of Bradley Hart was defaced and stuck to the wall).

114

Hart home, testified that he knew Bradley Hart as the "Deacon" of the church and was aware that he was not home on the day of the first burglary, because it was a Sunday and "he was always at church on Sundays." Bradley Hart's affiliation with the Germantown Assembly Church and attendance of church services, therefore, was clearly relevant. (N.T., 6/18/85, pp. 12-13, 48-49.)

Testimony regarding Bradley Hart's participation in the church "choir" and "Germantown Christian Fellowship Trio" was also relevant. Aldien Brown, a friend of Bradley Hart, identified a "Casio electronic piano" and a "portable recorder" recovered by police from Petitioner's residence as property belonging to the Harts. (N.T., 6/27/85, pp. 67-71.) In explaining how he was able to recognize the piano, Brown stated that he and Bradley Hart were members of the choir and that "Bradley used to use [the] Casio piano to rehearse the choir." Brown testified that he was able to identify the "recorder" because he operated as "sound engineer" of the "Fellowship Trio" that Bradley directed. (N.T., 6/19/85, pp. 13-14.)

Similarly, testimony regarding the name of the silverware that was included on Ferne Hart's bridal registry was also offered to identify items taken from the Hart home. Bradley Hart's mother, Joyce Hart, was asked to identify boxes of silverware at trial, which she described as a gift "that was given to Ferne and Bradley at their wedding." Joyce Hart testified that Ferne kept the silverware in a china closet and that she last saw the silverware in the cabinet following the second burglary of the Hart home in August 1984. She further stated that she was asked to identify the silverware at the police station following the murders. Hart explained that she "knew the name of the silverware, it says 'Orleans,' that was what she had registered, she was on the bridal registry that was the name that she selected, and that's what I had seen in her closet." (N.T., 6/19/85, pp. 7-9.)

Ferne Hart's alleged "meticulous housekeep[ing]" was mentioned by Dr. Samuel Hart in

describing why he noticed their had been a "disturbance" when he entered the Hart home on the day he discovered the bodies of his son and daughter-in-law.  (N.T., 6/19/85, pp. 9, 49-50.)  Thus, this evidence was relevant as well.   (Pet. at 133.)

Further, the probative value of this evidence was not "conspicuously outweighed" by its "inflammatory" or prejudicial effect so as to violate Petitioner's constitutional right to a fair trial. Lesko, 881 F.2d at 52 (setting forth the balancing test applied to determine whether the erroneous admission of evidence constitutes a violation of due process).  We reject Petitioner's characterization that these references to Bradley and Ferne Hart were "inflammatory," particularly considering the context surrounding the admission of the evidence.  Even considered out of context, however, these fleeting comments regarding the Harts are not of the character necessary to give rise to a due process violation.[78]  See Jameson v. Wainwright, 719 F.2d 1125, 1127 (8th Cir. 1983) ("To constitute a denial of fundamental fairness, the evidence erroneously admitted at trial must be material in the sense of [a] crucial, critical, highly significant factor.").

Petitioner next claims that the jury was improperly "presented photographic evidence and inflammatory testimony" concerning Lisa Hart, the daughter of Bradley and Ferne Hart.  Petitioner's trial counsel objected to the introduction of these photographs as irrelevant and unduly prejudicial.  The trial court determined that "one" photograph showing the "relative size" of the child was admissible on "the question of malice, the hatred, if any, that the perpetrators had for Bradley Hart and his family."  (N.T., 6/19/85, pp. 56-57.)  The Commonwealth also introduced testimony from

---

[78] We note that Petitioner also contends that testimony reflecting that Bradley Hart was "kind[] to his father" violated due process.  (N.T., 6/19/85, p. 44) (reflecting Dr. Samuel Hart's testimony that his son "came over to even help us load our stuff in the car for -- that's the kind of thing he would do"). This testimony was met by immediate objection by Defense counsel, which was sustained by the trial court.  (N.T., 6/19/85, p. 44.)

Dr. Bado, a family friend of the Harts, regarding Lisa Hart's physical condition after she was discovered and while she was being transported to the hospital.  Petitioner's counsel moved for a mistrial on the basis of this testimony, which the court denied.  (N.T., 6/20/85, pp. 51-57.)

On direct appeal, Petitioner challenged the trial court's decision to admit the photograph of Lisa Hart and the testimony of Dr. Bado.  The Pennsylvania Supreme Court rejected these arguments and held that the trial court properly admitted the evidence, because it was "relevant to establish malice" and "formed part of the natural development of the facts."  Wharton I, 607 A.2d 710, 719-20 (Pa. 1992).  The Court further noted that the trial court was not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration[.]"  Id. at 720.  We find no basis to upend this ruling on due process grounds, particularly considering that the trial court was in a "unique position to assess the relative probative value and inflammatory effect of proffered" evidence.  Lesko, 881 F.2d at 52.  The trial court provided a reasonable basis for its decision under state law, which was ultimately affirmed by the Pennsylvania Supreme Court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").

Petitioner also contends that the Commonwealth introduced prejudicial testimony from Dr. Samuel Hart, Bradley Hart's father.  Specifically, Petitioner challenges Dr. Hart's testimony that he found Lisa Hart sitting approximately 12 to 18 inches away from Ferne Hart's body, where he noticed a "dark spot on the rug" that was "warm . . . [and] damp."  (N.T., 6/19/85, pp. 61-62.)  Petitioner claims that this "testimony, of course, was offered so that the jury could speculate as to whether Lisa Hart witnessed her mother's death."  (Pet. at 135.)  Dr. Hart's testimony was offered to describe the Hart home and his observations on the day he discovered the bodies of Bradley and

117

Ferne Hart.  The location of Lisa Hart and the "dark spot" on the rug were part of the sequence of events that he observed on that day.  We fail to see how his testimony would lead the jury to "speculate" that Lisa Hart had witnessed the murder of her mother, over a day earlier.

Lastly, Petitioner asserts that the prosecutor invited the jury to "speculat[e] as to Lisa Hart's future without her parents" during his closing argument when he discussed the testimony of Thomas Nixon.  As previously discussed, Nixon testified that he attempted to help Petitioner and Eric Mason gain access into the Hart home in January 1984, by knocking on their door and asking if he could use the phone.  Nixon abandoned this plan without further incident, and testified that he next heard of the Harts approximately two weeks later, when he read in the newspaper that they were murdered. He testified that he then called Petitioner to ask if he and Mason committed the murders, and that when he told Petitioner "that if they were going to kill the mother and the father, they should have killed the baby also," Petitioner responded "We couldn't do it."  On cross examination, Nixon explained that he made this comment to Petitioner because "[he] wouldn't want to live in a world without [his] mother and father."  (N.T., 6/26/85, pp. 99-100, 107-12, 128.)

During closing arguments, Petitioner's counsel noted that there were many emotionally "tugg[ing]" moments at trial, including Nixon's testimony "talking about how tough it is to be left without parents[,]" but that the jury must "decide the case with [their] mind, not with [their] heart." (N.T., 6/28/85, p. 110.)  The prosecutor also discussed Nixon's testimony in his closing argument, asserting that Nixon "could tell you what its like to grow up without a mother and a father . . . and he can tell you about Robert Wharton admitting on the phone that they did it . . . . It may seem a little harsh to you when Nixon said, 'Well, if you killed the parents, you may have well killed the kid,' because Nixon knows what its like to grow up without parents."  (N.T., 6/28/85, pp. 186-87.)

118

Nixon's testimony was highly relevant, and was subject to challenge by Petitioner and his co-defendant.  It was hardly improper, therefore, for the prosecutor to highlight Nixon's testimony in his closing argument and attempt to explain its apparent "harsh[ness]."  Given the nature of the prosecutor's comment and the context surrounding Nixon's testimony, we cannot conclude that it "so infect[ed] the trial with unfairness" so as to violate Petitioner's right to a fair trial.[79]  Greer v. Miller, 483 U.S. 756, 765 (1987).

## 2.      The Second Penalty Hearing

Petitioner also claims that the Commonwealth introduced "victim impact" evidence during his second penalty hearing in violation of his "liberty interest" in having such evidence excluded under the due process clause.

A protected "liberty interest" may arise from "the laws of the state."  Asquith v. Dep't of Corr.,186 F.3d 407, 409 (3d Cir. 1999).  To constitute a "liberty interest," an individual must have a "substantial and legitimate expectation" in the subject of the deprivation.  Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); see Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 459 (1989) (reflecting that a "liberty interest" is predicated upon a "legitimate claim of entitlement").  Further, to implicate due process, the alleged deprivation must have "prejudiced" the defendant in a "very particular way," such that there is a reasonable likelihood that the deprivation implicated the petitioner's constitutional rights.[80]

---

[79] We also conclude that any derivative ineffective assistance claim in connection with Petitioner's challenges to the guilt phase of his trial are without merit.  United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).

[80] Taylor v. Horn, 504 F.3d 416, 449 (3d Cir. 2007) (holding that petitioner was not prejudiced in a way that implicated his federal constitutional rights); Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997) (holding that "erroneous jury instruction [must] have operated to lift the

Initially, we note that the federal constitution does not preclude victim impact evidence from capital sentencing proceedings.  In Payne v. Tennessee, the United States Supreme Court held that the Eighth Amendment "erects no *per se* bar" against the admission of "victim impact evidence or prosecutorial argument on that subject" during the sentencing phase of a capital trial.  501 U.S. 808, 824-27 (1991).  States, therefore, "may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."  Id. at 827.

Petitioner claims that the Pennsylvania death penalty statute in effect at the time of his second penalty hearing created a "liberty interest" ensuring that "victim impact" evidence would not be admitted against him.  The Pennsylvania statute provided that "[e]vidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matter relating to any of the aggravating or mitigating circumstances" specified in the statute.  The statute also directed that "[e]vidence of aggravating circumstances shall be limited to those circumstances specified" in the statutory list of such circumstances.  42 Pa.C.S. § 9711(a)(2) (1987).  Victim impact evidence was not included in this statutory list or referenced anywhere in the death penalty statute.  See Commonwealth v. Fisher, 681 A.2d 130, 146 (Pa. 1996). In 1996, four years after Petitioner's second penalty hearing, the Pennsylvania Supreme Court held that § 9711(a)(2) had precluded "victim impact" evidence, until the statute was amended in 1995 to explicitly allow for the admission of such evidence.  See Fisher, 681 A.2d at 146; Commonwealth

---

burden of proof on an essential element of an offense as defined by state law"); Hill v. Estelle, 653 F.2d 202, 205 (5th Cir. 1981) (holding that state trial judge's failure to recognize minimum possible sentence did not violate due process where trial judge's sentence was high enough to satisfy federal habeas court that the error did not prejudice the defendant).

v. McNeil, 679 A.2d 1253, 1259 (Pa. 1996).

Petitioner's "liberty interest" claim is thus based upon the Pennsylvania Supreme Court's interpretation of § 9711(a)(2) many years after his second penalty hearing.  Although these cases do discuss the retroactive application of § 9711(a)(2) and note that "victim impact" evidence was inadmissible, this was an open issue at the time of Petitioner's second penalty hearing. Consequently, we fail to see how Petitioner had a federally protected "liberty interest" regarding victim impact evidence.  Even if we were to assume that § 9711(a)(2) did somehow create a "liberty interest," Petitioner is not entitled to habeas relief on any of his specific allegations of error, which we review below.

Petitioner first asserts that at the second sentencing hearing the prosecutor elicited improper "victim impact" evidence from Bradley Hart's father, Dr. Samuel Hart.  Dr. Hart testified that Bradley Hart was a member of the "Philadelphia Boys Choir, the church choir, and even in school he was in glee club."  He further testified that his son was a member of the Philadelphia Boys Choir for many years, and traveled with them "to many countries, sung before kings and presidents." (N.T., 12/15/92, pp. 93-94.)

Dr. Hart, however, primarily testified regarding the "business ventures" he and Bradley Hart were involved in, which was relevant to the prosecution's theory that the murders were motivated by a dispute over a business debt allegedly owed by the Harts to Petitioner.  He also detailed the state of the Hart home on the day he discovered their bodies, and testified as to his role in identifying specific items that were recovered by police in connection with the burglaries of the Hart home. (N.T., 12/15/92, pp. 92-100, 110-28.)  Thus, his testimony was necessary, as the sentencing jury was not present at trial and had no knowledge of the underlying offenses.  The jury was entitled to hear

the underlying evidence in support of Petitioner's convictions in evaluating whether to impose life imprisonment or death. Dr. Hart's reference to Bradley Hart's participation in choir and glee club, when viewed in context of his entire testimony as well as the five days of evidence, represents a minor, isolated remark regarding his son's background. To the extent this specific portion of Dr. Hart's testimony constituted "victim impact" evidence, we are unable to decipher how Petitioner was prejudiced, such that his second penalty hearing violated due process.

Petitioner also asserts that it was improper for the Commonwealth to introduce a photograph of Lisa Hart, reflecting her in a "well-hydrated, well-fed, well-tended stage." (N.T., 12/15/92, p. 37.) The photograph was admitted into evidence over Petitioner's counsel's objection, and this issue was raised on appeal. The Pennsylvania Supreme Court rejected Petitioner's argument, holding that the photograph of Lisa Hart was "probative of whether [Petitioner] had created a grave risk of death to her[,]" which was one of the aggravating circumstances pressed by the Commonwealth. Specifically, the Court concluded that the photo permitted the jury "to see from her physical appearance that she was unable to care for herself upon being abandoned in a house where the thermostat had been turned down to approximately 50 degrees during the dead of winter." Commonwealth v. Wharton, 665 A.2d 458, 462-63 (Pa. 1995).

Because the photograph was offered in support of an aggravating circumstance, "grave risk of death," it was permissible under the prior version of § 9711(a)(2) and was not being offered as "victim impact" evidence. Although the erroneous admission of evidence can violate due process in certain circumstances, Albrecht v. Horn, 485 F.3d 103, 128 (3d Cir. 2007), Petitioner has given us no reason to question the appropriateness of the Pennsylvania Supreme Court's ruling, let alone

a reason to conclude that it was unconstitutional.[81]

Petitioner next contends that the trial court improperly admitted a photograph of Bradley and Ferne Hart prior to their murders, over the objection of Petitioner's counsel.  The Court determined that the jury had "the right to see what the victims looked like. . . .  Just as they can see what the [Petitioner] looks like.  He can invoke sympathy from his appearance.  It means that human beings were the victims."  (N.T., 12/15/92, pp. 105-07.)  Petitioner challenged the trial court's ruling on appeal and the Pennsylvania Supreme Court rejected his argument, holding that he failed to show how he was prejudiced.  The Court noted that the "jury had seen several photographs of the victims showing them bound, gagged and masked; photographs taken at the medical examiner's office; photographs of the crime scene; and photographs of the duct tape which has been removed from the victims bodies."  In light of the admission of these photographs, the Court determined that "the passions of the jury cannot possibly be said to have been inflamed by one innocuous photograph held up by a witness showing the couple before they were murdered."  Wharton II, 665 A.2d 458, 463 (Pa. 1995).  We agree with this analysis, and conclude that the admission of this photo, whether considered "victim impact" evidence or not, did not violate due process.

Petitioner also contends that the prosecutor improperly elicited "victim impact" evidence

_____

[81] In an attempt to bolster his claim, Petitioner points to the prosecutor's argument at the post-verdict motion hearing, following his second penalty hearing.  In response to an argument that the Commonwealth had improperly suppressed exculpatory medical records regarding Lisa Hart during the first penalty hearing, the prosecutor stated that if he had "tried this [case] initially, forget the medical records, little Miss Hart would have been exhibited to the ladies and gentlemen of the jury."  (N.T., 8/18/93, p. 16.)  Petitioner claims that this "frank admission" reveals the Commonwealth's true motivation in placing the photograph of Lisa Heart into evidence.  We disagree with Petitioner's characterization of the prosecutor's statement, and fail to see how these comments undermine the ruling of the Pennsylvania Supreme Court or otherwise impact our decision.

from a neighbor of the Harts, Jacqueline Poole, when he asked her what "kind of neighbors were the Harts?"  She responded, "[v]ery nice, loving, kind, lot of fun."  (N.T., 12/16/92, p. 13.)  This fleeting, generalized remark could not have prejudiced Plaintiff in a manner as to implicate his federal constitutional rights.  Cf. Commonwealth v. Freeman, 827 A.2d 385, 414 (Pa. 2003) (holding that brief, non-specific testimony that victim was "peaceful" and "nice," while victim impact evidence, was not prejudicial).

Lastly, Petitioner asserts that at the second penalty hearing, the prosecutor "immediately launched into the prohibited area of victim impact evidence" during his opening and closing arguments.  Petitioner cites to the following passages of the prosecutor's arguments:

–   "Bradley Hart, son of a minister, formerly a member of the Philadelphia Boys Choir; he traveled throughout the world with the Philadelphia Boys Choir.  Ferne Hart, his wife, they had been married approximately six years[.]"  (N.T., 12/15/92, pp. 8-9.)

–   "There will be no dream, hold on and listen, and listen to how two beautiful people, two people that had the world to look forward to, how they were taken out of this life, why they were taken out."  (N.T., 12/15/92, p. 16.)

–   "[Petitioner] "waited outside the house of a man who had sang before queens and kings, that had been married to a lovely lady" and that "Lisa Hart did not get to spend her first Christmas with her mother and her father.  They didn't get the joy of going to her christening or baptism or seeing the young lady grow up to be a young lady."  (N.T., 12/21/92, pp. 46-49.)

–   "But there is a time to be sympathetic, there's a time to be merciful.  But I submit to you, this is not the time, this is not the place, this is not the case.  Everyone's life means something and everyman's death diminishes me a bit."  (N.T., 12/21/92, p. 59.)

–   "As I look at Bradley Hart and his smiling wife, I can imagine the joy at the time of their wedding, I can imagine the joy of finding Ferne was with child, and I can imagine the proud parents for a young man on a upward thrust, with everything to live for. . . . Isn't it a sad commentary to look at these two beautiful people and say that they died just because they were there."  (N.T., 12/21/92, pp. 59-60.)

Attorney argument is not evidence.  See Commonwealth v. LaCava, 666 A.2d 221, 228 (Pa. 1995).  The trial court instructed the jury in this regard, and we must presume that the jury followed this instruction.  Id.; see Freeman, 827 A.2d at 412-14; Commonwealth v. Ligons, 773 A.2d 1231, 1238-39 (Pa. 2001).  The prosecutor's opening and closing arguments, therefore, did not insert "victim impact" evidence into Petitioner's second penalty hearing in violation of § 9711(a)(2).  Further, we do not consider the prosecutor's argument to have exceeded constitutional bounds.

In considering whether a prosecutor's comments give rise to a due process violation, the relevant question is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986).  In making this determination, the court must consider the entire record of the proceeding.  See Romano v. Oklahoma, 512 U.S. 1, 12 (1994).  It is not enough to show that the prosecutor's comments were "undesirable or universally condemned." Darden, 477 U.S. at 181.

Even if the prosecutor's comments in this case were inappropriate, they did not violate due process.  Viewed in the context of the entire penalty proceeding, which spanned over the course of five days, the challenged comments were brief, isolated remarks.  Moreover, the second penalty hearing jury was not present during trial, and therefore, was required to hear evidence related to the underlying crimes.  See, e.g., Commonwealth v. Brown, 786 A.2d 961, 969-71 (Pa. 2001) (reflecting that second penalty hearing jury was permitted to view life size pictures of the victim's injuries, which were admitted at trial on the issue of "intent," because it was relevant to the issue of "torture" at sentencing and the court instructed the jury that the picture was "designed specifically to enhance your ability to appreciate what the charges are against the defendant and not to arouse your

passions[.]")  This evidence necessarily touched upon the victims and the impact of Petitioner's crimes.

To the extent the prosecution's arguments improperly highlighted this evidence, the prejudicial impact was minimal.  The sentencing court instructed the jury that attorney argument was not evidence and that its verdict was to be based upon the evidence.  See (N.T., 12/14/92, p. 4) ("What the lawyers say is not evidence, ladies and gentlemen.  The lawyers are advocates.  They're partisans."); (N.T., 12/21/92, p. 98) ("It's your duty and yours alone to determine what the facts are, but you must determine it from the evidence presented during the course of the trial and not out of any extraneous matter.").  The court also instructed the jury that its verdict was to be based upon a weighing of the aggravating and mitigating circumstances, none of which implicated "victim impact" evidence.  (N.T., 12/21/92, pp. 104-25.)

Considering the comments complained of in the context of the entire penalty proceeding, as well as the court's clear and detailed instructions, we are unable to conclude that the comments so infected the second penalty hearing with unfairness as to make the resulting sentence a denial of due process.

### K.     Claim XVI – Did the Court's Refusal to Allow Testimony Regarding Petitioner's Religious Beliefs and His Co-defendant's Life Sentence During the Second Penalty Hearing Violate Due Process?

Petitioner next contends that his Eighth Amendment rights were violated when the court prevented the second penalty hearing jury from hearing mitigation evidence regarding his religious beliefs and the fact that his co-defendant was sentenced to life imprisonment.

The Eighth Amendment prohibition against cruel and unusual punishment requires that "the sentencer in a death penalty case be permitted to consider all relevant mitigation evidence that the

126

defendant proffers as counseling less than a sentence of death."[82]  Frey v. Fulcomer, 132 F.2d 916,

920 (3d Cir. 1997) (citing Eddings v. Oklahoma, 455 U.S. 104 (1982)).  The Eighth Amendment,

however, "does not deprive the State of its authority to set reasonable limits upon the evidence a

defendant can submit, and to control the manner in which it is submitted."  Oregon v. Guzek, 546

U.S. 517, 526 (2006).  Indeed, states retain the authority "to structure and shape consideration of

mitigating evidence 'in an effort to a achieve a more rational and equitable administration of the

death penalty.'"  Boyde v. California, 494 U.S. 370, 377 (1990).  Cf. Lockett v. Ohio, 438 U.S. 586,

605 & n.12 (1978) (holding that the jury may not be precluded from considering an aspect of the

defendant's character or record as a mitigating factor, but noting that the state court retained "the

traditional authority . . . to exclude, as irrelevant, evidence not bearing on defendant's character, prior

record, or circumstances of his offense").

        At the second penalty hearing, Petitioner presented testimony from his sister-in-law, Nadean

Wharton, who testified that she and Petitioner corresponded through letters and that one of those

letters quoted a particular biblical verse.  When she began to read the verse, the prosecution objected.

The court sustained the objection, noting that "this case must be decided on the laws of

Pennsylvania."  (N.T, 12/18/92, pp. 96-97.)  From this exchange, Petitioner claims that the trial

court's ruling violated his Eighth and Fourteenth Amendment rights to present mitigation evidence

regarding his religious views.

        While a petitioner's religious beliefs, affiliations and activities may constitute relevant

"mitigation evidence," the sentencing court has discretion to set reasonable limits upon how such

---

[82] The Eight Amendment applies to the states through the Fourteenth Amendment's Due
Process Clause.  See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976).

127

evidence is presented.  Oregon, 546 U.S. 517 at 526.  Petitioner has not identified any authority which suggests that a sentencing court may not, in the exercise of this discretion, determine that specific quotation to a biblical verse is inappropriate.

Even if we were to conclude that the court erred in this respect, the error was clearly harmless.[83]  The second penalty hearing jury was permitted to hear repeated references to Petitioner's religious background.  Nadean Wharton, testified that she communicated with Petitioner while he was in prison and spoke with him about "spiritual" matters.   See (N.T., 12/18/92, p. 96.)  She testified that she "asked him did he know the Lord Jesus Christ as his savior[,] and in letter he stated that he did [sic.]" (N.T., 12/18/92, p. 96-97.)   She also testified that she was "satisfied that [Petitioner] had reconciled himself -- and I don't mean to bring God into it -- But reconciled himself with God[,]" and that Petitioner "knows the Lord Jesus Christ[.]" (N.T., 12/18/93, p. 103.)  Petitioner's mother, Margaret Wharton, testified that he was "raised in a Christian home" and "grew up in the church."  She also testified that she knows that he has "strech[ed] out on Jesus" and read an "inspirational verse" that Petitioner gave to her.  See (N.T., 12/21/92, pp. 18, 32, 31, 36.)

In light of this evidence, Nadean Wharton's proposed reading of a bible verse would have added little, if anything, to further establish Petitioner's religious beliefs.  The court's exclusion of this evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 517 U.S. 619, 623 (1993).

---

[83] See Skipper v. South Carolina, 476 U.S. 1, 7-8 (1986) (addressing whether trial court's refusal to allow mitigation evidence was harmless); McGehee v. Norris, 588 F.3d 1185, 1197 (8th Cir. 2009) (applying harmless error review in this context); Bryson v. Ward, 187 F.3d 1193, 1205-06 (10th Cir. 1999) (noting that "several circuits" apply harmless error review in this context); Boyd v. French, 147 F.3d 319, 327-28 (4th Cir. 1998) (applying harmless error review). Cf. Arizona v. Fulminate, 499 U.S. 279, 311-12 (1991) (describing the nature of constitutional errors that are subject to harmless error review).

Petitioner also contends that the court committed constitutional error when it refused to admit evidence that his co-defendant, Eric Mason, had been sentenced to life imprisonment.  Generally, a sentencer may not be precluded from hearing "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  See Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605-06 (1978)).  Mason's sentence does not touch on any of these factors.

The issue of whether the sentence of a co-defendant must be admitted as mitigating evidence in capital cases, however, has not been addressed by the United States Supreme Court or the United States Court of Appeals for the Third Circuit.  See Frey v. Fulcomer, 974 F.2d 348, 365 n.21 & 22 (3d Cir. 1992).  Courts of Appeals that have addressed this issue have determined that such evidence is not required by the Eighth Amendment.[84]

We agree with this authority, and conclude that the Petitioner has failed to demonstrate that his constitutional rights were violated.  The trial court excluded evidence of Mason's life sentence as irrelevant, relying upon Pennsylvania Supreme Court precedent, and we will not disturb this ruling

---

[84] See Meyer v. Brinker, 506 F.3d 358, 375 (4th Cir. 2007) ("Since a co-defendant's sentence is neither an aspect of the defendant's character or record nor a circumstance of the offense, however, it is within 'traditional authority of the court to exclude' such evidence as 'irrelevant'"); Beardslee v. Woodford, 358 F.3d 560, 579 (9th Cir. 2004) ("Although a trial court is not necessarily precluded from allowing consideration of co-defendant sentences, a trial court does not commit constitutional error under Lockett by refusing to allow such evidence"); Schneider v. Delo, 85 F.3d 335, 342 (8th Cir. 1996) (holding that the court's refusal to permit evidence of co-defendant's plea deal and 30 year sentence was not constitutionally improper, because the evidence "had nothing to do with [defendant's] 'character or record' or with the 'circumstances of the offense'"); Brogdon v. Blackburn, 790 F.2d 1164, 1169 (5th Cir. 1986) (rejecting claim that trial court's decision to exclude co-defendant's life sentence at death penalty hearing violated the Eighth Amendment); see also Middlebrooks v. Bell, 619 F.3d 526, 540 (10th Cir. 2010) (acknowledging that the Eighth Amendment does not require states to recognize "the universe of mitigation evidence as encompassing information that a more culpable co-defendant received a lighter sentence").

on Eighth Amendment grounds.  (N.T., 12/18/92, pp. 123-25); see Commonwealth v. Hagg, 562 A.2d 289, 298 (Pa. 1989) (holding that the disposition of the cases against appellants's co-defendants, one of whom received life imprisonment, "has no bearing upon appellant's sentence"); Commonwealth v. Frey, 554 A.2d 27, 33 (Pa. 1989) ("The sentence received by a co-conspirator is not a mitigating circumstance as to appellants role in the crime").

Petitioner asks that we part from the weight of authority on this issue and follow McLain v. Calderon, 1995 WL 769176 at *72 (C.D.Cal. Aug. 22, 1995), which held that the "non-death sentence" of co-defendant is relevant mitigation evidence that must be presented to a sentencing jury in capital cases under the Eighth Amendment.[85]  McLain, however, was decided before the Ninth Circuit's Beardslee v. Woodford, 358 F.3d 560, 579 (9th Cir. 2004), which held that a sentencing court may properly preclude evidence relating to a co-defendant's sentence in a capital case.  It appears, therefore, that  McLain is no longer good law in the Ninth Circuit on this point.  Further, we do not find the McLain Court's analysis of pertinent United States Supreme Court precedent to be persuasive.

### L.  Claim VIII – Did the Prosecutor's Conduct During Petitioner's Second Penalty Hearing Violate Due Process?

Petitioner claims that, during his second penalty hearing in 1992, the prosecutor improperly "injected his personal opinions" into the case, vouched for the death penalty and disparaged areas of mitigation evidence offered by Petitioner in violation of the Sixth, Eighth and Fourteenth Amendments.  (Pet. at 102-10.)  The United States Supreme Court has recognized that "prosecutorial misconduct may so infec[t] the trial with unfairness as to make the resulting

---

[85] Although that Court found constitutional error, it denied the petitioner's claim for habeas relief because the error did not prejudice him.  McLain, 1995 WL 769176 at **72-73.

conviction a denial of due process." <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987). To constitute a denial of due process, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). In making this determination, the prosecutor's remark must be viewed in the context of the entire proceeding. <u>See</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 639 (1974).

Petitioner asserts that the prosecutor improperly bolstered his credibility with the jury by informing them that he "took an oath" to "truly try" cases and to apply the laws of the Commonwealth, thereby laying the "groundwork for the improper vouching that would follow." Petitioner notes that the prosecutor went on to improperly "vouch" for imposition of the death penalty during his summation by noting that he had been a homicide prosecutor for 17 years and "ha[d] seen a lot of lies, I've seen a lot of pain, and I've seen a lot of anguish. We don't stand up here, ladies and gentlemen, say, we want this verdict or we want that verdict, because we enjoy it." The prosecutor went on the explain that he "call[s] home" to talk to his parents before each "speech" to "tell them what [he is] doing, [to] ask how they are, and [that he] . . . always end[s] on the line, [']I will try to do the right thing.[']" Petitioner claims that the prosecutor continued to "use the weight of his office and his personal opinion to pursue the death penalty" by asserting:

> Maybe the Defense is banking on, as one of his mitigating circumstances, the time of year it is, time of year, receiving, warm. But I'll ask you to think past that. They did not enjoy Christmas of '85. Their limbs were stilled by a cold, calculated, intentional killing and drowning. Oh, yeah, the bindings, the clothing, all that's here. I wish I didn't have to make this argument. I wish I didn't have to be here. But a wish is just that. Let's deal with the reality. And the reality is, if this is not a death penalty case, please tell me what is.

(Pet. at 104-05; N.T., 12/21/92, pp. 43-45, 62.)

The prosecutor's comments noted above do not give rise to a due process violation. In

Darden v. Wainwright, the United States Supreme Court considered whether a prosecutor's closing argument rendered defendant's trial unfair.  477 U.S. 168 (1986).  There, the prosecutor asked the jury to return a death sentence, because "[t]hat's the only way that I know he is not going to get out on the public. . . . It's the only way I can be sure of it.  It's the only way anyone can be sure of it[.]"  Id. at 181 n.10.  The prosecutor also referred to the defendant as an "animal" and opined that he "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash."  Id. at 181 n.11 & 12.  He also said that he "wished" one of the victims had "blown . . . [defendant's] face off" and he "could see him sitting here without no face, blown away with a shotgun."  Id.

Despite these statements, the Darden Court determined that the comments did not deprive the defendant of due process, considering the circumstances surrounding the comments, the court's instructions, the evidence presented at trial and defense counsel's opportunity to rebut the argument presented by the prosecution.  Defendant's "trial was not perfect–few are–but neither was it fundamentally unfair."  Id. at 182.

Here, the prosecutor's statements pale in comparison to those considered in Darden.  Comments regarding the prosecutor's "oath" to uphold the law appear designed to encourage the jury to "honor [their] oath" to apply the law and to highlight the fact that the decision placed before them was the result of Petitioner's actions, not that of the Commonwealth.[86]  The prosecutor's comments that he always tries to do "the right thing" and statement that he "wish[ed]" he did not have to

---

[86] See (N.T., 12/21/92, p. 43) (reflecting that after asserting that he "would truly try the issues joined between the Commonwealth and the defendants[,]" he said "I took an oath to apply the laws of this Commonwealth.  All of you did" and that "he look[ed] to [the jury] now to honor [its] oath"); (N.T., 12/21/92, p. 44) ("[W]e don't stand up because we enjoy it[.] . . . We stand up here because someone made a choice.  That someone in this case was Robert Wharton").

describe the brutal murders at issue are similarly innocuous.

Further, while his comment that "if this is not a death penalty case, tell me what is" appears, when viewed in isolation, to insert some personal opinion into the case, we are convinced that this statement, when viewed in the context of the entire argument, did not undermine the fairness of Petitioner's penalty hearing. Indeed, the prosecutor went on to urge the jury to "deliberate, apply the law that's given to you, use your common sense," and to consider certain facts of record, which reflects that he was not asking the jury to defer to his opinion or consider factors outside of the record. (N.T., 12/21/92, pp. 62-66.) Given the Court's analysis in <u>Darden</u>, the comments made by the prosecutor in that case, we have no difficulty concluding that the comments of the prosecutor in Petitioner's case did not violate due process.

In addition, Petitioner's counsel had an opportunity to respond to the prosecution's summation, and in doing so, addressed many of the concerns Petitioner now raises. Petitioner's counsel stated that it was within the Commonwealth's discretion to seek the death penalty in each case, and noted that "[the prosecutor] said, if ever there was a death penalty case, isn't this it. Well, he told you what I knew as a matter of personal knowledge, that he has been prosecuting these cases for about 17 years, that is, murder cases. . . . And I dare say that Mr. King probably in each and every [capital case] . . . said to the jury sitting there, if this isn't a death penalty case, what is." Petitioner's counsel also stated that the prosecutor "believes that this case reaches that level," but "if we left everything to the prosecution, everybody would be convicted, and as to any murder in the first degree, everyone would be sentenced to death. . . . We have a jury because the jury sits between the prosecution and the defendant." We also conclude, therefore, that the response of Petitioner's counsel, coupled with the court's instruction to the jury to weigh the evidence, as opposed to

133

extraneous factors, quelled any prejudice from the prosecutor's comments.[87]  (N.T., 12/21/92, pp. 67-69, 98-107.)

In reaching this conclusion, we find Lesko v. Lehman, which Petitioner relies upon, to be distinguishable.  (Pet. at 107; Tr. Or. Arg., 10/10/06, p. 163.)  In Lesko, the Third Circuit determined that a prosecutor's closing argument during a sentencing was unconstitutionally prejudicial, because he commented on the defendant's failure to testify and apologize for his crimes, and appealed to the jury's vengeance by telling them to impose death because it had a "duty" to even the "score" by taking his life.  925 F.2d 1527, 1540, 1544-47 (3d Cir. 1991).  Here, the prosecutor's comments did not impact any individual constitutional rights, such as the Fifth Amendment privilege against self incrimination, and the comments at issue did not draw upon the jury's vengeance, such that the response of Petitioner's counsel and the court's instruction could not cure any resulting prejudice.

Lastly, Petitioner contends that the prosecutor improperly disparaged mitigation evidence in violation of the Eighth Amendment's requirement that "the sentencer be allowed to hear and consider any mitigating evidence that the defendant proffers as a basis for a sentence less than death."  Lockett v. Ohio, 438 U.S. 586, 604 (1978) (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976)); (Pet. at 107-109.)  Petitioner specifically points to the following passage from the prosecutor's summation:

> I had an old law school professor, Dr. Hal Vernon, who said, talking to us first year law students, he said, son, when you have the law on your side, you argue the law, when you have the facts on your side, you argue the facts, when you have

_____

[87] For these reasons, we also reject Petitioner's contention that the prosecution's summation effectively "diminished the jury's sense of responsibility" by suggesting that the Commonwealth only seeks the death penalty in cases where it is appropriate.  (Pet. at 106-07.) Even if the prosecutor's summation could be read in this way, Petitioner's counsel directly responded to this point.

> right on your side, you argue right, when have neither, maybe it's time to bring
> in tears, maybe it's time to sit here and talk about the person that I knew could
> not have done what Mr. Wharton has been convicted of doing.

(N.T., 12/21/93, pp. 44-45.)  Petitioner contends that these comments disparaged entire categories

of proper mitigation evidence, such as his "background and character."  (Pet. at 108.)  Petitioner also

asserts that the prosecutor's additional comment that "[h]ow can you sit here and justify because of

sympathy what happened" was similarly improper, because it undermined the importance of "mercy"

and "sympathy" as factors that could render the death penalty inappropriate.  (N.T., 12/21/92, p. 45;

Pet. at 109.)

Our careful review of the record reflects that the prosecutor never argued that the jury should

not consider categories of mitigation evidence.  Rather, the prosecutor noted that "mercy, [and]

sympathy" were evidence of mitigation and compared the evidence of Petitioner's good character

with the nature of the offense and alleged aggravating factors.  (N.T., 12/21/92, pp. 49-51.)  Viewed

in context, these comments did not "manipulate or misstate the evidence," such that Petitioner's

Eighth Amendment rights were undermined.  See Darden, 477 U.S. at 182-83.  Further, Petitioner's

counsel identified Petitioner's background as appropriate mitigation evidence during his summation

and the court instructed the jury that they "may consider sympathy or mercy as a reason to impose

a life sentence if such sympathy or mercy is based on mitigating evidence introduced at this hearing;

that is, any mercy should arise from the evidence and not merely represent some personal subjective

reason or excuse to avoid performance of an unpleasant duty. . . .  Look at the mitigating

circumstances."  (N.T., 12/21/92, pp. 86, 91, 126-27.)

In light of the court's instruction, and the context surrounding the prosecutor's statements,

we are unable to conclude that such comments violated the Eighth Amendment or due process.  Our

conclusion is further supported by the Pennsylvania Supreme Court's determination, on direct appeal, that the jury's finding that the "death sentence imposed by the jury was not the product of passion, prejudice or any other arbitrary factor" and that the aggravating circumstances they found were supported by the evidence of record. Wharton II, 665 A.2d at 463. Petitioner's derivative claims of trial court error and ineffective assistance of counsel, therefore, are also without merit.

**M.    Claim X – Did the Court's Refusal to Allow Petitioner's Counsel to Argue that the Jury's Verdict would be "Basically Irreversible" During the Second Penalty Hearing Violate Due Process?**

At the close of his summation during the second penalty hearing, Petitioner's counsel asserted "[y]ou know all the things you need to know at this point to reach a verdict. Please focus on the fact that your verdict has such tremendous implications, and it's basically irreversible." The court sustained an immediate objection by the Commonwealth and addressed the jury, saying "I've always told them, don't let anybody lay any guilt trip on you for whatever you think the proper verdict is." (N.T., 12/21/92, pp. 95-96.) Petitioner claims that, by "chastising trial counsel's comments, the court led the jury to believe that its decision was 'reversible' thereby diminishing the import of the decision" in violation of the principles set forth in Caldwell v. Mississippi, 472 U.S. 320 (1985) (plurality opinion). (Pet. at 117-18.)

In Caldwell, the defense attorney in a capital case pleaded with the jury to spare the defendant's life during his closing argument. In reply, the prosecutor stated:

> I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think its unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know – they know that your decision is not the final decision. My God, how unfair can you be? You're job is reviewable. They know it.

472 U.S. at 325. The trial court overruled an immediate objection by the defense, stating that "I

think it is proper that the jury realizes that it is reviewable automatically." Id. The prosecutor followed saying, "as Judge . . . has told you, that the decision you render is automatically reviewable by the [State] Supreme Court [sic]." Id. The jury subsequently sentenced the defendant to death.

The United States Supreme Court reversed, holding that "[i]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of defendant's death rests elsewhere." Id. at 328-29. The Court determined that the prosecutor's remarks to the jury violated this principle, as they "were quite focused, unambiguous and strong," and endorsed by the trial court. Id. at 339-40; see Romano v. Oklahoma, 512 U.S. 1, 8-9 (1994).

This case is distinguishable from Caldwell. Here, the court refused to allow Petitioner's counsel to characterize the jury's decision as "basically irreversible[,]" and urged the jury to impose "whatever you think the proper verdict is[,]" without consideration of any "guilt trip." In doing so, the court did not "affirmatively misle[ad] the jury as to its role in the sentencing process[,]" or suggest that the jury could shift "their sense of responsibility to an appellate court." See id. at 330; Romano, 512 U.S. at 9. Cf. Riley v. Taylor, 277 F.3d 261, 294-99 (3d Cir. 2001) (reflecting that a Caldwell violation occurs where the jury is "affirmatively misled" as to its role in sentencing). The court's comments were also not as "focused" or "strong" as the clear direction the jury received in Caldwell. Petitioner's claim, therefore, is without merit.

### N.    Claim XI – Did the Court Violate Petitioner's Due Process Rights During the Second Penalty Hearing by Failing to Instruct the Jury That, if Sentenced to Life, Petitioner Would Never be Eligible for Parole?

Petitioner next claims that he is entitled to relief under Simmons v. South Carolina, 512 U.S. 154 (1994), because the second penalty hearing jury was not instructed as to his ineligibility for

parole, although the Commonwealth "argued Petitioner's future dangerousness." (Pet. at 119-20);
see Commonwealth v. Yount, 615 A.2d 1316, 1320-21 (Pa. Super. 1992) (reflecting that a defendant
convicted of first degree murder is ineligible for parole in Pennsylvania).  Respondents contend that
Petitioner's future dangerousness was not placed at issue by the Commonwealth, and that he was
therefore not entitled to a parole ineligibility instruction.[88]

In Simmons, the United States Supreme Court considered whether a defendant's due process
rights were violated where the prosecution argued that he posed a future danger to society and the
trial court refused to instruct the jury as to his parole ineligibility.  512 U.S. at 157.  During its
closing argument, the prosecution asked the jury "what do we do with [defendant] now that he is in
our midst" and "urged that a verdict for death would be a response of society to someone who is a
threat.  Your verdict will be an act of self-defense."  Id. (internal quotation marks omitted). The
defense sought to rebut the prosecutions "generalized argument of future dangerousness" by
asserting that defendant's "dangerousness was limited to elderly women," such as those he attacked
in connection with his conviction, and "there was no reason to expect further acts of violence once
he was isolated in a prison setting."  Id. at 158.  In support of this theory, the defendant asked the
court to instruct the jury that he would serve the "balance of his life" in prison if he received a life
sentence.  The court rejected the defendant's request and also refused to specifically address the issue
when the jury asked, during deliberations, whether "the imposition of a life sentence carr[ied] with
it the possibility of parole."  Id. at 159-60.

---

[88] Respondent also asserts that a life sentence does not exclude the possibility of parole,
pointing to the fact that the Governor can commute a life sentence, and thereby leave open the
possibility of parole.  However, in Simmons, the Court appeared to reject the argument that a
possibility of commutation rendered an instruction as to parole ineligibility unnecessary, where
the defendant's future dangerousness is at issue.  Simmons, 512 U.S. at 166 & n.6, 177.

In <u>Simmons</u>, a plurality of the Court ruled that the trial court committed constitutional error,

reasoning that "where the defendant's future dangerousness is at issue, and state law prohibits the

defendant's release on parole, due process requires that the sentencing jury be informed that the

defendant is parole ineligible." 512 U.S. at 154, 177. The controlling opinion in <u>Simmons</u> was

Justice O'Connor's concurrence. In interpreting Justice O'Connor's opinion, the Third Circuit noted

that she "seemed to phrase the holding more narrowly" than the plurality as to when "future

dangerousness is at issue."[89] Specifically, Justice O'Connor determined that a parole ineligibility

instruction is required where such instruction is accurate and "the prosecution <u>argues</u> that the

defendant will pose a threat to society in the future."[90] <u>Simmons</u>, 512 U.S. at 177 (emphasis added).

Petitioner claims that the Commonwealth placed "future dangerousness" at issue during his

second penalty hearing, pointing to the following portion of the prosecutor's summation:

And as I close, Dr. Benjamin May, who was the President of Morehouse

---

[89] <u>Rompilla v. Horn</u>, 355 F.3d 233, 264-66 (3d Cir. 2004), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom.</u> <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005); <u>Bronshtein v. Horn</u>, 404 F.3d 700, 715-16 (3d Cir. 2005).

[90] The United States Supreme Court appeared to broaden <u>Simmons</u>'s "at issue" requirement in <u>Kelly v. South Carolina</u>, 523 U.S. 36 (2002). In <u>Kelly</u>, the Court determined that the defendant was entitled to a <u>Simmons</u> instruction where the prosecutor "accentuated the clear implication of future dangerousness raised by the evidence[.]" 523 U.S. at 255. The Court noted that "evidence of future dangerousness under <u>Simmons</u> is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." <u>Id.</u> at 254. The Court acknowledged that the evidence in a substantial portion, if not all, capital cases will show a defendant is likely to be dangerous in the future[,]" but left open the question as to whether a parole ineligibility instruction is required where the "evidence shows future dangerousness but the prosecutor does not argue it." <u>Id.</u> At oral argument before Judge Giles, who was previously assigned this case, Petitioner conceded that <u>Kelly</u> was inapplicable because it "was decided after our direct appeal and, therefore, we do not get the retroactive application" of the case. (Tr. Or. Arg., 10/10/06, pp. 35-36) (reflecting that the Petitioner was also not relying upon <u>Shafer v. South Carolina</u>, 532 U.S. 36 (2001) for the same reason).

College, once gave a speech when I was a boy. . . . And he said the following. "If I have but 60 seconds, that's one minute, may I not lose it, may I not abuse it, may I do something worth while."

This may be your only chance to sit in judgment of another member, another citizen. Under these facts and under anything that you hold supreme, your verdict should be the aggravating circumstances so outweigh the mitigating circumstances that the only verdict can be death. Death. Stop Robert Wharton. Stop him. Stop him in his tracks. Stop him as cold as he did Ferne Hart, beautiful Ferne. Stop him as he stopped Bradley, the boy with a voice of an angel who sang before Queens and Kings.

(N.T., 12/21/92, pp. 64-65.) Petitioner claims that, when viewed in conjunction with the nature of the offenses, these remarks placed Petitioner's future dangerousness at issue. (Pet'r's Reply at 38; Tr. Or. Arg., 12/21/92, pp. 27-28.) We disagree.

As noted previously, the Commonwealth presented four aggravating circumstances during Petitioner's second penalty hearing, none being future dangerousness, and argued that the jury should impose the death penalty because these aggravating factors outweighed the mitigating circumstances. Thus, unlike in Simmons, the prosecutor in this case did not "argue[] that petitioner's future danger was a factor for the jury to consider when fixing the appropriate punishment." 512 U.S. at 157. The prosecutor's comment that the jury should "Stop Robert Wharton," especially when considered in context, are wholly distinguishable from the comments in Simmons.

In Simmons, the prosecutor described the defendant as a "threat" and likened the imposition of the death penalty to an "act of self-defense." These remarks "strongly implied that petitioner *would* be let out eventually if the jury did not recommend a death sentence." Id. at 178 (O'Connor, J., concurrence). The comments in Simmons were also corroborated by the testimony of prosecution and defense witnesses, who "agreed that petitioner posed a continuing danger to elderly women." Id. at 157. In this case, the prosecutor urged the jury to "stop" Petitioner "as he stopped" his victims.

140

These statements imply that the jury should sentence Petitioner to death, not that he is a future danger to society. The Commonwealth also did not present evidence at the second penalty hearing on the issue of Petitioner's future dangerousness. We thus conclude that the Commonwealth did not "argue" future dangerousness or put it "at issue" in the manner described in Simmons. Consequently, Petitioner was not entitled to a parole ineligibility instruction under Simmons and appeal counsel was not ineffective for failing to press this issue.[91]

Petitioner also argues that, regardless of whether his future dangerousness was at issue, he was entitled to a parole ineligibility instruction pursuant to Townsend v. Burke, 334 U.S. 736 (1948). In Townsend, the United States Supreme Court reversed a criminal conviction where the defendant was not represented by counsel and, as a result, the sentencing court considered crimes of which he was acquitted. 334 U.S. at 740-41. The Townsend Court held that the defendant's sentence violated due process, because "while disadvantaged by lack of counsel, the prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue."[92] Id. Petitioner claims that, as in Townsend, the jury in his case operated under a "material misapprehension of law or fact relating to the sentencing decision[,]" because it was not instructed that a life sentence meant

---

[91] Petitioner also asserts that the court's failure to provide a parole ineligibility instruction violated Gardner v. Florida, 430 U.S. 349, 362 (1977), which held that it violates due process to execute a defendant "on the basis of information which he had no opportunity to deny or explain." The Simmons Court relied upon Gardner in reaching its conclusion, reasoning that it was constitutionally impermissible to preclude a defendant from informing the jury of his parole ineligibility to rebut the prosecution's assertion that he would be a future danger to society. 512 U.S. at 166, 175-76. Our conclusion as to Petitioner's Simmons claim, therefore, addresses his claim of error under Gardner.

[92] The Supreme Court reaffirmed this principle in United States v. Tucker, 404 U.S. 443, 447 (1972), which reversed a sentence because it was based, in part, upon prior convictions that were unconstitutionally obtained.

"life without possibility of parole[.]"   (Pet. at 121; Pet'r's Reply at 90 n.54.)

Townsend dealt with a jury verdict based upon incorrect information about a defendant's criminal history, not the issue of whether a trial court is required to instruct a jury about a defendant's parole ineligibility.  See United States v. Tucker, 404 U.S. 443, 447 (1972) (quoting Townsend, 334 U.S. at 741) (finding due process violation where the record made "evident that the sentencing judge gave specific consideration to the respondent's previous [unconstitutional] convictions").  It is, therefore, distinguishable from this case.  In any event, even if we were to read Townsend to extend beyond a jury's consideration of material misinformation about a defendant's criminal record, Petitioner's claim is without merit.  The jury was told that they could sentence Petitioner to "life imprisonment or death," and that if they "did not agree unanimously on a death sentence" they could either continue deliberating or could "stop deliberating and sentence the defendant to life in prison."  The court further instructed that if the jury was "deadlocked," it would be the court's "duty to sentence the defendant to life in prison."  (N.T., 12/21/92, pp. 116, 225-26.)  The court's instruction, therefore, did not suggest that a life sentence carried the possibility of parole or imply that Petitioner would be eligible for parole.  See also Rollins v. Horn, 2005 WL 1806504 at *38 n.34 (E.D.Pa. Jul. 26, 2005) (rejecting Townsend claim in death penalty case, based upon failure of trial court to instruct the jury that "life means life," because such an instruction does not materially misstate Pennsylvania law).

Lastly, Petitioner claims that he had a "liberty interest" in a parole ineligibility instruction, by virtue of state law.  Specifically, Petitioner claims that because a capital jury has discretion to sentence a defendant to "life without possibility of parole" or death under Pennsylvania statute, he had a legitimate and substantial expectation that they jury would be fully instructed in this manner.

142

In support of this argument, Petitioner relies upon Hicks v. Oklahoma, 447 U.S. 343 (1980).

In Hicks, the jury sentenced the defendant to a mandatory minimum sentence for a drug offense based upon a state "habitual offender" statute, which was later declared unconstitutional. On appeal, the state court affirmed the jury's sentence because it was within the range of punishment that would have been available had the jury not been instructed regarding the "habitual offender" statute. The United States Supreme Court reversed, holding that the sentence violated due process. The Court determined that the defendant had a "substantial and legitimate expectation" that he would be deprived of his "liberty only to the extent determined by the jury in the exercise of their statutory discretion[.]" 447 U.S. at 346. The Court concluded that defendant was denied this protected "liberty interest," when the appellate court affirmed his sentence on the assumption that the "jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision." Id.

Initially, we note that defendant's "liberty interest" argument, if accepted, would largely swallow the constitutional principle articulated in Simmons. In Simmons, it was "conclusively established" that the defendant was not subject to parole under state law. The Court, however, determined that even where "the only available alternative to death is life imprisonment without possibility of parole[,]" a parole ineligibility instruction is only constitutionally mandated where "defendant's future dangerousness is at issue." 512 U.S. 154, 162, 178 (1994). Given the Court's analysis in Simmons, we decline to conclude that due process required Pennsylvania to provide a parole ineligibility instruction in all capital cases, by virtue of their statutory scheme, regardless of whether future dangerousness is at issue.

In any event, Petitioner's Hicks claim is without merit. As articulated above, the jury

143

instruction provided in Petitioner's second penalty hearing was not inconsistent with Pennsylvania law, which provided that a capital jury "shall determine whether the defendant shall be sentenced to death or life imprisonment." 42 Pa.C.S. § 9711(a)(1). While "life imprisonment" in the capital context comes without parole, absent computation by the Governor, the court's failure to describe the statutory definition and its relationship with other statutory provisions was not constitutional error. Indeed, Pennsylvania maintains "the prerogative to determine how much (if at all) juries [are to be] . . . informed about the postsentence legal regime." O'Dell v. Netherland, 521 U.S. 151, 162 (1997). This is simply not a situation, as in Hicks, where the court infringed upon the statutory discretion provided to the jury under the state's sentencing regime.

### O.   Claim XIII – Did the Pennsylvania Supreme Court's Review of Petitioner's Death Sentence Violate Due Process?

At the time of Petitioner's direct appeal of his second death sentence in 1992, the Pennsylvania Supreme Court was statutorily required to determine whether his sentence was "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." 42 Pa.C.S. § 9711(h)(3)(iii) (1992). In light of this directive, the Pennsylvania Supreme Court, relying upon "information compiled by the Administrative Office of Pennsylvania Courts[,]" determined that "the death sentence imposed on [Petitioner] is not disproportionate to the sentences imposed in similar cases." Wharton II, 665 A.2d 458, 463 (Pa. 1995).

Petitioner challenged this determination through the PCRA process, asserting that the review he was provided was not "meaningful" in violation of "state and federal constitutional law." (Am. PCRA Pet. at 54-55, 58-60.) This claim was rejected by the PCRA Court and the Pennsylvania

144

Supreme Court.  The Pennsylvania Supreme Court determined that Petitioner's claim was similar to a claim it denied in <u>Commonwealth v. Gribble</u>, 703 A.2d 426 (Pa. 1997), and noted that there was "nothing arbitrary or capricious" in the manner it reviewed the proportionality of death sentences. <u>Commonwealth v. Wharton</u>, 811 A.2d 978, 991 (Pa. 2002) (quoting <u>Gribble</u>, 703 A.2d at 440). Before this Court, Petitioner again challenges the constitutionality of the Pennsylvania Supreme Court's proportionality review.

The United States Constitution does not require state appellate courts to engage in proportionality review in capital cases, <u>Pulley v. Hicks</u>, 465 U.S. 37, 50-51 (1984), and it is not the "province of a federal habeas court to reexamine state-court determinations on state court questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  Further, it is "unclear whether, under Third Circuit law, a state proportionality-review statute creates any cognizable liberty interest for due process purposes." <u>Riley v. Taylor</u>, 277 F.3d 261, 311-12 (3d Cir. 2001); <u>see</u> <u>Frey v. Fulcomer</u>, 132 F.3d 916, 925 n.7 (3d Cir. 1997).  Even assuming such a liberty interest exists, a federal court's review of state proportionality review is generally limited.  If a federal court finds that the state court performed its proportionality review in good faith, "it cannot 'look behind' the state court's conclusion of proportionality to consider whether the state court misapplied state proportionality law." <u>Id.</u> (quoting <u>Walton v. Arizona</u>, 497 U.S. 639, 656 (1990), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>Ring v. Arizona</u>, 536 U.S. 584 (2002)); <u>see</u> <u>also</u> <u>Bannister v. Delo</u>, 100 F.3d 610, 627 (8th Cir. 1996).

Petitioner contends that the Pennsylvania Supreme Court's proportionality review was not meaningful, because the database of cases that it relied upon included material inaccuracies and

omissions.[93]   Plaintiff claims that a "proportionality review grounded in an identifiably flawed database which the court has consistently refused to correct, is a review done in <u>bad</u> <u>faith</u>[,]" particularly considering that the "mistakes . . . have been frequently called to the Pennsylvania Supreme Court's attention[.]" (Pet. at 147-54; Pet'r's Reply at 94-95.)   There is no indication in Petitioner's submission, however, that the alleged errors in the database were called to the Supreme Court's attention at the time it performed its proportionality review of Petitioner's case in 1995.

In any event, the Pennsylvania Supreme Court has repeatedly rejected claims challenging its proportionality review process, including claims based upon the alleged errors Petitioner relies upon here.   In <u>Gribble</u>, the Pennsylvania Supreme Court held that "we believe that our proportionality review comports with the General Assembly's desire to afford capital defendants an additional check against the arbitrary imposition of the death penalty."   703 A.2d 426, 440 (Pa. 1997).   In <u>Commonwealth v. Harris</u>, the Court rejected a claim that the "data base maintained by the Administrative Office of Pennsylvania Courts (AOPC) is substantially flawed and the procedures which produce the results are inherently defective."[94]   Given the Supreme Court's pronouncement on this issue, there is no indication that the Court performed its proportionality review of Petitioner's claim in bad faith, either on direct appeal in 1995 or in its denial of his PCRA petition in 2002.   We, therefore, will not "look behind" the Supreme Court's conclusion to consider whether it properly

---

[93] In support of this allegation, Petitioner points to testimony taken in an unrelated case, <u>Commonwealth v. Terry</u>, from legal counsel for the Administrative Office of Pennsylvania Courts and a professor of sociology and statistics at Temple University.  <u>See</u> (Pet. at 147) (citing Case Number 1563, Court of Common Pleas, Montgomery County).

[94] 703 A.2d 441, 451-52 (1997); <u>see</u> <u>Commonwealth v. Laird</u>, 726 A.2d 346, 361 (Pa. 1999); <u>Commonwealth v. Albrecht</u>, 720 A.2d 693, 708-09 (Pa. 1998) (rejecting challenge to proportionality review because "litigants are afforded no access to the data upon which it is based and because that data, by virtue of underinclusiveness, is fundamentally flawed").

applied state proportionality law.  See Riley, 277 F.3d at 311-12; Stevens v. Beard, 701 F.Supp.2d 671, 706-07 (W.D.Pa. 2010).

Petitioner further asserts that he was unable to challenge the integrity of the database, since he "had neither notice of the nature of the review nor an opportunity to be heard" on this issue in violation of due process.  (Pet. at 152.)  Petitioner relies upon Gardner v. Florida, in which the United States Supreme Court held that a "petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."  430 U.S. 349, 361-62 (1977).  In Gardner, the judge rejected the jury's recommendation of mercy and imposed the death penalty in partial reliance on a confidential pre-sentence report that was not disclosed to petitioner or his counsel or included in the record on appeal. Id.

Gardner is distinguishable from this case.  The information that the Pennsylvania Supreme Court relied upon in performing its review "is made available by . . . [the Administrative Office of Pennsylvania Courts] free of charge."  Commonwealth v. DeHart, 516 A.2d 656, 260-61 (Pa. 1986). This information, therefore, is not of the "confidential" nature of the pre-sentence report at issue in Gardner.  In addition, the proportionality review process was "an appellate process, statutory mandated, to ensure that sentences of death are not imposed by Pennsylvania juries and/or jurists, in a disproportionate manner."  Laird, 726 A.2d at 361.  Under state law, it was not an "adversarial part of the trial or the sentencing procedures in a death penalty case."  Commonwealth v. Banks, 656 A.2d 467, 474 (1995).  In Gardner, the petitioner challenged the use of confidential information that the judge relied upon in sentencing him to death.

In denying Petitioner federal relief on this basis, our decision is in accordance with other

147

district courts that have rejected challenges to the Pennsylvania Supreme Court's proportionality review process.  Stevens v. Beard, 701 F.Supp.2d 671, 706-07 (W.D.Pa. 2010); Rollins v. Horn, 2005 WL 1806504 at **39-40 (E.D.Pa. Jul. 26, 2005); Jermyn v. Horn, 1998 WL 754567 at **52-54 (M.D.Pa. Oct. 27, 1998).

P.      **Claim V – Does Petitioner's Death Sentence Violate the Ex Post Facto Clause or Due Process?**

On October 1, 1986, Petitioner filed a direct appeal to the Pennsylvania Supreme Court, challenging his original death sentence.  (Pet. at 76.)  At this time, Pennsylvania's death penalty statute provided that, in disposing of a death penalty appeal, the Pennsylvania Supreme Court could "either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence."  42 Pa.C.S. § 9711(h)(2); see Commonwealth v. Williams, 522 A.3d 1058, 1067 (Pa. 1987).  On December 21, 1988, this provision was amended and the Supreme Court was granted authority to remand a defendant's case for a second penalty hearing.  See Commonwealth v. Young, 637 A.2d 1313, 1217 (Pa. 1993).  On April 28, 1992, the Pennsylvania Supreme Court vacated Petitioner's death sentence, due to an unconstitutionally vague jury instruction, and remanded the case for a new sentencing hearing in accordance with Pennsylvania's amended death penalty statute, 42 Pa.C.S. § 9711(h)(2).  See Wharton I, 607 A.2d 710, 723-24 (Pa. 1992).

Petitioner challenges the Court's remand of his case under the amended death penalty statute as a violation of the Ex Post Facto Clause and due process.  We will address each of his challenges in turn.

148

### 1.      The <u>Ex</u> <u>Post</u> <u>Facto</u> Claim

Petitioner first contends that the application of § 9711(h)(2) to his case violated the <u>Ex</u> <u>Post</u> <u>Facto</u> Clause of Article 1 of the Constitution.  (Pet. at 80-83.)  The Pennsylvania Supreme Court rejected this claim on PCRA appeal, relying upon <u>Commonwealth v. Young</u>, 637 A.2d 1313, 1317-18 (Pa. 1993).  In <u>Young</u>, the Pennsylvania Supreme Court held that the application of the amended death penalty statute to a defendant in Petitioner's position did not implicate the <u>Ex</u> <u>Post</u> <u>Facto</u> Clause, as interpreted in <u>Calder v. Bull</u>, 3 U.S. (1 Dall.) 386, 390 (1798) and <u>Collins v. Youngblood</u> 497 U.S. 37, 39-40 (1990).  Petitioner contends that the Pennsylvania Supreme Court unreasonably applied <u>Calder</u> to the facts of his case in the meaning of 28 U.S.C. 2254(d)(1), thereby providing him a basis for federal habeas relief on this claim.  We disagree.

In <u>Calder</u>, the United States Supreme Court held that "<u>ex post facto</u> laws," include:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony than the law required at the time  of the commission of the offense, in order to convict the offender.

3 U.S. (1 Dall.) at 390.  The United States Supreme Court subsequently applied <u>Calder</u> in <u>Collins v. Youngblood</u>, a case in which the defendant sought federal habeas relief based upon the retroactive application of a criminal statute that provided the state appellate court with authority to "reform" an improper verdict, rather than remanding the case for a new trial.  497 U.S. 37, 39-40 (1990).  In <u>Collins</u>, the jury imposed life imprisonment as well as a $10,000 fine, although a fine was not authorized under state law.  At the time, a jury verdict that included an improper punishment "was

149

void at its inception and had to be set aside." Id. at 39 n.1.  On direct appeal, the defendant's

conviction and sentence were nonetheless affirmed.

On state collateral review, petitioner raised this issue before the state appellate court.  While

his petition was pending, a criminal statute was passed which allowed "an appellate court to reform

an improper verdict that assesses a punishment not authorized by law." Id. at 40.  Relying upon the

statute, the court ordered that the improper fine be deleted and denied defendant's request for a new

trial.  The United States Supreme Court determined that the statute was not an ex post facto law

under Calder, because it "does not punish as a crime an act previously committed, which was

innocent when done; nor make more burdensome the punishment for a crime, after its commission;

nor deprived one charged with crime of any defense available according to law at the time when the

act was committed." Id. at 52.

In light of Collins, there was nothing unreasonable about the Pennsylvania Supreme Court's

determination that the application of § 9711(h)(2) to Petitioner's case did not violate the Ex Post

Facto Clause.  Like the statute at issue in Collins, § 9711(h)(2) did not render an act criminal, which

was previously innocent, "make more burdensome the punishment" for the crime at issue or deprive

petitioner of a defense that was previously available.  Rather, § 9711(h)(2) expanded the appellate

court's authority to order that errors be handled at the trial level.

Although this legislative change ultimately worked to Petitioner's disadvantage, this alone

is insufficient to constitute a constitutional violation.  Indeed, the Collins court expressly rejected

the proposition that the Ex Post Facto Clause captures any law, "which in relation to the offense or

its consequences, alters the situation of a party to his disadvantage[.]" Collins, 497 U.S. at 48-50.

The Ex Post Facto Clause, rather, is only concerned with "retrospective laws" that disadvantage

defendants in the manner described in the "Calder categories[.]"  Collins, 497 U.S. at 49-50.

Because application of the amended version of § 9711(h)(2) did not "disadvantage" Petitioner by

changing the elements of the offense; the nature and extent of the punishment available for the crime;

the amount or type of evidence necessary to sustain a conviction; or the available defenses, the

Pennsylvania Supreme Court reasonably denied his ex post facto claim.

Petitioner contends, however, that application of § 9711(h)(2) in his case implicates the

"Calder categories," as interpreted in Stogner v. California, 539 U.S. 607 (2003).[95]  In Stogner, the

Supreme Court was asked to consider whether application of a state law that authorized criminal

prosecution in child abuse cases beyond the statute of limitations was an ex post facto law.  Id. at

609-10.  The Court held that it was, under Calder's second category, as applied to the defendant,

reasoning that the state law "aggravate[d]" defendant's crime, or made it "greater than it was,"

because it "inflicted punishment" for past criminal conduct that, pursuant to the statute of limitations,

was no longer punishable.  Id. at 613-14.  The Stogner Court also noted that the law "may fall"

within Calder category four, which pertains to laws that reduce the "quantum of evidence required

to convict."  Id. at 615.  The Court determined that the state law effectively lowered the burden of

proof by allowing the prosecution to sustain a conviction after the statute of limitations had run,

although, previously, no "quantum of evidence" would be sufficient to convict a defendant after the

---

[95] Stogner was decided after the Petitioner's conviction became final and after the
Pennsylvania Supreme Court denied his claim for habeas relief.  Therefore, Stogner is irrelevant
to our consideration of whether the decision of the Pennsylvania Supreme Court was reasonable,
unless the Stogner Court's decision was "compelled by existing precedent" or certain narrow
exceptions apply.  See Purcell v. Horn, 187 F.Supp.2d 260, 370 (W.D.Pa. 2002) (citing Teague v.
Lane, 489 U.S. 288, 301, 316 (2002)).  We need not determine whether Stogner articulated a
"new rule" of constitutional law, however, because it does not provide Petitioner a basis for
relief.

limitations period.  Id. at 615.

The Court's holding in Stogner does not render the Pennsylvania Supreme Court's reliance on Collins unreasonable.  Collins dealt with a law that expanded the state appellate court's authority in its review of criminal sentences, much like § 9711(h)(2).  Stogner concerned a statute that abrogated the statute of limitations period for certain crimes and effectively expanded the period by which the state could prosecute and punish a defendant.  We fail to see how Stogner, rather than Collins, would have supplied the most compelling precedent on this issue, even if it was available to the Pennsylvania Supreme Court at the time of its review.

Further, Stogner does not assist Petitioner.  Before § 9711(h)(2) was amended, a defendant who was sentenced to death was not entitled to a life sentence, unless and until his death sentence was vacated by the Pennsylvania Supreme Court.  Petitioner's initial death sentence was not vacated until after § 9711(h)(2) was amended, thus, Petitioner was never entitled to the benefit of the former statute.  Unlike the defendant in Stogner, Petitioner was not deprived of a protection from punishment that he was previously guaranteed under the law.  This is a material difference, which renders Stogner distinguishable from this case.  See Stogner, 529 U.S. at 610 ("The law at issue here created a new criminal limitations period that extended the time in which prosecution is allowed. It authorized criminal prosecutions that the passage of time had previously barred.  Moreover, it was enacted after prior limitations periods for Stogner's alleged offenses had expired.  Do these features of the law, taken together, produce the kind of retroactivity that the Constitution forbids?  We conclude that they do.")

Given all of the above, Petitioner is not entitled to relief on his ex post facto claim.

## 2.    Due Process Claim

Petitioner also claims that the Pennsylvania Supreme Court delayed issuing a decision vacating his initial death sentence until § 9711(h)(2) was amended, so that it could remand his case for a second death penalty hearing.  He claims that the Court's reluctance to issue an opinion violated "fundamental notions of due process[,]" pursuant to In re Murchison, 349 U.S. 133, 136 (1955). (Pet. at 83-85.)  In support of his argument, Petitioner points to three Pennsylvania Supreme Court opinions from the 1980s, in which either a majority of the Court or concurring Justices criticized the previous version of § 9711(h)(2).[96]  Petitioner also relies upon the Court's alleged "delay" in issuing a decision vacating his initial death sentence.

In In re Murchison, the United States Supreme Court held that it violated due process for a judge to preside over a criminal contempt hearing relating to charges that the judge brought during a "one-man grand jury" proceeding.[97]  349 U.S. at 134, 136-37.  The Supreme Court directed that any "procedure which would offer a possible temptation to the average . . . judge not to hold the

---

[96] See Commonwealth v. Stoyko, 475 A.2d 714, 725 n.7 (Pa. 1984) (affirming death sentence and noting that, given a constitutional error at sentencing could guarantee a life sentence under previous version of § 9711(h)(2), sentencing counsel may be motivated to be ineffective to further his clients interests); Commonwealth v. Williams, 522 A.2d 1058, 1067-68 (Pa. 1987) (Nix., C.J., concurring) (noting, in case where the Court vacated a death sentence and remanded for imposition of life sentence, that "[a]s the statute is presently construed, judicial tribunals are reluctant to overturn sentences of death, particularly in circumstances as horrendous as this, where the action precludes the reimposition of a sentence of death, even though the subsequent proceeding is free of error and such a sentence is fully justified under the evidence"); Commonwealth v. Caldwell, 532 A.2d 813, 818 (Pa. 1987) (vacating death sentence and remanding for imposition of life sentence, but noting that "[p]reclusion of the reimposition of a death sentence may ultimately impinge upon the defendant's interest as well if it engenders a reluctance to vacate such a sentence, albeit unintentionally.  This unfortunate result could be avoided by permitting this Court to remand for resentencing").

[97] This grand jury procedure was available under the state law at issue in the case.  Id.

balance nice, clear, and true between the State and the accused denies the latter due process of law." Id. (quotation omitted.)  Given that the judge could not be "wholly disinterested" in the outcome of the case and would be influenced by what transpired at the grand jury proceeding, the Court concluded that his participation in the contempt hearing violated due process.  Id. at 136-38.

We conclude that Petitioner has failed to demonstrate that the Pennsylvania Supreme Court's handling of his collateral appeal violated due process.  In re Murchison is clearly distinguishable from this case, and does not stand for the proposition that a court's criticism of a statutory provision constitutes an actual or potential bias sufficient to violate due process in future cases.  Our review of the United States Supreme Court cases, rather, suggests that issues of judicial partiality, although fact-specific, generally concern a judge's bias against a particular party.  See e.g., Bracey v. Gramley, 520 U.S. 899, 905 (1997) (holding it would violate due process if judge was predisposed to rule in favor of those who offered him bribes); Aetna Life Ins. v. Lavoie, 475 U.S. 813, 822-25 (1986) (holding that judge violated due process by sitting on a case where it would be in his financial interest to rule in a party's favor); Ward v. Monroeville, 409 U.S. 57, 58-59 (1972) (same).

There is also no indication that the Pennsylvania Supreme Court was actually biased against Petitioner in this case or faced a "possible temptation" to delay its decision in an effort to avoid the ramifications of the former § 9711(h)(2).  The criticisms the Pennsylvania Supreme Court raised in previous opinions, unrelated to this case, are insufficient to convince us otherwise, particularly considering that these criticisms often came in cases where the Court nevertheless vacated the death penalty and remanded for a life sentence.   Even if these past comments somehow raised an "appearance of bias" – a proposition we reject – that would be insufficient to support a due process claim.  See Johnson v. Carroll, 369 F.3d 253, 262 (3d Cir. 2002) (holding that "none of the Supreme

154

Court cases relied upon by the District Court, [including In re Murchison,] and we are aware of none, has held or clearly established that an appearance of bias on the part of a judge, without more, violates the Due Process Clause.").

Similarly, the length of time the Pennsylvania Supreme Court considered Petitioner's appeal is insufficient to support a due process violation. The Petitioner's appellate brief was fully briefed in September 1987 and oral argument was held on December 7, 1987. On June 28, 1988, a second oral argument was scheduled for January 18, 1989. On December 21, 1988, § 9711(h)(2) was amended. Two years later, on December 10, 1990, the Court set a third oral argument for April 8, 1991. On April 21, 1991, following this argument, the Court issued its opinion vacating Petitioner's death sentence and remanding his case for a second penalty hearing, pursuant to the amended statute. (Pet. at 78-79.) The Court's lengthy consideration of this capital appeal does not provide a basis to infer that the Court refused to issue a decision or could have been influenced to delay its decision in anticipation of the amendment to § 9711(h)(2).[98]

### Q.   Cumulative Effect of All Errors

Petitioner does not specifically assert that the effect of all of his alleged errors provide a basis for relief. The United States Court of Appeals for the Third Circuit, however, has held that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if

---

[98] In his amended petition, Petitioner also alleges that his appellate counsel was ineffective for failing to challenge the inordinate delay by the Pennsylvania Supreme Court in deciding his appeal. (Am. Pet. at 9.) Respondent contends that this claim is procedurally defaulted, as it was never presented to the state courts and he is now foreclosed from seeking such review. (Resp. to Am. Pet. at 16-17.) We need not address this issue, however, as Petitioner's ineffective assistance claim is without merit for the reasons stated above. See United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) (counsel cannot be ineffective for failing to raise a meritless issue); 28 U.S.C. § 2254(b)(2) (directing that a claim may be denied on the merits, notwithstanding a petitioner's failure to properly exhaust state remedies).

155

cumulatively the prejudice resulting from them undermine the fundamental fairness of his trial and denied him his constitutional right to due process." Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008). Cumulative errors will only be deemed harmful where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." Id. (internal quotation marks omitted.) To satisfy this standard, a petition must show that the errors complained of "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986).

Considering the evidence presented at Petitioner's trial as well as his sentencing hearings, which have been recounted in great detail, we conclude that Petitioner's claims are insufficient to implicate the fundamental fairness of either his trial or his sentencing hearings.

## V.   CONCLUSION

Following an evidentiary hearing and careful consideration of his petition, and for the reasons articulated above, Petitioner is not entitled to habeas relief on any of his twenty-three claims for relief.  His petition, therefore, will be denied.

At the time of a final order denying a petition under 28 U.S.C. 2254, the court must determine whether to issue a certificate of appealability.  A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  To satisfy this burden, the petitioner must show "that a reasonable jurist would find the district court's assessment of the constitutional claims to be debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000)  We conclude that a reasonable jurist could debate whether the Court properly resolved Petitioner's ineffective assistance of counsel claims with respect to his

counsel's challenge to the voluntariness of his confession and the waiver of his <u>Miranda</u> rights at his suppression hearing and trial (Claim II), and Petitioner's Confrontation Clause claim under <u>Bruton v. United States</u>, 391 U.S. 123 (1968) (Claim VI).  The certificate of appealability is denied in all other respects.

An appropriate order follows.