# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT WHARTON** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner** | : | **No. 01-6049** |
| | : | |
| **v.** | : | **CAPITAL CASE** |
| | : | |
| **TAMMY FERGUSON,** | : | |
| **Superintendent,** | : | |
| | : | |
| **Respondent** | : | |


## BRIEF OF *AMICIS CURIAE*
## PENNSYLVANIA OFFICE OF ATTORNEY GENERAL

By Order dated May 7, 2019, this Court requested that the Pennsylvania
Office of Attorney General ("OAG") "submit an amicus brief in this matter, setting
out its position as to whether Petitioner is entitled to relief on his remaining habeas
claim": whether trial counsel was ineffective for failing to introduce evidence
regarding Petitioner's "positive" adjustment to prison between his two penalty
phase hearings. The Court's order identified several specific questions on which it
required further information in order to carry out its duty to resolve Petitioner's
legal claim.  The OAG files this *amicus* brief pursuant to that order.  As an *amicus
curiae* -- literally, a friend of the court -- the OAG neither supersedes the local
prosecutor under Pennsylvania law nor limits the proper exercise of prosecutorial
discretion as delineated by the Pennsylvania Supreme Court. *See Commonwealth v.*

*Brown*, 196 A.3d 130 (Pa. 2018).  Rather, this *amicus* brief attempts only to provide the assistance requested by this Court on the narrow factual and legal issues before it.

## I.   INTRODUCTION

In 1984, Petitioner Robert Wharton and a cohort murdered Bradley and Ferne Hart in their Mount Airy home, leaving their infant daughter to fend for herself in the unheated home in the dead of winter. The murders were the culmination of a series of crimes Wharton committed against the victims to avenge a disputed debt for construction work Wharton had performed in the summer of 1983. Two different juries sentenced Wharton to death.

Over the last three decades, the Supreme Court of Pennsylvania affirmed Wharton's judgment of sentence on direct appeal and affirmed the denial of relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, and this Court, during its initial review, denied all of Wharton's claims for habeas corpus relief under 28 U.S.C. § 2254.

Currently pending before the Court is Wharton's remaining claim of ineffective assistance of trial counsel for failing to investigate and present evidence of Wharton's "positive" prison adjustment at the second penalty phase hearing in 1992, a claim the Third Circuit remanded for an evidentiary hearing. This Honorable Court noted that, after advocating for decades to uphold Wharton's

death sentences, the Philadelphia District Attorney's Office now seeks to concede this claim and agree to habeas corpus relief.

In light of this proposed concession, by Order dated May 7, 2019, this Court requested that the OAG submit a brief as *amicus curiae*, setting forth its position as to whether the law requires relief on this remaining claim. Inquiry into the areas designated by the Court has provided evidence of Wharton's overwhelmingly negative prison adjustment, including his repeated attempts to escape custody, a recent declaration from trial counsel, William T. Cannon, Esquire, discussing what his strategy would have been if Wharton's prison records reflected negative behavior while incarcerated, and a report from forensic psychiatrist John S. O'Brien, III, M.D., J.D., opining that Dr. Krop's conclusions do not reflect "a balanced inquiry into [Wharton's] history, documented behavior or correctional adjustment and cannot be accepted at face value." This information suggests that Wharton is not entitled to relief on his ineffective assistance of counsel claim. Moreover, despite the statement in the Notice of Concession of Penalty Phase Relief filed in this matter (Doc. No. 155), family members of Bradley Hart and Ferne Hart have indicated that they were never contacted about the status of the case prior to the concession and that they are against penalty phase relief.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Wharton's Burglaries, Vandalism and Brutal Murders of the Two Victims

The Court has adopted the following facts supporting Wharton's first-degree

murder convictions, as described by the Supreme Court of Pennsylvania:

> The murders of Bradley Hart and his wife Fern[e] were the culmination of a series of crimes committed by [Wharton] and his cohorts against the Hart family in retribution for a dispute over the quality of home improvement work [Wharton] performed in the summer of 1983 at the Harts' residence and at a radio station owned by Hart's father, the Reverend Samuel Hart. When Hart refused to pay [Wharton]'s employer for the work, [Wharton] complained bitterly and blamed Bradley Hart for his lost wages. He vowed to make the Hart family pay.[1]
>
> [Wharton] began victimizing the Harts by burglarizing their home with Larue Owens on Sunday, August 14, 1983, at a time when [Wharton] and Owens knew the Harts would be at church. [Wharton] returned the following week [on August 22, 1983] with Owens and Eric Mason, and stole additional property. This time they also vandalized the Harts' home by slashing furniture; ransacking closets; mutilating family photographs; pouring different liquids such as bleach, paint, and oil throughout the house; and, defecating and urinating on the floors.[2] On September 4, 1983, [Wharton]

---

[1] Approximately three or four months before the victims' murders, Wharton told Bradley Hart's brother that Bradley owed him money and that if he did not pay, he was going to kill him. (N.T. 12/15/92, 64-66)

[2] After the first burglary on August 14, 1983, the victims implemented extra security measures at their home, which included putting bars on various windows and installing a home alarm system. (N.T. 12/14/92, 118-19; N.T. 12/15/92, 112, 122; N.T. 12/16/92, 45)

During the August 22, 1983 burglary, Wharton and his cohorts left a note at the scene, taunting the victim's failed efforts to safeguard his family. The note documented the items stolen and stated: "Thanks Bradly G.I. Hart. You have to go better than this to keep us out. Clean up good, didn't we. Thank you. Ha, ha." (N.T. 12/14/92, 90, 117-18) As if suggesting what was to

burglarized Reverend Hart's church, stole cash and computer equipment, and pinned a photograph of Bradley Hart to a wall with a letter opener. Then, in early January of 1984, Wharton, Mason and Thomas Nixon went to the Harts' home intending to rob them. The men abandoned their plan when they discovered the Harts had another person visiting in the house.

Finally, in the late evening of January 30, 1984, while Bradley and Fern[e] Hart were home alone with their seven-month-old daughter, [Wharton] and Mason came to the Harts' home. When Bradley Hart answered the door, [Wharton] and Mason forced their way in at knifepoint. Initially, they coerced Bradley Hart into writing [Wharton] a check for nine hundred and thirty four dollars as settlement for the debt [Wharton] felt was owed to him. Next, the two men tied up the Harts on a couch holding them captive, while the intruders watched television and talked for several hours. Eventually, they decided to separate the couple. [Wharton] took Fern[e] Hart upstairs where he bound her hands and legs; covered her eyes, nose, and mouth with duct tape; strangled her with a necktie; and ultimately drowned her in a bathtub. Meanwhile, Mason took Bradley Hart to the basement where Mason forced Bradley Hart to lie with his face in a pan of water; placed his foot on Bradley Hart's back; and strangled him to death with an electrical cord. [Wharton] and Mason fled, but not before they turned off the heat in the house and abandoned the Harts' infant child on a bed in an upstairs bedroom.[3]

On February 2, 1984, concerned that he had not heard from his son or daughter-in-law, Reverend Hart went to the home and discovered their bodies. When he found the infant, she was suffering from dehydration

---

(continued . . . )
come next, Wharton also left a doll with a rope tied around its neck on the floor in the dining room closet. (N.T. 12/14/92, 83-84)

[3] Police and the medical examiner who responded to the crime scene noted the cold temperature inside the victims' home when seven-month-old Lisa Hart was discovered next to her mother's body. One detective testified that it was so cold that he could see his breath coming from his mouth when speaking. The thermostat in the home had been turned down to approximately 50 degrees during the dead of winter. Outside temperatures from January 30, 1984 to February 2, 1984, averaged at 24 degrees. Snow and ice were still on the ground from the previous snowfall. (N.T. 12/14/92, 61; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34)

and neglect. She was immediately transported to a hospital where she experienced respiratory arrest brought on by shock and hypothermia. She eventually recovered.

An investigation immediately led police to suspect [Wharton]. When police executed search warrants on his girlfriend's house, they discovered items belonging to the Harts and obtained a warrant for [Wharton's] arrest. When he was taken into custody on February 7, 1984, he confessed and named Eric Mason as his accomplice in the murders.

*Wharton v. Vaughn*, 2012 WL 3535866, at *2-3 (E.D. Pa. Aug. 16, 2012), *aff'd in part, vacated in part*, 722 F. App'x 268 (3d Cir. 2018) (quoting *Commonwealth v. Wharton*, 886 A.2d 1120, 1121-22 (Pa. 2005)).

In his confession, Wharton detailed the home invasion and his murder of Ferne Hart:

… Brad opened the door and we talked in the doorway, and I pulled a knife out of my pocket, and I told him to get back in the house and sit down on the couch. His wife Ferne was downstairs in the living room, and I told them, both of them to sit down on the couch. Then I went to the door and let Eric in. … We tied them up and made them sit back down on the couch, and me and Eric just sat around messing around looking at T.V.

Then we put Brad in the basement, then we took Ferne upstairs. I think that's when Mason probably turned the heat off, I'm not sure. Then we put all the stuff in Brad's car and we went back to his house. Then we went down the basement and put tape around his face and neck, and … I went upstairs to the second floor. I left Eric in the basement.

Later in the car Eric said he got some water from the kitchen, put it in a bucket, and put Brad's face in it. I went upstairs to the bedroom and got Ferne and took her to the bathroom. I ran some water in the tub and dunked her head in the water. I had put this tape around her face

from her eyebrows down to her chin while we was in the bathroom
first before I dunked her head in the water. I held her head down in the
water till the bubbles stopped after a while.

(N.T. 12/17/92, 8-18) Wharton further told police that he tried to strangle Ferne

Hart with a tie before drowning her in the tub. Wharton explained that he killed the

victims "cause they knew me and would turn us in." (N.T. 12/17/92, 8-18)[4]

After the murders, police recovered from Wharton's home and his

girlfriend's home proceeds from each of the robberies, including the robbery of the

Hart's home on the night of their murders. (N.T. 12/16/92, 106-09; N.T. 12/17/92,

37-42; N.T. 12/18/92, 61-70) In a separate statement, Wharton admitted

burglarizing the Hart's home on August 14, 1983, and August 22, 1983. (N.T.

12/16/92, 98, 101)

---

[4] Wharton left Ferne Hart's body draped over the bathtub with her face submerged in the water,
her pants pulled down, and her shirt pulled up, exposing her breasts. Her hands and feet were
bound and a necktie had been pulled tightly around her neck. (N.T. 12/14/92, 43-58, 72-73; N.T.
12/15/92, 98; N.T. 12/16/92, 38-40) The medical examiner determined that the cause of her
death was mechanical asphyxia due to partial obstruction of her airway by the duct tape covering
her face and drowning. (N.T. 12/18/92, 9-10, 25-26, 34)

Police discovered Bradley Hart lying face down on the floor with his face submerged in a pail
of water. His hands were tied behind his back, his feet were tied with a necktie, silver duct tape
was wrapped around his entire face (front to back), one electrical cord was tightly wrapped
around his neck approximately three times and another extension cord was wrapped around his
neck and encircled his body. (N.T. 12/14/92, 36-42; N.T. 12/15/92, 99; N.T. 12/16/92, 33-35)
The medical examiner determined that the cause of death for Bradley Hart was mechanical
asphyxia due to combined effects of ligature and duct tape across his face involving his nose and
mouth. Bradley Hart was alive and may have been conscious when he was strangled. The
medical examiner opined that it was possible that Bradley Hart's face in the pail of water could
have contributed to his death by obstructing his breathing. (N.T. 12/18/92, 6-15, 33, 44)

7

### B.      Wharton's Murder Trials and Related State Court Proceedings

Following a 1985 trial before the Honorable Francis A. Biunno, the jury convicted Wharton of two counts of first-degree murder and related offenses.[5] Following the penalty phase, the jury sentenced Wharton to death for each of the murders.  The Supreme Court of Pennsylvania affirmed Wharton's convictions but vacated the death sentence due to an erroneous jury charge and remanded the matter for a new penalty hearing. *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992).

Wharton's second penalty phase hearing began on December 14, 1992. At the penalty hearing, the defense presented two mitigating circumstances: (1) Wharton's age at the time of the murders (twenty) (42 Pa.C.S. § 9711(e)(4)); and (2) the "catch-all mitigator" of any other evidence "concerning the character and record of the defendant and the circumstances of his offense" (42 Pa.C.S. § 9711(e)(8)). In support of these mitigating circumstances, trial counsel presented testimony from Wharton's family members regarding his positive attributes as a child and adult both before the murders and during the years between his two penalty phase hearings.

---

[5]  In addition to his convictions for first-degree murder, robbery, burglary and criminal conspiracy arising out of the February 2, 1984, crimes against the murder victims, on July 2, 1985, Wharton
was convicted of burglary and related offenses arising out of the August 14, 1983 and August 22, 1983 burglaries at the victims' home, as well as the burglary at the Hart's church in September 1983 (N.T. 12/15/92, 14-18).

On December 23, 1992, the jury unanimously concluded that the two aggravators it found—(1) that Wharton committed the killings during the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); and (2) that Wharton had been convicted of another offense punishable by life imprisonment or death (42 Pa.C.S. § 9711(d)(10))—outweighed the "catch-all" mitigating circumstance that it found. 42 Pa.C.S. § 9711(e)(8)).[6] The jury sentenced Wharton to death for each of the victim's murders. As it did following the 1985 trial, the trial court imposed those two death sentences consecutively. William T. Cannon, Esquire, represented Wharton at his 1985 trial and at his second penalty phase hearing in 1992.

The Supreme Court of Pennsylvania affirmed the death sentences. *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995). On June 10, 1996, the Supreme Court of the United States denied Wharton's petition for a writ of certiorari. *Wharton v. Pennsylvania*, 517 U.S. 1247 (1996).

Wharton subsequently sought relief under the PCRA, which was denied by the Honorable Gary S. Glazer without an evidentiary hearing on June 23, 1997. The Supreme Court of Pennsylvania affirmed the denial of PCRA relief on November 25, 2002. *Commonwealth v. Wharton*, 811 A.2d 978 (Pa. 2002).

---

[6] In reaching this conclusion, the jury noted three things that one or more jurors found to be mitigating: (1) Wharton did not murder baby Lisa Hart; (2) Wharton was a "good family member"; and (3) Wharton cooperated with police concerning the crimes.

### C.     Wharton's Habeas Corpus Proceedings

On October 7, 2003, Wharton filed in this Court a petition for writ of habeas corpus raising twenty-three claims, one of which was that trial counsel was ineffective for failing to present evidence of his alleged "positive adjustment" in prison during the years between his two penalty phase hearings (1985 to 1992). On August 16, 2012, the Court denied relief on each of the claims and concluded that a certificate of appealability ("COA") was warranted on two claims. Wharton sought reconsideration, which was denied on April 30, 2013.

Wharton filed a notice of appeal to the United States Court of Appeals for the Third Circuit and requested that the Court expand the COA. The Third Circuit expanded the COA to include a third claim: that trial counsel was ineffective for failing to introduce mitigating evidence regarding Wharton's positive adjustment to incarceration.

On January 11, 2018, the Third Circuit affirmed the denial of habeas corpus relief with respect to the first two issues but remanded the matter to this Court for an evidentiary hearing regarding the claim that trial counsel was ineffective for failing to present evidence of Wharton's positive prison adjustment. Following that decision, Wharton filed a petition for a writ of certiorari in the Supreme Court of the United States that was denied on December 3, 2018. *Wharton v. Vaughn*, 139 S. Ct. 594 (2018) (memorandum order).

On remand, in February 2019, the District Attorney's Office filed a Notice of Concession of Penalty Phase Relief, indicating that it was conceding relief on this penalty phase claim and that it would not pursue the death penalty in state court. The Notice of Concession provided that the decision to concede was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel." (Doc. No. 155) The parties subsequently submitted to the Court a Proposed Order that would grant habeas corpus relief.

By Order dated March 4, 2019, the Court noted that the Proposed Order failed to set out reasons why the merits of Wharton's remaining penalty phase claim "is apparent on the current record, such that the evidentiary hearing ordered by the Third Circuit is not required." The Court concluded that it could not make an independent evaluation of the merits of the penalty phase claim on the current record and permitted the parties to further brief the issue. In accordance with that Order, Wharton submitted a brief and requested that the Court expand the record to include a declaration, dated July 3, 2018, from trial counsel, William T. Cannon, Esquire. The District Attorney's Office also submitted a brief reiterating its new position that Wharton's remaining penalty phase claim was "not lacking in merit."

By Order dated May 7, 2019, this Court indicated that, in its brief, the District Attorney's Office "fails to indicate whether it did any investigation

11

regarding [Wharton's] adverse or negative adjustment to prison," fails to
"comment on the expert report [of Dr. Krop] submitted by [Wharton]," and
appears to have "accepted the additional evidence offered by [Wharton] at face
value, without exploring whether contrary views may be viable and worth
considering." Order at 2-3 ¶ 5. Under these circumstances, this Court requested the
perspective of the OAG, as *amicus curiae*, to help determine whether the law
entitles Wharton to relief on this claim.

As stated below, information gathered in response to the Court's concerns
suggests that Wharton's claim is not supported by law.

## III.   FACTS CONTRADICT WHARTON'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT CLAIMING THAT HE HAD A POSITIVE PRISON ADJUSTMENT.

To prevail on his ineffectiveness claim, Wharton must show that: (1)
counsel's performance was deficient in that it fell below "an objective standard of
reasonableness"; and (2) the deficient performance prejudiced the defense.
*Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).  The facts in this case
suggest that Wharton cannot meet this burden.

Review of Wharton's record reveals additional facts not previously provided
to the Court.  These include Wharton's numerous prison misconducts between
1985 and 1992 (two of which involved the possession of contraband that
constituted both an "implement of escape" and potential weapon), Wharton's

12

attempted escape from City Hall while in the custody of Philadelphia deputy sheriffs, and the fact that the Pennsylvania Department of Corrections (DOC) identified Wharton's areas of concerns as "assaultiveness" and "escape." These facts suggest that trial counsel's performance in not presenting evidence of Wharton's so-called "positive" prison adjustment did not fall below this objective standard of reasonableness.

Moreover, given the evidence presented at the penalty phase hearing detailing Wharton's terrorization of the victims during the months leading up to the murders, the heinous nature of the victims' murders, and the aggravating circumstances, it appears that Wharton would be unable to establish a reasonable probability that the jury would have voted for a sentence of life imprisonment if only it had heard about Wharton's so-called "positive" prison adjustment, which was *de minimis* at best and substantially outweighed by the evidence of his adverse prison behavior.

## A.   Wharton's Adverse Prison Adjustment

Wharton's prison records reveal that, from 1986 to 1992, he had adverse prison adjustment.[7] Many of these DOC records do not appear to have ever been

---

[7] Wharton entered SCI-Graterford on May 2, 1986, and was transferred to SCI-Huntingdon on September 25, 1986, where he remained during the time period between his two penalty phase hearings.

presented to the state court during the 1997 PCRA proceedings or this Court during

the pendency of these habeas corpus proceedings over the last eighteen years.[8]

### 1.      Wharton's Numerous Prison Misconducts[9]

#### a.      *Possession of Contraband—Implements of Escape*

On May 15, 1989, a routine security search of Wharton's single cell revealed

that he had hidden two pieces of metal antenna in the mounting of a toilet. One of

the pieces of antenna had been fashioned into a handcuff key. Wharton was

charged with "possession of contraband, implements of escape." (Misconduct

#220037)[10] Wharton entered a "not guilty" plea to the charge. Following a hearing

on May 17, 1989, the Hearing Examiner/Committee found Wharton guilty of the

---

[8] Wharton's ineffectiveness claim regarding his prison adjustment was first raised during his 1997 PCRA proceedings. In conjunction with those proceedings, Wharton proffered, *inter alia*, his numerous prison grievances, his monthly-generated Program Review Committee ("PRC") reviews, the short periodic reports prepared by a prison psychiatrist, and the declaration from Dr. Krop. The only addition to the record has been the July 2018 declaration from trial counsel, William T. Cannon, Esquire, that the defense recently provided to this Court when asking to expand the record.

　　The attached records have apparently never before been disclosed to the state and federal courts in order to provide a complete and genuine picture of Wharton's adjustment in prison. Because the attached records pertaining to Wharton's negative prison adjustment are essential to complete the record given the issue before the Court, the OAG respectfully requests that the record be expanded to include these records.

[9] The records pertaining to Wharton's misconducts are collectively attached as Exhibit A.

[10] For purposes of this charge, the DOC's Inmate Discipline Procedures Manual (DC-ADM 801) describes contraband, including an "implement of escape," as an item "which in the hands of an inmate present a threat to the inmate, others or to the security of the facility." *See* https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/801%20Inmate%20Discipline.pdf

charge, concluding that the confiscated evidence "clearly represents a handcuff key" and it was "more likely than not that the key was possessed and under the control of Wharton," who occupied a single cell. Wharton was sanctioned to 90 days of Disciplinary Custody ("DC").[11] Wharton appealed the guilty finding and, on review, the Program Review Committee ("PRC") found that "the misconduct is easily supported by the evidence" and that "[p]ossession of contraband such as a homemade handcuff key is an extremely serious misconduct."

On May 19, 1989, just two days after Wharton was found guilty of the above charge, prison officials conducted a random search of Wharton's cell and discovered a 4" piece of broken metal antenna hidden in the binding of his legal material. Wharton again was charged with "possession of contraband, implements of escape." (Misconduct #220044) Wharton entered a "not guilty" plea to the charge. Following a hearing on May 23, 1989, the Hearing Examiner/Committee found Wharton guilty of the charge, noting that Wharton was in a single cell and had sole control over his possessions. The Hearing Examiner also referred to Wharton's previous misconduct (#220037), in which "a handcuff key was fashioned out of such a piece [of] material." Wharton again was sanctioned to 90 days of DC status. Wharton appealed and, on June 2, 1989, the PRC sustained the

---

[11] An inmate on DC status is housed in a cell separate from general population and Administrative Custody inmates, and loses various privileges, including the loss of radio, television, telephone calls, and personal property unless approved by the Program Review Committee ("PRC"). Visits and exercise are also limited.

action of the Hearing Examiner. The PRC found that "[i]t is quite credible and actual that the material was used to make a handcuff key," similar to what Wharton had done just days earlier. The PRC commented, "Since the material was found in Mr. Wharton's cell and it is established that the material can be used as an implement of escape, the committee finds the evidence to be sufficient."

During the time following these misconducts, the PRC repeatedly referred to the serious nature of these particular misconducts. At Wharton's review on September 13, 1989, the PRC commented on this "very serious" misconduct and noted that Wharton "was less than truthful with PRC and denied having anything to do with the confiscated weapon or handcuff key." Likewise, at Wharton's PRC review on December 6, 1989, the PRC referred to Wharton's "past misconducts for abusing/modifying his antennas." And, a year later, on December 10, 1990, the PRC denied Wharton's request to restore his television privileges, stating that he "refused to even discuss why he had pieces of aerial and two lengths of antennas. He said he didn't have to. He did the time."[12]

---

[12] While the PRC mentioned some of these misconducts in Wharton's periodic PRC reports (which are a part of the current record in this case), the reports contain only fleeting and vague references that fail to convey any of the details of the misconducts or the gravity of the violations.

16

### b.   *Other Misconducts*

On July 21, 1986, Wharton was found guilty of refusing to obey an order (Misconduct #295858). Wharton was sanctioned with one week of DC status. Wharton appealed the finding of misconduct and, on July 30, 1986, the PRC sustained the action taken by the Hearing Examiner/Committee.

On May 21, 1988, Wharton was charged with (1) refusing to obey an oral or written order and (2) disruption or interference with the security or orderly running of the institution. A corrections officer had ordered Wharton to return to his cell and he refused to comply, twice. (Misconduct #168416) On May 26, 1988, Wharton was found guilty and sanctioned with a reprimand and warning.

On March 19, 1989, Wharton was charged with possession or circulation of a petition. (Misconduct #229068) The Hearing Examiner/Committee found Wharton guilty of the charge on March 22, 1989, and he was sanctioned with a reprimand and warning.

On January 12, 1992, Wharton was charged with refusing to obey an oral or written order (Misconduct #480813) after corrections officers observed him performing martial arts with another inmate in the yard. A corrections officer noted that, on two earlier occasions (December 10, 1991, and January 5, 1992), Wharton had been ordered to stop doing martial arts and he refused to comply. The inmate handbook also precluded inmates from practicing martial arts. Wharton entered a

"not guilty" plea to the charge and, on January 14, 1992, the Hearing
Examiner/Committee found him guilty. The Hearing Examiner noted that Wharton
had previously been ordered to cease doing martial arts, but he failed to comply.
He was sanctioned with a reprimand and warning.

### 2.    Wharton's 1986 Escape From City Hall

Wharton's escape attempts started years before his prison misconducts for
fashioning handcuff keys from metal contraband. On April 21, 1986, after less than
a year on death row, Wharton attempted to escape the custody of Philadelphia
deputy sheriffs when he was brought to City Hall for sentencing in an unrelated
home invasion/robbery case before the Honorable Samuel M. Lehrer.
*Commonwealth v. Robert Wharton*, No. CP-51-CR-0426921-1984.[13]

The Arrest Report provides that, while in the custody of deputy sheriffs after
his sentencing before Judge Lehrer, Wharton pushed a deputy sheriff into the
elevator door and ran downstairs from the second floor to the first floor of City
Hall. The Arrest Report provides that during his attempted escape, Wharton "used
[a] handcuff key to open his handcuffs." The deputy sheriff fired two shots at
Wharton to prevent his escape, wounding him in the thigh and buttocks. Wharton
was apprehended on the sidewalk outside of City Hall. Wharton was charged with
escape, simple assault, and weapons or implements of escape. *See* Exhibit B.

---

[13] The documents pertaining to Wharton's escape from City Hall are collectively attached as
Exhibit B.

A memo to Erskind DeRamus, former Deputy Commissioner of the DOC, from staff members at the Eastern Diagnostic and Classification Center reflects that, while in the sheriff's custody in City Hall for a court matter, Wharton "attempted to escape when he was temporarily left alone by the sheriff's office staff." The memo reflects that, on April 21, 1986, Wharton had been sentenced on a criminal matter (unrelated to his capital murder case), in which he had been convicted of robbery, criminal conspiracy, and burglary. *See* Exhibit B.

The assistant district attorney from the District Attorney's Office who was present during Wharton's robbery sentencing before Judge Lehrer on April 21, 1986, has a vivid recollection of Wharton's escape attempt. *See* Exhibit B.

Newspaper articles from the *Philadelphia Daily News* and *The Philadelphia Inquirer*, dated April 22, 1986, detailed how Wharton managed to open his handcuffs and snap apart a plastic cast that had been on his purportedly injured arm before breaking away and bolting from deputy sheriffs in City Hall. Wharton fled down the staircase in City Hall and exited the building before a deputy sheriff recaptured him by shooting him twice during his flight. *See* Exhibit B.

On December 3, 1986, Wharton pled guilty to escape and was sentenced to one to three years imprisonment (*Commonwealth v. Robert Wharton*, CP-51-CR-0819311-1986).[14] *See* Exhibit B.

Thus, Wharton made his first attempt to escape custody in April of 1986, just a year after commencing his incarceration on death row and,[15] by May of 1989, Wharton was still making efforts to escape state custody through his makeshift handcuff key (in addition to his habit of practicing martial arts).

### 3.    Wharton's Prescriptive Program Plans Identifying Assaultiveness and Escape as Areas of Concern

During the years leading up to his second penalty phase hearing in 1992, Wharton's DOC Prescriptive Program Plans identified his "Areas of Concern" as "Assaultiveness" and "Escape."[16]

Wharton's Prescriptive Program Plan for May 1989 identifies his "Areas of Concern" as "Assaultiveness" and "Escape." To assist Wharton with addressing these areas of concern, a DOC staff member recommended that Wharton have misconduct-free behavior, positive housing reports, and continue post-secondary

---

[14] The DOC's memo providing that Wharton was not prosecuted for the escape is inconsistent with the attached documentation from the court file reflecting that he was in fact prosecuted.

[15] Wharton subsequently filed a civil action in this district alleging that his civil rights were violated when he was shot during his attempted escape from custody. Civil Action No. 87-4976. The Court dismissed his claim, noting that "shooting an escaping convict is [not] a violation of that person's civil rights." *See* Exhibit B.

[16] Wharton's Prescriptive Program Plans are attached as Exhibit C.

school, as available. Upon reviewing Wharton's progress a year later, in May 1990, the staff member noted that he had received two Class I misconducts for possession of contraband, implements of escape.

Wharton's Prescriptive Program Plan initiated on May 17, 1990, continued to identify "Assaultiveness" and "Escape" as his "Areas of Concern."

Likewise, Wharton's Prescriptive Program Plan initiated a year later, on May 23, 1991, identified Wharton's "Areas of Concern" as "Assaultiveness" and "Escape." The DOC staff member recommended that Wharton, *inter alia*, maintain misconduct-free behavior. However, at his progress review approximately a year later, it was noted that Wharton had received a misconduct for which he was sanctioned with a reprimand and warning (presumably referring to Wharton's misconduct for refusing to obey an oral or written order, Misconduct #480813).

Wharton's Prescriptive Program Plan initiated on September 14, 1992, continued to identify "Assaultiveness" and "Escape" as Wharton's "Areas of Concern."

### B. The Relevant Facts Regarding Wharton's Adverse Prison Adjustment Tend to Negate the Claim That Trial Counsel Was Deficient in His Performance.

Wharton must demonstrate that trial counsel's conduct "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The law presumes

that counsel was effective:

> Judicial scrutiny of counsel's performance must be highly deferential.
> It is all too tempting for a defendant to second-guess counsel's
> assistance after conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel's
> was unreasonable. A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's perspective at the
> time. Because of the difficulties inherent in making the evaluation, a
> court must indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial
> strategy.

*Id.* at 689. In accordance with these standards, it is "only the rare claim of

ineffective assistance of counsel that should succeed under the properly deferential

standard to be applied in scrutinizing counsel's performance." *United States v.*

*Kauffman,* 109 F.3d 186, 190 (3d Cir.1997) (quoting *United States v. Gray,* 878

F.2d 702, 711 (3d Cir.1989)). Given the applicable legal standard and the complete

facts concerning Wharton's conduct in the period before the second penalty

hearing, a court likely could not hold that trial counsel's performance fell below an

objective standard of reasonableness.

    Trial counsel's strategy at the penalty phase was to present evidence of

Wharton's *positive* attributes through various family members. Consistent with that

strategy, Wharton's brother testified that Wharton was athletic, "always kind," helpful, and that he looked up to Wharton. (N.T. 12/18/92, 72-75) Wharton's brother-in-law testified that "you'd want your child to be like" Wharton in that he was "a loving person," protective family member, helpful to others, an excellent athlete, a leader in the community, "very kind," humble, supportive, and giving. (N.T. 12/18/92, 86-92) Wharton's aunt testified that Wharton was a "loveable," "innocent" and "wonderful" person who was artistic and creative. (N.T. 12/18/92, 106-08) Wharton's sister testified that he was a good big brother and father-figure. Wharton also helped her when she was sick. (N.T. 12/18/92, 112-14)

Wharton's mother testified that as a child Wharton was "bright," "artistic," "very kind," motivated, and helpful. He did not cause trouble. Wharton also helped her support and care for Wharton's father after he had a stroke and Wharton performed errands for elderly neighbors. Wharton's mother further testified that he excelled at sports, had "always been a kind hearted person," and helped her care for the children in her day care center. Wharton's mother pleaded for the jury to spare her son's life and sentence him to life imprisonment, emphasizing that he would never be free from prison. (N.T. 12/21/92, 17-39)

In addition to presenting testimony from Wharton's family members regarding his positive attributes prior to the victims' murders, trial counsel presented testimony from family regarding his positive attributes while

incarcerated. For example, Wharton's cousin testified that, during the previous five years of Wharton's incarceration, he helped her with her hot dog cart business by creating menus and flyers to help her generate business. According to his cousin, for the prior ten years, Wharton was "just a real good human being." Wharton's sister-in-law also testified that, since his incarceration, Wharton had accepted religion into his life. (N.T. 12/18/92, 95-101; N.T. 12/21/92, 9-11)

Trial counsel's strategy was to humanize Wharton by highlighting his positive attributes as a family member. Presenting tidbits of Wharton's "positive" behavior in prison in an attempt to add to this trial strategy would have been problematic for the defense. Had trial counsel presented records pertaining to Wharton's "positive" prison adjustment, he would have opened the door for the Commonwealth to rebut with the extensive damaging prison information detailed above.

Evidence of Wharton's numerous misconducts (including his possession of "implements of escape" that also could have been used as a weapon to harm prison staff or other inmates), his escape from City Hall not even a year after being on death row when he was brought to Philadelphia for sentencing in yet another home invasion/robbery, and the fact that he was consistently identified as having issues with "Assaultiveness" and "Escape," would have been detrimental to the defense

strategy of portraying Wharton as a kind, loving, innocent, and helpful person. It would have undermined the strategy trial counsel did use at the penalty hearing.

If anything, the jury would likely have found the full prison records *aggravating* rather than mitigating. If trial counsel had opened the door to evidence of Wharton's bad prison adjustment, he would likely be facing a challenge for doing exactly what he is now challenged for not doing. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (counsel was not ineffective for failing to present the additional mitigation evidence where "the worst kind of bad evidence would have come in with the good" and "[t]he only reason it did not was because [counsel] was careful in his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 792 (1987) (counsel was not ineffective for declining to present mitigating evidence that might have opened the door to damaging rebuttal evidence); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (counsel was not ineffective for declining to present mental health evidence that would have opened the door for rebuttal testimony that the defendant was a sociopath and had prior convictions).[17]

---

[17] Other federal courts have declined to find trial counsel ineffective under similar circumstances where introducing the purported positive prison records would have opened the door to evidence adverse to the defendant. *See Morgan v. Branker*, 2012 WL 2917841, at *20 (W.D.N.C. July 17, 2012) (trial counsel had a reasonable basis for declining to present records of the defendant's positive prison adjustment when doing so would have allowed the prosecutor to cross-examine DOC officials or introduce rebuttal evidence about, *inter alia*, the defendant's negative prison records detailing his infractions for fighting and disobeying orders); *Deck v. Steele*, 249 F. Supp. 3d 991, 1041 (E.D. Mo. 2017) (trial counsel not ineffective for failing to introduce the defendant's DOC records documenting, *inter alia*, his behavior, disciplinary actions, and grievances while incarcerated where the evidence would not be mitigating, but rather, would

Trial counsel, William T. Cannon, Esquire, contradicts Wharton's assertion that he was deficient in his performance. On May 31, 2019, trial counsel provided a declaration in which he stated that, before presenting evidence of Wharton's prison adjustment, he would have considered whether the prison records reflecting positive adjustment could have caused more harm than good to the defense by opening the door to the Commonwealth presenting evidence pertaining to Wharton's negative prison behavior. *See* Declaration of William Cannon, Esquire, attached as Exhibit D.[18]

Furthermore, presenting evidence of Wharton's "positive" prison adjustment could have impeded trial counsel's closing argument to the jury. In zealously arguing to the jury during his closing argument that a sentence of life in prison was appropriate, trial counsel repeatedly emphasized that, if Wharton was sentenced to life imprisonment, he would never leave the prison. Trial counsel impressed upon

---

(continued . . . )

support a finding that the defendant is a criminal offender unable to be rehabilitated); *see also Peterka v. McNeil*, 532 F.3d 1199 (11th Cir. 2008) (defense counsel did not perform deficiently in penalty phase by failing to introduce evidence of the defendant's prison record as mitigation where the evidence was minimal, consisting only of corrections officer's testimony that the defendant had been "a little better" than the normal person incarcerated for violent crime, and that the defendant had tried to "act properly" in prison).

[18] At the time Mr. Cannon gave his declaration to the defense on July 3, 2018, and was asked about why he did not obtain the DOC records regarding Wharton's "positive prison adjustment," the defense did not show him a single DOC document. *See* Exhibit D. Nor did the defense inquire as to what his strategy would have been if those records contained any *negative* information regarding Wharton.

the jury that Wharton would remain there for the rest of his life. (N.T. 12/21/92, 70, 89-90)

Evidence of Wharton's full record, however, would have led to rebuttal evidence that Wharton was an escape artist who, on one occasion, escaped the deputy sheriff's custody in City Hall and had to be shot twice to be recaptured, and who, on two later occasions, was found in possession of "implements of escape" in the form of makeshift handcuff keys, and who was known to practice martial arts. Such evidence would have either prevented or negated one of counsel's main arguments for a life sentence: given his risk of escape, there was no guarantee that Wharton would remain incarcerated for the rest of his life if sentenced to life imprisonment. Undoubtedly, in its own closing argument the Commonwealth would have argued that, by possessing "implements of escape" (pieces of mental antenna) that also could very well have been used as a weapon, along with his determined practice of martial arts, Wharton repeatedly demonstrated that he was an escape risk and posed a danger to others in prison and thus the only appropriate sentence to ensure the safety of those in prison and the community at large was death.

For these reasons, a court could not likely hold under the law that trial counsel performed below an objective standard of reasonableness by not presenting evidence of Wharton's "positive" prison adjustment.

### C.   Wharton Likely Cannot Establish the Required Prejudice – that is, a Reasonable Probability That the Outcome of His Penalty Phase Would Have Been Different if Only the Jury Had Heard Evidence of His "Positive" Prison Adjustment.

The applicable law suggests that Wharton cannot make the requisite showing of prejudice to prevail on his ineffectiveness claim. To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Strickland,* 466 U.S. at 694). A "reasonable probability" is one "sufficient to undermine confidence in the outcome" and is "less demanding than the preponderance standard." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo,* 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti,* 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

In assessing whether there was prejudice, courts must "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path." *Williams*, 637 F.3d at 227 (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)). "In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut

the petitioner's mitigation testimony." *Id.* (citing *Wong,* 558 U.S. at 26) (stating that "the reviewing court must consider all the evidence—the good and the bad— when evaluating prejudice"). Once the court has reconstructed the record, it must "reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id.* (quoting *Wiggins v. Smith,* 539 U.S. 510, 534 (2003)). Only then can the court determine whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Williams,* 637 F.3d at 227. Thus, even if counsel's performance was deficient, a petitioner cannot prevail if counsel's error "had no effect on the judgment." *Strickland,* 466 U.S. at 691.

In this case, the penalty phase record and aggravating circumstances, coupled with Wharton's negative prison behavior, suggest that, under the law, Wharton cannot establish a reasonable probability that the jury would have sentenced him to life imprisonment if it had heard about his prison adjustment.

### 1.    The Penalty Phase Record and Aggravators

Over the course of six days, the jury heard testimony regarding the details of Wharton's terrorization, destruction, and burglaries of the victims' home and church prior to the murders over a debt that he believed was owed to him (N.T. 12/14/92, 79-110); the jury heard testimony regarding the details of how the victims were separated, bound, masked with duct tape, strangled and/or drowned

even after Wharton forced Bradley Hart to write him a check to satisfy the purported debt (N.T. 12/14/92, 36-58, 72-73; N.T. 12/15/92, 98-99; N.T. 12/16/92, 33-44; N.T. 12/18/92, 6-16, 26-30); the jury heard testimony about how Wharton left the victims' baby girl alone in the unheated home in subfreezing temperatures after killing her parents (N.T. 12/14/92, 61; N.T. 12/15/92, 33-39; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34); the jury heard testimony regarding the events leading up to Wharton's arrest, during which police recovered proceeds from the series of burglaries/robberies at the victims' home (N.T. 12/16/92, 83-111; N.T. 12/17/92, 37-38; N.T. 12/18/92, 61-70); and the jury heard Wharton's confession to the brutal murders ("I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while"), and his explanation for why he killed them ("cause they knew me and would turn us in") (N.T. 12/17/92, 8-22).

In addition, the jury viewed extensive physical evidence of Wharton's crimes, including the ligatures, bindings, and duct tape that he used to subdue, mask, and strangle the victims. (N.T. 12/18/92, 55-59) The jury also viewed numerous photographs depicting the lifeless victims bound, masked, strangled and/or drowned at the crime scene: Ferne Hart on her knees, bent over the bathtub, with her face submerged in water, her hands and feet bound, her face masked with

30

duct tape, a necktie wrapped tightly around her neck, her shirt pulled up exposing her breasts, and her pants down to her ankles; and Bradley Hart lying face down on the ground with his face in a pail of water, his hands and feet bound, his face mummified with duct tape, two electrical cords tightly wrapped around his neck and a sneaker print visible on the back of his shirt. Photographs depicted the victims at the medical examiner's office, the duct tape that had been removed from the victims' bodies, and the family that existed before Wharton murdered the young couple and orphaned their child. (N.T. 12/15/92, 37; N.T. 12/16/92, 3-4)

In light of the particularly heinous nature of Wharton's crime spree and murders, coupled with the aggravating circumstances (killing while perpetrating a robbery/burglary and the fact that Wharton committed two murders), it appears unlikely that the jury would have reached a different result on the basis of brief, boilerplate comments in some monthly PRC reports noting that Wharton had periods where his adjustment was "routine," "positive," "satisfactory," "problem-free," or "uneventful."[19] The sentencing phase record and aggravating

---

[19] The PRC's monthly-generated reports upon which Wharton heavily relies also appear at times inaccurate, incomplete, or inconsistent. For example, Wharton's PRC review dated March 6, 1987, provides that "[t]here are no misconducts on record." Yet there was a misconduct on record at that time: Wharton had been found guilty of refusing to obey an order (Misconduct #295858). Similarly, the PRC's comments from June 3, 1987, reflect that Wharton's counselor stated that Wharton "makes no requests or raises no concerns" but is "a rather quiet individual who seldom makes a request or initiates any interaction." However, by June 3, 1987, Wharton had already filed numerous grievances complaining about trivial matters (such as the dessert on his food tray being placed too close to his meat). Likewise, Wharton's PRC review dated June 7, 1989, provides that Wharton has had "routine contacts" during the past month (i.e., from May 3,

circumstances would likely have overwhelmed any evidence regarding Wharton's spurts of "satisfactory" adjustment in between his misconducts and attempts to escape custody.

Under the law, therefore, Wharton is unlikely to meet his burden to show that he was prejudiced by trial counsel's failure to investigate and present his so-called "positive" prison adjustment records. *See Woodford v. Visciotti*, 537 U.S. 19 (2002) (the defendant was not prejudiced by trial counsel's failure to present evidence that he grew up in a dysfunctional family and suffered continuous psychological abuse where the cold-blooded circumstances of the murder and the aggravating evidence of the defendant's violent felony convictions were so severe that they completely overwhelmed the proffered mitigation); *Williams*, 637 F.3d at 236-37 (given the nature of the brutal crimes and aggravating circumstances, and the equivocal nature of the mitigation evidence, Williams could not meet "his burden of demonstrating there was a reasonable probability [that] the presentation

---

(continued . . . )

1989, to June 7, 1989), even though he had two serious misconducts during the month before for possession of contraband constituting "implements of escape." The PRC review covering that time period (the last PRC review being May 3, 1989) neglects to mention these misconducts other than to say that Wharton was appealing them.

Wharton's prison records also contain monthly updates, consisting of a few sentences or less, from a prison consulting psychiatrist. These brief and general updates indicate only that Wharton "had no evidence of a treatable mental disorder."

of [mitigating] evidence would have resulted in a life sentence instead of the death penalty").[20]

### 2. Dr. Krop's Assertions of Good Prison Adjustment Do Not Account for the Facts Now Before this Court.

Wharton proffers a declaration from Dr. Harry Krop in which he opines that Wharton made a "positive adjustment to prison life," would be a "prime candidate for constructive rehabilitation in the general prison population," and "would not pose a future danger to the prison community" if "he were to serve a sentence of life imprisonment." In support of his conclusion, Dr. Krop relies primarily on: (1) the "reports from prison mental health personnel and correctional counselors" (presumably, Wharton's PRC reviews and the few generic sentences generated by the consulting prison psychiatrist on a monthly basis); and (2) the large number of prison grievances filed by Wharton demonstrating his "relative acceptance of his incarceration" which is "an important element of his adjustment and shows that he will likely not be a future danger."

---

[20] *See also Trice v. Ward*, 196 F.3d 1151, 1163 (10th Cir. 1999) (the defendant failed to demonstrate that the outcome of the sentencing phase would have been different had counsel presented his positive prison records where the underlying facts of the defendant's crimes were horrific and the defendant confessed to the crimes); *Spreitzer v. Peters*, 1999 WL 688757, at *8 (N.D. Ill. Apr. 16, 1999), *aff'd sub nom, Spreitzer v. Schomig*, 219 F.3d 639 (7th Cir. 2000) (rejecting the defendant's claim of ineffectiveness assistance of counsel for failing to present evidence showing that he behaved well in prison where the neglected mitigating evidence was significantly outweighed by the aggravating evidence).

An experienced forensic psychiatrist, John S. O'Brien, III, M.D., J.D., has reviewed Dr. Krop's findings and concludes that they do not "reflect[] a balanced inquiry into Mr. Wharton's history, documented behavior or correctional adjustment and cannot be accepted at face value without exploring whether contrary views or opinions might be viable and worth considering." *See* Report of Dr. O'Brien, dated July 15, 2019, attached as Exhibit E, p.7.[21]  Dr. O'Brien was "struck by the degree to which the declaration by Dr. Krop overstates the positive and ignores the negative of Mr. Wharton's history and record," and opines that this "posture limits the accuracy and validity of Dr. Krop's opinions or conclusions." *See* Exhibit E, pp. 6-7.

Referring to Wharton's burglaries and vandalisms of the Hart's home and church, his burglaries of the Germantown Boys Club, and his robbery and burglary of a couple in their South Philadelphia home, Dr. O'Brien opines that Wharton's "pattern of illegal and antisocial behavior for a significant period of time prior to the Hart murders" is "inconsistent" with Dr. Krop's opinion that the charges for which Wharton was sentenced to death were "anomalous and out of character" for Wharton. *See* Exhibit E, p.2.

---

[21] As indicated in his report, Dr. O'Brien was consulted for the limited purpose of opining whether Dr. Krop's conclusions "can be accepted at face value without exploration or consideration of contrary views or opinions." *See* Exhibit E, p.1.

Dr. O'Brien further comments on Dr. Krop's failure to acknowledge Wharton's criminal history prior to the murders, his prison misconducts involving possession of contraband and implements of escape, and his attempt to escape City Hall in 1986.  Dr. O'Brien states:

> Despite his report of review of various records, it appears that Dr. Krop may have been wholly unaware of Mr. Wharton's extensive history of criminal behavior aside from his participation in the murders of Bradley and Ferne Hart. Dr. Krop makes no reference to Mr. Wharton's escape attempt in 1986 or to his having been found to be in possession of contraband and implements of escape in 1989, including what was identified as a handcuff key fashioned from an antenna, behavior strikingly similar to his escape attempt during which it appeared that Mr. Wharton removed his handcuff with a key.

*See* Exhibit E, p.6.

In addition, Dr. O'Brien discusses Wharton's negative prison adjustment as reflected in the DOC records, including his inability to be "truthful" with the PRC following his "very serious" misconducts of possessing implements of escape and his refusal to even discuss his misconducts with the PRC because he "did the time" in DC status:

> The Program Review Committee records document Mr. Wharton to be significantly limited in both his participation as well as in his open communication with the Committee and unable or unwilling to demonstrate insight into or remorse for his behavior both prior to and during his incarceration.  The records document ongoing serious behavioral transgression consistent with surreptitious future planning while portraying himself as polite, pleasant and well-adjusted.

*See* Exhibit E, pp. 4-5. Dr. O'Brien finds it significant that Dr. Krop failed to make

any reference to these records reflecting Wharton's adverse prison adjustment.

> Dr. Krop does not make reference to, or even document awareness of,
> Mr. Wharton's limited participation in Program Review Committee
> meetings, his reticence to discuss any issues or substance or his
> absolute refusal to discuss the May 15, 1989 misconduct that resulted
> in a lengthy period of disciplinary custody and a prolonged period
> afterward during which his radio and television privileges were not
> restored.

*See* Exhibit E, p.6.[22]

Dr. O'Brien also differed with Dr. Krop on the significance of Wharton's

prison grievances. As noted by Dr. O'Brien, many of Wharton's grievances

concerned his repeated requests for the restoration of radio and television

privileges after he was placed on DC status in May of 1989. Wharton repeatedly

claimed that the PRC was continuing to "punish him" for the conduct that resulted

in his DC status and the removal of privileges (*i.e.*, his possession of contraband

that constituted implements of escape). Dr. O'Brien opines that Wharton "at no

---

[22] It is unclear from the Krop declaration whether he was ever provided with the full prison
records.  Moreover, the declaration is undated and, thus, it is unknown exactly when it was
generated. All that is known is that it was created at some point before or during the pendency of
the 1997 PCRA proceedings. Dr. Krop did state that he conducted a forensic psychological
evaluation and clinical interview of Wharton, but failed to specify when he did these things.

In addition, while Dr. Krop stated that he reviewed psychological tests administered to
Wharton, he failed to identify those tests and when they were administered. As Dr. O'Brien
notes, Dr. Krop "does not specify when the tests were administered, by whom, or in what
context. There are a wide array of psychological tests that psychologists administer and interpret.
Dr. Krop does not specify what specific tests he reviewed nor provide the raw data from the
testing as an attachment or appendix to the declaration." *See* Exhibit E, p.5.

point demonstrated insight into the obvious reasons for the continued restriction."

*See* Exhibit E, p.3.[23] Dr. O'Brien also addresses the shortcomings of the PRC's

records upon which Dr. Krop relied. Dr. O'Brien notes that the PRC records fail to

reflect Wharton's most serious misconduct from May 1989, when he was in

possession of contraband and implements of escape, other than to note in June 7,

---

[23] Examples of the grievances Wharton filed include the following:

- In 1986, Wharton complained that he had been denied a chess set;

- In 1987, Wharton filed grievances complaining that the dessert on his food tray
  was too close to the meat, which made it "inedible;" that he did not receive his
  daily newspaper; and that his sink leaked hot water and made his cell too hot;

- In 1988, Wharton filed grievances complaining that corrections officers were
  whistling while they worked on the block after 10:00 a.m.; that two spoons were
  missing from his cell; that the corrections officer yelled too loud when it was time
  for inmates to exercise; that he did not "get jelly for each piece of toast" and for
  over a week he had "not gotten his jelly at all;" and that a corrections officer
  slapped a newspaper against his cell door and gave him a "dirty look;"

- In 1989, Wharton filed grievances complaining that a handball was confiscated
  from him while he was on disciplinary custody maximum status and not permitted
  to be in possession of it; that the price of cigarettes in the commissary was too
  high; and that his hairbrush was missing;

- In 1990, Wharton filed a grievance complaining that his sneakers were missing;

- In 1991, Wharton filed grievances complaining that his pillow was missing from
  his bed and that his blanket was too small; and that he did not like the type of
  sneakers he was required to wear; and

- In 1992, Wharton filed a grievance complaining that a newspaper and peanut
  butter were missing from his possessions.

In addition to the grievances, Wharton filed three unsuccessful civil actions in federal court
between 1985 and 1992 (and afterwards). *See Wharton v. Cassella, et al.*, CIV. A. No. 87-4976
(alleging civil rights violation when shot during his escape from City Hall), Exhibit B and note
15 *supra*; *Wharton, et al. v. Isett*, 3:88-cv-00800-SHR (prisoner civil rights action); *Wharton v.
Conrad, et al.*, 3:89-cv-01402-SHR (prisoner civil rights action).

1989 that he was "appealing his misconducts" and that he had disciplinary

sanctions imposed.

Furthermore, Dr. O'Brien calls into question Dr. Krop's opinion that

Wharton does not meet the criteria of an Antisocial Personality Disorder and his

conclusions that the victims' murders were an "out of character" and "anomalous"

act on Wharton's part. Dr. O'Brien opines that Wharton's lengthy criminal history

prior to the Hart murders exemplifies "a pervasive behavior pattern" that "is

consistent with the very diagnosis Dr. Krop indicates that in his opinion, Mr.

Wharton does not have." Dr. O'Brien explains:

> The nature of the killings of Bradley and Ferne Hart and the reasons
> for them reflect a callous disregard for, and violation of, the rights of
> others. Mr. Wharton's documented pattern of illegal behaviors during
> the period of time leading up to the murders of the Harts clearly
> reflect him to fail to conform to social norms with respect to lawful
> behaviors and to exhibit deceitfulness, impulsivity, aggressiveness,
> irresponsibility, lack of remorse, and reckless disregard for the safety
> of others.

See Exhibit E, p.7.

Given the limitations of the Krop declaration as highlighted by Dr.

O'Brien's report, Dr. Krop's opinion of Wharton's "positive" prison adjustment

would not likely have carried weight with the jury.[24] Under these circumstances, it

---

[24] To the contrary, it is significant to note that had Dr. Krop testified at the 1992 penalty phase
hearing that the charges for which Wharton was sentenced to death were "anomalous and out-of-
(continued . . . )

character" for Wharton, the Commonwealth would have rebutted with all of the details regarding
Wharton's extensive criminal history leading up to the Hart murders. The jury would have heard

appears that Wharton could not make the requisite showing of prejudice to prevail on his ineffectiveness claim.

## IV.   OTHER MATTERS FOR THE COURT'S CONSIDERATION

In addition to the issues discussed above, there are two other relevant matters for the Court's consideration as it relates to the ineffective assistance of counsel claim. These include the standard of review that applies to a hearing on this matter and the requirements of victims' rights provisions.

### A.    Standard of Review

In its mandate, the Third Circuit directed: "[I]t is now hereby ORDERED and ADJUDGED by this Court that the judgment of the District Court entered May 1, 2013, is affirmed in part, vacated in part, and remanded for further proceedings. … All of the above in accordance with the opinion of this Court."  Judgment dated January 11, 2018. In its Opinion, the Third Circuit directed: "Based on the foregoing, we will affirm in part and vacate in part the District Court's denial of Wharton's habeas petition, and we will remand for further proceedings consistent with this opinion." *Wharton v. Vaughn*, No. 13-9002, slip op. at 32 (3d Cir. January 11, 2018).

---

all about Wharton's series of burglaries of the Germantown Boy's Club in 1983, and his home invasion/robbery of another couple in South Philadelphia in early 1984 (just weeks before the Hart murders).

In its Opinion, the Third Circuit analyzed the reasoning of the Supreme Court of Pennsylvania relating to Wharton's positive adjustment claim. *Id.* at 23-26. The Third Circuit's analysis increases the difficulty faced by this Court in its own analysis for several reasons.

First, the Third Circuit stated that the record does not reflect whether Attorney Cannon ever sought or reviewed Wharton's prison records and, if not, his conduct can never be considered reasonable. *Id.* at 23-24. The problem, however, is that this standard conflicts with the law, which is that an attorney is not ineffective for failing to undertake a futile action, because the relevant question under *Strickland* is whether no competent attorney would think the challenged omission would fail. *See Premo v. Moore*, 563 U.S. 115, 124 (2011) ("Of course [possibly conceding that a motion to suppress would have succeeded] is not the same as a concession that no competent attorney would think a motion to suppress would have failed, which is the relevant question under *Strickland*.") (citing *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Harrington v. Richter*, 569 U.S. 86, 109-110 (2011)).

 Also, merely obtaining the records would not have satisfied *Strickland* because an attorney simply having possession of records does not benefit a client. It would only be the introduction of such records that might benefit the client. For purposes of *Strickland*, the correct question here would have been, to paraphrase

*Premo*, whether no competent lawyer would have disbelieved that presenting Wharton's prison records to the jury would have led to a sentence of life imprisonment rather than death. For purposes of federal habeas corpus review, the question has another layer, which is whether the state courts were unreasonable in concluding that no competent lawyer would believe that the prison records would not have changed the outcome. *See* 28 U.S.C. § 2254(d).

With respect to the prejudice prong, the Third Circuit held that the Supreme Court of Pennsylvania erred by applying a quantitative analysis, as opposed to a qualitative analysis, to Wharton's proffered evidence. Slip op. at 25. This holding, however, was premised on a misapprehension of the Supreme Court's analysis.

The Third Circuit quoted what it perceived as the Supreme Court's analysis as follows:

> [I]t is notable that the equivocal prison record evidence, had it been introduced, would have sounded under the catch-all mitigating circumstance, which the jury in fact found . . . . [Wharton] has not demonstrated that he was prejudiced by [Cannon's] failure to introduce this equivocal prison record evidence as additional proof of this mitigating circumstance found by the jury.

Slip op. at 24 (quoting *Commonwealth v. Wharton*, 811 A.2d 978, 989 (Pa. 2002); bracketed material added in Third Circuit Opinion).

However, the full statement by the Supreme Court of Pennsylvania was:

> Moreover, in assailing counsel's performance, it is notable that appellant never discusses the penalty phase presentation actually made by counsel, with the aim of demonstrating why the course counsel is

41

faulted for failing to pursue should be deemed to offer a greater prospect for success than the course counsel actually pursued. In this regard, it is notable that the equivocal prison record evidence, had it been introduced, would have sounded under the catch-all mitigating circumstance, which the jury in fact found in appellant's second penalty phase hearing. Appellant has not demonstrated that he was prejudiced by his counsel's failure to introduce this equivocal prison record evidence as additional proof of this mitigating circumstance found by the jury.

*Wharton*, 811 A.2d at 989.

Reading the entirety of this statement shows that the Supreme Court was not stating that the prison record evidence was cumulative because the jury already had found the relevant mitigating circumstance or that the Supreme Court was merely counting the two sets of factors to see which was greater. Slip op. at 25. The Supreme Court stated instead that, given that the jury had found the relevant mitigating circumstance, Wharton was required to show that presenting the prison records (the "additional proof" of the mitigating circumstance) would have offered "a greater prospect for success"; given the equivocal nature of the evidence and the failure to place that evidence into the context of the evidence otherwise introduced by counsel (and, as noted, into the context of the Commonwealth's evidence and likely-to-be-introduced evidence), Wharton failed to meet his burden.

Nothing in the record indicates why the Respondent did not file a petition for rehearing or a petition for writ of *certiorari* to further examine the rulings of the court of appeals. Based on that failure, it is now the law of the case that the holding

of the Supreme Court of Pennsylvania was unreasonable and that this Court must

conduct a hearing on Wharton's claim of positive adjustment to prison life. The

Third Circuit identified this stage of the proceedings as a *de novo* review of the

claim. Slip op. at 26. Importantly, however, the Third Circuit indicated that an

evidentiary hearing is subject to § 2254(e)(2) (Slip op. at 31 and n.22), which

provides:

> If the applicant has failed to develop the factual basis of a claim
> in State court proceedings, the court shall not hold an evidentiary
> hearing on the claim unless the applicant shows that—
>> **(A)** the claim relies on—
>>> **(i)** a new rule of constitutional law, made
>>> retroactive to cases on collateral review by the Supreme
>>> Court, that was previously unavailable; or
>>> **(ii)** a factual predicate that could not have been
>>> previously discovered through the exercise of due
>>> diligence; and
>> **(B)** the facts underlying the claim would be sufficient to
>> establish by clear and convincing evidence that but for
>> constitutional error, no reasonable factfinder would have found
>> the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). This provision must be read *in pari materia* with §

2254(e)(1), which provides that the state court record is presumed to be correct and

may be rebutted only by clear and convincing evidence.

Based on the foregoing, Wharton now has the burden of proving, by clear

and convincing evidence, that Attorney Cannon unreasonably failed to investigate

Wharton's prison adjustment *and* failed to present evidence of Wharton's

purported "positive adjustment" to prison life, and that Wharton was prejudiced by

those failures. As noted by the Third Circuit (Slip op. at 28-29), the record is not limited to the prison records proffered by Wharton, but would include both the evidence presented in state court and the additional records relative to Wharton's lack of "positive adjustment" and actual negative adjustment proffered by the Commonwealth.

In this context, it should be noted that Dr. Harry Krop, Wharton's expert psychologist, stated in his report (Petitioner's Motion to Expand Record, etc., Exhibit 3) that "the charges for which he [Wharton] was sentenced to death are anomalous and out-of-character for Mr. Wharton, particularly when viewed in the context of his history and psychological makeup." *Id.* at 1-2 ¶ 3. As discussed above, Wharton's complete prison records are not consistent with this conclusion. Additionally, his criminal record includes additional offenses that would have been presented by the Commonwealth to rebut the opinion that Wharton's behavior was "out-of-character" for him. Dr. Krop did not discuss this evidence, apparently because it was not made available to him. This Court, in contrast, is required to consider all such evidence relevant in assessing prejudice, the Opinion of the Third Circuit makes clear. *See esp.* Slip op. at 28-29 (to assess prejudice arising from alleged deficient performance, court must reconstruct record and assess it anew, including evidence that went unmentioned as well as any anti-mitigation evidence the Commonwealth would have presented).

### B.    Crime Victims' Rights

Consultation with the victims of crime, or the family members of homicide victims, is required under both federal and state law and is at issue in this matter before the Court. *See* DAO Notice of Concession of Penalty Phase Relief (Doc. No. 155).

The federal statute providing rights to the victims of crime provides in part:

> **(a) Rights of crime victims.**—A crime victim has the following rights:
> …
>> **(3)** The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>> **(4)** The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>> ...
>> **(7)** The right to proceedings free from unreasonable delay.
>> **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.
>> …

18 U.S.C. § 3771(a).

These rights apply to proceedings under § 2254:

> **(2) Habeas corpus proceedings.**—
>> **(A) In general.**—In a Federal habeas corpus proceeding arising out of a State conviction, the court shall ensure that a crime victim is afforded the rights described in paragraphs (3), (4), (7), and (8) of subsection (a).
>> **(B) Enforcement.**—

45

> **(i) In general.**—These rights may be enforced by the crime victim or the crime victim's lawful representative in the manner described in paragraphs (1) and (3) of subsection (d).
>
> **(ii) Multiple victims.**—In a case involving multiple victims, subsection (d)(2) shall also apply.
>
> **(C) Limitation.**—This paragraph relates to the duties of a court in relation to the rights of a crime victim in Federal habeas corpus proceedings arising out of a State conviction, and does not give rise to any obligation or requirement applicable to personnel of any agency of the Executive Branch of the Federal Government.
>
> **(D) Definition.**—For purposes of this paragraph, the term "crime victim" means the person against whom the State offense is committed or, if that person is killed or incapacitated, that person's family member or other lawful representative.

18 U.S.C. § 3771(b)(2).

The victims of crime have analogous rights under state law:

Victims of crime have the following rights:

…

> (4) In cases involving a personal injury crime or burglary, to submit prior comment to the prosecutor's office or juvenile probation office, as appropriate to the circumstances of the case, on the potential reduction or dropping of any charge or changing of a plea in a criminal or delinquency proceeding, or, diversion of any case, including an informal adjustment or consent decree.
>
> (5) To have opportunity to offer prior comment on the sentencing of a defendant or the disposition of a delinquent child, to include the submission of a written and oral victim impact statement detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. The written statement shall be included in any predisposition or presentence report submitted to the court. Victim-impact statements shall be considered by a court when determining the disposition of a juvenile or sentence of an adult.
>
> …

46

18 P.S. § 11.201.

Prosecutors have complementary duties to ensure that the victims' rights are

honored:

> …
> **(b) Pleading.**—In a personal injury crime or burglary, the prosecutor's
> office shall provide notice of and offer the opportunity to submit prior
> comment on the potential reduction or dropping of any charge or
> changing of a plea, a diversion of any case, including informal
> adjustment and consent decree, unless such notice is provided by the
> juvenile probation office.
> …
> **(e) Disposition.**—In a personal injury crime, if the prosecutor's office
> has advance notice of dispositional proceeding, the prosecutor shall
> make reasonable efforts to notify a victim of the time and place of the
> proceeding.
> **(f) Notice.**—The prosecutor's office shall provide all of the following
> to the victim:
>> (1) Upon request of the victim, notice of the disposition and
>> sentence of an adult, including sentence modifications.
>> (2) Upon request in a personal injury crime, reasonable attempts
>> to notify the victim as soon as possible when the adult is
>> released from incarceration at sentencing.
>> (3) If the prosecutor's office is prosecuting a personal injury
>> crime, notice prior to the entry of a consent decree.
>> …
>> (6) Upon request in a personal injury crime, notice of the filing,
>> hearing or disposition of appeals.
>> …

18 P.S. § 11.213(b), (e), (f).

The letters of the family members of Bradley Hart and Ferne Hart and the

sole surviving victim establish that these provisions of law have not been satisfied.

In their letters, the family members of the deceased state that they were not contacted about this case and that they oppose penalty phase relief. *See* Exhibit F.

In her letter for the Court, Lisa Hart-Newman states that she was seven months old when Wharton murdered her parents and left her alone to die in the unheated family home. She states that "[a]t no point was I contacted by … anyone … to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight." Ms. Hart-Newman further states that agreement to relief in this case "is an affront to justice and has shown a total disregard for the life of my parents, my own life, and the impact that this would have on our family." *See* Exhibit F.

Michael F.L. Allen is Ferne Hart's brother. In his letter for the Court, he states that "[a]t no time did any one … contact me concerning this matter." Mr. Allen states that agreement to relief "is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts." He further states that he knows "of no members of the Allen or Hart family who supports [agreement to relief]. I oppose the vacating of Robert Wharton's death penalty." *See* Exhibit F.

Patrice Carr is Bradley Hart's sister. In her letter for the Court, she states that she "was never contacted" about vacating Wharton's death sentence and that she "would have never, ever agreed to it and never will. Justice was served in

1985, and in 1992, justice was confirmed. The idea that this is even a consideration is unbearably painful and shocking." *See* Exhibit F.

Dr. Tony Hart, Bradley Hart's brother, was spoken to by the District Attorney's Office about the concession.  In Dr. Hart's letter for the Court, he states that he was misadvised about the posture of the case. Dr. Hart states that he was told "that Mr. Wharton had won an appeal and that in order to avoid a new trial a plea deal was offered and accepted." Dr. Hart further states that "[t]he family is in one accord asking that [Wharton's] status not change" and requests that the court "please not accept any such plea." *See* Exhibit F.

These letters are attached to assist in assuring compliance with the provisions of the Federal Crime Victims' Rights Act and the Pennsylvania Crime Victims Act.

## V.    CONCLUSION

WHEREFORE, the OAG respectfully submits the above-stated facts in accordance with this Honorable Court's request for additional information to assist it in resolving Petitioner's remaining ineffective assistance of counsel claim.

Respectfully submitted,

By: */s/ James P. Barker*
      James P. Barker
      Chief Deputy Attorney General
      Office of Attorney General
      Criminal Law Division
      Appeals and Legal Services Section
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      (717) 783-6896
      jbarker@attorneygeneral.gov

Date:  July 22, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused the foregoing *Brief Of Amicis Curiae Pennsylvania Office Of Attorney General* to be served on the following persons via ECF or by first class mail:

<u>Via ECF and/or First Class Mail</u>

| | |
|---|---|
| Victor J. Abreu, Esquire | Max Cooper Kaufman |
| Claudia Van Wyk, Esquire | Paul M. George |
| Federal Community Defender Office | Thomas W. Dolgenos |
| Capital Habeas Corpus Unit | District Attorney's Office |
| 601 Walnut Street, Suite 545 West | 3 South Penn Square |
| Philadelphia, PA 19106 | Philadelphia, PA 19107 |
| (Counsel for Petitioner) | (Counsel for Respondent) |

By: */s/ James P. Barker*
James P. Barker
Chief Deputy Attorney General
Pennsylvania Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor—Strawberry Square
Harrisburg, PA 17120
(717) 787-6348
jbarker@attorneygeneral.gov

51