| DC-43 | COMMONWEALTH OF PENNSYLVANIA | | | |
|---|---|---|---|---|
| PRESCRIPTIVE PROGRAM PLAN | Department of Corrections | | | |
| DC NUMBER | NAME | | INSTITUTION | DATE INITIATED |
| AY6874 | Wharton, Robert | | SCIH | 5-23-91 |

**AREAS OF CONCERN**
- ( ) Mental Health
- ( ) Vocational
- ( ) Academic
- ( ) Other
- ( ) Physical
- ( ) Drug
- ( ) Alcohol
- (X) Assaultiveness
- ( ) Sexual
- (X) Escape

**RECOMMENDED ACTIONS**
(The following is a list of suggested programs and/or kinds of behavior which may help you with the weakness and/or problem areas):

1) Maintain Misconduct-Free Behavior
2) Sustain positive housing reports.
3) Continue with Educational Development
4) Exercise Routinely
5) Maintain Counselor Contacts

_____  _____
Signature of Staff Member    Signature of Inmate (RHU)

Tentative Progress Review (date) 5-'92

**RESULTS ACHIEVED** or reasons for lack of results

1) Rec'd 1 misconduct - R/W
2) Sustained
3) Continues
4) Continues
5) Maintains

_____  9/14/92  _____
Signature of Staff Member    Date Reviewed    Signature of Inmate (RHU)

The two lists are not all inclusive and may change over time. Additional weaknesses and/or problem areas may be uncovered. Weaknesses and/or problem areas may be overcome or reduced in importance. Programs may be completed or additional programs may be indicated. These lists can and should be reviewed periodically to account for any progress or lack of progress. You should request a review through your Counselor to discuss any changes and to keep your prescriptive program current.
While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recommendations for program level changes, job changes, pre-release, commmutation, and parole.

| DC-43 | COMMONWEALTH OF PENNSYLVANIA | | |
|---|---|---|---|
| PRESCRIPTIVE PROGRAM PLAN | Department of Corrections | | |
| DC NUMBER: A46874 | NAME: Wharton, Robert | INSTITUTION: SCIH | DATE INITIATED: 9/14/92 |

**AREAS OF CONCERN**
- ( ) Mental Health
- ( ) Vocational
- ( ) Academic
- ( ) Other
- ( ) Physical
- ( ) Drug
- ( ) Alcohol
- (X) Assaultiveness
- ( ) Sexual
- (X) Escape

**RECOMMENDED ACTIONS**
(The following is a list of suggested programs and/or kinds of behavior which may help you with the weakness and/or problem areas):

1) Maintain Misconduct Free Behavior
2) Sustain Positive Housing Reports
3) Continue with Educational Development
4) Exercise Routinely
5) Maintain Counselor Contacts

_____ Signature of Staff Member
RHU Signature of Inmate

Tentative Progress Review (date) 5/93

**RESULTS ACHIEVED** or reasons for lack of results

1) No Misconducts
2) Good Reports
3) Continued
4) Takes Advantage of Yard & Exercise
5) Maintains

_____ Signature of Staff Member
Date Reviewed: 5/28/93
RHU Signature of Inmate

The two lists are not all inclusive and may change over time. Additional weaknesses and/or problem areas may be uncovered. Weaknesses and/or problem areas may be overcome or reduced in importance. Programs may be completed or additional programs may be indicated. These lists can and should be reviewed periodically to account for any progress or lack of progress. You should request a review through your Counselor to discuss any changes and to keep your prescriptive program current.

While all participation in all programs is strictly voluntary, progress or lack of progress in dealing with weaknesses and/or problem areas will be one of the factors taken into consideration for all actions requiring staff support such as recommendations for program level changes, job changes, pre-release, commutation, and parole.

WHITE - DC-15   YELLOW - Inmate After Progress Review   PINK - Other   GOLDENROD - Inmate When Initiated

EXHIBIT D

DECLARATION OF WILLIAM T. CANNON, ESQ.

# DECLARATION OF WILLIAM T. CANNON, ESQUIRE

I, William T. Cannon, Esquire, state as follows:

1. Since 1970, I have been licensed to practice law in Pennsylvania.

2. I have been a criminal defense attorney since 1976. More specifically, I have conducted approximately 80 trials in homicide cases.

3. I was trial counsel for defendant, Robert Wharton, at his jury trial in 1985, at which he was convicted of two counts of first degree murder and related offenses arising out of the deaths of Bradley Hart and Ferne Hart.

4. Following the 1985 penalty phase hearing, the jury sentenced defendant to death for both murders.

5. I also represented defendant at his second penalty phase hearing in 1992.

6. At the second penalty phase hearing, the defense presented two mitigators: (1) the age of defendant (20) at the time of the murders; and (2) any other evidence of mitigation concerning his character and record and the circumstances of his offense (the "catch all").

7. In support of these mitigators, I presented testimony from numerous members of defendant's family regarding his positive attributes as a child and an adult prior to the 1984 murders, as well as his positive behavior towards family while incarcerated between his two penalty phase hearings.

8. During my closing argument to the jury at the second penalty phase hearing, I emphasized to the jury that, if defendant was sentenced to life imprisonment, he would never leave the prison and would stay there for the rest of his life.

9. Following the second penalty phase hearing, the jury sentenced defendant to death for each of the first degree murder convictions.

10. I am aware that defendant's petition for writ of habeas corpus is currently pending in the United States District Court for the Eastern District of Pennsylvania. I am also aware that the issue before the Court is whether I was ineffective for failing to investigate and present evidence of defendant's positive adjustment in prison while he was incarcerated between his two penalty phase hearings.

11. In connection with this claim, on July 3, 2018, I gave a declaration to defendant's current lawyers, in which I stated: "I was not operating under any strategy or tactic when I did not investigate or present evidence of Mr. Wharton's positive prison adjustment at his second penalty hearing and argue to the jury that Mr. Wharton's life should be spared because he posed no danger to inmates or staff if he were sentenced to life."

12. When I gave my declaration, defendant's lawyers did not show me any documents from the Pennsylvania Department of Corrections ("DOC") regarding

defendant's time in prison between his two penalty phase hearings. I do not know the contents of the actual DOC records pertaining to defendant's prison adjustment between his two penalty phase hearings.

13. If any of the DOC records contained any information suggesting that defendant had engaged in negative behavior (such as misconducts) while incarcerated, or engaged in any behavior to suggest that he was an escape risk or possible danger to others in prison, I would have conducted a balancing test before presenting the DOC records to assess whether the DOC records could have caused more harm than good to the defense strategy at the second penalty phase hearing.

14. I know from my experience as a criminal defense attorney that, if I presented records pertaining to defendant's positive adjustment in prison, it could have opened the door for the prosecutor to present evidence regarding any negative behavior on defendant's part in prison.

I declare that the above statements are true and correct.

_____
William T. Cannon, Esq.

Date: May 31, 2019

EXHIBIT E

REPORT BY DR. JOHN O'BRIEN

JOHN S. O'BRIEN II, MD, JD
P.O. BOX 1009
NEW LONDON, PA 19360

TELEPHONE
(215) 563-4141

FAX
(215) 563-6191
E-mail: jsob22@aol.com

CELL PHONE
(267)258-1424

July 15, 2019

James P. Barker, Esq.
Chief Deputy Attorney General
Office of the Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor, Strawberry Square
Harrisburg, PA 17120

**RE: Robert Wharton v. Donald T. Vaughn, et al.
Civil Action #: 01-6049**

Dear Mr. Barker:

Pursuant to your request, I completed a review of materials which you forwarded to me regarding Robert Wharton. It is my understanding that Mr. Wharton is currently involved in appellate proceedings following his having been convicted and sentenced to death in connection with the murders of Bradley and Ferne Hart in Philadelphia, Pennsylvania in late January 1984. It is further my understanding that in requesting a review of materials regarding Mr. Wharton, you were interested in my opinion regarding an undated affidavit signed by Harry Krop, PhD and whether it is a document that reflects a balanced inquiry into Mr. Wharton's history and behavior and his adjustment to state incarceration as a death row inmate between 1986 and 1992 and can be accepted at face value without exploration or consideration of contrary views or opinions.

In completing my review of materials regarding Mr. Wharton, I reviewed:

1. Investigative materials from the Philadelphia Police Department into the murders of Bradley and Ferne Hart in their home in the Germantown section of Philadelphia on January 30, 1984. Their bodies were discovered by Mr. Hart's father on February 2, 1984, as was their 7-month old daughter, Lisa, who had been left abandoned in the unheated Hart residence since the time of their murders. The materials document that shortly afterward Mr. Wharton and an accomplice were arrested.

    The investigative materials include a statement provided to the police by Mr. Wharton in which he admitted to his involvement in the Hart murders as a result of Bradley Hart's owing him money for work performed upon Mr. Hart's property and a radio station owned by Mr. Hart's father. Mr. Wharton indicates that he entered the home of Bradley and Ferne Hart on the night of January 30, 1984 after

brandishing a knife while conversing with Bradley Hart at the front door. He then let his accomplice into the residence and demanded that Mr. Hart write him a check. The materials document that Mr. Hart wrote Mr. Wharton a check for $935 after which Mr. Wharton and his accomplice proceeded to kill the Harts in their residence because the Harts knew Mr. Wharton and would "turn us in." After murdering the Harts, Mr. Wharton and his accomplice left the Hart's infant daughter on a bed, turned the heat off in the house and proceeded to steal several items from the Hart residence, departing in Mr. Hart's stolen motor vehicle after changing the vehicle's license plate with plates taken from a vehicle nearby.

The investigative materials indicate that Mr. Wharton had previously burglarized and vandalized the Harts' residence twice in August 1983 and burglarized the Hart's church in September 1993. The investigative materials also document Mr. Wharton's participation in other robberies unrelated to the Harts, including burglaries of Germantown Boys Club and burglary and robbery of a couple in their residence in South Philadelphia during the same time period. The investigative materials reflect Mr. Wharton to have exhibited a pattern of illegal and antisocial behavior for a significant period of time prior to the Hart murders, inconsistent with a later opinion that the charges for which Mr. Wharton was sentenced to death were "anomalous and out of character" for Mr. Wharton.

The police investigative records document investigation of an escape attempt by Mr. Wharton while leaving court on April 21, 1986 after having been sentenced for an offense unrelated to his repeated criminal behavior directed at the Harts. At the time of the escape attempted, Mr. Wharton is documented to have been wearing a plastic cast and sling on his right arm resulting in his not being handcuffed on that side. During the escape attempt, Mr. Wharton removed the plastic cast and the handcuff on his other wrist and ran from sheriff's deputies, down the steps, and out the door of Philadelphia City Hall. He was apprehended after having been shot in the buttocks and thigh by deputies in hot pursuit. After his apprehension, a handcuff key was found in the vicinity where he removed his cast and handcuff, providing an explanation for his ability to remove the left handcuff. The materials regarding the escape attempt include copies of articles published the following day in the *Philadelphia Inquirer* and the *Philadelphia Daily News*. One of the articles makes reference to a "supposedly lame arm" as the reason for the molded plastic cast worn by Mr. Wharton on his right arm. Mr. Wharton was reportedly observed by sheriff's deputies to be "pumping both his arms while running," showing no apparent difficulty with the right arm after the

cast was removed.

2. Criminal Record regarding Robert Wharton from both the Court of Common Pleas of Philadelphia County, Pennsylvania and the Pennsylvania State Police Central Repository. These materials reflect offenses for which Mr. Wharton was arrested and later prosecuted that occurred in August and September 1983, January and February 1984 and April 1986. Charges lodged against Mr. Wharton included multiple counts of criminal attempt and criminal conspiracy, as well as multiple counts of burglary, robbery, theft, receipt of stolen property and aggravated and simple assault.

3. Records regarding Robert Wharton from Commonwealth of Pennsylvania Department of Corrections documenting Mr. Wharton's incarceration between April 1986 and December 1992 following his having been convicted of the first-degree murders of Bradley and Ferne Hart and sentenced to death. These records document Mr. Wharton's health, mental health, and behavioral adjustment to incarceration in state custody on death row. The records reflect that Mr. Wharton did not manifest, or report, any psychiatric or other mental health complaints and received no psychiatric or mental health counseling or treatment other than routine mental health assessment during his documented period of incarceration.

The DOC records document Mr. Wharton to have authored numerous grievances which were a reflection of a wide range of complaints and requests between December 27, 1986 and September 6, 1992. These grievances included Mr. Wharton's repeated request for the restoration of radio and television privileges following his being placed on disciplinary custody in May 1989. The grievances document Mr. Wharton's ongoing restriction from the possession of a radio or television following completion of his period of disciplinary custody, resulting in Mr. Wharton complaining that the Program Review Committee was continuing to "punish him" for the conduct that resulted in his disciplinary custody and the removal of privileges. He at no point demonstrated insight into the obvious reasons for the continued restriction.

The correctional records include documentation of various misconducts exhibited by Mr. Wharton, the most significant of which occurred on May 15, 1989 when a routine security check of Mr. Wharton's cell revealed him to be in possession of two small pieces of antenna, one of which had been fashioned into a handcuff key. He was also found to be in possession of a 4" piece of antenna secreted

in his legal documents. The discovery of these materials in Mr. Wharton's cell was described in the prison records as a "very serious" misconduct in the context of his escape attempt during court transport three years before.

The Department of Corrections records also include documentation of monthly Program Review Committee meetings regarding Mr. Wharton, the majority of which took place in his absence, between November 5, 1986 and October 27, 1993. In fact, the PRC records document that Mr. Wharton declined to participate in 60% of the meetings, beginning within two months after his arrival at the facility. The PRC meeting documentation indicates that Mr. Wharton would attend the meetings when he had complaints or specific requests. His requests included requests for a chess set, wristwatch, vending machine privileges, and radio and television privileges. His complaints included complaints about his inability to effectively communicate with his attorney. Generally, Mr. Wharton was reported to exhibit a "realistic attitude" and an "uneventful" and "satisfactory" adjustment by his counselor and no psychiatric or mental health issues or complaints by the psychiatrist who met with him for routine periodic assessment. Mr. Wharton was described by his counselor as an individual who "seldom makes a request or initiates any interaction" and was described as generally "pleasant and cheerful." The PRC records do not make specific reference to Mr. Wharton's misconduct on May 15, 1989 when he was discovered to be in possession of contraband and implements of escape until June 7, 1989 when Mr. Wharton was noted to be "appealing his misconducts" and reference was made to disciplinary sanctions imposed between May and November 1989. In July 1989, the PRC records document Mr. Wharton to complain about the total amount of disciplinary time he was facing. In September 1989, the records make specific reference to the PRC reviewing Mr. Wharton's "very serious" misconduct, noting that Mr. Wharton was "less than truthful" with the Committee about the misconduct indicating that he had nothing to do with the confiscated weapons or handcuff key. On December 7, 1989, following his completion of his period of disciplinary custody, Mr. Wharton asked for restoration of his radio and TV privileges. The PRC declined his request making reference to "past misconducts for abusing/modifying antennae." On January 10, 1990, Mr. Wharton refused to discuss the misconduct with the PRC, stating that he did not have to because he "did the time" in disciplinary custody. The Program Review Committee records document Mr. Wharton to be significantly limited in both his participation as well as in his open communication with the Committee and unable or unwilling to demonstrate insight into or remorse for his behavior both prior to and

during his incarceration. The records document ongoing serious behavioral transgression consistent with surreptitious future planning while portraying himself as polite, pleasant and well-adjusted.

4. Transcript of Penalty Phase Re-Hearing in the matter of the Commonwealth of Pennsylvania v. Robert Wharton before the Court of Common Pleas of Philadelphia dated December 14, 1992.

5. Transcript of Proceeding in Response to Post-Verdict Motions in the matter of the Commonwealth of Pennsylvania v. Robert Wharton before the Court of Common Pleas of Philadelphia dated August 18, 1993.

6. Appellate Opinions regarding the case of the Commonwealth of Pennsylvania v. Robert Wharton from the Supreme Court of Pennsylvania, decided on April 28, 1992, September 29, 1995 and November 25, 2002; from the United States District Court of the Eastern District of Pennsylvania decided on August 16, 2012; and from the United States Court of Appeals for the Third Circuit filed January 11, 2018.

7. Order in the matter of Robert Wharton v. Donald T. Vaughn, et al. from the United States District Court for the Eastern District of Pennsylvania. In the order, the United States District Court asserts it's inherent authority to designate amici curiae to assist in a proceeding and requests the Pennsylvania Attorney General to submit an amicus brief on the issue of whether relief should be granted on petitioner's remaining habeas claim based on the current record or whether the record should be expanded.

8. Undated Declaration of Harry Krop, PhD regarding Robert Wharton. In this declaration, Dr. Krop identifies himself as a PhD in psychology and a licensed psychologist with prior experience testifying in capital proceedings in Pennsylvania where he has repeatedly been involved as an expert for the Federal Defenders Association. Dr. Krop indicates that he conducted a forensic psychological evaluation of Robert Wharton and reviewed psychological tests administered to Mr. Wharton. He does not specify when the tests were administered, by whom, or in what context. There are a wide array of psychological tests that psychologists administer and interpret. Dr. Krop does not specify what specific tests he reviewed nor provide the raw data from the testing as an attachment or appendix to the declaration.

Dr. Krop indicates that he conducted a clinical evaluation of Mr.

Wharton and reviewed his records from the Pennsylvania Department of Corrections and "other documents related to the facts of his capital case," Dr. Krop expresses the opinion that Mr. Wharton is "psychologically intact" and "does not evidence a history of drug or alcohol abuse." He characterizes Mr. Wharton's participation in the murders of Bradley and Ferne Hart as an "out of character" and "anomalous" action on Mr. Wharton's part.

Dr. Krop sets forth a brief summary of the various proceedings in Mr. Wharton's case subsequent to his initial receipt of a death sentence in 1985. He indicates that Mr. Wharton's second penalty hearing was conducted in December 1992 and states that had he been asked to evaluate Mr. Wharton for his second penalty phase trial, "It would clearly have been important and professionally required for me or any competent forensic practitioner to inquire into the adjustments he made to life in state prison" during the six-year period between 1986 and 1992 and opine about whether Mr. Wharton "posed a risk of being a future danger in the event his life was spared." Dr. Krop indicates that in his opinion, Mr. Wharton's adjustment to life in state prison was "quite positive," indicating that Mr. Wharton had "every indication that he has not and will not present a danger should he spend his life in prison." Dr. Krop makes specific reference to Mr. Wharton filing a "large number of prison grievances related to his conditions of confinement" which he identifies as significant in "demonstrating relative acceptance of his incarceration." He characterizes that "relative acceptance" as "an important element of his adjustment and shows that he will likely not be a future danger."

Despite his report of review of various records, it appears that Dr. Krop may have been wholly unaware of Mr. Wharton's extensive history of criminal behavior aside from his participation in the murders of Bradley and Ferne Hart. Dr. Krop makes no reference to Mr. Wharton's escape attempt in 1986 or to his having been found to be in possession of contraband and implements of escape in 1989, including what was identified as a handcuff key fashioned from an antenna, behavior strikingly similar to his escape attempt during which it appeared that Mr. Wharton removed his handcuff with a key. Dr. Krop does not make reference to, or even document awareness of, Mr. Wharton's limited participation in Program Review Committee meetings, his reticence to discuss any issues of substance or his absolute refusal to discuss the May 15, 1989 misconduct that resulted in a lengthy period of disciplinary custody and a prolonged period afterward during which his radio and television privileges were not restored.

Having reviewed the materials forwarded to me regarding Mr. Wharton, I am struck by the degree to which the declaration prepared by Dr. Krop overstates the positive and ignores the negative of Mr. Wharton's history and record. It is my opinion that such a posture limits the accuracy and validity of Dr. Krop's opinions or conclusions. In his declaration, Dr. Krop specifically expresses the opinion that Mr. Wharton does not meet the criteria of an Antisocial Personality Disorder and characterizes his participation in the murders of Bradley and Ferne Hart as an "out of character" and "anomalous" act on his part without any documented awareness of a lengthy history of criminal behavior reflective of a longstanding pattern of behavior interrupted by his arrest for the Hart murders. Such a pervasive behavior pattern is consistent with the very diagnosis Dr. Krop indicates that in his opinion, Mr. Wharton does not have. The nature of the killings of Bradley and Ferne Hart and the reasons for them reflect callous disregard for, and violation of, the rights of others. Mr. Wharton's documented pattern of illegal behaviors during the period of time leading up to the murders of the Harts clearly reflect him to fail to conform to social norms with respect to lawful behaviors and to exhibit deceitfulness, impulsivity, aggressiveness, irresponsibility, lack of remorse, and reckless disregard for the safety of others. The available materials do not contain specific documentation of Mr. Wharton's behavior prior to the age of 15 which serves as the only potential limitation to his being identified as an individual with Antisocial Personality Disorder. It is my opinion that the declaration prepared by Dr. Krop is not a document that reflects a balanced inquiry into Mr. Wharton's history, documented behavior or correctional adjustment and cannot be accepted at face value without exploring whether contrary views or opinions might be viable and worth considering.

All the aforementioned opinions are rendered to a reasonable degree of medical certainty.

Thank you for the opportunity of reviewing records regarding Robert Wharton. Should you have any questions about my review of those records, or my opinions regarding them, please do not hesitate to contact me.

Sincerely,

John S. O'Brien II, MD, JD

JSO/fcn

EXHIBIT F

LETTERS FROM VICTIMS' FAMILY MEMBERS

June 6th, 2019

    Regarding Vacating Robert Wharton's Death Penalty

After speaking with my uncle, Tony Hart, I was made aware that changes were being proposed in Robert Wharton's sentencing. He had a meeting coming up with the Attorney General and the plan was made to include me in it. I was contacted by the Attorney General's office on June 6th and made aware of the status of the case. I was extremely disappointed to learn of the District Attorney's stance and very troubled that he implied that the family approved of his viewpoint. At no point was I contacted by the District Attorney or anyone in his office to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight. At seven months old, after my parent's had been murdered, I was left in a house where the heat had been intentionally turned off in hopes that I would die. I am the sole survivor of this tragedy and I am alive despite his efforts.

Every day I live with the effects of that horrific night. Who is he to demand relief from his circumstances when I, the victim, can get no relief from mine? Each milestone of my life, every occasion that is to be celebrated, is colored with the heartbreak of my parents not being here to share in it with me. And even the hard times are made harder by the reality that my parents are not here to render support. As a parent myself now, I can only imagine what their final thoughts must have been when they realized that they were going to die. I know they must have been of me as mine would be of my daughter. The older I get, the greater my understanding of their suffering grows. My grief intensifies instead of lessening.

The District Attorney's stance in this case is an affront to justice and has shown a total disregard for the life of my parents, my own life, and the impact that this would have on our family. The one highpoint in this entire situation has been the fact that justice was served when the verdict was rendered. I have held on to that from a child and even more so as an adult. But now attempts are being made to undo justice; to take away the one positive thing that can be held onto in a tragedy like this. Does a victim's life matter less the older the case gets? Is it diminished by the perpetrator's want of a more comfortable existence? I sincerely hope not. It is my belief that Robert Wharton's death penalty should be carried out or that otherwise he should remain on death row for the remainder of his natural life.

Lisa Hart-Newman

STATEMENT OF MICHAEL F. L. ALLEN
7th June, 2019

Ferne was my sister. Etched in my memory and crystallised on being told of her murder is the image of Ferne and Bradley together in the airport terminal in The Bahamas moments before they walked though the doorway leading to the US Customs and Immigration pre-clearance facility. It was the last time I saw her alive. A few months later whilst a university student in England, I received a telephone call and learned of her death.

Ferne was as delicate as the plant from which her name is borrowed. Bradley her husband was her strength. Robert Wharton displayed great capacity of a diabolical nature in the cold hearted killing of the innocent.

There were extraordinary days following the discovery of the lifeless and abandoned bodies of Ferne and Bradley and the recovery of the infant body of their daughter Lisa , left by Wharton, clinging to life. The Philadelphia investigating officers assigned to Ferne's case along with the prosecutor from the District Attorney's office were nothing less than brilliant in their handling of matters. Within days after the murders, Robert Wharton would be before the Philadelphia court charged with the murder of Ferne. In the midst of worrisome uncertainty, inestimable comfort came from an investigative department and a judicial system which worked for us and the people of East Mount Airy; injecting back into life a measure of sanity and confidence. Robert Wharton is a murderer. He was convicted in fair trial by a competent court. He is guilty of heinous acts. He has violated the sanctity of life... more than one life. He has disqualified himself from membership in a free society and has overstayed his time on the periphery of civil society. He should do the noble thing by abandoning his appeal and giving himself over to the consequences for his crimes.

I have noted the history of Wharton's attempts to extricate himself from just consequences for his acts, leading to the current proceeding. I also am aware of the position taken by the current District Attorney having read published information and having been briefed by Agent Tim Barrar on the 7th June, 2019.

At no time did any one from the District Attorney's office contact me concerning this matter.

I understand that the DA's office has gone on record to say that they communicated with the family of Wharton's victims. I understand that they have represented either expressly or impliedly that the family agrees with the outrageous position they have taken to seek to vacate Wharton's death penalty. The positon of the DA's office is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts.

As a matter of opinion, after some discussion with Tony Hart (Ferne's brother-in-law) regarding communication with personnel from the DA's office, it would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty. Perhaps it should be explored as to whether that communication was in effect a conversation cleverly directed by one who knew all, seeking to achieve a desired result from family members without full disclosure regarding consequences for vacating the death penalty. I know of no member of the Allen or Hart family who supports what the DA's office intends. I oppose the vacating of Robert Wharton's death penalty.

Michael F. L. Allen

June 8, 2019

Dear Mr. Tim Barrar,

My name is Patrice Carr. I am the sister of Bradley Hart, who was murdered, along with his wife, Ferne, back in January of 1984. Their infant baby girl, Lisa, survived but was left to die by these monsters of men. That was 35 years ago. Their killers were found and arrested within a week or two of their murders, then tried and convicted of multiple charges in 1985. I believe justice was served, where one, of the two murderers, was sentenced to death. This kind of sentence did not bring a sense of relief or satisfaction, but I felt that justice was served.

I, as well as the rest of my family, have had to deal and cope with this loss. My brother Bradley was my best friend from birth to the day he died. Out of five siblings, he was number four and I was number five. Growing up, we did everything together. He was someone I could trust and confide in. We played together, laughed together, vacationed together, sang together, celebrated life together. We loved each other very much.

Our family knew Ferne many years before she and Bradley started dating. Our parents had been long time friends. So when they started dating, my brother still let me hang out with them. I might have been a third wheel, but I didn't care. Ferne soon became a very close and dear friend to me. She was such a wonderful person, so sweet and generous and kind. So it turned into the three of us doing everything together. I can't put into words how much I miss them. How heartbroken I am that they weren't a part of my wedding, they never met the man I fell in love with! My children never met two people that I was very close to and would have been a great aunt and uncle to them. Every birthday, Christmas, graduation, every milestone is a reminder that they are no longer with us.

I will say, knowing that Bob Wharton is behind bars, sentenced to death, along with the healing that comes with the passage of time, I am more at peace and my memories of them are more joyful. But this situation has brought up all the sadness and pain all over again. I remember my adopted sister, Lydia, and I calling them from that Tuesday through that Thursday, wondering where they were. We drove to their house and knocked on their door, but no answer. And because their car was not there, we thought that they went on a trip somewhere. We kept saying, "They're grown people. They don't have to tell anyone where they're going or what they're doing. But it was so not like them." We talked every day and saw each other several times during the week.

I'll never forget when my parents came back home from a conference that Thursday. I asked if they had heard from Bradley and Ferne. They said no. My father, who was the only one with a key to their house, headed over there right away. He came back a short while later with Lisa in his arms and told us what he saw. What a horrifying and horrendous experience! I grabbed Lisa and between my mother and I we tried to warm her up and get her out of her wet/soiled diaper. I won't say much more about that, except that we had to throw out our clothes, and of

course hers, because the smell just wouldn't wash out. She was eight months old and was left in the house for three days, in cold January. They had turned the heat off in the house. My father found her next to her dead mother.

This was no accident. This was planned out and executed.

For the rest of his life, my father suffered from nightmares and depression. Both of my parents never really got over this horrific experience.

As far as removing or releasing the death sentences from Bob Wharton is concerned, I was never contacted or asked about it. I would have never, ever agreed to it and never will. Justice was served in 1985, and in 1992, justice was confirmed. The idea that this is even a consideration is unbearably painful and shocking. I'm just glad that my parents are not here to have to relive this ordeal all over again. My heart hurts for Lisa, who has lost the most, and now is confronted with this unsettling and very distressing idea.

Sincerely,

Patrice Carr

Tim Barrar

PA Attorney General Office

To Whom it may concern,

I was contacted by Heather from the District Attorney's office a couple months ago. She told me that Mr. Wharton had won an appeal and that in order to avoid a new trial a plea deal was offered and accepted. The plea as it was explained to me was life imprisonment and since no one is being put to death in Pennsylvania nothing would change.

It wasn't until after my conversation with Mr. Barrar from the Attorney General's office that it was explained to me that there are other possible ramifications in changing Mr. Wharton's status from the death penalty. The family is in one accord asking that his status not change and that the District Attorney do all that he can to maintain the death penalty in this case. If the DA is not willing, then we as a family ask the judge to please not accept any such plea.

Sincerely

Dr. Tony Hart – Brother of Bradley Hart