**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|                     |     |                 |
| :------------------ | :-- | :-------------- |
| ROBERT WHARTON,     | :   |                 |
|                     | :   | CIVIL ACTION    |
| Petitioner,         | :   |                 |
|                     | :   |                 |
| v.                  | :   | No. 01-6049     |
|                     | :   |                 |
| DONALD T. VAUGHN, et al., | : | **CAPITAL CASE** |
|                     | :   |                 |
| Respondents.        | :   |                 |

_____

### UNOPPOSED MOTION FOR STAY OR CONTINUANCE
### AND CONSOLIDATED RESPONSE TO AMICUS BRIEF
### AND COURT'S QUESTIONS

Petitioner Robert Wharton submits this consolidated motion for a stay or continuance and response to the amicus brief of the Attorney General and the Court's questions to the parties. *First*, Mr. Wharton moves, unopposed, for a stay of these proceedings until the argument and decision in *Cox and Marinelli v. Commonwealth*, Pennsylvania Supreme Court Docket Nos. 102 EM 2018 and 103 EM 2018 (oral argument scheduled September 11, 2019). This extraordinary King's Bench proceeding may render Mr. Wharton's habeas petition moot by declaring that the death penalty is unconstitutional. *Second*, he moves, again unopposed, for a continuance of the time to submit his full factual responses to the new evidence submitted in the Attorney General's amicus brief (ECF No. 171). *Third*, Mr. Wharton replies to the Attorney General's amicus brief, and, *fourth*, he submits responses to the questions in the Court's order of July 30, 2019 (ECF No. 174).

For the reasons below, the requested relief should be granted.

**TABLE OF CONTENTS**

I.   MOTION FOR STAY OR CONTINUANCE ................................................. 2

II.  REPLY TO ATTORNEY GENERAL'S AMICUS BRIEF ........................... 3

    A.   Prison Adjustment Evidence .............................................................. 4

        1.   Disciplinary Records ..................................................................4

        2.   Attempted Escape ......................................................................6

        3.   Prescriptive Program Plans ........................................................8

    B.   Counsel's Deficient Performance ...................................................... 8

    C.   Prejudice ............................................................................................ 10

        1.   Penalty Phase Record and Program Review Committee Reports.....................10

        2.   Expert Opinion by Drs. Krop and O'Brien .......................................11

    D.   Victim Statements ............................................................................. 14

    E.   The Court Should Accept the Parties' Settlement. ........................... 15

III. RESPONSES TO COURT'S QUESTIONS ......................................... 15

    A.   The AG's Proffer of Additional Evidence ....................................... 16

    B.   The Participation of the Attorney General ....................................... 18

CONCLUSION ................................................................................................. 22

CERTIFICATE OF SERVICE ....................................................................... 23

# I.    MOTION FOR STAY OR CONTINUANCE

On September 11, 2019, the Pennsylvania Supreme Court will hear oral argument in *Cox and Marinelli*, in which that court will decide whether to exercise its extraordinary King's Bench power to declare Pennsylvania's death penalty unconstitutional as applied.  Because the only issue remaining in this case is whether Mr. Wharton received ineffective assistance at the penalty phase of his trial, the decision in *Cox and Marinelli* could render this case moot.  The current briefing schedule in this case ends on September 6, only five days before the September 11 King's Bench argument in the Pennsylvania Supreme Court.  A short stay to await the Supreme Court's decision could prevent unnecessary labor by this Court and the litigants in these proceedings.

The Third Circuit has stayed several pending capital habeas cases to await the *Cox and Marinelli* decision.  *See Laird v. Secretary*, 3d Cir. Docket No. 17-9000 (stay granted May 10, 2019); *Lesko v. Secretary*, 3d Cir. Docket No.15-9005 (stay granted December 20, 2018); *Taylor v. Commissioner,* 3d Cir. Docket No. 14-9005 (stay granted December 7, 2018).

Alternatively, Mr. Wharton requests time to develop further evidence in response to the Attorney General's factual proffer.  The Attorney General's amicus brief ("AG Brief") relies on significant new evidence and factual allegations, including a detailed report by John S. O'Brien, M.D., J.D., criticizing the 1997 opinion of Mr. Wharton's expert, Harry Krop, Ph.D., and a new declaration from trial counsel, William Cannon, Esq.  Neither Dr. Krop nor Mr. Cannon has yet had an opportunity to conduct an updated record review.  Mr. Wharton requests a 60-day continuance to allow them time to review records and consult with his counsel.  Allowing Mr. Wharton this opportunity for further factual development may assist the Court in deciding whether to accept the proposed settlement, or, if the Court decides to hold an evidentiary hearing, may narrow the competing factual claims of the parties.

On August 22 and 23, 2019, undersigned counsel exchanged emails with Paul M. George, Assistant Supervisor, Law Division, Philadelphia District Attorney's Office, and with James P. Barker, Chief Deputy Attorney General. Mr. George stated that the District Attorney has no objection to either a stay or a continuance. Mr. Barker indicated his belief that, as a non-party, the Attorney General has no say in whether a stay issues or a continuance is granted. The Attorney General requests the opportunity to file his sur-reply before any stay may take effect, but that is his only objection.

A district court, as part of its power to control its own docket, has the discretion to stay proceedings. *See Clinton v. Jones*, 520 U.S. 681, 706-07 (1997) (citing *Landis v. North American Co.,* 299 U.S. 248, 254 (1936)). This power extends to habeas cases in appropriate circumstances. *Rhines v. Weber*, 544 U.S. 269, 276 (2005). For the reasons above, this Court should exercise its discretion to grant either a stay to await the outcome of the King's Bench proceedings in *Cox and Marinelli* or a continuance to allow for further factual development.

## II.     REPLY TO ATTORNEY GENERAL'S AMICUS BRIEF

The Third Circuit granted Mr. Wharton a hearing on the basis of the existing record. *See* Opinion, Third Circuit Docket No. 13-9002, at 32 (Jan. 11, 2018) (Exhibit 4 to Petitioner's Motion, ECF No. 163-4, PDF 314). The District Attorney decided to concede that Mr. Wharton is entitled to relief on the basis of the existing record, and Mr. Wharton moved for approval of the parties' proposed settlement. This Court denied the motion without prejudice. Before it would consider accepting the District Attorney's concession, it appointed the Attorney General as amicus curiae to assist it in evaluating the merits of the claim for relief. *See* Order, May 7, 2019 (ECF No. 165, Page 4).

The Attorney General has offered additional evidence[1] and argument, but its submissions do not undermine the sound reasons for accepting the parties' settlement agreement. For the reasons below, this Court should decide whether to accept the settlement based on the existing record, and should accept it.

## A. Prison Adjustment Evidence

Before addressing the legal claim of ineffective assistance, the Attorney General presents what he characterizes as "facts not previously provided to the Court," and maintains that the evidence demonstrates adverse prison adjustment. AG Brief at 12. Mr. Wharton's prison record is more positive than the Attorney General makes it appear.

### 1. Disciplinary Records

With one minor exception identified below, Mr. Wharton has already submitted, and this Court and the Third Circuit have already reviewed, prison records that reflected the same infractions the Attorney General discusses in his brief. The Third Circuit noted that Mr. Wharton's proffered evidence "does, at least to a degree, 'cut both ways,'" but found that Mr. Wharton had established a prima facie case of *Strickland*[2] prejudice. Opinion at 30 & n.21 (Wharton Exhibit 4, ECF No. 163-4, PDF 312).[3] The Attorney General provides further documentation about the infractions, but the Program Review Committee ("PRC") reports establish that the Committee was aware of all but one of them (which occurred before Mr. Wharton came under the Committee's

---

[1] Mr. Wharton addresses the Attorney General's request to expand the record (AG Brief at 14 n.8) in Point III.A below.

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

[3] Because the ECF header is obscured on most of the exhibits to Mr. Wharton's Motion to Expand Record, ECF No. 163, he refers to the PDF page number instead of the ECF page number.

supervision).   Nevertheless, the Committee repeatedly found Mr. Wharton's overall conduct satisfactory.

- *Contraband and implements of escape, May 15 and 19, 1989* (AG Brief at 14): Searches of Mr. Wharton's cell uncovered three hidden pieces of TV antenna, one fashioned into a handcuff key. AG Exhibit 1 (ECF No. 171-1, Pages 2 to 15).  As the Attorney General describes (AG Brief at 16), the PRC viewed the resulting institutional infractions as "very serious," but described his adjustment as "routine" and   reported that he was "polite and well mannered."   Mr. Wharton's proffer includes these observations.  PRC Report, September 13, 1989, Wharton Exhibit 2 (ECF No. 163, PDF 209).

- *Refusal to obey an order, July 21, 1986* (AG Brief at 17): Mr. Wharton, who had injured his back, refused to strip for a search before transportation to court.  Mr. Wharton protested the doctor's opinion that he was fit to attend court.  He received a sanction of one week with no work and no phone calls.  AG Exhibit B (ECF No. 171-1, Page 18).   This infraction occurred before he arrived in the Restrictive Housing Unit at SCI Huntington on September 25, 1986, following his formal sentencing to death the previous day.  He did not receive his first PRC review until September 29, 1986.  Wharton Exhibit 2 (ECF No. 163, PDF 26).  Therefore, this incident does not appear in the PRC review forms Mr. Wharton submitted to this Court and the Third Circuit.

- *Refusal to obey an order, May 21, 1988* (AG Brief at 17): The record shows that Mr. Wharton refused to leave the unit along with 21 other inmates.  His sanction was a reprimand and warning.  AG Exhibit B (ECF No. 171-2, Pages 3 to 4).  The

PRC noted this reprimand and nevertheless indicated that "no additional problems or issues were noted," that Mr. Wharton was reportedly "pleasant and cheerful," and that he "could be processed routinely." Mr. Wharton's proffer includes this report. Wharton Exhibit 2 (ECF No. 163, PDF 195).

- *Possession or circulation of a petition, March 19, 1989* (AG Brief at 17): The record reflects that Mr. Wharton received a reprimand and warning. AG Exhibit B (ECF No. 171-2, Page 5). The PRC noted that the petition related to phone call privileges, and that he had been "polite with his counselor" during the relevant period. Mr. Wharton did not appear before the committee, which the PRC described as "at his discretion." Mr. Wharton's submission includes this report. Wharton Exhibit 2 (ECF No. 163, PDF 205).

- *Refusal to obey an order, January 12, 1992* (AG Brief at 17): Mr. Wharton did not comply when an officer told him to stop practicing martial arts moves on the recreation yard with a fellow inmate. His sanction again was only a reprimand and warning. AG Exhibit B (ECF No. 171-2, Page 9). The next PRC report, on February 5, 1992, noted this infraction as "an issue practicing martial arts in the yard," but observed that Mr. Wharton had had "routine contacts" and "was conversant" with his counselor during the month. This report appears in Mr. Wharton's submission. Wharton Exhibit 2 (ECF No. 163, PDF 238).

2.    **Attempted Escape**

The jury announced its sentencing decision on July 5, 1985, but the court did not formally impose the death sentence until September 24, 1986. Penalty Trial Transcript, N.T. 7/5/85, at 76; Wharton Exhibit 2 (ECF No. 163, PDF 26). During the intervening time, he litigated post-

sentencing motions and stood trial for an unrelated armed robbery. *See* AG Exhibit B (ECF No. 171-2, Pages 13 to 17).

As the Attorney General describes (AG Brief at 18), on April 21, 1986, Mr. Wharton bolted from the sheriff's officers who were escorting him after his sentencing on the unrelated armed robbery conviction at Philadelphia City Hall. He shoved a Deputy Sheriff against the elevator door and ran down the stairs. The officer shot him in the buttocks and leg, and arrested him immediately outside the courthouse. *See* AG Exhibit B (ECF No. 171-2, Pages 17 to 23; No. 171-3, Pages 1 to 9).

This evidence is irrelevant to Mr. Wharton's *Skipper* claim, which, as the Third Circuit described it, concerns the evidence that he made "a positive adjustment to prison life." Wharton Exhibit 4 (ECF No. 163, PDF 304). Mr. Wharton broke away from two deputy sheriffs in the courthouse, not from corrections officers. He entered the custody of the Department of Corrections after he received his armed robbery sentence on April 21. Not until five months later, in September 1986, did authorities classify Mr. Wharton at the Eastern Diagnostic and Classification Center[4] and place him at SCI Huntingdon. Not until then did he begin, effectively, living in the highly restrictive conditions of death row under the supervision of Department of Corrections staff. Wharton Exhibit 2 (ECF No. 163, PDF 26); AG Exhibit B (ECF No. 171-3, Page 9). The escape

---

[4] "The Eastern Diagnostic and Classification Center . . . acted as the central reception and classification unit for all offenders sentenced to state prison sentences in the eastern part of the state. . . . [C]onvicted offenders would initially be committed to EDCC for diagnostic study and classification and a Central Classification Committee would then determine the appropriate institution, where they would serve their time." *See* City of Philadelphia, Philadelphia Historical Commission, Eastern State Penitentiary Task Force of the Preservation Commission of Greater Philadelphia, *Historic Structures Report, Eastern State Penitentiary* 232 (Vol. I, July 21, 1994), at https://tinyurl.com/y6p4gzh3 (visited Aug. 13, 2019).

attempt therefore occurred before he entered Department of Corrections custody and before the beginning of the period reflected in the PRC reports, during which he increasingly adjusted to his punishment. His behavior, with the exceptions noted above, was positive.

### 3. Prescriptive Program Plans

The Attorney General notes that four "Prescriptive Program Plan" forms prepared by Corrections staff in 1989-92 checked off "escape" and "assaultiveness" in a section entitled "areas of concern." AG Brief at 20; AG Exhibit C (ECF No. 171-4, Pages 21 to 22; 171-5, Pages 1 to 2). The record reflects no additional evidence of "escape" or "assaultiveness" beyond the escape attempt and infraction mentioned above. The forms also note Mr. Wharton's "positive housing reports," academic work, and maintenance of enumerated goals.

In summary, the additional prison records the Attorney General has presented do not alter the assessment of the Court of Appeals: while they include some negative material, they also reflect sustained, positive prison adjustment. The attempted escape took place before the beginning of the relevant period, and outside the custody of the Department of Corrections. Section II.C below addresses the escape's role in the necessary prejudice analysis.

### B. Counsel's Deficient Performance

The Attorney General repeats the error of the Pennsylvania Supreme Court by conflating the performance and prejudice prongs of the *Strickland* test for ineffective assistance of counsel.

To help demonstrate trial counsel's deficient performance under *Strickland*, Mr. Wharton presented the declaration of trial counsel, William Cannon, who stated that he never obtained his client's prison records from the six years between the first and second penalty trials, and had no strategic or tactical reason for failing to do so. Declaration of William Cannon, Esq., July 3, 2018, Wharton Exhibit 1 (ECF No. 163, PDF 20). The Attorney General now presents a second declaration from Mr. Cannon indicating that he did not review "documents from the Pennsylvania

8

Department of Corrections" before giving his 2018 declaration and that he did not, even at the time of the 2019 declaration, "know the contents of the actual DOC records."  Declaration of William Cannon, Esq., May 21, 2019, ¶¶ 12-13, AG Exhibit D (ECF No. 171-5, Pages 5 to 6).  Before Mr. Cannon made his 2018 declaration, Mr. Wharton's counsel sent him the Third Circuit briefs for both sides, which contained detailed discussions of the same infractions discussed above, based on the same records proffered in this Court.  *See* Exhibit 1, attached (letter to William Cannon, May 25, 2018).[5]

Mr. Cannon's 2019 declaration states that, before deciding whether to present any such records at trial, he would have "conducted a balancing test" weighing any negative behavior against its potential to support the defense strategy.  He never indicates that he would not have used the records.  AG Exhibit D (ECF No. 171-5, Page 6).  Relying principally on this second declaration, the Attorney General maintains that the "complete facts concerning Wharton's conduct" would likely prevent a reviewing court from holding that counsel was deficient.  He argues that the negative parts of the prison records, and the attempted escape, "would have been detrimental to the defense."  AG Brief at 22, 24.  Not only does Mr. Cannon provide no support for the AG's analysis, but the Third Circuit rejected that same analysis as an unreasonable application of *Strickland* by the Pennsylvania Supreme Court:

> In concluding that this claim failed under Strickland's performance prong, the PSC appeared to rely on the following: (a) Wharton's prison records "cut both ways"; and (b) Cannon presented other evidence that led the jury to find the catch-all mitigating factor. *See id*. But these points do not necessarily render Cannon's performance reasonable. If, for example, Cannon simply neglected to seek out the prison records, his conduct could be deemed unreasonable regardless of whether the records were particularly helpful or whether he presented other mitigating evidence to the jury. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (explaining

---

[5] Mr. Wharton moves to expand the record, pursuant to Rule 7 of the Rules Governing Section 2254 Cases, with this letter.

that counsel has an "obligation to conduct a thorough investigation of the defendant's background"); *see also Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). *Without knowing whether Cannon even considered obtaining the prison records, neither the content of those records, nor the presence of other evidence, could serve as the basis for rejecting Wharton's claim on Strickland's performance prong.* Accordingly, we conclude that the PSC's application of that prong was unreasonable.

Third Circuit Opinion, January 11, 2018, at 23-24, Wharton Exhibit 4 (ECF No. 163, PDF 305-06 (emphasis added)). That Mr. Cannon now indicates that he would have exercised caution about door-opening before *using* any prison records did not excuse his failure to *obtain* them.

In fact, Mr. Cannon was not cautious during the trial. As the Attorney General observes, part of trial counsel's strategy was to present evidence of Mr. Wharton's "positive attributes while incarcerated," relying exclusively on testimony from family members. AG Brief at 23-24 (citing N.T. 12/18/92, 95-101; N.T. 12/21/92, 9-11). That strategy, by creating a risk of opening the door to Mr. Wharton's prison conduct, only heightened the irresponsibility of counsel's failure to investigate it. Mr. Cannon's 2019 declaration does nothing to undercut the significance of his 2018 declaration for the performance prong: he never investigated whether or not the prison records would support his own strategy, and had no strategic or tactical basis for failing to do so.

### C. Prejudice

#### 1. Penalty Phase Record and Program Review Committee Reports

According to the Attorney General, the penalty phase record alone, including the facts of the crime and the aggravating factors, made it "unlikely" a jury would have reached a different result "on the basis of brief, boilerplate comments in some monthly PRC reports." AG Brief at 31. First, the *Strickland* prejudice test is not whether a different result is "likely" but whether there is a reasonable probability—one less than more likely than not—of a different result. *See Strickland*, 466 U.S. at 693.

Moreover, the Attorney General demonstrates misplaced confidence that the negative evidence "would likely have overwhelmed any evidence regarding Wharton's spurts of 'satisfactory' adjustment in between his misconducts and attempts to escape custody." AG Brief at 32. The satisfactory adjustment did not come in "spurts," but formed a steady and protracted baseline throughout the relevant period. The infractions, not the good conduct, were the exceptions, as the PRC reports reflect.

The Attorney General also dismisses the Program Review Committee reports as "at times inaccurate." AG brief at 31 n.19. In particular, he notes that the report for the period that included Mr. Wharton's infractions for possession of the pieces of antennas does not mention the infractions except to note that he was appealing them. *Id.* (citing PRC Report, June 7, 1989). *See also* Wharton Exhibit 2 (ECF No. 163, PDF 207 (including same report)). The record shows, however, that the PRC was well aware of the infractions and did not minimize them. For one thing, the PRC itself was responsible for adjudicating Mr. Wharton's appeals from the initial infractions, and its members did not need to document in any detail the existence of matters already under their own consideration. *See* Pennsylvania Department of Corrections, Policy Number DC-ADM 801, at 5-1, available at https://tinyurl.com/y2hxy83q (visited August 8, 2019). Also, the reports do address the infractions. Aside from the reference to the appeal on June 7, the Committee indicated on September 13 that the infractions were "very serious" and on December 6 that it was still "reluctant" to restore his TV and radio privileges because of them. These notations appear in Mr. Wharton's submissions. Wharton Exhibit 2 (ECF No. 163, PDF 209, 212). Nevertheless, throughout this time, the Committee repeatedly gave Mr. Wharton generally positive evaluations.

### 2. Expert Opinion by Drs. Krop and O'Brien

Mr. Wharton presented the expert opinion of Harry Krop, Ph.D., as part of his proffer in support of an evidentiary hearing in PCRA proceedings, the first round of federal habeas

proceedings in this Court, and the Third Circuit. He proffered the same declaration in support of his motion in this Court to approve a settlement with the District Attorney. In 1997, Dr. Krop reviewed records and conducted an in-person clinical interview of Mr. Wharton. He noted that Mr. Wharton did not meet criteria for anti-social personality disorder or have a significant criminal history "*prior to the offenses related to his capital case.*" Wharton Exhibit 3 (ECF No. 163-3, Page 2, PDF 278 (emphasis added)). He observed that the prison records consistently indicated that "Mr. Wharton has made a positive adjustment to prison." *Id.* at Page 3, PDF 279.

The Attorney General asked Dr. O'Brien to review records and give his opinion whether Dr. Krop's 1997 report "reflects a balanced inquiry into Mr. Wharton's history . . . and can be accepted at face value without exploration or consideration of contrary views or opinions." AG Exhibit E (ECF No. 171-5, Page 8 (O'Brien report at 1)). Dr. O'Brien did not examine Mr. Wharton. He criticizes Dr. Krop for "overstat[ing] the positive and ignor[ing] the negative of Mr. Wharton's history and record." O'Brien Report at 7 (ECF No. 171-5, Page 14).

First, Dr. O'Brien places great emphasis on Mr. Wharton's criminal record and his attempted escape, and he suggests that "Dr. Krop may have been wholly unaware of Mr. Wharton's extensive history of criminal behavior aside from his participation in the murders of Bradley and Ferne Hart." O'Brien Report at 6 (ECF No. 171-5 at 13). The record provides no support for this speculation.

Dr. O'Brien questions Dr. Krop's opinion, formed following a clinical interview, that Mr. Wharton did not meet criteria for anti-social personality disorder ("ASPD"). He views Mr. Wharton's record as reflecting a "longstanding pattern of behavior," "consistent with the very diagnosis" of ASPD. He acknowledges, however, that this diagnosis would not apply if Mr. Wharton had no documented antisocial behavior before age 15. O'Brien Report at 7 (ECF No.

171-5 at 14). There is no such documentation. Mr. Wharton had no juvenile arrests. *See* N.T. 11/30/92, at 26-27 (representation by Assistant District Attorney Roger King). Furthermore, the other criminal conduct on which Dr. O'Brien relies all occurred during a narrow time frame in 1983-84, and did not form a longstanding pattern.

Dr. O'Brien and the Attorney General place heavy emphasis on Mr. Wharton's attempted escape and his infraction for possessing a handcuff key. AG Brief at 14, 18; O'Brien Report at 2, 3-4 (ECF No. 171-5, Pages 9, 10-11). The attempted escape would have been irrelevant to rebut the proffered evidence, and would accordingly have been inadmissible, because it occurred before Mr. Wharton entered Department of Corrections custody, while he was under escort by deputy sheriffs in the courthouse. Members of the District Attorney's Office in previous administrations were aware of the attempted escape from the time it occurred, charged Mr. Wharton with escape, and secured his conviction for escape. Nevertheless, during years of litigation, they never mentioned it as potential rebuttal to Mr. Wharton's claim that he had made a good prison adjustment. Their years of silence about the attempted escape confirms its irrelevance and inadmissibility.

As for the handcuff key, that infraction fell relatively early in his incarceration. The Program Review Committee knew about it, and nevertheless found that it did not prevent him from adjusting in a satisfactory way.

The Attorney General does not mention that, even with no mitigation investigation or presentation except 44 pages of family testimony, the jury deliberations stretched over three days, and they reported a deadlock, before they reached their verdict. N.T. 12/18/92, at 72-116, N.T. 12/21/92, at 134; N.T. 12/22/92, at 1-17; N.T. 12/23/92, at 2. The evidence Mr. Wharton has proffered could demonstrate, after a hearing, a reasonable probability of a different outcome. That

is, it could demonstrate that, even with the information the prosecution would have highlighted if trial counsel had presented the positive adjustment evidence (which would have bolstered his own defense strategy), one or more jurors would ultimately have voted for a life sentence.

### D. Victim Statements

While the opinions of the Hart family could have no relevance at an evidentiary hearing on a claim that trial counsel provided ineffective assistance, the District Attorney appropriately contacted the family before deciding to seek a settlement. The Attorney General acknowledges that the District Attorney's representative contacted Tony Hart, the brother of victim Bradley Hart. AG Brief at 49.[6] Despite the Attorney General's charge that the District Attorney has violated federal and state laws designed to protect victims' rights (AG Brief at 47-49), the District Attorney's representative gave the family reasonable notice by contacting Mr. Hart and asking him to invite other family members to contact her, and by keeping him apprised of developments over an eight-month period. *See* District Attorney's Office Reply, ECF No. 176, Pages 3 to 4.

Tony Hart's most recent declaration reflects that he has changed his opinion about the appropriate sentence since the District Attorney's representative first contacted him. Those changed views should receive the District Attorney's respectful appreciation, but they can have no relevance to either the ineffective assistance claim before the court or the sentence Mr. Wharton should receive. *See* District Attorney's Office Reply, ECF No. 176, Pages 2 to 3. The District

---

[6] Mr. Hart's letter reflects some confusion about the procedural posture of the case. *See* Letter of Tony Hart, AG Exhibit E (ECF No. 171-5, Page 20). It is true, as he says the District Attorney's representative told him, that Mr. Wharton won an appeal in the Third Circuit and could potentially receive a new trial (of the penalty) as the result of the ongoing habeas proceedings. The settlement, if accepted, would result in a sentence of life imprisonment. It is not clear what "other possible ramifications" the Attorney General's representative explained to Mr. Hart that the District Attorney's representative did not.

Attorney, moreover, must also consider the views of the people of Philadelphia, who elected him on a platform that included a promise not to seek the death penalty in murder cases. The present request for settlement reflects the District Attorney's effort to honor that pledge to his fellow citizens and exercise the discretion entrusted to every prosecutor.

### E. The Court Should Accept the Parties' Settlement.

Federal courts entertain a strong presumption in favor of voluntary settlement agreements, especially in complex cases. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 311-12 (3d Cir. 2011). Whether to settle ordinarily remains in the hands of the parties. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 835 (3d Cir. 1995) ("our federal courts have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system"); *In re Amtrak Train Derailment in Philadelphia, Pennsylvania on May 12, 2015*, 268 F. Supp. 3d 739, 752 (E.D. Pa. 2017) (only certain types of cases such as class actions require court approval); *see also City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 95-96 (1st Cir. 2008) ("Private settlements usually 'do not entail the judicial approval and oversight involved in consent decrees.'") (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001)).

In this case, Mr. Wharton's counsel, representing his interests, and the District Attorney, representing the interests of the people of Philadelphia, have agreed on a settlement. This is not a class action; the Court has no fiduciary duty to oversee the settlement's terms. *See* Fed. R. Civ. P. 23(e). The Court should accept the parties' agreement.

## III. RESPONSES TO COURT'S QUESTIONS

The Court has directed the parties to answer questions that appear to rest on the assumption that it will reject the requested settlement and conduct an evidentiary hearing. The answers below also rest on that assumption, although Mr. Wharton urges the Court to approve the settlement.

### A.    The AG's Proffer of Additional Evidence

The Court asks, first, "whether the Court may (and/or should): (1) accept into the record—under Rule 7 of the Rules Governing Section 2254 Cases, or otherwise—the evidence referenced by the A.G.'s office[.]"  Order, July 30, 2019, ECF No. 174, Page 1.  The Attorney General also seeks to expand the record to include the additional evidence submitted with his amicus brief.  AG Brief at 14 n.8.

The Attorney General devotes several pages to the standard of review, arriving at the conclusion that Mr. Wharton bears the burden of proving that trial counsel failed to investigate and present evidence of positive prison adjustment, and that this failure prejudiced the defense. AG Brief at 43-44.  In other words, the Attorney General advocates for *de novo* review of the elements of *Strickland*.[7]  The Third Circuit has already ruled that Mr. Wharton has satisfied 28 U.S.C. § 2254(d), that *de novo* review applies, and that he is entitled to an evidentiary hearing. Third Circuit Opinion, Jan. 11, 2019, at 26, Wharton Exhibit 4 (ECF No. 163, PDF 308). Therefore, this Court is not limited to the state court record in ruling on this claim.  *See Hines v. Ricci*, No. 10-4130, 2013 WL 1285290, at *1, 21-25 (D.N.J. Mar. 26, 2013) (ordering evidentiary hearing to decide merits of claim after concluding on basis of state court record that 2254(d)(1) satisfied because state court adjudication contrary to controlling Supreme Court precedent). Nevertheless, its discretion has limits.  The ordinary rule of relevance applies, *see* Fed. R. Evid.

---

[7] The Attorney General quarrels with the Third Circuit's analysis of the Pennsylvania Supreme Court's opinion, and includes an undeveloped argument that "for purposes of federal habeas corpus review the question has another layer, which is whether the state courts were unreasonable in concluding that no competent lawyer would believe that the prison records would not have changed the outcome.  *See* 28 U.S.C. § 2254(d)."  AG Brief at 40-42.  This Court may not address any question through the lens of § 2254(d), and need not address the Attorney General's defense of the Pennsylvania Supreme Court's reasoning.  The Court of Appeals has already ruled that the state court applied *Strickland* unreasonably under § 2254(d).

402, and Rule 7 of the Rules Governing Habeas Cases gives it discretion only to allow the parties "to expand the record by submitting additional materials *relating to* the petition" (emphasis added).

The claim before this Court is that Mr. Wharton's trial counsel was ineffective for failing to investigate and present evidence of his prison adjustment during the time he was in the custody of the Department of Corrections. The Attorney General has submitted some materials that relate to that claim. The Court could expand the record to receive them pursuant to Rule 7 or admit them as exhibits at a hearing. Specifically, the Court could receive:

1.  Prison misconduct records (AG Exhibit A, ECF Nos. 171-1, Pages 1 to 19, and 171-2, Pages 1-11).

2.  Department of Corrections Prescriptive Program Plan forms (AG Exhibit C, ECF Nos. 171-4, Pages 21 to 22, and 171-5, Pages 1 to 2).

3.  Declaration of William Cannon, Esq. (trial counsel), May 31, 2019 (AG Exhibit D, ECF No. 171-5, Pages 3 to 6).

4.  Report of Dr. John O'Brien, July 15, 2019 (AG Exhibit E, ECF No. 171-5, Pages 7 to 14).

The AG's proffered prison records relate to the prison records on which Mr. Wharton relies. Mr. Cannon's new declaration relates to his earlier declaration, included in Mr. Wharton's proffer. Dr. O'Brien's report relates to the report of Dr. Krop, included in Mr. Wharton's proffer.

Some materials the Attorney General proffers, however, have no relevance to the sole claim before the Court, and the Court should not expand the record to include them or receive them in evidence at a hearing:

1.  Documents concerning the attempted escape. As discussed above, the attempted escape is irrelevant to the claim that Mr. Wharton made a good adjustment to prison. Accordingly, the Court should not receive the following evidence:

    a.  Court and discovery documents concerning attempted escape (portions of AG Exhibit B, ECF Nos. 171-2, Pages 12 to 23, and 171-3, Pages 1 to 9).

b. Newspaper articles concerning attempted escape (portions of AG Exhibit B, ECF Nos. 171-3, Pages 12 to 19, and 171-4, Pages 1 to 3).

c. Prison dispensary cards reflecting medical treatment for gunshot wounds and Westlaw opinions reflecting lawsuits based on Mr. Wharton's gunshot wounds during attempted escape (portions of AG Exhibit B, ECF No. 171-4, Pages 4 to 19).

d. Statement by Former Assistant District Attorney Carlos Vega, June 20, 2019 (included in AG Exhibit B, ECF Doc. No. 171-3, Pages 10 to 11). This statement not only addresses an irrelevant subject—the attempted escape—but it does not even convey personal knowledge. Mr. Vega states that he was inside the courtroom where Mr. Wharton had just received a sentence for an unrelated robbery when he heard a scuffle in the hallway. He did not witness the scuffle, Mr. Wharton's flight down the stairs, his shooting, or his arrest.

2. Statements by victim family members (AG Exhibit F, ECF No. 171-5, Pages 15 to 20). The family members offer no information relevant to trial counsel's investigation or presentation, or the impact of his deficient performance on the jurors' sentencing verdict. The Court should not expand the record to include them or receive them in evidence at a hearing.

## B.    The Participation of the Attorney General

The Court asks the parties to address a second question, whether "the Court may (and/or should) . . . (2) allow the A.G.'s Office to participate in the evidentiary hearing on Petitioner's remaining habeas claim mandated by the Third Circuit." Order, July 30, 2019, ECF No. 174, Page 1. The Court previously rejected Mr. Wharton's objections to the Attorney General's participation in the current round of briefing, observing (in paragraph 5) that it had not asked the Attorney General to intervene as a party but only to file a brief as amicus curiae, and (in paragraph 6) that Mr. Wharton had not substantiated suggestions of impropriety by naming particular members of the Attorney General's office who had previously participated in Mr. Wharton's prosecution. Order, June 24, 2019 (ECF No. 170, Page 2). Mr. Wharton's objections carry more force in relation to an evidentiary hearing:

*The role of amicus curiae*: While a district court has discretion to allow an amicus to play a role in litigation, the amicus cannot function as a party.  *See Liberty Res., Inc. v. Philadelphia Hous. Auth*., 395 F. Supp. 2d 206, 208-10 (E.D. Pa. 2005) (allowing amicus to participate but ordering that amicus "shall perform none of the functions reserved to parties, such as calling or cross-examining witnesses, taking depositions, or requesting the production of documents"); *Waste Mgmt of Pennsylvania, Inc., v. City of York*, 162 F. R. D. 34, 36-37 (M.D. Pa. 1995) ("The named parties should always remain in control, with the amicus merely responding to the issues presented by the parties.") (quoting *Wyatt by and through Rawlins v. Hanan*, 868 F. Supp. 1356, 1358 (M.D. Ala. 1994)).

Allowing the Attorney General to participate in an evidentiary hearing by calling or cross-examining witnesses, or otherwise controlling the issues contested or conceded, would convert his office from a friend of the court to a party to the litigation.  This Court should not allow it.

*Appearance of Impropriety*:  As described in Mr. Wharton's earlier motion, some current members of the Attorney General's staff left the Philadelphia District Attorney's Office, after many years of service there, in the wake of the election of the current District Attorney.  In particular, Ronald Eisenberg, who participated as an Assistant District Attorney in Mr. Wharton's direct appeal and later served as head of the Law Division, now serves as Senior Appellate Counsel for the Attorney General.  *See Commonwealth v. Wharton*, 607 A.2d 710, 712 (Pa. 1992); https://tinyurl.com/y485x9he (visited May 27, 2109).  His name appears on earlier pleadings in Mr. Wharton's case.  Another senior member of previous District Attorneys' administrations, Hugh Burns, now serves as a Senior Deputy Attorney General.  *See* https://tinyurl.com/y4m4wt5p (visited August 9, 2019).  Those staff members, and other former members of the Philadelphia District Attorney's Office, may have participated in the preparation of the Attorney General's

amicus brief and could play a role in the preparation or conduct of a hearing. The possibility of their direct or indirect participation in an evidentiary hearing at the same time as the current elected District Attorney—who is a party—would create an appearance of impropriety. The Court should not create that improper appearance by allowing the Attorney General to take part in any hearing.

*Federalism*: Under Pennsylvania law, the District Attorney has statutory responsibility for all prosecutions that arise in the county that elected him or her. *See* 16 Pa. Cons. Stat. § 4402. The Attorney General may assume responsibility for those prosecutions only in specifically enumerated situations.[8] *See Commonwealth v. Mulholland*, 702 A.2d 1027, 1036-38 (Pa. 1997); *Commonwealth v. Carsia*, 517 A.2d 956, 956-58 (Pa. 1986) (Commonwealth Attorneys Act "made it clear that the powers of the state Attorney General are no longer an emanation from some bed of common law precepts, but are now strictly a matter of legislative designation and enumeration."). In civil proceedings, the Attorney General has the power to sue on behalf of a state agency, or defend a state agency from suit, but petitioner's research has disclosed no reported case that extends that power to federal habeas corpus, in which the defendant is not a state agency but the prisoner's custodian. *See* 71 Pa. Cons. Stat. § 732-204. Finally, the Office of the Attorney General may conduct an investigation only if it reasonably believes that it will yield grounds for

---

[8] As relevant here, under the Commonwealth Attorneys Act, 71 Pa. Cons. Stat. § 732-205(c), the Attorney General may prosecute a case that otherwise belongs to the province of the district attorney only under the circumstances described in §§ 205(a)(3) (on the request of a district attorney who represents that s/he has insufficient resources or a conflict of interest); (a)(4) (on the petition of the Attorney General after a hearing before a judge assigned by the Supreme Court and a showing that the district attorney, who may oppose the petition, has abused his/her discretion in "fail[ing] or refus[ing] to prosecute"); or (a)(5) (on the request of the president judge of a county to the Attorney General, who may either decline or follow the procedure set forth in section (a)(4)).

prosecution authorized under § 205. *See Commonwealth v. Goodman,* 500 A.2d 1117, 1123, 1131 (Pa. Super. 1985).

In an earlier pleading, the AG argued that Mr. Wharton lacked standing to object to his appointment as amicus curiae. Citing *Death Row Prisoners of Pennsylvania v. Ridge*, 948 F. Supp. 1278 (E.D. Pa. 1996), and *Walter v. Beard*, No. 1:09-CV-2465, 2010 WL 936466, at *2 & n.1 (M.D. Pa. March 15, 2010), the AG maintained: "A state convict who brings an action in state court seeking habeas corpus relief does not have the requisite interest in the identity of counsel for the Commonwealth to have standing to object to the representation." Response of Amicus Curiae to Petitioner's Motion to Consider, ECF No. 169, at 5. In contrast to the prosecution defendants in these cases, Mr. Wharton has a strong interest in the identity of counsel for the Commonwealth. The Court appointed the AG as amicus curiae because the District Attorney, in the Court's view, had not provided a position sufficiently "adverse" to Mr. Wharton's position, and the AG has taken a highly adverse and injurious view of the facts and the law in his brief. These circumstances readily establish the "injury in fact" necessary for Article III standing. *See* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed. Aug. 2019 update); *cf. Carsia*, 517 A.2d at 956-58 (entertaining challenge by defendant-appellant to Attorney General's power to prosecute him in place of District Attorney).

Pennsylvania law carefully allocates authority between the Attorney General and county prosecutors. This Court, as a federal court, should not interfere with that balance by assigning the Attorney General an active role in Mr. Wharton's prosecution, effectively allowing the Attorney General to undertake functions that a state court would not allow. The Court should show the comity and respect for state law that our federal system demands.

## CONCLUSION

The people of Philadelphia elected their District Attorney on a platform that promised, among other things, that he would not seek the death penalty in murder cases.  By moving to settle this litigation, the District Attorney fulfills his campaign promise and appropriately exercises his prosecutorial discretion.  If this Court were to enlist a different prosecutor (the Attorney General) whose amicus brief has taken a different policy position, its action would threaten to undermine the respect for state sovereignty appropriate to the federal judiciary and thwart the will of a majority of Philadelphia's voters.

This Court should grant Mr. Wharton a stay to await the Pennsylvania Supreme Court's decision in *Cox and Marinelli* or a 60-day continuance for further fact development.  Alternatively, it should accept the parties' proposed settlement or, at a minimum, should not allow the Attorney General to participate in any evidentiary hearing.

Respectfully submitted,

LEIGH M. SKIPPER
Chief Federal Defender, by

/s/ Claudia VanWyk
CLAUDIA VAN WYK
VICTOR ABREU
Federal Community Defender Office
  Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106
(215) 928-0520
claudia_vanwyk@fd.org
victor_abreu@fd.org

*Counsel for Petitioner Robert Wharton*

Dated: August 23, 2019

**CERTIFICATE OF SERVICE**

I, CLAUDIA VAN WYK, hereby certify that on this date I served a copy of the foregoing

on the following persons in the manner indicated below:

BY ELECTRONIC SERVICE THROUGH ECF

MAX C. KAUFMAN
Supervisor, Federal Litigation Unit
PAUL M. GEORGE
Assistant Supervisor, Law Division
Office of the Philadelphia District Attorney
3 South Penn Square
Philadelphia, PA 19107

JAMES P. BARKER
Chief Deputy Attorney General
Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor, Strawberry Square
Harrisburg, PA 17120

/s/ Claudia VanWyk
Claudia VanWyk

Dated: August 23, 2019