## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT WHARTON,** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner** | : | **No. 2:01-cv-06049-MSG** |
| | : | |
| **v.** | : | **CAPITAL CASE** |
| | : | |
| **TAMMY FERGUSON,** | : | |
| **Superintendent,** | : | |
| | : | |
| **Respondent** | : | |

## SUR-REPLY BRIEF OF *AMICUS CURIAE* PENNSYLVANIA OFFICE OF ATTORNEY GENERAL TO REPLY BRIEFS FILED BY PETITIONER AND THE DISTRICT ATTORNEY'S OFFICE

AND NOW, comes the Pennsylvania Office of Attorney General as *amicus curiae*, through James P. Barker, Chief Deputy Attorney General, who files this Sur-Reply of *Amicus Curiae* Pennsylvania Office of Attorney General to Reply Briefs Filed by Petitioner and the District Attorney's Office, and in support thereof represents as follows:

## I.     INTRODUCTION

Before the Court is a Petition for Writ of Habeas Corpus filed by Petitioner Robert Wharton challenging two sentences of death. Over the last three decades, the Supreme Court of Pennsylvania affirmed Wharton's judgment of sentence on direct appeal and affirmed the denial of relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, and this Court, during

its initial review, denied all of Wharton's claims for habeas corpus relief under 28 U.S.C. § 2254. Currently pending before the Court is Wharton's remaining claim of ineffective assistance of trial counsel for failing to investigate and present evidence of Wharton's "positive" prison adjustment at the second penalty phase hearing in 1992, a claim the Third Circuit remanded for an evidentiary hearing.

After the remand, the District Attorney's Office filed a Notice of Concession of Penalty Phase Relief, indicating that it was conceding relief on the penalty phase claim and that it would not pursue the death penalty in state court. The Notice of Concession provided that the decision to concede was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel" (Doc. No. 155).

In light of this proposed concession, by Order dated May 7, 2019, this Court requested that the OAG submit a brief as *amicus curiae*, setting forth its position as to whether the law requires relief on this remaining claim. (Doc. No. 165) The Court indicated that, before conceding the claim, the District Attorney's Office "fails to indicate whether it did any investigation regarding [Wharton's] adverse or negative adjustment to prison," and appears to have "accepted the additional evidence offered by [Wharton] at face value, without exploring whether contrary views may be viable and worth considering." Order at 2-3 ¶ 5.

On June 12, 2019, Wharton filed a Motion to Modify or Reconsider the Court's May 7, 2019, Order. (Doc. No. 166) Wharton argued, *inter alia*, that participation in this case by any member of the OAG who was involved in his prosecution while a member of the District Attorney's Office would create "the appearance of a conflict of interest, if not an actual conflict." (Doc. No. 166) The OAG subsequently responded to the Motion to Modify or Reconsider. (Doc. No. 169)

By Order dated June 24, 2019, the Court denied Wharton's Motion to Modify or Reconsider Court Order. (Doc. No. 170) In doing so, the Court noted that Wharton had not cited any authority for the proposition that participation by any member of the OAG who was involved in Wharton's prosecution while a member of the District Attorney's Office would create "the appearance of a conflict of interest, if not an actual conflict," nor did the Court envision such a conflict.

On July 22, 2019, pursuant to the Court's May 7 Order, the OAG filed its *amicus* brief, setting forth its position that inquiry into the areas identified by the Court provided evidence of Wharton's overwhelmingly negative prison adjustment, negating his claim that trial counsel was ineffective.

On July 23, 2019, Wharton sought leave to file a reply to the *amicus* brief (Doc. No. 172), which the Court granted. (Doc. No. 174) The Court directed

3

Wharton to address the following questions: (1) whether, under Rule 7 of the Rules Governing Section 2254 Cases, the Court should accept into the record the evidence referenced by the OAG; and (2) whether the OAG should participate in an evidentiary hearing on Wharton's remaining habeas claim. Additionally, the Court stated that the OAG may submit a sur-reply to Wharton's reply brief addressing the same two questions.

Thereafter, the District Attorney's Office filed a Reply to the OAG's *amicus* brief, responding only to a narrow issue raised in the *amicus* brief. (Doc. No. 176) The OAG subsequently sought leave to combine responses to the reply briefs filed by Wharton and the District Attorney's Office, which this Court granted on August 13, 2019 (Doc. No. 178)

On August 23, 2019, Wharton filed his response to the *amicus* brief and the two questions posed by the Court.[1]

Pursuant to the Court's August 13 order, the OAG herein files this sur-reply to the reply briefs filed by Wharton and the District Attorney's Office.

---

[1] In that same filing, Wharton for the first time sought to stay these proceedings pending King's Bench litigation in state court involving other capital cases, and for a continuance to submit his full factual responses to the new evidence submitted by the OAG in its *amicus* brief. Those requests are pending before the Court. The District Attorney's Office has since filed its own motion seeking to hold these proceedings in abeyance.

## II.   SUR-REPLY TO WHARTON'S RESPONSE TO *AMICUS* BRIEF

### A.   The Evidence of Adverse Prison Adjustment

#### 1.   *Wharton's Escape From City Hall While In Custody*[2]

Wharton argues that his April 21, 1986 attempt to escape City Hall—which is the most damning piece of evidence highlighting his adverse prison adjustment—is "irrelevant" and "inadmissible." Despite the fact that, as of April 21, 1986, Wharton had been incarcerated for nine months as a convicted murderer under sentence of death, Wharton asserts that the Court should not consider his escape attempt because: (1) he had not yet entered the custody of the Pennsylvania Department of Corrections ("DOC") and, therefore, his escape attempt does not count; and (2) he tried to escape "deputy sheriffs" as opposed to "correctional officers." This argument is without merit.[3]

---

[2] The argument that the record should be expanded to include the records pertaining to Wharton's escape attempt is in Section IV.A, below.

[3] Wharton first states that he entered custody of the DOC after he received his home invasion/robbery sentence on April 21, 1986. He then states that, in September 1986, he was classified at the Eastern Diagnostic and Classification Center and placed at SCI-Huntingdon. According to Wharton, "[n]ot until then did he begin, effectively, living in the highly restrictive conditions of death row under the supervision of the Department of Corrections staff. The escape attempt therefore occurred before he entered the Department of Corrections custody . . . ." (Wharton Response, pp. 7-8). This recitation is incomplete.

Wharton was incarcerated as of the time of his arrest on February 7, 1984. The first jury convicted him of the victims' murders and sentenced him to death on July 5, 1985. While still incarcerated, Wharton was transported to City Hall for sentencing in his unrelated home invasion/robbery case. After he was sentenced in that case (when he attempted to escape City Hall), Wharton entered SCI-Graterford (*i.e.*, the DOC) on May 2, 1986. He was formally sentenced to death on September 24, 1986, and transferred to SCI-Huntingdon on September 25,

A petitioner's prison adjustment pertains to *his behavior and conduct* while incarcerated, regardless of whether it is in a county jail, a state correctional institution, or a federal prison. The physical location of the incarceration and the identity of the correctional facility or correctional personnel supervising the custody are completely irrelevant to an assessment of a petitioner's prison adjustment. All that is relevant is the petitioner's behavior *while in custody*.

Wharton fails to cite a single case to substantiate his assertion that his escape attempt should be discounted or is "inadmissible" because, in his opinion, it occurred before "the relevant period." Stated differently, Wharton provides no authority for his assertion that the "prison adjustment clock" does not start to run until a formally sentenced defendant enters the DOC, and that any period of incarceration prior to that is essentially non-existent or "irrelevant" to an assessment of a petitioner's adjustment to prison life. Nor can he provide such authority, as that is not the law.

Wharton's logic is contradicted by cases in which defendants claimed that trial counsel was ineffective for failing to present evidence of positive prison

---

1986, where he remained until his 1992 penalty phase hearing. Thus, Wharton entered the DOC on May 2, 1986, but was incarcerated long before then in different facilities for the offenses for which he was convicted in this case. Indeed, Wharton can hardly have expected to leave custody after confessing to two murders on February 7, 1984, and to other serious offenses shortly thereafter. Wharton's recitation also ignores his ongoing pattern of maladaptive behavior, including his possession of antennae fashioned into handcuff keys and his prohibited practice of martial arts, which extended well into the time of his DOC custody.

adjustment even during *pretrial* incarceration.  In determining whether to find

counsel ineffective for failing to present evidence of alleged positive adjustment

during *pretrial detention*, federal courts apply *Strickland* to analyze the

performance prong and prejudice prong.[4]  No court has declined to consider such a

claim, or declared such evidence "irrelevant" or "inadmissible" simply because it

pertained to adjustment prior to trial, *i.e.*, prison adjustment before the defendant

was convicted and entered a state correctional facility. Rather, courts focus on the

petitioner's behavior and conduct *while incarcerated* and whether trial counsel was

ineffective for failing to present it. What matters is the petitioner's adjustment to

prison life, not the location or specific dates of the imprisonment.

The same is true here. In July 1985, the first jury convicted Wharton of two

counts of first-degree murder and sentenced him to death for both murders.

Wharton was incarcerated and commenced his prison life, awaiting execution for

these capital offenses. Still in custody nine months later, Wharton was transported

---

[4] *See, e.g., Peterka v. McNeil*, 532 F.3d 1199, 1203-07 (11th Cir. 2008) (rejecting the petitioner's claim that penalty-phase counsel's performance was deficient because counsel failed to adequately investigate or present mitigating evidence of his good behavior during pretrial incarceration); *Jenkins v. Allen*, 2016 WL 4540920, at *58-61 (N.D. Ala. Aug. 31, 2016) (in order to show counsel was ineffective for failing to investigate and present evidence of his good conduct while he was incarcerated and awaiting trial as potential mitigation at the penalty phase, the petitioner must satisfy the two-pronged test articulated in *Strickland v. Washington*; the petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance); *Chinn v. Warden, Mansfield Corr. Inst.*, 2011 WL 5338973, at *102 (S.D. Ohio Oct. 14, 2011) (rejecting the petitioner's claim that counsel was ineffective for failing to offer evidence of his good pretrial detention behavior in the mitigation phase of his trial; "This Court cannot say that the evidence of good behavior pending trial was so persuasive that failure to present it was ineffective assistance of trial counsel.").

from his correctional facility to City Hall for sentencing in his unrelated home invasion/robbery case. While there as an incarcerated defendant awaiting sentencing after multiple convictions and in the custody of the Philadelphia deputy sheriffs, Wharton, in possession of a makeshift handcuff key, tried to escape City Hall and had to be shot twice to be apprehended outside the building. This behavior by Wharton as an incarcerated defendant is highly probative of just how poorly he was adjusting to prison life.

Nor may Wharton's escape attempt be discounted on the ground that he tried to bolt from Philadelphia "deputy sheriffs," as opposed to "correctional officers," a distinction without a difference. Wharton does not dispute that he was a convicted defendant who was brought to court for sentencing in his home invasion/robbery case when he tried to escape custody. Again, prison adjustment pertains to a petitioner's ability to adapt to life in prison. In this case, Wharton exhibited his failure to adapt when he tried to escape his prison life.[5]

---

[5] Wharton asserts that the fact that the District Attorney's Office never mentioned his escape attempt during the many years of litigation in this case "confirms its irrelevance and inadmissibility." (Wharton Response, p. 13)  There is no support for this contention.

During the PCRA proceedings and the pre-remand years of proceedings in this Court, there would have been no reason for the District Attorney's Office to look for evidence refuting Wharton's proffered evidence of positive prison adjustment. During the PCRA proceedings, Wharton filed a 125-page amended petition and his ineffectiveness claim regarding his positive prison adjustment was just one of *twenty-three* claims. Wharton attached no prison records to his amended petition to support his claim and the District Attorney's Office responded to that claim (and many others) accordingly in its motion to dismiss. It was not until the PCRA court issued a notice of intent to dismiss, *see* Pa.R.Crim.P. 907, that Wharton proffered the Declaration from

Wharton's argument reduces to a suggestion that he could not properly begin

adjusting until he was under the discipline of death row conditions.  He would have

been free to make such an argument to the jury; but he would not have been free to

bar the Commonwealth from responding to it with rebuttal.  An argument for a life

sentence in place of a death sentence is an argument for life in general population,

not on death row.  Evidence of a violent escape effort before he even got to state

custody would surely have been relevant to rebut any claim that Wharton would

have been a peaceful and placid inmate content to accept imprisonment for the rest

of his life.  Such evidence would be particularly probative in an instance such as

---

Dr. Krop and the more than 200 pages of prison records upon which he now relies. The PCRA court subsequently dismissed Wharton's PCRA petition without an evidentiary hearing. There was no need for the District Attorney's Office to refute Wharton's prison adjustment claim with independent evidence.

Likewise, during the pre-remand habeas corpus proceedings in this Court, there would have been no reason for the District Attorney's Office to look for evidence refuting Wharton's proffered evidence of positive prison adjustment. Again, Wharton's claim of positive prison adjustment was just one of twenty-three claims contained in massive filings by Wharton. The District Attorney's Office was able to respond adequately to that claim based solely on the records Wharton proffered to this Court, and this Court found the Commonwealth's response sufficient to resolve the claim against Wharton without litigating it at an evidentiary hearing. Wharton was the moving party during both the PCRA proceedings and the habeas corpus proceedings before this Court. As such, it was his burden to proffer evidence in support of his claim of positive prison adjustment. The PCRA court and this Court found that what he proffered alone was insufficient to entitle him to relief. The only reason why the additional evidence regarding Wharton's adverse prison adjustment (including his escape attempt) has *now* been presented to the Court is because the Third Circuit remanded the case for an evidentiary hearing to examine this particular issue more closely. The Third Circuit and this Court both pointed out the need for further investigation and the District Attorney's Office chose not to conduct such investigation. It was then that this Court asked the OAG to review the claim and determine whether there was a factual basis for conceding that Wharton's prison adjustment warranted relief.

this, where Wharton's initial escape was part of a pattern of conduct that was repeated well into Wharton's preferred time period. He points to no authority, much less clearly established federal law, supporting the exclusion of evidence based on such an artificial limitation. *See* 28 U.S.C. § 2254(d).

### 2.    *The Misconduct Records & Prescriptive Program Plans*

While conceding that the record should be expanded to include the prison misconduct records proffered by the OAG in its *amicus* brief, Wharton asserts that these prison misconduct records add nothing new to what has previously been submitted to this Court and the Third Circuit. (Wharton Response, p. 4)[6] This clearly is not the case.

As noted in the OAG's *amicus* brief, while the PRC mentioned some of these misconducts in Wharton's periodic PRC reports (which are a part of the current record in this case), the reports contain only brief, fleeting and vague references to them. In contrast, the actual misconduct records proffered by the OAG detail all of Wharton's misconducts, the gravity of the violations, his attempts to dispute each and every one of them, the PRC and Hearing Examiner's findings during each stage of the disciplinary process, and the sanctions imposed for the misconducts. The documents proffered by the OAG, which have never

---

[6] At no point in his response does Wharton offer an explanation as to why, during the last decade plus of federal litigation, he never provided to this Court the additional DOC records proffered by the OAG.

before been disclosed to the state and federal courts, provide a far more expansive and genuine picture of Wharton's adjustment in prison.

### 3.  *The Performance Prong*

Wharton asserts that, prior to obtaining Mr. Cannon's 2018 Declaration, he sent him the Third Circuit briefs submitted by both sides which "contained detailed discussions of the same infractions" "based on the same records proffered in this Court" (Wharton Response, p. 9). But providing trial counsel with the arguments contained in the Third Circuit briefs addressing some content of the prison records is far different than providing counsel with the hundreds of pages of actual DOC records,[7] especially those records proffered by the OAG that detail each of Wharton's misconducts

The Third Circuit briefs also do not address Wharton's attempt to escape City Hall in April 1986. Nor did the Third Circuit briefs address the Prescriptive Program Plans from 1989, 1990, 1991 and 1992, identifying Wharton's "Areas of Concern" as "Assaultiveness" and "Escape." Thus, Wharton did not provide trial counsel all relevant information simply by handing him the Third Circuit briefs.

---

[7] This point is readily apparent when examining the content of the Third Circuit briefs addressing the positive adjustment claim. The actual substance of certain prison records (those selected to be mentioned in the brief) represented a small portion of discussion in the briefs. The bulk of the discussion in the briefs pertained to legal arguments. As such, the briefs did not serve as a substitute for providing trial counsel with a complete set of the hundreds of actual DOC records that formed the basis of the ineffectiveness claim against him.

The briefs were insufficient to provide him with a complete, accurate and genuine picture of Wharton's prison adjustment or lack thereof.

Moreover, Wharton fails to acknowledge the consequences at trial if trial counsel had presented such truncated evidence of Wharton's so-called "positive" prison adjustment. Instead, Wharton asserts that trial counsel's failure to get the records in the first place is the end of the inquiry in assessing this ineffectiveness claim. That is not the law. Wharton must demonstrate that trial counsel's conduct "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

Wharton does not attempt to refute that presentation of boilerplate notations contained in the PRC records would have opened the door to the Commonwealth presenting the mountain of evidence regarding his numerous prison misconducts between 1985 and 1992, two of which involved the possession of contraband that constituted both an "implement of escape" and a potential weapon, another of which involved Wharton's repeated practice of martial arts – along with Wharton's attempted escape from City Hall. If trial counsel had opened the door to evidence of Wharton's bad prison adjustment, he would likely be facing a challenge for doing exactly what he is now challenged for not doing.[8]

_____

[8] In fact, Wharton effectively acknowledges as much in his Reply. He asserts that, by presenting evidence of "positive attributes while incarcerated" through family members, trial counsel created "a risk of opening the door to [his] prison conduct," which "only heightened the

Similarly, Wharton ignores that presenting rebuttal evidence of his escape attempt would have either prevented or negated one of trial counsel's main arguments for a life sentence: that if Wharton was sentenced to life imprisonment, he would never again be a threat to society, because he would never be able to leave the prison. Given his risk of escape, however, there was no guarantee that Wharton would remain incarcerated for the rest of his life if sentenced to life imprisonment.

Thus, the performance prong does not just require an assessment of the "positive" prison information and whether that information alone would have helped defendant. Rather, in determining whether an objectively reasonable basis exists for not using that information at trial, courts must consider the potential disadvantages and risks of using that evidence. In this case, Wharton's partial and misleading adjustment evidence would have been fatal to the defense strategy at the penalty phase.

---

irresponsibility of counsel's failure to investigate it." (Wharton Response, p. 10)  Thus, in hindsight, Wharton criticizes counsel for the evidence he chose to present at the penalty phase, asserting that it created a risk of opening the door for the Commonwealth to present evidence of his adverse prison adjustment. Wharton, however, cannot have it both ways. He cannot claim that trial counsel should have presented the records of his positive prison adjustment, and at the same time assert that counsel wrongly presented other evidence that risked opening the door to the damaging prison evidence.

### 4.    *The Prejudice Prong*

Tellingly, when addressing the prejudice prong (*i.e.*, whether there is a reasonable probability that the jury would have sentenced him to life instead of death if only it had heard the PRC's boilerplate notations that he had periods where his adjustment was "routine," "positive," "satisfactory," "problem-free," or "uneventful"), Wharton fails to take into account the following critical evidence:

- the penalty phase record setting forth the details of his terrorization, destruction, and burglaries of the victims' home and church prior to the murders over a debt that he believed was owed to him;

- the testimony that the victims were separated, bound, masked with duct tape, strangled and/or drowned even after Wharton forced Bradley Hart to write him a check to satisfy the purported debt;

- the evidence that Wharton left the victims' baby girl alone in the unheated home in subfreezing temperatures after killing her parents;

- the events leading up to Wharton's arrest, when police recovered proceeds from the series of burglaries/robberies at the victims' home;

- his confession to the brutal murders ("I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while"), and his explanation for why he killed them ("cause they knew me and would turn us in"); and

- the aggravating circumstances that the killing occurred while perpetrating a robbery/burglary, and that this was a double murder.

Regardless of whether counsel was deficient in his performance (and he was not), against the backdrop of this evidence, along with the substantial evidence of

Wharton's adverse prison adjustment, he cannot make the requisite showing of prejudice. *See Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) ("A careful prejudice inquiry requires that we "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path," which includes the evidence adduced at trial as well as that which was not presented; once the record is reconstructed, we must "reweigh the evidence in aggravation against the totality of available mitigation evidence;" only then can it be determined whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different).

### 5.    *Expert Opinions of Dr. Krop and Dr. O'Brien*

Wharton criticizes Dr. O'Brien's statement that Dr. Krop "may have been wholly unaware of Mr. Wharton's extensive history of criminal behavior aside from his participation in the murders of Bradley and Ferne Hart." According to Wharton, "[t]he record provides no support for this speculation." (Wharton Response, p. 12)

Dr. O'Brien's statement is by no means "speculation" given that Dr. Krop failed even to acknowledge Wharton's criminal history aside from his participation in the victims' murders. Dr. Krop makes no mention of the home invasion/robbery of the South Philadelphia couple in early 1984 (just weeks before the Hart murders) that Wharton admitted to committing. Dr. Krop also makes no mention of

the series of burglaries at the Germantown Boys Club in 1983 that Wharton admitted to committing (also prior to the Hart murders). Given Dr. Krop's complete failure to recognize *any* of this criminal behavior by Wharton prior to the Hart murders, Dr. O'Brien appropriately suggested that Dr. Krop may have been "wholly unaware" of it (giving Dr. Krop the benefit of the doubt as to his failure to acknowledge it). The only other remaining possibility (which is actually worse for Wharton) is that Dr. Krop *was* aware of Wharton's true history, but simply chose not to acknowledge it at all, let alone explain why he believed it had no impact on his conclusions that Wharton's adjustment was "quite positive."

Dr. Krop also failed to comment on Wharton's escape conviction, which further substantiates Dr. O'Brien's statement that Dr. Krop was likely "unaware" of his criminal history.

Wharton further critiques Dr. O'Brien (and the OAG) for placing "heavy emphasis" on his "*infraction* for possessing a handcuff key," stating that it "fell relatively *early* in his incarceration." (Wharton Response, p. 13) (emphasis added) This statement exemplifies Wharton's attempt to minimize his prison misconduct record.

Wharton had *two* misconducts for possession of contraband—implements of escape, not one.  During the first episode in 1989, Wharton had hidden two pieces of metal antenna in the mounting of his toilet, one of which had been fashioned

16

into a handcuff key.  During the second episode in 1989 (two days after being found guilty of the first incident), Wharton had hidden a 4-inch piece of broken metal antenna in the binding of his legal material. The PRC found it "quite credible" that the metal was to be "used to make a handcuff key," just as Wharton had done just days earlier. Wharton committed these two 1989 misconducts three years after he attempted to escape City Hall in April 1986, using his makeshift handcuff key. Thus, this was no momentary or minor lapse. During a three-year time span, between 1986 and 1989, Wharton exhibited a pattern of attempting to escape custody with his homemade handcuff keys. Unlike Dr. O'Brien, who appropriately acknowledged this history, Dr. Krop makes no mention of it at all.

## B.    The Proposed "Settlement."

Wharton urges this Court to accept the District Attorney's concession on the ground that the District Attorney must "consider the views of the people of Philadelphia, who elected him on a platform that included a promise not to seek the death penalty in murder cases." (Wharton Response, pp. 14-15)  It is unclear whether a promise not to "seek" the death penalty includes a promise to vacate all pre-existing death sentences, but the question is not ultimately relevant.  This Court has already held that, as a matter of both state and federal law, a prosecutor has no power to perform such a promise.

In its March 4, 2019 Memorandum Opinion, this Court extensively examined the Pennsylvania Supreme Court's decision in *Commonwealth v. Lavar Brown*, 196 A.3d 130 (Pa. 2018), as well as federal law.[9] The Court concluded that a "concession" or "settlement" by parties to a habeas corpus action neither binds nor empowers a habeas court, which may upset a state court judgment only upon a finding of legal error.  Wharton provides no basis for overturning the Court's ruling on this question. Instead he asserts that, "[b]y moving to settle this litigation, the District Attorney fulfills his campaign promise," Wharton Response at 22, suggesting that the Court is obliged to enlist itself in that endeavor.  As this Court has already determined, it has no power to grant relief on such grounds.

---

[9] *See also Commonwealth v. Chimenti*, No. 2262 EDA 2018, 2019 WL 4180660 at *10 (Pa. Super. September 4, 2019) ("We reject Appellant's claim … that the Commonwealth should have abided by an alleged agreement which was voided by the Supreme Court of Pennsylvania. Furthermore, notwithstanding the fact the current District Attorney's Office 'agrees' its predecessors breached the agreement, and thus Appellant is entitled to PCRA relief, we reject such an argument as it is beyond the power of the District Attorney. To adopt the position of the current District Attorney on the so-called plea agreement would allow the District Attorney to usurp the power of the judiciary, including that of our Supreme Court.").

On September 4, 2019, Wharton's counsel provided to the Court additional "authority" – in the form of an order in an unrelated habeas case – for the notion that the Court may simply accept the District Attorney's concession without a determination of its factual or legal merit. (Doc. No. 184) It is not clear why this Order, issued November 6, 2018, could not have been brought to the Court's attention previously. Regardless, the order in question contains no factual or legal analysis, and does not reveal whether the court engaged in factual or legal analysis before issuing the order, or whether it considered if it had a legal obligation to do so. Such an unexplained order obviously carries no persuasive or authoritative precedential value.  To the extent the Order suggests that the District Attorney's Office has engaged in similar conduct in other cases, the point is not contested.

III.    **RESPONSE REGARDING STATEMENTS OF VICTIMS' FAMILY MEMBERS.**

The District Attorney's Office suggests that it was inappropriate for the OAG to proffer statements from the surviving victim and the other family members of the victims because they are "irrelevant" to these proceedings.[10] It was the District Attorney's Office, however, that made the victim communications relevant by relying on them in its Notice of Concession. The Notice provided that the decision to concede penalty phase relief was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, *communication with the victims' family*, and notice to [Wharton's] counsel" (Doc. No. 155) (emphasis added). Thus, the Notice filed by the District Attorney's Office with this Court represented that the communications factored into the office's concession decision.

This Court concluded that it could not act on the basis of the concession alone, and subsequently requested the OAG to conduct further investigation into the matter. Contact with family members pursuant to that investigation revealed a somewhat different scenario than that suggested by the Notice. Moreover, had the Notice not referred to victim communication, the views of family members would still have been relevant as a matter of law.  Both the state Crime Victims Act and

---

[10] In its reply brief, the District Attorney's Office does not contest any other aspect of the OAG's *amicus* brief.

19

the federal Crime Victims' Rights Act, 18 P.S. §§ 11.101 *et seq*.; 18 U.S.C. § 3771, provide for consideration of the views of crime victims.

The District Attorney's Office nonetheless suggests that contacts with victims and family members are "private matters" that should not be shared with the Court.  But the original reference to such matters occurred in the Notice of Concession, not in the *amicus* brief.  In any case, there has been no violation of privacy in this case. The surviving victim and her family members desired to express their views to this Court, and wrote their letters knowing they would be made public.  The OAG has presented these letters to the Court verbatim, without extensive comment. The statements adequately serve to clear up any misimpressions that may have been created concerning the position of the victims on the appropriate disposition of the proceedings.

## IV.   EXPANSION OF RECORD AND EVIDENTIARY HEARING.

### A.   Expansion.

For the reasons stated in Section II.A.1 above, Wharton's attempt to escape City Hall while incarcerated is highly relevant to his claim of "positive" prison adjustment. Accordingly, the record should be expanded to include the following documents pertaining to Wharton's escape attempt attached as Exhibit B to the OAG's *amicus* brief:

- The court dockets and documents from the Quarter Sessions file (including the Arrest Report, Criminal Complaint, docket entries,

20

Written Guilty Plea Colloquy, High Bail Request Form, and sentencing paperwork) set forth the charges against Wharton, the factual basis for those charges and the disposition of the case;

- The memo dated July 23, 1986, to Erskind DeRamus (former Deputy Commissioner of the DOC), from staff members at the Eastern Diagnostic and Classification Center reflects that, while Wharton was in the sheriff's custody in City Hall for a court matter, he attempted to escape custody.  This document obtained directly from the DOC demonstrates that the DOC was advised that one of its inmates attempted to escape custody when he was brought to Philadelphia for his unrelated criminal matter;

- The statement from former prosecutor Carlos Vega provides an eyewitness account of Wharton's 1986 escape attempt. While Mr. Vega did not see Wharton's actual escape attempt, he was nearby at the time and heard the commotion and gunshots. Mr. Vega further describes seeing Wharton's purported "arm injury" that resulted in him having only one hand cuffed at the waist (as opposed to having both hands cuffed). Mr. Vega's statement is significant because, after thirty-three years, he is the only readily available living witness who was physically present when the escape attempt occurred and can recall the events.

- The newspaper articles and the DOC medical records (reflecting Wharton's gunshot wounds from his escape attempt) are further corroborating evidence of his escape attempt and capture, and provide additional critical details surrounding his escape that are not contained in the court file (such as eyewitness accounts that Wharton was "nursing a supposedly lame right arm" before he made a "miraculous recovery" that allowed him to "open his handcuffs and snap apart a plastic cast before fleeing from deputy sheriffs in City Hall"; that "Wharton was "pumping both of his arms while running, showing no difficulty with the supposedly lame arm"; and that a "handcuff key was found afterwards near the second floor elevator where Wharton bolted from deputies"); and

- The Westlaw opinions from Wharton's lawsuit against police for stopping his escape provide additional evidence of the incident, and

reflect on Wharton's willingness to accept punishment for his capital crimes.

Additionally, the letters submitted to the Court by the surviving victim and the other family members of the victims are relevant to complete the record concerning the Notice of Concession, and to assure compliance with the statutory rights of crime victims. The Court should expand the record to include these documents as well.

## B.    Evidentiary Hearing.

The Court has directed briefing on the possible participation of the OAG in the evidentiary hearing.  The extent to which an *amicus curiae* participates in a pending action is solely within the broad discretion of the district court. *Waste Mgmt. of Pa., Inc. v. City of York,* 162 F.R.D. 34, 36 (M.D. Pa. 1995). *See Hard Drive Prods., Inc. v. Does 1-1,495*, 892 F. Supp. 2d 334, 337 (D.D.C. 2012) (because the *amicus'* participation is for the benefit of the court, it is solely within the Court's discretion to determine "the fact, extent, and manner" of participation). That participation may include involvement in evidentiary proceedings, and many courts have so directed.[11] This Court therefore has discretion to conduct the hearing without the OAG, or to direct the OAG to take part in the proceedings.

---

[11] *See e.g.*, *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 272 F. App'x 817, 818 (11th Cir. 2008) (recognizing that court permitted *amici curiae* to participate in injunction hearing); *Massachusetts v. Microsoft Corp.,* 373 F.3d 1199, 1206 (D.C. Cir. 2004) (noting that district court allowed *amici curiae* to participate in hearing); *Black Hills Inst. of Geological*

At this point, however, the question may be premature, as it is not clear that any disputed facts exist for resolution at a hearing. Wharton's response concerning the additional materials challenges only their relevance, not their authenticity, and the District Attorney's response makes no challenge to the materials at all. The real

_____

*Research v. U.S. Dep't of Justice*, 978 F.2d 1043, 1044 (8th Cir. 1992) (noting that *amicus curiae* presented multiple expert witnesses at hearing in district court); *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) ("We conclude that the district judge did not abuse his discretion in appointing the Department of Justice and the United States Attorney as *amicus curiae*. Although we recognize that participation of the United States in this case was somewhat more than the usual participation of amici [in that the amicus participated fully in the discovery, trial, and appeal of this case], we are unable to say that the degree of amicus's participation was error or in any way prejudiced the rights of the State."), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)); *United States v. CVS Health Corp.*, 2019 WL 2085718, at *1 (D.D.C. May 13, 2019) (finding that it would be helpful for the *amici curiae* participating in the matter to present witnesses at a hearing; "This hearing is merely an opportunity for the parties and the *amici* to provide the Court with whatever information and analysis they believe will aid the Court in determining whether the Government's proposed final judgment is in the public interest."); *United States v. Collyard*, 2013 WL 1346202, at *1-3 (D. Minn. Apr. 3, 2013) (permitting *amicus curiae* to present evidence and question witnesses at evidentiary hearing addressing ineffective assistance of counsel claim, as well as file briefs; "This Court has invited third parties to appear as *amicus curiae* when the third parties' perspective, arguments, theories, and/or facts are helpful to the Court and may not otherwise be contained in the parties' briefs. Given the legal and factual issues regarding Defendant's ineffective assistance of counsel claim, the involvement of [the *amicus curiae*] in the upcoming hearing will assist the Court. Moreover, [the *amicus curiae*] may provide information not presented by the parties.") (citations omitted); *Southern Offshore Fishing Ass'n v. Mineta*, 2000 WL 33171005, at *1 (M.D. Fla. Dec. 7, 2000) (noting that the *amici curiae* participated at several court hearings and in discussions with counsel in chambers); *Wyatt By & Through Rawlins v. Hanan*, 868 F. Supp. 1356 (M.D. Ala. 1994) (district court reinstating federal government to its historical active role as *amicus curiae*, thus allowing it to address any issue raised by parties by conducting discovery and participating in trial through examination of witnesses and presentation of its own witnesses); *United States v. Hooker Chemicals & Plastics Corp.*, 101 F.R.D. 451, 459 (W.D.N.Y. 1984) ("the court strongly encourages each of the applicants to participate as *amici curiae* in the hearings that will be held in connection with the court's review of the proposed settlement and judgment"), *aff'd*, 749 F.2d 968 (2d Cir. 1984); *United States v. American Telephone and Telegraph Co.*, 1976 WL 1321, at *2 (D.D.C. 1976) (district court "invites and urges" *amicus* to attend and participate in the hearing); *see also Russell v. Bd. of Plumbing Examiners of Cty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) ("A court can allow *amici* to call their own witnesses and cross examine the witnesses of other parties"), *aff'd*, 1 F. App'x 38 (2d Cir. 2001).

remaining issues concern the legal significance of the documents in relation to the claim of ineffectiveness, which is a question to be resolved as a matter of law, not fact. While the court of appeals did remand the case to this Court in expectation that an evidentiary hearing would be required, subsequent events appear to have rendered moot any such requirement.

In any event, Wharton has now requested more time in an attempt to secure new statements from trial counsel and from his expert. These new statements would presumably present new opinions about what counsel should have done with the full set of documents, as opposed to the incomplete set previously reviewed. The Court has not yet ruled on this request. If it is granted, an assessment can be made at that time as to the existence of material issues of disputed fact.

In the meantime, Wharton seeks to limit the Court's discretion in conducting any hearing that may occur. He asserts that the Court cannot direct the OAG to participate in an evidentiary hearing because doing so would create "an appearance of impropriety." This alleged appearance, claims Wharton, arises because former lawyers of the District Attorney's Office, who are now employed by the OAG, may have been named on briefs filed by the District Attorney's Office in this case decades ago (Wharton Response, pp. 19-20). This is a retread of the argument already rejected by this Court in response to Wharton's reconsideration motion in

June. His argument has not improved. As before, Wharton is unable to cite any authority for his position.

 Nor does it have any clear rationale. Wharton's theory seems to be that the District Attorney is a "party" to this case. But the District Attorney is not a party to this case. His name does not appear on the docket; only the warden's does. It is true that in a great many habeas cases the District Attorney *is* named as a nominal party. But, as Wharton's counsel is undoubtedly aware, in such cases it is common that the Attorney General is also named as a party, for the sole purpose of ensuring a response to the petition. In this case neither is named and it is not clear how any of this advances Wharton's claim.

There is no mystery as to the cause of the OAG's participation as an *amicus* in this matter. This Court requested that participation, after the Notice of Concession, in order to preserve an adversary process that could assist the Court in carrying out its duty to determine the merits of the legal claim that the court of appeals ordered it to consider. *See Liberty Res., Inc. v. Philadelphia Housing Auth.*, 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005) (participation of an *amicus* is especially proper where the *amicus* will ensure "complete and plenary presentation of difficult issues so that the court may reach a proper decision"). The OAG has participated in this matter solely in accord with that request. The Court will

determine any further extent of that participation in the sound exercise of its discretion.

WHEREFORE, the Office of Attorney General, as *amicus curiae*, respectfully files this sur-reply brief.

By: /s/ James P. Barker
James P. Barker
Chief Deputy Attorney General
Pennsylvania Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor—Strawberry Square
Harrisburg, PA 17120
(717) 787-6348
jbarker@attorneygeneral.gov

Date:  September 6, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused the foregoing Surreply to be served

on the following persons via ECF or by first class mail:

<u>Via ECF and/or First Class Mail</u>

| | |
|---|---|
| Victor J. Abreu, Esquire | Max Cooper Kaufman |
| Claudia Van Wyk, Esquire | Paul M. George |
| Federal Community Defender Office | Nancy Winkleman |
| Capital Habeas Corpus Unit | District Attorney's Office |
| 601 Walnut Street, Suite 545 West | 3 South Penn Square |
| Philadelphia, PA 19106 | Philadelphia, PA 19107 |

By:  */s/ James P. Barker*
      James P. Barker
      Chief Deputy Attorney General
      Pennsylvania Office of Attorney General
      Criminal Law Division
      Appeals and Legal Services Section
      16th Floor—Strawberry Square
      Harrisburg, PA 17120
      (717) 787-6348
      jbarker@attorneygeneral.gov

Date:   September 6, 2019