IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON              : CIVIL ACTION
    Petitioner          :
                        : No. 01-6049
                        :
    v.                  :
TAMMY FERGUSON, Superintendent, : CAPITAL CASE
    Respondent          :

October 21, 2020

Dear Clerk:

Please find enclosed for filing in the above captioned matter one(1) Motion For Recusal.

Pursuant to Title 23, Chpt. 5, §144, when a recusal motion is filed the accused judge "shall proceed no further therein, but another judge shall be assigned to hear such proceedings."

For this reason it is requested that the enclosed motion be assigned to a judge different that the one presiding in the above captioned matter.

Very truly yours,

*Robert Wharton* (signature)

Robert Wharton

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT WHARTON<br>    Petitioner | : CIVIL ACTION<br>:<br>: No. 01-6049<br>: |
| v.<br>TAMMY FERGUSON, Superintendent,<br>    Respondent | :<br>:<br>: CAPITAL CASE<br>: |

### PETITIONER'S MOTION FOR RECUSAL

01. Petitioner, Robert Wharton, respectfully moves for recusal of District Court Judge Mitchell Goldberg ("Judge Goldberg") from consideration in the above captioned case. Petitioner submits that recusal is appropriate under the Due Process Clause of the United States Constitution, Article 1, Section 9 of the Pennsylvania Constitution, the Code of Judicial Conduct, and related case law.

02. This motion is further appropriate under 28 U.S.C. §455(a), which states "[a]ny just, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which impartiality might reasonably be questioned. Section 455(b) further states "[h]e shall disqualify himself in the following circumstances where impartiality might reasonably be questioned: (1) [w]here he has a personal bias or prejudice concerning a party..."

---

[1] Petitioner asserts that before this Court considers dismissing this petition, it should first consider the merits of the argument as a threshhold matter. This would be fair and akin to a pro se motion for appointment of new counsel. See Tabron v. Grace, 6 F.3d 147, 155(3rd Cir. 1993), wherein the Third Circuit held that the "arguable merit" of the claim must be considered and "[t]he appointment of counsel should be given serious consideration if the [ ] plaintiff has not alleged a frivolous or malicious claim and the pleading states a prima facie case."

[2] The language of 28 U.S.C. §455(a) seems to suggest that the accused judge has the ability to determine his/her own fate, however, Title 23, Chpt. 5, §144 requires that the accused judge "shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

1

03. The Third Circuit has interpreted this language as meaning that recusal is required when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." In re Kensington Int'l Ltd., 368 F.3d 289, 301(3d Cir. 2004).

04. In support of this motion, Petitioner avers the following.

PROCEDURAL BACKGROUND

05. Petitioner is currently before Judge Goldberg pursuant to a remand order from the Third Circuit requiring Judge Goldberg to conduct an evidentiary hearing to determine former counsel's effectiveness/ineffectiveness during petitioner's penalty phase hearing. Prior to that appeal, petitioner's habeas corpus petition was presided over by Judge Goldberg. During those proceedings, petitioner argued, amongst other claims, that petitioner's trial was rendered unconstitutional due to two Bruton violations and trial counsel ineffectiveness. It was mostly during the denial of these two claims Judge Goldberg's bias manifested most obviously. Because the facts and bias intertwined between the distinct claims, petitioner will only specify during which denial the particular bias occurred if needed to inform the Court.

06. The complained of bias manifested as a pattern of ignoring and/or minimizing evidence favorable to Petitioner and hyperbolizing, fabricating and/or unjustifiably bolstering all evidence against Petitioner. Judge Goldberg even ignored the law/legal standards of review all to petitioner's detriment and the Commonwealth's benefit.

07. Petitioner avers that the pattern described above has again manifested in the remanded proceedings. However, petitioner will start with examples from the previous proceedings as they are critical to establishing a pattern of bias.

JUDGE GOLDBERG IGNORED FACTS FAVORABLE TO PETITIONER

08. During Judge Goldberg's harmless analysis he concluded that Petitioner was not due relief from Bruton violations and trial counsel ineffectiveness due to overwhelming evidence,

2

however, Judge Goldberg ignored any evidence that contradicted his "overwhelming" evidence conclusion.

**ROBERT HART**

09. Robert Hart("Hart") who testified Petitioner said "that [the victim] wasn't paying [Petitioner's boss], so that [Petitioner's boss] couldn't pay us and that if [the victim] didn't pay him he was going to get him." District Court Opinion("DCO") at p.61. Judge Goldberg credited this testimony as a threat made by Petitioner to the victim. Id. However, there was ample evidence in the record to render it incredible.

10. However, Hart testified the threat took place in the middle of August and they went on into the beginning of September, NT 6/18/85, p.77. Petitioner's and Hart's boss testified the job for which Petitioner allegedly killed the victim started on September 7th. Based on these dated, Hart had Petitioner complaining about the victim not paying Petitioner three weeks before the start of the job.

11. Given that there was testimony that Petitioner's boss owed Petitioner in excess of $2,000, NT 6/17/85, p.106, if the statement was made, one cannot be certain it was aimed at the victim over the boss. Compare Washington v. Beard, 2015 U.S. LEXIS 5387 n.116(2015), wherein "ambiguous" testimony was unacceptable to substantiate harmless error. ("The 'him' could have meant Teagle or petitioner in context.").

12. Hart's father-in-law testified that Hart and Petitioner did not get along, Id. at 188, as did our boss, Id. at 108.

13. Petitioner was accused by Hart of damaging his car engine and told detectives, who were investigating his brother's death, that Petitioner never paid him for the damage. Id. at 94.

14. Hart had given detectives three statements in which he had not a clue as to who might want to harm his brother. Counsel had failed to impeach Hart with any of them. Judge Goldberg deemed the statements "summaries", and stated that it would be "unfair" to allow a witness to be impeached on a police officer's interpretation of what was said than the witness's verbatim words." DCO at p.82 N58.

15. The statements were not "summaries" because Hart

3

admitted they were his words and that it was his signature affixed to each one. NT 12/15/92, pp. 75, 85, 86.

SAM GALATAR

16. Sam Galatar("Galatar"), the aforementioned father-in-law, testified that Petitioner said that [the boss] owed [Petitioner] money for the radio station project and that he was going to get the money from [the victim]" DCO at 89; NT 6/17/85, p.117-118.

17. Judge Goldberg credited that testimony but ignored the part of Galatar's testimony where he admitted his testimony was not a "verbatim" account and that "[t]here are specific words I might add." Id. at 125.

18. Judge Goldberg improperly denied, in part, relief regarding Hart due to Hart's statements not being verbatim accounts, supra at ¶15, but credited Galatar's statements although they were not verbatim accounts.

19. Galatar testified the conversation Petitioner allegedly had with him occurred "inside" the Chew Avenue job and that they occurred at the "end of September, early October." Id. at 125 & 119, respectively. However, the boss testified the Chew Avenue job ended on September 17th, Id. at 74.

20. Galatar initially testified that he did not take Petitioner's alleged statements to imply "physical harm" or "assault" and did not even think them uncivil, Id. However, he amended those conclusions to a belief that Petitioner could "kill" or at least commit "bodily harm," Id. at 110-31.

21. This reversal in opinion came about "later on" after speaking with the victim's father, Id. at 130.

22. Galatar them reversed course again, testifying that the conclusion Petitioner could "kill" or commit "bodily harm" emanated from some "indirect threat" that occurred "on the job." Id.

THOMAS NIXON

23. Thomas Nixon("Nixon") testified he said to Petitioner, "If you were going to kill the mother and father, [you] should have killed the baby, also." To this Petitioner allegedly

4

responded, "We couldn't do it." Judge Goldberg credited this testimony. DCO at p.61 & 91-92.

24. However, Nixon received a favorable deal for his testimony, 6/25/85, p.124-121, in which he was allowed to plead guilty as a juvenile, Id. at 117, and avoid a lengthy sentence that he did not want to do, Id. at 157, he felt the deal insulated him from any culpability in the murders, Id. at 117.

25. Jurors were instructed Nixon was a corrupt source whose testimony should be viewed with "disfavor" and "caution." NT 07/01/85, p.21-22.

26. Nixon had been treated for psychological difficulties, Id. at 140.

27. Nixon was confronted with inconsistencies between his testimony and a statement to detectives, Id. at 149, 165, 160.

28. Nixon did not deny the ability to look a person in the eyes and lie, Id. at 165. Something he apparently displayed while on the stand; when asked about another relevant call he had made he responded "I asked him to come pick me up," and "I gave him the address," Id. at 124. However, when pressed about the person, he admitted the "him" was named "Grace," a "lady." Id.

29. Finally, an exchange between Nixon and his mother casts doubt on whether Petitioner made the statement attributed to him. Subsequent to the alleged phone call between Petitioner and Nixon, Nixon's mother asked him about the matter and rather than tell her Petitioner admitted involvement to him, Nixon responded he merely "thought" Petitioner and codefendant were involved. Id. at 123.

30. Judge Goldberg's one-sided harmless error review is inconsistent with how the U.S. Supreme Court handles evidence review during harmless analysis. See Kyles v. Whitley, 514 U.S. 419(1995); Schneble v. Florida, 405 U.S. 427(1972).

31. Specifically, regarding the Bruton violations, Judge Goldberg concluded that admitting [the codefendant's] confession did not undermine Petitioner's defense of police coercion. Judge Goldberg never considered the evidence that 1) Petitioner's codefendant's trial defense was that he "coherent[ly]" of his own "free will" confessed to the murders, NT 6/26/85, p.84 & 90, 2) that he was not physically abused by the detectives, Id. and 3) that he was "remorse[ful]" for his role in the crime, NT 7/5/85,

5

<pre>p.21-22. After the detective denied physically abusing
codefendant, codefendant's attorney stated, "Of course, I know
that." Codefendant's overall defense undermined Petitioner's
defense and the statement by counsel endorsing the improbability
of physical coercion was inappropriate testimony that could have
led jurors to believe he knows physical coercion does not occur.
    32. Judge Goldberg claims the "overwhelming evidence" paints
Petitioner as the "driving force" behind the murders, but this
ignores testimony from Nixon, a witness whose testimony Judge
Goldberg credited, supra at ¶23, who said; 1) on one occasion it
was the codefendant who solicited Nixon's aide in robbing the
victims, NT 6/26/85, p.97, 2) that is was he and codefendant who
prepared a hand-drawn map of the victim's home, Id. at 154-55, 3)
that codefendant provided Nixon with a weapon, Id. at 125, 4)
that it was the codefendant who maintained a photo album of the
victims, Id. at 141, and 5) that it was codefendant who stated
"he had robbed them before and that he wasn't done with them
yet," Id. at 144.</pre>

JUDGE GOLDBERT INTENTIONALLY MINIMIZED ALL PETITIONER'S EVIDENCE
<pre>    33. During Judge Goldberg's evidence analysis he
consistently minimized the impact of Petitioner's evidence, but
unjustifiably bolstered the Commonwealth's false and/or
conflicting testimony. These allegations require some
contextualization. Petitioner's trial defense focused on how and
when Petitioner suffered injuries; Petitioner contended police
abuse during the interrogation, while Detective Brown ("Brown")
contended they were incurred when he had to chase and tackle
Petitioner in order to effectuate arrest.
    34. Petitioner presented the testimony of four witnesses in
support of his position. Police Officer Duffy testified that he
"thoroughly searched Petitioner and did not see nor did
detectives mention to him, any injuries. DCO at 47 & evidentiary
hearing ("EH") notes of 2/8/12, p.16-17. He also testified that
pursuant to the police department policy any obvious injury--even
scratches or bruises to the head--required hospitalization. EH of
2/8/12, p.20. Brown pretended not to recognize the Police
Directive and the court simply accepted that lame explanation</pre>

6

from a veteran detective. DCO at p.52 and n.42.

35. Petitioner's mother testified that she did not see any scuffle or injuries, DCO at 55. Petitioner's sister testified she did not see petitioner get tackled, Id. at 54., and Petitioner's erstwhile fiance testified she did not see any injuries on Petitioner prior to being taken to the Police Headquarters. Id. at 56.

36. Judge Goldberg concluded the testimony of these witnesses was of "minimal" or "limited impeachment value," DCO at pp.47, 48, 54, 56, and did nothing to undermine Brown's "consistent" testimony, DCO at 50, 53, 54, and also concluded that due to the injuries being "minor," DCO at 47-48, 55, 56, and not being immediately "apparent," DCO at 47, it was understandable the witnesses did not see them. However, if Brown saw the injuries and the medical staff at the prison intake saw them, DCO at p.47, then they are "apparent."

37. Throughout Judge Goldberg's examination of Petitioner's witness's testimony, he held them accountable for any perceived inconsistency, but did not treat Brown similarly. At the evidentiary hearing Petitioner presented Brown's signed and adopted report (it had not been presented at petitioner's trial) which indicated that "at the time of [petitioner's] arrest" there were "no apparent injuries." DCO at 53. Neither did it mention anything about a chase(which was not addressed in the DCO). However, Judge Goldberg found this notation "not inconsistent with [Brown's] testimony." DCO at p.53. That conclusion is logic defying. If Brown saw the injury prior to putting the handcuffs on, then Petitioner was injured "at the time of arrest. See ¶36.

38. At petitioner's pre-trial suppression hearing Brown testified three times that petitioner was handcuffed in the interrogation room, DCO at 69, but at trial Brown testified repeatedly that petitioner was never handcuffed "at any point" in the interrogation room. Id. Judge Goldberg deemed this testimony an "immaterial inconsistency." DCO at 70.

39. In a related claim regarding the trial prosecutor failing to correct false testimony, Judge Goldberg concluded that "[o]utside of Brown's trial testimony that Petitioner was never handcuffed, Petitioner has not identified any inconsistencies in

7

his testimony..." Id. at n5. This is false. In addition to the handcuff testimony and the "no apparent injury" notation, petitioner presented evidence that Brown claimed to have found a critical piece of evidence in Petitioner's home but his report clearly indicated that he found the evidence at someone else's home. EH of 2/10/12, p.60.

## JUDGE GOLDBERG'S FABRICATED CONCLUSION

40. Judge Goldberg determined that Petitioner had been "convicted of [a] crime and served jail time," DCO at p.74 n54 -- the suggestion being that Petitioner was not a neophyte to interrogation/custody. However, at the time of the interrogation Petitioner had never been convicted of a crime and therefore had not served any time.

## JUDGE GOLDBERG'S PRE-EVIDENTIARY HEARING BIAS

41. In Judge Goldberg's Memorandum Order("MO") of March 4, 2019, he states that Petitioner "defecated on the victim's floor, MO at p.1. The incident referred to involved multiple parties and there is no support in the record that petitioner committed the act or even knew about it.

42. Judge Goldberg states that the female victim was "stripped almost entirely naked" by petitioner before her death. Id. There is no record support that the victim was "stripped" of her clothing.

43. Judge Goldberg states that Petitioner was "not satisfied" with killing the parents and "turned the heat off" so that the child would "freeze to death" and the child "barely survived. Id. at p.2, and the child "nearly froze to death," Id. at p.1. The parts about the chld nearly freezing to death is a falsehood, adopted by Judge Goldberg, that has been perpetuated by the Commonwealt for decades. Even the Attorney General has adopted this false narrative, infra at ¶51-52. The rest of Judge Goldberg's comments are biased hearsay as to Petitioner's alleged mens rea.

44. Initially, there is dispute as to whether the heat was off or on. A detective first testified that the heat was off and the thermostat was turned down, NT 6/20/85, p.71, but later

testified that the heat was on and the thermostat was turned down, 12/16/92, p.28. Further, there is no record evidence that petitioner turned down the heat.

45. Next, the child did survive and not just "barely." At trial the prosecutor called a relative of the victim's to testify that the child suffered a "ten-second respiratory arrest" on the way to the hospital, had "<u>severe</u> dehydration," "hypothermia," and "cyanosis." NT 6/20/85, p.53-54; 12/15/92, p.47. However, the trial prosecutor withheld the child's medical records which showed the child was simply "dehydrated" and was described by the accompanying relative as "slightly lethargic."

46. Regarding the home's temperature, no one knows what it was when the child was found. The grandfather, who found the child, never indicated what the temperature was when he first entered the home. He testified that after breaking the doors open he searched the home, exited it with the child, left the doors open, drove to his home and called the police. NT. 6/19/85, p.50 & 66. Additionally, he testified that it took over "40-minutes" for the police to arrive, Id. at 67.

47. That officer testified that he arrived around 5:20pm, 12/14/92, p. 31, that the front doors were open, Id. at p.35, and that he started his search of the home about 2-minutes after his arrival. Id. at 35-42.

48. Finally, a homicide detective testified the doors were still open, NT 6/20/85, p.62, when he arrived at 6:28 pm. Id. at p.62.

49. Using this information as a guideline, the doors were probably opened between 4:15pm and 4:30pm and stayed open throughout the processing of the home. The only people claiming the house was cold were those who entered it after the doors had been open a substantial amount of time.

THE ATTORNEY GENERAL'S FILINGS

50. The Attorney General ("AG"), acting in this matter in the role of amicus curiae, has filed several documents which cite to some of the false evidence cited above. However, they have incorporated in their filings new false evidence, suppositions

9

and biased evidence interpretations.

51. They falsely claim that the house was "unheated," Amicus Curiae Sur-Reply Brief at p.14, and that police and the medical examiner("M.E") who responded to the crime scene noted the cold temperature inside the victim's home <u>when [the child] was discovered</u>." Brief of Amicus Curiae at p.5 n3.

52. Based on the true facts, supra at ¶¶44-49, the child was found by a relative--not the police or M.E.--and that the police came along roughly an hour afterwards. The M.E. came along even later--at 7.05pm. NT 6/21/85, p.7. Both witnesses arrived at the crime scene substantially after the doors had been open and left that way.

53. In their Brief of Amicus Curiae, the AG claims Petitioner told police he tried to "strangle the victim with a tie," Id. at p.7, and that "a necktie had been pulled tightly around her neck," Id., citing NT 12/16/92, p.38-40.

54. The first quotation is culled from the false/coerced statement attributed to Petitioner. There is literally no evidence to support a strangling of the victim. While the detective falsely claimed--showing <u>his</u> bias--the necktie was tight, he originally testified it was "tied loosely, it wasn't very tight, it was just loosely tied around the neck." NT 6/20/85, p.79. Also, the M.E. testified the necktie was "loosely around the neck." NT. 6/21/85, p.8.

55. The AG claims that during a previous burglary at the home Petitioner "left a doll with a rope tied around its neck on the floor...as if suggesting what was to come." Brief of Amicus Curiae at p.4-5, n2.

56. Although there were several "cohorts," Id., involved in this burglary, Petitioner is assigned a sinister supposition although there is no evidence to support such a claim. Additionally, there is no evidence that the doll did not have the rope around its neck prior to the burglary.

57. The AG is claiming that Petitioner "confessed" to a robbery in South Philadelphia. Sur-Reply Brief of Amicus Curiae at p.15. That is a blatant falsehood.

58. The AG has taken the position that Petitioner does not

10

deserve penalty hearing relief. In so doing he has crafted arguments around false evidence, contradicted evidence, specious arguments and speculative allegations. Given Judge Goldberg's predisposition to credit any evidence against petitioner--even if it is contradictory or false--the AG's arguments will find traction if Judge Goldberg is allowed to continue presiding over the remanded proceedings.

STANDARD OF REVIEW

59. The Due Process Clause of the United States Constitution requires "an impartial and disinterested tribunal in both civil and criminal cases" in order to "preserve [] both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done." Marshall v. Jerrico, 446 U.S. 238, 242(198)(internal citation omitted). A fair trial in a fair tribunal is a basic requirement of due process." In re Murchinson, 349 U.S. 133, 136(1955). The Supreme Court has made clear that the Due Process Clause forbids any "'procedure which would offer a possible temptation to the average man as judge...not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.'" Id. (citing Tumey v. Ohio, 273 U.S. 510. 532(1927)).

60. An objective inquiry looks to "whether there is an unconstitutional potential for bias." Caperton v. Massey, 556 U.S. 868, 880(2009)(quoting Mayberry v. Pennsylvania, 400 U.S. 455, 465-66(1971)). The Supreme Court emphasized the reasons for this objective test:

> The difficulties of inquiring into actual bias...underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motive at work in deciding the case...[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias... In defining these standards the Court has asked whether, under realistic appraisal of psychological tendencies and human weakness, the interest

poses such risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. Caperton, 556 U.S. at 883.

61. [O]bjective standards may...bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." Id. at 886(quoting In re Murchinson, 349 U.S. at 136).

62. For this reason, "any tribunal permitted by law to try cases or controversies not only must be unbiased but must avoid even the appearance of bias." Com. v. Coating Corp., v. Continental Casualty Co., 393 U.S. 145, 150(1968); See also Marshall v. Jerrico, 446 U.S. at 243(affirming that "justice must satisfy the appearance of justice"); Haines v. Ligget Group Inc., 975 F.2d 81, 98(3d Cir. 1992)(stating that court has supervisory authority to reassign cases in order to "avoid both bias and the appearance of bias"); Lewis v. Curtis, 671 F.2d 779, 789(3d Cir. 1992)("Impartiality and the appearance of impartiality are the sine qua non of the American legal system.").

63. In Marshall v. Jerrico, the U.S. Supreme Court explained why "[t]he requirement of neutrality has been jealously guarded," and why the court has held that all Courts must appear neutral at all times:

> The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or <u>distorted conception of the facts</u> or the law. At the same time, it preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done, by ensuring that no person will be deprive of his interests in the absence of a proceeding in which he may present his case with <u>assurance that the arbiter is not predisposed to find against him</u>...we have employed the same principle in a variety of settings, demonstrating the powerful and independent constitutional interest in fair adjudicative procedure. Indeed, justice must satisfy the appearance of

12

justice, and this stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. 466 U.S. at 2542-43(emphasis added).

For all the reasons stated herein, Petitioner pray this Court will recuse Judge Goldberg from these proceedings.

Respectfully submitted,

*Robert Wharton*
Robert Wharton, Pro Se

Dated: October 21, 2020

CERTIFICATE OF SERVICE

I, Robert Wharton, hereby certify that a copy of the foregoing Motion for Recusal has been sent, via first class mail, postage paid on this date to the following:

Elizabeth McHugh, Esq.
Fed. Defenders Office
Curtis Center
601 Market St.
Phila. Pa. 19106

Max Kaufman, Esq.
Phila. District Attn's Office
3 South Penn Sqr.
Phila. Pa. 19107

James P. Barker, Esq.
Attorney General's Office
Criminal Law Division
16th Flr. Strawberry Sqr.
Harrisburg, Pa. 17120

*Robert Wharton*
Robert Wharton


Dated: October 21, 2020

Robt. Wharton
AF-6898
Box 244
Collegeville, Pa.
19426

U.S.M.S.
X-RAY

Clerk
U.S. Dist. Crthse
601 Market St.
Phila. Pa. 19106

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

