UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


ROBERT WHARTON             )    01-CV-6049
                              )
              Petitioner  )
     vs.              )
                              )
DONALD T. VAUGHN        )
                              )
                              )   Philadelphia, PA
                              )   February 12, 2021
              Respondent  )   1:10 p.m.


MOTIONS IN LIMINE HEARING VIA AUDIOCONFERENCING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Petitioner:          CLAUDIA VAN WYK, ESQUIRE
                          ELIZABETH McHUGH, ESQUIRE
                          FEDERAL COMMUNITY DEFENDERS OFFICE
                          601 Walnut Street, Suite 545
                          Philadelphia, PA  19106
                          215-928-0520




For the Respondent:          PAUL M. GEORGE, ESQUIRE
                          NANCY WINKELMAN, ESQUIRE
                          PHILA. DISTRICT ATTORNEY'S OFFICE
                          3 South Penn Square
                          Philadelphia, PA  19107
                          215-686-5700

SHANNAN GAGLIARDI, RDR, CRR
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, EASTERN DISTRICT OF PA
601 Market Street, Room 2609
Philadelphia, PA  19106
(267)299-7254

```
1    Amicus:                          JAMES P. BARKER, ESQUIRE
                                      CARI L. MAHLER, ESQUIRE
2                                     PA OFFICE OF THE ATTORNEY GENERAL
                                      Strawberry Square, 16th Floor
3                                     Harrisburg, PA  17120
                                      717-705-0098
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Clerk opens court at 1:10 p.m.)

2              THE COURT:  Good afternoon.  This is Mitch Goldberg.

3              Who is on the line for the attorney general?

4              MR. BARKER:  This is Jim Barker, and Cari Mahler is

5    also on the line, Your Honor.

6              MS. MAHLER:  Good afternoon, Your Honor.

7              THE COURT:  Hello.

8              And for Mr. Wharton?

9              MS. McHUGH:  Good afternoon, Your Honor, Elizabeth

10   McHugh.

11             MS. VAN WYK:  And Claudia Van Wyk also for

12   Mr. Wharton.  Good afternoon.

13             THE COURT:  Good afternoon.

14             And for the district attorney?

15             MR. GEORGE:  This is Paul George.

16             MS. WINKELMAN:  Good afternoon, Your Honor.  Nancy

17   Winkelman is also on.

18             THE COURT:  Who was the first one?

19             MR. GEORGE:  Paul George.

20             THE COURT:  Good afternoon.

21             And court reporter?

22             THE COURT REPORTER:  Hello, Your Honor.  This is

23   Shannan Gagliardi.

24             THE COURT:  My staff, Mr. Sonnie and Samantha, are

25   you on?

1          THE DEPUTY CLERK:  Yes, Judge.

2          THE LAW CLERK:  Yes, Judge.

3          THE COURT:  Okay.  We are going to just chat about

4    some motions in limine.  We have a hearing coming up on the

5    18th to be sort of bifurcated.  I've taken a closer look at

6    these.  A couple observations that I think can inform our

7    discussion.

8          One is that I think a lot of the objections raised --

9    not objections, issues raised particularly by the attorney

10   general are more trial-specific, and I'll get to those and I'll

11   explain what I mean when we get to them.  But a lot of them

12   are, I think, asking me to decide things out of context before

13   I really heard what the witnesses are going to say.  They are

14   sort of like preemptory objections.

15         I think the lawyers should remember that there's no

16   jury.  This is a hearing on the remand from the Third Circuit.

17   So we can allow testimony to come in, I can hear objections.  I

18   can think about things in context, and then if I agree with an

19   objection later, I can always exclude it and not consider it.

20   So that's just, you know, an overview of what I was thinking

21   about some of the things raised.

22         As far as the first issue, which I'm going to

23   characterize as the relevant time period we're talking about --

24   and, again, for the record and in context, the remand is on the

25   issue of whether there was a constitutional lapse by trial

1    counsel, Mr. Cannon, in the death penalty phase of this

2    proceeding whereby he provided ineffective assistance of

3    counsel for not presenting evidence of positive prison

4    adjustment on Mr. Wharton's behalf that could have been

5    considered by a jury for mitigation purposes.  That was, if I

6    think I have it right, the directive of the Third Circuit.

7           And I think there's a dispute over what the relevant

8    time period is for that, we'll call it, behavior analysis.  I

9    want to make sure I have dates right.  The first, I think

10   verdict, I think verdict, where a jury said the proper penalty

11   was death, was July 5, 1985.  There was a reversal in the state

12   courts and the second verdict.  So there's a retrial on the

13   penalty phase, and the second date of the second death penalty

14   verdict was December 14, 1992.  And the date of arrest since

15   Mr. Wharton has been in custody is February 7, 1984.

16           Do I have those dates right, Ms. McHugh?

17           MS. McHUGH:  Yes, Your Honor.  The only one I was

18   checking was the date of the second verdict.  I know it was

19   December of '92, but I don't know the exact date.

20           MS. VAN WYK:  This is Ms. Van Wyk.  I think it was

21   December 23.  It was right before Christmas.  But it's

22   approximately correct.

23           THE COURT:  14th, 23rd, December of 1992.  Thank you.

24           So I would then ask counsel for Mr. Wharton then, you

25   have the burden of presenting your case on ineffectiveness.

1          What are you going to argue is the operative dates?

2          MS. VAN WYK:  This is Ms. Van Wyk.  I mean, we agree

3    with the Court's suggestion the other day that, you know,

4    perhaps this is more properly viewed as a question about what

5    would be proper rebuttal.  And Your Honor just indicated the

6    claim has to do with counsel's failure to develop and present

7    evidence of prison adjustment, and it's not really clear to us

8    how the state would rebut that evidence.

9          THE COURT:  Well, we can make it clearer if you would

10   tell us what is it -- if I understand your position, you're

11   going to say, Judge Goldberg, you need to find that there was

12   ineffective assistance of counsel here, and the reason is

13   because Mr. Cannon dropped the ball and didn't present prison

14   conduct information.

15         Do I have that right so far?

16         MS. VAN WYK:  Yes, that's right so far.

17         THE COURT:  So my question is, during what time

18   period are you going to argue that he should have presented

19   that information?  Because that informs me and the AG's office,

20   you know, how to respond.  So what are you going to do?  I'm

21   asking for an offer of proof.

22         MS. VAN WYK:  We are going to prove his conduct upon

23   his arrival in the state prison system, which happened almost

24   really over a year after his original sentencing by the jury in

25   September of 1986.  Is that right?  Yes.  July '85 was the jury

1   verdict.  The escape was April 1986.  But the claim centers on

2   the record of how he conducted himself in the prison beginning

3   when he arrived there starting with his first program review

4   committee reports describing how --

5          THE COURT:  Excuse me.  Where was he from -- just

6   logistically, where was he from the date of the second verdict

7   of death, which we say is either the 14th or the 23rd, where

8   was he from that date -- I'm sorry.  One second.  Where was

9   he -- you're saying 1986.

10          So where was he in between the first verdict of

11   death, July 5, 1985, until 1986?

12          MS. VAN WYK:  He was mostly, I believe, in Eastern

13   State Penitentiary.  He had some outstanding -- he had some

14   burglary charges, and they were all burglary with other crimes.

15          THE COURT:  Okay.  Why are you not including that

16   time period?

17          MS. VAN WYK:  Because the claim relates to his

18   adjustment to his prison sentence.

19          THE COURT:  But he was in prison.

20          MS. VAN WYK:  He was certainly incarcerated, that's

21   correct, Your Honor.

22          THE COURT:  So why are you limiting -- if he was

23   incarcerated in 1984 -- I just want to understand why you're

24   picking the date you're picking in the timeline.  So he's

25   incarcerated in 1984.  He is given a first death penalty

1  sentence in July of 1985, but you're picking 1986.  I don't

2  understand why you're picking that date.

3          MS. McHUGH:  Your Honor, this is Ms. McHugh, if I

4  could just interject one fact.  The incarceration records from

5  the Philadelphia County, which was where he was, we don't have.

6  So the records that were proffered in state court as part of

7  the claim were the ones that were proffered.  You know, I don't

8  know what the thinking was behind that, but that's the records

9  that are in front of us that we have to prove the positive

10 adjustment.

11         THE COURT:  Understood.  Could you give me a month,

12 if possible, in 1986?

13         MS. McHUGH:  That he went to the state prison?  I

14 think it's the 5th of September.  It's September.

15         THE COURT:  I'm talking over you so I apologize.

16 Let's try not to talk over people.

17         MS. VAN WYK:  I apologize.

18         THE COURT:  I'm doing it too.  An apology not

19 necessary.  I'm doing it because I just want to understand your

20 thought process.

21         So let me understand this.  Mr. Wharton is going to

22 argue that there was a constitutional violation on the part of

23 Mr. Cannon for not presenting positive prison records, and

24 you're starting in September 1986.  And when the fact finder,

25 me, asks why are you starting on that date, you're saying

1   that's the first date that we can obtain records.  We

2   understand he was in jail since February of 1984, but we're

3   starting in '86 because that's when the records were available.

4            Is that accurate?

5            MS. VAN WYK:  That's part of it, Your Honor.

6            MS. McHUGH:  That's accurate, Your Honor.  This is

7   Ms. McHugh.  That's accurate with one caveat.  Whether or not

8   there were additional records available back then, I don't

9   know, but that's the records that we have now to prove in this

10  court.

11           THE COURT:  Okay.

12           MS. VAN WYK:  May I add one further thing, Your

13  Honor?

14           THE COURT:  Who is speaking?

15           MS. VAN WYK:  I'm sorry.  This is Ms. Van Wyk again.

16           The claim is that he underwent a process of

17  adjustment, and so the demonstration is through the records

18  that were accumulated over the time that he was incarcerated in

19  the state prison.

20           THE COURT:  Got it.  Okay.  And the rub of this, to

21  get to, I think, where this is all being driven, does everyone

22  agree -- I'm trying to find maybe someone who could help me.

23           What's the date of the escape?

24           MS. VAN WYK:  April '86, Your Honor.  I think the

25  21st.

1          THE COURT:  Thank you.  April 21st, '86.

2          So what the defense is trying to avoid then -- if I

3     understand the defense's argument, Mr. Wharton's argument, is

4     we are only going to present good behavior starting in

5     September of 1986.  The escape -- and I'm putting aside for

6     purposes of my question if the escape is allowed into evidence,

7     to what extent we'll get into the facts.

8          But your argument, Ms. McHugh and Ms. Van Wyk, is the

9     escape occurred prior to September of 1986.  It's our case.  We

10    only want -- we dictate the timeline.  We're starting

11    September 1986.  The escape was before that and, therefore,

12    excluded.

13         Is that your argument?  You have to pick one person

14    to argue for Mr. Wharton.

15         MS. McHUGH:  I apologize.  I'll let Ms. Van Wyk do

16    it.

17         THE COURT:  Okay.  Go ahead.

18         MS. VAN WYK:  The other piece of it, Your Honor,

19    is --

20         THE COURT:  Could you answer my question?  Before you

21    tell me the additional piece, do I have the first part right?

22    Is that your argument?

23         MS. VAN WYK:  That is our argument with an addition.

24         THE COURT:  Go ahead.

25         MS. VAN WYK:  We also would contend that how he

1  behaved during his, you know, being taken out of court is only

2  of questionable relevance to how he adjusted in the prison.

3  Just as, you know, if he had been disrespectful to the judge at

4  the sentencing on the robbery that he was sentenced on that

5  day, that would have limited relevance to how he would adjust

6  within the confines of a prison.

7        THE COURT:  Understood.  Got it.

8        I'm still asking questions of defense counsel.

9  Hypothetically, we're at death penalty trial, and Mr. Cannon

10 hypothetically acts, according to you, in a constitutional

11 manner as he should have and he introduces records indicating

12 positive adjustment from September of 1986 forward to the date

13 of the hearing.  And since we're dealing with two hearings, I

14 guess we're talking about all the way up to 1992.

15        And then in rebuttal, if the DA's Office wanted to

16 introduce the escape that occurred in April of 1986, you would

17 object and you would say that that would be inadmissible for

18 two reasons.  One, it predates 1986 and, two, it's an escape

19 that occurred for a case.  It's not a prison adjustment.  I'm

20 just repeating back to you what I think your argument is.

21        Is that right?

22        MS. VAN WYK:  Yes, Your Honor.

23        THE COURT:  Okay.  I understand your argument.  Let

24 me hear from the attorney general.

25        MR. BARKER:  Your Honor, this is Jim Barker.  First,

1    to clarify one thing, Mr. Wharton went into the Department of

2    Corrections on May 2nd of 1986.  After the escape attempt, I

3    guess prison officials in Philadelphia --

4           THE COURT:  Hold on.  You're saying he went into the

5    state prison system in May of '86, but then you say they only

6    have records since September.

7           Is that the difference between the May and the

8    September date?

9           MR. BARKER:  That could very well be.  I know that

10   after the escape attempt, Philadelphia prison officials sent

11   him over to Graterford.  He was kept there until September.

12   After September, he was moved to -- excuse me.  I'm sorry.  I'm

13   looking at someone's timeline.  He was moved in September to

14   Huntingdon.

15          THE COURT:  Go ahead.

16          MR. BARKER:  So those are the records we have.

17   Actually, from May until September he was in Graterford.

18          THE COURT:  Go ahead.

19          MR. BARKER:  Our argument would be this claim was

20   brought under Skipper, which was actually a pretrial detention

21   status.  So adjustment to prison life starts from the day that

22   you go into the prison generally, and that would include

23   whether you're being held in a county jail, whether the police

24   have you in a jail cell.  Whatever it is, your adjustment

25   starts from that first day.

1          And even if the Court were to for whatever reason go

2    with September, it really doesn't make sense to exclude the

3    escape because that's the reason for the repeated statement

4    that Mr. Wharton is an escape and assault risk.  So it's still

5    relevant, and the details of it explain all of that.  It also

6    puts into context the misconducts relating to the finding of

7    the handcuffs, the improvised handcuff key, which I guess now

8    is disputed.  But it explains all that.

9          And so we would say that it's relevant one way or the

10   another, but actually the relevant time period begins from the

11   moment he's taken into custody because that's the time he

12   starts adjusting to custody.

13         THE COURT:  Mr. George or Ms. Winkelman, do you want

14   to be heard on this issue?

15         MR. GEORGE:  Judge, I would only say that if the

16   claim of the defendant is that as of a certain date I became a

17   good prisoner and that's a mitigating factor, then what's

18   relevant is his conduct as of the date that he claims that he

19   became well-adjusted.

20         THE COURT:  Mr. George, if there was no evidence

21   presented at trial by Mr. Cannon, would the DA's Office

22   independently be allowed to introduce, in your view, the escape

23   information as part of his proof on aggravating circumstances?

24         MR. GEORGE:  To me that would depend on if it was

25   potentially admissible to rebut evidence of good character of

1    some other kind.  Then it could be that it might have some

2    relevance, and it could potentially be introduced in that

3    context.

4           Whether or not it rebuts a claim that as of a certain

5    date a defendant, or rather an incarcerated person, became a

6    good prisoner, adjusted to prison life, whatever it might be, I

7    would think that it would be admissible for that purpose.

8           THE COURT:  So is your view that the Commonwealth,

9    the DA's Office, your office, I realize we're reverting back a

10   lot of years, but a DA in the general sense in a death penalty

11   case is only allowed to introduce evidence of aggravating

12   circumstances in rebuttal to mitigating evidence?  You're not

13   saying that.

14          MR. GEORGE:  Certainly not.  You can put in evidence

15   of aggravating circumstances as part of your case in argument

16   for execution.  The question, as I understand it, is if certain

17   mitigating evidence was introduced, are you able to introduce

18   evidence to rebut it?  And the answer would be yes.

19          If this escape fits into one of the aggravating

20   circumstances, and certainly there are plenty of them in

21   Pennsylvania, then it would be admissible, in my view, in the

22   Commonwealth's case in chief in the penalty phase.

23          If it was going to be introduced to say, no, you

24   didn't have good adjustment as of a certain date as you claim,

25   then I think bad behavior before that date does not rebut the

1   defendant's claim.

2          THE COURT:  Got it.  I understand your position.

3   Thank you.

4          Okay.  I am -- and the luxury, again, of this being a

5   bench proceeding, not a jury, is I can always rethink this,

6   change my mind.  You know, I'm sure the lawyers will respect

7   the sanctity of my ruling, but talking out the other side of my

8   mouth, they can keep pressing this if they think that they need

9   to.

10          But I'm ruling that -- and I'm primarily basing my

11   ruling on the Skipper matter that says that we have to talk

12   about positive prison adjustment even going back to pretrial

13   detention.  I'm ruling that the evidence of the escape is

14   admissible, and so the next question is to what extent does the

15   attorney general -- how do you plan to introduce this evidence

16   and how far do you intend to go with it?

17          MR. BARKER:  Your Honor, we have submitted records

18   that substantiate it.  We have the guilty plea colloquy, the

19   judgment of sentence, the docket.

20          THE COURT:  Tell me what happened.  I'm not saying

21   I'm going to allow all this in.  I just want to know what

22   happened.

23          MR. BARKER:  Well, what happened was Mr. Wharton was

24   brought in for sentencing on a separate matter, and as they

25   were leaving the courtroom, he had a cast on his wrist.  He had

1    been claiming some sort of an injury.  There is nothing in the

2    medical records thereafter to substantiate it, so we don't know

3    whether that was a legitimate injury or not.

4           Somehow he got out of his handcuffs and shoved the

5    deputy sheriff, who was escorting him, into an elevator door.

6    There were two deputies there.  The one who was shoved was able

7    to get off two shots as Mr. Wharton was running down a set of

8    steps.  He got out onto the street outside of City Hall.

9           THE COURT:  Hold on.  They were in -- he got his

10   handcuffs off.  They were in, I guess, an elevator that takes

11   Mr. Wharton from, I guess, the general prison area in the

12   basement, I guess this is in City Hall, up to the courtroom.

13          And then at some point after or before the

14   proceedings did this occur?

15          MR. BARKER:  It was after.  It was when they were

16   returning to that area that Your Honor was talking about.

17          THE COURT:  He was able to get out of his handcuffs.

18   He pushed the guards or one guard out of the way and ran out of

19   the elevator.

20          Where did he run, down the hall?

21          MR. BARKER:  Your Honor, I don't think that they ever

22   got into the elevator.  I think that they got to the elevator

23   when he shoved the deputy.  So the deputy actually went and hit

24   the door of the elevator.

25          THE COURT:  And Mr. Wharton ran.

1      MR. BARKER:  He ran and made it to a stairwell.  It's

2  difficult to tell when exactly the sheriff got his shots off,

3  but he fired twice and hit Mr. Wharton.  Mr. Wharton kept

4  running after he was hit and made it out onto the street where

5  he collapsed, and that's where he was taken back into custody.

6      THE COURT:  How much of any of that, starting with

7  the littlest bit being he attempted to escape in another

8  proceeding on April 21, 1986, all the way to having that full

9  story told, what extent do you believe is admissible for you to

10  introduce?

11      MR. BARKER:  Well, I think all of the circumstances

12  that surround that would be relevant as to, you know, why he's

13  such an escape risk and whether he's actually adjusting to

14  prison life well.

15      THE COURT:  Okay.

16      MR. BARKER:  I would say that all of it.

17      THE COURT:  All right.  Let me hear from

18  Mr. Wharton's attorneys on that issue, that is, what evidence

19  is going to be allowed in on this issue.

20      MS. McHUGH:  Your Honor, this is Ms. McHugh.

21      First of all, the charge that Mr. Wharton pled guilty

22  to as a result of this incident was escape only.  He was

23  originally charged with implements of escape regarding a

24  handcuff key and assault, and those charges were nolle prossed

25  by the District Attorney's Office.

1          THE COURT:  Those charges are inadmissible.  They

2     were nolle prossed.  They were charges that were never proven.

3     They are excluded.

4          MS. McHUGH:  Okay.

5          MR. BARKER:  Your Honor, I will have to go back and

6     look at that.  I'm not sure that's correct.  I believe what

7     happened was the aggravated assault was reduced to simple

8     assault.

9          THE COURT:  Okay.  Whatever it turns out to be,

10    charges that were brought and not proven either by way of a

11    jury verdict or a plea are not admissible, whatever those

12    charges are.

13         MS. McHUGH:  And I would just add that in the AG's

14    exhibits, the bills of information, I believe it's somewhere

15    within Exhibits 7 through 10, they withdrew prosecution on

16    those two charges.  Mr. Barker is correct that the aggravated

17    assault was dismissed, but that was at a preliminary hearing,

18    apparently, prior to the bills of information.

19         THE COURT:  You guys will figure that out.  Let's

20    just agree that he only pled to an escape, and that's the only

21    thing that's admissible.

22         So what's Mr. Wharton's lawyers' view on how much of

23    the facts underlying that escape conviction are allowed in?

24         MS. McHUGH:  Well, our position, Judge, is that, you

25    know, there's a different version of this, and that's also

1   submitted in the AG's exhibits, which is Mr. Wharton's version

2   where he says that he was left unattended by the sheriffs and

3   that's how this incident, you know, how he was able to get

4   away.  So there is this distinct factual dispute as to whether

5   there was any such handcuff key or shoving or anything of that

6   nature.

7          Also submitted in the AG's exhibits is evidence that

8   the sheriff's office was under attack at that point for having

9   multiple incidents like this happen, and so there would be a

10  reason for these sheriffs to possibly embellish the facts.  So

11  without the ability to cross-examine the sheriff's officers,

12  which we know we cannot do because they are no longer

13  available, we would submit that any of the factual bases

14  substantiating those two charges that were dismissed and in

15  dispute, that that would not be admissible at a sentencing in

16  1992 and certainly would not be admissible at this hearing to

17  prove that that would have been evidence introduced in '92.

18          THE COURT:  Mr. Barker, how do you intend to prove

19  that story that you said occurred?

20          MR. BARKER:  Well, there are two ways to do it, Your

21  Honor.  Mr. Wharton actually pled guilty, and if you look at

22  the guilty plea colloquy, he admitted the charges that were in

23  the criminal complaint.  So the version of events was recited

24  in the affidavit that goes with the criminal complaint, and

25  that's what he pled guilty to.

 1          THE COURT:  Got it.  Does the colloquy acknowledge --

 2   does the colloquy have Mr. Wharton acknowledge that there were

 3   underlying facts in the complaint and he's read them and adopts

 4   them in some way?

 5          MR. BARKER:  Yes.  He admits to the charges as they

 6   are set forth in the criminal complaint, and both he and his

 7   attorney signed that.

 8          THE COURT:  Understood.

 9          Okay.  Does the DA wish to be heard on this issue?

10          MR. GEORGE:  No, thank you.

11          MS. McHUGH:  Your Honor, I do have one response to

12   Mr. Barker.  This is Ms. McHugh.

13          THE COURT:  Go ahead, Ms. McHugh.

14          MS. McHUGH:  I think that's actually very inaccurate

15   what he just represented to the Court.  I looked at the guilty

16   plea colloquy and the charging documents.  The affidavit that

17   he's referring to precedes the preliminary hearing and the

18   guilty plea.  There is no factual basis for the guilty plea in

19   the record.

20          So when he signs the guilty plea form, there's no --

21   you know, as Your Honor's familiar with, when you do a guilty

22   plea, they will sometimes read the facts that you're pleading

23   guilty to and do you agree with that, as you mentioned.  That's

24   not in the record here.

25          What we have is him simply signing the bills of

1   information, or the bill of information for the escape charge,

2   and you have a guilty plea colloquy that lays out his rights

3   for pleading guilty, which he signed.  The factual basis for

4   the plea is not in the record.  Any facts that were preceding

5   that were part of the complaint.  That was the first document

6   generated in this case and is not reliable as to what he's

7   pleading guilty to.

8              THE COURT:  Mr. Barker, in the submissions that you

9   have submitted, and I don't have all of them and the

10  attachments in front of me, in the submissions that you

11  submitted, are the documents there for me to find and look at

12  to support your argument that there's an adoptive admission?

13             MR. BARKER:  Your Honor, I'll have to go back through

14  them in detail.  At this point I don't want to make a

15  representation --

16             THE COURT:  Okay.  That's fair.

17             MR. BARKER:  -- that I'm going to later regret.

18             THE COURT:  That's fair.  So do that.  On this issue,

19  I've ruled that the escape is admissible.  I've ruled that the

20  conviction is admissible.

21             On the issue of to what extent are the facts

22  underlying the escape admissible, that is going to depend on

23  whether the attorney general can tie up an adoptive admission.

24  By that I mean -- and, Mr. Barker, go back and look at the

25  documents and let us know by way of email, I guess, since we're

1  all operating remotely and obviously copy counsel.  But if it's

2  not in there, let us know.  I'll look at this.

3          For instance, traditionally, in Federal Court, which

4  I know is different than state court, I'll ask in a plea, here

5  are the facts, Mr. Defendant.  Are they accurate?  Yes.  Are

6  you pleading guilty to those?  Yes.  That's an adoptive

7  admission.  But if, as Ms. McHugh says, you can't tie that up,

8  then it will be different.  So let's hold this issue under

9  advisement, and the issue being how far the facts can go.

10          MS. MAHLER:  Your Honor, this is Cari Mahler.  May I

11  just chime in for a moment?  Since I have the guilty plea in

12  front of me, it might help clarify.

13          THE COURT:  Go ahead, Ms. Mahler.

14          MS. MAHLER:  Thank you, Your Honor.

15          Page 3 of the guilty plea colloquy specifically has a

16  section entitled "Facts of my case and elements of the crimes."

17  And it specifically states, "The facts of the case have been

18  read to me.  The crimes and elements of the crimes have been

19  explained to me.  I committed the crimes, and that is why I am

20  pleading guilty."  It's signed by Robert Wharton.

21          THE COURT:  Okay.  Let me look at that.  That's very

22  helpful.  But I don't have it in front of me, so I'm going to

23  go back and look at that.  Understood.

24          MS. MAHLER:  Sure.  Thank you.

25          THE COURT:  Thank you.

1        All right.  So it looks like the next issue is

2   documents, and if you'll give me about -- I got something I got

3   to deal with, and it will literally take me no more than two

4   minutes.  Would everyone mind just staying on hold for two

5   minutes?  I'll come right back to you.  Will that work?  I'll

6   be right back.

7                    (Recess taken from 1:47 p.m. to 1:49 p.m.)

8               THE COURT:  All right.  I'm back.  Sorry about that.

9          Let me just ask some questions on the next issue.

10   Could either Ms. McHugh or Ms. Van Wyk, could you remind me

11   where Dr. Krop fits into all of this?

12               MS. VAN WYK:  That's my area, Your Honor.

13               THE COURT:  Who is speaking?

14               MS. VAN WYK:  I'm sorry.  This is Ms. Van Wyk.

15          Dr. Krop is not a witness.  He is not going to

16   testify, and we are not relying on his opinion as an

17   independent basis for our request for relief.

18               THE COURT:  Could you go back a little bit and give

19   me the history?  How does he fit into the whole scenario here?

20               MS. VAN WYK:  Yes.  When this petition began back in

21   the late 1990s, counsel for petitioner proffered prison

22   records, primarily the program review committee records and the

23   grievance records, along with the declaration from Dr. Krop,

24   all in support of the claim that trial counsel was ineffective.

25          We are not relying on -- oh, I'll step back.

1   Throughout the history of this litigation, because no hearing

2   was ever held, that factual proffer was the basis of the

3   various legal arguments that eventually came before this court

4   and went to the Third Circuit.

5         THE COURT:  What was the proffer?  What was he going

6   to say?

7         MS. VAN WYK:  He was going to say that he had

8   reviewed materials, which he doesn't enumerate, and had

9   conducted an in-person evaluation with Mr. Wharton, did not

10   think he conformed to the criteria for antisocial personality

11   disorder and that he would make a good prison adjustment, and

12   he gave, you know, some examples from the record that supported

13   that conclusion.

14         THE COURT:  Ms. Van Wyk, are any of your current

15   experts, who I understand to be Cynthia Link and Neil Blumberg,

16   are they going to reference Dr. Krop's opinions in any way?

17         MS. VAN WYK:  Dr. Krop's declaration has been

18   provided to Dr. Blumberg as part of the history of

19   Mr. Wharton's contact with various mental health providers.  He

20   also has the reports of several prison psychologists, including

21   a Dr. Saul.

22         THE COURT:  I'm just asking about Dr. Krop.

23         MS. VAN WYK:  Okay.

24         THE COURT:  And my question is, is Blumberg's opinion

25   in any way going to be dependent on the Krop affidavit?

1          MS. VAN WYK:  Not except to the extent that it's part

2     of the history he reviewed.  He's not relying on his opinion or

3     adopting it.

4          THE COURT:  Yeah.  I need you to be more specific.

5     So he's going to render an opinion, Blumberg, I'm not going to

6     get this as good as you would, but he's going to say, I

7     assume -- in a sentence or two, what is Blumberg's opinion?

8          MS. VAN WYK:  Blumberg's opinion, we asked him two

9     questions.  One, whether Mr. Wharton met the criteria for

10    antisocial personality disorder, and the answer to that is no.

11    And two, whether he had made a positive prison adjustment

12    during his time in state prison prior to the 1992 retrial, and

13    the answer to that is yes.

14         THE COURT:  So you're telling me when Blumberg is

15    asked what information did you review to reach those

16    conclusions, Blumberg is going to say the Krop affidavit; is

17    that accurate?

18         MS. VAN WYK:  That's right.

19         THE COURT:  All right.  So then if that's something

20    that he reviewed that assisted him in reaching those

21    conclusions that you articulated, do you agree then -- Ms. Van

22    Wyk's been talking here, right?

23         MS. VAN WYK:  Yes, Your Honor.

24         THE COURT:  I so miss talking to people in person.

25         Ms. Van Wyk, then don't you agree that the attorney

```
 1    general is entitled to know what Krop looked at?  And if the

 2    answer to that question is yes, why shouldn't you turn over

 3    that information?

 4              MS. VAN WYK:  Well, I guess it's easier to answer

 5    those questions backwards, Your Honor.

 6              He has been asked.  He can't reconstruct what he was

 7    given and neither can we.  We think it's logical to assume our

 8    predecessor counsel gave him the same proffer that was given to

 9    the Court back in 1997, but that's all we can say.  We have a

10    second declaration from him that has been provided to the AG

11    stating that he diligently searched his files, and there's

12    nothing.

13              THE COURT:  What happened in 1997?  I forget.  Remind

14    me.

15              MS. VAN WYK:  Judge Glazer denied an evidentiary

16    hearing after this information had been proffered.  So the

17    dispute thereafter was always about whether there was a prima

18    facie case sufficient to entitle Mr. Wharton to a hearing.

19              THE COURT:  Who denied it?

20              MS. VAN WYK:  Judge Glazer.

21              THE COURT:  In state court?

22              MS. VAN WYK:  Yes.

23              THE COURT:  So as I understand it, Krop was going to

24    testify in the PCRA matter for Mr. Wharton, but a hearing was

25    denied by Judge Glazer.
```

1          And prior to Krop testifying, was information that he

2     had reviewed turned over to anybody?

3          MS. VAN WYK:  The record does not spell that out.  I

4     believe all that ever happened was this proffer was made of the

5     records that I just mentioned and his declaration.  The hearing

6     was denied, and thereafter it was appealed to the Pennsylvania

7     Supreme Court.

8          THE COURT:  Right.

9          MS. VAN WYK:  And there wasn't a hearing or other

10    factual developments until the circuit remanded it to this

11    court in 2018.

12         THE COURT:  So you're telling me even though it looks

13    like he had materials that he reviewed, and the "he" is Krop,

14    there's no -- you're telling me there's no record that that

15    information was turned over to the DA's Office back in '96.

16         MS. VAN WYK:  I imagine they got a copy, but I don't

17    even know -- I mean, it was filed.  We have not been able to

18    recover --

19         THE COURT:  What was filed?

20         MS. VAN WYK:  The proffer was submitted to the Court.

21         THE COURT:  What do you mean by proffer?

22         MS. VAN WYK:  The proffer consists of the prison

23    records I mentioned.

24         THE COURT:  Okay.  So records.

25         MS. VAN WYK:  Of various times and Dr. Krop's

1   declaration.  That was submitted to the Court.  The PCRA court

2   issued a notice of intent to dismiss, and they had a chance to

3   respond.  And they responded to the proffer saying we thought

4   we were going to get a hearing.  This is what we would present

5   at the hearing.

6          THE COURT:  Okay.  And you're telling me -- I think

7   you already said this, Ms. Van Wyk, but you're saying you've

8   gone back to Krop and asked him to try to resurrect the

9   documents he reviewed, and he said that was a long time ago, I

10  couldn't, but I tried in good faith.

11         MS. VAN WYK:  He tried in good faith and he has no

12  independent recollection of the case, and we have been unable

13  to reconstruct what he was sent.

14         THE COURT:  Thank you.

15         Mr. Barker, with that representation and

16  understanding that Ms. Van Wyk has said that Krop will not

17  testify, Blumberg will rely in part on Krop's opinion, what is

18  it that you want that you don't have?

19         MR. BARKER:  Your Honor, what we don't have is

20  anything that relates to the testing that Dr. Krop supposedly

21  did.  What we have here is a PCRA petition that's filed on

22  January 21st of 1997 and a representation by Dr. Krop in his

23  second declaration that he was hired in 1997.

24         So I'm not exactly sure how he managed to interview

25  Mr. Wharton, perform tests that he claims that he did, as well

1    as review all of those records, travel to Pennsylvania for an

2    interview, and do anything in those three weeks.

3            So this is plainly something that was created after

4    the fact and apparently after the PCRA court issued its notice

5    of intention to dismiss, and it's only about three weeks before

6    the dismissal happened.  So I want to know how all of this was

7    done and why in the world this opinion would be anything that a

8    psychiatrist now, as well as Ms. Link, would be relying on.

9            THE COURT:  Well, let me ask Ms. Van Wyk.

10           When Dr. Blumberg is on the stand and he's asked by

11   Mr. Barker, okay, well, you reviewed a report by Krop, did you

12   review documents that supported that opinion in the report by

13   Krop?  Blumberg's answer is going to be no; is that right?

14           MS. VAN WYK:  If you mean did you review other

15   materials that have not been turned over, Blumberg will say no.

16   He has no record of test results, and, furthermore,

17   Dr. Blumberg's opinion is independent of Dr. Krop's.

18           THE COURT:  Ms. Van Wyk, I just want to -- I

19   interrupted you.  I'm sorry.  I assume you agree that when --

20   look, Mr. Barker is going to have to make a game-time decision

21   on how forceful and impactful he believes Blumberg's reliance

22   on Krop is going to be, and that's going to be his decision as

23   a trial lawyer.

24           Do you agree that he can fully explore with

25   Blumberg -- to the extent Mr. Barker concludes that Blumberg's

1  reliance on Krop is important, he can fully explore with

2  Blumberg that Blumberg, while he's relying on Krop, never got

3  to see the documents Krop relied on.

4        Do you agree with that?

5        MS. VAN WYK:  He can explore with Krop anything --

6        THE COURT:  No.  He can explore with Blumberg.

7        MS. VAN WYK:  I'm sorry.  Blumberg.

8        He can explore with Dr. Blumberg anything he was

9  provided to review, and we provided a lot of historical

10 materials, including Dr. Krop's declaration.

11        THE COURT:  He can also explore what Blumberg didn't

12 review, right?

13        MS. VAN WYK:  Namely, the other materials on which

14 Dr. Krop relied, sure.

15        THE COURT:  You know, I think we're a little bit, you

16 know, in the weeds here, which is okay.  This is important.

17        Mr. Barker, knowing that you're going to be able to

18 drill down on cross the alleged deficiencies on information

19 that Blumberg didn't review, problem solve for us here.

20 Ms. Van Wyk is telling me she's made a good faith search.  I

21 believe her.  I mean, we're talking about, you know, a long

22 time ago.

23        What is it you want me to order her to do more than

24 what's already done?

25        MR. BARKER:  Your Honor, if this was sort of a

1    preemptive motion, the way that the declaration is worded, and

2    in this instance I'm talking about the second declaration, I

3    can't tell whether counsel for Wharton had any of this

4    documentation because all they said was Dr. Krop doesn't have

5    it.  So I'm just doing a preemptive --

6         THE COURT:  Oh, if that's your concern, we can solve

7    that right now.  We've been talking at a higher level, and it's

8    more basic than that.

9         Ms. Van Wyk, I hear you saying a hundred percent you

10   do not have, nor were you able to obtain, the documents relied

11   upon by Dr. Krop; is that accurate?

12        MS. VAN WYK:  Yes, Your Honor.

13        THE COURT:  Well, then that's that.  She made a good

14   faith effort.

15        Mr. Barker, if you think the effort is deficient,

16   when Blumberg testifies, you can raise that point again.

17   Mr. Barker, you'll be given full -- you'll be given a lot of

18   latitude to explore any deficiencies you believe Blumberg had

19   in his testimony vis-a-vis not reviewing documents you think

20   were important.  And those deficiencies that you point out,

21   Mr. Barker, in your cross-examination will go to the weight I

22   will give to Dr. Blumberg's testimony.  So that resolves that

23   issue.  That's my ruling.

24        Let me just look at my notes as to the next issue.

25   Just give me a second.

1          Mr. George, I apologize.  I didn't mean to exclude

2     you.  Is there anything you want to add that you think could

3     change my ruling on this issue?

4          MR. GEORGE:  No.

5          THE COURT:  Okay.  All right.  Is there anything,

6     Mr. Barker, you want to bring to my attention regarding Defense

7     Expert Link?  Remembering, Mr. Barker, I can make rulings as I

8     get more familiar with what the witness is going to say, but

9     are there things that you think are properly resolvable now as

10    it relates to Link?

11         MR. BARKER:  No, Your Honor, I don't think there's

12    anything you can't resolve at the time of the hearing with

13    Ms. Link.

14         The only thing that I would say is I don't think that

15    she should be permitted to engage in conjecture about what

16    other prison officials were thinking.

17         THE COURT:  Yeah.  Well, generally, you correctly

18    cited the rules of evidence, but that's a game-time decision.

19    If Ms. McHugh or Ms. Van Wyk want to go there, maybe they can

20    think of a good reason, but that will be in context.  Thanks

21    for flagging that.  Just object at the time if you think

22    they're asking improper questions, okay?

23         MR. BARKER:  That's fine, Your Honor.

24         THE COURT:  Okay.  Ms. McHugh and Ms. Van Wyk, is

25    there anything you think I could resolve now -- remember, I can

1    resolve things as the witnesses testify -- that you think are

2    resolvable now in sort of a pretrial conference?

3              Can't hear you.  You're totally inaudible whoever is

4    speaking.

5              MS. VAN WYK:  I'm sorry.  That was Ms. Van Wyk, and I

6    inadvertently turned off my speaker instead of my mute.

7              I don't have anything on the issues that I was going

8    to address.

9              THE COURT:  Okay.  Ms. Van Wyk, in my experience in

10   the last 11 months, there has to be one technical glitch.  I

11   usually take care of that 50 percent of the time by forgetting

12   I'm on mute, but no worries.

13             Okay.  So I assume you speak for Ms. McHugh as well.

14   Nothing we can't deal with at the hearing, right?

15             MS. VAN WYK:  Your Honor, I'd like to have her speak

16   for herself because we're in different locations.

17             THE COURT:  Fine.  Sure.

18             MS. McHUGH:  Your Honor, I'm not sure if we raised

19   other motions in limine with respect to the testimony of the

20   victims, but I don't know if you're including that in that

21   question.

22             THE COURT:  Yeah.  I understand your position.  Your

23   position is that -- well, I'll say what I think it is, and

24   then, you know, you can say it better probably.

25             Your position is that the issue in front of me is one

1    of a constitutional ineffective assistance of counsel issue,

2    and what the victims think or they don't think is irrelevant to

3    that issue.  And, therefore, their testimony should be

4    precluded.

5              MS. McHUGH:  That's correct.  And I would also add to

6    that that, you know, just in response to one argument made by

7    the attorney general, which is that somehow we placed this

8    issue before the Court by the original reason, you know, the

9    original situation that happened before this hearing was

10   scheduled, which was whether or not the District Attorney's

11   Office would concede the claim.

12             And we did raise in our motions in limine that there

13   was one additional fact relevant to that discussion, which was

14   that there was a pretrial offer of life, which I presume had

15   been discussed with the family.

16             What the Court wants to make of that in terms of its

17   decision whether to, you know, accept any negotiations or

18   reject it, is we simply provided it as history of the case that

19   we thought the Court should be aware of.

20             But once this hearing starts and testimony is taken

21   on the constitutional issue, you know, whatever the victim's

22   opinion on that aspect was is no longer relevant.  It's a moot

23   point.  We're discussing a 6th Amendment claim, and, you know,

24   we're not trying to bring that into issue.  But we felt that,

25   since the Court's opinion mentioned the sudden change, that we

1    thought we should mention that.

2           But, you know, we will respect the Court's decision

3    on that, and if we're presenting a hearing on the 6th Amendment

4    claim, we're happy to do that.  But we do not think that

5    introduces this issue before the Court.

6           THE COURT:  Okay.  I understand.

7           Mr. Barker, do you want to be heard on this issue?

8           MR. BARKER:  Your Honor, I don't really have a whole

9    lot to add to what we put in our response to their motion.  The

10   reconsideration for the second time of the Court's decision not

11   to accept the settlement as it was called, you know, remains an

12   issue because the victims have a right to be heard on that

13   issue.  And as I said, I think the Court can easily separate

14   that from the ineffectiveness claim.

15          THE COURT:  Mr. George, do you want to be heard?

16          MR. GEORGE:  Well, I think we've made our position on

17   that clear.  I mean, I never would object to the attendance or

18   even the allocution of people who are survivors in a homicide

19   case.

20          I completely agree with the petitioner's point that

21   their opinion cannot be a factor in this Court's decision on

22   the issue that the Third Circuit remanded this case to this

23   Court to decide.

24          THE COURT:  Okay.  I think we're all in agreement,

25   and I can certainly, once I rule on the issue that I've been

1    directed to rule on by the Third Circuit, I'll say exactly how

2    I am basing my opinion or on what facts or law I'm basing my

3    opinion and what I'm not.  I don't want to reach any

4    conclusions now as to how the victim's family's views would

5    factor into that because we haven't developed a record yet.

6          But to be completely transparent, and I think I've

7    said this before so this should come as no surprise to anybody,

8    the issue of the victim's family's acquiescence, or the alleged

9    acquiescence, to the confession made by the DA's Office was

10   inserted in this case by the DA's Office, and we're going to

11   see that through and we're going to see how that plays out.

12         So that resolves that issue.  That's sort of a held

13   under advisement issue, and I think that generally addresses a

14   lot of things that we can address before we start teeing things

15   up.

16         I understand -- I hate to be insensitive.  I forget

17   which witness now has Covid and is sick.

18         MS. McHUGH:  Your Honor, this is Ms. McHugh.

19         Ms. Link, who was slated to testify next week on the

20   18th.  I can't say that she has Covid.  I'm certainly assuming

21   that based on my brief conversation with her.  But she's

22   extremely ill and would not be able to testify next week, and

23   so we would request to substitute Dr. Blumberg.  But she cannot

24   testify next week.

25         THE COURT:  Okay.  So we're going to just start with

1    Blumberg on the 18th.  Is that what you're saying?

2              MS. McHUGH:  Right.  That's correct.

3              MR. BARKER:  Your Honor, this is Jim Barker.  We have

4    a real problem with that.  First of all, we just got his report

5    yesterday, and Dr. O'Brien is not available on the 18th.

6              THE COURT:  Why?

7              MR. BARKER:  He has a hearing in Blair County.  We

8    were told that Dr. Blumberg was going to be testifying on the

9    25th, so we cleared his schedule for the 25th.

10             THE COURT:  Why does Dr. O'Brien have to be present?

11             MR. BARKER:  He wants to hear Dr. Blumberg's

12   testimony.

13             THE COURT:  Because he wants to factor it into his

14   opinion?

15             MR. BARKER:  Correct.

16             THE COURT:  We're going to have this -- there's so

17   many different variables here.

18             Steve, this is all going to be on the record, right?

19             THE DEPUTY CLERK:  Yes, sir.

20             THE COURT:  So, Mr. Barker, you know, Ms. Link is

21   sick.  So what's going to happen, and I think this is a

22   work-around, I'm going to order the testimony of Blumberg, who

23   is going to testify on the 18th, to be transcribed in an

24   expedited fashion so that your expert, Dr. O'Brien, can have

25   the benefit of reviewing that before he testifies.

1          Does that work?

2          MR. BARKER:  Your Honor, part of the problem, too, is

3   that I need Dr. O'Brien's assistance for cross-examination

4   purposes.  As I said, I'm still being given, you know, less

5   than a week to prepare cross-examination of the psychiatrist.

6          THE COURT:  Well, you can do it.  I hear what you're

7   saying.  We're going forward with Dr. Blumberg on the 18th.

8   I'll get you the transcript so that Dr. O'Brien can review it.

9   And if you can make a pitch to me, and I'll listen with an open

10  mind, Mr. Barker, that somehow you need to ask more questions

11  of Blumberg because you didn't have O'Brien there, then maybe

12  we'll bring Blumberg back and I'll let you ask further

13  questions.  Blumberg's testifying on the 18th with those

14  arrangements made.

15          So what else can I resolve for you folks?  I want to

16  say to Ms. McHugh and Ms. Van Wyk, it would be preferable if we

17  can keep the same schedule, but if we can't, that's what we're

18  going to do, okay?

19          MS. McHUGH:  Yes, Your Honor.  This is Ms. McHugh.  I

20  plan to try to touch base with her before the 18th to find out

21  what her condition is so I can inform the Court at that time.

22          THE COURT:  The first call you make as to her status

23  is to Mr. Barker, not me, okay?

24          MS. McHUGH:  Oh, okay.

25          THE COURT:  And in case I wasn't clear on the victim

1    family issue, I think I was, anyone from the victim's family

2    who wants to be heard will be heard.

3             So what else can I do for you folks to get us ready

4    for this hearing?

5             MR. BARKER:  Your Honor, the only other issue was

6    that Mr. Cannon told us that he was skeptical of the

7    misconduct, the implements of escape, and that he had sort of

8    changed his opinion on that and that he believes now that he

9    would challenge that because they didn't take photographs of

10   the alleged handcuff key that was improvised by Mr. Wharton.

11            As a result of that, we went out and found two of the

12   corrections officers who were involved in those proceedings,

13   and we would like to call them to the stand because that

14   contradicts the conjecture that apparently Mr. Cannon is

15   relying on Ms. Link for.  And our view is that we have two

16   direct witnesses to that, and they're very clear that this was

17   a handcuff key.  So we would like to call --

18            THE COURT:  We're just going to have to wait and see

19   how things develop.  I can't make a decision on -- that's based

20   on what Cannon says and what Link says, and I haven't even

21   heard from either of them.  It's a legitimate thought and hold

22   it.  I just can't rule on that right now whether those

23   witnesses can testify.  And logistically I understand this is a

24   nightmare, but we can just reschedule and make it work.  We're

25   all just going to have to be flexible.

1        I want the defense to know, I think the defense,

2   Ms. McHugh and Ms. Van Wyk -- and thank you, Mr. Barker, for

3   bringing that to my attention -- I am completely unfamiliar

4   with the concept of a lawyer who can avail themselves, that is,

5   Mr. Cannon, from traveling out of state insisting to be heard

6   live when most of the litigation world is doing this by Zoom

7   and putting in the request to the federal marshals that they

8   reimburse him for his travel expenses.

9        I am not saying that won't happen, but I want whoever

10  is interfacing with Mr. Cannon, I want you to tell him that I

11  am not blessing that and I'm not preemptively agreeing to it,

12  not because I'm trying to be difficult, but because I just

13  don't know whether it's permissible or not.  And I've never had

14  a request like this before.  I need to interface with the

15  United States Marshals and see if this is going to be a

16  problem, and I haven't had a chance to do that.  So I'm not

17  getting involved in Mr. Cannon's travel arrangements, but I

18  just want everyone to know this is not going to be rubber

19  stamped.  And I just don't know how this is going to play out.

20       So I'll try to look into this Tuesday and see.  I

21  guess I'll call the marshals and say here's my situation.  He's

22  subpoenaed.  I suppose the defense is going to subpoena him.

23  So if he's subpoenaed, are you going to pay for his travel

24  arrangements?  I'm happy to make that call Tuesday, but in the

25  interim, I just want everyone to know I don't know how this is

1  going to turn out, okay?

2          MS. McHUGH:  I understand, Your Honor.  This is

3  Ms. McHugh.  I just want to clarify something, that this

4  petition to the marshals is my request because I'm not

5  permitted to pay for his travel to come to court as a fact

6  witness.  He's not an expert witness that we're authorized to

7  do that for.

8          In other hearings in the federal system, this is how

9  this has been done.  We did not request that the marshals

10 subpoena him simply because he's been a cooperative witness,

11 and I didn't think that was necessary, especially since he was

12 an officer of the court.  However, I can, you know, amend that

13 motion to ask them to subpoena, if that's a requirement.

14         I was trying to reach the marshals yesterday to

15 clarify some of these issues.  In other cases where we've

16 requested this for fact witnesses, you know, the marshals

17 offices do it in different ways in different jurisdictions, so

18 I was trying to clarify that issue.

19         THE COURT:  Okay.  Who was just speaking?

20 Ms. McHugh?

21         MS. McHUGH:  Yes, it is.

22         THE COURT:  Ms. McHugh, I appreciate that.  I'm going

23 to stand down then in the hopes that you can clarify this.  And

24 if you can't and you need my intervention, you'll let me know

25 okay?

1          MS. McHUGH:  Yes.  I will say that the marshals will

2     require an order to do the things, but I'll try to get in touch

3     with them to find out how they prefer to do that.

4          THE COURT:  Yeah.  And if you need me to sign an

5     order, tell me who I have to interface with and who you've been

6     talking to and all that to make our life easier.

7          MS. McHUGH:  I understand.  And, Your Honor, if

8     there's one issue that I could address with respect to what

9     Mr. Barker said about the additional corrections officer

10    witnesses, I understand the Court wants to make a decision

11    later after you've heard some of the evidence as to whether

12    their testimony will be necessary.

13         I want to alert the Court that we have not received a

14    statement from these witnesses, and I may have additional

15    motions in limine because, just based on the proffer that was

16    submitted, it appears that a lot of their testimony would be

17    inappropriate for other evidentiary reasons.

18         THE COURT:  Understood.  Understood.  Understood.

19    You're five steps ahead of me.  Understood.  You won't need to

20    file anything in writing.  We can just talk it through, okay?

21    But thank you for the heads-up.

22         MS. McHUGH:  Thank you.

23         THE COURT:  Okay.  Anything else that I can help you

24    folks with in between now and the 18th?  If something else

25    comes up, I trust all the lawyers to use their judgment.  I

1    don't want to micromanage you, but you have an obligation in

2    Federal Court to meet and confer and try to resolve things on

3    your own.  But if you can't resolve them and it would make your

4    life easier for me to step in and give you clarity before the

5    18th, you can email Samantha, my law clerk, and I'll try to

6    help you out so we can have some productive time on the 18th.

7              All right.  Thank you, everyone.  One at a time.

8              MS. MAHLER:  Go ahead, Mr. George.

9              MR. GEORGE:  I just wanted to alert the Court that we

10   would like to -- the Commonwealth would like to avail itself of

11   your offer before to participate remotely.  I don't know if one

12   or both of us will be present on the 18th, but we will do that

13   remotely with this Court's permission.  I just wanted to

14   mention that when Ms. Waims testifies, if she testifies, it

15   would be our request that she also be permitted to testify

16   remotely.

17             THE COURT:  We'll make whatever arrangements we can,

18   Mr. George, to make everyone comfortable.

19             MR. GEORGE:  Thank you.

20             THE COURT:  Of course.

21             MS. MAHLER:  Your Honor, this is Cari Mahler, if I

22   may.  Just to confirm we're on the same page for the 18th, the

23   defense is presenting Dr. Blumberg first and actually not Link.

24   I'm only asking because I'm overnighting exhibit binders.

25             THE COURT:  My understanding is that the preferable

 1   course is that Link testifies if health permits as scheduled.

 2   If she can't, we're going to insert Blumberg in on the 18th,

 3   and you're going to use your judgment to -- I'm sorry.

 4   Mr. Wharton's counsel is going to use their best judgment as to

 5   when that decision can be made and alert the lawyers as soon as

 6   possible.  I prefer to keep the same schedule, but if Link is

 7   sick, we're going to go with Blumberg, okay?

 8            MS. MAHLER:  Okay.  Thank you, Your Honor.

 9            THE LAW CLERK:  Judge, this is Sam.  I just wanted to

10   raise one thing that I thought about maybe discussing.

11   Ms. Mahler had asked about some family members beyond those who

12   are going to testify basically wondering if the video link that

13   we provided is available for anyone from the defendant's family

14   to join.

15            THE COURT:  You know, even though we're in a Covid

16   situation, this is a public proceeding.  I cannot preclude

17   anyone from the public, a person on the street, from

18   participating, and so I'm going to -- I'll talk to Steve, Sam.

19            THE DEPUTY CLERK:  Judge, not to cut you off, but I

20   talked to our IT folks right before we got on the phone today

21   at 1:00.  What they'll do, we have the link that we sent to

22   counsel, or Sam sent to counsel, I think last week or the week

23   before.  What we will do is we will send a second link out for

24   nonparticipants.

25            So that will be a link where they can see what's

1  going on, but their audio will be muted.  So they won't be able

2  to speak, but they'll be able to watch everything, you know, as

3  if they were in person.  So that's a link that we can send out

4  Tuesday or Wednesday next week.  That's for anybody that wants

5  to.  Again, that's a nonparticipant.  We'll get that out next

6  week.

7              MS. VAN WYK:  Your Honor, this is Ms. Van Wyk.  I

8  have a related request.  Dr. Blumberg has some medical

9  residents who are his students in forensic psychiatry that

10 would like to observe.

11             Could they avail themselves of this same link that

12 Mr. Sonnie will send out?

13             THE COURT:  Yeah.  The proceeding is open to the

14 public, so yeah.

15             MS. VAN WYK:  Thank you.

16             THE DEPUTY CLERK:  We'll send it out.  We'll

17 highlight the fact that this is a nonparticipant link, and then

18 you folks, as far as I know, you can send that to anybody you

19 want.  Whoever they are, they can click into that link and

20 observe the proceedings.

21             MS. VAN WYK:  Okay.  Thank you very much.

22             THE DEPUTY CLERK:  Yeah, sure.

23             THE COURT:  Everyone have a nice weekend.  Take care.

24 Thanks for your time.

25                    (Proceedings adjourned at 2:26 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.


*Shannan Gagliardi*   3/16/21

Shannan Gagliardi, RDR, CRR