**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT WHARTON** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 01-6049** |
| | : | |
| **DONALD T. VAUGHN** | : | |

**COMMONWEALTH'S POST-HEARING BRIEF**

## I.     Preliminary Observations

Few things are more unpredictable than an individual juror's response, when asked to decide whether another person should live or die.  *Compare* United States v. Moussaoui, 382 F.3d 453, 457 (4th Cir. 2004) (Jury returns unanimous life sentence where defendant's actions "result[ed] in the deaths of thousands of persons on September 11, 2001") *with* Commonwealth v. Rainey, 928 A.2d 215, 221 (Pa. 2007) (death sentence imposed after jury finds three mitigators (age 18, absence of criminal history, catchall mitigator) and one aggravator (murder committed during the course of a felony)); Commonwealth v. Antoine Ligons, 971 A.2d 1125, 1134 (Pa. 2009) (jury finds *no* mitigating circumstances and imposes death, where Commonwealth asserted one aggravator (killing during perpetration of felony) and where defense asserted three mitigators (age 19, no significant criminal history, and catchall)).  Where any individual human being's reaction to a life and death decision remains uncertain, and where the question presented here admits of no mathematical, "hard science" answer, three factors should inform this court's decision.

### A.      The prior jury had great difficulty reaching a verdict

Despite the inherent difficulties, if there is any way to rationally predict how each juror would respond to new mitigation evidence, it is by assessing the degree of difficulty a jury already experienced in returning a death sentence, without the additional information.   Here, as the Court of Appeals observed, defendant's second penalty phase jury had great difficulty reaching a verdict. Wharton v. Vaughn, 722 F. App'x 268, 283 (3d Cir. 2018).   As trial counsel testified, the jury was out for three days.  (N.T. 2/25/21 at 127) ("there were one or more persons on that jury who were not prepared over three days to vote for death").   At one point, the jury announced that it was deadlocked.   (N.T. 12/21/92 at 12-13); Wharton, at 283 ("the jury at the second penalty hearing was deadlocked at one point").

As trial counsel also explained, where a human life hung in the balance, many Philadelphia judges would have taken the case from a deadlocked jury. Here, however, the trial court sent the jury back for another full day of deliberations.  (N.T. 3/8/21 at 70-73).  Significantly, the jury's inability to decide persisted, despite a 17 day presentation where the Commonwealth essentially retried defendant for the underlying offenses and introduced all of the horrible facts of his crimes.  (N.T. 2/25/21 at 118-119).

Where despite these circumstances, there were one or more jurors who held out during three days before agreeing on death, any reviewing court should be extremely wary of assuming that every juror would have discounted evidence of defendant's prison adjustment.  As Justice Stevens' concurrence in Fry v.

Pliler, 551 U.S. 112, 125 (2007) sensibly notes, a jury's uncertainty in reaching a verdict should be a significant factor in determining whether an error affected the outcome of a trial.  *Id.* at 125 (jury's "evident uncertainty in reaching a verdict" creates a "near-conclusive presumption" that error was not harmless) *citing* Kennedy v. Lockyer, 379 F.3d 1041, 1056, n.18 (9th Cir. 2004) ("From the fact that the first trial ended in a mistrial, as well as the fact that the jury deliberated for a considerable amount of time in the second trial, we infer that the question as to [the defendant's] guilt or innocence was a close one in both trials"); Powell v. Collins, 332 F.3d 376, 401 (6th Cir. 2003) (finding prejudicial error in a habeas case in part because the jury at one point told the court that it was "at a stalemate"); United States v. Varoudakis, 233 F.3d 113, 127 (1st Cir. 2000) (noting, in weighing harmlessness, that "the jury's 'impasse' note reveals uncertainty about [the defendant's] guilt"); United States v. Ottersburg, 76 F.3d 137, 140 (7th Cir. 1996) ("The length of the jury's deliberations makes clear that this case was not an easy one"); Medina v. Barnes, 71 F.3d 363, 369 (10th Cir. 1995) (finding prejudice in a habeas case where "at one point during their deliberations, the jurors indicated that they might be unable to reach a unanimous verdict").  Where, as here, the question is one of life or death rather than simply a defendant's guilt, the jury's prior struggle to reach a decision is entitled to even more weight.

One more aspect of the original jury's deliberations is worthy of note.  At least some members of defendant's jury expressed interest in exactly the type of information that counsel failed to present—defendant's behavior *after* the

crimes.  In assessing the weight of defendant's character evidence, the jury specifically asked whether it could consider defendant's behavior after the crime, or simply his character as it existed at the time of the crime.  (N.T. 12/22/92 at 10).

### B.    Defense counsel's opinion on the significance of prison adjustment

Nearly thirty years later, in 2021, trial counsel is the only living professional who was actually present at the penalty hearing and who is in a position to gauge, from direct experience, the potential impact of the mitigation evidence.  Although this was counsel's first death penalty case, he had been a practicing attorney for 16 years, both as a prosecutor and as a defense attorney. (N.T. 2/25/21 at 106, 166).  As counsel explained, he believed the prison records were "extremely favorable".  (N.T. 2/25/21 at 132).  He was "so regretful" that he had not presented them.  (N.T. 2/25/21 at 139, 163).  He "unequivocally" believed that they would have made a difference.  (N.T.  3/8/21 at 73).

Despite attempts to portray him as someone who would, in truth, have forgone presentation of these records for fear of the potential Commonwealth response, counsel repeatedly testified that he would have introduced the records. He also asserted his belief that he could have effectively addressed any rebuttal evidence. (N.T. 2/21/21 at 132-133, 139, 148, 154, 163, 165).  This testimony, from an attorney who participated in jury selection and then personally addressed the jury, should not be lightly discounted.

**C.    The difficulties inherent in conducting this review**

One additional factor should inform this Court's analysis.  The question here is not how a collateral review court itself would decide the question.  Rather, the prejudice inquiry focuses on the effect the same evidence would have on a hypothetical new jury.  <u>Saranchak v. Beard</u>, 616 F.3d 292, 309 (3d Cir. 2010) (state court erroneously upheld the PCRA court's decision by considering the effect that the new evidence would have on the particular judge rather than "considering, more abstractly, the effect the same evidence would have had on an unspecified, objective factfinder").  Accordingly, rather than considering how it would it personally assess the evidence of defendant's prison adjustment, this court must undertake the far more imprecise task of deciding how every juror, among twelve otherwise unknown persons, would factor the new evidence into a life and death decision.

**II.    Trial Counsel's Failure to Investigate and Present Evidence of Defendant's Positive Adjustment in State Prison Constituted Ineffective Assistance of Counsel.**

"To prevail on this claim, Wharton must show that (1) [trial counsel] acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence, and (2) had [counsel] presented that evidence at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty."  <u>Wharton</u>, 722 F. App'x at 281. For the following reasons, it is the Commonwealth's view that defendant has made that showing.

### A.      Counsel acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence.

Death penalty counsel must make "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins v. Smith, 539 U.S. 510, 524 (2003); Blystone v. Horn, 664 F.3d 397, 420 (3d Cir. 2011). Prior to the evidentiary hearing, defendant made a *prima facie* showing that counsel's failure to investigate his prison records was unreasonable. Wharton, 722 F. App'x at 282. As the Court of Appeals observed, "[I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing." Wharton, at 282 *quoting* Blystone, 664 F.3d at 420 (emphasis in original).

Based on his testimony, there can be little question that counsel's failure to investigate defendant's prison records was unreasonable. Counsel was court-appointed. (N.T. 2/25/21 at 105). This was his first case representing a defendant at a death penalty hearing. (N.T. 2/25/21 at 106). He did not request court funding for co-counsel or a mitigation specialist. (N.T. 2/25/21 at 115) ("I would not know at that time what a mitigation expert was"). He did not consult any experts. (N.T. 2/25/21 at 116). His failure to order the prison records was not a strategic decision. (N.T. 2/15/21 at 131-132). He did not realize that Skipper v. South Carolina, 476 U.S. 1 (1986), permitted a defendant to introduce prison records to demonstrate positive adjustment. (N.T. 2/25/21 at 166).

Importantly, counsel did not perform deficiently here because he is a "bad lawyer." Rather, defendant's 1992 penalty hearing occurred between 1980 and 2012. During that time, due to the systemic lack of meaningful compensation, training, or support for court-appointed counsel, *this was a period of institutionalized ineffective assistance of counsel in Philadelphia*. We draw this conclusion based upon the Commonwealth's study of 155 death sentences imposed in Philadelphia County, 152 of which were imposed between 1980 and 2012.[1]

This study revealed two facts about the compensation, training, and support afforded to court-appointed counsel between 1980 and 2012.

First, compensation for court appointed counsel was "woefully inadequate". In 2011, the Pennsylvania Supreme Court appointed Judge Benjamin Lerner to study the issue of compensation for court-appointed counsel in Philadelphia capital cases. Commonwealth v. McGarrell, 77 E.M. 2011, 2012 Pa. LEXIS 2854 (2/21/12). The Lerner Report confirmed that, from 1980 to 2012, the Philadelphia Court of Common Pleas paid court-appointed attorneys only $1800 to prepare a capital case and $400 for each day of trial. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3, *17. By contrast, according to a 2010 report, the median cost for the defense of an authorized federal death penalty

---

[1] The Commonwealth's study excluded a limited group of Philadelphia capital cases: (1) death penalties that were overturned *after* Lawrence S. Krasner became District Attorney, (2) cases where the defendant died in custody before the resolution of his post-conviction claims, and (3) the case of Gary Heidnik, the only Philadelphia defendant who filed no post-conviction appeals.

was $353,185.  <u>Report to the Committee on Defender Services on the Cost and</u> <u>Quality of Defense Representation in Federal Death Penalty Cases</u> (2010), at 24. (A copy of this Report is attached here as Appendix A.)

Significantly, the preparation fee for court-appointed counsel in Philadelphia was a flat fee.  It remained constant no matter how much or how little work the attorney did preparing for trial.  <u>Lerner Report</u>, 2012 Pa. LEXIS 2854, at 10.  In other words, if counsel spent hours interviewing the defendant's family, acquiring social history records, and consulting with experts, counsel received the same payment as an attorney who did nothing to prepare for the penalty phase.

As the Lerner Report also explained, the Philadelphia system was "completely inconsistent with how competent trial lawyers work." <u>Lerner Report</u>, 2012 Pa. LEXIS 2854, at *17.  The compensation system actually "punishe[d]" counsel for properly handling death penalty cases.  *Id.* at *27.  Specifically, the Philadelphia system provided a financial incentive for an attorney to engage in minimal pretrial preparation and encouraged the attorney to take the case to trial, even though for most capitally charged defendants the best outcome is often a non-trial resolution.  *Id.* at *17-*18, *27.[2]

Second, as trial counsel's testimony reflected, the system provided virtually no support in that era for court-appointed counsel.  No training existed,

---

[2]    In fact, if a capital case resulted in a negotiated guilty plea and life sentence, the court-appointed attorney would not only *not* receive any compensation beyond the original preparation fee, but even that payment would be reduced by a third.  *Id.* at *17.

even for someone such as trial counsel here, who was handling his first penalty phase case. (N.T. 2/25/21 at 113-114). The judges were reluctant to provide funding for experts. (N.T. 2/25/21 at 115-116). When asked about the budget for death cases in Philadelphia, counsel explained that, in that era, "the judges [were] pretty stingy." (N.T. 2/25/21 at 114-115). The court would typically allot $150 to $250 for court-appointed counsel to hire an investigator. (N.T. 2/25/21 at 115-116). The system began to provide a second attorney only in 2002, ten years after defendant's penalty hearing. <u>Lerner Report</u>, 2012 Pa. LEXIS 2854, at *9. As trial counsel here poignantly stated, "I was alone." (N.T. 3/8/21 at 74).

Although these systemic deficiencies are shocking, the result was not:

### 1.   *Most Philadelphia death sentences have been overturned*

As of January 1, 2018, **72%** of the 155 Philadelphia death sentences (112 out of 155) had been overturned at some stage of post-conviction review. (A list of the 112 overturned death sentences appears here in Appendix B, Part I, Sections A-B.) Over a dozen capital sentences that were still in place at the time of this study have since been overturned, bringing the total number of overturned Philadelphia death penalties even higher. Like this case, any capital sentence that has not been overturned remains in some stage of post-conviction review.

2. ***Most Philadelphia death sentences were overturned due to ineffective assistance of counsel***.

**66%** of the 112 overturned death sentences (74 out of 112) were specifically overturned because of ineffective assistance of trial counsel. Predictably, in **78%** (58 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the defendant was represented by court-appointed counsel—i.e., an attorney selected by the court to represent an indigent defendant.  (The 74 death sentences overturned due to ineffective assistance of counsel are listed in Appendix B, Part I, Section A(1).  The 58 cases where court-appointed counsel provided the ineffective assistance appear at Appendix B, Part I, Section A(2).)

3. ***The most common reason for a finding of ineffective assistance was counsel's failure to prepare a mitigation presentation.***

In **51%** (38 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the reviewing court specifically based its determination on trial counsel's failure to prepare and present a constitutionally acceptable mitigation presentation.  The 38 cases where court-appointed counsel failed to prepare an adequate mitigation presentation are listed in Appendix B, Part I, Section A(3).)

The repeated findings of ineffectiveness admit of only one explanation. They are directly related to the "woefully inadequate" preparation fee and the structural failure of the system to provide training, support, and resources for the attorneys chosen by the system to represent indigent defendants.

### 4. *Nearly all of the Philadelphia defendants who remained on death row in 2018 were persons of color represented by court-appointed counsel.*

Disturbingly, **91%** (41 out of 45) of the Philadelphia defendants on death row in 2018 (when Mr. Krasner took office) were, like defendant here, members of a racial minority group. **82%** (37 out of 45) of these defendants were, like defendant, African American. (A list of the individuals who remained on death row in 2018 appears in Appendix B, Part II.) In addition, **80%** (36 out of 45) of the Philadelphia defendants on death row in 2018 were, like defendant, represented by court-appointed counsel. (A list of the defendants represented by court-appointed counsel who remained on death row in 2018 appears in Appendix B, Part II, Section B.)[3]

### 5. *Nearly all of the systemic deficiencies between 1980 and 2012 were operative in this case.*

Defendant Wharton's case exemplifies nearly all of the systemic problems described above.

---

[3]     To complete the picture, it must also be noted that **62%** (28 out of 45) of the capitally sentenced Philadelphia defendants on death row in 2018 were represented by an attorney whom a reviewing court found to be ineffective in at least one other Philadelphia capital case. (A list of the persons on death row who were represented by an attorney who has been deemed ineffective in another capital case appears in Appendix B, Part II, Section C.) As the Lerner Report explains, given the "grossly inadequate" compensation and support, there were simply not enough qualified attorneys who were willing to accept appointments to such demanding cases. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3. Although no court has determined that counsel here provided ineffective assistance in another capital case, the system nevertheless appointed an attorney with no prior experience to present a penalty phase defense in a particularly challenging case. Soon afterward, like many similarly situated attorneys, he ceased to accept court appointments in capital cases. (N.T. 2/25/21 at 170).

Like most Philadelphia defendants still on death row, defendant is an indigent person of color represented by court-appointed counsel. His penalty hearing occurred in December, 1992, during the period of woefully inadequate funding and support. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3, *17.

As noted above, although this was counsel's first case representing a defendant in a death penalty hearing, he received no training. No second chair attorney assisted him. He lacked *all* of the other resources that would be standard in any capital proceedings today. He did not have a penalty phase investigator, a mitigation specialist, or a social worker. He did not retain any experts. He did not have a strategic reason to proceed without such assistance. As a result, counsel presented the type of mitigation that was characteristic of the era. He called defendant's relatives, all of whom gave abbreviated testimony about defendant's character and asked for mercy. (N.T. 2/25/21 at 123).

**B.    Defendant was prejudiced by counsel's inaction.**

Before deciding whether the introduction of defendant's prison records from 1986 to 1992 would create a reasonable probability of a different outcome, two threshold aspects of this question must be addressed.

First, the question here is *not* whether defendant committed terrible crimes before his incarceration. One cannot evaluate whether inmates have adjusted well to prison *after* incarceration based on the gravity of the offenses they committed *before* conviction. Despite the "common sense" mantra relied upon by the Friend of the Court's (FC's) expert ("past behavior is the best single predictor of future behavior"), many defendants who commit serious crimes

become well-adjusted inmates.  (N.T. 3/16/21 at 53, 57, 68; N.T. 5/8/21 at 72-73).  Therefore, it cannot be argued that defendant was incapable of making a positive adjustment to prison, based on either the facts underlying his murder case or his subsequent escape attempt.  Indeed, as his prison records indicate, defendant has been problem free for the last three decades.  (N.T. 2/25/21 at 93-98; N.T. 8/5/21 at 73).

Moreover, the facts of defendant's escape would have been admissible, whether or not defendant introduced evidence of positive prison adjustment.  Those facts could have been used either to establish the aggravators or to rebut the defense's character evidence.  *See e.g.* Commonwealth v. Sattazahn, 763 A.2d 359, 369 (Pa. 2000); Commonwealth v. Williams, 660 A.2d 1316, 1323 (Pa. 1995) (jury may consider all of defendant's existing convictions, including crimes committed after the crime at issue).  They would not, however, have been admissible to prove that defendant had a negative adjustment to state prison after the commission of those crimes.

Therefore, the facts underlying defendant's pre-state-prison escape attempt are relevant to the question presented here only in one respect: Would evidence regarding defendant's earlier escape have so enhanced the significance of defendant's subsequent handcuff key infractions (which occurred within a five day period in 1989) to the point that every juror would have (a) disregarded the remaining six years of defendant's overall positive adjustment, and (b) concluded that defendant posed a long term threat of future dangerousness?

13

Second, as the Supreme Court has explained, evidence of positive prison adjustment is significant in two different ways.  On one hand, in and of itself, evidence that a prisoner has adjusted positively during time already served is potentially mitigating.  Skipper, 476 U.S. at 5 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination").  Thus, as the Skipper court determined, it was error for the trial court to preclude evidence that appellant conducted himself well in prison, even though he had only been in jail for the 7½ months between his arrest and trial.  Skipper, 476 U.S. at 3.

On the other hand, and even more importantly, evidence regarding prison adjustment enables the jury to estimate what the defendant's *future* behavior will be.  As the Supreme Court explained:

> Consideration of a defendant's past conduct as indicative of his probable *future behavior* is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."

Skipper, at 5 *quoting* Jurek v. Texas, 428 U.S. 262, 275 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.) (emphasis added); *see also* Commonwealth v. Green, 581 A.2d 544, 562–563 (Pa. 1990) ("[E]vidence bearing on a defendant's behavior in jail, and hence, upon his likely future behavior in prison, might affect a jury's decision to impose a death sentence").

Hence, the question here is not simply whether defendant adjusted positively between his two penalty hearings.  The question is also how the jury—

14

had it been informed of defendant's adjustment—would have assessed defendant's "likely future behavior".

Here, of course, we now know that any expert who, in 1992, led the jury to believe that defendant was likely to be a disruptive, future danger in the prison setting, would have been wrong. In the intervening three decades, defendant has been a problem free inmate. (N.T. 2/25/21 at 93-98; N.T. 8/5/21 at 73). Despite this knowledge, the FC argues that, in 1992, the Commonwealth could have persuaded every juror to vote for death on the basis of a subsequently disproven prediction that he would be a future problem.

With these threshold considerations in mind, the question of prejudice may be examined. On the basis of the evidence adduced at the evidentiary hearing, there is a reasonable probability that at least one juror would have voted for life. Four arguments support this conclusion.

### 1. *The jury deliberated for three days despite the facts of this case.*

First, it must be recalled that, for 17 days, this jury listened to the horrible facts of the murders here. (N.T. 2/25/21 at 118). Such proceedings pose unique problems for the defense. The defendant can no longer contest guilt and there is no role for residual doubt. Moreover, unlike a combined guilt and penalty phase trial, the jury cannot register its indignation by finding a defendant guilty, yet still exercise mercy at the penalty phase. In contrast, in a stand-alone penalty trial, there is a genuine concern that, to the jury, a life sentence will viscerally seem like an acquittal.

15

Here, despite these factors, defendant's jury was out for three days and at one point announced that it was deadlocked.  Where the emotional impact of the facts surrounding these murders (about which the jury was fully informed) is so much greater than the facts surrounding his escape and his possession of the handcuff key, and where a death qualified jury nevertheless struggled to reach a verdict, it cannot be concluded that those additional facts would nullify the impact of six years of largely positive prison adjustment, in the mind of every juror.

### 2.     *Reputable experts disagreed on the whether defendant adjusted positively to state prison.*

Second, both sides presented the opinion testimony of experts, each of whom was qualified in their respective field.  Each expert adhered to their opinion despite cross-examination.  Although they did not agree, each expert supported their opinion with evidence from defendant's prison records.

Significantly, the FC's prison expert agreed with the defense that four of defendant's prison infractions were non-violent and non-serious.  (N.T. 5/11/21 at 19) ("four of them taken individually, seemed rather minor").  However, both FC experts contend that his two handcuff key infractions, occurring during a five day period, invalidate the remaining six years of defendant's incarceration and prove that he did not and would not adjust positively to prison.  Two equally qualified defense experts reached the opposite conclusion.  To them, these non-violent infractions did not negate his six years of otherwise acceptable conduct.

The question then becomes: Where equally qualified experts differ, would each and every juror, in a group that deliberated over the course of three days

and was at one point deadlocked, agree with the FC's experts and determine that defendant was poorly adjusted?  Or would one juror, who had at one point voted for life, adhere to that position on the basis of the defense experts' testimony regarding his remaining six years of acceptable prison behavior?  Although there can be no mathematically certain answer to this question, there is a reasonable probability that one juror—who already held out for life for three days in the face of the Commonwealth's 17 day presentation regarding the facts of these murders—would have credited the defense experts and maintained that position.  As trial counsel observed, the experts "would have been an even match".  (N.T. 2/25/21 at 165).

### 3.   *At least one juror might have credited the defense experts.*

Third, there are substantial reasons why one juror could have credited the defense experts, rather than those of the FC.   During FC expert Beard's testimony, it became clear that, in his mind, once prison officials discovered that an inmate with a prior escape conviction possessed a homemade handcuff key, nothing could ever demonstrate positive adjustment.  From then on, despite any prior or future evidence of positive adjustment, defendant would remain "poorly adjusted."[4]   For Beard, even defendant's use of the prison-instituted grievance procedure became evidence of poor adjustment.  (N.T. 5/11/21 at 61, 121).

---

[4]      As the Court of Appeals observed, "Most of [defendant's prison] evaluations … were positive.  Although they were brief and did not provide much in the way of specifics, they indicated that Wharton was adjusting well to prison life and that his behavior was generally satisfactory."  Wharton, *supra*, 722 F. App'x 268, 283.

Strangely, even if defendant had never possessed the handcuff key, Beard's assessment of defendant's prison adjustment "would still be a negative". (N.T. 5/11/21 at 69).

In view of Beard's transparent unwillingness to concede anything positive about defendant's prison record, there is a reasonable probability that at least one juror would view him as biased and reject his conclusion that two infractions over a five day period indelibly stamped defendant as a violent and poorly behaved inmate.[5]

For similar reasons, at least one juror might have questioned FC expert O'Brien's conclusions.  O'Brien was willing to opine that the prognosis for defendant's future adjustment was poor.  (N.T. 3/16/21 at 9-10) (defendant's "behavioral transgression" in prison "was consistent with surreptitious future planning while portraying himself as polite, pleasant, and well-adjusted").  If called as a witness at defendant's 1992 penalty hearing, he would have so testified.  (N.T. 3/8/21 at 41-42).  Yet, although he says *today* that he would have so testified *then,* he displayed no interest in what defendant's actual adjustment had been.  When asked if he had reviewed records of defendant's adjustment between 1992 and 2021, he acknowledged that he had not.  (N.T. 3/16/21 at 64).  Thus, although he would have told the 1992 jury that

---

[5]     Even expert Beard seemed to tentatively modify his assessment when he learned, apparently for the first time, that defendant had no misconducts for the past three decades.  (N.T. 5/11/21 at 73-74) ("I think if he hasn't had any misconducts, I think that's very commendable.  I think that's a good thing, but that's not what I looked at.  And I have no knowledge of what he's done or hasn't done since then.").

defendant's prognosis was poor, he was apparently unconcerned about the accuracy of his prediction.

### 4.  *The artificiality of the question*

Fourth, the Commonwealth must once again highlight the artificiality of the question, as formulated by both the Court and the FC.  As this Court has noted, this is a matter of life and death.  We now know that, however well intentioned, any opinions offered in 1992 about defendant's poor prognosis for positive prison adjustment would have been wrong.  We also know that, if defendant received a new penalty hearing, the defense would inform an objective factfinder that defendant's behavior has been unremarkable for nearly 30 years—a fact that no one would be able to credibly deny.  Under these circumstances, there is a reasonable probability that 30 years of positive behavior would negate any evidence pertaining to defendant's 1989 infractions and his earlier escape.

Yet, the FC continues to ignore this reality and to object to the inclusion of any evidence of defendant's subsequent adjustment.  Instead, the FC argues that its experts' *incorrect* assessments/predictions would have convinced the 1992 jury to vote for death.  In the Commonwealth's view, the FC's position is not only misguided, it belies common sense.

## III.  Commonwealth's Renewed Objection to these Proceedings

The Commonwealth renews its objection to what is, in effect, the appointment of a substitute prosecutor to conduct the evidentiary hearing required by the Court of Appeals.  This Court appointed the FC to submit an

19

amicus brief "on the issue of whether relief should be granted on Petitioner's remaining habeas claim based on the current record or whether the record before me should be expanded." Order (5/7/19) Document 165, at 4. Its Order did not instruct the FC to adopt any particular position. Nevertheless, all along, this Court evidently expected that the FC would adopt "the other side" and oppose relief. (N.T. 8/5/21 at 129) ("I don't have both sides, which is why I invited the AG's Office in and they've made objections and asked me to do things").

From the day of its appointment, the FC has far exceeded the role of a traditional court-appointed amicus and acted instead as a partisan party-opponent. It never behaved as an amicus from whom a court has requested an objective opinion. It did not act as "'an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one or another party.'" Sciotto v. Marple Newtown Sch. Dist., 70 F. Supp. 2d 553, 554 (E.D. Pa. 1999) *see also* Linker v. Custom-Bilt Machinery Inc., 594 F. Supp. 894, 897-98 (E.D. Pa. 1984) ("'an amicus who argues facts should rarely be welcomed.'"). To the contrary, both before and during the evidentiary hearing, the FC has acted as an unvarnished advocate, ignoring anything positive about the Commonwealth's position and accentuating, for effect, anything that could be said in opposition to penalty phase relief.

The examples are numerous. The FC questioned the defense expert about such topics as defendant's poor elementary school attendance. (N.T. 2/25/21

at 57-60).  Despite its own expert's concession to the contrary, it attempted to exaggerate the gravity of defendant's practicing-karate infraction (while defendant was in a caged exercise area).  (N.T. 3/8/21 at 53; N.T. 3/16/21 at 77).  It sought to cleanse the record of any reference to defendant's positive adjustment, during the three decades since his second penalty hearing.  It subjected trial counsel to tendentious cross-examination, plainly suggesting that, contrary to his testimony, he would not actually have introduced defendant's prison records.  (N.T. 3/8/21 at 22, 66-69).  It called expert O'Brien, who has been a prosecution witness in many Pennsylvania cases.[6]

Equally objectionable has been the inquiry, initiated by the FC and approved by this Court, into the Commonwealth's contact with the surviving victims.  This was never the purpose of the Court of Appeals' remand.  The Commonwealth has never suggested that it agreed to penalty phase relief because the family preferred such an outcome.  *See* Commonwealth's Brief (4/3/19) Document 162, at 3 ("[T]his Office determined that Wharton's remaining habeas claim—that his counsel was ineffective at his second penalty hearing for not investigating and presenting evidence of his adjustment to prison—is not lacking in merit").  And although the survivors certainly had every

---

[6]    A non-exhaustive Westlaw search reveals 31 cases, in appellate opinions alone, where O'Brien testified for the prosecution in opposition to a criminal defendant's mental health based claim.  The number of cases where he actually participated as a prosecution witness is far greater.  As trial counsel explained, he (like many defense attorneys) has dealt with O'Brien "in many cases".  (N.T. 2/25/21 at 165).  (A list of the 31 Westlaw cases is attached here as Appendix C.)

right to attend these proceedings, their views can have no bearing on the resolution of the only issue before this court—the validity of defendant's ineffectiveness claim. Despite these considerations, this Court allowed the FC to elicit the survivors' requests for the death penalty (N.T. 2/25/21 at 134-135, 139-140, 220-221; N.T. 5/11/21 at 164-165), even though they would never have been permitted to express such opinions at a penalty phase hearing. *See* Bosse v. Oklahoma, 137 S. Ct. 1, 2, (2016) *citing* Booth v. Maryland, 482 U.S. 496 (1987) (lower courts "remain[] bound by Booth's prohibition on … opinions from a victim's family members about … the appropriate sentence").

Finally, the FC's participation as a *de facto* prosecutor in this case, as well as this Court's approval of such conduct, are without precedent. Before and after Mr. Krasner's election, both the federal and state courts regularly accepted the Commonwealth's concessions of death penalty relief, without conducting evidentiary hearings and without appointing a substitute prosecutor to aggressively argue for death. (A list of 21 cases—11 federal and 10 state—where collateral review courts accepted the Commonwealth's agreement to penalty phase relief is attached here as Appendix D.) Indeed, even before Mr. Krasner's election, the Philadelphia District Attorney's Office routinely agreed to life sentences, in cases where it retained the option to move forward with a new penalty phase hearing. (A list of **65** cases where the Commonwealth agreed to a life sentence when it could have conducted a new penalty hearing, appears at Appendix B, Part I, Section C-1.) On none of these occasions did any court ever

appoint an amicus to either conduct an evidentiary hearing or to challenge the adequacy of the Commonwealth's contact with the victim's family.

**IV.    Commonwealth's Compliance with Victim's Rights Legislation**

It is clear by now what happened here.  In an effort to keep the surviving victims informed, Ms. Wames contacted Mr. Hart and informed him of the Commonwealth's revised position on the death penalty.  In response, he told her that he was not opposed to penalty phase relief.  Like the Commonwealth, he believed that defendant should never be released.

Mr. Hart also told Ms. Wames he would inform other surviving victims.  To facilitate this process, she provided him with her contact information and invited him to share it with the remaining survivors.  Thereafter, when Mr. Hart told her that his brother wished to attend future hearings, she reasonably assumed that Mr. Hart had, in fact, transmitted the requisite information to the family.  (N.T. 8/5/21 at 5).

Employing 20/20 hindsight, one could say that Ms. Wames should have taken additional steps.  But at the time, there was no reason to assume that Mr. Hart had not contacted the rest of the family.  Mr. Hart is a religious person who participates in missionary work.  He was not someone whose reliability was for some reason questionable.  Nor, under the circumstances, was there any reason to assume that other family members were opposed to death penalty relief.  In Ms. Wames' work, it is not uncommon for survivors to be indifferent to or even against the death penalty.  (N.T. 5/11/21 at 189).

23

**CONCLUSION**

For the foregoing reasons, trial counsel acted unreasonably by failing to investigate and present prison-adjustment evidence.  Had he done so, there is a reasonable probability that at least one juror would have voted against imposing the death penalty.  Accordingly, it is the Commonwealth's view that this Court should grant habeas relief on defendant's penalty-phase claim.


FOR THE COMMONWEALTH:


/s/ *Paul M. George*_____
PAUL M. GEORGE, Asst. Supervisor, law Division
Nancy Winkelman, Supervisor, law Division

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing Brief to be served

on the following persons via ECF:

James P. Barker
Cari Mahler
Pennsylvania Office of Attorney General
16th Floor-Strawberry Square
Harrisburg, PA 17120

Elizabeth McHugh
Claudia Van Wyk
Federal Community Defender Office
Capital Habeas Corpus Unit District Attorney's Office
601 Walnut Street, Suite 545 West 3 South Penn Square
Philadelphia, PA 19106

September 30, 2021                          /s/Paul M. George_____
                                            PAUL M. GEORGE