**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WHARTON, | : | |
| | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | No. 01-6049 |
| | : | |
| JAMIE SORBER, et al., | : | **CAPITAL CASE** |
| | : | |
| Respondents. | : | |

**PETITIONER ROBERT WHARTON'S POST-HEARING BRIEF**

LEIGH M. SKIPPER
Chief Federal Defender, by

ELIZABETH MCHUGH
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
 Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106
(215) 928-0520
elizabeth_mchugh@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner Robert Wharton*

Dated: September 30, 2021

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................i

INTRODUCTION ...................................................................................................1

PROCEDURAL BACKGROUND............................................................................2

ARGUMENT ...........................................................................................................3

I.     TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF MR. WHARTON'S PRISON ADJUSTMENT DURING THE TIME BETWEEN HIS INITIAL SENTENCING AND HIS RESENTENCING DEPRIVED HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL..................................................... 3

     A.    Legal Standards.................................................................................. 3

     B.    Counsel Was Deficient in Failing to Investigate and Present Available Evidence Concerning Petitioner's Positive Adjustment to Prison............................................. 7

     C.    The Readily Available Evidence Shows Counsel's Deficient Performance Prejudiced the Defense........................................................ 9

          1.    The Prison Records Provided Ample Documentary Evidence That Petitioner Was Making a Positive Adjustment in the State Correctional System..............9

          2.    Counsel Could Have Presented Expert Testimony Explaining Mr. Wharton's Good Adjustment. ............................................................11

     D.    The Available Rebuttal Does Not Undermine Petitioner's Showing of Prejudice.. 17

          1.    Expert Testimony Presented in Rebuttal.......................................18

          2.    Testimony of Former DOC Employees .........................................20

          3.    Evidence of the 1986 Escape .........................................................21

          4.    After Weighing the Mitigating Evidence With the Available Rebuttal, Counsel Would Not Have Hesitated To Present This Mitigating Evidence. ................22

     E.    The District Attorney's Confession of Error Further Supports a Grant of Relief. .. 24

II.    THE ATTORNEY GENERAL IMPROPERLY PARTICIPATED AS AN ADVOCATE IN THIS PROCEEDING AND IMPROPERLY WAS ALLOWED TO OBJECT TO A STIPULATION BETWEEN THE PARTIES. ................................................. 24

CONCLUSION.......................................................................................................25

# INTRODUCTION[1]

The Supreme Court held in *Skipper v. South Carolina*, 476 U. S. 1, 4-5 (1986), that the Eighth Amendment requires courts to allow capital defendants to present evidence of good behavior in prison. *Skipper*'s rule had been the law of the land for six years by the time of Mr. Wharton's retrial in 1992. Nevertheless, his trial counsel, William Cannon, did not know about *Skipper* in 1992 and neither gathered records, consulted experts, nor argued to the jury that Mr. Wharton's good prison adjustment should mitigate his punishment.

The hearing before this Court has demonstrated that trial counsel had no strategic reason for failing to investigate and present the evidence, thought the jury would have given it a receptive hearing that could have changed the already close outcome at the penalty retrial, and very much regretted his omission. Mr. Wharton could have made a strong presentation with voluminous prison records showing his overall adjustment and expert testimony to explain their significance to the jury. The experts could have provided counsel with persuasive responses to rebuttal information and experts the state presented. Mr. Cannon testified that he would have presented the prison adjustment evidence regardless of the rebuttal he might have encountered from the Commonwealth.

Counsel's failure to develop and present the prison adjustment evidence was unreasonable, and there is a reasonable probability that, with the evidence, at least one member of the jury that struggled through more than two days of deliberation would have voted for life. Counsel therefore deprived Mr. Wharton of the effective assistance of counsel. U. S. Const. amend. VI.

---

[1] This pleading uses the following citation abbreviations:
Transcripts - cited by date and page: xx/xx/xx Tr. xxx
Petitioner's exhibits - cited by exhibit and bates number: PE x, xxx.
Attorney General's exhibits - cited by exhibit number and, where needed, page number: AE xx, xxx.

This Court should accordingly accept the parties' proposed settlement and grant Mr. Wharton habeas relief on this ground.

## PROCEDURAL BACKGROUND

Mr. Wharton was convicted of two homicides and sentenced to death in 1986. After winning a new trial on the issue of penalty, he was resentenced to death in 1992, after over two days of deliberations and a reported deadlock. *See Wharton v. Vaughn*, 722 F. App'x. 268, 270 (3d Cir. 2018); 12-21-92 Tr. 137-40; 12-22-92 Tr. 12-13; 12-23-92 Tr. 2. This Court denied federal habeas relief in 2012, and Mr. Wharton appealed. ECF Nos. 126, 127, 133. In 2018, the Court of Appeals affirmed the denial of relief on his guilt-innocence phase claims but reversed the denial of relief on one of the penalty phase claims, remanding for an evidentiary hearing upon his "prima facie showing that there is a reasonable probability that at least one juror would have changed his or her vote if presented with [prison adjustment] evidence." 722 F. App'x. at 285.

Before the testimonial hearing began, the Philadelphia District Attorney's Office ("DAO") reached an agreement with Mr. Wharton's counsel to settle the case, and the parties submitted a proposed order to the Court. ECF No. 155, 156, 156-1. The Court ruled that it could not decide whether settlement was appropriate without holding the hearing that the Court of Appeals had ordered. ECF Nos. 160, 161, 165, 187. Because the DAO had indicated it would no longer support a death sentence, the Court, over Mr. Wharton's objection, appointed the Office of the Attorney General ("OAG") as amicus curiae to present a "counter" position. ECF No. 165, ECF No. 187 at 13. After entertaining argument and ruling on preliminary issues, the Court heard testimony on five dates between February 25 and August 5, 2021. ECF Nos. 227, 237, 247, 266, 270.

## ARGUMENT

I.    **TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF MR. WHARTON'S PRISON ADJUSTMENT DURING THE TIME BETWEEN HIS INITIAL SENTENCING AND HIS RESENTENCING DEPRIVED HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL.**

### A.    Legal Standards

*De Novo Review.* To obtain relief, a federal habeas petitioner must show in relevant part that the state court ruling rejecting a claim was "contrary to, or an unreasonable application of, clearly established federal law[.]" 28 U. S. C. §§ 2254(d)(1). Mr. Wharton has already satisfied that test. The Court of Appeals held that the Pennsylvania Supreme Court unreasonably applied both the performance prong and the prejudice prong of the test announced in *Strickland v. Washington*, 466 U. S. 668 (1984). *Wharton*, 722 F. App'x at 280-81. The Court of Appeals then conducted de novo review and held that he had made a prima facie showing of a *Strickland* claim that required an evidentiary hearing. *Id*. at 283-84. This Court, therefore, must review the *Strickland* claim de novo, and it may not employ "doubly deferential" scrutiny by applying § 2254(d). *See Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021).

*Deficient Performance. Strickland* requires a litigant seeking relief to demonstrate that trial counsel performed unreasonably under prevailing professional norms. 466 U. S. at 688. Courts have frequently held that an attorney's failure to investigate a client's correctional history was deficient.[2] Counsel's duty to investigate also extends to the professionally reasonable investigation and presentation of relevant expert testimony. *See Hinton v. Alabama*, 571 U. S. 263, 273 (2014)

---

[2]  *See Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001); *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997); *Horton v. Zant*, 941 F.2d 1449, 1462-63 (11th Cir. 1991); *Macias-Macias v. Collins*, 810 F. Supp. 782, 820-23 (W.D. Tex. 1991), *aff'd*, 979 F.2d 1067 (5th Cir. 1992); *Ex parte Land*, 775 So.2d 847, 853-54 (Ala. 2000), *overruled on other grnds, State v. Martin*, 69 So.3d 94 (Ala. 2011); *Torres-Arboleda v. Dugger*, 636 So. 2d 1321, 1325-26 (Fla. 1994); *Nance v. Ozmint*, 626 S.E.2d 878, 882-83 (S.C. 2006).

("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence. . . . This was such a case.") (quoting *Harrington v. Richter*, 562 U. S. 86, 106 (2011)).[3]

Moreover, the Supreme Court and the Court of Appeals for this Circuit have repeatedly recognized capital counsel's obligation to obtain and review relevant background records, including institutional records, as part of a reasonable investigation.[4] Pennsylvania courts, too,

---

[3] *See also Porter v. McCollum*, 558 U. S. 30, 32 (2009) (penalty phase representation found deficient where counsel "told the jury that [defendant] . . . was not 'mentally healthy'" but failed to investigate or present readily available evidence which would have proven this very fact); *Saranchak v. Secretary, Pa. Dept. of Corr.*, 802 F.3d 579, 594 (3d Cir. 2015) (trial counsel ineffective for not retaining defense mental health expert, despite belief that mental health was important to the case); *Showers v. Beard*, 635 F.3d 625, 632-33 (3d Cir. 2011) (trial counsel ineffective for not seeking expert testimony to rebut Commonwealth's theory and support defense theory); *Elmore v. Ozmint*, 661 F. 3d 783, 786, 859-64 (4th Cir. 2011) (counsel deficient in capital murder trial for "blind acceptance" of State's forensic evidence of guilt and failure to investigate or adequately challenge that evidence).

[4] *See McCollum*, 558 U.S. at 39(counsel deficient for failing to obtain school, medical, or military service records); *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (counsel deficient for failing to examine court file on prior conviction); *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003) (counsel unreasonably abandoned investigation after obtaining limited background records); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (counsel ineffective for deficient mitigation investigation, including failure to seek prison records, even though records included some negative information). *See also Abdul-Salaam v. Sec'y Pa. Dept. of Corr.*, 895 F.3d 254, 268 (3d Cir. 2018) ("This Court has highlighted that counsel often will need to obtain school, medical and other institutional records, which are 'readily available,' to glean the background information necessary to direct the rest of an investigation."); *Blystone v. Horn*, 664 F.3d 397, 423 (3d Cir. 2011) ("We think it abundantly clear that trial counsel fell short of professional standards in failing to explore institutional records in the course of investigating Blystone's background in this case."); *Bond v. Beard*, 539 F.3d 256, 288-90 (3d Cir. 2008) (counsel deficient in part because of failure to obtain school and medical records and failure to give consulting expert sufficient information); *Moore v. Johnson*, 194 F.3d 586, 621-22 (5th Cir. 1999) (counsel ineffective at penalty phase, in part, for failing to present mitigating evidence readily available in the prison records offered by the state, which showed good behavior).

have recognized that the same norms applied in the 1990s, when Mr. Wharton's penalty retrial took place.[5]

*Prejudice. Strickland* requires a showing that there is a reasonable probability "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The state court employed an improper test of prejudice in *Hinton*, where trial counsel unreasonably, through ignorance of the applicable funding law, presented an expert he knew to be poorly qualified instead of a more qualified but more expensive expert. The Supreme Court held that, "if there is a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced by his lawyer's deficient performance[.]" 571 U.S. at 276. It did not matter that the State presented opposing testimony from its own experts. "Prosecution experts, of course, can sometimes make mistakes." *Id*.

Applying the *Strickland* prejudice test does not require a reviewing court to substitute its own views of the evidence for those of the trial jury, but instead to "'speculate' as to the effect of the new evidence on the trial evidence." *See Andrus v. Texas*, 140 S. Ct. 1875, 1887 (2020) (remanding for new state court prejudice determination). Therefore, a reviewing court need not decide which of the experts presented at a hearing held the correct opinions. Instead, the court "must consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'"—and "reweigh" it against the aggravating

---

[5] *See Commonwealth v. Keaton*, 45 A.3d 1050, 1091-92 (Pa. 2012) (counsel deficient for inadequate preparation for 1994 penalty trial, including failure to obtain and provide to an expert defendant's records from school, adolescent counseling, juvenile dependency, and drug treatment); *Commonwealth v. Martin*, 5 A.3d 177, 196-98 (Pa. 2010) (counsel deficient in preparation for trial in mid-1990s for failing to contact defendant's prior doctors or obtain records from substance abuse and mental health treatment).

evidence to "assess whether there is a reasonable probability that [the defendant] would have received a different sentence[.]" *Id.* at 1886, (quoting *Wiggins* 539 U. S. at 536 , and *Sears v. Upton*, 561 U. S. 945, 956 (2010) (per curiam)); *see also Wiggins*, 539 U. S. at 535-36 (prejudice shown because of reasonable probability that counsel would have introduced evidence in admissible form, irrespective of whether evidence would have caused them to alter or merely supplement strategy they used at trial).

For example, in *Dunn v. Smith*, 430 F. Supp. 3d 568, 579-80 (E. D. Wis. 2019), *aff'd sub nom. Dunn v. Jess*, 981 F. 3d 582 (7th Cir. 2020), the state postconviction court ruled that counsel was deficient for not retaining a cause-of-death expert, but that the defendant suffered no prejudice. The court acknowledged that it was "certainly possible" that the jury would have believed the defense pathologist rather than the state medical examiner, but suggested the defendant needed to present "compelling" evidence for a different result. *Id.* at 579. The district court held, "This is not the standard." There was a reasonable probability that a no-causation defense expert would have led to a different result despite the possibility that "the jury may have reached the same conclusion even with such evidence[.]" *Id.* at 579-880.[6]

De novo application of these standards demonstrates that Mr. Wharton received ineffective assistance at his 1992 penalty phase retrial.

---

[6] *See also Felton v. Bartow*, 926 F.3d 451, 466-68 (7th Cir. 2019) (asking whether different outcome was reasonably likely if defense had presented medical expert testimony on cause of death) (citing *Strickland*, 466 U.S. at 696); *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 783, 789-90 (11th Cir. 2003) (noting state court applied "imprecise[]" prejudice test and applying "reasonable probability" test to trial counsel's omission of expert testimony), *abrogated on other grounds sub nom. Parker v. United States*, 993 F.3d 1257 (11th Cir. 2021).

### B.    Counsel Was Deficient in Failing to Investigate and Present Available Evidence Concerning Petitioner's Positive Adjustment to Prison.

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 571 U.S. at 274.[7] Mr. Cannon's omission of any presentation on prison adjustment stemmed purely from legal ignorance.

Mr. Cannon represented Mr. Wharton from the time of his arrest in February 1984 through his first trial, direct appeal, retrial, and second direct appeal. 2/25/21 Tr. 108-09. During the six years between the first and second trials, Mr. Cannon communicated with Mr. Wharton by phone and by mail. *Id*. at 112. As he was preparing for retrial, Mr. Cannon met with Mr. Wharton's family members, who told him that he continued to play a positive role in the family despite his incarceration. *Id*. at 129; *see also* 12/18/92 Tr. 76 (Larry Wharton); *id*. at 96-97 (Nadean Wharton); 12/21/92 Tr. 9 (Patricia Davis); *id*. at 31-32 (Margaret Wharton). Counsel was not aware of any problems Mr. Wharton had while incarcerated. 2/25/21 Tr. 129.

Nonetheless, Mr. Cannon did not order Mr. Wharton's incarceration records or investigate his prison adjustment. *Id*. at 129. Counsel explained that his failure to investigate this area of mitigation was not based on any strategy: "It was just pure ignorance." *Id*. His "failure to present, investigate [prison] records, present those records, present the expert testimony, [was] simply a

---

[7] *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel deficient for failing to move to suppress evidence because counsel's ignorance of law requiring discovery motion kept him ignorant of existence of the evidence); *Wright v. Clarke*, No. 19-7447, 2021 WL 2530199, at *5-*7 (4th Cir. June 21, 2021) (counsel "plainly deficient" for declining to object to jury instruction because he was unaware that the critical premise for instruction was legally incorrect); *Jones v. Ryan*, 327 F. Supp. 3d 1157, 1215-16 (D. Ariz. 2018) (counsel deficient for presenting post-conviction petition in ignorance of the need to develop relevant facts outside record and establish *Strickland* prejudice), *aff'd in part, vacated in part, remanded sub nom. Jones v. Shinn*, 943 F.3d 1211 (9th Cir. 2019).

failure on my part to be knowledgeable about the *Skipper* case . . . ." *Id*. at 166. Mr. Wharton's case was the first death penalty case he presented to a jury, and he had never participated in any formal death penalty training. Training resources for capital lawyers in Philadelphia at that time were woefully inadequate. Mr. Cannon did not understand the function of a mitigation specialist and did not request any funds for experts. *Id*. at 106-07, 114-15; 3/8/21 Tr. 74.

Mr. Cannon acknowledged that the evidence he failed to present would have been helpful to his case at sentencing, and that he had no tactical or strategic reason not to present it. 2/25/21 Tr. 143,166. At the 1992 sentencing, he presented two mitigating factors for the jury's consideration: Mr. Wharton's age at the time of the crime and the "catchall" mitigating factor (42 Pa. C.S.A. §9711 (e)(4), (8)). *Id*. at 121. To support the catchall factor, counsel presented the testimony of Mr. Wharton's relatives, who told the jury that they knew Mr. Wharton to be a good person and that he continued to be a supportive, caring, and involved family member even though incarcerated. *Id*. at 121,123; *see also supra*, p. 7 (testimony of family members).

Evidence of Mr. Wharton's positive adjustment to prison was consistent with counsel's mitigation strategy and would have corroborated the testimony of the family witnesses. Mr. Cannon recalled that the family testimony was well received (since the jury deliberated for three days and reported being deadlocked), but in comparison to the aggravating facts of the crime, this evidence alone was "not great," and he would have liked to present additional mitigation. 2/25/21 Tr. 125-127. The DOC records documenting Mr. Wharton's positive adjustment and polite demeanor with prison staff would have corroborated the family testimony by showing that Mr. Wharton had strong family ties and establishing that he was polite and respectful to prison staff. *Id*. at 140.  Counsel thought that unbiased information from prison personnel about Mr. Wharton's

positive adjustment and polite demeanor would have "unequivocally" made a difference to the jury. 3/8/21 Tr. 73.

The Supreme Court decided *Skipper* six years before Mr. Wharton's retrial. As in *Hinton*, counsel's ignorance of the *Skipper* case and his failure to request Mr. Wharton's incarceration records and investigate his adjustment to prison is a "quintessential example of unreasonable performance." *Hinton*, 571 U.S. at 274.

### C.    The Readily Available Evidence Shows Counsel's Deficient Performance Prejudiced the Defense.

#### 1.    The Prison Records Provided Ample Documentary Evidence That Petitioner Was Making a Positive Adjustment in the State Correctional System.

Mr. Wharton's incarceration records could have provided substantial evidence of his positive adjustment. The records document that throughout his six years at SCI Huntingdon, Petitioner was consistently polite and respectful to staff, maintained positive contacts with his counselor, pursued available educational opportunities, and used the grievance process to deal with problems, rather than act out. Even more telling, the records document that Petitioner was a peaceful inmate who never engaged in assaultive or violent behavior with any fellow inmates or staff.

Prison records document that Mr. Wharton adjusted well from the outset. In a classification summary from June 1986, shortly after Mr. Wharton's admission to the prison system, a counselor noted that "since his reception at EDCC, Mr. Wharton has reported no adjustment problems and has received no misconducts." AE 38, 3. He participated in Bible study, chapel services, and academic and vocational programs, and had a good relationship with his family. *Id*.

Beginning in September 1986, immediately after Mr. Wharton's arrival at SCI Huntingdon, the Program Review Committee (PRC) documented Petitioner's adjustment to the institution on a

monthly basis. PE 4, 919-990. In the 72 meetings between his arrival and his re-sentencing, the PRC reports consistently described Petitioner as polite, well-mannered, and cordial to his counselor and prison staff. *Id*. The PRC reports documented that Petitioner had good contacts with his counselor and maintained a problem-free, satisfactory, and otherwise uneventful adjustment. *Id*. Likewise, Mr. Wharton's annual Prescriptive Program Plans (PPP) documented that he met many of his institutional goals by sustaining positive housing reports and counselor contact, pursuing his education, and engaging in regular exercise. AE 31.

DOC officials commended Mr. Wharton for his commitment to furthering his education. Mr. Wharton made at least three requests to the PRC to take GED classes, which were not, at that time, offered to death row inmates. PE 4, 965-66, 972. He persisted and filed a grievance with the prison administration for the opportunity to obtain his GED. *Id*. at 867. In its response, the prison administration praised Mr. Wharton for his diligence in pursuing his education. *Id*. The records also document that prison staff commended him for his submission to the DOC Poetry and Prose Writing Project in 1990. PE 4, 878. Mr. Cannon testified that Mr. Wharton's educational pursuits would have given him the opportunity to argue to the jury that Petitioner was accepting of his situation and despite a possible life or death sentence, Petitioner did not "hang his head, he pursues things that around him to be a semi-vibrant member of the prison community by seeking educational opportunities, doing writings, doing drawings and participating to the extent that he can in prison life in a meaningful way." 2/25/21 Tr. 139.

The DOC records also document that Mr. Wharton appropriately used the grievance system to address any problems or concerns, rather than acting out when he encountered difficulties. PE 4, 775-919. Mr. Cannon explained that he could have argued to the jury that this appropriate use of the grievance procedure showed that he was adapting to prison life. *Id*. at 144.

10

As counsel acknowledged, the records included some negative information, specifically six misconducts over the six-year period. 2/25/21 Tr. 145-49. Of the six misconducts, only two were considered serious by prison officials. AE 16-19. On two different days in May 1989, prison guards recovered a makeshift handcuff key and two pieces of antenna from Petitioner's cell. *Id*. As a result, Mr. Wharton was found guilty of possessing implements of escape and sentenced to 180 days of disciplinary custody, which he served in isolation and without basic privileges such as radio, television, family visits, and phone calls. AE 27, 7-8. Even with those deprivations he maintained very good behavior and was rewarded by prison staff when they terminated his disciplinary custody three weeks early. PE 4, 954.

Counsel acknowledged that these misconducts reflected negatively on Mr. Wharton but explained that they would not have deterred him from presenting positive prison adjustment because the confiscated items "were not used by him in some creative way that would imperil prison security." 2/25/21 Tr. 148.

> I would have told the jury with great emphasis that these records reflect a period of 6.3 years during the course of which six nonviolent misconducts were achieved. In other words, 2,190 days went by, [of] consecutive confinement and he had six nonviolent misconducts over that entire period of time, so these records were very favorable."

*Id*. at 155. Mr. Cannon explained that this was a close case given that the jury deliberated for three days and were deadlocked. He believed that if the jury "had the opportunity to consider all of the positives in the prison record," they "would have clearly allowed the jury to return a verdict of life in prison." 3/8/21 Tr. 68.

### 2.   Counsel Could Have Presented Expert Testimony Explaining Mr. Wharton's Good Adjustment.

Mr. Cannon could have offered the testimony of experts to explain the significance of Mr. Wharton's records to the jury. For example, he could have presented an expert in prison

management and practice like Maureen Baird, who had 28 years' experience in the federal Bureau of Prisons and served as Warden in three different institutions. 8/5/21 Tr. 25-38; PE 41, 5720 (report), 41-A, 5736 (professional profile). In 2021, Ms. Baird assessed Mr. Wharton's institutional adjustment from 1986-92 on the basis of prison records for that time and other information relating to his criminal record. 8/5/21 Tr. 38, PE 41-C, 5744 (records reviewed). Her review also included (1) the decision in *Peterkin v. Jeffes*, 661 F. Supp. 895 (E.D. Pa. 1987) (PE 40), a prison conditions case that discussed in detail the protocols and conditions in the restricted housing unit ("RHU") at SCI Huntingdon around the time Mr. Wharton was there, and (2) DOC-ADM 801, which sets forth the inmate disciplinary and RHU procedures in the Pennsylvania Department of Corrections. 8/5/21 Tr. 26; PE 41-C, 5744-45; AE 27.

Ms. Baird found Mr. Wharton's overall adjustment positive: the monthly program review reports had a consistent positive theme, the yearly prescriptive program plans showed him meeting his yearly goals, his use of the grievance process was positive, and his educational efforts, ties to family and friends, and absence of assaultive behavior all reflected well on his institutional adjustment. 8/5/21 Tr. 39-42; PE 4, 769, 912, 919-990 (PRCs); OAG 31 (PPPs); PE 4, 776-918 (grievances). She placed particular emphasis on the month-in, month-out comments of his counselor and the other members of the program review committee in over 70 pages of reports:

> His relationship with his counselor and everybody on the committee that was involved in the committees, it appeared overly [sic] positive. They had many nice things to say about Wharton as far as how he interacted with stuff [sic] and how he conducted himself.

8/5/21 Tr. 46. Prison staff were "very complimentary of Wharton," "above and beyond what I'm used to seeing." 8/5/21 Tr. 74. In Ms. Baird's experience, prison staff are trained to be alert for inmates who are phonies or manipulators, and when they "pick up" on those tendencies their written reports reflect it. She saw no such indications here. 8/5/21 Tr. 46-48. She observed that

Mr. Wharton sometimes used the PRC meetings to make requests and bring issues to the PRC's attention. In her view, that "was definitely an appropriate use," because one of the reasons for the periodic reviews is "to bring to the table whatever it is that they need or want or having issues with." 8/5/21 Tr. 48. She did not consider it a negative that Mr. Wharton did not always attend the meetings. 8/5/21 Tr. 51.

As Ms. Baird had observed many times in her career, inmates in restrictive housing have opportunities to get into serious trouble despite their restrictions: for example, they may flood their cells, break sprinkler heads, throw things out of the cells, or hold their food trays. 8/5/21 Tr. 49. She saw no such indications from Mr. Wharton, although at that time RHU inmates left their cells three times a day to pick up their food trays, could "be violent" through the open cell bars, and had other out-of-cell opportunities to make trouble while under escort. 8/5/21 Tr. 48-50.

The records also showed that Mr. Wharton used the grievance process "exactly what it was intended for." He would try to resolve an issue informally before it went to a formal grievance. Often the grievances were granted, and his tone was "polite was well-mannered." In Ms. Baird's experience, the grievance process is important for institutional adjustment because if inmates cannot resolve problems they will "act out." Mr. Wharton persevered instead of acting out. 8/5/21 Tr. 57-60; *see* PE 4, 776.

Ms. Baird reviewed Mr. Wharton's criminal convictions and institutional infractions. 8/5/21 Tr. 43.[8]  The institution's officials, and Ms. Baird, considered four of them minor. 8/5/21

---

[8]  Infractions: PE 2, 351-71, 431, 500-05; PE 1, 282
Relevant PRC reports: PE4, 950-58
Relevant Grievances: PE 4, 866, 871-76
Homicide and Hart burglaries: PE 5, 1157-61
Other convictions: PE 5, 1175-95; OAG 6, 35
Escape: OAG 7-14

Tr. 62. The other two were serious. Specifically, Mr. Wharton was found guilty of possessing two pieces of antenna, one fashioned into what looked to officers like a homemade handcuff key, hidden behind the "hopper" to the toilet in his cell, on May 17, 1989. He was found guilty of possessing another piece of antenna in the binding of his legal work on May 19. He received two consecutive 90-day periods of disciplinary custody. PE 2, 358, 362. Ms. Baird considered these infractions serious and recognized that the institution officials considered them serious. 8/5/21 Tr. 65, PE 41, 5724-25. Nevertheless, "when I weighed everything else he was still overall positive." 8/5/21 Tr. 66; *see* PE 41, 5725.

Ms. Baird also found it significant that Mr. Wharton maintained his positive adjustment during his disciplinary time, with good behavior and no misconducts, given his isolation without access to television and telephone. In her experience, inmates sometimes deteriorate after two or three months of isolation. That Mr. Wharton did not do so spoke to his "maturity" and good adjustment. 8/5/21 Tr. 68. Similarly, Ms. Baird reviewed Mr. Wharton's criminal record, including the homicides and attempted escape, and determined that these offenses did not prevent him from making a good adjustment. She had known other inmates with histories of escape to go on to adjust well to incarceration. 8/5/21 Tr. 71-73.

Among the materials Ms. Baird reviewed was the report of Cynthia Link, a 25-year veteran of the Pennsylvania Department of Corrections and the former deputy warden and warden of SCI Graterford, which housed a portion of Pennsylvania's death row. PE 11, 4446. Ms. Link reviewed Mr. Wharton's records and concluded that his disciplinary file was minimal; that even though his May 1989 misconducts were serious, the institution could manage him if he received a life sentence; that the PRC reports showed positive adjustment and cooperation with staff; and that his use of the grievance system was routine and proactive. PE 11, 4447-50. Ms. Baird agreed with Ms.

14

Link's opinions. 8/5/21 Tr. 73-74. Ms. Link's report demonstrates that Ms. Baird was not the only expert who could have been available to trial counsel to attest to Mr. Wharton's prison adjustment.

Trial counsel could also have presented the testimony of a mental health expert to demonstrate the absence of disorders that could have affected Mr. Wharton's prison adjustment or potential for future violence. 2/25/21 Tr. 13, 35. In 2021, psychiatrist Neil Blumberg evaluated Mr. Wharton and reviewed his institutional, educational, and criminal history records to assess his prison adjustment between 1986 and 1992 and to determine whether he met criteria for an antisocial personality disorder in 1992. Because of the pandemic conditions at the time, they met by video conference. 2/25/21 Tr. 18, 65; PE 13, 4454; PE 14, 4459; PE 32, 5569 (reports and CV). Dr. Blumberg found that, before Mr. Wharton's arrest in 1983, he demonstrated no risk factors for future violence: no history of violent behavior up to that time in 1983, no indication of *early* violent behavior, no evidence of relationship instability, no problems with employment, no history of substance abuse problems, no evidence of major mental illness, no evidence of psychopathic tendences or personality disorder, and no failure of supervision. 2/25/21 Tr. 21-22.

Dr. Blumberg reviewed the evidence of Mr. Wharton's prior criminal behavior, including the homicides and the escape, and readily recognized that this conduct was a risk factor for violence. Nevertheless,

> you have to take into account a whole variety of other historical risk factors along with their current clinical condition and whether [sic] to more adequately determine what their future risk may be.

2/25/21 Tr. 94. He also reviewed the six prison misconducts and viewed four of them as minor. Dr. Blumberg viewed the other two, in May 1989, as serious, yet noted there was no evidence Mr. Wharton ever used the items as weapons or means of escape. 2/25/21 Tr. 22-23. In Dr. Blumberg's experience, persons confined on death row can find opportunities for disruptive or violent conduct despite their restrictive confinement, 2/25/21 Tr. 81, but he saw no evidence that Mr. Wharton ever

engaged in violent conduct in prison. 2/25/21 Tr. 22-23. He did not act out during his disciplinary time. 2/25/21 Tr. 27. While Dr. Blumberg discussed the infractions with Mr. Wharton, he assumed the truth of the institution's version of events, not Mr. Wharton's. 2/25/21 Tr. 27, 67.

Dr. Blumberg found ample evidence of Mr. Wharton's prosocial prison conduct. Mr. Wharton used the grievance system to resolve issues, he received positive PRC evaluations, and his regular reviews with the institution psychiatrist disclosed no evidence of a mental disorder or need for treatment. 2/25/21 Tr. 23-24. Dr. Blumberg also took into account the decreased likelihood of violent behavior as Mr. Wharton aged, and the fact that his current mental status examination showed no sign of mental illness or personality disorder. 2/25/21 Tr. 25. A lifelong personality disorder or other serious mental illness would have been evident on examination in 2021 if it had been present in 1992. 2/25/21 Tr. 26. In his opinion, Mr. Wharton had made a positive adjustment to incarceration. 2/25/21 Tr. 21.

On his second consultative question, Dr. Blumberg found that Mr. Wharton did not meet criteria for antisocial personality disorder or other personality disorder that "would be associated with increased risk of violence." 2/25/21 Tr. 20, 22. He disagreed with Dr. Saul's diagnosis of "mixed character disorder with sociopathic tendencies." 2/25/21 Tr. 34; *see* OAG 35 at 11. Mr. Wharton had no conduct disorder before age 15, and so would not have met the criteria for antisocial personality disorder in the 1992 Diagnostic and Statistical Manual of the American Psychiatric Association. 2/25/21 Tr. 35-36. The behaviors noted in his elementary school records fell far short of conduct disorder,[9] and the descriptions of his childhood behavior by his family

---

[9] "If all first graders who enjoy being a 'rough guy' or 'always got into scrapes' or by second grade were described as 'inconsiderate' or by third grade 'provokes trouble' or who in fourth grade got into 'several fights' or in fifth grade seemed 'disinterested' were labeled as budding psychopaths, the vast majority of male children would fall into this category." PE 32, 5573.  These types of

during the 1992 penalty phase described him in positive terms. 2/25/21 Tr. 39, 40. Dr. Blumberg

considered both Mr. Wharton's pre-prison and his post-prison behavior:

> What I'm saying is that I considered all of the offenses that he was convicted of
> and certainly, that timeframe between '83 and '86, his behavior during that
> timeframe would highlight violent behavior that he engaged in, although escape is
> not deemed to be a violent behavior, but certainly, illegal conduct, and some violent
> behavior that would've increased his risk for violence in doing the risk assessment.
> However, when I focused in on his behavior between '86 and '92 after his
> placement at SCI Huntingdon, he had made a positive adjustment, and that's where
> the focus was.

2/25/21 Tr. 42.

If counsel had asked in 1992, Dr. Blumberg would have said that nothing about Mr.

Wharton's mental health would have impaired his ability to adjust to prison. 2/25/21 Tr. 46.

### D.     The Available Rebuttal Does Not Undermine Petitioner's Showing of Prejudice

The OAG presented two expert witnesses, James A. Beard, Ph.D., an expert in corrections,

and John S. O'Brien, M.D., a psychiatrist. While they disagreed with the ultimate opinions of Dr.

Blumberg and Ms. Baird—that Petitioner had made a good adjustment to incarceration—the

experts all agreed in several key respects. Accordingly, had this rebuttal expert testimony been

presented at trial, counsel could have elicited helpful information from the Commonwealth

experts. The OAG also presented two former DOC employees (Daniel Hayes and George Conrad)

who had direct knowledge of Petitioner's 1989 misconducts. These witnesses did not add any

additional negative information about those incidents. However, they did provide some helpful

information which would have supported counsel's arguments that Petitioner had made a good

adjustment to prison.  Finally, the OAG submitted documentary evidence and the testimony of

former Assistant District Attorney Carlos Vega about Mr. Wharton's 1986 escape from City Hall.

---

behaviors do not meet criteria for conduct disorder and "are often seen in elementary school
males." 2/25/21 Tr. 39.

AE 6-14.  Counsel testified that, even with the available rebuttal, he would have presented evidence of Petitioner's adjustment to prison since the positives heavily outweighed any negative information.

### 1.    Expert Testimony Presented in Rebuttal

#### a.    Dr. O'Brien

Dr. O'Brien concluded that although Mr. Wharton had maintained good relationships with staff, pursued his education, and never engaged in violence, he had nonetheless made a poor adjustment to prison due to his two 1989 misconducts and his attempted escape from City Hall in 1986. 3/8/21 Tr. 42. However, Dr. O'Brien agreed with the defense experts in several key respects.

First, he agreed with Dr. Blumberg and Ms. Baird that inmates with a history of violent crime can make a positive adjustment to prison. He testified that he has seen inmates with a history of terrible crimes make a positive adjustment to prison on many occasions. 3/8/21 Tr. 52. Although Dr. O'Brien opined that Mr. Wharton's past criminal history made him a poor candidate for good prison adjustment, he agreed with Dr. Blumberg that there are certain risk factors for predicting future violence in a clinical setting. 3/16/21 Tr. 53. He acknowledged that many of these risk factors (history of major mental health disorder and substance abuse, early violent behavior, adverse childhood experiences, trauma, and victimization) were not present in Mr. Wharton's history. *Id*. at 53-56.

Dr. O'Brien also agreed with Dr. Blumberg, Ms. Baird, and Dr. Beard that Mr. Wharton did many positive things while in custody. He agreed that Mr. Wharton's efforts to further his education represented a constructive use of his time. 3/8/21 Tr. 67. He acknowledged that the PRC reports documented that Mr. Wharton was polite, cooperative, and interactive with staff, and that his PPP reports showed that Mr. Wharton met his yearly institutional goals of maintaining positive

contacts with his counselor, pursuing his education, and engaging in physical exercise. *Id*. at 75-76; 3/16/21 Tr. 29.

Dr. O'Brien concurred with Dr. Blumberg and Ms. Baird that Mr. Wharton's use of the grievance process showed that he was abiding by the rules of the institution. 3/16/21 Tr. 31. He adopted Dr. Blumberg's opinion that Mr. Wharton's "use of the grievance process demonstrate[d] a willingness to utilize appropriate methods for resolving difficulties." *Id*.

He also concurred with Dr. Blumberg, Ms. Baird, and Dr. Beard that there are many opportunities for inmates to engage in violent behavior even in the restrictive RHU setting, and certainly when the inmate travels outside the institution. *Id*. at 28, 32. He recognized that Mr. Wharton left the institution on several occasions without incident. *Id*.

### b.      Dr. Jeffrey A. Beard

Dr. Jeffrey A. Beard, a former secretary of the Pennsylvania Department of Corrections, likewise believed Mr. Wharton's overall adjustment to prison was negative due primarily to his two 1989 misconducts and 1986 attempted City Hall escape. 5/11/21 Tr. 17-18. Nevertheless, he too agreed with Dr. Blumberg and Ms. Baird in several important areas.

He agreed with Ms. Baird that the Pennsylvania DOC was well equipped to house inmates like Mr. Wharton for a life sentence. Dr. Beard explained that even without his conviction for murder, the Department of Corrections would have given Mr. Wharton a high public risk score, which would have mandated housing him in a maximum-security prison. *Id*. at 84-85. Dr. Beard testified that these maximum-security facilities were well equipped to handle high risk inmates and he could have told Mr. Wharton's sentencing jury that if they sentenced him to life imprisonment, the DOC had an institution that could house him and keep other inmates and staff safe. *Id*. at 32, 85-88. Dr. Beard also agreed with Ms. Baird that Mr. Wharton's time in disciplinary

custody was difficult and his good behavior under those conditions was a positive factor in his adjustment. *Id*. at 107.

Like Dr. O'Brien, Dr. Blumberg, and Ms. Baird, Dr. Beard testified that Mr. Wharton's attendance at religious services, educational pursuits, good housing reports, contact with family, and lack of violence were all evidence of positive adjustment to incarceration. *Id*. at 78-79, 84, 117, 130, 138. He also concurred with Dr. Blumberg and Ms. Baird that age and maturity helps inmates adjust to a structured setting and that with the passage of time most inmates will settle down (and if they are released they are less likely to reoffend). *Id*. at 139. Dr. Beard explained that "people do change" and "once they're in the system for a while get into a routine [they] do tend to behave themselves better . . . ." *Id*. at 74

Finally, Dr. Beard, like Dr. Blumberg, Dr. O'Brien, and Ms. Baird, recognized that an inmate can engage in violent or aggressive behavior in the RHU and that, in his experience, some capital case inmates acted out regularly. *Id*. at 126, 128. Dr. Beard corroborated the testimony of Corrections Officer Dan Hayes that during that time at SCI-Huntingdon, inmates were not always handcuffed when they came out of the cell. *Id*. at 23. He agreed that Mr. Wharton, despite having these opportunities to engage in violent behavior, had no history of altercations with staff or other inmates. *Id*. at 79.

The above testimony demonstrates that, even if the government had presented similar rebuttal testimony, trial counsel could have used it to buttress his position that Mr. Wharton had maintained an overall positive adjustment to prison and would continue to do so if sentenced to life imprisonment.

## 2.    Testimony of Former DOC Employees

The OAG also presented retired DOC corrections officer Daniel Hayes and retired DOC hearing examiner George Conrad to testify about their first-hand knowledge of Mr. Wharton's

1989 misconducts. Neither added anything negative about his conduct that was not already stated in the paperwork from those incidents. However, much like the rebuttal expert witnesses, they did provide additional information that supported the conclusion that Mr. Wharton's adjustment was positive. For example, CO Hayes could have told the jury that in the late 1980's and early 90's inmates in the RHU had the opportunity to leave their cells without handcuffs three times a day to retrieve their food trays. 3/16/21 Tr. 169. Hearing Examiner Conrad could have told the jury that he was aware that inmates in the RHU assaulted people even while handcuffed. *Id*. at 208. CO Hayes could also have told the jury that Mr. Wharton was not known to him and during his years at the RHU this was his only contact with him. *Id*. at 175. With this information, counsel could have argued to the jury that Mr. Wharton's peaceful adjustment and lack of violence were significant in light of the opportunities for violence even in this most structured prison setting.

### 3. Evidence of the 1986 Escape

The OAG introduced court records showing that Mr. Wharton pled guilty to third-degree felony escape following an incident in April 1986 when he broke free from sheriff's deputies while leaving City Hall. AE 6-13. It also proffered two newspaper accounts and Mr. Vega, who saw Mr. Wharton immediately before the event and heard gunshots but did not witness the escape. AE 14, 3/16/21 Tr. 102. While Mr. Wharton does not dispute that he attempted to escape and was convicted of that charge, he has never admitted that he assaulted the sheriff and utilized a handcuff key.[10] The records do not contain any written accounts of the incident by the deputies involved— only brief second-hand accounts in paperwork used to justify the charges and request bail. AE 7, 8. In fact, the newspaper articles contain conflicting accounts of the incident. Later, the DAO

---

[10] Long before litigation in this case, Mr. Wharton provided his account of the escape – that he was briefly left unattended and walked away. See AE 25, 5, 8.

agreed to withdraw the charges of simple assault and implements of escape and Mr. Wharton pled

guilty only to escape.  AE 11 at 3, 4; AE 12.  In short, Mr. Wharton did not adopt the charges of

pushing a sheriff and using a handcuff key as the basis for his guilty plea to escape. AE 11, 12.[11]

> **4.     After Weighing the Mitigating Evidence With the Available Rebuttal, Counsel Would Not Have Hesitated To Present This Mitigating Evidence.**

Mr. Cannon made clear that even if the available rebuttal evidence had been introduced at

sentencing, he would have not hesitated to introduce Petitioner's prison records. "There's nothing

–there's nothing that I have seen in a way of, you know, non-mitigation evidence that would

discourage me from putting these records before the jury and calling expert witnesses to allow the

jury to understand the significance of these records in terms of Mr. Wharton's conduct and the role

that they would play in deciding his fate." 2/25/21 Tr. 163-64. Counsel explained that he would

not have been concerned about this rebuttal evidence because the jury had just heard about the

"grisly and bad" facts of the homicide and ". . . hearing about some escape in '86, and some would-

be handcuff key, to me, that would have very little impact on their decision whether Mr. Wharton

---

[11] Counsel testified that he would have filed a pretrial motion to limit the scope of that evidence to only the facts supporting the conviction for escape, not the nolle prossed charges of simple assault and possession of implements of escape. 2/25/21 Tr. 162.  Counsel testified that in his experience Judge Biunno would have likely ruled in his favor. *Id.* Counsel's assessment of the strength of that motion is supported by relevant case law. Pennsylvania law in 1992, before the adoption of the Pennsylvania Rules of Evidence, provided that evidence of other crimes "is not admissible solely to show a defendant's bad character or propensity for continuing criminal acts," *Commonwealth v. Seiders*, 614 A.2d 689, 690 (Pa. 1992), and required a court determining admissibility for another purpose to consider "the strength or weakness of the prior bad acts evidence in supporting the issue." *Commonwealth v. Schwartz*, 615 A.2d 350, 356 (Pa. Super. 1992); s*ee also Commonwealth v. Hughes*, 865 A.2d 761, 795–99 (Pa. 2004) (adjudicating ineffective assistance claim relating to 1981 trial and holding that, where there has been no conviction, evidence of prior offense is inadmissible to rebut either "no significant history of prior criminal convictions" mitigating factor or non-statutory good character mitigating evidence). Here, because the factual grounds for the assault and implements of escape charge were never resolved, counsel could have argued that they were too unreliable and prejudicial for admission.

should receive life in prison or the death penalty." *Id*. at 200. Evidence of the serious 1989 misconducts would not have deterred him from introducing Mr. Wharton's prison adjustment because that evidence "pales in comparison to spending 2,002 pages of days locked up in a capital cell and having six misconducts, four of which resulted in a caution or a warning, and . . . no Draconian punishment." *Id*. at 191. Counsel viewed any argument by the prosecutor that possession of the contraband items was evidence of an attempted escape as extremely weak, especially since Mr. Wharton was never criminally charged with escape in connection with that incident. 3/8/21 Tr. 16, 78.

As to the attempted escape from City Hall, Mr. Cannon acknowledged that the evidence was not helpful but explained that it would not have significantly weakened his argument that "life means life." 3/8/21 Tr. 33. Mr. Cannon believed that, because the incident had happened years before in a different venue than the state correctional institution, it would have had diminished impact with the jury. *Id*. at 43. Mr. Cannon weighed the escape evidence against Mr. Wharton's positive adjustment to prison and "absolutely would have presented these records, and I'm so regretful that I failed to do so." 2/25/21 Tr. 163.

In summary, because Mr. Cannon had no idea in 1992 that he could present positive prison adjustment evidence, he never developed or presented powerful information that could have complemented and supported his own strategy of showing Mr. Wharton's continued positive role in his family even from his prison cell between 1986 and 1992. As it was, the jury deliberated for more than two days, reporting a deadlock on day two and struggling until 3 PM on day three before reaching a verdict. As in *Dunn*, there is a reasonable probability that a prison adjustment presentation would have led at least one juror to vote for life—despite the possibility that "the jury

may have reached the same conclusion even with such evidence[.]" 430 F. Supp. 3d at 579-880.

Counsel's deficient performance therefore prejudiced Mr. Wharton's defense at the penalty phase.

    **E.**    **The District Attorney's Confession of Error Further Supports a Grant of Relief.**

For all the reasons above, Mr. Wharton has demonstrated that his attorney's ineffective failure to investigate and present evidence of his prison adjustment requires relief. The DAO's agreement that relief is appropriate provides further support for that conclusion. Although confessions of error do not bind a reviewing court, they "are, of course, entitled to and given great weight[.]" *Sibron v. New York*, 392 U. S. 40, 58 (1968) (citing *Young v. United States*, 315 U. S. 257, 258 (1942)). The view of the District Attorney, the elected representative of the citizens of Philadelphia, should carry substantial weight with this Court.

**II.**    **THE ATTORNEY GENERAL IMPROPERLY PARTICIPATED AS AN ADVOCATE IN THIS PROCEEDING AND IMPROPERLY WAS ALLOWED TO OBJECT TO A STIPULATION BETWEEN THE PARTIES.**

Mr. Wharton has objected to the Attorney General's participation in these proceedings in what effectively was an advocate's role. The OAG's advocacy created the appearance of a conflict of interest, invaded the proper statutory role of the District Attorney, violated the Pennsylvania Constitution, and exceeded the statutory powers of the Attorney General. *See* ECF No. 166 at 2-6; ECF No. 180 at 19. It also exceeded the proper role of an amicus curiae, violated principles of federalism by interfering with state law's allocation of authority between district attorneys and the Attorney General, and violated the principles of party presentation. *See* ECF No. 180 at 19, 20; ECF No. 214 at 10. The Court rejected these arguments before the hearing began.

At the end of the hearing, Mr. Wharton's counsel proffered a stipulation between the parties—Mr. Wharton and the District Attorney—that if prison expert Cynthia Link had testified she would have done so consistently with her report. 8/5/21 Tr. 128 (citing PE 11).  Ms. Link's

evidence could have demonstrated persuasively that expert testimony about Mr. Wharton's prison adjustment was readily available if trial counsel had sought it. The Court rejected the stipulation without factual basis because of the unelaborated opposition of the OAG, whom it had invited to participate to "have both sides." *Id*. at 129. Mr. Wharton objects to the Court's decision to allow a non-party to reject a stipulation between the parties, for all the same reasons he objected to the Attorney General's participation throughout the hearing, as set forth immediately above.

This Court should disregard the Attorney General's position, accept the stipulation, and grant relief on the basis of the record created at this hearing and the concession of relief by the District Attorney.

## CONCLUSION

For these reasons, the Court should grant Mr. Wharton habeas relief.

Respectfully submitted,

LEIGH M. SKIPPER
Chief Federal Defender, by

/s/ Claudia Van Wyk
ELIZABETH MCHUGH
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
 Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106
(215) 928-0520
elizabeth_mchugh@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner Robert Wharton*

Dated: September 30, 2021

25

## CERTIFICATE OF SERVICE

I, CLAUDIA VAN WYK, hereby certify that on this date I served a copy of the foregoing on the following persons in the manner indicated below:

BY ELECTRONIC SERVICE THROUGH ECF

PAUL M. GEORGE
Assistant Supervisor, Law Division
NANCY WINKELMAN
Supervisor, Law Division
Office of the Philadelphia District Attorney
3 South Penn Square
Philadelphia, PA 19107

JAMES P. BARKER
Chief Deputy Attorney General
CARI L. MAHLER
Senior Deputy Attorney General
Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor, Strawberry Square
Harrisburg, PA 17120

/s/ Claudia VanWyk
Claudia VanWyk

Dated: September 30, 2021