**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WHARTON | : | CIVIL ACTION |
| | : | |
| Petitioner | : | No. 01-6049 |
| v. | : | |
| | : | CAPITAL CASE |
| JAMIE SORBER, et al. | : | |
| | : | |
| Respondent | : | |

**POST-HEARING BRIEF OF *AMICIS CURIAE*
PENNSYLVANIA OFFICE OF ATTORNEY GENERAL**

## I.   INTRODUCTION

In July 1985, a jury found Wharton guilty of two counts of first degree murder and sentenced him to death for the brutal murders of Bradley and Ferne Hart, after which he left their seven-month-old daughter alone in the family's unheated home in the dead of winter. After a new sentencing hearing was granted, a second jury, in December 1992, returned a verdict of death for a second time. Wharton's sentences were upheld for decades until the Third Circuit remanded for an evidentiary hearing in 2018 on the sole issue of whether trial counsel was ineffective for failing to present evidence of Wharton's alleged "positive" prison adjustment during the time period between his two penalty phase hearings (1985-1992).[1]

The evidence presented at the hearing before this Court demonstrated that, based on Wharton's 1986 escape from City Hall and his two 1989 misconducts for possession of implements of escape *alone*, trial counsel's performance in not presenting evidence of Wharton's "positive" prison adjustment was objectively reasonable. Moreover, given the evidence presented at the

---

[1] Given this clearly established time period, any evidence pertaining to Wharton's prison adjustment after December of 1992 is irrelevant, as none of that evidence would have even existed at the time of the second penalty phase hearing.

penalty phase hearing detailing Wharton's terrorizing of the victims during the months leading up to the murders, the heinous nature of the victims' murders, and the aggravating circumstances, Wharton cannot establish a reasonable probability that the jury would have voted for a sentence of life imprisonment if only it had heard about Wharton's "positive" prison adjustment, which was *de minimis* at best and substantially outweighed by the evidence of his negative prison behavior.

## II. WHARTON HAS FAILED TO SHOW THAT TRIAL COUNSEL WAS INEFFECTIVE.

To prevail on his ineffectiveness claim, Wharton must show that: (1) counsel's performance was deficient in that it fell below "an objective standard of reasonableness"; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Wharton has failed to meet this stringent burden.

### A. Trial Counsel's Performance in Not Opening the Door to Wharton's 1986 City Hall Escape and Two 1989 Misconducts for Possession of Contraband Implements of Escape Was Objectively Reasonable.

Wharton must demonstrate that trial counsel's conduct "fell below an *objective* standard of reasonableness." *Strickland*, 466 U.S. at 688 (emphasis added).[2] "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The law presumes that counsel was effective:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or

---

[2] Trial counsel's proclamation – in hindsight 30 years later – that he "was so regretful" he was not able to present the positive prison adjustment evidence at Wharton's penalty phase (N.T. 2/25/21, 164-65), is irrelevant to whether his performance was *objectively* reasonable under *Strickland*. *See Harrington v. Richter*, 562 U.S. 86, 109-10 (2011) ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

> adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* at 689. In accordance with these standards, it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997) (quoting *United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989)).

The evidence presented at the hearing established that trial counsel's performance did not fall below an objective standard of reasonableness. To the contrary, if counsel had opened the door with the "positive" prison adjustment evidence, the Commonwealth would have rebutted with evidence of negative prison adjustment that would have been detrimental to the defense and would have significantly impeded trial counsel's ability to make certain vital arguments in closing when asking the jury to spare his life.

### 1. Wharton's 1986 Escape From City Hall

On April 21, 1986, less than a year after having been sentenced to death by a jury, Wharton attempted to escape the custody of Philadelphia deputy sheriffs when he was being escorted out of City Hall's Courtroom 225 following sentencing in an unrelated robbery case before the Honorable Samuel M. Lehrer. OAG Ex. 6-14.

A prosecutor assigned to the case was present in the courtroom during Wharton's sentencing, and recalled that Wharton had his left hand in a sling with either a cast or bandage around it and his right hand was cuffed to a waist belt. The prosecutor was concerned about security and a potential escape knowing that Wharton had been convicted of a double homicide and was on the second floor of City Hall, close to street level (N.T. 3/16/21, 101-10).

When exercising his right to allocution, Wharton acknowledged that he had caused a lot of people pain and suffering, that he was sorry for his crimes and that "any time I serve, I will use to better myself." Minutes later, however, at approximately 5:00 p.m., he pushed a deputy sheriff into the closed elevator door and ran downstairs from the second floor to the first floor of City Hall. During his attempted escape, Wharton "used [a] handcuff key to open his handcuffs." The deputy sheriff fired two shots at Wharton to prevent his escape, wounding him in the thigh and buttocks. Wharton was apprehended on the sidewalk outside of City Hall. On December 3, 1986, Wharton pled guilty to escape and was sentenced to one to three years imprisonment. OAG Ex. 6-14 & 24.

Newspaper articles from the *Philadelphia Daily News* and *The Philadelphia Inquirer*, dated April 22, 1986, detailed how Wharton managed to open his handcuffs and snap apart a plastic cast that had been on his purportedly injured arm before breaking away and bolting from deputy sheriffs in City Hall. Wharton fled down City Hall's spiral stairwell and exited the building before a deputy sheriff recaptured him by shooting him twice during his flight. A deputy sheriff observed Wharton "pumping both of his arms while running, showing no difficulty with the supposedly lame arm. The molded plastic cast, ripped apart along its seams, was bouncing and waving from the sling still attached to Wharton's shoulder as he ran." A handcuff key was found near the second floor elevator where Wharton escaped from the deputies. OAG Ex. 14a-k.

If trial counsel had opened the door to the so-called "positive" prison adjustment evidence, the Commonwealth could have presented testimony from the Philadelphia deputy sheriffs about the 1986 escape, which unfolded *in the very same City Hall courthouse in which the jurors themselves were sitting* (N.T. 2/25/21, 116). Such testimony would have included evidence of the handcuff key that Wharton was hiding at the same moment he was claiming remorse for his crimes. The evidence would also have shown that the escape resulted in gunfire in the middle of the city

during rush hour, and that Wharton was apprehended only because he was shot. The Commonwealth also could have introduced the Quarter Sessions file reflecting that Wharton pled guilty to the escape (N.T. 2/25/21, 199-200; OAG Ex. 11-13).

Tellingly, in May of 1989, three years after entering the DOC (midway through the six-year time period between his two penalty phase hearings),[3] Wharton was still making efforts to escape custody through his makeshift handcuff key and other hidden implements of escape.

### 2.  Wharton's Two May 1989 Implements of Escape Misconducts

#### a.  May 15, 1989 Misconduct for Makeshift Handcuff Key

On May 15, 1989, Corrections Officer Daniel Hayes' routine security search of Wharton's single cell in the Restricted Housing Unit ("RHU")[4] revealed that he had hidden two pieces of metal antenna in the mounting of a toilet. One of the pieces of antenna had been fashioned into a handcuff key. Wharton was charged with "possession of contraband, implements of escape," a Class I misconduct.[5] The contraband ("2 pieces of antenna one fashioned like a hand cuff key") was placed on a Confiscated Items Receipt (N.T. 3/16/21, 154-58, 193; OAG Ex. 16-17a).

---

[3] Wharton entered SCI Graterford on May 2, 1986, and was transferred to SCI Huntingdon on September 25, 1986, where he remained during the time period between his two penalty phase hearings.

[4] In May of 1989, SCI Huntingdon's RHU was an extremely regimented environment. Inmates generally were in their single cells 22-23 hours a day, ate meals in their cells, exercised one to two hours a day, showered in small groups escorted by two corrections officers, and received a monthly telephone call. There was no congregate activity and no freedom to move around and interact with others, like in general population. Due to this highly structured environment, there was far less opportunity for inmates to commit misconducts (N.T. 3/16/21, 189-90; N.T. 5/11/21, 21-24).

[5] The DOC's Inmate Discipline Procedures Manual (DC-ADM 801), which controls inmate disciplinary and restrictive housing practices, describes an "implement of escape" as items "which in the hands of an inmate present a threat to the inmate, others or to the security of the facility" (N.T. 5/11/21, 42-43; OAG Ex. 27). Under the 801 Manual, possession of contraband implements of escape is a Class I Category B misconduct because it is a serious threat to the prison staff, the inmate, other inmates and the community at large outside the prison. As explained by Jeffrey Beard, the DOC's former Secretary of Corrections, "anything that an inmate possesses that could

CO Hayes testified that in May of 1989, RHU corrections officers used handcuffs and handcuff keys on a regular basis. Any time inmates were removed from their cell, they were restrained by handcuffs. CO Hayes found Wharton's misconduct serious "because you don't expect an inmate to have a cuff key;" inmates in the RHU are restrained for a reason and having a handcuff key that can remove their cuffs poses a danger to the safety of those in the institution. During his 28 years as a corrections officer in the DOC, this particular misconduct by Wharton was the only time that CO Hayes, who regularly searched the mounting bolts of the toilets in the RHU cells, found a makeshift handcuff key and one that "looked like it could have worked" (N.T. 3/16/21, 151-66; N.T. 5/11/21, 23).

Following a disciplinary hearing on May 17, 1989, Hearing Examiner George Conrad found Wharton guilty of the charge, concluding that the confiscated physical evidence -- which he personally examined at the hearing -- "clearly represents a handcuff key" and it was "more likely than not that the key was possessed and under the control of Wharton," who had occupied a single cell for several months. Wharton was sanctioned to 90 days of Disciplinary Custody ("DC") (N.T. 3/16/21, 190-200; OAG 17b-c).[6]

---

perhaps help them to escape from the facility" "has to be considered to be very serious" given the primary responsibility "to keep the inmates that have been sent to us and not to let them escape." "Any situation that looks like the inmate might be contemplating an escape" has to be viewed as "very serious." The only charges more severe than the Class 1 Category B misconducts are the Class I Category A misconducts identified as first degree felonies under the Pennsylvania Crimes Code (murder, rape, arson, robbery, etc.) (N.T. 3/16/21, 158-60, 194; N.T. 5/11/21, 37-44; OAG Ex. 27).

[6] DC status is the most restrictive status of confinement to which an inmate found guilty of a Class 1 misconduct may be committed. An inmate on DC status is housed in a separate section of the RHU (although the physical structure of the cell and accommodations in the cell are the same as Administrative Custody status), and loses various privileges, including the loss of radio, television, telephone calls, and personal property unless approved by the PRC (N.T. 3/16/21, 203-04; N.T. 5/11/21, 38-45).

George Conrad delineated the numerous reasons why he discredited Wharton's proffered version of events (*i.e.*, the contraband must have been in the toilet mounting of his cell before he got there): The CO had no reason to fabricate finding the handcuff key; the key was found in a cell occupied solely by Wharton; and in the RHU, a makeshift handcuff key is not something an inmate would leave behind, as it is a valuable commodity to either use or sell (N.T. 3/16/21, 201-02).

As the hearing examiner for this particular misconduct and having been a hearing examiner in the DOC for 10 years, Conrad found Wharton's misconduct to be serious, stating "[t]here can't be any good reasons for an inmate to . . . make a handcuff key and free himself from handcuffs. . . . When you take your handcuffs off, you're going to assault. I mean, it's basically – for me it spells you're going to assault someone. Either staff or another inmate" (N.T. 3/16/21, 205-05).[7]

On review, the Program Review Committee ("PRC")[8] found that "the misconduct is easily supported by the evidence" and that "[p]ossession of contraband such as a homemade handcuff key is an extremely serious misconduct." OAG Ex. 17e.

### b. May 19, 1989 Implements of Escape Hidden in Legal Binding

On May 19, 1989, just two days after Wharton was found guilty of the above charge, prison officials conducted a random search of Wharton's cell and discovered a 4" piece of broken metal antenna hidden in the binding of his legal material. Wharton again was charged with "possession of contraband, implements of escape." OAG Ex. 18-19a.

---

[7] As of May of 1989, George Conrad had seen handcuff keys on the corrections officers on a daily basis. Additionally, out of the thousands of misconducts over which he presided during his 10 years as a hearing examiner, he discovered an inmate had fashioned a handcuff key out of a piece of antenna only approximately ten times; it was uncommon (N.T. 3/16/21, 185-86, 199, 206).

[8] The PRC is comprised of upper level administrators, specifically two deputy superintendents and the classification and treatment manager or their designee if they are not available (N.T. 5/11/21, 40).

On May 23, 1989, the hearing examiner found Wharton guilty of the charge, noting that Wharton was in a single cell and had sole control over his possessions. The hearing examiner also referred to Wharton's previous misconduct, in which "a handcuff key was fashioned out of such a piece [of] material." Wharton again was sanctioned to 90 days of DC status. OAG Ex. 19b.

On June 2, 1989, the PRC sustained the action of the hearing examiner. The PRC found that "[i]t is quite credible and actual that the material was used to make a handcuff key," similar to what Wharton had done just days earlier. The PRC commented, "[s]ince the material was found in Mr. Wharton's cell and it is established that the material can be used as an implement of escape, the committee finds the evidence to be sufficient." OAG Ex. 19c-e.

As a result of Wharton's 1986 escape from City Hall and two May 1989 implements of escape misconducts, coupled with his prior crimes of violence (murders and robbery), the DOC consistently identified Wharton's "Areas of Concern" as "Assaultiveness and "Escape" in his Prescriptive Program Plans from 1989 to 1992 (OAG Ex. 31a-31d; N.T. 3/8/21, 23-24; N.T. 5/11/21, 56-60).[9]

Undoubtedly, if trial counsel had opened the door to the "positive" prison adjustment evidence, the Commonwealth could have rebutted by presenting testimony from corrections officers (such as CO Hayes), hearing examiners (such as George Conrad) and PRC members, introducing various prison disciplinary records, and displaying physical evidence (such as Wharton's confiscated makeshift handcuff key to compare to CO Hayes' actual DOC-issued handcuff key) pertaining to Wharton's implements of escape misconducts committed in the highly

---

[9] The "NV" ("not verified") handwritten notations next to "Escape" in the "Areas of Concern" for the May 1989 and May 17, 1990 Prescriptive Program Plans (OAG Ex. 31a-b) were made before the 1986 escape was verified, and simply were not updated (OAG Ex. 39; N.T. 5/11/21, 34-36; 56-60).

regimented environment of the RHU's "Administrative Custody Max" where Wharton was housed

(N.T. 2/25/21, 174, 181-85, 191; N.T. 3/8/21, 22; N.T. 3/16/21, 166-67).

### 3. The Expert Witnesses Who Found That Wharton Had Negative Prison Adjustment

#### a. Former PA DOC Secretary of Corrections Jeffrey A. Beard, Ph.D.

Jeffrey A. Beard, Ph.D, who was the Secretary of Corrections for the PA DOC for 10 years,

whose expansive career in the DOC spanned 38 years (1972 to 2010), and who subsequently was

the Secretary of Corrections for the California Department of Corrections and Rehabilitation

Headquarters, opined that Wharton had negative prison adjustment (N.T. 5/11/21, 10-15, 62; OAG

Ex. 4-5). Beard summarized his opinion as follows:

> Well, when I first start taking a look at any case for consideration for any kind of change in status, the very first thing I look at is an inmate's behavior. In this particular case we're looking at 1985 to 1992, and the inmate's behavior during that period of time. The first thing I note is in 1986, he had a serious premeditated escape attempt from the Philadelphia courtroom and he had a handcuff key, got out of his handcuffs, ran out of the room, may have been feigning an arm injury, because he had a cast that came loose during the course of the whole process. Shoved a deputy sheriff into an elevator door, ran downstairs, outside the door during the course of that, was shot twice in the upper thigh which put both himself and everybody around at serious risk. And the fact that it occurred at 5:00 when people would be going home would even increase the risk to bystanders in a situation like that. So I saw that as a very serious event.
>
> So then I looked at what did he do in the six years that he was – in the Pennsylvania Department of Corrections. And I noted that he had six misconducts. And this six misconducts did not occur during the first few months or first year of his incarceration as in some cases, we do have inmates, they come in, they have adjustment difficulties. And they get a series of misconducts, but then they settle down. These misconducts occurred throughout the course of the six years, the last being in 1992. And so I saw that as pretty serious, you know, we've got continuing misbehavior during the entire six years.[10]

---

[10] Wharton's four other misconducts consisted of the following: (1) July 21, 1986 - refusing to obey an order; (2) May 21, 1988 - refusing to obey an order and disruption or interference with the security or orderly running of the institution; (3) March 19, 1989 - possession or circulation of a petition; and (4) January 12, 1992 - refusing to obey an order after corrections officers observed

> When I break down those misconducts, four of them taken individually, seemed rather minor, and even though they were, I think all class one misconducts, they were generally seen as lower level class one misconducts, but when I looked at the other two misconducts that occurred in 1989, these were misconducts that the staff at Huntingdon had seen as being serious or very serious, and I concurred with them that they were serious, because in this case Mr. Wharton had a – was found in his cell, a manufactured handcuff key that was made out of antenna material. An additional antenna material. And then four days later, they found more antenna material in some of his personal documents. To me, just taking that alone, I see that as being extremely serious, because handcuffs are used to provide security on escorting capital cases within the institution. They're also used if a person is taken to court or taken to an outside doctor's appointment, and so far an inmate to have possession of a handcuff key, we've to consider it to be very, very serious.

> But then, you know, you relate that back to the 1986 escape when he had a handcuff key, and that makes it even more serious, because, you know, I've always found that one of the best predictors of future behavior is past behavior. . . . And so in the past he had a handcuff key and used it.

(N.T. 5/11/21, 17-20).

Elaborating on the seriousness of Wharton's 1986 escape from City Hall, Beard described it as a "premeditated incident" because he had a handcuff key and there was the possibility he was feigning an arm injury. "All of this was a premediated attempt by him to get out of custody, and should he do that put the public at great risk. And in doing so, he put himself, obviously, at great risk, and other people who were in the vicinity when he did that" (N.T. 5/11/21, 27-28).

Beard also explained how Wharton's remarks at the robbery sentencing on April 21, 1986—when he acknowledged that he caused a lot of people pain and suffering, that he was sorry

---

him performing martial arts (prohibited by the inmate handbook) with another inmate in the yard, despite having received two earlier warnings (OAG Ex. 20-23; N.T. 5/11/21, 50).

With regard to the 1992 misconduct for practicing martial arts, both Beard and Dr. John O'Brien agreed that such conduct was particularly serious in light of the City Hall escape attempt, in which Wharton assaulted a sheriff in order to effectuate his escape (N.T. 3/8/21, 27; N.T. 5/11/21, 50-51).

for his crimes and that "any time I serve, I will use to better myself"—just minutes before he escaped custody "makes things that much worse."

> here's an individual who in one moment can be very contrite and sorry for what they have done, and saying they're going to do something positive, while he's sitting there, planning to escape minutes later, actually, tries to escape, makes an attempt to escape. And so that puts, you know, when you look then at his record down, you know, in the preceding years while he was in the DOC, and you look at things like his, you know, relationship counselors and psychiatrists, even though they were very superficial, they -- he was generally pleasant and contrite, while here's an individual who can be contrite and everything else, and still be planning something very serious. So it throws into the question everything that you see going on with Mr. Wharton during that six-year time period of time while he was in the Pennsylvania Department of Corrections.

(N.T. 5/11/21, 47-48).

Beard testified that the 1986 escape attempt in conjunction with the two May 1989 possession of contraband implements of escape misconducts "form the great part of my opinion that he had negative adjustment during that time period" because "you have somebody who is serving time for a various serious crime, who is trying to get away into the community and put the community at risk. And then several years later, is caught with material that could allow him to make the same kind of attempt again" (N.T. 5/11/21, 46).

In Beard's extensive experience in the DOC, the fact that there was no indication in the records that Wharton ever tried to use the makeshift handcuff key or the pieces of antenna to try to escape did not lessen the severity of these two misconducts. "[I]f you have no intention of using it why would you have it, number one, and number two, he simply may not have had the opportunity to do it. We don't know, and don't know what he was thinking, because he refused to talk to the PRC when they tried to engage him in that matter" (N.T. 5/11/21, 46, 66).

Like Hearing Examiner Conrad, Beard found Wharton's claim that he had no knowledge of the handcuff key in his cell implausible for various reasons. First, a RHU inmate who

manufactures a handcuff key is not going to leave it behind and it is rare that the inmate was moved from the cell very quickly. Second, RHU cells are searched any time an inmate is moved out of a cell and before another inmate is put in there. Third and "even more telling," is that this was a manufactured handcuff key and three years before, "he had a handcuff key and he tried to escape." (N.T. 5/11/21, 40-41).

Moreover, Beard, who (unlike defense corrections expert Maureen Baird) sat on the PRC for 9 years while a Deputy Superintendent at SCI Rockview, testified that the PRC records further substantiated his opinion that Wharton had negative prison adjustment. To Beard, Wharton's conduct before the PRC regarding his two serious misconducts "creates a very concerning situation, and a very negative situation in my view" (N.T. 5/11/21, 20-21).

At Wharton's PRC review on September 13, 1989 (four months after the implements of escape misconducts while Wharton was still in DC), the PRC commented on this "very serious" misconduct and noted that Wharton "was less than truthful with PRC and denied having anything to do with the confiscated weapon or handcuff key." Wharton's unwillingness to discuss the implements of escape misconducts and accept responsibility for them contributed to Beard's opinion of his negative adjustment (N.T. 5/11/21, 52-53; OAG Ex. 37a).

Likewise, at Wharton's PRC review on December 6, 1989 (seven months after his two implements of escape misconducts and a month after his DC ended), the PRC referred to Wharton's "past misconducts for abusing/modifying his antennas" when declining his request to restore his radio and television privileges. The PRC, having sole discretion on when to restore privileges, could have restored Wharton's privileges then but presumably did not, according to Beard, because of Wharton's denial and refusal to accept responsibility for the misconducts. As

Beard explained, inmates displaying positive adjustment are more forthcoming and open with staff (OAG Ex. 37b; N.T. 5/11/21, 53-54, 104-11).

And, a month later, on January 10, 1990 (eight months after his implements of escape misconducts and two months after his DC ended), the PRC again denied Wharton's request to restore his television privileges, stating that he "refused to even discuss why he had pieces of aerial and two lengths of antennas. He said he didn't have to. He did the time." Beard opined that while the PRC could have restored his privileges then, it again declined to do so because of Wharton's continual refusal to even discuss the misconducts and his defiance (OAG Ex. 37c; N.T. 5/11/21, 54-55). It was not until March 7, 1990 (ten months after the implements of escape misconducts occurred and four months after his time in DC) that the PRC finally reinstated Wharton's privileges (N.T. 5/11/21, 55-56).

In contrast to former PA DOC Secretary of Corrections Jeffrey Beard, defense corrections expert Maureen Baird -- who never worked in the PA DOC in any capacity (rather, her experience has been exclusively in federal corrections) and who never managed a correctional institution where death row inmates or convicted murders were designated (N.T. 8/5/21, 80-83) -- opined that Wharton overall had positive prison adjustment. Baird conceded that, in assessing prison adjustment, more weight must be placed on significant factors, such as (1) those involving escape risk or a threat to others in the community at large and (2) whether the inmate has engaged in any conduct that poses a threat to those in the institution itself or in the security of the institution. She also recognized that a huge priority of a prison is to protect public safety by ensuring that violent offenders serve their sentences in prison facilities that are secure. Despite acknowledging all of this, Baird  chose to rely more on commonplace "positive" factors – e.g., Wharton's family ties, housing reports, educational efforts, the PRC's periodic boilerplate statements that he was "polite"

and had "satisfactory" adjustment, and his use of the grievance system – than on the egregious evidence of his City Hall escape from custody and his continued efforts to escape custody through his construction of a makeshift handcuff key and possession of other implements of escape. Baird "felt it would be unfair" to place more weight on Wharton's escape-related conduct, even though these, by her own admission, were significant factors in a prison adjustment assessment (N.T. 8/5/21, 95-97, 123-25).[11]

## b. Forensic Psychiatrist Dr. John O'Brien, II

Dr. John O'Brien, an expert in psychiatry and forensic psychiatry, also opined that Wharton displayed negative prison adjustment during the 1986-1992 time period.

Dr. O'Brien found Wharton's 1986 escape from City Hall suggestive of "advanced planning" and a significant factor to consider in assessing his adjustment to prison and the risk of future problems. Dr. O'Brien cited Wharton's behavior during his April 21, 1986 sentencing hearing (when he apologized for his crimes and escaped custody moments later) to illustrate that Wharton's self-professions do not provide a reliable basis for assessing his risk of future problems or the adequacy of his prison adjustment. Wharton's conduct reflected that he is a planner and clever enough to keep his plans to himself and then surprise people (N.T. 3/8/21, 21-24).

Dr. O'Brien emphasized that Wharton's two 1989 implements of escape misconducts occurred in the middle of the relevant six-year time period, and were especially serious when

---

[11] Counsel for Wharton and the Commonwealth offered a stipulation after all of the testimony had been presented to the effect that the parties agreed to the admission as substantive evidence of the report of Cynthia Link, a previously proffered defense corrections expert. OAG objected to the stipulation. OAG continues to object as (1) counsel for Wharton previously indicated that, due to an illness, Link was to be replaced as the expert (*see* N.T. 3/16/21 at 230-231 (Court summarizing off the record conference and counsel agreeing to the summary)), and (2) the stipulation removes an expert from cross-examination, thereby undermining the reason that the Court invited OAG to participate, i.e. to assure that an authentic adversarial proceeding occurred.

viewed in the context of his 1986 City Hall escape attempt. Dr. O'Brien found no basis to conclude that Wharton made a good prison adjustment when halfway through the six-year time period he engaged in the same kind of behavior he had displayed his 1986 escape attempt (N.T. 3/8/21, 43).

Dr. O'Brien detailed the critical flaws in Dr. Blumberg's opinion that Wharton had positive prison adjustment. First and foremost, Dr. Blumberg failed to sufficiently consider Wharton's 1986 City Hall escape in his analysis. Dr. Blumberg repeatedly, and conveniently, testified that the "focus" of his assessment of Wharton's prison adjustment was on his time in *state custody at SCI Huntingdon* from September 1986 to 1992, *i.e.*, *after* the April 1986 City Hall escape (N.T. 2/25/21, 18, 21, 41-42*, 50, 65, 67, 79; *See* N.T. 2/25/21, 43 - "I focused on his adjustment after that;" N.T. 2/25/21, 44 - my "focus on his adjustment began after he was placed at SCI Huntingdon which would've been in September of 86;" N.T. 2/25/21, 54 - "the focus of my assessment was on his adjustment to prison after he was confined at SCI Huntingdon"). To Dr. Blumberg, it was as if Wharton's escape from City Hall did not exist (*See* N.T. 2/25/21, 49 - testifying that he had no information that Wharton had poor prison adjustment *prior to* September of 1986).

Second, Dr. O'Brien found that Dr. Blumberg's failure to recognize the similarity and connection between Wharton's 1986 escape and 1989 implements of escape misconducts undermined the validity of his conclusions (N.T. 3/16/21, 21-23). With this "narrow focus," Dr. O'Brien opined, you only get a limited view of someone like Wharton (N.T. 3/8/21, 30-31).

Like Beard, Dr. O'Brien found that Wharton's refusal to accept responsibility for his misconducts, his "less than truthful" conduct before the PRC regarding the misconducts, and his

unwillingness to communicate with the PRC about his misconducts demonstrated negative prison adjustment (N.T. 3/8/21, 26-27; N.T. 3/16/21, 76).[12]

Further commenting on Wharton's negative interactions with the PRC, both Dr. O'Brien and Beard noted that Wharton did not attend 60% of the monthly PRC meetings during the six-year time period. Of the 29 meetings he attended (out of 72), he asked for things or had an agenda for being there approximately 23 of those times. To Beard, that Wharton only generally went to the PRC review when he had an agenda was "not something that he would look real positively upon" (N.T. 5/11/21, 51-52). Dr. O'Brien described his interactions with the PRC as "very superficial" (N.T. 3/8/21, 25; N.T. 3/16/21, 75).

If trial counsel had opened the door to the "positive" prison adjustment, the Commonwealth could have rebutted with the above-referenced testimony and PRC records.

### 4. Opening the Door to the "Positive" Prison Adjustment Would Have Had a Detrimental Impact on Trial Counsel's Strategy and Arguments at the Penalty Phase.

Presenting the so-called positive prison adjustment evidence would also have negatively impacted trial counsel's strategy and arguments at the penalty phase.

Trial counsel's strategy at the penalty phase was to present evidence of Wharton's *positive* attributes through various family members (N.T. 2/25/21, 173-74). Consistent with that strategy,

---

[12] Both Beard and Dr. O'Brien pointed to Wharton's 1987 federal civil action against the deputy sheriffs who shot him as additional evidence of his failing to accept responsibility for his actions (OAG Ex. 25 & 26). Beard opined that Wharton was trying to shift blame for his actions onto other people (*i.e.,* the fact that he got shot during his escape is someone else's fault, not his). Beard testified that this pattern continued with his 1989 misconducts and his attempts to shift blame onto someone else (*i.e.,* it was someone else's makeshift handcuff key in his toilet mounting and he did not know where the contraband found in the binding of his legal material came from) (N.T. 5/11/21, 28-29; OAG Ex. 17 & 19). Dr. O'Brien called this behavior "ongoing manifestations of his disinclination, unwillingness to accept responsibility" (N.T. 3/8/21, 26-27).

Wharton's brother testified that Wharton was athletic, "always kind," helpful, and that he looked up to Wharton (N.T. 12/18/92, 72-75). Wharton's brother-in-law testified that "you'd want your child to be like" Wharton in that he was "a loving person," a protective family member, helpful to others, an excellent athlete, a leader in the community, "very kind," humble, supportive, and giving (N.T. 12/18/92, 86-92). Wharton's aunt testified that Wharton was a "loveable," "innocent" and "wonderful" person who was artistic and creative (N.T. 12/18/92, 106-08). Wharton's sister testified that he was a good big brother and father-figure (N.T. 12/18/92, 112-14).

Wharton's mother testified that as a child Wharton was "bright," "artistic," "very kind," motivated, and helpful. He did not cause trouble. Wharton also helped her support and care for Wharton's father after he had a stroke and Wharton performed errands for elderly neighbors. Wharton's mother further testified that he excelled at sports, had "always been a kind hearted person," and helped her care for the children in her day care center. Wharton's mother pleaded for the jury to spare her son's life and sentence him to life imprisonment, emphasizing that he would never be free from prison (N.T. 12/21/92, 17-39).

In addition to presenting testimony from Wharton's family members regarding his positive attributes prior to the victims' murders, trial counsel presented testimony from family regarding his positive attributes while incarcerated. Wharton's cousin testified that, during the previous five years of Wharton's incarceration, he helped her with her hot dog cart business by creating menus and flyers to help her generate business. According to his cousin, for the prior ten years, Wharton was "just a real good human being." Wharton's sister-in-law also testified that, since his incarceration, Wharton had accepted religion into his life (N.T. 12/18/92, 95-101; N.T. 12/21/92, 9-11).

17

Trial counsel's strategy was to humanize Wharton by highlighting his positive attributes as a family member. Presenting tidbits of Wharton's "positive" behavior in prison in an attempt to add to this trial strategy would have been catastrophic for the defense. Had trial counsel presented records pertaining to Wharton's "positive" prison adjustment, he would have opened the door for the Commonwealth to rebut with the extensive damaging prison information detailed above.

Evidence of Wharton's April 1986 escape from City Hall, not even a year after the jury sentenced him to death, when he was brought to Philadelphia for sentencing in a robbery case, and his two 1989 implements of escape misconducts *alone* would have been detrimental to the defense strategy of portraying Wharton as a kind, loving, innocent, and helpful person. It would have undermined the strategy trial counsel did use at the penalty hearing. From a jury's perspective, in terms of an inmate's adverse behavior while incarcerated, attempts to escape custody are the most serious because they are the only ones that affect *them* living outside the prison.

If anything, the jury would likely have found the full prison records *aggravating* rather than mitigating. If trial counsel had opened the door to evidence of Wharton's bad prison adjustment, he would likely be facing a challenge for doing exactly what he is now challenged for not doing. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (counsel was not ineffective for failing to present the additional mitigation evidence where "the worst kind of bad evidence would have come in with the good" and "[t]he only reason it did not was because [counsel] was careful in his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 792 (1987) (counsel was not ineffective for declining to present mitigating evidence that might have opened the door to damaging rebuttal evidence).

Federal courts have declined to find trial counsel ineffective under similar circumstances where introducing the purported positive prison records would have opened the door to evidence

adverse to the defendant. *See Morgan v. Branker*, 2012 WL 2917841, at *20 (W.D.N.C. July 17, 2012) (trial counsel reasonably declined to present records of the defendant's positive prison adjustment when doing so would have allowed the prosecutor to cross-examine DOC officials or introduce rebuttal evidence about, *inter alia*, the defendant's negative prison records detailing his infractions for fighting and disobeying orders); *see also Peterka v. McNeil*, 532 F.3d 1199 (11th Cir. 2008) (defense counsel did not perform deficiently in penalty phase by failing to introduce evidence of the defendant's prison record as mitigation where the evidence was minimal, consisting only of corrections officer's testimony that the defendant had been "a little better" than the normal person incarcerated for violent crime, and that the defendant had tried to "act properly" in prison).

Furthermore, presenting evidence of Wharton's "positive" prison adjustment could have impeded trial counsel's closing argument to the jury. In zealously arguing to the jury during his closing argument that a sentence of life in prison was appropriate, trial counsel repeatedly emphasized that, if Wharton was sentenced to life imprisonment, he would never leave the prison. Trial counsel impressed upon the jury that Wharton would remain there for the rest of his life (N.T. 12/21/92, 70, 89-90). Evidence of Wharton's complete prison adjustment record, however, would have led to rebuttal evidence that Wharton was an escape artist who, on one occasion, escaped the deputy sheriff's custody in City Hall and had to be shot twice to be recaptured, and who, on two occasions three years later, was found in possession of implements of escape (once in the form of a makeshift handcuff key). Such evidence -- revealing a striking common theme -- would have either prevented or negated one of counsel's main arguments for a life sentence: given his risk of escape, there was no guarantee that Wharton would remain incarcerated for the rest of his life if sentenced to life imprisonment. Undoubtedly, in its own closing argument, the Commonwealth would have argued that by possessing implements of escape (one fashioned into a handcuff key),

19

Wharton repeatedly demonstrated that he was an escape risk and posed a danger to others in prison and thus the only appropriate sentence to ensure the safety of those in prison and the community at large -- such as the jurors themselves -- was death (N.T. 3/8/21, 37).[13]

For all of these reasons, trial counsel did not perform below an objective standard of reasonableness by not presenting Wharton's "positive" prison adjustment evidence.

### B. Wharton Cannot Establish a Reasonable Probability That the Outcome of His Penalty Phase Would Have Been Different if Only the Jury Had Heard Evidence of His "Positive" Prison Adjustment.

Wharton cannot make the requisite showing of prejudice to prevail on his ineffectiveness claim. To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Strickland*, 466 U.S. at 694). A

---

[13] Tellingly, trial counsel's testimony on this point – that Wharton's 1986 escape from City Hall would not have dissuaded him from presenting the "positive" prison adjustment evidence because he viewed it as an isolated incident that occurred six years before the 1992 penalty phase (N.T. 2/25/21, 201; N.T. 3/8/21, 8) – is completely inconsistent with the rationale he gave to the trial court and this Court regarding why he did not pursue the (e)(1) mitigator. Trial counsel told the trial court in 1992 and 1993 that he did not want to open the door to Wharton's prior crimes (home invasion/robbery of the Pravdo couple in South Philadelphia on January 3, 1983, and his burglary of the Germantown Boys Club on February 20, 1983) because it would have undermined his strategy of portraying Wharton in a positive light (N.T. 12/18/92, 122-24 – "I do not wish to acquaint this jury with crimes that they are not presently familiar with or know about and, therefore, I will not pursue that mitigating circumstances before this jury;" N.T. 8/18/93, 18-20 – by presenting the (e)(1) mitigator, the jury "would have been familiarized with matters that otherwise never would have been brought to their attention and would have created a bigger backlash for my client that he otherwise would have been exposed to"). Trial counsel reiterated this when testifying that having the jury hear about Wharton's prior crimes would have undermined his defense strategy of painting the defendant in a positive light when arguing to the jury that Wharton should not get the most severe penalty of death (N.T. 2/25/21, 122; N.T. 3/8/21, 37-41; P19, PE5044-46; P30, PE5541-5543). In light of this repeatedly stated rationale and strategy by trial counsel, his testimony that he would not have hesitated to open the door to Wharton's 1986 escape from City Hall is baffling, at best. The City Hall escape occurred 2-3 years *after* the Pravdo robbery and Germantown Boys Club burglary, was much closer in time to the 1992 penalty phase, and was far more relevant and harmful to a claim of positive prison adjustment than the prior burglary and robbery (N.T. 3/8/21, 41-42).

"reasonable probability" is one "sufficient to undermine confidence in the outcome" and is "less demanding than the preponderance standard." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo,* 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti,* 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

In assessing whether there was prejudice, courts must "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path." *Williams,* 637 F.3d at 227 (quoting *Wong v. Belmontes,* 558 U.S. 15, 20 (2009)). "In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Id.* Once the court has reconstructed the record, it must "reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id.* (quoting *Wiggins v. Smith,* 539 U.S. 510, 534 (2003)). Only then can the court determine whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Williams,* 637 F.3d at 227. Thus, even if counsel's performance was deficient, a petitioner cannot prevail if counsel's error "had no effect on the judgment." *Strickland,* 466 U.S. at 691.

In this case, the penalty phase record and aggravating circumstances, coupled with the evidence regarding Wharton's negative prison behavior, establish that Wharton has failed to establish a reasonable probability that the jury would have sentenced him to life imprisonment if it had heard about his alleged positive prison adjustment.

Over the course of six days,[14] the jury heard testimony regarding the details of Wharton's repeated terrorization, destruction, vandalization and burglaries of the victims' home and church prior to the murders over a debt that he believed was owed to him (N.T. 12/14/92, 79-110); the jury heard testimony regarding the details of how the victims were separated, bound, masked with duct tape, strangled and/or drowned even after Wharton forced Bradley Hart to write him a check to satisfy the purported debt (N.T. 12/14/92, 36-58, 72-73; N.T. 12/15/92, 98-99; N.T. 12/16/92, 33-44; N.T. 12/18/92, 6-16, 26-30); the jury heard testimony about how Wharton left the victims' baby girl alone in the unheated home in subfreezing temperatures after killing her parents (N.T. 12/14/92, 61; N.T. 12/15/92, 33-39; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34); the jury heard testimony regarding the events leading up to Wharton's arrest, during which police recovered proceeds from the series of burglaries/robberies at the victims' home (N.T. 12/16/92, 83-111; N.T. 12/17/92, 37-38; N.T. 12/18/92, 61-70); and the jury heard Wharton's confession to the brutal murders ("I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while"), and his explanation for why he killed them ("cause they knew me and would turn us in") (N.T. 12/17/92, 8-22).

In addition, the jury viewed extensive physical evidence of Wharton's crimes, including the ligatures, bindings, and duct tape that he used to subdue, mask, and strangle the victims (N.T. 12/18/92, 55-59). The jury also viewed numerous photographs depicting the lifeless victims bound, masked, strangled and/or drowned at the crime scene: Ferne Hart on her knees, bent over the

---

[14] The District Attorney's Office's repeated assertions (adopting trial counsel's testimony) that the jury listened to evidence for 17 days (DAO PHB, 2, 15) is incorrect. In actuality, the jury heard 6 days of evidence. The penalty phase started on December 14, 1992 and the evidence concluded on December 21, 1992 (excluding Saturday, December 19 and Sunday, December 20, 1992), at which time deliberations commenced.

bathtub, with her face submerged in water, her hands and feet bound, her face masked with duct tape, a necktie wrapped tightly around her neck, her shirt pulled up exposing her breasts, and her pants down to her ankles; and Bradley Hart lying face down on the ground with his face in a pail of water, his hands and feet bound behind his back, his entire face mummified with duct tape, two electrical cords tightly wrapped around his neck and a sneaker print visible on the back of his shirt. Photographs depicted the victims at the medical examiner's office, the duct tape that had been removed from the victims' bodies, and the family that existed before Wharton murdered the young couple and orphaned their child (N.T. 12/15/92, 37; N.T. 12/16/92, 3-4).

In light of the particularly heinous nature of Wharton's crime spree and murders, coupled with the aggravating circumstances (killing while perpetrating a robbery/burglary and the fact that Wharton committed two murders), the jury would not have reached a different result on the basis of: brief, boilerplate comments in some monthly PRC reports noting that Wharton had periods where his adjustment was "routine," "positive," "satisfactory," "problem-free," or "uneventful" and was "cordial" and "polite"; evidence that he pursued the GED; maintained family ties; had good housing reports; filed grievances;[15] did not act out further in DC; and did not physically assault or spit on anyone in the RHU. The sentencing phase record and aggravating circumstances would have overwhelmed any evidence regarding Wharton's spurts of "satisfactory" adjustment in between his misconducts and attempts to escape custody.

---

[15] Wharton's grievances, which defense corrections expert Maureen Baird found "positive," included complaints that the dessert on his food tray was too close to the meat, which made it "inedible;" that corrections officers were whistling while they worked on the block after 10:00 a.m.; that he did not "get jelly for each piece of toast" and for over a week he had "not gotten his jelly at all;" and that a corrections officer slapped a newspaper against his cell door and gave him a "dirty look." Needless to say, any assertion by Wharton that these grievances reflected positive adjustment would likely be defeated by the jury viewing them as petty and highly offensive given his horrific crimes against the victims in this case. Beard found that Wharton's grievances added nothing positive to the mix (N.T. 5/11/21, 61-62, 122-25).

Wharton has failed to show that he was prejudiced by trial counsel's failure to present his so-called "positive" prison adjustment records. *See Woodford v. Visciotti*, 537 U.S. 19 (2002) (the defendant was not prejudiced by trial counsel's failure to present evidence that he grew up in a dysfunctional family and suffered continuous psychological abuse where the cold-blooded circumstances of the murder and the aggravating evidence of the defendant's violent felony convictions were so severe that they completely overwhelmed the proffered mitigation); *Williams*, 637 F.3d at 236-37 (given the nature of the brutal crimes and aggravating circumstances, and the equivocal nature of the mitigation evidence, Williams could not meet "his burden of demonstrating there was a reasonable probability [that] the presentation of [mitigating] evidence would have resulted in a life sentence instead of the death penalty"); *Bryan v. Bobby*, 843 F.3d 1099, 1115-16 (6th Cir. 2016) (the defendant failed to establish a reasonable probability that the result of the penalty phase would have been different if counsel had presented his "mixed prison record" where he had killed one person and repeatedly tried to kill another, all while trying to escape arrest for another committed offense); *Trice v. Ward*, 196 F.3d 1151, 1162-63 (10th Cir. 1999) (the defendant failed to demonstrate that the outcome of the sentencing phase would have been different had counsel presented his positive prison records where the underlying facts of the defendant's crimes were horrific and the defendant confessed to the crimes); *Spreitzer v. Peters*, 1999 WL 688757, at *8 (N.D. Ill. Apr. 16, 1999), *aff'd sub nom, Spreitzer v. Schomig*, 219 F.3d 639 (7th Cir. 2000) (rejecting the defendant's claim of ineffectiveness assistance of counsel for failing to present evidence showing that he behaved well in prison where the neglected mitigating evidence was significantly outweighed by the aggravating evidence).[16]

---

[16] Any assertion that the jury's deliberations lasted three days is belied by the record. The jury started deliberating at 4:07 p.m. on December 21, 1992 and recessed for the day at 4:50 p.m. (deliberating for about 45 minutes). The jury resumed deliberations on December 22, 1992 at 11:00

Under these circumstances, Wharton has failed to make the requisite showing of prejudice to prevail on his ineffectiveness claim.

## III. THE VICTIMS IN THS CASE WERE NOT PROPERLY NOTIFIED OF PROCEEDINGS AND PERMITTED TO VOICE THEIR VIEWS AND CONCERNS.

Prosecutors are obligated to notify and consult with victims of crime. *See* 18 U.S.C. § 3771(a), (b)(2); 18 P.S. §§ 11.201, 11.213(b), (e), (f). It is clear from the post-hearing brief filed by the Commonwealth that the only person who was contacted was Dr. Tony Hart, and he was not fully informed. The only surviving direct victim, Lisa Hart Newman, was never contacted. The family of Ferne Hart was never contacted. And Dr. Hart never agreed to act as the family representative for purposes of the Pennsylvania Crime Victims Act. It was only after this Court permitted Lisa Hart-Newman and other families to appear and make their views known that their rights were honored.

Respectfully submitted,

By: */s/ James P. Barker*
James P. Barker
Chief Deputy Attorney General

*/s/ Cari Mahler*
Senior Deputy Attorney General
Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section

---

a.m. At 4:34 p.m. (after 5½ hours), the jury indicated that it was unable to reach a unanimous verdict (N.T. 12/21/92, 134-38; N.T. 12/22/92, 8, 12-13). The trial court told the jury that it had not deliberated "nearly long enough" and dismissed the jury for the day. In denying trial counsel's "very much premature" motion for a mistrial, the trial court noted that "the deliberation period of approximately eight hours after several weeks of trial, is certainly not unduly long" (N.T. 12/22/92, 15). On December 23, 1992, at 3:00 p.m., the jury reached a verdict (N.T. 12/23/92, 2).

## CERTIFICATE OF SERVICE

I, James P. Barker, hereby certify that on this date I served a copy of the foregoing on the

following persons in the manner indicated below:

BY ELECTRONIC SERVICE THROUGH ECF

ELIZABETH MCHUGH
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545
Philadelphia, PA 19106

PAUL M. GEORGE
Assistant Supervisor, Law Division
NANCY WINKELMAN
Supervisor, Law Division
Office of the Philadelphia District Attorney
3 South Penn Square
Philadelphia, PA 19107

By: _/s/ James P. Barker_____
James P. Barker

Date: October 22, 2021