## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Robert Wharton                          :
       Petitioner              : Civil Action
     v.                              : No. 01-6049
                                      :
Donald T. Vaughn, et al.,               :
        Respondent              :


November 18, 2021


Dear Clerk,

Please find enclosed for filing in theabove captioned matter two(2) copies of a Motion For a Stay And For Certification Of Recusal Motion.

Very truly yours,

Robert Wharton

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Robert Wharton | : |
|       Petitioner | : Civil Action |
|     v. | : No. 01-6049 |
| | : |
| Donald T. Vaughn, et al., | : |
|       Respondent | : |

<u>MOTION FOR A STAY AND FOR CERTIFICATION OF RECUSAL MOTION</u>

NOW COMES, Movant, Robert Wharton, requesting that the court (1) certify for immediate appeal the issue of recusal that was previously made, and denied, to this court, and (2) stay the instant proceedings pending the disposition of the intermediate appeal that would occur as a result of a certification by this court. In support of this motion Movant states the following.

<u>BACKGROUND</u>

01. Previously, Movant had requested that the court recuse itself in the instant matter due to a demonstrable bias in the original habeas corpus proceedings and again in the remanded habeas corpus proceedings. The complained of bias manifested as a pattern of completely ignoring and/or minimizing evidence favorable to Movant and hyperbolizing, fabricating and/or unjustifiably bolstering all evidence against Movant. The court also ignored the law/legal standards of review all to Movant's detriment and the Commonwealth's benefit.

02. Because this court continued the pattern of viewing the evidence in favor of the Commonwealth, also, the Attorney General, acting in the roll the Commonwealth, has taken the position that Movant does not deserve penalty hearing relief and, in espousing said opinion, has crafted arguments around false evidence, contradicted evidence, specious arguments and speculative allegations, Movant has requested recusal. Given the court's

1

predisposition to credit any evidence *against* Movant -- even if it  is contradictory or outright false -- the AG's arguments will find traction if the court is allowed to continue presiding over the remanded proceedings.

03.     Movant has previously cited extensively from the record in support of the recusal request and has appended that recitation of facts to this Motion.

04.     The unique circumstances of the instant case presents important questions requiring resolution by a court. Questions such as:

(I) What is the role of 28 U.S.C. § 455  which allows a court that has been accused of impropriety to decide if recusal is required - when the U. S. Supreme Court has made clear that a judge cannot sit in judgment of him/herself?

Answered, infra at ¶¶ 09-15.

(II) Does the conflict between the two statutes, 28 U.S.C.  § 455 and § 144, the latter of which requires that a proceeding immediately cease and that a judge, other than the accused, determine if recusal is appropriate, require a resolution?

Answered in the affirmative, infra at ¶¶ 16-25.

(III) If 28 U.S.C. § 455 is to be the dominant statute, is an accused court obligated to properly respond to the recusal motion, i.e., determine the merit of the assertions, and, should they be found valid, the court either recuse or refer the motion to another court for resolution.

Answered in the affirmative, infra at ¶¶ 26-28.

(IV) Given the import of factual accuracy under AEDPA and federal jurisprudence in general, does a recusal motion - like the one Movant has made - that is asserting a persistent pattern of incorrect fact determinations, take on a more traditional quality in the context of the ordinary recusal claims?

2

Answered in the affirmative, infra at ¶ 29-32.

## STANDARD FOR RECUSAL/BIAS

05.     In deciding whether a judge is biased, the question is *not* if he/she harbors an "*actual, subjective bias*", but instead whether, as an objective matter, "the average judge in his position is 'likely to be neutral, or whether there is an unconstitutional '*potential* for bias.'" Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 881 (2009). The Supreme Court has also, when speaking about judicial bias, used the terms "*risk* of bias," Williams v. Pennsylvania, 136 S.Ct. 1899, 1905 (2016), and "*appearance* of bias." See Com. v. Coating Corp. v. Continental Casualty Co., 393 U.S. 145, 150 (1968). All emphasis added.

06.     Therefore, under these holdings, Movant is not obligated to demonstrate an actual bias by this court, but only that the facts enumerated by Movant evince the "appearance" of bias.

## STANDARD FOR CERTIFICATION OF A COURT ORDER

07.     Section 1929(b) permits a district court to certify an order to the appellate court if the court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(B). Thus, institutional efficiency is a major purpose of the certification provision. Forsyth v. Kliendienst, 599 F.2d 1203, 1208 (3d Cir. 1979). See also Milbert v. Bison Laboratories, Inc., 261 F.2d 431, 433 (3d Cir. 1958)(used in exceptional cases where an intermediate appeal would avoid protracted and expensive litigation).

## STANDARD FOR A STAY

08.     For a stay or injunction pending appeal, the movant must show both 1) a "strong" likelihood of success on the merits and (2) irreparable injury absent a stay or

injunction. Hilton v. Braunskill, 481 U..S. 770, 776(1987). The first two factors are "the most critical." Nkin v. Holder, 556 U.S. 418, 434 (2009). After that, we also balance (3) whether a stay or injunction will injure other interested parties (also called the balance of the equities) and (4) the public interest.

## ARGUMENT

09.    Title 28 U.S.C. § 455 (a) states: "Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "He shall also disqualify himself under circumstances where he has a personal bias . . . or personal knowledge of disputed evidentiary facts . . . ." § 455 (b) (1).

10.    This statute allows a judge to make a unilateral decision as to his impartiality despite the holdings of the United States Supreme Court.

11.    Movant's first question basically asks does a judge's statutory bestowal to decide his/her fate in the face of a recusal motion conflict with the Court's holdings on judicial self-policing.

12.    Movant asserts it does not outweigh the Court's conclusion that a judge, like any other person, can be susceptable to the limitations of the psyche. In crafting the due process objective standards that guide a bias determination, the Court "has asked whether under realistic appraisal of psychological tendencies and human weakness, the interest poses such risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. *Caperton*, 556 U.S. at 883.

13.    In *Williams*, the Court recognized the inherent problems with judicial self-regulation, that is, that "[b]ias is easy to attribute to others and difficult to discern in oneself," 136 S.Ct. at 1905, and that "no man can be a judge in his own case . . . . " In re Murchison, 349 U.S. 133, 136-37 (1955). See also, ABA Model Code of Judicial Conduct Rules 2.11(A)(1), (A)(6)

4

(b) (2011) (no judge may participate "in *any* proceeding in which the judge's impartiality might reasonably be questioned . . .").

14.     The Court has recognized bias is difficult to discern from within or without, and that bias may be "unconscious[]" or "inadvertent," Williams, 136 S.Ct. at 1906-07. These "difficulties of inquiring into actual bias . . . underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motive at work in deciding the case ... and ..."[t]he due process clause has been inplemented by objective standards that do not require proof of actual bias . . . ." *Caperton*, 556 U.S. at 883.

15.     Because of the complexities in determining the existence of judicial bias and the low standard required to prove bias, § 455 should not be exalted above the Court's holdings nor § 144.

16.     Question two proposes that the conflict between § 455 and § 144 is ripe for resolution.

17.     Title 28  U.S.C. § 144 states in part that when a claim of judicial bias is levied against a judge that judge "shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

18.     Movant asserts this statute should be the prevailing statute as it is closest in operation, to the body of Supreme Court cases, the ABA standards, supra at ¶ 21, and the Code of Conduct for United States Judges, infra at 44,  espousing judges must not preside over the case of which the bias has manifested.

19.     For this reason, "any tribunal permitted by law to try cases or controversies not only must be unbiased but must avoid even the appearance of bias." Com. v. Coating Corp. v. Continental Casualty Co., 393 U.S. 145, 150(1968); see also Marshall v. Jerrico, 446 U.S. 238, 243 (1981)(affirming that "justice must satisfy the appearance of justice"); Haines v. Liggett

Group Inc., 975 F.2d 81, 98(3d Cir. 1992)(stating that court has supervisory authority to reassign cases in order to "avoid both the bias and the appearance of bias"); Lewis v. Curtis, 671 F.2d 779, 789(3d Cir. 1992)("Impartiality and the appearance of impartiality are the sine qua non of the American legal system").

20.     In *Jerrico*, the U.S. Supreme Court explained why "[t]he requirement of neutrality has been jealously guarded," and why the court has held that all courts must appear neutral at all times:

> The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an **erroneous or distorted conception of the facts or the law** At the same time, it preserves both the appearance and reality of fairness, generating the feeling so important to a popular government, that justice has been done, by ensuring that no person will be deprived of his interests in the absence of a proceding in which he may present his case with assurance that the abriter is not predisposed to find against him. . . we have employed  the same principle in a variety of settings, demonstrating the powerful and independent constitutional interest in fair adjudicative procedure. Indeed, justice must satisfy the appearance of justice, and this stringent rule may sometimes bar trial by judges who have no actual bias and who would do their best to weigh the scales of justice equally between contending parties. 466  U.S. at 2542-43(emphasis added). See also *Williams* and *Caperton*, supra.

21.     Because the standard for recusal is low, instantaneous removal from the offended proceeding is consistent with the mandate of a fair arbitor. Section 455 is inconsistent with how the Court concludes a judge should not sit in judgment of himself.

22.     Next, sections 455 and §144 conflict. The familiar principle of statutory construction applies, i.e., "conflicting statues should be interpreted so as to give effect to each . . . ." Watt v. Alaska, 451 U.S. 259, 267 (1981).  Without depreciating the general rule, we decline to read that the more recent of two irreconcilably conflicting statutes governs, the

United States Supreme Court will decline to read two statutes as being irreconcilably conflicted without seeking to ascertain the actual intent of congress; the court's examination of the legislative history of two apparently conflicting statutes is guided by the maxim that repeals by implication are not favored, and the intention of the legislature to repeal must be clear and manifest, so that the court will read the statutes to give effect to each if it can do so while preserving their sense and purpose. Id at 267. See also, Morton v. Mancari, 417 US 535, 549(1974).

23.     Because both sections of the statute are extant, courts "must"   give effect  to § 144. A difficult proposition considering the requirements of the independent statutes are polar opposits; one requiring immediate relinquishment of the case in question and the other allowing the judge to decide if recusal is warranted. Movant offers, in support of the position that another judge should  address a recusal motion, that the Code of Conduct of United States Judges suggests that Movant's position is the correct one.

24.     The commentary to Canon 2(A) clarifies that an "appearance of impropriety occurs *when reasonable minds, with the knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's . . .  impartiality . . . is impaired*." Fields v. Am. Airlines, Inc., 2020 U.S. Dist. LEXIS 185601, October 7, 2020. All emphasis added.

25.     Movant's question is important and necessitates appellate review to resolve.

26.     Third in the line of questions, Movant poses the question that if § 455 takes precedence over § 144, a challenged court should, in the spirit of compromise, see ¶¶ 23-24, supra, and as a threshhold matter,  decide if the allegations that form the recusal motion are meritorious. Akin to the procedure employed for deciding if the appointment of new counsel is warranted. See Tabron v. Grace, 6 F. 3d 147, 155 (3d Cir. 1993)("Before the court is justified in exercising its discretion in favor of appointment, it must first appear that the claim has some merit in fact and law.")(Quoting Spears v. United States, 266 F.Supp. 22, 26(S.D.W.Va. 1967).

27.     Next Movant would further suggest that, continuing with the reasonable accommodation theme among statutes, if a court were to decide there existed no bias, then the case could proceed to a second judge for review. This suggestion is different than another court reviewing judge's conclusion(s) for error and it protects a petitioner from a court crafting onerous credibility determinations that could prove harmful to the petitioner. See ¶30, infra.

28.     Under such circumstances, both statutes would retain their vibrancy, to some extent, while not relinquishing, in toto, its effect.

29.     Finally, Movant asks should a recusal motion based on incorrect factual interpretations strengthen a recusal motion due to the important role facts play in petitioners obtaining habeas relief.

30.     Under the Antiterrorism and Effective Death Penalty Act (AEDPA), federal habeas relief for any claim heard on the merits in state court proceedings can be granted in two circumstances. The second circumstance being if a court determines that the state court's adjudication of the claim ". . . resulted in a decision that was based on an **_unreasonable determination of the facts in light of the evidence presented in the state court proceedings_**." 28 U.S.C. §2254(d)(1)(2). Also, "credibility determinations are uniquely the province of the fact-finder;" this does not limit our jurisdictional reach, but rather acknowledges the high standard a defendant faces in challenging a trial court's credibility determination. Government of the Virgin Islands v. Gereau, 502 F.2d 914, 11 V.I. 265 (3d. Cir. 1974). The "high standard" that rebuts the presumption of correctness is "clear and convincing evidence." 28 U.S.C. §2254(d) (1). "A clear example of of an unreasonable factual determination occurs where the state court erroneously finds a fact that lacks any support in the record. Wiggins v. Smith, 539 U.S. 510, 528 (2003).

31.     A habeas corpus petitioner can, through a showing of  "clear and convincing" evidence reverse a state court's factual findings and maybe even help reverse a habeas petitioner's conviction -- which was determined by the much higher beyond a reasonable

doubt standard. With that in mind, If a movant demonstrates by clear and convincing evidence, i.e., that a court has found to be fact something that lacks any support in the record, then surely Movant has vaulted the much lower standard, supra at ¶05, to support recusal.

32.     Given the import of factual accuracy under AEDPA, a fact-based recusal challenge, that has gone unrefuted -- as in the instant case -- must establish a bias and basis for recusal.


## Certification of a Court Order

33.     Section 1929(b) permits a district court to certify an order to the appellate court if the court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(B).

34.     Movant has presented this court with four pertinent questions involving various aspects of judicial recusal. These questions reflect a recusal process that is unbridled, unfocused and inconsistent with the Supreme Court's holdings. Given the low standard for recusal and the potency of Movant's allegations, the questions should be addressed forthwith by an appellate court.

## Stay of the Proceedings

35.     The prerequisites for a stay are  1) a "strong" likelihood of success on the merits and (2) irreparable injury absent a stay or injunction. After that, we also balance (3) whether a stay or injunction will injure other interested parties (also called the balance of the equities) and (4) the public interest.

36.     Movant asserts the arguments presented herein are "strong;" fortified by the facts as set forth in the attachment. The fact that there is a conflict in the recusal statutes and, although the Court requires conflicting statutes both be given effect, only the statute that gives

judges unilateral authority to decide if they are biased is the statute being used is "strong" justification warranting clarification by the courts.

37.     The sole usage of § 455 is at odds with the Court's holdings on conflicting statutes, see ¶¶ 22-23, supra, *and* the Court's holdings on judicial self-regulation, supra, at ¶¶ 12-14. Under these combined circumstances, there is a "'strong' likelihood of success on the merits."

38. If this court is biased, even if unintentionally, Movant will be injured as Movant's due process rights are being violated:

> The Due Process Clause of the United States Constitution requires "an impartial and
> disinterested tribunal in both civil and criminal cases" in order to "preserve [] both
> the appearance and reality of fairness, generating the feeling so important to a
> popular government, that justice has been done." Marshall v. Jerrico, 446 US.
> 238, 242 (1981)(internal citation omitted). A fair trial in a fair tribunal is a basic
> requirement of due process. In re Murchinson, 349 U.S. 133 (1955). The Supreme
> Court has made clear that the Due Process Clause forbids any "'procedure which
> would offer a  possible temptation to the average man as judge - - - not to hold the
> balance nice, clear and true between the State and the accused denies the latter
> due     process of law,'" Id. (citing Tumey v. Ohio, 273 U.S. 510, 532 (1927)).

39.     Additionally, this court held an evidentiary hearing(s) and credibility determinations must be made of the witnesses that testified.

40.     Should this court ultimately rule against Movant, in part or wholly, based on the credibility determinations,  Movant would have a "high standard" to overcome in attempting to discredit this court's findings. A standard Movant would not have to overcome if the credibility determinations were found by an unbiased judge.

41.     Because this scenario would replicate the appeal of the denial of Movant's guilt phase claims, Movant would be irreparably injured absent a "stay or injunction."

42.     Next, Movant asserts that no party to these proceedings would be injured should this court grant a stay/injunction.

43.     The Commonwealth has conceded penalty phase error. The Attorney General (its participation in this matter is debatable) has not refuted any of Movant's arguments regarding its presentation of erroneous facts nor responded to Movant's attempts to have this court recuse. Therefore, their actions/inactions demonstrate they are indifferent to this side-proceeding and will not be injured should a stay be granted.

44.     Finally, the public interest factor weighs in Movant's favor. Fair proceedings reinforce the publics faith that every defendant, petitioner, plaintiff, etc., is being treated equally and fairly. "Court's in our system elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The *citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, [an] interest of the highest order.*" Republican Party of Minn. v. White, 536 U.S. 765, 793 (2002). All emphasis added.

45.     Additionally, the Code of Conduct of United States Judges discusses the role of public confidence in judicial integrity. Canon 2(A). Commentary: "[A] judge should . . . at all times act in a manner that *promotes public confidence in the integrity and impartiality of the judiciary.*" Emphasis added.

For all the reasons stated above, Movant requests that this court stay the proceedings and certify for immediate appellate review Movant's recusal motion.


Respectfully submitted,

Robert Wharton, Pro se
AY-6874
1200 Mokychic Drive
Collegeville, Pa. 19426


Dated: November 18, 2021

**Certificate of Service**

I, Robert Wharton, hereby certify that an accurate copy of the foregoing Motion For A Stay And For Certification Of Recusal Motion, has been sent, via first class mail, postage paid, to the following:

> Paul M. George, Esq.
> Assistant Supervisor,
> Law Division
> Phila. District Attorney's Office
> 3 South Penn Sqr.
> Phila. Pa. 19107
>
> James P. Barker, Esq.
> Chief Deputy Attorney General
> Criminal Law Division
> Appeals & Legal Services Division
> 16th Flr., Strawberry Sqr.
> Harrisburg, Pa. 17120

Robert Wharton

Dated: November 18, 2021

1

# ATTACHMENT

## ATTACHMENT TO MOTION FOR A STAY AND FOR CERTIFICATION OF RECUSAL

01.     The following facts were cited in support of Movant's recusal motion.

02.     Robert Hart ("Hart") who testified Movant said "that [the victim] wasn't paying [Movant's boss] so that [Movant's boss] couldn't pay us and that if [the victim] didn't pay him he was going to get him." District Court Opinion("DCO") at p.61. The court credited this testimony as  a threat made by Movant towards the victim. Id. However, there was ample evidence in  the record to render it incredible.

03.     Hart testified the threat took place in the middle of August and [the threats] went on into the beginning of September , N.T. 6/18/85, p.77. Movant's and Hart's boss testified the job for which Movant allegedly killed the victim started on September 7th. Based on these dates, Hart. had Movant complaining about the victim not paying Movant *three weeks before* the start of the job.

04.     Also, given that there was testimony that Movant's boss owed Movant in excess of $2000, NT. p.106, if the statement was made, one cannot be certain it was aimed at the victim over the boss. Compare Washington v. Beard, 2015 U.S. LEXIS 5387 n. 116(2015), wherein "ambiguous" testimony was not acceptable to substantiate harmless error.  ("The 'him' could have meant Teagle or Movant in context").

05.     Also, Hart's father-in Law testified , as did our boss, that Hart and Movant did not get along. N.T.  6/18/85, p.108 and 188 respectively.

06.     Movant was accused by Hart of damaging a $75 scrap yard car engine and told detectives, *who were investigating his brother's death*, that Movant never paid him for the damage. Id. at 94.

07.     Hart had given detectives three statements in which he had not a clue (although Movant had allegedly threatened his brother's life repeatedly over a three-week period, supra at ¶10, as to who might want to harm his brother. Counsel had failed to impeach Hart with any of the statements. The court deemed the statements "summaries" and stated that if would be "unfair" to allow a witness to be impeached on a police officer's interpretation of what was said than the witness's verbatim words. " DCO  at p.82 n.58.

08.     The three statements were not "summaries" as the court claimed; Hart admitted they were his words and that it was his signature affixed to each one. NT. 12/15/92, pp. 75, 85, 86.

1

(A prior inconsistent statement may be used as substantive evidence when the statement is reduced to a writing, signed and adopted by the witness. Com. v. Lively, 530 Pa. 464 (Pa. 1992)).

SAM GALATAR

09.     Sam Galatar ("Galatar"), the aforementioned father-in-law, testified that Movant said that [the boss] owed [Movant]money for the radio station project and that Movant was going to get the money from the [victim]" DCO at 89, NT 6/17/85, P.117-118.

10.     The court credited that testimony but ignored the part of Galatar's testimony where he admitted his testimony was not a "verbatim" account and that "[t]here are specific words I might add." Id. at 125. There was never any clarification as to what parts of his testimony were verbatim and what "words" Galatar "add[ed]"

12     The court **did not** credit the verbatim accounts of Hart, see ¶14 supra, because it would have been in Movant's favor to do so, but the court found it "[]fair" to credit Galatar's non-verbatim testimony when it was against Movant.

13.     Galatar testified the conversation Movant allegedly had with him occurred "inside" the [temporary workplace site] and that they occurred a the "end of September, early October." Id. at 125 & 119, respectively. However, the boss testified that the [temporary workplace site] job ended on September 17th , Id. at 74.

14.     Galatar initially testified that he did not take Movant's alleged statements to imply "physical harm" or "assault" and did not even think them uncivil, Id. However, he amended those conclusions to a belief that Movant could "kill" or at least commit "bodily harm," Id. at 130-31.

15.     This reversal in opinion came about  "later on" after speaking with the victim's father, (Id. at 130.

16.     Galatar then reversed course again, testifying that the conclusion Movant could "kill" or commit "bodily harm" emanated from some "indirect threat" that occurred "on the job." Id. Galatar's obviously contrived, confused, non-verbatim and influenced testimony should not have been used in any fashion to sustain Movant's conviction.

THOMAS NIXON

2

17.     THOMAS NIXON ("Nixon")testified he said to Movant, "if you were going to kill the mother and father, [you] should have killed the baby, also." To this Movant allegedly responded, "we couldn't do it." The court credited this testimony. DCO at p.61 & 91-92.

18.     However, Nixon received a favorable deal for his testimony, 6/25/85, p.124-125, in which he was allowed to plead guilty as a juvenile, Id. at 117, avoid a lengthy sentence that he did not want to serve, Id. at 157, and he felt the deal insulated him from any culpability in the murders, Id. at 117.

19.     Jurors were instructed Nixon was a corrupt source whose testimony should be viewed with "disfavor" and "caution." NT 7/01/85, p.21-22.

20.     Nixon had been treated for psychological difficulties, Id. at 140.

21.     Nixon was confronted with inconsistencies between his testimony and a statement to detectives, Id. at 149, 160, 165.

22.     Nixon did not deny the ability to look a person in the eye and lie, Id. at 165. Something he apparently displayed while on the stand. When asked about a relevant phone call he had made, he responded: "I asked *him* to come pick me up," and "I gave *him* the address," Id. at 124. However, when pressed about the person, he admitted the "him" was in fact a "lady" named "Grace." Id.

23.     Finally, an exchange between Nixon and his mother casts doubt on whether Movant made the statement attributed to him by Nixon. Subsequesnt to the alleged phone call between Movant and Nixon, Nixon's mother asked him about the matter and rather than tell her Movant admitted involvement to him, Nixon responded he merely "thought" Movant and codefendant were involved, Id. at 123.

24.     The court's one-side harmless error review is inconsistent with how the U.S. Supreme Court handles evidence review during harmless error analysis. Kyles, v. Whitley, 514 U.S. 419, 454 (1995)(Perhaps those suspicious circumstances would not defeat confidence in the verdict if the eyewitnesses had generally agreed on a description and were free of impeachment, **but confidence that the verdict woud have been unaffected cannot survive when suppressed evidence woud have entitled a jury to find that the eyewitnesses were not consistent (and that much of the other evidence was <u>conflicted, dubious or tainted</u>;** Schneble v. Florida, 405 U.S. 427 (1972)(**The evidence supporting the prosecutor's theory was "overwhelming and "<u>not contradicted</u> by any other evidence in the case"**).

25.     Specifically, regarding the *Bruton* (v. United States, 391 U.S. 123(1968)) violations, ths

3

court concluded that admitting [the codefendant's] confession did not undermine Movant's defense of police coercion. The court never considered the evidence that 1) Movant's codefendant's trial defense was that he "coherent[ly]" of his own "free will" confessed to the murders, NT 6/26/85, p.84 & 90, 2( that he was not physically abused by the detectives, Id. and, 3) that he was "remorse[ful]" for his role in the crime, NT 7/585, p.21-22. After the detective denied physically abusing codefendant, codefendant's attorney stated, "Of course, I know that." Codefendant's overall defense undermined Movant's defense and the statement by counsel endorsing the improbability of physical coercion was inappropriate unsworn testimony that could have led jurors to believe he knows physical coercion by police does/did not occur.

26.    The court claims the "overwhelming evidence" paints Movant as the "driving force" behind the murders, but this ignores testimony from Nixon, again, a witness whose testimony the court credited, supra at ¶23, who said: 1) on one occasion it was the codefendant who solicited Nixon's aide in robbing the victims; 2) that it was he and codefendant who prepared a hand-drawn map of the victim's home; 3) that codefendant maintained a photo album of the victims; and, 4) that it was codefendant who stated "he had robbed them before and that he wasn't done with them yet." NT 6/26/85, p.97, 154-55, 141, 144, respectively

The Court Intentionally Minimized All Movant's Evidence

27.    During the court's evidence analysis it consistently minimized the impact of Movant's evidentiary hearing evidence, but unjustifiably bolstered the Commonwealth's false and/or conflicting testimony. These allegations require some contextualization. Movant's trial defense focused on how and when Movant suffered injuries. Movant contended police abuse during the interrogation, while Detective Brown ("Brown") contended the injuries were incurred when he had to chase and tackle Movant in order to effectuate arrest.

28.    Movant presented the testimony of four witnesses in support of his position. Police Officer Duffy testified that he "thoroughly searched Movant and did not see, nor did detectives mention to him any injuries. DC0 at 47 and evidentiary hearing ("EH") notes of 2/8/12, p.16-17. He also testified that pursuant to the police department policy, any obvious injury - - even scratches or bruises to the head - - require hospitalization. EH of 2/8/12, p.20. Brown pretended not to recognize the Police Directive and the court simply accepted the lame explanation from a veteran detective. DCO at p.52 and n 42.

29.    Movant's mother testified that she did not see any scuffle or injuries, DCP at 55. Movant's sister testified she did not see Movant get tackled, id. at 54 , and Movant's erstwhile fiance testified she did not see any injuries on Movant prior to being taken to Police

4

Headquarters, Id. at 56.

30.     This court concluded the testimony of these witnesss was of "minimal" or "limited" impeachment value," DCO at pp. 47, 48, 54, 56, and did nothing to undermine Brown's "consistent" testimony, Id. at 50, 53, 54, and also concluded that due to the injuries being "minor," DCO at 47-48, 55, 56, and not being immediately "apparent," Id. at 47, it was understandable the witnesses did not see them. However, on a common sense note, if Brown allegedly saw the injuries and the medical staff at the prison intake saw them, DCO at 47, then they would have been "apparent."

31.     Throughout  the court's examination of Movant's witness's testimony, they were held accountable for any perceived inconsistency, but the court did not similarly treat Brown's signed and adopted report (which had not been presented at Movant's trial) which indicated that "at the time of [Movant's] arrest there were "no apparent injuries." DCO at 53. However, the court found this notation "not inconsistent with [Brown's] testimony." Id. That conclusion is logic defying; if Brown saw the injury prior to putting the hadncuffs on (which was what he testified to), then Movant was injured "at the time of arrest." See ¶ 36, supra. Neither did it mention anything about a chase (which was not addressed in the DCO).

32.     At Movant's pre-trial suppression hearing, Brown testified three times Movant was handcuffed in the interrogation room, DCO at 69, but at trial Brown testified repeatedly that Movant was never handcuffed "**at any point**" in the interrogation room, id. This court deemed the testimony an "immaterial inconsistency." DCO at 70.

33.     In a related claim regarding the trial prosecutor failing to correct the false testimony. The court concluded that "[o]utside of Brown's trial testimony that Movant was never handcuffed, Movant has not identified inconsistencies in his testimony . . . ." Id. at n.5. This is false. In addition to the handcuff testimony and the "no apparent injury" notation, Movant presented evidence that Brown claimed to have found a critical piece of evidence in Movant's home but his report clearly indicated that he found the evidence at someone else's home. EH of 2/10/12, p.60.

The Court's Fabricated Conclusion

34.     The court determined that Movant had been "convicted of [a] crime and served jail time, DCO at p.74 n.54 - the suggestion being that Movant was not a neophyte to interrogation/custody. However, at the time of the interrogation Movant had **never** been convicted of a crime and therefore had not served any time.

<u>The Court's Bias and the Current Proceedings</u>

35.     In the court's Memorandum Order ("MO") of March 4, 2019, he states that Movant "defecated on the victim's floor, MO at p.1. The incident referred to involved multiple parties and there is no support in the record that Movant commmitted the act or even knew about it.

36.     The court states that the female victim was 'stripped almost entirely naked" by Movant before her death. Id. There is no record support that the victim was 'stripped of her clothing."

37.     The court states that Movant was "not satisfied" with killing the parents and "turned the heat off" so that the child would "freeze to death," that the child "barely survived," Id. at p.23, and that the child "nearly froze to death," Id. at p.1. The parts about the child nearly freezing to death is a falshood -- adopted by the court -- that has been perpetuated by the Commonwealth for decades (Even the Attorney General has adopted this false narrative, infra at ¶51-52). The rest of the court's comments are baseless conclusions as to Movant's alleged mens rea.

38.     Regarding the heat, there is dispute as to whether the heat was off or on. A detective first testified that the heat was off and the thermostat was turned down, NT 6/21/85, p.71, but later testified that the heat was on and the thermostat was turned down, 12/16/92, p.28. Further, there is no record evidence that Movant turned down the heat.

39.     Next, the child did survive and not just "barely." At trial, the prosecutor called a relative of the victims' to testify that the child suffered a "ten-second respiratory arrest" on the way to the hospital and had "severe dehydration ... hypothermia ... and cyanosis." NT 6/20/85,p.53-54, NT 12/15/92, p.47. This was all fabricated. The tial prosecutor withheld the child's medical records which showed the she was simply "dehydrated" and was described by the accompanying relative as "slightly lethargic." NT 12/15/92, p.58.

40.     Regarding the home's temperature, no one knows what it was when the child was found. The grandfather, who found the child, never indicated what the temperature was when he first entered the home. He testified that after breaking the doors open he searched the home, exited it with the child, left the doors open, drove to his home and called the police. NT 6/19./85, P.50 & 66. Additionally, he testified that it took over "40-minutes" for the police to arrive , Id. at 67.

41.     That officer testified that he arrived around 5:20 p.m. NT 12/14/92, P.31, that the front doors were open, Id. at 36, and that he started his search of the home about 2-minutes after his arrival., Id at 35-42.

42.     Finally, a homicide detective testified the doors were still open, NT 6/20/85, p.62, when he arrived at 6:28 p.m. Id.

43.     Using this infomation as timeline, the doors were probably opened between 4:15 p.m. and 4:30 p.m. and stayed open throughout the processing of the home, the only people claiming the house was cold were those who entered it after the doors had been open at least 2-hours. Infra at   ¶¶51-52.

44.     The Attorney General ("AG") acting in the role of amicus curiae, has filed several documents which cite to some of the false evidence cited above and  they have incorporated in their filings new **false evidence, suppositions and biased evidence interpretations.**

45.     They falsely claim that the house was "unheated," Amicus Curiae Sur-Reply Brief at p.14, and a detective and the medical examiner ("M.E.") who responded to the crime scene noted the cold temperature inside the victims' home when [the child] was discovered." Brief of Amicus Cuiriae at p.5 n.3.

46.     Based on the true facts, supra at ¶¶ 44-49, the child was found by  a relative - not the detective or M.E. -- and that the police came along hours afterwards. The M.E. came along even later - - at 7:05 p.m. NT 6/21/85, p.7.

47.     In their Brief of Amicus Curiae, the AG claims Movant told police he tried to "strangle the victim with a tie, Id. at p.7, and that "a necktie had been pulled tightly around her neck, Id.at citing NT 12/16/92, p.38-40.

48.     The first quotation is culled from the false/coerced statement attributed to Movant. There is literally no evidence to support a strangling of the victim. While the detective falsely claimed -- showing his bias -- the necktie was tight, he originally testified it was "tied loosely, it wasn't very tight, it was just loosely tied around the neck. NT 6/20/85, p.79. Also, the M.E. testified the necktie was "loosely around the neck. NT 6/21/85, p.8.

49.     The AG claims that during a previous burglary at the home Movant "left a doll with a rope tied around its neck on the floor . . .  as if suggesting what was to come. Brief of Amicus Curiae at p.4-6, n2.

50.     Although there were several "cohorts," Id., involved in this burglary, Movant is assigned the sinister supposition although there is no evidence to support such a claim. Additionally, there is no evidence that the doll did not have the rope around its neck prior to the burglary.

51.     The AG is claiming that Movant "confessed" to a robbery in South Philadelphia. Sur-

Reply Brief of Amicus Curiae at p.15. That is a blatant falsehood.

Rob. Wharton
AY-6874
1200 Mokychic Dr.
Collegeville, Pa.
19426

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL



neopost
11/19/2021
US POSTAGE $002.56⁰

FIRST-CLASS MAIL

ZIP 19426
041M11225211



RECEIVED
NOV 22 2021

Kate Barkman,
Clerk
U.S. Dist. Crthse.
601 Market St.
Rm. 2609
Phila. Pa. 19106-1797

U.S.M.S.
X-RAY