# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON,

                *Petitioner*,

           *v.*

DONALD T. VAUGHN,

                *Respondent*.

Civil Action

No. 01-cv-6049

**GOLDBERG, J.**                                        **May 11, 2022**

## <u>MEMORANDUM OPINION</u>

In this ongoing federal death penalty habeas matter, Petitioner Robert Wharton, now joined by the Philadelphia District Attorney's Office, advocates that I vacate a jury's sentence of death, affirmed decades ago by the Pennsylvania Supreme Court. Both Wharton and the District Attorney assert that such relief should be granted because trial counsel was ineffective for failing to offer positive prison adjustment evidence during the death penalty phase of Wharton's trial. Both Wharton and the District Attorney take this position despite the fact that had trial counsel presented such mitigation evidence, Wharton's premeditated escape from a City Hall courtroom and his subsequent fashioning of escape tools in prison would also have been presented in rebuttal to the sentencing jury.

After considering the record developed during hearings on Wharton's habeas petition, and having reviewed the matter's entire history, I conclude that there is no reasonable probability that, but for counsel's alleged deficient performance, one juror would have voted to impose a life, rather than a death sentence.

This Opinion sets forth the basis for my denial of Wharton's ineffective assistance of counsel claim and also addresses an issue of possible lack of candor to the Court on the part of the Philadelphia District Attorney's Office.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Overview

Wharton received the death penalty in 1985 after he and his co-defendant forced their way into the home of Bradley and Ferne Hart at knifepoint and strangled the Harts to death. Wharton and his co-defendant then turned off the heat and abandoned the Harts' infant, Lisa, to freeze to death. Lisa was found two days later suffering from dehydration but miraculously survived.

Before me on remand from the United States Court of Appeals for the Third Circuit is Wharton's single, remaining ineffective assistance of counsel claim for death penalty habeas corpus relief. Wharton seeks to vacate his two death sentences because his trial counsel was allegedly ineffective for failing to present evidence of Wharton's alleged positive adjustment to prison at the penalty phase of his state court proceeding. I had previously decided that a hearing on this claim was unnecessary because Wharton had failed to make a prima facie showing of a Sixth Amendment violation. The Third Circuit disagreed and remanded the matter, directing that I hold an evidentiary hearing.

After I attempted to schedule this hearing, the District Attorney's Office, which had zealously defended Wharton's death sentence for decades, changed its position and advised that it now believed a Sixth Amendment violation had occurred and that it joined with Wharton in his requested relief. For reasons explained below, I invited the Pennsylvania Office of the Attorney General to participate in the evidentiary hearings so that I would have the benefit of a developed

factual record. These hearings were held on February 25, 2021, March 8, 2021, March 16, 2021, May 11, 2021, and August 5, 2021.

B.     **Wharton's Penalty Hearing and Death Sentence**

Wharton was first sentenced to death on July 5, 1985, but that sentence was vacated due to a jury instruction error. See Commonwealth v. Wharton, 607 A.2d 710, 721-24 (Pa. 1992). At Wharton's second penalty hearing in 1992, held seven years after the first, the Commonwealth presented evidence of the history between Wharton and the Hart family, including his participation in burglaries of the Hart home on August 14, 1983 and August 22, 1983 and a September 6, 1983 burglary of the Germantown Christian Assembly Church, where Bradley Hart worked. (See Aug. 16, 2012 Mem. Opinion, ECF No. 126, at 107.) The jury also heard the grisly evidence regarding Wharton's involvement in the murders of Bradley and Ferne Hart. (See id.)

In support of life imprisonment, Wharton's trial counsel, William Cannon, offered evidence of his character from his family members, including the testimony of his mother, brother, sister, aunt, cousin, and brother-in-law. They testified that Wharton was a good family member and community member; that he was kind, humble, athletic, loving, loveable, and "good with his hands"; and that he had accepted religion into his life. (See ECF No. 126 at 107; N.T., 02/25/21, 123:7-15, 125:4-126:16.)

Based upon this evidence, the jury found two aggravating circumstances: that Wharton committed a killing while perpetrating a felony (a robbery), 42 Pa. Con. Stat. § 9711(d)(6), and that Wharton had been convicted of another offense punishable by life imprisonment or death (that is, Wharton committed two homicides), 42 Pa. Con. Stat. § 9711(d)(10). The jury also found certain mitigating circumstances under the Pennsylvania statute's "catch-all" provision, 42 Pa. Con. Stat. § 9711(e)(8), including that Wharton "did not murder Lisa Hart," was a good family

member, and cooperated with police.[1] (N.T., 02/25/21, 121:7-13.) The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and, on December 23, 1992, returned a verdict of death on each murder count.

### C.   PCRA Proceedings

Following an unsuccessful direct appeal, Wharton petitioned for relief under Pennsylvania's Post Conviction Relief Act (PCRA). Among other arguments, Wharton contended that his trial counsel was ineffective at the second penalty hearing for failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between the two penalty hearings.

The PCRA court rejected Wharton's petition and the Pennsylvania Supreme Court affirmed, finding that Wharton had not shown either that counsel's performance was deficient or that Wharton was prejudiced by the failure to offer prison adjustment evidence. Commonwealth v. Wharton, 811 A.2d 978, 981 (Pa. 2002). Regarding deficient performance, the Pennsylvania Supreme Court decided that counsel did not act unreasonably by failing to present evidence of prison adjustment because the evidence was not "sterling" and "cut both ways." Id. at 988-89. Regarding prejudice, the court found that prison adjustment evidence could not have aided Wharton's case for life imprisonment because the evidence supported only the "catch-all" mitigating factor that the jury in fact found. Id. at 989. As explained below, the Court of Appeals for the Third Circuit later found this analysis to be an unreasonable application of federal law. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

---

[1]       "Mitigating circumstances shall include … [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Con. Stat. § 9711(e)(8).

     **D.**      **Wharton's Federal Habeas Petition**

Following the conclusion of the PCRA proceedings, Wharton filed federal habeas claims under 28 U.S.C. § 2254. On August 16, 2012, I issued an extensive opinion denying each of Wharton's twenty-three claims.

Wharton appealed, and in January 2018, the Court of Appeals for the Third Circuit affirmed twenty-two of those rulings and remanded for an evidentiary hearing on a single issue: Whether, under Strickland v. Washington, 466 U.S. 668 (1984), Wharton can establish that: (1) his counsel acted unreasonably by failing to investigate and/or present prison adjustment evidence; and (2) if so, there was a reasonable probability that at least one juror would have changed his or her vote if presented with prison records from the time between Wharton's death penalty hearings. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

The Third Circuit determined that the Pennsylvania Supreme Court used an "unreasonable application of Strickland" in affirming the denial of Wharton's PCRA petition and that Wharton was entitled to de novo review of the claim of counsel's failure to present prison records. Id. at 281. In considering whether Wharton had made a prima facie showing of a Sixth Amendment violation, the Third Circuit explained that Wharton's prison records from the time between his two penalty hearings could establish that he was adjusting well to prison life, and this may have affected the jury's sentence. The Third Circuit also noted that the prison records could "cut both ways" because "the Commonwealth might have countered with other evidence, including an expert holding a contrary opinion." Id. The Third Circuit thus determined that a hearing before me was necessary to resolve this remaining Strickland claim. Id. at 284.

Soon after remand, I scheduled a status conference with Wharton's counsel and the District Attorney to discuss the remand hearing process. On February 6, 2019, with little explanation, the District Attorney responded by filing a "Notice of Concession of Penalty Phase Relief," which in

pertinent part stated that the decision to concede was made "**[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel**." (Notice of Concession, ECF No. 155, ¶ 9.) This concession also advised that the District Attorney would not "seek new death sentences in state court" and that "the grant of sentencing relief on [Wharton's] penalty phase ineffectiveness claim in accordance with [the District Attorney's] concession would end the litigation of this case … and eliminate the need for … [further] proceedings in this Court." (Id. at ¶ 10-11.) The Notice provided no factual or legal analysis as to the District Attorney's basis for this complete about-face, and no explanation as to why, after decades of advocating for the death penalty, the District Attorney had now reached the conclusion that a Sixth Amendment violation had occurred due to a failure on trial counsel's part to introduce positive prison adjustment evidence. And as will be explained infra, this concession notice was filed five months after the Pennsylvania Supreme Court had explicitly found, in a death penalty matter on collateral review, that the District Attorney does not maintain prosecutorial discretion to alter a capital jury's verdict via an agreement or by concession and that vacating a jury's death sentence should only occur after careful and independent judicial review. Commonwealth v. Brown, 196 A.3d 130, 144-46 (Pa. 2018)

The District Attorney's concession notice was followed by a draft order, submitted two days later, by Wharton's counsel and the District Attorney. This Order proposed that the death penalty sentence be vacated and suggested that I had undertaken a "careful and independent review of the parties' submissions and all prior proceedings in this matter," and had thus concluded that a Sixth Amendment violation had in fact occurred. (Proposed Order, ECF No. 156.) Because I had

received no facts or analysis which would allow me to undertake a "careful independent review" and grant such extraordinary relief, I declined to sign this proposed order.

Rather, given the Third Circuit's directive to hold a hearing and the District Attorney's unwillingness to fully explain its concession, and based upon my obligation to independently examine the remaining issue in this case that necessarily required a full exploration of facts,[2] I ordered the parties to provide a fulsome explanation justifying the relief requested. (March 4, 2019 Order, ECF No. 160.) The District Attorney responded that the jury's verdict and the Pennsylvania Supreme Court's affirmance of that verdict should be overturned because: de novo review was ordered by the Third Circuit; trial counsel had submitted a declaration "that he had no strategy for not presenting adjustment evidence"; and at one point the jury had been deadlocked. (ECF No. 162.) The District Attorney thus continued to decline or refused to provide me with any evidence of Wharton's positive prison adjustment, the crux of the matter before me, nor did it advise that there was any evidence to the contrary I should consider—e.g., negative prison adjustment.

Given the District Attorney's continued reluctance to provide me with a meaningful analysis regarding its concession, and my inability to properly explore this highly factual issue, I appointed the Pennsylvania Attorney General to investigate and provide, if available, evidence of Wharton's prison adjustment, including contrary facts. As will be detailed infra, the Attorney

---

[2]     In Sibron v. New York, 392 U.S. 40 (1968), the United States Supreme Court reasoned that "[i]t is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained." Id. at 58. Other precedent, including a recent pronouncement by the Pennsylvania Supreme Court, supports this conclusion. See Young v. United States, 315 U.S. 257, 258-59 (1942) ("[O]ur judicial obligations compel us to examine independently the errors confessed."); Commonwealth v. Brown, 196 A.3d 130, 141-49 (Pa. 2018) ("[I]f the 'power' of a court amounts to nothing more than the power 'to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power.'").

General's investigation revealed significant negative prison adjustment evidence, including an attempted, planned escape from a City Hall courtroom and subsequent efforts to manufacture escape tools while in prison.

In addition, because the District Attorney cited communications with the victims' family members as a reason for its concession of death penalty relief, and because I have a statutory obligation in 28 U.S.C. § 2254 proceedings to afford victims an opportunity to be heard where sentencing or release is involved, I allowed that the parties and the Attorney General could introduce evidence of the District Attorney's communication with the victims' family members and the family's view on the proposed concession of relief. (Notice of Concession, ECF No. 155, ¶ 9.)

## II.    **EVIDENCE PRESENTED AT THE HABEAS EVIDENTIARY HEARINGS**

Hearings in this matter took place over the course of five days. During these proceedings, I heard testimony from multiple prison and psychiatric experts, Wharton's trial counsel, a former corrections officer assigned to Wharton's housing unit, a former Department of Corrections ("DOC") hearing examiner who reviewed one of Wharton's misconducts, and a former Philadelphia Assistant District Attorney who was present on the day of Wharton's escape from a Philadelphia Court of Common Pleas courtroom in 1986. I also heard testimony regarding the District Attorney's communications with the victims' family.[3]

I have considered the following facts in conjunction with Wharton's remaining Sixth Amendment claim. These facts cover Wharton's prison adjustment between the two jury verdicts sentencing Wharton to death, which is the relevant time period for purposes of Wharton's Sixth

---

[3]     As the victims' family's testimony has no bearing on the merits of Wharton's Sixth Amendment claim, it is discussed later in this opinion.

Amendment Claim. <u>See</u> <u>Wharton</u>, 722 F. App'x at 283 (analyzing "Wharton's prison records for the time between his two penalty hearings").[4]

### A.     Trial Counsel's Investigation into Prison Adjustment

1.     Wharton's trial counsel, William Cannon, acknowledged that he did not investigate Wharton's prison adjustment in preparation for the penalty hearing. Cannon admitted there was no strategy involved in his decision not to request prison records and that it was "pure ignorance." (N.T., 02/25/21, 129:2-14.)

2.     Cannon had worked on four or five prior cases where his client faced a possible death penalty, but Wharton's case was the first time he had represented a client at the penalty phase of such a proceeding. (N.T., 02/25/21, 106-07.)

### B.     Wharton's Adjustment to Incarceration: The 1986 Escape Attempt

3.     On April 21, 1986, less than a year after he was first sentenced to death (but before judgment of death was formally entered), Wharton was transported to City Hall in Philadelphia County to attend a sentencing hearing in an unrelated robbery case. (OAG Ex. 6.)

4.     When given an opportunity to address the court, Wharton stated:

> … I believe I did lose sight of reality and caused a lot of people pain and suffering. As you said, something went wrong somewhere. Unfortunately the family isn't here to accept my apology, but I'm sorry and any time I serve I will use to better myself.

(N.T., 04/21/1986, 36.)

5.     Shortly after making this statement, and while being transported from the second-floor City Hall courtroom to the seventh-floor "cell room," Wharton pushed the deputy sheriff transporting him into a closing elevator door and ran down the courthouse stairs from the second

---

[4]     The Attorney General investigated and presented all of the evidence regarding Wharton's negative prison conduct and adjustment.

to the first floor. (OAG Ex. 7.) To effectuate this escape, Wharton had used a key to open his handcuffs. (Id.) While Wharton was fleeing down a public stairwell toward the exit leading to the street, a deputy sheriff was forced to fire two shots at Wharton to prevent his escape, wounding Wharton in the left thigh. (Id.)[5]

6.      On December 3, 1986, as a result of this incident, Wharton pled guilty to escape. (OAG Exs. 11-12.)

**C.      Wharton's 1986 Classification Assessment**

7.      In July 1986, the Pennsylvania Department of Corrections ("DOC") performed a classification assessment for Wharton. The DOC's Classification Summary includes Wharton's account of the Hart murders:

> "In 1/84, two other guys and I burglarized a house in S. Phila. and robbed the owners. We took their car and were later arrested after one of the guys left his identification in the car. Police found the guy's cards. One guy got arrested, implicated me and I was arrested about 2 months later."

(OAG Ex. 39 at 4.)

8.      The Summary included a psychiatric report, which, consistent with the above, noted that Wharton "used a great deal of denial and rationalization." (OAG Ex. 39 at 8.) The report stated:

> [Wharton] impresses as a sociopath with dependent features and dissocial attitudes. He does not cope well with rejection and tends to cling to important

---

[5]      In a prior written order, I overruled Wharton's objection to admission of the facts underlying his escape as reflected in the 1986 arrest report. (ECF No. 227 ¶¶ 11-14.) When Wharton pleaded guilty to escape, he signed an acknowledgement that the "facts" of the crime had been read to him. (Id. ¶ 13.) I therefore ruled that, in 1992, the Commonwealth could have sought to introduce these facts as Wharton's adoptive admission. (Id. ¶ 14.)

Other details pertaining to Wharton's 1986 escape are set out in newspaper articles. As to these, I found that the articles were not admissible to prove the truth of the facts described therein. (Id. ¶ 20.) Rather, the newspaper articles were accepted only to show that the parties would have been aware of the facts contained in them when preparing for the 1992 sentencing hearing.

others. He does not trust authority figures and will not seek their help. He found acceptance among a group of his peers and was easily led by them.

(Id.)

9.     The Summary determined that Wharton was "<u>an extremely high public risk because of his Murder detainer and because he admits attempting to escape from Sheriff's on 4/21/86</u>." (OAG Ex. 39 at 4 (emphasis added).) The Summary also determined that Wharton was a "moderate institutional risk." (Id.)

### D.     Wharton's Prison Adjustment at SCI Huntington

10.    In September 1986, Wharton was placed at the Restricted Housing Unit ("RHU") at State Correctional Institution Huntington ("SCI Huntington"). (N.T., 02/25/21, 18:11; N.T., 02/25/21, 20:25-21:2.)

### 1.     Misconduct Findings

11.    While incarcerated at SCI Huntington, Wharton received six misconducts, the last occurring in 1992. (N.T., 02/25/21, 22:12-14; N.T., 05/11/21, 18:16-24.) None of Wharton's misconducts involved violence, and four were relatively minor. (N.T., 02/25/21, 22:14-23:10; N.T., 05/11/21, 19:2-5; N.T., 08/05/21, 42:2-11, 62:4-16.) However, two of Wharton's misconducts, described below, were considered by Huntington to be serious, involving implements of escape. (N.T., 02/25/21, 22:15-23:8; N.T., 03/16/21, 10:19-20; N.T., 05/11/21, 19:5-23; N.T., 08/05/21, 65:3-9.)

12.    On May 15, 1989, Daniel Hayes, a Corrections Officer assigned to the RHU, found two pieces of broken antenna in one of the holes in the wall behind Wharton's toilet where there was a bolt securing the toilet to the wall. (N.T., 03/16/21, 156:6-158:15; N.T., 03/16/21, 165:1-19.) The smaller piece of antenna was fashioned into the shape of a handcuff key. (Id.; OAG Ex. 17A.)

13.     Hayes had been employed at SCI Huntington for about five years and had used handcuffs and handcuff keys every day. (N.T., 03/16/21, 150:18-153:20.) The makeshift handcuff key found in Wharton's cell was the only time in Hayes's 28-year career that he had found a makeshift handcuff key that he thought "would work." (N.T., 03/16/21, 163:21-24.) Wharton's cell was a single cell that had been occupied only by him when Hayes found the makeshift handcuff key. (N.T., 03/16/21, 199:19-200:3; OAG Ex. 17C.)

14.     Hayes filed a misconduct report against Wharton for possessing implements of escape. (OAG Ex. 17A.) Hayes's report was reviewed and approved by the ranking corrections officer on duty, "C. Kyle." (Id.; N.T., 03/16/21, 160:15-161:8.) Hayes showed Kyle the pieces of antenna that he had found before Kyle "signed off" on the report. (N.T., 03/16/21, 160:15-161:8.) Kyle did not conduct an additional investigation of the incident. (N.T., 03/16/21, 172:19-23.) There is no evidence that Wharton had used or attempted to use the handcuff key. (N.T., 02/25/21, 27:2-7.)

15.     Wharton pled not guilty to the misconduct, arguing that another inmate in the cell before him must have hidden the antenna behind the toilet. (OAG Ex. 17B.)

16.     George Conrad was the hearing examiner with the Pennsylvania Department of Corrections in 1989 who presided over Wharton's misconduct hearing stemming from the makeshift handcuff key. (N.T., 03/16/21, 185, 190-91.) As reflected in the Disciplinary Hearing Report on Wharton's misconduct, Conrad found that the physical evidence "clearly represents a handcuff key. Conrad stated the key was found in a single cell occupied by Wharton for several months. It is more likely than not that the key was possessed and under the control of Wharton." (OAG Ex. 17C.) Conrad found Wharton guilty. (N.T., 03/16/21, 196.)

17.     Conrad admitted that inmates can sometimes be taken out of their cells unexpectedly with no time to gather any contraband, and, at the time of the hearing, there was no evidence presented regarding when the toilet mounting in Wharton's cell had been searched prior to May 15, 1989. (N.T., 03/16/21, 209:15-210:9; N.T., 03/16/21, 211:18-212:2.) However, as the Attorney General's corrections expert, Jeffrey Beard, testified, each RHU cell is searched before a new inmate is moved into it. (N.T., 05/11/21, 40:8-41:14.)

18.     Four days after the May 15, 1989 search of Wharton's cell and finding of a handcuff key, Wharton's cell was searched again, and an additional four-inch piece of antenna was found hidden in the binding of Wharton's legal material. (OAG Ex. 19A.) Wharton was again found guilty of possessing implements of escape. (OAG Ex. 19C.) The hearing examiner at Wharton's second misconduct hearing in 1989 noted that Wharton, again, denied that the piece of antenna was his, stating that he had "no idea" where the corrections officer found it. (OAG Ex. 19B.) The hearing examiner explained: "[T]he reporting officer specifically found the piece of antenna in [Wharton's] legal material binding. Wharton is in a single cell and has sole control over his possessions. … Also noted that a handcuff key was fashioned out of such a piece [of] material in the past by Wharton." (OAG Ex. 19B.)

19.     According to the Department of Correction's Policy Statement on Inmate Disciplinary and Restricted Housing Procedures, possession of contraband/implements of escape is a Class 1, Category B misconduct. (OAG Ex. 27; N.T., 05/11/21, 43:5-44:2.) The only misconducts more serious than implements of escape, which are in Category A of the Class 1 misconducts, are murder, rape, arson, and robbery. (Id.) Conrad explained that possessing implements of escape is a significant misconduct because it presents "a serious threat to a prison system" and the outside community. (N.T., 03/16/21, 194.)

20.     Wharton was sentenced to 90 days in Disciplinary Custody, the maximum sanction for a Class 1 misconduct, for each of his 1989 implements of escape misconducts. (OAG Exs. 17C, 19C; N.T., 05/11/21, 39:21-24.) Wharton was released from Disciplinary Custody three weeks early for good behavior. (N.T., 05/11/21, 64:1-15.)

21.     Conrad testified that in his experience, approximately ten to twelve of the more than a thousand hearings in which he participated during the ten years that he was a Hearing Examiner involved a makeshift handcuff key. (N.T., 03/16/21, 206:5-17.) He explained that such a misconduct was uncommon. (Id.)

22.     As late as 1990, Wharton denied the possession of the antenna material, telling the Program Review Committee ("PRC") that he had served his time and did not want to discuss it. As a result of his refusal to accept responsibility for these misconducts, Wharton's radio and television privileges were not reinstated until March 1990. (N.T., 05/11/21, 54:20-56:3; OAG Ex. 37C.)

2.     Wharton's Participation in Prison Life

23.     While incarcerated at SCI Huntington, Wharton had the opportunity to attend monthly meetings with the PRC to review his conduct and prison adjustment. (N.T., 03/08/21 (Part 2), 24:25-25:20, 55:5-10, 56:17-57:4; see also Wharton Ex. 4 at 919-990; OAG Exs. 37A-C.) Inmates were not required to attend these meetings and could decline to do so. (Id.; N.T., 08/05/21, 50:25-51:10.) Wharton attended approximately forty percent of the PRC meetings available to him during the relevant period. (Id.)

24.     The PRC noted in various reviews that Wharton was polite, cordial, well-mannered, well-behaved, and had regular contacts with his counselor. (N.T., 02/25/21, 132:2-140:19; see Wharton Ex. 4 at 919-990; OAG Ex. 37A-C; N.T., 08/05/21, 39:6-14.) Wharton did not exhibit any signs of assaultive, predatory, or violent behavior while incarcerated at SCI Huntington during

14

the relevant time period. (N.T., 08/05/21, 42:6-11.) According to Wharton's corrections expert, Baird, the PRC repeatedly noted that Wharton was adjusting well. (N.T., 08/05/21, 48:20-24.)

25.     DOC records for Wharton also include Prescriptive Program Plans ("PPP"). (OAG Exs. 31A-D.) In various PPP reports, DOC staff notes that Wharton "maintain[s] misconduct free behavior," "sustain[s] positive housing reports," "exercise[s] routinely," "maintain[s] counselor contacts," and "continue[s] with educational development." (N.T., 05/11/21, 117:8-10.)

26.     Wharton also participated in a poetry project while incarcerated. (N.T., 02/25/21, 138:10-17; N.T., 05/11/21, 65:1-7; N.T., 08/05/21, 40:15-22.) He made efforts to improve his education by seeking to earn his high school equivalency diploma, playing chess, and learning Spanish. (N.T., 02/25/21, 32:4-16, 139:3-139:14; N.T., 05/11/21, 65:8-19; see also OAG Ex. 39; N.T., 08/05/21, 40:15-22.)

27.     The 1986 Classification Assessment noted that Wharton "expressed an interest in both academic and vocational programs." (OAG Ex. 39 at 3.)

28.     Wharton made multiple requests to study for his GED while at SCI Huntington. (Wharton Ex. 4 at PE0965-66, 0972.) When these requests were denied, Wharton filed a grievance. (Id. at PE0867.) In response to the grievance, prison staff "arranged" for capital inmates such as Wharton to be given GED tests. (Id.) The response also "commend[ed] [Wharton] for [his] interest in taking the test." (Id.)

29.     The 1986 Classification Assessment noted that Wharton had an interest in "Bible Study and Chapel services while incarcerated." (OAG Ex. 39 at 3.)

30.     Wharton was visited by family members during the relevant period of incarceration and regularly attended chapel services. (N.T., 02/25/21, 139:18-23; N.T., 05/11/21, 65:13-16, 84:1-4; see also OAG Ex. 39; N.T., 08/05/21, 40:13-22.)

31.     Wharton received no negative housing reports or negative psychiatric reports. (N.T., 05/11/21, 116:23-117:5; see also Wharton Ex. 4 at 992-1019.)

32.     Wharton utilized the grievance system at SCI Huntington. (N.T., 02/25/21, 31:15-32:3; 143:16-144:24; Wharton's Ex. 4 at 768-918.) "When [Wharton] felt that he was not being treated fairly or that the conditions with his confinement were not appropriate, he would file a complaint." (N.T., 02/25/21, 31:18-20.)

### E.     Trial Counsel's Later Assessment of Wharton's Adjustment After He Had an Opportunity to Review Prison Adjustment Information

33.     Wharton's Trial Counsel, William Cannon, acknowledged that the prosecution's case at the second penalty hearing was "extremely strong." (N.T., 02/25/2021, 128:2-3.)

34.     Cannon felt that the mitigation evidence he offered at the penalty hearing, which consisted of testimony from Wharton's family members, "wasn't strong." (N.T., 02/25/2021, 128:4-16.)

35.     Cannon first reviewed Wharton's prison records in connection with the present federal proceedings, roughly six months before the evidentiary hearing. After this review, Cannon believed Wharton's adjustment to prison was "extremely favorable, extremely," and "all positive." (N.T., 02/25/2021, 131-34.)

36.     Cannon testified that he would have wanted to present Wharton's prison records to the jury and regretted "so much" that he did not do so in 1992. (N.T., 02/25/2021, 138-39.)

37.     Cannon said he would have argued from the prison records that Wharton was

> a person who ha[d] accepted his then situation in life. He is either going to serve … the rest of his life in prison or he's going to face the death penalty, but rather than hang his head, he pursues things that [allow] him to be a semi-vibrant member of the prison community by seeking educational opportunities, doing writings, doing drawings and participating to the extent that he can in prison life in a meaningful way.

(N.T., 02/25/2021, 139.)

16

38.     Cannon felt this evidence would have corroborated the positive testimony of Wharton's family members. Cannon also believed that records of Wharton's grievance filings helped Wharton's image by showing he was "living within the system." (N.T., 02/25/2021, 140, 144.)

39.     Cannon acknowledged that presenting evidence of positive prison adjustment would have opened the door to rebuttal evidence. (N.T., 02/25/2021, 174.)

40.     Cannon did not consider the misconducts for possessing makeshift handcuff keys a problem because the keys were never used. (N.T., 02/25/2021, 148, 191.)

41.     When Cannon represented Wharton at the 1992 sentencing hearing, he was aware of Wharton's 1986 escape. (N.T., 03/08/2021, 35.) Had the prosecution sought to introduce Wharton's escape conviction to rebut evidence of Wharton's adjustment to prison, Cannon would have sought to exclude the escape charge on the ground that it happened while Wharton was in County, rather than State, custody. Alternatively, Cannon would have sought to exclude the facts surrounding the escape. (N.T., 02/25/2021, 161-62.)

42.     Even if the escape charge could not be excluded at the penalty phase, Cannon testified that he would still have presented prison adjustment evidence to the jury. Cannon conceded that he could have "done without" evidence of the escape charge, but explained that the facts related to Wharton's escape efforts were minor compared to the "very grisly and bad" facts of the murders that the jury would have heard anyway.  (N.T., 02/25/2021, 33, 163, 200.)

F.     **Expert Opinions on Wharton's Adjustment**

43.     Corrections officers Hayes and Conrad, as well as the Attorney General's corrections expert, Jeffrey Beard,[6] all testified that an inmate, especially one housed in the RHU, in the possession of a handcuff key is a serious threat to a prison system, to staff at the facility, the inmate, other inmates at the facility, and the community outside of the prison. (N.T., 03/16/21, 159:3-160:14, 194:1-25, 204:13-206:4; N.T., 05/11/21, 38:2-15, 46:4-47:3; N.T., 08/05/21, 103:7-12.) Hayes, Conrad, Beard, and Wharton's own corrections expert, Maureen Baird,[7] all confirmed that an implements of escape charge constitutes a very serious misconduct. (Id.)

44.     Wharton's corrections expert Baird acknowledged that in her experience, escape is a "greatest security level prohibited act." (N.T., 08/05/21, 96:15-19.)

45.     Baird considered Wharton's use of PRC meetings "appropriate." (N.T., 08/05/21, 47:24-48:19.) Baird explained that one of the reasons why a prison system conducts reviews for a capital inmate is so that the inmate can discuss problems they are having or make requests of the Committee. (Id.) The PRC meetings are a forum for the inmate to voice his concerns. (Id.)

46.     Baird opined that Wharton's use of the grievance process was "appropriate," "constructive," and "pro-social" or, in other words, that he used this process "the way it was intended." (N.T., 08/05/21, 61:20-24.) Baird explained that Wharton often attempted to resolve issues informally with prison staff first, but, if they were not resolved, he would file a grievance. (Id.) Baird stated that Wharton was, in fact, often granted relief by the institution after filing a

---

[6]     Jeffrey Beard is the former Secretary of Corrections of both the State of California and the Commonwealth of Pennsylvania. He has been working in corrections since 1971. Beard currently works as a consultant on correctional issues. (OAG Ex. 5.)

[7]     Maureen Baird has been employed as a warden and other executive roles in various federal prisons since 1989. Baird also currently works as a consultant on correctional issues. (Wharton's Ex. 41.)

grievance. (N.T., 08/05/21, 57:14-59:23; Wharton's Ex. 4 at 780-81 (food tray grievance).) She characterized Wharton's tone in these grievances as "not demanding," "polite," and "well-mannered." (N.T., 08/05/21, 59:24-60:7.)

47.     According to Baird, Wharton's records showed that the impression of Wharton from his counselor and the members of the PRC was "overly positive." (N.T., 08/05/21, 46:15-21.) Baird said Wharton had a rapport with and the respect of prison staff. (N.T., 08/05/21, 67:17-23.)

48.     Baird explained that "strong ties" to family are important to an inmate's adjustment. According to Baird, family visits demonstrate to an inmate that "somebody really cares about [him]," which is significant because a lack of family connection while incarcerated can lead to feelings of "hopelessness" and a negative adjustment. (N.T., 08/05/21, 40:23-42:5.)

49.     Baird noted that, in the isolation of the RHU, an inmate's mental health can decline rapidly. (N.T., 08/05/21, 55:20-25.) "Everything becomes … overly depressive," including "feelings of hopelessness," and "inmates will start acting out after … a long period of restricted housing." (N.T., 08/05/21, 56:3-17.) Baird testified that there was no evidence of this kind of mental deterioration and no evidence of a mental health issue that could affect institutional safety or institutional adjustment in Wharton's psychiatric records. (N.T., 08/05/21, 56:18-57:5.) Baird expressed surprise that Wharton handled restrictive housing "so well." (Id.)

50.     Wharton's psychiatric expert, Neil Blumberg,[8] testified that when Wharton tortured and murdered the Harts, he was 21 years old, and his brain was not fully developed. (N.T.,

---

[8]     Neil Blumberg is a medical doctor and licensed psychiatrist who has provided expert consulting services in various roles in the criminal justice system, including in capital sentencing. (Wharton's Ex. 14; N.T., 02/25/21, 15-17.)

02/25/21, 25:2-10.) In Blumberg's opinion, Wharton's prison psychiatric records reflect a more mature brain with a reduced tendency to engage in impulsive behavior. (Id.)

51.     In particular, Blumberg noted that Wharton met regularly with a counselor and never received a negative report. (N.T., 02/25/21, 21:12-25:24; see also N.T., 05/11/21, 116:23-117:7; N.T., 08/05/21, 52:16-22, 120:12-24.)

52.     Experts on both sides agreed that Wharton did not meet the criteria for antisocial personality disorder. (N.T., 02/25/21, 20:5-8; N.T., 03/08/21 (Part 2), 14:11-25.)

53.     The Attorney General's psychiatric expert, Dr. John O'Brien,[9] opined that Wharton did exhibit some antisocial traits, including that Wharton "can present himself as behaving in a certain way when … evidence suggests that he's actually thinking and preparing to behave differently." (N.T., 03/08/21 (Part 2), 32:2-5.) Wharton's corrections expert, Baird, disagreed, noting that prison staff are trained to identify inmates who are "[phonies]" or "manipulators" and that there was no indication in the records demonstrating that Wharton possessed these character traits. (N.T., 08/05/21, 47:11-23.)

54.     The Attorney General's corrections expert, Jeffrey Beard, testified that being polite to staff, attending PRC meetings, meeting with a counselor, and exhibiting no negative housing or psychiatric reports reflects the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

55.     Beard characterized elements of Wharton's 1986 escape as suggesting a "premeditated" plan. Specifically, Wharton came into City Hall with a concealed handcuff key,

---

[9]     John O'Brien is a medical doctor and former licensed psychiatrist who has been employed as a staff psychiatrist at various hospitals. (OAG Ex. 2.)

and may have been feigning an arm injury so that he could keep one arm unrestrained in a sling. (N.T., 05/11/2021, 27-28.)

56.    Beard stressed that Wharton's repeated effort to escape "throws into question" all the positive reports from Wharton's counselors and other prison staff. Beard described how Wharton appeared "very contrite" at his 1986 plea allocution in City Hall, while, at the same time, Wharton was carrying a concealed handcuff key and planning to escape. Beard compared this behavior to Wharton's politeness with staff at SCI Huntington while Wharton was simultaneously in possession of makeshift handcuff keys. Beard stated that such behavior fit his experience with inmates who appear polite while waiting for staff to let "their guard down." (N.T., 05/11/2021, 48-49.)

57.    Ultimately, Beard considered Wharton's 1986 escape and two misconducts for possessing implements of escape to "form the greater part of [his] opinion that [Wharton] had negative adjustment" to prison. (N.T., 05/11/2021, 46.) These incidents were most significant to Beard because they "put the community at risk." (Id.)

## III.    DISCUSSION: STRICKLAND ANALYSIS

Wharton asserts that his Sixth Amendment rights were violated during the second penalty hearing when his counsel failed to obtain and introduce mitigating evidence contained in his prison files for the seven years following Wharton's 1985 murder convictions. Wharton claims that his prison files from that period provided counsel with significant mitigating circumstances to explore and present to the jury as evidence that he "made a positive adjustment to prison life; [would not be] a future danger should he remain incarcerated for life; and [was] amenable to rehabilitation." (Pet. at 55.)

Ordinarily, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts owe substantial deference to the decisions of state courts. <u>Weeks v. Snyder</u>, 219 F.3d 245, 258 (3d Cir. 2000). Here, the Third Circuit has previously determined that the Pennsylvania Supreme Court's reasoning in denying Wharton's Sixth Amendment claim constituted an unreasonable application of federal law and that Wharton was entitled to a de novo review of this claim in federal court.[10] <u>Wharton</u>, 722 F. App'x at 280-81. I therefore consider de novo whether Wharton has satisfied the requirements of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Under <u>Strickland</u>, Wharton must "show that counsel's performance was deficient" and that this performance caused him prejudice. <u>Strickland</u>, 466 U.S. at 687. A court may approach the analysis in either order, and, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." <u>Id.</u> at 697. Because the prejudice element of Wharton's <u>Strickland</u> claim is more straightforward, I begin my analysis there.

To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." <u>Id.</u> Because Wharton is challenging the sentence imposed at a penalty hearing,

---

[10]     The Third Circuit found that the Pennsylvania Supreme Court misapplied both the deficient performance and prejudice elements of <u>Strickland</u>. As to deficient performance, the Third Circuit decided that Cannon's decision not to obtain prison records could not be defended on the ground that the records "cut both ways" since Cannon was unaware of the records' contents. <u>Wharton</u>, 722 F. App'x at 280. As to prejudice, the Third Circuit found it unreasonable to assume that additional evidence going to the "catchall" mitigating factor was superfluous merely because the penalty jury already found that factor. <u>Id.</u> at 280-81. Rather, since the jury must weigh the aggravating and mitigating factors, additional evidence to support the "catchall" factor had the potential to tip the balance, and thus a hearing in federal court was necessary to develop that evidence. <u>Id.</u>

prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty." Bond v. Beard, 539 F.3d 256, 285 (3d Cir. 2008).

In considering prejudice, I must review the evidence that was before the sentencing jury; the mitigating evidence that counsel failed to present; and "the anti-mitigation evidence that the Commonwealth would have presented to rebut" that evidence. Williams v. Beard, 637 F.3d 195, 227 (3d Cir. 2011). Once the record is "reconstructed," I must "reweigh the evidence in aggravation against the totality of available mitigation evidence" and determine whether there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. Id. (internal quotation marks omitted).

### A.     The Evidence Presented at the Penalty Hearing

During Wharton's 1992 penalty hearing, the Commonwealth presented evidence of the history between Wharton and the Hart family, including the burglaries of their home and Bradley Hart's father's church. Because those facts were important in establishing the aggravating factors underlying Wharton's death sentence, and are therefore important in my Strickland analysis, I recount those here.

Angry that he had not been paid what he believed was a debt owed for construction work, in early August, 1983, Wharton and Larue Owens went to the Harts' home at a time when they knew the family would be at church. Wharton entered the house through an unlocked basement window, and he and Owens stole numerous items. (N.T., 12/15/92, 95-99.)

On August 22, 1983, the next Sunday, Wharton and Owens, joined by co-defendant Eric Mason, again burglarized the Harts' home. This time, in addition to stealing property, they committed multiple acts of vandalism that resulted in the house being temporarily uninhabitable. Wharton and his cohorts smeared pancake batter, mustard, and tomato sauce on the walls, slashed

the sofa and sliced its cushions, defaced family pictures by blotting paint on the faces of Bradley, Ferne, and their baby daughter Lisa Hart, left a child's doll hanging with a rope tied around its neck, left the refrigerator door open, piled food inside the oven and turned it on, dumped the contents of cabinets and drawers all over the kitchen, urinated in the second floor hallway and defecated on the bathroom floor, heaped clothes on the bed and splattered them with paint and turpentine, flipped over the bassinet and slashed the baby's mattress in the form of an "X," threw books and papers all over the floor of the office, and turned up the thermostat causing the smell of urine and rotten eggs to permeate the home. (N.T., 12/14/92, 79-84, 83-86, 98; N.T., 12/16/92, 99-101.)

On September 4, 1983, Wharton and Mason burglarized the Germantown Christian Assembly, a church founded by Bradley Hart's father. Wharton and Mr. Mason stabbed a picture of Bradley Hart on the wall with a letter opener and stole a computer and petty cash. (N.T., 12/15/92, 17-18.)

Finally, on January 30, 1984 at 10:00 p.m., Wharton confronted Bradley Hart at knifepoint and forced his way into the Harts' home. Once inside, Wharton let Mason in and ordered Bradley Hart to write him a check for $935.00. Wharton and Mason then tied up Bradley and his wife, Ferne, holding them and their seven-month-old daughter Lisa. After watching television for several hours, Wharton decided to kill the victims to avoid being identified. He and Mason separated Bradley and Ferne. Wharton took Ferne Hart and her daughter to the second floor, and Mason took Bradley Hart to the basement. Wharton taped Ferne's face with duct tape covering her eyes and mouth and tied her hands and feet. They similarly taped and bound Bradley Hart. They also wrapped electrical cords around Bradley's neck. (N.T., 12/14/92, 123-25; N.T., 12/17/92, 8-9.)

24

Wharton and Mason removed various items from the house, including silverware, cameras, jewelry, and the victims' wallets, and placed them in Bradley's car. Wharton returned to the second floor, moved Ferne to the bathroom, strangled her with one of her husband's ties, then filled the bathtub and forced her head under water. Mason forced Bradley Hart to lie on the floor of the basement with his face in a shallow pan of water. He then stood on Bradley's back and pulled the cords around his neck, strangling him to death. (N.T., 12/17/92, 9-10.) Wharton and Mason removed additional property from the house, including the baby's crib, then turned off the heat and drove away in Bradley's car, leaving seven-month-old Lisa, in the dead of winter, with her dead parents. (N.T., 12/17/92, 10.) Lisa was found two days later suffering from severe dehydration, and on the way to the hospital, suffered respiratory arrest, but survived. (N.T., 12/15/92, 34-36, 47.)

In seeking life imprisonment at the second penalty hearing, Wharton countered those facts with evidence of his character from his family members. (See infra Section I.B.)

It is important to consider the strength of the evidence already offered in support of Wharton's death sentence because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Here, the vicious nature of Wharton's offenses and the aggravating circumstances found by the jury cannot be understated. The brutality exhibited by Wharton and his co-defendant as they terrorized Bradley and Ferne Hart for months before murdering them and leaving their infant daughter to freeze to death would surely have weighed heavily in the minds of the jury.[11]

---

[11]   The District Attorney points to the fact that: (1) deliberations lasted two or three days (depending on how it is counted); and (2) at the end of the second day, the jury submitted a note stating, "We the Jury at this point in time are unable to reach a unanimous verdict." (N.T.,

**B.      Mitigating Evidence Not Presented and Rebuttal Anti-Mitigation Evidence**

I must now decide whether, had evidence of Wharton's adjustment to prison been added to the above presentation, there is a reasonable probability that the outcome would have been different. This analysis must be done in conjunction with considering anti-mitigation evidence that would have been offered in rebuttal. In so doing, the question is not whether Wharton's adjustment was positive or negative. Rather, I must determine whether there is a reasonable probability that one juror would have found that Wharton's evidence of mitigation, including his prison adjustment, outweighed evidence in aggravation.

Wharton proposes that his counsel could have offered evidence of his positive behavior while in prison. To recap, Wharton's positive behavior was that he attended PRC meetings, actively pursued his education, took part in a poetry activity, attended chapel services, was polite to staff, and handled disagreements through the proper grievance process rather than acting out. (Supra ¶¶ 23-32.) In addition, Wharton amassed only two serious misconducts during his six years in prison, and could have offered an expert to characterize his behavior as positive. (Supra ¶¶ 11, 48-55.)

Again, under Strickland, I cannot consider these facts in isolation but rather must do so as part of "the totality of the evidence before the … jury," including the prosecution's case for

---

12/22/92, at 12-13.) According to the District Attorney, these facts establish a reasonable probability that, had the jury been presented with positive prison adjustment evidence, one juror would have voted for a life sentence.

In some cases, the length of a jury's deliberations can be relevant in assessing whether an error during trial was harmless. See Johnson v. Superintendent, SCI Fayette, 949 F.3d 791, 805 (3d Cir. 2020). Johnson is the most recent Third Circuit case to consider this issue. In Johnson, the jury deliberated for six full days (longer than the trial itself), and the Third Circuit viewed the trial evidence to be "not overwhelming." Id. at 805. Johnson also involved a significant Confrontation Clause violation. Here, the jury heard overwhelming evidence of aggravating factors. A three-day deliberation over whether to impose a death sentence provides little insight into what form the jury's deliberations took before the jury was ultimately convinced of its conclusion.

aggravation. Strickland, 466 U.S. at 695. In so doing, and after careful review of all the prison conduct evidence, I agree with corrections expert Jeffrey Beard, who explained that the behavior Wharton characterized as positive is the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

Wharton also offered expert testimony that, at the time of the murders, he was just 21 years old and his brain was not fully formed. While I agree that Wharton's age should be considered, his deliberate method of murdering the Harts reflects much more than youthful impulsivity. And in any event, the positive aspects of Wharton's adjustment to SCI Huntington were unremarkable, and would not have convinced the jury that Wharton had grown into a less dangerous person while incarcerated.

This conclusion is significantly strengthened by the fact that Wharton's "adjustment" in prison was marred by multiple efforts to escape. Wharton's escape conviction and surrounding facts, wherein he fled from a courthouse and had to be shot by Philadelphia Sheriffs to prevent him from entering into the public, would greatly undermine any positive prison adjustment evidence. It is difficult to fathom how any juror would have found Wharton's positive adjustment evidence more significant than this premeditated escape from a City Hall courtroom followed by two subsequent misconducts, received days apart, for possessing a makeshift handcuff key and other implements of escape. This particular evidence would be most significant in the minds of the sentencing jury, especially when viewed in conjunction with the facts of Wharton's murder of Bradley and Ferne Hart.

Wharton and the District Attorney emphasize that Wharton's trial counsel, William Cannon, did not view Wharton's attempts to escape as sufficiently serious to outweigh the mitigating effect of Wharton's prison adjustment evidence. While Mr. Cannon's assessment of his

own effectiveness may be relevant, I find his testimony unconvincing. At Wharton's 1992 penalty hearing, Cannon called Wharton's mother, as a witness, to ask for mercy, who acknowledged, tearfully, that her "son will never be free." (N.T., 12/21/1992, 37.) Cannon then recalled the mother's testimony in closing to remind the jury that Wharton "is never coming out of jail," an argument that would have had little value had the jury heard the escape evidence. (Id. at 89.)[12]

Similarly, I agree with Beard's assessment that Wharton's 1986 escape and subsequent misconducts for possessing implements of escape reflect calculated planning and undermine Wharton's superficially good prison behavior. While Wharton promised the sentencing judge in 1986 that he would seek to better himself while in prison, he simultaneously possessed a handcuff key that he used to nearly escape from City Hall. And while Wharton acted politely toward prison staff at SCI Huntington, he continued his efforts to make yet another handcuff key. These facts would have greatly undermined, rather than corroborated, Wharton's family members' testimony as to his character. In particular, the jury would be left with the distinct impression that Wharton's positive attributes could not be trusted.[13]

---

[12]     Cannon also testified that he would have sought to exclude evidence of the escape. Such effort would not have succeeded. In a death penalty hearing, the prosecution may offer evidence to rebut the defendant's evidence in mitigation, even if the rebuttal evidence does not itself constitute an aggravating factor. See Commonwealth v. Basemore, 582 A.2d 861, 870 (Pa. 1990); see also Wharton, 722 F. App'x at 283 ("[W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony….").

[13]     I also note that had the penalty hearing included evidence of positive prison adjustment, the jury would also likely have heard, in rebuttal, of Wharton's repeated failure to accept responsibility for his misconducts. Wharton refused to admit that the makeshift handcuff key and additional pieces of antenna found in his single cell belonged to him. He claimed that he had no idea where the second piece of antenna came from, even though it was recovered from the binding of his own legal material. This is consistent with the psychological evaluation performed at the time of his classification assessment in which Wharton was described as using "a good deal of denial and rationalization" and minimizing "the few transgressions he admitted to doing." (OAG Ex. 39.)

C.    **Expert Testimony**

The expert opinions offered during the hearing support my conclusion that the mitigation evidence that could have been offered would not have changed any juror's mind. According to Baird, while the two implements of escape "incidents" were serious, Wharton's adjustment was positive overall. Baird testified that Wharton used PRC meetings and the grievance process appropriately, had a positive rapport with prison staff, maintained strong ties with his family, and kept a positive outlook despite the bleakness of his situation. (Supra ¶¶ 48-52.) Baird also noted that "other than the incident in 1986" (i.e., escaping), Wharton's behavior while incarcerated was "uneventful." (N.T., 08/05/21, 42:12-20.)

But even if the penalty phase jury accepted Baird's assessment, its effect on the overall impression of Wharton's positive adjustment would have been small compared to the overwhelming evidence of aggravation. Baird minimized Wharton's implements of escape misconducts on the ground that the makeshift keys were not actually used to escape. This reasoning would have been unconvincing to a jury that would also hear evidence that Wharton did, in fact, come alarmingly close to escaping from City Hall. Wharton's psychiatric expert, Dr. Blumberg, similarly discounted Wharton's escape conviction by focusing solely on Wharton's time at SCI Huntington. Had Wharton's trial counsel called experts such as these to testify at the second penalty hearing, they would not have been able to undo the substantial negative impression left by Wharton's multiple attempts to escape.

Countering this testimony would have been Beard's opinions prioritizing threats to the safety of the prison and the outside community over other aspects of Wharton's adjustment. Beard would have told the jury that Wharton's "premeditated attempt" to escape from City Hall using a concealed handcuff key "put the public at great risk." (N.T., 05/11/21, 27-28.) And Beard would have explained that Wharton's pleasant behavior toward prison staff was "superficial" given that

29

Wharton was simultaneously fashioning implements in an effort to escape yet again, thus "throw[ing] into question everything that you see going on with Mr. Wharton during that six-year period of time while he was in the Pennsylvania Department of Corrections." (N.T., 15/11/21, 48-49.)

Considering this testimony as a whole, as I must under <u>Strickland</u>, the opinions of these experts would not have altered the penalty jury's impression that Wharton's behavior from 1986 to 1992 was not sufficiently mitigating to tip the balance in favor of life imprisonment.

### D.    Conclusion—<u>Strickland</u> Analysis

Given "the overwhelming aggravating factors," and the fact that Wharton's multiple efforts to escape would have rebutted any mitigation based on Wharton's adjustment to prison, "there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." <u>Strickland</u>, 466 U.S. at 700. In light of the weight of the evidence in aggravation as compared to the weight of the mitigation evidence that was presented at Wharton's second penalty hearing and the hearings before me, I decline to grant relief on Wharton's remaining Sixth Amendment claim. It was Wharton's burden to demonstrate that because of the mitigation his counsel did not present, there is a reasonable probability that one juror would have voted to impose a sentence of life imprisonment rather than the death penalty. Wharton has not met that burden. For the reasons set forth above, Wharton's petition for a writ of habeas corpus is denied.

## IV.    <u>THE DISTRICT ATTORNEY'S POSSIBLE BREACH OF THE DUTY OF CANDOR</u>

While every case is important, determining whether a defendant's sentence of death should be vacated due an alleged Sixth Amendment violation necessitates meticulous scrutiny, utmost

care, and diligence from all involved—the presiding judge and the attorneys. This process must include transparency from the attorneys and complete candor to the court so that all material facts can be considered.

That said, I preliminarily conclude that on two critical issues in this case, it appears that the District Attorney was less than candid with this Court. The first issue pertains to facts known to the District Attorney, but withheld, regarding Wharton's premeditated escape from a Philadelphia courtroom. This escape was <u>not</u> disclosed to me when the District Attorney requested that I blindly vacate Wharton's death sentence on the ground that his trial counsel had ineffectively failed to offer positive prison adjustment evidence, and was only brought to my attention after I appointed the Attorney General's Office.

The second possible instance of lack of candor involves the District Attorney's representation to me that in reaching its decision to concede the death penalty, and asking that I vacate Wharton's death sentence, the District Attorney had consulted with the victims' family. Yet the fully developed record before me reflects that no communication occurred between the District Attorney and the only surviving victim, Lisa Hart-Newman, and that minimal and woefully deficient communication took place with the siblings of the deceased, Bradley and Ferne Hart.

"[A]n attorney, as an officer of the Court, has an overarching duty of candor to the Court." <u>Eagan by Keith v. Jackson</u>, 855 F. Supp. 765, 790 (E.D. Pa. 1994). That duty requires that a "lawyer shall not knowingly … make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer…." Pa. Rule of Professional Conduct 3.3(a)(1).

The duty of candor "takes its shape from the larger object of preserving the integrity of the judicial system." <u>United States v. Shaffer Equipment Co.</u>, 11 F.3d 450, 458 (4th Cir. 1993); Pa.

Rule of Professional Conduct 3.3 cmt. 2. In matters of criminal justice, in particular, "[t]he need to develop all relevant facts in the adversary system" and to avoid "judgments … founded on a partial or speculative presentation of the facts" is "fundamental and comprehensive." United States v. Nixon, 418 U.S. 683, 709 (1974). The attorneys who represent the government in such matters therefore have "special responsibilities to both [the] court and the public at large" and a concomitant obligation to "ensure that the tribunal is aware of … significant events that may bear directly on the outcome of litigation." Douglas v. Donovan, 704 F.2d 1276, 1279 (D.C. Cir. 1983); see also United States v. Tocur Int'l, Inc., 35 F. Supp. 2d 1172, 1188 (N.D. Cal. 1998); Brewer v. District of Columbia, 891 F. Supp. 2d 128, 133 n.7 (D.D.C. 2012); Fusari v. Steinberg, 419 U.S. 379, 391 (1975) (Burger, J., concurring). These lawyers must be "minister[s] of justice and not simply … advocate[s]." Pa. Rule of Professional Conduct 3.8 cmt. 1; American Bar Association, Standards for the Prosecution Function § 3-1.4, "The Prosecutor's Heightened Duty of Candor" ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts….").

The duty of attorneys to be especially forthcoming with the court is further heightened where the proceeding lacks the "balance of presentation by opposing advocates." See Pa. Rule of Professional Conduct 3.3 cmt. 14. This was exactly the dynamic at play here, where Wharton's counsel and the District Attorney joined to advocate that the death sentence be vacated. "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa. Rule of Professional Conduct 3.3(d). But a proceeding may be in effect ex parte where, although others are "technically parties to [it], they ha[ve] no adversarial interest in opposing [the movant's] request." Eagan by Keith v. Jackson, 855 F. Supp. 765, 790 (E.D. Pa. 1994). The heightened duty

of candor that applies in ex parte proceedings is therefore "equally applicable when the parties make a joint request to the Court because, in this situation also, the Court is denied the benefit of adversarial advocacy." Pa. Env't Def. Found. v. U.S. Dep't of Navy, No. 94-cv-1486, 1995 WL 56602, at *2 (E.D. Pa. Feb. 3, 1995).

Lastly, the duty of candor in this case has special significance to constitutional matters of federalism and Article III jurisdiction, given that these proceedings involve a federal court being asked to interfere with a state criminal prosecution. Federal courts must exercise habeas jurisdiction in "light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States…." Rose v. Lundy, 455 U.S. 509, 515 (1982). And "the jurisdiction of courts of the United States to issue writs of habeas corpus is limited to cases of persons alleged to be restrained of their liberty in violation of" federal law. Matters v. Ryan, 249 U.S. 375, 377 (1919).

Viewed through this lens, the timing of the District Attorney's presentation of its concession is troubling. Shortly before the District Attorney asked me to vacate Wharton's sentence, the Pennsylvania Supreme Court had ruled, in a separate but similar death penalty matter, that was also on collateral review, that the District Attorney does not have the authority to stipulate to such relief on behalf of the state. See Commonwealth v. Brown, 196 A.3d 130, 144-46 (Pa. 2018). Thus, the District Attorney was well aware that state law did not afford that Office the discretion to decide that a death sentence should be removed without a further independent review by a court. Id. at 144. Yet this is exactly what the District Attorney attempted to do in federal court.

In Brown, the same prosecutor's office sought the power to stipulate to death penalty relief and was denied that right by the Pennsylvania Supreme Court. The court stated that at the collateral review stage of a case, "the prosecutor's discretion … is limited to attempts, through the exercise

of effective advocacy, to persuade the courts to agree that error occurred as a matter of law. Prosecutorial discretion provides no power to instruct a court to undo the verdict without all necessary and appropriate judicial review." Brown, 196 A.3d at 146 (emphasis added). The court went on to proclaim that "[a]fter the jury … reached its decision to enter a verdict recommending a death sentence, the district attorney lost any prosecutorial discretion to alter that verdict." Id. at 149.

Four months after Brown was decided, the District Attorney filed a stipulation of death penalty relief in this case, without substantial explanation and despite having zealously defended Wharton's death sentence for twenty-six years. Complete candor was thus imperative to ensure that this was not a collusive misuse of federal jurisdiction to alter state policy in a manner not required by federal law. Cf. Leyva v. Williams 504 F.3d 357, 362 (3d Cir. 2007) ("A federal court has jurisdiction to entertain a habeas petition under 28 U.S.C. § 2254(a) only if a petitioner is in custody in violation of the constitution or federal law." (alterations and quotation marks omitted)).[14]

Applying all of these principles, it is likely that the District Attorney's Office failed to disclose all relevant information and provided other information that was misleading, and thus was not candid with this Court. When the District Attorney notified me that it was conceding Wharton's habeas petition and asked that I grant the requested relief, I was unaware of the most important

---

[14] This is not the first time the District Attorney has attempted to use this Court to evade the strictures of the state judicial system, while providing incomplete information and asking that I grant relief before hearing evidence, based on its concession alone. In Martinez v. DelBalso, No. 19-cv-5606, 2021 WL 510276 (E.D. Pa. 2021), the assigned Assistant District Attorney affirmatively advised me that the District Attorney's Office was waiving the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) despite the existence of a long-pending petition in state court seeking identical relief. Id. at *1. Then, without advising me that any facts related to exhaustion had changed, the District Attorney litigated and obtained the relief it was seeking in the state court while a hearing was scheduled on the federal petition. Id. at *1-2.

facts bearing on the merits of the habeas petition: Wharton's 1986 escape attempt that nearly succeeded and his continued propensity to fashion implements of escape while in prison. These facts were known to the District Attorney and bore directly on the issue on remand—yet that Office decided to withhold this information. (N.T., 5/11/21, 66:16-19.) Instead, in asking me to grant relief, the District Attorney chose only to represent that it had reached its decision after having "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)." (ECF No. 162 at 4.) And when pressed for an explanation, the District Attorney relied on a declaration of trial counsel that Wharton's prison records could have shown that Wharton "posed no danger to inmates or staff if he were sentenced to life," a statement that was entirely misleading without also disclosing Wharton's 1986 escape attempt.

The District Attorney's Office may well have concluded that Wharton's escape conduct would not tip the scales in favor of maintaining the death penalty. But surely, these incidents would be crucial information to provide to a judge who had been asked to vacate a death penalty sentence. This lapse on the part of the District Attorney also ignores the public's right to know the position taken by the District Attorney and to understand the basis for a court's decision as to whether a significant penalty imposed by a jury thirty years ago for a horrific crime would be preserved or set aside. As one commentator aptly stated, "prosecutors are expected to volunteer relevant factual and legal information in various situations where other lawyers … might legitimately remain reticent." Bruce A. Green, <u>Candor in Criminal Advocacy</u>, 44 Hofstra L. Rev. 1105, 1116 (2016).

A second possible critical lapse of candor on the part of the District Attorney pertains to that Office's purported communication with the victims' family. When the District Attorney filed its notice conceding that Wharton's death sentences should be vacated, it cited "communications

with the victims' family" as a basis for that change of course. (Notice of Concession, ECF No. 155, ¶ 9.) "[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Pa. Rule of Professional Conduct 3.3 cmt. 3 (emphasis added). Having provided no details regarding the victims' family's position on this significant concession, where the facts were so heinous and the most serious penalty—death—had been imposed, the unmistakable impression conveyed by the District Attorney's concession was that the victims' family had agreed with the District Attorney's change of position. But this was not the case.

Lisa Hart-Newman, now age thirty-seven, the infant left to die by Wharton, is a surviving victim but was never contacted by the District Attorney. In her June 6, 2019 letter to this Court, Lisa Hart-Newman stated that she was "extremely disappointed to learn of the District Attorney's stance [to seek to vacate the death penalty] and very troubled that the District Attorney implied that the family approved of his viewpoint." (ECF No. 117-5, Ex. F.) She stressed:

> At no point was I contacted by the District Attorney or anyone in his office to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight. At seven months old, after my parents had been murdered, I was left in a house where the heat had been intentionally turned off in hopes that I would die. I am the sole survivor of this tragedy and I am alive despite his efforts.

(Id.)

During the hearing, Lisa Hart-Newman testified that, when she did find out about the District Attorney's concession, "it was as though, well, it's already done, and there's nothing you can do about it. … [Y]ou don't matter, essentially." (N.T., 03/16/21, 90:3-14.) Hart-Newman explained that if the District Attorney had contacted her about its concession, she would have said "Please don't do this. I don't in any way agree with the position that you've taken in this matter, and as a victim I feel like that should matter." (N.T., 03/16/21, 90:23-91:9.)

Both of the deceased parents, Bradley and Ferne Hart, had siblings, but as confirmed by the District Attorney's Victim Witness Coordinator, only one member of the entire Hart family was contacted, Dr. David "Tony" Hart, Bradley Hart's brother. While the Victim Witness Coordinator testified that she eventually informed Tony Hart that a "committee" had decided to concede Wharton's death sentence, Tony Hart's testimony at the evidentiary hearing reflects that either this message was not conveyed or it was not clearly understood. (See N.T., 05/11/21, 185.) But in any event, the District Attorney's Office made this concession without the input of Lisa Hart-Newman or the other siblings of the deceased.

While Tony Hart had difficulty recalling the specifics of his conversation with the District Attorney's Victim Witness Coordinator, he remembered being "left with the impression that she would get back to us, that they were considering … what they were going to do with regard to the case[,] that Wharton had … won the right to an appeal, and that they weren't sure … what they were going to do, what their position was going to be, and so … she was going to get back to me and let me know, keep me informed." (N.T., 05/11/21, 145:21-146:3.) Tony Hart explained that his impression was that Wharton "had won the right to be heard again." (N.T., 05/11/21, 153:22-154:8.) In short, even after subsequent contact with the District Attorney's representative, it was Tony Hart's belief that the District Attorney's Office never provided "any detail" and never "clearly communicated" to him that the Office had decided to concede the death penalty. (N.T., 05/11/21, 146, 160.)[15]

---

[15]     In his letter submitted to the Court, Tony Hart stated that he was told by the District Attorney that "in order to avoid a new trial, a plea deal was offered and accepted." (OAG's Amicus Br., Ex. F.) If this information was in fact relayed by the District Attorney's representative, it would have been entirely misleading in that a "new trial," which could have retraumatized the family, had never been an option or even remotely contemplated by the Third Circuit. (N.T., 05/11/21, 146:16-147:15.)

Tony Hart explained that it was not until the Attorney General's Office contacted him in May or June 2019 that he fully understood what was happening, i.e. that the District Attorney had conceded the death penalty. (N.T., 05/11/21, 156:22-157:9.) Tony Hart recalled being "taken [a]back" by the conversation with the Attorney General's Office. (N.T., 05/11/21, 160:13-161:15.) He explained that had he fully understood that the District Attorney's Office was considering conceding the death penalty, he would have immediately informed Lisa Hart-Newman and his other family members, which he did after speaking with the Attorney General's Office. In fact, only after the Attorney General's Office spoke to the victims' family members was it learned that none of the family agreed that the jury's sentence of death should be vacated. (See N.T., 05/11/21, 164-65; ECF No. 117-5, Ex. F.)

Bradley and Ferne Hart's other siblings also expressed outrage regarding the District Attorney's failure to contact their family. In his letter to the Court, dated June 7, 2019, Ferne Hart's brother, Michael Allen, stated:

> I understand that the DA's office has gone on record to say that they communicated with the family of Wharton's victims. I understand that they have represented either expressly or impliedly that the family agrees with this outrageous position they have taken to seek to vacate Wharton's death penalty. The position of the DA's office is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts.

(ECF No. 117-5, Ex. F.) Michael Allen added that "it would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty." (Id.)

The District Attorney responds to all of this by positing that Tony Hart, a family member, was in fact contacted and that the Victim Witness Coordinator believed Tony Hart would pass her contact information along to his siblings and niece. (DAO Ex. 1.) But the Victim Witness Coordinator did not ask Tony Hart to act as the family's liaison, and Tony Hart believed she never

asked him to pass on that a concession of the death penalty was being considered. (N.T., 05/11/21, 148-49, 167-68, 203.) Nor did the Coordinator confirm whether Tony Hart had conveyed any information she had provided him to his family, nor did she inquire as to whether the other family members might have a different view regarding concession of death penalty relief. (N.T., 08/05/21, 5:5-18, 6:5-12, 20:5-21:4.) In fact, Tony Hart was left with the impression that the family's views would not "make any difference" to the Office's decision making. (N.T., 05/11/21, 158.) And, as noted above, the Victim Witness Coordinator never contacted the only surviving victim, Lisa Hart-Newman. (N.T., 05/11/21, 202.) Tellingly, the District Attorney acknowledges that "[e]mploying 20/20 hindsight, one could say that [the Victim Witness Coordinator] should have taken additional steps." (District Attorney's Post-Hearing Brief at 23.)[16]

I recount all of this background on the District Attorney's contacts with the victims to assess whether the District Attorney's representation to me that its concession was based, in part, on "communications with the victims' family" lacked candor. I conclude that, before making such a representation, the District Attorney should have delved much deeper, where it would have easily learned, as the Attorney General did, that the victims' family and the only surviving victim were vehemently opposed to vacating the death sentence. See Pa. Rule of Professional Conduct 3.3 cmt. 3 ("[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." (emphasis added)) Had these facts, readily obtainable, been known to me, they could have been material to my decision regarding what weight to give the District Attorney's

---

[16]     The District Attorney also argues that it had no "reason to assume that other family members were opposed to death penalty relief" because "it is not uncommon for survivors to be indifferent to or even against the death penalty." (District Attorney's Brief at 23.) But the District Attorney stated that its concession was based on "communication with the victims' family" not speculation that the family would agree with its decision. (ECF No. 155 ¶ 9 (emphasis added).)

concession of Wharton's habeas petition. The thoroughness of the District Attorney's assessment of its case is a factor in evaluating whether its concession reflects an application of "considered judgment" as opposed to merely the "differing views of the current office holder." See Young v. United States, 315 U.S. 257, 258 (1942); Brown, 196 A.3d at 149.

And finally, in asking me to sign a stipulated order based upon insufficient information, the District Attorney ignored the fact that there is a statutory obligation to ensure that victims are provided an opportunity to be heard at proceedings involving sentencing or release and are "treated with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(b)(2)(A). To carry out this obligation, I must depend on truthful information from the lawyers who practice before me.

The District Attorney's Office should be given an opportunity to explain or challenge my preliminary conclusion that there has been a breach of their duty of candor. And facts may need to be developed as to who made decisions regarding communications with this Court.[17]

An order to show cause will follow.

---

[17]    The February 6, 2019 concession and proposed order asking me to vacate the jury's verdict was submitted by the Supervisor of the District Attorney's Federal Litigation Unit who represented that members of a "Capital Case Review Committee" had reviewed this matter.