# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

**GOLDBERG, J.**                                                         **May 11, 2022**

## <u>MEMORANDUM OPINION</u>

In this ongoing federal death penalty habeas matter, Petitioner Robert Wharton, now joined by the Philadelphia District Attorney's Office, advocates that I vacate a jury's sentence of death, affirmed decades ago by the Pennsylvania Supreme Court. Both Wharton and the District Attorney assert that such relief should be granted because trial counsel was ineffective for failing to offer positive prison adjustment evidence during the death penalty phase of Wharton's trial. Both Wharton and the District Attorney take this position despite the fact that had trial counsel presented such mitigation evidence, Wharton's premeditated escape from a City Hall courtroom and his subsequent fashioning of escape tools in prison would also have been presented in rebuttal to the sentencing jury.

After considering the record developed during hearings on Wharton's habeas petition, and having reviewed the matter's entire history, I conclude that there is no reasonable probability that, but for counsel's alleged deficient performance, one juror would have voted to impose a life, rather than a death sentence.

1

This Opinion sets forth the basis for my denial of Wharton's ineffective assistance of counsel claim and also addresses an issue of possible lack of candor to the Court on the part of the Philadelphia District Attorney's Office.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Overview

Wharton received the death penalty in 1985 after he and his co-defendant forced their way into the home of Bradley and Ferne Hart at knifepoint and strangled the Harts to death. Wharton and his co-defendant then turned off the heat and abandoned the Harts' infant, Lisa, to freeze to death. Lisa was found two days later suffering from dehydration but miraculously survived.

Before me on remand from the United States Court of Appeals for the Third Circuit is Wharton's single, remaining ineffective assistance of counsel claim for death penalty habeas corpus relief. Wharton seeks to vacate his two death sentences because his trial counsel was allegedly ineffective for failing to present evidence of Wharton's alleged positive adjustment to prison at the penalty phase of his state court proceeding. I had previously decided that a hearing on this claim was unnecessary because Wharton had failed to make a prima facie showing of a Sixth Amendment violation. The Third Circuit disagreed and remanded the matter, directing that I hold an evidentiary hearing.

After I attempted to schedule this hearing, the District Attorney's Office, which had zealously defended Wharton's death sentence for decades, changed its position and advised that it now believed a Sixth Amendment violation had occurred and that it joined with Wharton in his requested relief. For reasons explained below, I invited the Pennsylvania Office of the Attorney General to participate in the evidentiary hearings so that I would have the benefit of a developed

factual record. These hearings were held on February 25, 2021, March 8, 2021, March 16, 2021, May 11, 2021, and August 5, 2021.

### B. Wharton's Penalty Hearing and Death Sentence

Wharton was first sentenced to death on July 5, 1985, but that sentence was vacated due to a jury instruction error. See Commonwealth v. Wharton, 607 A.2d 710, 721-24 (Pa. 1992). At Wharton's second penalty hearing in 1992, held seven years after the first, the Commonwealth presented evidence of the history between Wharton and the Hart family, including his participation in burglaries of the Hart home on August 14, 1983 and August 22, 1983 and a September 6, 1983 burglary of the Germantown Christian Assembly Church, where Bradley Hart worked. (See Aug. 16, 2012 Mem. Opinion, ECF No. 126, at 107.) The jury also heard the grisly evidence regarding Wharton's involvement in the murders of Bradley and Ferne Hart. (See id.)

In support of life imprisonment, Wharton's trial counsel, William Cannon, offered evidence of his character from his family members, including the testimony of his mother, brother, sister, aunt, cousin, and brother-in-law. They testified that Wharton was a good family member and community member; that he was kind, humble, athletic, loving, loveable, and "good with his hands"; and that he had accepted religion into his life. (See ECF No. 126 at 107; N.T., 02/25/21, 123:7-15, 125:4-126:16.)

Based upon this evidence, the jury found two aggravating circumstances: that Wharton committed a killing while perpetrating a felony (a robbery), 42 Pa. Con. Stat. § 9711(d)(6), and that Wharton had been convicted of another offense punishable by life imprisonment or death (that is, Wharton committed two homicides), 42 Pa. Con. Stat. § 9711(d)(10). The jury also found certain mitigating circumstances under the Pennsylvania statute's "catch-all" provision, 42 Pa. Con. Stat. § 9711(e)(8), including that Wharton "did not murder Lisa Hart," was a good family

member, and cooperated with police.[1] (N.T., 02/25/21, 121:7-13.) The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and, on December 23, 1992, returned a verdict of death on each murder count.

### C. PCRA Proceedings

Following an unsuccessful direct appeal, Wharton petitioned for relief under Pennsylvania's Post Conviction Relief Act (PCRA). Among other arguments, Wharton contended that his trial counsel was ineffective at the second penalty hearing for failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between the two penalty hearings.

The PCRA court rejected Wharton's petition and the Pennsylvania Supreme Court affirmed, finding that Wharton had not shown either that counsel's performance was deficient or that Wharton was prejudiced by the failure to offer prison adjustment evidence. Commonwealth v. Wharton, 811 A.2d 978, 981 (Pa. 2002). Regarding deficient performance, the Pennsylvania Supreme Court decided that counsel did not act unreasonably by failing to present evidence of prison adjustment because the evidence was not "sterling" and "cut both ways." Id. at 988-89. Regarding prejudice, the court found that prison adjustment evidence could not have aided Wharton's case for life imprisonment because the evidence supported only the "catch-all" mitigating factor that the jury in fact found. Id. at 989. As explained below, the Court of Appeals for the Third Circuit later found this analysis to be an unreasonable application of federal law. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

---

[1]    "Mitigating circumstances shall include … [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Con. Stat. § 9711(e)(8).

**D.** **Wharton's Federal Habeas Petition**

Following the conclusion of the PCRA proceedings, Wharton filed federal habeas claims under 28 U.S.C. § 2254. On August 16, 2012, I issued an extensive opinion denying each of Wharton's twenty-three claims.

Wharton appealed, and in January 2018, the Court of Appeals for the Third Circuit affirmed twenty-two of those rulings and remanded for an evidentiary hearing on a single issue: Whether, under Strickland v. Washington, 466 U.S. 668 (1984), Wharton can establish that: (1) his counsel acted unreasonably by failing to investigate and/or present prison adjustment evidence; and (2) if so, there was a reasonable probability that at least one juror would have changed his or her vote if presented with prison records from the time between Wharton's death penalty hearings. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

The Third Circuit determined that the Pennsylvania Supreme Court used an "unreasonable application of Strickland" in affirming the denial of Wharton's PCRA petition and that Wharton was entitled to de novo review of the claim of counsel's failure to present prison records. Id. at 281. In considering whether Wharton had made a prima facie showing of a Sixth Amendment violation, the Third Circuit explained that Wharton's prison records from the time between his two penalty hearings could establish that he was adjusting well to prison life, and this may have affected the jury's sentence. The Third Circuit also noted that the prison records could "cut both ways" because "the Commonwealth might have countered with other evidence, including an expert holding a contrary opinion." Id. The Third Circuit thus determined that a hearing before me was necessary to resolve this remaining Strickland claim. Id. at 284.

Soon after remand, I scheduled a status conference with Wharton's counsel and the District Attorney to discuss the remand hearing process. On February 6, 2019, with little explanation, the District Attorney responded by filing a "Notice of Concession of Penalty Phase Relief," which in

pertinent part stated that the decision to concede was made "**[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel**." (Notice of Concession, ECF No. 155, ¶ 9.) This concession also advised that the District Attorney would not "seek new death sentences in state court" and that "the grant of sentencing relief on [Wharton's] penalty phase ineffectiveness claim in accordance with [the District Attorney's] concession would end the litigation of this case … and eliminate the need for … [further] proceedings in this Court." (Id. at ¶ 10-11.) The Notice provided no factual or legal analysis as to the District Attorney's basis for this complete about-face, and no explanation as to why, after decades of advocating for the death penalty, the District Attorney had now reached the conclusion that a Sixth Amendment violation had occurred due to a failure on trial counsel's part to introduce positive prison adjustment evidence. And as will be explained infra, this concession notice was filed five months after the Pennsylvania Supreme Court had explicitly found, in a death penalty matter on collateral review, that the District Attorney does not maintain prosecutorial discretion to alter a capital jury's verdict via an agreement or by concession and that vacating a jury's death sentence should only occur after careful and independent judicial review. Commonwealth v. Brown, 196 A.3d 130, 144-46 (Pa. 2018)

The District Attorney's concession notice was followed by a draft order, submitted two days later, by Wharton's counsel and the District Attorney. This Order proposed that the death penalty sentence be vacated and suggested that I had undertaken a "careful and independent review of the parties' submissions and all prior proceedings in this matter," and had thus concluded that a Sixth Amendment violation had in fact occurred. (Proposed Order, ECF No. 156.) Because I had

received no facts or analysis which would allow me to undertake a "careful independent review" and grant such extraordinary relief, I declined to sign this proposed order.

Rather, given the Third Circuit's directive to hold a hearing and the District Attorney's unwillingness to fully explain its concession, and based upon my obligation to independently examine the remaining issue in this case that necessarily required a full exploration of facts,[2] I ordered the parties to provide a fulsome explanation justifying the relief requested. (March 4, 2019 Order, ECF No. 160.) The District Attorney responded that the jury's verdict and the Pennsylvania Supreme Court's affirmance of that verdict should be overturned because: de novo review was ordered by the Third Circuit; trial counsel had submitted a declaration "that he had no strategy for not presenting adjustment evidence"; and at one point the jury had been deadlocked. (ECF No. 162.) The District Attorney thus continued to decline or refused to provide me with any evidence of Wharton's positive prison adjustment, the crux of the matter before me, nor did it advise that there was any evidence to the contrary I should consider—e.g., negative prison adjustment.

Given the District Attorney's continued reluctance to provide me with a meaningful analysis regarding its concession, and my inability to properly explore this highly factual issue, I appointed the Pennsylvania Attorney General to investigate and provide, if available, evidence of Wharton's prison adjustment, including contrary facts. As will be detailed infra, the Attorney

---

[2]   In Sibron v. New York, 392 U.S. 40 (1968), the United States Supreme Court reasoned that "[i]t is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained." Id. at 58. Other precedent, including a recent pronouncement by the Pennsylvania Supreme Court, supports this conclusion. See Young v. United States, 315 U.S. 257, 258-59 (1942) ("[O]ur judicial obligations compel us to examine independently the errors confessed."); Commonwealth v. Brown, 196 A.3d 130, 141-49 (Pa. 2018) ("[I]f the 'power' of a court amounts to nothing more than the power 'to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power.'").

General's investigation revealed significant negative prison adjustment evidence, including an attempted, planned escape from a City Hall courtroom and subsequent efforts to manufacture escape tools while in prison.

In addition, because the District Attorney cited communications with the victims' family members as a reason for its concession of death penalty relief, and because I have a statutory obligation in 28 U.S.C. § 2254 proceedings to afford victims an opportunity to be heard where sentencing or release is involved, I allowed that the parties and the Attorney General could introduce evidence of the District Attorney's communication with the victims' family members and the family's view on the proposed concession of relief. (Notice of Concession, ECF No. 155, ¶ 9.)

## II.   EVIDENCE PRESENTED AT THE HABEAS EVIDENTIARY HEARINGS

Hearings in this matter took place over the course of five days. During these proceedings, I heard testimony from multiple prison and psychiatric experts, Wharton's trial counsel, a former corrections officer assigned to Wharton's housing unit, a former Department of Corrections ("DOC") hearing examiner who reviewed one of Wharton's misconducts, and a former Philadelphia Assistant District Attorney who was present on the day of Wharton's escape from a Philadelphia Court of Common Pleas courtroom in 1986. I also heard testimony regarding the District Attorney's communications with the victims' family.[3]

I have considered the following facts in conjunction with Wharton's remaining Sixth Amendment claim. These facts cover Wharton's prison adjustment between the two jury verdicts sentencing Wharton to death, which is the relevant time period for purposes of Wharton's Sixth

---

[3]   As the victims' family's testimony has no bearing on the merits of Wharton's Sixth Amendment claim, it is discussed later in this opinion.

8

Amendment Claim. See Wharton, 722 F. App'x at 283 (analyzing "Wharton's prison records for the time between his two penalty hearings").[4]

### A. Trial Counsel's Investigation into Prison Adjustment

1. Wharton's trial counsel, William Cannon, acknowledged that he did not investigate Wharton's prison adjustment in preparation for the penalty hearing. Cannon admitted there was no strategy involved in his decision not to request prison records and that it was "pure ignorance." (N.T., 02/25/21, 129:2-14.)

2. Cannon had worked on four or five prior cases where his client faced a possible death penalty, but Wharton's case was the first time he had represented a client at the penalty phase of such a proceeding. (N.T., 02/25/21, 106-07.)

### B. Wharton's Adjustment to Incarceration: The 1986 Escape Attempt

3. On April 21, 1986, less than a year after he was first sentenced to death (but before judgment of death was formally entered), Wharton was transported to City Hall in Philadelphia County to attend a sentencing hearing in an unrelated robbery case. (OAG Ex. 6.)

4. When given an opportunity to address the court, Wharton stated:

> … I believe I did lose sight of reality and caused a lot of people pain and suffering. As you said, something went wrong somewhere. Unfortunately the family isn't here to accept my apology, but I'm sorry and any time I serve I will use to better myself.

(N.T., 04/21/1986, 36.)

5. Shortly after making this statement, and while being transported from the second-floor City Hall courtroom to the seventh-floor "cell room," Wharton pushed the deputy sheriff transporting him into a closing elevator door and ran down the courthouse stairs from the second

---

[4] The Attorney General investigated and presented all of the evidence regarding Wharton's negative prison conduct and adjustment.

to the first floor. (OAG Ex. 7.) To effectuate this escape, Wharton had used a key to open his handcuffs. (Id.) While Wharton was fleeing down a public stairwell toward the exit leading to the street, a deputy sheriff was forced to fire two shots at Wharton to prevent his escape, wounding Wharton in the left thigh. (Id.)[5]

6.  On December 3, 1986, as a result of this incident, Wharton pled guilty to escape. (OAG Exs. 11-12.)

**C.  Wharton's 1986 Classification Assessment**

7.  In July 1986, the Pennsylvania Department of Corrections ("DOC") performed a classification assessment for Wharton. The DOC's Classification Summary includes Wharton's account of the Hart murders:

> "In 1/84, two other guys and I burglarized a house in S. Phila. and robbed the owners. We took their car and were later arrested after one of the guys left his identification in the car. Police found the guy's cards. One guy got arrested, implicated me and I was arrested about 2 months later."

(OAG Ex. 39 at 4.)

8.  The Summary included a psychiatric report, which, consistent with the above, noted that Wharton "used a great deal of denial and rationalization." (OAG Ex. 39 at 8.) The report stated:

> [Wharton] impresses as a sociopath with dependent features and dissocial attitudes. He does not cope well with rejection and tends to cling to important

---

[5]  In a prior written order, I overruled Wharton's objection to admission of the facts underlying his escape as reflected in the 1986 arrest report. (ECF No. 227 ¶¶ 11-14.) When Wharton pleaded guilty to escape, he signed an acknowledgement that the "facts" of the crime had been read to him. (Id. ¶ 13.) I therefore ruled that, in 1992, the Commonwealth could have sought to introduce these facts as Wharton's adoptive admission. (Id. ¶ 14.)

Other details pertaining to Wharton's 1986 escape are set out in newspaper articles. As to these, I found that the articles were not admissible to prove the truth of the facts described therein. (Id. ¶ 20.) Rather, the newspaper articles were accepted only to show that the parties would have been aware of the facts contained in them when preparing for the 1992 sentencing hearing.

others. He does not trust authority figures and will not seek their help. He found acceptance among a group of his peers and was easily led by them.

(Id.)

9.      The Summary determined that Wharton was "<u>an extremely high public risk because of his Murder detainer and because he admits attempting to escape from Sheriff's on 4/21/86</u>." (OAG Ex. 39 at 4 (emphasis added).) The Summary also determined that Wharton was a "moderate institutional risk." (Id.)

### D.      Wharton's Prison Adjustment at SCI Huntington

10.      In September 1986, Wharton was placed at the Restricted Housing Unit ("RHU") at State Correctional Institution Huntington ("SCI Huntington"). (N.T., 02/25/21, 18:11; N.T., 02/25/21, 20:25-21:2.)

### 1.      Misconduct Findings

11.      While incarcerated at SCI Huntington, Wharton received six misconducts, the last occurring in 1992. (N.T., 02/25/21, 22:12-14; N.T., 05/11/21, 18:16-24.) None of Wharton's misconducts involved violence, and four were relatively minor. (N.T., 02/25/21, 22:14-23:10; N.T., 05/11/21, 19:2-5; N.T., 08/05/21, 42:2-11, 62:4-16.) However, two of Wharton's misconducts, described below, were considered by Huntington to be serious, involving implements of escape. (N.T., 02/25/21, 22:15-23:8; N.T., 03/16/21, 10:19-20; N.T., 05/11/21, 19:5-23; N.T., 08/05/21, 65:3-9.)

12.      On May 15, 1989, Daniel Hayes, a Corrections Officer assigned to the RHU, found two pieces of broken antenna in one of the holes in the wall behind Wharton's toilet where there was a bolt securing the toilet to the wall. (N.T., 03/16/21, 156:6-158:15; N.T., 03/16/21, 165:1-19.) The smaller piece of antenna was fashioned into the shape of a handcuff key. (Id.; OAG Ex. 17A.)

11

13.     Hayes had been employed at SCI Huntington for about five years and had used handcuffs and handcuff keys every day. (N.T., 03/16/21, 150:18-153:20.) The makeshift handcuff key found in Wharton's cell was the only time in Hayes's 28-year career that he had found a makeshift handcuff key that he thought "would work." (N.T., 03/16/21, 163:21-24.) Wharton's cell was a single cell that had been occupied only by him when Hayes found the makeshift handcuff key. (N.T., 03/16/21, 199:19-200:3; OAG Ex. 17C.)

14.     Hayes filed a misconduct report against Wharton for possessing implements of escape. (OAG Ex. 17A.) Hayes's report was reviewed and approved by the ranking corrections officer on duty, "C. Kyle." (Id.; N.T., 03/16/21, 160:15-161:8.) Hayes showed Kyle the pieces of antenna that he had found before Kyle "signed off" on the report. (N.T., 03/16/21, 160:15-161:8.) Kyle did not conduct an additional investigation of the incident. (N.T., 03/16/21, 172:19-23.) There is no evidence that Wharton had used or attempted to use the handcuff key. (N.T., 02/25/21, 27:2-7.)

15.     Wharton pled not guilty to the misconduct, arguing that another inmate in the cell before him must have hidden the antenna behind the toilet. (OAG Ex. 17B.)

16.     George Conrad was the hearing examiner with the Pennsylvania Department of Corrections in 1989 who presided over Wharton's misconduct hearing stemming from the makeshift handcuff key. (N.T., 03/16/21, 185, 190-91.) As reflected in the Disciplinary Hearing Report on Wharton's misconduct, Conrad found that the physical evidence "clearly represents a handcuff key. Conrad stated the key was found in a single cell occupied by Wharton for several months. It is more likely than not that the key was possessed and under the control of Wharton." (OAG Ex. 17C.) Conrad found Wharton guilty. (N.T., 03/16/21, 196.)

17. Conrad admitted that inmates can sometimes be taken out of their cells unexpectedly with no time to gather any contraband, and, at the time of the hearing, there was no evidence presented regarding when the toilet mounting in Wharton's cell had been searched prior to May 15, 1989. (N.T., 03/16/21, 209:15-210:9; N.T., 03/16/21, 211:18-212:2.) However, as the Attorney General's corrections expert, Jeffrey Beard, testified, each RHU cell is searched before a new inmate is moved into it. (N.T., 05/11/21, 40:8-41:14.)

18. Four days after the May 15, 1989 search of Wharton's cell and finding of a handcuff key, Wharton's cell was searched again, and an additional four-inch piece of antenna was found hidden in the binding of Wharton's legal material. (OAG Ex. 19A.) Wharton was again found guilty of possessing implements of escape. (OAG Ex. 19C.) The hearing examiner at Wharton's second misconduct hearing in 1989 noted that Wharton, again, denied that the piece of antenna was his, stating that he had "no idea" where the corrections officer found it. (OAG Ex. 19B.) The hearing examiner explained: "[T]he reporting officer specifically found the piece of antenna in [Wharton's] legal material binding. Wharton is in a single cell and has sole control over his possessions. … Also noted that a handcuff key was fashioned out of such a piece [of] material in the past by Wharton." (OAG Ex. 19B.)

19. According to the Department of Correction's Policy Statement on Inmate Disciplinary and Restricted Housing Procedures, possession of contraband/implements of escape is a Class 1, Category B misconduct. (OAG Ex. 27; N.T., 05/11/21, 43:5-44:2.) The only misconducts more serious than implements of escape, which are in Category A of the Class 1 misconducts, are murder, rape, arson, and robbery. (Id.) Conrad explained that possessing implements of escape is a significant misconduct because it presents "a serious threat to a prison system" and the outside community. (N.T., 03/16/21, 194.)

20.     Wharton was sentenced to 90 days in Disciplinary Custody, the maximum sanction for a Class 1 misconduct, for each of his 1989 implements of escape misconducts. (OAG Exs. 17C, 19C; N.T., 05/11/21, 39:21-24.) Wharton was released from Disciplinary Custody three weeks early for good behavior. (N.T., 05/11/21, 64:1-15.)

21.     Conrad testified that in his experience, approximately ten to twelve of the more than a thousand hearings in which he participated during the ten years that he was a Hearing Examiner involved a makeshift handcuff key. (N.T., 03/16/21, 206:5-17.) He explained that such a misconduct was uncommon. (Id.)

22.     As late as 1990, Wharton denied the possession of the antenna material, telling the Program Review Committee ("PRC") that he had served his time and did not want to discuss it. As a result of his refusal to accept responsibility for these misconducts, Wharton's radio and television privileges were not reinstated until March 1990. (N.T., 05/11/21, 54:20-56:3; OAG Ex. 37C.)

           2.     Wharton's Participation in Prison Life

23.     While incarcerated at SCI Huntington, Wharton had the opportunity to attend monthly meetings with the PRC to review his conduct and prison adjustment. (N.T., 03/08/21 (Part 2), 24:25-25:20, 55:5-10, 56:17-57:4; see also Wharton Ex. 4 at 919-990; OAG Exs. 37A-C.) Inmates were not required to attend these meetings and could decline to do so. (Id.; N.T., 08/05/21, 50:25-51:10.) Wharton attended approximately forty percent of the PRC meetings available to him during the relevant period. (Id.)

24.     The PRC noted in various reviews that Wharton was polite, cordial, well-mannered, well-behaved, and had regular contacts with his counselor. (N.T., 02/25/21, 132:2-140:19; see Wharton Ex. 4 at 919-990; OAG Ex. 37A-C; N.T., 08/05/21, 39:6-14.) Wharton did not exhibit any signs of assaultive, predatory, or violent behavior while incarcerated at SCI Huntington during

14

the relevant time period. (N.T., 08/05/21, 42:6-11.) According to Wharton's corrections expert, Baird, the PRC repeatedly noted that Wharton was adjusting well. (N.T., 08/05/21, 48:20-24.)

25.     DOC records for Wharton also include Prescriptive Program Plans ("PPP"). (OAG Exs. 31A-D.) In various PPP reports, DOC staff notes that Wharton "maintain[s] misconduct free behavior," "sustain[s] positive housing reports," "exercise[s] routinely," "maintain[s] counselor contacts," and "continue[s] with educational development." (N.T., 05/11/21, 117:8-10.)

26.     Wharton also participated in a poetry project while incarcerated. (N.T., 02/25/21, 138:10-17; N.T., 05/11/21, 65:1-7; N.T., 08/05/21, 40:15-22.) He made efforts to improve his education by seeking to earn his high school equivalency diploma, playing chess, and learning Spanish. (N.T., 02/25/21, 32:4-16, 139:3-139:14; N.T., 05/11/21, 65:8-19; see also OAG Ex. 39; N.T., 08/05/21, 40:15-22.)

27.     The 1986 Classification Assessment noted that Wharton "expressed an interest in both academic and vocational programs." (OAG Ex. 39 at 3.)

28.     Wharton made multiple requests to study for his GED while at SCI Huntington. (Wharton Ex. 4 at PE0965-66, 0972.) When these requests were denied, Wharton filed a grievance. (Id. at PE0867.) In response to the grievance, prison staff "arranged" for capital inmates such as Wharton to be given GED tests. (Id.) The response also "commend[ed] [Wharton] for [his] interest in taking the test." (Id.)

29.     The 1986 Classification Assessment noted that Wharton had an interest in "Bible Study and Chapel services while incarcerated." (OAG Ex. 39 at 3.)

30.     Wharton was visited by family members during the relevant period of incarceration and regularly attended chapel services. (N.T., 02/25/21, 139:18-23; N.T., 05/11/21, 65:13-16, 84:1-4; see also OAG Ex. 39; N.T., 08/05/21, 40:13-22.)

31.     Wharton received no negative housing reports or negative psychiatric reports. (N.T., 05/11/21, 116:23-117:5; see also Wharton Ex. 4 at 992-1019.)

32.     Wharton utilized the grievance system at SCI Huntington. (N.T., 02/25/21, 31:15-32:3; 143:16-144:24; Wharton's Ex. 4 at 768-918.) "When [Wharton] felt that he was not being treated fairly or that the conditions with his confinement were not appropriate, he would file a complaint." (N.T., 02/25/21, 31:18-20.)

### E.     Trial Counsel's Later Assessment of Wharton's Adjustment After He Had an Opportunity to Review Prison Adjustment Information

33.     Wharton's Trial Counsel, William Cannon, acknowledged that the prosecution's case at the second penalty hearing was "extremely strong." (N.T., 02/25/2021, 128:2-3.)

34.     Cannon felt that the mitigation evidence he offered at the penalty hearing, which consisted of testimony from Wharton's family members, "wasn't strong." (N.T., 02/25/2021, 128:4-16.)

35.     Cannon first reviewed Wharton's prison records in connection with the present federal proceedings, roughly six months before the evidentiary hearing. After this review, Cannon believed Wharton's adjustment to prison was "extremely favorable, extremely," and "all positive." (N.T., 02/25/2021, 131-34.)

36.     Cannon testified that he would have wanted to present Wharton's prison records to the jury and regretted "so much" that he did not do so in 1992. (N.T., 02/25/2021, 138-39.)

37.     Cannon said he would have argued from the prison records that Wharton was

> a person who ha[d] accepted his then situation in life. He is either going to serve … the rest of his life in prison or he's going to face the death penalty, but rather than hang his head, he pursues things that [allow] him to be a semi-vibrant member of the prison community by seeking educational opportunities, doing writings, doing drawings and participating to the extent that he can in prison life in a meaningful way.

(N.T., 02/25/2021, 139.)

38.     Cannon felt this evidence would have corroborated the positive testimony of Wharton's family members. Cannon also believed that records of Wharton's grievance filings helped Wharton's image by showing he was "living within the system." (N.T., 02/25/2021, 140, 144.)

39.     Cannon acknowledged that presenting evidence of positive prison adjustment would have opened the door to rebuttal evidence. (N.T., 02/25/2021, 174.)

40.     Cannon did not consider the misconducts for possessing makeshift handcuff keys a problem because the keys were never used. (N.T., 02/25/2021, 148, 191.)

41.     When Cannon represented Wharton at the 1992 sentencing hearing, he was aware of Wharton's 1986 escape. (N.T., 03/08/2021, 35.) Had the prosecution sought to introduce Wharton's escape conviction to rebut evidence of Wharton's adjustment to prison, Cannon would have sought to exclude the escape charge on the ground that it happened while Wharton was in County, rather than State, custody. Alternatively, Cannon would have sought to exclude the facts surrounding the escape. (N.T., 02/25/2021, 161-62.)

42.     Even if the escape charge could not be excluded at the penalty phase, Cannon testified that he would still have presented prison adjustment evidence to the jury. Cannon conceded that he could have "done without" evidence of the escape charge, but explained that the facts related to Wharton's escape efforts were minor compared to the "very grisly and bad" facts of the murders that the jury would have heard anyway.  (N.T., 02/25/2021, 33, 163, 200.)

### F. Expert Opinions on Wharton's Adjustment

43.     Corrections officers Hayes and Conrad, as well as the Attorney General's corrections expert, Jeffrey Beard,[6] all testified that an inmate, especially one housed in the RHU, in the possession of a handcuff key is a serious threat to a prison system, to staff at the facility, the inmate, other inmates at the facility, and the community outside of the prison. (N.T., 03/16/21, 159:3-160:14, 194:1-25, 204:13-206:4; N.T., 05/11/21, 38:2-15, 46:4-47:3; N.T., 08/05/21, 103:7-12.) Hayes, Conrad, Beard, and Wharton's own corrections expert, Maureen Baird,[7] all confirmed that an implements of escape charge constitutes a very serious misconduct. (Id.)

44.     Wharton's corrections expert Baird acknowledged that in her experience, escape is a "greatest security level prohibited act." (N.T., 08/05/21, 96:15-19.)

45.     Baird considered Wharton's use of PRC meetings "appropriate." (N.T., 08/05/21, 47:24-48:19.) Baird explained that one of the reasons why a prison system conducts reviews for a capital inmate is so that the inmate can discuss problems they are having or make requests of the Committee. (Id.) The PRC meetings are a forum for the inmate to voice his concerns. (Id.)

46.     Baird opined that Wharton's use of the grievance process was "appropriate," "constructive," and "pro-social" or, in other words, that he used this process "the way it was intended." (N.T., 08/05/21, 61:20-24.) Baird explained that Wharton often attempted to resolve issues informally with prison staff first, but, if they were not resolved, he would file a grievance. (Id.) Baird stated that Wharton was, in fact, often granted relief by the institution after filing a

---

[6]     Jeffrey Beard is the former Secretary of Corrections of both the State of California and the Commonwealth of Pennsylvania. He has been working in corrections since 1971. Beard currently works as a consultant on correctional issues. (OAG Ex. 5.)

[7]     Maureen Baird has been employed as a warden and other executive roles in various federal prisons since 1989. Baird also currently works as a consultant on correctional issues. (Wharton's Ex. 41.)

grievance. (N.T., 08/05/21, 57:14-59:23; Wharton's Ex. 4 at 780-81 (food tray grievance).) She characterized Wharton's tone in these grievances as "not demanding," "polite," and "well-mannered." (N.T., 08/05/21, 59:24-60:7.)

47.     According to Baird, Wharton's records showed that the impression of Wharton from his counselor and the members of the PRC was "overly positive." (N.T., 08/05/21, 46:15-21.) Baird said Wharton had a rapport with and the respect of prison staff. (N.T., 08/05/21, 67:17-23.)

48.     Baird explained that "strong ties" to family are important to an inmate's adjustment. According to Baird, family visits demonstrate to an inmate that "somebody really cares about [him]," which is significant because a lack of family connection while incarcerated can lead to feelings of "hopelessness" and a negative adjustment. (N.T., 08/05/21, 40:23-42:5.)

49.     Baird noted that, in the isolation of the RHU, an inmate's mental health can decline rapidly. (N.T., 08/05/21, 55:20-25.) "Everything becomes … overly depressive," including "feelings of hopelessness," and "inmates will start acting out after … a long period of restricted housing." (N.T., 08/05/21, 56:3-17.) Baird testified that there was no evidence of this kind of mental deterioration and no evidence of a mental health issue that could affect institutional safety or institutional adjustment in Wharton's psychiatric records. (N.T., 08/05/21, 56:18-57:5.) Baird expressed surprise that Wharton handled restrictive housing "so well." (Id.)

50.     Wharton's psychiatric expert, Neil Blumberg,[8] testified that when Wharton tortured and murdered the Harts, he was 21 years old, and his brain was not fully developed. (N.T.,

---

[8]     Neil Blumberg is a medical doctor and licensed psychiatrist who has provided expert consulting services in various roles in the criminal justice system, including in capital sentencing. (Wharton's Ex. 14; N.T., 02/25/21, 15-17.)

02/25/21, 25:2-10.) In Blumberg's opinion, Wharton's prison psychiatric records reflect a more mature brain with a reduced tendency to engage in impulsive behavior. (Id.)

51.     In particular, Blumberg noted that Wharton met regularly with a counselor and never received a negative report. (N.T., 02/25/21, 21:12-25:24; see also N.T., 05/11/21, 116:23-117:7; N.T., 08/05/21, 52:16-22, 120:12-24.)

52.     Experts on both sides agreed that Wharton did not meet the criteria for antisocial personality disorder. (N.T., 02/25/21, 20:5-8; N.T., 03/08/21 (Part 2), 14:11-25.)

53.     The Attorney General's psychiatric expert, Dr. John O'Brien,[9] opined that Wharton did exhibit some antisocial traits, including that Wharton "can present himself as behaving in a certain way when … evidence suggests that he's actually thinking and preparing to behave differently." (N.T., 03/08/21 (Part 2), 32:2-5.) Wharton's corrections expert, Baird, disagreed, noting that prison staff are trained to identify inmates who are "[phonies]" or "manipulators" and that there was no indication in the records demonstrating that Wharton possessed these character traits. (N.T., 08/05/21, 47:11-23.)

54.     The Attorney General's corrections expert, Jeffrey Beard, testified that being polite to staff, attending PRC meetings, meeting with a counselor, and exhibiting no negative housing or psychiatric reports reflects the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

55.     Beard characterized elements of Wharton's 1986 escape as suggesting a "premeditated" plan. Specifically, Wharton came into City Hall with a concealed handcuff key,

---

[9]     John O'Brien is a medical doctor and former licensed psychiatrist who has been employed as a staff psychiatrist at various hospitals. (OAG Ex. 2.)

and may have been feigning an arm injury so that he could keep one arm unrestrained in a sling. (N.T., 05/11/2021, 27-28.)

56.     Beard stressed that Wharton's repeated effort to escape "throws into question" all the positive reports from Wharton's counselors and other prison staff. Beard described how Wharton appeared "very contrite" at his 1986 plea allocution in City Hall, while, at the same time, Wharton was carrying a concealed handcuff key and planning to escape. Beard compared this behavior to Wharton's politeness with staff at SCI Huntington while Wharton was simultaneously in possession of makeshift handcuff keys. Beard stated that such behavior fit his experience with inmates who appear polite while waiting for staff to let "their guard down." (N.T., 05/11/2021, 48-49.)

57.     Ultimately, Beard considered Wharton's 1986 escape and two misconducts for possessing implements of escape to "form the greater part of [his] opinion that [Wharton] had negative adjustment" to prison. (N.T., 05/11/2021, 46.) These incidents were most significant to Beard because they "put the community at risk." (Id.)

## III.     DISCUSSION: STRICKLAND ANALYSIS

Wharton asserts that his Sixth Amendment rights were violated during the second penalty hearing when his counsel failed to obtain and introduce mitigating evidence contained in his prison files for the seven years following Wharton's 1985 murder convictions. Wharton claims that his prison files from that period provided counsel with significant mitigating circumstances to explore and present to the jury as evidence that he "made a positive adjustment to prison life; [would not be] a future danger should he remain incarcerated for life; and [was] amenable to rehabilitation." (Pet. at 55.)

21

Ordinarily, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts owe substantial deference to the decisions of state courts. <u>Weeks v. Snyder</u>, 219 F.3d 245, 258 (3d Cir. 2000). Here, the Third Circuit has previously determined that the Pennsylvania Supreme Court's reasoning in denying Wharton's Sixth Amendment claim constituted an unreasonable application of federal law and that Wharton was entitled to a de novo review of this claim in federal court.[10] <u>Wharton</u>, 722 F. App'x at 280-81. I therefore consider de novo whether Wharton has satisfied the requirements of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Under <u>Strickland</u>, Wharton must "show that counsel's performance was deficient" and that this performance caused him prejudice. <u>Strickland</u>, 466 U.S. at 687. A court may approach the analysis in either order, and, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." <u>Id.</u> at 697. Because the prejudice element of Wharton's <u>Strickland</u> claim is more straightforward, I begin my analysis there.

To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." <u>Id.</u> Because Wharton is challenging the sentence imposed at a penalty hearing,

---

[10]     The Third Circuit found that the Pennsylvania Supreme Court misapplied both the deficient performance and prejudice elements of <u>Strickland</u>. As to deficient performance, the Third Circuit decided that Cannon's decision not to obtain prison records could not be defended on the ground that the records "cut both ways" since Cannon was unaware of the records' contents. <u>Wharton</u>, 722 F. App'x at 280. As to prejudice, the Third Circuit found it unreasonable to assume that additional evidence going to the "catchall" mitigating factor was superfluous merely because the penalty jury already found that factor. <u>Id.</u> at 280-81. Rather, since the jury must weigh the aggravating and mitigating factors, additional evidence to support the "catchall" factor had the potential to tip the balance, and thus a hearing in federal court was necessary to develop that evidence. <u>Id.</u>

prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty." Bond v. Beard, 539 F.3d 256, 285 (3d Cir. 2008).

In considering prejudice, I must review the evidence that was before the sentencing jury; the mitigating evidence that counsel failed to present; and "the anti-mitigation evidence that the Commonwealth would have presented to rebut" that evidence. Williams v. Beard, 637 F.3d 195, 227 (3d Cir. 2011). Once the record is "reconstructed," I must "reweigh the evidence in aggravation against the totality of available mitigation evidence" and determine whether there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. Id. (internal quotation marks omitted).

## A. The Evidence Presented at the Penalty Hearing

During Wharton's 1992 penalty hearing, the Commonwealth presented evidence of the history between Wharton and the Hart family, including the burglaries of their home and Bradley Hart's father's church. Because those facts were important in establishing the aggravating factors underlying Wharton's death sentence, and are therefore important in my Strickland analysis, I recount those here.

Angry that he had not been paid what he believed was a debt owed for construction work, in early August, 1983, Wharton and Larue Owens went to the Harts' home at a time when they knew the family would be at church. Wharton entered the house through an unlocked basement window, and he and Owens stole numerous items. (N.T., 12/15/92, 95-99.)

On August 22, 1983, the next Sunday, Wharton and Owens, joined by co-defendant Eric Mason, again burglarized the Harts' home. This time, in addition to stealing property, they committed multiple acts of vandalism that resulted in the house being temporarily uninhabitable. Wharton and his cohorts smeared pancake batter, mustard, and tomato sauce on the walls, slashed

the sofa and sliced its cushions, defaced family pictures by blotting paint on the faces of Bradley, Ferne, and their baby daughter Lisa Hart, left a child's doll hanging with a rope tied around its neck, left the refrigerator door open, piled food inside the oven and turned it on, dumped the contents of cabinets and drawers all over the kitchen, urinated in the second floor hallway and defecated on the bathroom floor, heaped clothes on the bed and splattered them with paint and turpentine, flipped over the bassinet and slashed the baby's mattress in the form of an "X," threw books and papers all over the floor of the office, and turned up the thermostat causing the smell of urine and rotten eggs to permeate the home. (N.T., 12/14/92, 79-84, 83-86, 98; N.T., 12/16/92, 99-101.)

On September 4, 1983, Wharton and Mason burglarized the Germantown Christian Assembly, a church founded by Bradley Hart's father. Wharton and Mr. Mason stabbed a picture of Bradley Hart on the wall with a letter opener and stole a computer and petty cash. (N.T., 12/15/92, 17-18.)

Finally, on January 30, 1984 at 10:00 p.m., Wharton confronted Bradley Hart at knifepoint and forced his way into the Harts' home. Once inside, Wharton let Mason in and ordered Bradley Hart to write him a check for $935.00. Wharton and Mason then tied up Bradley and his wife, Ferne, holding them and their seven-month-old daughter Lisa. After watching television for several hours, Wharton decided to kill the victims to avoid being identified. He and Mason separated Bradley and Ferne. Wharton took Ferne Hart and her daughter to the second floor, and Mason took Bradley Hart to the basement. Wharton taped Ferne's face with duct tape covering her eyes and mouth and tied her hands and feet. They similarly taped and bound Bradley Hart. They also wrapped electrical cords around Bradley's neck. (N.T., 12/14/92, 123-25; N.T., 12/17/92, 8-9.)

Wharton and Mason removed various items from the house, including silverware, cameras, jewelry, and the victims' wallets, and placed them in Bradley's car. Wharton returned to the second floor, moved Ferne to the bathroom, strangled her with one of her husband's ties, then filled the bathtub and forced her head under water. Mason forced Bradley Hart to lie on the floor of the basement with his face in a shallow pan of water. He then stood on Bradley's back and pulled the cords around his neck, strangling him to death. (N.T., 12/17/92, 9-10.) Wharton and Mason removed additional property from the house, including the baby's crib, then turned off the heat and drove away in Bradley's car, leaving seven-month-old Lisa, in the dead of winter, with her dead parents. (N.T., 12/17/92, 10.) Lisa was found two days later suffering from severe dehydration, and on the way to the hospital, suffered respiratory arrest, but survived. (N.T., 12/15/92, 34-36, 47.)

In seeking life imprisonment at the second penalty hearing, Wharton countered those facts with evidence of his character from his family members. (See infra Section I.B.)

It is important to consider the strength of the evidence already offered in support of Wharton's death sentence because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Here, the vicious nature of Wharton's offenses and the aggravating circumstances found by the jury cannot be understated. The brutality exhibited by Wharton and his co-defendant as they terrorized Bradley and Ferne Hart for months before murdering them and leaving their infant daughter to freeze to death would surely have weighed heavily in the minds of the jury.[11]

---

[11]    The District Attorney points to the fact that: (1) deliberations lasted two or three days (depending on how it is counted); and (2) at the end of the second day, the jury submitted a note stating, "We the Jury at this point in time are unable to reach a unanimous verdict." (N.T.,

**B.      Mitigating Evidence Not Presented and Rebuttal Anti-Mitigation Evidence**

I must now decide whether, had evidence of Wharton's adjustment to prison been added to the above presentation, there is a reasonable probability that the outcome would have been different. This analysis must be done in conjunction with considering anti-mitigation evidence that would have been offered in rebuttal. In so doing, the question is not whether Wharton's adjustment was positive or negative. Rather, I must determine whether there is a reasonable probability that one juror would have found that Wharton's evidence of mitigation, including his prison adjustment, outweighed evidence in aggravation.

Wharton proposes that his counsel could have offered evidence of his positive behavior while in prison. To recap, Wharton's positive behavior was that he attended PRC meetings, actively pursued his education, took part in a poetry activity, attended chapel services, was polite to staff, and handled disagreements through the proper grievance process rather than acting out. (Supra ¶¶ 23-32.) In addition, Wharton amassed only two serious misconducts during his six years in prison, and could have offered an expert to characterize his behavior as positive. (Supra ¶¶ 11, 48-55.)

Again, under Strickland, I cannot consider these facts in isolation but rather must do so as part of "the totality of the evidence before the … jury," including the prosecution's case for

---

12/22/92, at 12-13.) According to the District Attorney, these facts establish a reasonable probability that, had the jury been presented with positive prison adjustment evidence, one juror would have voted for a life sentence.

    In some cases, the length of a jury's deliberations can be relevant in assessing whether an error during trial was harmless. See Johnson v. Superintendent, SCI Fayette, 949 F.3d 791, 805 (3d Cir. 2020). Johnson is the most recent Third Circuit case to consider this issue. In Johnson, the jury deliberated for six full days (longer than the trial itself), and the Third Circuit viewed the trial evidence to be "not overwhelming." Id. at 805. Johnson also involved a significant Confrontation Clause violation. Here, the jury heard overwhelming evidence of aggravating factors. A three-day deliberation over whether to impose a death sentence provides little insight into what form the jury's deliberations took before the jury was ultimately convinced of its conclusion.

aggravation. <u>Strickland</u>, 466 U.S. at 695. In so doing, and after careful review of all the prison conduct evidence, I agree with corrections expert Jeffrey Beard, who explained that the behavior Wharton characterized as positive is the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

Wharton also offered expert testimony that, at the time of the murders, he was just 21 years old and his brain was not fully formed. While I agree that Wharton's age should be considered, his deliberate method of murdering the Harts reflects much more than youthful impulsivity. And in any event, the positive aspects of Wharton's adjustment to SCI Huntington were unremarkable, and would not have convinced the jury that Wharton had grown into a less dangerous person while incarcerated.

This conclusion is significantly strengthened by the fact that Wharton's "adjustment" in prison was marred by multiple efforts to escape. Wharton's escape conviction and surrounding facts, wherein he fled from a courthouse and had to be shot by Philadelphia Sheriffs to prevent him from entering into the public, would greatly undermine any positive prison adjustment evidence. It is difficult to fathom how any juror would have found Wharton's positive adjustment evidence more significant than this premeditated escape from a City Hall courtroom followed by two subsequent misconducts, received days apart, for possessing a makeshift handcuff key and other implements of escape. This particular evidence would be most significant in the minds of the sentencing jury, especially when viewed in conjunction with the facts of Wharton's murder of Bradley and Ferne Hart.

Wharton and the District Attorney emphasize that Wharton's trial counsel, William Cannon, did not view Wharton's attempts to escape as sufficiently serious to outweigh the mitigating effect of Wharton's prison adjustment evidence. While Mr. Cannon's assessment of his

own effectiveness may be relevant, I find his testimony unconvincing. At Wharton's 1992 penalty hearing, Cannon called Wharton's mother, as a witness, to ask for mercy, who acknowledged, tearfully, that her "son will never be free." (N.T., 12/21/1992, 37.) Cannon then recalled the mother's testimony in closing to remind the jury that Wharton "is never coming out of jail," an argument that would have had little value had the jury heard the escape evidence. (Id. at 89.)[12]

Similarly, I agree with Beard's assessment that Wharton's 1986 escape and subsequent misconducts for possessing implements of escape reflect calculated planning and undermine Wharton's superficially good prison behavior. While Wharton promised the sentencing judge in 1986 that he would seek to better himself while in prison, he simultaneously possessed a handcuff key that he used to nearly escape from City Hall. And while Wharton acted politely toward prison staff at SCI Huntington, he continued his efforts to make yet another handcuff key. These facts would have greatly undermined, rather than corroborated, Wharton's family members' testimony as to his character. In particular, the jury would be left with the distinct impression that Wharton's positive attributes could not be trusted.[13]

---

[12]     Cannon also testified that he would have sought to exclude evidence of the escape. Such effort would not have succeeded. In a death penalty hearing, the prosecution may offer evidence to rebut the defendant's evidence in mitigation, even if the rebuttal evidence does not itself constitute an aggravating factor. See Commonwealth v. Basemore, 582 A.2d 861, 870 (Pa. 1990); see also Wharton, 722 F. App'x at 283 ("[W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony….").

[13]     I also note that had the penalty hearing included evidence of positive prison adjustment, the jury would also likely have heard, in rebuttal, of Wharton's repeated failure to accept responsibility for his misconducts. Wharton refused to admit that the makeshift handcuff key and additional pieces of antenna found in his single cell belonged to him. He claimed that he had no idea where the second piece of antenna came from, even though it was recovered from the binding of his own legal material. This is consistent with the psychological evaluation performed at the time of his classification assessment in which Wharton was described as using "a good deal of denial and rationalization" and minimizing "the few transgressions he admitted to doing." (OAG Ex. 39.)

C.    **Expert Testimony**

The expert opinions offered during the hearing support my conclusion that the mitigation evidence that could have been offered would not have changed any juror's mind. According to Baird, while the two implements of escape "incidents" were serious, Wharton's adjustment was positive overall. Baird testified that Wharton used PRC meetings and the grievance process appropriately, had a positive rapport with prison staff, maintained strong ties with his family, and kept a positive outlook despite the bleakness of his situation. (Supra ¶¶ 48-52.) Baird also noted that "other than the incident in 1986" (i.e., escaping), Wharton's behavior while incarcerated was "uneventful." (N.T., 08/05/21, 42:12-20.)

But even if the penalty phase jury accepted Baird's assessment, its effect on the overall impression of Wharton's positive adjustment would have been small compared to the overwhelming evidence of aggravation. Baird minimized Wharton's implements of escape misconducts on the ground that the makeshift keys were not actually used to escape. This reasoning would have been unconvincing to a jury that would also hear evidence that Wharton did, in fact, come alarmingly close to escaping from City Hall. Wharton's psychiatric expert, Dr. Blumberg, similarly discounted Wharton's escape conviction by focusing solely on Wharton's time at SCI Huntington. Had Wharton's trial counsel called experts such as these to testify at the second penalty hearing, they would not have been able to undo the substantial negative impression left by Wharton's multiple attempts to escape.

Countering this testimony would have been Beard's opinions prioritizing threats to the safety of the prison and the outside community over other aspects of Wharton's adjustment. Beard would have told the jury that Wharton's "premeditated attempt" to escape from City Hall using a concealed handcuff key "put the public at great risk." (N.T., 05/11/21, 27-28.) And Beard would have explained that Wharton's pleasant behavior toward prison staff was "superficial" given that

29

Wharton was simultaneously fashioning implements in an effort to escape yet again, thus "throw[ing] into question everything that you see going on with Mr. Wharton during that six-year period of time while he was in the Pennsylvania Department of Corrections." (N.T., 15/11/21, 48-49.)

Considering this testimony as a whole, as I must under <u>Strickland</u>, the opinions of these experts would not have altered the penalty jury's impression that Wharton's behavior from 1986 to 1992 was not sufficiently mitigating to tip the balance in favor of life imprisonment.

### D.     Conclusion—<u>Strickland</u> Analysis

Given "the overwhelming aggravating factors," and the fact that Wharton's multiple efforts to escape would have rebutted any mitigation based on Wharton's adjustment to prison, "there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." <u>Strickland</u>, 466 U.S. at 700. In light of the weight of the evidence in aggravation as compared to the weight of the mitigation evidence that was presented at Wharton's second penalty hearing and the hearings before me, I decline to grant relief on Wharton's remaining Sixth Amendment claim. It was Wharton's burden to demonstrate that because of the mitigation his counsel did not present, there is a reasonable probability that one juror would have voted to impose a sentence of life imprisonment rather than the death penalty. Wharton has not met that burden. For the reasons set forth above, Wharton's petition for a writ of habeas corpus is denied.

### IV.     <u>THE DISTRICT ATTORNEY'S POSSIBLE BREACH OF THE DUTY OF CANDOR</u>

While every case is important, determining whether a defendant's sentence of death should be vacated due an alleged Sixth Amendment violation necessitates meticulous scrutiny, utmost

care, and diligence from all involved—the presiding judge and the attorneys. This process must include transparency from the attorneys and complete candor to the court so that all material facts can be considered.

That said, I preliminarily conclude that on two critical issues in this case, it appears that the District Attorney was less than candid with this Court. The first issue pertains to facts known to the District Attorney, but withheld, regarding Wharton's premeditated escape from a Philadelphia courtroom. This escape was <u>not</u> disclosed to me when the District Attorney requested that I blindly vacate Wharton's death sentence on the ground that his trial counsel had ineffectively failed to offer positive prison adjustment evidence, and was only brought to my attention after I appointed the Attorney General's Office.

The second possible instance of lack of candor involves the District Attorney's representation to me that in reaching its decision to concede the death penalty, and asking that I vacate Wharton's death sentence, the District Attorney had consulted with the victims' family. Yet the fully developed record before me reflects that no communication occurred between the District Attorney and the only surviving victim, Lisa Hart-Newman, and that minimal and woefully deficient communication took place with the siblings of the deceased, Bradley and Ferne Hart.

"[A]n attorney, as an officer of the Court, has an overarching duty of candor to the Court." <u>Eagan by Keith v. Jackson</u>, 855 F. Supp. 765, 790 (E.D. Pa. 1994). That duty requires that a "lawyer shall not knowingly … make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer…." Pa. Rule of Professional Conduct 3.3(a)(1).

The duty of candor "takes its shape from the larger object of preserving the integrity of the judicial system." <u>United States v. Shaffer Equipment Co.</u>, 11 F.3d 450, 458 (4th Cir. 1993); Pa.

31

Rule of Professional Conduct 3.3 cmt. 2. In matters of criminal justice, in particular, "[t]he need to develop all relevant facts in the adversary system" and to avoid "judgments … founded on a partial or speculative presentation of the facts" is "fundamental and comprehensive." United States v. Nixon, 418 U.S. 683, 709 (1974). The attorneys who represent the government in such matters therefore have "special responsibilities to both [the] court and the public at large" and a concomitant obligation to "ensure that the tribunal is aware of … significant events that may bear directly on the outcome of litigation." Douglas v. Donovan, 704 F.2d 1276, 1279 (D.C. Cir. 1983); see also United States v. Tocur Int'l, Inc., 35 F. Supp. 2d 1172, 1188 (N.D. Cal. 1998); Brewer v. District of Columbia, 891 F. Supp. 2d 128, 133 n.7 (D.D.C. 2012); Fusari v. Steinberg, 419 U.S. 379, 391 (1975) (Burger, J., concurring). These lawyers must be "minister[s] of justice and not simply … advocate[s]." Pa. Rule of Professional Conduct 3.8 cmt. 1; American Bar Association, Standards for the Prosecution Function § 3-1.4, "The Prosecutor's Heightened Duty of Candor" ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts….").

The duty of attorneys to be especially forthcoming with the court is further heightened where the proceeding lacks the "balance of presentation by opposing advocates." See Pa. Rule of Professional Conduct 3.3 cmt. 14. This was exactly the dynamic at play here, where Wharton's counsel and the District Attorney joined to advocate that the death sentence be vacated. "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa. Rule of Professional Conduct 3.3(d). But a proceeding may be in effect ex parte where, although others are "technically parties to [it], they ha[ve] no adversarial interest in opposing [the movant's] request." Eagan by Keith v. Jackson, 855 F. Supp. 765, 790 (E.D. Pa. 1994). The heightened duty

of candor that applies in <u>ex parte</u> proceedings is therefore "equally applicable when the parties make a joint request to the Court because, in this situation also, the Court is denied the benefit of adversarial advocacy." <u>Pa. Env't Def. Found. v. U.S. Dep't of Navy</u>, No. 94-cv-1486, 1995 WL 56602, at *2 (E.D. Pa. Feb. 3, 1995).

Lastly, the duty of candor in this case has special significance to constitutional matters of federalism and Article III jurisdiction, given that these proceedings involve a federal court being asked to interfere with a state criminal prosecution. Federal courts must exercise habeas jurisdiction in "light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States…." <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982). And "the jurisdiction of courts of the United States to issue writs of habeas corpus is limited to cases of persons alleged to be restrained of their liberty in violation of" federal law. <u>Matters v. Ryan</u>, 249 U.S. 375, 377 (1919).

Viewed through this lens, the timing of the District Attorney's presentation of its concession is troubling. Shortly before the District Attorney asked me to vacate Wharton's sentence, the Pennsylvania Supreme Court had ruled, in a separate but similar death penalty matter, that was also on collateral review, that the District Attorney does not have the authority to stipulate to such relief on behalf of the state. <u>See</u> <u>Commonwealth v. Brown</u>, 196 A.3d 130, 144-46 (Pa. 2018). Thus, the District Attorney was well aware that state law did not afford that Office the discretion to decide that a death sentence should be removed without a further independent review by a court. <u>Id.</u> at 144. Yet this is exactly what the District Attorney attempted to do in federal court.

In <u>Brown</u>, the same prosecutor's office sought the power to stipulate to death penalty relief and was denied that right by the Pennsylvania Supreme Court. The court stated that at the collateral review stage of a case, "the prosecutor's discretion … is limited to attempts, through the exercise

of effective advocacy, to persuade the courts to agree that error occurred as a matter of law. Prosecutorial discretion provides <u>no power</u> to instruct a court to undo the verdict without all necessary and appropriate judicial review." <u>Brown</u>, 196 A.3d at 146 (emphasis added). The court went on to proclaim that "[a]fter the jury … reached its decision to enter a verdict recommending a death sentence, the district attorney lost any prosecutorial discretion to alter that verdict." <u>Id.</u> at 149.

Four months after <u>Brown</u> was decided, the District Attorney filed a stipulation of death penalty relief in this case, without substantial explanation and despite having zealously defended Wharton's death sentence for twenty-six years. Complete candor was thus imperative to ensure that this was not a collusive misuse of federal jurisdiction to alter state policy in a manner not required by federal law. <u>Cf.</u> <u>Leyva v. Williams</u> 504 F.3d 357, 362 (3d Cir. 2007) ("A federal court has jurisdiction to entertain a habeas petition under 28 U.S.C. § 2254(a) only if a petitioner is in custody in violation of the constitution or federal law." (alterations and quotation marks omitted)).[14]

Applying all of these principles, it is likely that the District Attorney's Office failed to disclose all relevant information and provided other information that was misleading, and thus was not candid with this Court. When the District Attorney notified me that it was conceding Wharton's habeas petition and asked that I grant the requested relief, I was unaware of the most important

---

[14]     This is not the first time the District Attorney has attempted to use this Court to evade the strictures of the state judicial system, while providing incomplete information and asking that I grant relief before hearing evidence, based on its concession alone. In <u>Martinez v. DelBalso</u>, No. 19-cv-5606, 2021 WL 510276 (E.D. Pa. 2021), the assigned Assistant District Attorney affirmatively advised me that the District Attorney's Office was waiving the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) despite the existence of a long-pending petition in state court seeking identical relief. <u>Id.</u> at *1. Then, without advising me that any facts related to exhaustion had changed, the District Attorney litigated and obtained the relief it was seeking in the state court while a hearing was scheduled on the federal petition. <u>Id.</u> at *1-2.

facts bearing on the merits of the habeas petition: Wharton's 1986 escape attempt that nearly succeeded and his continued propensity to fashion implements of escape while in prison. These facts were known to the District Attorney and bore directly on the issue on remand—yet that Office decided to withhold this information. (N.T., 5/11/21, 66:16-19.) Instead, in asking me to grant relief, the District Attorney chose only to represent that it had reached its decision after having "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)." (ECF No. 162 at 4.) And when pressed for an explanation, the District Attorney relied on a declaration of trial counsel that Wharton's prison records could have shown that Wharton "posed no danger to inmates or staff if he were sentenced to life," a statement that was entirely misleading without also disclosing Wharton's 1986 escape attempt.

The District Attorney's Office may well have concluded that Wharton's escape conduct would not tip the scales in favor of maintaining the death penalty. But surely, these incidents would be crucial information to provide to a judge who had been asked to vacate a death penalty sentence. This lapse on the part of the District Attorney also ignores the public's right to know the position taken by the District Attorney and to understand the basis for a court's decision as to whether a significant penalty imposed by a jury thirty years ago for a horrific crime would be preserved or set aside. As one commentator aptly stated, "prosecutors are expected to volunteer relevant factual and legal information in various situations where other lawyers … might legitimately remain reticent." Bruce A. Green, <u>Candor in Criminal Advocacy</u>, 44 Hofstra L. Rev. 1105, 1116 (2016).

A second possible critical lapse of candor on the part of the District Attorney pertains to that Office's purported communication with the victims' family. When the District Attorney filed its notice conceding that Wharton's death sentences should be vacated, it cited "communications

35

with the victims' family" as a basis for that change of course. (Notice of Concession, ECF No. 155, ¶ 9.) "[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Pa. Rule of Professional Conduct 3.3 cmt. 3 (emphasis added). Having provided no details regarding the victims' family's position on this significant concession, where the facts were so heinous and the most serious penalty—death—had been imposed, the unmistakable impression conveyed by the District Attorney's concession was that the victims' family had agreed with the District Attorney's change of position. But this was not the case.

Lisa Hart-Newman, now age thirty-seven, the infant left to die by Wharton, is a surviving victim but was never contacted by the District Attorney. In her June 6, 2019 letter to this Court, Lisa Hart-Newman stated that she was "extremely disappointed to learn of the District Attorney's stance [to seek to vacate the death penalty] and very troubled that the District Attorney implied that the family approved of his viewpoint." (ECF No. 117-5, Ex. F.) She stressed:

> At no point was I contacted by the District Attorney or anyone in his office to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight. At seven months old, after my parents had been murdered, I was left in a house where the heat had been intentionally turned off in hopes that I would die. I am the sole survivor of this tragedy and I am alive despite his efforts.

(Id.)

During the hearing, Lisa Hart-Newman testified that, when she did find out about the District Attorney's concession, "it was as though, well, it's already done, and there's nothing you can do about it. … [Y]ou don't matter, essentially." (N.T., 03/16/21, 90:3-14.) Hart-Newman explained that if the District Attorney had contacted her about its concession, she would have said "Please don't do this. I don't in any way agree with the position that you've taken in this matter, and as a victim I feel like that should matter." (N.T., 03/16/21, 90:23-91:9.)

Both of the deceased parents, Bradley and Ferne Hart, had siblings, but as confirmed by the District Attorney's Victim Witness Coordinator, only one member of the entire Hart family was contacted, Dr. David "Tony" Hart, Bradley Hart's brother. While the Victim Witness Coordinator testified that she eventually informed Tony Hart that a "committee" had decided to concede Wharton's death sentence, Tony Hart's testimony at the evidentiary hearing reflects that either this message was not conveyed or it was not clearly understood. (See N.T., 05/11/21, 185.) But in any event, the District Attorney's Office made this concession without the input of Lisa Hart-Newman or the other siblings of the deceased.

While Tony Hart had difficulty recalling the specifics of his conversation with the District Attorney's Victim Witness Coordinator, he remembered being "left with the impression that she would get back to us, that they were considering … what they were going to do with regard to the case[,] that Wharton had … won the right to an appeal, and that they weren't sure … what they were going to do, what their position was going to be, and so … she was going to get back to me and let me know, keep me informed." (N.T., 05/11/21, 145:21-146:3.) Tony Hart explained that his impression was that Wharton "had won the right to be heard again." (N.T., 05/11/21, 153:22-154:8.) In short, even after subsequent contact with the District Attorney's representative, it was Tony Hart's belief that the District Attorney's Office never provided "any detail" and never "clearly communicated" to him that the Office had decided to concede the death penalty. (N.T., 05/11/21, 146, 160.)[15]

---

[15]     In his letter submitted to the Court, Tony Hart stated that he was told by the District Attorney that "in order to avoid a new trial, a plea deal was offered and accepted." (OAG's Amicus Br., Ex. F.) If this information was in fact relayed by the District Attorney's representative, it would have been entirely misleading in that a "new trial," which could have retraumatized the family, had never been an option or even remotely contemplated by the Third Circuit. (N.T., 05/11/21, 146:16-147:15.)

Tony Hart explained that it was not until the Attorney General's Office contacted him in May or June 2019 that he fully understood what was happening, i.e. that the District Attorney had conceded the death penalty. (N.T., 05/11/21, 156:22-157:9.) Tony Hart recalled being "taken [a]back" by the conversation with the Attorney General's Office. (N.T., 05/11/21, 160:13-161:15.) He explained that had he fully understood that the District Attorney's Office was considering conceding the death penalty, he would have immediately informed Lisa Hart-Newman and his other family members, which he did after speaking with the Attorney General's Office. In fact, only after the Attorney General's Office spoke to the victims' family members was it learned that none of the family agreed that the jury's sentence of death should be vacated. (See N.T., 05/11/21, 164-65; ECF No. 117-5, Ex. F.)

Bradley and Ferne Hart's other siblings also expressed outrage regarding the District Attorney's failure to contact their family. In his letter to the Court, dated June 7, 2019, Ferne Hart's brother, Michael Allen, stated:

> I understand that the DA's office has gone on record to say that they communicated with the family of Wharton's victims. I understand that they have represented either expressly or impliedly that the family agrees with this outrageous position they have taken to seek to vacate Wharton's death penalty. The position of the DA's office is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts.

(ECF No. 117-5, Ex. F.) Michael Allen added that "it would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty." (Id.)

The District Attorney responds to all of this by positing that Tony Hart, a family member, was in fact contacted and that the Victim Witness Coordinator believed Tony Hart would pass her contact information along to his siblings and niece. (DAO Ex. 1.) But the Victim Witness Coordinator did not ask Tony Hart to act as the family's liaison, and Tony Hart believed she never

asked him to pass on that a concession of the death penalty was being considered. (N.T., 05/11/21, 148-49, 167-68, 203.) Nor did the Coordinator confirm whether Tony Hart had conveyed any information she had provided him to his family, nor did she inquire as to whether the other family members might have a different view regarding concession of death penalty relief. (N.T., 08/05/21, 5:5-18, 6:5-12, 20:5-21:4.) In fact, Tony Hart was left with the impression that the family's views would not "make any difference" to the Office's decision making. (N.T., 05/11/21, 158.) And, as noted above, the Victim Witness Coordinator never contacted the only surviving victim, Lisa Hart-Newman. (N.T., 05/11/21, 202.) Tellingly, the District Attorney acknowledges that "[e]mploying 20/20 hindsight, one could say that [the Victim Witness Coordinator] should have taken additional steps." (District Attorney's Post-Hearing Brief at 23.)[16]

I recount all of this background on the District Attorney's contacts with the victims to assess whether the District Attorney's representation to me that its concession was based, in part, on "communications with the victims' family" lacked candor. I conclude that, before making such a representation, the District Attorney should have delved much deeper, where it would have easily learned, as the Attorney General did, that the victims' family and the only surviving victim were vehemently opposed to vacating the death sentence. See Pa. Rule of Professional Conduct 3.3 cmt. 3 ("[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." (emphasis added)) Had these facts, readily obtainable, been known to me, they could have been material to my decision regarding what weight to give the District Attorney's

---

[16]     The District Attorney also argues that it had no "reason to assume that other family members were opposed to death penalty relief" because "it is not uncommon for survivors to be indifferent to or even against the death penalty." (District Attorney's Brief at 23.) But the District Attorney stated that its concession was based on "communication with the victims' family" not speculation that the family would agree with its decision. (ECF No. 155 ¶ 9 (emphasis added).)

concession of Wharton's habeas petition. The thoroughness of the District Attorney's assessment of its case is a factor in evaluating whether its concession reflects an application of "considered judgment" as opposed to merely the "differing views of the current office holder." <u>See</u> <u>Young v. United States</u>, 315 U.S. 257, 258 (1942); <u>Brown</u>, 196 A.3d at 149.

And finally, in asking me to sign a stipulated order based upon insufficient information, the District Attorney ignored the fact that there is a statutory obligation to ensure that victims are provided an opportunity to be heard at proceedings involving sentencing or release and are "treated with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(b)(2)(A). To carry out this obligation, I must depend on truthful information from the lawyers who practice before me.

The District Attorney's Office should be given an opportunity to explain or challenge my preliminary conclusion that there has been a breach of their duty of candor. And facts may need to be developed as to who made decisions regarding communications with this Court.[17]

An order to show cause will follow.

---

[17]  The February 6, 2019 concession and proposed order asking me to vacate the jury's verdict was submitted by the Supervisor of the District Attorney's Federal Litigation Unit who represented that members of a "Capital Case Review Committee" had reviewed this matter.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

## <u>ORDER</u>

**AND NOW**, this 13th day of May, 2022, for the reasons set out in my May 11, 2022 Memorandum Opinion, noting a possible breach of the duty of candor to the Court on the part of the Philadelphia District Attorney's Office, it is hereby **ORDERED** that the Supervisor of the District Attorney's Office's Federal Litigation Unit, who signed the February 6, 2019 concession and thereafter submitted, along with Petitioner's counsel, the proposed order suggesting that I grant the petition for habeas corpus vacating the jury's verdict, **shall appear for a hearing on June 2, 2022, at 9:30  a.m. in Courtroom 17-A** to address the concerns raised in my Opinion.[1]

**BY THE COURT:**


 */s/ Mitchell S. Goldberg*
**MITCHELL S. GOLDBERG, J.**

---

[1] Counsel for all parties including the Attorney Generals' Office shall be present at the hearing.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **ROBERT WHARTON,** | **Civil Action** |
| *Petitioner*, | |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

## <u>ORDER</u>

**AND NOW**, this 26<sup>th</sup> day of May, 2022, it is hereby **ORDERED** that:

1.       Pursuant to the District Attorney's request for a postponement, the hearing scheduled for June 2, 2022 at 9:30 a.m. is rescheduled for **June 10, 2022 at 9:30 a.m. in Courtroom 17-A**.

2.       The District Attorney asks that Max Kaufman be excused from the June 10 hearing because he "was not part of the decision-making process that led to the Concession." Because Mr. Kaufman submitted and signed the Notice of Concession of Penalty Relief, Notice of Proposed Order, and a Brief purporting to explain the basis for the concession, and did so acting as a Supervisor for the District Attorney's Office, he shall be present at the hearing. <u>See</u> Fed. R. Civ. P. 11(b)(2)-(4) (submissions to the court by an attorney certify that after reasonable inquiry the legal contentions are warranted and factual contentions have evidentiary support). Consequently, the District Attorney's Office's motion to excuse Mr. Kaufman is denied and The District Attorney's Office is directed to forward this Order to Mr. Kaufman.

1

**BY THE COURT:**


*/s/ Mitchell S. Goldberg*
MITCHELL S. GOLDBERG, J.

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

## <u>ORDER</u>

**AND NOW**, this 6th day of June, 2022, upon consideration of the Motion to Continue Hearing filed by the Philadelphia District Attorney's Office (ECF #294), it is hereby **ORDERED** that the motion is **GRANTED**. The hearing scheduled for June 10, 2022 is **RESCHEDULED** to be held on **Thursday, June 23, 2022 at 9:00 a.m. in Courtroom 17-A.**

**BY THE COURT:**

*/s/ Mitchell S. Goldberg*
**MITCHELL S. GOLDBERG, J.**

# EXHIBIT 5



LAWRENCE S. KRASNER
DISTRICT ATTORNEY

**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

February 6, 2018

Honorable Mitchell S. Goldberg
United States District Court Judge
United States District Court, Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 7614
Philadelphia, PA 19106-1741

    RE:   **Robert Wharton v. Donald T. Vaughn, Civil Action No. 01-6049**

Dear Judge Goldberg:

    Enclosed please find a copy of respondent's Notice of Concession of Penalty

Phase Relief, which has been filed with the Court.

                Respectfully Submitted,

                Max C. Kaufman
                Supervisor, Federal Litigation Unit

Enclosure

cc:    Victor Abreu, Esquire
        Claudia VanWyk, Esquire

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON,          :            CIVIL ACTION
       **Petitioner**

    v.                      :

DONALD T. VAUGHN,       :            NO. 01-6049
       **Respondent**

## NOTICE OF CONCESSION OF PENALTY PHASE RELIEF

1.      Petitioner is a Pennsylvania state prisoner who was convicted of two

counts of first-degree murder in 1985 and received two sentences.

2.      In 2003, petitioner filed a petition for a writ of habeas corpus in federal

court.

3.      In 2012, this Court denied the habeas petition.  The Court granted a

certificate of appealability (COA) on two claims: that counsel was ineffective at the

suppression hearing and at trial for not presenting evidence supporting the

involuntariness of his confession, and that petitioner's rights under the Confrontation

Clause were violated.

4.      The Third Circuit Court of Appeals subsequently expanded the COA to

include another ineffectiveness claim: that counsel was ineffective for not investigating

petitioner's adjustment to prison or presenting evidence of that adjustment at the

second penalty hearing.

5.      On January 11, 2018, the Third Circuit Court affirmed in part and denied in

part this Court's denial of petitioner's habeas petition.  The Third Circuit affirmed the

1

denial of relief on the two guilt-phase claims, vacated the denial of the sentencing claim, and remanded to this Court for an evidentiary hearing on that surviving claim.

6. On December 3, 2018, the United States Supreme Court denied petitioner's petition for a writ of certiorari.

7. On January 4, 2019, petitioner filed in this Court a *pro se* motion for the appointment of new counsel.

8. On January 9, 2019, this Court scheduled a status conference for February 14, 2019.

9. Following review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance at the second penalty hearing, and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences.

10. In addition, respondent agrees that, following the grant of a conditional writ as to petitioner's death sentences, it will not seek new death sentences in state court.

11. Because all of petitioner's other claims have been fully and finally litigated, the grant of sentencing relief on petitioner's penalty phase ineffectiveness claim in accordance with respondent's concession would end the litigation of this case in federal court. Thus, the grant of penalty phase relief would render moot petitioner's motion for new counsel, and eliminate the need for the scheduled status conference or other proceedings in this Court.

Respectfully submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON,          :               CIVIL ACTION
       Petitioner

   v.                        :

DONALD T. VAUGHN,        :             NO. 01-6049
       Respondent

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on February 6, 2019, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

> Shawn Nolan, Esquire
> Victor Abreu, Esquire
> Claudia VanWyk, Esquire
> Defender Association of Philadelphia
> Federal Court Division
> The Curtis Center, Suite 545 West
> Independence Square West
> Philadelphia, PA 19106
> (215) 928-0520

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

# EXHIBIT 6



LAWRENCE S. KRASNER
DISTRICT ATTORNEY

# DISTRICT ATTORNEY'S OFFICE
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

April 3, 2019

Honorable Mitchell S. Goldberg
United States District Court Judge
United States District Court, Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 7614
Philadelphia, PA 19106-1741

RE:  **Wharton v. Ferguson**, No. 01-6049

Dear Judge Goldberg:

Enclosed please find a copy of respondent's brief in response to the Court's

order of March 4, 2019.

Respectfully Submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit

Enclosure

cc:  Claudia Van Wyk, Esquire
Victor J. Abreu, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT WHARTON,** | : | **CIVIL ACTION** |
| **Petitioner** | | |
| | : | |
| v. | : | |
| | : | |
| **TAMMY FERGUSON,** | : | **NO. 01-6049** |
| **Respondent** | | |

## BRIEF

By order entered March 4, 2019, this Court invited the parties to submit briefs on

the following issues: (1) whether the Court has the authority and/or the obligation to

grant habeas relief to petitioner based solely on the District Attorney's concession of the

remaining habeas claim, or whether the Court must independently review, and

determine the merits of, that now-conceded claim; and (2) if the Court must make an

independent determination on the merits, whether that is possible on the current record,

without conducting the evidentiary hearing as directed by the United States Court of

Appeals for the Third Circuit. This is the Commonwealth's brief.

**I.    A prosecutor is ethically obligated to concede relief when the prosecutor believes that justice so requires; in this situation, a court may, but is not required, to accept that concession.**

Prosecutors have an ongoing and abiding obligation to pursue justice. See

American Bar Association Criminal Justice Standards, Rule 3.-1.2(a), 3.8.1. "The

[prosecutor] is the representative not of any ordinary party to a controversy, but of a

sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a

case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

1

This prosecutorial responsibility continues throughout the duration of a case. See, e.g., Commonweath v. DiPasquale, 431 Pa. 536, 540-41 (Pa. 1968) (District Attorney "has a [g]eneral and widely recognized power" to decide "whether and when to continue or discontinue a case"); see also United States v. Maloney, 755 F.3d 1044 (9th Cir. 2014) (en banc) (granting U.S. Attorney's Motion to Summarily Reverse the Conviction, Vacate the Sentence and Remand to the District Court; U.S. Attorney's motion based on trial prosecutor's improper closing argument).

Put another way, a prosecutor's responsibility includes changing course, if a prosecutor determines that the facts and law require a position different from that previously taken. This does not mean that the prior prosecutor's position was unethical or wrong. It means just that the current prosecutor is exercising his/her own independent judgment as s/he is ethically required to do.

For example, in 2012 Solicitor General Donald B. Verrilli acknowledged during oral argument in the U.S. Supreme Court that the government had changed its position on the question whether American courts have jurisdiction to hear cases involving alleged human rights abuses in other countries. Transcript of Oral Argument at 43-44, Kiobel v. Royal Dutch Petroleum Co., No. 10-1491, 569 U.S. 108 (2012). See also Brief for the United States as Amicus Curiae Supporting Neither Party, at n. 9, U.S. Airways Inc. v. McCutchen, No. 11-1285 (U.S. Sept. 5, 2012) (federal government changed position in U.S. Supreme Court in labor case); Brief for the United States as Amicus Curiae Supporting Petitioners, NLRB v. Murphy Oil USA, Nos. 16-285, 16-300, 16-1307, at 13 (same; Acting Solicitor General Jeffrey B. Wall stating, "after the change in

administration, the office reconsidered the issue and has reached the opposite conclusion").

Here, the District Attorney's Office carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984).  More specifically, this Office determined that Wharton's remaining habeas claim – that his counsel was ineffective at his second penalty hearing for not investigating and presenting evidence of his adjustment to prison – is not lacking in merit.

The circumstances supporting this conclusion include the Third Circuit's ruling that the state court's rejection of the issue was not reasonable, and that the claim should therefore be reviewed under a non-deferential, de novo standard.  See Wharton v. Vaughn, 722 Fed. Appx. 268, 280 (3d Cir. 2018).

In addition, the Commonwealth notes petitioner's argument that, following the Third Circuit's decision, Wharton's counsel at the second penalty hearing executed a declaration under penalty of perjury.  In the declaration, counsel stated that "[i]f I were called to testify at [the evidentiary hearing ordered by the Third Circuit], I would explain that I was not operating under any strategy or tactic when I did not investigate and present evidence of Mr. Wharton's positive prison adjustment at his second penalty hearing and argue to the jury that Mr. Wharton's life should be spared because he posed no danger to inmates or staff if he were sentenced to life" (Declaration of William T. Cannon, Esq., July 3, 2018).

On the question of prejudice, even in the absence of any prison adjustment evidence, the sentencing jury initially reported that it was deadlocked on whether to

sentence Mr. Wharton to death. Ultimately, even without the evidence, the jury found

the catch-all mitigating circumstance. These facts support petitioner's argument that if

the prison adjustment evidence had been presented to the jury, "there is a reasonable

probability that at least one juror would have voted against imposing the death penalty."

Wharton, 722 Fed. Appx. at 281.

    In light of the meritoriousness of Wharton's surviving claim, the District Attorney's

Office has determined that continuing to seek affirmance of Wharton's death sentence

does not justify further expenditure of judicial and legal resources, and years more of

litigation.

    Further, the concession procedure followed by the Commonwealth in this case

repeatedly has been approved by the courts of this district. In at least six other cases,

this Office's written notice of concession was, in material respect, the same as the

notice filed here. See Speight v. Beard, No. 04-04110, Doc. 94 at 10 n.11 (E.D. Pa.

Dec. 22, 2014); Lambert v. Folino, No. 10-01339, Doc. 91 (E.D. Pa. April 10, 2018);

Mason v. Wetzel, No. 17-3759, Doc. 25 (E.D. Pa. June 1, 2018); Brown v. Beard, No.

04-4125, Doc. 69 (E.D. Pa. June 20, 2018); Marshall v. Wetzel, No. 03-3308, Doc. 172

(E.D. Pa. June 25, 2018). Whitaker v. Mooney, No. 14-2321, Doc. 68 (E.D. Pa. June

27, 2018). In each of these cases, the court accepted the Commonwealth's

concession. See Speight v. Beard, 2017 WL 914907 at *17 (E.D. Pa. March 3, 2017)

(memorandum opinion of Quinones Alejandro, J.) (accepting concession of capital

penalty phase relief); Lambert v. Folino, No. 10-01339, Doc. 95 (E.D. Pa. April 26,

2018) (order of Joyner, J.) (accepting concession of grant of new trial); Mason v.

Wetzel, No. 17-3759, Doc. 31, at 2 (E.D. Pa. Aug. 7, 2018) (so-ordered stipulation of

Beetlestone, J.) (accepting concession of capital penalty phase relief); Brown v. Beard, No. 04-4125, Doc. 71 (E.D. Pa. June 27, 2018) (order of Pratter, J.) (accepting concession of grant of new trial); Marshall v. Wetzel, 2018 WL 5801313 at *37 (E.D. Pa. Nov. 6, 2018) (opinion of Leeson, J.) (accepting concession of capital penalty phase relief); Whitaker v. Mooney, No. 14-2321, Doc. 69 (E.D. Pa. June 27, 2018) (order of Smith, J.) (accepting concession of grant of new trial). Indeed, as far as this Office is aware, there has not been a prior instance where a court in this district has declined to accept a concession of relief by the Commonwealth in a pending habeas case.

This Office's considered judgment to concede penalty phase relief under the specific circumstances of this case, while not binding on this Court, is entitled to great weight. See Young v. United States, 315 U.S. 257, 258-259 (1942) ("The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight").

In short, a prosecutor is ethically obligated to concede relief when the prosecutor believes that the circumstances so require, and in this situation, a court may, but is not bound to, accept that concession.

## II. If the record is insufficient to rule on the remaining claim, the Court can conduct an evidentiary hearing.

This Court has concluded that it "cannot independently evaluate the merits of the [r]emaining [s]entencing [c]laim on the current record." Wharton, 2019 WL 1014729 at *7. To the extent this remains the Court's view following consideration of the responsive filings of the parties, including any motion to expand the record under Habeas Rule 7 filed by petitioner, this Office has no opposition to the Court holding an evidentiary hearing.

Respectfully submitted,

MAX C. KAUFMAN
Supervisor, Federal Litigation Unit
PAUL M. GEORGE
Assistant Supervisor, Law Division
NANCY WINKELMAN
Supervisor, Law Division

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ROBERT WHARTON,　　　　　　　　:　　　　　　CIVIL ACTION
　　　　Petitioner

　　v.　　　　　　　　　　　　　　　:

TAMMY FERGUSON,　　　　　　　　:　　　　　　NO. 01-6049
　　　　Respondent

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on April 3, 2019, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

> Claudia Van Wyk, Esquire
> Victor J. Abreu, Esquire
> Defender Association of Philadelphia
> Federal Court Division
> The Curtis Center, Suite 545 West
> Independence Square West
> Philadelphia, PA 19106
> (215) 928-0520

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

IMANUEL BASSIL ALI,

        Petitioner,

        v.

JOHN E. WETZEL, Secretary, Pennsylvania
Department of Corrections; ROBERT D.
GILMORE, Superintendent of the State
Correctional Institution at Greene; and
STEVEN R. GLUNT, Superintendent of the
State Correctional Institution at Rockview,

        Respondents.
_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION**

No. 11-1812

**Hon. Eduardo C. Robreno**
**United States District Judge**

**THIS IS A CAPITAL CASE**

_____

## JOINT MOTION FOR PARTIAL GRANT OF
## THE WRIT OF HABEAS CORPUS

_____

Petitioner, Imanuel Bassil Ali, and Respondent, the Commonwealth of Pennsylvania,

jointly move this Court for an order granting the writ of habeas corpus in part.  By and through

this motion, the parties agree that the writ should be granted as to a penalty-phase claim – Claim

XV – of the Petition for a Writ of Habeas Corpus.  (Doc. 26).  Relief is due on that claim because

the prosecutor violated clearly established federal law by repeatedly commenting on Mr. Ali's

supposed lack of remorse, and Mr. Ali's attorney ineffectively failed to object.  The parties

jointly ask that the Court enter the attached proposed order and judgment granting the writ in

1

part, order that the state court re-sentence Mr. Ali, and then proceed with the remainder of Mr. Ali's habeas petition in the normal course.

In support of his motion, the parties jointly aver as follows:

## I.     APPLICABLE LEGAL PRINCIPLES

### A.     The Privilege Against Self-Incrimination

It is axiomatic that the Self-Incrimination Clause of the Fifth Amendment is violated if a prosecutor comments on a criminal defendant's decision not to testify in his own defense. *See Griffin v. California*, 380 U.S. 609, 613-15 (1965). In *Griffin*, a capital case, the defendant did not testify during the guilt-phase of his trial. The prosecutor argued in closing that Griffin's failure to explain how the victim died or who killed her suggested that Griffin was guilty. *Id.* at 610-11. The prosecutor concluded, "These things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know." *Id.* at 611. The Court concluded that Griffin's constitutional rights under the Self-Incrimination Clause had been violated and reversed the conviction.[1]

In 1981, the United States Supreme Court extended that principle to penalty-phase proceedings in capital cases. *See Estelle v. Smith*, 451 U.S. 454, 462-63 (1981). It is the clearly

---

[1] The same legal principle – derived from the Fifth Amendment – has existed by federal statute since the late-19th century. *See Wilson v. United States*, 149 U.S. 60 (1893). In *Wilson*, a new trial was ordered because, after the defendant opted not to testify, the prosecutor argued in closing, "If I am ever charged with a crime, . . . I will go on the stand and hold up my hand before high heaven and testify to my innocence of the crime." *Id.* at 66. The Court held that the prosecutor's commentary on the defendant's silence violated the defendant's statutory right against self-incrimination and ordered a new trial.

established federal law set forth by *Griffin* and *Estelle v. Smith* that the trial prosecutor violated in this case.

In *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), the Third Circuit applied the holding of *Estelle v. Smith* and *Griffin* to a Pennsylvania capital case, noting "that the *Griffin* rule is applicable in both the guilt and penalty phases of a death penalty trial." *Lesko*, 925 F.2d at 1541. In *Lesko*, the defendant actually *did* testify: he offered mitigating testimony about his childhood during the penalty-phase of his trial, though he did not testify about the crime or proclaim his innocence. *Id.* at 1542. In his closing argument, "[t]he prosecutor asked the jury to consider Lesko's 'arrogance' in taking the 'witness stand' to present mitigating evidence about his background, without even having the 'common decency to say I'm sorry for what I did.'" *Id.* at 1544. The Third Circuit found that Lesko's testimony of a biographical nature was not tantamount to a "complete waiver of the defendant's self-incrimination privilege or his rights under *Griffin*." *Id.* at 1542. It concluded that the "prosecutor's criticism of Lesko's *failure to express remorse* penalized the assertion of his [F]ifth [A]mendment privilege against self-incrimination," and granted penalty-phase relief. *Id.* at 1545 (emphasis added).

## B.    The Right to the Effective Assistance of Counsel

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance was deficient because it fell below "an objective standard of reasonableness," *id.* at 688; and (2) that the deficient performance prejudiced the defense because there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt with respect to the

3

defendant's guilt or the appropriate punishment. *Id.* at 695; *see also Wiggins v. Smith*, 539 U.S. 510, 538 (2002); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

## II.   STIPULATIONS OF FACT

The parties stipulate to the following facts:

Mr. Ali exercised his Fifth and Fourteenth Amendment right not to testify at both the guilt and penalty phases of his trial.

During the penalty-phase of Mr. Ali's trial, the defense called his son, Emanuel Lester, Jr., to testify. Notes of Testimony (NT) 11/13/91 at 76. The prosecutor established on cross examination that Mr. Ali had been in touch with his son after Mr. Ali's arrest leading up to trial. The following exchange between the prosecutor and Mr. Ali's son occurred:

> Q.    During the time you talked to him during the course of the past year or 18 months, did he ever express one bit of remorse about what he had done?
>
> A.    No, no, it wasn't about that.
>
> Q.    It wasn't about that. It wasn't about that at all, was it?
>
>        MR. CONNER:    Objection, Your Honor.
>
>        THE COURT:    Sustained.

Ex. A (NT 11/13/91 at 81). The parties stipulate that this portion of the prosecutor's cross-examination was an improper commentary on Mr. Ali's constitutionally-protected decision to remain silent (i.e., not to testify).

During his penalty phase closing argument, the prosecutor again emphasized Mr. Ali's purported failure to express remorse:

> And you heard testimony at the penalty phase in mitigation. What did you hear in mitigation? Did you hear one ounce of remorse? One ounce of remorse? Did you

4

hear one morsel, one iota in excusion [*sic*] for this behavior? Is there an excuse for
this behavior? Is there something that mitigates this behavior? I didn't hear it, did
you? If so, say so in your penalty. But did you hear one bit of excuse or mitigation,
of remorse or one bit of human element?

Ex. B (NT 11/13/91 at 95). Near the end of his summation, the prosecutor continued, "That is a

murderer. That is a torturer. That is a beater of children; remorseless, concernless [*sic*]." Ex. B

(*id.* at 98-99).[2]

Mr. Ali's counsel did not object. *Id.* Defense counsel later testified in a post-trial

hearing that he had no strategic reason for failing to object. NT 2/21/95 at 72-74. In post-trial

motions and a subsequent motion for reconsideration, Mr. Ali's new counsel raised precisely this

error—and his counsel's failure to object—with the trial court. *See* NT 2/21/95 at 72-73; NT

6/12/95 at 3-22. The trial court denied Mr. Ali's motions.

## III.   STIPULATIONS OF LAW

The parties stipulate that the prosecutor improperly commented on Mr. Ali's

constitutionally-protected right against self-incrimination in violation of the Fifth and Fourteenth

Amendments. Specifically, the parties stipulate that the comments violated clearly established

federal law as determined by the United States Supreme Court in *Griffin v. California*, 380 U.S.

609, and *Estelle v. Smith*, 451 U.S. 454. The parties also stipulate that the violation had a

substantial and injurious effect on the jury's sentence of death. *Brecht v. Abrahamson*, 507 U.S.

619, 622 (1993).

---

[2] The Commonwealth previously argued that "the prosecutor never referred to petitioner's failure
to testify" and that, as such, relief was not due on this claim. (Doc. 64 at 125). On further
analysis of the trial record, that position cannot be defended. The Commonwealth hereby
amends its Response (Doc. 64) as to Claim XV as set forth herein.

The parties further stipulate that Mr. Ali's trial counsel was ineffective within the meaning of *Strickland v. Washington* for failing to object to the prosecutor's improper comments.

The Pennsylvania Supreme Court rejected this claim for relief on direct appeal. Despite federal authorities to the contrary, it reasoned that "the privilege against self-incrimination . . . ha[s] no direct application to the [sentencing] phase." *Commonwealth v. Lester*, 722 A.2d 997, 1009 (Pa. 1999). As such, it found that counsel was not ineffective for failing to object.

The Pennsylvania Supreme Court itself acknowledged, in a 2003 published opinion, that its decision in Mr. Ali's direct appeal was contrary to *Estelle*. *See Freeman*, 827 A.2d at 410 (collecting Pennsylvania Supreme Court decisions, including Mr. Ali's, which held that the Fifth Amendment does not apply at sentencing, and stating that "[n]otwithstanding the line of authority from this Court relied upon by the Commonwealth, it appears that the United States Supreme Court – the ultimate authority on Fifth Amendment questions – has indicated that the constitutional privilege does apply to the penalty phase of capital trials. *See Estelle v. Smith*, 451 U.S. 454, 462-63 (1981)").

The parties stipulate, as the state court has acknowledged, that the state court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), specifically *Griffin v. California* and *Estelle v. Smith*. The parties further stipulate that, under a *de novo* review, Mr. Ali's sentence was in violation of the Constitution. As such, habeas relief on this claim is appropriate.

6

## IV.    CONCLUSION

The law and the undisputed facts lead inexorably to the conclusion that the sentence must be vacated and a new sentencing hearing ordered.  The parties respectfully request that the Court accept these stipulations of fact and law and grant the petition for writ of habeas corpus in part as set forth herein.


Respectfully submitted,                              Respectfully submitted,


 /s/ Shawn Nolan_____                        /s/ Paul George_____
Shawn Nolan                                          Paul George
Capital Habeas Corpus Unit                     Assistant Supervisor
Federal Community Defender Office        Law Division
Eastern District of Pennsylvania            Philadelphia District Attorney's Office
Curtis Center, Suite 545 West                 Three South Penn Square
601 Walnut Street                                    Philadelphia, PA 19107-3499
Philadelphia, PA 19106                          (215) 686-5730
(215) 928-0520


Dated:  September 17, 2019
          Philadelphia, PA

7

## CERTIFICATE OF SERVICE

I, Shawn Nolan, hereby certify that on this date I filed the foregoing *Joint Motion for Partial Grant of the Writ of Habeas Corpus* and the attached *Order* and *Judgment* through the Court's electronic filing system thereby causing service to be made on the following person:

<div align="center">

Catherine Kiefer, Esq.
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

</div>

I also caused the foregoing to be served on the following person by depositing it in the United States mail, postage paid:

<div align="center">

Paul George, Esq.
Assistant Supervisor, Law Division
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

</div>

/s/ Shawn Nolan_____
Shawn Nolan

Dated: September 17, 2019

# Exhibit A

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

| | |
|---|---|
| COMMONWEALTH | : NOVEMBER TERM 1990 |
| | : |
| | : NOS. 0300 - 0307 |
| | : |
| VS. | : MURDER; PIC GENLY; ENDANG |
| | : WELFARE CHILDREN; AGG |
| | : ASSAULT; ENDANG WELFARE |
| | : CHILDREN; ENDANG WELFARE |
| EMANUEL LESTER | : CHILDREN |

- - -

PENALTY PHASE
VOL. I

- - -

Wednesday, November 13, 1991
Room 690, City Hall
Philadelphia, Pennsylvania

- - -

BEFORE: HONORABLE RICARDO C. JACKSON, J.

- - -

APPEARANCES:

JOSEPH McGETTIGAN, ESQUIRE
Assistant District Attorney
Appearing for the Commonwealth

DANIEL CONNER, ESQUIRE
Court-Appointed Counsel
Appearing for Defendant

- - -

## I N D E X

| WITNESSES | DR | CR | REDR | RECR |
|---|---|---|---|---|
| DR. IAN HOOD | | | | |
| BY: Mr. McGettigan | 4 | | | |
| BY: Mr. Conner | | 12 | | |
| | | | | |
| DEFENSE | | | | |
| | | | | |
| JOAN WICKER | | | | |
| BY: Mr. Conner | 20 | | 32 | |
| BY: Mr. McGettigan | | 26 | | |
| | | | | |
| NADINE LESTER | | | | |
| BY: Mr. Conner | 33 | | 41 | |
| BY: Mr. McGettigan | | 36 | | |
| | | | | |
| DR. JOHN O'BRIEN | | | | |
| BY: Mr. Conner | 43 | | 63 | |
| BY: Mr. McGettigan | | 47 | | |
| | | | | |
| THERESA LESTER | | | | |
| BY: MR. Conner | 63 | | | |
| BY: Mr. McGettigan | | 66 | | |
| | | | | |
| TRACEY LESTER | | | | |
| BY: Mr. Conner | 68 | | | |
| BY: Mr. McGettigan | | 70 | | |
| | | | | |
| CHRISTINE LESTER | | | | |
| BY: Mr. Conner | 73 | | | |
| BY: Mr. McGettigan | | 74 | | |
| | | | | |
| EMANUEL LESTER, JR. | | | | |
| BY: Mr. Conner | 76 | | | |
| BY: Mr. McGettigan | | 77 | | |

- - -

Emanuel Lester, Jr. - Cross

1    A.    Yes.

2    Q.    Did he have any problems that you were aware of?

3    A.    No, sir.

4    Q.    Acted in his right mind?

5    A.    Yes, sir.

6    Q.    He never got violent with you or anything, did he?

     A.    Never in his life.

     Q.    He didn't have a drug problem that you were aware of

9    then, did he?

10   A.    Not that I was aware of.

11   Q.    And you saw him all the time like you said, right?

12   A.    Right.

13   Q.    Everything was just fine?

14   A.    Everything was just fine.  He could be considered

15   one of the privileged father anybody would like to have.

16   Q.    And during the past year or year and-a-half since

17   Mr. Lester has been arrested on this offense you talked to

18   him on a regular basis?

19   A.    Say that again.

20   Q.    You talked to him on a regular basis since April of

21   last year?

22   A.    Yes, sir.

23   Q.    And he is fine since then, right?

24   A.    Everything been fine.

25   Q.    Does the name Sheila Manigault mean anything to you?

Emanuel Lester, Jr. - Cross

1    A.    Yes, sir.

2    Q.    What does it mean to you?

     A.    Well, her and my father, they had grew up together,

4    they was young kids, when he was little.

5    Q.    That is the only way you know the name Sheila

6    Manigault?

     A.    Right.

     Q.    You knew why Mr. Lester was arrested and charged

9    with murder, didn't you?  You knew he was arrested and

10   charged with murder?

11   A.    When the two detectives came to the house they told

12   me.

13   Q.    During the time you talked to him during the course

14   of the past year or 18 months, did he ever express one bit

15   of remorse about what he had done?

16   A.    No, no, it wasn't about that.

17   Q.    It wasn't about that.  It wasn't about that at all,

18   was it?

19            MR. CONNER:  Objection, Your Honor.

20            THE COURT:  Sustained.

21            MR. McGETTIGAN:  I have nothing further.

22            MR. CONNER:  Move to strike.

23            THE COURT:  Denied.

24            MR. CONNER:  No further questions.

25            THE COURT:  You may step down.

# Exhibit B

This exhibit is redacted in conformity with rule 5.2(a)(3) of the Federal Rules of Civil Procedure and Local Rule 5.1.2(12)(b) & (c) (Public Access).

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

COMMONWEALTH : NOVEMBER TERM 1990
:
: NOS. 0300 - 0307
:
VS. : MURDER; PIC GENLY; ENDANG
: WELFARE CHILDREN; AGG
: ASSAULT; ENDANG WELFARE
: CHILDREN; ENDANG WELFARE
EMANUEL LESTER : CHILDREN

- - -

PENALTY PHASE
VOL. I

- - -

Wednesday, November 13, 1991
Room 690, City Hall
Philadelphia, Pennsylvania

- - -

BEFORE: HONORABLE RICARDO C. JACKSON, J.

- - -

APPEARANCES:

JOSEPH McGETTIGAN, ESQUIRE
Assistant District Attorney
Appearing for the Commonwealth

DANIEL CONNER, ESQUIRE
Court-Appointed Counsel
Appearing for Defendant

- - -

I N D E X

| WITNESSES | DR | CR | REDR | RECR |
|---|---|---|---|---|
| DR. IAN HOOD | | | | |
| BY: Mr. McGettigan | 4 | | | |
| BY: Mr. Conner | | 12 | | |
| DEFENSE | | | | |
| JOAN WICKER | | | | |
| BY: Mr. Conner | 20 | | 32 | |
| BY: Mr. McGettigan | | 26 | | |
| NADINE LESTER | | | | |
| BY: Mr. Conner | 33 | | 41 | |
| BY: Mr. McGettigan | | 36 | | |
| DR. JOHN O'BRIEN | | | | |
| BY: Mr. Conner | 43 | | 63 | |
| BY: Mr. McGettigan | | 47 | | |
| THERESA LESTER | | | | |
| BY: MR. Conner | 63 | | | |
| BY: Mr. McGettigan | | 66 | | |
| TRACEY LESTER | | | | |
| BY: Mr. Conner | 68 | | | |
| BY: Mr. McGettigan | | 70 | | |
| CHRISTINE LESTER | | | | |
| BY: Mr. Conner | 73 | | | |
| BY: Mr. McGettigan | | 74 | | |
| EMANUEL LESTER, JR. | | | | |
| BY: Mr. Conner | 76 | | | |
| BY: Mr. McGettigan | | 77 | | |

- - -

1        This was pain, this was suffering inflicted

2   throughout the residence of a human being, upon that

3   human being while her children were present, by that

4   person there as she screamed for her life.  And what

5   human kindness, what human consideration did he

6   show?  He kicked her daughter, he punched her

7   daughter in the eye, he grabbed her daughter by the

8   throat and threw her across the room and put a

9   pillow over her face.  That is what you saw.

10        And you heard testimony at the penalty phase

11   in mitigation.  What did you hear in mitigation?

12   Did you hear one ounce of remorse?  One ounce of

13   remorse?  Did you hear one morsel, one iota in

14   excusion for this behavior?  Is there an excuse for

15   this behavior?  Is there something that mitigates

16   this behavior?  I didn't hear it, did you?  If so,

17   say so in your penalty.  But did you hear one bit of

18   excuse or mitigation, of remorse or one bit of human

19   element?  Not from that witness stand.

20        And think about this, the testimony that you

21   heard -- and it is regrettable that family members

22   must sit on that witness stand and testify in these

23   proceedings -- but did they tell you about a life

24   that was barren of human kindness?  No, they didn't.

25   Did they tell you about a life that was bereft of

family contact?  No, they didn't.  Did they tell you
about a life or a person who had no possibility of
assistance or people who were concerned for him?
No, they didn't.  They told you about a person who
could and did select his way to go in life, his rite
of passage.  And how did his rite of passage end?
Before you here now.  He had not one person to turn
to?  Wrong.  That is not what you heard.  This is a
person who selected his path in life, and because he
selected that path in life there is another human
life that will never be here again: Sheila
Manigault.  And does that name mean anything to
those people?  Well, he was someone who grew up with
her.  Yeah, that's right.  She grew up and she died
because of him.  Because she had shown a kindness,
she died.  Because she took someone in, she died.
Because she let someone share her table and her
roof, she died.  Because she didn't open the door
fast enough, she died and he didn't.

        And you heard Dr. O'Brien.  I love that
testimony.  Did that testimony demonstrate to you by
any standard that there is anything that absolves
the defendant of full responsibility of this act?
Did it?  If so, say so by your penalty.  Or did it
strike you that Dr. O'Brien had an ax to grind and

had an agenda of his own?  And think about the
defendant's behavior.

Think about this:  The penalty that you
should, I submit, by the evidence and law impose is
an irrevocable one and an appropriate one.  The
penalty Mr. Conner will put forth is life without
parole.  There are some penalties that are
appropriate and some that aren't, and life
imprisonment with or without parole is not the
appropriate penalty, because the only penalty that
adequately addresses the horror of the acts Mr.
Lester committed is one that says he should forfeit
his life, because this life in prison without
parole, well that doesn't say much for society's
concern for those who would have the misfortune of
being incarcerated near Mr. Lester or those who have
the misfortune of having to guard Mr. Lester.  And
it really doesn't say much about society's concern
for the lives of the innocent or lives stripped from
them by the acts of Mr. Lester.  So, consider what
your verdict says and consider what the evidence
says.

I ask you in all earnestness to hold within
you the strength that ██████ ██████ showed,
because you have a difficult task, but don't shirk

1    it because it is unpleasant, don't shirk it because
2    it is difficult.  Show sympathy for all, but do not
3    let sympathy for the one who sits here, who deserves
4    none, keep you from what your duty says you should
5    do.  Sheila Manigault deserves sympathy, but that
6    shouldn't influence your verdict.  And ███████
     deserves sympathy, but that shouldn't influence your
     verdict.  Do what the law and facts say you should
     do and do what is right and impose the appropriate
10   penalty.
11          You know, you sat here for the past week,
12   ten days or so, and you have been hearing testimony
13   and you have listened to lawyers and the Judge and
14   police officers, and what you have said that you
15   acknowledged by your verdict yesterday is that you
16   sat here in the presence of a person who has taken a
17   human life.  That is an awesome thing.  There are
18   some of us, because of our experiences in life, that
19   have had occasion in the past to see human lives
20   taken by means of violence.  It is not a pleasant
21   thing and it is something that lives with you.  It
22   is something that you now share as an experience.
23   You have sat in the same room with a person who
24   under these heinous and atrocious and violent
25   circumstances took a human life.  That is a

...torturer. That is a torturer. That is a beater of children; remorseless, concernless. **Your verdict** stripped him of that cloak of innocence and he sits before you now on one of the occasions he elects to sit here and you can't see it underneath that suit, you can't see it on top of that suit, but **the blood** of his victim is still on him and it will **remain** there.

Now, I told you Sheila Manigault has no rights left. She has none. And I believe that you gave her that one thing that Sheila Manigault has a right to ask for from beyond her grave, but she has just a bit more that we should consider now, as does ▆▆▆▆ ▆▆▆▆, as does that duty which brings you here now, and that is not to look away from what the evidence says Mr. Chester did, because it says he held a struggling woman under scalding water for seconds while she hollered and he beat her from one room to another and punched her so hard in the stomach that the impact was visible on her internal organs, and that he held her under water for not one minute or two minutes or three minutes, but more than three minutes, four minutes under water. And if one can imagine torture greater than scalding of the face, greater than having your hair pulled out

# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

IMANUEL BASSIL ALI,

        Petitioner,

        v.

JOHN E. WETZEL, Secretary, Pennsylvania
Department of Corrections; ROBERT D.
GILMORE, Superintendent of the State
Correctional Institution at Greene; and
STEVEN R. GLUNT, Superintendent of the
State Correctional Institution at Rockview,

        Respondents.

---

**CIVIL ACTION**

No. 11-1812

**Hon. Eduardo C. Robreno**
**United States District Judge**

**THIS IS A CAPITAL CASE**

---

## ORDER

AND NOW, this _____ day of _____, 2019, upon careful

and independent consideration of Imanuel Bassil Ali's petition for writ of habeas corpus (Doc.

No. 26), memorandum of law (Doc. No. 51), and reply (Doc. No. 72-2); the Commonwealth's

response to the petition (Doc. No. 64); and the parties' joint motion for partial grant of the writ of

habeas corpus (Doc. No. 94) and the exhibits thereto; it is ORDERED that:

1.  The stipulations of the parties contained in the joint motion is attached to and

    incorporated into the terms of this order;

2.  Claim XV of Ali's Petition for Writ of Habeas Corpus is CONDITIONALLY

    GRANTED by separate judgment, filed contemporaneously with this Order. *See* Fed.

    R. Civ. P. 58(a); Rule 12 of the Rules Governing Section 2254 Cases in the United

    States District Courts;

3. If Ali is re-sentenced to any sentence other than a death sentence, all claims for relief in his petition relating to the penalty-phase of his trial will be deemed moot; all other pending claims and motions shall be unaffected by this Order; and

4. Ali shall be resentenced in the Court of Common Pleas of Philadelphia County as set forth in the Judgment.

IT IS SO ORDERED.

By the Court:

_____
The Honorable Eduardo C. Robreno
United States District Judge

# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IMANUEL BASSIL ALI, | : |
| Petitioner, | :    CIVIL ACTION |
|  | :    No. 11-1812 |
| v. | : |
|  | :    **Hon. Eduardo C. Robreno** |
| JOHN E. WETZEL, Secretary, Pennsylvania:    **United States District Judge** | |

IMANUEL BASSIL ALI,

                Petitioner,

      v.

JOHN E. WETZEL, Secretary, Pennsylvania:
Department of Corrections; ROBERT D.
GILMORE, Superintendent of the State
Correctional Institution at Greene; and
STEVEN R. GLUNT, Superintendent of the
State Correctional Institution at Rockview,

                Respondents.

CIVIL ACTION

No. 11-1812

**Hon. Eduardo C. Robreno**
**United States District Judge**

**THIS IS A CAPITAL CASE**

## JUDGMENT

In accordance with the Court's separate Order, filed contemporaneously with this Judgment, on this _____ day of _____, 2019,

### JUDGMENT IS ENTERED

**CONDITIONALLY GRANTING IN PART** plaintiff's Petition for Writ of Habeas Corpus. The writ is granted as to Claim XV, which affords petitioner relief as to his sentence only; the conviction remains.

Within 90 days of the date of the entry of this Judgment, the Court of Common Pleas of the Commonwealth of Pennsylvania shall vacate petitioner's sentences in *Commonwealth v. Ali (a.k.a. Lester)*, CP-51-CR-1103001-1990, for the offense of first degree murder and related offenses. The parties and the court shall ensure that petitioner is re-sentenced without undue delay.

IT IS SO ORDERED.

By the Court:

_____
The Honorable Eduardo C. Robreno
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                     :
RALPH BIRDSONG,                      :
                                     :
                    Petitioner,      :          CIVIL ACTION NO. 11-CV-4240
                                     :
          v.                         :          CAPITAL CASE
                                     :
JOHN E. WETZEL, et al.,              :
                                     :
                    Respondents.     :
_____:

## STIPULATION TO AMENDMENT OF RESPONDENTS' ANSWER
## AND TO PETITIONER'S ENTITLEMENT TO SENTENCING RELIEF

Petitioner Ralph Birdsong, through counsel, and Respondents, through their counsel the Philadelphia District Attorney's Office, respectfully stipulate to amendment of Respondents' Response to Petition for Writ of Habeas Corpus (Doc. 50) and to Petitioner's entitlement to sentencing relief based on Claim V of his Petition for a Writ of Habeas Corpus by a Prisoner in State Custody (Doc. 9), as follows:

### PURPOSE OF STIPULATION

The parties agree that the terms of this Stipulation are in their respective interests. The purpose of this Stipulation is to reflect the parties' agreement that Mr. Birdsong should be granted relief from his death sentence, and it is anticipated that the Commonwealth will not seek to re-impose a death sentence upon the return of the case to the Pennsylvania courts. The parties do not intend this stipulation to alter their respective positions on Mr. Birdsong's claims that he is entitled to relief from his convictions.

1

## PROCEDURAL HISTORY

Petitioner Ralph Birdsong is a death-sentenced Pennsylvania prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. The crimes for which Mr. Birdsong was prosecuted occurred on July 17, 1988, and his capital trial was held in the Philadelphia Court of Common Pleas in October, 1989. Mr. Birdsong was convicted and sentenced to death.

On November 9, 1994, the Pennsylvania Supreme Court affirmed his convictions and sentence on direct appeal. *Commonwealth v. Birdsong*, 650 A.2d 26 (Pa. 1994). The court subsequently denied his post-conviction challenges. *See Commonwealth v. Birdsong*, 24 A.3d 319 (Pa. 2011).

On April 27, 2012, Petitioner filed his Petition for Writ of Habeas Corpus in this Court, followed by a Memorandum of Law on May 15, 2013. Docs. 9, 25. In Claim V, Petitioner alleged that his trial counsel provided constitutionally ineffective assistance in failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of trial. Doc. 9 at 14-52, 67; Doc. 25 at 46-73.[1]

Respondents filed their Response on June 2, 2015. Doc. 50. As to Claim V, Respondents asserted that the claim was procedurally defaulted and not meritorious. *Id*. at 114-45.

## TERMS OF STIPULATION

The following constitute the terms of the parties' Stipulation:

1.     This Court should vacate Petitioner's death sentence by conditionally granting the Petition for a Writ of Habeas Corpus by a Prisoner in State Custody (Doc. 9) as to Claim V, which alleged that trial counsel was ineffective for failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of trial.

---

[1] Pin cites to court documents refer to the page numbers printed on the submitted document, not necessarily to the page number provided by the Court's ECF system.

2.      Pursuant to Fed. R. Civ. P. 15(b), Respondents may amend their Response with the opposing party's written consent, and Petitioner, through counsel, consents to such amendment as set forth herein.

3.      Respondents hereby amend their Response to Petition for Writ of Habeas Corpus by withdrawing those portions pertaining to Claim V.  *See* Doc. 50 at 114-45.

4.      Respondents decline to assert, and affirmatively waive, any procedural default defenses to Claim V.  Petitioner and Respondents agree that the standards of review under 28 U.S.C. § 2254 do not bar relief as to Claim V.  *See* Doc. 25 at 63-73.

5.      Petitioner and Respondents agree that trial counsel's mitigation investigation and presentation were constitutionally deficient because, inter alia, counsel failed to obtain and present available mitigation information from family members, lay witnesses, and professional witnesses; failed to obtain, review, and/or present available social history records; failed to timely and adequately consult with mental health experts; and failed to adequately consult with the client.

6.      Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of trauma, impairment, and childhood depravation was substantial and of a similar nature to the unpresented evidence upon which the United States Supreme Court has granted relief on similar post-conviction claims.  A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which included no records or other material evidence and filled only nine pages of transcript—including testimony and closing argument.

7.      The parties anticipate that, upon acceptance of this Stipulation, the Court will treat Petitioner's other claims regarding his death sentence as moot (Claims I, II, and VI) and proceed to consider Petitioner's remaining claims challenging his convictions only.

8.      The parties further anticipate that the Court's conditional grant of the writ as to Petitioner's death sentence will form a part of its final order in these habeas proceedings.

9.      A proposed order encompassing the terms of the Stipulation is attached for the Court's consideration.

**SO STIPULATED:**

/s/ Timothy Kane                          /s/ Max Kaufman
TIMOTHY KANE                         MAX KAUFMAN
Federal Community Defender Office        Chief, Federal Litigation Unit
Eastern District of Pennsylvania         Philadelphia District Attorney's Office
Capital Habeas Corpus Unit               Three South Penn Square
The Curtis Center, Suite 545 W           Philadelphia, PA 19107
Philadelphia, PA 19106

                                         Counsel for Respondents

Counsel for Petitioner

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
RALPH BIRDSONG,                         :
                                        :
                    Petitioner,         :        CIVIL ACTION NO. 11-CV-4240
                                        :
         v.                             :
                                        :
JOHN E. WETZEL, et al.,                 :
                                        :
                    Respondents.        :
_____:

## ORDER

    **AND NOW**, this _____ day of _____, 2019, upon consideration of Petitioner's Petition for a Writ of Habeas Corpus by a Prisoner in State Custody (Doc. 9), the parties' Stipulation (Doc. 99), and the full record in this case, it is **ORDERED** as follows:

1. The parties' Stipulation is **ACCEPTED** by the Court;

2. Petitioner's Petition for a Writ of Habeas Corpus is **GRANTED** as to Claim V. The Court finds that Petitioner was deprived of the effective assistance of counsel at the sentencing phase of trial, based on counsel's failure to investigate and present available mitigating evidence;

3. Because the writ is granted as to Claim V, Petitioner's other claims regarding his death sentence are moot and will not be further considered by the Court;

4. Upon completion of review of Petitioner's claims challenging his convictions, this Order will be incorporated into the Court's final order with respect to these habeas proceedings.

**IT IS SO ORDERED.**

                                            BY THE COURT:


                                          _____

                                          HON. JEFFREY L. SCHMEHL

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of August, 2019, I caused a true and correct copy of the foregoing Stipulation to be served by the Court's Electronic Case Filing system upon all counsel of record.


/s/ Timothy Kane
Timothy Kane

June 20, 2018

The Honorable Gene E.K. Pratter
United States District Court
10613 United States Courthouse
601 Market Street
Philadelphia, PA 19106

      *Re:*    Brown v. Beard, *No. 05-CV-4125 (capital case)*

Dear Judge Pratter:

      Following the discussion at the status conference on May 23, 2018, and several detailed subsequent discussions with counsel for the petitioner, the respondents, after careful consideration, have determined not to oppose a conditional grant of habeas corpus in this case, with the respondents to commence retrial proceedings in the Court of Common Pleas of Philadelphia within a reasonable time to be set by the Court, e.g., 180 days. Counsel for the petitioner has advised that the Defender Association of Philadelphia will be prepared to represent the petitioner in connection with the state court retrial proceedings. The petitioner in turn has agreed that the respondents' determination not to oppose relief will not be understood or argued to constitute an admission or concession that the petitioner's claims have merit. The petitioner, through his current counsel, also agrees that—as with continuances granted at the request of or with the consent of his state court counsel—should the petitioner be found not to be competent to proceed in connection with state court retrial proceedings, periods of time when the petitioner is not competent to stand trial should not be counted against the Commonwealth.

      This agreement, which would grant as uncontested all the relief the petitioner has requested in this proceeding, would dispose of the entire litigation before this Court.

To summarize:

- The respondents have determined not to oppose the grant of a conditional writ of habeas corpus (which is all the relief the petitioner is seeking in this proceeding), with the respondents to then commence retrial proceedings in the Court of Common Pleas within a reasonable time to be set by the Court.

- The petitioner agrees that the respondents' determination not to oppose a grant of relief will not be understood or argued to constitute an admission or concession that the petitioner's claims have merit. The petitioner, through his current counsel, agrees that should the petitioner be found not presently

The Honorable Gene E.K. Pratter
June 20, 2018
Page 2 of 2

competent to stand trial, periods of time when he is not competent to stand trial should not be counted against the Commonwealth.

Should the Court determine that it would be helpful, counsel would submit a proposed order that would effectuate their agreement.


Respectfully submitted,



*/s/ Michael Gonzales*                                  */s/ Joshua S. Goldwert*
MICHAEL GONZALES                          JOSHUA S. GOLDWERT
Assistant Federal Defender                    Assistant District Attorney

*/s/ Cristi A. Charpentier*                            */s/ Max C. Kaufman*
CRISTI A. CHARPENTIER                     MAX C. KAUFMAN
Supervisory Assistant Federal Defender   Supervisor, Federal Litigation Unit
Federal Community Defender Office         Philadelphia District Attorney's Office
  for the Eastern District of Pennsylvania


*Counsel for Petitioner*                              *Counsel for Respondents*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

DEWITT CRAWLEY,       :

      :       **CIVIL ACTION**

      Petitioner,       :

      :       No. 99-5919

      v.       :

Martin Horn et al ,       :

      Respondents.       :       **THIS IS A CAPITAL CASE**

_____ :

      :

      :

      :

      :

      :

## PETITIONER'S MOTION TO REACTIVATE CASE

Petitioner, Dewitt Crawley, through undersigned counsel, respectfully moves to reactivate Petitioner's case from suspense and stay of federal proceedings, so that the Court may consider and endorse the stipulation by and between counsel which is likewise being filed today for the Court's consideration. Happily, the parties have come to a meeting of the minds regarding the resolution of this case and seek the Court's imprimatur.

In support of this motion, Petitioner states the following.

1. This is a capital habeas corpus proceeding brought by a Pennsylvania state prisoner on death row at SCI-Greene.

2.     The procedural history has been detailed in several prior filings and most recently in this Court's own Order to put the matter into civil suspense on September 12, 2014.

3.     At about that same time, counsel for Petitioner and the Commonwealth began discussions about possible resolutions to this matter.  Following an agreement in principle that this case could be resolved in a way which would leave the murder convictions in tact and that the sentence on each charge of first degree murder could be life without the possibility of parole, the parties last week agreed upon a settlement letter which is being filed today which, following the review by the Court and its approval,  serves as the Order of the Court as well.

4.     Counsel have discussed this thoroughly with their client and he is full agreement with the terms and conditions.

A proposed order is attached.

WHEREFORE, Petitioner respectfully requests that this Court grant Petitioner's *Motion to Reactivate* this case from the suspense list and then consider and approve stipulation by and between the parties which resolve this case for all time.

2

Respectfully Submitted,


/s/ Cristi Charpentier
Cristi Charpentier
Capital Habeas Corpus Unit
Federal Court Division
Defender Association of Philadelphia
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA  19106
(215) 928-0520

Dated: February 2, 2015


# CERTIFICATE OF SERVICE


I, Cristi Charpentier, hereby certify that on February 2, 2015, I caused the

foregoing motion to be served on the following person by ECF and/or first class

U.S. mail:

Thomas Dolgenos
Office of the Philadelphia District Attorney
3 South Penn Square West
Phila PA 19103

(Counsel for Respondents, Commonwealth of Pennsylvania)


s/ Cristi Charpentier
CRISTI CHARPENTIER

Dated: February 2, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEWITT CRAWLEY,                          :
                                         :
          Petitioner,                    :
                                         :      CIVIL ACTION
     v.                                  :      (HABEAS CORPUS)
                                         :      No. 99-5919
MARTIN HORN, *et al*                     :
                                         :      Honorable Timothy J. Savage
          Respondents.                   :      United States District Judge
_____         :
                                         :
                                         :
                                         :

## **ORDER**

**AND NOW**, this _____ day of February, 2015, upon consideration of *Petitioner's Motion for Reactivation of Federal Habeas Corpus Proceedings*, for the purpose of considering the settlement stipulation presented by the parties it is **ORDERED** that the motion is **GRANTED**.

                                   _____
                                   Honorable Timothy J. Savage
                                   United States District Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

DEWITT CRAWLLEY,            :

                        :

        Petitioner,     :

                        :     CIVIL ACTION

       v.             :     (capital habeas corpus)

                        :

MARTIN HORN, Commissioner,     :     No.  99-5919

Pennsylvania Department of Corrections and   :

DONALD L. KELCHNER, Superintendent   :

of the State Correctional Institution at   :

Muncy,                    :     Honorable Judge Savage

                        :

        Respondents.

_____

### STIPULATION AND ORDER

Petitioner, DEWITT CRAWLEY, through undersigned counsel, Defender Association of Philadelphia, Federal Court Division, Capital Habeas Corpus Unit, and Respondents through their counsel, the District Attorney of Philadelphia County, Pennsylvania, hereby *Stipulate* as follows:

### Purpose of Stipulation

The parties agree to the terms of this *Stipulation* because each believe that the terms are in their respective interests.  The purpose of this *Stipulation* is to insure that in exchange for the termination of these habeas corpus proceedings, Petitioner will be sentenced to life imprisonment.  Accordingly, the terms of this *Stipulation* should be construed in accordance with that purpose.

## Procedural History

Petitioner was convicted, in the Philadelphia County Court of Common Pleas, of three counts of first degree murder and sentenced to death on all three counts. On direct appeal, the Pennsylvania Supreme Court found numerous errors and affirmed the convictions and sentences. Commonwealth v. Crawley, 514 Pa. 539, 526 A.2d 334, 344 (1987).

Petitioner then filed a petition for state post-conviction relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. C.S. §§ 9541 et seq., relief was denied by the Court of Common Pleas, and the Pennsylvania Supreme Court affirmed. Commonwealth v. Crawley, 541 Pa. 408, 663 A.2d 676 (1995).

Following the filing of a petition pursuant to the Pennsylvania Post Conviction Act, the Court of Common Pleas denied the petition for state post-conviction relief, and Petitioner timely appealed to the Pennsylvania Supreme Court.

Pending before this Court is a habeas petition. The matter is in a state of suspense on this Court's docket.

## Terms of the Stipulation

The following constitute the terms of the *Stipulation*.

I.      The Court shall conditionally grant the *Petition for a Writ of Habeas Corpus* as to the claim identified in the *Petition* as "Claim III". The Court will deny the remainder of the Claims in the *Petition*;

II.     It is the understanding of the parties that granting the Writ as to Claim III will result in the vacation of Petitioner's death sentence for the offense of first degree murder, while leaving intact his convictions and sentences for the other offenses of which he was convicted;

III.    The Court shall stay the execution of the *Writ* for 90 days from the date of its acceptance of this *Stipulation* to permit Respondents to have Petitioner re-sentenced to life imprisonment in state court.

IV.     Within 30 days, Respondents will notify the Court of Common Pleas of their intent not to seek re-sentencing.  Petitioner will be sentenced to life imprisonment for first degree murder in Philadelphia County.

V.      In consideration of Respondents' agreement not to seek capital re-sentencing, Petitioner agrees to waive any further appeals in any court (state or federal) challenging his convictions and/or sentences ;

VI.     If for any reason the terms of this *Stipulation* are not met, either party may reactivate the instant action in this Court.  In that event, the parties will each return to the status quo existing on the date that this *Stipulation* was accepted by the Court.

VII.    Once executed by the parties and signed by this Court, this document will constitute both the agreement of the parties and the Order of the Court granting relief to Petitioner on the terms set forth above.

VIII.   Upon completion of the state court proceedings (set forth above) the parties shall report the same to this Court, at which time this matter will be closed and final.

**STIPULATED:**

**For Petitioner:**                              **For Respondents:**

/s/ cristi charpentier                           /s Thomas Dolgenos
Cristi Charpentier                               Thomas W. Dolgenos
Supervisory AFD                                  Chief, Federal Litigation Unit
Capital Habeas Corpus Unit                       Philadelphia County District Attorney's Office
Federal Court Division                           1421 Arch Street
Defender Association of Philadelphia             Philadelphia, PA 19102
Suite 545 West, The Curtis Center               (215) 686-5704
Philadelphia, PA 19106                           (215) 686-5725 (fax)
(215) 928-0520                                   Thomas.dolgenos@phila.gov
cristi_charpentier@fd.org


**SO ORDERED, this _____ day of February 2015**

_____
**HONORABLE TIMOTHY SAVAGE**
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ANTHONY FLETCHER, | : | |
| Petitioner, | : | No. 10-3188 |
| v. | : | |
| JEFFREY BEARD, et al., | : | **THIS IS A CAPITAL CASE** |
| Respondents. | : | |
|  | : | |

### SECOND AMENDED STIPULATION

Petitioner, Anthony Fletcher, through undersigned counsel, Capital Habeas Corpus Unit of the Community Federal Defender Office for the Eastern District of Pennsylvania, and Respondents through their counsel, the Philadelphia County District Attorney's Office, hereby stipulate as follows:

### Purpose of Stipulation

The parties agree to the terms of this *Stipulation* because each believes that the terms are in their respective interests. The purpose of this *Stipulation* is to effectuate the agreement between the parties to resolve these habeas proceedings. Pursuant to this agreement, Petitioner will be granted a conditional writ of habeas corpus as to his conviction of first-degree murder. Upon the return of the case to state court, he will plead *nolo contendere* to third-degree murder. In addition, he will be sentenced to consecutive terms of 10 to 20 years of imprisonment for third-degree murder, and two and a half to five years imprisonment for possession of an instrument of crime. A proposed order granting the requested relief was filed on December 1, 2020. Accordingly, the terms of this *Stipulation* should be construed in accordance with that purpose.

1

**Procedural History**

Petitioner was convicted of first-degree murder and possession of an instrument of crime by a jury in the Court of Common Pleas of Philadelphia County, Pennsylvania, on January 29, 1993. Thereafter he was sentenced to death. The Pennsylvania Supreme Court affirmed his conviction and sentence. *Commonwealth v. Fletcher*, 750 A.2d 261 (Pa. 2000).

The PCRA court granted Mr. Fletcher a new trial, but the grant of relief was vacated on appeal. After unsuccessfully litigating his request for post-conviction relief in the state courts, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court. This habeas litigation was stayed for several years as Petitioner attempted to exhaust additional claims in the state courts. Following the conclusion of those state court proceedings, this Court reinstated these habeas proceedings, which are currently pending.

**Terms of the Stipulation**

The following constitute the terms of the *Stipulation*:

1.   The Court shall conditionally grant the *Petition for a Writ of Habeas Corpus* as to the claim identified in the Petition as "Claim I," which alleges that trial counsel was ineffective for failing to investigate the forensic evidence regarding whether the shooting took place during a struggle by either hiring a defense expert or interviewing the medical examiner who conducted the autopsy, Dr. Park.

2.   The Court shall require the Commonwealth of Pennsylvania to retry or release Mr. Fletcher within 180 days for the offense of murder in the matter of *Commonwealth v. Fletcher*, No. CP-51-CR-0360011-1992.[1] The parties understand that the grant of the writ will leave intact Mr. Fletcher's conviction of possession of an instrument of crime in that matter.

3.   Upon the issuance of the conditional writ, the parties shall present the Court of Common pleas with an agreement that Petitioner shall plead *nolo contendere* to third-degree murder in *Commonwealth v. Fletcher*, No. CP-51-CR-0360011-1992.

---

[1] The parties agree not to oppose an extension of the 180-day deadline upon a showing of good cause.

2

4.    The Commonwealth will recommend and Petitioner will agree to a sentence of 10 to 20 years of imprisonment for the offense of third-degree murder, and two and a half to five years imprisonment for the offense of possession of an instrument of crime in *Commonwealth v. Fletcher*, No. CP-51-CR-0360011-1992, the sentences to run consecutively.

5.    In consideration of Respondents' agreement not to further contest the Petition for Writ of Habeas Corpus, Petitioner agrees to waive any further challenges in any court (state or federal) to his convictions and/or sentences in *Commonwealth v. Fletcher*, No. CP-51-CR-0360011-1992.

6.    If for any reason the terms of this *Stipulation* are not met, either party may reactivate the instant action in this Court.  In that event, the parties will each return to the status quo existing on the date that this *Stipulation* was accepted by the Court.

7.    Once executed by the parties and signed by this Court, this document will constitute the agreement of the parties and the Order of the Court granting relief to Petitioner on the terms set forth above.

8.    Upon completion of the state court proceedings, the parties shall report to the Court at which time these federal habeas proceedings will be closed.

9.    The Commonwealth's agreement to the grant of conditional habeas relief in this case shall not be construed as a concession to relief in any other matter.

**So STIPULATED:**

/s/ Matthew Lawry
MATTHEW LAWRY
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
The Curtis Center, Suite 545 W
Philadelphia, PA 19106

Counsel for Petitioner

/s/ Max Kaufman
MAX KAUFMAN
Acting Chief, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Counsel for Respondents

Dated:  December 10, 2020

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

**Daniel Gwynn**,

                Petitioner,      )        Civil Number:  08-5061

                             )

        v.                 )

                             )        *This is a Capital Case*

**Jeffrey A. Beard**, et al.,      )

                             )

             Respondents.    )

_____)

## STIPULATION TO PETITIONER'S ENTITLEMENT TO SENTENCING RELIEF

Petitioner Daniel Gwynn, through counsel, and Respondents, through the Philadelphia District Attorney's Office, respectfully stipulate to Petitioner's entitlement to sentencing relief based on Claim I of his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5), as follows:

### Purpose of Stipulation

The parties agree that the terms of this Stipulation are in their respective interests. The purpose of this Stipulation is to reflect the parties' agreement that Mr. Gwynn should be granted relief from his death sentence, and it is anticipated that the Commonwealth will not pursue the reimposition of a sentence of death upon the return of the case to the Pennsylvania courts. The parties do not intend this Stipulation to alter their respective positions on Mr. Gwynn's claims that he is entitled to relief from his convictions.

### Procedural History

Petitioner Daniel Gwynn is a death-sentenced Pennsylvania prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. The crimes for which Mr. Gwynn was prosecuted occurred on

November 20, 1994. Mr. Gwynn was convicted and sentenced to death in the Philadelphia Court of Common Pleas in November 1995.

The Pennsylvania Supreme Court affirmed his convictions and death sentence on direct appeal. *Commonwealth v. Gwynn*, 723 A.2d 143 (Pa. 1998). The state court subsequently denied his post-conviction challenges. *Commonwealth v. Gwynn*, 943 A.2d 940 (Pa. 2008); *Commonwealth v. Gwynn*, No. 644 CAP (June 17, 2013) (per curiam).

Mr. Gwynn filed a Petition for Writ of Habeas Corpus in federal court on March 7, 2009. In Claim I, Petitioner alleges that his trial counsel provided constitutionally ineffective assistance in failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of his trial. (ECF No. 5 at 4-27).

## Terms of Stipulation

The following constitute the terms of the parties' Stipulation:

1. This Court shall vacate Petitioner's death sentence by conditionally granting the Petition for Writ of Habeas Corpus as to Claim I, which alleged that trial counsel was ineffective for failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of Petitioner's trial.

2. Respondents decline to assert, and affirmatively waive, any procedural default defenses to Claim I. Petitioner and Respondents agree that the standards for review under 28 U.S.C. § 2254 do not bar relief as to Claim I.

3. Petitioner and Respondents agree that trial counsel's mitigation investigation and presentation were constitutionally deficient because, among other things, counsel failed to interview significant witnesses, collect relevant social history records, hire a mitigation investigator, and engage a mental health expert.

4. Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of Petitioner's childhood abuse and neglect, his mental health impairments, and his history of substance abuse was substantial and of a similar nature to the unpresented evidence upon which the United States Supreme Court has granted relief on similar post-conviction claims. A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which consisted of brief testimony from a few witnesses whose only instruction was to beg for Petitioner's life.

5. The parties anticipate that, upon acceptance of this Stipulation, the Court will treat Petitioner's other claims regarding his death sentence as moot (Claims VI, VII, IX, XI, and XII, as well as the sentencing phase aspect of Claims VIII and XIV), and proceed to consider Petitioner's remaining claims challenging his convictions only.

6. The parties further anticipate that the Court's conditional grant of the writ as to Petitioner's death sentence will form a part of its final order in these habeas proceedings.

7. A proposed order encompassing the terms of the Stipulation is attached for the Court's consideration.

**SO STIPULATED:**

/s/ *Matthew Stiegler*
Matthew Stiegler
7145 Germantown Ave. Suite 2
Philadelphia, PA 19119
(215) 242-1450
Matthew@StieglerLaw.com

/s/ *Gretchen M. Engel*
Gretchen M. Engel
Center for Death Penalty Litigation
123 W. Main Street, Suite 700
(919) 956-9545
Gretchen@cdpl.org

*Counsel for Petitioner*

Dated December 18, 2020

/s/ *Max Kaufman*
Max Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-8000
Max.Kaufmann@phila.gov

# CERTIFICATE OF SERVICE

I certify that today I served all counsel of record with this *Stipulation* through this Court's

Electronic Case Filing system.

<p style="text-align: right">/s/ <em>Gretchen M. Engel</em><br>
Gretchen M. Engel<br>
N.C. Bar # 19558<br>
Center for Death Penalty Litigation<br>
123 W. Main Street, Suite 700<br>
(919) 956-9545<br>
Gretchen@cdpl.org</p>

December 18, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
Daniel Gwynn,                              )
                          Petitioner,      )        Civil Number:  08-5061
                                           )
              v.                           )
                                           )        *This is a Capital Case*
Jeffrey A. Beard, et al.,                  )
                                           )
                          Respondents.     )
_____)

## ORDER

AND NOW, this the _____ day of _____, 2020, upon consideration of the

Parties' Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5), the parties

Stipulation (ECF No. 106), and the full record in this case, it is ORDERED as follows:

1. The parties Stipulation is ACCEPTED by the Court;

2. Daniel Gwynn's Petition for Writ of Habeas Corpus is GRANTED as to Claim I.  The
   Court finds that Petitioner was deprived of the effective assistance of counsel at the
   sentencing phase of his trial based on counsel's failure to investigate, develop, and present
   available mitigating evidence;

3. Because the writ is granted as to Claim I, Petitioner's other claims regarding his death
   sentence are moot and will not further be considered by the Court; and

4. Upon completion of review of Petitioner's claims challenging his convictions, this Order will
   be incorporated into the Court's final order with respect to these habeas corpus proceedings.

BY THE COURT:

_____
Hon. Petrese B. Tucker

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|   |   |   |
|---|---|---|
| SHELDON HANNIBAL, | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 13-0619 |
| JOHN E. WETZEL, Secretary, Pennsylvania Department of Corrections; ROBERT GILMORE, Superintendent of the State Correctional Institution at Greene; MARK GARMAN, Superintendent of the State Correctional Institution at Rockview, | : | Hon. Gerald A. McHugh |
| | : | **THIS IS A CAPITAL CASE** |
| Respondents. | : | |
| | : | |

**STIPULATION TO PETITIONER'S ENTITLEMENT TO SENTENCING RELIEF**

Petitioner, Sheldon Hannibal, through counsel, and Respondents, through their counsel, the Philadelphia District Attorney's Office, respectfully stipulate to Petitioner's entitlement to sentencing relief based on Claim VII of his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 5), as follows:

**PURPOSE OF STIPULATION**

The parties agree that the terms of this Stipulation are in their respective interest. The purpose of this Stipulation is to reflect the parties' agreement that Mr. Hannibal should be granted relief from his death sentence, and it is anticipated that the Commonwealth will not seek to re-impose a sentence of death upon the return of the case to the Pennsylvania courts. The parties do not intend this stipulation to alter their respective positions on Mr. Hannibal's claims that he is entitled to relief from his convictions.

1

## PROCEDURAL HISTORY

Petitioner Sheldon Hannibal is a death-sentenced Pennsylvania prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. The crimes for which Mr. Hannibal was prosecuted occurred on October 25, 1992, and his capital trial was held in the Philadelphia Court of Common Pleas in March 1994. Mr. Hannibal was convicted and sentenced to death.

On June 20, 2000, the Pennsylvania Supreme Court affirmed his convictions and sentence on direct appeal. *Commonwealth v. Hannibal*, 753 A.2d 1265 (Pa. 2000). The court subsequently denied his post-conviction challenges. *Commonwealth v. Hannibal*, 156 A.3d 197 (Pa. 2016).

On July 28, 2017, Petitioner filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 in this Court. In Claim VII, Petitioner alleged that his trial counsel provided constitutionally ineffective assistance in failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of trial. ECF No. 5 at 50-66.[1]

Petitioner filed a discovery motion on November 2, 2017. ECF No. 8. On October 4, 2019, the Commonwealth agreed to make the original files of the Philadelphia Police Department and the Philadelphia District Attorney's Office available for review. That review was completed in December 2019.

## TERMS OF STIPULATION

The following constitute the terms of the parties' Stipulation:

1.  This Court should vacate Petitioner's death sentence by conditionally granting the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 5) as to Claim VII, which alleged that trial counsel was ineffective for failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of trial.

---

[1] Pin cites to court documents refer to the page numbers printed on the submitted document, not necessarily to the page number provided by the Court's ECF system.

2.      Respondents decline to assert, and affirmatively waive, any procedural default defenses to Claim VII. Petitioner and Respondents agree that the standards of review under 28 U.S.C. § 2254 do not bar relief as to Claim VII.

3.      Petitioner and Respondents agree that trial counsel's mitigation investigation and presentation were constitutionally deficient because, inter alia, counsel failed to obtain and present available mitigation information from family members, lay witnesses, and professional witnesses; failed to obtain, review, and/or present available social history records; failed to consult with mental health experts; and failed to adequately consult with the client.

4.      Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of brain damage and borderline intellectual functioning was substantial and of a similar nature to the unpresented evidence upon which the United States Supreme Court has granted relief on similar post-conviction claims. A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which included no records or other material evidence and filled a scant twenty-two pages of transcript—including testimony and argument. NT 3/11/94, 43-58.

5.      The parties anticipate that, upon acceptance of this Stipulation, the Court will treat Petitioner's other claims regarding his death sentence as moot (Claims VI, VIII, IX, X, XI, XII, and XIII) and proceed to consider Petitioner's remaining claims challenging his convictions only.

6.      The parties further anticipate that the Court's conditional grant of the writ as to Petitioner's death sentence will form a part of its final order in these habeas proceedings.

7.      A proposed order encompassing the terms of the Stipulation is attached for the Court's consideration.

**SO STIPULATED:**

/s/ Shawn Nolan
SHAWN NOLAN
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545W
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Petitioner*

/s/ Max Kaufman
MAX KAUFMAN
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-8000

*Counsel for Respondents*

Dated: February 4, 2020

3

## CERTIFICATE OF SERVICE

I, Shawn Nolan, Esq., hereby certify that on this date I caused a true and correct copy of the foregoing *Stipulation* to be served by the Court's Electronic Case Filing system upon all counsel of record.

/s/ Shawn Nolan
SHAWN NOLAN

Dated: February 4, 2020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHELDON HANNIBAL, | : | |
| | : | |
| Petitioner, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-0619 |
| | : | |
| JOHN E. WETZEL, Secretary, Pennsylvania | : | Hon. Gerald A. McHugh |
| Department of Corrections; ROBERT | : | |
| GILMORE, Superintendent of the State | : | **THIS IS A CAPITAL CASE** |
| Correctional Institution at Greene; MARK | : | |
| GARMAN, Superintendent of the State | : | |
| Correctional Institution at Rockview, | : | |
| | : | |
| Respondents. | : | |
| | : | |

## ORDER

**AND NOW**, this _____ day of _____, 2020, upon consideration of the Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5), the parties' Stipulation (ECF No. 40), and the full record in this case, it is **ORDERED** as follows:

1. The parties' Stipulation is **ACCEPTED** by the Court;

2. Petitioner's Petition for Writ of Habeas Corpus is **GRANTED** as to Claim VII. The Court finds that Petitioner was deprived of the effective assistance of counsel at the sentencing phase of trial based on counsel's failure to investigate, develop, and present available mitigating evidence;

3. Because the writ is granted as to Claim VII, Petitioner's other claims regarding his death sentence are moot and will not further be considered by the Court; and

4. Upon completion of review of Petitioner's claims challenging his convictions, this Order will be incorporated into the Court's final order with respect to these habeas corpus proceedings.

BY THE COURT:

_____

Hon. Gerald A. McHugh



LAWRENCE S. KRASNER
DISTRICT ATTORNEY

**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

April 10, 2018

The Honorable J. Curtis Joyner
United States District Court
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

> Re: ***Lambert v. Folino*, 10-1339**

Dear Judge Joyner,

This letter is to inform the Court that, upon review by the new administration of the Philadelphia District Attorney's Office (DAO), the DAO does not oppose the grant of a conditional writ of habeas corpus in this case.

Respectfully submitted,

*/s/ Catherine B. Kiefer*
CATHERINE B. KIEFER
Assistant District Attorney

*/s/ Max C. Kaufman*
MAX C. KAUFMAN
Supervisor, Federal Litigation Unit

cc: Cheryl Sturm, Esq.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEROME MARSHALL             :           **CIVIL ACTION**
     **Petitioner**

     **v.**                          :

**JOHN E. WETZEL, et al.**      :           **NO. 03-03308**
     **Respondents**

## STATUS REPORT

1.     Petitioner is a Pennsylvania death-row prisoner who was convicted of three counts of first-degree murder and received two death sentences.

2.     Pending before this Court is petitioner's petition for a writ of habeas corpus pursuant to 28 U.C.S. § 2254.

3.     On May 9, 2018, the Court ordered that "on or before June 6, 2018 counsel for Respondents shall advise the Court and Petitioner's counsel [of] the status of the review of Petitioner's death sentences" (Doc. No. 170 at 1).

4.     Respondents hereby report that they intend to agree to the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences only.[1]

5.     In addition, respondents intend to agree that, following the grant of a conditional writ as to petitioner's death sentences, they will not seek new death sentences in state court.

---

[1] Respondents do <u>not</u> intend to concede habeas relief as to petitioner's underlying convictions.

1

6.    While it is respondents' intention to make these concessions in the near future, they will not formally do so until the families of petitioner's victims have been notified, or efforts at family notification have proved fruitless.

Respectfully submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEROME MARSHALL             **:**            CIVIL ACTION
    **Petitioner**

v.                       **:**

JOHN E. WETZEL, et al.      **:**           NO. 03-03308
    **Respondents**

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on June 6, 2018, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

Christian J. Hoey, Esquire
Rubino & Hoey, LLC
50 Darby Road
Paoli, PA 19301
(610) 647-5151

Maureen Clair Coggins, Esquire
509 Swede Street
Norristown, PA 19404
(610) 721-2725

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____
                                    :
Lenwood Mason,                      :
                                    :          Docket Number 17-3759
            Petitioner,             :
                                    :       Honorable Wendy Beetlestone
      v.                            :       United States District Judge
                                    :
John Wetzel, Secretary, PA          :       **Capital Habeas Corpus Proceedings**
Department of Corrections, *et al.*,:
                                    :
            Respondents.            :
                                    :
_____     :

### SO-ORDERED STIPULATION

Petitioner, Lenwood Mason, through his counsel Michael Wiseman, and Respondents, through their counsel, Assistant District Attorney Kelly Wear, hereby stipulate to the following.

### Preamble

1.      Petitioner is currently under a sentence of death imposed by the Court of Common Pleas, Philadelphia County, under docket number CP-51-CR-0700431-1994 (Phila., CCP).

2.      It is the intent of the parties to see that Mr. Mason no longer face a sentence of death when the case is returned to the state courts at the conclusion of these habeas corpus proceedings. Thus, the Stipulation should be construed to

effectuate that intent:  that Mr. Mason never again face a sentence of death for his convictions under the above docket number.

## Stipulation

3.      The Parties hereby stipulate and agree to the grant of a writ of habeas corpus as to petitioner's sentence of death. Although the grant of relief as to the petitioner's death sentence would, in theory, permit respondents to pursue a new capital sentencing proceeding in state court, respondents hereby agree not to do so. Respondents agree to relief as to petitioner's death sentence only, and do not agree to relief with respect to petitioner's underlying convictions.

4.      Neither the parties' agreement to the grant of relief as to the petitioner's death sentence, nor the Court's approval of the same, shall be argued or construed in any form to constitute a concession or admission that any of petitioner's claims have merit or that there was otherwise a violation of petitioner's legal rights in this case.

5.      Upon the Court's acceptance of this Stipulation, the remaining guilt-phase claims will be resolved by the Court during the remaining course of this litigation.

**SO Stipulated**

/s/ Michael Wiseman                    /s/ Kelly Wear

Michael Wiseman                        Kelly Wear
Counsel for Petitioner                 Counsel for Respondents

Dated:        August 7, 2018           August 7, 2018

**SO ORDERED,**

                                       Wendy Beetlestone
                                       United States District Judge

# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                              |   |                              |
|------------------------------|---|------------------------------|
|                              | : |                              |
| CRAIG MURPHY,                | : |                              |
|                              | : | CIVIL ACTION                 |
| Petitioner,                  | : |                              |
|                              | : | No. 99-6362                  |
| v.                           | : |                              |
|                              | : | **Hon. R. Barclay Surrick**  |
| JOHN E. WETZEL, et al.,      | : | **United States District Judge** |
|                              | : |                              |
| Respondents.                 | : |                              |
|                              | : |                              |

## STIPULATION TO PENALTY PHASE RELIEF

The parties jointly submit this Stipulation to Penalty Phase Relief on Claim I of the Petition for Writ of Habeas Corpus. (Doc. 10). Claim I alleges that Petitioner's death sentence is invalid because the jury considered a sentence in another case that was subsequently reversed on appeal in support of its finding of an aggravating circumstance. (*See* Doc. 10 at 9-31).

The parties hereby stipulate that this claim is properly before the Court. The parties stipulate that there are no disputes of material fact as to this claim. The parties further stipulate that Petitioner's entitlement to relief on this claim is clear. *See Johnson v. Mississippi*, 486 U.S. 578, 584-86 (1988) (holding that a death sentence based on a prior conviction that is subsequently reversed violations the Eighth and Fourteenth Amendments); *Commonwealth v. Karabin*, 559 A.2d 19, 22-24 (Pa. 1989) (affirming vacation of death sentence on facts materially indistinguishable from this case).

1

By and through this stipulation the parties intend to be—and are—legally bound by their agreement. *See, e.g.*, *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980) *Combustion Sys. Servs., Inc. v. Schuylkill Energy Resources, Inc.*, No. 92-cv-4228,1994 WL 229762, at *2 (E.D. Pa. 1994).

The Commonwealth concedes only that relief from the death penalty is appropriate and does not concede relief with respect to any of Petitioner's guilt phase claims. The parties agree that Petitioner's guilt phase claims will remain unaffected by this stipulation and will be litigated in due course. A proposed order that effectuates this stipulation and orders re-sentencing by the state court is attached.

IT IS SO STIPULATED.

Respectfully submitted,                                    Respectfully submitted,


/s/ Loren D. Stewart_____            /s/ Paul George_____
Loren D. Stewart                                      Paul George
David Zuckerman                                     Assistant Supervisor
Assistant Federal Defenders                       Law Division
Federal Community Defender Office             Philadelphia District Attorney's Office
  for the Eastern District of Pennsylvania      Three South Penn Square
Curtis Center, Suite 545 West                    Philadelphia, PA 19107-3499
601 Walnut Street                                    (215) 686-5730
Philadelphia, PA 19106
(215) 928-0520

Dated: April 7, 2021

**CERTIFICATE OF SERVICE**

I, Loren Stewart, hereby certify that on this date I filed the foregoing Stipulation to

Penalty Phase Relief through the Court's electronic filing system thereby causing service to be

made on the following person:

Paul George, Esq.
Assistant Supervisor, Law Division
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

/s/ Loren D. Stewart
Loren D. Stewart

Dated: April 7, 2021

# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| _____ | : |  |
| CRAIG MURPHY, | : |  |
|  | : | CIVIL ACTION |
| Petitioner, | : |  |
|  | : | No. 99-6362 |
| v. | : |  |
|  | : | **Hon. R. Barclay Surrick** |
| JOHN E. WETZEL, et al., | : | **United States District Judge** |
|  | : |  |
| Respondents. | : | **THIS IS A CAPITAL CASE** |
| _____ | : |  |

## ORDER

AND NOW, this _____, day of _____, 2021, upon consideration of the parties'

Stipulation to Penalty Phase Relief, it is hereby **ORDERED** that:

1. The Court accepts the parties' stipulation and finds that Petitioner is entitled to relief

    from the death penalty on Claim I of his Petition for Writ of Habeas Corpus (Doc.

    10).[1] Petitioner's death sentence is hereby **VACATED**;

2. The petition for writ of habeas corpus (Doc. 10) is **GRANTED IN PART** as to

    Claim I. The other claims remain pending before the Court pending the resolution of

    the parties discovery review and further briefing (*see* Doc. 54);

---

[1] Specifically, the Court finds that the sentencing jury based its death verdict at least in part on a criminal conviction in another case that was subsequently reversed on appeal. *See Commonwealth v. Murphy*, 591 A.2d 278 (Pa. 1991) (reversing conviction and death sentence and granting new trial). Based on that subsequently-reversed conviction, the jury found the existence of the "significant history" aggravating circumstance in 42 Pa. C.S. § 9711(d)(9). The Court further finds that the state court determination to deny Petitioner relief from his death sentence on this claim was contrary to *Commonwealth v. Karabin*, 559 A.2d 19, 22-24 (Pa. 1989), and contrary to and/or an unreasonable application of clearly established federal law as set forth in *Johnson v. Missisippi*, 486 U.S. 578, 584-86 (1988). 28 U.S.C. § 2254(d)(1).

3. The Philadelphia Court of Common Pleas shall **RESENTENCE** Petitioner in

   <u>Commonwealth v. Murphy</u>, CP-51-CR-0126101-1984, by September 1, 2021.

**IT IS SO ORDERED.**

BY THE COURT:

_____
R. Barclay Surrick, J.



LAWRENCE S. KRASNER
DISTRICT ATTORNEY

### DISTRICT ATTORNEY'S OFFICE
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

Direct extension:    215-686-5706
Fax:                        215-686-8725
john.goldsborough@phila.gov

June 27, 2018

Honorable Edward G. Smith
Holmes Building, 4th Floor
101 Larry Holmes Drive
Easton, PA  18042-7722

  **Re: Whitaker v. Mooney, et al.**
     <u>**Civil Action No. 14-2321 (3d Cir. No. 15-3365)**</u>

Dear Judge Smith:

   This letter is to inform the Court that, per the recent telephone conference, and after review by the Philadelphia District Attorney's Office (DAO), the DAO does not oppose the grant of a conditional writ of habeas corpus in this case.  Enclosed is a proposed conditional writ order to which both sides have agreed.

   Both sides would appreciate it if Your Honor would please also ensure that the original state-court trial file for CP-51-CR-0413791-2002, i.e., CP 0204-1379, is returned to the Philadelphia Court of Common Pleas Criminal Division Office of the Clerk of Court as soon as possible, to avoid any delay in listing the case there.  Thank you.

          Respectfully submitted,

          /s
          JOHN W. GOLDSBOROUGH
          Assistant District Attorney

          /s
          MAX C. KAUFMAN
          Supervisor, Federal Litigation Unit

/jwg
Enclosure
cc: Will W. Sachse, Esquire
  Katherine Unger Davis, Esquire
  Rory Michael Gledhill, Esquire

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK WHITAKER                    :            CIVIL ACTION

      V.                              :

VINCENT MOONEY, et al.           :            NO. 14-2321


## ORDER

     **AND NOW**, this _____ day of June, 2018, it is **ORDERED** that the Petition for Writ of Habeas Corpus is **CONDITIONALLY GRANTED** as to petitioner's conviction in case CP-51-CR-0413791-2002. The petitioner shall be released from custody resulting from his convictions and sentences in this case unless the Commonwealth retries him for the charges within 120 days.


_____

**EDWARD G. SMITH, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK WHITAKER** | : | **CIVIL ACTION** |
| **V.** | : | |
| **VINCENT MOONEY, et al.** | : | **NO. 14-2321** |

**CERTIFICATE OF SERVICE**

I, JOHN W. GOLDSBOROUGH, hereby certify that on June 27, 2018, a copy of the foregoing was served by this Court's electronic court filing system upon:

> Will W. Sachse, Esquire
> Katherine Unger Davis, Esquire
> Rory Michael Gledhill, Esquire
> Dechert LLP
> 2929 Arch Street
> Philadelphia, PA 19104

/s_____
JOHN W. GOLDSBOROUGH
Assistant District Attorney
District Attorney's Office
Three South Penn Square
Corner of Juniper and S. Penn Square
Philadelphia, PA 19107-3499
john.goldsborough@phila.gov
215-686-5706

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT WHARTON,** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner,** | : | **No. 01-6049** |
| | : | |
| **v.** | : | **THIS IS A CAPITAL CASE** |
| | : | |
| **DONALD T. VAUGHN, et al.** | : | |
| | : | |
| **Respondents.** | : | |

**Goldberg, J.**                                                           **March 4, 2019**

## <u>MEMORANDUM OPINION</u>

Thirty-five years ago, Petitioner Robert Wharton and his cohort murdered a West Philadelphia couple and nearly froze to death their six-month-old daughter. The facts of these killings are particularly horrific.

Angry that he had not been paid what he believed was debt owed for construction work, Wharton first terrorized his victims by breaking into their home, mutilating family pictures, vandalizing the home and defecating on the floor. On January 30, 1984, Wharton and his accomplice again broke into the victims' home, where they tied the couple up, and then watched television for several hours contemplating the couple's fate. The wife, Ferne Hart, was then bound in duct tape, taken to the second floor, stripped almost entirely naked and drowned in the bathtub. The husband, Bradley Hart, was taken to the basement and strangled to death with an electrical cord while being forced to lay face down in a pan of water.

1

Not satisfied, and knowing that the couple's six-month-old was also in the house, Wharton turned the heat off and left the child alone in the house in the dead of winter to freeze to death. Found two days later, the infant barely survived.

In 1985, after having confessed to the murders, Wharton was convicted of two counts of first-degree murder and sentenced to death.

For the past three decades, Wharton has sought to overturn his conviction and death sentence. Wharton's efforts were consistently and zealously opposed by the Philadelphia District Attorney's Office. Wharton's conviction and death sentence have been reviewed by the Pennsylvania Supreme Court on direct review and state collateral review. And on federal habeas review in this Court, Wharton raised 23 separate claims, which I addressed in a 157-page opinion denying each of the claims. Wharton appealed to the United States Court of Appeals for the Third Circuit, and, in 2018, that court affirmed my decision in all respects except as to one penalty-phase claim, pertaining to whether counsel was ineffective for failing to place before the penalty phase jury evidence of Wharton's adjustment to prison. The Third Circuit remanded the case to this Court for the sole purpose of conducting an evidentiary hearing on that single claim.

As it did in the state court proceedings, the Philadelphia District Attorney's Office zealously advocated against Wharton in the federal court proceedings, consistently seeking the affirmance of the death sentence.

Then, most recently on February 6, 2019—a week before a status-of-counsel hearing was scheduled to take place before me—the District Attorney's Office submitted notice that, after three decades of advocating for a death sentence for Wharton, it would no longer contest the only remaining penalty-phase claim and would not seek a new death sentence in state court. This notice provided no explanation for this complete reversal of course, and requested that I issue an order

summarily granting relief, without conducting the evidentiary hearing as directed by the Third Circuit. Unsurprisingly, Wharton's counsel joined in this request, submitting a one-page joint proposed order to that effect.

Notwithstanding the prosecutor's unexplained concession, the law requires that I independently evaluate the merits of Wharton's remaining claim. Because I cannot do so on the current record, I will deny the parties' request that I summarily grant habeas relief, and will order that the parties further brief the issues discussed below.

## I.   FACTUAL & PROCEDURAL BACKGROUND[1]

As discussed above, Wharton was convicted in the Philadelphia Court of Common Pleas in 1985 of two counts of first-degree murder and other related offenses. The victims were Bradley and Ferne Hart, whom Wharton and another man murdered as retribution for criticisms of, and failure to pay for, certain construction work that Wharton had performed. Wharton v. Vaughn, 722 F. App'x 268, 270 (3d Cir. 2018).

At trial, the prosecution introduced Wharton's confession, and other compelling evidence such as the victim's property being found in Wharton's possession. The jury convicted Wharton of both murders and, following the separate penalty phase, returned a verdict of death. Wharton, 722 F. App'x at 271.

Wharton appealed to the Pennsylvania Supreme Court, which, in 1992, affirmed the conviction but reversed the death sentence, due to a defect in the jury charge. In a second penalty hearing held later that year, another jury returned a verdict of death. Wharton appealed again, but this time, in 1995, the Pennsylvania Supreme Court affirmed. Wharton, 722 F. App'x at 271-72.

---

[1] A more detailed recitation of the factual and procedural background of this case can be found in the opinion of the Third Circuit, affirming in part, and vacating and remanding in part, this Court's denial of habeas relief. Wharton v. Vaughn, 722 F. App'x 268, 270-272 (3d Cir. 2018). The facts set out below are derived from that opinion and the record in this case.

Thereafter, Wharton filed a petition in the Philadelphia Court of Common Pleas under the Pennsylvania Post Conviction Relief Act ("PCRA"). The PCRA court denied the petition without hearing in 1997, and the Pennsylvania Supreme Court affirmed in 2002. Wharton, 722 F. App'x at 272.

In December 2001, Wharton initiated this federal habeas proceeding under 28 U.S.C. § 2254. This matter was initially assigned to the Honorable James T. Giles, who appointed Wharton counsel. Thereafter, Wharton filed his habeas petition and supporting memorandum of law. Judge Giles held oral argument on the petition in 2006. (See Doc. Nos. 1, 5, 22, 69.)

In 2008, before a decision was rendered on Wharton's habeas petition, the case was reassigned to me. Thereafter, I permitted certain discovery and held an evidentiary hearing on several of Wharton's 23 claims, after which I permitted supplemental briefing. (See Doc. Nos. 81, 106, 112-113, 116.)

In August 16, 2012, I issued a 157-page opinion denying relief on each of Wharton's 23 claims, but granting a certificate of appealability on two of the claims. Wharton appealed, and the Third Circuit expanded the certificate of appealability to include one additional claim, concerning whether Wharton's counsel at the second penalty hearing was ineffective for failing to introduce mitigating evidence that Wharton was adjusting well to incarceration. (I refer to this claim hereinafter as the "Remaining Sentencing Claim.") (See Doc. Nos. 126-127.)

In January 2018, the Third Circuit affirmed all of my rulings including the denial of the two claims on which I had granted the certificate of appealability, and remanded on only one issue—the Remaining Sentencing Claim. The Third Circuit directed that I hold an evidentiary hearing on the Remaining Sentencing Claim, because such a hearing could show: (1) that Wharton's counsel at the second penalty hearing acted unreasonably by failing to investigate

4

Wharton's adjustment to prison, and (2) that there is a reasonable probability that, had counsel presented the evidence of adjustment, the jury would have voted against imposing a death sentence. Wharton, 722 F. App'x at 272-284.

Following that decision, Wharton filed a petition for a writ of certiorari with the U.S. Supreme Court, which was denied on December 3, 2018. At that point, the case became ripe for addressing the Remaining Sentencing Claim on remand. See Wharton v. Vaughn, 139 S. Ct. 594 (cert denied Dec. 3, 2018).

On January 4, 2019, Wharton filed in this Court a *pro se* "Petition for Appointment of New Counsel," seeking to remove his current counsel—the Capital Habeas Corpus Unit of the Federal Community Defender's Office—which has represented Wharton since being appointed by Judge Giles in 2003. After receiving this *pro se* submission, I scheduled a status conference to address the issue with counsel. (See Doc. Nos. 13, 152-53.)

However, shortly before this hearing, on February 6, 2019, the Philadelphia District Attorney's Office filed a "Notice of Concession of Penalty Phase Relief." The Notice indicates that the prosecutor is conceding relief on the Remaining Sentencing Claim, and that it will not "not seek new death sentences in state court." The Notice further states that the "the grant of sentencing relief on [Wharton's] penalty phase ineffectiveness claim in accordance with [its] concession would end the litigation of this case . . . and eliminate the need for . . . [further] proceedings in this Court." Curiously, after 35 years of consistently and zealously seeking a death sentence, the Notice provides no explanation as to the basis of the concession, noting only that the decision to concede was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel." (Doc. No. 155.)

5

Two days later, the parties submitted for my approval a one-page Proposed Order granting habeas relief. The Proposed Order provides that "upon a careful and independent review of the parties' submissions and all prior proceedings in this matter," the petition for a writ of habeas corpus is "granted in part, as to the sentences of death, on the ground of counsel's ineffectiveness at the second penalty hearing." The Proposed Order further provides that Wharton "shall be released from custody unless the Commonwealth of Pennsylvania grants him a new sentencing hearing or resentences him to life without parole within 180 days." However, like the District Attorney's Notice, the Proposed Order does not set out the reasons why the merit of Wharton's Remaining Sentencing Claim is apparent on the current record, such that the evidentiary hearing ordered by the Third Circuit is not required. (Doc. No. 156)

Because I conclude that I must independently evaluate the merits of Wharton's Remaining Sentencing Claim, notwithstanding the District Attorney's unexplained about-face, and because I cannot do so on the current record, I decline to adopt the parties' Proposed Order. Rather, I will order the parties to provide any facts and legal authority supporting their request that I grant of habeas relief on the current record.

## II.    DISCUSSION

The prosecutor's unexplained concession of the Remaining Sentencing Claim presents two questions: (1) whether I have the obligation—or even the authority—to grant Wharton's petition for a writ of habeas corpus under 28 U.S.C. § 2254, based solely on this concession, or whether I must independently review, and determine the merits of, that now-conceded claim; and (2) if I must make an independent determination on the merits, whether I can do so on the current record, without conducting the evidentiary hearing directed by the Third Circuit.

For the reasons set out below, I conclude that I must make an independent determination of the merits of the Remaining Sentencing Claim, and that I cannot do so on the current record. However, because the Notice and the parties' Proposed Order do not sufficiently address these issues, I will give the parties the opportunity to brief them.

### A. May a Court Grant Habeas Relief Based Only on the District Attorney's Concession, or Must it Independently Evaluate the Merits of the Conceded Claim?

The federal statute authorizing a district court to grant habeas relief to a state prisoner, 28 U.S.C. § 2254, limits a district court's authority to grant such relief. Specifically, § 2254(a) provides, in relevant part, that "a district court shall entertain an application for a writ of habeas corpus . . . *only on the ground that [the state prisoner] is in custody in violation of the Constitution or laws or treaties of the United States*." (emphasis added) Thus, under § 2254, a district court's authority to grant the writ is limited to those cases in which there has been a violation of the Constitution or laws of the United States. It logically follows that a district court cannot dispense with this limitation merely because the prosecutor has now changed its position and conceded that there has been such a violation.

In addition to being consistent with the plain text of § 2254, this conclusion is supported by the cases that address the effect of a state's concession of a habeas claim. At least two Courts of Appeals—the Courts of Appeals for the Fifth and Seventh Circuits—have squarely addressed the question and concluded that such a concession does not relieve a court of its responsibility to consider the merits of a habeas claim. See Johnson v. McCaughtry, 265 F.3d 559, 564 (7th Cir. 2001); Every v. Blackburn, 781 F.2d 1138, 1140–41 (5th Cir. 1986).

In Johnson, a state prisoner brought a petition for a writ of habeas corpus pursuant to § 2254. 265 F.3d at 562. The district court denied the petition as barred by the statute of limitations. Id. But after the petitioner appealed to the Seventh Circuit, "the government confessed error . . . ,

stating that [the petitioner's] habeas petition was timely filed, and requesting remand" to the district court for consideration of the merits. Id. at 564. Notwithstanding this concession, the Seventh Circuit independently considered the statute of limitations issue, explaining that "[r]egardless of which position the [state] chooses to advocate, we will make an independent judicial assessment of whether the district court correctly dismissed [the petitioner's] petition based on the statute of limitations." Id.

Likewise, Every involved a state prisoner's § 2254 petition. 781 F.2d at 1139. There, the petitioner sought habeas relief on the ground that the state sentencing court had violated his right to due process by failing to consider certain sentencing alternatives. Id. The district court denied the habeas petition on the merits, concluding that the state sentencing court had, in fact, been aware of the sentencing alternatives. Id. at 1140. After the petitioner appealed to the Fifth Circuit, the state "concede[d] that [the petitioner] should receive another evidentiary hearing" on the claim. Id. The Fifth Circuit refused to summarily accept that concession, holding that "[t]he state's confession of error, if incorrect, d[id] not bind [the court]." Id. Rather, the court "retain[ed] the . . . full authority to reject a state's erroneous confession of error and to decide the case in accord with the law." Id. at 1141.

Multiple district courts have likewise refused to blindly accept a state's concession of habeas relief. See Saldano v. Cockrell, 267 F. Supp. 2d 635, 642 (E.D. Tex. 2003) (noting, in reaching the merits of a § 2254 petition in which the state conceded, that the court was nevertheless "required to perform an independent analysis of [the petitioner]'s claim"); Keyes v. Renico, No. 05-cv-71160, 2005 WL 2173212, at *3 (E.D. Mich. Sept. 2, 2005) (same); Korematsu v. United States, 584 F. Supp. 1406, 1413–14 (N.D. Cal. 1984) (concluding, in reaching the merits of a petition for a writ of coram nobis challenging a federal criminal conviction, that notwithstanding

8

the government's concession, the court must independently review "the original record and the evidence . . . to determine whether there is support for the petition"). And my research has revealed no cases reaching a contrary conclusion.

The courts in <u>Johnson</u> and <u>Every</u> relied on two U.S. Supreme Court decisions in which the Court declined to accept concessions by the government made for the first time on direct appeal. <u>See</u> <u>Young v. United States</u>, 315 U.S. 257, 258 (1942); <u>Sibron v. New York</u>, 392 U.S. 40, 58-59 (1968). In <u>Young</u>, a person convicted of a federal drug offense in district court appealed his conviction. 315 U.S. at 257-58. By the time the case reached the U.S. Supreme Court on direct appeal, the government had conceded that the conviction should be reversed. <u>Id.</u> at 258. Before addressing the merits of the defendant's claims, the Court first noted that it was not bound by the government's concession:

> The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But such a confession does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.

<u>Id.</u> at 258–59 (citations omitted).

Similarly, in <u>Sibron</u>, a person convicted of a New York state drug offense appealed his conviction, and the New York Court of Appeals affirmed. 392 U.S. at 44. The U.S. Supreme Court granted certiorari on the issue of whether certain evidence should have been suppressed because it was obtained in violation of the Fourth and Fourteenth Amendments. <u>Id.</u> Before the U.S. Supreme Court, the district attorney responsible for the prosecution conceded that the evidence should have

9

been suppressed. Id. at 58. Citing its opinion in Young, the Court concluded that this concession was not binding, and did not relieve the Court of its obligation to make an independent determination of the merits of the defendant's constitutional claim. Id. And, of particular relevance here, the Court noted that this obligation to conduct an independent assessment was heighted by the fact that the concession was made "not by a state official, but by the elected legal officer of one political subdivision within the State"—namely one county's district attorney. Id. at 58-59. As the Court explained:

> It is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained. For one thing, as we noted in Young, "our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." . . . Moreover, in this case the confession of error on behalf of the entire state executive and judicial branches is made, not by a state official, but by the elected legal officer of one political subdivision within the State. The District Attorney for Kings County seems to have come late to the opinion that this conviction violated [the defendant's] constitutional rights. For us to accept his view blindly in the circumstances, when a majority of the Court of Appeals of New York has expressed the contrary view, would be a disservice to the State of New York and an abdication of our obligation to lower courts to decide cases upon proper constitutional grounds in a manner which permits them to conform their future behavior to the demands of the Constitution.

Id. (citations omitted).

Here, as in Sibron, the district attorney for a single county within the Commonwealth of Pennsylvania has "come late to the opinion" that a conviction affirmed by the Commonwealth's highest court violates the Constitution. For more than three decades the Philadelphia District Attorney's Office has zealously resisted Wharton's numerous efforts to overturn his death sentence. This litigation has included direct review, state collateral review, federal habeas review before this Court, and affirmance of all but one claim by the Third Circuit. Yet, after so many years of advocating for a death sentence, the District Attorney's Office has now come to believe Wharton's sentence violates the Constitution. And this concession is made without a single

explanation. To accept that view "blindly" and summarily grant habeas relief without independently reviewing the merits of the remaining claim would be an abdication of my responsibility to perform the judicial function.

Finally, while not binding in this federal habeas proceeding under § 2254, I note that the Pennsylvania Supreme Court has taken a similar view that a district attorney's concession of a PCRA petition does not preclude it from reaching the merits of that petition. See Commonwealth v. Brown, 196 A.3d 130, 141-49 (Pa. 2018). In Brown, as here, the Philadelphia District Attorney's Office initially opposed a PCRA petition filed by a state prisoner under sentence of death—only to concede the petition after a change of administration in the Office. Relying on Young and Sibron, as well as the text of the PCRA, the court rejected the District Attorney's argument that its concession of relief was an exercise of its prosecutorial discretion, and thus binding on the court:

> After the jury in this case reached its decision to enter a verdict recommending a death sentence, the district attorney lost any prosecutorial discretion to alter that verdict. If the law were otherwise, district attorneys would have the powers of courts, while courts would be reduced to mere rubber stamps . . . . [I]f the "power" of a court amounts to nothing more than the power "to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power."

> Finally, we note that the Philadelphia District Attorney's Office, through the exercise of its prosecutorial discretion, actively sought and obtained a death sentence for [the petitioner]. It cannot now seek to implement a different result based upon the differing views of the current office holder with respect to the prior exercise of prosecutorial discretion. Elections alone cannot occasion efforts to reverse the result of judicial proceedings obtained by the prior office holder. Every conviction and sentence would remain constantly in flux, subject to reconsideration based upon the changing tides of the election cycles.

Id. at 149 (citations omitted).

The reasoning in Brown—supported by the U.S. Supreme Court's decisions in Young and Sibron, and consistent with the reasoning of the Courts of Appeals for the Fifth and Seventh Circuits—is equally applicable here. Accordingly, I will not blindly accept the Philadelphia

District Attorney's concession of the Remaining Sentencing Claim and grant habeas relief. Rather, I must independently evaluate that claim to determine whether it has merit. However, I will allow the parties to further brief this legal issue should they choose to do so.

### B. Can an Independent Evaluation of the Merits of the Remaining Sentencing Claim Be Made on the Current Record?

Having concluded that I must independently evaluate the merits of the Remaining Sentencing Claim, it remains to determine whether I can make such an evaluation on the current record before me.

As noted above, the Third Circuit has concluded that Wharton is entitled to an evidentiary hearing on the Remaining Sentencing Claim, because such a hearing could demonstrate that his counsel: (1) "acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence," and (2) that "had [his counsel] presented that evidence at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty." Wharton, 722 F. App'x at 281. Neither the District Attorney's Notice nor the parties' Proposed Order identifies facts in the record that conclusively establish Wharton's entitlement to relief on the Remaining Sentencing Claim, such that the evidentiary hearing ordered by the Third Circuit is not required. Accordingly, I conclude that I cannot independently evaluate the merits of the Remaining Sentencing Claim on the current record. However, I will allow the parties to further brief this issue should they choose to do so.

### III. CONCLUSION

For the reasons set out above, I decline to enter the parties' Proposed Order summarily granting habeas relief. However, I will permit both parties to further brief the issues discussed above, before determining the appropriate course of action in this matter.

An appropriate Order follows.

12

# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | : | |
|---|---|---|
| **ROBERT WHARTON,** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner,** | : | **No. 01-6049** |
| | : | |
| **v.** | : | **THIS IS A CAPITAL CASE** |
| | : | |
| **DONALD T. VAUGHN, et al.** | : | |
| | : | |
| **Respondents.** | : | |

_____ :

## ORDER

    **AND NOW**, this 4th day of March, 2019, upon consideration of the Philadelphia District Attorney's Office's "Notice of Concession of Penalty Phase Relief" (Doc. No. 155), and the parties' "Notice of Joint Filing of Proposed Order" (Doc. No. 156), and for the reasons set forth in the accompanying Memorandum Opinion, it is **ORDERED** that the parties' request that I adopt the Proposed Order is **DENIED**.

    It is further **ORDERED** that each party may file, **within 30 days of the date of this Order,** a brief addressing the issues raised in the accompanying Memorandum Opinion, specifically: (1) whether I have the authority and/or the obligation to grant habeas relief to Petitioner based solely on the District Attorney's concession of the remaining habeas claim, or whether I must independently review, and determine the merits of, that now-conceded claim; and (2) if I must make an independent determination on the merits, whether that is possible on the current record, without conducting the evidentiary hearing as directed by the United States Court of Appeals for the Third Circuit.

BY THE COURT:

*/s/ **Mitchell S. Goldberg***

Mitchell S. Goldberg, J.

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ROBERT WHARTON, | CIVIL ACTION |
| Petitioner, | No. 2:01-cv-06049-MSG |
| v. |  |
| DONALD T. VAUGHN, |  |
| Respondent. | CAPITAL CASE |

**Expert Report of Professor Bruce A. Green**

I have been retained on behalf of the Office of the Philadelphia District Attorney ("Office") to render objective expert opinions on the questions of professional conduct raised in the Court's May 11, 2022 Memorandum Opinion ("Opinion"). Specifically, I have been asked to address whether the Court should impose sanctions in connection with the Office's filing of the Notice of Concession of Penalty Phase Relief ("Notice").

The Court's Opinion (at pp. 35-40) identifies "two critical issues." the first regarding the Office's nondisclosure of Wharton's escape attempt, and the second regarding the Notice's statement that it was preceded by "communication with the victims' family," when in fact the Office communicated with only one family member. For purposes of rendering opinions on these two issues, I rely on Max C. Kaufman's Affidavit dated May 21, 2002, and other material already before the Court. My opinion is that the Office's lawyers did not violate any ethical duty or engage in sanctionable misconduct for the reasons discussed below.

**<u>Qualifications</u>**

I am the Louis Stein Chair at Fordham University School of Law and Director of the Louis Stein Center for Law and Ethics. I have been admitted to practice law in New York, the United States District Courts for the Southern and Eastern Districts of New York, and the Supreme Court of the United States. My qualifications to provide expert opinions on questions of lawyers' professional conduct are set forth more fully in my curriculum vitae, which is available here: https://www.fordham.edu/download/downloads/id/1503/bruce_green.pdf.

I have been a full-time law professor at Fordham University since 1987. After graduating from Columbia Law School in 1981, I served as a law clerk to Judge James L. Oakes of the United States Court of Appeals for the Second Circuit, and then as a law clerk to Justice Thurgood Marshall of the Supreme Court of the United States. I then became an Assistant United States Attorney for the Southern District of New York, eventually serving as Deputy Chief and then Chief of the Criminal Division's appeals unit.

I have regularly taught courses in legal ethics since 1987.  I teach a survey course on Professional Responsibility and a seminar on Ethics in Criminal Advocacy.  In the survey course, I assign a casebook that I co-authored: Jefferson, Pearce, Green et al., *Professional Responsibility: A Contemporary Approach* (4th ed. 2020).  I am responsible for the casebook's section on prosecutors' professional conduct.

I have organized or co-organized numerous conferences and programs for academics and practitioners on issues of legal ethics, and I speak frequently at Continuing Legal Education and academic programs regarding legal ethics issues in litigation generally and criminal advocacy in particular.  I have written extensively – well over 150 book chapters and articles in law reviews and other legal periodicals, mostly on legal ethics issues.

I have engaged extensively in various professional work relating to legal ethics, primarily involving drafting, interpreting, or enforcement of professional conduct rules.  In New York, I am the immediate past chair of the New York City Bar's Committee on Professional Ethics; on the New York State Bar Association, I am a member and past chair of the Committee on Professional Ethics, and I serve on the Committee on Standards of Attorney Conduct; and I previously served on the Departmental Disciplinary Committee of the First Department.  On the national level, I chair the Multistate Professional Responsibility Examination drafting committee; I previously served on the American Bar Association ("ABA") Standing Committee on Ethics and Professional Responsibility, to which I am now a liaison; I chaired the ethics committees of the ABA's Litigation and Criminal Justice Sections; I served on the ABA Litigation Section's Task Force on Settlement Ethics; I was Reporter to the ABA Commission on Multijurisdictional Practice; and I chaired the Section on Professional Responsibility of the Association of American Law Schools.  In recognition of my work in the field of legal ethics, I was the 2018 recipient of the Michael Franck Professional Responsibility Award.

Among the subjects on which I have addressed in my teaching, scholarship and professional service are lawyers' duty of candor to the court,[1] including in the context of criminal prosecution and defense.[2]

I occasionally testify as an expert witness, give advice, draft amicus briefs, and render other professional services on lawyers' professional conduct.  As an expert witness, I render opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated.

**<u>Relevant Factual Basis</u>**

For purposes of rendering opinions, I have received and reviewed the documents listed in the attached List of Documents Reviewed.

---

[1] *See* Bruce A. Green, *Resolving Ethics Questions in Good Faith,* Litigation, vol. 46, no. 2, Winter 2020, p. 39; Bruce A. Green, *Deceitful Silence*, Litigation, Winter 2007, p. 24.

[2] *See* Bruce A. Green, *Candor in Criminal Advocacy,* 44 Hofstra L. Rev. 1105 (2016).

**Opinions**

*1. The Notice's failure to identify extra-record evidence of an escape attempt that was potentially contrary to Wharton's* Strickland *claim was not sanctionable misconduct.*

The Court concluded that although the prosecution did not offer evidence of Wharton's escape attempt at Wharton's capital sentencing proceeding, the prosecution could have introduced it in support of the imposition of the death penalty if Wharton had introduced evidence of good adjustment in prison following the first death penalty hearing; that the Court could consider this extra-record evidence in connection with Wharton's *Strickland* claim; that this evidence was significantly contrary to Wharton's *Strickland* claim in that it tended to show that Wharton was not prejudiced by his counsel's inadequate representation, since, with the addition of this evidence, the jury would likely have imposed the death penalty in any event; and that, because the escape attempt was not in the record, the Office should have disclosed Wharton's escape attempt in its Notice to enable the Court to make an adequately informed ruling on Wharton's claim.

For purposes of this opinion, I assume that the Court was correct about the eventual importance of the evidence of Wharton's escape attempt to the *Strickland* claim, once the Court concluded that it could and should undertake an independent determination rather than simply accepting the Office's concession, as courts in the Eastern District had previously done.  I further assume that pursuant to its supervisory authority over the conduct of lawyers appearing before the Court and/or over criminal proceedings before the Court, the Court has authority to require the prosecution in future habeas cases before the Court to disclose extra-record evidence that is contrary to a claim that the prosecution does not contest.  Even so, in filing the Notice in February 2019, the Office's lawyers did not violate their candor obligations under the professional conduct rules or federal decisions relating to litigation sanctions, because they stated nothing that was false in the Notice, and they did not intend to mislead the court or to withhold information that they knew the court expected to receive.

As Max Kaufman's affidavit explains, he did not intend to deceive the Court in omitting reference to Wharton's escape attempt from the Notice.  Kaufman, who drafted and signed the Notice, was not aware of the escape attempt at the time he filed it.  He did not learn of it until it was called to the Court's attention by the Attorney General several months later.  Further, neither Kaufman nor other prosecutors in the Office would reasonably have known that, in general, the Court would have expected the Notice to include factual or evidentiary information contrary to Wharton's *Strickland* claim.  It appears that neither Judge Goldberg nor any other judge before whom the Office appeared had previously expressed that expectation when the Office does not contest a criminal defendant's claim in habeas or other proceedings, and the Office was not aware of decisions (and I know of none) issued by courts outside the jurisdiction that announced this sort of expectation.

Indeed, the Office could reasonably have assumed at the time that courts did *not* expect a discussion of the evidence, whether supporting or contrary, in a prosecutor's barebones Notice conceding relief sought by the defendant.  As the Commonwealth's Post-Hearing Brief notes at

page 22, it had been the practice since before the current District Attorney took office for state and federal courts to accept the Office's concessions of death penalty relief without requiring a full explanation of the facts supporting/weighing against the concession. *See also* Commonwealth's April 3, 2019 Brief in response to the Court's March 4, 2019 order at 4-5 (observing that: "[T]he concession procedure followed in this case repeatedly has been approved by the courts of this district. . . .  Indeed, as far as this Office is aware, there has not been a prior instance where a court in this district has declined to accept a concession of relief by the Commonwealth in a pending habeas case.") (citations omitted).

In general, lawyers should not be subject to sanction for failing to disclose facts to a court where, as here, the lawyers did not intend to mislead the court and were unaware that the court expected disclosure in the situation or that the court would be misled by the lawyers' silence. The relevant professional conduct rules do not provide for sanctioning lawyers who unwittingly or unintentionally mislead the court or fail to disclose information that the court would have considered to be important.  The relevant rule is Rule 3.3 of the Pennsylvania Rules of Professional Conduct ("Pennsylvania Rules"), which is titled "Candor Toward the Tribunal."  It is based on Rule 3.3 of the ABA Model Rules of Professional Conduct, which is the basis of other states' candor rules as well.  Rule 3.3(a)(1) provides: "A lawyer shall not *knowingly* . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  (Emphasis added.)[3] Comment [3] to Rule 3.3 recognizes that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."[4]  The rule's *mens rea* requirement of knowledge applies to misleading nondisclosures covered by the rule no less than to affirmative misrepresentations.[5]  The rule would not apply to an innocent nondisclosure even if, in retrospect, the court was misled.

---

[3] For purposes of the Pennsylvania Rules, "knowingly" is defined in Rule 1.0(f) to denote "actual knowledge of the fact in question" which "may be inferred from circumstances."

[4] *See, e.g.*, *Matter of Piccone*, 2016 USPTO OED LEXIS 102, *133 (U.S. Dep't of Commerce, Patent & Trademark Office 2016) ("Although it is certainly possible that Respondent intended to deceive the district court by not revealing his suspension, the OED Director has not presented clear and convincing evidence that Respondent's actions were anything more than negligent, and they were arguably truthful.").  That decision, however, involved the failure of a lawyer to reveal his suspension to practice law and inability to appear before the tribunal; the failure to provide evidence supporting or contradicting the decision of the DAO in the notice pleading Notice is entirely different, in my view.

[5] *See* Green, *Candor in Criminal Advocacy, supra*, at 1109-1110 ("authorities have interpreted both the rule proscribing false statements and the rule proscribing "conduct involving dishonesty, fraud, deceit or misrepresentation" to the text of the note to forbid lawyers' silence in other situations where their declarations or conduct would otherwise be intentionally or knowingly misleading").

The Court's Opinion refers to Rule 3.3(d), which concerns lawyers' disclosure obligations in *ex parte* proceedings, as another potential source of a disclosure obligation.  In my judgment, Rule 3.3(d) does not require prosecutors to make evidentiary submissions contrary to a habeas petition.  First, I do not believe that a habeas proceeding in which the State decides not to contest the petition is an *ex parte* proceeding within the meaning of the rule.  *Cf.* NYC Bar Ass'n Comm. on Prof'l Ethics, Op. 2019-1 (2019) ("Opinion 2019-1") (concluding: "Rule 3.3(d) does not apply to adversarial proceedings in which both sides are present, but one appears *pro se*. Nor does the rule apply to proceedings in which an adverse or other interested party received notice sufficiently in advance to provide a reasonable opportunity to appear but has simply chosen not to do so.  Such a proceeding is, by its nature, an adversarial proceeding, not an ex parte one, as the standard definitions of the term reflect.").[6]  I recognize that there may be room for disagreement on this question, however.[7]  Second, to the extent that the rule might require the introduction of evidence that is contrary to an uncontested habeas petition, it should apply only to counsel for the petitioner, who is the proponent of the motion and who has the evidentiary burden, and not to the prosecutor's office which has elected not to contest the motion.[8]

Assuming that Rule 3.3(d) might generally apply to a prosecutor's office that does not contest a habeas motion, the rule would not have applied to the nondisclosure of Wharton's escape attempt.  Like Rule 3.3(a), Rule 3.3(d) has a knowledge requirement.  *See* Opinion 2019-1 ("Under the rule, in addition to any disclosures that must be made under other law, a lawyer appearing, or making an application, on behalf of a party in an 'ex parte proceeding' must disclose material facts known to the lawyer *if the lawyer knows that the facts are significant to the tribunal's decision* – i.e., that the facts will facilitate an 'informed decision.'") (emphasis

---

[6] I chaired the Committee at the time it issued this opinion, participated in all of the Committee's discussions of the opinion, and participated in drafting it.

[7] The Court's Order identified two decisions suggesting that Rule 3.3(d) applies when adverse parties agree on a matter.  The first, *Eagan by Keith v. Jackson*, 855 F. Supp. 765 (E.D. Pa. 1994), is addressed in the footnote that follows.  In the other, *Pa. Env't Def. Found. v. U.S. Dep't of Navy*, No. 94-cv-1486, 1995 WL 56602 (E.D. Pa. Feb. 3, 1995), a lawyer was sanctioned for inducing opposing counsel to make a false statement in a joint application for a continuance (unwittingly false on the part of opposing counsel, who was deceived along with the court).  The opinion took the view that this was an *ex parte* proceeding because there was a joint application and therefore no adversariness, but the more obvious and straightforward justification for discipline would have been that the sanctioned lawyer violated Rule 8.4(a) by inducing another to make a false statement to the court in violation of Rule 3.3(a).

[8] In *Eagan by Keith v. Jackson*, *supra*, 855 F. Supp. at 790, the court found that plaintiff's counsel's fee application was *ex parte* under the rule because the defendants had no adversarial interest in opposing it.  The decision might support imposing a disclosure obligation on the habeas petitioner when the prosecution does not oppose the petition, but not on the State, which was in the position analogous to that of the adversarially indifferent defendants.

added).  Here, Kaufman was unaware of Wharton's escape attempt, much less that evidence of
the escape attempt would be significant to the Court's decision.

The same is true for the supervisors who directed Kaufman to submit the Notice to the
Court.  These lawyers would not reasonably have anticipated that extra-record evidence contrary
to Wharton's *Strickland* claim would be significant to the Court, regardless of their knowledge of
the escape evidence, given most courts' practice of accepting simple notices of concession of
penalty phase relief without requiring further explication or conducting evidentiary hearings.
Nor could the Office have anticipated that the Court would infer from the Notice's silence that
there was no evidence outside the record that might be contrary to the habeas claim.  The Notice
contained no discussion of the evidence relevant to Wharton's claim and no representation
regarding the adequacy of the evidence.  It was simply a concession, not an implied
representation that there was no extra-record evidence contrary to Wharton's claim.

In 2019, the Office filed the Notice.  The Court then filed its March 4, 2019 Order and
Opinion requesting briefing on two discrete issues: (1) "May a Court grant habeas relief based
only on the District Attorney's Concession, or must it independently evaluate the merits of the
conceded claim"; and (2) "Can an independent evaluation of the merits of the remaining
sentencing claim be made on the current record" (Memorandum Opinion dated March 4.)[9]   At
the time of its Notice, the Office might reasonably have expected the Court to order evidentiary
submissions or conduct an evidentiary hearing (as it eventually did) if the Court thought it
necessary to inquire into the evidentiary basis of Wharton's claim.  But the Office would not
have expected the Court to draw inferences about the evidence from the Notice; nor would the
Office have anticipated that the Court expected the Notice to include evidentiary disclosures.
Likewise, the Court did not make that request in its Order of March 4.  In other words, this was
not a situation where the Office deliberately created a judicial misconception or failed to correct
a known judicial misunderstanding.

That said, professional conduct rules do not establish the limits of lawyers' duty of
candor to the court.[10]   Wholly apart from the rules, courts have supervisory authority to establish
certain disclosure obligations and then to sanction lawyers appearing before them who
knowingly disregard these obligations.  I assume for purposes of this opinion that the District

---

[9] The Court's March 4, 2019 Order requested materially the same, asking the DAO brief  "(1)
whether I have the authority and/or the obligation to grant habeas relief to Petitioner based solely
on the District Attorney's concession of the remaining habeas claim, or whether I must
independently review, and determine the merits of, that now-conceded claim; and (2) if I must
make an independent determination on the merits, whether that is possible on the current record,
without conducting the evidentiary hearing as directed by the United States Court of Appeals for
the Third Circuit."

[10] *See, e.g., United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993); *see also*
Green, *Candor in Criminal Advocacy, supra*, at 1110-1111.

Court has authority to require that when prosecutors do not contest a criminal defendant's application in general, or a post-conviction petition in particular, the prosecution must disclose extra-record evidence that it knows to be contrary the application.[11]  Such a disclosure rule might be justified by the Court's conclusion that it is obligated to make an independent evidentiary determination, not just accept factual allegations of the uncontested habeas petition, by the prosecutors' heightened (though not necessarily enforceable) candor duty as "ministers of justice," or by other considerations.  To the extent that the Court has now established such a disclosure obligation by its Opinion in this case, it can enforce the disclosure obligation going forward.  However, it would not be appropriate for the Court to impose sanctions for a nondisclosure prior to its Opinion, because neither this Court nor any other court in the jurisdiction had previously expressed such an expectation.  Nor should the prosecutors reasonably have anticipated it.  On the state of the law and procedure when the Office filed its Notice in Wharton's case, the Office would not reasonably have perceived that its two-page Notice, summarizing procedural steps but entirely omitting any discussion of relevant evidence, was incomplete, and that, as a matter of candor, the Notice was required to identify extra-record evidence that might contradict the petitioner's claim.

> 2. *The Notice's reference to "communication with the victims' family," when only one family member was contacted, was not sanctionable misconduct.*

The Office's Notice stated in part: "Following review of this case . . ., communication with the victims' family, and notice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance . . . and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences."  The Court has expressed concern that it was misled regarding the victims' family members' knowledge of, and reaction to, the Office's concession.  In its view, the phrase implied that the victims' family members had been told of the Office's position and did not oppose it.  This would have been relevant, in the Court's view, not only to the Court's statutory obligations to treat the victims fairly and to give them an opportunity to be heard, but also to deciding what weight to give to the Office's concession.  In fact, the Office's representative had communicated with only a single family member (albeit with the expectation that he would spread the word to others).  Later, family members objected to the Office's concession.

Even so, the phrase in the Notice would not warrant professional discipline or sanction because, as Max Kaufman's May 21, 2022 affidavit expresses, no one realized that the phrase might be misleading much less intended to mislead the Court.  When Kaufman filed the Notice, he meant only to communicate that the Office's decision to concede penalty phase relief had been communicated to the victims' family, which he believed to be the case.  He did not intend to imply that every member of the victims' family had been contacted or that the family agreed

---

[11]  Insofar as the Court has now established this obligation, a question remains about the timing of the requisite disclosure, i.e., whether it must be made when the prosecution first gives notice that it will not contest the habeas petition or may await a later time when the Court is receiving evidence.

with the Office's decision.[12]   There is no reason to believe that he or anyone else in the Office anticipated the Court's reading of the phrase and its significance to the Court.  And Kaufman apologized in his affidavit for the Notice's lack of clarity.

I hereby submit this Expert Report in the captioned matter.

s/Bruce A. Green

June 16, 2022

---

[12] As of September 2021, when the Office filed the post-hearing brief, its understanding was that its representative had contacted a family member who said that he did not oppose penalty phase relief and who said that he would inform other surviving victims, which the representative later assumed he had done.   Commonwealth's Post-Hearing Brief at p. 23.

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Robert Wharton**, | : | Civil Action |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| **Donald Vaughn, et al.,** | : | No. 01-6049 |
| Respondents. | : | |

## PHILADELPHIA DISTRICT ATTORNEY'S OFFICE MOTION (1) TO EXCUSE MAX KAUFMAN FROM THE JUNE 2, 2022 HEARING, AND (2) TO CONTINUE HEARING

The Philadelphia District Attorney's Office (DAO) files this Motion (1) to excuse Max Kaufman from the June 2, 2022 hearing, and (2) to continue that hearing for the following reasons:

First, as to the request to excuse Mr. Kaufman:

1.    By Order dated May 13, 2022, this Court ordered the Supervisor of the DAO's Federal Litigation Unit who signed the February 6, 2019 Notice of Concession of Penalty Phase Relief (Concession) to appear for a hearing to address the concerns raised in the Court's May 11, 2022 Opinion.  That person is Max Kaufman.

2.    Mr. Kaufman no longer is employed by the DAO, having resigned voluntarily in February 2021 in order to clerk for the Honorable Kevin Dougherty of the Pennsylvania Supreme Court, where he remains working.

3.    As explained in his Affidavit (attached as Exhibit A), Mr. Kaufman was not part of the decision-making process that led to the Concession.

4.    The persons who have relevant knowledge and information, DAO Law Division Assistant Supervisor Paul George and Law Division Supervisor Nancy Winkelman, will appear before the Court.

Second, as to the request to continue the hearing:

5. Because of the nature of the Court's concerns, the DAO is in the process of engaging outside counsel to represent it in the Rule to Show Cause hearing. The DAO is moving as expeditiously as possible, and expects that it will have counsel in place this week. Counsel will then need to review the underlying case and study the issues raised by the Court in its May 11 Opinion.

6. The DAO therefore requests that the Court permit a brief continuance of the June 2 hearing to a date when its counsel will be available to appear.

For these reasons, the Philadelphia District Attorney's Office requests that the Court (1) excuse Mr. Kaufman from the June 2, 2022 hearing, and (2) continue that hearing to a date when its counsel will be available to appear.

Respectfully submitted,

*/s/ Nancy Winkelman*
Supervisor, Law Division
Philadelphia District Attorney's Office

*/s/ Paul George*
Assistant Supervisor, Law Division
Philadelphia District Attorney's Office

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2022, I caused the foregoing Brief to be served on the following persons via ECF:

James P. Barker
Cari Mahler
Pennsylvania Office of Attorney General
16th Floor-Strawberry Square
Harrisburg, PA 17120

Elizabeth McHugh
Claudia Van Wyk
Federal Community Defender Office
Capital Habeas Corpus Unit District Attorney's Office
601 Walnut Street, Suite 545 West 3 South Penn Square
Philadelphia, PA 19106

/s/ Nancy Winkelman
Supervisor, Law Division
Philadelphia District Attorney's Office

/s/ Paul George
Assistant Supervisor, Law Division
Philadelphia District Attorney's Office

# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

**ROBERT WHARTON,**
      **Petitioner**

**No. 01-cv-6049**

    **v.**

**DONALD T. VAUGHN**
      **Respondent**

### AFFIDAVIT OF MAX C. KAUFMAN, ESQ.

I, Max C. Kaufman, hereby swear and affirm as follows:

1.    I am the attorney ordered to appear for a hearing in this case on June 2, 2022.

2.    I no longer work at the Philadelphia District Attorney's Office (DAO). I worked as an Assistant District Attorney (ADA) at the DAO from May 2003 to February 2021, at which time I voluntarily left the office. From May 2003 to January 2013, I worked as an ADA in the Appeals Unit of the Law Division of the DAO. The remainder of my time with the DAO was spent as an ADA in the Federal Litigation Unit of the Law Division. From September 2017 until my departure from the DAO, I was the Supervisor of the Federal Litigation Unit.

3.    I currently work as a law clerk for the Honorable Kevin M. Dougherty of the Pennsylvania Supreme Court.

4.    Under the administration of District Attorney Lawrence Krasner, which began in January 2018, my direct supervisors were Nancy Winkelman, Supervisor of the Law Division, and Paul George, Assistant Supervisor of the Law Division.

5.    Under the Krasner administration, the DAO created and utilized a Capital Case Review Committee (Committee). I was not a member of the Committee, nor was I ever aware of the membership of the Committee or of how precisely it operates. I never

1

participated in any of the Committee's deliberations, or attended any of its meetings. I never had any input in the Committee's decision-making, in this or any other case. A final decision by the Committee with respect to a case represented the final, authoritative position of the DAO as to the matter, and was not subject to reconsideration or change by me.

6.      My supervisors instructed me to adhere to the following procedure with respect to capital cases pending in federal court: In any pending capital case in which there was set to be active litigation such as briefing or a hearing, I was to notify Mr. George of the case in advance so that he could bring it before the Committee for its review. I was instructed that, to the extent possible, I should not proceed with active litigation of the case until I first heard back from Mr. George regarding the decision of the Committee.

7.      Pursuant to this procedure, I advised Mr. George that the Third Circuit had remanded this case to this Court for an evidentiary hearing.[1]

8.      Thereafter, Mr. George advised me that the Committee had made a final decision to concede penalty phase relief in the case.

9.      In addition, the Victim/Witness Coordinator for the Law Division, Heather Wames, advised me that the Committee's final decision to concede penalty phase relief had

---

[1] I do not recall exactly when I notified Mr. George of the remand. The Third Circuit issued its decision remanding the case on January 11, 2018. Thereafter, Wharton filed a petition for a writ of certiorari to the United States Supreme Court raising the single issue of whether the Third Circuit erred in rejecting his guilt-phase claim that his counsel was ineffective at the suppression hearing and at trial for not presenting evidence that his confession was involuntary. The United States Supreme Court ultimately denied certiorari on December 3, 2018. I note that Mr. George entered his notice of appearance in the case in this Court on December 4, 2018. As I am no longer employed by the DAO, I do not presently have access to any emails or other communications I may have sent or received in relation to this case, which presumably would help in recreating the precise timeline of events.

been communicated to the victims' family.  I do not recall what specific information Ms. Wames relayed to me about her contacts with the family. I had no involvement in notifying the victims' family, nor did I direct Ms. Wames to do so.  I did not supervise Ms. Wames.

10.     After being so advised by Mr. George and Ms. Wames, I drafted the Notice of Concession of Penalty Phase Relief docketed on February 6, 2019 (Notice of Concession), consistent with the information provided to me.[2]

11.     At the time I filed the Notice of Concession, I was not personally aware of Wharton's attempted escape in 1986, or of the other additional negative prison adjustment evidence noted by the Attorney General in its brief filed on July 22, 2019. Because I had no authority to unilaterally reconsider or change the decision of the Committee to concede penalty phase relief, I did not conduct any independent investigation or evaluation of the case before filing the Notice of Concession.  I did not personally learn of the attempted escape and other additional negative prison adjustment evidence identified by the Attorney General until after the Attorney General filed its brief on July 22, 2019, which, as discussed below, was after I had discontinued my involvement in this matter.

12.     The language of the Notice of Concession providing that the DAO was not contesting penalty phase relief "[f]ollowing . . . communication with the victims' family" does not state, and was not intended to imply, that every member of the victims' family

---

[2] Previously, I drafted the DAO's response in opposition to Wharton's 2018 certiorari petition.  However, I did not work on this case when it was before this Court prior to Wharton's appeal to the Third Circuit in 2013, nor did I draft the DAO's brief for appellee in the Third Circuit.

had been contacted by the DAO, or that the victims' family agreed with the decision of the Committee to concede penalty phase relief. This language was merely intended to convey that the Committee's decision to concede penalty phase relief was communicated to the victims' family, information I included, along with the facts of review by the Committee and notice to counsel, to provide a brief synopsis of the process leading to the concession. Indeed, it was my understanding that while the victims' families were notified of the Committee's decisions to concede relief, their agreement was not a condition precedent to concession. In other words, while the families had a say in the Committee's process, they did not have a veto. Although it was not my intention, it is now apparent to me the admittedly vague "communication with the victims' family" language was amenable to the interpretation that the victims' family agreed with the concession of penalty phase relief. Please know this was certainly not my intention, and I apologize to the Court for the lack of clarity.

13.    My final work on this case was drafting the DAO's responsive brief to the Court's March 4, 2019 order, which requested briefing on two issues: (1) whether the Court had the authority and/or the obligation to grant habeas relief based solely on the DAO's concession of the remaining habeas claim, or whether the Court had to independently review, and determine the merits of, the conceded claim; and (2) if the Court had to make an independent determination on the merits, whether that was possible on the current record, without conducting the evidentiary hearing as directed by the Third Circuit. The brief argued the Court could, but was not bound to, accept the DAO's concession. In addition, the brief represented that if the Court remained of the view following the responsive filings of the parties and any motion to expand the record filed

4

by Wharton, that the record was insufficient to rule on the remaining claim, the DAO had

no opposition to the Court holding an evidentiary hearing.

14.     Thereafter, I requested permission to stop working on the case.  I requested to

stop working on the case because it seemed apparent the case was evolving from a

perfunctory concession of relief to active litigation on Wharton's behalf.  To the extent I

had a choice in the matter, I did not want to spend time and effort that could otherwise

be devoted to other cases in my heavy caseload actively advocating for relief for

Wharton.  My supervisors graciously permitted me to stop working on the case.  I had

no further involvement in it until my voluntary departure from the DAO in February 2021.

I hereby swear and affirm that the foregoing statements are true and correct to

the best of my knowledge and belief.

Max C. Kaufman

Signed and Sworn to Before Me:

Date: 05/21/2022

Commonwealth of Pennsylvania - Notary Seal
Thael M. Quran, Notary Public
Philadelphia County
My commission expires May 2, 2026
Commission number 1420077
Member, Pennsylvania Association of Notaries

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WHARTON | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 01-6049** |
| | : | |
| DONALD T. VAUGHN | : | |

## COMMONWEALTH'S POST-HEARING BRIEF

### I.    Preliminary Observations

Few things are more unpredictable than an individual juror's response, when asked to decide whether another person should live or die.  *Compare* United States v. Moussaoui, 382 F.3d 453, 457 (4th Cir. 2004) (Jury returns unanimous life sentence where defendant's actions "result[ed] in the deaths of thousands of persons on September 11, 2001") *with* Commonwealth v. Rainey, 928 A.2d 215, 221 (Pa. 2007) (death sentence imposed after jury finds three mitigators (age 18, absence of criminal history, catchall mitigator) and one aggravator (murder committed during the course of a felony)); Commonwealth v. Antoine Ligons, 971 A.2d 1125, 1134 (Pa. 2009) (jury finds *no* mitigating circumstances and imposes death, where Commonwealth asserted one aggravator (killing during perpetration of felony) and where defense asserted three mitigators (age 19, no significant criminal history, and catchall)).  Where any individual human being's reaction to a life and death decision remains uncertain, and where the question presented here admits of no mathematical, "hard science" answer, three factors should inform this court's decision.

## A. The prior jury had great difficulty reaching a verdict

Despite the inherent difficulties, if there is any way to rationally predict how each juror would respond to new mitigation evidence, it is by assessing the degree of difficulty a jury already experienced in returning a death sentence, without the additional information. Here, as the Court of Appeals observed, defendant's second penalty phase jury had great difficulty reaching a verdict. Wharton v. Vaughn, 722 F. App'x 268, 283 (3d Cir. 2018). As trial counsel testified, the jury was out for three days. (N.T. 2/25/21 at 127) ("there were one or more persons on that jury who were not prepared over three days to vote for death"). At one point, the jury announced that it was deadlocked. (N.T. 12/21/92 at 12-13); Wharton, at 283 ("the jury at the second penalty hearing was deadlocked at one point").

As trial counsel also explained, where a human life hung in the balance, many Philadelphia judges would have taken the case from a deadlocked jury. Here, however, the trial court sent the jury back for another full day of deliberations. (N.T. 3/8/21 at 70-73). Significantly, the jury's inability to decide persisted, despite a 17 day presentation where the Commonwealth essentially retried defendant for the underlying offenses and introduced all of the horrible facts of his crimes. (N.T. 2/25/21 at 118-119).

Where despite these circumstances, there were one or more jurors who held out during three days before agreeing on death, any reviewing court should be extremely wary of assuming that every juror would have discounted evidence of defendant's prison adjustment. As Justice Stevens' concurrence in Fry v.

Pliler, 551 U.S. 112, 125 (2007) sensibly notes, a jury's uncertainty in reaching a verdict should be a significant factor in determining whether an error affected the outcome of a trial.  *Id.* at 125 (jury's "evident uncertainty in reaching a verdict" creates a "near-conclusive presumption" that error was not harmless) *citing* Kennedy v. Lockyer, 379 F.3d 1041, 1056, n.18 (9th Cir. 2004) ("From the fact that the first trial ended in a mistrial, as well as the fact that the jury deliberated for a considerable amount of time in the second trial, we infer that the question as to [the defendant's] guilt or innocence was a close one in both trials"); Powell v. Collins, 332 F.3d 376, 401 (6th Cir. 2003) (finding prejudicial error in a habeas case in part because the jury at one point told the court that it was "at a stalemate"); United States v. Varoudakis, 233 F.3d 113, 127 (1st Cir. 2000) (noting, in weighing harmlessness, that "the jury's 'impasse' note reveals uncertainty about [the defendant's] guilt"); United States v. Ottersburg, 76 F.3d 137, 140 (7th Cir. 1996) ("The length of the jury's deliberations makes clear that this case was not an easy one"); Medina v. Barnes, 71 F.3d 363, 369 (10th Cir. 1995) (finding prejudice in a habeas case where "at one point during their deliberations, the jurors indicated that they might be unable to reach a unanimous verdict").  Where, as here, the question is one of life or death rather than simply a defendant's guilt, the jury's prior struggle to reach a decision is entitled to even more weight.

One more aspect of the original jury's deliberations is worthy of note.  At least some members of defendant's jury expressed interest in exactly the type of information that counsel failed to present—defendant's behavior *after* the

3

crimes. In assessing the weight of defendant's character evidence, the jury specifically asked whether it could consider defendant's behavior after the crime, or simply his character as it existed at the time of the crime. (N.T. 12/22/92 at 10).

**B.    Defense counsel's opinion on the significance of prison adjustment**

Nearly thirty years later, in 2021, trial counsel is the only living professional who was actually present at the penalty hearing and who is in a position to gauge, from direct experience, the potential impact of the mitigation evidence. Although this was counsel's first death penalty case, he had been a practicing attorney for 16 years, both as a prosecutor and as a defense attorney. (N.T. 2/25/21 at 106, 166). As counsel explained, he believed the prison records were "extremely favorable". (N.T. 2/25/21 at 132). He was "so regretful" that he had not presented them. (N.T. 2/25/21 at 139, 163). He "unequivocally" believed that they would have made a difference. (N.T. 3/8/21 at 73).

Despite attempts to portray him as someone who would, in truth, have forgone presentation of these records for fear of the potential Commonwealth response, counsel repeatedly testified that he would have introduced the records. He also asserted his belief that he could have effectively addressed any rebuttal evidence. (N.T. 2/21/21 at 132-133, 139, 148, 154, 163, 165). This testimony, from an attorney who participated in jury selection and then personally addressed the jury, should not be lightly discounted.

4

### C. The difficulties inherent in conducting this review

One additional factor should inform this Court's analysis. The question here is not how a collateral review court itself would decide the question. Rather, the prejudice inquiry focuses on the effect the same evidence would have on a hypothetical new jury. <u>Saranchak v. Beard</u>, 616 F.3d 292, 309 (3d Cir. 2010) (state court erroneously upheld the PCRA court's decision by considering the effect that the new evidence would have on the particular judge rather than "considering, more abstractly, the effect the same evidence would have had on an unspecified, objective factfinder"). Accordingly, rather than considering how it would it personally assess the evidence of defendant's prison adjustment, this court must undertake the far more imprecise task of deciding how every juror, among twelve otherwise unknown persons, would factor the new evidence into a life and death decision.

## II. Trial Counsel's Failure to Investigate and Present Evidence of Defendant's Positive Adjustment in State Prison Constituted Ineffective Assistance of Counsel.

"To prevail on this claim, Wharton must show that (1) [trial counsel] acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence, and (2) had [counsel] presented that evidence at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty." <u>Wharton</u>, 722 F. App'x at 281. For the following reasons, it is the Commonwealth's view that defendant has made that showing.

5

## A. Counsel acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence.

Death penalty counsel must make "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins v. Smith, 539 U.S. 510, 524 (2003); Blystone v. Horn, 664 F.3d 397, 420 (3d Cir. 2011). Prior to the evidentiary hearing, defendant made a *prima facie* showing that counsel's failure to investigate his prison records was unreasonable. Wharton, 722 F. App'x at 282. As the Court of Appeals observed, "[I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing." Wharton, at 282 *quoting* Blystone, 664 F.3d at 420 (emphasis in original).

Based on his testimony, there can be little question that counsel's failure to investigate defendant's prison records was unreasonable. Counsel was court-appointed. (N.T. 2/25/21 at 105). This was his first case representing a defendant at a death penalty hearing. (N.T. 2/25/21 at 106). He did not request court funding for co-counsel or a mitigation specialist. (N.T. 2/25/21 at 115) ("I would not know at that time what a mitigation expert was"). He did not consult any experts. (N.T. 2/25/21 at 116). His failure to order the prison records was not a strategic decision. (N.T. 2/15/21 at 131-132). He did not realize that Skipper v. South Carolina, 476 U.S. 1 (1986), permitted a defendant to introduce prison records to demonstrate positive adjustment. (N.T. 2/25/21 at 166).

Importantly, counsel did not perform deficiently here because he is a "bad lawyer." Rather, defendant's 1992 penalty hearing occurred between 1980 and 2012. During that time, due to the systemic lack of meaningful compensation, training, or support for court-appointed counsel, *this was a period of institutionalized ineffective assistance of counsel in Philadelphia*. We draw this conclusion based upon the Commonwealth's study of 155 death sentences imposed in Philadelphia County, 152 of which were imposed between 1980 and 2012.[1]

This study revealed two facts about the compensation, training, and support afforded to court-appointed counsel between 1980 and 2012.

First, compensation for court appointed counsel was "woefully inadequate". In 2011, the Pennsylvania Supreme Court appointed Judge Benjamin Lerner to study the issue of compensation for court-appointed counsel in Philadelphia capital cases. Commonwealth v. McGarrell, 77 E.M. 2011, 2012 Pa. LEXIS 2854 (2/21/12). The Lerner Report confirmed that, from 1980 to 2012, the Philadelphia Court of Common Pleas paid court-appointed attorneys only $1800 to prepare a capital case and $400 for each day of trial. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3, *17. By contrast, according to a 2010 report, the median cost for the defense of an authorized federal death penalty

---

[1] The Commonwealth's study excluded a limited group of Philadelphia capital cases: (1) death penalties that were overturned *after* Lawrence S. Krasner became District Attorney, (2) cases where the defendant died in custody before the resolution of his post-conviction claims, and (3) the case of Gary Heidnik, the only Philadelphia defendant who filed no post-conviction appeals.

was $353,185.  <u>Report to the Committee on Defender Services on the Cost and</u> <u>Quality of Defense Representation in Federal Death Penalty Cases</u> (2010), at 24. (A copy of this Report is attached here as Appendix A.)

Significantly, the preparation fee for court-appointed counsel in Philadelphia was a flat fee.  It remained constant no matter how much or how little work the attorney did preparing for trial.  <u>Lerner Report</u>, 2012 Pa. LEXIS 2854, at 10.  In other words, if counsel spent hours interviewing the defendant's family, acquiring social history records, and consulting with experts, counsel received the same payment as an attorney who did nothing to prepare for the penalty phase.

As the Lerner Report also explained, the Philadelphia system was "completely inconsistent with how competent trial lawyers work."  <u>Lerner Report</u>, 2012 Pa. LEXIS 2854, at *17.  The compensation system actually "punishe[d]" counsel for properly handling death penalty cases.  *Id.* at *27.  Specifically, the Philadelphia system provided a financial incentive for an attorney to engage in minimal pretrial preparation and encouraged the attorney to take the case to trial, even though for most capitally charged defendants the best outcome is often a non-trial resolution.  *Id.* at *17-*18, *27.[2]

Second, as trial counsel's testimony reflected, the system provided virtually no support in that era for court-appointed counsel.  No training existed,

---

[2]    In fact, if a capital case resulted in a negotiated guilty plea and life sentence, the court-appointed attorney would not only *not* receive any compensation beyond the original preparation fee, but even that payment would be reduced by a third.  *Id.* at *17.

8

even for someone such as trial counsel here, who was handling his first penalty phase case. (N.T. 2/25/21 at 113-114). The judges were reluctant to provide funding for experts. (N.T. 2/25/21 at 115-116). When asked about the budget for death cases in Philadelphia, counsel explained that, in that era, "the judges [were] pretty stingy." (N.T. 2/25/21 at 114-115). The court would typically allot $150 to $250 for court-appointed counsel to hire an investigator. (N.T. 2/25/21 at 115-116). The system began to provide a second attorney only in 2002, ten years after defendant's penalty hearing. Lerner Report, 2012 Pa. LEXIS 2854, at *9. As trial counsel here poignantly stated, "I was alone." (N.T. 3/8/21 at 74).

Although these systemic deficiencies are shocking, the result was not:

### 1. *Most Philadelphia death sentences have been overturned*

As of January 1, 2018, **72%** of the 155 Philadelphia death sentences (112 out of 155) had been overturned at some stage of post-conviction review. (A list of the 112 overturned death sentences appears here in Appendix B, Part I, Sections A-B.) Over a dozen capital sentences that were still in place at the time of this study have since been overturned, bringing the total number of overturned Philadelphia death penalties even higher. Like this case, any capital sentence that has not been overturned remains in some stage of post-conviction review.

9

**2.** ***Most Philadelphia death sentences were overturned due to ineffective assistance of counsel***.

**66%** of the 112 overturned death sentences (74 out of 112) were specifically overturned because of ineffective assistance of trial counsel. Predictably, in **78%** (58 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the defendant was represented by court-appointed counsel—i.e., an attorney selected by the court to represent an indigent defendant. (The 74 death sentences overturned due to ineffective assistance of counsel are listed in Appendix B, Part I, Section A(1). The 58 cases where court-appointed counsel provided the ineffective assistance appear at Appendix B, Part I, Section A(2).)

**3.** ***The most common reason for a finding of ineffective assistance was counsel's failure to prepare a mitigation presentation.***

In **51%** (38 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the reviewing court specifically based its determination on trial counsel's failure to prepare and present a constitutionally acceptable mitigation presentation. The 38 cases where court-appointed counsel failed to prepare an adequate mitigation presentation are listed in Appendix B, Part I, Section A(3).)

The repeated findings of ineffectiveness admit of only one explanation. They are directly related to the "woefully inadequate" preparation fee and the structural failure of the system to provide training, support, and resources for the attorneys chosen by the system to represent indigent defendants.

### 4. *Nearly all of the Philadelphia defendants who remained on death row in 2018 were persons of color represented by court-appointed counsel.*

Disturbingly, **91%** (41 out of 45) of the Philadelphia defendants on death row in 2018 (when Mr. Krasner took office) were, like defendant here, members of a racial minority group. **82%** (37 out of 45) of these defendants were, like defendant, African American. (A list of the individuals who remained on death row in 2018 appears in Appendix B, Part II.) In addition, **80%** (36 out of 45) of the Philadelphia defendants on death row in 2018 were, like defendant, represented by court-appointed counsel. (A list of the defendants represented by court-appointed counsel who remained on death row in 2018 appears in Appendix B, Part II, Section B.)[3]

### 5. *Nearly all of the systemic deficiencies between 1980 and 2012 were operative in this case.*

Defendant Wharton's case exemplifies nearly all of the systemic problems described above.

---

[3] To complete the picture, it must also be noted that **62%** (28 out of 45) of the capitally sentenced Philadelphia defendants on death row in 2018 were represented by an attorney whom a reviewing court found to be ineffective in at least one other Philadelphia capital case. (A list of the persons on death row who were represented by an attorney who has been deemed ineffective in another capital case appears in Appendix B, Part II, Section C.) As the Lerner Report explains, given the "grossly inadequate" compensation and support, there were simply not enough qualified attorneys who were willing to accept appointments to such demanding cases. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3. Although no court has determined that counsel here provided ineffective assistance in another capital case, the system nevertheless appointed an attorney with no prior experience to present a penalty phase defense in a particularly challenging case. Soon afterward, like many similarly situated attorneys, he ceased to accept court appointments in capital cases. (N.T. 2/25/21 at 170).

Like most Philadelphia defendants still on death row, defendant is an indigent person of color represented by court-appointed counsel. His penalty hearing occurred in December, 1992, during the period of woefully inadequate funding and support. Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3, *17.

As noted above, although this was counsel's first case representing a defendant in a death penalty hearing, he received no training. No second chair attorney assisted him. He lacked *all* of the other resources that would be standard in any capital proceedings today. He did not have a penalty phase investigator, a mitigation specialist, or a social worker. He did not retain any experts. He did not have a strategic reason to proceed without such assistance. As a result, counsel presented the type of mitigation that was characteristic of the era. He called defendant's relatives, all of whom gave abbreviated testimony about defendant's character and asked for mercy. (N.T. 2/25/21 at 123).

**B. Defendant was prejudiced by counsel's inaction.**

Before deciding whether the introduction of defendant's prison records from 1986 to 1992 would create a reasonable probability of a different outcome, two threshold aspects of this question must be addressed.

First, the question here is *not* whether defendant committed terrible crimes before his incarceration. One cannot evaluate whether inmates have adjusted well to prison *after* incarceration based on the gravity of the offenses they committed *before* conviction. Despite the "common sense" mantra relied upon by the Friend of the Court's (FC's) expert ("past behavior is the best single predictor of future behavior"), many defendants who commit serious crimes

12

become well-adjusted inmates. (N.T. 3/16/21 at 53, 57, 68; N.T. 5/8/21 at 72-73). Therefore, it cannot be argued that defendant was incapable of making a positive adjustment to prison, based on either the facts underlying his murder case or his subsequent escape attempt. Indeed, as his prison records indicate, defendant has been problem free for the last three decades. (N.T. 2/25/21 at 93-98; N.T. 8/5/21 at 73).

Moreover, the facts of defendant's escape would have been admissible, whether or not defendant introduced evidence of positive prison adjustment. Those facts could have been used either to establish the aggravators or to rebut the defense's character evidence. *See e.g.* Commonwealth v. Sattazahn, 763 A.2d 359, 369 (Pa. 2000); Commonwealth v. Williams, 660 A.2d 1316, 1323 (Pa. 1995) (jury may consider all of defendant's existing convictions, including crimes committed after the crime at issue). They would not, however, have been admissible to prove that defendant had a negative adjustment to state prison after the commission of those crimes.

Therefore, the facts underlying defendant's pre-state-prison escape attempt are relevant to the question presented here only in one respect: Would evidence regarding defendant's earlier escape have so enhanced the significance of defendant's subsequent handcuff key infractions (which occurred within a five day period in 1989) to the point that every juror would have (a) disregarded the remaining six years of defendant's overall positive adjustment, and (b) concluded that defendant posed a long term threat of future dangerousness?

13

Second, as the Supreme Court has explained, evidence of positive prison adjustment is significant in two different ways. On one hand, in and of itself, evidence that a prisoner has adjusted positively during time already served is potentially mitigating. Skipper, 476 U.S. at 5 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination"). Thus, as the Skipper court determined, it was error for the trial court to preclude evidence that appellant conducted himself well in prison, even though he had only been in jail for the 7½ months between his arrest and trial. Skipper, 476 U.S. at 3.

On the other hand, and even more importantly, evidence regarding prison adjustment enables the jury to estimate what the defendant's *future* behavior will be. As the Supreme Court explained:

> Consideration of a defendant's past conduct as indicative of his probable *future behavior* is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."

Skipper, at 5 *quoting* Jurek v. Texas, 428 U.S. 262, 275 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.) (emphasis added); *see also* Commonwealth v. Green, 581 A.2d 544, 562–563 (Pa. 1990) ("[E]vidence bearing on a defendant's behavior in jail, and hence, upon his likely future behavior in prison, might affect a jury's decision to impose a death sentence").

Hence, the question here is not simply whether defendant adjusted positively between his two penalty hearings. The question is also how the jury—

14

had it been informed of defendant's adjustment—would have assessed defendant's "likely future behavior".

Here, of course, we now know that any expert who, in 1992, led the jury to believe that defendant was likely to be a disruptive, future danger in the prison setting, would have been wrong. In the intervening three decades, defendant has been a problem free inmate. (N.T. 2/25/21 at 93-98; N.T. 8/5/21 at 73). Despite this knowledge, the FC argues that, in 1992, the Commonwealth could have persuaded every juror to vote for death on the basis of a subsequently disproven prediction that he would be a future problem.

With these threshold considerations in mind, the question of prejudice may be examined. On the basis of the evidence adduced at the evidentiary hearing, there is a reasonable probability that at least one juror would have voted for life. Four arguments support this conclusion.

### 1. *The jury deliberated for three days despite the facts of this case.*

First, it must be recalled that, for 17 days, this jury listened to the horrible facts of the murders here. (N.T. 2/25/21 at 118). Such proceedings pose unique problems for the defense. The defendant can no longer contest guilt and there is no role for residual doubt. Moreover, unlike a combined guilt and penalty phase trial, the jury cannot register its indignation by finding a defendant guilty, yet still exercise mercy at the penalty phase. In contrast, in a stand-alone penalty trial, there is a genuine concern that, to the jury, a life sentence will viscerally seem like an acquittal.

Here, despite these factors, defendant's jury was out for three days and at one point announced that it was deadlocked. Where the emotional impact of the facts surrounding these murders (about which the jury was fully informed) is so much greater than the facts surrounding his escape and his possession of the handcuff key, and where a death qualified jury nevertheless struggled to reach a verdict, it cannot be concluded that those additional facts would nullify the impact of six years of largely positive prison adjustment, in the mind of every juror.

### 2. *Reputable experts disagreed on the whether defendant adjusted positively to state prison.*

Second, both sides presented the opinion testimony of experts, each of whom was qualified in their respective field. Each expert adhered to their opinion despite cross-examination. Although they did not agree, each expert supported their opinion with evidence from defendant's prison records.

Significantly, the FC's prison expert agreed with the defense that four of defendant's prison infractions were non-violent and non-serious. (N.T. 5/11/21 at 19) ("four of them taken individually, seemed rather minor"). However, both FC experts contend that his two handcuff key infractions, occurring during a five day period, invalidate the remaining six years of defendant's incarceration and prove that he did not and would not adjust positively to prison. Two equally qualified defense experts reached the opposite conclusion. To them, these non-violent infractions did not negate his six years of otherwise acceptable conduct.

The question then becomes: Where equally qualified experts differ, would each and every juror, in a group that deliberated over the course of three days

and was at one point deadlocked, agree with the FC's experts and determine that defendant was poorly adjusted? Or would one juror, who had at one point voted for life, adhere to that position on the basis of the defense experts' testimony regarding his remaining six years of acceptable prison behavior? Although there can be no mathematically certain answer to this question, there is a reasonable probability that one juror—who already held out for life for three days in the face of the Commonwealth's 17 day presentation regarding the facts of these murders—would have credited the defense experts and maintained that position. As trial counsel observed, the experts "would have been an even match". (N.T. 2/25/21 at 165).

### 3. *At least one juror might have credited the defense experts.*

Third, there are substantial reasons why one juror could have credited the defense experts, rather than those of the FC. During FC expert Beard's testimony, it became clear that, in his mind, once prison officials discovered that an inmate with a prior escape conviction possessed a homemade handcuff key, nothing could ever demonstrate positive adjustment. From then on, despite any prior or future evidence of positive adjustment, defendant would remain "poorly adjusted."[4] For Beard, even defendant's use of the prison-instituted grievance procedure became evidence of poor adjustment. (N.T. 5/11/21 at 61, 121).

---

[4] As the Court of Appeals observed, "Most of [defendant's prison] evaluations … were positive. Although they were brief and did not provide much in the way of specifics, they indicated that Wharton was adjusting well to prison life and that his behavior was generally satisfactory." Wharton, *supra*, 722 F. App'x 268, 283.

Strangely, even if defendant had never possessed the handcuff key, Beard's assessment of defendant's prison adjustment "would still be a negative". (N.T. 5/11/21 at 69).

In view of Beard's transparent unwillingness to concede anything positive about defendant's prison record, there is a reasonable probability that at least one juror would view him as biased and reject his conclusion that two infractions over a five day period indelibly stamped defendant as a violent and poorly behaved inmate.[5]

For similar reasons, at least one juror might have questioned FC expert O'Brien's conclusions. O'Brien was willing to opine that the prognosis for defendant's future adjustment was poor. (N.T. 3/16/21 at 9-10) (defendant's "behavioral transgression" in prison "was consistent with surreptitious future planning while portraying himself as polite, pleasant, and well-adjusted"). If called as a witness at defendant's 1992 penalty hearing, he would have so testified. (N.T. 3/8/21 at 41-42). Yet, although he says *today* that he would have so testified *then*, he displayed no interest in what defendant's actual adjustment had been. When asked if he had reviewed records of defendant's adjustment between 1992 and 2021, he acknowledged that he had not. (N.T. 3/16/21 at 64). Thus, although he would have told the 1992 jury that

---

[5] Even expert Beard seemed to tentatively modify his assessment when he learned, apparently for the first time, that defendant had no misconducts for the past three decades. (N.T. 5/11/21 at 73-74) ("I think if he hasn't had any misconducts, I think that's very commendable. I think that's a good thing, but that's not what I looked at. And I have no knowledge of what he's done or hasn't done since then.").

18

defendant's prognosis was poor, he was apparently unconcerned about the accuracy of his prediction.

### 4. *The artificiality of the question*

Fourth, the Commonwealth must once again highlight the artificiality of the question, as formulated by both the Court and the FC. As this Court has noted, this is a matter of life and death. We now know that, however well intentioned, any opinions offered in 1992 about defendant's poor prognosis for positive prison adjustment would have been wrong. We also know that, if defendant received a new penalty hearing, the defense would inform an objective factfinder that defendant's behavior has been unremarkable for nearly 30 years—a fact that no one would be able to credibly deny. Under these circumstances, there is a reasonable probability that 30 years of positive behavior would negate any evidence pertaining to defendant's 1989 infractions and his earlier escape.

Yet, the FC continues to ignore this reality and to object to the inclusion of any evidence of defendant's subsequent adjustment. Instead, the FC argues that its experts' *incorrect* assessments/predictions would have convinced the 1992 jury to vote for death. In the Commonwealth's view, the FC's position is not only misguided, it belies common sense.

## III. Commonwealth's Renewed Objection to these Proceedings

The Commonwealth renews its objection to what is, in effect, the appointment of a substitute prosecutor to conduct the evidentiary hearing required by the Court of Appeals. This Court appointed the FC to submit an

amicus brief "on the issue of whether relief should be granted on Petitioner's remaining habeas claim based on the current record or whether the record before me should be expanded." Order (5/7/19) Document 165, at 4. Its Order did not instruct the FC to adopt any particular position. Nevertheless, all along, this Court evidently expected that the FC would adopt "the other side" and oppose relief. (N.T. 8/5/21 at 129) ("I don't have both sides, which is why I invited the AG's Office in and they've made objections and asked me to do things").

From the day of its appointment, the FC has far exceeded the role of a traditional court-appointed amicus and acted instead as a partisan party-opponent. It never behaved as an amicus from whom a court has requested an objective opinion. It did not act as "'an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one or another party.'" Sciotto v. Marple Newtown Sch. Dist., 70 F. Supp. 2d 553, 554 (E.D. Pa. 1999) see also Linker v. Custom-Bilt Machinery Inc., 594 F. Supp. 894, 897-98 (E.D. Pa. 1984) ("'an amicus who argues facts should rarely be welcomed.'"). To the contrary, both before and during the evidentiary hearing, the FC has acted as an unvarnished advocate, ignoring anything positive about the Commonwealth's position and accentuating, for effect, anything that could be said in opposition to penalty phase relief.

The examples are numerous. The FC questioned the defense expert about such topics as defendant's poor elementary school attendance. (N.T. 2/25/21

at 57-60). Despite its own expert's concession to the contrary, it attempted to exaggerate the gravity of defendant's practicing-karate infraction (while defendant was in a caged exercise area). (N.T. 3/8/21 at 53; N.T. 3/16/21 at 77). It sought to cleanse the record of any reference to defendant's positive adjustment, during the three decades since his second penalty hearing. It subjected trial counsel to tendentious cross-examination, plainly suggesting that, contrary to his testimony, he would not actually have introduced defendant's prison records. (N.T. 3/8/21 at 22, 66-69). It called expert O'Brien, who has been a prosecution witness in many Pennsylvania cases.[6]

Equally objectionable has been the inquiry, initiated by the FC and approved by this Court, into the Commonwealth's contact with the surviving victims. This was never the purpose of the Court of Appeals' remand. The Commonwealth has never suggested that it agreed to penalty phase relief because the family preferred such an outcome. *See* Commonwealth's Brief (4/3/19) Document 162, at 3 ("[T]his Office determined that Wharton's remaining habeas claim—that his counsel was ineffective at his second penalty hearing for not investigating and presenting evidence of his adjustment to prison—is not lacking in merit"). And although the survivors certainly had every

---

[6]     A non-exhaustive Westlaw search reveals 31 cases, in appellate opinions alone, where O'Brien testified for the prosecution in opposition to a criminal defendant's mental health based claim. The number of cases where he actually participated as a prosecution witness is far greater. As trial counsel explained, he (like many defense attorneys) has dealt with O'Brien "in many cases". (N.T. 2/25/21 at 165). (A list of the 31 Westlaw cases is attached here as Appendix C.)

right to attend these proceedings, their views can have no bearing on the resolution of the only issue before this court—the validity of defendant's ineffectiveness claim. Despite these considerations, this Court allowed the FC to elicit the survivors' requests for the death penalty (N.T. 2/25/21 at 134-135, 139-140, 220-221; N.T. 5/11/21 at 164-165), even though they would never have been permitted to express such opinions at a penalty phase hearing. *See* Bosse v. Oklahoma, 137 S. Ct. 1, 2, (2016) *citing* Booth v. Maryland, 482 U.S. 496 (1987) (lower courts "remain[] bound by Booth's prohibition on ... opinions from a victim's family members about ... the appropriate sentence").

Finally, the FC's participation as a *de facto* prosecutor in this case, as well as this Court's approval of such conduct, are without precedent. Before and after Mr. Krasner's election, both the federal and state courts regularly accepted the Commonwealth's concessions of death penalty relief, without conducting evidentiary hearings and without appointing a substitute prosecutor to aggressively argue for death. (A list of 21 cases—11 federal and 10 state—where collateral review courts accepted the Commonwealth's agreement to penalty phase relief is attached here as Appendix D.) Indeed, even before Mr. Krasner's election, the Philadelphia District Attorney's Office routinely agreed to life sentences, in cases where it retained the option to move forward with a new penalty phase hearing. (A list of **65** cases where the Commonwealth agreed to a life sentence when it could have conducted a new penalty hearing, appears at Appendix B, Part I, Section C-1.) On none of these occasions did any court ever

appoint an amicus to either conduct an evidentiary hearing or to challenge the adequacy of the Commonwealth's contact with the victim's family.

## IV.  Commonwealth's Compliance with Victim's Rights Legislation

It is clear by now what happened here.  In an effort to keep the surviving victims informed, Ms. Wames contacted Mr. Hart and informed him of the Commonwealth's revised position on the death penalty.  In response, he told her that he was not opposed to penalty phase relief.  Like the Commonwealth, he believed that defendant should never be released.

Mr. Hart also told Ms. Wames he would inform other surviving victims.  To facilitate this process, she provided him with her contact information and invited him to share it with the remaining survivors.  Thereafter, when Mr. Hart told her that his brother wished to attend future hearings, she reasonably assumed that Mr. Hart had, in fact, transmitted the requisite information to the family.  (N.T. 8/5/21 at 5).

Employing 20/20 hindsight, one could say that Ms. Wames should have taken additional steps.  But at the time, there was no reason to assume that Mr. Hart had not contacted the rest of the family.  Mr. Hart is a religious person who participates in missionary work.  He was not someone whose reliability was for some reason questionable.  Nor, under the circumstances, was there any reason to assume that other family members were opposed to death penalty relief.  In Ms. Wames' work, it is not uncommon for survivors to be indifferent to or even against the death penalty.  (N.T. 5/11/21 at 189).

23

**CONCLUSION**

For the foregoing reasons, trial counsel acted unreasonably by failing to investigate and present prison-adjustment evidence. Had he done so, there is a reasonable probability that at least one juror would have voted against imposing the death penalty. Accordingly, it is the Commonwealth's view that this Court should grant habeas relief on defendant's penalty-phase claim.

FOR THE COMMONWEALTH:


/s/ *Paul M. George*_____
PAUL M. GEORGE, Asst. Supervisor, law Division
Nancy Winkelman, Supervisor, law Division

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing Brief to be served

on the following persons via ECF:

James P. Barker
Cari Mahler
Pennsylvania Office of Attorney General
16th Floor-Strawberry Square
Harrisburg, PA 17120

Elizabeth McHugh
Claudia Van Wyk
Federal Community Defender Office
Capital Habeas Corpus Unit District Attorney's Office
601 Walnut Street, Suite 545 West 3 South Penn Square
Philadelphia, PA 19106

September 30, 2021                        /s/Paul M. George_____
                                         PAUL M. GEORGE

# Report to the Committee on Defender Services
# Judicial Conference of the United States
# Update on the Cost and Quality of Defense Representation
# in Federal Death Penalty Cases

**Jon B. Gould**
**Lisa Greenman**

**September 2010**

> **This report updates the 1998 Spencer Report. It includes revised commentary, endorsed by the Judicial Conference Committee on Defender Services, to the 1998 recommendations approved by the Judicial Conference.**

# Table of Contents

Executive Summary ................................................................................ viii

I.  Introduction ...................................................................................... 1

II.  Decisions by the Department of Justice to Seek the Death Penalty: Their Implications
for Defense Costs .............................................................................. 3

    A.  Defendants Subject to Capital Prosecution:  Potential Death Penalty Cases,
1989-2009 ............................................................................. 3

    B.  The Attorney General's Decision-Making and How It Has Changed ................... 5

    C.  Resolution of Authorized Cases ....................................................... 8

    D.  Geographic Distribution of Authorized Cases ........................................ 12

III.  Costs of Defending Federal Capital Cases ................................................ 17

    A.  Cases Examined ......................................................................... 17

    B.  Data Examined .......................................................................... 20

IV.  Findings ........................................................................................ 24

    A.  Total Case Costs ...................................................................... 24

    B.  Comparison to the Spencer Report .................................................... 26

    C.  Attorney Costs ........................................................................ 28

    D.  Expert Costs .......................................................................... 31

    E.  Transcript Costs ...................................................................... 32

V.  Explanations for and Predictors of Case Costs ............................................ 33

    A.  Hypotheses ............................................................................. 33

    B.  Use of Experts ........................................................................ 35

    C.  Case Characteristics .................................................................. 37

    D.  The Attorney General Making the Authorization Decision ............................. 39

i

E. Exceptional Cases ....................................................................................41

    1. High Cost Trials ...............................................................................41

    2. Lowest Cost Trials ...........................................................................43

        a. "Bad Facts" ...............................................................................46

        b. Defense Experience ..................................................................48

        c. Geography ................................................................................50

VI.    Qualitative Data from Judges and Counsel ...................................................57

    A. Interviewees .................................................................................57

    B. Overview of Interviews ................................................................59

        1. Judges ...........................................................................................59

        2. Defense Counsel ............................................................................60

    C. Federal Death Penalty Resource Counsel .............................................61

    D. The Role of Federal Defender Organizations .......................................64

    E. Quality of Representation: Trial Counsel .............................................66

    F. Case Budgeting .............................................................................69

    G. Expert Services .............................................................................71

        1. Guilt Phase Experts .......................................................................72

        2. Mental Health Experts ...................................................................72

        3. Mitigation Specialists ...................................................................74

        4. Jury Consultants ...........................................................................75

        5. Victim Liaisons .............................................................................75

        6. Future Dangerousness and Prison Conditions Experts ...................77

        7. Requests for Expert Services .........................................................77

        8. $7,500 Threshold for Circuit Approval of Expert Payments ..........78

H. Case Management ...................................................................................78

    1. Severance .........................................................................................81

    2. Discovery .........................................................................................82

    3. Jury Selection ..................................................................................82

I. The Capital Authorization Process ........................................................84

J. Appellate and Post-Conviction Representation ....................................86

    1. Quality and Availability of Appellate Counsel................................86

    2. Quality and Availability of Post-Conviction Counsel .....................87

VII.   Conclusion ...................................................................................................89

VIII.  Recommendations & Commentary..............................................................90

  1.    Qualifications for Appointment ..............................................................90

    a.    Quality of Counsel ..........................................................................90

    b.    Qualifications of Counsel ................................................................90

    c.    Special Considerations in the Appointment of Counsel on Appeal................90

    d.    Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings ........................................................90

    e.    Hourly Rate of Compensation for Counsel......................................90

  2.    Consultation with Federal Defender Organizations or the Administrative Office ......98

    a.    Notification of Statutory Obligation to Consult................................98

    b.    Consultation by Courts in Selecting Counsel ..................................98

    c.    Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel..........................................98

  3.    Appointment of More than Two Lawyers ................................................102

4. Appointment of the Federal Defender Organization .................................................103

    a. FDO as Lead Counsel ................................................................................103

    b. FDO as Second Counsel .............................................................................103

5. The Death Penalty Authorization Process ..............................................................106

    a. Streamlining the Authorization Process.....................................................106

    b. Court Monitoring of the Authorization Process..........................................106

6. Federal Death Penalty Resource Counsel ..............................................................108

    a. Information from Resource Counsel...........................................................108

    b. Technology and Information Sharing .........................................................108

7. Expert ........................................................................................................................111

    a. Salaried Positions for Penalty Phase Investigators .......................................111

    b. Negotiating Reduced Rates........................................................................111

    c. Directory of Experts..................................................................................111

8. Training.......................................................................................................................114

9. Case Budgeting .........................................................................................................115

    a. Consultation with Prosecution ..................................................................115

    b. Prior to Death Penalty Authorization........................................................115

    c. After Death Penalty Authorization ............................................................115

    d. Advice from Administrative Office and Resource Counsel ..........................115

    e. Confidentiality of Case Budgets ................................................................115

    f. Modification of Approved Budget...............................................................115

    g. Payment of Interim Vouchers ....................................................................115

    h. Budgets in Excess of $250,000...................................................................115

    i. Death Penalty Not Authorized....................................................................115

iv

|  | j. | Judicial Conference Guidelines ................................................................115 |
|  | k. | Judicial Training for Death Penalty Cases ............................................115 |

10. Case Management ....................................................................................................119

    a. Non-lawyer Staff ..............................................................................................119

    b. Multi-defendant Cases ......................................................................................119

        i. Early Decision Regarding Severance ............................................................119

        ii. Regularly Scheduled Status Hearings ..........................................................119

        iii. "Coordinating Counsel" ...............................................................................119

        iv. Shared Resources .........................................................................................119

        v. Voucher Review ............................................................................................119

11. Availability of Cost Data ........................................................................................122

Appendix A: Data Examined ................................................................................................123

Appendix B: Supplemental Data ..........................................................................................124

Appendix C: Authorized versus Non-authorized Case Costs ..............................................128

Appendix D: Cost Estimates in 2010 Dollars ......................................................................129

# Figures and Tables

**Figure or Table**

**Page**

Figure 1: "Death Eligible" Federal Capital Defendants, 1989-2009, by Calendar Year of Indictment ........................................................................................................................... 5

Figure 2: U.S. Department of Justice Capital Authorizations, 1989-2009, by Year of Authorization ................................................................................................................ 8

Figure 3: Number of Federal Capital Defendants Tried, 1989-2009, by Calendar Year......... 9

Figure 4: Number of Federal Death Sentences, 1989-2009, by Calendar Year ................... 11

Table 1: Federal Death Penalty Prosecutions, 1989-2009 ................................................... 12

Figure 5: Number of Authorized Federal Capital Defendants, 1989-1997 and 1998-2009, by Circuit .................................................................................................................... 13

Figure 6: Number of Federal Defendants Authorized for Capital Prosecution, by State, 1989-1997 ................................................................................................................. 15

Figure 7: Number of Federal Defendants Authorized for Capital Prosecution, by State, 1998-2009 ................................................................................................................. 16

Figure 8: Federal Death-Eligible Cases Studied, 1998-2004.................................................. 19

Table 2: Total Cost for Defense Representation in Federal Capital Cases, 1998-2004 ......... 25

Figure 9: Cost Variance in Authorized Capital Cases, Trials vs. Pleas, 1998-2004.............. 26

Table 3: Total Case Cost, Spencer Report Compared to Update........................................... 27

Table 4: Attorney Cost, 1998-2004 ...................................................................................... 28

Table 5: Attorney Hours, Spencer Report Compared to Update .......................................... 29

Table 6: Attorney In-Court Hours, Spencer Report Compared to Update ........................... 30

Table 7: Attorney Out-of-Court Hours, Spencer Report Compared to Update ..................... 30

Table 8: Expert Costs, Spencer Report Compared to Update................................................ 32

Table 9: Transcript Cost Per Defendant, 1998-2004 ........................................................... 33

Figure 10:  Division of Expert Costs for Trial Cases.................................................. 36

Figure 11:  Division of Expert Costs for Plea Cases ................................................. 37

Table 10:  Factors that Predict Increased Case Cost, Bivariate Relationships ...................... 39

Table 11:  Effect of Attorney General's Decision-Making on Capital Case Length and on Plea vs. Trial ........................................................................................................ 41

Table 12:  Cost Drivers in High Cost Capital Trials.................................................42

Table 13:  Relationship Between Defense Cost and Death Sentence......................................45

Table 14: Attorneys in Low-Cost and Other Cases ..................................................50

Table 15: Regional Variation in Capital Trials by State, 1998-2004 ....................................51

Table 16: Outcomes of Federal Death Penalty Trials by Cost, 1998-2004 ...........................54

Figure B.1:  Number of Federal Capital Defendants Going to Trial/Trials Commencing, by Calendar Year ................................................................................................ 124

Table B.1: Number of Federal Capital Defendants Going to Trial/Trials Commencing, by Calendar Year ................................................................................................ 125

Figure B.2:  Current Population of Federal Death Row by State and Circuit ..................... 126

Figure B.3: Federal Death Sentences in the Modern Era by State and Circuit.................... 127

Figure C.1:  Median Costs for Defense Representation in Federal Capital Cases, 1998-2004 ................................................................................................ 128

Figure D.1:  Estimated Median Costs in 2010 ................................................................... 129

**Executive Summary**

It has been more than 10 years since publication of the Spencer Report of the United States Judicial Conference Committee on Defender Services Subcommittee on Federal Death Penalty Cases, which contained findings on the cost, quality, and availability of defense representation in federal death penalty cases. The Subcommittee's recommendations for the judiciary and defense counsel, aimed at containing costs while ensuring high quality defense services in capital cases, were approved by the Judicial Conference in September 1998. At the request of the Defender Services Committee and the Office of Defender Services of the Administrative Office of the U.S. Courts, these issues have been re-examined and the findings updated.

Part I of this report offers an introduction and overview of the research.

Part II examines the way prosecution policies and practices have developed from 1989, the beginning of the modern federal death penalty era, through the end of 2009. Prosecution decisions – whether, where, and how to charge death-eligible cases in the federal courts; whether or not to pursue a sentence of death for an eligible defendant; and how that death penalty "authorization" decision is made – are significant drivers of the cost of defense representation. Among the findings discussed in Part II are the following:

- The 1994 Federal Death Penalty Act vastly increased the number of crimes eligible for capital prosecution, with dramatic effect on the number of cases requiring capital defense services. The impact of this increase was only partially felt by the time the Spencer Report was published in 1998 and has had greater impact in the years since then.

- The process by which the Attorney General decides whether to seek the death penalty for a defendant charged with a capital offense (i.e., "authorizes" capital prosecution for a "death-eligible" defendant) has changed, increasingly removing discretion from local prosecutors and centralizing decisionmaking in the Department of Justice. Among other things, this has resulted in more defendants being authorized for capital prosecution without the request of local prosecutors.

- A higher proportion of authorized cases has been proceeding to trial rather than reaching settlement through a plea agreement.

- As the Justice Department has sought to nationalize the federal death penalty, more capital cases have been authorized in states that historically did not prosecute many (or any) capital cases in state court.

- Since 1989, the Attorney General has sought the death penalty against approximately 463 federal defendants. Approximately 262 of those defendants have stood trial, and 66 individuals, or approximately one quarter of those tried, have received a sentence of death.

Parts III, IV, and V of this report discuss the costs associated with defending a federal capital case. All authorized federal death penalty representations furnished by panel attorneys that began and ended between 1998 and 2004 were examined, along with a sample of cases in which the defendant was eligible for capital prosecution but the case was not authorized. Cost and other quantitative data from those cases were collected and analyzed to determine the factors that influence defense costs.

Among the findings are:

- The median cost of a case in which the Attorney General authorized seeking the death penalty was nearly eight times greater than the cost of a case that was eligible for capital prosecution but in which the death penalty was *not* authorized.

- The median cost of a case that was authorized and went to trial was more than twice the cost of a case that was authorized but resolved through a plea agreement.

- The cost of defending cases has increased substantially since the 1998 Spencer Report. Numerous factors likely account for this increase, including inflation, a higher degree of complexity in the cases, legal developments heightening obligations on counsel, expanded areas of litigation, advances in forensic science, as well as the geographic location where prosecutions are brought.

The following chart summarizes median defense costs in cases between 1998 and 2004:

**Median Costs for Defense Representation by Panel Attorneys in Federal Capital Cases, 1998-2004**

| Type of Case | Total Cost | Attorney Cost | Attorney Total Hours | Attorney In-Court Hours | Attorney Out-of-Court Hours | Expert Cost | Transcript Cost |
|---|---|---|---|---|---|---|---|
| **Death Eligible, Not Authorized** | $44,809 | $42,148 | 436 | 34 | 350 | $5,275 | $210 |
| **Authorized** | $353,185 | $273,901 | 2,014 | 306 | 1,645 | $83,029 | $5,223 |
| **Trials** | $465,602 | $352,530 | 2,746 | 353 | 2,373 | $101,592 | $10,269 |
| **Pleas** | $200,933 | $122,772 | 1,028 | 42 | 992 | $42,049 | $82 |

It should be noted that the figures in this chart are medians, and therefore the subparts do not sum to the whole (e.g., attorney in-court and out-of-court hours cannot be added to yield attorney total hours, and so on). In addition, it should be noted that the maximum hourly rate of compensation in capital cases for panel attorneys during the period of the study was $125. The maximum hourly rate effective January 1, 2010, is $178.

This section of the report also takes a closer look at the cases at the high and low end of the cost continuum, finding that:

- As a group, the highest cost cases (top 20 percent) were distinguishable from the group of all other cases based on the presence of a number of factors associated with higher costs. In general, in the higher cost cases there were more offenses alleged and a greater number of defendants and victims, and these cases also were more likely to include complex conspiracy-related charges, such as Continuing Criminal Enterprise (CCE), Racketeering Influenced and Corrupt Organizations Act (RICO), and terrorism-related offenses, as well as allegations of "future dangerousness" of the defendant. In addition, the group of highest cost cases generally was more likely to involve, singly or in combination, such factors as geographically far-ranging investigations, non-English speaking persons, diverse cultures, and complex issues of mental health or forensic science. In contrast, an absence of the aforementioned cost-increasing factors did not distinguish the group of low-cost cases (lowest 30 percent) from the group of all other cases.

- There was a strong association between a lower cost defense representation and an increased likelihood of a death sentence at trial. For trial cases in which defense spending was among the lowest one-third of all trial cases, the rate of death sentencing was 44 percent. For trial cases in which defense resources were in the remaining two-thirds of cost, the likelihood of a death sentence was 19 percent. Thus, the lowest cost cases were more than twice as likely to yield sentences of death.

- Geography and state court death penalty practices appear to be significantly correlated both with defense cost and with the likelihood of a death sentence at trial. There was a strong association between the state in which a prosecution was brought and the likelihood of a death sentence.

Section VI describes qualitative data obtained through interviews of federal judges who had presided over a federal death penalty case and experienced federal capital defense counsel on topics such as the quality of defense representation, case budgeting and case management practices, the role of experts, and the death penalty authorization process. Reported findings include the following:

- Judges expressed satisfaction with the quality and availability of defense counsel, while lawyers identified some concerns about the quality of representation.

- Judges voiced concern about the length of time that passes before a decision is made by the Attorney General regarding whether or not a case will be authorized for capital prosecution, and lawyers highlighted concerns about the lack of deference to the wishes of local U.S. Attorneys, particularly when the prosecution and defense have arrived at a mutually acceptable plea agreement.

- The assistance of the Federal Death Penalty Resource Counsel Project and an expansion to include separate projects for trial, appellate, and post-conviction cases was viewed favorably by lawyers and judges, who found the services to be helpful.

- Case budgeting is now the norm in federal death penalty trials, and the process is valued by both judges and lawyers.

- Expert services, including expert witnesses, investigators, and all services other than counsel, are a significant component of capital defense costs.

- Federal capital trials are extremely complex from a case management perspective. They consume enormous amounts of time and other resources and also exact a significant emotional toll on all participants. Particular areas of focus were court practices relating to severance, discovery, and jury selection.

Finally, in Sections VII and VIII, the Recommendations of the 1998 Spencer Report are reaffirmed, and the Commentary associated with those recommendations is updated to reflect the past 12 years of experience with federal capital litigation. The Recommendations suggest strategies to contain costs while ensuring the high quality of defense representation that

capital cases demand. They address areas including qualifications for appointed counsel, case management and case budgeting, the number of appointed counsel, appointment of federal defender organizations, and death penalty training programs. Updated Commentary addresses numerous areas, including:

- The skills and experience required for capital defense counsel at trial, on appeal, and in post-conviction, and what is meant by the policy that capital defense counsel have "distinguished prior experience" in capital representation.

- The benefits of appointing new counsel on appeal.

- The need for courts to consult with the district's federal defender organization or the Administrative Office of the U.S. Courts with respect to each capital case, and the availability of Resource Counsel to assist in this process at every stage of litigation.

- The potential benefits of relying on federal defender organizations to provide representation in capital cases where appropriate resources are available.

- Encouragement for communication between the judiciary and the Department of Justice about federal death penalty policies and practices that may enhance efficiency and cost savings.

- Case management practices, such as approaches to discovery, that are intended to have a beneficial impact on defense costs.

The 1998 Spencer Report remains pertinent today. It is a helpful primer on the distinguishing characteristics of a federal death penalty case and the unique demands these cases place on counsel. Its Recommendations, likewise, remain sound. The following report builds on the Spencer Report's foundation, providing a more current view of federal capital practice, more recent data on the cost of defense representation, and additional ideas on cost containment.

# I.    Introduction[1]

In May 1998, the United States Judicial Conference Committee on Defender Services approved the document entitled "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," which has become known as "the Spencer Report," after the chair of the subcommittee that produced the report, Judge James R. Spencer.[2] In September 1998, the Judicial Conference of the United States adopted the report's recommendations, which have been relied upon by courts and defense counsel ever since. (JCUS-SEP 98, pp. 67-74).

Much of the Spencer Report remains as relevant in 2010 as it was in 1998 – for example, its detailed description of the characteristics of federal death penalty prosecutions and its discussion of the special duties such cases impose on defense counsel.  Similarly, its recommendations remain sound, as they endorse policies derived from core values consistently enunciated by the Defender Services Committee: high standards for appointed counsel, fair funding for the defense that is predicated on sound case-budgeting practices, and an appreciation of the scope and depth of counsel's responsibilities.  The recommendations encourage the Administrative Office of the U.S. Courts to provide training and technical support for court-appointed counsel, and promote strategic case management and other approaches intended to contain costs while maintaining high-quality representation.

---

[1] For the research and writing of this report, the Judicial Conference Committee on Defender Services and the Administrative Office of the U.S. Courts thank Jon Gould, J.D., Ph.D., Director of the Center for Justice, Law, and Society at George Mason University.  Professor Gould was assisted by Lisa Greenman, staff attorney with the Federal Public Defender Organization for the District of Maryland.  Sylvia Fleming, Information Technology Specialist in the Office of Defender Services, compiled extensive quantitative data from the CJA payment system, and Holly Stevens, doctoral candidate at George Mason University, provided valuable technical and editorial assistance.

[2] The Spencer Report can be found at
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/RecommendationsCostQuality.aspx

On the other hand, case-related data in the Spencer Report, including the cost information frequently relied upon by defense counsel and the courts in assessing the reasonableness of individual case budgets, are substantially outdated. The Spencer Report examined cases from 1989 to 1997, the first years of the modern federal death penalty.[3] Only a limited number of cases had reached resolution in the trial courts by that time, and no case had proceeded through the appellate and post-conviction stages. In the years since, there have been significant changes in the way cases are charged, investigated, and litigated. As of the close of 2009, more than 450 federal death penalty prosecutions have been authorized, resulting in more than 200 federal death penalty trials involving about 250 defendants. Direct appeals for approximately 60 death sentence cases have been resolved or are pending, and approximately 30 capital post-conviction proceedings pursuant to 28 U.S.C. § 2255 have concluded or are underway.

For these reasons, the Administrative Office's Office of Defender Services undertook this re-examination of the cost, quality, and availability of defense representation in federal death penalty cases since the time of the Spencer Report, with research progressing in two phases. In the first phase, cost data on federal death penalty cases between 1998 and 2004, as well as data on prosecution trends from 1988 through 2007 were collected and analyzed. A preliminary report summarizing those data and employing statistical techniques to elucidate the factors that affect case cost was released in June of 2008. The second phase of research delved deeper into the quantitative findings and expanded upon these statistical results through interviews and other qualitative research techniques to understand the effect these factors may have on the cost,

---

[3] Congress revived the federal death penalty in 1988, when it authorized capital punishment for the narrow category of "drug kingpin" murders. 21 U.S.C. § 848, *codifying* Pub. L. 100-690, 102 Stat. 4382 (1988). In 1994, Congress passed the Federal Death Penalty Act, which expanded the number of federal crimes punishable by death to approximately 50. 18 U.S.C. §§ 3591-3598, *codifying* Pub L. 103-322, 108 Stat. 1959 (1994).

2

quality, and availability of defense representation in federal death penalty cases. A basic familiarity with the elements of a federal death penalty case is presumed here. An introduction to that material can be found in the Spencer Report. See Footnote 2, supra.

Drawing on both phases of research, this final report presents information on the authorization, defense, and management of federal capital cases.[4] In succeeding sections, data are offered on the changing frequency and geography of capital authorizations, the costs and comparative expenses of defending capital cases, and the various factors involved in a capital representation. Additional sections address the impressions and concerns of federal judges who have presided over these matters and lawyers who have defended the accused, examining in more depth the availability and quality of capital defense in the federal system. With these findings as a guide, the report concludes by re-affirming the Spencer Report's recommendations and, as appropriate, providing updated commentary.

## II. Decisions by the Department of Justice to Seek the Death Penalty: Their Implications for Defense Costs

### A. Defendants Subject to Capital Prosecution: Potential Death Penalty Cases, 1989-2009

Although this study focuses primarily on what happens after the Attorney General has authorized capital prosecution for a defendant ("authorized" cases), both the total number of potential capital prosecutions ("death-eligible" cases) and the process by which the Department of Justice chooses from among those cases those individual defendants against whom it will seek the death penalty (the death penalty "authorization" process) have profound consequences for

---

[4] This report incorporates the findings published in the June 2008 preliminary report on Phase I of the research and therefore supersedes that report. In addition, data for the years 2008 and 2009 was added to the analysis of prosecution trends.

defense representation.[5]  It is therefore necessary to develop an understanding of patterns and trends.[6]

As previously noted, in 1994 Congress expanded the number of offenses punishable by death to approximately 50.  As a result, in the second half of the 1990s the number of death-eligible federal capital defendants surged.  According to the Federal Death Penalty Resource Counsel Project, which monitors federal prosecutions for the Defender Services program, there were 26 death-eligible defendants in 1993, 63 in 1994, and then upwards of 150 in almost every subsequent year. [7]

Figure 1 illustrates this trend, showing, by year of indictment, the number of federal defendants charged with offenses punishable by death between 1989 and 2009.[8]  These numbers should be viewed as a good estimate, but not a precise count of each and every such case.

---

[5] The number of such "death-eligible" prosecutions affects the availability of qualified capital defense attorneys and the cost of representation because, pursuant to 18 U.S.C. §3005, any defendant charged with an offense punishable by death must be appointed two counsel, at least one of whom has special qualifications, who are paid, pursuant to 18 U.S.C. § 3599, at the higher hourly rate applicable to death penalty cases.  Unless and until the Department of Justice notifies the court that it will not seek the death penalty against the defendant, these appointments remain in effect and the increased rate of compensation for both counsel applies.  Since a significant portion of costs in capital defense relate to developing mitigation evidence in preparation for a separate sentencing trial, these costs similarly continue to accrue until the government decides not to seek the death penalty.

[6] In this report, the term "death-eligible" refers to a case that is expected to be or already has been filed in federal court and in which at least one count of the indictment alleges or is expected to allege an offense for which the death penalty is a possible punishment.  It is essential to note that such federal death-eligible cases do not constitute the entire universe of "potential" federal death penalty prosecutions.  Rather, these death-eligible federal cases are themselves the result of a selection process.  As a jurisdictional matter, most federal death penalty cases could be prosecuted in either federal court or state court.  Federal authorities, often in consultation with state law enforcement agencies, determine whether and where to bring the prosecution, a decision that may turn on any one of a number of factors.  This research has found no source from which the number of all such potential federal death penalty cases can readily be ascertained.

[7] The Federal Death Penalty Resource Counsel Project, established by the Administrative Office's Office of Defender Services, provides training and advice regarding trial issues to appointed counsel and the courts.  (See infra, pages 61-63.)  It is one of three Death Penalty Resource Counsel Projects referred to throughout this report as "Resource Counsel" or "the Resource Counsel Projects."  The Federal Capital Appellate Resource Counsel Project and the Federal Capital Habeas Project provide similar support for cases on appeal, and in post-conviction cases pursuant to 28 U.S.C. § 2255, respectively.

[8] The Federal Death Penalty Resource Counsel Project provided the data in Figures 1 through 7.

4



**Figure 1**

**"Death-Eligible" Federal Capital Defendants, 1989- 2009, by Calendar Year of Indictment**



**B.      The Attorney General's Decision-Making and How It Has Changed[9]**

As indicated in footnote 6, supra, it has not been possible to examine in this research the universe of all cases in which federal capital prosecution is an option.  However, once the government has determined that it will charge a defendant with a death-eligible offense in federal court and has obtained an indictment, it must decide whether or not it will seek the death penalty for the defendant.  This decision and the process by which it is made have significant cost

_____

[9] We note that as this report was completed in 2010, the Department of Justice was engaged in a review of its authorization procedures.

5

consequences. As described in Section IV.A. (pp. 24-26) of this report, cases in which pursuit of the death penalty was authorized were substantially more costly to defend than those not authorized. In addition, authorized cases that went to trial were significantly more expensive than those resolved with a guilty plea.

The Department of Justice does not permit a federal prosecutor to seek the death penalty for a defendant unless specifically authorized to do so by the Attorney General of the United States.[10] Prior to 1995, a local prosecutor was required to present a death-eligible case to the Attorney General only if he sought permission for a capital prosecution. Because the Attorney General had no formal mechanism to learn of death-eligible defendants, there was little possibility that the Attorney General would require a local prosecutor to seek the death penalty where the United States Attorney did not wish to do so. That is, if local federal prosecutors wished to seek the death penalty, the Attorney General could authorize it or not. But the Attorney General would not know of, and thus would not authorize, a capital prosecution if the local prosecutor made no request. Regardless of whether the death penalty was authorized, the U.S. Attorney's Office retained full discretion as to the ultimate disposition of the case. A plea agreement could be negotiated between the parties without further involvement by the Attorney General.

Beginning in 1995, Attorney General Janet Reno promulgated a formal protocol that centralized death penalty decision-making and required Attorney General review of *all* death-eligible cases.[11] This increased the possibility that capital prosecutions would be pursued in cases in which they were not requested by local prosecutors. Once the death penalty was

---

[10] U.S. Attorney's Manual, Title 9-10.000**.**

[11] Id.

authorized, however, the local U.S. Attorney still had the discretion to negotiate a plea bargain. In practice, according to the Federal Death Penalty Resource Counsel, Attorney General Reno rarely exercised her authority to overrule a U.S. Attorney's recommendation against the death penalty. When she did, each such case was ultimately resolved through a negotiated plea agreement resulting in a sentence other than death. These plea agreements were facilitated by the previously described policy that vested decision-making authority respecting plea bargains in the local U.S. Attorney's Office.

Death penalty decision-making changed again in 2001. The authorization decisions of the next Attorney General, John Ashcroft, were less deferential to local prosecutors, and the number of capital prosecutions authorized without the recommendation of the local U.S. Attorney increased substantially.[12] Attorney General Ashcroft also instituted a formal policy requiring approval from his office before an authorized case could be settled by plea agreement. These new policies and practices had significant impact. Over time, proportionally fewer cases reached a negotiated resolution and a greater proportion of cases went to trial.

Figure 2 (p. 8) reflects the number of defendants for whom the Attorney General authorized a capital prosecution each year between 1989 and 2009, a total of 465. The pattern of prosecutions in Figure 2 matches the trend in death-eligible offenses found in Figure 1 (p. 5), with cases rising significantly following passage of the 1994 Federal Death Penalty Act and then remaining at or above the 1995 level through 2007. Interestingly, the number of cases

---

[12] According to data compiled by the Federal Death Penalty Resource Counsel Project, Attorney General Reno required a death penalty prosecution without a request for permission from the local prosecutors 14 percent of the time (26 of 182 authorization decisions) and Attorney General Ashcroft did so 30 percent of the time (42 of 139 authorization decisions).

authorized annually by the Department of Justice has varied from 2002 through 2009, rising in 2003 and 2006 and dropping thereafter.[13]

**Figure 2**
**U.S. Department of Justice Capital Authorizations, 1989-2009,**
**by Year of Authorization**



### C.    Resolution of Authorized Cases

By the end of 2009, 262 authorized defendants had been tried.[14]  Figure 3 (p. 9) shows the number who went to trial each year between 1989 and 2009.  There was a total of 204 trials

_____

[13] As a point of clarification, Figure 2 does not reflect the total number of authorized federal death penalty cases pending trial in the courts each year, but rather the number of times the Department of Justice authorized a new capital prosecution.

for these 262 defendants, reflecting the fact that some trials involved more than one capital

defendant.[15]

**Figure 3**

**Number of Federal Capital Defendants Tried, 1989-2009, by Calendar Year**



---

[14] The vast majority of these defendants proceeded through both guilt and penalty phases, although in some instances a two-phase capital trial was not completed (e.g., the guilt phase verdict acquitted the defendant of the capital charge), and in others the case was resolved in another fashion (e.g., after trial commenced, there was a negotiated guilty plea to a sentence other than death or the death penalty authorization was withdrawn). Cases are assigned to the calendar year in which trial began.

[15] A chart showing both the number of capital trials and the number of defendants tried by calendar year is provided in Appendix B (p. 125).

The number of capital trials rose at a relatively consistent rate between 1989 and 2007, even while the number of death penalty prosecutions authorized by the Attorney General varied. Stated differently, regardless of the number of federal capital prosecutions authorized, proportionally fewer authorized defendants each year resolved their cases through pretrial guilty pleas, and a greater proportion went to trial.

Among the authorized cases that proceeded to trial, approximately one quarter ended with the defendant being sentenced to death. Through the end of 2009, 68 of the 262 capital defendants who proceeded to trial were sentenced to death.[16]  Figure 4 (p. 11) shows the number of federal death sentences returned each year from 1989 through 2009, and Table 1 (p. 12) provides summary data. A chart reflecting the number of defendants under sentence of death as of March 2010, and the states and federal circuits in which their cases were tried, is provided in Appendix B (p. 126-27).

---

[16] Among the 463 defendants for whom capital prosecution has been authorized, the cases of many of those authorized later in the time period are still pending. Of the 262 that went to trial, two defendants were sentenced to death twice, the second death sentence following an appellate reversal and retrial. For purposes of this report, each death sentence is recorded.

**Figure 4**

**Number of Federal Death Sentences, 1989-2009, by Calendar Year**



**Table 1**
**Federal Death Penalty Prosecutions, 1989-2009**

| | |
|---|---|
| Defendants Authorized | 463 |
| Capital Trials | 204 |
| Capital Defendants Tried | 262 |
| Defendants Sentenced to Death | 68[17] |
| Death Verdicts as a Percentage of Capital Defendants Tried | 26% |

## D.      Geographic Distribution of Authorized Cases

The geography of the federal death penalty has changed as well.  In the period analyzed in the Spencer Report, just after the federal death penalty was reinstated, federal capital prosecutions clustered mainly in states with active state court death penalty prosecutions, such as Texas, Virginia, Missouri, and Georgia.  Subsequently, however, the Department of Justice began authorizing cases more broadly, explaining that it sought to establish national consistency and eliminate geographic disparities.[18]  Thus, the proportion of prosecutions brought in jurisdictions with little or no death penalty experience has increased.[19]  Figure 5 illustrates this

---

[17] This number includes two death sentences that were imposed by a jury but not imposed by the court because a new trial motion was granted.

[18] "[T]he goal of the Department's death penalty review and decision-making process is nationwide consistency in the fair and even-handed application of federal capital sentencing laws in appropriate cases, irrespective of geography or local predisposition for or against the death penalty."  Statement of Barry Sabin, Dep. Ass't Att'y Gen. of the United States.  *Oversight of the Federal Death Penalty*: *Hearing before the Senate Committee on the Judiciary,* 110th Cong. (2007).

[19] For example, in Puerto Rico, where a comparatively large number of federal capital prosecutions have been authorized, there is a constitutional prohibition against the death penalty.  The District of Columbia has rejected by referendum an effort to establish a local death penalty.  Additional non-death penalty states where federal capital prosecutions have been authorized include Iowa, Michigan, West Virginia, Vermont, and Massachusetts. *See also*, Rory K. Little, *Good Enough for Government Work?  The Tension Between Uniformity and Differing Regional Values in Administering the Federal Death Penalty*, 14 Fed. Sentencing Rep. 7 (2001); Benjamin Weiser & William Glaberson, *Ashcroft Pushes Executions in More Cases in New York*, N.Y. Times, Feb. 6, 2003, at A1.

trend. In the first decade of the federal death penalty, cases were authorized in each of the 12 federal circuits, although the distribution was uneven. The Fourth Circuit had the most authorized cases, while the Seventh Circuit had the fewest.

**Figure 5**
**Number of Authorized Federal Capital Defendants, 1989-1997 and 1998-2009, by Circuit**



A decade later, the Fourth Circuit still had the largest federal capital caseload – about one-fifth of all federal death penalty cases brought nationwide – but the proportional shares among the circuits changed significantly. Whereas the Ninth Circuit had only 4 percent of federal capital cases between 1989 and 1997, its proportion increased more than threefold to 14

percent of the national docket in 1998-2009.  Similarly, the Second Circuit's percentage rose from 8.5 to 12.3 percent of the national capital caseload, while the Fifth, Eleventh, and DC Circuits represented a smaller share of the expanded national docket.  In the period between 1998 and 2009, the number of authorized federal capital prosecutions increased in each circuit except the Tenth.

These dynamics are displayed at the state level in Figures 6 and 7 (p. 15 and 16). Although Figure 5 (p. 13) includes all authorized cases, both pleas and trials, Figures 6 and 7 portray the geographic distribution of the trial cases, comparing the period of the present study with the years addressed in the Spencer Report.  As these maps illustrate, the Department of Justice has brought the federal death penalty to a larger group of states in the past decade, resulting in more cases being tried in jurisdictions where non-federal death penalty prosecutions are rare or non-existent.



**Figure 6. Number of Federal Defendants Authorized for Capital Prosecution, by State, 1989 -1997**

**Number of Defendants**

- 1
- 2 -3
- 4 - 5
- 6 - 9
- 10 - 15
- 16+

| State | AK | AL | AR | CA | CO | DC | FL | GA | IA | IL | KS | LA | MD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Def. | 1 | 3 | 5 | 5 | 2 | 7 | 5 | 4 | 2 | 4 | | 5 | 3 |
| State | MI | MO | NC | NJ | NM | NY | OK | PA | PR | TN | TX | VA | |
| # Def. | 8 | 8 | 5 | 2 | 6 | 12 | 3 | 5 | 8 | 2 | 11 | 21 | |



**Figure 7. Number of Federal Defendants Authorized for Capital Prosecution, by State, 1998 –2009**

| State | AK | AL | AR | AZ | CA | CO | CT | DC | FL | GA | HI | ID | IA | IL | IN | KS | KY | LA | MA |
|-------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| # Def. | 2 | 3 | 2 | 6 | 36 | 4 | 4 | 10 | 10 | 5 | 2 | 1 | 2 | 8 | 6 | 4 | 4 | 5 | 4 |

| State | MD | MI | MO | MS | NC | ND | NJ | NM | NY | OH | OK | PA | PR | SC | TN | TX | VA | VT | WV |
|-------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| # Def. | 23 | 11 | 18 | 3 | 5 | 2 | 1 | 2 | 32 | 6 | 2 | 14 | 14 | 3 | 13 | 17 | 31 | 3 | 7 |

III.     **Costs of Defending Federal Capital Cases**

As later sections of this report explain, changes initiated by Congress and the Department of Justice have had profound effects on the cost of defending federal capital cases.  The 1994 Federal Death Penalty Act vastly increased the number of capital-eligible crimes, but the cost impact could not be fully captured at the time of the Spencer Report.  In addition, in the past decade, the Department of Justice has authorized capital prosecutions more frequently, and more often without the request (or even against the expressed recommendation) of local prosecutors, than previously.  More of these cases are being brought in jurisdictions where non-federal death penalty prosecutions are rare or non-existent, and a greater percentage of federal capital prosecutions are proceeding to trial rather than being settled by plea agreement.

A.     **Cases Examined**

To analyze the cost of defense representation in authorized federal death penalty cases, a database of such cases was developed.  As with the Spencer Report, research focused on panel attorney appointments – those cases in which a capital defendant is represented by private attorneys appointed pursuant to the Criminal Justice Act (CJA), whose compensation by the federal courts is recorded in the CJA payment system.  All federal death penalty representations that began between 1998 and 2004 and concluded in the district court by the end of 2004 were examined, and almost all were included in the database.[20]

Excluded from the database were those very few cases in which representation was provided, in whole or in part, by privately retained counsel, or by counsel whose services were

---

[20] This time period immediately follows the years covered by the Spencer Report and represents a span in which the maximum rate of compensation for appointed defense counsel remained constant at $125 per hour (the same hourly rate that applied during the Spencer Report).  In a few cases, payments were made for services performed after December 31, 2004.  Because the amounts were small and comparatively insignificant, these cases were retained in the research. Those few cases with incomplete data were excluded from the analysis.

provided *pro bono,* without compensation.  For purposes of cost analysis, cases in which representation was provided, in whole or in part, by a federal defender organization were excluded because the cost of representation is not captured by the CJA payment system.[21]  These federal defender cases were identified, coded, and made part of the database for other purposes, however.  Federal defender organizations were involved in a higher proportion of cases during the period of this study than during the period of the Spencer Report.

Also excluded from the database were authorized cases that did not proceed as capital prosecutions through ultimate disposition, either because the death penalty authorization was withdrawn by the Department of Justice or the notice of intent to seek the death penalty was dismissed.[22]  In both sets of circumstances, the representation then would have gone forward as a non-capital matter and thus costs could not reasonably be compared with those in cases that proceeded to conclusion as capital matters.  However, as with the Spencer Report, a companion group of death-eligible, non-authorized cases was drawn in order to examine the increased cost of representation when the Department of Justice authorizes a death penalty prosecution.

All reported data refer to the defense of an individual defendant in a single case, or as the CJA payment system uses the term, a "representation."  When the term "case" is used (e.g., "median case cost"), it refers to the representation of a single defendant who may or may not have been among multiple defendants joined in an indictment.

---

[21] The CJA Panel Attorney Payment System is a judiciary-wide application  in which all attorney and expert service provider vouchers for representation-related work performed are recorded, processed and paid.

[22] Authorization might be withdrawn if, for example, new information relevant to guilt or punishment convinced prosecutors and the Attorney General that death would not be an appropriate sanction.  Notice of intent to seek the death penalty might be dismissed upon the order of a judge for a legal reason, such as having been filed too close to an already established trial date, or because the defendant was diagnosed with mental retardation.  Cases in which the defendant entered a plea of guilty to the death-eligible charge in exchange for the prosecution agreeing to a life sentence and dismissing the death penalty request were retained in the research.

Figure 8 illustrates the dataset of federal death-eligible cases examined. For the period 1998-2004, the study examined 214 cases, of which 119 were authorized as capital prosecutions. Of these, 95 were CJA panel attorney representations and 24 involved representation by federal defenders. Thirty-three of the 95 authorized panel cases were resolved by plea agreement, and 62 were tried. The costs from the 95 authorized panel cases were compared with the costs in 95 death-eligible but not authorized CJA panel attorney cases.[23]

**Figure 8**

**Federal Death-Eligible Cases Studied, 1998-2004**



---

[23] The non-authorized cases were chosen at random from a list maintained by the Federal Death Penalty Resource Counsel Project. Because these 95 cases were selected for comparison of costs with the 95 authorized CJA panel attorney cases, only representations that did not involve a federal defender organization were included.

19

### B.    Data Examined

This report analyzes the cost of federal death penalty representations and examines the factors that may influence case cost.  For each of the 95 CJA panel attorney representations reflected in Figure 8, more than 40 sets of data were collected and coded.  The list of recorded data is delineated in Appendix A (p. 123).  Initially, seven elements of case cost were coded from data collected from the CJA payment system.  These included:[24]

- Total case cost
- Cost of counsel
- Cost of experts
- Attorney hours
- In-court attorney hours
- Out-of-court attorney hours
- Cost of transcripts

These cost variables ("dependent variables") were matched against factors that may have influenced case cost ("independent variables").  The latter were collected from a variety of sources, including the CJA payment system, the electronic public access service that provides case and docket information from federal courts (PACER), and the Federal Death Penalty Resource Counsel Project.  In some cases, the attorneys of record were contacted to obtain necessary information.

Some of the independent variables are straightforward and easily understood:

- Defendant's name
- Circuit of prosecution
- District of prosecution
- State of prosecution
- Whether the case was resolved by trial or plea
- How the case concluded – whether acquittal, dismissal, or verdict of guilt

---

[24] "Total case cost" reflects the combined costs of counsel and experts (or, in CJA terminology, "services other than counsel"), but does not include transcript costs or certain travel costs that may be billed directly through the court rather than through CJA vouchers.  "Cost of transcripts" reflects payments to the official court reporter for producing a record of court proceedings.

- Defendant's sentence (if not acquitted or dismissed)
- Number of defendants named in the indictment

The remaining factors are more complex and are discussed in some detail in the paragraphs following this list. They include:

- Number of defense counsel
- Number of prosecutors
- Number of defendants
- Number of homicides alleged in the indictment
- Race, gender, and ethnicity of defendant and victims
- Involvement of victims in criminal activity
- Prosecution's allegation of "future dangerousness"
- Number of offenses alleged in the indictment
- Nature (magnitude) of offenses alleged in the indictment
- Case length
- Features of the Department of Justice's capital authorization process
- Experts utilized by the defense
- State history and experience with death penalty litigation

The number of attorneys who staffed each side of a case was noted. The recorded number reflects all lawyers whose appearance in the case, as reflected on PACER, lasted longer than 30 days. As required by 18 U.S.C. § 3005, in all cases, defendants were represented by at least two lawyers, and in some cases more lawyers entered appearances, either to substitute for or to supplement the two statutorily required counsel. These numbers do not reflect additional counsel, if any, permitted to assist appointed counsel for limited purposes. The number of prosecutors showed greater variability, ranging from one to as many as seven lawyers who entered an appearance and remained in the case for longer than 30 days.

The numbers of defendants and of charged homicides in each representation were coded. These data included the number of codefendants joined in the case, regardless of whether they were charged with a capital crime, as one measure reflecting the size of the case. Also recorded was the number of homicides attributed in the indictment to the defendant named in the representation, as an indicator of the scope of criminal responsibility for that defendant. (The

21

number of homicides alleged as "aggravating factors" in support of a death sentence was not included in this figure, as the data could not be easily verified.)  The race, ethnicity, and gender of victims and defendants, as well as whether victims were themselves connected to criminal activities, were recorded.  Where prosecutors alleged "future dangerousness" of the defendant as an aggravating factor in support of the death penalty, this was noted.

The total number of indicted offenses in each case, whether charged against that particular capital defendant or a codefendant, was recorded.  In most cases, the capital defendant faced the greatest number of charges, but even when he did not, this variable was another measure of the size and scope of the case.  A category was created to note three types of indictments that are generally complicated and multifaceted, indicating case magnitude: continuing criminal enterprise (CCE), racketeering (RICO), and terrorism.

Several measures reflecting the length of a case were recorded.  The date of the first appointment of counsel was noted as a "start date."  The date on which the government filed notice of its decision to authorize capital prosecution was recorded, as was the date of conclusion in the district court, whether by acquittal, dismissal, or sentence.  The data also indicate which of two Attorneys General authorized the capital prosecution (the study period encompassed part of the tenure of Attorney General Reno and the full tenure of Attorney General Ashcroft).

Several variables were collected to reflect the use of experts in each representation.  The term "experts" is used here, as in the Spencer Report, to embrace the "services other than counsel" that are authorized under the Criminal Justice Act.  18 U.S.C. § 3006A(e); 18 U.S.C. § 3599(f).  Thus, in addition to professionals traditionally thought of as experts, such as doctors or scientists, the term includes fact investigators, paralegal assistants, reproduction services, as well as fingerprint examiners, pathologists, mitigation specialists, jury consultants, etc.  Information

was drawn from the CJA payment system reflecting notations contained in the form CJA 31 that defense counsel use when itemizing claims for such expenditures.  The CJA 31 provides 24 potential categories of services other than counsel that may be used in a representation.[25]  The data include these itemized costs from each case.

Finally, data were collected to reflect the history and experience of states with the death penalty.  These variables are used later to examine the relationship between state court capital practice and case cost in federal capital prosecutions.  Data were collected indicating whether there was a state death penalty statute in the jurisdiction where the federal prosecution was brought; the number of years following *Furman v. Georgia*[26] before that state reinstituted the death penalty; the number of years following *Gregg v. Georgia*[27] before the state executed a defendant;[28] the number of defendants on that state's death row as a percentage of its population; the number of executions in the state post-*Gregg* as a percentage of its population; and the size of the state's death row as related to its crime rate.

---

[25] The CJA 31 was revised to capture these 24 categories in 1995, and includes a category designated as "other," for types of services not identified.  Prior to that, only 12 categories (including "other") were available on the form.

[26] *Furman v. Georgia*, 408 U.S. 238 (1972), held execution to be cruel and unusual punishment under the Eighth Amendment based on its randomness, effectively bringing capital punishment to a halt while states re-evaluated their sentencing procedures.

[27] *Gregg v. Georgia,* 428 U.S. 153 (1976), upheld the constitutionality of capital sentencing statutes drafted to comply with *Furman* by providing for guided decision-making.

[28] In states that have not reinstituted the death penalty, these figures reflect, respectively, the time between *Furman* and the present and the time between *Gregg* and the present.

**IV.    Findings**

    **A.    Total Case Costs**

The costs of defending federal death-eligible cases spanned a wide range between 1998 and 2004.  As Table 2 (p. 25) indicates, the cost of death-eligible, non-authorized cases ranged from a high of $681,556 to a low of $1,613.  The median cost was $44,809.  Because the median reflects the middle case of a group, it is generally a better measure of a "typical" case than an average, or mean cost figure.[29]  Nevertheless, Table 2 also provides the mean cost, which at $76,665 indicates that costs varied more extensively in cases above the median than in cases below the median (or, put another way, the highest cost cases were further from the median than were the lowest cost cases).

Authorized cases are substantially more expensive than non-authorized cases.  The median amount of $353,185 for authorized cases in Table 2 (p. 25) indicates that cases in which a capital prosecution was authorized cost almost eight times as much as those death-eligible cases that were not authorized.  (This median figure reflects all authorized cases, both those resolved by a guilty plea and those that went to trial.  Trial cases are significantly more costly, as explained below.)  Authorized cases ranged in cost from a high of $1,788,246 to a low of $26,526.  As this wide range from high to low is present in the non-authorized cases as well, it probably reflects (among other things) an inherently broad range of litigation complexity that exists in all death-eligible cases, authorized and non-authorized.  Even so, there is no mistaking

---

[29] The median reflects the middle unit in a group of cases.  In a collection of 101 cases, for example, the 51st case would be the median.  The mean, or average, adds costs from all of the cases and divides by the number of cases.

the vast increase in cost when the Department of Justice decides to authorize a capital prosecution.[30]

As Table 2 shows, the median cost for authorized cases that were tried ($465,602) is 2.3 times greater than for those that were pled ($200,933). It is not surprising that trials would generally be more costly than pleas. Nor is it surprising that, in the context of capital litigation, a case that is resolved with a guilty plea is, nevertheless, resource intensive, as Figure 9 (p. 26) illustrates. In order to reach disposition in a capital case, defense counsel must thoroughly investigate and prepare for trial. Figure 9 contains two plea cases that are "outliers" by virtue of their high cost. If these are removed from the analysis, the range of plea costs narrows considerably.

**Table 2**

**Total Cost for Defense Representation in Federal Capital Cases, 1998-2004**

| Type of Case | Median | Mean | High | Low |
|---|---|---|---|---|
| Not Authorized | $44,809 | $76,665 | $681,556 | $1,613 |
| Authorized | $353,185 | $491,905 | $1,788,246 | $26,526 |
| *Trials* | $465,602 | $620,932 | $1,788,246 | $67,366 |
| *Pleas* | $200,933 | $245,946 | $1,174,942 | $26,526 |

---

[30] Appendix C (p. 128) summarizes the differences in various case costs between authorized and non-authorized capital cases.

**Figure 9**
**Cost Variance in Authorized Capital Cases, Trials vs. Pleas (1998-2004)**



### B.    Comparison to the Spencer Report

Case costs have changed substantially since the period covered by the Spencer Report. As Table 3 (p. 26) shows, costs have risen for each category of death-eligible cases, whether authorized or not, trials or pleas.[31]   Unfortunately, it is not possible to offer a direct comparison between current data and those compiled in the Spencer Report.  Although the Spencer Report published mean data on case cost, it excluded from its analysis some exceptional cases.  The Spencer Report did not include certain cases that had atypically high costs (e.g., the Oklahoma City bombing cases), and included cases that would have been excluded from the present study because they had no penalty phase trial (for example, the jury's guilt phase verdict precluded the death penalty, or a guilty plea to a non-death sentence was entered before verdict).

---

[31] This report is necessarily retrospective, comparing costs from 1998-2004 to those from 1989-1997.  Appendix D (p. 129) provides an estimate for the costs of capital defense in 2010 dollars.

26

It can be stated, however, that costs have risen across all categories of cases and that they have risen more considerably among authorized cases than non-authorized cases, and in trials more than in pleas.  Indeed, the most significant change in case cost between the time of the Spencer Report and the current update is that the cost of trials has increased substantially.  Not only did a higher percentage of federal capital cases proceed to trial between 1998 and 2004 than in the period covered by the Spencer Report (Figure 3, p. 9), but the cost of those trials was also higher (Table 3).  Later sections of this report offer likely explanations for these developments.

**Table 3**
**Total Case Cost – Spencer Report Compared to Update**

| Type of Case | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| **Not Authorized** | $76,665 $44,809 | $55,773 |
| **Authorized** | $491,905 $353,185 | $218,113 |
| ***Trials*** | $620,932 $465,602 | $269,139 |
| ***Pleas*** | $245,946 $200,933 | $192,333 |

Some of the increase in total case costs is probably attributable to a rising Consumer Price Index (CPI) between the time of the Spencer Report and the present update.  Over the period of this update, the CPI rose at an annual rate of 2.45 percent.  Inflation does not explain the entire rise in case costs since the time of the Spencer Report, nor does it distinguish between rates for authorized and non-authorized cases or pleas and trials, but the CPI does suggest that some portion of rising costs is due to forces outside of litigation.  Although the maximum hourly

rate for defense counsel remained fixed between both periods, expert expenses, attorney travel, and the cost of associates (if paid less than $125) and paralegals were subject to inflation.[32]

### C.    Attorney Costs

Defense counsel's time, both in- and out-of-court, and the use of experts on behalf of the defense influence case cost.  Tables 4 through 8 present these findings from the current study, and (in all but Table 4) compare these data with those presented in the Spencer Report.  Table 4 provides data on attorney cost in the 1998-2004 cases. (It is not possible to compare total attorney cost from the most recent cases to those at the time of the Spencer Report because the earlier study did not separate these data as a portion of total costs.)    Similar to total case cost, the median expense for an attorney's time was significantly greater – 6.5 times more – in authorized cases than in death-eligible, non-authorized prosecutions.  Attorney cost in authorized cases was 2.8 times greater in trials than for pleas.

**Table 4**
**Attorney Cost – 1998-2004**

| Type of Case | Median | Mean |
|---|---|---|
|  |  |  |
| **Not Authorized** | $42,148 | $62,336 |
| **Authorized** | $273,901 | $363,776 |
| *Trials* | $352,530 | $462,037 |
| *Pleas* | $122,772 | $176,464 |

These same trends are reflected in Table 5 (p. 29), which presents the total attorney hours.  In death-eligible cases between 1998 and 2004, defense attorneys spent 4.6 times more

---

[32] As indicated on p.129, infra, the maximum hourly rate of compensation for appointed counsel during the period of this study was $125.  That rate has increased over the intervening years.  Since January 1, 2010, the maximum hourly rate has been $178.

hours on authorized than non-authorized cases (comparing medians), and 2.6 times more time on trials than on pleas for authorized cases. The fact that the ratio between authorized and non-authorized cases is greater in Table 4 (p. 28) than in Table 5 probably reflects the fact that, in most instances, attorneys are paid a lower hourly rate in death-eligible cases that are not authorized as capital prosecutions than in those cases that are authorized.[33] In addition, attorney cost includes certain travel and other expenses that do not correlate with hours, and these are presumably higher in authorized than in non-authorized matters.

**Table 5**
**Attorney Hours – Spencer Report Compared to Update**

| Type of Case | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| **Not Authorized** | 637 436 | 429 |
| **Authorized** | 2,815 2,014 | 1,464 |
| *Trials* | 3,557 2,746 | 1,889 |
| *Pleas* | 1,403 1,028 | 1,262 |

As previously mentioned, it is difficult to make a direct comparison to the Spencer data, which reflects adjusted mean costs and hours. Still, it is instructive to note that attorney hours have risen over time for each type of case, but much more significantly in authorized cases that go to trial. Whatever forces drive case cost – which this report addresses in a later section – they appear to influence attorney hours more extensively in authorized capital trials than in other representations.

---

[33] Guide § 630.30.20 identifies the factors a court should consider in deciding whether to reduce the hourly rate and/or number of counsel when the government decides not to seek the death penalty.

Tables 6 and 7 (p. 30) compare attorneys' time in- and out-of-court when representing death-eligible defendants.  Attorneys spent more time in- and out-of-court in authorized cases than in non-authorized matters and more in trials than pleas.  Moreover, attorney time has risen in all forms of representation from the time of the Spencer Report (even accounting for the hybrid quality of the Spencer data).  The data clearly show that the ratio of attorney time spent in-court to out-of-court is greater for trials than pleas.  In capital trials, defense counsel spent a median 353 hours in-court and 2,373 hours out-of-court.  In pleas, they spent a median 42 hours in-court and 992 hours out-of-court.

**Table 6**
**Attorney In-Court Hours – Spencer Report Compared to Update**

| Type of Case | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | 106 34 | 38 |
| Authorized | 401 306 | 231 |
| *Trials* | 537 353 | 409 |
| *Pleas* | 142 42 | 61 |

**Table 7**
**Attorney Out-of-Court Hours – Spencer Report Compared to Update**

| Type of Case | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | 531 350 | 391 |
| Authorized | 2,414 1,645 | 1,233 |
| *Trials* | 3,019 2,373 | 1,480 |
| *Pleas* | 1,261 992 | 1,201 |

### D.    Expert Costs

The use of experts has a substantial influence on case cost.  For purposes of this report, the term "experts" refers not only to expert witnesses but also to investigators and all service providers other than counsel.  As Table 8 (p. 31) indicates, experts were utilized in both authorized and non-authorized cases.  There is a significant difference, however, in the prevalence, and hence cost, of expert assistance between authorized and non-authorized cases.  Whereas the median for expert costs was $5,275 in non-authorized cases, it was $83,029 in authorized cases.  Further, experts were utilized more extensively in capital trials, where the median cost for experts was $101,592, than in pleas, where the median was $42,049.

Although the comparison between the Spencer Report and the present update is imperfect, Table 8 (p. 32) suggests expert costs have risen substantially in capital trials.  As discussed in Section V, this trend likely reflects, among other developments, counsel's increased emphasis on developing information about the defendant's background and life history, as required by U.S. Supreme Court cases such as *Wiggins v. Smith*, 539 U.S. 510 (2003).[34]  There has also been a significant increase in the investigation and presentation of scientific evidence and litigation that challenges such evidence.  The geographic shift in where federal capital prosecutions are authorized and the increase in the complexity of prosecutions also may influence the use and cost of experts.

---

[34] *Wiggins* discussed defense counsel's responsibility to conduct a full social history investigation of a capital defendant and cited the American Bar Association's standards as guidance as to what constitutes reasonable performance of counsel in a death penalty case.

**Table 8**
**Expert Costs – Spencer Report Compared to Update**

| Case Type | 1998-2004 Mean Median | Spencer Report Adjusted Mean Only |
|---|---|---|
| Not Authorized | $14,330 $5,275 | $10,094 |
| Authorized | $128,129 $83,029 | $51,889 |
| *Trials* | $158,895 $101,592 | $53,143 |
| *Pleas* | $69,482 $42,049 | $51,028 |

## E.       Transcript Costs

Finally, another contributor to the cost of defense representation is the expense of acquiring the transcript of district court proceedings.  These figures are not included in the data in Table 2 (p. 25) that report total case cost; [35] however their expense, especially in capital trials, is noteworthy, with a median cost per capital trial defendant of $10,269.  Table 9 (p. 33) presents data on transcript costs per representation, which show a sizeable difference between costs expended for transcripts in capital trials when compared to other proceedings.  It should be noted that transcript costs are incurred separately by each defendant in a case (as well as by the court and by the prosecution).  That the mean costs for non-authorized cases ($4,144) and capital pleas ($1,337) are substantially higher than the median costs in these cases ($210 and $82, respectively) indicates that there are some unusual cases in these categories that have substantially higher transcript costs than the other more "typical" cases.  By contrast, whereas

---

[35] Although transcripts of all pretrial and trial proceedings must be produced for an appeal, they are also typically ordered for counsel's use during the pendency of a case in the trial court, as verbatim records are relied upon for pleadings, examinations, and arguments.  Because some transcript costs reflected in the CJA payment system for the cases included in this analysis may have been incurred in connection with an appeal, while others were generated during the course of the trial representation, they were not included in the "total case costs."  Regardless of when in the process they are incurred, the costs of transcript production are an expense associated with capital trials.  It should be noted that in a co-defendant case, one defendant will pay the full rate for production of a transcript and other defendants will be charged the lower rate applicable to copies of that transcript.

some transcripts in capital trials cost more than the median case, the relative similarity between

mean and median costs ($16,487 versus $10,269) shows that most capital trials carry a

considerable transcript expense.

**Table 9**
**Transcript Cost Per Defendant, 1998-2004**

| Case Type | Median | Mean |
|-----------|--------|------|
| Not Authorized | $210 | $4,144 |
| Authorized | $5,223 | $11,274 |
| *Trials* | $10,269 | $16,487 |
| *Pleas* | $82 | $1,337 |

## V.     Explanations for and Predictors of Case Costs

### A.     Hypotheses

Numerous factors likely account for the increase in overall case costs in the years

following the Spencer Report. These explanations, which are complementary, include:

- <u>Inflation</u>. Some of the increase in case costs is likely related to inflation. The rate of inflation from 1998 to 2004 averaged approximately 2.45 percent annually, which over six years could compound to approximately 15 percent. Although the CJA hourly rate of $125 remained constant between the time of the Spencer Report and this update, all costs other than legal fees (including those of experts (including investigators and mitigation specialists), paralegals, associate counsel paid less than $125, travel, copying, technology, etc., were subject to inflation.

- <u>Differences in cases studied</u>. The collection of cases in the Spencer Report was constructed differently from the present study. For example, the Spencer Report excluded certain high cost cases, like the two representations arising out of the Oklahoma City bombing, and included certain cases that did not proceed through a penalty phase trial, either because the government withdrew its request for the death penalty or because the defendants were acquitted of the capital charge. (See Spencer Report at 8, n. 13.) For those reasons, costs reported in the Spencer study may have appeared lower than they would have using the current methodology.

33

- **Expanded areas of litigation.** Defense practice has continued to evolve and become more sophisticated since the first decade of the federal death penalty. For example, both the prosecution and the defense now make greater use of scientific evidence and experts and mount more extensive challenges to such evidence. The issue of the defendant's future dangerousness within the Federal Bureau of Prisons is one such area.

- **Pretrial litigation of mental health issues.** As a result of changes in case law and new Federal Rule of Criminal Procedure 12.2, which governs mental health evaluations of the defendant, both the prosecution and defense now engage in more extensive pre-trial litigation over mental health issues. In addition to more time being spent on these issues, the hourly rate paid to mental health experts appears to have risen significantly since the time of the Spencer Report. See pages 72-73.

- **Higher expectations for performance of defense counsel in death penalty cases.** In recent years, standards of practice for providing constitutionally adequate defense representation have been clarified, particularly with respect to the duties of counsel vis-a-vis investigating and presenting evidence in mitigation of sentence. See *Wiggins v. Smith*, 539 U.S. 510 (2003), and the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 31 Hofstra L. Rev. 913 (2003) and *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 Hofstra L. Rev. 677 (2008).

- **Geographic shift.** As discussed earlier in this report, the Department of Justice has changed its charging practices and authorized more capital prosecutions in areas where there is little or no capital punishment under state law and therefore there are few or no local capital defense practitioners. Disparities between local practice and federal policy may well raise the cost of litigation. A lack of capital experience might require a greater investment of time, for example. In addition, a higher proportion of cases being tried in jurisdictions known for more extensive advocacy by both prosecution and defense, as discussed below (pp. 50-56), would increase cost.

- **Changing nature of capital prosecutions.** Data suggest that a greater proportion of the 1998 – 2004 cases involve highly complex issues at the guilt and penalty phases than at the time of the Spencer Report, requiring more extensive defense work. This hypothesis is supported by the increased number of in-court attorney hours, indicating that substantially more court time is being required for cases to reach resolution. This hypothesis suggests that a greater proportion of the overall number of prosecutions contains features that increase litigation costs. For example, many cases in the current study include all or some of the following features:

  - Multiple codefendants
  - Multiple homicides (in the indictment and/or as aggravating factors alleged in support of the death penalty)
  - Complex offenses (such as CCE, RICO, and terrorism allegations that involve numerous instances of conduct over an extended period of time and in multiple locations, including outside the United States)

- Foreign national and/or non-English speaking defendants, family members, or victims
- Voluminous discovery

## B. Use of Experts

The research connects several of the factors above to the cost of defending federal capital cases.  As Table 8 (p. 32) illustrates, expert costs were higher during the period studied than during the period covered by the Spencer Report, but constituted the same percentage of overall case costs.  Spencer Report at 10-11.   The cost of "experts" here references the costs associated not just with "expert witnesses" but with all services other than those of counsel, including investigators, mitigation specialists, and numerous others whose efforts are required in a capital representation.  As Figures 10 and 11 (pp. 36-37) demonstrate, almost 60 percent of expert expenses were attributable to two types of experts: investigators and mitigation specialists.  The categories "investigator" and "mitigation specialist" are imprecise, however, because in some cases mitigation investigation was recorded under the generic heading "investigator" on the CJA 31.[36]   Expenses for mitigation specialists could not be broken out for the Spencer Report analysis – the CJA payment system did not identify such costs at the time – but as the courts have come to authorize additional work for this important part of capital representations, mitigation specialists have become a significant portion (25 percent) of expert expenses.  So too, investigative expenses represented almost one-third of total expert costs, likely reflecting the additional work necessary to investigate an increasingly complex set of capital charges, many involving multiple jurisdictions, or defendants or witnesses who reside in other countries.

---

[36] Services provided pursuant to the Criminal Justice Act other than those of defense counsel are recorded on a CJA Form 31, which is submitted to the court for authorization and payment.  Counsel services are recorded on a CJA Form 30.

Interestingly, while the total cost of expert expenses in capital trials is different from pleas, the proportions are similar.  Regardless of whether it was resolved by trial or plea, a capital case required the same type of preparation, including the use of experts.  Table 8 (p. 31) indicates that total expert expenses were almost 2.5 times greater in trials than pleas, but Figures 10 and 11 (pp. 36-37) demonstrate that in both types of authorized cases, expenditures for investigation and mitigation experts each accounted for about 30 percent of expert costs.

**Figure 10**
**Division of Expert Costs for Trial Cases**



**Figure 11**
**Division of Expert Costs for Plea Cases**



C.     Case Characteristics

Quantitative research was conducted to examine the relationship of case cost with several factors that reflect particular aspects of a representation's complexity.[37]  Initially, it is important to note those factors that did not predict case cost.  Neither the defendant's nor the victim's race or gender affected the cost of federal capital defense representation.[38]  The same was true for whether or not the victim was connected to the criminal activity of the defendant.  Finally, the prosecution's allegation of future dangerousness did not predict case cost.

---

[37] The variables were tested in bivariate, or one-to-one, relationships, assessing the influence of a single variable on total case costs.

[38] Interestingly, the interplay between a defendant's and a victim's demographics (e.g., a cross-racial homicide) influenced case costs, but the small number of cases analyzed was insufficient to achieve statistical significance.  In panel appointments, median total case cost for white defendants tried for capital offenses against white female victims was $631,382.  By contrast, median total case costs for non-white defendants tried for capital offenses against white female victims were $248,477.  A larger number of cases or qualitative research could help to elucidate the nature of this relationship.

The factors that did predict increased case costs, whether in capital trials or pleas, included:

- Number of offenses
- Number of defendants
- Number of victims
- Offense complexity
- Number of defense counsel
- Number of prosecutors

Most of these influences make intuitive sense and are shown in Table 10 (p. 39).  As the number of offenses, defendants, and victims rises in a case, so do the number of facts and circumstances that counsel must investigate.  These require additional attorney and expert time.  Similarly, while every death penalty case is complex to defend, certain offenses – in particular CCE, RICO, and terrorism – present multi-faceted and wide-ranging fact patterns that require additional investigators, attorney time, and expert consultation.

It may also seem apparent that the number of defense counsel is related to case cost: generally, the greater the number of defense attorneys involved, the higher the cost.  But as data from both the Spencer Report and this update show, the number of prosecutors is an even stronger predictor of case cost, at least in trials.  The number of prosecutors can be an effective signal for the complexity of a case – presumably the Department of Justice assigns additional prosecutors to those cases that are most involved and will require the greatest effort.  In addition, defense teams also require more attorney time and expert assistance in an effort to keep pace with the prosecution's presentation of evidence, as reflected by its resources.

Table 10 (p.39) provides additional details on the relationships between these factors and case cost, displaying all variables tested that had a statistically significant (i.e., reliable) relationship to case cost.  Case length is positively correlated with case cost –  the longer a case

38

lasts the more expensive it is.[39]  Conversely, a state's "capital culture" – its history and

experience with the death penalty – was negatively associated with trial costs.  Federal capital

trials are more expensive when brought in districts where there is no state death penalty, or

where the state has neither sentenced to death nor executed many capital defendants.  This

phenomenon is discussed further in section V.E.2.c. (pp. 50-56) below.

**Table 10**
**Factors that Predict Increased Case Cost – Bivariate Relationships**

| Factor | Case Cost Influenced | Bivariate Correlation |
|---|---|---|
| Case Length | Trial | .487 |
| Case Length | Plea | .428 |
| Number of Defendants | Trial | .244 |
| Number of Defendants | Plea | .748 |
| Number of Victims | Trial | .466 |
| Number of Victims | Plea | .557 |
| Number of Offenses | Trial | .530 |
| Number of Offenses | Plea | .414 |
| Number of Prosecutors | Trial | .612 |
| Number of Defense Counsel | Trial | .480 |
| Offense Type | Trial | .356 |
| State Capital Culture | Trial | -.370 |

Note: All relationships statistically significant at .05 level.

### D.    The Attorney General Making the Authorization Decision

Case lengths varied considerably depending on the Attorney General who authorized the

capital prosecution.  As Table 11 (p. 40) illustrates, within the study period, trial cases authorized

by Attorney General Janet Reno were completed in a median 688 days, compared to 836 days in

---

[39] In Table 10, the "Bivariate Correlation" column reflects the strength of the relationship between the variables in the first two columns.   A negative number reflects a relationship that reduces cost.  Thus, "case length" has a strong positive correlation with the cost of both trial and plea cases, and increases cost.

cases authorized by Attorney General John Ashcroft.[40]   Capital cases involving guilty pleas were also shorter when they were authorized by Attorney General Reno, taking a median 578 days, compared to 744 days under Attorney General Ashcroft.   Put another way, the time required to prepare and complete capital trials was 22 percent shorter, and capital pleas were 29 percent faster, when begun under Attorney General Reno than Attorney General Ashcroft.   Moreover, authorized cases in this group were much more likely to be resolved by a guilty plea when begun by Attorney General Reno (27 trials, 31 pleas) than by Attorney General Ashcroft (48 trials, 12 pleas).   Since capital cases resolved by guilty pleas are less expensive to litigate than capital trials (see pp. 23-24), and cases of shorter duration are generally less expensive than those that last longer (see p. 28-29), capital litigation was generally less costly for cases authorized by Attorney General Reno than Attorney General Ashcroft.

Some of these differences between Attorneys General are explained by the amount of time it took each to decide to authorize a capital prosecution, because the authorization process was faster in the Reno Justice Department than it was under Attorney General Ashcroft.   As Table 11 (p. 40) indicates, the Department of Justice took a median 178 days to authorize capital prosecutions under Attorney General Reno.   With Attorney General Ashcroft, this figure was two-thirds greater (297 days).   Judges and lawyers interviewed for this report had additional thoughts on the impact of the authorization process on case costs, which are discussed in Section VI. below.[41]

---

[40] These statistics relate only to those death-eligible cases that were ultimately authorized for capital prosecution. The analysis here does not include case length data for death-eligible cases that were not authorized.

[41] In 2007, after consultation with the Department of Justice, the Judicial Conference adopted a policy designed to facilitate prompt decision-making on the part of the government as to whether or not to seek the death penalty.  The policy urges judges to set reasonable deadlines for various stages of the authorization process.  See *Guide to Judiciary Policy*, Volume 7A, Guidelines for Administering the CJA and Related Statutes (Guide), § 670 "Scheduling of Federal Death Penalty Case Authorization to Control Costs."

**Table 11**
**Effect of Attorney General's Decision-Making on Capital Case Length**
**and on Plea vs. Trial**
(Includes cases litigated by federal defenders as well as panel attorneys)

| Attorney General Who Authorized | Number of Capital Trials | Median Case Length | Number of Capital Pleas | Median Case Length | Median Days To Authorize |
|---|---|---|---|---|---|
| Janet Reno | 27 cases | 688 days | 31 cases | 578 days | 178 days |
| John Ashcroft | 48 cases | 836 days | 12 cases | 744 days | 297 days |

Note: All relationships statistically significant at the .05 level.

### E.    Exceptional Cases

In addition to examining federal capital cases as a whole, this update analyzed those cases at either extreme of defense cost – both the highest cost cases and the lowest cost cases – to better understand why certain representations are most costly while others are well below average.

### 1.    High Cost Trials

Many high cost capital trials – those at the 80th percentile or higher, costing $749,000 or more to defend – present a particular set of extraordinary circumstances when compared to capital trials as a whole.  Whereas other capital trials averaged six defendants, for high cost cases it was 11; whereas other cases averaged seven counts in the indictment and two homicide victims, the high cost representations averaged 61 counts and 36 victims.  Table 12 (p. 41) illustrates these differences, showing that the high cost trials also were more likely to involve exceptionally complex offenses (e.g., CCE, RICO, and terrorism) and prosecutors' allegations of the defendant's future dangerousness.[42]  Most of these factors were identified as cost-drivers in

---

[42] This last finding is especially telling since future dangerousness does not predict overall cost in trial cases generally (see discussion, page 45-46).

capital trials as a whole, but in the high cost cases they occur more frequently and often in tandem with each other (e.g., multiple victims and offenses). Further analysis revealed the presence, in many high cost cases, of additional cost-drivers that affect both the guilt and sentencing phases and that are not as likely to be found in other capital trials. These include international (or otherwise geographically far-ranging) guilt and/or penalty investigations; non-English speaking defendants, family members, victims, and witnesses; and complex mental health, forensic science, or cultural issues relevant to guilt, penalty, or both.[43]

**Table 12: Cost Drivers in High Cost Capital Trials[44]**

|  | Average Number of Defendants | Average Number of Victims | Average Number of Offenses | Exceptionally Complex Offenses | Future Dangerousness |
|---|---|---|---|---|---|
| **High Cost Trials (80th percentile)** | 11 | 36 | 61 | 75 percent | 81 percent |
| **All Other Trial Cases** | 6 | 2 | 7 | 40 percent | 64 percent |

Note: All relationships statistically significant at the .05 level

These findings are fairly intuitive in explaining the relationship between defense costs and case facts: put simply, many high cost cases had more complex facts. These comparisons become clearer when examining how the *very* highest of the high cost trial cases – the nine in the

---

[43] These additional cost-drivers were more difficult to identify and measure than those factors related more directly to the guilt phase of defense. As a result, they were not included in the quantitative analysis but were revealed and considered in the qualitative research.

[44] The high cost trials include two U.S. Embassy bombing cases. But, even excluding those two cases from the analysis, high cost trials included significantly more complex facts than did other cases.

90th percentile, costing more than $1,269,100 to defend – differ from other cases, as the representations present very different fact patterns.  On average:

- The highest cost cases each had 15 indicted defendants (both eligible and not eligible for the death penalty) compared to 6 in other cases.
- Prosecutors charged 101 offenses in the highest cost cases, whereas they charged 9 offenses in other cases.
- The highest cost cases had 59 victims compared to two in other cases.
- 78 percent of the highest cost cases involved exceptionally complex charges (CCE, RICO, terrorism), whereas 48 percent of other cases had these charges.
- Prosecutors alleged the defendant's future dangerousness in all of the highest cost cases versus 63 percent of defendants in other cases.

It is not difficult to understand how these differences in case complexity would translate into higher costs.  As counsel prepare for trial, the attorneys are faced with the extra efforts of not only understanding case facts but also presenting them in a clear and convincing way in court.  Their task becomes more involved when they must deal with complicated facts, which themselves may raise evidentiary and other claims requiring litigation.  When many complex facts converge in an individual case – when the defense must investigate multiple victims, offenses, and codefendants; when the events at issue, including both the offense and the defendant's history, span a significant period of time and numerous locations; when counsel must coordinate with lawyers for numerous defendants, and juggle witnesses from various jurisdictions and in multiple languages – it is understandable that defense representation at trial costs more than in other cases.

## 2. Lowest Cost Trials

Whereas the high cost cases had clear indications that they were extraordinary among federal capital prosecutions, the lowest cost cases did not have similar distinguishing characteristics to explain why they were lower cost.  Compared to trial cases as a whole, low cost trials did not evidence appreciable differences in case facts such as the number of defendants,

offenses, victims, or the prosecution's allegation of future dangerousness, except in one area – low cost cases were less likely to involve complex charges such as CCE, RICO, or terrorism. Although many of the fact patterns were relatively similar between low cost trial cases and trials as a whole, the sentencing outcomes of these representations were substantially different.[45] During the period of this study, defendants who received the least amount of attorney and expert time, and whose defense representation thus cost the least, faced a higher probability of receiving a death sentence at trial. Specifically, as Table 13 shows, individuals whose defense cost less than $320,000 in combined attorney and expert assistance – the lowest one-third of federal capital trials – had a 44 percent chance of being sentenced to death at trial. Individuals whose total representation costs were above that amount – the remaining two-thirds of defendants – had a 19 percent chance of being sentenced to death. Defendants in the low-cost group thus were more than twice as likely to be sentenced to death.[46] The findings are similar when separately examining the influence of attorney costs and expert expenses on trial verdicts, although because of the smaller numbers involved, the results in both instances approach but do not reach the level of statistical significance.

---

[45] The lowest cost trials concluded in fewer days than did other capital trials, but it appears that this shorter duration is not because they presented appreciably different case facts.

[46] Among other things, this finding raises the question of whether there is a "floor" of expenditures necessary for a capital representation at trial. If so, the range of relevant cases would span from above $320,000 in defense expenditures. The median cost for this smaller range of cases is $797,000.

**Table 13**
**Relationship Between Defense Cost and Death Sentence**

| Total Trial Cost | Sentenced to Death | Other Verdicts | Total Cases |
|---|---|---|---|
| Lowest Cost Cases (under $320,000) | 44 percent | 56 percent | 18 |
| Remaining Two-Thirds of Cases | 19 percent | 81 percent | 43 |
| Total Cases | 16 | 45 | 61 |

Note: All relationships significant at the .05 level.

Although this update has focused on the cost of defending federal capital prosecutions and the factors that predict or explain case costs, the relationship between case cost and sentencing outcome was too significant to disregard.[47]  For this reason, additional research was conducted to explore the possible explanations for this connection.  In addition to further quantitative tests, researchers conducted interviews with capital trial attorneys, resource counsel, post-conviction lawyers, and judges.  Much of that work is described in section VI of this report (pp. 57-89), addressing the quality and availability of federal capital defense.  For present purposes, both quantitative and qualitative data were utilized in assessing the relationship between case cost and sentencing outcome.

---

[47] This relationship was identified in the preliminary report published in October 2008, which is superseded by this final report.

### a. "Bad Facts"

Several possible explanations were examined to explain the relationship between case cost and a death sentence. First, the research considered whether low cost is reflective of a case having "bad facts," that is, whether the low cost cases, on average, are ones in which the crime was so heinous, the prosecution's evidence so clear, or the mitigation evidence so scant that attorneys and/or judges decided that additional defense efforts would have no appreciable benefit in staving off a conviction or a sentence of death. The findings, however, indicate that this explanation is improbable. Throughout the qualitative research, trial judges and defense counsel indicated that none of these factors would be predictive of a case requiring a lesser commitment of time and resources from counsel. To the contrary, they said that strong evidence of guilt or highly disturbing evidence in aggravation would intensify the need for a comprehensive investigation of mitigating factors. With appropriate investigation there should be, in the words of one judge, "no such thing"[48] as a case in which mitigation evidence was so scant that there was little to be done. Lawyers, as well, dismissed the "bad facts" hypothesis, saying it was inconsistent with both their experience and prevailing norms and the standard of practice set by the ABA Guidelines. Both judges and lawyers expressed disbelief that a federal death penalty case could be tried through penalty verdict for the amounts dispensed in the low cost cases.[49]

These findings are underscored by the assessment of quantitative data collected for this study. Those data indicate that the relationship between case cost and outcome is not mediated or "explained" by the presence or absence of several measures of "difficult" case facts, such as

---

[48] Interviews with judges and lawyers were conducted with a promise of anonymity and, therefore, are unattributed in this report.

[49] In the lowest cost case in this group, which resulted in a sentence of death, the defense received a total of $67,365 for attorney and expert services.

i) the prosecution's allegation of the defendant's future dangerousness, ii) the victim's criminal activity, or lack thereof, iii) the victim's race and gender in relation to those of the defendant, or iv) the number of defendants, victims, or offenses charged.

The cost-outcome nexus is partially explained by one aspect of case facts – whether an indictment charges a complex criminal enterprise such as gang or organized crime activities or terrorism – but even here the relationship does not fully account for the connection between case cost and death sentence, nor are defendants charged with these arguably more "serious" crimes more likely to be sentenced to death.  Of course, cases involving charges of CCE, RICO, or terrorism cost more to defend than do other federal capital charges, since they often involve complex fact patterns that necessitate additional effort to investigate and to explain to jurors.  But the heightened seriousness or complexity of such charges does not translate into a greater risk of a death sentence for defendants charged with CCE, RICO, or terrorism.

To be sure, the explanation may flow in the opposite direction – that cases of lower complexity employ fewer resources and that jurors may more readily impose the death penalty when the case facts are less complicated and easier to understand.   But, even if this is true, the complexity of charges does not fully explain the connection between low cost cases and a death sentence, as the association between low cost and death outcome still holds when controlling for the complexity of the charge.[50]  Put simply, case type may explain some, but not all, of the relationship between defense resources and the defendant's sentence of death.

---

[50] Examining those cases that did not involve RICO, CCE, or terrorism charges, a defendant had a 50 percent chance of being sentenced to death if the representation cost less than $320,000.  By contrast, a defendant had a 35 percent chance of receiving a death sentence if the representation costs were more than $320,000.

### b. Defense Experience

The research also considered the efforts of the attorneys involved in a representation. Experienced, zealous, and effective attorneys may investigate and litigate more extensively and make greater use of expert and other resources, ultimately attaining fewer death sentences. Certainly, the quantitative analysis evidenced a positive relationship between defense costs and the hours that defense attorneys spent on a case: the more hours worked, the higher the cost of representation. Further, there is a negative, or inverse, relationship between the attorneys' hours on a case and their client's risk of being sentenced to death; the more hours dedicated to a case, the lower the risk of a death sentence.[51]

The question remains *why* lawyers in low cost cases would dedicate less time to the representation than would lawyers in other cases. Some of the difference can be explained by case facts, as the data show a positive relationship between hours worked and the nature of the charge, the number of defendants in the indictment, and the presence of a victim who had no criminal involvement. In CCE, RICO, and terrorism cases, defense attorneys billed more hours than in other cases, as they did in cases in which there were multiple defendants and victims who had no criminal involvement. But, as indicated earlier, almost none of these factors mediated the relationship between case cost and the defendant's sentence. Even if a few case facts are correlated with additional attorney effort, these facts do not predict the defendant's sentence.

In a related finding, attorneys in low cost trials divided their efforts differently from lawyers in cases that were not low cost. Although attorneys across the board spent more time on out-of-court activities than in-court matters, lawyers in low cost trials spent a lower proportion of their overall time on out-of-court efforts than did lawyers in other cases. That is, lawyers in low

---

[51] The bivariate correlation is -.234 with a marginal statistical significance of .06.

cost trials were less likely to engage in out-of-court investigation, research, and preparation than were attorneys in other cases.[52]

During the qualitative stage of research, some respondents suggested that these differences might turn on the death penalty experience of the lawyers involved. To investigate this claim, a panel of distinguished capital attorneys acquainted with the federal capital cases at issue was asked to compare the qualifications of the lawyers in these cases and also to identify whether judges had obtained and followed the recommendation of the federal defender organization or the Administrative Office when appointing counsel for each case. See 18 U.S.C. § 3005.[53] As Table 14 (p. 50) indicates, defendants in low cost cases were much less likely to have been represented by attorneys viewed as having "distinguished prior experience" in capital litigation, as recommended in the Spencer Report, than were defendants in other cases.[54] Further, judges in the low cost cases were significantly less likely to have followed the recommendations of the federal defender organization or the Administrative Office in appointing counsel than were judges in other cases.

---

[52] Interestingly, there was no difference in the proportionate use of expert assistance in the two categories of cases. Low cost cases employed fewer expert hours than did others, but there was not a statistically significant difference in the *relative* use of experts between low cost and other cases.

[53] The statute provides that "the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts" when appointing counsel. 18 U.S.C. § 3005.

[54] Judicial Conference policy calls for appointed counsel in a federal death penalty case to have "distinguished prior experience" in capital litigation. See Spencer Report, Recommendation 1(b) (Qualifications of Counsel), and Guide, § 620.30(e).

**Table 14**
**Attorneys in Low-Cost and Other Cases**

|  | Lowest Cost Trial Cases | Other Trial Cases |
|---|---|---|
| **Counsel with "Distinguished Prior Experience"** | 21 percent | 79 percent |
| **Counsel Recommended by FDO or Administrative Office** | 17  percent | 83 percent |

Note: All relationships statistically significant at the .05 level.

The research did not evaluate attorney effort or strategy in particular representations, so it is impossible to apply these assessments of quality to an individual case or to conclude that defendants in higher cost cases necessarily received better, or even minimally effective, representation.  Regardless of the amount spent on representation, there are undoubtedly cases in which the lawyers did not use their resources effectively or sufficiently.  Still, the evaluation is instructive in appreciating the distinction between low cost and other trial cases.  As a whole, defendants in low cost cases were less likely to be represented by lawyers deemed by their peers to have "distinguished prior experience" as capital trial lawyers.  They also were less likely to be represented by lawyers who were recommended for the case by the district's federal defender or the Administrative Office.

### c.  Geography

In capital cases, brought under federal law and under the supervision of federal judges, one might expect a consistent level of defense resources regardless of the state in which a case is tried.  Considering as well that the Department of Justice has increasingly "nationalized" federal death penalty prosecutions over the past decade (see Section II.D., pp. 12-16), regional differences in costs ought to be narrowing as more federal districts are exposed to capital

prosecutions. Yet the data for the period encompassed by this study, 1998 through 2004, demonstrate significant geographic variation in the distribution of defense resources. As Table 15 indicates, defense costs were substantially different based on the state in which cases were brought and tried. Among those states with at least two federal capital trials during the study period,[55] six were below the national median of $465,602 in defense resources and nine were above. More significantly, federal capital trials brought in the four highest cost states expended six times greater defense resources than trials conducted in the four lowest cost states.[56]

**Table 15**
**Regional Variation in Capital Trials by State, 1998-2004**

| State | Circuit | Median Defense Cost at Trial | Number of Capital Trials |
|-------|---------|------------------------------|--------------------------|
| Georgia | 11 | $132,334 | 2 |
| Texas | 5 | $197,324 | 7 |
| North Carolina | 4 | $208,802 | 2 |
| Florida | 11 | $313,243 | 2 |
| Indiana | 7 | $419,950 | 2 |
| Maryland | 4 | $435,657 | 4 |
| New York | 2 | $496,927 | 7 |
| Virginia | 4 | $519,108 | 8 |
| Missouri | 8 | $525,279 | 5 |
| Michigan | 6 | $567,549 | 2 |
| Pennsylvania | 3 | $672,204 | 2 |
| California | 9 | $1,039,655 | 2 |
| Connecticut | 2 | $1,213,063 | 3 |
| Massachusetts | 1 | $1,220,267 | 2 |
| District of Columbia | DC | $1,762,893 | 3 |
| National | ---- | $465,602 | 55 |

[55] For these purposes, the District of Columbia is treated as a state.

[56] The Spencer Report found no regional cost variation but noted that the number of cases was too small for meaningful analysis. The present analysis not only includes sufficient cases but also suggests that the second decade of the federal death penalty has seen significant regional variation in the cost of capital trials.

Some of the state differences may be explained by varying legal markets and geographic differences in experts' rates.[57]  For example, many of the nation's most vigorous legal communities are found in those states where spending for capital defense is above the national median, suggesting that some of the variance in capital costs is reflective of how litigation is generally approached by the local bar.[58]  Moreover, unlike the hourly rate for learned counsel, which is constant throughout the country, experts' rates in capital cases vary depending on the location in which a case is brought.  The cost of practice for an investigator or a doctor is likely to be higher in New York City than in Roanoke, Virginia, for example.

Still, these explanations do not adequately account for the steep regional differences in defense resources.  Even acknowledging varying rates for experts, expert costs make up only a third of total case costs, an amount that would not explain the significant state variations seen in Table 15 (p. 51).  Moreover, given the many specialized issues involved in capital litigation, defense lawyers often call on experts from outside the state in which the case will be tried.

Attorney markets are an insufficient explanation, as well.  Although vigorous legal communities are found in states where capital spending is above the national median (such as New York, Los Angeles, and Washington, D.C.), many of the same kinds of communities exist in states where federal resources are less plentiful (including Dallas, Atlanta, and Miami).  Considering, too, that trial counsel earn the same hourly rate in federal capital cases regardless of where a case is brought, the regional differences cannot adequately be explained by varying private legal markets.

---

[57] In addition, all three cases in the District of Columbia were exceptionally complex representations as discussed in Section V.A., page 33.

[58] Such differences in "local legal culture" have been well documented in socio-legal research publications, which describe a process by which common experiences of litigation become shared norms for the local legal market.  *See, e.g.,* Thomas W. Church, Jr., *Examining Local Legal Culture*, 10 Law and Social Inquiry 449 (1985).

By contrast, a state's capital culture is strongly correlated with the practice and cost of defending federal capital cases. A state's per capita execution rate[59] was highly predictive of the defense cost of federal capital trials brought in that state. Although there were some exceptions, in general defense resources spent on federal capital trials were lowest in those states that had the highest per capita execution rates. Just six percent of low cost trials were brought in states without the death penalty, whereas 28 percent of all other federal capital trials occurred in states without the death penalty. In states with costs above the national mean of $620,932, there either is no state death penalty statute or executions are exceedingly rare.

Table 16 (p. 54) presents these data, showing the relationship between state capital culture and defense resources at trial. Perhaps more significantly, geography also helps to explain the relationship between low cost cases and death sentences at trial, to the point that the influence of low cost is significantly affected by a state's capital culture. Put another way, it is not just that defendants in low cost cases are disproportionately sentenced to death, but that federal cases brought in states with a historically strong attachment to the death penalty[60] are more likely to be low cost *and* disproportionately end in a death sentence.[61] The findings suggest that the link between low cost cases and death sentence at trial is concentrated in particular states.

---

[59] This is defined as the total number of capital defendants executed in a state post-*Gregg v. Georgia*, divided by the state's population in 2000.

[60] See Section III.B, p. 23, for data that were collected to reflect the history and experience of states with the death penalty.

[61] Regression equations confirm this finding, which Table 16 (p.54) illustrates in a more straightforward way.

**Table 16**
**Outcomes of Federal Death Penalty Trials by Cost, 1998-2004**
**(Excluding federal districts with a single trial)[62]**

| State | State Per Capita Execution Rate | Median Defense Cost at Trial | % of Trials Resulting in a Death Sentence[63] |
|---|---|---|---|
| Georgia | 4.8 | $132,334 | 50 percent |
| Texas | 19 | $197,324 | 71 percent |
| North Carolina | 5.3 | $208,802 | 50 percent |
| Florida | 4 | $313,243 | 0 percent |
| -------$320,000------ | ----------------- | Threshold | ---------------- |
| Indiana | 3.1 | $419,950 | 50 percent |
| Maryland | 0.94 | $435,657 | 25 percent |
| New York | 0 | $496,927 | 0 percent |
| Virginia | 13.8 | $519,108 | 0 percent |
| Missouri | 11.7 | $525,279 | 60 percent |
| Michigan | 0 | $567,549 | 50 percent |
| Pennsylvania | 0.24 | $672,204 | 0 percent |
| California | 0.38 | $1,039,655 | 0 percent |
| Connecticut | 0.29 | $1,213,063 | 0 percent |
| Massachusetts | 0 | $1,220,267 | 50 percent |
| District of Columbia | 0 | $1,762,893 | 0 percent |
| National | ------ | $465,602 | 27 percent |

It is possible for a capital defendant to be sentenced to death while receiving considerable defense resources and when tried in a state without a historic attachment to the death penalty; similarly, a defendant may be acquitted or receive a life sentence when tried in a low cost case in a state with a strong capital culture. But, excluding those federal districts that experienced just one capital trial during the period of this report, and excluding cases in which the defendant was represented by a federal defender organization or retained counsel (because cost comparisons are not possible), half of all death sentences issued (7 of 14) were concentrated

---

[62] Puerto Rico was also excluded. Its cost structure is significantly different from that in states in the continental United States, as the rate for investigators and other local services is much lower, and although learned counsel are paid at the capital CJA rate, other appointed counsel typically are not.

[63] These cases are limited to panel representations and do not include capital trials by federal defenders.

in three states whose median federal defense expenditure fell below the low cost threshold of $320,000. Stated more starkly, 61 percent (8 of 13) of the federal defendants tried in states with low cost trial defense received a death sentence, whereas only 19 percent (8 of 42) of the federal defendants tried in other states were sentenced to death.

Some of this geographic effect may be influenced by policies of the federal courts. For example, federal capital cases brought in the states of the Fifth Circuit are subject to a circuit policy, titled "Special Procedures for Reviewing Attorney Compensation in Death Penalty Cases," that considers attorney compensation in excess of $100,000 at the district court level to be "presumptively excessive," requiring approval of the circuit chief judge. Although capital defendants in the Fifth Circuit are not *necessarily* limited to $100,000 in attorney time – a district judge may issue a special finding to be approved by the chief judge of the circuit – the existence of this rule may limit capital defense expenditures in the states comprising that circuit.[64]

In addition, geographic effects may reflect the influence of juries. In general, the potential universes of jurors in state and federal courts overlap more than they are unique, and the social or political culture of a state likely carries over to federal court as well.[65] If the local culture supports capital punishment and the death penalty is a regular aspect of state criminal law practice, it is not surprising that federal jurors in that state would be as likely to impose the death penalty as state jurors.

---

[64] The national median for counsel costs (not including the cost of expert services) for capital cases in the period of this study was about $274,000 for authorized cases overall, $353,000 for trial cases, and $123,000 for guilty pleas. See Table 4, p. 28.

[65] It is not suggested here that state and federal jury pools are entirely comparable. They are not. For obvious reasons – their geographic boundaries are different – there can be a dramatic difference in the demographic composition of a federal district court jury and a state court jury.

Still, this explanation does not account for the relationship between geography and defense resources. Even if jurors are more likely to impose the death penalty in states with an active capital practice, why do federal defendants receive fewer resources for their defense in these same jurisdictions? Judges interviewed reported that they regularly "provide what the defense requests,"[66] and that they are satisfied with the quality of advocacy in the capital cases they tried, and yet some jurisdictions appear to be providing fewer defense resources than others. The qualitative data collected through interviews with lawyers and judges strongly suggest that despite the recognition that prevailing professional norms in capital defense are nationally established, there is within certain jurisdictions a prevailing "local legal culture" that affects counsel's approach to federal capital defense. Certainly, past research suggests that "participants in the federal and state courts in the same locale [have] relatively consensual views of the appropriate length of time to disposition for cases."[67] It would not be surprising, then, if "the lawyers who litigate [death penalty cases] in a given jurisdiction and the judges who hear these [cases] become accustomed to an acceptable range of time and effort for the litigation."[68]

It is important to note that the mandate for this update did not include examining sentencing practices, nor was a complete universe of data collected for such an analysis. As such, the explanations offered here should not be considered a definitive accounting of the relationship among geography, cost, and case outcome. Nevertheless, the findings strongly suggest that more research is needed and that the topic merits additional consideration by the judiciary.

---

[66] Similarly, with some exceptions, defense lawyers said that their formal requests for resources are generally received favorably by judges.

[67] Stephen L. Wasby, "Of Note." *Justice System Journal* 21:131 (2007).

[68] *Id.*

## VI.     Qualitative Data from Judges and Counsel

In addition to quantitative measures, the research considered the experience of federal district judges who have presided over federal death penalty trials, as well as that of Resource Counsel and other defense lawyers, including both CJA panel attorneys and federal defenders with substantial federal capital experience.[69]  All subjects were interviewed over the course of one to three hours, using a detailed protocol relating to federal capital practice, including, most particularly, their assessment of the cost, quality, and availability of defense counsel in federal death penalty cases.  In addition, qualitative information was collected, less formally, at training programs where capital defense counsel gathered, and at meetings of advisory groups for the defender services program and of the Judicial Conference Committee on Defender Services.  Read in tandem with the quantitative data presented in preceding sections, the interviews provide context for the discussion of the cost of capital defense and offer critical assessments of capital case practice and management.  The judges and attorneys who participated in the research are not identified in this report (and masculine gender is used throughout), as each was assured anonymity for his insights and experience with respect to federal capital defense practice.

### A.     Interviewees

The 25 federal district court judges who participated in the interviews are from 17 federal districts and 10 judicial circuits, and each presided over at least one of the 61 trial cases in the database assembled for this report.  The judges interviewed reflect the broad geographic range of those cases, and are a diverse group by all measures.  Their courts are in urban as well as rural locations and in states that vary in their approach to the death penalty; some of their states have a

---

[69] The Resource Counsel Projects are described in Section VI.C. (pp.61-63) of this report and in the Commentary accompanying Recommendation 2 (Consultation with Federal Defender Organizations or the Administrative Office, p. 98-101) and Recommendation 6 (Federal Death Penalty Resource Counsel, pp.108-110).

very active death penalty practice while others have little or none.  Interviews involved judges appointed by both Democratic and Republican administrations.  The judges brought to the bench different types of legal experience and varying levels of involvement with death penalty matters. Before appointment, several judges had spent many years as federal or state prosecutors; some had been in charge of a U.S. Attorney's Office; others had prosecuted or presided over state death penalty trials.  Some of the judges had practiced criminal defense, including state death penalty defense, and others took the bench with little or no criminal law experience.  While on the federal bench, some of the judges had presided over capital habeas corpus proceedings challenging state death sentences, and others had not.  All of the judges interviewed had presided over at least one federal death penalty prosecution that had proceeded through a sentencing phase, and some had presided over several such trials.  Most also had presided over additional cases that either were eligible but not authorized for capital prosecution or that were authorized but resolved without a trial.   With few exceptions, interviews were conducted in the judges' chambers.

Interviews also were conducted with all of the Resource Counsel Projects and with CJA panel attorneys and federal defenders experienced in defending federal death penalty trials throughout the country.  In addition, representatives of the Defender Services Death Penalty Working Group and the Defender Services Advisory Group were interviewed.  Interviews were conducted at the lawyers' offices, at national training conferences, at the Administrative Office of the U.S. Courts, and via telephone.

## B.    Overview of Interviews

### 1. Judges

In general, judges expressed satisfaction with the quality and availability of defense counsel.  Almost universally, judges praised the work of the lawyers who appeared before them in capital cases.  Judges also believed the hourly rate and overall amounts paid to counsel in their cases were reasonable given the demands of death penalty representation.  Some judges felt that the amounts paid were high but eminently justified, while others viewed similar amounts as "bargains."   In general, judges thought the payments they authorized were necessary and appropriate for the defense of these cases.  The overwhelming majority of judges believed the lawyers who served on their cases were conscientious, efficient, and gave the court and taxpayers good value.  This is due in part, the judges said, to their use of case budgeting, which the judges found helpful in terms of case management and accountability. Almost all judges reported ultimately approving most attorney vouchers that were submitted to them, and authorizing most, but not all, requests for expert services.  With respect to services other than counsel, there was a marked change from 1998, when the Spencer Report was written, as now all judges referenced the importance of a thorough social history investigation and the assistance of mitigation specialists.  Judges' opinions diverged most sharply with respect to whether or not they permitted counsel to be assisted by a jury consultant at trial.  Some judges thought this work essential to the defense, and others believed it unnecessary.  The judges interviewed consistently raised a significant concern about capital case processing that has major cost implications.  Almost unanimously, they said that the death penalty authorization process takes too long.

## 2. Defense Counsel

Lawyers' views of the quality of representation in federal death penalty cases spanned a wider range than those of the judges. They identified both excellence and serious deficiencies. They pointed out that although there were exceptions, in most instances deficiencies did not seem to be associated with a denial of compensation or other resources by the court. Rather, they said, problems stemmed from attorneys overlooking important aspects of investigation or litigation. Like the judges, most counsel reported successful experiences with case budgeting and general satisfaction with the way their requests for resources were met by the court. Most said unequivocally that the resources they received in federal court compared favorably to those available to their counterparts (or themselves, in many instances) in state court capital cases. (Lawyers from one state did say their state court afforded greater time than their federal district court for trial preparation and provided more extensive court proceedings, e.g., voir dire). Like the judges, the lawyers who were interviewed suggested that certain Department of Justice policies and practices impeded efficiency and also increased costs. Lawyers suggested that significant cost savings would result if decisions not to seek the death penalty were made more quickly and if, in general, the Department of Justice showed greater deference to the recommendation of the local U.S. Attorney. The delay in deciding not to seek the death penalty, combined with the possibility that the Department of Justice may require capital prosecution notwithstanding the local recommendation, means that counsel cannot triage a case and must treat every case, even the most unlikely, as though it will someday proceed to a penalty phase.

The remainder of this section of the report offers more detail on the comments of judges and defense counsel, and updated information about issues relevant to understanding the quality, availability, and cost of defense representation in federal death penalty cases based on their

experiences over the past decade.  The discussions assume familiarity with the components of a federal capital representation.  A basic introduction to concepts such as the two phase capital trial process, the scope of the penalty phase, the special obligations of counsel in a death penalty case, the death penalty authorization process of the Department of Justice, and the importance of experts can be found in the 1998 Spencer Report.

### C.        Federal Death Penalty Resource Counsel

In order to improve the quality of representation and the cost effectiveness of defense services, in 1992 the judiciary established the Federal Death Penalty Resource Counsel Project.  Spencer Report at 28-30.  When the Spencer Report was published in 1998, that Project consisted of three experienced capital litigators who supported the work of appointed counsel and provided advice to judges and the Administrative Office of the U.S. Courts on a part-time basis.  They provided this assistance for cases at all stages of litigation, including at trial, and, to a lesser extent, on appeal and in post-conviction proceedings.  Reflecting the expanded need in this area, there are now three separate Resource Counsel Projects that support the three different stages of capital litigation.  The Federal Death Penalty Resource Counsel Project addresses trial matters, while appellate and post-conviction assistance is provided by the Federal Capital Appellate Resource Counsel Project and the Federal Capital Habeas Project, respectively.  The Resource Counsel Projects serve the courts by recommending counsel for cases at trial, on appeal, and in post-conviction.  They also offer consultation, training, and other support to the courts and counsel.[70]

---

[70] See Commentary accompanying Recommendation 6 (Federal Death Penalty Resource Counsel):

> Trial level Resource Counsel are assigned to each defense team at the outset of every death-eligible case, and continue to support the efforts of appointed counsel through the conclusion of trial.  Appellate and

The expansion of the Resource Counsel Projects has been driven by the increased demand for assistance that is reflected in Section II.C. (p. 8) of this report. The number of federal capital prosecutions being initiated and authorized and the number of defendants whose cases are being tried rather than resolved by a guilty plea have increased substantially, resulting in much greater need for trial level support. Also, as the number of death sentences has risen over the years, more cases have entered the appellate and post-conviction stages as capital representations. Resource Counsel providing trial support may have conflicts precluding continued assistance in these later stages of litigation and, as discussed throughout this report, trial, appellate, and post-conviction litigation require different types of legal expertise. Another reason for the growth of the Resource Counsel Projects stems from recognition on the part of defender services advisory groups that the quality of defense representation was uneven – excellent in many cases, but markedly deficient in others – and that additional support and specialized expertise for appeals and post-conviction representation were necessary. The increasingly large body of federal death penalty law with which counsel need to be familiar was another factor. For all of these reasons, as well as the expansion of the Justice Department's centralized unit of full-time death penalty specialists who assist prosecutors at all stages of litigation,[71] the judiciary has supported expanding the Resource Counsel Projects.

---

post-conviction Resource Counsel assume responsibility at the appropriate procedural junctures, and provide consultation and assistance throughout those stages of the case. In addition, the National Mitigation Coordinator provides information, referrals, and case-specific consultation, and is extensively involved in the planning and delivery of training. The four Projects work together on issues of common concern, and support one another in providing training and disseminating information to counsel. They also provide consultation and advice to the Administrative Office and to courts.

Infra, at pp. 108-109.

[71] The Justice Department's Capital Case Unit, described in footnote 72 below, was in formation but unstaffed at the time of the Spencer Report. Spencer Report at 29, n 43.

Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel.  Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting.  Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable.  Every year, the Resource Counsel Projects sponsor a variety of training programs, including one national "Strategy Session."  Lawyers said they relied on these training programs more than any others to keep up to date on developments in federal capital defense.  For the defense function in the federal courts, there is no systemic counterpart to the Criminal Division of the Justice Department, which centrally supports the work of federal prosecutors nationwide, or the Justice Department's National Advocacy Center.[72]  Although federal defender organizations are funded from a central source and are administered within the judiciary, the representation they provide is entirely de-centralized.  In addition, the majority of federal capital defendants are represented by panel attorneys who, for the most part, are sole practitioners or work in small law firms comprised of fewer than one half dozen attorneys.  Thus, the Resource Counsel Projects play a critical role in supporting the delivery of high quality capital defense services.  Additional information about their work is found in the following Spencer Report Recommendations and associated Commentary:  Recommendations 1 (Qualifications for Appointment), 2 (Consultation with Federal Defender Organizations or the Administrative Office), 6 (Federal Death Penalty Resource Counsel), and 8 (Training).

---

[72] The Capital Case Unit, a component of the Department of Justice's Criminal Division, oversees capital prosecutions.  Its attorneys provide resource counsel support to prosecutors nationwide in death-eligible and authorized cases at all stages of litigation.  They also provide direct representation in some cases.  In addition to the support offered by the Capital Case Unit, assistance for prosecutors is available from numerous other specialized components of the Justice Department.

### D.    The Role of Federal Defender Organizations

Federal defender organizations play two primary roles in federal death penalty representation.  First, 18 U.S.C. § 3005 imposes a statutory responsibility upon the court to consult with the district's federal defender in every case in which death is a possible punishment.[73]   Second, federal defender organization staff attorneys serve as appointed counsel in a growing number of federal death penalty cases.  In addition, federal defender organizations support capital trial representation by sponsoring regional capital training, often in collaboration with Resource Counsel; facilitating contact between Resource Counsel and CJA panel attorneys; disseminating information among attorneys who accept capital appointments; convening meetings of capital lawyers in their districts to discuss issues of common concern; and assisting appointed counsel in other ways.

In terms of efficiency and quality of representation, an appropriately staffed and funded institutional defender organization is well suited to the demands of defending a death penalty case.  In fact, some experienced capital trial lawyers suggest that, particularly in light of the exceptionally high need for teamwork, a specialized institutional defender is the most advantageous model for capital defense in terms of quality, efficiency, and cost effectiveness. Some sole practitioners said in interviews that their work had been more efficient and effective when they were employed in a well-resourced state capital defender office where lawyers, investigators, mitigation specialists, and paralegals were all at hand.  In their federal capital cases, they said, even when the appointing judge provides them with the resources they request,

---

[73] "In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts."  18 U.S.C. § 3005.  Recommendation 2 (Consultation with Federal Defender Organizations and the Administrative Office), page 98, discusses this role.

their work as panel attorneys costs more and is of lesser quality than that which they achieved in their state defender organization.

Over the past decade, federal defender organizations increasingly have taken responsibility for capital representation at all stages.  Just as at the time of the Spencer Report, however, few federal defender offices employ trial or appellate attorneys qualified to serve as "learned counsel" pursuant to 18 U.S.C. § 3005.  In most instances in which they are appointed, federal defender organizations are co-counsel with an experienced capital litigator.  The defender organization thus benefits from the expertise of the "learned counsel," and the "learned counsel" benefits from the institutional resources and local court expertise of the defender staff.

In interviews, judges, CJA panel attorneys, and federal defender lawyers expressed differing views about the appointment of federal defender organizations in federal capital trial cases.  These disparate views likely reflect the fact that each district's defender organization operates independently in many important respects; there are thus many differences among them, including great differences in the size of the offices and in the presence or absence of lawyers with capital experience.  In addition, some heads of defender organizations view capital defense as at the core of their mission, while others view it as a distraction that deflects resources away from serving the much larger majority of the organization's clients.  One panel attorney who previously worked in a well resourced state capital defender organization suggested that federal defender attorneys generally function more like sole practitioners and less like members of a team, which capital defense work requires.  Some judges said the defender office in their district provided the highest quality capital representation available. "Our best defenders are federal defenders," said one judge.  Others described their defender organization's capital work less favorably.   One called his defender organization's work in capital cases "mediocre."

A number of judges endorsed appointing their district's federal defender whenever possible, but they also emphasized the need to protect the organization from being given too many cases, echoing the Spencer Report's warning that a single death penalty case can significantly disrupt the functioning of an entire defender office. See Spencer Report at 32. Interviews with heads of defender offices that have participated in capital trials confirmed the extraordinary impact they had. The updated Commentary associated with Recommendation 4, like the Commentary published in 1998, encourages courts to appoint federal defender organizations only if sufficient resources and expertise are available and only after consultation between the court and the federal defender. See Recommendation 4 (Appointment of the Federal Defender Organization, p. 103).

### E.    Quality of Representation: Trial Counsel

The Spencer Report identified specific qualifications designed to ensure that appointed counsel possess the high level of expertise required for federal capital representation. The updated Commentary associated with Recommendation 1 (Qualifications for Appointment, pp. 91-98) in this report updates those criteria. Interviews for this report found judges to be extremely satisfied with the quality of representation provided by trial lawyers in federal death penalty cases. Interviews with lawyers, though, found them to be less satisfied with the quality of work they observed from their colleagues and suggested a mixed picture.

Judges consistently praised the work of the lawyers who appeared before them in capital cases. "Excellent, professional, and hardworking," said one judge. "Superb," said another. A third judge said he thought that taxpayers got a "bargain" even though the costs of counsel were substantial, and suggested that the lawyers' work in his case was "worth two or three times what

they were paid." Although not all judges spoke this glowingly, no judge suggested he was less than satisfied with the quality of appointed counsel.

All judges emphasized that it is important to take great care in the appointment of counsel, and most praised the federal defender or Resource Counsel or both for their recommendations. One judge offered the following list of attributes most important for a capital trial lawyer. He or she should be diligent, intelligent, and an expert on the law; have stamina, emotional stability, and an ability to see ahead; be well-organized and highly experienced; should both seek out and be receptive to advice; have empathy for the client as well as an ability to gain the client's trust and guide his decisions; have the ability to understand a culture other than his or her own; and be zealous without being unreasonable. Another judge added that counsel must be able to work collaboratively as part of a team. This judge, who prosecuted state death penalty cases before being appointed to the bench, also emphasized that successfully counseling a client through a plea agreement or a capital trial requires a particular skill set and a substantial investment of time from the commencement of the case. He said that in evaluating counsel's performance he considers whether the lawyers are meeting with and addressing the concerns of the client during the pretrial period. He finds this a helpful indicator of whether the case will be able to reach trial or disposition without disruption.

In discussing the quality of defense counsel, several judges and many lawyers identified as an important skill the ability to understand a culture other than one's own, pointing out the small number of capital defense lawyers who speak languages other than English or are members of racial or ethnic minorities. This lack of diversity "is not a good thing," said one judge, pointing out that most capital defense lawyers are white and male. Judges and lawyers said efforts should be made to engage women and more people of color, Spanish speakers, and

minority groups in capital defense, and that all lawyers should work to achieve a higher degree of what some called "cultural competence."[74]  Some judges described specific efforts made in their districts to attain a more diverse CJA panel, such as reaching out to minority bar associations and establishing mentoring programs.  Although he strongly favored such efforts, one judge pointed out how close he believed the lawyers and defendants grew to one another in the death penalty trials over which he presided, seemingly transcending boundaries of race, ethnicity, and class.  He attributed this to the emotional intensity of a death penalty case.

Unlike the interviews with judges, the interviews with CJA panel attorneys, federal defenders, and Resource Counsel suggested that the quality of representation in federal death penalty trials is not uniformly excellent and that there are instances of poor quality representation in capital work.  Lawyers described an array of deficiencies, some concerning legal issues that were overlooked or not preserved for review, and many more pertaining to the investigation and preparation of the penalty phase of the case.  The existence of undeveloped but highly consequential mental health issues, including claims of mental retardation, was another area of concern identified by lawyers who either observed the cases at the trial level or reviewed them later during appellate and post-conviction proceedings.  Resource Counsel said that during the past several years they have increased their capacity to provide individualized case assistance to counsel, but that even so, some lawyers resist their offers of help or do not follow suggestions. Queried about why lawyers were more critical than judges concerning the quality of federal capital trial counsel, most attorneys responded that judges are at a disadvantage in assessing counsel.  Judges see what has been presented in court, and have some idea about what has been

---

[74] A "culturally competent" professional is one who possesses the knowledge, attitudes, and skills that allow for working effectively cross-culturally.  See Scharlette Holdman and Christopher Seeds, Cultural Competency in Capital Mitigation, 36 Hofstra L. Rev. 883 (2008).

done outside of court, they said, but lawyers view the case from the inside and know what was possible but remained undone.

### F.    Case Budgeting

Case budgeting was new when the Spencer Report was issued, but is now well established.  Budgets are developed by counsel and approved by district courts in virtually every trial level capital case.[75]  This is consistent with Judicial Conference policy, which encourages such budgets.  *See Guide to Judiciary Policy*, Volume 7A, Guidelines for Administering the CJA and Related Statutes (Guide), § 640, and Recommendation 9 in Part VIII of this report.  Judges and lawyers interviewed unanimously and enthusiastically endorsed the budgeting process, identifying a number of ways in which it benefits lawyers, judges, and the taxpaying public.

Judges observed that case budgeting not only saves money but also is an effective case management tool.  Descriptions of the impact of budgeting were remarkably consistent.  "It makes people feel accountable, makes the lawyers think about the allocation of time," said one judge.  "It helps lawyers to plan their cases and allows the judge to know what's coming," said another.  "It requires people to focus," said a third.  Defense attorneys, said another judge, "are not out to waste time.  They think these things through.  The [budgets] are obviously the product of lots of thought.  They take this responsibility very seriously."

Judges emphasized that case budgeting does not mean micromanaging the lawyers, seeking ways to deny them resources, or "pinching pennies."  Rather, they said, the process is intended to ensure that costs are incurred in a way that is mindful of "the big picture."   "Be realistic," said one judge. "It's going to cost money."  Several judges recommended meeting

---

[75] This section addresses case budgeting in trial cases only.  The research for this report did not address the cost of appellate representation.

regularly with defense counsel to review the budget. Authorizing funding "in increments," one judge explained, helps lawyers focus on proceeding systematically.

Almost all judges said they believed the lawyers they appointed billed responsibly and that their budget requests and individual vouchers were reasonable. They said that although total amounts paid were high, they believed the lawyers' work gave taxpayers good value. However, one judge did say he found it necessary to "rein in" attorney spending and deny requests for counsel fees and expert services he deemed excessive. This judge presides in a district where case costs are low and the rate of death sentencing is high (see pages 43 to 56, supra). This judge also said that when he did approve defense requests he sometimes found himself "caught in the middle" between defense attorneys and the circuit chief judge whose approval he was required to obtain.

Case budgeting is addressed *ex parte*. Guide, § 640.20(b); Recommendation 9(e), page 115. In most district courts, the process is directed by the presiding judge, who sometimes delegates authority to a magistrate judge. In others, a designated court employee serves as an intermediary between the court and counsel.[76] Some of the judges interviewed received help from Resource Counsel either reviewing an entire case budget or evaluating the reasonableness of certain proposed expenditures. Regardless of the method employed, though, almost every judge expressed satisfaction with the way he had approached budgeting. Some judges said they had not budgeted their first trial case, but relied on the process for a later case or cases.

Lawyers expressed appreciation for the way case budgeting helps them plan their legal work and the case investigation. In addition, they said, having a budget in place gives the court

---

[76] The Administrative Office is currently conducting a pilot program for such case-budgeting initiatives in three circuits, which have employed case-budgeting attorneys. Their mandate includes high cost non-capital as well as capital case budgeting.

more confidence that requests for services are well founded, making voucher review faster and more efficient. Attorneys also endorsed a relatively new practice in which some district courts approve a "starter budget" that authorizes the initial phase of services required to develop a better informed and more detailed budget, and that allows counsel to begin investigating factors to present to the U.S. Attorney and Department of Justice.

While most lawyers did not find the budgeting process itself onerous, there were some exceptions. In a few districts, there were complaints about the way a court employee (not a judge) approached budgeting. In one example, lawyers said that in order to obtain approval for a trip to the jail, they were asked to identify topics they wished to discuss with the client. They felt this was intrusive and imposed on the attorney-client relationship, and said it took time and ultimately cost money to respond to such requests. In another district where budgeting is managed by a court employee, however, attorneys reported very good communication. They said their requests were handled intelligently and respectfully, and that the court employee was helpful and supportive of their work.

### G. Expert Services

In death penalty cases, both the prosecution and the defense make more extensive use of investigators, expert witnesses, and other case-related services than they do in non-capital cases.[77] More types of experts are employed, and a wider range of services and more time are required of them. See Spencer Report, pp. 21-25. The following section of this report describes several types of experts frequently relied upon in capital cases and some observations of judges and lawyers with respect to their significance. This discussion is intended to illuminate both their function and their relationship to defense costs.

---

[77] As indicated on page 31, supra, when this report refers to "experts," the term encompasses not just expert witnesses, but investigators and all "services other than counsel."

71

### 1.    Guilt Phase Experts

To investigate, prepare, and present evidence of guilt, the government most often is able to rely on salaried employees of such agencies as the Federal Bureau of Investigation, the Drug Enforcement Agency, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and others. Defense counsel, however, must retain, and courts therefore must authorize payment for, private individuals to carry out similar functions. Likewise, with respect to the many types of specialized forensic science expertise that may be relevant during the guilt phase (e.g., ballistics, DNA, serology, narcotics), the prosecution often can utilize salaried members of law enforcement agencies, while the defense generally must hire experts who charge an hourly rate for their services. Fact investigators and forensic science evaluators are common in both capital and non-capital cases.

### 2.    Mental Health Experts

Mental health experts – psychologists, neuropsychologists, psychiatrists, and others – while not unique to death penalty cases, are relied upon to a much greater extent in capital than in non-capital matters. They may be retained to evaluate a defendant, review records, consult with counsel, testify, or all of the above. They may conduct complex neurological assessments, including MRI or PET scans. They may act as "teaching witnesses," to educate a judge or jury about such issues as traumatic brain injury, fetal alcohol syndrome, addiction, mental retardation, or other complex mental conditions. The services of a mental health expert or experts were obtained in virtually every case examined for this study; in a substantial number of those cases that proceeded to trial, such experts were called to testify.

With respect to controlling expenditures, lawyers and judges reported that it is sensible and cost-effective to have mental health evaluations and expert consultations proceed in stages,

rather than arranging for multiple experts and assessments at once. Evaluation ordinarily should move from the general to the more specific, since initial findings will indicate whether there is a need for certain types of specialized expertise. In addition, lawyers specializing in this area explained that expert evaluations typically should be undertaken only after the defense has completed substantial investigation, so that the expert inquiry can be properly focused, and the evaluation based on a reliable foundation of knowledge. A lawyer offered the following example: a life history investigation may reveal that a defendant failed in school beginning in the early grades. A neuropsychological evaluation might then be obtained, revealing that the defendant has a low IQ. This in turn may necessitate more specialized investigation and testing to assess for adaptive function and a possible diagnosis of mental retardation.

Mental health experts are retained by the prosecution as well as the defense. Lawyers and judges indicated that the hourly rates paid to these experts by both sides have risen significantly in the past decade. One judge recalled the trial testimony of a psychiatrist who was being paid between $650 and $800 an hour for his work for the prosecution. Several defense lawyers said that though their expert costs were high, defense experts' hourly rates were no higher than, and in many cases were lower than, those of the mental health experts employed by prosecutors.[78]

---

[78] The current rate sheet for a nationally prominent firm frequently employed by the prosecution in federal death penalty cases indicates hourly rates of up to $900 for some mental health experts. Expert Rates, Park Dietz & Associates, available upon request. In a recent non-capital federal case, a different prosecution expert testified that he was paid $500,000 by the U.S. Attorney's Office for his report, on which he spent approximately 1,000 hours. http://www.deseretnews.com/article/705349138/Expert-paid-500K-for-Mitchell-report.html

### 3.      Mitigation Specialists

As the Spencer Report indicated, effective representation in a death penalty case requires a thorough investigation of the defendant's life history to develop information relevant to sentencing.  Spencer Report at 24-25.[79]  The investigation typically is undertaken with the assistance of a mitigation specialist who has a graduate level degree as well as extensive training and experience in the defense of capital cases.  The mitigation specialist generally coordinates a multi-generational investigation of the defendant's family; identifies medical, psychological, and other issues requiring expert evaluation; and assists attorneys in locating experts and providing documentary materials for the experts to review.  The mitigation specialist's hourly rate is less than counsel's and less than that of the expert witness(es) whose testimony may rely on the results of this investigation.

The Spencer Report found mitigation experts in short supply.  Interviews with judges and defense counsel for this report established that the problem continues.  Appreciation was expressed by lawyers for the annual mitigation training program sponsored by the Office of Defender Services of the Administrative Office of the U.S. Courts, and for the availability of some support for mentoring by senior mitigation specialists.   One judge said that finding a good mitigation specialist was much harder than finding counsel, and defense lawyers agreed.  The shortage of mitigation specialists is even more severe when specialized skills such as foreign language ability are required.  As a result, counsel frequently must retain mitigation specialists from other geographic areas.  Recommendation 7 (Experts) and the accompanying commentary support efforts to enhance the availability of mitigation specialists.

---

[79] This responsibility is described in greater detail in the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003), and *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev 677 (2008).

### 4.    Jury Consultants

Jury consultants provide a range of services in federal death penalty cases, from developing questionnaires to participating in voir dire.  As the Spencer Report explained, jury selection is more complicated in a capital trial.  Spencer Report at 16-17.  The process of determining whether potential jurors should be disqualified because of their views about the death penalty is complex and time consuming.  The involvement of jury consultants in federal death penalty cases has found broader acceptance since the time of the Spencer Report, and such experts are now authorized in a majority of cases that proceed to trial, but the opinions of judges and lawyers about their utility continue to differ.  Lawyers interviewed for this study viewed jury consultants as essential.  While some judges agreed (one said access to a jury consultant was "not only reasonable, but important to a fair trial"), many judges expressed uncertainty about their value but said they gave the benefit of the doubt to defense counsel's strong belief that the defense required the assistance.  Some judges said they authorized jury consultants in capital cases but not in non-capital ones.  Others said they authorized a jury consultant if the prosecution retained one.

### 5.    Victim Liaisons

In a federal capital case, the victim's family has a role at every stage of the proceedings, from the capital authorization process, in which their views are considered in accordance with the Justice Department's protocol, through the sentencing phase, where they are afforded the opportunity to testify.  U.S. Attorney's Offices have special staff to coordinate the contacts of victims and their families with prosecutors and the court.  Defense counsel have an obligation to communicate with victims as they would any other witnesses, and many lawyers reported they

prefer to rely on specially trained victim liaisons to carry out this sensitive task.[80]  The work that is performed by a victim liaison varies.  It may include serving as a conduit for family members' questions of or about the defendant, the defense function, the facts of the offense, or the court proceedings and for conveying the responses of defense counsel back to the family.  The liaison also may, if the family so requests, convey to defense counsel the family members' wishes and priorities in terms of the disposition of the case, and the liaison may address the family's desired role during pre-trial or trial proceedings.  In some instances, a victim's family may wish to avoid a capital trial, a fact which can be very important to both prosecution and defense in reaching a plea agreement.

Victim liaisons have played a role in federal capital cases only for about 10 years.  Very few judges interviewed for this report had heard of them, likely because the practice has become more prevalent in cases litigated after the period encompassed in this study.[81]  The lawyers who had employed a victim liaison said that while family members are free to decline any interaction, those who did choose to communicate with the liaison seemed to find it helpful and said the liaison's work made a valuable contribution to their representation.  These lawyers also said that the services of a liaison may have a positive impact on reducing costs, because it may facilitate a non-trial disposition.  Even where that is not the case, they pointed out, the victim liaison fulfills an important function in establishing (or attempting to establish) contact with individuals to whom the defense must reach out based on their relationship to the victim and their required role

---

[80] The use of specially trained victim liaisons is discussed in the *ABA Guidelines*, Commentary to ABA Guideline 10.9.1, 31 Hofstra L. Rev. at 1042, where it is suggested that "approaches to the victim's family should be undertaken with sensitivity" and that defense counsel " should consider seeking the assistance of . . . a defense-victim liaison . . . in the outreach effort."

[81] The one judge familiar with victim liaison work said he viewed it as important.

in the litigation, and does so at an hourly rate lower than counsel's. Defense-initiated victim contact is "simply essential to the effective delivery of defense services," said one attorney.

### 6. Future Dangerousness and Prison Conditions Experts

At the sentencing phase, a federal capital trial jury must decide between two options: a sentence of life in prison without the possibility of release and a sentence of death. Another type of expert unique to death penalty cases is an individual who can inform the jury about the conditions of life in prison. To provide information about whether a defendant will be dangerous to others if incarcerated for life, both prosecution and defense counsel rely on social scientists who study prisons or on corrections officials with experience administering high-security facilities. Such experts inform jurors about the nature of prison life, the extent to which federal prisons ensure (or cannot ensure) the safety of prisoners and corrections staff, and the rates of violence in prison. Testimony from such experts was very common in cases that went to trial. Judges and lawyers said that knowledge of the prison environment seemed extremely important to jurors and the testimony of these experts was highly valued.

### 7. Requests for Expert Services

Most judges reported that they found the majority of defense counsel's requests for expert services reasonable and approved them, and defense attorneys similarly reported that courts generally ruled favorably upon their applications. Judges said that they found the requests for expert services were made in good faith and reflected a genuine need. They also indicated that the life and death stakes and the nature of the resources marshaled by the prosecution disposed them toward granting all reasonable defense requests and toward giving the defense the benefit of the doubt where any existed. Prosecution resources were described by judges as "vast" and "limitless." The defense is always out-resourced, one judge explained, because

"defense counsel doesn't have the FBI to do its investigation. We do what we can to level the playing field." Prosecution spending was referred to by one judge as "an open spigot" and by another as "a blank check." Another judge asked why "no one ever talks about the government's costs. That's where the money is really spent," he said.

### 8. $7,500 Threshold for Circuit Approval of Expert Payments

As required by statute, once the cost of expert services in a capital case totals $7,500, the district court judge must obtain approval from the chief judge of the circuit, or his or her designee, in order to authorize further payments. 18 U.S.C. § 3599(g)(2). Although intended as a cost control measure, judges said the threshold would need to be substantially higher to serve as a meaningful control.[82] Almost all judges said they succeeded in gaining approval from their circuit chief, most without any difficulty. Many judges said they thought it was sensible to have some type of oversight of the expenditures they authorized. Nevertheless, several judges questioned whether circuit court judges are well situated to evaluate district judges' decisions about the reasonableness of trial costs. One judge expressed concern that decision-making was "arbitrary," while another pointed out that the prosecution did not have to seek court permission for its expenditures. A third judge, who had difficulty obtaining approval, described his circuit's review process as "terrible."

### H. Case Management

Most judges said they took special steps to prepare for presiding over a federal death penalty case. They obtained materials from the Federal Judicial Center (FJC) and attended FJC training seminars, contacted the Administrative Office, spoke to experienced capital prosecutors

---

[82] The median cost of expert services in cases analyzed for this report was $42,000 for cases ending in a guilty plea and just over $100,000 for cases ending in a trial. Supra at p.32, Table 8. In interviews, judges referred to the $7,500 threshold as outdated, unreasonably low, and "wholly unrealistic."

and defense attorneys, and read the Spencer Report.  Most reached out to other federal judges who had presided over death penalty trials, speaking with judges in their own and in other districts.  Compared to other complex cases, said one judge, his federal death penalty preparation involved "a greater quantity of time and intensity of focus."  It was "like getting ready for an extended journey."   Another judge said his preparation included reading all of the U.S. Supreme Court's capital decisions.  He compared it to studying for the bar exam, and said the materials he compiled on capital cases "took up a whole wall."  "You can't work on anything else for weeks," he said.  "It takes all your time."

Both lawyers and judges described capital litigation as exacting an enormous emotional toll, not only from the defendant and his counsel, but also from jurors, prosecutors, judges, and courtroom staff.  One judge said that a colleague who presided over a death penalty trial called to warn him about the stress.  The caller had suffered a heart attack shortly after his trial.  This judge described having nightmares during his case and said that some of the jurors did as well.  One of the lawyers involved in the trial was hospitalized with chest pains.  That judge described the experience as "a year out of time," when everything but the capital trial receded.  The lawyers and the judge essentially shut themselves off from any other work.  Another judge said he had to let a lawyer withdraw from a case because he was unable to bear the financial cost of shutting down the rest of his practice indefinitely.  Defending one of these cases requires "complete commitment," said another judge.  They are enormous and long-term and it is "almost impossible to know when the commitment will end, making it hard to plan for the future."

Death penalty cases require "more stamina, time, and emotional effort," said one judge.  To illustrate the emotional investment of the lawyers, one judge recalled the reaction of an attorney when a life verdict was returned.  "He just started sobbing with relief," the judge said.

Another judge made a similar observation: "You can literally see the emotional and physical toll on the lawyers.  It's visible."  Speaking of his own stress level, one judge said, "You don't sleep at night.  You wake up at 3 a.m.  It totally consumes your life.  You can just cancel everything else in your work and personal life."

Most judges described federal death penalty cases as extremely complex to manage, whether they involved a single defendant or multiple defendants.  Some compared their capital trials to the most complex civil litigation they had presided over, while others said the capital trials were even more challenging than those matters, noting that the life and death stakes made them also much more stressful.   In a published article, one judge said his single defendant capital trial involved 250 pretrial motions, some requiring many hours of hearings, and three interlocutory appeals.  Presiding over the penalty phase was, he said, like "chuting the Colorado River on a tea tray."[83]  Not every judge agreed, however.  One said that while the pressure for lawyers was greater because of the stakes, it was not so for him as the judge.  "Everyone overdoes it in death penalty cases," said another judge, who felt his experiences prior to joining the federal bench, as a defense lawyer and as a state court judge presiding over state death penalty trials, made him especially efficient.  He suggested that judges inexperienced with capital cases "think everything is an important thing," and thus let cases run too long.

When discussing case management issues bearing on case cost, judges emphasized three things:  streamlining the death penalty authorization process; the benefits of an early decision on severance; and the efficiencies that can be achieved through conscientious discovery practices.  Another aspect of capital case management on which all judges commented was voir dire, because capital jury selection is generally very time consuming and different from selecting a

---

[83] Ponsor, *Life, Death and Uncertainty*, Boston Globe, July 8, 2001, at D2.

non-capital jury. The authorization process is discussed separately, in Section II (p. 3) and in Section VI (I) (p. 82). The other three subjects are addressed below. In addition, many judges said their capital trials demonstrated the importance of conducting regular status hearings as well as periodic conferences to review the case budget with defense counsel. These and other cost-containment suggestions relating to case management are also discussed in Recommendation 9 (Case Budgeting, p.115) and Recommendation 10 (Case Management, p.119).

### 1. Severance

Defendants are severed much more frequently in capital than in non-capital cases, both for legal reasons (e.g., evidence is admissible against one defendant but not another) and for case management reasons, including cost efficiency. As the Spencer Report noted, multi-defendant cases generally cost more to defend, per defendant, than single defendant cases, and this effect "may be magnified in a case in which some defendants face the death penalty and other defendants face only non-capital charges." Spencer Report at 11. From the earliest pre-trial period through the end of a penalty trial, the defense of capital and non-capital defendants is likely to proceed very differently. In most cases in this study, courts found it efficient to sever non-capital defendants early in the proceedings. One judge described it as "virtually mandatory," not in a legal sense but in a practical one. Non-capital cases typically resolve, whether by plea or by trial, long before capital cases, and thus their representation costs cease. The majority of cases proceeding to trial have involved just one defendant for whom the government is seeking the death penalty, but severance practices with regard to capital defendants' trials have varied. In multi-defendant cases involving more than one authorized defendant, many judges have followed the practice of trying each capital defendant separately.

Some have conducted joint trials and some have severed the penalty phase trial for each defendant after a joint trial in the guilt phase.

### 2. Discovery

The amount of material produced for discovery in a federal death penalty case can be overwhelming, particularly when there are multiple defendants and when alleged conduct spans an extended period of time. A judge who has presided over several large multi-defendant death penalty cases, himself a former prosecutor, had numerous suggestions about containing the costs of discovery. "There's much the government can do to mitigate the cost of huge discovery so these costs aren't passed on to the CJA," he said. He suggested that either the judge or a court administrator work with counsel for both sides to identify methods of containing discovery costs, e.g., negotiating with vendors for discounts on large reproduction orders. The judge also suggested that the government be encouraged or required by the court to organize materials in a manner reasonably convenient for defense counsel to access, such as a readable electronic format. Along the same lines, the government could assist by providing any transcripts that have been prepared along with the recordings of wiretapped conversations it turns over in discovery. Such practices would not cost the prosecution much, but could save the defense, and thus the public, a great deal of expense by avoiding costly duplication of effort.

### 3. Jury Selection

The Spencer Report described the heightened significance and complexity that the death penalty adds to jury selection. Spencer Report at 16-17, 25. Not surprisingly, judges and lawyers described jury selection in capital cases as dramatically different from that in non-capital

trials.[84]  Jury selection takes longer in federal death penalty cases, both because the total number of jurors questioned is larger, and because there is, necessarily, more extensive questioning of each individual prospective juror.[85]  Many lawyers and judges said that in general, voir dire is the single most determinative factor in the outcome of a trial.  In fact, judges declared it essential for a trial judge new to capital cases to become educated about voir dire in advance of trial.

In almost all cases, juror questionnaires that the lawyers participated in drafting were distributed and used to winnow the jury pool.  This was typically followed by group voir dire and then by more extensive individual voir dire.   One judge said he did not allow questionnaires because it "lets lawyers find ways to keep jurors off the jury."   Instead, he said, he asks a series of questions and then lets the lawyers do the remaining voir dire.  Most judges said they found it appropriate to give counsel a much larger role and greater latitude in the questioning than would be their practice in a non-capital case.  While most judges said it was necessary to dedicate a great deal more time to selecting a capital jury, there were a few notable exceptions.  The majority of judges and lawyers described a jury selection process that took weeks or even months, but a few described a shorter process.  Two judges said their voir dire of prospective jurors lasted only one day, a fact that many other judges found disturbing.  Those districts where voir dire was most brief were located in states with a large number of state court death penalty trials, although not all such states had abbreviated voir dire.

---

[84] In a capital case, ordinarily the same jury will decide both the guilt and penalty phase verdicts, and so, among other things, the court must determine whether jurors should be disqualified because their views about the death penalty, for or against, would make them unable to follow the law governing penalty phase deliberations.

[85] A large pool is required because of the range of issues that may cause an individual to be excused, including the death qualification inquiry, pretrial publicity, or other factors related to the nature of the guilt or sentencing portion of the case.

83

## I.    The Capital Authorization Process

The Department of Justice seeks the death penalty against only a small percentage of the defendants charged with death-eligible offenses.  The process by which the Attorney General determines whether to seek the death penalty and whether, in cases in which capital prosecution has been authorized, to permit a plea agreement involving a sentence other than death is described in Section II.B (pp. 5-8) of this report.  A decision not to authorize capital prosecution has obvious and dramatic cost consequences, as it may reduce the number of defense counsel required, as well as their hourly rate, and will certainly narrow the scope of their responsibilities.  The Spencer Report recommended that the authorization process be streamlined so that these cost savings could be maximized.[86]  Spencer Report at 19-21, 49-50.  Lawyers and judges interviewed for this report, however, still find the process inefficient and extremely costly.

Trial judges interviewed consistently expressed a high degree of dissatisfaction with authorization decision-making because the process generally takes too long.  Judges were concerned because the delay in decision-making drives costs higher.  While prolonged decision-making proceeds, two lawyers (paid at the higher capital rate) continue to treat a case as capital, preparing motions, investigating for mitigation, and hiring and utilizing experts.  The money is spent even when the case is not ultimately authorized.  Judges were troubled because this aspect of the authorization process places an unnecessary burden on CJA resources, the judiciary, and ultimately the taxpayer.

---

[86] This study found that authorized cases cost about eight times as much as cases that are not authorized.   See Table 3, page 26.  The median defense cost of an authorized federal death penalty case between 1998 and 2004 was $353,185.  By comparison, the median defense cost of a case that was eligible for capital prosecution but was not authorized was $44,809.  Capital authorization thus increased the median defense cost of a case by $308,376.

Many judges said that in their cases it took the Justice Department "too long" to make a decision about whether or not the death penalty would be authorized.  Judges had this concern with respect to cases ultimately authorized for prosecution as well as cases that were not, but their concerns were heightened with respect to the latter.[87]  They emphasized that the process took months, even where cases could be identified as unlikely to be authorized based on what already was known about the defendant, the prosecution's case, or both.  The Justice Department's process "has got to be faster," said one judge, who felt "the local prosecutors lost control" and the case "got lost in the bureaucracy."

Some judges said they tried to accelerate the authorization process by setting deadlines that would bind prosecutors to returning the Attorney General's decision by a certain date, while others indicated they were reluctant to do so for fear this might cause the government to provide notice of authorization simply as a placeholder.   For example, one judge emphasized that as a cost management tool, it was critical to be aggressive in setting deadlines and requiring strict adherence from the government, with forfeiture of the right to seek the death penalty resulting from non-compliance.  This judge pointed out that the death penalty is not sought in the overwhelming majority of capital-eligible cases, and that the prosecution should be able to identify most of those cases much more quickly.  Another judge expressed reluctance to pressure the local prosecutors for fear it would precipitate a premature decision to seek death.  (In that judge's case, the local prosecutors recommended against authorization but the Attorney General authorized the case.)

---

[87] Judges noted that in cases where death penalty authorization does appear a realistic possibility, it is important to allow defense counsel sufficient opportunity to gather and present their best arguments to the local prosecutors and the Justice Department.  From a cost standpoint, they said, investing in the effort to avoid a capital prosecution is the approach most likely to avoid greater future costs.

While judges were most concerned with the amount of time it took for a decision not to seek the death penalty, lawyers emphasized the way authorization decisions are re-visited later in the litigation. In a federal death penalty case, if the defense and U.S. Attorney reach a negotiated settlement, the Justice Department's protocol will not allow a plea to proceed unless it is approved by the Attorney General. Lawyers described cases in which costly trials went forward because the Justice Department refused to approve such a settlement. They viewed the subsequent expenditure of time, money, and other resources as wasteful when both sides had agreed to what each viewed as a fair resolution of the case. They pointed out that the sentences of life without the possibility of release that resulted from these trials could have been had at a much lower price had the Justice Department heeded the recommendation of the local U.S. Attorney.

### J.       Appellate and Post-Conviction Representation

Although research for this report focused primarily on trial representation, the interviews yielded information relevant to the quality and availability of appellate and post-conviction representation that warrants attention. The following section discusses those issues.

#### 1.       Quality and Availability of Appellate Counsel

Until recently, it was not uncommon for courts of appeals automatically to continue the appointment of a death-sentenced federal defendant's trial lawyers through the appeal.[88] Interviews with experienced capital appeals lawyers suggested that this practice had a negative impact on the quality of appellate representation. They noted that counsel who lacked capital appeals experience sometimes overlooked the importance of litigating and emphasizing appellate

---

[88] The reasons why this is not a preferred practice in capital (or in non-capital) representation are discussed more fully in the Commentary accompanying Recommendation 1(c) (Special Considerations in the Appointment of Counsel on Appeal).

issues pertaining to sentencing, and yet where error is found and relief granted in capital cases, it is more typically in the sentencing phase.  For example, in one case the primary issue raised on appeal related to an arguably frivolous speedy trial claim, while a potentially meritorious death-sentencing claim was wholly ignored.  The lawyers noted that while most federal death penalty appellate decisions have been affirmances, those in which relief was granted have all involved penalty phase errors.  One capital appeals specialist expressed surprise that he saw briefing in federal court that was "beneath the standard of practice in state capital appeals."

It was also noted that lawyers without capital appellate experience have rarely, if ever, confronted other challenges unique to these appeals.  These include a voluminous record that can extend to tens of thousands of pages (and which may have to be supplemented to bring all relevant issues before the appellate court) and that can give rise to a vast number of potential issues; the special need to select and present issues with a view toward future proceedings (e.g., post-conviction litigation and clemency); and special difficulties in managing clients who are on death row.  Finally, capital appeals specialists noted that even trial counsel who do have strong appellate credentials may have difficulty viewing the case within the "four corners" of the record rather than through their extensive outside-the-record experiences at trial.  As a result, legal issues missed at trial may be neglected on appeal as well.  For this reason, they explain, it is important to bring a fresh perspective, as well as appellate expertise, to the examination of the record.

### 2. Quality and Availability of Post-Conviction Counsel

Concerns about appointment of counsel were greater with respect to post-conviction representation.  Post-conviction specialists from various regions noted that, contrary to Spencer Report Recommendation 1(d), some courts had appointed attorneys who lacked capital post-

conviction experience.  They said this lack of experience was especially consequential in light of the one year statute of limitations within which motions for relief pursuant to 28 U.S.C. § 2255 must be thoroughly investigated and filed.  They said there is little time available for inexperienced counsel to "learn the ropes," and no safety net if they fail, as this is the one and only opportunity for post-conviction investigation and presentation of claims challenging the constitutionality of a federal conviction and death sentence.

Among the problems resulting from the appointment of inexperienced post-conviction counsel was a failure to fully investigate potential post-conviction claims, particularly those requiring investigation outside the trial record and relating to the penalty phase, such as ineffective assistance of counsel, juror misconduct, and government suppression of evidence favorable to the defense.  One striking concern, they said, was the number of instances in which viable claims of mental retardation and other mental conditions were either overlooked or insufficiently developed, first at trial and then again in the post-conviction stage.  The inadequacy of post-conviction mitigation investigation in general was a focal point of concern. The Commentary accompanying Recommendation 1(d) (Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings, p. 90) identifies the prior experience counsel should bring to a federal capital post-conviction representation.

As explained earlier, interviews with trial judges found that in general they had confidence in the work that was done by the trial counsel they appointed.  Although only a limited number of judges interviewed had presided over capital 2255 proceedings, their perceptions about the high quality of trial representation seemed to inform their views about the resources that would be required for post-conviction defense representation.  According to experienced post-conviction lawyers, some judges are reluctant to grant the resources necessary

88

to fulfill post-conviction counsel's duty to conduct an independent outside-the-record investigation.  They also pointed out that even highly experienced and dedicated trial counsel can miss, and have missed, important issues or areas of investigation.  This point was confirmed by experienced trial counsel.

At least one judicial district has adopted a policy of transferring capital 2255 proceedings to a judge other than the one who presided over the trial, and a judge from that district spoke favorably about it.  Under this policy, he said, there is "no question about impartiality," adding that it gives him more confidence in the process "to have another set of eyes on the case."  Having the trial court preside over the post-conviction proceedings is "too much like having the trial court rule on the appeal of its decisions," he said.

## VII.    Conclusion

The 1998 Spencer Report concluded by offering 11 recommendations to encourage both high quality representation and cost containment in the defense of federal death penalty cases.  Those recommendations were adopted by the Judicial Conference and remain Conference policy today.  This report concludes by offering updated commentary to accompany those same recommendations, in order to reflect the judiciary's evolving experience with these highly complex and intensely demanding matters.

# VIII.    RECOMMENDATIONS AND COMMENTARY[89]

## 1. Qualifications for Appointment.

a. <u>Quality of Counsel.</u>  Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

b. <u>Qualifications of Counsel.</u>  As required by statute, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

c. <u>Special Considerations in the Appointment of Counsel on Appeal.</u>  Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing appellate counsel, courts should, among other relevant factors, consider:

> i. the attorney's experience in federal criminal appeals and capital appeals;

> ii. the general qualifications identified in paragraph 1(a), above; and

> iii. the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

d. <u>Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings.</u>  In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications set forth in paragraph 1(a).

e. <u>Hourly Rate of Compensation for Counsel.</u>  The rate of compensation for counsel in a capital case should be maintained at a level sufficient to assure the appointment of attorneys who are appropriately qualified to undertake such representation.

---

[89] Section VIII utilizes a numbering system that is different from the rest of this report in order to match the numbered recommendations in the original Spencer Report.

90

### Commentary

As Recommendation 1(a) indicates, the first responsibility of the court in a federal death penalty case is to appoint experienced, well-trained, and dedicated defense counsel who will provide high quality legal representation.  Federal law requires the appointment of two counsel to represent a defendant in a federal death penalty case, of whom at least one must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005.  Additional requirements relating to counsel's experience are codified at 18 U.S.C. § 3599.  Legislatures, courts, bar associations, and other groups that have considered the qualifications necessary for effective representation in death penalty proceedings have consistently demanded a higher degree of training and experience than that required for other representations.  As provided in the Defender Services Program Strategic Plan, counsel in federal death penalty cases are expected to comply with Guidelines 1.1 and 10.2 et seq. of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003), and the *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev 677 (2008).[90]

Heightened standards are required to ensure that representation in federal death penalty cases is both cost-effective and commensurate with the complexity and high stakes of the litigation.  Counsel in a federal death penalty case must not only be skilled in defending the charged offense, e.g., a homicide, but also must be thoroughly knowledgeable about a complex body of constitutional law and special procedures that do not apply in other criminal cases.  They must be able to direct extensive and sophisticated investigations into guilt/innocence and

---

[90] Aimed at providing counsel services "consistent with the best practices of the legal profession," the Defender Services Program Strategic Plan was endorsed by the Defender Services Committee of the United States Judicial Conference.  See Goal 2 (Quality of Representation), Strategy 16 (Capital Representations).

91

mitigation of sentence.  They must have the counseling skills to advise a client deciding between pleading guilty in return for a life sentence and proceeding to trial where the sentencing options are death or life imprisonment without the possibility of release.[91]  They must have communication skills to establish trust with clients, family members, witnesses, and others whose backgrounds may be culturally, racially, ethnically, linguistically, socioeconomically, and otherwise different from counsel's.  They must be able to work effectively as part of a defense team and collaboratively with counsel for codefendants.  And, for post-conviction cases, counsel also must be familiar with the unique jurisprudence and practices applicable in habeas corpus. Finally, counsel must be able, notwithstanding exceptional knowledge and skill, to commit sufficient time and resources, taking into account the extraordinary demands of a federal death penalty representation.

The standards listed in Recommendations 1(b) – (d) are designed to assist courts in identifying the specific types of expertise and distinguished prior experience which have been deemed most valuable to this demanding work in the experience of the federal courts thus far. They emphasize the importance of bringing to bear both death penalty expertise and experience in the practice of criminal defense in the federal courts.  As described further in the commentary to Recommendation 2, the qualifications of counsel must be assessed with respect to the particular demands of the individual case, the stage of the litigation, and the defendant.

---

[91] A guilty plea negotiated at any point in the proceedings brings substantial cost savings, and such a disposition is always available if the sides can find agreement, even after the death penalty has been authorized.  The Federal Death Penalty Resource Counsel Project recently estimated that plea agreements have been reached in approximately 25 percent of *authorized* federal capital prosecutions since 1988.  Appointed counsel's negotiating skills thus are very important.

The governing statute calls for capitally qualified counsel to be appointed "promptly," 18 U.S.C. § 3005.  Recommendation 1(b) endorses appointment of specially qualified counsel "at the outset" of a case, which in some cases may mean prior to the formal filing of a charging document.  Courts should not wait to see whether the government will seek capital prosecution before appointing appropriately qualified counsel and granting them the resources necessary for a preliminary investigation.  The goals of efficiency and quality of representation are achieved by early appointment of learned counsel in cases where capital indictment may be sought. Virtually all aspects of the defense of a federal death penalty case, beginning with decisions made at the earliest stages of the litigation, are affected by the complexities of the penalty phase. Early appointment of "learned counsel" is also necessitated by the formal authorization process adopted by the Department of Justice to guide the Attorney General's decision-making regarding whether to seek imposition of a death sentence once a death-eligible offense has been indicted. Integral to the authorization process are presentations to the local United States Attorney's Office and Justice Department officials of the factors which would militate against a death sentence.  See United States Attorney's Manual § 9-10.000.  A mitigation investigation therefore must be undertaken at the commencement of the representation.  Delay in appointment of learned counsel risks missing this important opportunity to avoid the high cost of a capital prosecution.  Since an early decision not to seek death is the least costly way to resolve a potential capital charge, a prompt preliminary mitigation investigation leading to effective advocacy with the local U.S. Attorney and with the Justice Department is critical both to a defendant's interests and to sound fiscal management of public funds.  And, since the local prosecutor's recommendation most often prevails with the Attorney General, the opportunity to persuade the U.S. Attorney not to request capital authorization is extremely important.

Recommendation 1(b)'s requirement of "distinguished prior experience" contemplates excellence, not simply prior experience, at the relevant stage of proceedings: trial, appeal, or post-conviction.  It is expected that a lawyer appointed as "learned counsel" for trial previously will have tried a capital case through the penalty phase, whether in state or in federal court, and will have done so with distinction.  Excellence in general criminal defense will not suffice because the preparation of a death penalty case requires knowledge, skills, and abilities which even the most seasoned lawyers will not possess if they lack capital experience.  And not all capital trial experience will qualify as "distinguished."  Consultation with federal defender organizations and Resource Counsel, as described in Recommendation 2 (Consultation with Federal Defender Organizations or the Administrative Office), can help ensure that appointed counsel meet this criterion.[92]

Courts should appoint counsel with "distinguished prior experience" in death penalty trials, appeals, or post-conviction representation, even if meeting the standard requires appointing counsel from outside the district in which a matter arises.  Appointing such qualified defense counsel generally produces cost efficiencies, including a higher likelihood of a non-trial disposition.  The costs of travel and other expenses associated with bringing counsel from

_____

[92] The term federal defender organization (FDO) is used here to refer to a Federal Public Defender Organization (FPDO) and a Community Defender Organization (CDO), two different organizational models that fulfill the same function of providing counsel for indigent criminal defendants in the federal courts pursuant to the Criminal Justice Act (CJA), 18 U.S.C. § 3006A.  A Federal Public Defender Organization is a federal office, headed by a Federal Public Defender who is selected by the Circuit Court of Appeals.  The attorneys and other staff are employees of the federal judiciary.  A Community Defender Organization is a not-for-profit corporation governed by a board of directors and led by an executive director.  Both types of organization are funded and administered by the federal judiciary. Among the 94 judicial districts, 90 are served by an FDO.

The term "Resource Counsel" refers to the death penalty experts who serve in the Federal Death Penalty Resource Counsel Project (trial level), the Federal Capital Appellate Resource Counsel Project (appellate level), and the Federal Capital Habeas Project (post-conviction level).  These groups are referred to collectively as "Resource Counsel" or "the Resource Counsel Projects."  The work of the three Resource Counsel Projects and the National Mitigation Coordinator is described in the commentary accompanying Recommendation 2 (Consultation with Federal Defender Organizations or the Administrative Office) and Recommendation 6 (Federal Death Penalty Resource Counsel).

another jurisdiction can be minimized with careful planning by counsel and the court.  With appropriate forethought, investigations, client counseling, court appearances, and other obligations can be coordinated to maximize the efficient use of counsel's time and ensure cost-effectiveness.  In the institutional defender context, when it is helpful and desirable, attorney resources can be shared between defender offices pursuant to an established protocol.

Recommendation 1(c) provides that counsel on appeal should include "at least one attorney who did not represent the appellant at trial."  Like capital trial representation, capital appellate representation should be tailored to the individual requirements of the case, stage of proceedings, and client.  There should be no presumption of continuity from trial to appeal in federal death penalty cases, and courts frequently relieve and replace both trial counsel.  Capital appellate work is a specialty, and a lawyer is rarely a specialist in both trial and appellate representation.[93]  Even if trial counsel does possess "distinguished prior experience" in appellate as well as trial representation, there is value in bringing fresh perspective to issues that have been litigated below.  In addition, a new lawyer may, if appropriately experienced, be able to provide continued representation following the appeal in any post-conviction proceedings, which a trial lawyer could not, due to a conflict of interest.[94]  This would afford continuity of representation at that stage and, presumably, cost savings.  To address particular case-specific demands, such as an especially complex trial record or managing the needs of a defendant with significant mental health issues, some courts have found it helpful and cost-efficient to appoint one of the

---

[93] See *Good Practices for Panel Attorney Programs in the U.S. Courts of Appeals,* Vera Institute of Justice (2006) (the Defender Services Committee endorsed the report's recommendation that circuits adopt a flexible approach rather than requiring CJA trial counsel to continue representing the defendant through the appeal, and encouraging deference to trial counsel regarding whether continued representation is in the client's best interests and consistent with counsel's professional skills and obligations). http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/VERASuggestedGoodPractices.aspx.

[94] Where a claim of ineffective assistance of counsel on appeal is possible, continued representation would not be appropriate.

95

defendant's trial attorneys as third counsel on appeal, to provide limited and/or temporary assistance as required.

Recommendation 1(d) highlights the need for specialized expertise in post-conviction representation.  Like trial and appellate counsel, post-conviction lawyers for federal death penalty cases should be selected based on an individualized assessment of the requirements of the case, the stage of the litigation, and the defendant.   Habeas corpus practice is a complex subspecialty of capital representation.  A lawyer qualified to be learned counsel in a federal capital trial or on appeal will not necessarily have such expertise.  Challenges include an accelerated timeline, a tangle of specialized procedural law applicable to capital proceedings pursuant to 28 U.S.C. § 2255, and an obligation that includes a full investigation of both phases of the trial to identify any possible constitutional infirmities.  This underscores the importance of appointing counsel with the experience and dedication – as well as the time and resources – to devote to this intensely demanding work.  The one-year statute of limitations makes it especially important that counsel be appointed promptly.  Federal Capital Habeas Resource Counsel recommend that appointment take place prior to the denial of certiorari by the Supreme Court. As indicated in Recommendation 4 (Appointment of the Federal Defender Organization), a number of federal defender organizations have staff attorneys who specialize in post-conviction capital litigation.  Where they possess the requisite expertise, appointment of federal defender organizations should be considered in capital 2255 cases.  For capital habeas corpus cases brought pursuant to 28 U.S.C. § 2254, involving state death sentenced prisoners, representation

by an institutional defender organization has been endorsed by the Committee on Defender Services as offering cost and other efficiencies together with high quality representation.[95]

   Recommendation 1(e) recognizes that appropriate rates of compensation are essential to maintaining the quality of representation required in a federal capital case.  The time demands of these cases are such that a single federal death penalty representation is likely to become, for a substantial period of time, counsel's exclusive or nearly exclusive professional commitment.  It is therefore necessary that the hourly rate of compensation be fair in relation to the costs associated with maintaining a criminal practice.  The rate ($178 as of January 1, 2010) should be reviewed at least every three years to ensure that it remains sufficient in light of inflation and other factors.  (See 18 U.S.C. § 3006A(d)(1) and 18 U.S.C. § 3599(g)(1).)

---

[95] Report on Death Penalty Representation, prepared by the Committee on Defender Services Subcommittee on Death Penalty Representation, approved by the Judicial Conference (JCUS-SEP 95, pp. 69, 78-81).

**2. Consultation with Federal Defender Organizations or the Administrative Office.**

a. <u>Notification of Statutory Obligation to Consult.</u>  The Administrative Office of the U.S. Courts (Administrative Office) and federal defender organizations should take appropriate action to ensure that their availability to provide statutorily mandated consultation regarding the appointment of counsel in every federal death penalty case is well known to the courts. (See 18 U.S.C. § 3005.)

b. <u>Consultation by Courts in Selecting Counsel.</u>  In each case involving an offense punishable by death, courts should, as required by 18 U.S.C. § 3005, consider the recommendation of the district's Federal Public Defender (FPD) (unless the defender organization has a conflict) about the lawyers to be appointed. In districts not served by a Federal Public Defender Organization, 18 U.S.C. § 3005 requires consultation with the Administrative Office. Although not required to do so by statute, courts served by a Community Defender Organization (CDO) should seek the advice of that office.

c. <u>Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel.</u>  In discharging their responsibility to recommend defense counsel, FDOs and the Administrative Office should consult with Federal Death Penalty Resource Counsel in order to identify attorneys who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as lead and second counsel.

## Commentary

Courts are required pursuant to 18 U.S.C. § 3005 to consider the recommendation of their federal defender organization or the Administrative Office regarding the appointment of both counsel in each federal death penalty case.[96]  Most courts are aware of the statute and policy and do consult about their appointments, though a small number still do not.  The Administrative Office should continue to ensure that all courts are aware of the importance and availability of consultation for all federal capital appointments, and should make specific outreach to courts that for any reason have not consulted with federal defenders or Resource Counsel.

---

[96] The specific language of the statute requires the court to "consider the recommendation of the *Federal Public Defender* organization, or, if no such organization exists in the district, of the Administrative Office…." 18 U.S.C. § 3005.  Emphasis added.  There is no indication in the legislative history that this reference was intended to exclude Community Defender Organizations, and the most reasonable interpretation is that this was inadvertent and that Congress's intention was to include all federal defender organizations.  As a matter of policy, the Judicial Conference recommends that consultation be made with the district's FDO, regardless of whether it is organized as an FPD or a CDO.  See Recommendation 1, Footnote 94.

98

Recommendation 2(b) emphasizes that consultation should be made for "*each case involving an offense punishable by death.*"  It is not satisfied where a court selects counsel from a pre-existing list, because recommendations concerning appointment of counsel are best obtained on an individualized, case-by-case basis.  The relative infrequency of federal death penalty appointments, and the typically swift response which any court requesting a recommendation can expect, makes lists or "panels" of  "capitally-qualified" attorneys both unnecessary and, in some respects, impractical.[97]  Currently, within a short time after receipt of a request, the federal defender or Administrative Office (through Resource Counsel, as described below and in Recommendation 6) provides the court with the names of attorneys who not only are qualified to serve as counsel but who also have been contacted and indicated their willingness to serve in the particular case.[98]  These individualized recommendations help to ensure that counsel are well-suited to the demands of a particular case and compatible with one another and the defendant.  Whether at trial, on appeal, or in post-conviction, the federal defender and Resource Counsel are likely to have access to information that the court lacks.  That information includes factors relating to the defendant or to counsel who are candidates for appointment.  Consideration of these factors is essential to establishing a defense team that functions effectively.  Case-specific consultation is also required by Judicial Conference policy (see Guide, §§ 620.30(a) and (b), explaining the 18 U.S.C. § 3005 consultation requirement and

---

[97] The distinction between being qualified to serve and willing to do so is significant.  Many defense counsel would not be willing to accept appointment to more than one federal death penalty case at a time.  Furthermore, since accepting a federal death penalty appointment requires a substantial time commitment which may ultimately cause the attorney to become entirely unavailable for any other fee-generating work, appointment in such a case is not lightly undertaken.

[98] In some instances, in fact, it is the federal defender or Resource Counsel who first alerts the court to the need for an appointment.  For example, prior to an indictment issuing, the U.S. Attorney's Office may inform the defender or Resource Counsel of an imminent capital prosecution in which a defendant will need capitally qualified counsel, or the defender or Resource Counsel may become aware of an investigation and the need for counsel through other means.

99

suggesting that in developing a recommendation, consideration be given to "the facts and circumstances of the case.")

Recommendation 2(c) recognizes the role of Resource Counsel in the consultation process. When this Recommendation was first made, there was a single Federal Death Penalty Resource Counsel Project charged with responsibility for assisting in federal death penalty proceedings at all stages of litigation: trial, appeal, and post-conviction. Those functions have now been distributed among three projects, each of which addresses a different stage of litigation: the Federal Death Penalty Resource Counsel Project (trial), the Federal Capital Appellate Resource Counsel Project, and the Federal Capital Habeas Project.[99] Referred to collectively here as "Resource Counsel" or "the Resource Counsel Projects," these lawyers are death penalty experts. They are knowledgeable about and maintain effective communication with defense counsel nationwide, and their ability to promptly match attorneys with cases is of great value to the judiciary.

The appropriate Resource Counsel Project should be consulted about appointment of counsel in every trial, appellate, and post-conviction case, whether by the court, the federal defender, or both. In addition, prior to recommending counsel for appointment in a federal capital case, federal defenders should advise potential counsel that any attorney appointed is expected to consult regularly with Resource Counsel.[100] Federal defenders and Resource Counsel should also ensure, prior to making a recommendation to a court, that prospective defense counsel are able to dedicate the time required to the new capital case.

---

[99] The National Mitigation Coordinator also provides assistance in federal death penalty cases, as described in Recommendation 6 (Federal Death Penalty Resource Counsel).

[100] See Defender Services Strategic Plan, Goal 2 (Quality of Representation), Strategy 17 (Capital Representations).

100

Together, Resource Counsel and federal defenders have been instrumental in providing high quality representation to federal defendants from trial through post-conviction proceedings. Recommendation 2(c) recognizes the value of Resource Counsel and urges federal defenders and the Administrative Office to continue to work closely with them.

### 3. Appointment of More Than Two Lawyers.

<u>Number of Counsel.</u>  Courts should not appoint more than two lawyers to provide representation to a defendant in a federal death penalty case unless exceptional circumstances and good cause are shown. Appointed counsel may, however, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.

### Commentary

The norm in federal death penalty cases is the appointment of two counsel per defendant.

Courts contemplating the appointment of a third counsel for trial, appeal or post-conviction representation might consider contacting the Administrative Office, the federal defender organization or the appropriate Resource Counsel Project (see Recommendation 6) for information and advice about whether circumstances warrant such appointment.

Notwithstanding this suggested limit on the number of attorneys charged with responsibility for the defense in its entirety, courts are encouraged to permit appointed counsel to employ additional attorneys to perform more limited services where to do so would be cost-effective or otherwise enhance the effective use of resources.  For example, in many federal death penalty cases, the prosecution provides to defense counsel an extensive amount of discovery material which must be reviewed for relevance and organized for use by the defense.  Allowing appointed counsel to obtain legal assistance from an associate at his or her firm or from another appropriately qualified lawyer may prove economical because the work is performed at a lower hourly rate, or this assistance may be a necessity in light of the volume and nature of the work or court deadlines.  See Guide, §§ 620.10.10 and 230.23.10(f).

**4. Appointment of the Federal Defender Organization (FDO).**

a. <u>FDO as Lead Counsel.</u>  Courts should consider appointing the district's FDO as lead counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has one or more lawyers with experience in the trial and/or appeal of capital cases who are qualified to serve as "learned counsel"; and

> ii. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

> iii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

b. <u>FDO as Second Counsel.</u> Courts should consider appointing the district's FDO as second counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

> ii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

### Commentary

Effective capital representation requires a team of many players, and the institutional strength of a federal defender organization lends itself to good teamwork.  On the other hand, a defender organization can meet the demands of a capital case only if the assigned personnel possess the requisite qualifications and have available to them the time and other resources the case requires.  Thus, courts are encouraged to appoint an FDO as either lead or second counsel in a capital case, but only after consideration of the factors identified in this Recommendation and consultation with the federal defender.

Recommendations 4(a) and (b) acknowledge that capital cases inevitably and seriously disrupt the normal functioning of an office.  To undertake too much death penalty litigation would seriously threaten the effective performance of a defender organization's responsibility to provide representation to a substantial number of financially eligible criminal defendants in its district each year.  Therefore, a federal defender organization should not be required to accept more than one federal death penalty trial representation at a time unless the head of the organization believes such an arrangement is appropriate.  In addition, the head of an FDO accepting a capital appointment must be prepared to seek additional resources as necessary and to shift responsibilities among staff so that those entrusted with capital cases have sufficient time for that work and other demands upon them are limited.[101]  Regardless of what level of capital experience the federal defender has, all FDOs with federal capital cases should maintain close contact and collaborate with the appropriate Resource Counsel Project.[102]

In addition to serving as counsel, many federal defender organizations play a valuable administrative and leadership role with respect to death penalty representation in their districts, for example, by sponsoring training, facilitating relationships with Resource Counsel, and disseminating information to panel attorneys.  This important work should continue to be supported and encouraged by the Administrative Office.  Also, federal defender organizations should identify and share best practices they have developed in providing capital representation and in supporting the work of other capital lawyers.

---

[101] These warnings about avoiding over-commitment should be understood to extend to panel attorneys accepting appointment in capital cases as well. As noted in the commentary accompanying Recommendation 2 (Consultation with Federal Defender Organizations or the Administrative Office), in making recommendations and appointments, courts, federal defenders and Resource Counsel should ensure that prospective defense counsel are sufficiently free of other obligations to dedicate the time required to the new capital case.

[102] See Defender Services Strategic Plan, Goal 2 (Quality of Representation), Strategy 16 (Capital Representations).

104

Courts are encouraged to consider appointing federal defender organizations with the requisite expertise to represent federal death-sentenced prisoners in appellate and post-conviction proceedings, as well as at trial.  There are particular benefits to the appointment of well-resourced offices in capital 2255 proceedings, which require digesting and briefing large amounts of legal and factual material and conducting a thorough investigation within a very compressed timetable.  Post-conviction representation makes demands that can be efficiently met by institutional representation.[103]  In addition, it has proved much harder to find qualified, available attorneys for 2255 matters than for capital trial cases.

Over the past several years, a number of federal defender organizations have accepted capital appeals and 2255 representations, most of them having acquired the necessary expertise through their representation of state death-sentenced prisoners pursuant to 28 U.S.C. § 2254.  The Administrative Office should evaluate the need for counsel in capital 2255 proceedings, continue to support federal defender organizations in meeting the need, and consider whether to establish additional capacity for institutional representation in capital cases in the defender program.

---

[103] Report on Death Penalty Representation, prepared by the Committee on Defender Services Subcommittee on Death Penalty Representation, approved by the Judicial Conference (JCUS-SEP 95).

**5. The Death Penalty Authorization Process.**

a. <u>Streamlining the Authorization Process.</u> The Department of Justice should consider adopting a "fast track" review of cases involving death-eligible defendants where there is a high probability that the death penalty will not be sought.

b. <u>Court Monitoring of the Authorization Process.</u> Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously.

<div align="center">

**Commentary**

</div>

A decision not to seek the death penalty against a defendant has large and immediate cost-saving consequences. The sooner that decision is made, the larger the savings. Since the death penalty ultimately is sought against only a small number of the defendants charged with death-eligible offenses, the process for identifying those defendants should be expeditious in order to preserve funding and minimize the unnecessary expenditure of resources. The current process, however, is not expeditious; rather, even in cases in which authorization for capital prosecution is viewed as unlikely by both the prosecution and the defense, the process is lengthy and seemingly inefficient, involving multiple levels of review, and results in unnecessary costs being incurred. The process also limits the availability of lawyers qualified to serve as "learned counsel" for other capital appointments. Recommendations 5(a) and (b) call upon the Department of Justice and the judiciary to maximize cost-savings by increasing the efficiency of the authorization process. The Department of Justice can do this by evaluating and streamlining its procedures. Judges can do this by establishing reasonable deadlines and maintaining oversight during the pre-authorization stage of the litigation.[104] Courts should ensure, however, that whatever decision-making timetables are imposed are sufficient to allow for meaningful pre-authorization advocacy by counsel for the defendant. Where authorization to seek the death

---

[104] Section 670 of the Guide sets forth Judicial Conference policy on "scheduling of federal death penalty case authorization to control costs."

penalty is significantly likely, the prosecution and defense should be given every opportunity to explore the reasons for not authorizing or for negotiating an early disposition of the case.

In addition to acting in their individual capacities to pursue efficiency goals, the Department of Justice and the judiciary should seek opportunities to communicate with one another about the impact of federal death penalty policies on the efficient administration of justice.  Given the enormous resource demands and cost implications, it would be wise for the judiciary, the Department of Justice, and the Administrative Office to communicate and work together at the highest levels.

**6. Federal Death Penalty Resource Counsel**

a.  <u>Information from Resource Counsel.</u>  In all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation.  The judiciary should allocate resources sufficient to permit the full value of these services to be provided in every case.

b.  <u>Technology and Information Sharing.</u>  The Administrative Office should explore the use of computer-based technology to facilitate the efficient and cost-effective sharing of information between Resource Counsel and defense counsel in federal death penalty cases.

<div align="center"><b>Commentary</b></div>

When Recommendation 6 was issued in 1998, there was only one Federal Death Penalty Resource Counsel Project, and it offered support for all cases, whether at trial, on appeal, or in post-conviction.  As Recommendation 2 (Consultation with Federal Defender Organizations or the Administrative Office) describes, there is now a separate Resource Counsel Project dedicated to each stage of litigation.  The trial-level Federal Death Penalty Resource Counsel Project has been joined by the Federal Capital Appellate Resource Counsel Project and the Federal Capital Habeas Project.  There is also a National Mitigation Coordinator who collaborates with Resource Counsel and supports work in all death penalty matters that arise in the federal courts.[105] Recommendation 6 and other references to Resource Counsel in these Recommendations and Commentary apply to each of the Resource Counsel Projects.

The Resource Counsel Projects serve CJA counsel, federal defenders, and the courts by recommending counsel for every case at trial, on appeal, and in post-conviction, and by providing numerous other services, including case consultation, training, and assistance with case budgeting.  Trial-level Resource Counsel are assigned to each defense team at the outset of every death-eligible case, and continue to support the efforts of appointed counsel through the

---

[105] The National Mitigation Coordinator also works with the Habeas Assistance and Training Counsel Project (HAT) in connection with capital post-conviction representation in the federal courts pursuant to 28 U.S.C. §2254.

conclusion of trial.  Appellate and post-conviction Resource Counsel assume responsibility at the appropriate procedural junctures, and offer consultation and assistance throughout those stages of the case.  The National Mitigation Coordinator provides information, referrals, and case-specific consultation, and is extensively involved in the planning and delivery of training.  The four Projects work together on issues of common concern, and support one another in conducting training and disseminating information to counsel.  They also provide consultation and advice to the Administrative Office and to courts.

Recommendation 6(a) urges both the judiciary and counsel to maximize the benefits of Resource Counsel's services.  Together, the Resource Counsel Projects are essential to the delivery of high quality, cost-effective representation.  Their work should continue to be facilitated by the Administrative Office, and counsel in all federal death penalty cases are encouraged to maintain regular contact with Resource Counsel.  See Defender Services Strategic Plan, Goal 2 (Quality of Counsel), Strategy 16 (Capital Representations).  In addition, federal defender organizations should advise potential appointed counsel that they are expected to consult with Resource Counsel if they accept a capital representation.  *Id*., Strategy 17 (Capital Representations).  The Department of Justice provides centralized support to prosecutors nationwide at all stages of federal death penalty proceedings.  Although the Resource Counsel Projects cannot match that capacity, the judiciary should allocate resources sufficient to permit the full value of their services to be provided in every case.

Recommendation 6(b) recognizes the critical role of technology in sharing information.  The website maintained by Resource Counsel (www.capdefnet.org) recently has been upgraded.  It is a valuable resource, enhancing quality of representation in a cost-efficient manner, and it is relied upon extensively by appointed counsel nationwide.  The Administrative Office should

109

support the ongoing development of this cost-effective means of assisting appointed counsel in federal death penalty cases.  The database of case related information maintained by Resource Counsel is also an essential resource and, similarly, should receive ongoing support as indicated in the Commentary to Recommendation 11 (Availability of Cost Data).

## 7. Experts

a. Salaried Positions for Penalty Phase Investigators. The federal defender program should consider establishing salaried positions within FDOs for persons trained to gather and analyze information relevant to the penalty phase of a capital case. FDOs should explore the possibility that, in addition to providing services in death penalty cases to which their FDO is appointed, it might be feasible for these investigators to render assistance to panel attorneys and to other FDOs.

b. Negotiating Reduced Rates. Counsel should seek to contain costs by negotiating reduced hourly rates and/or total fees with experts and other service providers.

c. Directory of Experts. A directory of experts willing to provide the assistance most frequently needed in federal death penalty cases, and their hourly rates of billing, should be developed and made available to counsel.

### Commentary

Penalty phase investigators or "mitigation specialists" are individuals trained and experienced in the development and presentation of evidence for the penalty phase of a capital case. As indicated in the 2003 ABA Guidelines,[106] this function is an essential component of effective capital defense representation; however, mitigation specialists are in short supply and in many cases they are not available locally. Recommendation 7(a) suggests ameliorating this problem by employing and training persons for this work in federal defender organizations. In 2004 the Defender Services Committee authorized a position for a National Mitigation Coordinator in a federal defender office to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts. In addition to leveraging his own significant knowledge and skills through case consultations, the National Mitigation Coordinator has enhanced defense representation and contributed to cost containment efforts by recruiting more mitigation specialists to work on federal capital cases, matching mitigation specialists with

---

[106] American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003). See also Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 677 (2008) for an elaboration on the mitigation function, including the role of mitigation specialists.

counsel, and providing expanded training opportunities both for defender staff and for private mitigation specialists who are authorized to work on federal cases.  This training enhances the skills and availability of such professionals.

In addition, because of the cost containment potential, Recommendation 7(a) suggests that salaried federal defender employees might work not only on cases in which their office is appointed, but also, in appropriate instances, on other cases. Procedures that will facilitate lending such non-attorney staff members between defender offices have been developed by the Administrative Office.

Recommendation 7(b) encourages counsel to negotiate a reduced hourly rate for expert services whenever possible.  Private experts must be employed in death penalty cases, but the cost of their services can and should be contained.  When asked to provide services for the defense of a CJA-eligible criminal defendant, many experts are willing to accept fees lower than their customary hourly rates for private clients.  The types of experts employed in capital cases can be highly specialized, however, and sometimes a particular expert is required and it is not possible to negotiate a reduced rate.  It should be noted that the government, too, employs private experts, often at high hourly rates, a factor the courts could consider in assessing the reasonableness of proposed defense expenditures.

With respect to Recommendation 7(c), it should be noted that while maintaining formal lists of experts has proved to be problematic, substantial progress has been made in collecting and sharing appropriate information of this nature with defense counsel and courts, particularly since 2004 when the National Mitigation Coordinator position was established.  Resource Counsel, federal defenders, and the National Mitigation Coordinator have knowledge of a wide range of expert service providers throughout the country and they are available to assist in

112

matching cases with experts and evaluating costs during the case-budgeting process and at any

other stage of litigation.

**8. Training.**

<u>Federal Death Penalty Training Programs.</u> The Administrative Office should continue to offer and expand training programs designed specifically for defense counsel in federal death penalty cases.

<div align="center">

**Commentary**

</div>

Specialized death penalty training programs are relied upon by even the most highly experienced counsel to update and refine their skills and knowledge. Death penalty law is not only complex but also is rapidly evolving, and counsel are obligated to keep pace with developments throughout the federal courts. Continuing education in the latest forensic science developments is another responsibility of capital lawyers. Resource Counsel, the National Mitigation Coordinator, and federal defenders, with the support of the Administrative Office, have substantially increased training opportunities over the past several years. Counsel appointed in federal capital cases may attend a variety of specialized trial, appellate, and post-conviction programs organized or supported by each of the Resource Counsel Projects. Defender offices sponsor local and regional training as well. Programs focusing on forensic science, mitigation investigation, and victim contact offer further opportunities for skill-building and information sharing. Financial assistance to facilitate attendance at training programs and other logistical support are made available through the Training Branch of the Administrative Office's Office of Defender Services. These opportunities for counsel to benefit from the research and experience of others and share information and ideas are important and cost-effective. Their quality and utility has been universally praised by defense counsel. The Administrative Office should ensure that training opportunities continue to expand to meet the needs of capital defense teams.

**9.  Case Budgeting.**

a. <u>Consultation with Prosecution.</u> Upon learning that a defendant is charged with an offense punishable by death, courts should promptly consult with the prosecution to determine the likelihood that the death penalty will be sought in the case and to find out when that decision will be made.

b. <u>Prior to Death Penalty Authorization.</u> Ordinarily, the court should require defense counsel to submit a litigation budget encompassing all services (counsel, expert, investigative and other) likely to be required through the time that the Department of Justice (DOJ) determines whether or not to authorize the death penalty.

c. <u>After Death Penalty Authorization.</u> As soon as practicable after the death penalty has been authorized by DOJ, defense counsel should be required to submit a further budget for services likely to be needed through the trial of the guilt and penalty phases of the case. In its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time.

d. <u>Advice from Administrative Office and Resource Counsel.</u> In preparing and reviewing case budgets, defense counsel and the courts should seek advice from the Administrative Office and Federal Death Penalty Resource Counsel, as may be appropriate.

e. <u>Confidentiality of Case Budgets.</u> Case budgets should be submitted <u>ex parte</u> and should be filed and maintained under seal.

f. <u>Modification of Approved Budget.</u> An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

g. <u>Payment of Interim Vouchers.</u> Courts should require counsel to submit vouchers on a monthly basis, and should promptly review, certify and process those vouchers for payment.

h. <u>Budgets In Excess of $250,000.</u> If the total amount proposed by defense counsel to be budgeted for a case exceeds $250,000, the court should, prior to approval, submit such budget for review and recommendation to the Administrative Office.

i. <u>Death Penalty Not Authorized.</u> As soon as practicable after DOJ declines to authorize the death penalty, the court should review the number of appointed counsel and the hourly rate of compensation needed for the duration of the proceeding pursuant to the Guide, § 630.30.

j. <u>Judicial Conference Guidelines.</u> The Judicial Conference should promulgate guidelines on case budgeting for use by the courts and counsel.

k. <u>Judicial Training for Death Penalty Cases.</u> The Federal Judicial Center should work in cooperation with the Administrative Office to provide training for judges in the management of federal death penalty cases and, in particular, in the review of case budgets.

## Commentary

When Recommendation 9 was issued in 1998, case budgeting was new to the courts.  It is now well established, representing the norm in federal death penalty cases.  Judicial Conference policy with respect to capital case budgeting is set forth in Section 640 of the Guide, and district and appellate courts in various parts of the country are experimenting with different approaches to case budgeting.  Reports on their methods and progress will be forthcoming as those initiatives are evaluated.  In the meantime, certain things are clear.  Drafting a case budget requires the lawyer to incorporate cost considerations into litigation planning and encourages the use of less expensive means to achieve the desired end.  Submission and review of a budget assists the court in monitoring the overall cost of representation in the case, and determining the reasonableness of costs.  Both judges and counsel consistently describe the budgeting process as valuable.  They also emphasize the importance of a focus on the "big picture" rather than "nickels and dimes," and of an understanding that case budgeting is about ensuring planned, thoughtful, and responsible spending as opposed to simply cutting costs.  Resource Counsel are available to assist courts and counsel with drafting and evaluating case budgets.

Because of the unpredictability of pretrial litigation, it is impractical to require counsel to budget for an entire case from start to finish.  At a minimum, the budgeting process should occur in two stages, as suggested in Recommendations 9(b) and (c).  The first stage begins when the lawyer is sufficiently familiar with the case to be able to present a budget reasonably related to the anticipated factual and legal issues in the case and continues until the Department of Justice makes its decision as to whether it will seek the death penalty.  Prior to this first-stage budget, in

some districts the court orders a "starter budget" approving funds for an initial allotment of counsel's time as well as service providers such as an investigator, paralegal, mitigation specialist, and associate counsel. This allows counsel to begin work without delay, and a formal first-stage budget is submitted after counsel has had an opportunity to assess the needs of the case more thoroughly. As indicated in the Commentary to Recommendation 1(b) (Qualifications of Counsel), courts should not defer appointing "learned counsel" and authorizing an appropriate investigation at this stage. As recognized in Section 640.40 of the Guide, it will be necessary for counsel to begin work immediately, so courts should be prepared to authorize funds for this purpose, even if a case budget has not yet been submitted or approved.

If a death penalty notice is filed, a further budget should be prepared. The court may require a single budget from authorization through trial, though it may be more practical to develop a series of budgets covering shorter increments of time. If the prosecution will not seek the death penalty, Recommendation 9(i) calls for the court to review the case in accordance with the Guide, § 630.30, to determine whether the number or compensation of counsel should be reduced.

Consistent with the Criminal Justice Act, 18 U.S.C. § 3006A, Recommendation 9(e) calls for case budgets to be submitted ex parte and maintained under seal. Guide, § 640.20(b). A case budget requires defense counsel to develop an overall litigation plan for the case. Consequently, it contains privileged information and is an extremely sensitive document.

Recommendation 9(g) encourages prompt and efficient consideration and payment of interim vouchers in capital cases. Delay in approving payments to experts or counsel may prevent the defense from moving forward to develop its case, negatively affect the quality of representation, and/or delay expeditious and cost-effective disposition of the matter.

Case budgeting in post-conviction cases should proceed in much the same way as trial case budgeting.  Costs can be significant because counsel is obligated to thoroughly and independently investigate both phases of the trial to determine whether there are any potential constitutional infirmities.  Guideline 10.7 (Investigation), American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1015 (2003).  A capital post-conviction budget should include the costs of counsel, investigators, and experts.  The budgeting process should be completed quickly in light of the one-year statute of limitations for filing a motion pursuant to 28 U.S.C. § 2255.

**10. Case Management.**

a. <u>Non-Lawyer Staff.</u> Where it will be cost-effective, courts should consider authorizing payment for services to assist counsel in organizing and analyzing documents and other case materials.

b. <u>Multi-defendant Cases.</u>

    i. <u>Early Decision Regarding Severance.</u> Courts should consider making an early decision on severance of non-capital from capital codefendants.

    ii. <u>Regularly Scheduled Status Hearings.</u> Status hearings should be held frequently, and a schedule for such hearings should be agreed upon in advance by all parties and the court.

    iii. "<u>Coordinating Counsel.</u>" In a multi-defendant case (in particular a multi-defendant case in which more than one individual is eligible for the death penalty), and with the consent of co-counsel, courts should consider designating counsel for one defendant as "coordinating counsel."

    iv. <u>Shared Resources.</u> Counsel for codefendants should be encouraged to share resources to the extent that doing so does not impinge on confidentiality protections or pose an unnecessary risk of creating a conflict of interest.

    v. <u>Voucher Review.</u> In large multi-defendant cases, after approving a case budget, the court should consider assigning a magistrate judge to review individual vouchers. The court should meet with defense counsel at regular intervals to review spending in light of the case budget and to identify and discuss future needs.

**Commentary**

Recommendation 10(a) recognizes that the large volume of discovery materials and pleadings associated with a federal death penalty case may make it cost-effective for courts to authorize (and appointed counsel to employ) the services of law clerks, paralegals, secretaries, or others to perform organizational work which would otherwise have to be performed by counsel at a higher hourly rate. (See also Commentary accompanying Recommendation 3 (Appointment of More Than Two Lawyers), endorsing the practice of authorizing counsel to obtain the services of additional attorneys under appropriate circumstances.) Judicial Conference policy provides that, in general, appointed counsel may not be reimbursed for expenses deemed part of their office overhead (Guide, § 230.66.10); however, unusual expenses of this nature may be

119

compensated (Guide, § 320.70.30).  The Guidelines suggest that in determining whether an expense is unusual or extraordinary, "consideration should be given to whether the circumstances from which the need arose would normally result in an additional charge to a fee paying client over and above that charged for overhead expenses." (Guide, § 320.70.30).

Recommendations 10(b)(i) – (iv) address some of the particular management burdens associated with multi-defendant federal death penalty cases.  Special efforts are required to ensure the orderly administration of justice in these matters, which tend to become costly and cumbersome for courts and counsel.  Courts should also consider encouraging prosecutors to provide discovery in a way that will make information much more accessible and therefore less costly for the defense to assimilate.  For example, the way in which the government organizes the material it turns over to defense counsel and the way it formats it can have significant cost consequences.  Where there is extensive wiretap evidence, the government might be asked to provide defense counsel not just with recordings, but with any transcripts of those recordings.  Such time and cost savings possibilities should be urged wherever possible.  The court might initiate discussion about how best to contain discovery costs by soliciting a list of ideas from the parties.

Recommendation 10(b)(i) suggests that courts make early decisions concerning severance of non-capital from capital codefendants.  In general, capital cases remain pending longer than non-capital cases and involve far greater amounts of pre-trial litigation.  Separating the cases of non-capital codefendants, where appropriate, may lead to swifter and less costly dispositions in those cases.  The earlier such a decision is implemented, the greater will be the cost savings.

120

Recommendation 10(b)(ii) suggests that courts schedule frequent status hearings so that discovery and other matters may proceed efficiently and problems may be noted early and swiftly resolved.  If the schedule for such status hearings (on a monthly or other basis) is agreed upon in advance, all parties can plan accordingly and valuable time will not be consumed with counsel and judges trying to find a mutually convenient time for their next meeting.

Recommendation 10(b) (iii) suggests that, if all counsel agree, courts consider designating the attorneys for one defendant as "coordinating counsel."  Coordinating counsel might be responsible for arranging for the efficient filing and service of motions and responses among the codefendants, scheduling co-counsel meetings and court dates, facilitating discovery, or completing any other tasks deemed appropriate by counsel and the court.  In multi-defendant cases where the federal defender organization represents a defendant eligible for the death penalty, courts should (taking into account the views of the federal defender) consider designating the FDO as coordinating counsel because of its institutional capabilities.  In the event that a panel attorney is designated as coordinating counsel, the additional time and resources demanded by this role should be compensated.

121

## 11.  Availability of Cost Data

The Administrative Office should improve its ability to collect and analyze information about case budgets and the cost of capital cases.

### Commentary

The cost data for this report were assembled by painstaking manual collection, necessitated by the limitations of the only available information source, the CJA payment system.[107]  Given the significance of capital case costs to the federal defender program, the Administrative Office has given priority to developing an electronic CJA voucher processing system that will provide accurate and reliable case data that are accessible for analysis. Enhancing the ability of the Defender Services program to analyze and make use of cost and other quantitative data relating to federal death penalty cases would assist in making resource allocation decisions and in establishing policy.  In addition, the judiciary should give further consideration to geographic disparities in defense resources and the relationship between low cost defense representation and sentencing outcome in capital cases.  The Administrative Office should work with the Department of Justice to obtain useful data about prosecution costs in federal capital cases.

This report could not have been completed without extensive assistance from the federal capital trial, appellate, and post-conviction Resource Counsel Projects, including access to information from their databases.   These data are vitally important to the Defender Services program and their collection and analysis should remain a priority and be supported by the Administrative Office.

---

[107] The CJA Panel Attorney Payment System is a judiciary-wide application in which all attorney and expert service provider vouchers for representation-related work performed are recorded, processed and paid.

# APPENDIX A:  DATA EXAMINED

| | |
|---|---|
| Defendant name | Circuit |
| District | Type of Counsel |
| Case proceeds to conclusion as death authorized | Case resolved by trial or plea |
| If tried, defendant guilty of the capital count | Sentence |
| Number of defense counsel | Number of prosecutors |
| Number of defendants | Number of indicted offenses |
| Category of offense | Exceptional offenses |
| Date defense counsel appointed | Date of authorization by DOJ |
| Attorney General who authorized | Number of victims |
| Date case ends (sentencing or acquittal) | Total hours by defense counsel |
| Number of days from opening to authorization | In-court hours by defense counsel |
| Number of days from opening to closing of case | Out-of-court hours by defense counsel |
| Categories of experts used | Total cost for defense counsel |
| Expenses for each category of expert used | Total cost for experts |
| Total cost for experts and defense counsel | Cost of transcripts |
| First and last dates of counsel payments | Race of Victim |
| Victim's connection to criminal activity | Race of Defendant |
| Gender of Victim | Gender of Defendant |

Government alleges future dangerousness against defendant
Whether state had the death penalty at the time of indictment
Number of years post-*Furman* that the state (re-)instituted the death penalty
Number of years post-*Gregg* that state executed its first prisoner
Number of prisoners executed by the state post-*Gregg* on a per capita basis
State's current death row population on a per capita basis
State's current murder rate

In addition, a request was made to the U.S. Department of Justice for comparative data on the hours spent and expert costs expended in prosecuting federal capital cases. However, those data were not usable for purposes of comparison in the form provided.

**APPENDIX B: SUPPLEMENTAL DATA**

**Figure B.1**

**Number of Federal Capital Defendants Going to Trial/Trials Commencing,
by Calendar Year**



**Table B.1**
**Number of Federal Capital Defendants Going to Trial/Trials Commencing,**
**by Calendar Year**

| Year | Number of Trials | Number of Defendants |
|------|------------------|----------------------|
| 1989 | 0 | 0 |
| 1990 | 0 | 0 |
| 1991 | 5 | 6 |
| 1992 | 1 | 1 |
| 1993 | 3 | 7 |
| 1994 | 2 | 4 |
| 1995 | 6 | 9 |
| 1996 | 6 | 8 |
| 1997 | 11 | 14 |
| 1998 | 12 | 14 |
| 1999 | 5 | 7 |
| 2000 | 12 | 16 |
| 2001 | 9 | 13 |
| 2002 | 14 | 15 |
| 2003 | 16 | 21 |
| 2004 | 16 | 21 |
| 2005 | 25 | 32 |
| 2006 | 17 | 23 |
| 2007 | 22 | 26 |
| 2008 | 11 | 12 |
| 2009 | 11 | 13 |
| **TOTAL** | **204** | **262** |

**Figure B.2**
**Current Population of Federal Death Row by State and Circuit***



*Total federal death row population was 57, as of March 16, 2010.

**Figure B.3**
**Federal Death Sentences in the Modern Era by State and Circuit***



*Total number of Federal Death Sentences in the modern era was 68, as of March 16, 2010.

**APPENDIX C: AUTHORIZED VERSUS UNAUTHORIZED CASE COSTS**

<u>Table C.1</u>
**Median Costs for Defense Representation in Federal Capital Cases, 1998-2004[108]**

| Type of Case | Total Cost | Attorney Cost | Attorney Total Hours | Attorney In-Court Hours | Attorney Out-Court Hours | Expert Cost | Transcript Cost |
|---|---|---|---|---|---|---|---|
| **Not Authorized** | $44,809 | $42,148 | 436 | 34 | 350 | $5,275 | $210 |
| **Authorized** | $353,185 | $273,901 | 2,014 | 306 | 1,645 | $83,029 | $5,223 |
| **Trials** | $465,602 | $352,530 | 2,746 | 353 | 2,373 | $101,592 | $10,269 |
| **Pleas** | $200,933 | $122,772 | 1,028 | 42 | 992 | $42,049 | $82 |

Authorized representations are almost eight times more expensive to defend than are capital-eligible cases that the Department of Justice decides not to authorize.

---

[108] Because these figures are medians, the subparts (e.g., attorney in-court and out-court hours) do not sum to the whole (e.g., attorney total hours).

128

## APPENDIX D: COST ESTIMATES IN 2010 DOLLARS

Table D.1 below adjusts the total defense cost figures presented in this report to estimated 2010 values. The amounts were adjusted to account for inflation based on the consumer price index (CPI). The adjustment was made for the period from 2001, the mid-point of the time period under review, to 2010, using the inflation calculator produced by the Bureau of Labor Statistics of the U.S. Department of Labor.

It should be noted that during the period studied, 1998-2004, the maximum hourly rate for counsel in federal capital cases was $125/hour; it has risen incrementally since then to the present level of $178/hour. This increased hourly rate is not reflected in the estimate below. Because of differences in recordkeeping, it was not possible to adjust attorney fees to 2010 levels using these rates, and, instead, the CPI was employed to account for increased costs. Expert costs do not present this phenomenon. Because the CPI likely represents a smaller increase in attorney costs than their actual amounts, the figures in the table below *underestimate* the value of defense costs in 2010 dollars.

### Table D.1

### Estimated Median Costs in 2010

| Type of Case | Median Cost 2010 (*Estimated*) | Median Cost 1998-2004 |
|---|---|---|
|  |  |  |
| **Not Authorized** | $54,667 | $44,809 |
| **Authorized** | $430,886 | $353,185 |
| *Trials* | $568,034 | $465,602 |
| *Pleas* | $245,138 | $200,933 |

129

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON   :
         :    **CIVIL ACTION**
         :    **No. 01-6049**
         :
DOANLD T. VAUGHN   :


# APPENDIX B


# COMMONWEALTH'S STUDY OF 155 CAPITAL CASES
## 1978-2018

# TABLE OF CONTENTS

**INTRODUCTION**

**PART I: 112 Philadelphia Death Sentences Overturned During Post-Conviction Review**

**A.** **74 Cases Overturned Due to Ineffective Assistance of Counsel**...................A-001

    1.     Summary of 74 IAC cases.................................................................A-002-161

    2.     IAC cases where counsel was court-appointed (*Total 58*)...............A-162-169

    3.     IAC cases where counsel failed to prepare and present constitutionally acceptable mitigation (*Total 38*)...........................A-170-181

**B.** **38 Capital Cases Overturned on other Grounds**.............................................A-182

    1.     Sentences overturned due to trial court error (*Total 16*).................A-183-188

    2.     Sentences overturned due to prosecutorial misconduct (Total10)..A-188-191

    3.     Sentences overturned due to changes in the law (*Total 8*)..............A-191-193

    4.     Sentences overturned due to actual innocence (*Total 1*)........................A-193

    5.     Sentences overturned for unspecified reasons (*Total 3*)................A-193-194

**C.** **Non-Capital Outcome of 102 Overturned Cases on Remand**.......................A-195

    1.     Non-capital outcome of IAC cases (*Total 67*)................................A-196-204

    2.     Non-capital outcome of cases overturned on other grounds (*Total 35*) .......................................................................................................A-205-210

**CI.** **Commonwealth Agreement to Non-Capital Outcome in 65 cases**.................A-211

    1.     DAO agreement in IAC cases (*Total 50*)........................................A-212-221

    2.     DAO agreement in cases overturned for other reasons (*Total* 15)...A-222-224

**CII.** **Overturned Philadelphia Death Sentences – Duration of Litigation Between Arrest and Non-Capital Resolution (*Average 17 years*)**..A-225

    1.     Duration of IAC cases prior to non-capital disposition....................A-225-234

    2.     Duration of cases overturned for other reasons prior to non-capital resolution..................................................................A-235-239

**PART II:   45 Philadelphia Defendants Who Remain Sentenced to Death**...............A-240

  **A.  Race of Philadelphia Defendants
     Currently Sentenced To Death**....................................................................A-240-242

  **B.  Death Row Defendants Represented at Trial
     By Court-Appointed Counsel**............................................................A-243-246

  **C. Death Sentenced Defendants Represented at Trial by Attorneys Who Have
     Another Death Sentence Overturned on Grounds of Ineffective
     Assistance**.........................................................................................A-246-252


**PART III:   Philadelphia Death Sentences Imposed Before and After February 2012**..A-253

  **A.   Death Sentenced Imposed Before February 2012 (*Total* 152)**...............A-253-268

  **B.   Death Sentences Imposed After February 2012 (*Total 3*)**.....................A-268-269

# INTRODUCTION

This Appendix identifies 155 cases, decided since 1978, where a Philadelphia Common Pleas Court sentenced a defendant to death.[1] It does not include any death cases that have been resolved by the current administration of the Philadelphia District Attorney's Office, i.e., any matters resolved after December 31, 2017.[2]

The Appendix divides the 155 capital cases into three parts. Part I addresses **112** cases (**72%** of the total) where a reviewing court **overturned** a Philadelphia defendant's death sentence prior to January 2, 2018. Part II evaluates **45** Philadelphia cases where the defendant remains on death row.[3] Part III separates the 155 cases into two groups: those decided before and those decided after February 2012. All defense counsel are identified solely by a letter code.

---

[1] In 1978, the Pennsylvania legislature enacted this state's current capital punishment statute. *See* 42 Pa.C.S.A. § 9711(a)(1) (effective 9/13/78).

[2] This study also does not include <u>Commonwealth v. Gary Heidnik</u>, CP-51-CR-0437091-1987 and a small number of cases where a death-sentenced Philadelphia defendant died of natural causes before the resolution of his appeals, i.e., before a final appellate decision either overturning or affirming the death sentence.

[3] Although there are 112 overturned cases and 45 Philadelphia defendants housed on death row, this Appendix analyzes a total of 155 cases, rather than 157. This is because, in two Philadelphia cases, the defendant remains on death row even though a federal district court has ordered penalty phase relief. <u>Commonwealth v. Fahy</u>, CP-51-CR-0222831-1981 (Third Circuit Court of Appeals holding case in abeyance; cross-appeals pending); <u>Commonwealth v. Porter</u>, CP-51-CR-0622491-1985 (cross-appeals pending before Third Circuit Court of Appeals). As a result, these two cases appear in both Part I of this Appendix (listing cases where the death sentence has been overturned) *and* Part II (listing the individuals currently housed on death row).

# DAO APPENDIX - PART I

## 112 PHILADELPHIA CASES
## OVERTURNED DURING POST-CONVICTION REVIEW

### PART I, SECTION A, SUBSECTION ONE

### 74 CASES OVERTURNED DUE TO INEFFECTIVE ASSISTANCE

Part I, Section A, Subsection One of the DAO Appendix lists 74 cases where a reviewing court overturned a Philadelphia death sentence due to ineffective assistance of counsel. This Appendix refers to such cases as "IAC cases". For each IAC case, Subsection One identifies:

    a.    The nature of the ineffectiveness claim;

    b.    The relief granted (new trial or new sentencing hearing);

    c.    Whether the case ultimately had a non-capital outcome;

    d.    The duration of litigation from the date of arrest to non-capital resolution; and

    e.    Whether court-appointed counsel represented the defendant at the trial stage.

1. **Commonwealth v. Lawrence Baker**, CP-51-CR-0629891-1981

    **a. Claim of Ineffectiveness**

    Defendant claimed ineffectiveness when counsel failed to object to the ADA's penalty phase argument. Commonwealth v. Baker, 511 A.2d 777, 787 (Pa. 1986).

    **b. Relief Received by the Defendant**

    Although the Court agreed that counsel was ineffective, Defendant received appellate relief pursuant to the relaxed waiver rule. Baker, 511 A.2d at 790 n.10 ("Hence, we need not specifically rule on Appellant's contention that trial counsel was ineffective in not objecting to the Assistant District Attorney's comments").

    **c. Outcome – Life Sentence**

    On remand, the Defendant received a life sentence pursuant to the version of the statute governing sentencing procedure for murder of the first degree then in effect. Baker, 511 A.2d at 791; see 42 Pa.C.S. § 9711(h)(2) (stating that a court "shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence") (repealed effective 12/21/88). Defendant resentenced to Life. Online Docket Entry, p.3, 7/30/86

    **d. Duration of Litigation Prior to Resolution**

    Arrest date: April 8, 1981 – Resentenced: July 30, 1986 = **5 yrs, 3 mos, 22 d**

    **e. Trial Counsel – *Court-Appointed***

    Defendant was represented by court-appointed counsel RRR. Baker, 511 A.2d at 780-781.

## 2. **Commonwealth v. Lee Baker**, CP-51-CR-0405062-1984

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel failed to object to improper jury instructions. Baker v. Horn, 383 F. Supp. 2d 720, 764-765 (E.D. Pa. 2005).

### b. Relief Received by the Defendant

The federal district court held that trial counsel's failure to object to defective jury instructions constituted ineffective assistance of counsel. Baker, 383 F. Supp. 2d at 765, 777-779 ("The instructions at times flatly contradicted Pennsylvania law on first-degree murder and accomplice liability and at other times were ambiguous in critical ways").

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

Defendant entered a negotiated guilty plea before the Homicide Calendar Judge and received a term of years sentence:

> Negotiated guilty plea. Defendant waived formal arraignment, plead and was adjudged guilty.

Online Docket Entry, pp.3, 6, 5/23/2008.[3]

### d. Duration of Litigation Prior to Resolution

Arrest: March 8, 1984 – Resentenced: May 23, 2008 = **24 yrs, 2 mos, 15 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel Z. *See* Docket Entries, at p.3 (attached); Z was court-appointed. CPCMS, Secure Docket.

---

[3]    In Philadelphia, pursuant to Local Rule 605, the Homicide calendar Judge addresses pretrial matters, including negotiated guilty pleas.

COURT OF COMMON PLEAS
## OFFICE OF COURT ADMINISTRATION
APPEALS DIVISION
ROOM 601 CITY HAL.I..
PHIL.AOELf:'HIA, PA, 1**g107**

E0W4RD j. IIR4D1.EY
l'III:■l0 ( NT JUOOK

## DOCKET ENTRIES

| COMMONWEALTH | 1984 April |
| | 516 - Possessing Instruments of Cri:-i |
| VS. | Generally, Possessing Instruments *o i* |
| | Crime, Concealed Weapon |
| LEE BAKER | 5l7-Robbery |
| **AKA:** | 518 - Criminal Conspiracy |
| HERBERT BAKER, JR, | 520 - Murder, First Degree |

---

April 6, 1984          -    Pro Se Appli6ation for Reduction of Bail, filed.

**Apr l 25, 1984**     Court Room 253
The defendant, Lee Baker has been arraigned und r Penna. Criminal Coda Section 303-306 as to all bills.
                                   Sabo, J.

May 31, 1984     -0-2     Notice of Joint ;rial,.filed.

June 18, 1984     -D-3     Motion to suppress statement of Defendant, Motion to Suppress In Cou Identification of the Commonwealth Witness, ●●●●●●11,// Motion to Suppress In Court Identification of ●the Commonwealth Witness, ■M Jt: ff] t T § Motion to Suppress In Court Identi-fcation of.the Commonwealth Witness, •● I lt. Motion to Suppr ss.In Court Identification of \f Commonwealth Witnes; s, _ filed. Omnibus PreTrial Motion for Relief returnable E-18-84.

**June 19, 1984**     Court .Room 253
Motion to Suppress Idenitifciation aI.ῌ, statements begun.

A-5

Lee Baker (Page 3)

| | |
|---|---|
| Sept. 24, 1984 | Court Room 253<br>Presiding Honorable Albert F. Sabo<br>Defendant present with counsel<br>**ADA Thomas Bello**<br>Court Reporter, William Falcone<br><br>Defendarit pleads Not Guilty.<br>Jury trial requested. |
| Sept. 25, 1984<br>S pt • 26, 1 9 8 4 | Testimony taken, cont'd 9-28-84 defense request. Co-defe ndant's counsel, M. Strutin to observe Jewish holiday on 9-27-84 |
| Sept. 24, 1984 | Juror #2 was excused by agreement for medical reason (HBP) and alternate #13 becomes Juror #2. |
| Sept. 28, 1984 | Juror #4 excused by agreement, husband gravely ill, alternate #13 becomes **Juror** #4. |
| Oct • .1, 1984 | Commonwealth rests.<br>Demurrer overruled. |
| Oct. 2, 1984 | Defense motion for mistrial denied. |
| Oct. 3, 1984 /- | As to Bill 517 April 1984, Commonwealth's motion to have bill amened to add victr . granted.<br><br>Defense rests; Arguments heard, charge ty Judge. |
| EoDie · | 4:50 pm jury begins deliberation to 6pm. |
| Oct. 4, 1984 | Jury continues to deliberat.<br>12:15 pm. After due deliberation the Jury returned with a VERDICT:<br>**516 - Guilty**<br>517 - Guilty<br>518 - Guilty<br>520 - Gu,ilty as to Murde r, ·1st degree |
| Oct. 5, 1984 | Jury deliberates further as. t penalty. |
| Oct. S, 1984 | Jury has returned and fixed the penalty at Death. Motions *td* be filed, Sentence deferred to 12-3-84. Presentence and psy hiatric reports ordered. neft. in custody, bail revoked.<br>. Sabo, J. |

A-6

### 3. <u>Commonwealth v. Billa</u>, CP-51-CR-0136311-1987

#### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to request a limiting instruction regarding prior bad acts evidence. <u>Commonwealth v. Billa</u>, 555 A.2d 835, 842 (Pa. 1989).

#### b. Relief Received by the Defendant

The Pennsylvania Supreme Court agreed that Defendant was entitled to penalty phase relief on these grounds:

> [A]ppellant asserts, *inter alia*, that counsel was constitutionally ineffective in failing to request a limiting instruction on the jury's consideration of the evidence of the prior sexual assault. Under the circumstances, we agree.

<u>Billa</u>, 555 A.2d at 842.

#### c. Outcome – *Commonwealth Agreement to Different Sentence*

On remand, Defendant entered a guilty plea and received a life sentence. <u>Online Docket Entry</u>, p.3, 1/11/90.

#### d. Duration of Litigation Prior to Resolution

Arrest Date: January 17, 1987 – Resentenced: January 11, 1990 = **2 yrs, 11 mos, 25 d**

#### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel QQ. <u>Defendant's Motion for Post-Conviction </u>Relief, 6/13/12, at p.5 (attached). <u>QQ </u>was court-appointed. <u>Petition for Leave to </u>Withdraw as Counsel, at p.1 ("[QQ],was appointed trial by the Honorable Nelson Diaz, on January 2, 1987").

A-7



i=' COURT .\.OM I N I ST :1.\ noN
.\r' PE.\ LS OF I 'i'I O N
COM 101 CITY : AI..L

DOCKET ENTRIES

| COMMONWEALTH | 1987 March |
|---|---|
| VS. | 1460 Attempted Involuntary Deviate Sexual Intercourse |
| | 1470 Rape |
| | 1471 Aggravated Assault |
| LOUIS BILLA | 1472 Robbery |

| DATE | DOC. # | DOCUMENT DESCRIPTION |
|---|---|---|
| 2/19/87 | -1 | - Notice of Mandatory Minimum Sentence Case, filed. |
| 4/10/87 | D- | - Commonwealth's Motion for Consolidation, filed. |
| 4/13/87 | | - Court Room 232<br>Defense Counsel Defender Association<br>Honorable Stanley Kubacki, Presiding<br><br>-Defender Association permitted to withdraw as counsel. **CMRN A ft11 a**, Esquire, appointed as counsel of record. Continued for C/W to consolidate with CP ?7-01-3631. Defender Association turns over discovery to counsel. List for consolidation 4-16-c-7. List for trial 5-26-87, Room 232, E.P.D.<br>Kuhacv.i, J. |

COMMONWEALTH OF PENNSYLVANIA

APPELLEE :

 

 

COMMONWEALTH OF PENNSYLVANIA

SUPREME COURT OF PENNSYLVANIA

EASTERN DISTRICT

NO. 164E.D. 1\PP L OC E

 

: 1987

APPELLANT

 

PETITION FOR LEAVE TO WITHDRAW AS COUNSEL AND APPOINTMENT OF NEW COUNSEL

 

      Now comes, **_____idl§l1n,_** ESQUIRE, attorney for the above appellant and avers:

    1. _____ §. **Wfl£]** J£(. ESQUIRE, was appointed trial counsel in the above captioned matter by the Honorable Nelson Diaz, Court of Common Pleas, Philadelphia County on January 2, 1987.

    2. Following trial, appellant was found guilty of murder in the first degree and sentenced to death on June 12, 1987.

    . Petitioner, herein, argued Post-Verdict Motions which were denied.

    t. Petitioner subsequently filed a timely appeal on behalf of appellant.

    3. Petitioner also filed a brief on behalf of appellee.

S.  :r.' ti.ti.orc0.r    as just J.e̅lJ·ed ":ha: ap9eJ.la!,t has fi.lec a

A-009

pro-se motion for new counsel alleging ineffective representation of petitioner.

7.   Since this is a death penalty ma ter, the interests of justice may best be served if new counsel is appointed to continue the representation of appellant.

8.   It is Petitioner's belief that the financial status of appellant has not changed.

WHEREFORE, Petitioner requests this Honorable Court enter an Order removing him as counsel and appointing new counsel for appellant.



4. **Commonwealth v. John M. Blount,** CP-51-CR-0124901-1990

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel failed to object to improper penalty phase jury instructions. Commonwealth v. Blount, 647 A.2d 199, 209-210 (Pa. 1994)

### b. Relief Received by the Defendant

The Supreme Court granted penalty phase relief. Court-appointed trial counsel failed to object when the trial court gave an erroneous instruction that "improperly infringed upon the sole province of the jury to weigh aggravating and mitigating circumstances." Blount, 647 A.2d at 209-210 ("Given the seriousness of the trial court's action in this instance we can discern no reasonable basis why trial counsel failed to object").

### c. Outcome – Life Sentence

After a new sentencing hearing, Defendant was sentenced to life imprisonment. Blount v. Wetzel, 2015 WL 851855, at *2 (E.D. Pa. Feb. 27, 2015); Online Docket Entry, p.12, 7/24/96.[4]

### d. Duration of Litigation Prior to Resolution

Arrest: October 25, 1989 – Resentenced July 24, 1996 = **6 yrs, 8 mos, 29 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel Y. Order, 2/9/90, Clarke, J. (attached); CPCMS, Secure Dockets.

---

[4] Defendant was seventeen years old at the time of the offense. Blount, 2015 WL 851855, at *2. Accordingly, he ultimately would have received relief under Roper v. Simmons, 543 U.S. 551 (2005).

*41J*

COMMONWEALTII

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

vs.

C.P. 90-01-2490-2501

JOHN M. BLOUN'.1.'

Homicide

O R D E R

AND NOW, this 9th day of February, 19 90

bhe Court Orders the appointment ▮▮▮▮▮▮▮▮▮▮ Esquire,

tb. epresent the above-captioned defendant.

ЗY THE COURT:

Eugene H. Clarke.,Jr., _____ Judge

Dnte:  February 9, 1990

5. **Commonwealth v. Aquil Bond**, CP-51-CR-0502971-2004

### a. Claim of Ineffectiveness

Defendant claimed that court-appointed penalty phase counsel failed to prepare and present available mitigation evidence.

### b. Relief Received by the Defendant

The PCRA court granted summary relief based on the existing record:

> Petitioner's motion for summary relief is denied as to the guilt phase and granted as to the penalty phase. The petitioner's death sentence is vacated.

Online Docket Entry, p.38, 3/18/14. As the PCRA court explained:

> With regard to the penalty phase, I will say frankly and candidly that based on existing law, I see absolutely no way in which, that counsel's woefully deficient performance at the penalty phase hearing can possibly stand.

(N.T. 3/18/14 at 70-71). Thereafter, the PCRA court granted Defendant's petition for a new trial. On Line Docket Entry, p.52, 3/13/17.

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

Case resolved through negotiated disposition, March 13, 2017. Online Docket Entry, p.52, 5/19/17.

### d. Duration of Litigation Prior to Resolution

Arrest: November 11, 2003 – Death Penalty Relief: March 13, 2017 = **13 yrs, 4 mos, 2 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by penalty phase counsel C. (N.T. 3/18/14 at 70-71); C was court-appointed. CPCMS, Secure Dockets.

6. **Commonwealth v. Jesse Bond, CP-51-CR-2217781-1992**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare for the penalty phase. Bond v. Beard, 539 F.3d 256, 291 (3d Cir. 2008), *as amended* (Oct. 17, 2008).

### b. Relief Received by the Defendant

The Third Circuit held that trial counsel provided ineffective assistance by failing to prepare for Defendant's penalty phase. Bond, 539 F.3d at 291 ("Counsel performed an inadequate and tardy investigation into Bond's childhood").

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On remand, the Commonwealth agreed to Life:

> Order - Sentence/Penalty Imposed Re-sentencing. The death penalty sentence was set aside by the 3rd Circuit. The Commonwealth will not seek the death penalty. Defense motion to remove 1st degree is denied. The defendant is re-sentenced to life without parole. All other charges remain the same.

Online Docket Entry, p.11, 11/15/12.

### d. Duration of Litigation Prior to Resolution

Arrest: November 28, 1991 – Resentenced: November 15, 2012 = **20 yrs, 11 mos, 18 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel C. Bond, 539 F.3d at 281.

## 7. __Commonwealth v. Billy Brooks__, CP-51-CR-0128471-1991

### a. Claim of Ineffectiveness

Defendant sought relief due to trial counsel's failure to consult. Commonwealth v. Brooks, 839 A.2d 245 (Pa. 2003).

### b. Relief Received by the Defendant

The Pennsylvania Supreme Court awarded a new trial due to ineffectiveness of counsel. Court-appointed counsel never met with his capitally charged client. Brooks, 839 A.2d at 248 ("As we agree with Appellant that counsel was clearly ineffective in this regard, we reverse").

### c. Outcome – Defendant deceased while in custody

This case was closed on remand, due to the death of the Defendant. Online Docket Entry, p.27, 9/24/2008 ("Due to the Death of the Appellant on 6/29/2008, This Appeal Has Been Closed").

### d. Duration of Litigation Prior to Resolution

Arrest: December 27, 1990 – Abated: September 24, 2008 =
**17 yrs, 8 mos, 28 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel MMM. Brooks, 839 A.2d at 247. (Noting that "[i]t appears that [MMM] was suspended from the practice of law on October 26, 1993, and has not applied for readmission"); Order, 7/25/91, Stiles, J. (attached); CPCMS, Secure Dockets.

1)T

AUGUST 1, 1991

COMMUNWEAL 'l 'H UF 1-'ENN.:>.t.LVhNlA

CCJUR£ OF  UM.MUN PLEAS
PHILADELPHIA COUNTY

VS.

C.P. 9101-2847-2850

BILLY BROOKS., Defendant
PP# 506207

Homicide Case

O R D E R

NOW, this   25th    day of      July                 19

the Court Orders  the appointment of                    ,    Esq1

as counsel, to represent the defendant in the above-captioned

homicide matter.

This appointment is not transferable and is effective

immediately.

BY THE COURT:



Michael R. Stiles, Judge

Listed 7/29/91 Room
646 City Hall

Date:    July 25, 1991

A-17

8.  **Commonwealth v. Samuel Carson, CP-51-CR-0228371-1994**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare for the penalty phase.

### b. Relief Received by the Defendant

The Supreme Court remanded this matter to the PCRA court for an evidentiary hearing concerning Defendant's claim that trial and appellate counsel were ineffective in failing to investigate and present mitigation evidence. Commonwealth v. Carson, 913 A.2d 220, 267-268 (Pa. 2006).

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On remand from the appellate court, the Commonwealth stipulated to penalty-phase relief due to counsel's failure to investigate and present mitigating evidence. Commonwealth Response to Petition for Writ of Habeas Corpus, No. 11-1845, at p.8 ("the Commonwealth agreed to relief on the claim of counsel ineffectiveness"). The Commonwealth subsequently agreed to a life sentence:

> Order - No Penalty Phase Hearing Scheduled. Both sides agree to Life Imprisonment

Online Docket Entry, p.12, 4/04/11; Order, 4/4/11, Temin, J. (attached).

### d. Duration of Litigation Prior to Resolution

Arrest: January 8, 1994 – Resentenced: April 4, 2011 = **17 yrs, 2 mos, 27 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel Q. Post-Sentence Motion, 7/16/95, at p.1 (attached); CPCMS, Secure Dockets.

**File Copy**

Commonwealth of Pennsylvania

v.

Samuel Carson

**IN THE COURT OF** COnliMON **PLEAS OF PHILADELPHIA** COUhl rV**, PENNSYLVANIA**

**CRIMINAL DIVISION**

: **DOCKET NO: CP-51-CR-0228371-1994**

# ORDER

AND NOW, this 4th day of April, 2011, after consideration of the Motion to Cancel Penalty Phase Hearing presented by the Attorney for the Defendant, it is ORDERED that the Motion to Cancel Penalty Phase Hearing is  GRANTED

On 4/2/2008,  defendant's  death sentence  was vacated  by the Hon.  William J.  Mandredi. By agreement *gf* counsel on 4/4/2011, defendant  re-sentenced  to Life  Imprisonment without

BY THE <u>COURT</u>:

enior Judge Carolyn Engel Temin

A-018

AOPC 2061 REV. 10/14/2010

A-018



_____ ESQUIRE

I.D.

_____ <u>Attorney for Defendant</u>

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

CRIMINAL TRIAL DIVISION _____.-,

COMMONWEALTH OF PENNSYLVANIA

vs.

SAMUEL CARSON

( UARY TERM, 1RE.CiEW1EO

No. 2837

MAY TERM, 1994"

NOS. 1841, 1844.ir JIDIH iI MotIОn.Gourr

1a46 and 1848=irst Judicial District of PA

TRIAL JUDGE:
  HON. PAUL RIBNER

JUL1D1995

<u>POST-SENTENCING</u> <u>MOTION</u>

;srro-?S-JY

TO THE HONORABLE PAUL RIBNER:

Defendant, Samuel Carson, by his court-appointed attorney. **ill.JIA.a.• ,•••** ; Esquire' submits the following pleading in support of his request that he be granted a new trial:[1]

_____

[1] It is respectfully asked that when a copy of the trial record has been furnished to defendant's counsel, that he be permitted to submit a supplementary pleading setting forth additional issues which he deems necessary and important, and that he be given the opportunity to submit a legal memorandum in support of his position in this case, this prior to the presentation of oral argument sur Post-Sentencing Motions.

A-019

### 9. <u>Commonwealth v. Ronald Clark</u>, CP-51-CR-1241151-1993

#### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare for the penalty phase.

#### b. Relief Received by the Defendant

The PCRA court granted Defendant's request for a new penalty hearing based on trial counsel's ineffectiveness in failing to present additional mitigation evidence. The Commonwealth did not appeal this order. <u>Commonwealth v. Clark</u>, 961 A.2d 80, 83 (Pa. 2008).

#### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On remand from the appellate court, the Commonwealth agreed to a life sentence. <u>Online Docket Entry</u>, p.13, 8/16/11 ("Order - Sentence/Penalty Imposed – agreement").

#### d. Duration of Litigation Prior to Resolution

Arrest: November 3, 1993 – Resentenced: August 16, 2011 = **17 yrs, 9 mos, 13 d**

#### e. Trial Counsel – *Court-Appointed*

"[Defendant] was represented at trial by [CC]." <u>Clark v. Beard</u>, No. CV 10-3164, 2015 WL 7294971, at *3 (E.D. Pa. June 1, 2015).

Defendant was represented by court-appointed counsel <u>CC</u>. *See* <u>Motion for Withdrawal of Counsel</u> (attached); <u>Correspondence</u>, 11/30/93 (attached); <u>CPCMS, Secure Dockets</u>.

IN   THE COMMONWEAL TH OF PENNSYLVANJ:A
COURT  OF  COMMON-PlEAS  OF  PMilAOELPMIA–COUNTY

**COMMONWEALTH** OF **PENNSYLVANJ!Etft/JWf£If))**

VS                                                   CRIMINAL  TRIAL  DIVISION

AUG 19 1!394

:Boi\),Q/cl ..c.) Ae k·.       .CLERkO              CP ll⁰3 fo - 4 ll 5
l/3 l–iJ./6:i          f OUAATERSESSICW
                       –:–––––_ S PP#(o E\-S4'-7'
            π^{j/)_jrf)U ,

MOTION FOR WITHDRAWAL OF COUNSEL

n  (),q1       **AN** –D **APPOINTMENT** OF–NEW COUNSEL

'-'l ..o.-  ?)

·       I, the undersigned, in **this** pro-se motion   respactfully  **re**-.

presents the following:

                                                        ci .
    On ilJ3Jq3.. petitioner **w as** ·arr sted, and charged :w: t lF :.  -f/   t .:.

· _muelee–J·vufR_ 61 o-, to/(1"{. P.c. r.e,'m ⸗ l g  p:f2fk:A· ... . .. . .. .. .    ·: ·..:

hav in g occurred in il'hiladelphia County.                                 …

    1. ·–T he ·court  appointe                         ........esq.· .

to represent petitioner.                                         .       ·    .      ..

    2.  Petitioner request **this** Honorable Court ·to remove ..t'h–_ ·,..; ·•.
above named attorney from any further proceeding because his/her
continued representation is deni s petitioner  due process  of law
as guarantee which is mandated **by** the United States Constitution.

    a)   Counsel do-not co municate or answe to reasonable re
 uests i.e., return phone calls to designated persons   who will
:eep petitioner informed of his legal matter;

    b)   counsel do not contact witnesse/s who were made known

A-021

TTOR EY AT LAW

<u>November</u> 30, 1993

Stephen Jaffe
supervisor
Criminal Listings Unit
Room 481
34 S. 11th Street
Philadelphia, PA 19107

RE: commonwealth vs. Ronald Clark
**MC# 9311-212**

Dear Mr Jaffe:

I received notification of my appointment to the above homicide preliminary hearing on the morning that is was last listed, November 23, 1993. At that time, being unprepared I requested a continuance and was given a date of December 14, 1993, which upon review of my calendar appeared to be a satisfactory date. Unfortunately, I am scheduled to take the CLE Ethics course held that day at the Philadelphia Convention center. As you know, this course is a mandatory requirement. I must complete same before the end of this year. As such, I would appreciate your effort in rescheduling this matter to December 15 or ·1ater.

By copy of this letter I am informing the District Attorney's Office of my situation, with a request that office contact you should December 15th be an unsatisfactory date.

Thank you.

R r.r:-.[ .:{:.D                very truly yours,

DEC O 31993

MUNICIf'AL COURT
CA\MINAL LISTING

**VML/mk**
cc: David Webb, Esquire

District Attorney's Office – Homicide Unit                     A-022

**10.** <u>**Commonwealth v. Rodney Collins**</u>, **CP-51-CR-0815881-1992**

   **a. Claim of Ineffectiveness**

Defendant raised ineffectiveness claims regarding trial counsel's performance at both the guilt and penalty phases.

   **b. Relief Received by the Defendant**

On February 15, 2005, the PCRA court issued an opinion denying relief on all of appellant's guilt-phase claims but vacating appellant's death sentence. <u>Commonwealth v. Collins</u>, 957 A.2d 237, 243 (Pa. 2008).

The Commonwealth did not appeal from the PCRA court's grant of a new penalty hearing. <u>Collins</u>, 957 A.2d at 243.

   *c.* **Outcome –** *Commonwealth Agreement to a Different Sentence*

The Commonwealth did not seek a new penalty phase hearing. Defendant was resentenced to Life before the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.17, 11/05/09 ("On count 1, life without parole. All of the other charges remain the same").

   **d. Duration of Litigation Prior to Resolution**

Arrest: July 15, 1992 – Resentenced: November 5, 2009 = **17 yrs, 3 mos, 21 d**

   *e.* **Trial Counsel –** *Not court-appointed*

Defendant was represented by counsel <u>YY</u>. *See* <u>Bill of Information</u> (attached). Trial counsel was *not* court-appointed.

A-023

PRE-TRIAL T/WJJVflUJJlll

TRIAL .  I /

| DAT£ | ROOM | COURT STENO | COURT CLERK |
|---|---|---|---|
| JUDGE | I•O• | COUNSEl. | |
| ftctA | | | |

CP..S1-CR.e815BBl-19112Comm.•Collins,Rodney
Non.P ic: Atthlved File Sc.an

5139064

VERDICT  0/27/97. Judgment of sentence affirmed
By Supreme

to/1,(M   adaed M.   !J(; c.,c..P

OA

c-f

CW, L/1.>-3

Judr,e

ENTENCE

ATE  11/1/95   ROOM  707.   COURT STENO  Linda Settles   COURT CLERK  T.M. Aatural

DGE  uanita K. Stout   AOA  Fran Schneider   COUNSEl

pu f  "f—  'li;ft    f

jm_k

coMMONWEAI.TH vs.

NAME. *A/K/A.* 40 0RE5S, 2Il° CODE          '!Jt!'  •NO.-  10 ts U

RECORD CON. NOi                ROONEY          COLLINS

POLICE PHOTO NO.               05500 WYALUSING       AVE      OTN#M5362512
704608                         PHIL .      PA   1 9131

STATUS OF DEFENDANT                                PLACE OF PRELIM. HEARING        ISSUING AUTH.
                                                   RM 675 CITY HALL               RET ACOO              339

Bail Mode S                                        DT. OF INCIDENT | BIRTH DATE   SEX | RACE | D.C. NO.
Ioll Set S                                         7/14/92  |  7/23/68           M.  |  N   | 9219050715
ure Nome                                           ATTY. CO. | M.C. CASE NO.     COMPLAINT DT. | DT. PRELI HEARING
:Addr••              0000                          55046C | 92/07-1139 1/1       7/15/92  |  8/05/92
IISM,      7Btl.l. NO:—      I⁰ n  8/12/92!        DATE OF ARRAIGN.
                                                   8/26/92 RM.625  A

CHARGE COOU a CHARGES
12000-NUR0ER 2502-
15000•VOLUNTARY MANSLAUGHTER   2503 F2

11. **Commonwealth v. Ronald Collins, CP-51-CR-0614771-1992**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare for the penalty phase.

### b. Relief Received by the Defendant

The Supreme Court affirmed the PCRA court's decision granting penalty phase relief due to counsel's failure to present mitigating evidence. Commonwealth v. Collins, 888 A.2d 564 (Pa. 2005):

> [W]e agree with the PCRA court's determination that counsel did not conduct a reasonable investigation to uncover the relevant mitigating evidence …

*Id*. at 583.

### c. Outcome – *Commonwealth agreement to a judge-only penalty phase*

The Commonwealth agreed that the trial court could conduct the penalty phase without a jury and the court imposed Life. Online Docket Entry, p.13, 5/11/2009 ("Order - Sentence/Penalty Imposed").

### d. Duration of Litigation Prior to Resolution

Arrest: April 11, 1992 – Resentenced: May 11, 2009 = **17 yrs, 1 mos**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel L. Docket Entry, 10/17/94 (attached). L was court-appointed. CPCMS, Secure Dockets.



COMMONWEALTH VS

POLia PHOT0 10 - - - - -   0 5 5 0 0   **WV LUSING   AVE**

608892        PHILA.        PA  19100

;;r;.ru:;er **"FENDANT**

RH 675  CITY HALL
OELEUN
338

4/11/92        7 /.7/64

CHARGE CODES & CHARGES
12000•MUROER  2502
i5000-VOLUNTARY MANSLAUGHTER  2503  2

**DEFEND :02/e"   4M HAS BE N AIDIUGNED**

UNDER PENNA. CRIMINAL CODE SECTION 30J-J06

BY THE COURT:

U126

10-6-94    243    Debra Calladel   (Williams)
ADA  Roland Cameron   COUNSEL

DEFENSE ATTORNEY  10/17/94 - 243 the defendant, upon a being
Guilty - Jury trial.
DEFENDANT  10-20-94 Rm. 243 at 12 PM the jury retired for deliberation,
10/21/94 at 10:55 Am the jury returned to the Court a Verdict of
VERDICT  guilty of first degree Murder. Continued until 10/24 in as to penalty
hearing  10-24-94 - 11:50 the jury retired to deliberate on the penalty.
10-25-94 - at 10:29 Am - the jury fixed the penalty at death.
Listed for formal Sentencing 1/18/95 Rm 243.
By the Court  [signature] Judge

SENTENCE  Formal Sentencing
DATE  April 20, 1995  ROOM  243   COURT STENO  Debra Hamer  [signature]
JUDGE  Hon. Eugene H. Clarke  ADA  Edward Cameron
This

12. **Commonwealth v. Robert Cook, CP-51-CR-0826512-1987**

    **a. Claim of Ineffectiveness**

Defendant filed a PCRA petition claiming the trial counsel provided ineffective assistance at the guilt and penalty phases. Commonwealth v. Cook, 952 A.2d 594, 600–601 (Pa. 2008).

    **b. Relief received by Defendant**

The PCRA court granted Defendant a new penalty hearing. The Commonwealth initially appealed that decision but ultimately withdrew its appeal. Commonwealth v. Cook, 952 A.2d 594, 601 (2008).

    *c.* **Outcome –** *Defendant's new penalty phase still has not occurred.*

    **d. Duration of Litigation Prior to Resolution**

Arrest: August 8, 1987 = **31 yrs and counting**

    *e.* **Trial Counsel –** *Court-Appointed*

Defendant was represented by court-appointed counsel CC. *See* Cook, 952 A.2d at 616-617 (affirming the trial court's refusal to appoint new counsel and noting that, "While an indigent is entitled to free counsel, he is not entitled to free counsel of his own choosing").

13. **Commonwealth v. Bernard Cousar**, CP-51-CR-0607431-1999

### a. Claim of Ineffectiveness

Defendant raised ineffectiveness claims relating to the guilt phase and to counsel's failure to prepare and present mitigation evidence. Commonwealth v. Cousar, 154 A.3d 287, 293 (Pa. 2017).

### b. Relief received by Defendant

The parties agreed that appellant was entitled to a new penalty hearing. Cousar, 154 A.3d at 293. The PCRA court entered the following Order:

> AND NOW, this 20th day of November, 2014, with the agreement of the Commonwealth, it is ORDERED that relief be granted to Petitioner as to Claim XIX of his Post Conviction Relief Act (PCRA) Petition, which claimed ineffective assistance of counsel for failure to investigate, develop and present mitigating evidence at his penalty hearing.

Online Docket Entry, p.10, 11/20/14.

### c. Outcome – *Undetermined*[5]

### d. Duration of Litigation Prior to Resolution

Arrest: May 14, 1999 = 20 yrs **and counting**

### e. Trial Counsel – *Court Appointed*

Defendant was represented by counsel NN and AAA Cousar, 154 A.3d at 293. Both attorneys were court-appointed. PCRA Court Opinion, Sarmina, J., p.1 n.1 (attached); CPCMS, Secure Dockets.

---

[5] In 2017, the Pennsylvania Supreme Court determined that Defendant was entitled to an evidentiary hearing on certain of his guilt phase claims. Cousar, 154 A.3d at 300. No new penalty phase hearing has been scheduled.

PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH

CP-Sl-CR-0508652-1999
CP-:.1-CR-0607431-1999
CP-.:-1-CR-1008141-1999

v.

Supreme Court No.
704 CAP

BERNARD COUSAR

Sannina,J.
August 12, 2015

F:ILED

AUG 12  2015

OPINION

Criminal Appeals Unit
First Judicial District of PA

PROCEDURAL HISTORY

On May 9, 2001 following a capital jury trial[1] before the Honorable James A. Lineberger,

Bernard Cousar (hereafter, petitioner) was convicted of two counts of murder of the first degree (H-

1), criminal conspiracy (F-1), burglary (F-1), two counts of robbery (F-1), aggi:avated assault (F-1),

and two counts of possessing instruments of crime (PIC)(M-1).[2] Notes of Testimony (N.T.) 5/9/01

at 4-7. Following the penalty phase, on May 11, 2001, the jury sentenced petitioner to death on each

of the murder convictions, after which Judge Lineberger imposed sentence on all charges.[3] N.T.



[1]   ::.nw.s.ii  .:i  ; e_a al:! p  :::.a;  ; tid-Un  d  1 !;::; : :n ?we cn ere i: 
no indication on the record th I [ ] t was co urt-appo inted or that he ever formally entered his appea rance . David Mischak,
Esquire represented petitioner at his formal imposition of sentence and on direct appeal, afti:l: . .!.  ft liled a
motion fo, new court-appointed counsd. On CP-51-CR-0508652-1999 .. t,pno, = ch,,ged .,;th aunin
.::..:::.ibr...... ..d  sr....:  :ct.....  |-I-I   |P   g'    p  5      6     ?1  Silt ioner
pcuuoncr w3.s charged with murder (vtctlm .I   t•:y... 1d PIC.

[2] 18 Pa.C.S. §§ 2502(a), 903(a), 3502(a), 3701(a)(1), 2702(a) , and 907(a), respec tively.

[3] Pe titioner was sentenced by Judge Lineberger to two consecutive death sentences. N.T. 5/11/01 at 38.  With respect
to the charge of robbery, victin:Ji!.-.](] !.J.lr petitioner was sentenced to a concurrent term of not less than five nor
more than ten years in prison. With respect to the charge of PIC, victir -[.lla.·petitioner was sentenced to a
consec utive term of not less than one nor more than two years in prison .  'With respect to  the charge of PIC, victim
1££311.:UM   § petitioner was sentenced to a concun:ent term of not less than one nor mo:e than two years in prison.
With respect to the charge of burglary, petitioner was sentenced to a consecutive term of nor less than five nor more
than ten ye:1rs in priso n.  With respect to the char ge of aggravated assault, victim  1D ,____ petitioner was
sentenc ed to a consecutive term of not less than five nor more than ten years in prison. With respect to the charge of

A-29

[FN<sub>co nt'd . . . . </sub>]

## 14.  **Commonwealth v. Dewitt Crawley**, CP-51-CR-0201551-1984

### a.  Claim of Ineffectiveness

Defendant raised claims of trial counsel's ineffectiveness. *See* <u>Crawley v. Horn</u>, 7 F. Supp. 2d 587, 588 (E.D. Pa. 1998) ("Petitioner filed a PCRA petition in 1990, collaterally attacking his sentences for alleged ineffectiveness of counsel during the penalty phase of his trial").

### b.  Relief Received by the Defendant

Defendant was awarded a new penalty phase by the PCRA court.

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth agreed to a life sentence:

> Order - Sentence/Penalty Imposed Re-sentencing upon appeal. By agreement the above defendant is re-sentenced to life without parole on first degree murder. The Court recommends the defendant continue to be housed in a single cell. He is to be removed from death row.

<u>Online Docket Entry</u>, p.13, 5/1/15.

### d.  Duration of Litigation Prior to Resolution

Arrest: December 23, 1983 – Resentenced: May 1, 2015 = **31 yrs, 4 mos, 8 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by <u>JJJ</u>. <u>Commonwealth v. Crawley</u>, 526 A.2d 334, 346 (Pa. 1987). <u>JJJ</u> was court-appointed. *See* <u>Docket Entry</u>, 9/10/84 (attached).



A-031

15.    **<u>Commonwealth v. Junious Diggs</u>, CP-51-CR-0709781-2002**

   **a. Claim of Ineffectiveness**

Defendant raised claims of trial counsel's ineffectiveness in a *pro se* petition.

   **b. Relief Received by the Defendant**

Without requiring defense counsel to file an amended PCRA petition, the Commonwealth agreed that Defendant was entitled to penalty phase relief.

   *c.* **Outcome -** *Commonwealth Agreement to a Different Sentence*

At the PCRA stage, with the Commonwealth's agreement, the PCRA court vacated Defendant's sentence and the Commonwealth agreed to a life sentence. <u>Secure Docket Entry</u>, p.19, 8/14/12; <u>Written Agreement Colloquy</u>, at p.2 (attached).

   **d. Duration of Litigation Prior to Resolution**

Arrest: May 18, 2002 – Resentenced: May 1, 2015 =
**12 yrs, 11 mos, 13 d**

   *e.* **Trial Counsel –** *Court-Appointed*

Defendant was represented by <u>G</u>. <u>G</u> was court-appointed. <u>CPCMS, Secure Dockets</u>.

AuAug. , '.!129 9:18AM cSC' GREENE Dep Area 724-852-5522 21s 603 ?4:No. 0405 P. 1 p. 1

# IN THE COURT OF CO.MMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

**COMMONWEALTH** *OF* **PENNSYL*VANTA.***

          Respondent,

    v.

JUNIOUS DIGGS,

        Petitioner.

Criminal .Division

No. CP-5J-CR-070978J 2002

Hono1·ablc Cllrolyn Engel Temjn

. **CAPITAL PCRA**

## WRITTEN AGREEMENT COLLOQUY

1.    I can rend, write, and understnnd the English language.

2-:---l <u>am not</u> being treated by a psychiatrist or psychologist for mental problems.

3.    I am *not* currenrly under the influence of d1'Ug!i, .ilcohol, or medication.

4.    **J** understand that a jury sitting before the Honor.iblc James A. Lineberger has found me guilty of c;,ne count of Murder in the Firsl. Degree for lhe shooting of Johnetta Bryant, Bul'glary, Pos ei;sion of an Instrument of Cdme, and Criminal Trespass.

5.    I unders1.:ind char as to the count of first degree murder, che jury found thal the aggravating circilmstance outweighed the mitig-.iting circumstance and, accordingly, imposed a death sentence.

6.    l understand 1hnt Judge Lineberger formally imposed the death entcnce, as well as an aggregate conct1ncnt term of imprisonment of seven and one-hntf to fifteen yea.rs for burglary and possession of an ins1ru111enr of crime.

A-033

7.     I understand 1hat, on direct appeal. the Pennsylvania Supn:me Court uffirmed the judgments of sen,encc,

8.     I under.stand that the United St:.tte,; Supreme Court denied my pecition for a writ of certiorari.

9.     I understand Lhat Biily H. Nolas, Esquire, is currently representing me during these PCRA proceedings, .md that 1 have a legal team, including Investigator Rachel Aaron, working on my cuse from Mr. NoJns' office at the Federal Community Defender's Office (FCDO}.

10.    I underscand thnt, during these PCRA proceedings, the Dii;trict Attorney's Office bas agreed rhal this Coll1'l may vac11ce my deach sentence and impose u life sentence. widi no possibility of parole, provided that:

    (il)     J agree to withdraw my current PCRA peril.ion;

    (b)      I agree *to* never seek or fiJe, or hv.ve filed on my behalf, any state or fcde.ral colh1ter,d appeal of this agrccmcol;

    ©        1ngrec to never:;eek or file, or have filed on my behAlf, a PCRA petition. a federal haberu; petition, or any olhc1· motion challenging either my conviction or sencence;

    (d)      *l* agree co never seek or file. or have filed on my behalf, any claims of ineffccrivc ui;siscance of past or present cotlnscl;

    (e)      I lcnow thnt I am giving up Lhe..<ie righti. forever.

11.    I agree that ll copy of chis written agreement and colloquy shall become part of my

2

prison record.

12.  1 have fully di:;cui;sed aU of my right11 with my PCRA lawyer, Mr. Nolas, and wirh Rachel Aaron. an investigator at d1e FCDO, and I am i,atisfied that I fully understand all of my rights that I am giving up, and what *1* am receiving in return.

13.  Other than the terms and conditions scl forth in chis Agreement. nobody hii.s promised me anything, or forced me. or threatened me to accept the terms and condltions of the Agreement. J, myself, have dc:cidcd to accept all terms and c:ondit1ons of the Agreement, I know ·bat J do and say today is final.

J4.  l have read this Agreement and have discui.:;e_d *ic* in its entirety with *Mr.* Nolas and Ms. Aaron. T have no que.•nions regarding «he rcrms and conditions of this Agrcmenc and J understnnd exactly what is writl<?l he   ! 11111. acii;ficd with the vice and services I have received from Mr. Nolas and '.\k A.lfon.

l5.  I.im nol contcliting the Commonwealth's evidence or the jury'11 finding of guilt.

l6.  I accepr aU of the ternu and conditioos of this. Agreement, knowingly. intelligently, llJld voluntltily.

I HAVE READ ALL OF THE ABOVE AND HAVE DISCUSSED IT WITH MY LEGAL TEAM. I FULLY UNDERSTAND WHAT IS SET FORTH IN THIS AGREEMENT AND T ACCEPT ALL TERMS AND CONDITIONS OF THIS AGREEMENT.

DATE: *Zbvka* 12

Dilousotoos

3

A-35

## CERTIFICATION OF DEFENSE COUNSEL

I, Billy H. Nolas, Esquire, certify that:

(1)    I am an attorney admitted to practice by the Supreme Court of Pennsylvania.

(2)    I represent the defendant herein.

(3)    I have no reason to believe that the defendant cannot fully understand everything that is being said and done here today.

(4)    The defendant has reviewed and discussed the terms of the written agreement colloquy in my presence and appeared to fully understand it. Ms. Aaron and I have reviewed the Agreement completely with the defendant, explained all of the items on the Agreement, and answered any question he had; the defendant appeared to understand the information and explanations provided.

(5)    The defendant is knowingly, voluntarily, and intelligently agreeing to all the terms and conditions of this Agreement.

(6)    We made no promises to the defendant other than any listed in this Agreement.

(7)    Although the decision was made exclusively by the defendant, we agree with his decision.

By: _____ Billy H. Nolas, Esquire        Date: ___1/2 i/J|___

A-37

## DISTRICT ATTORNEY'S CERTIFICATIONS

I certify that I am the assigned prosecutor in this PCRA case and that the terms, conditions or agreements mentioned herein are true and correct, as they are set forth above. I have asked whether there is anything in the written agreement colloquy form or anything else about this case that the defendant does not understand, and the defendant has indicated that he

und2;evzg::tiss;l

Robin Godffey, Assistant District ko:ney
Chief, PCRA Unit

Date:

A-38

### JUDGE'S CERTIFICATIONS

I certify that I am the Judge having jurisdiction to hear this case and that I am satis ftcc' the defendant understands fuJiy the nature and quality of the Agreement that the defendant is entering before me. The defendant has exercised a knowing, intelligent, and voluntary acceptance of the Agreement mentioned above. The defendant has been colloquied to determine whether he understands everything that is being said and done in court, as well as to determine whether the defendant is entering this Agreement of his own free will.

The Honorable Carolyn Engel/Temin
Court of Common Pleas

Date:

A-39

## 16.   Commonwealth v. Daniel Dougherty, CP-51-CR-0705371-1999

### a.  Claim of Ineffectiveness

Defendant filed a PCRA petition claiming, *inter alia*, that the trial counsel provided ineffective assistance at the guilt and penalty phases.

### b.  Relief Received by the Defendant

The Commonwealth conceded that trial counsel was ineffective at the penalty phase "for failure to investigate and present certain mitigation evidence". Online Docket Entry, p.23, 2/7/12.

### c.  Outcome – *Commonwealth Agreement to a Different Sentence*

The Commonwealth agreed that it would not pursue the death penalty at a new sentencing hearing and agreed to a life sentence. Commonwealth v. Dougherty, 2017 WL 4949000, at *2 (Pa. Super. 2017) ("[U]pon the agreement of the parties, Dougherty's death sentences were vacated, and sentences of life in prison were imposed for each of Dougherty's murder convictions"). The PCRA court's order reads:

> [B]ased upon the Commonwealth's certification that, in the exercise of its discretion, it will not pursue a new penalty hearing in this matter, defendant's sentence of death is hereby vacated and a new sentence of life imprisonment is hereby imposed.

Online Docket Entry, p.23, 2/7/12.

### d.  Duration of Litigation Prior to Resolution

Arrest: April 14, 1999 – Resentenced: February 7, 2012 =
**12 yrs, 9 mos, 24 d**

### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by E. S*ee* Bill of Information (attached). Counsel apparently represented Defendant *pro bono*. (N.T. 6/10/00 at 101).





17. **Commonwealth v. Joseph Elliott,** CP-51-CR-0410911-1994

   **a. Claim of Ineffectiveness**

   Defendant claimed that trial counsel provided ineffective assistance at the penalty phase because of "the failure to produce mental health testimony." Commonwealth v. Elliott, 80 A.3d 415, 424 (Pa. 2013).

   **b. Relief Received by the Defendant**

   On February 26, 2010, "the Commonwealth agreed not to oppose Elliott's request for a new penalty hearing." Elliott, 80 A.3d at 424 n.5.

   *c.* **Outcome –** *Commonwealth Agreement to Lesser Sentence*

   On May 1, 2015, Defendant was resentenced to Life by the Homicide Calendar Judge:

   > Order - Sentence/Penalty Imposed Re-sentencing upon appeal. This matter came back from Supreme Court. He is resentenced to life without parole on first degree murder. He is to be taken off of death row.

Online Docket Entry, p.23, 5/1/15

   **d Duration of Litigation Prior to Resolution**

   Arrest: December 16, 1993 – Resentenced: May 1, 2015 =
   **21 yrs, 4 mos, 15 d**

   **e. Trial Counsel –** *Court-Appointed*

   Defendant was represented by court-appointed counsel SS. Elliott, 80 A.3d at 422. (noting that the trial court "denied [Defendant's] request for the appointment of new counsel"); CPCMS, Secure Dockets.

**18.** **Commonwealth v. Henry Fahy**, CP-51-CR-0222831-1981

    **a. Claim of Ineffectiveness**

Defendant claimed that trial counsel was ineffective for failing to prepare for the penalty phase.

    **b. Relief Received by the Defendant**

The Federal Court granted penalty phase relief because of counsel's failure to develop and present mitigation evidence and for suggesting to the jury that Defendant might someday be released:

> The petition will be granted for: (1) ineffective assistance of trial counsel for failing to develop and present available and compelling mitigating evidence and for suggesting Fahy would likely be released on parole; and (2) the erroneous jury charge that prevented the jury from considering non-statutory mitigating evidence.

Fahy v. Horn, 2014 WL 4209551, at *1 (E.D. Pa. Aug. 26, 2014).

    *c.* **Outcome –** *Defendant's case is in abeyance in the Third Circuit.*

    **d. Duration of Litigation Prior to Resolution**

Arrest: Jan. 30, 1981 – New Penalty Phase granted August 26, 2014**=**
**33 yrs, 6 mos, 27 d**

    **d. Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel Q.  Commonwealth v. Fahy, 516 A.2d 689, 696 (Pa. 1986); Cover Page, N.T. 1/20/83 (attached). This was Q's first capital case. Commonwealth v. Ramos, CP-51-CR-0100891-1999, N.T. 9/25/08 at 17.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH

VS.

HENRY FAHY

- FEBRUARY TERM, 1981
- 2284 Poss.1NSTRUMENT CRIME., GENERALLY
- 2286 - RAPE
- 2288 - MURDER, GENERALLY
- 2289 - BURGLARY

JANUARY 20, 1983

COURTROOM 253, CITY HALL

JURY TRIAL

BEFORE: HONORABLE ALBERT F, SABO, J,

PRESENT: JUDITH FRANKEL RUBINO... !ESQUIRE

ASSISTANT DISTRICT ATTORNEY
FOR THE COMMONWEALTH

ESQUIRE

N L DEFENSE
(COURT-APPOINTED)

HENRY FAHY,
DEFENDANT

**■■**..

**-.-**

**---**

. -
18
7 -

A-04

19. **Commonwealth v. Lester Fletcher**, CP-51-CR-0709931-2001

### a. Claim of Ineffectiveness

Defendant claimed ineffectiveness for counsel's failure to investigate and present mitigation evidence.

### b. Relief Received by the Defendant

The Commonwealth agreed to penalty phase relief:

[W]ith the agreement of the Commonwealth, it is ORDERED that relief be granted to Petitioner as to Claim IX … which claimed ineffective assistance of counsel for failure to investigate, develop and present mitigating evidence at his penalty hearing.

Online Docket Entry, p. 11, 2/7/11. Thereafter, the Supreme Court granted the parties' joint motion for remand for re-sentencing. Commonwealth v. Fletcher, 43 A.3d 1289 (Pa. 2012).

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On July 18, 2012, the trial court resentenced Defendant to Life:

Order Modifying Sentence - Death penalty is vacated and the defendant is now sentenced to life in prison without the possibility of parole. The defendant has agreed to withdraw all current appeals and waives all future appeals.

Online Docket Entry, p.13, 7/18/12.

### d. Duration of Litigation Prior to Resolution

Arrest: March 27, 2001 – Resentenced: July 18, 2012 = **11 yrs, 3 mos, 21 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed mitigation counsel AAA. Online Docket Entry, p.6, 10/24/01; Commonwealth v. Fletcher, 861 A.2d 898, 914 (Pa. 2004).

**20.** <u>**Commonwealth v. Kenneth Ford**</u>, **CP-51-CR-1032221-1989**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel failed to prepare for the penalty phase.

### b. Relief Received by the Defendant

The Supreme Court granted penalty phase relief based upon counsel's failure to investigate and present evidence of mitigation. <u>Commonwealth v. Ford</u>, 809 A.2d 325, 331 (Pa. 2002) ("During Appellant's penalty phase in the instant case, trial counsel presented virtually no evidence of mitigating circumstances").

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

On November 29, 2004, with the agreement of the Commonwealth, the PCRA court resentenced Defendant to Life. (N.T. 11/29/04 at 1-5) (attached); <u>Online Docket Entry</u>, p.9, 11/29/2004.

### d. Duration of Litigation Prior to Resolution

Arrest: September 9, 1989 – Resentenced: November 29, 2004 =
**15 yrs, 2mos, 20 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel <u>A</u>. *See* <u>Order of Appointment</u> (attached).

[N THE COURT OF COMMON PL1...AS OF PHILADELPHIA
0   Trial Division          D   Family Court Division
    Crimin..il Section           O   Domestic Rel.   0   Juvenile       ☐  Women's          D  Misdemeanant's
                                                                            Crimin..l

N THE PHILADELPHIA MUNICIPAL COURT
    D  Criminal Section


Ql:.ommontncaltb                          Date:   SEPTEMBER 13. 1989

                    vs.
                                                  MURDER

                                                  MC 8909 0586 – 0587 – 0588

                                                  PP# 498890

    KENNETH FORD                                  THIS APPOINTMENT IS NOT TRANSFERABLE


**fjerebp ttrtif** $p_{ff}$  That on       12 TH        day of _____       SEPTEMBER A.O. 19_!9


ON. JUDGE, CURTIS C.'CARSON APPOINTED ([        E  SQ U I R E


ïll a

0  DEFEND KENNETH FOR'l:}' IN ACCORDANCE WITH LAvl.


_Peti oil_ /Aa,,u<-_Lr        _Cou,t Clerk_

•25 ( Rov. 12/69)



---

# First Judicial District of Pennsylvania

*89103222*
*Kenneth Ford*

---

*Sentencing Volume 1*
*November 29, 2004*





JAN O 4 2005

CLERK Or QUAR1ER SESSIONS

---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 11-29-04"FORD.rxt,J Pages*
*CRS Catalog JD: 04120716*

89tb3222
Kenneth Ford

Page 1

(2)        IN THE COURT OF COMMON PLEAS
[31    FJRST JUDICIAL DISTRICT OF PENNSYLVANIA
(4)
[SJ COMMONWEALTH        : OCTOBER TERM, 1989
[61
(7)    vs                    :
[B] KENNETH FORD      : NO.: 3222

(9)      Monday, November 29, 2004
(101
{111   Courtroom 602 • Criminal Justice Center

(12)      Philadelphla, Pennsylvania

(13)        RESENTENCING

(14)

(15)   BEFORE:  THE HONORABLE JANE C. GREENSPANJ.

(16)

(17)

(18)   APPEARANCES:
(19)      VERNON CHESTNUT ESQ.
           Assislanl Dlslrlcl Attorney
           For L"9 Ccmmom*".;!a!+.h
(20)      MARC BOOKMAN, ESQ. and
1211      KARL SCHWARTZ, ESQ.
(22)       For the Defendant
(23)
(24)
{25)        KEVIN FLANAGAN, RPR

Page 2

|111
|[21
131    THE COURT: We can have the
C4]   Defendant sworn, please.
[SJ      COURT OFFICER: State your
161   full name, spell your last name.

/m       THE DEFENDANT: Kenneth Ford;
jl 8]  F-0 -R-D.

[91
]110     KENNETH FORD, having been
1111   first duly sworn, was examined and
1[12]   testified, as follows:
1[1 3]
||[4]    THE COURT: It is my
]|[5]  understanding, Mr. Ford, that the-· it
          is a little unclear as to how this
1|[8]
[[17]  opinion from Justice Nigro is worded.
1[[8]  He remands for a new sentencing hearing
1[[9]  but the Commonwealth has agreed that the
11201   death sentences will be vacated and I
j(21]  will impose two consecutive life
]]221   sentences on those death sentences. It
11[23]   is my intention that all the remaining
h24J   sentences remain the same as they were
[251   imposed originally; do you understand

Page 3

[1]
[2]   all ofthnt?
[3]      THE DEFENDANT: Yes, ma'am .
[4]      THE COURT: Is there anything
(SJ   you wish to say to me before I sentence
(6)   you? You have that right but you don't
[7J   have to if you don't want to.
[8]      THE DEFENDANT: No, not
19]   really.
(10)     MR. CHESTNUT: Before
(11)   sentencing, Mr. McCann reviewed the
(12)   Supreme Court's opinion. He also
(13)   considered the information that
(14)   Mr. Bookman and Mr. Schwartz had
(15)   provided to him. Based on all the
[16]   information that he has, he is agreeing

[17]                          [24]   and
[18]                          [25]   also
[19}                                 talki
[20)                                 ng to
[21)                                 the
[22]                                 famil
[23]                                 ies in

Page 4

1(1)
|[2]    THE COURT: Thank you. Then
| 131  on I guess it is 8910, 3222, I sentence
| 141  you to life imprisonment without parole;
|[SJ   on the bill, 8910, 3227, I sentence you
| 161  to a consecutive term of life
/m    imprisonment without parole. All the
| I8J  remaining sentences or all the remaining
|91   bills that have sentences on them are to
|c101   remain as they were when originally
11111   sentenced.
1[(12)     It is my understanding that there
1(1 3)  may be some agreement - I don't know ifthere
1(14)   is. If there is no agreement with regard to
1115}   filing any notices of appeal, you do have that
1(1 6)   right within thirty days in writing.  If you

these cases, it is his position that just for the purposes of this
hearing,
that we will not seek the death penalty. We will would ask for the
imposition of two consecutive life sentences.
        MR. BOOKMAN: We are greatly appreciative of the District
Attorney's review of this matter.

wish to do that and cannot afford Counsel, Counsel will be appointed for you for that purpose free of charge. Your Lawyers understand all of this.

**MR. SCHWARTZ:** For the record and for Mr. Ford's edification, there is no agreement regarding waiver but I would ask because we run into these problems whenever this happens, that

Page5

(1)
[2]     when the clerk prepares the short, it
[3J     indicate that the death sentences have
(4)     been permanently vacated and the
[5]     Defendant is to be taken off of death
[6J     row.
[7]          THE COURT: That will be done,
(81     **MR. SCHWARTZ:** Thank you.
[9]               ---
(1OJ         (Whereupon, the proceedings
(11]    were adjourned, at this time.)
(12}
[13]
(14]
[15]
(16)
(171
[18]
(19)
(20)
(21)
[22]
(23)
(24)
{25}

### 21.  Commonwealth v.William Gribble, CP-51-CR-1220811-1992

#### a.  Claim of Ineffectiveness

At the PCRA stage, Defendant claimed that "counsel was ineffective in failing to perform a reasonable investigation and thereby failing to locate and call available family members who had additional evidence material to mitigating circumstances." Commonwealth v. Gribble, 863 A.2d 455, 475 (Pa. 2004).

#### b.  Relief received by Defendant

The PCRA court granted Defendant a new sentencing hearing. Gribble, 863 A.2d at 458.

The Supreme Court remanded for an evidentiary hearing on Defendant's ineffective assistance claims. Gribble, 863 A.2d at 476 (noting that "[t]he family member witnesses whom counsel is faulted for failing to have interviewed and presented at the penalty phase are the sort of witnesses whose existence should have been readily apparent or discoverable to any counsel who conducted a reasonable investigation").

#### c.  Outcome – Life Sentence after New Penalty Hearing

After a second penalty phase hearing, the Defendant received Life. Online Docket Entry, p.20, 3/10/09 ("Original Sentence of 8/11/94 is vacated. Jury Hung on Penalty Phase").

#### d.  Duration of Litigation Prior to Resolution

Arrest: November 15, 1992 – Resentenced: March 10, 2009 = **16 yrs, 3 mos, 23 d**

#### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel JJ. Commonwealth's Motion to Dismiss PCRA Petition ("Defendant was represented at trial by [JJ]"); CPCMS, Secure Dockets.

22. **Commonwealth v. Donald Hall**, CP-51-CR-0210711-1982

### a. Claim of Ineffectiveness

Defendant claimed that new penalty phase counsel was ineffective for failing to raise the issue of the Commonwealth's prior concession that it would not seek the death penalty before the commencement of Defendant's second penalty phase hearing. Commonwealth v. Hall, 1993 WL 1156097 (Pa. Com. Pl. July 23, 1993).

### b. Relief Received by the Defendant

The PCRA court determined that new penalty phase counsel was ineffective:

> This Court concludes that defense counsel … was ineffective for failure to raise the concession issue before Judge Sabo during presentence motions. … [T]his Court finds that the sentences of death should be vacated and sentences of life imprisonment imposed.

Hall, 1993 WL 1156097, at *633 *affirmed* Commonwealth v. Hall, 645 A.2d 888 (Pa. Super. 1994) (Table).

### c. Outcome – Life Sentence

After the PCRA court's determination, Defendant received Life pursuant to the version of 42 Pa.C.S. § 9711(h)(2) in effect at the time of his trial (stating that a court "shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.") (repealed effective December 21, 1988). Online Docket Entry, p.3, 2/29/96.

### d. Duration of Litigation Prior to Resolution

Arrest: February 2, 1982 – Resentenced: February 29, 1996 = **14 yrs, 27 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel H. Hall, 1993 WL 1156097, at *623; CPCMS, Secure Dockets.

**23.**   **Commonwealth v. Ronald Hanible, CP-51-CR-0409021-1999**

### a. Claim of Ineffectiveness

Defendant claimed that defense counsel failed to present mitigating evidence. Commonwealth v. Hanible, 30 A.3d 426, 438 (Pa. 2011).

### b. Relief Received by the Defendant

The Commonwealth agreed that Defendant was entitled to a new penalty hearing:

> The Commonwealth filed a motion to dismiss the PCRA petition, but subsequently agreed that a new penalty hearing was warranted due to trial counsel's failure to present available mitigating evidence.

Hanible, 30 A.3d at 438.

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

The Commonwealth did not seek a new penalty hearing and Defendant was resentenced to life in prison by the Homicide Calendar Judge.  Online Docket Entry, p.20, 9/24/13.

### d. Duration of Litigation Prior to Resolution

Arrest: January 21, 1999 – Resentenced: September 24, 2013 = **14 yrs, 8 mos, 3 d**

### e. Trial Counsel - *Court-Appointed*

Defendant was represented by QQ. QQ was court-appointed. Secure Docket Entry, p. 9; CPCMS, Secure Dockets.

24. <u>**Commonwealth v. John Harris**</u>, **CP-51-CR-0903421-1992**

   **a. Claim of Ineffectiveness**

   Defendant claimed that counsel provided ineffective assistance during the penalty phase. <u>Commonwealth v. Harris</u>, 852 A.2d 1168, 1170 (Pa. 2004).

   **b. Relief Received by the Defendant**

   The PCRA court entered an order granting an evidentiary hearing on Appellant's claims that counsel had been ineffective during the penalty phase, but denying relief on the guilt-phase claims. <u>Harris</u>, 852 A.2d at 1171. The Commonwealth did not appeal the PCRA court's penalty phase decision. *Id.* n.6.

   *c.* **Outcome –** *Commonwealth Agreement to a Different Sentence*

   By agreement, Defendant was resentenced to Life by the Homicide Calendar Judge (Lerner, J.). <u>Online Docket Entry</u>, p.8, 2/28/05.

   **d. Duration of Litigation Prior to Resolution**

   Arrest: August 22, 1992 – Resentenced: February 28, 2005 =
   **12 yrs, 6 mos, 6 d**

   *e.* **Trial Counsel –** *Court-Appointed*

   Defendant was represented by counsel <u>K</u>. <u>Commonwealth v. Harris</u>, 703 A.2d 441, 447 n.11 (Pa. 1997). <u>K</u> was court-appointed. <u>CPCMS, Secure Dockets</u>.

25. **Commonwealth v. Donetta Hill**, CP-51-CR-0518391-1991

### a. Claim of Ineffectiveness

At the PCRA stage, Defendant claimed that her court-appointed counsel provided ineffective assistance at both the trial and penalty phases of her trial.

### b. Relief Received by the Defendant

The federal court agreed with Defendant's ineffectiveness claim:

> In clear contravention of prevailing professional norms at the time of trial, Petitioner's trial attorney did not conduct a social history investigation.

Hill v. Wetzel, 279 F. Supp. 3d 550, 566 (E.D. Pa. 2016).

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

The Commonwealth agreed that Defendant should receive a Life sentence:

> [D]uring state post-conviction proceedings, the Commonwealth and Ms. Hill's attorneys stipulated that she should be resentenced to life without the possibility of parole.

Hill, 279 F. Supp. 3d at 557 n.1. The new sentence was imposed on March 21, 2012. Online Docket Entry, p.21, 3/21/12. After the federal court granted her a new guilt phase trial, the Commonwealth negotiated a term of years sentence for third degree murder. Online Docket Entry, p.22, 7/12/17.

### c. Duration of Litigation Prior to Resolution

Arrest: April 20, 1991 – Resentenced: August 14, 2006 =
**15 yrs, 3 mos, 25 d**

### d. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel CC. Commonwealth v. Hill, 16 A.3d 484, 486 (Pa. 2011); Hill, 279 F. Supp. 3d at 556; CPCMS, Secure Dockets.

26. **Commonwealth v. William Holland**, CP-51-CR-1014291-1984

    **a. Claim of Ineffectiveness**

Defendant claimed that trial counsel was ineffective for "(1) for failing to obtain potentially helpful records; (2) for failing to investigate, develop, and present expert testimony; (3) for failing to properly interview and present testimony from Petitioner's family and other acquaintances." Holland v. Horn, 150 F. Supp. 2d 706, 729 (E.D. Pa. 2001), *aff'd*, 519 F.3d 107 (3d Cir. 2008).

    **b. Relief Received by the Defendant**

The federal court determined that Defendant was denied his 5th Amendment right to a court-appointed defense expert for help in developing defenses in support of mitigation at the penalty phase. Holland, 150 F. Supp. 2d at 749.

    *c.* **Outcome –** *Defendant died in custody prior to resolution*

Defendant died prior to resentencing. Online Docket Entry, p.6, 10/21/10 ("Case Abated - Defendant Deceased").

    **d. Duration of Litigation Prior to Resolution**

Arrest: August 8, 1984 – Died in Custody: October 21, 2010 =
**26 yrs, 2 mos, 13 d**

    **d. Trial Counsel –** *Court-Appointed*

Defendant was represented by court-appointed counsel DD. Holland, 150 F. Supp. 2d at 713; (N.T. 6/5/85 at 1.2) (attached); CPCMS, Secure Dockets.

IN THE COURT OF CO.MHON PL3P,S

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

iiRJAL DIVISION

(4)

COMMONWEALTH                                    6CTOBER '] ERM, 1984

                                    :    NOS.  1429 INVOLUNTARY MANSLAUGHTE
                                    :         14.;0 MURDER

                                         1437 ATT INVOL DEV SET NTER
                                         1438 ATTEMPTED RAPE
                                         1439 ROBBERY

                                         1440 CRIM TRESP BLDGS OCC S
                                              DEFIANT TRESPASSER
                                         1441 BURGLARY
                                              THEFT UNL TAK/DISP
                                              THEFT R.S.P.
                                         1442 REAP
                                              TERRORISTIC THREATS
                                         1443 SIMPLE ASSAULT
WILLIAM C. HOLLAND            :                AGGRAVATED ASSAULT


                    Room 232, City Hall
                  Philadelphia, Pennsylvania
                       June 5, 1985



BEFORE:    HONORABLE STANLEY L. KUBACKI, J. and a Jury



APPEARANCES

                    WILLIAM CHADWICK, ESQUIRE

                    Assistant District Attorney
                    For the Commonwealth

           **Mi:llf)X$).(Qil-,** ESQUIRE
                    For the Defendant

ALSO PRESENT:

                    GWEN DOGGETT,
                    Official Spanish Interpreter

RECORD
FILED IN
SUPREME
COURT

I\UG ʹ1

1986

HSTERU
mstRICI

A
-
0
5
6

1.2

(In the courtroom, out of the presence of the jury.)

THE COURT:  I believe you wanted to make a statement for the record.

Yes, I did want to make a statement for the record.  With the Court's indulgence, I was in the process of discussing this matter with my client, Mr. William Holland.  Would the Court be good enough to give me a few extra minutes with him so I can clarify this matter before I make the statement?

**THE COURT:  Sure.**

(Pause.)

THE COURT:  Yes, sir.

Good morning, Your Honor.

The matter before the Bar of the Court is Commonwealth versus William Holla.nd, a homicide matter.  My name is  I am court appointed to represent the defendant William Holland.  The matter is here today for a jury trial.  Before the matter goes to trial, I requested to put a statement for the record.  Before I do that, with the Court's kind permission, I would like to call

A-057

## 27. <u>Commonwealth v. Arnold Holloway</u>, CP-51-CR-0613051-1985

### a. Claim of Ineffectiveness

Defendant claimed that counsel was ineffective for failing to investigate his background for mental health issues and because he failed to request that a mental health expert be appointed to assist the defense. <u>Holloway v. Horn</u>, 161 F. Supp. 2d 452, 573-74 (E.D. Pa. 2001).

### b. Relief Received by the Defendant

The District Court concluded that Holloway's counsel provided ineffective assistance in failing to investigate mental-health issues and request the assistance of a mental-health expert. <u>Holloway v. Horn</u>, 355 F.3d 707, 713 (3rd Cir. 2004).

On appeal, the Third Circuit, gave additional relief on defendant's <u>Batson</u> claim. <u>Holloway v. Horn</u>, 355 F.3d at 730 (remanding the case for retrial).

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On remand, Defendant entered an open plea and received a term of years sentence. <u>Online Docket Entry</u>, p.5, 4/14/05.

### d. Duration of Litigation Prior to Resolution

Arrest: May 31, 1985 – Resentenced: April 14, 2005 =
**19 yrs, 10 mos, 14 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by counsel <u>J.   Holloway</u>, 355 F.3d at 722. <u>J</u> was *not* court-appointed.

**28.** <u>**Commonwealth v. Steven Hutchinson**</u>**, CP-51-CR-0408581-1998**

### a. Claim of Ineffectiveness

Defendant filed a PCRA petition, raising numerous guilt and penalty phase claims. <u>Commonwealth v. Hutchinson</u>, 25 A.3d 277, 284 (Pa.  2011).

### b. Relief Received by the Defendant

"[W]ith with the agreement of the Commonwealth, the PCRA court entered an order … granting Appellant a new penalty phase hearing." <u>Hutchinson</u>, 25 A.3d at 284.

### c. Outcome – *Commonwealth Agreement to Different Sentence*

On January 23, 2013, Defendant was resentenced to Life by the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.16, 1/23/2013.

### d. Duration of Litigation Prior to Resolution

Arrest March 2, 1998 – Resentenced: January 23, 2013 =
**14 yrs, 10 mos, 21 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>RR</u>. <u>Hutchinson</u>, 25 A.3d at 286. <u>RR</u> was court-appointed. <u>CPCMS, Secure Dockets</u>.

**29.** **Commonwealth v. Kareem Johnson, CP-51-CR-1300424-2006**

### a. Claim of Ineffectiveness

Defendant filed a PCRA petition, raising numerous guilt and penalty phase claims.

### b. Relief received by Defendant

"At the PCRA stage, the Commonwealth conceded that Defendant was denied effective assistance of counsel … and therefore the parties stipulated that Appellant was entitled to a new trial." Commonwealth v. Johnson, 2018 WL 3133226. The PCRA Docket entries state:

> AGREEMENT AND ORDER - There is an agreement by and between Petitioner and the Commonwealth. All parties agree that Petitioner is entitled to the grant of a new trial based on ineffective assistance of counsel at the guilty-innocence phase of trial …

Online Docket Entry, p.24, 4/22/15.

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On February 17, 2016, the Commonwealth filed a notice with the trial court indicating that it would no longer be seeking the death penalty. Brief for Appellee, Commonwealth v. Johnson, 927 EDA 2016, at p.2 n.1; Online Docket Entry, p.30, 2/17/16 ("Notice of Removal of Capital Designation").

### d. Duration of Litigation Prior to Resolution

Arrest: May 22, 2006 – Death Penalty Removed: February 17, 2016 = **9 yrs, 8 mos, 26 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel F and FFF. On Line Docket Entry, p.11, 6/18/07. Both attorneys were court-appointed. PCRA Petition, 8/15/14 at 5 (attached); CPCMS, Secure Dockets.

fIIf!)
08/15/2014 05:24:50 PM
f'allIlIalId
By: P. MCI

IN THE COURT OF COMMON PLEAS
OF PHU.ADELPHIA COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,

           Respondent,

        **v.**

KAREEM JOHNSON,

           Petitioner.

<u>CRIMINAL DMSION</u>

CP-5 I-CR-1300424-2006

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS
AND FOR COLLATERAL REUEF FROM CRIMINAL CONVICflON
PURSUANT TO THE POST CONVICTION RELIEF ACT, 42 PA. CS.§ !t541** *ET SEQ.*

Eric J. Montroy
Pa. Bar No. 90949
Amy Gershenfeld Donnella
Pa. Bar No. 85194
Michael Gonzales
Pa. Bar No. 89351
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
The Curtis Center, Suite 545-W
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Kareem Johnson

Dated: Philadelphia, Pennsylvania
      August 15, 2014

CP•51.CR 1J00424•2000 ClIllffl v Johnson Koreern
PCRA. Amenalld PCRA Pel1llon Flle<l



A-61

7186383661

7.     Trial counsel filed a postverdict motion, which was later denied when counsel failed to brief it.

8.     Trial counsel continued to represent Petitioner on direct appeal to the Pennsylvania Supreme Court. That Court refused to consider two of the claims appellate counsel raised on the basis that they were inadequately briefed. The Pennsylvania Supreme Court affirmed the conviction and sentence of death. <u>Commonwealth v. Johnson,</u> 985 A.2d 915 (Pa. 2009).

9.     Petitioner filed a petition for certiorari with the United States Supreme Court, which was denied on October 4, 2010. <u>Johnson v. Pennsylvania,</u> 131 S.Ct. 250 (2010).

10.     Petitioner filed a timely pro se PCRA petition on December 16, 2010. On December 21, 2010, undersigned counsel entered their appearance on Petitioner's behalf. This First Amended PCRA Petition is being timely filed.

11.     On January 14, 2011, the Governor signed a warrant for th<: execution of Petitioner. On January 18, 2011, the Honorable Carolyn Engel Temin ordered that Petitioner's impending execution be stayed until the resolution of PCRA proceedings.

### PRIOR COUNSEL

12.     Petitioner was represented at trial **b   quire, and** Esquire. **III  i** was appointed several months aftc •**IE**   1 **1111:**, and designated to serve *as* penalty phase <u>counsel.</u> **I Ilf  I**l <u>continued</u> to represent Petitioner through direct appeal to the Pennsylvania Supreme Court.

### ELIGIDJLITY FOR RELIEF

A.     Federal Constitutional Standards.

*5*

30. **Commonwealth v. William Johnson, CP-51-CR-0936052-1991**

### a. Claim of Ineffectiveness

At the PCRA stage, Defendant claimed that his trial attorney provided ineffective assistance. In the amended petition, counsel raised numerous claims, "most of which alleged that trial counsel was ineffective for various reasons." Commonwealth v. Johnson, 139 A.3d 1257, 1270 (Pa. 2016)

### b. Relief Received by the Defendant

At the PCRA stage, the Commonwealth agreed that Defendant should have a new penalty phase hearing. (N.T. 5/22/14 at 4).

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth subsequently agreed that it would not pursue the death penalty. (N.T. 10/7/16 at 5) ("The Commonwealth has determined we will not be going forward with the new penalty hearing").

Defendant was subsequently sentenced to Life. Online Docket Entry, p.20 9/21/16.

### d. Duration of Litigation Prior to Resolution

Arrest: June 14, 1991 – Resentenced: September 21, 2016 =
**25 yrs, 3 mos, 7 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel EE. Commonwealth v. Johnson, 668 A.2d 97, 104 n.17 (Pa. 1995). EE was court-appointed. CPCMS, Secure Dockets.

### 31.  <u>Commonwealth v. Damon Jones</u>, CP-51-CR-0907121-1982

#### a.  Claim of Ineffectiveness

Defendant claimed that trial counsel failed to investigate and present evidence in support of mitigating circumstances.  <u>Commonwealth v. Jones</u>, 912 A.2d 268, 290 (Pa. 2006).

#### b.  Relief Received by the Defendant

[T]he PCRA court found that there was substantial information available at the time of trial that trial counsel should have investigated and that would have supported the statutory mitigating circumstances of Jones' inability to appreciate the criminality of his conduct …

<u>Jones</u>, 912 A.2d at 292.

#### c.  Outcome – *Commonwealth Agreement to Different Sentence*

Defendant was resentenced to Life.  <u>Online Docket Entry</u>, p.45, 12/14/12; <u>Memorandum Opinion</u>, <u>Commonwealth v. Jones</u>, 520 EDA 2013, at 1 (Pa. Super. 11/24/14) ("[T]he Commonwealth elected not to re-pursue the death penalty following the grant of penalty phase relief during PCRA proceedings").

#### d.  Duration of Litigation Prior to Resolution

Arrest: August 8, 1982 – Resentenced: December 14, 2012 = **30 yrs, 4 mos, 6 d**

#### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by <u>Y. Jones</u>, 912 A.2d at 291. ("Jones' trial counsel, [Y], called no witnesses and presented no evidence at Jones' penalty hearing").  <u>Y</u> was *not* court-appointed.

**32.** **Commonwealth v. James Jones, CP-51-CR-1024861-1980**

**a. Claim of Ineffectiveness**

Defendant claimed trial counsel provided ineffective assistance when he failed to object to the inclusion of an uncharged aggravating circumstance and failed to investigate and prepare a mitigation presentation. Commonwealth v. Jones, 876 A.2d 380, 383 (Pa. 2005)

**b. Relief Received by the Defendant**

The PCRA court awarded penalty phase relief and denied all guilt phase relief. Jones, 876 A.2d at 380 (Pa. 2005). The Commonwealth initially filed a cross-appeal contesting the award of a new penalty hearing, but then withdrew its cross-appeal. Jones, 876 A.2d at 383 n.6.

**c. Outcome –** ***Commonwealth Agreement to Lesser Sentence***

Defendant was subsequently sentenced to Life, by agreement:

> Order Granting Motion to Vacate Sentence
> Commonwealth withdraws penalty phase for death sentence.
> Court orders death sentence vacated and imposes sentence of
> Life Imprisonment.

Online Docket Entry, p.11, 8/16/11.

**d. Duration of Litigation Prior to Resolution**

Arrest: October 3, 1980 – Resentenced August 16, 2011 =
**30 yrs, 10 mos, 13 d**

**e. Trial Counsel -** ***Not court-appointed***

Defendant was represented by counsel HHH. Docket Entry, 5/28/81 (attached). HHH was *not* court-appointed.



COURT OF COMMON PLEAS
## OFFICE OF COURT ADMINISTRATION
**APPEALS DIVISION**
**ROOM eo1 CITY HALL**
**PHILADELPHIA, PA. 18107**

EDWARD J, IRADLEY
fIUI:■IIH N .IUDOC

UI)·DR't€0    DOCKET ENTRIES    ft S    *OF-- S -h-*

CP 1-<:R-1D2"881-1980 comm- . Jen.e• **Jan189**
kl        and Ttanlffli1tal *al*Roatd lo Appofta'- CO<III

Commonwealth                    1980 October

\11\11111\\**III**\1111\1\ **II**\
**2133130381**

Vs                              **2486** - Arson Endangering Persons
                                        Arson Endangering Property
James Jones                     2487 - Murder, First Degree
                                2491 - Murder, First Degree


**Feb. 18, 1980**      D-1     Motion for the Appointment of an
                               investigator, granted by Judge Rihner,
                               cost not to exceed $150.00.

Nov. 12, 19 BO                 The defendant has been arraigned undeI
                               Penn. Criminal Code Section 303-306
                                                Rihner, J.

Nov. 20, 1980          D-2     Motion to Quash, filed.

**Jan•** 27, 1981       D-3     Motion to Quash denied.
                                                Rihner, J.

Jan. 27, **1981**       D-4     Order of Judge Rihner entered wherein
                               James Jones is to be detained at the
                               Phila. County Prison, Detention Centei

**Feb.** 18, 1981       0-S     Motion to Suppress, filed.
                               To be heard at time of trial.
                                                Rihner, J.

                       0-6     Amended Motion to Suppress, #27-43, f ed

March 27, 1981                 court Room 453

                       Ap      3, 1981
                       ri
                       l

D-7    Defendant Gui   y
       arraigne
       d and
       plead Not
       Jury
       trial
       requeste
       d.

       Amended
       Motion to
       Suppress
       further

                        Amended to include points 44-45-and 4 .

April 13, 1981              Motion to Suppress held under adviseme!Qt.

|  | Trial before the He~~~~~~~~~~~~~~~ |
|  | Defense attorney; ~~~~~~~~~~~~~~~ |
|  | ADA: Roger King |

May 28, 1981       Court Room 453
Commonwealth Rests.

May 29, 1981.       Motion to Demur is denied.
Defense rests.

Motion for a Directed Verdict is deni .

June 1, 1981       Closing remarks and summation by counsdl

June 3, 1981       Charge by the Court to the Jury

4:30pm the Jury retired to deliberate

June 4, 1981       11:40am Question from Jury, **Answer by** o

12:15pm
After due deliberation, the Jury retu ne
**VERDICT:**
**2486** - Guilty of Arson Endangering Pe o:
Two counts and Arson Endangering Prop t:

2487 - Guilty of Murder - First Degree

2491 - Guilty of Murder - First Degree

Jurors polled individually.

June 5, 1981       Penalty Hearing:
5:50 pm - Jury Deliberation
7:45 pm - Question from the Jury answe1t1ec
       by the Court.
8:30pm - After due deliberation, the
Jury finds aggravating circumstances
outweigh mitigating circumsatnas and
sets the Penalty at Death on Bills
2487 and 2491.

Sentence deferred pending disposition
of written Post Trial Motions.
Presentence investigation and psychiatrL<
examination ordered. Defendant to be
held at the Detention Center.
          Latrone, J.

J°"o f  \J↓\9  I  0-\Oft  N *o-fwt,.) Yo*  w TR; L '1-tJD/0\t

ARR.EST [6] f- t>S ftJ, , L?O,

**33.** <u>**Commonwealth v. Thomas Jones**</u>**, CP-51-CR-0403101-1982**

### a. Claim of Ineffectiveness

Defendant claimed that counsel was ineffective at the trial and penalty phases of his trial.

### b. Relief Received by the Defendant

On remand from the Pennsylvania Supreme Court, the Post-Verdict Motions Judge "found that trial counsel had provided ineffective assistance during the penalty phase of the proceeding". <u>Commonwealth's Brief for Appellee,</u> <u>Jones v. Frank</u>, 1999 WL 33620698 (C.A.3), at p.4.

Thereafter, the Pennsylvania Supreme Court entered a Per Curiam Order granting Defendant's Motion for Extraordinary Relief and remanding "to the trial court to vacate the sentence of death and to impose a sentence of life imprisonment based on that court's finding of ineffective assistance of trial counsel during the penalty stage." <u>Commonwealth v. Jones</u>, 550 A.2d 536, 536 (Pa. 1988)

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On January 18, 1989, the Common Pleas Court vacated the death sentence and imposed a life sentence. <u>Commonwealth's Brief for Appellee</u>, <u>Jones v. Frank</u>, 1999 WL 33620698 (3d Cir.), at p.4.

### d. Duration of Litigation Prior to Resolution

Arrest: January 27, 1982 – Resentenced: January 18, 1989 =
**6 yrs, 11 mos, 22 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by counsel <u>DDD</u>. <u>DDD</u> was *not* court-appointed. <u>Jones v. Frank</u>, 28 F. Supp. 2d 956, 958-959 (E.D. Pa. 1998).

34. **Commonwealth v. Alexander Keaton**, **CP-51-CR-0319251-1993**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel's preparation and presentation of mitigation evidence constituted ineffective assistance. Commonwealth v. Keaton, 45 A.3d 1050 (Pa. 2012).

### b. Relief Received by the Defendant

The PCRA court granted penalty phase relief and the Pennsylvania Supreme Court affirmed. Keaton, 45 A.3d at 1091 ("[W]e agree with the PCRA court that trial counsel's investigation regarding penalty phase mitigating evidence fell below the standard expressed in Williams and Wiggins").

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

On June 12, 2014, by agreement, Defendant was sentenced to Life by the Homicide Calendar Judge:

> Sentence/Penalty Imposed Resentencing upon appeal. The death penalty has been vacated. The defendant has been resentenced to life without parole. The defendant is to be taken off of death row.

Online Docket Entry, p. 26, 6/12/14; *see also* Commonwealth's Response to Petition for Writ of Habeas Corpus, Keaton v. Folino, No. 11-cv-7225 (E.D. Pa.) ("[B]y agreement, a life sentence was imposed in 2014").

### d. Duration of Litigation Prior to Resolution

Arrest: January 14, 1993 – Resentenced June 12, 2014 = **21 yrs, 4 mos, 29 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel LL. Keaton, 45 A.3d at 1070, 1087.

## 35. Commonwealth v. Joseph Kindler, CP-51-CR-0827471-1982

### a. Claim of Ineffectiveness

Defendant raised claims of trial counsel's ineffectiveness at the penalty phase.

### b. Relief Received by the Defendant

The Third Circuit granted penalty phase relief based upon counsel's ineffectiveness. Kindler v. Horn, 642 F.3d 398, 405 (3d Cir. 2011) (concluding that "(1) that the jury instructions and verdict sheet used during the penalty phase of his trial denied [Defendant] due process of law pursuant to the Supreme Court's holding in Mills and (2) that Kindler was denied effective assistance of counsel during the penalty phase").

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

The Commonwealth subsequently agreed to a Life sentence:

> Order - Sentence/Penalty Imposed
> Defendant sentenced to life without parole, Commonwealth is not seeking the death penalty. Sentence has been agreed to by counsel.

Online Docket Entry, p.26, 3/01/18

### d. Duration of Litigation Prior to Resolution

Arrest: August 19, 1982 – Resentenced: March 1, 2018 = **35 yrs, 6 mos, 10 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by counsel A.  *See* Petition to Withdraw Appearance (attached).  A was *not* court-appointed.



ESQUIRE

COMMONWEALTH OF PENNSYLVANIA

vs.

JOSEPH KINDLER

COURT OF COMMON PLEAS
T::lIAL  *DJ  VJSJON*
CRIMINAL SECTION

AUGUST  *TERM.* 1982

*No*  2747

S'JR CHARGE: MURDER

PETITION TO WITHDRAW APPEARANCE AND TO
APPOINT ·coUNSEL

TO THE HONORABLE JOHN A. GEISZ, THE JUDGE 0  THE SAID COURT:

The Petition ⬭ ⊐⊏        ⬇ESQUIRE, respectfully represents:

1.  That, your Petitioner has represented the Defendant above named
    since the date of his arrest and throug out trial.

2.  That, the Defendant has been continually incarcerated since the
    date of his arrest.

3.  That, Defendant and his family are without furids to hire counsel
    to proceed with post-trial motions or any appeal if necessary.

A-71

4. That, on February 21, 1984, this Honorable Court entered an order denying Defendant the right to have the notEs of testimony herein transcribed at the cost of the courity.

5. That, whereas Defendant is not in a positiou to pay for said notes, and Petitioner will not lay out said funds, the Defendant will not be able *to* properly proceed with his appeals.

6. That, is is neither the fault of Defendant not Petitioner that the Defendant is indigerit.


WHEREFORE, Petitioner prays this Honorable Court enter an Order authorizing Court Administration to administer a "pauper's oath" to Defendant, and if he so qualifies for court-appointed counsel, to withdraw the appearance of Petitioner herein.

And he will ever pray.

Respectfully submitted,

Attorney For Defendant
Joseph Kindler

## 36.   Commonwealth v. Michael LaCava, CP-51-CR-0711041-1990

### a.  Claim of Ineffectiveness

Defendant claimed that counsel provided ineffective assistance at the penalty phase when he failed to object to the prosecutor's improper closing statement. Commonwealth v. LaCava, 666 A.2d 221 (Pa. 1995).

### b.  Relief Received by the Defendant

The Pennsylvania Supreme Court determined that counsel was ineffective. LaCava, 666 A.2d at 237 ("we find that trial counsel had no reasonable basis for failing to object to [the prosecutor's] comments").

### c.  Outcome – *Life Sentence after New Penalty Hearing*

Defendant resentenced to Life after a new penalty phase hearing. Online Docket Entry, p.3, 3/22/96; Commonwealth's Response to Petition for Writ of Habeas Corpus, p.2 ("Petitioner received a new sentencing hearing on March 22, 1996. The jury imposed a sentence of life imprisonment").

### d.  Duration of Litigation Prior to Resolution

Arrest: June 15, 1990 – Resentenced: March 22, 1996 = **5 yrs, 9 mos, 7 d**

### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by counsel YY, throughout the trial and the first penalty phase. Commonwealth's Motion to Dismiss PCRA Petition. YY was *not* court-appointed.

## 37.    Commonwealth v. Robert Lark, CP-51-CR-0120121-1980

### a.  Claim of Ineffectiveness

Defendant claimed ineffectiveness of appellate counsel (who was also his trial counsel) for failing to raise a preserved Batson claim on direct appeal.  Lark v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 596, 600 (3d Cir. 2011).

### b.  Relief Received by the Defendant

The Third Circuit affirmed the federal district court's grant of a writ of habeas corpus. Lark v. Sec'y Pennsylvania Dep't of Corr., 566 F. App'x 161, 162 (3d Cir. 2014).

### c.  Outcome – *Life Sentence After New Trial*

After a retrial, a jury convicted Defendant. After a new penalty phase, the jury was unable to render a unanimous verdict and the trial court sentenced Defendant to Life. (N.T. 11/9/17 at 103).

### d.  Duration of Litigation Prior to Resolution

Arrest: January 9, 1980 – Resentenced: November 9, 2017 = **37 yrs, 10 mos**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by counsel VV.   Lark v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d at 599. VV was court-appointed. Affidavit of V.V., Esq. (attached).

COMMONWEALTH OF PENNSYLVANIA

SS. )

COUNTY OF PHIl..ADELPBIA

A.FFIDA}IT OF :ra●,●1-• ESQUIRE

ESQUIRE. &'Near and affi.tm as fQlllJW$; I was court appointed trial ecnmscl for Robcn Lark in QnnmntrWCrutb v.urk. CP 80-01-2012 through 2022. I believed that the court would not pay for expert consultants tc, a.ssist·me i!l my defense of Mr. L:lrk, and I therefore did nol request that experts, such as medical a11d mitigation experts be appointed or retained.

While1donothaveaspecificrecollectiono[jwyselectioIhadoostrategic, tactical nr legal re.ru;on for not asking the prospective jurors, who initially indicated 1.h:it they bad some moral or religious belief that would prevent them from voting for the death penalty in the proper case, any questions in an effort to rehabilitate them.

I had no tactical reason for failing to lltlgate a motion to .uppres.s the physk.al evidence which was lutroduccd aiii!,I Mr. wk at trial 1 blew that Mr. Lark bad pled guilty to the charge of Possessing an Instrument of Crime as laid in Bill of lnfonnatlon 80-01-2017. I ha.cl no tactical reason for failing to raise and argue oor did I even consider \ ta.ising or arguing a Motion to Dismiss the othor charges arl.o;ing out of the same criminnl \ episode plllSUant to 18 Pa.. C.S.A 109 nnd 110.

; I did not any mitiptlon witnesses 1lt the scntcnr.mg ph.uc of the trial \ because the first consideration that I gave to mitigation and/or sentencing issues was after \ th .

e Jury bad !Ctumed a guilty verdict on the first degree murder cbaJgc at 2:27 p.m. on June

28, 1985. The only opponunity tbnt I ba.d to invcstigat• the citigation i&oucs was botwQco.

the time the jury rctu.med the guilty verdict and the time that the sentencing hearing began

almost immediately thereafter. I did not develop psycbologica]. mental health or

background miti&ation evidence in that time



before me this ih'\iay

of 'f"eo{\'Qf 'I, 1995.

## Qcrlmio:fS\:{{1cl1"ttl

NOTARIAi. SEAL
PATrllCtA M. McCOR.\.11CK. Nol.3ly Public
City 0/ P:iilad..ilphia, flhila. County
My Commission F.:tcires June 24. 1996

38. **Commonwealth v. Reginald Lewis**, CP-51-CR-0205851-1983

    **a. Claim of Ineffectiveness**

Defendant claimed penalty phase ineffectiveness. <u>Lewis v. Horn</u>, 2006 WL 2338409, at *2 (E.D. Pa. Aug. 9, 2006).

    **b. Relief received by Defendant**

The federal district court agreed that counsel provided ineffective assistance at the penalty phase. <u>Lewis,</u> 2006 WL 2338409, at *11 (finding no reason … for trial counsel's failure to investigate and present mitigating evidence").

On appeal, the Third Circuit remanded the case for an evidentiary hearing on Defendant's ineffectiveness claim. <u>Lewis v. Horn</u>, 581 F.3d 92, 117 (3d Cir. 2009).

On July 25, 2011, the Commonwealth notified the district court that it would not contest the grant of conditional relief as to Lewis's death sentence.  <u>Order</u>, <u>Lewis v. Horn</u>, 00-cv-802 (E.D. Pa. July 26, 2011), ECF No. 80.

    **c. Outcome – *Commonwealth Agreement to a Different Sentence***

On July 9, 2012, by agreement, Lewis was re-sentenced to life without parole:

> Sentencing. This case is being re-sentenced upon appeal. The defendant will receive life without parole. The death penalty has been removed.

<u>Online Docket Entry</u>, p.3, 7/9/12.

    **d. Duration of Litigation Prior to Resolution**

Arrest: January 26, 1983 – Resentenced: July 9, 2012 = **29 yrs, 5 mos, 13 d**

    **e. Trial Counsel – *Court-Appointed***

Defendant was represented by court-appointed trial and appeal counsel <u>QQ</u>. <u>Commonwealth v. Lewis</u>, 567 A.2d 1376, 1378 (Pa. 1989); <u>Commonwealth v. Lewis</u>, 743 A.2d 907, 909 (Pa. 2000).

### 39.   <u>Commonwealth v. Steven McCrae</u>, CP-51-CR-0204521-1999

#### a.  Claim of Ineffectiveness

Defendant filed a PCRA petition claiming that trial counsel was ineffective for failing to investigate and present mitigation evidence. <u>Written Agreement Colloquy</u>, at p.2 (attached).

#### b.  Relief Received by the Defendant

The Commonwealth agreed to penalty phase relief.

#### c.  Outcome – *Commonwealth Agreement to a Different Sentence*

The Commonwealth "agreed that [the PCRA] Court may vacate [Defendant's] two death sentences and impose two consecutive life sentences." <u>Written Agreement Colloquy</u>, 4/13/06 at p.2 (attached).

#### d.  Duration of Litigation Prior to Resolution

Arrest: January 12, 1999 – Resentenced: April 13, 2006 = **7 yrs, 3 mos, 1 d**

#### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by counsel <u>NNN</u>. <u>NNN</u> was *not* court-appointed.   <u>Bill of Information</u> (attached).

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION - CRIMINAL SECTION

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | **FEBRUARY TERM, 1999**<br>**NO. 0452** |
| **v.** | |
| **STEVEN MCCRAE** | **(PCRA)** |

### WRITTEN AGREEMENT COLLOQUY

I.      I can read, write and understand the English language.

2.      I am not being treated by a psychiatrist or psychologist for any mental problems.

3.      I am not currently under the influence of drugs, alcohol, or medication.

4.      I understand that a jury sitting before the Honorable Gary S. Glazer has convicted me of two counts of first degree murder, criminal conspiracy, and possession of an instrument of crime in connection with the shooting deaths of Kendrick Haskell and John Ford.

5.      I understand that, as to both counts of first degree murder, the jury found that the aggravating circumstances outweighed the mitigating circumstances and, accordingly, imposed sentences of death for each murder conviction.

6.      I understand that Judge Glazer then formally imposed consecutive death sentences for the two counts of first degree murder, along with consecutive sentences of five to ten years imprisonment for conspiracy, and two and one-half to five years imprisonment for possession of an instrument of crime.

7.      I understand that, on direct appeal, the Pennsylvania Supreme Court affirmed the judgments of sentence.

8.      I understand that the United States Supreme Court denied writ of certiorari.

A-79

9.      I understand that current counsel, Barnaby Wittels, Esquire, is representing me during these PCRA proceedings, and that he has filed PCRA petitions on my behalf claiming: (1) that counsel was ineffective at the penalty hearing for failing to investigate and present additional mitigation evidence; (2) that the prosecutor committed misconduct at the guilt and penalty phases of trial; and (3) that this Court erred when it instructed the jury at the penalty phase.

10.      I understand that, during these PCRA proceedings, the District Attorney's Office has agreed that this Court may vacate my two death sentences and impose two consecutive life sentences (i.e., one after the other), with no possibility of parole, provided that:

    (a)      I agree to withdraw my current PCRA petition;

    (b)      I agree to never seek or file, or have filed on my behalf, any direct appeal, or any state or federal collateral appeal of this Agreement;

    (c)      I agree to never seek or file, or have filed on my behalf, a PCRA petition, a federal habeas petition, or any other motion challenging either my conviction or sentence;

    (d)      I agree to never seek or file, or have filed on my behalf, any claims of ineffective assistance of past or present counsel;

    (e)      I agree to never seek or file, or have filed on my behalf, any claims of trial court error or prosecutorial misconduct;

    (f)      I agree to never seek or file, or have filed on my behalf, any petitions for pardon before the Pennsylvania Board of Pardons on this case; and

    (g)      I know that I am now giving up these rights forever.

2

A-080

11.     I understand that by accepting this Agreement, I am forgoing the Commonwealth's alternative offer of a new penalty phase hearing.

12.     I agree that a copy of this written Agreement and Colloquy shall become part of my prison record.

13.     I have fully discussed all of my rights as they apply to a PCRA proceeding with my PCRA lawyer, Barnaby Wittels, Esquire, and I am satisfied that I fully m1derstand all of the rights that I am giving up, and what I am receiving in return.

14.     Other than the terms and conditions set forth in this Agreement, nobody has promised me anything, or forced me, or threatened me to accept the tenns and conditions of this Agreement. I, myself, have decided to accept all terms and conditions of this Agreement. I !mow what I do and say today is final.

15.     I have read this Agreement and have discussed it in its entirety with PCRA counsel, Barnaby Wittels, Esquire. I have no questions regarding the terms and conditions of the Agreement and I understand exactly what is written here. I am satisfied by the advice and services I have received from Mr. Wittels.

16.     I admit that I am, in fact, guilty of the murders of both Kendrick Haskell and John Ford, and of conspiracy and possession of an instrument of crime in accordance with the evidence presented at my trial.

17.     I accept all of the tenns and conditions of this Agreement, knowingly, intelligently, and voluntarily.

I HAVE READ ALL OF THE ABOVE AND HAVE DISCUSSED IT WITH MY LAWYER. I FULLY UNDERSTAND WHAT IS SET FORTH IN THIS AGREEMENT AND I ACCEPT ALL TERMS AND CONDITIONS OF THIS AGREEMENT.


Date:   <-1J {'5/06

A-082

## CERTIFICATION OF DEFENSE COUNSEL

I certify that:

(I)     I am an attorney admitted to the Supreme Court of Pennsylvania.

(2)     I represent the defendant herein.

(3)     I have no reason to believe that the defendant cannot fully understand

everything that is being said and done here today.

(4)     The defendant read the above written agreement colloquy in my presence

and appeared to fully understand it. I have reviewed the Agreement

completely with the defendant, explained all of the items on the

Agreement, and answered any questions that he had. The defendant

understands the infonnation and my explanations.

(5)     The defendant is knowingly, intelligently and voluntarily agreeing to all

terms and conditions in this Agreement.

(6)     I made no promises to the defendant other than any listed on  this

Agreement.

(7)     Although this decision was made exclusively by the defendant, I agree

with his decision.

_____        _____

Barnaby Wittels, Esquire                    Address

Date:

*5*

## DISTRICT ATTORNEY'S CERTIFICATION

I certify that we are the assigned assistant district attorneys in this case and that the terms, conditions or agreements mentioned herein are true and correct, as they are set forth above. I have asked the defendant if there is anything on the written agreement colloquy form or anything else about this case that the defendant does not understand, and the defendant has indicated the he understands everything that is set forth. The defendant states that PCRA counse], Barnaby WitteJs, Esquire, has answered any questions he has.

_____
Robin Godfrey, Assistant District Attorney
Chief, PCRA Unit

_____
Cari Mahler, Assistant District Attorney
PCRA Unit

Date: _____

6

A-084

## <u>JUDGE'S CERTIFICATION</u>

I certify that I am the Judge having the jurisdiction to hear this case and that I am satisfied the defendant understands fully the nature and quality of the Agreement that the defendant is entering before me. The defendant has exercised a knowing, intelligent, and voluntary acceptance of the Agreement mentioned above. I have colloquied the defendant on the record to detennine whether he understands everything that is being said and done here today, as well as to detennine whether the defendant is entering this Agreement of his own free will.

_____

The Honorable Gary S. Glazer
Court of Common Pleas

Date: _____

7

| STATUS OF OFFENDANT | | | | |
|---|---|---|---|---|
| **Bail 5111 S** | **Bail Mode$** | | | O C NO 9825081362 |
| Surety Name & Adcireu | | | C;OMPLAINT oT 1/12/99 | OT PREL. HEARING 2/09/99 |
| 015M. !BILL NO | IOATE 2/16/99 | CATE OF ARRAIG II 3/C3/99 | | 504 |

CHARGE COOES III CH.\ GES.Q

2502    H

---

:NTENCS

40. **Commonwealth v. Bernard McGill**, CP-51-CR-0339201-1990

    **a. Claim of Ineffectiveness**

Defendant claimed "that trial counsel was ineffective for failing to investigate fully, possible mitigating circumstances for his penalty phase." Commonwealth v. McGill, 832 A.2d 1014, 1025 (Pa. 2003).

    **b. Relief Received by the Defendant**

The Supreme Court remanded the matter to the PCRA court to conduct an evidentiary hearing regarding Defendant's penalty phase claims. McGill, 832 A.2d at 1026.

    *c.* **Outcome –** *Commonwealth Agreement to a Different Sentence*

On remand, with the Commonwealth's agreement, the Homicide Calendar Judge resentenced Defendant to Life:

> Order - Sentence/Penalty Imposed Sentencing. Revised upon appeal, the death penalty is vacated. The defendant is re-sentenced to life without parole

Online Docket Entry, p.15, 1/7/13.

    **d. Duration of Litigation Prior to Resolution**

Arrest: February 17, 1990 – Resentenced: January 7, 2013 = **22 yrs, 10 mos, 21 d**

    *e.* **Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel W. McGill, 832 A.2d at 1017. W was court-appointed. CPCMS, Secure Dockets.

### 41.   <u>Commonwealth v. Nathaniel McNair</u>, CP-51-CR-1224591-1987

####   a.  **Claim of Ineffectiveness**

After his conviction and death sentence were affirmed on direct appeal, Defendant filed a PCRA petition.

####   b.  **Relief Received by the Defendant**

Defendant received penalty phase relief at the PCRA stage after a hearing.

####   c.  **Outcome – *Commonwealth Agreement to a Different Sentence***

Defendant's sentence changed to Life. <u>Online Docket Entry</u>, p.4, 4/4/02 By agreement, the Commonwealth did not appeal the grant of penalty phase relief and Defendant did not appeal the denial of guilt phase PCRA claims.

####   d.  **Duration of Litigation Prior to Resolution**

Arrest: December 25, 1987 – Resentenced: April 4, 2002 = **14 yrs, 3 mos, 10 d**

####   e.  **Trial Counsel – *Court-Appointed***

Defendant was represented by counsel QQ. <u>Commonwealth v. McNair</u>, 603 A.2d 1014, 1015 (Pa. 1992). QQ was court-appointed. (<u>Cover Page</u>, N.T. 11/22/88) ("[QQ] for Defendant") (attached).

j)

IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH                    :   DECEMBER TERM 1987

                                :   BILL NOS. 2459 - 2463

                                -   CIU H  CONSP CY ; - P.I.C

        V.                      :   GENLY, PIC WEAPON;

                                    INVOL HANSL: MURDER,
                                    VOL HANSL; SIMPL
HATHAHIEL  UCUAIR               ASSLT, AGG **ASSAULT**


                            JURY TRIAL


                    Wednesday, November 16, 1988
                     Courtroom 246, City Hall
                     Philadelphia, Pennsylvania


BEFORE:

        HONORABLE GEORGE J. IVINS, J., PRESIDING

APPEARANCES:

        JUDITH RUBINO, ESQUIRE
        Assistant District Attorney
        For the Commonwealth of Pennsylvania

                .. , ESQUIRE
        Court-Appointed Counsel
        Attorney *tor* the Defendant  cITair

ft)

A-089

## 42.  **Commonwealth v. Christopher McNeil,** CP-51-CR-0500461-1991

### a.  **Claim of Ineffectiveness**

Defendant claimed that counsel was ineffective for failing to object to victim impact testimony, which was inadmissible at the time of his trial. Commonwealth v. McNeil, 679 A.2d 1253, 1259 (Pa. 1996)

### b.  **Relief Received by the Defendant**

The Pennsylvania Supreme Court agreed that counsel was ineffective for failing to object and remanded for a new sentencing hearing. McNeil, 679 A.2d at 1259-1260. ("We find no reasonable basis for counsel's failure to object").

### c.  **Outcome – Life**

On June 23, 1997, Defendant was resentenced to Life:

Final Disposition 1 / MURDER-1ST DEGREE Guilty
Confinement LIFE

Online Docket Entry, p.4, 6/23/97

### d.  **Duration of Litigation Prior to Resolution**

Arrest: March 26, 1991 – Resentenced: June 23, 1997 = **6 yrs, 2 mos, 28 d**

### e.  **Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel Q. Q was court-appointed. *See* Court-Appointed Counsel's Petition to Withdraw (attached); CPCMS, Secure Dockets.



Law Offices                  Esquire

COHHONWE..U.TH OF PENNSYLVANIA      :   COHHOU PLEAS COURT OF PHILADELPHIA
                                        CRIMINAL TRIAL DIVISION
         v.                             MAY TERM, 1991
                                        NOS. 46, 48, SO, 52 and 54
CHRISTOPHER J. McNEIL                   TRIAL JUDGE: BIUNNO, J.


                    PETITION TO WITIIDRAW
               AS DE:EHDANT'S COURT-APPOINTED COUNSEL


lO-1HE HOUORABLE **FRANC1S A.** BIUNNO! - - - - - -

                    • Esquire, Court-Appointed Counsel for the subject
Defendant requests that he be permitted to withdraw as Defendant's Court-
Appointed Counsel based upon the following:

         1.  Petitioner was appointed by the Court (Halbert, J.) on March
28, 1991, to represent Christopher J. McNeil who had been charged with
murder and other serious criminal offenses.  Defendant's arrest was derived
from a shooting which occurred shortly after midnight, December 5, 1990, at
or near the intersection of 53rd Street and Parkside Avemue, this City, the
decedent being one John Arasian.

         2.  Petitioner diligently represented the Defendant at all stages of
the proceedings, having investigated the case carefully, having reviewed
trial strategy with him often and at length and having involved himself
in assiduous preparation for trial.

         3.  The *case* was called to trial before the Hon. Francis A. Biunno
and a death-qualified jury, commencing on March 23, 1992, in Courtroom 602,

A-091

**43.** __Commonwealth v. William Mikell__, **CP-51-CR-0716051-1987**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to request an alibi instruction. Commonwealth v. Mikell, 729 A.2d 566, 570 (Pa. 1999).

### b. Relief Received by the Defendant

The Supreme Court ordered a new trial, finding counsel ineffective for failing to request an alibi instruction. Mikell, 729 A.2d at 571 ("[C]ounsel's inexplicable failure to request an alibi instruction constituted constitutionally ineffective assistance of counsel").

### c. Outcome – *Defendant Received Life after New Trial*

The Commonwealth did not seek a death sentence at Defendant's second trial. After the retrial, Defendant was convicted of first degree murder by a jury and resentenced by the trial court to Life:

> RESULT COMMON PLEAS TRIAL
> MURDER JURY VERDICT GUILTY - SENTENCE IMPOSED
> SENTENCE: LIFE

Online Docket Entry, p.13, 12/9/04. *See also* Brief for Appellee, Commonwealth v. Mikell, 1127 EDA 2005 (Pa.Super. 2005) ("… a jury again found him guilty of first-degree murder, robbery and possessing an instrument of crime. The following day, Judge Sarmina sentenced him to life imprisonment").

### d. Duration of Litigation Prior to Resolution

Arrest: May 5, 1987 – Resentenced: December 9, 2004 = **17 yrs, 7 mos, 4 d**

### e Trial Counsel – *Court-Appointed*

Defendant was represented by counsel B at the first trial. Bill of Information (attached); B was court-appointed. CPCMS, Secure Dockets.



A-093

44. <u>**Commonwealth v. Mikal Moore**</u>, **CP-51-CR-0701141-1998**

### a. Claim of Ineffectiveness

On direct appeal, Defendant claimed that trial counsel was "ineffective for eliciting from a detective that Appellant exercised his right to remain silent and declined to make a post-arrest statement." <u>Commonwealth v. Moore</u>, 937 A.2d 1062, 1067 n.1 (Pa. 2007). Pursuant to <u>Commonwealth v. Grant</u>, the Court declined to address these ineffectiveness claims. <u>Moore</u>, 937 A.2d at 1067.

### b. Relief Received by the Defendant

After the Pennsylvania Supreme Court affirmed his conviction, Defendant filed a PCRA petition. <u>Online Docket Entry</u>, p.12, 2/4/09.

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

At the PCRA stage, the Commonwealth agreed to Life. <u>Online Docket Entry</u>, p.22, 3/27/17 ("Order - Sentence/Penalty Imposed By Agreement this court Vacates previous sentence of DEATH and reimposes a sentence of LIFE as to Murder 1st Degree").

### d. Duration of Litigation Prior to Resolution

Arrest: April 28, 1998 – Resentenced: March 27, 2017 =
**18 yrs, 10 mos, 27 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>ZZ</u>. <u>Brief for Appellee</u>, No. 396 Capital Appeal Docket, at p.4 (attached). <u>ZZ</u> was court-appointed. <u>CPCMS, Secure Dockets</u>.

SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRf CT


NO. 396                                    CAPITAL APPEAL DOCKET



COMMONWEALTH OF PENNSYLVANIA,
                                   Appellue


V.


MIKAL MOORE,
                         Appellant



BRIEF FOR APPELLEE

Appeal from the September 28, 1999 Judgments of Sentence
of the Court of Common Pleas of Philadelphia County,
Criminal Division at July Term, 1998, No. 0114.



                    REGINA M. OBERHOL7ER
                    Assistant District Attorney
                    HUGH J. BURNS, JR.
                    Chief, Appears Unit
                    RONALD EISENBERG
                    Deputy District Attorney
                    ARNOLD GORDON
                    First Assistant District Al1orney
                    LYNNE ABRAHAM
                    District Attorney

1421 Arch Street
Philadelphia, PA 19102

that, if Kinney had snitched on defendant, he would get someone to stab Kinney and would have Pryer stabbed as well (N.T. 6/22/99, 28; 6/23/99, 5-10, 35-37).

At trial, Donald Burroughs's father, sister and long-time friend testified that defendant had repeatedly bullied the victim, who was twenty-one at the time of his murder, throughout his teenage years. This bullying included including taking his money, beating him up for a beverage bottle, and generally trying to pick fights whenever he saw the victim. He also encouraged his friends to assault Mr. Burroughs. On at least one occasion, the victim was taken to the hospital for treatment of injuries inflicted by defendant. The victim had most recently complained to his sister only a week before he was killed, and his father as he was leaving for work the day he was killed, that he was still having problems with defendant (6/16/99, 10-22, 51-65, 79-89).

On June 28, 1999, a jury convicted defendant of murder in the first degree and possessing an instrument of crime. Following a penalty hearing, the jury found one aggravating circumstance - that defendant had a significant history of felony convictions involving the use or threat of violence[1] - and no mitigating circumstances. The jury therefore returned a sentence of death. The trial court formally imposed the death sentence, as well as an additional two-and-a-half to five year sentence for the conviction for possessing an instrument of crime, on September 28. 1999.

Defendant filed post-sentence motions. While the post.sentence motions were pending, both trial counsel, . ....         Esquire, and...-         passed away. Presert counsel was subsequently appointed and filed amended post-sentence

---

[1]    42 Pa.C.S. § 9711(d){9}.

45. <u>**Commonwealth v. Salvador Morales**</u>, **CP-51-CR-1012921-1982**

   a. **Claim of Ineffectiveness**

   Defendant claimed that trial counsel was ineffective for failing to object to the prosecutor's statements during closing arguments at trial and at the penalty hearing. <u>Commonwealth v. Morales</u>, 701 A.2d 516, 527 (Pa. 1997)

   b. **Relief received by Defendant**

   The Pennsylvania Supreme Court agreed that "[t]he prosecutor invited the jury to sentence this defendant to death in order to compensate for the alleged evils perpetrated by stereotypical liberal judges who routinely allow criminals to go free." <u>Morales</u>, 701 A.2d at 529 (remanding the case for a new sentencing hearing).

   c. **Outcome – *Defendant sentenced to Life after new penalty hearing***

   On January 4, 2000, after a second penalty phase hearing, Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.4, 1/4/2000; <u>Pirela v. Vaughn</u>, 2013 WL 11323274, at *5 (E.D. Pa. Apr. 29, 2013).

   d. **Duration of Litigation Prior to Resolution**

   Arrest: September 30, 1982 – Resentenced: January 4, 2000 =
   **17 yrs, 3 mos, 5 d**

   e. **Trial Counsel – *Court-Appointed***

   Defendant was represented by counsel <u>U</u>. <u>Bill of Information</u> (attached). <u>U</u> was court-appointed. <u>Commonwealth v. Morales</u>, <u>Brief for Appellant</u>, 1995 WL 17019887 (Pa.), at p.2 (attached).



IN THE SUPREME COURT OF PENNSYLVANItA

No. 84 Capital Appeal Docket 1995

COMMONWEALTH OF PENNSYLVANIA

**v.**

SALVADOR MORALES
a/k/a SIMON PIRELA

BRIEF FOR APPELLANT

APPEAL FROM TJlB ORDER OF 11IE PmLADELPHIA CC>UNTY
COURT OF COMMON PLEAS AT NO. 8210-1292-129'5

James D. Crawford (#03848)
Joseph T. lllkens (#674(15)
Attorneys for Appellaut

Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2162

Of Counsel.

# FACTS

Pirela is confined in Graterford Prison, after being convicted of and sentenced for possessing an instrument of crime, criminal conspiracy, and first degree murder.

Pircla, an uneducated, learning disabled and brain damagtd Hispanic man who **speaks and understands** no English and is illiterate in Spanish, was charged with the murder of Jorge Figueroa.[1] Pirela was accused, along with bis brother and co-defendant Heriberto Pirela, a/k/a Carlos Tirado {7irado"), of summoning Figueroa to the JJiome of Tirado's lover. Elizabeth "Lisa" Colon, with the intention of killing lim, allegedly (!Ver _grog debts. _ When Figueroa arrived at the Colon residence, be allegedly was stabbed to death by Pirela and Tirado.

A jury convicted Pirela after a fourteen-day trial presided over by Judge Sabo.[2] Commonffl1th y. Moples. Oct. Term 1982, Diet. Nos. 1292-9.5 (C.P. Phlla., Crim. Div.) - - - - -            ·-- ·-  --- - at trial.  If  prosecution's chief witneaes were Soila •Soto" Oreo, a fourteen-year-old heroin dealer: Lisa Colon (Tirado's Jover); and Heriberto "Eddie" Colon, Lisa's brother, who testified against Pirela in Cxcmmgc for lcniellcy in connection with bis guilty plea for bis participation in an umelatcd **murder and robbcey.** (241a-243a).

---

1.  The **w -W!'** 1            aube aim: sceoe rcfcmd to appellant as Pirela. 
    ᵇᵒ ʷᵘˢᵗ·ᵗⁱᵐᵉ.lih:Jf ●  - — ... ia       O.lil.vcnt1ct ●...... ;**Sabo** .₁.......  voir 
    elac.hlm.. :· ;il.lili _  iai,:.  -wiaai  aon ̔e  "1— ---- - ●_  r 
    ᵍ.  ... .. .. P,     ,   ......-   6.....t ᵈ⌐-ᵉ. ᵐ :1bc ᵣ. ·"-..... 
    _  .  .  . ... .     efeiled to Pirela through·tiJc alias "Salvador 
    *Moniei:•ᵢ etii&:ial*            **ere- also made** to bis brother's alias.

2.  **JDOtiom wcre· heird** mf May 1-2, 1983; voir dire took until the ninth day of trial, 
    J.lay 12. The guilt **phase began** on the ninth y and closi:ng arguments were 
    **prc«Ued oa:** the twelftti'uy of"iiial 'May 17. Judge Sabo charged the jury and it 
    ʷᴹᵘʳⁿ..d a verdict·on May 18; the penalty phase was completed the next day, May 19.

-2-

**46.** **Commonwealth v. Willard Moran, CP-51-CR-1130901-1981**

### a. Claim of Ineffectiveness

Defendant filed a PCRA petition claiming the trial counsel was ineffective for failing to convey a plea offer. Order, 1/27/99, Lineberger, J. (attached).

### b. Relief Received by the Defendant

The PCRA court granted relief, vacating the sentence of death and imposing a sentence of Life. Order, *supra* (attached) ("The Court finds that Defendant has proven that his trial counsel failed to convey a pretrial offer to plead guilty and receive a life imprisonment sentence").

The Commonwealth did not appeal the PCRA court's decision.

### c. Outcome – *Commonwealth Agreement to a Different Sentence*

Defendant was resentenced to Life. Online Docket Entry, p.3, 1/27/99.

### d. Duration of Litigation Prior to Resolution

Arrest: November 8, 1981 – Resentenced: January 27, 1999 =
**17 yrs, 2 mos, 19 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by counsel KKL. Bill of Information (attached). KKL was *not* court-apppointed.

IN **THE COURT OF COMMON PLEAS**
**OF PHILADELPHIA COUNTY**

**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA

   v.                             : C.P. No. 8111-3090 et seq.

WILLARD MORAN, JR.

### ORDER

AND NOW, this 25th day of January, 1999, after consideration of defendant's claims for relief

under the Post-Conviction Relief Act, and after reviewing the response of the Commonwealth and

the Notes of Testimony of the evidentiary hearing of June 25, 1998, it is hereby ORDERED and

DECREED that the relief requested is GRANTED in part and DENIED in part, as follows: -

    1.    Defendant's motion to have the sentence of death vacated and a sentence of life

imprisonment imposed is GRANTED. The Court finds that Defendant has proven that his trial

counsel failed to convey a pretrial offer to plead guilty and receive a life imprisonment sentence, in

exchange for cooperation with the federal and state governments. Accordingly, Defendant's sentence

of death is hereby VACATED, and Defendant is hereby sentenced to a term of life imprisonment.

Defendant is granted credit for all time served since September 30, 1981.

    2.    All other requests for relief contained in documents filed by Defendant under the Post

Conviction Relief Act are DENIED.

    The Court further ORDERS that Defendant is to serve his sentence in federal custody under

the Federal Witness Protection Program (Witness Unit only).



BY THE COURT:

Lineberger, J.

A-102

hj

COMMONWEALTH VS.

| RECORD SUM. NO. | NAME, L/R/L ADDRESS, ZIP CODE |
| --- | --- |
| POLICE PHOTO NO. 994295 | HOWARD   E MORAN LACASCADO   ST GLOCESTER  NJ 08003 |

031192 NOV 1981

| STATUS OF DEFENDANT | PLACE OF PRELIM. HEARING RM 675 CITY HALL | | ISSUING AUTH. MCCABE,JR. | 225 |
| --- | --- | --- | --- | --- |
| Bail Set $   Bail Made $ | DT. OF INCIDENT 12/14/80 | BIRTH DATE 6/18/80 | SEX N | RACE C 1 |
| Surety Name & Address | ATTY. CO. 79490 | U. C. CASE NO. 81/11-0981 1/1 | COMPLAINT'S 11/09/81 | DT.PRELIM.HEARING 11/18/81 |
| DISM.   BILL NO.   DATE 11/25/81 | | DATE OF ARRAIGN. 12/02/81 RM.613 P | POL.SUBD. | |

CHARGE CODES & CHARGES
12000-MURDER 2502
19000-VOLUNTARY MANSLAUGHTER   2503 F2

PRETRIAL  WAIVER JURY
TRIAL

| DATES | ROOM 653 | COURT STENO | COURT CLERK |
| --- | --- | --- | --- |
| May 27 1982 | | Frances | |
| Paul Kramer | Joseph Murray | | |

PLEA

Defense Motion to Suppress Physical Evidence
and Statements to heard and denied. C-6/2/82-RM653
6-1-82-RM653 - Jury Selection started 6/1/82. Jury Selection Completed
6-9-82-RM653 - Deft. arraigned, Pleads not guilty - Testimony
started after Jury was sworn - 6/29/82-Testimony Completed
7/1/82 - Jury returned with a Verdict of guilty. Murder 1st degree
7/2/82 - after deliberation on Penalty, Jury returned finding

VERDICT (2) Aggravating Circumstances and No Mitigating Circumstances
Setting the Sentence at Death - Sentence Deferred
Pending Post Trial Motion.
C - 7/19/82 - RM 613 - 3 pm.

SENTENCE

| DATE | ROOM | COURT STENO | COURT CLERK |
| --- | --- | --- | --- |
| JUDGE | ADA | COUNSEL | |

A-103

**47.** <u>**Commonwealth v. Kelvin Morris**</u>**, CP-51-CR-0704091-1982**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare and present mitigation evidence. Defendant also claimed that counsel had a conflict of interest, because he once represented Defendant's brother, who was also a suspect in the charged homicide. <u>Morris v. Beard</u>, 2012 WL 4757868, at *1 (E.D. Pa. Oct. 5, 2012).

### b. Relief Received by the Defendant

The federal court ruled that "defense counsel's failure to conduct a reasonable investigation of mitigating evidence in anticipation of Morris's capital sentencing hearing, failure to present available mitigating evidence at that hearing, and failure to make a sufficient argument at that hearing violated Morris's Sixth Amendment right to effective assistance of counsel." <u>Morris</u>, 2012 WL 4757868, at *1. The federal court also ordered a new trial due to the conflict of interest. *Id*.

The Commonwealth did not challenge the federal court's Order vacating Defendant's death sentence. <u>Morris</u>, 2012 WL 4757868, at *2. Although the Commonwealth challenged Defendant's right to guilt phase relief, the federal court ultimately granted a new trial. *Id*.

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, the Commonwealth negotiated a term of years sentence in exchange for Defendant's guilty plea. <u>Online Docket Entry</u>, p.12, 6/7/13; <u>Negotiated Guilty Plea Order</u> (attached).

### d. Duration of Litigation Prior to Resolution

Arrest: May 21, 1982 – Resentenced: June 7, 2013 = **31 yrs, 17 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>LLL</u>. <u>LLL</u> was court-appointed. <u>Morris v. Beard</u>, 633 F.3d 185, 189 (3d Cir. 2011).

Commonwealth of Pennsylvania

v.

Kelvin J Morris

**;IN THE COURT OF &JMMON PLEAS OF
jPHILADELPHIA COUNTY, PENNSYLVANIA**

**!CRIMINAL DIVISION**

| | |
|---|---|
| **DOCKET NO:** | **CP-51-CR-0704091-1982** |
| **OTN:** | **M 109949-0** |
| **PIO:** | **0509571** |

# NEGOTIATED GUiITY PLEA UPON APPEAL ORDER

AND NOW, this 7th day of June, 2013, the defendant having been convicted in the above-captioned

case is hereby sentenced by this Court as follows:

**Count 1** - 18 § 2702 §§ A - Aggravated Assault (F1)

To be confined for a minimum period of 5 Year(s) and a maximum period of 10 Year(s) at __tl.__

To be placed on Probation for a maximum period of 10 Year(s) to be supervised by First Judicial District County Probation Department.

**Count 3** -18 § 907 §§A-Poss Instrument Of Crime W/Int (M1)

To be placed on Probation for a maximum period of 5 Year(s) to be supervised by First Judicial District County Probation Department.

**Count 5** - 18 § 2502 §§ C - Murder Of The____e_____(F1)

To be confined for 10 to 20 years at

The following conditions are imposed:

Other: Life sentence vacated and death penalty was set aside in federal court

Credit for time served: Credit for time served effective May 22, 1982.

Other: Mental health evaluation from the street ordered.

Immediate Parole: Defendant paroled immediately.

Other: Mandatory court costs and fines waived.

**Count 7** - 18 § 3701 §§ A11 - Robbery-Inflict Serious Bodily Injury (F1)

To be placed on Probation for a maximum period of 20 Year(s) to be supervised by First Judicial District County Probation Department.

**LINKED SENTENCES:**

Link 1
CP-51-CR-0704091-1982 - Seq. No. 1 (18§ 2702 §§ A) - Probation is Consecutive to
CP-51-CR-0704091-1982 - Seq. No. 1 (18§ 2702 §§A) - Confinement

**Link2**
CP-51-CR-0704091-1982 - Seq. No. 1 (18§ 2702 §§ A) - Confinement is Consecutive to
CP-51-CR-0704091-1982 - Seq. No. 5 (18§ 2502 §§ C) - Confinement

**LInk3**
CP-51-CR-0704091-1982 - Seq. No. 7 (18§ 3701 §§ A11) - Probation is Consecutive to
CP-51-CR-0704091-1982 - Seq. No. 1 (18§ 2702 §§ A) - Probation

**LInk4**
CP-51-CR-0704091-1982 - Seq. No. 3 (18§ 907 §§ A) - Probation is Consecutive to
CP-51-CR-0704091-1982 - Seq. No. 7 (18§ 3701 §§A11) - Probation

CP- 5 1- C -R0704091-1982Comm. v. Morris, Kelvin
Order • Sentence/Penally Imposed



7029342971

Printed: 06/07_R9H) :05:31PM

48.   **<u>Commonwealth v. Craig Murphy</u>, CP-51-CR-0925231-1985**

### a.  Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to cross-examine the sole identification witness to establish bias.  <u>Commonwealth v. Murphy</u>, 591 A.2d 278, 280–281 (Pa. 1991).

### b.  Relief Received by the Defendant

The Supreme Court agreed and ordered a new trial.  <u>Murphy</u>, 591 A.2d at 280-281 ("Appellant was clearly prejudiced by counsel's performance. Wilson was the only eyewitness to the crime and her testimony was crucial to the Commonwealth's case").

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, Defendant entered a guilty plea for a Life sentence.   <u>Online Docket Entry</u>, p.3, 11/22/91 ("Guilty Plea … Confinement LIFE").

### d.  Duration of Litigation Prior to Resolution

Arrest: 1985 (<u>Murphy</u>, at 278) – Resentenced: November 22, 1991: = **6 yrs**

### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by counsel <u>N</u>. <u>Commonwealth's Motion to Dismiss PCRA Petition</u>, at p.5. <u>N</u> was *not* court-appointed.

### 49.  Commonwealth v. William Nieves, CP-51-CR-1009681-1993

#### a.  Claim of Ineffectiveness

Defendant claimed that trial counsel provided ineffective assistance when he incorrectly advised him that, if he testified, the prosecutor could cross-examine him regarding prior non-*crimen falsi* convictions. Commonwealth v. Nieves, 746 A.2d 1102, 1104 (Pa. 2000)

#### b.  Relief Received by the Defendant

The Pennsylvania Supreme Court agreed that Defendant was entitled to a new trial due to defense counsel's ineffectiveness. Nieves, 746 A.2d at 1104-1105 ("We agree with Appellant that such advice was clearly unreasonable as it is well-established that evidence of prior convictions can only be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement").

#### c.  Outcome – *Defendant acquitted after retrial*

Defendant was acquitted after retrial. Online Docket Entry, p.3, 12/20/00.

#### d.  Duration of Litigation Prior to Resolution

Arrest: September 21, 1993 – Acquittal: December 20, 2000 =
**7 yrs, 2 mos, 29 d**

#### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by counsel E. CPCMS, Secure Dockets. E was *not* court-appointed.

A-107

50. __Commonwealth v. Kelley O'Donnell__, CP-51-CR-1220812-1992

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare and present mitigation evidence.

### b. Relief Received by the Defendant

The Supreme Court granted penalty phase relief due to the inadequacy of the colloquy that preceded Defendant's agreement to a sentencing hearing before the trial court, rather than a jury.

In so ruling, the Court was also "compelled to note that the record raises serious doubts regarding counsel's effectiveness during the penalty phase." Commonwealth v. O'Donnell, 740 A.2d 198, 214 n.13 (Pa. 1999) (criticizing trial counsel's failure to "present or argue any further evidence of mitigation even though the record itself indicates that other evidence of mitigation was available and known to counsel").

### c. Outcome – *Defendant sentenced to Life after new penalty hearing*

After a new sentencing hearing, the jury unanimously agreed upon a Life sentence. Commonwealth v O'Donnell, 2006 WL 5429138 (Pa.Com.Pl. Nov. 21, 2006); Commonwealth Response to PCRA Petition, 9/18/17 ("On February 6, 2002, the jury found that the Commonwealth had failed to establish the aggravating circumstance of robbery, requiring a verdict of life imprisonment").

### d. Duration of Litigation Prior to Resolution

Arrest: November 14, 1992 – Resentenced: February 6, 2002 =
**9 yrs, 2 mos, 23 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by GGG. GGG was *not* court-appointed. O'Donnell v. Lamas, No. CIV.A. 09-3435, 2012 WL 7018079, at *1 (E.D. Pa. Feb. 1, 2012).

## 51.   <u>Commonwealth v. Lamont Overby</u>, CP-51-CR-1006081-1996

### a.  Claim of Ineffectiveness

After Defendant's direct appeal was denied, he filed a PCRA petition. <u>Online Docket Entry</u>, p.9, 07/08/2004.

### b.  Relief Received by the Defendant

The PCRA court granted penalty phase relief. <u>Online Docket Entry</u>, p.20, 10/18/13 ("PCRA Petition GRANTED in part. Sentence of DEATH is VACATED").

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

After the PCRA court granted penalty phase relief, the Commonwealth agreed to Life. <u>Online Docket Entry</u>, p.20, 10/18/13 ("After hearing, sentence of LIFE imprisonment without the possibility of parole is imposed for Murder in the First Degree").

### d.  Duration of Litigation Prior to Resolution

Arrest: August 29, 1996 – Resentenced: October, 18, 2013 = **17 yrs, 1 mos, 19 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>EE</u>. (N.T. 7/17/98, 8-9). <u>EE</u> was court-appointed. <u>CPCMS, Secure Dockets</u>.

**52.** <u>**Commonwealth v. Kevin Pelzer**</u>**, CP-51-CR-1031752-1988**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to prepare and present mitigation evidence.

### b. Relief Received by the Defendant

The Pennsylvania Supreme Court determined that trial counsel's mitigation representation at the penalty phase was deficient:

> Having reviewed the testimony presented at the penalty phase, the additional evidence that allegedly could have been discovered and presented, and the parties' arguments, we conclude that the PCRA court did not err in holding that Pelzer established the performance prong of <u>Strickland</u>, *i.e.,* that trial counsel's penalty phase performance in ascertaining and presenting mitigation evidence was deficient.

<u>Commonwealth v. Daniels</u>, 104 A.3d 267, 302 (Pa. 2014).

### c. Outcome – *Defendant's case remains open*

Defendant's case remains open.  He has received a new appeal from the denial of his PCRA petition, pursuant to <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899 (2016). <u>Online Docket Entry</u>, p.31, 6/1/17.

### d. Duration of Litigation Prior to Resolution

Arrest: September, 1988 – Penalty remains unresolved: = **31 yrs**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel QQ. <u>Commonwealth v. Daniels</u>, 104 A.3d 267, 276 (Pa. 2014). QQ was court-appointed. <u>CPCMS, Secure Dockets</u>.

53. **Commonwealth v. Curry Perry, CP-51-CR-0418121-1989**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel provided ineffective assistance at both the trial and penalty phase. Commonwealth v. Perry, 644 A.2d 705, 709 (Pa. 1994).

### b. Relief Received by the Defendant

The Supreme Court agreed that Defendant received ineffective assistance that entitled him to a new trial:

> Applying this standard to counsel's representation in this case leads inexorably to the conclusion that trial counsel was constitutionally ineffective and that appellant must be granted a new trial. There is no question that appellant's underlying allegations of ineffectiveness—failure to interview appellant prior to trial, failure to prepare for trial, failure to use his investigator, unawareness that he was defending a capital case, and failure to prepare for the death penalty hearing—have merit. Counsel's failure to interview witnesses was ineffective, arguably *per se*.

Perry, 644 A.2d at 709.

### c. Outcome – *Defendant acquitted after retrial*

On remand, Defendant was retried and acquitted. Online Docket Entry, p.2, 6/26/96.

### d. Duration of Litigation Prior to Resolution

Arrest: March 17, 1989 (Perry, 644 A.2d at 707) – Acquitted: June 26, 1996 = **7 yrs, 3 mos, 9 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by court-appointed counsel X. Perry, 644 A.2d at 707; CPCMS, Secure Dockets.

## 54.   Commonwealth v. Otis Peterkin, CP-51-CR-0207841-1982

### a.  Claim of Ineffectiveness

Defendant raised numerous claims of ineffective assistance of counsel at the pre-trial, trial, sentencing and post-trial stages of his case. Peterkin v. Horn, 176 F. Supp. 2d 342, 374 (E.D. Pa. 2001), *amended on reconsideration in part,* 179 F. Supp. 2d 518 (E.D. Pa. 2002).

### b.  Relief received by the Defendant

The federal district court granted a new trial:

We therefore find that trial counsel's representation of the Petitioner was blatantly deficient at least with respect to his failure to provide notice of an alibi defense and to interview alibi and fact witnesses for the defense, that appellate counsel was likewise ineffective in failing to raise these claims earlier and that these deficient performances prejudiced the defense to the extent that Petitioner was deprived of a fair, reliable trial.

Peterkin v. Horn, 176 F. Supp. 2d 342, 376–377 (E.D. Pa. 2001), amended on reconsideration in part, 179 F. Supp. 2d 518 (E.D. Pa. 2002).

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, Defendant entered a guilty plea and received Life. Online Docket Entry, p.3, 12/6/02 ("Guilty Plea … Confinement LIFE").

### d.  Duration of Litigation Prior to Resolution

Arrest: December 2, 1981 – Resentenced: December 6, 2002 = **21 yrs, 4 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by counsel CC. Brief for Appellee, at 1. CC was court-appointed.   Peterkin, 176 F. Supp.2d at 349.

A-112

## 55.   Commonwealth v. Michael Rainey, CP-51-CR-0419613-1990

### a.  Claim of Ineffectiveness

Defendant claimed that appellate counsel failed to raise trial counsel's failure to investigate and present mitigating evidence.  Commonwealth v. Rainey, 928 A.2d 215, 237-238 (Pa. 2007).

### b.  Relief Received by the Defendant

The Supreme Court determined that counsel failed to present mitigation:

The proffered evidence indicates Appellant's dysfunctional background, his low level of functioning, and, most significantly, evidence of schizophrenia, paranoia, and bipolar affective disorder. This proof, if believed by the jury, would have been sufficient to implicate the mental health mitigator and potentially affect the weight the jury ascribed to the catch-all mitigator.

Rainey, 928 A.2d at 240. The Court determined that an evidentiary hearing was required to "allow Appellant the opportunity to develop this claim and challenge the reasonableness of counsel's actions." Rainey, 928 A.2d at 241.

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, with the Commonwealth's agreement, the Homicide Calendar Judge sentenced Defendant to Life. Online Docket Entry, p.12, 3/10/09 ("Order - Sentence/Penalty Imposed: Court orders the death penalty sentence vacated and a new sentence of life without parole on 1st degree murder imposed"); Rainey v. Beard, 2014 WL 12696531, at *1 (E.D. Pa. Jan. 31, 2014).

### d.  Duration of Litigation Prior to Resolution

Arrest: January 9, 1990 – Resentenced: March 10, 2009 = **19 yrs, 2 mos, 1 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by counsel OO. Commonwealth v. Rainey, Brief for Appellant, 2006 WL 2643352 (Pa.), 5. OO was court-appointed. CPCMS, Secure Dockets.

56. **Commonwealth v. Wilfredo Ramos, CP-51-CR-0100891-1999**

### a. Claim of Ineffectiveness

Defendant claimed that he received ineffective assistance at the penalty phase due to counsel's failure to investigate and present mitigation evidence. Commonwealth v. Ramos, 2017 WL 4286386, at *7 (Pa. Super. Ct. Sept. 27, 2017).

### b. Relief Received by the Defendant

The PCRA court vacated Defendant's death sentence "based upon the Commonwealth's agreement not to contest [Appellant]'s request for a new penalty hearing based upon ineffective assistance of trial counsel at the penalty hearing for failure to investigate and present certain mitigation evidence." Ramos, 2017 WL 4286386, at *7.

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth agreed to Life:

[B]ased upon the Commonwealth's agreement not to contest defendant's request for a new penalty hearing based upon ineffective assistance of trial counsel at the penalty hearing … and based upon the Commonwealth's certification that, in the exercise of its discretion, it will not pursue a new penalty hearing in this matter, defendant's sentence of death is hereby vacated and a new sentence of life imprisonment is hereby imposed.

Online Docket Entry, p.18, 4/18/08.

### d. Duration of Litigation Prior to Resolution

Arrest: November 17, 1998 – Resentenced: April 18, 2008 = **9 yrs, 5 mos, 1 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by Q.   Q was court-appointed. Commonwealth v. Ramos (PCRA) (N.T. 9/25/08 at 18); CPCMS, Secure Dockets.

**57.**   <u>**Commonwealth v. Lloyd Reid**</u>**, CP-51-CR-0405461-1991**

    **a.  Claim of Ineffectiveness**

Defendant filed a post-sentence motion claiming that trial counsel was ineffective at the guilt and penalty phases of his trial. <u>Post-Sentence Motion Court Opinion</u>, at 2.

    **b.  Relief Received by the Defendant**

The post-sentence motion court vacated the death sentence. <u>Reid v. Price</u>, 2000 WL 992609, at *1 (E.D. Pa. July 17, 2000).

    *c.*  **Outcome -** *Commonwealth Agreement to a Different Sentence*

Before the new penalty phase hearing, the Commonwealth withdrew the death certification and defendant was sentenced to life imprisonment. <u>Brief for Appellee Commonwealth of Pennsylvania</u>, 1563 EDA 2018, at p.2.

Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.3, 10/20/94.

    **d.  Duration of Litigation Prior to Resolution**

Arrest: March 23, 1991 – Resentenced: October 20, 1994 =
**3 yrs, 6 mos, 27 d**

    *e.*  **Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel <u>OO</u>. <u>OO</u> was court-appointed. <u>Defendant's Post-Sentence Motion</u> (attached); <u>CPCMS, Secure Dockets</u>.



ATTORNEY FOR  Defendant ;

COMMONWEALTH OF PENNSYLVANIA

    v.

LLOYD REID

COURT OF COMMON PLEAS
DIVISION

TERM,

C.P. *No.* 91-04-0546, et seq
      [Homicide, inter alia)

Defendant's Post-Sentence Motion for
Arrest of Judgment and/or New Trial, and for
New Effective Counsel

JUDGE TEMIN:

        Lloyd Reid, by his  Court-Appointed Attorney     ir
,, Es q ., respectfully avers:

        l}   Jury Trial commenced on 11/12/91;

        2)   on 11/14/91 the Jury returned a verdict of
Murder in the First Degree, Robbery, and Possessing Criminal
Instrument;

        3)   on 11/15/91 the Jury returned a sentence of
"Death";

A-116

### <u>ARREST OF JUDGMENT</u>

4)  Your Honor should have sustained the timely Demurrer to the charge of Murder in the First D gree as the evidence of premeditation was purely speculative and conjectural, and insufficient as a matter of law;

### <u>NEW TRIAL</u>

5)  Your Honor committed reversible error in admit ing the "surprise" expert ballistics opinion that scientific tests had narrowed down the murder weapon to one of only two model revolvers, one of  which was the Commonwealth exhibit allegedly recovered near Defendant;

6)  Defense Counsel was ineffective in failing to present the evidence tending to disprove that Defendant was the actual shooter; to wit:     during the Robbery which caused the Police investigation that discovered the alleged murder weapon, Defendant was NOT holding the gun, but was turning out the pockets of the"victim, while his co-conspirator held the gun.  Said evidence would have tended to disprove the Premeditation argued by the Prosecutor.

WHEREFORE, Defendant humbly prays for arrest of Judgment; and/or New Trial; and New Counsel.



ESQUIRE
Attorney for Defendant

A-117

### 58.  <u>Commonwealth v. Timothy Rice</u>, CP-51-CR-0906231-1996

#### a.  Claim of Ineffectiveness

Defendant claimed that direct appeal counsel was ineffective for not challenging his death sentence under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002). <u>Commonwealth Motion to Dismiss PCRA Petition</u>, at p.6.

#### b.  Relief Received by the Defendant

At the PCRA stage, the Commonwealth agreed that the PCRA court should grant Defendant's motion to vacate his death sentence. <u>Commonwealth v. Rice</u>, 2013 WL 11256379, at *2 (Pa. Super. Aug. 5, 2013).

#### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth also agreed to the imposition of a Life sentence:

> [T]he PCRA court, with the agreement of the Commonwealth, granted Rice's motion to vacate both death sentences, and instead, imposed two consecutive life sentences.

<u>Commonwealth v. Rice</u>, 2013 WL 11256379, at *2 (Pa. Super. Aug. 5, 2013).

#### d.  Duration of Litigation Prior to Resolution

Arrest: March 23, 1991 – Resentenced: January 27, 2012 = **20 yrs, 10 mos, 4 d**

#### e.  Trial Counsel - *Court-Appointed*

On appeal, Defendant was represented by new counsel <u>UU</u>. <u>UU</u> was court-appointed.   <u>Commonwealth Motion to Dismiss PCRA Petition</u>, at p.5; <u>CPCMS, Secure Dockets</u>.

**59.**  **Commonwealth v. Delores Rivers**, CP-51-CR-0335191-1988

### a. Claim of Ineffectiveness

On collateral review, Defendant claimed that trial counsel was ineffective for failing to present mitigating evidence at the penalty phase of trial. Specifically, she contended that trial counsel failed to investigate and present evidence of her mental health problems, childhood physical/sexual abuse, and drug abuse, and that trial counsel should have presented the testimony of a mental health expert at the penalty hearing. Commonwealth's Response to Petitioner's Reply Brief, Rivers v. Horn, 02-cv-1600 (E.D. Pa.).

### b. Relief Received by the Defendant

The federal district court vacated Defendant's sentence and granted penalty phase relief on Claim IX of Defendant's petition, which alleged that "trial counsel was ineffective at the penalty phase in failing to investigate and present mitigating evidence." Federal Docket Entry, 5/10/05; Commonwealth's Memorandum of Law, Rivers v. Horn, 02-cv-1600; Docket Entry, CP-51-CR-0335191-1988, 6/30/05 (noting that Defendant's death sentence was "vacated by Federal Court on 3/10/05") (attached).

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth agreed to Life if Defendant would waive all future appeals. Court Commitment, 6/30/05 (attached); Docket Entry, *supra* (noting that the sentencing court imposed Life "as per attached agreement") (attached); Written Agreement Colloquy, 6/30/05 (attached).

### d. Duration of Litigation Prior to Resolution

Arrest: February 27, 1988 – Resentenced: June 30, 2005 =
**17 yrs, 4 mos, 3 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel MM. MM was court-appointed. Docket Entry, 10/17/91 (attached); CPCMS, Secure Dockets.

COWMONWEALTH VS.  ~~Delores  River~~

NAME, A/1</A, AffESS, ZIP CODE

*ff'*   1)1671/

SUPPLEMENT TO:
INDICTMENT NO.

YEAR, TERM & NO.
CP 8803- 5,( 7.1

THIS CASE INVOLVES NOS,
TO

STATUS OF DEFENDANT

DOCKET IN CHRONOLOGICAL ORDER
(List Charge No. and follow with sentence -signed & *dated by Judge*)

| DATE 6/30/05 | TYPE PROCEEDING | COURT Of |
| COURT CLERK | COURT STENO | TEN |
| ADA | DEF. COUNSEL | |
| CONT. CODE | | |

D  B.W. ISSUED        D  BAIL SUED OUT

D  B.W. WITHDRAWN     0   NEW BAIL

| DATE | TYPE | |
| COURT CLERK | COURT>T<NO, | |
| ADA | DEF, COUNSEL | |
| CONT. CODE | CONT. TO RM, | ON(Dati) |

0  8.W. ISSUED        0  BAIL SUED OUT

D  B.W. WITHDRAWN     0   NEW BAIL

D  SAME BAIL      ...S._____

| PROCEEDING | | |
| DATE | TYPE | COURTROOM |
| COURT CLERK | COURT STENO, | |
| ADA | DEF, COUNSEL | |
| CONT. CODE | CONT. TO RM, | ON(Date) |

A-120

☐ B.W. ISSUED          ☐ BAIL SUED OUT

☐  B.W. WITHDRAWN      ☐ NEW BAIL

0    SAME **BAIL**          1 _____

6,288A

DC-30OB **(PART** I)
**Rev.** 7/99

COURT **COMMITMENT**
STATE OR COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania

vs.

Type or Print Legibly

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
BOX 598 CAMP HILL, PA. 17001-0598
Attn: Central Office Records

NOTE: Additional supply of this form available at above address

☐ DC-300B (PART II) attached

COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX

SEX   ☑ F   ☐ M   Date of Birth        SID        COURT OF INITIAL   ☐ COMMON

COMMITTING COUNTY

MANDATORY SENTENCE   ☐        COURT NUMBER,-:        JURISDICTION   PLEAS   DATE-TE .M

☐ Yes   **D** No   COUNTY REFERENCE#:

BOOT **CAMP RECOMMENDED**   **O** Yes   ☐ No

The above defendant after   ☐ Pleading guilty   ☐ Nolo contendre   ☐ 0-..Being found, guilty   ☐ GBMI

was on        , sentenced by Judge

to a term of n es .     emrs:- ---- onths:---- days **nijore** than ____ years, ____ months,

____ days, **or  y**                       for the offense of

Murder            (Section _____ of the

Crimes Code) or (other statute) _____. It is further ordered.that the
said defendant be delivered by the fmi>Pjr- u h3.ny to and treated as the law directs at the
facility located at

Fine:                Cost:                Restitution:

Amount$              Amount$              Amount$

Balance$             Balance$             Balance $

CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE)

EFFECTIVE DATE OF SENTENCE
6/30/06

THIS SENTENCE IS CC

THIS SENTENCE IS CONSECUTIVE TO:

PROSECUTING ATTORNEY

DEFENSE ATTORNEY
COURT REPORTER

DISPOSITION ON NON-INCARCERATION OFFENSE(S)

(THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE)

A-121

(SEAL)

In witness, whereof I have hereunto set my hand and seal of aid C9,!Jrt, this _..2'0_ day of _:::::r:i/∨t_ , _.-:: q;J_

_d-r-+_

AUTHORIZED SIGNAT,

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

TRIAL DIVISION - CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA                    MARCH TERM, 1988

V.

DELORES RIVERS                                           NO. 3519

## WRITTEN AGREEMENT COLLOQUY

1.      I can read, write and understand the English language.

2.      I am not being treated by a psychiatrist or psychologist for any mental problems.  I fully understand what is going on today.

3.      I am not currently under the influence of drugs, alcohol, or medication.

4.      I understand that I was convicted by a jury before the Honorable John Poserina of Murder in the First Degree, Robbery and Possession of an Instrument of Crime for the murder of Violet Burt.

5.      I understand that I was sentenced to death by that jury, that my death sentence was affirmed by the Pennsylania Supreme Court, that my Post-Conviction Relief Act Petition was denied in the Philadelphia Court of Common Pleas, and that the denial ofmy P.C.R.A. petition was affirmed by the Pennsylvania Supreme Court.

6.      I understand that I filed a petition for writ of habeas corpus in federal court that was pending when my attorney entered into a stipulation on my behalf on April 25, 2005. I understand that pursuant to that stipulation, and an Order by the Honorable Mary A. McLaughlin dated May 10, 2005, theiollowing has happened:

A-122

a.       The federal court has conditionally granted Claim IX in my habeas petition and denied the remainder of the claims in the petition;

b.       It is my understanding that the Court's granting of my petition as to Claim IX will result in the vacation of my death sentence for first degree murder, while leaving intact my convictions and sentences for the other offenses of which I was convicted;

c.       It is my understanding that my case bas been returned to Common Pleas Court so that I will be sentenced to life imprisonment for my first degree murder conviction;

d.       fu consideration of the Commonwealth's agreement not to seek capital re-sentencing, I agree to waive any further appeals in any court (state or federal) challenging my convictions and/or sentences.

7.       I understand that a life sentence in Pennsylvania means life without the possibility of parole at any future time.

8.       I have fully discussed all my rights as they apply to my federal habeas petition and this agreement with my lawyers, Victor Abreu, Esquire, and David Wycoff, Esquire, and I am satisfied that I fully understand those rights.

9.       fu return for the District Attorney's decision to not seek the death penalty in this case, I agree to the following terms and conditions of this written agreement:

a.       I agree to accept a sentence of life imprisonment for murder in the first degree;

b.       I agree to have my current federal habeas petition dismissed;

c.       I agree to never seek or file, or have filed on my behalf, any direct or collateral appeals of either my conviction or sentence or this Agreement to either the

A-123

Pennsylvania Superior or Supreme Courts, or to any federal courts. I know that I am now giving up these rights forever.

d.      I agree to never seek or file, or have filed on my behalf, any claims of ineffective assistance of counsel, including but not limited to: a claim of lack of preparation for trial, lack of defense strategy, failure to file pre-trial motions and a claim of any defense attorney errors pre-trial, trial and post-trial. I know that I am now giving up these rights forever.

e.      I agree to never seek or file, or have filed on my behalf, any claims of trial court error regarding any pre-trial, trial or post-trial rulings, or any claim of prosecutorial misconduct pre-trial, trial or post-trial. I know that I am now giving up these rights forever.

f.      I agree to never seek or file, or have filed on my behalf, any Petitions for Allocatur in either the State or Federal Court systems relating to this case. I know that I am now giving up these rights forever.

g.      I agree to never seek or file, or have filed on my behalf, any state or federal collateral appeals of my conviction or sentence on this agreement, including but not limited to, any relief under the Post Conviction Relief Act or any Federal Habeas Corpus Petitions.

h.      I know I could continue to litigate my federal habeas petition and have all my claims decided by the Honorable Mary McLaughlin.  I know that I am now giving

up that right forever and agree to have my federal habeas petition dismissed. I also know that my federal habeas petition will be denied with prejudice with respect to every claim except claim IX, and I know that means I am forever giving up the right to pursue those claims in state or federal court.

1.      I agree that no other court will review my case after today.

J.      I agree to never seek or file, or have filed on my behalf, any Petitions for Pardon before the Pennsylvania Board of Pardons on this case or my convictions or sentences or this agreement;

k.      ~~I agree to never seek or file, or have filed on my behalf, any A l for Commutation of my sentences to the Governor of the C onwe f Pennsylvania;~~     *f':'- tfjk*

1.      I agree to never seek or file, or have filed on my behalf, any Petitions for Extraordinary Relief or Post-Sentence Motion before any state or f(?deral court relating to my convictions or sentences or this agreement. I know that I am now giving up that right forever.

m.     I agree that a copy of this written agreement and colloquy shall become part of my prison record or file.

10.    In return for my decision to comply with all of the terms and conditions of this agreement and to give up each and every one of the rights described above, the District Attorney agrees not to seek the death penalty against me of murder in the first degree for which I have been found guilty, and previously sentenced to death.

A-125

11.     Other than the terms and conditions set forth in this agreement, nobody has promised me anything or forced me or threatened me to accept the terms and conditions of this agreement. I, myself, have decided to accept all terms and conditions of this agreement. I know what I do and say today is final.

12.     I have read this agreement and discussed this agreement, in its entirety, with my counsel. I have no questions regarding the terms and conditions of the agreement and I understand exactly what is written here.

13.     I am satisfied with the advice and service I have received from my counsel, Victor Abreu, Esquire, and David Wycoff, Esquire. I have discussed my case fully with my counsel. My lawyers have spent enough time on my case and I have had enough time to discuss my case fully with my lawyers.

14.     My lawyers have left the final decision as to what to do on my case with me, and I have decided, myself, to accept the terms and conditions of this Agreement.

15.     My lawyers have fully explained to me what it means to accept the terms and conditions of this Agreement and they have each reviewed and explained this written agreement colloquy with me and it is my decision to accept all terms and condition of this written agreement.

16.     I admit that I am in fact guilty of first degree murder, robbery, and possession of an instrument of crime in accordance with the evidence presented at trial.

17.     I accept all terms and conditions of this agreement, knowingly, intelligently and voluntarily.

A-126

I HAVE READ ALL OF THE ABOVE AND HAVE DISCUSSED IT WITH MY LAWYERS. I FULLY UNDERSTAND WHAT IS SET FORTH IN THIS AGREEMENT AND I ACCEPT ALL TERMS AND CONDITIONS OF THIS AGREEMENT.

*Wtl&*

~~OLORES RIVERS~~

Date:   _b   Jal  As_

## CERTIFICATION OF DEFENSE COUNSEL

I certify that:

(1)     I am an attorney admitted to the Supreme Court of Pennsylvania:

(2)     I represent the defendant herein.

(3)     I know no reason why the defendant cannot fully understand everything that is being said and done here today.

(4)     The defendant read the above written agreement colloquy in my presence and appeared to fully understand it. I have gone over the agreement completely with the defendant, explained all of the items on the agreement, and answered any questions she had. The defendant understands the information and my explanations.

(5)     The defendant is knowingly, intelligently and voluntarily agreeing to all terms and conditions in this agreement.

(6)     I made no promises to the defendant other than any listed on this agreement.

(7)     Although this decision was made exclusively by the defendant, I agree with her decision.

ictor Abreu, Esquire

David Wycoff, Esquire

0/2 )s                    (Date)

A-128

## DISTRICT ATTORNEY'S CERTIFICATION


I certify that I am the assigned assistant district attorney in this case and that the terms, conditions or agreements mentioned herein are true and correct, as they are set forth above. I have asked the defendant if there is anything on the written agreement colloquy form or anything else about this case that the defendant does not understand, and the defendant has indicated the she understands everything that is set forth. The defendant states that any questions she has have been answered fully by defense counsel, Victor Abreu, Esquire and David Wycoff, Esquire.

/ Edw ard Mccann, Assistant istrict Attorney
Chief, Homicide Unit


Date:

### <u>JUDGE CERTIFICATION</u>

 I certify that I am the Judge having the jurisdiction to hear this case and that I am satisfied the

defendant understands fully the nature and quality of the agreement that the defendant is entering

before me. The defendant has exercised a knowing, intelligent, voluntary acceptance of the

agreement mentioned above. I have colloquied the defendant on the record to determine whether

the defendant understands everything that is being said and done here today, as well as to

determine whether the defendant is entering this agreement of her own free will.

Hon. John Poserina
Judge, Court of Common Pleas


Date:   6-30-tJS

A-130

ppc.rnl D.P. J94 0

COURT OF COMMON PLgA
iPPEALS DIVISION
ROOH 601 CITY HALL
PHILADELPHIA, PA. 19107

COMMONWEALTH

VS.

DELORES RIVERS

CCP Lower Court Numbers

CP# 8803-3519 to 3524

DEATH PENALTY

Phila. **Pollce** Photo *I:* 508674        Computer L ad *n:* 8803-3519        C

Offense Trackin *I:* M3 12721           **Appellate** C:t. *D: 1.5.J L-:c. Prl't#t or.r* nr,;

Jonn-Poserina -

Ji@ge:--

| DATE: | UOC., | DESCRIPTION OF ACTION: |
|-------|-------|------------------------|
| 10-17-91 | D-7 | Notice or Appeal to ___Supreme___ Court **from** the final - /judgment entered on 10-3-91 |
| | | Appeal filed by: **1 1ꞮꞮꞱJTꞮFꞮcꞮt** · _____ Status:   IfP/ )(>$WU.ff". _ _____ |
| | | Appointment of Counsel Request forwarded. Counsel appointed: _____ |
| 11/26/91 | | Bills of Information locat,ed. Docket entries prepar@d,   i xiuxiu», . |
| 10[23/91 | D-8 | Order pursuant to Pa. H.A-P. 1925(b), riled. |
| 10/28/91 | D-9 | Statement of Mat ter:i  pursuant  to PRAf l92!J ( ti J, r11ec1. |
| 10/31/91 | D-1O | Record returned from Judv,t Opinion filed. |

0 _"J

D-11  --  <u>NOTES OF TESTIMONY:</u> (One envelope exhibits)
3/24/88,3/1/89 , 3/2/89,3/3/89, 3/6/89,3/Bi il
3/9/89,3/10/89,3/13/89,3/14/89,3/15/89,3/16/89

Record transmitted to Appellte Court.

60.  <u>__Commonwealth v. Florencio Rolan__</u>, **CP-51-CR-0228931-1984**

### a.  Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective at the penalty phase.

### b.  Relief Received by the Defendant

The PCRA court vacated the death sentence "upon finding that Defendant's right to effective assistance of counsel was violated during the penalty phase of his trial." <u>Rolan v. Vaughn</u>, 2004 WL 2297407, at *1 (E.D. Pa. Oct. 12, 2004) *affirmed* 445 F.3d 671 (3d Cir. 2006).

The Superior Court affirmed the grant of a new sentencing hearing. <u>Commonwealth v. Rolan</u>, 4581 Philadelphia 1997 (Pa. Super. June 9, 1999).

### c.  Outcome – *Defendant sentenced to Life after new penalty hearing*

After a re-sentencing hearing, a jury unanimously sentenced Defendant to Life. <u>Rolan</u>, 2004 WL 2297407, at *1.

### d.  Duration of Litigation Prior to Resolution

Arrest: November 30, 1983 – Resentenced: May 2, 2003 (<u>Rolan v. Vaughn</u>, 445 F.3d 671, 674 (3d Cir. 2006)) = **19 yrs, 5 mos, 2 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>O</u> <u>Rolan v. Coleman</u>, 680 F.3d 311, 315 (3d Cir. 2012). <u>O</u> was court-appointed. <u>Rolan v. Vaughn</u>, <u>Brief for Appellant</u> (Commonwealth), 2004 WL 5026812 (3d Cir.).

A-132

**61.** <u>**Commonwealth v. Saharris Rollins**</u>**, CP-51-CR-0405851-1986**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing "to investigate or present to the jury significant mitigating evidence regarding Petitioner's physically and psychologically traumatic upbringing." <u>Rollins v. Horn</u>, 2005 WL 1806504, at *6 (E.D. Pa. July 26, 2005).

### b. Relief Received by the Defendant

The Third Circuit granted penalty phase relief. <u>Rollins v. Horn</u>, 386 F. App'x 267, 270 (3d Cir. 2010) ("Rollins' attorney performed deficiently by failing to adequately investigate and present evidence of mitigating circumstances").

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, the Commonwealth agreed to Life. <u>Online Docket Entry</u>, p.6, 12/21/11 ("This case was sent back from Federal court. The original sentence was vacated. Listed for re-sentencing. The Commonwealth will not seek the death penalty on remand").

The Common Pleas court sentenced Defendant to Life. <u>Online Docket Entry</u>, p.6, 1/13/12 ("The defendant has been re-sentenced to life without parole").

### d. Duration of Litigation Prior to Resolution

Arrest: February 26, 1986 – Resentenced: January 13, 2012 = **26 yrs, 11 mos, 18 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by <u>HH</u>. <u>Commonwealth v. Rollins</u>, <u>Commonwealth's Brief for Appellee</u>, 1999 WL 33657491 (Pa.), p.17. <u>HH</u> was court-appointed. <u>Statement of Matters Complained of on Appeal</u> (attached).





IDENTIFICATION NO. ▮▮▮▮▮

Atttorney for Defendant

Court Appointed by:
Honorable Murray C. Goldman

IN THE COURT OF COMMON PLEAS

OF PHILADELPHIA COUNTY

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA          April Term, 1986

                VS.              _____  Nos    058:.; 0586 ;-0 5 8 7 ;-0 8 8

SAHARRIS ROLLINS a/k/a
        HAROLD ALVEREZ

STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Defendant, Saharris Rollins, by and through his court-appointed attorney, L L, states the below as the matters complained of on appeal:

1.    Trial Court erred in failing to exclude the "Ballistic Match-Up" evidence of a subsequent crime.

2.    Trial Court erred in allowing the entire subsequent crime to be tried during the course of the trial.

3.    Trial Court erred in failing to find the show-up identifications of Richard Campbell, Dennis Danzler and Sharon Williams constitutionally infirm.

fFiLEID

OCT 2 0 1987

APPEALS 01 /ISION. ROOM 60:
COURT OF COMMON PLEAS PHlu,

1) –;J\

A-134

62. **Commonwealth v. James Melvin Smith**, CP-51-CR-0717891-1983

### a. Claim of Ineffectiveness

In his PCRA petition, Defendant raised three claims: "whether <u>Atkins</u> barred Appellant's execution; whether Appellant had been forcibly medicated at the time of trial; and whether trial counsel was ineffective during the penalty phase with regard to the presentation of mitigating evidence." <u>Commonwealth v. Smith</u>, 17 A.3d 873, 882 (Pa. 2011).

### b. Relief Received by the Defendant

On June 19, 2009, defense counsel and the Commonwealth stipulated that Appellant would be granted a new penalty phase hearing based on the ineffectiveness of trial counsel. <u>Smith</u>, 17 A.3d at 882.

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

Defendant was resentenced to Life. <u>Smith v. Wetzel</u>, 2015 WL 4886421, at *1 (E.D. Pa. Aug. 14, 2015); <u>Online Docket Entry</u>, p.18, 10/25/2012 ("The defendant is re-sentenced to life without parole. The defendant is to be taken off of death row forthwith"); <u>Commonwealth's Response to Petition for Writ of Habeas Corpus</u> ("The prosecution later agreed not to seek a new capital sentencing proceeding").

### d. Duration of Litigation Prior to Resolution

Arrest: May 4, 1983 – Resentenced: October 25, 2012 =
**29 yrs, 5 mos, 21 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>BB</u>. <u>Smith</u>, 17 A.3d at 881; <u>Commonwealth v. Smith</u>, 540 A.2d 246, 247 (Pa. 1988). <u>BB</u> was court-appointed. <u>Cover Page</u>, N.T. 9/22/83 (attached).

A-135

D!  Tm:   COURT OF CO!·t·lOI PLEA!:

FIRST JUDICIAL DISTRICT OF PEN rn YLVJ.lU  A

CRIMINAL TRIAL DIVISION

COMMONWEALTH                              JULY SESSIONS, 1983

VS                              #1789:  MURDER
                                        VOLUNTARY MANSLAUGHTER
JAMES M. SMITH
                                F.1790:  INVOLUNTARY  HANSLAUGHT I:.l·

                                #1791:  CRIMINAL CONSPIR?\.CY

                                #1792:  P.I.C. - GENERALLY


                                CITY HALL
                                ROOH 646


                                        WEDNESDAY
                                        FEBRUARY 6'rl-i, 1985
                                        11:45 A.1-1.


B.CFOru::      Hon. EUGENE GELFAHD, JUDGE
                  AND A JURY


APPEARA.T\l'CES:   ROBERT MYERS, ESQUIRE
                   ASSISTANT DISTRICT ATTORNEY

                **;.tJ:lii&aW  I LB  b** ESQUIRE
                   ATTOP.lrnY  FOR  DErr:NOANT   (COUR'J.'-.APPOIUTED)


                REPORTED BY:   HILLIAI-1 J.   SCHl\EFER, R.P.R./C.i-i.
                               OFFICIAL COURT REPORTER

                TYPI:D  BY:       HAP.GOT BERGER :;ERVICES



COURT OF COMMON ?LEAS
## OFFICE OF COURT ADMINISTRATION
**APPEALS DIVISION**
ROOM ao, CITY HAL.I.
**PHILADELPHIA. PA. 1g107**

r:cw..,.a J. .,.A0t.rt
11nlDIN1' JIIDOI

## DOCKET ENTRIES

*APPEALS*

---

Co mrnonwe  :'11cb:r n TOfN YSOFRC          1983 July

**vs**                                      1789 - Murder, First Degree
                                            1791 - Criminal Conspiracy
**JAMES MELVIN SMITH**                      1792 - Possession Instrument of Crim
                                                   Generally

---

Estimated Run Date under Rule 1100 is 10-31-83.

May 31, 1983          D-1      - Pro Se Motion for a PreTrial Order
                                 Restraining and Enjoining the DA fron
                                 Cross-Examining or Interrogating the
                                 defendant concerning his prior crimi dl
                                 record.

June 13, 1983         **D-2**    - Omnibus PreTrial Motion for Relief,
                                 filed.

Sept. 1, 1983         **D-3**    - Notice of Joint Trial, filed.

Sept. 1, 1983                  - Court Room 643
                                 Defendant has been arraigned under Pa,.
                                 Criminal Code Section 303-306.
                               - Bail set at $25,000.00.
                                                      Richette, J.

Sept. 22, 1983                 - **CR 643**
                               - Defense Motion to Sever denied.
                               -  Rich rd MoQr , E   w  h    Court
                                 appoints-                  q.        I'l

                                 Defendant waived Rule 1100, new rundat
                                 is 12-31-83.
                                                      Richette, J.

Oct. 31, 1983         **D-4**    - Petition for the Hiring of an Investiq to
                                 filed.

Oct. 31, 1983         D-5      - Motion to Suppress Statements, Physicc
                                 Evidence and Id ntification, filed.

A-137

63.  **Commonwealth v. Willie Sneed, CP-51-CR-0606741-1984**

    a.  **Claim of Ineffectiveness**

Defendant claimed that trial counsel provided ineffective assistance at the penalty phase.  Commonwealth v. Sneed, 899 A.2d 1067, 1077 (Pa. 2006) ("appellee contended that counsel failed to present any character witnesses and, essentially, failed to present any mitigation defense whatsoever").

    b.  **Relief Received by the Defendant**

The PCRA court agreed that trial counsel was ineffective at the sentencing hearing. Sneed, 899 A.2d at 1071.

The Supreme Court affirmed the granting of penalty phased relief. Sneed, 899 A.2d at 1084 ("We are satisfied that if the jury had heard testimony and argument regarding the mitigation evidence presented by appellee at the PCRA hearing, there is a reasonable probability that at least one juror would have struck a different balance and voted not to impose the death penalty").

    c.  **Outcome - *Commonwealth Agreement to a Different Sentence***

On remand, the Commonwealth agreed to Life. Online Docket Entry, p.8, 12/18/12 ("Order Granting Motion to Vacate Sentence By agreement of counsel, Court orders DEATH SENTENCE imposed on 4/2/1986 VACATED and imposes a new sentence of LIFE Imprisonment").

    d.  **Duration of Litigation Prior to Resolution**

Arrest: April 10, 1984 – Resentenced: December 18, 2012 = **28 yrs, 8 mos, 8 d**

    e.  **Trial Counsel – *Court-Appointed***

Defendant was represented by counsel JJ.  Commonwealth v. Sneed, 526 A.2d 749, 751 (Pa. 1987); Commonwealth Brief for Appellee, 601 Capital Appeal Docket, at p.6. JJ was court-appointed. Cover Page, Trial Transcript, ("APPEARANCES [JJ] for Defendant Sneed") (attached).

ct)

IN THE  COURT OF COnI!Orl     PLEAS

FIRST JUDICIAL DISTRIC'I- OF PENUSYLVAllIJ\

CRIMINAL TRIAL DIVISION

COi·lil Otll'7EALTH                    :    JUHC TERII, 1984

                                       :    CP NOS. 0669 - 0673

                                            !IURDER,  VOL liAHSL;
        v.
                                            IHVOL ZIAHSL;  ROBDCnY;

                                            POSS INSTR CRIM GENLY,

WILLIES. SNEED                    :    CRIMINAL CONSPIRACY


                            JURY TRIAL



                    Monday, February 25, 1985
                    Courtroom 246, City Hall
                    Philadelphia, Pennsylvania


BEFORE:

        HONORABLE GEO!"tGE J.   IVIllS,  J.,   PRESIDIIiG

APPEAP..AHCCS:

        JANES LONG, JR., ESQUIRE
        Assistant District Attorney
        For the Commonwealth of Pennsylvania
        ▬▬▬▬▬▬▬,, ESQUIRE
        Cotfr E:.-i\ )p 'l.:."te d C u sel
        Attorney for the Defendanc Sneed

(4)

A-139

**64.**   <u>**Commonwealth v. Brian Thomas**</u>, **CP-51-CR-0827161-1985**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel was ineffective for failing to investigate and present evidence regarding his mental health history at the penalty phase.

### b. Relief received by Defendant

The Third Circuit remanded the matter for an evidentiary hearing "concerning the extent, if any, of Thomas' counsel's pre-sentencing investigative efforts to obtain mitigating evidence." <u>Thomas v. Horn</u>, 570 F.3d 105, 130 (3d Cir. 2009) (noting that "there exists a reasonable probability that effective counsel would have chosen to present evidence of Thomas' mental health history, and that its presentation would have convinced at least one juror to sentence Thomas to life imprisonment").

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

On remand, the Commonwealth notified the court that it would no longer contest the grant of conditional relief as to Thomas's death sentence. <u>Thomas v. Horn</u>, 00-cv-803-CMR (E.D. Pa. Dec. 20, 2011), ECF No. 98.

The Commonwealth did not seek a new penalty hearing. Defendant was resentenced to Life by the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.14, 9/24/13 ("The death penalty has been vacated. Life without parole on count #9").

### d. Duration of Litigation Prior to Resolution

Arrest: August 12, 1985 – Resentenced: September 24, 2013 = **28 yrs, 1 mos, 12 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>PPP</u>. <u>PPP</u> was court-appointed. <u>Thomas v. Beard</u>, 388 F. Supp. 2d 489, 493 (E.D. Pa. 2005) ("[Defendant] was represented by court-appointed counsel").

### 65.   <u>Commonwealth v. LeRoy Thomas</u>, CP-51-CR-1207001-1994

#### a.  Claim of Ineffectiveness

Defendant claimed penalty phase ineffectiveness for failure to present mitigating evidence. <u>Commonwealth v. Thomas</u>, 44 A.3d 12, 16 (Pa. 2012)

#### b.  Relief Received by the Defendant

At the PCRA stage, the Commonwealth agreed to a new penalty hearing. <u>Thomas</u>, 44 A.3d 12, 16 n.3. ("[A]ppellant's claim that trial counsel was ineffective for failing to present mitigating evidence was rendered moot after the parties stipulated to a new penalty hearing").

At the PCRA hearing, the Commonwealth agreed that Defendant received ineffective assistance at the penalty phase. (N.T. 9/18/07 at 4-5).

#### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

With the Commonwealth's agreement, the Homicide Calendar Judge resentenced Defendant to Life:

> Order - Sentence/Penalty Imposed Re-sentencing upon appeal. The death penalty has been vacated upon appeal. New sentence of life without parole. The defendant is to be taken off of death row.

<u>Online Docket Entry</u>, p.16, 3/15/13.

#### d.  Duration of Litigation Prior to Resolution

Arrest: December 7, 1994 – Resentenced: March 15, 2013 = **18 yrs, 3 mos, 8 d**

#### e.  Trial Counsel - *Not court-appointed*

Defendant was represented by <u>E</u>. (N.T. 5/9/95 at 1). <u>E</u> was *not* court-appointed.

**66.** <u>**Commonwealth v. Michael Thomaston**</u>, **CP-51-CR-0400541-1995**

### a. Claim of Ineffectiveness

After his capital sentence, Defendant's new counsel filed post-sentence motions challenging the effectiveness of trial counsel. <u>Commonwealth v. Thomaston</u>, 118 EDA 2003 (Pa. Super. 11/16/04) (Memorandum) ("Appellant filed post-sentence motions … alleging ineffective assistance of counsel and requesting either a new trial or a new penalty hearing"). Defendant challenged trial counsel's stewardship at the penalty phase for "not objecting to the elicitation of defendant's criminal history, and the court's explanation of age as a mitigating factor." <u>Commonwealth Letter Brief for Appellee</u>, 118 EDA 2003, at p.4.

### b. Relief Received by the Defendant

At the post-sentence motion stage, the Common Pleas Court vacated the death sentence and granted a new penalty phase hearing. <u>Opinion</u>, Mazzola, J., 12/4/03 at p.1; <u>Thomaston</u>, 118 EDA 2003, at p.4.

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth did not seek a new penalty hearing and the PCRA court imposed Life. <u>Online Docket Entry</u>, p.4, 12/11/02; <u>Brief for Appellee</u>, 314 EDA 2008 ("Judge Mazzola reviewed the record, denied defendant's request for a new trial, but vacated his death sentence and imposed a sentence of life imprisonment").

### d. Duration of Litigation Prior to Resolution

Arrest: February 2, 1995 – Resentenced: December 11, 2002 = **7 yrs, 10 mos, 9 d**

### e. Trial Counsel – *Court-Appointed*

Defendant was represented by counsel <u>T</u>. <u>T</u> was court-appointed. <u>Docket Entry</u> (attached); <u>CPCMS, Secure Dockets</u>.

A-142



COURT OF COMMON PLEAS
TRIAL DIVISION
APPEALS UNIT
ROOM 206 CRIMINAL JUSTICE CENTER
1301 FILBERT STREET
PHILADELPHIA, PA  19107

683-7522, 7523

*FREDERICA MASSIAH-JACKSON*
President Judge
Trial Division

JAMES J. FITZGERALD, III
Administrative Judge
Trial Division

D. WEBSTER KEOGH
Supervising Judge
Criminal Division

SUSAN CARMODY
Supervisor

COMMONWEALTH

CP#9504-0054 1/3

VS

PP#743257

Michael E. Thomaston

CHARGES:   #1     Murder   H               #2     Robbery   F
           #7     PIC Ml                   #8     Criminal Conspiracy   Fl

| **DATE** | **DOCUMENT#** | **COURT ACTION** |
|---|---|---|
| 3-7-95 | D-1 | . sq. appointed as counsel for the defendant. |
| | | Means, *l.* |
| 4-12-95 | | Arraigment. C- 5-12-95, rm 625. |
| | | Temin, J. |
| 5-12-95 | | Additional Discovery received. Inv. ongoing. Motion to be filed.. T.E. C- 6-12-95, rm 625. |
| | | Temin, J. |
| 6-12-95 | | Defense counsel to file Motion to quash. List 6-26-95, rm 625. |
| | | Temin, J. |
| 6-26-95 | | List w/co-defendants. C - 7-11-195, rm 625. |
| | | Temin, J. |

A-143

67. <u>**Commonwealth v. Andre Thompson**</u>, **CP-51-CR-0221931-1993**

    **a. Claim of Ineffectiveness**

After his death sentence was affirmed, Defendant filed a PCRA petition. <u>On Line Docket Entry</u>, p.6, 10/27/00.

    **b. Relief Received by the Defendant**

The Commonwealth agreed to penalty phase relief.

    *c.* **Outcome -** *Commonwealth Agreement to a Different Sentence*

At the PCRA stage, the Commonwealth agreed to a term of years sentence. <u>Online Docket Entry</u>, p.12, 9/20/05 ("Murder Guilty Pleas Negotiated/Sentence Imposed: Minimum Sentence: 10 Years 0 Months 0 Days, Maximum Sentence: 20 Years 0 Months 0 Days Concurrent With Other Charge(s) Within The Same Case").

    **d. Duration of Litigation Prior to Resolution**

Arrest: December 23, 1992 – Resentenced: Sept. 20, 2005 = **12 yrs, 7 mos, 28 d**

    *e.* **Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel Q. <u>Bill of Information</u> (attached); Q was court-appointed. (N.T. 10/14/93 at 1) (attached).



1

IN THE COURT OF COMMON PLEAS OF PHIUJ)ELPHIA COUNTY

FOR THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

* * *

COMMONWEALTH                    FEBRUARY TERM, 1993

VS.

ANDRE THOMPSON  **A/K/A**
ANTHONY RODGERS          C.P. NO. 2193

* * *

THURSDAY, OCTOBER 14, 1993
COURTROOM 453, CITY HALL
PHILADELPHIA, PENNSYLVANIA

* * *

BEFORE:  THE HONORABLE ROBERT A. LATRONE, J.
(AND A JURY)

* * *

APPEARANCES:

GAIL F IRMAN, ESQUIRE,
ASSISTANT DISTRICT ATTOR. EY
FOR THE COMMONWEALTH

4ih0,II!!::a   ·. ESQUIRE,
COURT-APPOINTED COUNSEL
FOR THE DEFENDANT

A-146

68.   **Commonwealth v. Louis Thompson**, CP-51-CR-0436071-1990

   **a.  Claim of Ineffectiveness**

   Defendant raised ineffectiveness claims after his capital conviction.

   **b.  Relief Received by the Defendant**

   At the PCRA stage, the Commonwealth agreed that Defendant received ineffective assistance at his penalty phase:

   Commonwealth is in agreement with petitioner's PCRA claims <u>AS TO PENALTY PHASE ONLY</u>

<u>Docket Entry</u>, 5/21/04 (emphasis in original) (attached).

   **c.  Outcome - *Commonwealth Agreement to a Different Sentence***

   With the Commonwealth's agreement, Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.6, 5/21/04.; <u>Correspondence with PCRA Counsel</u>, 5/5/04 (attached).

   **d.  Duration of Litigation Prior to Resolution**

   Arrest: April 14, 1990 – Resentenced: May 21, 2004 = **14 yrs, 1 mos, 7 d**

   **e.  Trial Counsel – *Court-Appointed***

   Defendant was represented by counsel <u>TT</u>. <u>TT</u> was court-appointed. <u>Order Vacating Homicide Appointment</u> (attached).

A-147

OOOOSIOIOCOtd

COMMONWEAL TH VS.

SUPPLEMENT TO:
INDICTMEl-ff NO.

NAME. A/t(/A. AOORESS, ZIP cooe:

_Lou,s7'k Ov?_

4882
ff  3C.o

YEAR,  TERM  & NO.

CP 9004.-3(o(J7

THIS CASE INVOLVES NOS.

3607 TO 3612

STATUS OF DEFENDANT

DOCKET IN CHRONOLOGICAL ORDER

*(List Chorgi, No. r:md foll o w with si:n f l!f!C:e - s i gn i:d & doted by J vd ge )*

PROCEEDING

| COURT CLERK | TvPe: | courTRooM |
|---|---|---|
| Stphony | | \cod- |
| ADA Sheryl LaBar and | COURT STENO. Odalys Cummins | |
| CONT. COOE Robin Godfrey | DEF. COUNSEL Ronald Greenblatt | |
| | CONT. TO RM. | ON *(Date)* |

| | | PROCEEDING | |
|---|---|---|---|
| D B.W. ISSUED | 0 | BAIL SUED OUT | |
| D B.W. WITHDRAWN | 0 | NEW BAIL | |
| D SAME BAIL | | s | |

OATe:          TYPE;          COURTROOM

| COURT CL.e:RK | COURT STENO, |
|---|---|
| AOA | OE;F, COUNSEL. |
| CONT, COOE | CONT, TO RM, ON *(Date )* |

| D S.W. ISSUED | D BAIL SUED OUT |
|---|---|
| | 0 J NE BAIL |

| ☐ sAME BAIL | s |
|---|---|

OATE          TYPE          COURTROOM          PROCEEDING

| COI,JRT CL.ERK | J COURT STENO. |
|---|---|
| AOA | OE:E COUNSE L. |
| CONT. c o o e: | CONT. TO AM. ION (D • le ) |

| D S.W. ISSUED | D B AI L SUED OUT |
|---|---|
| D S.W. WITHDR AWN | 0 N E W BAIL |

cJo

10 0,     5-a-1-o'f

Co....''''''''ht i-:, tn  Q J

w,Tu rJ, Tu.M-e.r5 f>ci:)\- alwt

'7      tJ    kct-'( Prh"rS'E Ot.JL--'j,

?-eh-h  q—

()D-c.A..v._J._ w\kcu..J  a..-1\ cia \M.$

CL4-- \v  fL-ia.+e- .  Cs-e-e

ColloiJi Ov\ ""1.coi.d QAA.1Sl")"'-':-J

M-12-,,v<O y-a..,_ .Lu,,,. 011\

\w'ltl<e)              "f

oW ses) l'oo[tva..cJe.s

1                          0 &e.J._

tr          /- 3l  -"ll  o-v1.d.

1L\v{?O  ct.. uz----  j_p
                                    f..._

1r\YQV\ VV...'€,/,t.A  u.h\ko J \

p D9;;L\:JI  1        (-)c'{AO\€_ .

a.£2

si    s-.rj_) u...a.,,.,w,-e.5

+\-ot Jc.

A-148

0   SAME BAIL          S _____

.- 88 A

April 29, 2004

Ronald L. Greenblatt, Esq.
1429 Walnut Street, Suite 1001
Philadelphia, PA  19102

Re: <u>Commonwealth v. Louis Thompson</u> CP 9004-3607-3612
    **Written Agreement     N.L. May 5, 2004**

Dear Ron,

As we discussed earlier this week, our office has a few, small proposed changes to the Written Agreement that you have drafted regarding your client Louis Thompson.

Referring to the example agreement for the <u>Farugi</u> case, which was your template for the present agreement, we would like you to add the following changes:

1) Your document, page *5,* begins with subset numbers 2-7.  Your #7 corresponds to the <u>Farugi</u> #7.  However, <u>Farugi</u> then has a number 8, stating simply that: "I agree that no other court will review my case after today." We propose adding the #8 clause.

2) Immediately after your #7 (pg. 5), the next c1ause is given outline #13. This clause corresponds exactly to <u>Farugi</u> #13. However, on the <u>Farugi</u> document, before #13 and after #8, are subset letters (h), (i),G), and (k).  We propose that you include <u>Farugi</u> clauses (h), (i), and (k)----clause (i) is admittedly not relevant to this type of agreement.

Thank you for your attention to this matter. This letter is being faxed to your office today, as well as being mailed, in order to expedite these changes before our May *5* hearing date.  Please call me with regarding any questions or disagreements with these proposed changes.

Sincerely,


Sheryl LaBar, Assistant District Attorney
PCRA Unit   215-686-5716

A-150

IN ·H E COURT Ol• COili PLEAS OF F-HiLADELFH.I

D Trial Di\'ision
  Criminal Section

D Family Court Division
  D Domcst ic Rel.  0  J u ve nile•  ☐ Women's Crimin ]  D isd1!m<:ennn1 •

IN TUE ? HIL AO ELPHIA  mNtCIPAL COURT
  D Crimi na l s ction

antmonwezt

**Dote:** NOVfMBfB 26TH, 1991

MURDER

CP 904-360-8612

PP# 364882

LOUIS THOMPSON

TO VACATE HOi": CIDE APPOINTMENT

====i  ltt t p::ttrtifp.,- Tnet on- - =  =..-==:·:........  .  fay of  OCTOBER R  _ A -:o-:1 9 1
HON. JUDGE CLARK PERMITTED  ESQUIRE

TO WITHDRAW AS DEFENSE COUNSEL If  THE ABOVE CAPTIOm:D CASE•

l'ourl C:lr.rlt

6°25 (Rn. 12/69)



A-150

69.   **Commonwealth v. William Tilley**, CP-51-CR-1210781-1985

    a.  **Claim of Ineffectiveness**

Defendant raised ineffectiveness claims after his capital conviction. Commonwealth v. Tilley, 780 A.2d 649, 652 (Pa. 2001).

    b.  **Relief Received by the Defendant**

At the PCRA stage, the Commonwealth agreed that Defendant was entitled to a new penalty phase. As the Commonwealth's attorney explained:

> [T]he Commonwealth determined that it was appropriate to agree to a new penalty phase based on [trial counsel's] admissions in that affidavit that he essentially did nothing in preparation for the penalty phase hearing; he didn't really think about it; he didn't think his client could get the death sentence and basically started prepping at the end of the guilty phase or, worse, didn't prep at all. That is the basis for our agreement.

(N.T. 5/1/07 at 7-8). As the PCRA court observed, this was trial counsel's "first capital case and he was unfamiliar with the law and didn't think he would reach a penalty phase." (N.T. 5/1/07 at 8).

    c.  **Outcome –** *Unresolved due to Defendant's death in custody*[6]

    d.  **Duration of Litigation Prior to Resolution**

Arrest: August 2, 1985 – New Penalty Hearing Ordered: May 1, 2007 = **21 yrs, 8 mos, 29 d**

    e.  **Trial Counsel –** *Court-Appointed*

Defendant was represented by counsel II. (N.T. 5/7/07 at 7); II was court-appointed. Conversation with Trial Counsel.

---

[6] After receiving a new penalty phase, Defendant appealed the denial of his remaining guilt phase issues. The case was closed upon his death. On Line Docket Entry, p.10, 1/21/2009.

70.  **Commonwealth v. Philip Trivigno**, **CP-51-CR-0100861-1996**

### a. Claim of Ineffectiveness

Defendant claimed that the prosecutor argued future dangerousness and that trial counsel did not request a Simmons instruction. Commonwealth v. Trivigno, 750 A.2d 243, 257 (Pa. 2000) (noting that "no Simmons instruction was requested").

### b. Relief Received by the Defendant

The Pennsylvania Supreme Court granted penalty phase relief. Trivigno, 750 A.2d at 254 ("Given that the prosecution had placed Trivigno's future dangerousness at issue, the trial court should have at this point explained what a life sentence means in accordance with Simmons").

### c. Outcome – *Defendant received Life after new penalty hearing*

After a new penalty phase hearing, the jury imposed Life.   Online Docket Entry, p.4, 1/29/03; PCRA Opinion, Tucker, J. 11/2/16, at p.2.

### d. Duration of Litigation Prior to Resolution

Arrest: December 19, 1995 – Resentenced: January 29, 2003 = **7 yrs, 1 mos, 10 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by counsel BBB. (N.T. 9/7/96 at 1). BBB was *not* court-appointed.

71. **Commonwealth v. Vinson Washington**, **CP-51-CR-0310321-1994**

    **a. Claim of Ineffectiveness**

Defendant's PCRA petition claimed that trial counsel violated his duty of loyalty to him "by laboring under a conflict of interest that caused him to sabotage his defense, thus denying him effective assistance of counsel." Defendant cited a letter that his lawyer wrote to a defense expert in which the lawyer stated that Defendant may "epitomize the banality of evil." Commonwealth v. Washington, 880 A.2d 536, 541 (Pa. 2005).

    **b. Relief Received by the Defendant**

On appeal from the denial of post-conviction relief, the Pennsylvania Supreme Court remanded the matter for an evidentiary hearing. Washington, 880 A.2d at 546 ("this case is remanded to the PCRA court for an evidentiary hearing on the claim that trial counsel breached his duty of loyalty to Appellant because of personal feelings of hostility that counsel harbored and that the breach caused trial counsel to render ineffective assistance").

On remand, the Commonwealth agreed that Defendant was entitled to a new penalty phase hearing. Online Docket Entry, p.9, 7/15/08 ("Commonwealth agrees to stipulation to grant the defendant a new penalty phase").

    *c.* **Outcome -** *Commonwealth Agreement to a Different Sentence*

The parties entered into a negotiated guilty plea and Defendant was sentenced to Life. On Line Docket Entry, p.13, 5/16/11 ("[B]ased on stipulation of parties, the defendant is sentenced to LIFE Imprisonment").

    **d. Duration of Litigation Prior to Resolution**

Arrest: February 12, 1994 – Resentenced: May 16, 2011 =
**17 yrs, 3 mos, 4 d**

    *e.* **Trial Counsel –** *Court-Appointed*

Defendant was represented by QQQ. QQQ was court-appointed. Court Order, 3/30/94 (attached); CPCMS, Secure Dockets.

COURT OF COMMON PLEAS
TRIAL DIVISION
APPEALS UNIT
ROOM 601 CITY HALL
PHILADELPHIA, -PA. 19107

Alex Bonavitacola                           Joanne Morelli Besden
Administrative Judge                        Supervisor
Trial Division


COMMONWEALTH                                CP# 94-03-1032-1037

    VS                                      PP# 721806


**VINSON WASHINGTON**                               **DEATH PENALTY**

CHARGES:  **BILLS #1032 - MURDER**
                **VOLUNTARY MANSLAUGHTER**
         **#1034 - ROBBERY**
         **#1035 - PIC - GENERALLY**
         **PIC - CONCEALED WEAPON**
         **R IMN ALCONSPI** .R.AY

| DATE | DOCUMENT# | COURT ACTION |
|------|-----------|--------------|
| 3-23-94 | D-1 | Notice Of Mandatory Minimum Sentence Case, Filed. |
| 3-23-94 | D-2 | Notice Of Joint Trial, Filed. |
| 3-23-94 | D-3 | Notice Of Aggravating Circumstances, Filed. |
| 3-23-94 | | Formal Arraignment Waived Under Criminal Code 303-306. **NOT GUILTY** plea entered. Commonwealth Notices Given; 352 Mandatory Minimum. Estimated 1100 Run Date 1-12-95. Informal *Discovery* not Complete to be mailed within 30 days. Listed For Trial E.P.D. 4-25-94 for status and filing of motions. **Foy, T/C.** |
| 3-30-94 | D-4 | Petition For Leave To Employ Special Investigator, Filed. |

A-154

Continued **VINSON WASHINGTON**                                    p:i.ge 2

| | **DOCUMENT#** | **COURT ACTION** |
|---|---|---|
| 3-30-94 | D-5 | **ORDER.** AND NOW, this 23rd day of March, 1994, upon consideration of the foregoing Petition, and after hearing thereon, it is ORDERED that **·rumfl -.,,** . Esquire, attorney for the above named destitute defendant, who is char9ed with murder, be and is hereby authorized to employ a special investigator to assist him in the defense of said defendant, said expense to be an allowance charged. against the County of Philadelphia. Not to exceed $500.00. **Davis, J.** |
| 3-30-94 | D-6 | Petition For Leave To Employ **A** Psychiatrist, Filed. |
| 3-30-94 | D-7 | **ORDER.** AND NOW, this 23rd day Qf March 1994 upon consideration of the foregoing Petition, and after hearing thereon, it is **ORDERED** that . : -- ■ **b.** Esquire, attorney for the above named destitute defendant, who is charged with murder, be and is hereby authorized to employ a psychiatrist to assist him in the defense of said defendant, said expense to be an allowance charged against the County of Philadelphia. Not to exceed $1,000.00. **Davis, J.** |
| 4-5-94 | D-8 | Motion For Appointment Of Associate Counsel, Filed. |
| 4-5-94 | D-9 | AND NOW, this 29th day of· March, 1994, upon consideration and upon motion of **nau.11 ut:•9 · • .,** Esquire, attorney for defendant herein, it is hereby ORDERED AND DECREED: That, the motion is G "TED, and **r -** ;. **•MF.** Esquire is appointed as Associate Counsel in this matter. Davis, J. |
| 4-25-94 | | Status Listing. Time Ruled Excludable. Davis, J. |
| 5-6-94 | D-10 | omnibus Motion, Filed. |

:2

## 72.  **Commonwealth v. Derrick White**, CP-51-CR-0012991-2010

### a.  **Claim of Ineffectiveness**

After his capital conviction, Defendant filed a PCRA petition claiming that mitigation counsel provided ineffective assistance at the penalty phase.  Defendant's petition "raise[d] a single, limited ineffectiveness issue, related to penalty phase counsel's failure to present to the jury evidence in support of the age mitigator. Per Curiam Remand Order, 7/2/13, Commonwealth v. White, No. 663 CAP.

### b.  **Relief Received by the Defendant**

On remand, the trial court granted Defendant a new penalty phase hearing. Commonwealth v. White, (Memorandum Opinion), 1152 EDA 2015, at p.5.

### c.  **Outcome – *Aggravator quashed by resentencing court***

Thereafter, the court quashed the sole aggravating circumstance and sentenced Defendant to Life. White, *supra*, at p. 5.

### d.  **Duration of Litigation Prior to Resolution**

Arrest: July 22, 2010 – Resentenced: March 23, 2015 = **4 yrs, 8 mos, 1 d**

### e.  **Trial Counsel – *Court-Appointed***

Defendant was represented by trial counsel P and by mitigation counsel C. Both were court-appointed. Entry of Appearance, 8/24/10 (attached); Entry of Appearance, 2/17/11 (attached); CPCMS, Secure Dockets.

Commonwealth of Pennsylvania
Court of Common Pleas

**ENTRY OF APPEARANCE**

County of _____  _____ (/c?c.1,
_____  Judicial District

Docket No.  C:...('0'C..ti.._ C<,c.,,(1..'t7/-µ   / e,

**COMMONWEALTH OF PENNSYLVANIA**

v.

ft,<·1·4{/1   LJf:!1:-Tf.

Please enter my appearance for the defendant in the above-captioned case.

/ 7      fr6   .::>.u l/

**Dale**

Signature of Attorney for Defendant

Name and address of Attorney for Defendant:

Name:

Supreme Court ID No:

Firm:

Address;

Phone No:

Fax No: (optional)

Email Address: (optional)

☐ Court Appointed

*Check Applicable:*

D Privately Retained

D Public Defender

D Pro Bono Counsel

*[Philadelphia Use Only)*

Common Pleas Court Trial Division, Criminal Section

Common Pleas Court, Family Court Division
Philadelphia Municipal Court, Criminal Division   ☐

AOPC 2042 REV. 9/16/2009

Printed: 9/16/2009 '12: 3

Commonwealth of Pennsylvania

Court of _____ 

County or _____

_____ Judicial District

Docket No _____

To the Clerk of Court s:

t:ᴺTF \' OP APPE. RAJ c E

1IMON\JEALTH OF PEf\!t JSYLVLiNf!1,

[J)E/40e/\' lJ/f-ttE

_____ ee for Jhe defendant in the abova-- captioned case.

Signature of Attorney for Defendant

Date

Name and address of Attorney for Defendant

Name:

Supreme Court ID No:

Firm :

Address:

Phone No:

Fax No: (optional)

E97ail Addcesc.--; fep:i::na!)-          .::/

Ch:k Applicable:     rt _____ Appointed

    0    Privately Retained

    D    Public Defender

    D    Pro Bono Counsel

*[Philadelphia Use Only]*

Common Pleas Court Trial Division, Criminal Section

Common Pleas Court, Family Court Division

Phi!adel;:>hia t1unicpc;l Court, Crimina l Divisio

A-158

Pnntecl 212/2010 9 29 or.:.1.·i

## 73.   Commonwealth v. Christopher Williams, CP-51-CR-0417523-1992

### a.  Claim of Ineffectiveness

Defendant raised ineffectiveness claims after his capital conviction, based upon trial counsel's failure to investigate medical and forensic evidence. On Line Docket Entry, p.21, 1/3/13.

### b.  Relief Received by the Defendant

After an evidentiary hearing, the PCRA court determined that "trial counsel was ineffective for failing to investigate the medical and forensic evidence" and that "appellate counsel was ineffective for failing to raise this claim on appeal." Online Docket Entry, p.25, 12/30/13 *affirmed* Commonwealth v. Williams, 141 A.3d 440 (Pa. 2016).

### c.  Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth subsequently "withdrew the capital designation on this case". Online Docket Entry, p.32, 8/9/18.

### d.  Duration of Litigation Prior to Resolution

Arrest: March 11, 1992 – Capital Designation Withdrawn: August 9, 2018  = **26 yrs, 4 mos, 29 d**

### e.  Trial Counsel – *Court-Appointed*

Defendant was represented at trial by counsel EE. EE was court-appointed. Order of Appointment (attached). Defendant was represented by XX on direct appeal. XX was court-appointed. Commonwealth v. Williams, 720 A.2d 679, 682 (Pa. 1998);   Williams, 141 A.3d at 448; CPCMS, Secure Dockets.

THE COURT OF COMMON PLEAS OF PHILADELPHIA

☐ Trial Division          ☐ Family Court Division
   Criminal Section        ☐ Domestic Rel.        ☐ Juvenile   ☐ Women's   ☐ Misdemeanant
                                                              Criminal

IN .THE PHILADELPHIA MUNICIPAL COURT

D  Criminal .Ssc on

(.cmmontuealtb                    Date:        APRIL  6 , . 1992

11&.

MURDER

MC  9203-1193-1196

PP# 692468

CHRISTOPHER   WILLIAMS          THIS  APPCJINTHENT  IS  NOT TRANSFERABLE

:B  9 ,I-,I-,          w-       That on ———   17-TH        doy olf        : M RC H          i.D. 19    g

HON.  JUDGE MASSIAH-JACKSON   APPOINTED    : uan1111i1LSP} ,  ESQUIRE :

REflibllaiiili'dlt,c.

TO DEFEND .IN ACCORDANCE WITH LAW.

Court Cle

6•2.5 (Rev. 12/6')

**74.**   **Commonwealth v. Craig Williams, CP-51-CR-0525631-1987**

### a. Claim of Ineffectiveness

Defendant claimed that trial counsel provided ineffective assistance at the guilt and penalty phases of his trial.  Commonwealth v. Williams, 980 A.2d 510, 533 (Pa. 2009) (Saylor, J. dissenting).

### b. Relief received by Defendant

At the PCRA stage, the Commonwealth consented to the grant of a new capital penalty hearing.  Williams, 980 A.2d at 513.

### c. Outcome - *Commonwealth Agreement to a Different Sentence*

The Commonwealth did not seek a new penalty hearing and the Homicide Calendar Judge resentenced Defendant to Life.  Online Docket Entry, p.17, 5/1/12.

### d. Duration of Litigation Prior to Resolution

Arrest: April 25, 1987 – Resentenced: May 1, 2012 = **25 yrs, 6 d**

### e. Trial Counsel - *Not court-appointed*

Defendant was represented by M.   Commonwealth's Motion to Dismiss PCRA Petition, at p.1.  M was privately retained. Williams, 980 A.2d at 533 (Saylor, J. dissenting) ("Pervading several of Appellant's claims is the allegation that his trial counsel conducted no investigation of guilt or penalty, but rather, focused his efforts on the extraction of fees from those concerned about Appellant").

# PART I, SECTION A, SUBSECTION TWO

### PHILADELPHIA DEATH SENTENCES
### OVERTURNED DUE TO INEFFECTIVE ASSISTANCE
### WHERE THE DEFENDANT HAD COURT-APPOINTED COUNSEL

Part I, Section A, Subsection Two lists the IAC cases where court-appointed trial counsel—i.e. an attorney selected by the Philadelphia Court of Common Pleas for an indigent defendant—represented the accused at trial. Court-appointed counsel represented the defendants in **58 (78%)** of the 74 cases where the defendant received post-conviction relief due to ineffective assistance.

The same information regarding whether counsel was court-appointed appears in the preceding list of 74 IAC cases (Part I, Section A, Subsection One). That information is separately detailed here, for ease of reference.

Each case is listed by the defendant's name, Common Pleas Court docket number, and by the number assigned to it in Part I, Section A, Subsection One.

**1.**    (1) <u>**Comm. v. Lawrence Baker**</u>**, CP-51-CR-0629891-1981**

Trial counsel was court-appointed. <u>Commonwealth v. Baker</u>, 511 A.2d 777, 787, 780-781 (Pa. 1986).

**2.**    (2) <u>**Comm. v. Lee Baker**</u>**, CP-51-CR-0405062-1984**

Trial counsel was court-appointed. <u>Docket Entries</u>, at p.3; <u>Conversation with counsel</u>.

**3.**     (3) <u>**Comm. v. Billa,**</u> **CP-51-CR-0136311-1987**

Trial counsel was court-appointed. <u>Defendant's Motion for Post-Conviction Relief</u>, 6/13/12, at p.5; <u>Docket Entry</u>, 4/13/87; <u>Petition for Leave to Withdraw as Counsel</u>, at p.1.

**4.**     (4) <u>**Comm. v. John M. Blount,**</u> **CP-51-CR-0124901-1990**

Trial counsel was court-appointed. <u>Order</u>, 2/9/90, Clarke, J.

**5.**     (5) <u>**Comm. v. Aquil Bond,**</u> **CP-51-CR-0502971-2004**

Trial counsel was court-appointed. (N.T. 3/18/14 at 70-71); <u>CPCMS, Secure Dockets</u>.

**6.**     (6) <u>**Commonwealth v. Jesse Bond,**</u> **CP-51-CR-2217781-1992**

Trial counsel was court-appointed. <u>Bond v. Beard</u>, 539 F.3d 256, 281 (3d Cir. 2008).

**7.**     (7) <u>**Comm. v. Billy Brooks,**</u> **CP-51-CR-0128471-1991**

Trial counsel was court-appointed. <u>Commonwealth v. Brooks</u>, 839 A.2d 245, 247 (Pa. 2003).

**8.**     (8) <u>**Comm. v. Samuel Carson,**</u> **CP-51-CR-0228371-1994**

Trial counsel was court-appointed. <u>Post-Sentence Motion</u>, 7/16/95, at p.1

**9.**     (9) <u>**Comm. v. Ronald Clark,**</u> **CP-51-CR-1241151-1993**

Trial counsel was court-appointed. *See* <u>Motion for Withdrawal of Counsel</u>; <u>Correspondence</u>, 11/30/93.

**10.**     (11) <u>**Comm. v. Ronald Collins,**</u> **CP-51-CR-0614771-1992**

Trial counsel was court-appointed. <u>Docket Entry</u>, 10/17/94; <u>CPCMS, Secure Dockets</u>.

**11.**     (12) <u>**Comm. v. Robert Cook**</u>**, CP-51-CR-0826512-1987**

Trial counsel was court-appointed. <u>Commonwealth v. Cook</u>, 952 A.2d 594, 616 (2008).

**12.**     (13) <u>**Comm. v. Bernard Cousar**</u>**, CP-51-CR-0607431-1999**

Trial counsel was court-appointed. <u>Commonwealth v. Cousar</u>, 154 A.3d 287, 293 (Pa. 2017); <u>PCRA Court Opinion</u>, p.1 n.1.

**13.**     (14) <u>**Comm. v. Dewitt Crawley**</u>**, CP-51-CR-0201551-1984**

Trial counsel was court-appointed.   <u>Commonwealth v. Crawley</u>, 526 A.2d 334, 346 (Pa. 1987); <u>Docket Entry</u>, 9/10/84.

**14.**     (15) <u>**Comm. v. Junious Diggs**</u>**, CP-51-CR-0709781-2002**

Trial counsel was court-appointed. <u>CPCMS, Secure Dockets</u>.

**15.**     (17) <u>**Comm. v. Joseph Elliott**</u>**, CP-51-CR-0410911-1994**

Trial counsel was court-appointed. <u>Commonwealth v. Elliott</u>, 80 A.3d 415, 422 (Pa. 2013); <u>CPCMS, Secure Dockets</u>.

**16.**     (18) <u>**Comm. v. Henry Fahy**</u>**, CP-51-CR-0222831-1981**

Trial counsel was court-appointed. <u>Commonwealth v. Fahy</u>, 516 A.2d 689, 696 (Pa. 1986); (N.T. 1/20/83 at 187).

**17.**     (19) <u>**Comm. v. Lester Fletcher**</u>**, CP-51-CR-0709931-2001**

Trial counsel was court-appointed.   <u>Online Docket Entry</u>, p.6, 10/24/01; <u>Commonwealth v. Fletcher</u>, 861 A.2d 898, 914 (Pa. 2004).

**18.**     (20) <u>**Comm. v. Kenneth Ford**</u>**, CP-51-CR-1032221-1989**

Trial counsel was court-appointed. <u>Order of Appointment</u>.

**19.** (21) **Comm. v.William Gribble, CP-51-CR-1220811-1992**

Trial counsel was court-appointed. <u>Commonwealth's Motion to Dismiss PCRA Petition</u> ("Defendant was represented at trial by [court-appointed counsel]); <u>CPCMS, Secure Dockets</u>.

**20.** (22) **Comm. v. Donald Hall, CP-51-CR-0210711-1982**

Trial counsel was court-appointed. <u>Commonwealth v. Hall</u>, 1993 WL 1156097 at *623.

**21.** (23) **Comm. v. Ronald Hanible, CP-51-CR-0409021-1999**

Trial counsel was court-appointed. <u>Secure Docket Entry</u>, p.9.

**22.** (24) **Comm. v. John Harris, CP-51-CR-0903421-1992**

Trial counsel was court-appointed. <u>Commonwealth v. Harris</u>, 703 A.2d 441, 447 n.11 (Pa. 1997); <u>Docket Entry</u>.

**23.** (25) **Comm. v. Donetta Hill, CP-51-CR-0518391-1991**

Trial counsel was court-appointed. <u>Commonwealth v. Hill</u>, 16 A.3d 484, 486 (Pa. 2011); <u>Hill v. Wetzel</u>, 279 F. Supp. 3d 550, 566 (E.D. Pa. 2016).

**24.** (26) **Comm. v. William Holland, CP-51-CR-1014291-1984**

Trial counsel was court-appointed. <u>Holland v. Horn</u>, 150 F. Supp. 2d 706, 713 (E.D. Pa. 2001); (N.T. 6/5/85 at 1.2).

**25.** (28) **Comm. v. Steven Hutchinson, CP-51-CR-0408581-1998**

Trial counsel was court-appointed. <u>Commonwealth v. Hutchinson</u>, 25 A.3d 277, 286 (Pa. 2011).

**26.** (29) **Comm. v. Kareem Johnson, CP-51-CR-1300424-2006**

Trial counsel was court-appointed. <u>PCRA Petition</u>, 8/15/14 at 5.

**27.**   (30) **Comm. v. William Johnson, CP-51-CR-0936052-1991**

Trial counsel was court-appointed. Commonwealth v. Johnson, 668 A.2d 97, 104 n.17 (Pa. 1995).

**28.**   (34) **Comm. v. Alexander Keaton, CP-51-CR-0319251-1993**

Trial counsel was court-appointed. Commonwealth v. Keaton, 45 A.3d 1050, 1087 (Pa. 2012).

**29.**   (37)   **Comm. v. Robert Lark, CP-51-CR-0120121-1980**

Trial counsel was court-appointed.   Lark v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 596, 599 (3d Cir. 2011); Affidavit of Trial Counsel.

**30.**   (38) **Comm. v. Reginald Lewis, CP-51-CR-0205851-1983**

Trial counsel was court-appointed. Commonwealth v. Lewis, 567 A.2d 1376, 1378 (Pa. 1989); Commonwealth v. Lewis, 743 A.2d 907, 909 (Pa. 2000).

**31.**   (40)   **Comm. v. Bernard McGill, CP-51-CR-0339201-1990**

Trial counsel was court-appointed.   Commonwealth v. McGill, 832 A.2d 1014, 1017 (Pa. 2003).

**32.**   (41) **Comm. v. Nathaniel McNair, CP-51-CR-1224591-1987**

Trial counsel was court-appointed.   Commonwealth v. McNair, 603 A.2d 1014, 1015 (Pa. 1992); ("Cover Page, N.T. 11/22/88).

**33.**   (42) **Comm. v. Christopher McNeil, CP-51-CR-0500461-1991**

Trial counsel was court-appointed.   Court-Appointed Counsel's Petition to Withdraw.

**34.**   (43) **Comm. v. William Mikell, CP-51-CR-0716051-1987**

Trial counsel was court-appointed. Bill of Information.

**35.**   (44) <u>**Comm. v. Mikal Moore**</u>**, CP-51-CR-0701141-1998**

Trial counsel was court-appointed. <u>Brief for Appellee</u>, No. 396 Capital Appeal Docket, at p.4; <u>CPCMS, Secure Dockets</u>.

**36.**   (45) <u>**Comm. v. Salvador Morales**</u>**, CP-51-CR-1012921-1982**

Trial counsel was court-appointed.  <u>Bill of Information</u>; <u>Commonwealth v. Morales</u>, <u>Brief for Appellant</u>, 1995 WL 17019887 (Pa.), at p.2.

**37.**   (47) <u>**Comm. v. Kelvin Morris**</u>**, CP-51-CR-0704091-1982**

Trial counsel was court-appointed. <u>Morris v. Beard</u>, 633 F.3d 185, 189 (3d Cir. 2011).

**38.**   (51) <u>**Comm. v. Lamont Overby**</u>**, CP-51-CR-1006081-1996**

Trial counsel was court-appointed. (N.T. 7/17/98, 8-9).

**39.**   (52) <u>**Comm. v. Kevin Pelzer**</u>**, CP-51-CR-1031752-1988**

Trial counsel was court-appointed. <u>Commonwealth v. Daniels</u>, 104 A.3d 267, 276 (Pa. 2014).

**40.**   (53) <u>**Comm. v. Curry Perry**</u>**, CP-51-CR-0418121-1989**

Trial counsel was court-appointed. <u>Commonwealth v. Perry</u>, 644 A.2d 705, 707 (Pa. 1994).

**41.**   (54) <u>**Comm. v. Otis Peterkin**</u>**, CP-51-CR-0207841-1982**

Trial counsel was court-appointed. <u>Peterkin v. Horn</u>, 176 F. Supp. 2d 342, 349 (E.D. Pa. 2001).

**42.**   (55) <u>**Comm. v. Michael Rainey**</u>**, CP-51-CR-0419613-1990**

Trial counsel was court-appointed.   <u>Commonwealth v. Rainey</u>, <u>Brief for Appellant</u>, 2006 WL 2643352 (Pa.), 5.

**43.**   (56) <u>**Comm. v. Wilfredo Ramos,**</u> **CP-51-CR-0100891-1999**

Trial counsel was court-appointed. <u>Commonwealth v. Ramos</u> (PCRA) (N.T. 9/25/08 at 18).

**44.**   (57) <u>**Comm. v. Lloyd Reid,**</u> **CP-51-CR-0405461-1991**

Trial counsel was court-appointed. <u>Defendant's Post-Sentence Motion</u>.

**45.**   (58) <u>**Comm. v. Timothy Rice,**</u> **CP-51-CR-0906231-1996**

Counsel was court-appointed.   <u>Commonwealth Motion to Dismiss PCRA Petition</u>, at p.5.

**46.**   (59) <u>**Comm. v. Delores Rivers,**</u> **CP-51-CR-0335191-1988**

Trial counsel was court-appointed.  <u>Online Docket Entry</u>, 10/17/91.

**47.**   (60)  <u>**Comm. v. Florencio Rolan,**</u> **CP-51-CR-0228931-1984**

Trial counsel was court-appointed. <u>Rolan v. Coleman</u>, 680 F.3d 311, 315 (3d Cir. 2012); <u>Rolan v. Vaughn</u>, <u>Brief for Appellant</u> (Commonwealth), 2004 WL 5026812 (3d Cir.).

**48.**   (61) <u>**Comm. v. Saharris Rollins,**</u> **CP-51-CR-0405851-1986**

Trial counsel was court-appointed.   <u>Commonwealth's Brief for Appellee</u>, 1999 WL 33657491 (Pa.), p.17; <u>Statement of Matters Complained of on Appeal</u>.

**49.**   (62) <u>**Comm. v. James Melvin Smith,**</u> **CP-51-CR-0717891-1983**

Trial counsel was court-appointed. <u>Commonwealth v. Smith</u>, 17 A.3d 873, 881 (Pa. 2011); <u>Commonwealth v. Smith</u>, 540 A.2d 246, 247 (Pa. 1988); <u>Cover Page, N.T. 9/22/83</u>.

**50.**   (63) <u>**Comm. v. Willie Sneed,**</u> **CP-51-CR-0606741-1984**

Trial counsel was court-appointed. <u>Commonwealth v. Sneed</u>, 526 A.2d 749, 751 (Pa. 1987); <u>Commonwealth Brief for Appellee</u>, 601 Capital Appeal Docket, at

p.6; Cover Page, Trial Transcript, ("APPEARANCES [Court-Appointed Counsel] for Defendant Sneed").

**51.** (64) **Comm. v. Brian Thomas, CP-51-CR-0827161-1985**

Trial counsel was court-appointed. Thomas v. Beard, 388 F. Supp. 2d 489, 493 (E.D. Pa. 2005).

**52.** (66) **Comm. v. Michael Thomaston, CP-51-CR-0400541-1995**

Trial counsel was court-appointed. Docket Entry.

**53.** (67) **Comm. v. Andre Thompson, CP-51-CR-0221931-1993**

Trial counsel was court-appointed. Bill of Information; (N.T. 10/14/93 at 1).

**54.** (68) **Comm. v. Louis Thompson, CP-51-CR-0436071-1990**

Trial counsel was court-appointed.   Bill of Information; Order Vacating Homicide Appointment.

**55.** (69) **Comm. v. William Tilley, CP-51-CR-1210781-1985**

Trial counsel was court-appointed.  (N.T. 5/7/07 at 7); Conversation with Trial Counsel.

**56.** (71) **Comm. v.Vinson Washington, CP-51-CR-0310321-1994**

Trial counsel was court-appointed. Court Order, 3/30/94.

**57.** (72) **Comm. v. Derrick White, CP-51-CR-0012991-2010**

Trial counsel was court-appointed. Entry of Appearance, 8/24/10; Entry of Appearance, 2/17/11.

**58.** (73) **Comm. v. Christopher Williams, CP-51-CR-0417523-1992**

Trial counsel was court-appointed. Order of Appointment; Commonwealth v. Williams, 720 A.2d 679, 682 (Pa. 1998); Commonwealth v. Williams, 141 A.3d 440, 448 (Pa. 2016).

## PART I, SECTION A, SUBSECTION THREE

## IAC CASES REQUIRING PENALTY PHASE RELIEF BECAUSE COUNSEL FAILED TO PREPARE AND PRESENT CONSTITUTIONALLY ACCEPTABLE MITIGATION

Part I, Section A, Subsection Three lists the IAC cases where a reviewing court ordered a new penalty phase, specifically because counsel failed to prepare and present mitigation evidence. **38 (51%)** of the 74 IAC determinations were based upon counsel's failure to prepare a constitutionally adequate mitigation presentation.

The defendant had court-appointed counsel in **31 (82%)** of the 38 IAC cases where counsel failed to prepare and present available mitigation.

This list designates each case by the Defendant's name, the Common Pleas Court Docket Number, and the number assigned to the case in Part I, Section A (listing Philadelphia death sentences overturned due to ineffective assistance of counsel). The same information regarding whether counsel failed to prepare adequate mitigation appears in the preceding list of 74 IAC cases (Part I, Section A, Subsection One). That information is separately detailed here, for ease of reference.

### 1.      (5) <u>Commonwealth v. Aquil Bond</u>, CP-51-CR-0502971-2004

The PCRA court granted summary relief based on court-appointed penalty phase counsel's failure to prepare and present available mitigation evidence. (N.T. 3/18/14 at 70-71) ("I see absolutely no way in which, that counsel's woefully deficient performance at the penalty phase hearing can possibly stand").

Defendant's penalty phase counsel was court-appointed. (N.T. 3/18/14 at 70-71); <u>CPCMS, Secure Dockets</u>.

A-170

### 2. (6) **Commonwealth v. Jesse Bond**, CP-51-CR-2217781-1992

The Third Circuit concluded that trial counsel provided ineffective assistance by failing to prepare for Defendant's penalty phase. Bond v. Beard, 539 F.3d 256, 291 (3d Cir. 2008) ("Counsel performed an inadequate and tardy investigation into [Defendant's] childhood").

Defendant was represented by court-appointed counsel. Bond, 539 F.3d at 281.

### 3. (8) **Commonwealth v. Samuel Carson**, CP-51-CR-0228371-1994

After the Supreme Court remanded this matter to the PCRA court for an evidentiary hearing concerning Defendant's claim that trial and appellate counsel were ineffective in failing to investigate and present mitigation evidence, the Commonwealth stipulated that penalty phase relief. Commonwealth v. Carson, 913 A.2d 220, 267-268 (Pa. 2006); Commonwealth Response to Petition for Writ of habeas Corpus, No. 11-1845, at p.8 ("the Commonwealth agreed to relief on the claim of counsel ineffectiveness").

Defendant was represented by court-appointed counsel. Post-Sentence Motion, 7/16/95, at p.1; CPCMS, Secure Dockets.

### 4. (9) **Commonwealth v. Ronald Clark**, CP-51-CR-1241151-1993

The PCRA court granted Defendant's request for a new penalty hearing based on trial counsel's ineffectiveness in failing to present additional mitigation evidence. The Commonwealth did not appeal this order. Commonwealth v. Clark, 961 A.2d 80, 83 (Pa. 2008).

Defendant was represented by court-appointed counsel. Clark v. Beard, 2015 WL 7294971, at *3; Motion for Withdrawal of Counsel.

### 5. (11) **Commonwealth v. Ronald Collins**, CP-51-CR-0614771-1992

The Supreme Court affirmed the PCRA court's decision granting penalty phase relief due to counsel's failure to present mitigating evidence. Commonwealth v. Collins, 888 A.2d 564, 583 (Pa. 2005) ("[W]e agree with the PCRA court's determination that counsel did not conduct a reasonable investigation to uncover the relevant mitigating evidence").

Defendant was represented by court-appointed counsel. <u>Docket Entry</u>, 10/17/94; <u>CPCMS, Secure Dockets</u>.

**6.** (13) **<u>Commonwealth v. Bernard Cousar</u>, CP-51-CR-0607431-1999**

The parties agreed appellant was entitled to a new penalty hearing due to counsel's failure to prepare and present mitigation evidence <u>Commonwealth v. Cousar</u>, 154 A.3d 287, 293 (Pa. 2017); <u>On Line Docket Entry</u>, p.10, 11/20/14.

Defendant was represented by court-appointed counsel. <u>Cousar</u>, 154 A.3d at 293; <u>PCRA Court Opinion</u>, Sarmina, J., p.1 n.1.

**7.** (16) **<u>Comm. v. Daniel Dougherty</u>, CP-51-CR-0705371-1999**

The Commonwealth agreed not to contest Defendant's claim that trial counsel was ineffective at the penalty phase "for failure to investigate and present certain mitigation evidence". <u>Online Docket Entry</u>, p.23, 2/7/12.

Trial counsel was *not* court-appointed and was apparently *pro bono*. *See* <u>Bill of Information</u>.

**8.** (17) **<u>Commonwealth v. Joseph Elliott</u>, CP-51-CR-0410911-1994**

The Commonwealth agreed not to oppose Defendant claim that trial counsel provided ineffective assistance at the penalty phase because of "the failure to produce mental health testimony." <u>Commonwealth v. Elliott</u>, 80 A.3d 415, 424 n.5 (Pa. 2013).

Defendant was represented by court-appointed counsel. <u>Elliott</u>, 80 A.3d at 422; <u>CPCMS, Secure Dockets</u>.

**9.** (18) **<u>Commonwealth v. Henry Fahy</u>, CP-51-CR-0222831-1981**

The Federal Court granted penalty phase relief because of counsel's failure to develop and present mitigation evidence and for suggesting to the jury that Defendant might someday be released. <u>Fahy v. Horn</u>, 2014 WL 4209551, at *1.

Defendant was represented by court-appointed counsel. <u>Commonwealth v. Fahy</u>, 516 A.2d 689, 696 (Pa. 1986). This was counsel's first capital case.

Commonwealth v. Ramos, CP-51-CR-0100891-1999, N.T. 9/25/08 at 17.
Defendant also represented by [court-appointed counsel] (N.T. 1/20/83 at 187).

### 10.    (19) <u>**Commonwealth v. Lester Fletcher**</u>, CP-51-CR-0709931-2001

With the Commonwealth's agreement, the PCRA court granted penalty phase relief on Defendant's claim of "ineffective assistance of counsel for failure to investigate, develop and present mitigating evidence at his penalty hearing." <u>Online Docket Entry</u>, p. 11, 2/7/11.

Defendant was represented by court-appointed mitigation counsel. <u>Online Docket Entry</u>, p.6, 10/24/01; <u>Commonwealth v. Fletcher</u>, 861 A.2d 898, 914 (Pa. 2004).

### 11.    (20) <u>**Commonwealth v. Kenneth Ford**</u>, CP-51-CR-1032221-1989

The Supreme Court granted penalty phase relief based upon counsel's failure to investigate and present evidence of mitigation. <u>Commonwealth v. Ford</u>, 809 A.2d 325, 331 (Pa. 2002) ("During Appellant's penalty phase in the instant case, trial counsel presented virtually no evidence of mitigating circumstances").

Defendant was represented by court-appointed counsel. <u>Order of Appointment</u>.

### 12.    (21) <u>**Commonwealth v. William Gribble**</u>, CP-51-CR-1220811-1992

The Supreme Court remanded for an evidentiary hearing on Defendant's ineffective assistance claims. <u>Gribble</u>, 863 A.2d at 476 (noting that "[t]he family member witnesses whom counsel is faulted for failing to have interviewed and presented at the penalty phase are the sort of witnesses whose existence should have been readily apparent or discoverable to any counsel who conducted a reasonable investigation"). On remand, the PCRA court granted Defendant a new sentencing hearing.

Defendant was represented by court-appointed counsel. <u>Commonwealth's Motion to Dismiss PCRA Petition</u> ("Defendant was represented at trial by [court-appointed counsel]"). <u>CPCMS, Secure Dockets</u>.

A-173

### 13.    (23) **Commonwealth v. Ronald Hanible, CP-51-CR-0409021-1999**

The Commonwealth agreed that "a new penalty hearing was warranted due to trial counsel's failure to present available mitigating evidence." Commonwealth v. Hanible, 30 A.3d 426, 438 (Pa. 2011).

Defendant was represented by court-appointed counsel. Secure Docket Entry, p.9.

### 14.    (24) **Commonwealth v. John Harris, CP-51-CR-0903421-1992**

Defendant claimed that counsel provided ineffective assistance during the penalty phase and the PCRA court granted relief. The Commonwealth did not appeal the PCRA court's decision. Commonwealth v. Harris, 852 A.2d 1168, 1170, 1171 n.6 (Pa. 2004).

Defendant was represented by court-appointed counsel. Commonwealth v. Harris, 703 A.2d 441, 447 (Pa. 1997); Docket Entry.

### 15.    (25) **Commonwealth v. Donetta Hill, CP-51-CR-0518391-1991**

The federal district court granted penalty phase relief because "[i]n clear contravention of prevailing professional norms at the time of trial, Petitioner's trial attorney did not conduct a social history investigation." Hill v. Wetzel, 279 F. Supp. 3d 550, 566 (E.D. Pa. 2016).

Defendant was represented by court-appointed counsel. Commonwealth v. Hill, 16 A.3d 484, 486 (Pa. 2011); Hill, 279 F. Supp. 3d at 556.

### 16.    (26) **Commonwealth v. William Holland, CP-51-CR-1014291-1984**

The federal court determined that Defendant was denied his 5th Amendment right to a court-appointed defense expert for help in developing defenses in support of mitigation at the penalty phase. Holland v. Horn, 150 F. Supp. 2d 706, 749 (E.D. Pa. 2001), *aff'd*, 519 F.3d 107 (3d Cir. 2008).

Defendant was represented by court-appointed counsel. Holland, 150 F. Supp. 2d at 713; (N.T. 6/5/85 at 1.2).

A-174

**17.**   **(27)**   **Comm. v. Arnold Holloway,** CP-51-CR-0613051-1985

The federal district court determined that Defendant's counsel "provided ineffective assistance in failing to investigate mental-health issues and request the assistance of a mental-health expert." Holloway v. Horn, 161 F. Supp. 2d 452, 573-574 (E.D. Pa. 2001); Holloway v. Horn, 355 F.3d 707, 713 (3rd Cir. 2004).

Trial counsel was not court-appointed. Holloway, 355 F.3d at 722.

**18.**   **(31)**   **Commonwealth v. Damon Jones,** CP-51-CR-0907121-1982

The PCRA court concluded that "there was substantial information available at the time of trial that trial counsel should have investigated and that would have supported the statutory mitigating circumstances." . Commonwealth v. Jones, 912 A.2d 268, 292 (Pa. 2006).

Trial counsel was *not* court appointed. Jones, 912 A.2d at 291. ("Jones' trial counsel, [Court-Appointed Counsel], called no witnesses and presented no evidence at Jones' penalty hearing").

**19.**   **(32)**   **Commonwealth v. James Jones,** CP-51-CR-1024861-1980

Defendant claimed trial counsel provided ineffective assistance when he failed to object to the inclusion of an uncharged aggravating circumstance and failed to investigate and prepare a mitigation presentation. The PCRA court awarded penalty phase relief and denied all guilt phase relief. Commonwealth v. Jones, 876 A.2d 380, 383 (Pa. 2005).

Trial counsel was *not* court-appointed. Docket Entry, 5/28/81.

**20.**   **(34)**   **Comm. v. Alexander Keaton,** CP-51-CR-0319251-1993

The PCRA court granted penalty phase relief and the Pennsylvania Supreme Court affirmed. Commonwealth v. Keaton, 45 A.3d 1050, 1091 (Pa. 2012) ("[W]e agree with the PCRA court that trial counsel's investigation regarding penalty phase mitigating evidence fell below the standard expressed in Williams and Wiggins").

Defendant was represented by court-appointed counsel. Keaton, 45 A.3d at 1070, 1087.

A-175

### 21.    (38) **Commonwealth v. Reginald Lewis**, CP-51-CR-0205851-1983

The federal district court concluded that counsel provided ineffective assistance at the penalty phase. Lewis v. Horn, 2006 WL 2338409, at *11 (E.D. Pa. Aug. 9, 2006) ("The fact that trial counsel failed to present any evidence whatsoever in mitigation leads inexorably to the conclusion that he failed to make any reasonable effort to uncover such evidence"). After the Third Circuit remanded the case for an evidentiary hearing, the Commonwealth notified the district court that it would not contest the grant of conditional relief as to Lewis's death sentence. Order, Lewis v. Horn, 00-cv-802 (E.D. Pa. July 26, 2011), ECF No. 80.

Defendant was represented by court-appointed counsel. Commonwealth v. Lewis, 567 A.2d 1376, 1378 (Pa. 1989); Commonwealth v. Lewis, 743 A.2d 907, 909 (Pa. 2000).

### 22.    (39) **Commonwealth v. Steven McCrae**, CP-51-CR-0204521-1999

After Defendant filed a PCRA petition claiming that trial counsel was ineffective for failing to investigate and present mitigation evidence, The Commonwealth "agreed that [the PCRA] Court may vacate [Defendant's] two death sentences and impose two consecutive life sentences." Written Agreement Colloquy, at p.2.

Trial counsel was *not* court-appointed. Bill of Information.

### 23.    (40) **Commonwealth v. Bernard McGill**, CP-51-CR-0339201-1990

Defendant claimed "that trial counsel was ineffective for failing to investigate fully, possible mitigating circumstances for his penalty phase." Commonwealth v. McGill, 832 A.2d 1014, 1025-1026 (Pa. 2003). After the Supreme remanded the matter for an evidentiary hearing regarding Defendant's penalty phase claims, the Commonwealth agreed to a life sentence. Online Docket Entry, p.15, 1/7/13.

Defendant was represented by court-appointed counsel. McGill, 832 A.2d at 1017; CPCMS, Secure Dockets.

### 24.    (47) **Commonwealth v. Kelvin Morris**, CP-51-CR-0704091-1982

The federal court concluded that "defense counsel's failure to conduct a reasonable investigation of mitigating evidence in anticipation of [Defendant's]

capital sentencing hearing, failure to present available mitigating evidence at that hearing, and failure to make a sufficient argument at that hearing violated [Defendant's] Sixth Amendment right to effective assistance of counsel." Morris v. Beard, 2012 WL 4757868, at *1.

Defendant was represented by court-appointed counsel. Morris v. Beard, 633 F.3d 185, 189 (3d Cir. 2011).

### 25.   (50) **Comm. v. Kelley O'Donnell, CP-51-CR-1220812-1992**

The Supreme Court granted penalty phase relief due to the inadequacy of the colloquy that preceded Defendant's sentencing hearing. The Court also noted that "the record raises serious doubts regarding counsel's effectiveness during the penalty phase." Commonwealth v. O'Donnell, 740 A.2d 198, 214 n.13 (Pa. 1999) (criticizing trial counsel's failure to "present or argue any further evidence of mitigation even though the record itself indicates that other evidence of mitigation was available and known to counsel").

Trial Counsel was *not* court-appointed. Defendant was represented by Steven Sigal, Esquire. O'Donnell v. Lamas, 2012 WL 7018079, at *1 (E.D. Pa. Feb. 1, 2012).

### 26.   (52) **Commonwealth v. Kevin Pelzer, CP-51-CR-1031752-1988**

The Supreme Court determined that trial counsel's mitigation representation at the penalty phase was deficient. Commonwealth v. Daniels, 104 A.3d 267, 302 (Pa. 2014) ("[W]e conclude that the PCRA court did not err in holding that … trial counsel's penalty phase performance … in ascertaining and presenting mitigation evidence was deficient").

Defendant was represented by court-appointed counsel. Commonwealth v. Daniels, 104 A.3d 267, 276 (Pa. 2014).

### 27.   (53) **Commonwealth v. Curry Perry, CP-51-CR-0418121-1989**

The Supreme Court concluded that Defendant received ineffective assistance that entitled him to a new trial, in part because counsel's "unawareness that he was defending a capital case, and failure to prepare for the death penalty hearing"). Commonwealth v. Perry, 644 A.2d 705, 709 (Pa. 1994).

Defendant was represented by court-appointed counsel. <u>Perry</u>, 644 A.2d at 707.

## 28.   (55) **<u>Commonwealth v. Michael Rainey</u>, CP-51-CR-0419613-1990**

Defendant claimed that appellate counsel was ineffective for failing to raise trial counsel's failure to investigate and present mitigating evidence. <u>Commonwealth v. Rainey</u>, 928 A.2d 215, 237-238 (Pa. 2007). The Supreme Court determined that there was mitigation evidence that trial counsel failed to present and remanded for an evidentiary hearing. <u>Rainey</u>, 928 A.2d at 240-241.

Defendant was represented by court-appointed counsel. <u>Commonwealth v. Rainey</u>, <u>Brief for Appellant</u>, 2006 WL 2643352 (Pa.), 5.; <u>CPCMS, Secure Docket</u>.

## 29.   (56) **<u>Commonwealth v. Wilfredo Ramos</u>, CP-51-CR-0100891-1999**

The PCRA court vacated Defendant's death sentence "based upon the Commonwealth's agreement not to contest [Defendant]'s request for a new penalty hearing based upon ineffective assistance of trial counsel at the penalty hearing for failure to investigate and present certain mitigation evidence." <u>Commonwealth v. Ramos</u>, 2017 WL 4286386, at *7.

Defendant was represented by court-appointed counsel. <u>Commonwealth v. Ramos</u> (PCRA) (N.T. 9/25/08 at 18).

## 30.   (59) **<u>Commonwealth v. Delores Rivers</u>, CP-51-CR-0335191-1988**

The federal district court vacated Defendant's sentence and granted penalty phase relief on Claim IX of Defendant's petition, which alleged that "trial counsel was ineffective at the penalty phase in failing to investigate and present mitigating evidence." <u>Federal Docket Entry</u>, 5/10/05; <u>Commonwealth's Memorandum of Law, Rivers v. Horn</u>, 02-cv-1600.

Defendant was represented by court-appointed counsel. <u>Docket Entry</u>, 10/17/91.

**31.**   (61) <u>**Commonwealth v. Saharris Rollins**</u>, CP-51-CR-0405851-1986

The Third Circuit granted penalty phase relief. <u>Rollins v. Horn</u>, 386 F.App'x 267, 270 (3d Cir. 2010) ("Rollins' attorney performed deficiently by failing to adequately investigate and present evidence of mitigating circumstances").

Defendant was represented by court-appointed counsel. <u>Commonwealth v. Rollins</u>, <u>Commonwealth's Brief for Appellee</u>, 1999 WL 33657491 (Pa.), p.17.; <u>Statement of Matters Complained of on Appeal</u>.

**32.**   (63) <u>**Commonwealth v. Willie Sneed**</u>, CP-51-CR-0606741-1984

The Supreme Court affirmed the granting of penalty phased relief. <u>Commonwealth v. Sneed</u>, 899 A.2d 1067, 1084 (Pa. 2006) ("We are satisfied that if the jury had heard testimony and argument regarding the mitigation evidence presented by appellee at the PCRA hearing, there is a reasonable probability that at least one juror would have struck a different balance and voted not to impose the death penalty").

Defendant was represented by court-appointed counsel. <u>Commonwealth v. Sneed</u>, 526 A.2d 749, 751 (Pa. 1987); <u>Commonwealth Brief for Appellee</u>, 601 Capital Appeal Docket, at p.6.; <u>Statement of Matters Complained of on Appeal</u>.

**33.**   (64) <u>**Commonwealth v. Brian Thomas**</u>, CP-51-CR-0827161-1985

The Third Circuit remanded the matter for an evidentiary hearing. <u>Thomas v. Horn</u>, 570 F.3d 105, 130 (3d Cir. 2009) (noting that "there exists a reasonable probability that effective counsel would have chosen to present evidence of Thomas' mental health history, and that its presentation would have convinced at least one juror to sentence Thomas to life imprisonment"). On remand, the Commonwealth notified the court that it would no longer contest the grant of conditional relief as to Thomas's death sentence. <u>Thomas v. Horn</u>, 00-cv-803-CMR (E.D. Pa. Dec. 20, 2011), ECF No. 98.

Defendant was represented by court-appointed counsel. <u>Thomas v. Beard</u>, 388 F. Supp. 2d 489, 493 (E.D. Pa. 2005) ("[Defendant] was represented by court-appointed counsel").

A-179

### 34.   (65) **Commonwealth v. LeRoy Thomas,** CP-51-CR-1207001-1994

At the PCRA hearing, the Commonwealth conceded that Defendant received ineffective assistance at the penalty phase. (N.T. 9/18/07 at 4-5).

Trial counsel was *not* court-appointed. (N.T. 5/9/95 at 1).

### 35.   (68) **Commonwealth v. Louis Thompson,** CP-51-CR-0436071-1990

At the PCRA stage, the Commonwealth agreed that Defendant received ineffective assistance at his penalty phase. <u>Online Docket Entry</u>, 5/21/04 ("Commonwealth is in agreement with petitioner's PCRA claims <u>AS TO PENALTY PHASE ONLY</u>") (emphasis in original).

Defendant was represented by court-appointed counsel. <u>Bill of Information</u>; <u>Order Vacating Homicide Appointment</u>.

### 36.   (69) **Commonwealth v. William Tilley,** CP-51-CR-1210781-1985

At the PCRA stage, the Commonwealth agreed that Defendant was entitled to a new penalty phase. (N.T. 5/1/07 at 7-8) ("[T]he Commonwealth determined that it was appropriate to agree to a new penalty phase based on [trial counsel's] admissions … that he essentially did nothing in preparation for the penalty phase hearing").

Defendant was represented by court-appointed counsel. (<u>Conversation with Trial Counsel</u>).

### 37.   (72) **Commonwealth v. Derrick White,** CP-51-CR-0012991-2010

After his capital conviction, Defendant filed a PCRA petition claiming that mitigation counsel provided ineffective assistance at the penalty phase for failing to "present to the jury evidence in support of the age mitigator". <u>Per Curiam Remand Order</u>, 7/2/13, <u>Commonwealth v. White</u>, No. 663 CAP. On remand, the trial court granted Defendant a new penalty phase hearing.

Defendant was represented by court-appointed mitigation counsel. <u>Entry of Appearance</u>, 2/17/11.

38.    (73) **Comm. v. Christopher Williams, CP-51-CR-0417523-1992**

After an evidentiary hearing, the PCRA court determined that "trial counsel was ineffective for failing to investigate the medical and forensic evidence" and that "appellate counsel was ineffective for failing to raise this claim on appeal."  On Line Docket Entry, p.25, 12/30/13; Commonwealth v. Williams, 141 A.3d 440 (Pa. 2016) (*affirmed*).

Defendant was represented at trial by court-appointed counsel. Order of Appointment. Defendant was represented on direct appeal by court-appointed counsel. Commonwealth v. Williams, 720 A.2d 679, 682 (Pa. 1998). Williams, 141 A.3d at 448.

# PART I, SECTION B

## 38 CASES OVERTURNED ON OTHER GROUNDS

This Section lists 38 Philadelphia capital cases that were overturned for reasons other than ineffective assistance of counsel. We group the cases in five categories, based upon the reason for the reversal of the original death sentence:

a.    Sentences Overturned due to Trial Court Error - *Total 16*
b.    Sentences Overturned due to Prosecutorial Misconduct - *Total 10*
c.    Sentences Overturned due to Changes in the Law - *Total 8*
d.    Sentences Overturned due to Actual Innocence - *Total 1*
e     Sentences Overturned for Unspecified Reasons - *Total 3*

For each case, this list also specifies the final, post-reversal resolution of the defendant's sentence, where available. As will be seen, **34** out of 38 cases **(89%)**, resulted in a non-capital disposition—either a life sentence, a terms of years sentence, an acquittal, or a withdrawal of prosecution.[7] None of these non-capital dispositions occurred during the administration of the current Philadelphia District Attorney. Many were imposed with the agreement of the Commonwealth.

For each case, this list also calculates the length of time between arrest and the resolution of the capital aspect of the case. The average length of time for the

---

[7] Four overturned death cases did *not* result in non-capital dispositions. One defendant was resentenced to death, but died from natural causes while in custody. Commonwealth v. Alfred Jasper, CP-51-CR-0613941-1984. One defendant died before his resentencing hearing. Commonwealth v. Willie Clayton, CP-51-CR-1127941-1984. In two cases the defendant's sentence is still in litigation. Commonwealth v. Washington, CP-51-CR-1210371-1993; Commonwealth v. Ernest Porter, CP-51-CR-0622491-1985.

non-capital resolution is **17** years. Thus, on average, **seventeen (17)** years of litigation elapsed before the case resulted in a non-capital resolution.

**(1).    Death Sentences Overturned due to Trial Court Error (Total 16)**

    **1.    <u>Mumia Abu-Jamal</u>, CP-51-CR-0113571-1982**

Defendant phrased his issue regarding an incorrect jury instruction as a claim of ineffective assistance of counsel. <u>Abu-Jamal v. Horn</u>, 520 F.3d 272, 298 (3d Cir. 2008). However, the Third Circuit decided the claim in his favor, without specifically finding that trial counsel was ineffective. <u>Abu-Jamal v. Sec'y, Pa. Dep't of Corrections</u>, 643 F.3d 370, 381-382 (3d Cir. 2011).

**Result:** On remand the Commonwealth did not seek a new penalty phase hearing. <u>Online Docket Entry</u>, p.10, 8/13/12 ("And Now this 13th day of August 2012, the Commonwealth having not requested a new sentencing hearing … it is Hereby Decreed that Mumia Abu-Jamal is sentenced to life imprisonment").

Arrest: December 9, 1981 – Resentenced: August 13, 2012 = **30 yrs, 8 mos, 4 d**

    **2.    <u>Commonwealth v. Sam Bannerman</u>, CP-51-CR-1033281-1984**

The Supreme Court granted a new trial Per Curiam because the trial court failed to give an appropriate good character instruction. <u>Commonwealth v. Bannerman</u>, 579 A.2d 1295 (Pa. 1990).

**Result**: Defendant entered guilty plea and was resentenced to Life. <u>Online Docket Entry</u>, p.2, 10/9/91.

Arrest: October 16, 1984 – Resentenced: October 9, 1991 = **6 yrs, 11 mos, 23 d**

    **3.    <u>Commonwealth v. James Bryant</u>, CP-51-CR-1023791-1983**

The Supreme Court twice granted Defendant a new trial due to the improper admission of other crimes evidence. <u>Commonwealth v. Bryant</u>, 530 A.2d 83, 85 (Pa. 1987); <u>Commonwealth v. Bryant</u>, 611 A.2d 703, 704 (Pa. 1992).

**Result:** Case nolle prossed. <u>On Line Docket Entry</u>, p.3, 1/25/93.

Arrest: October 27, 1983 – Nolle Prosequi: January 25, 1993 = **9 yrs, 2 mos, 29 d**

### 4.   **<u>Commonwealth v. Kevin Chandler</u>, CP-51-CR-0832561-1993**

The Supreme Court vacated Defendant's death sentence after the trial court refused to give a <u>Simmons</u> instruction. <u>Commonwealth v. Chandler</u>, 721 A.2d 1040, 1046–1047 (Pa. 1998) ("Once the issue of future dangerousness is raised, and the defendant requests a <u>Simmons</u> instruction … the trial court is required … to give the jury an instruction on what the term 'life imprisonment' means in Pennsylvania").

**Result:** Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.5, 8/11/99.

Arrest: October 27, 1983 – Resentenced: August 11, 1999 = **15 yrs, 9 mos, 15 d**

### 5.   **<u>Commonwealth v. Willie Clayton</u>, CP-51-CR-1127941-1984**

The Supreme Court granted a trial due to the improper admission of other crimes evidence. <u>Commonwealth v. Clayton</u>, 483 A.2d 1345, 1349 (Pa. 1984).

**Result**: Defendant died before the resolution of his PCRA petition. <u>Online Docket Entry</u>, p.9, 6/25/14 ("Order Dismissing PCRA Petition as Moot-Defendant Deceased").

Arrest: November 9, 1984 – Abated: June 25, 2014 = **29 yrs, 7 mos, 16 d**

### 6.   **<u>Commonwealth v. George Goins</u>, CP-51-CR-0829421-1981**

The Supreme Court vacated Defendant's death sentence because the trial court erroneously allowed the jury to consider the significant criminal history aggravator, where Defendant only had one prior violent felony conviction. <u>Commonwealth v. Goins</u>, 495 A.2d 527, 532 (Pa. 1985).

**Result**: Defendant's sentence automatically modified to Life, based on the law as it existed at that time. <u>Goins</u>, 495 A.2d at 534.

Arrest: June 30, 1981 – Resentenced: September 4, 1985 = **4 yrs, 2 mos, 5 d**

### 7.   <u>Commonwealth v. William Green</u>, CP-51-CR-0427361-1982

The Supreme Court overturned Defendant's death sentence due to the improper admission of hearsay at the penalty phase. <u>Commonwealth v. Green</u>, 581 A.2d 544, 564 (Pa. 1990) ("We find that this hearsay evidence was improperly admitted at the sentencing hearing and that it improperly prejudiced Appellant by providing a basis for the jury to reject Appellant's sole mitigation evidence and a basis to decline to find a mitigating circumstance in Appellant's favor under our sentencing statute").

**Result**: Remanded for a new penalty hearing. Defendant resentenced to Life. <u>Online Docket Entry</u>, p.3, 9/10/91.

Arrest: April 16, 1982 – Resentenced: September 10, 1991 = **9 yrs, 4 mos, 25 d**

### 8.   <u>Commonwealth v. Eric Grier</u>, CP-51-CR-0334871-1989

The Supreme Court granted a new trial due to the trial court's erroneous instruction on accomplice liability.  <u>Commonwealth v. Grier</u>, 638 A.2d 965, 965 (Pa. 1994).

**Result:** On remand, the Defendant entered a guilty plea and received Life. <u>Online Docket Entry</u>, p.3, 1/5/98.

Arrest: March 16, 1989 – Resentenced: January 5, 1998 = **8 yrs, 9 mos, 20 d**

### 9.   <u>Commonwealth v. Derrick Harvey</u>, CP-51-CR-0307631-1998

The Supreme Court vacated Defendant's death sentence because the Commonwealth failed to "present sufficient evidence to establish all of the elements" of the drug aggravator.  <u>Commonwealth v. Harvey</u>, 812 A.2d 1190, 1199–2000 (Pa. 2002).

**Result:**  On March 28, 2003, Defendant was resentenced to life imprisonment without parole following his new penalty hearing. <u>Harvey v. Folino</u>, 2011 WL 9155257, at *3 (E.D. Pa. Dec. 20, 2011).

Arrest: January 12, 1998 – Resentenced: March 28, 2003 = **5 yrs, 2 mos, 16 d**

### 10.     __Commonwealth v. Andrew Huffman__, CP-51-CR-0511051-1989

The Supreme Court granted a new trial due to the trial court's erroneous instruction on accomplice liability. Commonwealth v. Huffman, 638 A.2d 961, 962 (Pa. 1994).

**Result**: Defendant sentenced to Life. Unclear from Docket Entries whether he entered a guilty plea or went to trial and was convicted.  Also unclear whether the Commonwealth agreed or a new penalty phase resulted in Life. Online Docket Entry, p.4, 1/14/98.

Arrest: April 5, 1989 – Resentenced: January 14, 1998 = **8 yrs, 9 mos, 9 d**

### 11.     __Commonwealth v. Alfred Jasper__, CP-51-CR-0613941-1984

The Supreme Court determined that the trial court's jury instruction violated Mills v. Maryland, 486 U.S. 367 (1988). The case was remanded for a new sentencing hearing. Commonwealth v. Jasper, 587 A.2d 705, 712 (Pa. 1991).

**Result:**   Defendant was sentenced to death a second time but died during pendency of the subsequent appeals. Online Docket Entry, p.3, 9/13/00.

Arrest: May 4, 1984 – Abated: September 13, 2000 = **16 yrs, 4 mos, 9 d**

### 12.     __Commonwealth v. Marcus Lloyd__, CP-51-CR-0501982-1998

On direct appeal, the Commonwealth agreed that the trial court improperly submitted the history of violent felony aggravator to the jury. Commonwealth's Petition to Remand for Resentencing, at p.1 ("[T]he Commonwealth is obliged to note that … the aggravating circumstance of 'significant history of felony convictions involving use or threat of violence to person' was incorrectly submitted").

Based upon the Commonwealth's petition, the Supreme Court remanded for a new sentencing hearing. Commonwealth v. Lloyd, 800 A.2d 927 (Pa. 2002).

**Result**: On August 20, 2003, the Common Pleas Court conducted a new penalty phase hearing. The Commonwealth agreed to a new sentencing hearing before the trial court, without a jury. Online Docket Entry, p.6, 8/20/03. The

sentencing court imposed consecutive life sentences. Commonwealth v. Lloyd, 2004 WL 3481055 (Pa.Super. 2004), at 5.

Arrest: March 31, 1998 – Resentenced: August 20, 2003 = **5 yrs, 4 mos, 20 d**

### 13.   Commonwealth v. Michael Overby, CP-51-CR-0105802-1995

The Supreme Court granted a new trial due to the admission of an improperly redacted out-of-court statement from a codefendant. Commonwealth v. Overby, 809 A.2d 295, 306 (Pa. 2002) ("It is clear that the admission of [codefendant's] hearsay statement, as redacted, prejudiced Appellant").

**Result**: On remand, Defendant was sentenced to Life. Not clear if he had a new trial or the Commonwealth agreed to a life sentence. Online Docket Entry, p.24, 6/21/07.

Arrest: July 26, 1994 – Resentenced: June 21, 2007 = **12 yrs, 10 mos, 26 d**

### 14.   Commonwealth v. Ernest Porter, CP-51-CR-0622491-1985

The federal district court determined that the trial court's jury instruction violated Mills v. Maryland, 486 U.S. 367 (1988). Porter v. Horn, 276 F. Supp. 2d 278, 311 (E.D. Pa. 2003).

Case remains unresolved.

Arrest: May 3, 1985 – Defendant's case remains unresolved.

### 15.   Commonwealth v. Paul Rizzuto, CP-51-CR-0132391-1994

The Supreme Court vacated Defendant's death sentence because the jury failed to find a mitigator established by stipulation. Commonwealth v. Rizzuto, 777 A.2d 1069 (Pa. 2001).

**Result:** After a new hearing, Defendant was sentenced to Life. Online Docket Entry, p.5, 10/7/03.

Arrest: January 21, 1994 – Resentenced: October 7, 2003 = **9 yrs, 8 mos, 16 d**

### 16.   Commonwealth v. Bobby Sims, CP-51-CR-0500751-1982

The Supreme Court reversed Defendant's conviction because the trial court refused to permit Defendant to compel a witness to claim his attorney-client privilege in front of the jury. Commonwealth v. Sims, 521 A.2d 391, 395 (Pa. 1987).

**Result**: Defendant pleaded guilty to a term of years sentence. Online Docket Entry, p.3, 9/25/87.

Arrest: May 3, 1982 – Resentenced: September 25, 1987 = **5 yrs, 4 mos, 22 d**

### (2).   Death Sentences Overturned due to Prosecutorial Misconduct (Total 10)

### 1.   Commonwealth v. Jose DeJesus, CP-51-CR-0704671-1998

The Supreme Court vacated Defendant's death sentence because the prosecutor requested the jury to "send a message" with its verdict. Commonwealth v. DeJesus, 860 A.2d 102, 118–119 (Pa. 2004).

**Result**: The Commonwealth agreed to Life in exchange for Defendant's guilty plea. On Line Docket Entry, p.5, 1/4/18 ("Commonwealth agrees that PCRA petition is granted as to the death penalty sentences … Re-sentenced to Life without the possibility of parole").

Arrest**:** June 1, 1998 – Resentenced: January 4, 2018 = **19 yrs, 7 mos, 3 d**

### 2.   Commonwealth v. James Dennis, CP-51-CR-0104841-1992

The Third Circuit granted Defendant a new trial due to a Brady violation. Dennis v. Sec'y Dept. Corrs., 834 F.3d 263 (3d Cir. 2016) (*en banc*).

**Result:** On remand, the Commonwealth agreed to a negotiated guilty plea to third degree murder. On Line Docket Entry, p.25, 12/22/16.

Arrest: November 21, 1991 – Resentenced: December 22, 2016 = **25 yrs, 1 mos, 1 d**

### 3.   **Commonwealth v. Calvin Floyd, CP-51-CR-0813171-1980**

The Supreme Court vacated Defendant's death sentence due to the prosecutor's improper closing argument. Commonwealth v. Floyd, 484 A.2d 365, 370 (Pa. 1984) ("It is extremely prejudicial for a prosecutor to importune a jury to base a death sentence upon the chance that a defendant might receive parole").

**Result**: Defendant's sentence automatically modified to Life, based on the law as it existed at that time.

Arrest: July 2, 1980 – Resentenced: November 24, 1984 = **4 yrs, 6 mos, 22 d**

### 4.   **Commonwealth v. Donald Hardcastle, CP-51-CR-0632881-1982**

The federal court awarded a new trial due to a Batson violation. Hardcastle v. Horn, 332 F. App'x 764, 766 (3d Cir. 2009).

**Result**: On remand, Defendant entered a negotiated guilty plea for a term of years sentence. Online Docket Entry, p.5, 3/16/11.

Arrest: September 1, 1983 – Resentenced: March 16, 2011 = **27 yrs, 6 mos, 15 d**

### 5.   **Commonwealth v. James Lambert, CP-51-CR-0803432-1983**

The Third Circuit granted a new trial on the basis of Brady violations. Lambert v. Beard, 537 F. App'x 78, 80 (3d Cir. 2013).

**Result:** Defendant entered a negotiated guilty plea to third degree murder for a term of years sentence. Online Docket Entry, p.10, 12/18/17.

Arrest: May 4, 1983 – Resentenced: December 18, 2017 = **34 yrs, 7 mos, 14 d**

### 6.   **Commonwealth v. Cam Ly, CP-51-CR-1125561-1986**

The Supreme Court agreed that the prosecutor withheld Brady material, but the Court denied relief on materiality grounds. Commonwealth v. Cam Ly, 980 A.2d 61, 83 (Pa. 2009).

A-189

**Result:** When Defendant filed a new PCRA petition, the Commonwealth agreed to Life. Online Docket Entry, p.10, 12/12/13 ("re-sentenced to life without parole. … By agreement there are no appellate and post-conviction rights").

Arrest: October 7, 1986 – Resentenced: December 12, 2013 = **27 yrs, 2 mos, 5 d**

### 7.    Commonwealth v. Lawrence Smith, CP-51-CR-1001002-2000

The Supreme Court reversed Defendant's death sentence, determining that "the prosecutor improperly referred to a fact not of record and … the Commonwealth has failed to establish that this error was harmless." Commonwealth v. Smith, 861 A.2d 892, 898 (Pa. 2004).

**Result:** The Commonwealth did not request a new penalty hearing and the Defendant was resentenced to Life. Online Docket Entry, p.17, 11/1/05.

Arrest: July 17, 2000 – Resentenced: November 1, 2005 = **5 yrs, 3 mos, 15 d**

### 8.    Commonwealth v. Anthony Washington, CP-51-CR-1210371-1993

The federal district court granted a new trial due to Brady violations and the prosecutor's improper closing argument. Washington v. Beard, 2015 WL 234719, at *1 (E.D. Pa. Jan. 16, 2015).

**Result**: The Commonwealth removed the capital designation. Online Docket Entry, 3/14/19. Retrial scheduled for July 22, 2019.

Arrest: April 20, 1993 – De-Capitalized: March 14, 2019 = 2**5 yrs, 11 mos, 22 d**

### 9.    Commonwealth v. Terrence Williams, CP-51-CR-0823621-1984

An equally divided Supreme Court affirmed the PCRA court's decision granting a new penalty phase hearing because "the Commonwealth willfully suppressed material exculpatory evidence." Commonwealth v. Williams, 168 A.3d 97, 112 (Pa. 2017) (remanding for a new penalty phase trial).

**Result:** The Commonwealth did not seek a new penalty phase and Defendant was resentenced to Life. Online Docket Entry, p.17, 12/29/17 ("Order - Sentence/Penalty Imposed Remand From Supreme Court. Defendant Resentenced. Murder-Life Without Parole").

Arrest: July 24, 1984 – De-Capitalized: December 29, 2017 = **33 yrs, 5 mos, 5 d**

### 10.   <u>Commonwealth v. Zachary Wilson</u>, CP-51-CR-0929501-1986

The Third Circuit granted a new trial because the Commonwealth withheld <u>Brady</u> material. <u>Wilson v. Beard</u>, 589 F.3d 651, 667 (3d Cir. 2009).

**Result**: On retrial, Defendant was convicted but the Commonwealth did not seek the death penalty.  <u>Commonwealth v. Wilson</u>, 147 A.3d 7, 12 (Pa. Super. 2016).

Arrest: September 8, 1986 – Life sentence: April 1, 2014 = **27 yrs, 6 mos, 24 d**

## (3).   Death Sentences Overturned due to Changes in the Law (Total 8)

- ***Reversals Pursuant To* <u>Atkins v. Virginia</u> (Total 6)**

### 1.   <u>Commonwealth v. Edward Bracey</u>, CP-51-CR-0632821-1991

The Supreme Court affirmed the PCRA court's determination that Defendant is intellectually disabled. <u>Commonwealth v. Bracey</u>, 117 A.3d 270, 284 (Pa. 2015).

Arrest: February 4, 1991 – Resentenced: January 10, 2014 = **22 yrs, 11 mos, 6 d**

### 2.   <u>Commonwealth v. Joseph D'Amato</u>, CP-51-CR-1219941-1981

Defendant resentenced to Life pursuant to <u>Atkins</u>.   <u>On Line Docket Entry</u>, p.18, 6/13/13.

Arrest: December 10, 1981 – Resentenced: June 13, 2013 = **31 yrs, 6 mos, 3 d**

### 3.   <u>Commonwealth v. Harrison Graham</u>, CP-51-CR-0839481-1987

Defendant resentenced to Life pursuant to <u>Atkins</u>. <u>On Line Docket Entry</u>, p.9, 12/18/03.

Arrest: August 17, 1987 – Resentenced: December 18, 2003 = **16 yrs, 4 mos, 1 d**

### 4.   <u>Commonwealth v. Melvin Howard</u>, CP-51-CR-0304271-1988

The Commonwealth agreed to vacate Defendant's death sentence, pursuant to <u>Atkins</u>. <u>On Line Docket Entry</u>, p.11, 6/10/11. <u>Howard v. Horn</u>, 56 F. Supp. 3d 709, 715 (E.D. Pa. 2014) ("Petitioner's death sentence was vacated and he was resentenced to life in prison without parole").

Arrest: February 13, 1988 — Resentenced: June 10, 2011 = **23 yrs, 3 mos, 28 d**

### 5.   <u>Commonwealth v. Raymond Whitney</u>, CP-51-CR-1114161-1981

The Court of Common Pleas found "the evidence of [Defendant's] mental retardation 'overwhelming'." The Court vacated Defendant's death sentence and resentenced him to life without possibility of parole. The Commonwealth did not appeal. <u>Whitney v. Horn</u>, 2008 WL 4761733, at *3 (E.D. Pa. Oct. 30, 2008).

Arrest: October 10, 1981 – Resentenced: January 16, 2008 = **26 yrs, 3 mos, 6 d**

### 6.   <u>Commonwealth v. Simon Pirela</u>, CP-51-CR-0121431-1983

The Pennsylvania Supreme Court affirmed the PCRA court's determination that Defendant is intellectually disabled Per Curiam. <u>Commonwealth v. Pirela</u>, 929 A.2d 629 (Pa. 2007).

Arrest: December 20, 1982 – Resentenced: April 30, 2004 = **21 yrs, 4 mos, 10 d**

- ***Reversals Pursuant to <u>Roper v. Simmons</u>*** (Total 2)

### 7.   <u>Commonwealth v. Kevin Hughes</u>, CP-51-CR-0116881-1980

The PCRA court granted relief pursuant to <u>Roper</u> "because Petitioner was less than eighteen years old at the time of the offense". <u>Online Docket Entry</u>, p.8, 3/21/05.

Arrest: January 12, 1980 — Resentenced: March 21, 2005 = **25 yrs, 2 mos, 9 d**

### 8. <u>Commonwealth v. Percy Lee</u>, CP-51-CR-0511562-1986

Because Lee was 17 at the time of the murders, his death sentence was later vacated under <u>Roper</u> and replaced with two consecutive life sentences. <u>Lee v. Smeal</u>, 447 F. App'x 357, 359 n.2 (3d Cir. 2011).

Arrest: February 28, 1986 — Resentenced: September 20, 2005 = **19 yrs, 6 mos, 23 d**

## (4). Death Sentences Overturned due to Actual Innocence (Total 1)

### 1. <u>Commonwealth v. Neil Ferber</u>, CP-51-CR-0710481-1981

After conviction and death sentence, Defendant "ultimately was released from custody after law enforcement authorities conceded that he, in fact, had nothing whatsoever to do with these murders." <u>Neil Ferber & Annette Ferber, h/w v. City of Philadelphia, Sergeant Daniel Rosenstein & Officer Dominic Frontino</u>, 1994 WL 1251179 (Pa. Com. Pl. Oct. 3, 1994), <u>aff'd in part, rev'd in part sub nom.</u> <u>Ferber v. City of Philadelphia</u>, 661 A.2d 470 (Pa. Commw. Ct. 1995).

**Result:** Case nolle prossed. <u>Online Docket Entry</u>, p.3, 3/7/86.

Arrest: June 8, 1981 – March 7, 1986 = **4 yrs, 8 mos, 27 d**

## (5). Sentences Overturned at PCRA Stage for Reasons Unspecified in the Docket Entries (Total 3)

### 1. <u>Commonwealth v. Kenneth Miller</u>, CP-51-CR-0902382-1998

At the PCRA stage, the PCRA court vacated Defendant's sentence and imposed Life. <u>Secure Docket Entry</u>, p.52, 5/13/14.

Arrest: July 31, 1998 – Resentenced: May 13, 2014 = **15 yrs, 9 mos, 13 d**

### 2.      **Commonwealth v. Jose DeJesus**, CP-51-CR-1103501-1997

At the post-conviction stage, the PCRA court vacated Defendant's sentence and imposed Life. Secure Docket Entry, p.24, 1/4/18 ("Order Granting Motion to Vacate Sentence Listed Today for Re-Sentencing. Commonwealth agrees that PCRA petition is granted as to the death penalty sentences … Re-sentenced to Life without the possibility of parole").

Arrest: October 30, 1997 – Resentenced January 4, 2018 = **20 yrs, 2 mos, 5 d**

### 3.      **Commonwealth v. DeJesus**, CP-51-CR-1103511-1997

The Commonwealth agreed to PCRA relief and a sentence of Life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 16).

Arrest: September 23, 1997 – Resentenced: January 4, 2018 = **20 yrs, 3 mos, 12 d**

# PART I, SECTION C

## NON-CAPTIAL OUTCOMES OF CASES ON REMAND

Part I, Section C lists the cases where, on remand, the previously death-sentenced defendant received something other than a capital sentence. **102 (91%)** of the 112 overturned Philadelphia death sentences resulted in a non-capital disposition.

Section C, Subsection One lists the **67** ineffective assistance cases ("IAC cases") that resulted in a non-capital disposition. This list designates each case by the Defendant's name, the Common Pleas Court Docket Number, and the number assigned to the case in Part I, Section A (listing Philadelphia death sentences overturned due to ineffective assistance of counsel).

Section C, Subsection Two lists the **35** cases overturned on other grounds that resulted in a non-capital disposition. This list also designates each case by the Defendant's name, the Common Pleas Court Docket Number, and the number assigned to the case in Part I, Section B (listing Philadelphia death sentences overturned on grounds other than ineffectiveness).

### (1).    *SUBSECTION ONE* – **Non-Capital Outcomes of IAC Cases**

After remand, **none** of the 74 IAC cases resulted in a new death sentence. **67 (90%)** of the 74 defendants ultimately received either a non-capital sentence or a

guilt phase acquittal. Three died of natural causes while in custody.[8] Four still await new penalty hearings, while reviewing courts consider their guilt phase claims.[9]

**1.**     (1) **Comm. v. Lawrence Baker, CP-51-CR-0629891-1981**

On remand, the Defendant received a life sentence pursuant to the version of the statute governing sentencing procedure for murder of the first degree then in effect. Commonwealth v. Baker, 511 A.2d 777, 791 (Pa. 1986); Online Docket Entry, p.3, 7/30/86.

**2.**     (2) **Commonwealth v. Lee Baker, CP-51-CR-0405062-1984**

Negotiated guilty plea. Online Docket Entry, p.6, 5/23/2008

**3.**     (3) **Commonwealth v. Billa, CP-51-CR-0136311-1987**

On remand, Defendant entered a guilty plea and received a life sentence. Online Docket Entry, p.3, 1/11/90

**4.**     (4) **Commonwealth v. John M. Blount, CP-51-CR-0124901-1990**

After a new sentencing hearing, Defendant was sentenced to life imprisonment. Blount v. Wetzel, 2015 WL 851855, at *2; Online Docket Entry, p.12, 7/24/96.

**5.**     (5) **Commonwealth v. Aquil Bond, CP-51-CR-0502971-2004**

Case resolved through negotiated disposition.   Online Docket Entry, p.52, 5/19/17.

---

[8]   Commonwealth v. Billy Brooks, CP-51-CR-0128471-1991, Commonwealth v. William Holland, CP-51-CR-1014291-1984, and Commonwealth v. William Tilley, CP-51-CR-1210781-1985.

[9]   Commonwealth v. Robert Cook, CP-51-CR-0826512-1987, Commonwealth v. Bernard Cousar, CP-51-CR-0508652-1999, Commonwealth v. Henry Fahy, CP-51-CR-0222831-1981, and Commonwealth v. Kevin Pelzer, CP-51-CR-1031752-1988.

**6.**    (6) <u>**Commonwealth v. Jesse Bond,**</u> **CP-51-CR-2217781-1992**

On remand from the appellate courts, Defendant received a life sentence. <u>Online Docket Entry</u>, p.11, 11/15/12.


**7.**    (8) <u>**Commonwealth v. Samuel Carson,**</u> **CP-51-CR-0228371-1994**

<u>Online Docket Entry</u>, p.12, 4/04/11 ("Both sides agree to Life Imprisonment").

**8.**    (9) <u>**Commonwealth v. Ronald Clark,**</u> **CP-51-CR-1241151-1993**

<u>Online Docket Entry</u>, p.13, 8/16/11 ("Order - Sentence/Penalty Imposed – agreement").

**9.**    (10) <u>**Commonwealth v. Rodney Collins**</u>, **CP-51-CR-0815881-1992**

Defendant resentenced to Life.   <u>Docket Entry</u>, p.17, 11/05/09 ("On count 1, life without parole. All of the other charges remain the same").

**10.**    (11)  <u>**Commonwealth v. Ronald Collins,**</u> **CP-51-CR-0614771-1992**

"Order - Sentence/Penalty Imposed" <u>Online Docket Entry</u>, p.13, 5/11/2009.

**11.**    (14) <u>**Commonwealth v. Dewitt Crawley,**</u> **CP-51-CR-0201551-1984**

<u>Online Docket Entry</u>, p.13, 5/1/15 ("By agreement the above defendant is resentenced to life without parole on first degree murder").

**12.**    (15) <u>**Commonwealth v. Junious Diggs,**</u> **CP-51-CR-0709781-2002**

With the Commonwealth's agreement, the PCRA court vacated Defendant's death sentence and sentenced Defendant to Life. <u>Secure Docket Entry</u>, p.19, 8/14/12; <u>Written Agreement Colloquy</u>, at p.2.

**13.**    (16) <u>**Comm. v. Daniel Dougherty,**</u> **CP-51-CR-0705371-1999**

<u>Online Docket Entry</u>, p.23, 2/7/12 (death sentence vacated and life sentence imposed).

**14.**    (17) **Commonwealth v. Joseph Elliott,** **CP-51-CR-0410911-1994**

Online Docket Entry, p.23, 5/1/15 ("He is resentenced to life without parole on first degree murder").

**15.**    (19) **Commonwealth v. Lester Fletcher,** **CP-51-CR-0709931-2001**

Online Docket Entry, p.13, 7/18/12 ("Death penalty is vacated and the defendant is now sentenced to life in prison without the possibility of parole").

**16.**    (20) **Commonwealth v. Kenneth Ford,** **CP-51-CR-1032221-1989**

With the agreement of the Commonwealth, the PCRA court resentenced Defendant to Life. (N.T. 11/29/04 at 1-5); On Line Docket Entry, p.9, 11/29/2004.

**17.**    (21) **Commonwealth v.William Gribble,** **CP-51-CR-1220811-1992**

After a second penalty phase hearing, the Defendant received Life. Online Docket Entry, p.20, 3/10/09 ("Original Sentence of 8/11/94 is vacated. Jury Hung on Penalty Phase").

**18.**    (22) **Commonwealth v. Donald Hall,** **CP-51-CR-0210711-1982**

Defendant received Life pursuant to the version of 42 Pa.C.S. § 9711(h)(2) in effect at the time of his trial. Online Docket Entry, p.3, 2/29/96.

**19.**    (23) **Commonwealth v. Ronald Hanible,** **CP-51-CR-0409021-1999**

Defendant resentenced to life in prison. Online Docket Entry, p.20, 9/24/13.

**20.**    (24) **Commonwealth v. John Harris,** **CP-51-CR-0903421-1992**

Defendant was resentenced to Life. Online Docket Entry, p.8, 2/28/05.

**21.**    (25) **Commonwealth v. Donetta Hill,** **CP-51-CR-0518391-1991**

After the federal court granted her a new guilt phase trial, the Commonwealth negotiated a term of years sentence for third degree murder. Online Docket Entry, p.22, 7/12/17.

**22.**  (27) <u>**Comm. v. Arnold Holloway**</u>**, CP-51-CR-0613051-1985**

On remand, Defendant entered an open plea and received a term of years sentence. <u>Online Docket Entry</u>, p.5, 4/14/05.

**23.**  (28) <u>**Comm. v. Steven Hutchinson**</u>**, CP-51-CR-0408581-1998**

Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.16, 1/23/2013.

**24.**  (29) <u>**Commonwealth v. Kareem Johnson**</u>**, CP-51-CR-1300424-2006**

The Commonwealth filed a notice with the trial court indicating that it would no longer be seeking the death penalty.  <u>Online Docket Entry</u>, p.30, 2/17/16 ("Notice of Removal of Capital Designation").

**25.**  (30) <u>**Comm. v. William Johnson**</u>**, CP-51-CR-0936052-1991**

Defendant sentenced to Life. <u>Online Docket Entry</u>, p.20 9/21/16.

**26.**  (31) <u>**Commonwealth v. Damon Jones**</u>**, CP-51-CR-0907121-1982**

Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.45, 12/14/12.

**27.**  (32) <u>**Commonwealth v. James Jones**</u>**, CP-51-CR-1024861-1980**

<u>Online Docket Entry</u>, p.11, 8/16/11 ("Court orders death sentence vacated and imposes sentence of Life Imprisonment").

**28.**  (33) <u>**Commonwealth v. Thomas Jones**</u>**, CP-51-CR-0403101-1982**

On January 18, 1989, the Common Pleas Court vacated the death sentence and imposed a life sentence. <u>Commonwealth's Brief for Appellee</u>, <u>Jones v. Frank</u>, 1999 WL 33620698 (3d Cir.), at p.4.

**29.**  (34) <u>**Comm. v. Alexander Keaton**</u>**, CP-51-CR-0319251-1993**

Defendant resentenced to life   without parole.  <u>Online Docket Entry</u>, p. 26, 6/12/14.

**30.**   (35) **<u>Commonwealth v. Joseph Kindler</u>, CP-51-CR-0827471-1982**

<u>Online Docket Entry</u>, p.26, 3/01/18 ("Defendant sentenced to life without parole, Commonwealth is not seeking the death penalty. Sentence has been agreed to by counsel").

**31.**   (36) **<u>Comm. v. Michael LaCava</u>, CP-51-CR-0711041-1990**

Defendant resentenced to Life after a new penalty phase hearing.   <u>Online Docket Entry</u>, p.3, 3/22/96.

**32.**   (37) **<u>Commonwealth v. Robert Lark</u>, CP-51-CR-0120121-1980**

After a new penalty phase, the jury was unable to render a unanimous verdict and the trial court sentenced Defendant to Life. (N.T. 11/9/17 at 103).

**33.**   (38) **<u>Commonwealth v. Reginald Lewis</u>, CP-51-CR-0205851-1983**

<u>Online Docket Entry</u>, p.3, 7/9/12 ("The defendant will receive life without parole. The death penalty has been removed").

**34.**   (39) **<u>Commonwealth v. Steven McCrae</u>, CP-51-CR-0204521-1999**

The Commonwealth "agreed that [the PCRA] Court may vacate [Defendant's] two death sentences and impose two consecutive life sentences." <u>Written Agreement Colloquy</u>, 4/13/06 at p.2.

**35.**   (40) **<u>Commonwealth v. Bernard McGill</u>, CP-51-CR-0339201-1990**

<u>Online Docket Entry</u>, p.15, 1/7/13 ("Revised upon appeal, the death penalty is vacated. The defendant is re-sentenced to life without parole").

**36.**   (41) **<u>Comm. v. Nathaniel McNair</u>, CP-51-CR-1224591-1987**

Defendant's sentence changed to Life. <u>Online Docket Entry</u>, p.4, 4/4/02.

**37.**   (42) **<u>Comm. v. Christopher McNeil</u>, CP-51-CR-0500461-1991**

<u>Online Docket Entry</u>, p.4, 6/23/97 ("Guilty … Confinement Life").

**38.**     (43) **Commonwealth v. William Mikell, CP-51-CR-0716051-1987**

Online Docket Entry, p.13, 12/9/04 ("Sentence: Life").

**39.**     (44) **Comm. v. Mikal Moore, CP-51-CR-0701141-1998**

Online Docket Entry, p.22, 3/27/17 ("Order - Sentence/Penalty Imposed By Agreement this court Vacates previous sentence of DEATH and reimposes a sentence of LIFE as to Murder 1st Degree").

**40.**     (45) **Comm. v. Salvador Morales, CP-51-CR-1012921-1982**

After a second penalty phase hearing, Defendant was resentenced to Life. Online Docket Entry, p.4, 1/4/2000; Pirela v. Vaughn, 2013 WL 11323274, at *5.

**41.**     (46) **Commonwealth v. Willard Moran, CP-51-CR-1130901-1981**

Defendant was resentenced to Life. Online Docket Entry, p.3, 1/27/99.

**42.**     (47) **Commonwealth v. Kelvin Morris, CP-51-CR-0704091-1982**

The Commonwealth negotiated a term of years sentence in exchange for Defendant's guilty plea.  On Line Docket Entry, p.12, 6/7/13; Negotiated Guilty Plea Order.

**43.**     (48) **Commonwealth v. Craig Murphy, CP-51-CR-0925231-1985**

On remand, Defendant entered a guilty plea for a Life sentence.   Online Docket Entry, p.3, 11/22/91 ("Guilty Plea … Confinement LIFE").

**44.**     (49)  **Commonwealth v. William Nieves, CP-51-CR-1009681-1993**

Defendant was acquitted after retrial. Online Docket Entry, p.3, 12/20/00.

**45.**     (50) **Comm. v. Kelley O'Donnell, CP-51-CR-1220812-1992**

After a new sentencing hearing, the jury unanimously agreed upon a life sentence. Commonwealth v O'Donnell, 2006 WL 5429138 (Pa.Com.Pl. Nov. 21, 2006).

**46.** (51) **Commonwealth v. Lamont Overby, CP-51-CR-1006081-1996**

Online Docket Entry, p.20, 10/18/13 ("After hearing, sentence of LIFE imprisonment without the possibility of parole is imposed for Murder in the First Degree").

**47.** (53) **Commonwealth v. Curry Perry, CP-51-CR-0418121-1989**

Defendant was retried and acquitted. Online Docket Entry, p.2, 6/26/96.

**48.** (54) **Commonwealth v. Otis Peterkin, CP-51-CR-0207841-1982**

On remand, Defendant entered a guilty plea and received Life. Online Docket Entry, p.3, 12/6/02 ("Guilty Plea … Confinement LIFE").

**49.** (55) **Commonwealth v. Michael Rainey, CP-51-CR-0419613-1990**

Online Docket Entry, p.12, 3/10/09 ("Order - Sentence/Penalty Imposed: Court orders the death penalty sentence vacated and a new sentence of life without parole on 1st degree murder imposed").

**50.** (56) **Comm. v. Wilfredo Ramos, CP-51-CR-0100891-1999**

Online Docket Entry, p.18, 4/18/08 ("[B]ased upon the Commonwealth's certification that, in the exercise of its discretion, it will not pursue a new penalty hearing in this matter, defendant's sentence of death is hereby vacated and a new sentence of life imprisonment is hereby imposed").

**51.** (57) **Commonwealth v. Lloyd Reid, CP-51-CR-0405461-1991**

Defendant was resentenced to Life. Online Docket Entry, p.3, 10/20/94.

**52.** (58) **Commonwealth v. Timothy Rice, CP-51-CR-0906231-1996**

Commonwealth v. Rice, 2013 WL 11256379, at *2 (Pa. Super. Aug. 5, 2013). ("[T]he PCRA court, with the agreement of the Commonwealth, granted [Defendant's] motion to vacate both death sentences, and instead, imposed two consecutive life sentences").

**53.**   (59) **Commonwealth v. Delores Rivers, CP-51-CR-0335191-1988**

The Commonwealth agreed to Life if Defendant would waive all future appeals. Court Commitment, 6/30/05.

**54.**   (60) **Commonwealth v. Florencio Rolan, CP-51-CR-0228931-1984**

After a re-sentencing hearing, a jury unanimously sentenced Defendant to Life. Rolan v. Vaughn, 2004 WL 2297407, at *1.

**55.**   (61) **Commonwealth v. Saharris Rollins, CP-51-CR-0405851-1986**

On remand, the Commonwealth agreed to Life. Online Docket Entry, p.6, 12/21/11 ("This case was sent back from Federal court. The original sentence was vacated. Listed for re-sentencing. The Commonwealth will not seek the death penalty on remand").

**56.**   (62) **Comm. v. James Melvin Smith, CP-51-CR-0717891-1983**

Online Docket Entry, p.18, 10/25/2012 ("The defendant is re-sentenced to life without parole. The defendant is to be taken off of death row forthwith").

**57.**   (63) **Commonwealth v. Willie Sneed, CP-51-CR-0606741-1984**

Online Docket Entry, p.8, 12/18/12 ("Order Granting Motion to Vacate Sentence By agreement of counsel, Court orders DEATH SENTENCE imposed on 4/2/1986 VACATED and imposes a new sentence of LIFE Imprisonment").

**58.**   (64) **Commonwealth v. Brian Thomas, CP-51-CR-0827161-1985**

Online Docket Entry, p.14, 9/24/13 ("The death penalty has been vacated. Life without parole on count #9").

**59.**   (65) **Commonwealth v. LeRoy Thomas, CP-51-CR-1207001-1994**

Online Docket Entry, p.16, 3/15/13 ("New sentence of life without parole. The defendant is to be taken off of death row").

**60.**   (66) <u>**Comm. v. Michael Thomaston,**</u> **CP-51-CR-0400541-1995**

The PCRA court imposed Life. <u>Online Docket Entry</u>, p.4, 12/11/02.

**61.**   (67) <u>**Comm. v. Andre Thompson,**</u> **CP-51-CR-0221931-1993**

At the PCRA stage, the Commonwealth agreed to a term of years sentence. <u>Online Docket Entry</u>, p.12, 9/20/05.

**62.**   (68) <u>**Commonwealth v. Louis Thompson,**</u> **CP-51-CR-0436071-1990**

Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.6, 5/21/04.

**63.**   (70) <u>**Commonwealth v. Philip Trivigno,**</u> **CP-51-CR-0100861-1996**

After a new penalty phase hearing, the jury imposed Life.   <u>Online Docket Entry</u>, p.4, 1/29/03; <u>PCRA Opinion</u>, Tucker, J. 11/2/16, at p.2.

**64.**   (71) <u>**Comm. v.Vinson Washington**</u>, **CP-51-CR-0310321-1994**

<u>Online Docket Entry</u>, p.13, 5/16/11 ("[B]ased on stipulation of parties, the defendant is sentenced to LIFE Imprisonment").

**65.**   (72) <u>**Commonwealth v. Derrick White,**</u> **CP-51-CR-0012991-2010**

The PCRA court quashed the sole aggravating circumstance and sentenced Defendant to Life. <u>Commonwealth v. White</u>, (Memorandum Opinion), 1152 EDA 2015, at p.5.

**66.**   (73) <u>**Comm. v. Christopher Williams**</u>, **CP-51-CR-0417523-1992**

The Commonwealth subsequently "withdrew the capital designation on this case". <u>Online Docket Entry</u>, p.32, 8/9/18.

**67.**   (74) <u>**Commonwealth v. Craig Williams,**</u> **CP-51-CR-0525631-1987**

The Commonwealth agreed to the imposition of a life sentence.   <u>Online Docket Entry</u>, p.17, 5/1/12.

### (2). *SUBSECTION TWO* - Non-Capital Outcomes of Cases Overturned on Other Grounds

**35 (92%)** of the 38 Philadelphia death cases overturned on other grounds resulted in a non-capital disposition—either a life sentence, a terms of years sentence, an acquittal, or withdrawal of prosecution. Four overturned death cases did *not* result in non-capital dispositions. One defendant was resentenced to death but died of natural causes while in custody.[10] One defendant died before his resentencing hearing.[11] In one case, the defendant's sentence remains the subject of ongoing litigation.[12]

### 1.  <u>Mumia Abu-Jamal</u>, CP-51-CR-0113571-1982

On remand the Commonwealth did not seek a new penalty phase hearing. <u>On Line Docket Entry</u>, p.10, 8/13/12 ("And Now this 13th day of August 2012, the Commonwealth having not requested a new sentencing hearing … it is Hereby Decreed that Mumia Abu-Jamal is sentenced to life imprisonment").

### 2.  <u>Commonwealth v. Sam Bannerman,</u> CP-51-CR-1033281-1984

Defendant entered guilty plea and was resentenced to Life. <u>Online Docket Entry</u>, p.2, 10/9/91.

### 3.  <u>Commonwealth v. Edward Bracey,</u> CP-51-CR-0632821-1991

The Supreme Court affirmed the PCRA court's determination that Defendant is intellectually disabled. <u>Commonwealth v. Bracey</u>, 117 A.3d 270 (Pa. 2015). Resentenced: January 10, 2014

---

[10]    <u>Commonwealth v. Alfred Jasper</u>, CP-51-CR-0613941-1984.

[11]    <u>Commonwealth v. Willie Clayton</u>, CP-51-CR-1127941-1984.

[12]    <u>Commonwealth v. Ernest Porter</u>, CP-51-CR-0622491-1985.

4.      **<u>Commonwealth v. James Bryant</u>, CP-51-CR-1023791-1983**

Case nolle prossed. <u>Online Docket Entry</u>, p.3, 1/25/93.

5.      **<u>Commonwealth v. Kevin Chandler</u>, CP-51-CR-0832561-1993**

Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.5, 8/11/99.

6.      **<u>Commonwealth v. Joseph D'Amato</u>, CP-51-CR-1219941-1981**

Defendant resentenced to Life pursuant to <u>Atkins</u>. <u>Online Docket Entry</u>, p.18, 6/13/13.

7.      **<u>Commonwealth v. Jose DeJesus</u>, CP-51-CR-0704671-1998**

The Commonwealth agreed to Life in exchange for Defendant's guilty plea. <u>On Line Docket Entry</u>, p.5, 1/4/18 ("Commonwealth agrees that PCRA petition is granted as to the death penalty sentences … Re-sentenced to Life without the possibility of parole").

8.      **<u>Commonwealth v. Jose DeJesus</u>, CP-51-CR-1103501-1997**

At the post-conviction stage, the PCRA court vacated Defendant's sentence and imposed Life. <u>Secure Docket Entry</u>, p.24, 1/4/18 ("Order Granting Motion to Vacate Sentence Listed Today for Re-Sentencing. Commonwealth agrees that PCRA petition is granted as to the death penalty sentences … Re-sentenced to Life without the possibility of parole").

9.      **<u>Commonwealth v. DeJesus</u>, CP-51-CR-1103511-1997**

The Commonwealth agreed to PCRA relief and a sentence of Life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 16).

10.      **<u>Commonwealth v. James Dennis</u>, CP-51-CR-0104841-1992**

On remand, the Commonwealth agreed to a negotiated guilty plea to third degree murder. <u>Online Docket Entry</u>, p.25, 12/22/16.

11.    **<u>Commonwealth v. Neil Ferber</u>, CP-51-CR-0710481-1981**

After conviction and death sentence, Defendant "ultimately was released from custody after law enforcement authorities conceded that he, in fact, had nothing whatsoever to do with these murders." <u>Neil Ferber & Annette Ferber, h/w v. City of Philadelphia, Sergeant Daniel Rosenstein & Officer Dominic Frontino</u>, 1994 WL 1251179 (Pa. Com. Pl. Oct. 3, 1994), <u>aff'd in part, rev'd in part sub nom.</u> <u>Ferber v. City of Philadelphia</u>, 661 A.2d 470 (Pa. Commw. Ct. 1995).  Case nolle prossed.  <u>On Line Docket Entry</u>, p.3, 3/7/86.

12.    **<u>Commonwealth v. Calvin Floyd</u>, CP-51-CR-0813171-1980**

Defendant's sentence automatically modified to Life, based on the law as it existed at that time.

13.    **<u>Commonwealth v. George Goins</u>, CP-51-CR-0829421-1981**

Defendant's sentence automatically modified to Life, based on the law as it existed at that time.

14.    **<u>Commonwealth v. Harrison Graham</u>, CP-51-CR-0839481-1987**

Defendant resentenced to Life pursuant to <u>Atkins</u>. <u>Online Docket Entry</u>, p.9, 12/18/03.

15.    **<u>Commonwealth v. William Green</u>, CP-51-CR-0427361-1982**

Remanded for a new penalty hearing. Defendant resentenced to Life. <u>Online Docket Entry</u>, p.3, 9/10/91.

16.    **<u>Commonwealth v. Eric Grier</u>, CP-51-CR-0334871-1989**

On remand, the Defendant entered a guilty plea and received Life. <u>Online Docket Entry</u>, p.3, 1/5/98.

17.    **<u>Commonwealth v. Donald Hardcastle</u>, CP-51-CR-0632881-1982**

On remand, Defendant entered a negotiated guilty plea for a term of years sentence. <u>Online Docket Entry</u>, p.5, 3/16/11.

### 18.   <u>**Commonwealth v. Derrick Harvey**</u>, CP-51-CR-0307631-1998

On March 28, 2003, Defendant was resentenced to life imprisonment without parole following his new penalty hearing. <u>Harvey v. Folino</u>, 2011 WL 9155257, at *3 (E.D. Pa. Dec. 20, 2011).

### 19.   <u>**Commonwealth v. Melvin Howard**</u>, CP-51-CR-0304271-1988

The Commonwealth agreed to vacate Defendant's death sentence, pursuant to <u>Atkins</u>. <u>On Line Docket Entry</u>, p.11, 6/10/11. <u>Howard v. Horn</u>, 56 F. Supp. 3d 709, 715 (E.D. Pa. 2014) ("Petitioner's death sentence was vacated and he was resentenced to life in prison without parole").

### 20.   <u>**Commonwealth v. Andrew Huffman**</u>, CP-51-CR-0511051-1989

Defendant sentenced to Life.  Unclear from Docket Entries whether he entered a guilty plea or went to trial and was convicted. Also unclear whether the Commonwealth agreed or a new penalty phase resulted in Life. <u>Online Docket</u> <u>Entry</u>, p.4, 1/14/98.

### 21.   <u>**Commonwealth v. Kevin Hughes**</u>, CP-51-CR-0116881-1980

The PCRA court granted relief pursuant to <u>Roper</u> "because Petitioner was less than eighteen years old at the time of the offense". <u>Online Docket Entry</u>, p.8, 3/21/05.

### 22.   <u>**Commonwealth v. James Lambert**</u>, CP-51-CR-0803432-1983

Defendant entered a negotiated guilty plea to third degree murder for a term of years sentence. <u>Online Docket Entry</u>, p.10, 12/18/17.

### 23.   <u>**Commonwealth v. Percy Lee**</u>, CP-51-CR-0511562-1986

Because Lee was 17 at the time of the murders, his death sentence was later vacated under <u>Roper</u> and replaced with two consecutive life sentences. <u>Lee v.</u> <u>Smeal</u>, 447 F. App'x 357, 359 n.2 (3d Cir. 2011).

### 24.    Commonwealth v. Marcus Lloyd, CP-51-CR-0501982-1998

On August 20, 2003, the Common Pleas Court conducted a new penalty phase hearing. The Commonwealth agreed to a new sentencing hearing before the trial court, without a jury. Online Docket Entry, p.6, 8/20/03. The sentencing court imposed consecutive life sentences. Commonwealth v. Lloyd, 2004 WL 3481055 (Pa.Super.), at 5.

### 25.    Commonwealth v. Cam Ly, CP-51-CR-1125561-1986

When Defendant filed a new PCRA petition, the Commonwealth agreed to Life. Online Docket Entry, p.10, 12/12/13.

### 26.    Commonwealth v. Kenneth Miller, CP-51-CR-0902382-1998

At the PCRA stage, the PCRA court vacated Defendant's sentence and imposed Life. Secure Docket Entry, p.52, 5/13/14.

### 27.    Commonwealth v. Michael Overby, CP-51-CR-0105802-1995

On remand, Defendant was sentenced to Life. Not clear if he had a new trial or the Commonwealth agreed to a life sentence. Online Docket Entry, p.24, 6/21/07.

### 28.    Commonwealth v. Simon Pirela, CP-51-CR-0121431-1983

The Pennsylvania Supreme Court affirmed the PCRA court's determination that Defendant is intellectually disabled. Commonwealth v. Pirela, 929 A.2d 629 (Pa. 2007).

### 29.    Commonwealth v. Paul Rizzuto, CP-51-CR-0132391-1994

After a new hearing, Defendant was sentenced to Life. Online Docket Entry, p.5, 10/7/03.

### 30.    Commonwealth v. Bobby Sims, CP-51-CR-0500751-1982

Defendant pleaded guilty to a term of years sentence. Online Docket Entry, p.3, 9/25/87.

**31.     Commonwealth v. Lawrence Smith, CP-51-CR-1001002-2000**

The Commonwealth did not request a new penalty hearing and the Defendant was resentenced to Life. Online Docket Entry, p.17, 11/1/05.

**32.     Commonwealth v. Anthony Washington, CP-51-CR-1210371-1993**

The Commonwealth removed the capital designation. Online Docket Entry, 3/14/19. Retrial scheduled for July 22, 2019.

**33.     Commonwealth v. Raymond Whitney, CP-51-CR-1114161-1981**

The Court of Common Pleas found "the evidence of [Defendant's] mental retardation 'overwhelming'." The Court vacated Defendant's death sentence and resentenced him to life without possibility of parole. The Commonwealth did not appeal. Whitney v. Horn, 2008 WL 4761733, at *3 (E.D. Pa. Oct. 30, 2008).

**34.     Commonwealth v. Terrence Williams, CP-51-CR-0823621-1984**

The Commonwealth did not seek a new penalty phase and Defendant was resentenced to Life. On Line Docket Entry, p.17, 12/29/17 ("Order - Sentence/Penalty Imposed Remand From Supreme Court. Defendant Resentenced. Murder-Life Without Parole").

**35.     Commonwealth v. Zachary Wilson, CP-51-CR-0929501-1986**

On retrial, Defendant was convicted but the Commonwealth did not seek the death penalty. Commonwealth v. Wilson, 147 A.3d 7, 12 (Pa. Super. 2016).

# PART I, SECTION D

## COMMONWEALTH AGREEMENT TO NON-CAPTIAL OUTCOMES IN CASES WHERE THE DEATH SENTENCE WAS OVERTURNED

As noted in Part I, Section C, 102 of the 112 overturned Philadelphia death sentences ultimately resulted in a non-capital disposition. The Philadelphia District Attorney's Office (DAO) agreed to non-capital dispositions in **65 (63.7%)** of the 102 Philadelphia cases where the original death sentence was overturned. In all of these cases, the Commonwealth could have retried either the guilt or the penalty phase. Instead, it elected to pursue a non-capital resolution. In each of these **65** cases, the Commonwealth's agreement to a non-capital resolution occurred **before** the current Philadelphia District Attorney assumed office.

Part I, Section D is divided into two Subsections. Section D, Subsection One lists the pre-2018 cases where the DAO agreed to a non-capital sentence after a finding of prior counsel's ineffectiveness. (Total **50**). Each case is listed by the defendant's name, Common Pleas Court docket number, and by the number assigned to it in Part I, Section A, Subsection One. The same information regarding whether the DAO agreed to a non-capital resolution appears in the preceding list of 74 IAC cases (Part I, Section A, Subsection One). That information is separately detailed here, for ease of reference.

Section D, Subsection Two lists pre-2018 cases where the Commonwealth agreed to a non-capital sentence after a reviewing court vacated the original sentence on other grounds. (Total **15**).

### (1). *SUBSECTION ONE* – **DAO Agreement in IAC Cases (Total – 50)**

**1.**      (2) **Comm. v. Lee Baker**, **CP-51-CR-0405062-1984**

After the District Court ruled that counsel was ineffective, Defendant entered a negotiated guilty plea and received a term of years sentence. Baker v. Horn, 383 F. Supp. 2d 720, 765, 777-779 (E.D. Pa. 2005); Online Docket Entry, p.6, 5/23/2008 ("Negotiated guilty plea. Defendant waived formal arraignment, plead and was adjudged guilty").

**2.** (3) **Comm. v. Billa**, **CP-51-CR-0136311-1987**

After the Supreme Court ruled that counsel was ineffective, Defendant pleaded guilty and received a life sentence. Commonwealth v. Billa, 555 A.2d 835, 842 (Pa. 1989); Online Docket Entry, p.3, 1/11/90.

**3.**      (5) **Comm. v. Aquil Bond**, **CP-51-CR-0502971-2004**

After the PCRA court vacated Defendant's death sentence, the case was resolved through a negotiated disposition. Online Docket Entry, p.52, 3/13/17; Online Docket Entry, p.52, 5/19/17.

**4.**      (6) **Comm. v. Jesse Bond**, **CP-51-CR-2217781-1992**

After the Third Circuit ruled that counsel was ineffective, the Commonwealth agreed to a life sentence. Bond v. Beard, 539 F.3d 256, 291 (3d Cir. 2008); Online Docket Entry, p.11, 11/15/12 ("The Commonwealth will not seek the death penalty").

**5.** (8) **Comm. v. Samuel Carson**, **CP-51-CR-0228371-1994**

After the Supreme Court remanded for an evidentiary hearing on Defendant's ineffectiveness claim, the Commonwealth agreed to a life sentence.

A-212

Commonwealth v. Carson, 913 A.2d 220, 267-268 (Pa. 2006); Online Docket Entry, p.12, 4/04/11 ("Both sides agree to Life Imprisonment").

### 6.    (9)  **Comm. v. Ronald Clark**, CP-51-CR-1241151-1993

After the PCRA court granted Appellant's request for a new penalty hearing based on trial counsel's ineffectiveness, the defendant pleaded guilty in exchange for a life sentence. Commonwealth v. Clark, 961 A.2d 80, 83 (Pa. 2008); Online Docket Entry, p.13, 8/16/11 ("Order - Sentence/Penalty Imposed – agreement").

### 7. (10) **Comm. v. Rodney Collins**, CP-51-CR-0815881-1992

After the PCRA court granted Appellant a new penalty hearing based on trial counsel's ineffectiveness, the Commonwealth did not appeal. Collins, 957 A.2d at 243. Thereafter, the Commonwealth did not seek a new penalty hearing.  Defendant was resentenced to Life by the Homicide Calendar Judge. Online Docket Entry, p.17, 11/05/09 ("On count 1, life without parole. All of the other charges remain the same").

### 8. (14) **Comm v. Dewitt Crawley**, CP-51-CR-0201551-1984

After Defendant raised claims of trial counsel's ineffectiveness at the PCRA stage, the Commonwealth agreed to a life sentence. Crawley v. Horn, 7 F. Supp. 2d 587, 588 (E.D. Pa. 1998); Online Docket Entry, p.13, 5/1/15 ("By agreement the above defendant is re-sentenced to life without parole").

### 9. (16) **Comm. v. Daniel Dougherty,** CP-51-CR-0705371-1999

At the PCRA stage, the Commonwealth conceded that trial counsel was ineffective at the penalty phase "for failure to investigate and present certain mitigation evidence." Online Docket Entry, p.23, 2/7/12. The Commonwealth agreed that it would not pursue the death penalty at a new sentencing hearing and agreed to a life sentence. Commonwealth v. Dougherty, 2017 WL 4949000, at *2 (Pa. Super. 2017) (death sentences vacated and life imposed "upon the agreement of the parties").

**10.**   (17) <u>**Comm. v. Joseph Elliott**</u>, **CP-51-CR-0410911-1994**

At the PCRA stage, "the Commonwealth agreed not to oppose Elliott's request for a new penalty hearing." <u>Commonwealth v. Elliott</u>, 80 A.3d 415, 424 n.5 (Pa. 2013). Thereafter, the Commonwealth agreed to a life sentence and the defendant was resentenced, by video, before the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.23, 5/1/15.

**11.**   (19) <u>**Comm. v. Lester Fletcher**</u>, **CP-51-CR-0709931-2001**

After the Supreme Court granted the parties' joint motion for remand, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Fletcher</u>, 43 A.3d 1289 (Pa. 2012); <u>Online Docket Entry</u>, p.13, 7/18/12 ("The defendant has agreed to withdraw all current appeals and waives all future appeals").

**12.** (20) <u>**Comm. v. Kenneth Ford**</u>, **CP-51-CR-1032221-1989**

After the Supreme Court ruled that counsel was ineffective, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Ford</u>, 809 A.2d 325, 331 (Pa. 2002); <u>Online Docket Entry</u>, p.9, 11/29/2004.

**13.**   (23) <u>**Comm. v. Ronald Hanible**</u>, **CP-51-CR-0409021-1999**

At the PCRA stage, the Commonwealth "agreed that a new penalty hearing was warranted due to trial counsel's failure to present available mitigating evidence." <u>Commonwealth v. Hanible</u>, 30 A.3d 426, 438 (Pa. 2011); The Commonwealth did not seek a new penalty hearing and Defendant was resentenced to life in prison by the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.20, 9/24/13.

**14.**   (24) <u>**Comm. v. John Harris**</u>, **CP-51-CR-0903421-1992**

After the PCRA court granted an evidentiary hearing on Appellant's claim that counsel had been ineffective during the penalty phase, Defendant was resentenced to Life before the Homicide Calendar Judge. <u>Commonwealth v. Harris</u>, 852 A.2d 1168, 1171 (Pa. 2004); <u>Online Docket Entry</u>, p.8, 2/28/05.

**15.**   (25) **Comm. v. Donetta Hill, CP-51-CR-0518391-1991**

After the District Court ruled that counsel was ineffective, Defendant entered a negotiated guilty plea and received a term of years sentence.  Hill v. Wetzel, 279 F. Supp. 3d 550, 566 (E.D. Pa. 2016); Online Docket Entry, p.22, 7/12/17.

**16.**   (27) **Comm. v. Arnold Holloway, CP-51-CR-0613051-1985**

After the Third Circuit ruled that counsel was ineffective, the Commonwealth agreed to term of years sentence. Holloway v. Horn, 355 F.3d 707, 730 (3rd Cir. 2004) (remanding the case for retrial); Online Docket Entry, p.5, 4/14/05.

**17.**   (28) **Comm. v. Steven Hutchinson, CP-51-CR-0408581-1998**

"[W]ith with the agreement of the Commonwealth, the PCRA court entered an order … granting Appellant a new penalty phase hearing." Commonwealth v. Hutchinson, 25 A.3d 277, 284 (Pa. 2011). By agreement, Defendant was resentenced to Life. Online Docket Entry, p.16, 1/23/2013.

**18.**   (29) **Comm. v. Kareem Johnson, CP-51-CR-1300424-2006**

"At the PCRA stage, the Commonwealth conceded that Defendant was denied effective assistance of counsel … and therefore the parties stipulated that Appellant was entitled to a new trial." Commonwealth v. Johnson, 2018 WL 3133226. Thereafter, the Commonwealth notified the trial court that that it would not seek the death penalty. Brief for Appellee, Commonwealth v. Johnson, 927 EDA 2016, at p.2 n.1; Online Docket Entry, p.30, 2/17/16 ("Notice of Removal of Capital Designation").

**19.** (30) **Comm. v. William Johnson, CP-51-CR-0936052-1991**

At the PCRA stage, the Commonwealth agreed that Defendant should have a new penalty phase hearing. (N.T. 5/22/14 at 4). The Commonwealth subsequently agreed that it would not pursue the death penalty. (N.T. 10/7/16 at 5) ("The Commonwealth has determined we will not be going forward with the new penalty hearing"). Defendant was subsequently sentenced to Life. Online Docket Entry, p.20 9/21/16.

**20.**   **(31) Comm. v. Damon Jones, CP-51-CR-907121-1982**

After the Supreme Court ruled that counsel was ineffective, Defendant pleaded guilty and received a life sentence. Commonwealth v. Jones, 912 A.2d 268, 290 (Pa. 2006); Commonwealth v. Jones, 520 EDA 2013, at 1 (Pa. Super. 11/24/14) ("[T]he Commonwealth elected not to re-pursue the death penalty following the grant of penalty phase relief during PCRA proceedings").

**21. (32) Comm. v. James Jones, CP-51-CR-1024861-1980**

The PCRA court awarded penalty phase relief and denied all guilt phase relief. Commonwealth v. Jones, 876 A.2d 380, 383 (Pa. 2005). Defendant subsequently sentenced to Life, by agreement. Online Docket Entry, p.11, 8/16/11 ("Commonwealth withdraws penalty phase for death sentence").

**22. (34) Comm. v. Alexander Keaton, CP-51-CR-0319251-1993**

After the Supreme Court affirmed the PCRA court's grant of penalty phase relief, the Commonwealth agreed to a life sentence. Commonwealth v. Keaton, 45 A.3d 1050 (Pa. 2012); Commonwealth's Response to Petition for Writ of Habeas Corpus, Keaton v. Folino, No. 11-cv-7225 (E.D. Pa.) ("[B]y agreement, a life sentence was imposed").

**23. (35) Comm. v. Joseph Kindler, CP-51-CR-0827471-1982**

After the Third Circuit ruled that counsel was ineffective, the Commonwealth agreed to a life sentence. Kindler v. Horn, 642 F.3d 398, 405 (3d Cir. 2011); On Line Docket Entry, p.26, 3/01/18 ("Commonwealth is not seeking the death penalty").

**24. (38) Comm. v. Reginald Lewis, CP-51-CR-0205851-1983**

After the Third Circuit remanded for an evidentiary hearing on Defendant's ineffectiveness claim, the Commonwealth agreed to a life sentence. Lewis v. Horn, 581 F.3d 92, 117 (3d Cir. 2009); Online Docket Entry, p.3, 7/9/12 ("The death penalty has been removed").

**25.**   (39) <u>**Comm. v. Steven McCrae**</u>, **CP-51-CR-0204521-1999**

After Defendant filed a PCRA petition claiming that trial counsel was ineffective for failing to investigate and present mitigation evidence, the Commonwealth "agreed that [the PCRA] Court may vacate [Defendant's] two death sentences and impose two consecutive life sentences." <u>Written Agreement Colloquy</u>, 4/13/06 at p.2.

**26.**   (40) <u>**Comm. v. Bernard McGill**</u>, **CP-51-CR-0339201-1990**

After the Supreme Court remanded for a hearing regarding Defendant's penalty phase ineffectiveness claims, the Commonwealth agreed to a life sentence. <u>Commonwealth v. McGill</u>, 832 A.2d 1014, 1026 (Pa. 2003); <u>Online Docket Entry</u>, p.15, 1/7/13 ("Revised upon appeal, the death penalty is vacated. The defendant is re-sentenced to life without parole").

**27. (43)** <u>**Comm. v. William Mikell**</u>, **CP-51-CR-0716051-1987**

After the Supreme Court agreed with Defendant's ineffectiveness claim and ordered a new trial, Defendant was re-convicted by a jury. However, the Commonwealth did not seek a death sentence and the trial court resentenced Defendant to life imprisonment. <u>Online Docket Entry</u>, p.13, 12/9/04.

**28.**   (44) <u>**Comm. v. Mikal Moore**</u>, **CP-51-CR-0701141-1998**

At the PCRA stage, the Commonwealth agreed to a life sentence. <u>Online Docket Entry</u>, p.22, 3/27/17 ("Order - Sentence/Penalty Imposed By Agreement this court Vacates previous sentence of DEATH and reimposes a sentence of LIFE as to Murder 1st Degree").

**29. (46)** <u>**Comm. v. Willard Moran**</u>, **CP-51-CR-1130901-1981**

The PCRA court granted relief, vacating the sentence of death and imposing a sentence of Life. <u>Order</u>, 1/27/99, Lineberger, J. ("The Court finds that Defendant has proven that his trial counsel failed to convey a pretrial offer to plead guilty and receive a life imprisonment sentence"). After the Commonwealth did not appeal the PCRA court's decision, Defendant was resentenced to Life. <u>Docket Entry</u>, p.3, 1/27/99.

**30.**   (47) <u>**Comm. v. Kelvin Morris**</u>**, CP-51-CR-0704091-1982**

After the District Court ruled that counsel was ineffective, Defendant entered a negotiated guilty plea and received a term of years sentence. <u>Morris v. Beard</u>, 2012 WL 4757868, at *1 (E.D. Pa. Oct. 5, 2012); <u>Online Docket Entry</u>, p.12, 6/7/13.

**31.** (48) <u>**Comm. v. Craig Murphy, CP-51-CR-0925231-1985**</u>

After the Supreme Court agreed with Defendant's ineffectiveness claim and ordered a new trial, Defendant entered a guilty plea for a life sentence. <u>Commonwealth v. Murphy</u>, 591 A.2d 278, 280–281 (Pa. 1991); <u>Online Docket Entry</u>, p.3, 11/22/91 ("Guilty Plea … Confinement LIFE").

**32.**   (51)  <u>**Comm. v. Lamont Overby**</u>, CP-51-CR-1006081-1996

After the PCRA court granted penalty phase relief, the Commonwealth agreed to Life. <u>On Line Docket Entry</u>, p.20, 10/18/13 ("After hearing, sentence of LIFE imprisonment without the possibility of parole is imposed for Murder in the First Degree").

**33.** (56) <u>**Comm. v. Otis Peterkin, CP-51-CR-0207841-1982**</u>

After the District Court ruled that counsel was ineffective, Defendant entered a guilty plea and received a life sentence. <u>Peterkin v. Horn</u>, 176 F. Supp. 2d 342, 376–377 (E.D. Pa. 2001); <u>Online Docket Entry</u>, p.3, 12/6/02 ("Guilty Plea … Confinement LIFE").

**34.** (55) <u>**Comm. v. Michael Rainey, CP-51-CR-0419613-1990**</u>

After the Supreme Court remanded for a hearing regarding the mitigation evidence that trial counsel failed to present, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Rainey</u>, 928 A.2d 215, 237-238, 240 (Pa. 2007); <u>Online Docket Entry</u>, p.12, 3/10/09.

**35.**   (56) <u>**Comm. v. Wilfredo Ramos**</u>, CP-51-CR-0100891-1999

The PCRA court vacated Defendant's death sentence "based upon the Commonwealth's agreement not to contest [Appellant]'s request for a new penalty hearing based upon ineffective assistance of trial counsel at the

penalty hearing for failure to investigate and present certain mitigation evidence." Commonwealth v. Ramos, 2017 WL 4286386, at *7 (Pa. Super. Ct. Sept. 27, 2017). Thereafter, the Commonwealth agreed to a life sentence. Online Docket Entry, p.18, 4/18/08 (noting "the Commonwealth's certification that, in the exercise of its discretion, it will not pursue a new penalty hearing").

### 36. (57) **Comm. v. Lloyd Reid, CP-51-CR-0405461-1991**

After the post-sentence motion court vacated Defendant's death sentence, the Commonwealth withdrew the death certification and defendant was sentenced to life imprisonment. Reid v. Price, 2000 WL 992609, at *1 (E.D. Pa. July 17, 2000); Brief for Appellee Commonwealth of Pennsylvania, 1563 EDA 2018, at p.2.

### 37. (58) **Comm. v. Timothy Rice, CP-51-CR-0906231-1996**

The PCRA court, with the agreement of the Commonwealth, vacated both death sentences and imposed two consecutive life sentences. Commonwealth v. Rice, 2013 WL 11256379, at *2 (Pa. Super. Aug. 5, 2013).

### 38. (59) **Comm. v. Delores Rivers, CP-51-CR-0335191-1988**

After the District Court ruled that counsel was ineffective, Defendant entered a guilty plea and received a life sentence. Federal Docket Entry, 5/10/05; Docket Entry, CP-51-CR-0335191-1988, 6/30/05 (imposing a life sentence "as per attached agreement").

### 39. (61) **Comm. v. Saharris Rollins, CP-51-CR-0405851-1986**

After the Third Circuit ruled that counsel was ineffective, the Common Pleas Court imposed a life sentence. Rollins v. Horn, 386 F. App'x 267, 270 (3d Cir. 2010); Online Docket Entry, p.6, 12/21/11 ("The Commonwealth will not seek the death penalty on remand").

### 40. (62) **Comm. v. James Smith, CP-51-CR-0717891-1983**

At the PCRA stage, defense counsel and the Commonwealth stipulated that Defendant would be granted a new penalty phase hearing based on the ineffectiveness of trial counsel. Commonwealth v. Smith, 17 A.3d 873, 882

(Pa. 2011). Thereafter, the Commonwealth agreed to a life sentence. <u>Commonwealth's Response to Petition for Writ of Habeas Corpus</u> ("The prosecution later agreed not to seek a new capital sentencing proceeding").

### 41. (63) <u>Comm. v. Willie Sneed</u>, CP-51-CR-0606741-1984

After the Supreme Court affirmed the PCRA court's grant of penalty phase relief, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Sneed</u>, 899 A.2d 1067, 1084 (Pa. 2006); <u>Online Docket Entry</u>, p.8, 12/18/12 ("Order Granting Motion to Vacate Sentence By agreement of counsel, Court orders DEATH SENTENCE imposed on 4/2/1986 VACATED and imposes a new sentence of LIFE Imprisonment").

### 42. (64) <u>Comm. v. Brian Thomas</u>, CP-51-CR-0827161-1985

After the Third Circuit remanded for an evidentiary hearing on Defendant's ineffectiveness claim, the Commonwealth agreed to a life sentence. <u>Thomas v. Horn</u>, 570 F.3d 105, 130 (3d Cir. 2009); <u>Online Docket Entry</u>, p.14, 9/24/13.

### 43. (65) <u>Comm. v. LeRoy Thomas</u>, CP-51-CR-1207001-1994

At the PCRA stage, the Commonwealth agreed to a new penalty hearing. <u>Commonwealth v. Thomas</u>, 44 A.3d 12, 16 n.3 (Pa. 2012) ("the parties stipulated to a new penalty hearing"); The Commonwealth subsequently agreed to a life sentence before the Homicide Calendar Judge. <u>Online Docket Entry</u>, p.16, 3/15/13.

### 44.    (66) <u>Comm. v. Michael Thomaston</u>, CP-51-CR-0400541-1995

At the post-sentence motion stage, the Common Pleas Court vacated the death sentence and granted a new penalty phase hearing. <u>Commonwealth v. Thomaston</u>, 118 EDA 2003, at 4 (Pa. Super. 11/16/04) (Memorandum). The Commonwealth did not seek a new penalty hearing and the PCRA court imposed Life. <u>Online Docket Entry</u>, p.4, 12/11/02; <u>Brief for Appellee</u>, 314 EDA 2008 ("Judge Mazzola reviewed the record, denied defendant's request for a new trial, but vacated his death sentence and imposed a sentence of life imprisonment").

**45.**   (67) <u>**Comm. v. Andre Thompson**</u>, **CP-51-CR-0221931-1993**

At the PCRA stage, the Commonwealth agreed to a term of years sentence. <u>Online Docket Entry</u>, p.12, 9/20/05

**46.**   (68) <u>**Comm. v. Louis Thompson**</u>, **CP-51-CR-0436071-1990**

At the PCRA stage, the Commonwealth agreed that Defendant received ineffective assistance at his penalty phase. <u>Docket Entry</u>, 5/21/04. With the Commonwealth's agreement, Defendant was resentenced to Life. <u>Online Docket Entry</u>, p.6, 5/21/04; <u>Correspondence</u>, 4/29/04.

**47.**   (69) <u>**Comm. v. William Tilley**</u>, **CP-51-CR-1210781-1985**

At the PCRA stage, the Commonwealth agreed that Defendant was entitled to a new penalty phase. (N.T. 5/1/07 at 7-8). The case was closed upon Defendant's death. <u>Online Docket Entry</u>, p.10, 1/21/2009.

**48.**   (71) <u>**Comm. v.Vinson Washington**</u>, **CP-51-CR-0310321-1994**

After the Supreme Court remanded for a hearing regarding trial counsel's ineffectiveness, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Washington</u>, 880 A.2d 536, 546 (Pa. 2005); <u>Online Docket Entry</u>, p.13, 5/16/11 ("[B]ased on stipulation of parties, the defendant is sentenced to LIFE Imprisonment").

**49.**   (73) <u>**Comm. v. Christopher Williams**</u>, **CP-51-CR-0417523-1992**

After the PCRA court determined that prior counsel were ineffective, the Commonwealth "withdrew the capital designation on this case". <u>Online Docket Entry</u>, p.25, 12/30/13; <u>On Line Docket Entry</u>, p.32, 8/9/18.

**50.**   (74) <u>**Comm. v. Craig Williams**</u>, **CP-51-CR-0525631-1987**

At the PCRA stage, the Commonwealth consented to the grant of a new capital penalty hearing. <u>Commonwealth v. Williams</u>, 980 A.2d 510, 513 (Pa. 2009). The Commonwealth did not seek a new penalty hearing and the Homicide Calendar Judge resentenced Defendant to Life. <u>Online Docket Entry</u>, p.17, 5/1/12.

### (2).   *SUBSECTION TWO* – DAO Agreement in Cases Overturned for Other Reasons (Total – 15)

### 1.   <u>Comm. v. Mumia Abu-Jamal</u>, CP-51-CR-0113571-1982

After Defendant received a penalty phase relief, the Commonwealth did not seek a new penalty phase hearing. <u>Abu-Jamal v. Sec'y, Pa. Dep't of Corrections</u>, 643 F.3d 370, 381-382 (3d Cir. 2011); <u>Online Docket Entry</u>, p.10, 8/13/12 ("the Commonwealth having not requested a new sentencing hearing … it is HEREBY DECREED that Mumia Abu-Jamal is sentenced to life imprisonment").

### 2.   <u>Comm. v. Jose DeJesus</u>, CP-51-CR-1103501-1997

The Commonwealth agreed to PCRA relief and a sentence of life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 15).

### 3.   <u>Comm. v. Jose DeJesus</u>, CP-51-CR-1103511-1997

The Commonwealth agreed to PCRA relief and a sentence of Life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 16).

### 4.   <u>Comm. v. DeJesus</u>, CP-51-CR-0704671-1998

The Commonwealth agreed to PCRA relief and a sentence of Life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 16).

### 5.   <u>Comm. v. James Dennis</u>, CP-51-CR-0104841-1992

After the Third Circuit granted Defendant a new trial due to a <u>Brady</u> violation, the Commonwealth agreed to a negotiated guilty plea to third degree murder. <u>Dennis v. Sec'y Dept. Corrs.</u>, 834 F.3d 263 (3d Cir. 2016) (*en banc*); <u>Online Docket Entry</u>, p.25, 12/22/16.

### 6.   <u>Comm. v. Eric Grier</u>, CP-51-CR-0334871-1989

The Pennsylvania Supreme Court granted a new trial due to the trial court's erroneous instruction on accomplice liability. On remand, Defendant entered a guilty plea and received a life sentence. <u>Commonwealth v. Grier</u>, 638 A.2d 965, 965 (Pa. 1994); <u>Online Docket Entry</u>, p.3, 1/5/98.

### 7.  <u>Comm. v. Donald Hardcastle</u>, CP-51-CR-0632881-1982

The federal court awarded a new trial due to a <u>Batson</u> violation. On remand, Defendant entered a negotiated guilty plea for a term of years sentence. <u>Hardcastle v. Horn</u>, 332 F. App'x 764, 766 (3d Cir. 2009); <u>Online Docket Entry</u>, p.5, 3/16/11.

### 8.  <u>Comm. v. James Lambert</u>, CP-51-CR-0803432-1983

After the Third Circuit granted a new trial based on <u>Brady</u> violations, Defendant entered a negotiated guilty plea to third degree murder for a term of years sentence. <u>Lambert v. Beard</u>, 537 F. App'x 78, 80 (3d Cir. 2013); <u>Online Docket Entry</u>, p.10, 12/18/17.

### 9.  <u>Comm. v. Cam Ly</u>, CP-51-CR-1125561-1986

After the Supreme Court agreed that the prosecutor withheld <u>Brady</u> material, but denied relief on materiality grounds, the Commonwealth agreed to a life sentence. <u>Commonwealth v. Cam Ly</u>, 980 A.2d 61, 83 (Pa. 2009); <u>Online Docket Entry</u>, p.10, 12/12/13 ("re-sentenced to life without parole. In all other respects the sentence remains the same. By agreement there are no appellate and post-conviction rights").

### 10. <u>Comm. v. Al Peoples</u>, CP-51-CR-1044981-1989

The Commonwealth agreed to Life at the PCRA stage. <u>Online Docket Entry</u>, p.16, 6/24/11 ("The original guilty verdict is reinstated. Life without Parole").

### 11.  <u>Comm. v. Bobby Sims</u>, CP-51-CR-0500751-1982

The Supreme Court reversed Defendant's conviction because the trial court refused to permit Defendant to compel a witness to "claim his "attorney-client privilege" in front of the jury. <u>Commonwealth v. Sims</u>, 521 A.2d 391, 395 (Pa. 1987). Thereafter, Defendant pleaded guilty to a term of years sentence. <u>Online Docket Entry</u>, p.3, 9/25/87.

### 12.   Comm. v. James Melvin Speight, CP-51-CR-1036271-1992

During federal habeas corpus proceedings, the Commonwealth agreed that it would not contest penalty phase relief. Speight v. Beard, 2017 WL 914907, at *1 (E.D. Pa. Mar. 7, 2017) (noting that "Respondents advised this Court that they no longer opposed a grant of relief as to the death penalty").

### 13.   Comm. v. Morris Spence, CP-51-CR-CP-51-CR-0933911-1986

The Pennsylvania Supreme Court affirmed Defendant's conviction and sentence on direct appeal. Commonwealth v. Spence, 627 A.2d 1176, 1185 (Pa.1993). When Defendant filed a PCRA petition, the Commonwealth agreed to a term of years sentence. Online Docket Entry, p.12, 8/30/06.

### 14.   Comm. v. Terrence Williams, CP-51-CR-0823621-1984

An equally divided Supreme Court affirmed the PCRA court's decision granting a new penalty phase hearing because "the Commonwealth willfully suppressed material exculpatory evidence." Commonwealth v. Williams, 168 A.3d 97, 112 (Pa. 2017) (remanding "for a new penalty phase trial"). The Commonwealth did not seek a new penalty phase and Defendant received a Life sentence. Online Docket Entry, p.17, 12/29/17 ("DEFENDANT RESENTENCED...LIFE WITHOUT PAROLE").

### 15.   Comm. v. Zachary Wilson, CP-51-CR-0929501-1986

The Third Circuit granted a new trial because the Commonwealth withheld Brady material. Wilson v. Beard, 589 F.3d 651, 667 (3d Cir. 2009). On retrial, Defendant was convicted but the Commonwealth did not seek the death penalty. Commonwealth v. Wilson, 147 A.3d 7, 12 (Pa. Super. 2016).

# PART I, SECTION E

## OVERTURNED PHILADELPHIA DEATH SENTENCES
## LISTED ACCORDING TO THE DURATION OF THE LITIGATION
## BETWEEN ARREST AND A NON-CAPITAL RESOLUTION

For each of the 102 overturned Philadelphia death sentences that resulted in a non-capital resolution, Part I, Section E describes the length of time that elapsed between arrest and an alternative disposition.

Subsection One lists the duration of each of the 67 IAC cases, prior to a non-capital resolution. Subsection Two calculates the duration of the 35 cases overturned on other grounds. The average amount of time between arrest and non-capital disposition for these 102 cases is **17** years. The same information regarding the duration of litigation appears in the preceding list of 74 IAC cases (Part I, Section A, Subsection One) and in the list of cases overturned for other reasons (Part I, Section B). That information is separately detailed here, for ease of reference.

**(1).** *SUBSECTION ONE* **– Duration of IAC Cases Prior to Non-Capital Disposition (Average – 15.5 years)**

On remand, **67 (90%)** of the 74 IAC cases were resolved without re-imposition of the death penalty. *See* Appendix, Part I, Section C (above). The

average amount of time between arrest and the non-capital resolution of these 67

IAC cases is **17 years**.[13]

- **IAC Cases Resolved within 5 Years**

   **Three (3)** out of 74 IAC cases (**4%**) were resolved with a non-capital disposition within five years of arrest.

   1.   (3) <u>**Commonwealth v. Billa**</u>, **CP-51-CR-0136311-1987**

   (Arrest Date: January 17, 1987 – Resentenced: January 11, 1990 = **2 yrs, 11 mos, 25 d**)

   2.   (57) <u>**Commonwealth v. Lloyd Reid**</u>, **CP-51-CR-0405461-1991**

   (Arrest: March 23, 1991 – Resentenced: October 20, 1994 = **3 yrs, 6 mos, 27 d**)

   3.   (72) <u>**Commonwealth v. Derrick White**</u>, CP-51-CR-0012991-2010

   (Arrest: July 22, 2010 – Resentenced: March 23, 2015 = **4 yrs, 8 mos, 1 d**)

- **IAC Cases Resolved between 5 and 10 Years**

   **Fourteen (14)** out of 74 IAC cases (**19%**) were resolved with a non-capital disposition between 5 and 10 years after arrest.

   1.   (1) <u>**Comm. v. Lawrence Baker**</u>, **CP-51-CR-0629891-1981**

   (Arrest date: April 8, 1981 – Resentenced: July 30, 1986 = **5 yrs, 3 mos, 22 d**)

   2.   (4) <u>**Commonwealth v. John M. Blount,**</u> **CP-51-CR-0124901-1990**

   (Arrest: October 25, 1989 – Resentenced July 24, 1996 = **6 yrs, 8 mos, 29 d**)

---

[13]   Each IAC case is identified by name and by the number assigned to it in the alphabetical list appearing in Part I, Section A.

**3.**     (29) <u>**Commonwealth v. Kareem Johnson**</u>, **CP-51-CR-1300424-2006**

(Arrest: May 22, 2006 – Death Penalty Removed: February 17, 2016 =
 **9 yrs, 8 mos, 26 d**)

**4.**     (33) <u>**Commonwealth v. Thomas Jones**</u>, **CP-51-CR-0403101-1982**

(Arrest: January 27, 1982 – Resentenced: = January 18, 1989 =
**6 yrs, 11 mos, 22 d**)

**5.**     (36) <u>**Commonwealth v. Michael LaCava**</u>, **CP-51-CR-0711041-1990**
(Arrest: June 15, 1990 – Resentenced: March 22, 1996 = **5yrs, 9 mos, 7 d**)

**6.**     (39) <u>**Commonwealth v. Steven McCrae**</u>, **CP-51-CR-0204521-1999**

(Arrest: January 12, 1999 – Resentenced: April 13, 2006 = **7 yrs, 3 mos, 1 d**)

**7.**     (42) <u>**Comm. v. Christopher McNeil**</u>, **CP-51-CR-0500461-1991**

(Arrest: March 26, 1991 – Resentenced: June 23, 1997 = **6 yrs, 2 mos, 28 d**)

**8.**     (48) <u>**Commonwealth v. Craig Murphy**</u>, **CP-51-CR-0925231-1985**

(Arrest: 1985 – Resentenced: November 22, 1991 = **6 yrs**)

**9.**     (49) <u>**Commonwealth v. William Nieves**</u>, **CP-51-CR-1009681-1993**

(Arrest: September 21, 1993 – Acquittal: December 20, 2000 =
**7 yrs, 2 mos, 29 d**)

**10.**     (50) <u>**Comm. v. Kelley O'Donnell**</u>, **CP-51-CR-1220812-1992**

(Arrest: November 14, 1992 – Resentenced: February 6, 2002 =
 **9 yrs, 2 mos, 23 d**)

**11.**     (53) <u>**Commonwealth v. Curry Perry**</u>, **CP-51-CR-0418121-1989**

(Arrest: March 17, 1989 – Acquitted: June 26, 1996 = **7 yrs, 3 mos, 9 d**)

**12.**     (56) <u>**Commonwealth v. Wilfredo Ramos,**</u> **CP-51-CR-0100891-1999**

(Arrest: November 17, 1998 – Resentenced: April 18, 2008 =
**9 yrs, 5 mos, 1 d**)

**13.**     (66) <u>**Comm. v. Michael Thomaston,**</u> **CP-51-CR-0400541-1995**

(Arrest: February 2, 1995 – Resentenced: Dec. 11, 2002 = **7 yrs, 10 mos, 9 d**)

**14.**     (70) <u>**Commonwealth v. Philip Trivigno,**</u> **CP-51-CR-0100861-1996**

(Arrest: December 19, 1995 – Resentenced: Jan. 29, 2003 =
**7 yrs, 1 mos, 10 d**)

- **IAC Cases Resolved between 10 and 15 Years**

**Ten (10)** out of 74 IAC cases (**13.5%**) were resolved with a life sentence between 10 and 15 years after arrest.

**1.**     (5) <u>**Commonwealth v. Aquil Bond,**</u> **CP-51-CR-0502971-2004**

(Arrest: November 11, 2003 – Death Penalty Relief: March 13, 2017 =
**13 yrs, 4 mos, 2 d**)

**2.**     (15)   <u>**Commonwealth v. Junious Diggs,**</u> **CP-51-CR-0709781-2002**

(Arrest: May 18, 2002 – Resentenced: May 1, 2015 =
**12 yrs, 11 mos, 13 d**)

**3.**     (16) <u>**Comm. v. Daniel Dougherty,**</u> **CP-51-CR-0705371-1999**
(Arrest: April 14, 1999 – Resentenced: February 7, 2012 =
**12 yrs, 9 mos, 24 d**)

**4.**     (18) <u>**Commonwealth v. Lester Fletcher,**</u> **CP-51-CR-0709931-2001**

(Arrest: March 27, 2001 – Resentenced: July 18, 2012 = **11yrs, 3 mos, 21 d**)

**5.**      (21) <u>**Commonwealth v. Donald Hall**</u>, **CP-51-CR-0210711-1982**

(Arrest: February 2, 1982 – Resentenced: February 29, 1996 = **14 yrs, 27 d**)

**6.**      (22) <u>**Commonwealth v. Ronald Hanible**</u>, **CP-51-CR-0409021-1999**

(Arrest: January 21, 1999 – Resentenced: September 24, 2013 = **14 yrs, 8 mos, 3 d**)

**7.**      (23) <u>**Commonwealth v. John Harris**</u>, **CP-51-CR-0903421-1992**

(Arrest: August 22, 1992 – Resentenced: February 28, 2005 = **12 yrs, 6 mos, 6 d**)

**8.**      (27) <u>**Comm. v. Steven Hutchinson**</u>, **CP-51-CR-0408581-1998**
(Arrest March 2, 1998 – Resentenced: January 23, 2013 = **14 yrs, 10 mos, 21 d**)

**9.**      (66) <u>**Comm. v. Andre Thompson**</u>, **CP-51-CR-0221931-1993**

 (Arrest: December 23, 1992 – Resentenced: Sept. 20, 2005 = **12 yrs, 7 mos, 28 d**)

**10.**      (67) <u>**Commonwealth v. Louis Thompson**</u>, **CP-51-CR-0436071-1990**

(Arrest: April 14, 1990 – Resentenced: May 21, 2004 = **14 yrs, 1 mos, 7 d**)


- **IAC Cases Resolved between 15 and 20 Years**

**Nineteen (19)** out of 74 IAC cases (**26%**) were resolved with a life sentence between 15 and 20 years of arrest.

**1.**      (8) <u>**Commonwealth v. Samuel Carson**</u>, **CP-51-CR-0228371-1994**
(Arrest: January 8, 1994 – Resentenced: April 4, 2011 = **17 yrs, 9 mos, 27 d**)

**2.**      (9) <u>**Commonwealth v. Ronald Clark**</u>, **CP-51-CR-1241151-1993**
(Arrest: November 3, 1993 – Resentenced: August 16, 2011 = **17 yrs, 9 mos, 13 d**)

3.    (10) **Commonwealth v. Rodney Collins, CP-51-CR-0815881-1992**

(Arrest: July 15, 1992 – Resentenced: November 5, 2009 =
**17 yrs, 3 mos, 21 d**)

4.    (11) **Commonwealth v. Ronald Collins, CP-51-CR-0614771-1992**

(Arrest: April 11, 1992 – Resentenced: May 11, 2009 = **17 yrs, 1 mos**)

5.    (20) **Commonwealth v. Kenneth Ford, CP-51-CR-1032221-1989**

(Arrest: September 9, 1989 – Resentenced: November 29, 2004 =
**15 yrs, 2 mos, 20 d**)

6.    (21) **Commonwealth v.William Gribble, CP-51-CR-1220811-1992**

(Arrest: November 15, 1992 – Resentenced: March 10, 2009 =
**16 yrs, 3 mos, 23 d**)

7.    (25) **Commonwealth v. Donetta Hill, CP-51-CR-0518391-1991**

(Arrest: April 20, 1991 – Resentenced: August 14, 2006 = **15yrs, 3 mos, 25 d**)

8.    (27) **Comm. v. Arnold Holloway, CP-51-CR-0613051-1985**

(Arrest: May 31, 1985 – Resentenced: April 14, 2005 = **19 yrs, 10 mos, 14 d**)

9.    (41) **Comm. v. Nathaniel McNair, CP-51-CR-1224591-1987**

(Arrest: December 25, 1987 – Resentenced: April 4, 2002 =
**14 yrs, 3 mos, 10 d**)

10.    (43) **Commonwealth v. William Mikell, CP-51-CR-0716051-1987**

(Arrest: May 5, 1987 – Resentenced: December 9, 2004 =
**17 yrs, 7 mos, 4 d**)

11.    (44) **Commonwealth v. Mikal Moore, CP-51-CR-0701141-1998**

(Arrest: April 28, 1998 – Resentenced: March 27, 2017 =

**18 yrs, 10 mos, 27 d)**

**12.**     (45) <u>**Comm. v. Salvador Morales**</u>**, CP-51-CR-1012921-1982**

(Arrest: September 30, 1982 – Resentenced: January 4, 2000 =
**17 yrs, 3 mos, 5 d**)

**13.**     (46) <u>**Commonwealth v. Willard Moran**</u>**, CP-51-CR-1130901-1981**

(Arrest: November 8, 1981 – Resentenced: January 27, 1999 =
**17 yrs, 2 mos, 19 d**)

**14.**     (51) <u>**Commonwealth v. Lamont Overby**</u>**, CP-51-CR-1006081-1996**

(Arrest: August 29, 1996 – Resentenced: October, 18, 2013 =
**17 yrs, 1 mos, 19 d**)

**15.**     (55) <u>**Commonwealth v. Michael Rainey**</u>**, CP-51-CR-0419613-1990**

(Arrest: January 9, 1990 – Resentenced: March 10, 2009 =
**19 yrs, 2 mos, 1 d**)

**16.**     (59) <u>**Commonwealth v. Delores Rivers**</u>**, CP-51-CR-0335191-1988**

(Arrest: February 27, 1988 – Resentenced: June 30, 2005 =
**17 yrs, 4 mos, 3 d**)

**17.**     (60) <u>**Commonwealth v. Florencio Rolan**</u>**, CP-51-CR-0228931-1984**

(Arrest: November 30, 1983 —— Resentenced: May 2, 2003 =
**19 yrs, 5 mos, 2 d**)

**18.**     (65) <u>**Commonwealth v. LeRoy Thomas**</u>**, CP-51-CR-1207001-1994**

(Arrest: December 7, 1994 – Resentenced: March 15, 2013 =
**18 yrs, 3 mos, 8d**)

**19.**     (71) <u>**Comm. v. Vinson Washington**</u>**, CP-51-CR-0310321-1994**

(Arrest: February 12, 1994 – Resentenced: May 16, 2011 =

**17 yrs, 3 mos, 4 d**)

- **IAC Cases Resolved between 20 and 25 Years**

**Seven (7)** out of 74 IAC cases (10**%**) were resolved with a non-capital disposition between 20 and 25 years after arrest.

1.   (2) **Commonwealth v. Lee Baker, CP-51-CR-0405062-1984**

(Arrest: March 8, 1984 – Resentenced: May 23, 2008 = **24 yrs, 2 mos, 15 d**)

2.   (6) **Commonwealth v. Jesse Bond, CP-51-CR-2217781-1992**

(Arrest: November 28, 1991 – Resentenced: November 15, 2012 = **20 yrs, 11 mos, 18 d**)

3.   (17) **Commonwealth v. Joseph Elliott, CP-51-CR-0410911-1994**

(Arrest: December 16, 1993 – Resentenced: May 1, 2015 = **21 yrs, 4 mos, 15 d**)

4.   (34) **Comm. v. Alexander Keaton, CP-51-CR-0319251-1993**

(Arrest: January 14, 1993 – Resentenced June 12, 2014 = **21 yrs, 4 mos, 29 d**)

5.   (40) **Commonwealth v. Bernard McGill, CP-51-CR-0339201-1990**

(Arrest: February 17, 1990 – Resentenced: January 7, 2013 = **22 yrs, 10 mos, 21 d**)

6.   (54) **Commonwealth v. Otis Peterkin, CP-51-CR-0207841-1982**

(Arrest: December 2, 1981 – Resentenced: December 6, 2002 = **21 yrs, 4 d**)

7.   (58) **Commonwealth v. Timothy Rice, CP-51-CR-0906231-1996**

(Arrest: March 23, 1991 – Resentenced: January 27, 2012 = **20 yrs, 10 mos, 4 d**)

- **IAC Cases Resolved between 25 and 30 Years**

**Eight (8)** out of 74 IAC cases (**11%**) were resolved with a non-capital disposition between 25 and 30 years after arrest.

1.  (30) **Commonwealth v. William Johnson, CP-51-CR-0936052-1991**

(Arrest: June 14, 1991 – Resentenced: September 21, 2016 = **25 yrs, 3 mos, 7 d**)

2.  (38) **Commonwealth v. Reginald Lewis, CP-51-CR-0205851-1983**

(Arrest: January 26, 1983 – Resentenced: July 9, 2012 = **29 yrs, 5 mos, 13 d**)

3.  (61) **Commonwealth v. Saharris Rollins, CP-51-CR-0405851-1986**

(Arrest: February 26, 1986 – Resentenced: January 13, 2012 = **26 yrs, 11 mos, 18 d**)

4.  (62) **Comm. v. James Melvin Smith**, CP-51-CR-0717891-1983

(Arrest: May 4, 1983 – Resentenced: October 25, 2012 = **29 yrs, 5 mos, 21 d**)

5.  (63) **Commonwealth v. Willie Sneed, CP-51-CR-0606741-1984**

(Arrest: April 10, 1984 – Resentenced: December 18, 2012 = **28 yrs, 8 mos, 8 d**)

6.  (64) **Commonwealth v. Brian Thomas, CP-51-CR-0827161-1985**

(Arrest: August 12, 1985 – Resentenced: Sept. 24, 2013 = **28 yrs, 1 mos, 12 d**)

7.  (73) **Comm. v. Christopher Williams**, CP-51-CR-0417523-1992

(Arrest: March 11, 1992 – Capital Designation Withdrawn: August 9, 2018 = **26 yrs, 4 mos, 29 d**)

8.      (74) **Commonwealth v. Craig Williams**, CP-51-CR-0525631-1987

(Arrest: April 25, 1987 — Resentenced: May 1, 2012 = **25 yrs, 6 d**)

- **IAC Cases Resolved after 30 Years**

**Six (6)** out of 74 IAC cases (**8%**) were resolved with a non-capital disposition after 30 years from the date of arrest.

1.      (14) **Commonwealth v. Dewitt Crawley, CP-51-CR-0201551-1984**

(Arrest: December 23, 1983 – Resentenced May 1, 2015 =
**31 yrs, 4 mos, 8 d**)

2.      (31) **Commonwealth v. Damon Jones, CP-51-CR-0907121-1982**

(Arrest: August 8, 1982 – Resentenced: December 14, 2012 =
**30 yrs, 4 mos, 6 d**)

3.      (32) **Commonwealth v. James Jones, CP-51-CR-1024861-1980**

(Arrest: October 3, 1980 – Resentenced August 16, 2011 =
**30 yrs, 10 mos, 13 d**)

4.      (35) **Commonwealth v. Joseph Kindler**, CP-51-CR-0827471-1982

(Arrest: August 19, 1982 – Resentenced: March 1, 2018 = **35 yrs, 6 mos, 10 d**)

5.      (37) **Commonwealth v. Robert Lark, CP-51-CR-0120121-1980**

(Arrest: January 9, 1980 – Resentenced: November 9, 2017 =**37 yrs, 10 mos**)

6.      (47) **Commonwealth v. Kelvin Morris, CP-51-CR-0704091-1982**

(Arrest: May 21, 1982 – Resentenced: June 7, 2013 = **31 yrs, 17 d**)

**(2).**   *SUBSECTION TWO* **– Duration of Cases Overturned for Other Reasons Prior to Non-Capital Disposition (Average – 17 years)**

For each case overturned for reasons other than ineffectiveness, this list calculates the length of time between arrest and the resolution of the capital aspect of the case. The average length of time for the non-capital resolution is **17** years.

**1.**   <u>**Mumia Abu-Jamal**</u>, **CP-51-CR-0113571-1982**

(Arrest: December 9, 1981 – Resentenced: August 13, 2012 = **30 yrs, 8 mos, 4 d**)

**2.**   <u>**Commonwealth v. Sam Bannerman**</u>, **CP-51-CR-1033281-1984**

(Arrest: October 16, 1984 – Resentenced: October 9, 1991 = **6 yrs, 11 mos, 23 d**)

**3.**   <u>**Commonwealth v. Edward Bracey**</u>, **CP-51-CR-0632821-1991**

(Arrest: February 4, 1991 – Resentenced: January 10, 2014 = **22 yrs, 11 mos, 6 d**)

**4.**   <u>**Commonwealth v. James Bryant**</u>, **CP-51-CR-1023791-1983**

(Arrest: October 27, 1983 – Nolle Prosequi: January 25, 1993 = **9 yrs, 2 mos, 29 d**)

**5.**   <u>**Commonwealth v. Kevin Chandler**</u>, **CP-51-CR-0832561-1993**

(Arrest: October 27, 1983 – Resentenced: August 11, 1999 = **15 yrs, 9 mos, 15 d**)

**6.**   <u>**Commonwealth v. Joseph D'Amato**</u>, **CP-51-CR-1219941-1981**

(Arrest: December 10, 1981 – Resentenced: June 13, 2013 = **31 yrs, 6 mos, 3 d**)

**7.**   <u>**Commonwealth v. Jose DeJesus**</u>, **CP-51-CR-0704671-1998**

(Arrest: June 1, 1998 – Resentenced: January 4, 2018 = **19 yrs, 7 mos, 3 d**)

**8.**   <u>**Commonwealth v. Jose DeJesus**</u>, **CP-51-CR-1103501-1997**

(Arrest: October 30, 1997 – Resentenced January 4, 2018 = **20 yrs, 2 mos, 5 d**)

A-235

9.   **Commonwealth v. DeJesus, CP-51-CR-1103511-1997**

(Arrest: September 23, 1997 – Resentenced: January 4, 2018 =
**20 yrs, 3 mos, 12 d**)

10.   **Commonwealth v. James Dennis, CP-51-CR-0104841-1992**

(Arrest: November 21, 1991 – Resentenced: December 22, 2016 =
**25 yrs, 1 mos, 1 d**)

11.   **Commonwealth v. Neil Ferber, CP-51-CR-0710481-1981**

(Arrest: June 8, 1981 – Nolle Pros: March 7, 1986 = **4 yrs, 8mos, 27 d**)

12.   **Commonwealth v. Calvin Floyd, CP-51-CR-0813171-1980**

(Arrest: July 2, 1980 – November 24, 1984 = **4 yrs, 4 mos, 22 d**)

13.   **Commonwealth v. George Goins, CP-51-CR-0829421-1981**

(Arrest: June 30, 1981 – September 4, 1985 = **4 yrs, 2 mos, 5 d**)

14.   **Commonwealth v. Harrison Graham, CP-51-CR-0839481-1987**

(Arrest: August 17, 1987 – Resentenced: December 18, 2003 =
**16 yrs, 4 mos, 1 d**)

15.   **Commonwealth v. William Green, CP-51-CR-0427361-1982**

(Arrest: April 16, 1982 – Resentenced: September 10, 1991 = **9 yrs, 4 mos,
25 d**)

16.   **Commonwealth v. Eric Grier, CP-51-CR-0334871-1989**

(Arrest: March 16, 1989 – Resentenced: January 5, 1998 =
**8 yrs, 9 mos, 20 d**)

17.     **<u>Commonwealth v. Donald Hardcastle</u>, CP-51-CR-0632881-1982**

(Arrest: September 1, 1983 – Resentenced: March 16, 2011 =
**27 yrs, 6 mos, 15 d**)

18.     **<u>Commonwealth v. Derrick Harvey</u>, CP-51-CR-0307631-1998**

(Arrest: January 12, 1998 –– Resentenced: March 28, 2003 =
 **5 yrs, 2 mos, 16 d**)

19.     **<u>Commonwealth v. Melvin Howard</u>, CP-51-CR-0304271-1988**

(Arrest: February 13, 1988 –– Resentenced: June 10, 2011 =
**23 yrs, 3 mos, 28 d**)

20.     **<u>Commonwealth v. Andrew Huffman</u>, CP-51-CR-0511051-1989**

(Arrest: April 5, 1989 – Resentenced: January 14, 1998 = **8 yrs, 9 mos, 9 d**)

21.     **<u>Commonwealth v. Kevin Hughes</u>, CP-51-CR-0116881-1980**

(Arrest: January 12, 1980 –– Resentenced: March 21, 2005 =
**25 yrs, 2 mos, 9 d**)

22.     **<u>Commonwealth v. James Lambert</u>, CP-51-CR-0803432-1983**

(Arrest: May 4, 1983 – Resentenced: December 18, 2017 =
**34 yrs, 7 mos, 14 d**)

23.     **<u>Commonwealth v. Percy Lee</u>, CP-51-CR-0511562-1986**

(Arrest: February 28, 1986 – Resentenced: September 20, 2005 =
**19 yrs, 6 mos, 23 d**)

24.     **<u>Commonwealth v. Marcus Lloyd</u>, CP-51-CR-0501982-1998**

(Arrest: March 31, 1998 – Resentenced: August 20, 2003 =
**5 yrs, 4 mos, 20 d**)

**25.**   __Commonwealth v. Cam Ly__, **CP-51-CR-1125561-1986**

(Arrest: October 7, 1986 – Resentenced: December 12, 2013 =
**27 yrs, 2 mos, 5 d** )

**26.**   __Commonwealth v. Kenneth Miller__, **CP-51-CR-0902382-1998**

(Arrest: July 31, 1998 – Resentenced: May 13, 2014 = **15 yrs, 9 mos, 13 d**)

**27.**   __Commonwealth v. Michael Overby__, **CP-51-CR-0105802-1995**

(Arrest: July 26, 1994 – Resentenced: June 21, 2007 = **12 yrs, 10 mos, 26 d)**

**28.**   __Commonwealth v. Simon Pirela__, **CP-51-CR-0121431-1983**

Arrest: December 20, 1982 – Resentenced: April 30, 2004 =
**21 yrs, 4 mos, 10 d**

**29.**   __Commonwealth v. Paul Rizzuto__, **CP-51-CR-0132391-1994**

(Arrest: January 21, 1994 – Resentenced: October 7, 2003 =
**9 yrs, 8 mos, 16 d)**

**30.**   __Commonwealth v. Bobby Sims__, **CP-51-CR-0500751-1982**

(Arrest: May 3, 1982 – Resentenced: September 25, 1987 = **5 yrs, 4 mos)**

**31.**   __Commonwealth v. Lawrence Smith__, **CP-51-CR-1001002-2000**

(Arrest: July 17, 2000 – Resentenced: November 1, 2005 =
**5 yrs, 4 mos, 22 d**)

**32.**   __Commonwealth v. Anthony Washington__, **CP-51-CR-1210371-1993**

(Arrest: April 20, 1993 – De-Capitalized: March 14, 2019 =
**25 yrs, 10 mos, 22 d**)

**33.**   __Commonwealth v. Raymond Whitney__, **CP-51-CR-1114161-1981**

(Arrest: October 10, 1981 – Resentenced: January 16, 2008 =

**26 yrs, 3 mos, 6 d)**

### 34. <u>Commonwealth v. Terrence Williams</u>, CP-51-CR-0823621-1984

Arrest: July 24, 1984 – De-Capitalized: December 29, 2017 =
**(33 yrs, 5 mos, 5 d )**

### 35. <u>Commonwealth v. Zachary Wilson</u>, CP-51-CR-0929501-1986

(Arrest: September 8, 1986 – Life sentence: April 1, 2014 =
**27 yrs, 6 mos, 24 d)**

# APPENDIX - PART II

## 45 PHILADELPHIA DEFENDANTS
## WHO REMAIN SENTENCED TO DEATH

Appendix Part II lists Philadelphia defendants who are currently sentenced to death. The Philadelphia District Attorney's Office has identified **45** Philadelphia defendants who are currently on death row. Part II lists these defendants in three categories: (1) Race, (2) Whether court-appointed counsel represented the defendant, and (3) Whether a reviewing court has determined that the attorney who represented the defendant was also ineffective in at least one other Philadelphia capital case.

**A.    RACE OF PHILADELPHIA DEFENDANTS CURRENTLY SENTENCED TO DEATH**

- ***Black Defendants* (37)**

    1.  **Ralph Birdsong -** CP-51-CR-0140802-1989

    2.  **John W. Brown** - CP-51-CR-0738881-1990

    3.  **Kenneth Brown** - CP-51-CR-1124661-1993

    4. **Lavar Brown** - CP-51-CR-0208091-2004

    5. **Omar Cash** - CP-51-CR-0000573-2009

    6. **Jerry Chambers** - CP-51-CR-1101421-2003

    7. **Jermont Cox** - CP-51-CR-0231581-1993

    8. **Russell Cox** - CP-51-CR-0511561-1986

**9. Henry Daniels** - CP-51-CR-1031751-1988

**10. Anthony Fletcher** - CP-51-CR-0360011-1992

**11. Gibson, Ronald**- CP-51-CR-0128091-1991

**12. Daniel Gwynn** - CP-51-CR-1207051-1994

**13. Sheldon Hannibal** - CP-51-CR-0428351-1993

**14.  Darien Houser** - CP-51-CR-0605180-2004

**15. Aaron Jones** - CP-51-CR-1035061-1991

**16. Lewis Jordan (aka John Lewis)** - CP-51-CR-0000455-2008

**17. Emanuel Lester** - CP-51-CR-1103001-1990

**18**. **Antoine Ligons** - CP-51-CR-0500861-1998

**19. Jerome Marshall** - CP-51-CR-1117211-1983

**20. Craig Murphy** - CP-51-CR-0126101-1984

**21. Ricardo Natividad** - CP-51-CR-0400131-1997

**22. Donyell Paddy** - CP-51-CR-0709621-1993

**23**. **Borgela Philistin** - CP-51-CR-0709691-1993

**24. Ernest Porter -** CP-51-CR-0622491-1985

**25. Gregory Powell** - CP-51-CR-0100741-1998

**26. Derrick Ragan** - CP-51-CR-0926161-1990

**27. Anthony Reid** - CP-51-CR-0602521-1989

**28. Larry Rush** – CP-51-CR-0708711-1987

**29. Christopher Roney -** CP-51-CR-0208663-1996

**30. Rasheen Simpson** - CP-51-CR-1103161-1996

**31. Christopher Smith** - CP-51-CR-0502972-2004

**32. Melvin Speight** - CP-51-CR-1036271-1992

**33. Ralph Stokes, Ralph** - CP-51-CR-0345761-1982

**34. Dante Thomas** - CP-51-CR-0606781-2006

**35**. **Herbert Watson** - CP-51-CR-0932031-1982

**36. Wharton, Robert** - CP-51-CR-0222581-1984

**37. Roy Williams** - CP-51-CR-0124571-1991

- *Asian Defendants* **(2)**

   **1**. **Le, Tam** - CP-51-CR-0002231-2015

   **2. Sam, Thavirak** – CP-51-CR-0743591-1989

- *Latino Defendants* **(2)**

   **1. Rivera, William -** CP-51-CR-0902431-1996

   **2. Uderra, Jose** - CP-51-CR-1051452-1991

- *White Defendants* **(4)**

   **1. Fahy, Henry** - CP-51-CR-0222831-1981

   **2. Richard Hackett** – CP-51-CR-0933912-1986

   **2. Ogrod, Walter** - CP-51-CR-0532781-1992

   **3. Pierce, Michael** - CP-51-CR-0813121-1989

**B.      CURRENT DEATH ROW DEFENDANTS REPRESENTED AT TRIAL BY COURT-APPOINTED COUNSEL**

Section B lists the Philadelphia death row defendants who were represented by court-appointed counsel at trial. **36** out of 45 **(80%)** of these Philadelphia defendants were represented by court-appointed counsel.

- ***Black defendants represented by court-appointed counsel***

Court-appointed counsel represented **78% (29 out of 37)** of the black defendants from Philadelphia currently sentenced to death.[14]

   **1. Ralph Birdsong -** CP-51-CR-0140802-1989
   - Court-Appointed Counsel <u>PP</u>

   **2. John W. Brown** - CP-51-CR-0738881-1990
   - Court-Appointed Counsel <u>Q</u>

   **3. Kenneth Brown** - CP-51-CR-1124661-1993
    - Court-Appointed counsel <u>MM</u>

   **4. Lavar Brown** - CP-51-CR-0208091-2004
   - Court-appointed counsel <u>UU</u> and <u>WW</u>

   **5. Omar Cash** - CP-51-CR-0000573-2009
   - Court-Appointed counsel <u>AA</u> and <u>EE</u>.

   **6. Jerry Chambers** - CP-51-CR-1101421-2003
   - Court-Appointed counsel <u>JJ</u> and <u>AAA</u>

   **7. Russell Cox** - CP-51-CR-0511561-1986
   **-** Court-Appointed counsel <u>HH</u>.

---

[14] Undersigned counsel believe that 78% is an underestimate, but have not counted any cases where it could not be independently confirmed that counsel was court-appointed.

**8. Henry Daniels** - CP-51-CR-1031751-1988
- Court-Appointed Counsel <u>L</u>

**9.  Anthony Fletcher** - CP-51-CR-0360011-1992
- Court-Appointed Counsel <u>RR</u>

**10. Daniel Gwynn** - CP-51-CR-1207051-1994
- Court-Appointed Counsel <u>EE</u>

**11.  Sheldon Hannibal** - CP-51-CR-0428351-1993
- Court-Appointed counsel <u>RR</u>

**12. Darien Houser** - CP-51-CR-0605180-2004

**13. Lewis Jordan (aka John Lewis)** - CP-51-CR-0000455-2008
- Court-Appointed counsel <u>F</u> and <u>FFF</u>

**14. Emanuel Lester** - CP-51-CR-1103001-1990
- Court-Appointed Counsel <u>G</u>

**15. Antoine Ligons** - CP-51-CR-0500861-1998
- Court-Appointed counsel <u>OOO</u>

**16.  Jerome Marshall** - CP-51-CR-1117211-1983
- Court-Appointed counsel <u>FF</u>

**17. Craig Murphy -** CP-51-CR-0126101-1984
- Court-appointed counsel <u>N</u>

**18. Ricardo Natividad** - CP-51-CR-0400131-1997
- Court-Appointed counsel <u>QQ</u>

**19. Donyell Paddy** - CP-51-CR-07096211993
- Court-Appointed counsel <u>III</u>

**20.  Borgela Philistin** - CP-51-CR-0709691-1993
- Court-Appointed counsel <u>CCC</u>

**21. Gregory Powell** - CP-51-CR-0100741-1998
- Court-Appointed counsel <u>AAA</u>)

**22. Anthony Reid -** CP-51-CR-0602521-1989
- Court-Appointed Counsel <u>C</u>

**23. Larry Rush –** CP-51-CR-0708711-1987
- Court-Appointed Counsel <u>H</u>

**24.  Rasheen Simpson** - CP-51-CR-1103161-1996
- Court-Appointed counsel in <u>FFF</u>

**25.  Christopher Smith -** CP-51-CR-0502972-2004
- Court-Appointed counsel <u>EEE</u>

**26. Melvin Speight** - CP-51-CR-1036271-1992
- Court-Appointed Counsel <u>G</u>

**27. Herbert Watson** - CP-51-CR-0932031-1982
- Court-Appointed counsel <u>KK</u>

**28. Wharton, Robert** - CP-51-CR-0222581-1984
- Court-Appointed Counsel <u>D</u>

**29. Roy Williams** - CP-51-CR-0124571-1991
- Court-appointed counsel <u>Y</u>

- ***Asian Defendants represented by court-appointed counsel***

  Both Asian defendants on death row (100%) had court-appointed counsel.

  **1. Sam, Thavirak** – CP-51-CR-0743591-1989
   - Court-Appointed counsel <u>V</u>)

  **2. Le, Tam** - CP-51-CR-0002231-2015
  - Court-Appointed Counsel <u>G</u> and <u>I</u>

- ***Latino Defendants represented by court-appointed counsel***

  Both Latino defendants on death row (100%) had court-appointed counsel.

A-245

**1. Rivera, William -** CP-51-CR-0902431-1996
- Court-appointed counsel <u>GG</u> and <u>AAA</u>

**2. Uderra, Jose -** CP-51-CR-1051452-1991
- Court-Appointed counsel <u>OOO</u>

- *White Defendants represented by court-appointed counsel*

Three out of four White defendants on death row (75%) were represented by court-appointed counsel.

**1. Fahy, Henry -** CP-51-CR-0222831-1981
- Court-Appointed counsel <u>Q</u>

**2. Ogrod, Walter -** CP-51-CR-0532781-1992
- Court-Appointed Counsel <u>R</u>

**3. Pierce, Michael -** CP-51-CR-0813121-1989
- Court-Appointed counsel <u>III</u>

## C. DEATH SENTENCED DEFENDANTS REPRESENTED AT TRIAL BY ATTORNEYS WHO HAVE HAD AT LEAST ONE OTHER DEATH SENTENCE OVERTURNED ON GROUNDS OF INEFFECTIVE ASSISTANCE

Part II, Section C lists the Philadelphia defendants currently on death row who were represented, at trial, by attorneys who have had at least one other death penalty case overturned due to a finding of ineffective assistance of counsel. **28 (62%)** of the 45 Philadelphia defendants on death row were represented by such counsel.[15]

---

[15]    The cases where these attorneys represented other defendants whose death sentences were overturned due to a finding of ineffectiveness, appear in Appendix

**1.     John W. Brown** - CP-51-CR-0738881-1990

Defendant was represented by court-appointed counsel Q.
Court-appointed counsel Q provided ineffective assistance in:

> (8)   Comm. v. Samuel Carson, CP-51-CR-0228371-1994
> (18) Comm. v. Henry Fahy, CP-51-CR-0222831-1981
> (42) Comm. v. Christopher McNeil, CP-51-CR 0500461-1991
> (56) Comm. v. Wilfredo Ramos, CP-51-CR-0100891-1999
> (67) Comm. v. Andre Thompson, CP-51-CR-0221931-1993

**2.     Kenneth Brown** - CP-51-CR-1124661-1993

Defendant was represented by court-appointed counsel MM.
Court-appointed counsel MM provided ineffective assistance in:

> (59)   Comm v. Delores Rivers, CP-51-CR-0335191-1988

**3.     Lavar Brown** - CP-51-CR-0208091-2004

Defendant was represented by court-appointed counsel UU.
Court-appointed counsel UU provided ineffective assistance in:

> (58)  Comm. v. Timothy Rice, CP-51-CR-0906231-1996

**4.     Omar Cash** - CP-51-CR-0000573-2009

Defendant was represented by court-appointed counsel EE.
Court-appointed counsel EE provided ineffective assistance in:

> (30) Comm. v. William Johnson, CP-51-CR-0936052-1991
> (51) Comm v. Lamont Overby, CP-51-CR-1006081-1996

---

A (listing the 73 Philadelphia IAC cases where a defendant received penalty phase relief).

**5.    Jerry Chambers** - CP-51-CR-1101421-2003

Defendant was represented by Court-Appointed counsel <u>JJ</u> and <u>AAA</u>.

Court-appointed counsel <u>JJ</u> provided ineffective assistance in:

      (21) <u>Comm.v.William Gribble</u>, CP-51-CR-1220811-1992
      (63) <u>Comm. v. Willie Sneed</u>, CP-51-CR-0606741-1984

Court-appointed counsel <u>AAA</u> provided ineffective assistance in:

      (13) <u>Comm. v. Bernard Cousar</u>, CP-51-CR-0607431-1999
      (19) <u>Comm. v. Lester Fletcher</u>, CP-51-CR-0709931-2001

**6.    Russell Cox** - CP-51-CR-0231581-1993

Court-Appointed counsel <u>HH</u> provided ineffective assistance in:

      (61) <u>Comm. v. Saharris Rollins</u>, CP-51-CR-0405851-1986

**7.    Henry Daniels** - CP-51-CR-1031751-1988

Court-Appointed counsel <u>L</u> provided ineffective assistance in:

      (11) <u>Comm. v. Ronald Collins</u>, CP-51 CR-0614771-1992

**8.    Henry Fahy** - CP-51-CR-0222831-1981

Defendant was represented by court-appointed counsel <u>Q</u>.
Court-appointed counsel <u>Q</u> provided ineffective assistance in:

      (8)   <u>Comm. v. Samuel Carson</u>, CP-51-CR-0228371-1994
      (42) <u>Comm. v. Christopher McNeil,</u> CP-51-CR 0500461-1991
      (56) <u>Comm. v. Wilfredo Ramos</u>, CP-51-CR-0100891-1999
      (67) <u>Comm. v. Andre Thompson</u>, CP-51-CR-0221931-1993

**9.    Anthony Fletcher** - CP-51-CR-0360011-1992

Defendant was represented by court-appointed counsel <u>RR</u>.
Court-appointed counsel <u>RR</u> provided ineffective assistance in:

(28) <u>Comm. v. Steven Hutchinson</u>, CP-51-CR-0408581-1998

**10.    Ronald Gibson** - CP-51-CR-0128091-1991

Defendant was represented by counsel <u>N</u>.
Counsel <u>N</u> provided ineffective assistance in:

(48) <u>Comm. v. Craig Murphy</u>, CP-51-CR-0925231-1985

**11.    Daniel Gwynn** - CP-51-CR-1207051-1994

Defendant was represented by court-appointed counsel <u>EE</u>.
Court-appointed counsel <u>EE</u> provided ineffective assistance in:

(30)   <u>Comm. v. William Johnson</u>, CP-51-CR-0936052-1991
(51) <u>Comm v. Lamont Overby</u>, CP-51-CR-1006081-1996

**12.    Sheldon Hannibal** - CP-51-CR-0428351-1993

Defendant was represented by court-appointed counsel <u>RR</u>.
Court-appointed counsel <u>RR</u> provided ineffective assistance in:

(28) <u>Comm. v. Steven Hutchinson</u>, CP-51-CR-0408581-1998

**13.    Darien Houser** - CP-51-CR-0605180-2004

Defendant was represented by Court-Appointed counsel <u>G</u> and <u>AAA</u>.

Court-appointed counsel <u>G</u> provided ineffective assistance in:

(15) <u>Comm. v. Junious Diggs</u>, CP-51-CR-0709781-2002

Court-appointed counsel AAA provided ineffective assistance in:

(13) <u>Comm. v. Bernard Cousar</u>, CP-51-CR-0607431-1999
(19) <u>Comm. v. Lester Fletcher</u>, CP-51-CR-0709931-2001

**14.** **Lewis Jordan** - CP-51-CR-0000455-2008

Defendant was represented by court-appointed counsel <u>F</u> and <u>FFF</u>. Court-appointed counsel <u>F</u> and <u>FFF</u> provided ineffective assistance in:

    (29) <u>Comm. v. Kareem Johnson</u>, CP-51-CR-1300424-2006

**15.** **Le, Tam** - CP-51-CR-0002231-2015

Defendant was represented by court-appointed counsel <u>G</u> and <u>I</u>. Court-appointed counsel <u>G</u> provided ineffective assistance in:

    (15) <u>Comm. v. Junious Diggs</u>, CP-51-CR-0709781-2002

**16.** **Emanuel Lester** - CP-51-CR-1103001-1990

Defendant was represented by court-appointed counsel <u>G</u>. Court-appointed counsel <u>G</u> provided ineffective assistance in:

    (15) <u>Comm. v. Junious Diggs</u>, CP-51-CR-0709781-2002

**17.** **Craig Murphy -** CP-51-CR-0126101-1984

Defendant was represented by court-appointed counsel <u>N</u>. Counsel <u>N</u> provided ineffective assistance in:

    (48) <u>Comm. v. Craig Murphy</u>, CP-51-CR-0925231-1985

**18.** **Ricardo Natividad** - CP-51-CR-0400131-1997

Defendant was represented by court-appointed counsel <u>QQ</u>. Court-appointed counsel <u>QQ</u> provided ineffective assistance in:

    (3)  <u>Comm v. Billa</u>, CP-51-CR-0136311-1987
    (22) <u>Comm v. Ronald Hanible</u>, CP-51-CR-0409021-1999
    (38) <u>Comm. v. Reginald Lewis</u>, CP-51-CR-0205851-1983
    (41) <u>Comm. v. Nathaniel McNair,</u> CP-51-CR-1224591-1987
    (52) <u>Comm. v. Kevin Pelzer</u>, CP-51-CR-1031752-1988

**19.    Gregory Powell** - CP-51-CR-0100741-1998

Defendant was represented by court-appointed counsel <u>AAA</u>.
Counsel <u>AAA</u> provided ineffective assistance in:

>    (13) <u>Comm. v. Bernard Cousar</u>, CP-51-CR-0607431-1999
>    (19) <u>Comm v. Lester Fletcher</u>, CP-51-CR-0709931-2001

**20.    Derrick Ragan** - CP-51-CR-0926161-1990

Defendant was represented by counsel <u>KKL</u>.
Counsel <u>KKL</u> provided ineffective assistance in:

>    (31) <u>Commonwealth v. Willard Moran</u>, CP-51-CR-1130901-1981

**21.    Anthony Reid -** CP-51-CR-0602521-1989

Defendant was represented by court-appointed counsel <u>C</u>.
Counsel <u>C</u> provided ineffective assistance in:

>    (5)   <u>Comm. v. Aquil Bond</u>, CP-51-CR-0502971-2004
>    (6)   <u>Comm. v. Jesse Bond</u>, CP-51-CR-2217781-1992
>    (72) <u>Comm. v. Derrick White</u>, CP-51-CR-0012991-2010

**22.    Rivera, William -** CP-51-CR-0902431-1996

Defendant was represented by court-appointed penalty counsel <u>AAA</u>.
Counsel <u>AAA</u> provided ineffective assistance in:

>    (13) <u>Comm. v. Bernard Cousar</u>, CP-51-CR-0607431-1999
>    (19) <u>Comm. v. Lester Fletcher</u>, CP-51-CR-0709931-2001

**23.    Christopher Roney -** CP-51-CR-0208663-1996

Defendant was represented by counsel <u>KKL</u>.
Counsel <u>KKL</u> provided ineffective assistance in:

>    (31) <u>Commonwealth v. Willard Moran</u>, CP-51-CR-1130901-1981

**24.**   **Larry Rush** - CP-51-CR-0708711-1987

Defendant was represented by counsel <u>H</u>.
Counsel <u>H</u> provided ineffective assistance in:

(22) <u>Comm. v. Donald Hall</u>, CP-51-CR-0210711-1982

**25.**   **Rasheen Simpson** - CP-51-CR-1103161-1996

Defendant was represented by counsel <u>FFF</u>.
Counsel <u>FFF</u> provided ineffective assistance in:

(29) <u>Comm. v. Kareem Johnson</u>, CP-51-CR-1300424-2006

**26.**   **Melvin Speight** - CP-51-CR-1036271-1992

Defendant was represented by court-appointed counsel <u>G</u>.
Counsel <u>G</u> provided ineffective assistance in:

(15) <u>Comm. v. Junious Diggs</u>, CP-51-CR-0709781-2002

**27.**   **Dante Thomas** - CP-51-CR-0606781-2006

Defendant was represented by counsel <u>KKL</u>.
Counsel <u>KKL</u> provided ineffective assistance in:

(31) <u>Commonwealth v. Willard Moran</u>, CP-51-CR-1130901-1981

**28.**   **Roy Williams** - CP-51-CR-0124571-1991

Defendant was represented by court-appointed counsel <u>Y</u>.
Counsel <u>Y</u> provided ineffective assistance in:

(4) <u>Comm. v. John M. Blount,</u> CP-51-CR-0124901-1990

# APPENDIX - PART III

## Philadelphia Death Sentences
## Imposed Before and After February 2012

In **152** (**98%**) of the 155 Philadelphia capital cases, the defendant was convicted and sentenced prior to 2012. In 73 of the 74 IAC cases, the conviction occurred before 2012. In 38 of the 38 cases overturned on other grounds, the conviction occurred before 2012. In 43 of the 45 cases where the defendant remains sentenced to execution, the conviction occurred before 2012.

A.   **CONVICTIONS PRIOR TO 2012**

  *(i) 73 out of 74 IAC cases*

     1.   <u>**Commonwealth v. Lawrence Baker,**</u> CP-51-CR-0629891-1981

       *Conviction date:  5/23/83*

     2.   <u>**Commonwealth v. Lee Baker,**</u> CP-51-CR-0405062-1984

       *Conviction date: 10/4/84*

     3.   <u>**Commonwealth v. Billa,**</u> CP-51-CR-0136311-1987

       *Conviction date:  6/12/87*

     4.   <u>**Commonwealth v. John M. Blount,**</u> CP-51-CR-0124901-1990

       *Conviction date:  2/25/91*

     5.   <u>**Commonwealth v. Aquil Bond,**</u> CP-51-CR-0502971-2004

       *Conviction date: 7/26/05*

6.    **Commonwealth v. Jesse Bond**, CP-51-CR-2217781-1992

*Conviction date: 7/28/93*

7.    **Commonwealth v. Billy Brooks**, CP-51-CR-0128471-1991

*Conviction date: 1/23/92*

8.    **Commonwealth v. Samuel Carson**, CP-51-CR-0228371-1994

*Conviction date: 7/18/95*

9.    **Commonwealth v. Ronald Clark**, CP-51-CR-1241151-1993

*Conviction date: 12/6/94*

10.   **Commonwealth v. Rodney Collins**, CP-51-CR-0815881-1992

*Conviction date: 5/18/93*

11.   **Commonwealth v. Ronald Collins**, CP-51-CR-0614771-1992

*Conviction date: 10/21/94*

12.   **Commonwealth v. Robert Cook**, CP-51-CR-0826512-1987

*Conviction date: 11/15/88*

13.   **Commonwealth v. Bernard Cousar**, CP-51-CR-0607431-1999

*Conviction date: 5/11/01*

14.   **Commonwealth v. Dewitt Crawley**, CP-51-CR-0201551-1984

*Conviction date: 6/10/85*

15.   **Commonwealth v. Junious Diggs**, CP-51-CR-0709781-2002

*Conviction date: 3/9/04*

16.   **Commonwealth v. Daniel Dougherty**, CP-51-CR-0705371-1999

*Conviction date: 10/6/00*

17. **<u>Commonwealth v. Joseph Elliott</u>,** CP-51-CR-0410911-1994

*Conviction date:* 12/8/94

18. **<u>Commonwealth v. Henry Fahy</u>**, CP-51-CR-0222831-1981

*Conviction date: 1/24/83*

19. **<u>Commonwealth v. Lester Fletcher</u>,** CP-51-CR-0709931-2001

*Conviction date: 8/22/02*

20. **<u>Commonwealth v. Kenneth Ford</u>,** CP-51-CR-1032221-1989

*Conviction date: 3/9/92*

21. **<u>Commonwealth v.William Gribble</u>,** CP-51-CR-1220811-1992

*Conviction date: 6/30/93*

22. **<u>Commonwealth v. Donald Hall</u>,** CP-51-CR-0210711-1982

*Conviction date: 6/18/87*

23. **<u>Commonwealth v. Ronald Hanible</u>,** CP-51-CR-0409021-1999

*Conviction date: 6/13/01*

24. **<u>Commonwealth v. John Harris</u>,** CP-51-CR-0903421-1992

Conviction date: 2/21/95

25. **<u>Commonwealth v. Donetta Hill</u>,** CP-51-CR-0518391-1991

*Conviction date: 3/11/93*

26. **<u>Commonwealth v. William Holland</u>,** CP-51-CR-1014291-1984

*Conviction date: 2/7/86*

27. **<u>Commonwealth v. Arnold Holloway</u>,** CP-51-CR-0613051-1985

*Conviction date: 5/23/86*

28.   **Commonwealth v. Steven Hutchinson,** CP-51-CR-0408581-1998

*Conviction date:  12/10/99*

29.   **Commonwealth v. Kareem Johnson,** CP-51-CR-1300424-2006

*Conviction date: 7/3/07*

30.   **Commonwealth v. William Johnson,** CP-51-CR-0936052-1991

*Conviction date:  5/17/94*

31.   **Commonwealth v. Damon Jones,** CP-51-CR-0907121-1982

*Conviction date:  12/30/87*

32.   **Commonwealth v. James Jones,** CP-51-CR-1024861-1980

*Conviction date:  6/6/85*

33.   **Commonwealth v. Thomas Jones,** CP-51-CR-0403101-1982

*Conviction date: 8/4/82*

34.   **Commonwealth v. Alexander Keaton**, CP-51-CR-0319251-1993

*Conviction date : 11/29/94*

35.   **Commonwealth v. Joseph Kindler,** CP-51-CR-0827471-1982

*Conviction date:  11/16/83*

36.   **Commonwealth v. Michael LaCava,** CP-51-CR-0711041-1990

*Conviction date:  6/29/91*

37.   **Commonwealth v. Robert Lark,** CP-51-CR-0120121-1980

*Conviction date:   6/28/85*

**38.**     **Commonwealth v. Reginald Lewis,** CP-51-CR-0205851-1983

*Conviction date*:  8/12/83

**39.**     **Commonwealth v. Steven McCrae,** CP-51-CR-0204521-1999

*Conviction date:  11/27/00*

**40.**     **Commonwealth v. Bernard McGill,** CP-51-CR-0339201-1990

*Conviction date:  7/28/92*

**41.**     **Commonwealth v. Nathaniel McNair,** CP-51-CR-1224591-1987

*Conviction date:  11/21/88*

**42.**     **Commonwealth v. Christopher McNeil,** CP-51-CR-0500461-1991

*Conviction date***:** *4/10/92*

**43.**     **Commonwealth v. William Mikell,** CP-51-CR-0716051-1987

*Conviction date:  1/30/89*

**44.**     **Commonwealth v. Mikal Moore,** CP-51-CR-0701141-1998

*Conviction date:  6/28/99*

**45.**     **Commonwealth v. Salvador Morales,** CP-51-CR-1012921-1982

*Conviction date:  5/18/83*

**46.**     **Commonwealth v. Willard Moran,** CP-51-CR-1130901-1981

 *Conviction date:  7/2/82*

**47.**     **Commonwealth v. Kelvin Morris,** CP-51-CR-0704091-1982

*Conviction date:  11/30/83*

48. **<u>Commonwealth v. Craig Murphy</u>,** CP-51-CR-0925231-1985

*Conviction date:  7/21/86*

49. **<u>Commonwealth v. William Nieves</u>,** CP-51-CR-1009681-1993

 *Conviction date:  10/24/94*

50. **<u>Commonwealth v. Kelley O'Donnell</u>,** CP-51-CR-1220812-1992

*Conviction date:  7/1/93*

51. **<u>Commonwealth v. Lamont Overby</u>,** CP-51-CR-1006081-1996

*Conviction date:  7/22/98*

52. **<u>Commonwealth v. Kevin Pelzer</u>,** CP-51-CR-1031752-1988

*Conviction date:  11/14/89*

53. **<u>Commonwealth v. Curry Perry</u>,** CP-51-CR-0418121-1989

*Conviction date:  11/15/90*

54. **<u>Commonwealth v. Otis Peterkin</u>,** CP-51-CR-0207841-1982

*Conviction date:  11/22/82*

55. **<u>Commonwealth v. Michael Rainey</u>,** CP-51-CR-0419613-1990

*Conviction date:  12/1/93*

56. **<u>Commonwealth v. Wilfredo Ramos</u>,** CP-51-CR-0100891-1999

*Conviction date:  1/11/00*

57. **<u>Commonwealth v. Lloyd Reid</u>,** CP-51-CR-0405461-1991

*Conviction date:  11/15/91*

58. **<u>Commonwealth v. Timothy Rice</u>,** CP-51-CR-0906231-1996

*Conviction date:  10/16/97*

59. **<u>Commonwealth v. Delores Rivers</u>,** CP-51-CR-0335191-1988

*Conviction date:  10/3/91*

60. **<u>Commonwealth v. Florencio Rolan</u>,** CP-51-CR-0228931-1984

*Conviction date:  5/21/84*

61. **<u>Commonwealth v. Saharris Rollins</u>,** CP-51-CR-0405851-1986

*Conviction date:  5/11/87*

62. **<u>Commonwealth v. James Melvin Smith</u>,** CP-51-CR-0717891-1983

*Conviction date:  2/6/85*

63. **<u>Commonwealth v. Willie Sneed</u>,** CP-51-CR-0606741-1984

*Conviction date:  4/2/86*

64. **<u>Commonwealth v. Brian Thomas</u>,** CP-51-CR-0827161-1985

*Conviction date:  8/7/86*

65. **<u>Commonwealth v. LeRoy Thomas</u>,** CP-51-CR-1207001-1994

*Conviction date:  7/26/95*

66. **<u>Commonwealth v. Michael Thomaston</u>,** CP-51-CR-0400541-1995

*Conviction date:  2/27/97*

67. **<u>Commonwealth v. Andre Thompson</u>,** CP-51-CR-0221931-1993

*Conviction date:  3/18/96*

68.    **Commonwealth v. Louis Thompson,** CP-51-CR-0436071-1990

*Conviction date:  7/31/92*

69.    **Commonwealth v. William Tilley,** CP-51-CR-1210781-1985

*Conviction date:  11/24/87*

70.    **Commonwealth v. Philip Trivigno,** CP-51-CR-0100861-1996

*Conviction date:  9/27/96*

71.    **Commonwealth v.Vinson Washington**, CP-51-CR-0310321-1994

*Conviction date:  11/4/94*

72.    **Commonwealth v. Christopher Williams**, CP-51-CR-0417523-1992

*Conviction date*:  8/6/93

73.    **Commonwealth v. Craig Williams,** CP-51-CR-0525631-1987

 *Conviction date*:  *6/17/88*

*(ii)   38 of the 38 cases overturned due to reasons other than IAC*

1.    **Commonwealth v. Jose DeJesus,** CP-51-CR-0704671-1998

*Conviction date:  10/28/99*

2.    **Commonwealth v. James Dennis,** CP-51-CR-0104841-1992

*Conviction:  6/17/93*

3.    **Commonwealth v. Calvin Floyd,** CP-51-CR-0813171-1980

*Conviction date:  10/5/82*

4.  **<u>Commonwealth v. Donald Hardcastle,</u>** CP-51-CR-0632881-1982

    *Conviction date*: 12/8/82

5.  **<u>Commonwealth v. James Lambert,</u>** CP-51-CR-0803432-1983

    *Conviction date:  2/18/86*

6.  **<u>Commonwealth v. Cam Ly,</u>** CP-51-CR-1125561-1986

    *Conviction date*:  3/16/88

7.  **<u>Commonwealth v. Lawrence Smith,</u>** CP-51-CR-1001002-2000

    *Conviction date*:  3/4/02

8.  **<u>Commonwealth v. Anthony Washington,</u>** CP-51-CR-1210371-1993

    *Conviction date***:** 12/9/94

9.  **<u>Commonwealth v. Terrence Williams,</u>** CP-51-CR-0823621-1984

    *Conviction date*:  7/1/87

10. **<u>Commonwealth v. Zachary Wilson,</u>** CP-51-CR-0929501-1986

    *Conviction date***:** *1/25/88*

11. **<u>Mumia Abu-Jamal</u>**, CP-51-CR-0113571-1982

    *Conviction date*: 5/25/83

12. **<u>Commonwealth v. Sam Bannerman,</u>** CP-51-CR-1033281-1984

    *Conviction date: 6/10/86*

13. **<u>Commonwealth v. James Bryant,</u>** CP-51-CR-1023791-1983

    *Conviction date*:  10/22/84

14. **<u>Commonwealth v. Kevin Chandler,</u>** CP-51-CR-0832561-1993

    *Conviction date:  5/5/95*

A-261

15. **Commonwealth v. Willie Clayton,** CP-51-CR-1127941-1984

    *Conviction date:  2/25/86*

16. **Commonwealth v. George Goins,** CP-51-CR-0829421-1981

    *Conviction date*:  2/15/84

17. **Commonwealth v. William Green,** CP-51-CR-0427361-1982

    *Conviction date: 11/12/82*

18. **Commonwealth v. Eric Grier,** CP-51-CR-0334871-1989

     *Conviction date*:  *10/16/90*

19. **Commonwealth v. Derrick Harvey,** CP-51-CR-0307631-1998

    *Conviction date*:  3/19/99

20. **Commonwealth v. Andrew Huffman,** CP-51-CR-0511051-1989

    *Conviction date*:  10/18/90

21. **Commonwealth v. Alfred Jasper,** CP-51-CR-0613941-1984

     *Conviction date* :  5/6/86

22. **Commonwealth v. Marcus Lloyd,** CP-51-CR-0501982-1998

    *Conviction date*:  12/20/99

23. **Commonwealth v. Michael Overby,** CP-51-CR-0105802-1995

     *Conviction date*:  4/30/98

24. **Commonwealth v. Ernest Porter,** CP-51-CR-0622491-1985

    *Conviction date*:  6/27/86

25. **<u>Commonwealth v. Paul Rizzuto,</u>** CP-51-CR-0132391-1994

   *Conviction date*:  11/17/98

26. **<u>Commonwealth v. Bobby Sims,</u>** CP-51-CR-0500751-1982

   *Conviction date*:  3/8/84

27. **<u>Commonwealth v. Edward Bracey,</u>** CP-51-CR-0632821-1991

   *Conviction date*:  10/5/92

28. **<u>Commonwealth v. Joseph D'Amato,</u>** CP-51-CR-1219941-1981

   *Conviction date***:** 2/8/83

29. **<u>Commonwealth v. Harrison Graham,</u>** CP-51-CR-0839481-1987

   *Conviction date***:** 5/3/88

30. **<u>Commonwealth v. Melvin Howard,</u>** CP-51-CR-0304271-1988

   *Conviction date*: *9/14/89*

31. **<u>Commonwealth v. Raymond Whitney,</u>** CP-51-CR-1114161-1981

   *Conviction date***:** 2/3/83

32. **<u>Commonwealth v. Simon Pirela,</u>** CP-51-CR-0121431-1983

   *Conviction date***:** 3/12/84

33. **<u>Commonwealth v. Kevin Hughes,</u>** CP-51-CR-0116881-1980

   *Conviction date*: *10/27/83*

34. **<u>Commonwealth v. Percy Lee,</u>** CP-51-CR-0511562-1986

   *Conviction date*: 4/25/91

35. **<u>Commonwealth v. Neil Ferber,</u>** CP-51-CR-0710481-1981

*Conviction date:  10/1/84*

36. **<u>Commonwealth v. Kenneth Miller,</u>** CP-51-CR-0902382-1998

*Conviction date:*  12/23/99

37. **<u>Commonwealth v. Jose DeJesus,</u>** CP-51-CR-1103501-1997

Conviction date:  8/17/99

38. **<u>Commonwealth v. DeJesus</u>**, CP-51-CR-1103511-1997

*Conviction date*: 9/29/98

**(iii)  *43 of the current 45 death row cases***

1.  **Ralph Birdsong -** CP-51-CR-0140802-1989

*Conviction date:  10/27/89*

2.  **John W. Brown** - CP-51-CR-0738881-1990

*Conviction date 7/25/91*

3.  **Kenneth Brown -** CP-51-CR-1124661-1993

*Conviction date:  2/21/95*

4.  **Lavar Brown** - CP-51-CR-0208091-2004

*Conviction date: 8/17/05*

5.  **Jerry Chambers** - CP-51-CR-1101421-2003

*Conviction date: 5/26/05*

6.    **Jermont Cox** - CP-51-CR-0231581-1993

*Conviction date:*  4/12/95

7.    **Russell Cox** - CP-51-CR-0511561-1986

*Conviction date*: 4/25/91

8.     **Henry Daniels** - CP-51-CR-1031751-1988

*Conviction date*:  4/23/90

9.    **Anthony Fletcher** - CP-51-CR-0360011-1992

*Conviction date*:  2/5/93

10.    **Gibson, Ronald**- CP-51-CR-0128091-1991

*Conviction date*: 10/10/91

11.    **Daniel Gwynn** - CP-51-CR-1207051-1994

*Conviction date*: 11/6/95

12.    **Sheldon Hannibal** - CP-51-CR-0428351-1993

*Conviction date*:  10/25/94

13.    **Darien Houser** - CP-51-CR-0605180-2004

*Conviction date*:  3/13/06

14.    **Aaron Jones** - CP-51-CR-1035061-1991

*Conviction date*: 2/28/94

15.    **Lewis Jordan (aka John Lewis)** - CP-51-CR-0000455-2008

*Conviction date*:  11/24/09

A-265

**16.**   **Emanuel Lester** - CP-51-CR-1103001-1990

*Conviction date*:  11/14/91

**17.**   **Antoine Ligons** - CP-51-CR-0500861-1998

*Conviction date*:  6/1/99

**18.**   **Jerome Marshall** - CP-51-CR-1117211-1983

*Conviction date*:  11/6/85

**19.**   **Craig Murphy** - CP-51-CR-0126101-1984

*Conviction date*:  11/1/90

**20.**   **Ricardo Natividad** - CP-51-CR-0400131-1997

*Conviction date*:  11/12/97

**21.**   **Donyell Paddy** - CP-51-CR-0709621-1993

*Conviction date*:  12/19/95

**22.**   **Borgela Philistin** - CP-51-CR-0709691-1993

*Conviction date*: 2/9/95

**23.**   **Ernest Porter -** CP-51-CR-0622491-1985

*Conviction date*:  6/27/86

**24.**   **Gregory Powell** - CP-51-CR-0100741-1998

 *Conviction date*:  11/28/00

**25.**   **Derrick Ragan** - CP-51-CR-0926161-1990

*Conviction date*:  3/18/92

26.  **Anthony Reid** - CP-51-CR-0602521-1989

*Conviction date:*  8/14/90

27.  **Larry Rush** – CP-51-CR-0708711-1987

*Conviction date*: 6/29/88

28.  **Christopher Roney -** CP-51-CR-0208663-1996

*Conviction date:  10/30/96*

29.  **Rasheed Simpson** - CP-51-CR-1103161-1996

*Conviction date:*   12/22/97

30.  **Christopher Smith** - CP-51-CR-0502972-2004

*Conviction date:* 7/26/05

31.  **Melvin Speight** - CP-51-CR-1036271-1992

*Conviction date*: 2/24/94

32.  **Ralph Stokes, Ralph** - CP-51-CR-0345761-1982

*Conviction date:* 6/9/87

33.  **Dante Thomas** - CP-51-CR-0606781-2006

*Conviction date:  9/19/07*

34.  **Herbert Watson** - CP-51-CR-0932031-1982

*Conviction date*: 5/17/84

35.  **Wharton, Robert** - CP-51-CR-0222581-1984

*Conviction date*:  9/24/86

36.  **Roy Williams** - CP-51-CR-0124571-1991

*Conviction date*:  9/14/93

37.  **Sam, Thavirak** – CP-51-CR-0743591-1989

*Conviction date:*  7/2/91

38.  **Rivera, William -** CP-51-CR-0902431-1996

*Conviction date*:  3/20/98

39.  **Uderra, Jose** - CP-51-CR-1051452-1991

*Conviction date*:   6/8/93

40.  **Fahy, Henry** - CP-51-CR-0222831-1981

*Conviction date*:  11/2/83

41.  **Richard Hackett** – CP-51-CR-0933912-1986

*Conviction date*:  7/18/88

42.  **Ogrod, Walter** - CP-51-CR-0532781-1992

*Conviction date*:  11/8/96

43.  **Pierce, Michael** - CP-51-CR-0813121-1989

*Conviction date*:11/1/90

A.  **CONVICTIONS AFTER 2012 (*Total 3*)**

1.  **Derrick White** - CP-51-CR-0012991-2010

*Conviction date: 2/29/12*

2.    **Omar Cash** - CP-51-CR-0000573-2009

       *Conviction date:  11/15/13*

3.    **Le, Tam** - CP-51-CR-0002231-2015

       *Conviction date:  12/1/16*

# APPENDIX C

## Reported Opinions Where O'Brien Testified for the Prosecution

1. Commonwealth v. Rollins, No. 2111 EDA 2019, 2020 WL 605173, at *6 (Pa. Super. Ct. Feb. 7, 2020), opinion corrected and superseded, No. 2111 EDA 2019, 2020 WL 620070 (Pa. Super. Ct. Feb. 7, 2020) ("Dr. O'Brien opined that upon reviewing all of the evidence, there were several instances that showed Appellant acted intentionally on the day of the crimes.")

2. Commonwealth v. Simminger, No. 1688 EDA 2018, 2019 WL 3946052, at *5 (Pa. Super. Ct. Aug. 21, 2019) ("Dr. O'Brien determined that Appellant was manipulative and exaggerated his mental health symptom to obtain benefits.")

3. Commonwealth v. Landis, No. 257 EDA 2018, 2019 WL 1556224, at *3 (Pa. Super. Ct. Apr. 10, 2019) ("In rebuttal, the Commonwealth presented the expert testimony of Dr. John O'Brien … who opined [Appellant] did not have a mental health defense.")

4. Commonwealth v. Rivera, 650 Pa. 169, 182, 199 A.3d 365, 373 (2018) ("Dr. O'Brien also opined appellant was not suffering from extreme mental and emotional disturbance at the time of the offense and instead chose not to conform his conduct to the requirements of the law.")

5. Commonwealth v. Moore, No. 1609 MDA 2017, 2018 WL 4610012, at *3 (Pa. Super. Ct. Sept. 26, 2018) ("He found nothing about her cognitive limitations that interfere with her ability to communicate, to understand what's being asked and to provide appropriate answers.")

6. Commonwealth v. Atem, No. 3380 EDA 2016, 2018 WL 3980318, at *3 (Pa. Super. Ct. Aug. 21, 2018) ("The Commonwealth's expert, Dr. John O'Brien … concluded [Atem] did not suffer from PTSD on February 18, 2015, and was *capable* of forming the requisite intent for murder.")

7. Commonwealth v. Smith, No. 3599 EDA 2016, 2018 WL 3133669, at *3 (Pa. Super. Ct. June 27, 2018) (Commonwealth expert "Dr. O'Brien was not confident of Appellant's rehabilitation because Appellant merely presented a superficial sense that he can adjust, essentially "flying under the radar" for the previous ten years.")

8. <u>Commonwealth v. Messner</u>, No. 3641 EDA 2016, 2017 WL 6545783, at *4 (Pa. Super. Ct. Dec. 22, 2017) ("Dr. O'Brien offered the opinion that Appellant was "capable of intentional behavior at, before, and after the time of the murder.")

9. <u>Commonwealth v. Ramos</u>, No. 426 EDA 2015, 2017 WL 4286386, at *9 (Pa. Super. Ct. Sept. 27, 2017) (the court heard "additional testimony about Appellant's mental abilities from Commonwealth witness Dr. John Sebastian O'Brien.")

10. <u>Commonwealth v. Silvonek</u>, No. 818 EDA 2016, 2017 WL 3411919, at *4 (Pa. Super. Ct. Aug. 9, 2017) ("The trial court accepted Dr. O'Brien's expert testimony that Silvonek was a manipulator.")

11. <u>Commonwealth v. Woychio</u>, No. 556 MDA 2015, 2016 WL 904002, at *2 (Pa. Super. Ct. Mar. 9, 2016) ("The Commonwealth called one expert witness: John Sebastian O'Brien, III. Dr. O'Brien was of the opinion that the Defendant was competent to stand trial.")

12. <u>Jones v. United States</u>, No. CV 13-3748 (SRC), 2016 WL 81253, at *2 (D.N.J. Jan. 7, 2016) ("The Government's expert, Dr. John S. O'Brien, found that Jones was malingering to avoid prosecution.")

13. <u>Commonwealth v. Gore</u>, No. 1411 EDA 2013, 2014 WL 10558237, at *2 (Pa. Super. Ct. Nov. 24, 2014) ("[Dr. O'Brien] opined, however, that Appellant's actions … evinced his knowledge that the killing was wrong.")

14. <u>Commonwealth v. Daniels</u>, 104 A.3d 267, 299 (Pa. 2014) ("Dr. O'Brien also did not agree that there was evidence of a learning disability.")

15. <u>Commonwealth v. Houston</u>, No. 1123 EDA 2013, 2014 WL 10919607, at *1 (Pa. Super. Ct. June 17, 2014) ("Commonwealth presented expert testimony of Dr. O'Brien, who opined that neither Appellant's borderline personality disorder nor substance abuse had compromised her abilities as to render Appellant incapable of forming intent to kill; Dr. O'Brien explained Appellant was fully capable of forming specific intent to kill at time of murder.")

16. <u>Commonwealth v. Perez</u>, 93 A.3d 829, 839 (Pa. 2014) (addressing whether trial counsel was ineffective for failing to object to the testimony of Dr. John O'Brien)

17. <u>Commonwealth v. C.B.</u>, No. 108 MDA 2013, 2013 WL 11253451, at *2 (Pa. Super. Ct. Oct. 16, 2013) (Commonwealth expert John O'Brien opined that juvenile defendant not amenable to treatment)

18. <u>United States v. Calloway</u>, No. CRIM. 08-775 FSH, 2012 WL 1981518, at *1 (D.N.J. May 31, 2012) ("Dr. John S. O'Brien II, an independent expert chosen by the government.")

19. <u>Robinson v. Beard</u>, No. 1:05-CV-1603, 2011 WL 4592366, at *19 (M.D. Pa. Sept. 30, 2011), <u>aff'd</u>, 762 F.3d 316 (3d Cir. 2014) ("The Commonwealth presented the testimony of John O'Brien, M.D., a forensic psychiatrist.")

20. <u>United States v. Henry</u>, No. CIV.A. 11-1101, 2011 WL 3417117, at *6 (E.D. Pa. Aug. 3, 2011) ("At that hearing, [gov expert] Dr. O'Brien opined that Henry was competent to stand trial.")

21. <u>Dooley v. SCI Huntingdon Superintendent</u>, No. CIV.A. 09-5755, 2010 WL 4909604, at *1n.9 (E.D. Pa. Nov. 30, 2010) ("Dr. O'Brien concluded that [Petitioner] was not suffering from paranoid schizophrenia; but rather, he suffered from residual psychotic symptoms from his prior drug use.")

22. <u>United States v. Olhovsky</u>, 562 F.3d 530, 541 (3d Cir. 2009), <u>as amended</u> (May 5, 2009) ("Dr. O'Brien noted his 'serious concerns regarding [defendant's] predilection for child pornography and propensity for future involvement in either procuring, distributing, and/or collecting child pornographic materials.'")

23. <u>Porter v. Beard</u>, No. CIV-A07-3456, 2008 WL 4710796, at *8 (E.D. Pa. Oct. 22, 2008) ("Commonwealth presented expert testimony from Dr. John O'Brien to contradict Petitioner's expert mental health testimony.")

24. <u>Du Pont v. Stowitzky</u>, No. CIV.A. 06-0147, 2008 WL 4283356, at *10 (E.D. Pa. Sept. 18, 2008), <u>aff'd</u>, 402 F. App'x 736 (3d Cir. 2010) ("trial court did not err in allowing Dr. O'Brien to testify as an expert witness for the prosecution" after initially consulting with the defense)

25. <u>Commonwealth v. Watson</u>, 952 A.2d 541, 548 (Pa. 2008) ("the PCRA court held a second evidentiary hearing at which Dr. O'Brien testified for the Commonwealth")

26. <u>Commonwealth v. Sam</u>, 952 A.2d 565, 569 (Pa. 2008) ("The Commonwealth then presented the testimony of Dr. O'Brien.")

27. <u>United States v. Adamson</u>, No. CRIM.A. 04-672, 2008 WL 167299, at *4 (E.D. Pa. Jan. 16, 2008) ("Dr. O'Brien testified that, based on the medical records, there was absolutely no evidence to support the position that the medications administered to the defendant had any deleterious effect on the defendant.")

28. <u>Commonwealth v. Jones</u>, 912 A.2d 268, 292 (Pa. 2006) ("The Commonwealth presented Dr. John O'Brien … He concluded that Jones did not suffer from schizophrenia, even in remission.")

29. <u>Commonwealth v. Sneed</u>, 899 A.2d 1067, 1078 (Pa. 2006) ("Dr. John S. O'Brien II … found no evidence in appellee's behavior at the time of the murder which would indicate that he was suffering from any extreme mental or emotional disturbance, or that appellee was suffering from any psychiatric or cognitive problem that could have substantially impaired his capacity to conform his conduct to the requirements of law.")

30. <u>United States v. Mintz</u>, 77 F. App'x 115, 116 (3d Cir. 2003) ("In rebuttal, the government offered the testimony of Dr. John O'Brien. He similarly opined that, notwithstanding his mental illness, defendant had the capacity to form the intent to retaliate and do harm to others.")

31. <u>Fahy v. Horn</u>, No. CIV.A. 99-5086, 2003 WL 22017231, at *19 (E.D. Pa. Aug. 26, 2003), <u>aff'd in part, vacated in part, remanded,</u> 516 F.3d 169 (3d Cir. 2008) ("Dr. John O'Brien, on behalf of the Commonwealth, gave expert testimony regarding Fahy's mental health")

# APPENDIX D

## CASES WHERE FEDERAL ANS STATE COURTS
## ACCEPTED DAO CONCESSIONS OF PENALTY PHASE RELIEF

### A. Federal Cases – Concessions of Penalty Phase Relief

1. Ali v. Wetzel, 11-cv-1812, Document 122 (Order, 8/13/20), Robreno, J.

2. Birdsong v. Wetzel, 11-cv-4240, Document 103 (Order, 1/2/20), Schmehl, J.

3. Crawley v. Horn, 99-cv-5919, Document 46 (Order, 2/17/15), Savage, J.

4. Fletcher v. Beard, 10-cv-3188, Document 99 (Order, 12/11/20), Surrick, J.

5. Gibson v. Wetzel, 11-cv-4550, Document 110 (Order, 2/24/21), Jones, J.

6. Gwynn v. Beard, 08-cv-5061, Document 107 (Order, 1/13/21), Tucker, J.

7. Hannibal v. Wetzel, 13-cv-0619, Document 41 (Order, 2/7/20), McHugh, J.

8. Mason v. Wetzel, 17-cv-3759, Document 31 (Order 8/7/18), Beetlestone, J.
*See* 2021 WL 3709476, at *1 n.1 (E.D. Pa. Aug. 20, 2021) ("The parties have entered into a stipulation by which the Commonwealth agreed to the grant of habeas corpus relief as to Mason's death sentence, which stipulation was so-ordered by the Court.")

9. Marshall v. Wetzel, 03-cv-3308, Document 172 (Order, 6/25/18), Leeson, J.
2018 WL 5801313 at *37 (E.D. Pa. Nov. 6, 2018) (opinion of Leeson, J.)

10. Murphy v. Wetzel, 99-cv-6362, Document 33 (Order, 4/23/21), Surrick, J.

11. Speight v. Beard, 04-cv-4110, Quiñones Alejandro, J.
*See* 2017 WL 914907, at *3 (E.D. Pa. Mar. 7, 2017) (Commonwealth "advised this Court that they would: not contest a conditional grant of relief as to [Petitioner's] death sentence" and would not "seek a new penalty hearing")

**B. State Cases**

1.  <u>Commonwealth v. Kenneth Brown</u>, CP-51-CR-1124661-1993
Concession of DP relief accepted 8/26/19, Brinkley, J.

2. <u>Commonwealth. v. Laquaille Bryant</u>, CP-51-CR-0006272-2008
Concession of DP relief accepted 8/26/19, Minehart, J.

3. <u>Commonwealth v. Russell Cox</u>, CP-51-CR-0511561-1986
Concession of DP relief accepted 5/10/21, Brandeis-Roman, J.

4. <u>Commonwealth v. Christopher Kennedy</u>, CP-51-CR-0310461-2003
Concession DP relief accepted 3/11/19, Sarmina, J.

5. <u>Commonwealth v. Orlando Maisonet</u>, CP-51-CR-1134831-1990
Concession accepted 5/9/19, O'Keefe, J.

6. <u>Commonwealth v. Gregory Powell</u>, CP-51-CR-0100741-1998
Concession of DP relief accepted 6/17/19, Brinkley, J.

7. <u>Commonwealth v. Ragan</u>, CP-51-CR-0926161-1009
Concession of new trial accepted 9/9/19, Tucker, J.

8. <u>Commonwealth v. Thavirak Sam</u>, CP-51-CR-0743591-1989
Concession of DP relief accepted 11/12/19, Minehart, J.

9. <u>Commonwealth v. Anthony Washington</u>, CP-51-CR-1210371-1993
Order granting motion to vacate sentence, 7/22/19, McDermott, J.

10. <u>Commonwealth v. Herbert Watson</u>, CP-51-CR-0932031-1982
Concession of DP relief accepted, 11/14/19, Minehart, J.

2

# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

**ROBERT WHARTON, Petitioner**                    **No. 01-cv-6049**

      **v.**

**TAMMY FERGUSON, Superintendent, Respondent**

### AFFIDAVIT OF HEATHER WAMES
### VICTIM/WITNESS COORDINATOR, LAW DIVISION
### PHILADELPHIA DISTRICT ATTORNEY'S OFFICE

I am the Victim/Witness Coordinator for the Law Division of the Philadelphia District Attorney's Office. My responsibilities include ensuring compliance with Federal and State Law in terms of consultation with the victims of direct crime, or, in this case, of homicide, with the family members of those victims. I view and treat my communications with victims/family members as private matters.

However, in this case, the Pennsylvania Office of the Attorney General has filed a brief that includes representations about the Philadelphia District Attorneys Office's communications with the family members of the two victims in this case and attached letters from some of those family members, including David Hart, the family member with whom I communicated with regarding a possible change in status of this case. This brief and the attached letters put my private communications into issue, and into public record. Because of this, I feel obligated to set forth the factual record that demonstrates the steps I took to ensure that the Philadelphia District Attorney's Office fully complied with Federal and State law with regard to victims' rights. While I respect that a victim/family member has the right to change his/her view of a situation, that does not change the underlying facts of my communications with that person.

1. On November 30, 2018, I was given this case in order to locate and contact the victims' family regarding the habeas case pending in federal court, and, in particular, the death penalty aspect of that case.

2. On December 13, 2018, I contacted David Hart a/k/a "Tony" (to his family and friends). Mr. Hart is one of the siblings of Bradley Hart, one of the two decedents

in this case. I explained to Mr. Hart that this case was in federal habeas proceedings and that our office was reviewing the death penalty phase of the case. I inquired as to Mr. Hart's position on death penalty relief. Mr. Hart stated that he did not feel a certain way about the death penalty, but was adamant that defendant not be released. I confirmed with Mr. Hart that his mother and father had passed away in 2012 and asked him to provide me with contact information for anyone else in his family who he thought may want to know about the possible case status change. Mr. Hart stated he would talk to his sister, brother, his brother-in-law (Ferne's brother) and his niece, Lisa (daughter of decedents Bradley and Ferne) and would provide them with my contact information. Mr. Hart stated that Ferne's brother, Michael Allen, is an attorney in the Bahamas and also stated that his niece, Lisa, who has her own children now, was visiting the family in Bahamas. I sent a follow-up email to Mr. Hart confirming our conversation and invited his other family members to contact me. (A copy of my email to Mr. Hart is attached here.)

3.  On January 23, 2019, I spoke with Mr. Hart and advised him that the office intended to agree to death penalty relief in the defendant's pending habeas case. I informed Mr. Hart that, if death penalty relief was granted, the defendant would be serving a sentence of life without parole. I informed Mr. Hart that eventually there would most likely be a re-sentencing hearing. Mr. Hart stated that both he and his brother would like to attend the re-sentencing hearing. I told Mr. Hart I would keep him informed him of the date when I received it.

4.  On April 4, 2019, I spoke with Mr. Hart (I returned his call as he had left me a voicemail) regarding the re-sentencing hearing. I informed Mr. Hart that any re-sentencing hearing would be a ways off and explained that the federal court had refused to accept the parties' agreement that defendant is entitled to penalty phase relief, indicated that it intended to hold an evidentiary hearing, and asked the parties to file briefs on that issue. I further informed Mr. Hart that briefs were filed on April 3, 2019. I told him I would keep him posted. Mr. Hart stated that he will be away a lot due to missionary travel to Uganda in June, India in November, and Jamaica in December and asked that, if/when the Court decides to conduct a hearing, we should keep his travel schedule in mind.

5.  On July 3, 2019, I spoke with Mr. Hart to explain that this case was still held up in the courts. Mr. Hart informed me that the AG's office had reached out to him and his family and that the AG's office had told him that if the defendant received death penalty relief, it was more likely he would be released. Mr. Hart stated that both Michael Allen and Lisa are opposed to any such relief. I told Mr. Hart that I was unsure of what the outcome of this case would be, but I was sure that death

penalty relief did not mean that the defendant would be released. I told Mr. Hart I would keep him posted moving forward.

6. After my July 3rd correspondence with Mr. Hart, I never received any phone calls or correspondence from any other family member nor did Mr. Hart provide me with their views regarding death penalty relief for the defendant.


_____

Heather Wames, Victim/Witness Coordinator          Date: 7/31/19
Law Division, Philadelphia District Attorney's Office

Sworn to and subscribed before me
this 31st day of July 20 19.


Commonwealth of Pennsylvania - Notary Seal
SUSAN HACKETT, Notary Public
Philadelphia County
My Commission Expires June 16, 2022
Commission Number 1064744

# Commonwealth v. Robert Wharton

### Heather Wames

Thu 12/13/2018 10:30 AM

To tonyhartsprint@gmail.com <tonyhartsprint@gmail.com>;

Hello David,
It was a pleasure speaking with you today. As discussed, our office is currently reviewing the death penalty phase of the above-mentioned matter. If we decide to remove the death penalty the defendant will be serving life without parole. As we move forward I will keep you apprised of the decision and if/when a re-sentencing hearing will occur. Please provide my contact information to your siblings as well as Bradley & Ferne's daughter. If they have any questions or just simply want to give their input, let them know that I would be happy to assist in any way I can. The same goes for you, David. If you have any questions or I can be of any assistance in this matter, please do not hesitate to contact me.
Regards,
Heather

**Heather Wames**
Victims/Witness Coordinator - Law Division
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, Pennsylvania 19107
heather.wames@phila.gov
215-686-5768