UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON,                    :    Case No. 2:01-cv-06049-MSG
                                   :
        Petitioner,                :
v.                                 :    Philadelphia, Pennsylvania
                                   :    June 23, 2022
DONALD T. VAUGHN et al.            :    8:58 a.m.
                                   :
        Respondents.               :
. . . . . . . . . . . .

TRANSCRIPT OF SHOW CAUSE HEARING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Petitioner:            Elizabeth McHugh, Esquire
                              Federal Community Defender Office
                              EDPA
                              Suite 545 West, The Curtis Center
                              601 Walnut Street
                              Philadelphia, PA 19106

For The Philadelphia:         David Rudovsky, Esquire
District Attorney's Office     Kairys Rudovsky Messing Feinberg
                              & Lin, LLP
                              The Cast Iron Building
                              Suite 501 South
                              718 Arch Street
                              Philadelphia, PA 19106

                              John S. Summers, Esquire
                              Andrew M. Erdlen, Esquire
                              Hangley Aronchick Segal & Pudlin
                              One Logan Square 27th Floor
                              Philadelphia, PA 19103

For Donald T. Vaughn:         Max Cooper Kaufman, Esquire
                              Nancy Winkelman, Esquire
                              Paul M. George, Esquire
                              Philadelphia District Atty's
                              Office
                              3 South Penn Square
                              Philadelphia, PA 19107

```
For the Pennsylvania Office:    James P. Barker, Esquire
of Attorney General            PA Attorney General's Office
                               16th Floor Strawberry Square
                               Harrisburg, PA 17120

                               Cari L. Mahler, Esquire
                               PA Office of Attorney General
                               1000 Madison Avenue
                               Suite 310
                               Norristown, PA 19403

Court Reporter/Deputy Clerk:   Jimmy Cruz

Transcription Service:         O'Connor Legal, Medical & Media
                               Services, LLC
                               P.O. Box 384
                               South Sutton, NH 03273
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

O'CONNOR LEGAL, MEDICAL & MEDIA SERVICES LLC
603.865.1255 • 888.524.5596
www.oconnorlmms.com

(Call to Order of the Court)

THE DEPUTY CLERK:  All, rise.  United States District Court for the Eastern District of Pennsylvania is now in session.  The Honorable Mitchell S. Goldberg presiding.

THE COURT:  Good morning.

ANDREW ERDLEN:  Morning, Your Honor.

THE COURT:  Have a seat.

DAVID RUDOVSKY:  Good morning, Your Honor.

THE COURT:  Good morning.

ELIZABETH MCHUGH:  Morning, Your Honor.

JAMES BARKER:  Morning, Your Honor.

PAUL GEORGE:  Good morning, Your Honor.

THE COURT:  I'll never tire of starting a court proceeding asking this question.  Is there anyone in the room who is not fully vaccinated?  There's a lot of people here.  So, okay.  We're all fully vaccinated.

So, good morning.  This is the matter of Wharton v. Vaughn.  We are here for an exploration of a concern I have raised regarding the Philadelphia District Attorney's Office litigation conduct in this matter, as it relates to their obligation to be candid with the Court, pursuant to their ethical obligations, and also whether, separately, there should be any type of sanctions levied, based on my independent authority to oversee the case.

So, let's start with identification of who's here for

who. And Jimmy, do you have a legal pad there for me, or could you grab one? Thank you. All right. Who is here, on behalf of the DA's Office?

MR. RUDOVSKY: Your Honor, David Rudovsky, point Counsel, and Co-Counsel.

THE COURT: Morning.

JOHN SUMMERS: John Summers, Your Honor. Good morning, Your Honor.

THE COURT: Good morning.

MR. ERDLEN: Good morning, Your Honor. Andrew Erdlen.

THE COURT: Good morning.

MR. ERDLEN: Good morning.

THE COURT: And I think I asked you before, Mr. Erdlen. Would you spell your last name for me?

MR. ERDLEN: Yes, it's E-R-D-L-E-N.

THE COURT: Okay.

MR. ERDLEN: And I'm with the Hangley Aronchick firm.

THE COURT: Yes, as is Mr. Summers, correct?

MR. ERDLEN: (No audible response).

THE COURT: Okay. And for the Attorney General?

MR. BARKER: Morning, Your Honor. James Barker from the Attorney General's Office.

CARI MAHLER: Good morning, Your Honor.

Cari Mahler on behalf of the Office of Attorney General.

THE COURT:  Hi, good morning.  And I think I asked Counsel for Mr. Wharton to appear.  Are they here?

MS. MCHUGH:  Good morning, Your Honor.

THE COURT:  Yes.

MS. MCHUGH:  Elizabeth McHugh from the Federal Defender on behalf of -

THE COURT:  Good morning -

MS. MCHUGH:  - Mr. Wharton.

THE COURT:  - Ms. McHugh.  Okay.  All right.  I'm certainly not going to take the time to relay my concerns that are, I think, laid out hopefully clearly in my Opinion on this matter.

So, I said I wanted to provide the District Attorney's Office with an opportunity to provide explanation, should they deem it appropriate, or they want to, regarding the concerns I've raised.

And unless someone wants to say something further before we start, we will give you that opportunity.  So, go ahead.

MR. RUDOVSKY:  I have a few comments, if I can -

THE COURT:  Yeah.

MR. RUDOVSKY:  - make, Judge.

THE COURT:  Go ahead.

MR. RUDOVSKY:  For the record, number 1 -

THE COURT:  Sure.

MR. RUDOVSKY:  - we have moved very broadly to preclude this hearing, based first on your initial Opinion, which raised only the issues concerning lack of duty of candor, under the Rules of Professional Responsibility.

And our Motion to Preclude this hearing included any inquiry into any conduct that could ultimately be sanctionable, because your Ruling yesterday seemed to change the focus of where this hearing was going.

We had prepared for hearing in which you were going to look into the issues of the duty of candor.  That's why we asked that this matter be referred for Three-Judge Court, with appropriately confidentiality and all those kinds of issues.

In response, in your Ruling yesterday, you now say that your concern is -- or what you want to look at today, is that the District Attorney's Office may have litigated this case in a way that threatened to undermine the limited role Federal Habeas Corpus Jurisdiction is intended to play in the State Criminal Justice System.

THE COURT:  Well, I said a lot more in my Opinion -

MR. RUDOVSKY:  I -

THE COURT:  - than that.

MR. RUDOVSKY:  You did.  I want to be clear that you also said that your initial Opinion included that, as well.

THE COURT:  It did.

MR. RUDOVSKY:   We read that somewhat differently.

THE COURT:   Um-hmm.

MR. RUDOVSKY:   But that that'll be dispute we can address later.  But there is a new focus here.  I mean, those words were never used in the Opinion.

THE COURT:   They weren't?

MR. RUDOVSKY:   And it raises for us -

THE COURT:   Nothing, I -

MR. RUDOVSKY:   I -

THE COURT:   I don't want to get into a situation where we're going to pull out the Opinion.  But I will, if I have to.

But I think that was a big part of the Opinion, that my concern clearly involved the possible improper use of the District Attorney's Office to circumvent the very limited focus that a Federal Court has when they are examining a Federal Habeas case.

That has been where a jury has concluded that a death penalty's appropriate.  And the Pennsylvania Supreme Court has concluded that that verdict is sound and should be affirmed.  I mean, Mr. Rudovsky, certainly we won't quibble that -

MR. RUDOVSKY:   Right.

THE COURT:   - a Federal Court has very limited -- let me just finish my thought.

MR. RUDOVSKY:   Yeah, oh, sure.  No, no.

THE COURT:   Yeah.

MR. RUDOVSKY:   For sure.

THE COURT:   A Federal Court has very limited jurisdiction when it comes to a Federal Habeas matter and can only get involved when there's been a constitutional violation. So when you say a new focus, I'm sure I addressed this in my Opinion, as it relates to the DA's Office conduct.

I'm concerned that they tried to circumvent that well-established caselaw.  So, go ahead.  I'm -

MR. RUDOVSKY:   Well -

THE COURT:   - sorry to interrupt you.

MR. RUDOVSKY:   So, I -

THE COURT:   Yeah.

MR. RUDOVSKY:   And we understand ultimately -

THE COURT:   Yeah.

MR. RUDOVSKY:   - you ruled that, on the ineffectiveness of assistance of Counsel issue, which was remanded by the Third Circuit, that, while Counsel may have acted deficiently, there was no prejudice, right?  That was the issue.

THE COURT:   Yeah.

MR. RUDOVSKY:   There were arguments made on both sides.  Lawyers often will make arguments that may seen inconsistent with Doctrine, which may ask you to change Doctrine.

That's what Lawyers do.  That's what District Attorneys do.  That's what Defense Lawyers do, all appropriate.

What we're concerned with is an inquiry into the decision-making process of the District Attorney's Office as to why they took certain positions raises issues of our deliberative process, work product.

There are cases, for example, that Circuit Courts have ruled that Defendants are not entitled to the inner workings of Death Penalty Committees of the Department of Justice, where -

THE COURT:   But I'm not a Counsel -

MR. RUDOVSKY:   And -

THE COURT:   - for the Defendant.

MR. RUDOVSKY:   Right, I understand that.

THE COURT:   I'm a -

MR. RUDOVSKY:   But -

THE COURT:   - independent Federal Judge, who's has to make Decisions based on facts given to me.

MR. RUDOVSKY:   And we understand that.  And there's Decisions that say that what the internal deliberations of Government Officials -- and this is District Attorneys.  This is the Department of Justice.  This is any Government Agency -- should not be done with a fishbowl.  So, I just raise that because we were concerned that this language -

THE COURT:    Sure.

MR. RUDOVSKY:    - could indicate a hearing that went well-beyond an appropriate scope of inquiry.  We're -

THE COURT:    I understand.

MR. RUDOVSKY:    - ready to proceed and object on those grounds.  But I -

THE COURT:    Sure.

MR. RUDOVSKY:    - wanted to preserve those issues -

THE COURT:    Right.

MR. RUDOVSKY:    - for the record, and -

THE COURT:    So, can I comment on that point?

MR. RUDOVSKY:    Please.

THE COURT:    I understand what you're saying now.  And my suggestion would be, rather like your input, my suggestion would be let's take it one step at a time.

And I don't hear you saying you're going to blanketly object to any inquiry.  I don't hear you saying you're going to instruct the Lawyers from the DA's Office not to answer.

But, you certainly reserve your right.  And I want you to have a comfort level.  If you think that my inquiries, or if the other Lawyers have inquiries, impede or infringe on the privileges that you've raised, object.

MR. RUDOVSKY:    Yeah.

THE COURT:    And we will -

MR. RUDOVSKY:    I know.

THE COURT:   - talk about it.

MR. RUDOVSKY:   I think we're on -

THE COURT:   Yeah.

MR. RUDOVSKY:   - the same page.

THE COURT:   We are.

MR. RUDOVSKY:   We've preserved -

THE COURT:   We are.

MR. RUDOVSKY:   - our objection to the hearing.   I -

THE COURT:   Understood.

MR. RUDOVSKY:   I'm not going to instruct -

THE COURT:   Yeah.

MR. RUDOVSKY:   - our witnesses not to -

THE COURT:   Okay.

MR. RUDOVSKY:   - say anything, for sure.

THE COURT:   Okay.

MR. RUDOVSKY:   And I'll object, if we think the -

THE COURT:   As is your -

MR. RUDOVSKY:   - line is being crossed.

THE COURT:   - absolute right.

MR. RUDOVSKY:   Right; now, you also introduced this by saying that you're holding this hearing to give the Office of the District Attorney and the Respondents here an opportunity to explain what they did.

Our position at this point, just to be clear, is that we don't think any explanation is necessary.  You can obviously

ask questions.  But -

THE COURT:  Sure.

MR. RUDOVSKY:  - we are not bringing them in to explain anything.

THE COURT:  Understood.

MR. RUDOVSKY:  We've made all the arguments in the briefs.  You know our position that they did not violate any lack of candor.

They were never asked for specific information.  That's why they didn't give it.  They had no duty under the Rules.  We have an Expert Report on that.

That's our position.  But obviously if the Court wants to proceed with this inquiry, we will abide by those rules.

THE COURT:  Understood; I have a couple preliminary questions, Mr. Rudovsky.  Excuse me.  As to the hierarchy in the District Attorney's Office, am I to -- do I understand it correctly that Mr. Kaufman -- and by the way, is Mr. Kaufman here?

MAX KAUFMAN:  Yes, Your Honor.

MR. RUDOVSKY:  Yes.

THE COURT:  Mr. Kaufman, good morning.

MR. KAUFMAN:  Good morning.

THE COURT:  Mr. Kaufman, at the -- you can have a seat, sir -- Mr. Kaufman, at the time -- at the pertinent time

period was Chief of the Federal Habeas Unit.  Mr. George, who litigated the proceeding in front of me, was the Assistant Chief of the Appeals Unit.

And Ms. Winkelman was the Chief, I think.  Maybe they still have these positions.  I know Mr. Kaufman has gone onto a job for a Supreme Court Justice -- Pennsylvania Supreme Court Justice.

MR. RUDOVSKY:   The exact -

THE COURT:   Ms. Winkelman was head of Appeals?  Did I have -

MR. RUDOVSKY:   No.

THE COURT:   - that right?

MR. RUDOVSKY:   The exact title is Ms. Winkelman was head of the -- let her say.

NANCY WINKELMAN:   Your Honor, I'm the Supervisor of the Law Division at the Philadelphia DA's Office.

THE COURT:   Okay.  All right.  So, with your permission, Mr. Rudovsky, I wanted to start with -- given the hierarchy -- I wanted to start with Ms. Winkelman and ask a couple questions.  Okay?

It's been suggested to me, Ms. Winkelman.  Where are you going to be comfortable sitting?  Is right there okay?  You don't need to -- you want to take the witness stand or -

MS. WINKELMAN:   No, I don't.

MR. RUDOVSKY:   I -

THE COURT:    It's been suggested to me that -

MR. RUDOVSKY:    It may be easier -

THE COURT:    - I should swear -

MR. RUDOVSKY:    - if the -

THE COURT:    - you in.  I'm not going to do that. You're an Officer of the Court.  It's expected your answers are going to be completely honest.  So, you want to -

MS. WINKELMAN:    Yes.

THE COURT:    I'd rather just look at you rather than have you in the witness stand.  Could you just sit right there? Are you comfortable sitting right there?

MR. RUDOVSKY:    Actually, can -

THE COURT:    Or Counsel Table?

MR. RUDOVSKY:    - we bring a chair right here?

THE COURT:    Yeah, do you -

MR. RUDOVSKY:    Yeah.

THE COURT:    Mr. Cruz, can we bring a chair?

(Asides)

THE COURT:    All right.  So, I want to -- there's a lot of background in this case.  And we've been on sort of a long path.

The Third Circuit issued its Opinion back in January of 2018 and directed that we hold a hearing on -- and I'm not going to certainly recapture the entire procedural history. You're aware of it.  I'm aware of it.  It would take an entire

day to relay it.

But the Third Circuit affirmed all of my denials of Mr. Wharton's Claims that were raised by the Capital Habeas Unit of the Federal Defender's Office except one.  There was not a reversal.  It was a remand.

And the remand was regarding my Decision that a hearing was not necessary.  An evidentiary hearing was not necessary to explore the following issue.

And we all know the issue, but I just want to state it.  The issue is:  was Trial Counsel, Mr. Cannon, ineffective?  That is, was there a violation of the Sixth Amendment to effective assistance of Counsel, such that he failed to properly investigate Prison adjustment and Prison conduct on the part of Mr. Wharton, such that that could have been presented to the death penalty jury and wasn't?  And was Mr. Cannon's deficiency in not investigating and presenting that evidence, did that present a violation?

So, of course, Ms. Winkelman, we can agree that the Third Circuit directed a hearing on that issue.  But importantly, and to get to my first question, they said -- and I want to read this part, because this is how I understood it -- Third Circuit directed -- and I quote:

"As for Strickland's prejudice prong to determine whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote, we

must" --

Not may.

-- "We must reconstruct the record and assess it anew.  In doing so, we cannot merely consider the mitigation evidence that went unmentioned in the first instance.  We must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the Petitioner's mitigation testimony."

I don't think -- and you can certainly disagree with me -- there's any vagueness in that statement at all.  I read it to say the hearing must include not only positive mitigation evidence of Prison adjustment, but also negative evidence.

The Third Circuit went on to say, "Of course, had Wharton presented the testimony of Dr. Crop" -- and that was an Expert presented in the State proceeding in his favor -- "the Commonwealth might have countered with other evidence holding a contrary opinion.  To-date, though, the Commonwealth has yet to proffer any such testimony," which I think further confirms my view that you were obligated to present both evidence in favor of Mr. Wharton -- and by the way, you are the Prosecutor.

We have a Defense Attorney very capable of doing that.  But it was expected that you would present not only favorable evidence, but evidence that would not be favorable.

And you withheld the fact that Mr. Wharton violently

escaped from a City Hall Courtroom.  So why did you do that?  Why did -

MR. RUDOVSKY:   Your Honor -

THE COURT:   - you withhold that information?

MR. RUDOVSKY:   - I object to the conclusion that anybody withheld any information that was ever requested by this Court on the remand.  In fact, it's just to the contrary.

What the District Attorney's Office did was file a Notice that, after having reviewed the case, they agreed there was merit to the Defendant's Claim, having reviewed whatever evidence they had at that time, therefore consistent with what they'd been doing for years, before Larry Krasner was District Attorney, and while he was.  They simply filed a Notice saying that's our position.

You followed up, Judge, with an Order not for any information, pro or con, as to why they did it, or their legal reasoning, or the caselaw, or anything like that.  What you did was issue a very limited Order saying whether you were bound by that concession.  And if you were not, should there be a hearing?

They responded in kind.  And they said, as we all know, no, you're not bound by the concession.  It's something you might give some -- a deference to, when the Prosecutor makes that kind of concession.  Judges do that, completely up to you.  And if you think an evidentiary hearing, where all

these facts would come out, is necessary, that's fine.

THE COURT:   I -

MR. RUDOVSKY:   And -

THE COURT:   - didn't think -

MR. RUDOVSKY:   - that's what you did.

THE COURT:   - an evidentiary hearing was -

MR. RUDOVSKY:   You didn't ask -

THE COURT:   - necessary.

MR. RUDOVSKY:   - for any of that information.

THE COURT:   The Third Circuit ordered the hearing.

MR. RUDOVSKY:   The Third Circuit ordered the hearing.  They didn't say when and where, number 1, any Party had -

THE COURT:   Okay.

MR. RUDOVSKY:   - to produce any evidence, other than at a hearing.

THE COURT:   Okay.

MR. RUDOVSKY:   And what the District Attorney's Office did, as Lawyers do all the time, they fight some issues and they concede some issues.  And when they concede an issue, they'll often say we don't take our position to what, in this case, the Petitioner has said.

The Lawyer was on the prong of a Sixth Amendment Claim, the performance prong, clearly ineffective, did not know he could present this kind of evidence.  And in our view, given

all the circumstances, we think it was prejudicial, given our Expert Report, given the fact the jury was deadlocked, so on and so forth.

That was their position.  They did what Lawyers do all the time and said, under those circumstances, we agree with our Opponent.  Lawyers do it in civil cases.  They do it in criminal cases.  It goes on all the time.

The Solicitor General changes position before the Supreme Court with new Administrations on basic legal Doctrine. There are cases where State Attorney Generals on a Defendant's Petition for Review of a Criminal Conviction have said to the Supreme Court, on review of this case again, even though we defended the conviction below, we think the Defendant's Constitutional Claims are right.

Supreme Court doesn't ask for the reasons.  They appoint an Amicus, which is what you did, to argue the other side.

What the District Attorney's Office did here was completely consistent with their internal Policies and what Government Lawyers do all the time.  And so, when you say in that last -- that's why I object -- that last point -

THE COURT:   It's quite a long -

MR. RUDOVSKY:   - you had an -

THE COURT:   - objection.

MR. RUDOVSKY:   - obligation by what the

Third Circuit said to immediately provide you with all this information. We don't think that there was any obligation, under the rules, your internal rules.

You could have had rules that say, if you -- and we'd suggest this -- if you come before me to concede an issue on a case like this, give me the reasons. That's fine. You can have that internal rule. There was no internal rule.

We have a half-dozen Judges in this District who we've submitted similar concessions to. Nobody's ever said, wait a minute. You got to give me the reasons. And not only do you have to give me the reasons, but I'm going to find you possibly sanctionable misconduct for not doing so. Prior Administrations have done it. Lawyers do it all the time.

So I only take issue with the last premise of your question that the Third Circuit had somehow ordered the District Attorney's Office to provide this Court immediately with all the evidence in the case. You wait for a hearing, if you even have a hearing.

THE COURT: Okay. Your multifaceted objection is preserved. Ms. Winkelman, did you read the Third Circuit Opinion, as I did, as directing your Office to provide negative -- I'll read it again. "We must also take in account of the anti-mitigation evidence."

Did you read the Third Circuit as directing that any hearing must also take into account anti-mitigation evidence?

And if you did, why didn't you provide me with the information that Mr. Wharton escaped from a City Hall Courtroom, was 20, 30 feet from Broad Street, and had to be shot to prevent the escape?  Why didn't you provide me with that information?

MS. WINKELMAN:  So, Your Honor, thank you for giving me the opportunity to explain.  I want to just start by saying I started my career in this Courthouse 30-some years ago clerking for Dolores Sloviter.

I then went to the Schnader Firm, where I worked for 29 years, until I came to the DA's Office in 2018.  My professional reputation is extraordinarily important to me.

THE COURT:  Of course, it is.  And you have an excellent professional reputation, as far as I've heard.

MS. WINKELMAN:  So, if I may continue?

THE COURT:  Sure.

MS. WINKELMAN:  My integrity, my reputation, my candor, my ethics have never been questioned.  And it's something I take very, very seriously.  I was stunned to read the last 10 pages of your May 11th -

THE COURT:  All right.  I'm going to -

MS. WINKELMAN:  - Opinion.

THE COURT:  - interrupt you and say, respectfully, Mr. Rudovsky, in response to my question, repeated everything that has been said in a Brief, which I've carefully read.  I don't -- we haven't had cases together before.  But, Lawyers

talk.  And I agree.  Your reputation in the legal community is exemplary.

I am here to ask questions.  Are you going to answer my -- I'd rather avoid all the speeches.  I just want answers to questions, so I can try to give you the benefit of the doubt.  So will you answer my question or not?

MS. WINKELMAN:   I absolutely will.

THE COURT:   Thank you.

MS. WINKELMAN:   And I -

THE COURT:   Please.

MS. WINKELMAN:   - needed to get that off my chest.

THE COURT:   Understood.

MS. WINKELMAN:   So if -

THE COURT:   Okay.

MS. WINKELMAN:   - it felt like a little grandstanding, I apologize.

THE COURT:   It -

MS. WINKELMAN:   This is -

THE COURT:   I understand.

MS. WINKELMAN:   - a big deal to me.

THE COURT:   I've lost countless hours of sleep over this.  This is not something that I take at all lightly.  Trust me.  This has been very difficult for everyone involved.  I get that.

But, this is my obligation to make sure that, when I

make Decisions -- now, I'm going to grandstand for a second -- when I make Decisions like life-and-death Decisions as to whether to vacate a death penalty on one of the most horrific crimes I've ever witnessed in my 35 years of practice, that I am given ample information to make that Decision.

So I'm going to ask the question for the third time. Did you read the Third Circuit Opinion, as I did.  And if you did, why didn't you tell me that Mr. Wharton, in his rehabilitation as a Prisoner, had escaped?

MS. WINKELMAN:   So, when the case was remanded -- and I am trying to answer -

THE COURT:   Okay.

MS. WINKELMAN:   - your question as -

THE COURT:   And I won't -

MS. WINKELMAN:   - directly -

THE COURT:   - interrupt you.  Go -

MS. WINKELMAN:   So -

THE COURT:   - ahead.

MS. WINKELMAN:   - give me a little -

THE COURT:   I will.

MS. WINKELMAN:   - space, please.

THE COURT:   I will.

MS. WINKELMAN:   When the case was remanded, as we were looking at capital cases that had an active -- something active going on, we -- when the case was remanded from the

Third Circuit -- we looked at this case.  We had a decision point about what to do with it.  We ended up -

THE COURT:   Who's we?  May I ask who we is?

MS. WINKELMAN:   The Office has a Capital Case Review Committee.

THE COURT:   I'm asking, who's on the Committee?

MS. WINKELMAN:   Well, first I should say the Committee reports to the District Attorney, makes recommendations to the District Attorney.  The high-level Executives in the Office, the First Assistants, the Supervisors of several Units in the Office, including Victim's Services Unit, Homicide Unit, Law Division, Conviction Integrity -- and I say including because I'm not sure if I'm missing someone -- looks at these capital cases.

And I can't remember the discussion on this particular case.  I do know that there was a recommendation that we concede penalty phase relief in this case.

We followed the practice of former Administrations in the form of Notice of Concession that we filed with this Court. It was substantially similar to numerous other Notices.  And we've provided those to the Court, that we have filed in other cases before DA Krasner, or Nancy Winkelman, or anybody else came into this Office.

We had never, to my knowledge, had a Court ask -- have a problem with our Notice of Concession.  We view that as

part of the role of a Prosecutor, part of our ethical obligations.  So that's what we filed.

In response to that Notice of Concession, the Court entered an Order.  And the Court asked us to brief two discrete issues.

THE COURT:  But my question was, prior to filing the Notice of Concession, if you read the Third Circuit Opinion as I did, again, requiring the exploration of anti-mitigation evidence, why did you not tell me that there was anti-mitigation evidence?

MS. WINKELMAN:  Your Honor, we didn't tell you anything.  And this isn't a question of withholding.  This is a question of our practice, our practice.

And again, this was prior to DA Krasner.  The practice of the Office, when -

THE COURT:  But I'm asking you to focus on what the Third Circuit directed us to do -- me to do, explore anti-mitigation evidence.  You read that, of course.  Would you agree that escaping from a City Hall Courtroom is anti-mitigation?

MS. WINKELMAN:  I'm not trying to evade your question.  I feel that, at that point, the Office had a decision to make about what to do with the penalty phase.

THE COURT:  Yeah.

MS. WINKELMAN:  The capital -

THE COURT:  Respectfully -

MS. WINKELMAN:  - punishment.

THE COURT:  - I do think you're evading my question.

MR. RUDOVSKY:  And Judge, I -

THE COURT:  And I'm going to ask -- well, no.  I'm talking to Ms. Winkelman -- going to ask -

MR. RUDOVSKY:  I'd just object -

THE COURT:  - it one more time.

MR. RUDOVSKY:  - to that line of questioning.

THE COURT:  Okay.  Well, why did you decide -- why did your Committee decide to withhold anti-mitigation evidence from this Court, when we were directed to explore that?

MS. WINKELMAN:  We did not withhold evidence.  We followed a practice that the Office had followed in numerous other cases.  Can I tell you that, in those other cases, there was a lot else that could have been -

THE COURT:  I don't -

MS. WINKELMAN:  - said?

THE COURT:  I'm not concerned with other cases.  I'm concerned with Mr. Wharton's case.

MS. WINKELMAN:  And I'm concerned with -- our process was no different.  And I just want to continue, because the Court then asked two questions.

And we answered those questions.  We were meticulous in answering the questions the Court asked.  If the Court had

asked other questions, if the Court had asked for a fulsome explanation, we would have provided that.

Well, Mr. Kaufman filed, along with you and Mr. George, on April 3rd, a Brief.  And in that Brief, you laid out -- this is after I didn't accept the concession -- you laid out reasons for your concession.

And I'm on page 3.  You said -- you cited Mr. Cannon's Declaration, which said that he wasn't operating under any strategy.

And you cited a fact.  That's a fact.  And you cited the fact that the jury for the -- the death penalty jury for a period of time had been deadlocked.  And this is on the issue of prejudice.

But you didn't mention the escape.  Why?  So you got into the facts, but not all of them.

MS. WINKELMAN:  Well, we got in the facts at a very high level.  And I -

THE COURT:  You don't think an escape from City Hall's a high level?

MS. WINKELMAN:  - did not know about the escape -

MR. RUDOVSKY:  And Judge, may -

MS. WINKELMAN:  - Your Honor.

MR. RUDOVSKY:  - I just say that -

THE COURT:  Sure.

MR. RUDOVSKY:  - on the escape attempt, what is so

interesting to us is that, as you say, the zealous Advocates in the District Attorney's Office who sought the death penalty, right, and defended it for 25 years.

You use the word "zealous".  The word was used in the hearing of the former District Attorney for the death penalty. We respect that.  That was their position.

At the first -- at the death penalty hearing, when Mr. Wharton presented evidence of good character, right, that could have been impeached with this escape attempt. District Attorney never used it.  It was not in any of the Opinions.  It was almost to them irrelevant.

If they didn't use it then, even under your theory here that the District Attorney somehow had to give you everything at this point, you're assuming that that was something that was considered relevant and so on, and so forth.

That was for the full hearing, which you had.  All they were doing was saying, we've reviewed it.  We have a basis for deciding, based on what has been provided to us that the Lawyer was ineffective and that there was prejudice.

We're just giving you a Notice.  That's all Mr. Kaufman did.  He didn't lie about anything.  He said, here's the Notice, and then waited for further instructions from you.

And what you did was two things:  ask the legal questions.  Can I have a hearing?  They said yes.  And then,

participate in that hearing.

How that could either violate a duty of candor, or, even more broadly, undermine Federal Habeas Law, Lawyers have no way of undermining Federal Habeas Law, unless they act, right, corruptly. Judges control Federal Habeas Law. You made a Ruling.

THE COURT: Well, Judges need information to make informed Rulings.

MR. RUDOVSKY: And you got it all at the hearing. You got everything you needed at the hearing. You made a Ruling. And you found -

THE COURT: At what hearing?

MR. RUDOVSKY: - at the end -- and you found at the end --

THE COURT: Excuse me. What hearing?

MR. RUDOVSKY: When you had the full evidentiary hearing in this case, after appointing the Attorney General.

THE COURT: And it wasn't until the Attorney General was appointed and midway through the hearing that I had to ask Mr. George, did you have this information about the escape? And he said, yes.

MR. RUDOVSKY: No, no, no. The question was, did the District Attorney's Office know of the escape? Well -

THE COURT: Okay.

MR. RUDOVSKY: - obviously, they knew of the escape.

They prosecuted Mr. Wharton.

THE COURT:    Right.

MR. RUDOVSKY:    That was how many years ago, right? That was over 40 years ago.  No evidence that he either personally knew about it, and the District Attorney had never even used it before, when they could have.  My point -

THE COURT:    That was -

MR. RUDOVSKY:    - is -

THE COURT:    - their decision -

MR. RUDOVSKY:    My point is simply -

THE COURT:    - if that's right.

MR. RUDOVSKY:    - all of that came out.  And not only was there no lack of duty of candor, but how does a Lawyer, by conceding an issue, or by arguing a position, undermine Federal Habeas Law?  They can't do it.

You have the power to do it, extend it, restrict it. The Third Circuit has that power.  The Supreme Court has that power.  They go back-and-forth.

You had the Martinez case 10 years ago.  Now, you got Shin, right?  They change their positions on Habeas Corpus Doctrines all the time.  Lawyers make arguments to extend or restrict.

And when a Prosecutor decides whether to fight an issue, they have the same considerations.  They have no power to undermine anything, unless you're right that they acted

corruptly in some way.

But that's the ethical issue.  That's the ethical issue.  And that's why we think this thing is completely inappropriate.  I've said it.  I won't say it again.

THE COURT:  So you know, honestly, I don't think you've answered my question.  But I'm going to move on, okay, unless you want to say something more, or else I'm going on.

MS. WINKELMAN:  The answer -

THE COURT:  You want me to ask it again, or you want to move on?

MS. WINKELMAN:  I answered the best that I -

THE COURT:  Okay.

MS. WINKELMAN:  - can.

THE COURT:  Okay.  As Chief of the Appeals Division for the Philadelphia District Attorney's Office, I'm going to assume you were aware of the Pennsylvania Supreme Court's Decision in Commonwealth v. Brown, which was decided in 2018, prior to your issuance of your concession.

Again, I'm sorry.  I'm going to have to quote from some language to get to my question.  So, the Supreme Court of Pennsylvania -- and I believe it is a very similar case.

It was a death penalty case.  It was a PCRA matter.  State collateral review matter; this is a Federal matter.  The District Attorney -- the current District Attorney, your Office, Mr. Krasner's Office, presented a concession along the

same lines to the death penalty.

And the Supreme Court of Pennsylvania rejected that process in my view. That's the way I read the case. And it said the following.

The jury -- and I'm going to paraphrase some of this -- the jury, having rendered a verdict, neither the Parties, by agreement, nor this Court, absent a Finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence. The Pennsylvania Supreme Court went on to say:

"After the jury in this case reached its decision and entered a verdict recommending a death sentence, the District Attorney lost any prosecutorial discretion to alter that verdict. The power of a Court amounts to nothing more than the power to do exactly what the Parties" --

I'm sorry.

"If the power of a Court amounts to do nothing more than the power to do exactly what the Parties tell it to do, simply because they said so, without any actual merits review, it is not judicial power at all. The District Attorney cannot now seek to implement a different result based upon differing view of the current Officeholder."

And the important part I take away from that,

Ms. Winkelman, is that my read of what your Supreme Court -- Pennsylvania Supreme Court told you in these type of matters is that the only way a Decision can be made to take a death penalty verdict affirmed by the Highest Court off the table was through a merits review.  That's what they're saying, merits review.

So my question, then, is:  how could I have a merits review without knowing there was anti-mitigation evidence?  How did you expect me to do that without telling me that Mr. Wharton had escaped?

MS. WINKELMAN:  So, Your Honor, in the Brief that we filed -- I believe it was April 3rd -- that you were referencing, we were very clear that the Court was not obligated to accept our concession.

I understand what the Supreme Court said in the Lavar Brown case.  And we have filed the Notice in this court and Notices since Lavar Brown in other courts, with a Notice of Concession.

It is not our position that a Court is bound by that. The Court is fully within its power to do exactly what this Court did and say, I'm not going to accept this concession.  I want to hear more.

And we had days of evidentiary hearings.  That is the role of a Prosecutor.  And that is the role of a Court.  We coexist.  I don't see -

THE COURT:   Are you telling me, when we went to the hearings, at some point your Office was going to -- if I hadn't appointed the Attorney General, who were the ones to tell me about the escape -- and we haven't talked about what the victim's view in the case was.

But, are you telling me that, when I had the hearing that the Third Circuit ordered, at some point your Office was -- if I didn't have the Attorney General as an Advocate, your Office was going to tell me about the escape?

MS. WINKELMAN:   I have to tell you I was not aware of the escape.  And I am perplexed.  I -

THE COURT:   But you weren't -- when did you become aware of the escape?

MS. WINKELMAN:   I've tried to remember, Your Honor. And I don't know.  But I was not -

THE COURT:   Were you part of the Committee that recommended the concession?

MS. WINKELMAN:   Yes.

THE COURT:   Were you aware of the escape then?

MR. RUDOVSKY:   Your Honor -

MS. WINKELMAN:   I -

MR. RUDOVSKY:   - I'm going to object here.  This goes right into that deliberative process that I talked about.

THE COURT:   Um-hmm.

MR. RUDOVSKY:   I can give you case cites on

deliberative process.  This is an area that I think I'm going instruct her not to answer, both work product and deliberative process.

Let me quote from a Circuit Court case on that issue. Case called the Assembly of the State of California, Ninth Circuit case, 968 F.2d 916.

"Government Agencies should not have to operate in a fishbowl.  We encourage internal debates.  We encourage devil's advocates' positions.

"We encourage Governmental Agencies to explore all possibilities of what their litigation position should be and the reasons for it.  And none of that should be made public."

That's all protected by the privilege.  And I mentioned the other cases before, several cases where Lawyers have tried to just do the same thing.

What is the DA/DOJ position?  Why did they recommend the death penalty in this case?  Was there something improper about it?

And what the Courts have said uniformly, all the Circuit Courts that have addressed it, is that that's not an area where they have to disclose anything about their internal deliberations.

You're now asking about the internal deliberations of this Committee, which resulted in -- and the final result we

know -- that there was merit to the Claim that was made by Mr. Wharton. And that's all they did.

They notified you of that. And you were free. And you did, as we've said, hold a full hearing. And you had all the facts.

And in fact, you found -- even though you found no prejudice -- you found that it was a plausible issue, because you issued a Certificate of Appealability. And we appreciate that. That'll be up in the Third Circuit.

It's not as if this was an implausible position, even after a full hearing with all the evidence and Experts on both sides, and pro and con. And I go back to the fact that this surfaced for the first time, this evidence of the escape, when it had never been used before and could have been used before -

THE COURT:    Yeah.

MR. RUDOVSKY:    - by the -

THE COURT:    You -

MR. RUDOVSKY:    - zealous Advocates -

THE COURT:    - said that -

MR. RUDOVSKY:    - for the death penalty.

THE COURT:    - very clearly. So, I haven't looked at the cases you've cited, and I'm certainly not prepared to instruct your Client to answer right now. So I -

MR. RUDOVSKY:    I appreciate it.

THE COURT:    - haven't looked at those cases and I

will.  But I do have a question for you, Mr. Rudovsky, which is don't you think -- this is not a law firm.

This is the DA's Office of the City of Philadelphia. They represent the Commonwealth, the people.  Don't you think the public has a right to know the deliberative process that that office made when conceding a death penalty?

MR. RUDOVSKY:  Absolutely not.

THE COURT:  No?

MR. RUDOVSKY:  Absolutely -

THE COURT:  Okay.

MR. RUDOVSKY:  - not.  As with -

THE COURT:  Why not?

MR. RUDOVSKY:  And it's not whether it's a private law office, it's a Governmental Agency.  All these cases say that they should be free to have internal debates.

Pre-decisional discussions should be free-flowing. They shouldn't be in a fishbowl.  Neither the public and we suggest this Court is entitled to know what went into -

THE COURT:  How about the victims?

MR. RUDOVSKY:  - those deliberations.

THE COURT:  Do they have a right to know?

MR. RUDOVSKY:  If you disagreed with their conclusion, which you did, at the end of the day when they said, we think there's merit to the Claim here, both on the performance prong and the prejudice prong, you're free to

reject that. That's what they told you, and hold a full hearing.

You issued a Ruling. You stand by that and we appealed it. Mr. Wharton appealed it. We will see what the Third Circuit says.

But having decided, as Lawyers do, Government Agencies do, the Solicitor General does all the time, change positions on strongly held views of the prior Administration.

So, sure, the prior Administration pushed for the death penalty in this case. This Office said, given the Ineffectiveness Claim, we don't think the death penalty can stand. He's entitled to a new hearing.

THE COURT: Do the victims -

MR. RUDOVSKY: That goes on all the time.

THE COURT: - have a right to know the basis for the District Attorney's decision, which may or may not have included -- I mean, I thought I heard Ms. Winkelman say that, at some point, the DA's Office was aware of the escape. Do the victims have a right to know the deliberative process and that that included a concession, even though Mr. Wharton escaped?

MR. RUDOVSKY: The victims have certain rights, both under Federal and State Law, to be notified, communicated with about the status of the case. That was done, we understand, or that could have been done more with the young victim, right.

It wasn't, but the family was.  You heard a lot of evidence about that.  I won't go into that.

The victims on the other hand have absolutely no say, none -- and we've briefed this.  And we haven't heard anything in contrary -- that either the District Attorney or this Court would take their views into account on the constitutional issue.  That is, if a victim says, don't concede on Sixth Amendment -

THE COURT:   No, I'm not -

MR. RUDOVSKY:   - violations -

THE COURT:   - saying take their views into account.  I'm saying, do the victims and the public have a right to know -- well, let's just stick to the victims, because you've answered the public part.  So let me rephrase.

Do the victims have a right to know the deliberative process of an Elected Official, the DA of Philadelphia, as it relates to whether to concede a death penalty case where the Defendant had escaped?

MR. RUDOVSKY:   They have a right to know of the decision.  They have the right to know that there was a decision-making process.  They were informed of that.  As to the particulars, as to what went on and who said what, what the reasons were, absolutely not.

THE COURT:   Not, okay.  So, I'm going to respect your objection.  I haven't looked at those cases.  I'm going to

rephrase my question and we will see, Mr. Rudovsky, if you have a problem with the rephrase, which is asking Ms. Winkelman specifically, you were part of the Committee that made the decision to concede.  Were you aware at the time that Mr. Wharton had escaped from a City Hall Courtroom?

MR. RUDOVSKY:   Same objection, but -

THE COURT:   You'll allow it?

MR. RUDOVSKY:   - she can -

THE COURT:   Okay.

MR. RUDOVSKY:   Yeah, yeah.

MS. WINKELMAN:   I was not.

THE COURT:   You were not aware?

MS. WINKELMAN:   I was not aware.

THE COURT:   Okay.  Were you a voting member of that Committee?

MS. WINKELMAN:   Yes.

THE COURT:   Okay.  Was -- who was aware?

MR. RUDOVSKY:   You're assuming, Judge, that anybody was aware.  She -

THE COURT:   Okay.

MR. RUDOVSKY:   - was not aware.  Nobody -- apparently, if she was not aware -

THE COURT:   Now, I'm confused.

MR. RUDOVSKY:   - then nobody said anything.

THE COURT:   I thought we established that the

DA's Office was -- I mean, you just said, of course we're aware. It happened -

MR. RUDOVSKY: Well, right.

THE COURT: - six -

MR. RUDOVSKY: So this -

THE COURT: Twelve years ago.

MR. RUDOVSKY: - is an entity that's been around for 200 years. And in 1984, whenever that escape attempt was -- and I have the year wrong, right? Obviously people knew about it, that he was prosecuted.

THE COURT: Yeah, but I asked Mr. George during the hearing, was the DA's Office aware that Mr. Wharton escaped when you conceded, and he said yes.

MR. RUDOVSKY: And you didn't ask him if he was aware or if anybody in this Committee was aware. You simply -

THE COURT: All right.

MR. RUDOVSKY: - just asked -

THE COURT: Who was aware?

MR. RUDOVSKY: - that question.

THE COURT: Who was aware of his escape at your office?

MS. WINKELMAN: I couldn't answer.

THE COURT: Was Mr. Krasner aware?

MS. WINKELMAN: I could not answer that.

THE COURT: Was Mr. Krasner advised that you were

conceding, even though the issue was Prison adjustment and Mr. Wharton had escaped from a City Hall Courtroom?  Was he aware of that?

MR. RUDOVSKY:   I would object to what Mr. Krasner knew or didn't know.  It'd be hearsay if it -

THE COURT:   Okay.

MR. RUDOVSKY:   - was.

THE COURT:   Is that an instruction, or you're going to allow it?

MR. RUDOVSKY:   It's an objection.

THE COURT:   Got it; what's the answer?

MS. WINKELMAN:   I'm sorry.  Could you rephrase the -

THE COURT:   Was Mr. Krasner aware, when you -- let me back up.  Did Mr. Krasner approve of the concession?

MS. WINKELMAN:   The final decision was Mr. Krasner's.

THE COURT:   Was he -- oh, you said you weren't aware.  You're not sure who was aware.  Do you know if anyone advised Mr. Krasner, before he approved the concession, that Mr. Wharton had escaped from a City Hall Courtroom?

MS. WINKELMAN:   I don't know.

THE COURT:   Don't know, okay.  All right.

MS. WINKELMAN:   Your Honor, may I -

THE COURT:   Yes?

MS. WINKELMAN:   - say something -

THE COURT:   Of course, of course.

MS. WINKELMAN:   - on the issue of the escape is -

THE COURT:   Yes.

MS. WINKELMAN:   - I don't believe -- and you started this conversation with me by reading the Third Circuit's Opinion, language from the Opinion -- I don't believe there was anything in that Opinion about the escape.

I don't believe there was anything in the Pennsylvania Supreme Court's Opinion affirming this case and the penalty about the escape.  I don't believe that in the numerous Briefs that the District Attorney's Office filed in this case that there was -- including about this particular Claim -- that there was discussion about the escape.  I am perplexed as to why that is.  I do appreciate -

THE COURT:   As to why what is?  I'm sorry.

MS. WINKELMAN:   Why it is that the escape was not part of the briefing and the Opinions in this case.

THE COURT:   Whose briefing?

MS. WINKELMAN:   The DA's briefing seeking to uphold the death penalty; I don't believe that the escape was part of the arguments there.  I'm perplexed as to why, if I'm correct about that.  I'm perplexed as to why that would be.

THE COURT:   But you're Chief of the Appeals Unit.

MR. RUDOVSKY:   Judge, we're referring to the previous Briefs on appeal, which you've referred to.  The

Pennsylvania Supreme Court case -

THE COURT:   Oh, not the current case?

MR. RUDOVSKY:   That's right.

THE COURT:   Got it.

MR. RUDOVSKY:   The PCRA -

THE COURT:   Okay.

MS. RUDOVSKY:   - Opinion and -

THE COURT:   I misunderstood.

MS. RUDOVSKY:   - the Third Circuit Opinion -

THE COURT:   Right, right.

MR. RUDOVSKY:   - no argument by the prior -- right, that was the prior Administration -

THE COURT:   Right.

MR. RUDOVSKY:   - who argued it.

THE COURT:   Prior DA's Office?

MR. RUDOVSKY:   Right, prior DA's Office -

THE COURT:   Um-hmm.

MR. RUDOVSKY:   - seeking to uphold the death penalty.

THE COURT:   Um-hmm.

MR. RUDOVSKY:   Not only didn't they use that evidence, right, at the hearing, they didn't make any reference to it to the Pennsylvania Supreme Court.  They made no reference it to the Third Circuit.  I -

THE COURT:   But she's in charge.  She's -

MR. RUDOVSKY:   At what -

THE COURT:   - got a very serious position.  She's at the Head of Appeals of the -

MR. RUDOVSKY:   Right.

THE COURT:   - fourth, fifth, whatever, largest -

MR. RUDOVSKY:   And -

THE COURT:   - DA's Office in the -

MR. RUDOVSKY:   - she can -

THE COURT:   - country.

MR. RUDOVSKY:   - look as to what the zealous DAs did before and what they considered relevant.  There's no hint to anybody.

If you put yourself in her position, or anybody's position in that Office, when this case gets remanded, we knew some of the information.  We knew his background.  We knew the mitigation evidence that was presented and the aggravating circumstances that were presented to the jury.  Nothing about the escape attempt was presented; it wasn't on the radar screen of anybody.

MS. WINKELMAN:   And I mean -

THE COURT:   I mean, and not to be argumentative, but it was on the radar screen of the Third Circuit in my opinion, because they -

MR. RUDOVSKY:   Why wouldn't they have mentioned that?  Why wouldn't they have said, for example -

THE COURT:   How would they know?  It wasn't part -

MR. RUDOVSKY:   Well -

THE COURT:   - of the record.

MR. RUDOVSKY:   - they have way -

THE COURT:   No one told them.

MR. RUDOVSKY:   No way of knowing, and there was nobody in the office at this point who would either recall that, or think it was relevant, if it hadn't been used before. That's my simple -

THE COURT:   Okay.

MR. RUDOVSKY:   - point.

THE COURT:   All right.  Did you want to finish?  I'm sorry.

MS. WINKELMAN:   No, huh-uh.

THE COURT:   Okay.

(Asides)

THE COURT:   During your participation -- respecting Mr. Rudovsky's concerns -- during your participating in the Committee that recommended and told Mr. Kaufman to concede, what was your understanding as to the victims' position as to whether they were in favor or not of the concession, understanding Mr. Rudovsky's statement, which was said in a Brief and said eloquently again that the ultimate decision lies with your Office?

But did you understand?  Well, what was your

understanding of their position as to whether they were in favor of the concession?

MS. WINKELMAN:   My understanding was through our Victim Witness Coordinator, who you heard from -

THE COURT:   Um-hmm.

MS. WINKELMAN:   - that she had spoken with I believe the eldest brother of one of the victims.  This man is in some sort of minister or kind of -- some kind of religious work.

Her sense -- Ms. Wanes' sense was that he was somewhat of the spokesperson, the patriarch of the family.  He did not express a view that he was strongly against the concession.

Ms. Wanes invited him to give her contact information to the other members of the family and to the surviving victim, Ms. Hart.  And encouraged him to have them contact her if she -- if they wanted to discuss this with her.  And she was not contacted by them.  So that's my understanding -

THE COURT:   Thank you.

MS. WINKELMAN:   - at the time of the -

THE COURT:   Um-hmm.

MS. WINKELMAN:   - communications with the victims' family.

THE COURT:   You were, I assume, somewhat familiar with the case.  So you understood that there was a victim that had survived.  The mother and father were murdered.

Seven-month-old, eight-month-old -- I forget the exact age.  An infant was left by Mr. Wharton in the house to freeze to death.

Did you -- since you're of a high supervisory position in the Office, before the concession was agreed to and recommended to the DA, who approved it, did you direct anyone to contact the surviving victim to get her views?

MS. WINKELMAN:  Your Honor, it would not be my authority, my role.  There's a Supervisor of Victim Witnesses.  I am not a Victim Witness person/specialist.  I don't know that area and the best practices.

We have stated to the Court in our Post-Hearing Brief that it would have been -- in looking back on it, that would have been an appropriate -- and something we should have done.  We recognize our mistake.

But it wouldn't have been my responsibility or my role.  I'm not the Supervisor of the Victim Witness -- anybody in the Victim Witnesses Service to tell them who to contact, who not to contact, how to make contact, what kind of discussions to have.  That's not my lane.  And Your Honor, a couple times you've called me the Chief of Appeals.

THE COURT:  Am I -

MS. WINKELMAN:  Just so you understand -

THE COURT:  - giving you more authority or less in either?

MS. WINKELMAN:   Well -

THE COURT:   What's your title?  I'm sorry.

MS. WINKELMAN:   - I'm the Supervisor of the Law Division.  And just -

THE COURT:   The Law Division.

MS. WINKELMAN:   - so the Court understands, the Law Division includes an Appeals Unit -

THE COURT:   Right.

MS. WINKELMAN:   - which has its Supervisor.

THE COURT:   Um-hmm.

MS. WINKELMAN:   It includes PCRA Unit -

THE COURT:   Um-hmm.

MS. WINKELMAN:   - which has a Supervisor.  It includes the Federal Litigation Unit, Federal Habeas Unit, which has a Supervisor.  And it includes Civil Litigation, which has -

THE COURT:   I -

MS. WINKELMAN:   - a Supervisor.

THE COURT:   I've diminished your authority.  I apologize.  You have a lot more authority than that.

(Asides)

THE COURT:   If it was the Committee's decision -- and I'm a little muddled in my notes.  So I just want to go back, just to be sure the record's clear.

When the decision was made to concede by the

Committee that you were on, you can't remember whether you were aware of the escape or not.  Is that right?

MS. WINKELMAN:   (No audible response).

THE COURT:   Were you?

MS. WINKELMAN:   I was not aware.

THE COURT:   You were not aware.  Okay.  So you remember that you were not aware?

MS. WINKELMAN:   At that time.

THE COURT:   At that -

MS. WINKELMAN:   Correct.

THE COURT:   - time, okay.  And you -- I think the objection was posed when I asked you who on the Committee was aware.  We can maybe revisit that later, after I read the cases Mr. Rudovsky cited.  And you're unaware as to whether Mr. Krasner was aware of the escape?

MS. WINKELMAN:   Correct.

THE COURT:   Okay.  But he did approve the concession?

MS. WINKELMAN:   Yes.

THE COURT:   Okay.  Was Mr. Kaufman -- as I understand Mr. Kaufman's Affidavit, he was not part of that Committee?

MS. WINKELMAN:   Correct.

THE COURT:   Why did you, or others, decide to have Mr. Kaufman file the concession, when he didn't have any

decision-making authority, as it relates to the concession?

MS. WINKELMAN: Mr. Kaufman was the Supervisor of the Federal Litigation Unit. And it was normal practice before Mr. Krasner or me, or 2018, for the Supervisor of the Federal Litigation Unit to file the -- a Notice of Concession when the Office was conceding penalty phase relief.

So we were just following -- we were following what -- the way the prior Administrations had handled it. Seemed appropriate and reasonable, no question about the process, when the Office was going to concede penalty phase relief.

We've filed substantially similar Notices of Concession. And they were filed by the Head of the Federal Litigation Unit, in this case Mr. Kaufman.

(Asides)

THE COURT: Rule 11 of the Federal Rules of Civil Procedure requires that every Pleading that's filed by an Attorney -- and Mr. Kaufman filed -- was the Signator on the matters that were filed with me.

It requires that the Signator has certified that, to the best of the person's knowledge, information, and belief that the information -- and I'm paraphrasing -- are warranted by existing law. And the factual contentions have evidentiary support. Why was Mr. Kaufman -

MS. WINKELMAN: I'm sorry.

MR. RUDOVSKY: No. Yeah.

THE COURT: You need a second?

MR. RUDOVSKY: No, no, no.

THE COURT: Okay.

MR. RUDOVSKY: I just gave her a copy of the Rule.

THE COURT: Okay, thank you. And I have a copy if you need one. Why was Mr. Kaufman asked to sign Pleadings on a very substantial matter, but not told the basis of what he was signing at all, as I understand his Affidavit, in light of the edicts of Rule 11?

MS. WINKELMAN: This is how the Office had operated. This is not a Mr. Krasner Policy. The Office had, before 2018, and has, since 2018, filed the Notices of Concession. And our Supervisor of Federal Litigations -

THE COURT: Yeah, listen. I don't want to get too far out of the record. But, Mr. Krasner has very publicly stated that he's going to do things a lot different than other Administrations have done. And that's his right, as an Elected Official. But you keep saying this is the way other Administrations have done things.

MS. WINKELMAN: That's -

THE COURT: So, that's your answer?

MS. WINKELMAN: The fact of the matter is, Your Honor -- and I certainly -- I know what Mr. Krasner has said, that he's doing things differently. But in this, the fact is that, before Mr. Krasner came into the Office, the

Office had filed these Notices of Concession of Penalty Phase Relief -- and Your Honor has now seen them, as I've said before. We've provided them to you -- before Mr. Krasner came into the office and since -

THE COURT: Okay.

MS. WINKELMAN: - that are substantially similar. In the many radical things that my Boss could be, we could talk about. This is not one of them.

THE COURT: Okay.

MR. RUDOVSKY: And Judge -

THE COURT: I -

MR. RUDOVSKY: - may I just say that -

THE COURT: Sure.

MR. RUDOVSKY: - I understand your point about Rule 11. We go back to the basic point we made in our Brief, which I think you appreciate.

The Notice was a Notice. It simply said the Office position is we're not contesting.

THE COURT: Yeah, but it's -

MR. RUDOVSKY: It wasn't an advocacy point.

THE COURT: It was a Pleading, right, some -

MR. RUDOVSKY: It was -

THE COURT: - sort of -

MR. RUDOVSKY: - a Notice Pleading.

THE COURT: Okay.

MR. RUDOVSKY:   Under the Rules of Civil Procedure, it's a Notice Pleading.  This is our position only.

THE COURT:   Um-hmm.

MR. RUDOVSKY:   No advocacy one way or the other, and he's instructed -- on Mr. Kaufman's part -- he's instructed by his Supervisors just to file this.  It's perfectly appropriate to have the Head of the Unit file it.  And whether he filed or somebody from the Committee filed it, or Larry Krasner filed it, I think makes no difference ultimately on the candor issue.

THE COURT:   Okay.  I understand your answer to be -- and I'll give you a chance to elaborate -- we asked Mr. Kaufman to file Pleadings, Notice of Concessions, whatever you want to call them.  I think they're Pleadings.  And we did that and asked him to do it without any information, because that's the way other Administrations have done it.

MR. RUDOVSKY:   Objection, Your Honor.

THE COURT:   Okay.

MR. RUDOVSKY:   I think that misstates it.

THE COURT:   Okay.

MR. RUDOVSKY:   The -

THE COURT:   How so?

MR. RUDOVSKY:   - people who instructed him to do it had made a reasonable decision, based on everything they looked at on remand, that they were not going to contest this Claim. They had every discretionary right to do it, absent some kind

of corruption that somebody paid them all $50,000 to do it, or something like that.

They followed Office Policy. They read the law. They decided the Defendant was right on this issue. They made the legal conclusion as to what they're going to do. And they simply told Mr. Kaufman, as Head of the Unit, file a Notice of our conclusion.

THE COURT:   I understand all -

MR. RUDOVSKY:   And that's -

THE COURT:   - that.

MR. RUDOVSKY:   - all he did. But -

THE COURT:   My question is why? Why didn't he -- Mr. Kaufman's Supervisors advise him of the basis of what was being conceded, and the investigation that was done or not done? And I heard your Client's answer to be, because this is the way other Administrations have -

MR. RUDOVSKY:   And -

THE COURT:   - done it.

MR. RUDOVSKY:   - there was nothing to provide. I'll go deeper with you, right?

THE COURT:   Okay.

MR. RUDOVSKY:   Why didn't they do it? Because all he's doing is acting kind of -- it's a ministerial act. I'm advising the Court of the decision of the District Attorney of Philadelphia that we are not going to contest this issue.

That's all he did.  He didn't have to know the reasons one way or the other.  He had no authority to countermand that, I mean, just in terms of -

THE COURT:  Okay.

MR. RUDOVSKY:  - chain of command in the Office.

THE COURT:  So he was just a Filer?

MR. RUDOVSKY:  File it, notify the Judge.

THE COURT:  Right.

MR. RUDOVSKY:  And then, it's in your hands.

THE COURT:  Head of the Habeas Unit of the DA's Office, okay.  Jimmy, could you show this?  I don't know whether you have this in front of you.

I want to ask you a question about this Proposed Order that you submitted.  I want to give you a chance to read it before I ask you a question about it.  Show this to Ms. Winkelman, please.

MS. WINKELMAN:  Thank you.

THE COURT:  I may have written some notes on that. So please don't read them, Mr. Rudovsky.  Jimmy, go get that back, please, when they're done.

(Asides)

THE COURT:  Thank you.

MR. RUDOVSKY:  Judge, could I just suggest that it be marked, so if we're going to -

THE COURT:  Yeah.

MR. RUDOVSKY:   Is that right?

MS. WINKELMAN:   Right.

THE COURT:   Well, we can't mark this, because I -- I've -

MR. RUDOVSKY:   Oh, right, well -

THE COURT:   On the back -

MR. RUDOVSKY:   - one of the original ones.

THE COURT:   - is written down the train schedule of when I was supposed to pick up my dad last week.  So we're not going to mark it, include that into evidence.

But we will make it park of the record.  And it's identified as a Docket Number.  So, that'll suffice.  It's Document 156, filed February 8th, 2019.

So this is filed by Max Kaufman and the Federal Defender's Unit.  And it comes right after the concession, if my memory's right, a couple days after the concession.

And it's a Proposed Order.  And in the Proposed Order, after the concession, you're asking me to sign an Order which says -- and I'll read it verbatim -- "And upon careful and independent review of the Parties' submissions and all prior proceedings in this matter, it is hereby ordered that" -- and then it grants the relief.

So, my question is:  did you -- first of all, did you have a part in drafting this document?  Or was this Mr. Kaufman?

MS. WINKELMAN:   I did not have a part in drafting that document -

THE COURT:   Okay.

MS. WINKELMAN:   - to my recollection.

THE COURT:   Okay.  As Supervisor of the Law Division, do you now have a concern that you have asked a Federal Judge in a death penalty matter to sign off on an Order which says that the Judge has done an independent review, knowing that the Judge didn't have information about an escape?

MS. WINKELMAN:   Your question permits me to comment. And I will answer the question.  But it's been floating around with me that part of the dynamic here is that we filed these -- I'm going to call them -- Form Notices of Concession of Penalty Phase Relief in other cases, as I've said a number of times, before the Krasner Administration and since.  And we have not had an experience with a Judge rejecting the concession.

Your Honor has raised a concern.  And we're here. But this language was, I suspect, form language.  We hadn't had any Judge question it, or have any problems with it, much less to the point of violating a duty of candor that we take so seriously.

So, that's how I want to answer your question.  It was, I suspect, form language.  And nobody -- no other Federal Judge prior or since has had the concern that this Court has had.

THE COURT:   Do you believe that, had I signed this Order, it would be accurate such that I had conducted a careful and independent review, not knowing about the escape?

MS. WINKELMAN:   I can't answer that question for the Court.

THE COURT:   Okay.

(Asides)

THE COURT:   And by the way -- and I really don't want this to devolve into what other Judges have done.  But I do disagree with your assertion that other Judges in this court have not questioned stipulations submitted by your Office, disagree.  Want to take a brief recess?

MR. RUDOVSKY:   Thank you, Your Honor.

THE COURT:   Ten minutes.

(Recess at 10:11 a.m., until 10:22 a.m.)

THE COURT:   I wanted to ask Mr. George some questions.  Thank you.

MR. RUDOVSKY:   Just I'll make the same objections I made before, and -

THE COURT:   Preserved.

MR. RUDOVSKY:   - are guided by them.  Thank you, Your Honor.

THE COURT:   Understood.  I'll say the same thing I said to Ms. Winkelman, say it to you.  It was suggest that I should -- any Q&A between myself and the Lawyers should be done

under oath.

But you're an Officer of the Court.  I don't think that's necessary.  I'm not going to do that.  Were you part of -- Mr. George -- were you part of the Committee that determined that the death penalty should be conceded?

MR. GEORGE:  I was part of the Committee.  I did not make the determination.  Mr. Krasner did that.

THE COURT:  Okay.  Were you aware?  Well, so is it a recommendation to Mr. Krasner?

MR. GEORGE:  Yes.

THE COURT:  Okay.  And were you aware, when your Committee, for lack of a better word deliberated -- if that's the right word -- well, let me back up.  Mr. Rudovsky, are you okay with me asking him who was on the Committee?

MR. RUDOVSKY:  Yeah, I think -

THE COURT:  Who's on the -

MR. RUDOVSKY:  Yeah.

THE COURT:  - Committee?

MR. RUDOVSKY:  For sure.

THE COURT:  Okay.  Who's on the Committee?  Who was on the Committee, not present?

MR. GEORGE:  The First Assistants -

THE COURT:  Um-hmm.

MR. GEORGE:  - each of them is on the Committee. The Chief of this Conviction Integrity Unit; the Chief of the

Homicide -

THE COURT:   Who was that -

MR. GEORGE:   - Division.

THE COURT:   - at the time, Chief of the Conviction Integrity Unit?

MR. GEORGE:   Patricia Cummings, at that time.

THE COURT:   Um-hmm.

MR. GEORGE:   The Chief of the Homicide Unit, which was Anthony Bocci at that time.  If there's somebody else that was on the Committee at that time, I can't remember who -

THE COURT:   Okay.

MR. GEORGE:   - it was.

THE COURT:   Fair enough; I think Ms. Winkelman said she was unaware.

MR. GEORGE:   She was on the Committee.  Pardon -

THE COURT:   And -

MR. GEORGE:   - me, yes.

THE COURT:   - she -- yes.

MR. GEORGE:   Yes.

THE COURT:   We established that.

MR. GEORGE:   Yeah.

THE COURT:   She was unaware of the Wharton escape, at the time she participated in those deliberations.  Were you aware?

MR. GEORGE:   No, not at that time.

THE COURT:   Was anyone on the Committee aware?

MR. GEORGE:   I don't believe so.  It's certainly to my recollection.  And I don't remember the details of the Committee discussions.  And there would have been more than one.

THE COURT:   Um-hmm.

MR. GEORGE:   I don't remember that being -- that coming up.

THE COURT:   Okay.

MR. GEORGE:   I mean, I should say that, in the 1980's, of course, I would have been aware of it, because I was -- had a cordial, professional relationship with Mr. Vega.  But that -

THE COURT:   Who was that?

MR. GEORGE:   - I would not connect -

THE COURT:   Who?

MR. GEORGE:   - that with this case -

THE COURT:   Yeah, yeah.

MR. GEORGE:   - in 2019 or 2018.

THE COURT:   Okay.  So -- and I'm not trying to put words in your mouth.  I'm just trying to sort of get through this.

So fair to say -- well, let me just ask.  Was there any discussion amongst the Committee, before you made a recommendation to Mr. Krasner, about the escape?

MR. GEORGE:    No, I would have prepared myself for -

THE COURT:    The wit -

MR. GEORGE:    - those -

THE COURT:    The witness answered before the Lawyer could object.

MR. RUDOVSKY:    And this limited question, I will not object to, Judge.

THE COURT:    All right, go ahead.

MR. GEORGE:    I wanted to say that my own preparation for those meetings included reading the Opinions and Briefs that have already been referred to by Ms. Winkelman, Briefs filed by the prior Administration, Opinions in Appellate Courts addressing the issues.  And that escape attempt was not ever mentioned in any of them.

And I also read that the jury determined, as one of the mitigating factors that they weighed, in coming to their decision, that Wharton had no significant criminal history. So, at the point in time when the Committee was engaged in these discussions, the escape was not addressed.

THE COURT:    Did you, in your capacity as a Committee Member, and having reviewed -- I assume you reviewed the Third Circuit Remand Opinion?

MR. GEORGE:    Yes.

THE COURT:    Where the Third Circuit said we must take into account the anti-mitigation evidence that the

Commonwealth would have presented to rebut the Petitioner's mitigation testimony, and the further comment -- and I'm going to paraphrase -- that the Third Circuit noted that the hearing before me should also explore anti-mitigation evidence.

Did you or anyone on the Committee, before you made your recommendation to Mr. Krasner, suggest that your office should do an investigation to determine whether there was, in fact, anti-mitigation evidence?

MR. GEORGE:   No, I did not read the Opinion to require our Office to maintain the position that it had previously maintained under the prior Administration.

THE COURT:   Yeah, I'm not sure I understand your -- maybe I asked a bad question.

MR. GEORGE:   In other words, I didn't read the Opinion to say that the Office had to keep on advocating the position that it had advocated before, and therefore -

THE COURT:   Sure.

MR. GEORGE:   - do the -

THE COURT:   Okay.

MR. GEORGE:   - do the things that it would have done, had it determined to -

THE COURT:   Right.

MR. GEORGE:   - continue to advocate that position.

THE COURT:   Right, okay.  So I had a good discussion with Ms. Winkelman about this.  So I won't beat a dead horse.

But, when the Third Circuit says that the hearing -- and I'm paraphrasing.  And maybe I shouldn't.

But when the Third Circuit says that the hearing that they ordered me to hold should take into account any mitigation evidence, isn't it your obligation, as an Advocate, and the only -- I mean, I can't do an investigation.  So, that's why I appointed the Attorney General.

But you didn't do the investigation.  Why?  Why didn't you and your Office, why didn't you recommend to Mr. Krasner or the Committee that you look into anti-mitigation evidence, which we now know is an escape, before you conceded?

MR. GEORGE:  I don't think that the way the question is phrased accurately reflects what happens in the Committee.  There is give-and-take.  There is debate.  There is discussion.

THE COURT:  Yeah, not my question.

MR. GEORGE:  And -

THE COURT:  I don't think I'm being clear.  My question, I'll try to really make it pithy.  Given the Third Circuit's Opinion, which references anti-mitigation evidence that had to be considered, why didn't your Office do an investigation into anti-mitigation evidence before you recommended a concession?

MR. GEORGE:  I believe that whatever might be said about the thoroughness of the investigation, that that did occur.  I mean, certainly the facts of this case are incredibly

grim. And certainly that would have been discussed thoroughly at the meetings of this Committee. So that the suggestion that the pros and cons of whether or not Mr. Wharton's issue had merit weren't discussed would be -- that would be an inaccurate suggestion.

THE COURT: Well, I'm not -- I'm really trying hard not to be argumentative with you. But, I'm not suggesting that your Committee didn't factor in the pros and cons, including the heinous nature of the crime. I'm not saying that. Of course, you did. I assume you did. My question is: why didn't you do the investigation, which the AG's Office did, to determine that there was substantial, in my view, anti-mitigation evidence?

MR. RUDOVSKY: I object again on the grounds I said before about the inquiry into what this Office should have done, what they should have done. In fact, he's already given you a response that the jury found no pertinent criminal history, based on what the prior Administration had actually produced.

Why should they even go beyond that at that point, assuming we get into any questions about how they weighed all this evidence? I mean, he -

THE COURT: Okay.

MR. RUDOVSKY: I think he's given you an honest answer about what they knew. He knew nothing about the escape

attempt then.  Nancy Winkelman didn't.

Nobody raised it.  Nobody should have raised it, because nobody thought it was relevant, or knew about it at the time.  And -

THE COURT:  Well, the AG's Office thought it was relevant.

MR. RUDOVSKY:  Well, yeah.  That's kind of right.  So, later, that they came in and now kind of said we want to add stuff.  We could have used it before.  Well, I'm not sure why we didn't use it before.  But we will use it now.  That's fine, and you heard it.

THE COURT:  Okay.

MR. RUDOVSKY:  And at all pertinent -- absolutely pertinent to your Opinion, we agreed with that.  You could consider it.

We disagree obviously on the weight you would give to that, and what the question's on prejudice.  But that has nothing to do with this Committee's deliberations, Your Honor.

MR. BARKER:  Your Honor, may I make a point?

THE COURT:  Sure.

MR. BARKER:  Our argument was just characterized inaccurately.  We didn't say that we should have used it before.  We never said that.

I don't believe that the escape was admissible under the evidence that was presented at trial.  And as far as the

prior history goes -

THE COURT:   Wait, wait.  Say that again.

MR. BARKER:   I don't believe that the escape would have been admissible in response to the mitigation that was presented by the Commonwealth at the time.  The evidence that was presented was he's a nice guy.  Don't kill him, basically, is a summary.

The only time that anyone came close to this was when Mr. Wharton's mother testified something along the lines of, I know he's never going to get out of Prison.  But don't give him the death penalty.  That's as close as it got.

That has nothing to do with his escape.  What she knows or doesn't know about whether he's going to get out of there, this doesn't rebut that.

So I don't believe it's accurate to say that this was admissible at any time.  You have to remember that the escape happened after the murder.

So as far as his prior history of being violent, has -- it would not have been admissible.  And again -

THE COURT:   But -

MR. BARKER:   - I -

THE COURT:   - what about the Third Circuit's statement that anti-mitigation evidence would be fair game?

MR. BARKER:   - I believe it was.  But what they're asking for is to say that other mitigation evidence should have

been presented.  That's what makes the escape admissible.  That evidence wasn't presented.

THE COURT:   I'm having a little -

MR. BARKER:   That's why we're -

THE COURT:   - trouble -

MR. BARKER:   - here.

THE COURT:   - following what you're saying.  So let me say it back to you.  I'll come back to you.

MR. RUDOVSKY:   Yeah.

THE COURT:   And just -

MR. RUDOVSKY:   No, I'm sorry.

THE COURT:   - have a seat.  Actually, I'm not understanding what you're saying.

MR. BARKER:   Okay.

THE COURT:   Try it again.

MR. BARKER:   Well, to start with, the Notice of Aggravating Circumstances was filed back, I believe, in 1985 -

THE COURT:   Um-hmm.

MR. BARKER:   - before the escape attempt.

THE COURT:   Um-hmm.

MR. BARKER:   So as far as that being admissible as part of an aggravator, the -

THE COURT:   That -

MR. BARKER:   - aggravator -

THE COURT:   - meaning -

MR. BARKER:   The escape.

THE COURT:   Go ahead.

MR. BARKER:   That would not have existed at the time the Notice of Aggravating Circumstances was filed.  So it wasn't relevant to the circumstances that were filed.

THE COURT:   Um-hmm; you're saying it was relevant when Mr. Cannon put into evidence what?

MR. BARKER:   I'm saying that, as close as Mr. Cannon came was the evidence of Mr. Wharton's mother saying, my son's going to spend the rest of his life in Prison.  That's about as close as it came for the escape to be admissible during the penalty phase.

THE COURT:   Okay.

MR. BARKER:   And I don't believe that that's fair rebuttal, at all, to say that an escape that she may or may not have known about somehow should have been inquired into.  And it's certainly not admissible as substantive evidence.  It's still not a mitigating -- or still not an aggravating circumstance.

THE COURT:   Okay.

MR. BARKER:   And it wasn't proper rebuttal to the mitigating evidence that was presented originally.  What I'm saying is, it becomes relevant only if Mr. Cannon had tried to go down this path of, well, he was a nice guy in jail.  He hasn't killed anybody or done anything bad, once he was

arrested.

THE COURT:   Okay.  So where were we?

MR. RUDOVSKY:   Just let me just say, we've briefed that issue on once Mr. Wharton, at the second penalty hearing, presented evidence of good character, non-dangerousness, under the Pennsylvania Rules, at death penalty hearings, it's an open field.

He could have well-been impeached.  But, wait a minute.  He's not dangerous.  He's of good character.  Here's a guy that escaped and was shot in City Hall, absolutely impeaching evidence, never used.  And we -- I'm not going to go into it -- we gave you the cases on Pennsylvania -

THE COURT:   Yeah.

MR. RUDOVSKY:    - Law -

THE COURT:   Okay.

MR. RUDOVSKY:    - on the death penalty in our briefing.

THE COURT:   Okay.

(Asides)

THE COURT:   Lot of information, so I just want to sort of make sure I recap what you said, which is you didn't know about the escape during the Committee's deliberations. And you don't remember whether it was even discussed, or what was your answer, Mr. George?

MR. GEORGE:   My -

THE COURT:   I'm sorry.

MR. GEORGE:   - recollection is that it was not discussed -

THE COURT:   Not discussed.

MR. GEORGE:   - because it wasn't -- we weren't aware of it.

THE COURT:   Oh, right.  And then, when I asked you why didn't you do further investigation, you said, we discussed the pros and cons extensively.  We didn't think we had to.  Is that a fair -

MR. GEORGE:   Yes, sir.

THE COURT:   - characterization?  Okay.  When did you find out that Mr. Wharton had escaped?

MR. GEORGE:   I don't know that I found out about it prior to the AG's filings.

THE COURT:   Okay.  And so, you learned about it from the AG?

MR. GEORGE:   That's my recollection, yes.

THE COURT:   When they filed their papers and said there had been an escape?

MR. GEORGE:   Yes.

THE COURT:   Okay.

MR. GEORGE:   Yes.

THE COURT:   Did the Committee reconvene, once you learned that information?

MR. GEORGE:   I don't -

THE COURT:   Was there any -

MR. GEORGE:   - believe -

THE COURT:   - discussion?

MR. GEORGE:   - so.

THE COURT:   And -

MR. GEORGE:   It -

THE COURT:   - this may sort of bleed into Mr. Rudovsky's issue, so he'll state what he needs to state. But, did anyone in your Office say, well, now we know about this?  Maybe we ought to reconsider our position, or discuss it, or anything like that.

MR. GEORGE:   I don't recall that there was another meeting.  There could have been, however.  The Committee meets regularly.

THE COURT:   Um-hmm.

MR. GEORGE:   So, something that might not be on the Agenda at any particular meeting could come up, because just because the meetings occurred every couple of weeks.  But I don't recall whether that ever did or did not come up again.

(Asides)

THE COURT:   I mean, it may be prudent for me to get the transcript, which I can.  But I recall in the hearings that we held, where you were Counsel and the AG represented, I asked you, was the DA's Office aware of the escape prior to your

concession, and you said yes.  Is my memory wrong?  Could be.

MR. GEORGE:  No, I think that was the answer I gave. And of course, it was so.  The Office had prosecuted the guy. So, yes, the District Attorney's Office was aware of it, clearly.

However, I'm telling you that it was not something that was on our radar during preparation for our Committee meetings with respect to this case, and it wasn't something that was discussed at those meeting.

THE COURT:  Are you saying, when I asked you, was the DA's Office aware of the escape prior to the concession, and your answer was yes, you meant to say the DA's Office going back two decades?

I mean, clearly my question was the current DA's Office.  Is that -

MR. GEORGE:  I -

THE COURT:  - what you're saying?

MR. RUDOVSKY:  Your Honor, I have the exact words here, if I -

THE COURT:  Yeah, could you -

MR. RUDOVSKY:  - could put it on?

THE COURT:  - read them?

MR. RUDOVSKY:  Yeah, yeah.  And -

THE COURT:  Thank you.

MR. RUDOVSKY:  - I think you're actually very close

to what was said.

THE COURT:  Yeah.

MR. RUDOVSKY:  I have a question.  It's page 66 of the transcript of -- it's either November 5th, '21 or -

THE COURT:  It's cited in my -

MR. RUDOVSKY:  - May 11th.

THE COURT:  - Opinion.

MR. RUDOVSKY:  But we know what we're referring to.

THE COURT:  Yeah.

MR. RUDOVSKY:  The question from the Court was, I have a question before you start, to Mr. George.

THE COURT:  Yes.

MR. RUDOVSKY:  Was the District Attorney's Office aware of the escape from City Hall prior to filing the Notice of Concession?  Answer, yes.

THE COURT:  That's it.

MR. RUDOVSKY:  There was no follow-up questions.

THE COURT:  Yeah.

MR. RUDOVSKY:  Were you -

THE COURT:  That's it.

MR. RUDOVSKY:  - aware or anything -

THE COURT:  Yeah.

MR. RUDOVSKY:  - like that?

THE COURT:  So by that -- thank you -- by that, did you mean the District Attorney's Office throughout the last

three decades?  Or by that, did you mean the current District Attorney's Office?

MR. GEORGE:   No, I meant the District Attorney's Office, as an entity -

THE COURT:   As an entity.

MR. GEORGE:   - was clearly aware, because they -

THE COURT:   Right.

MR. GEORGE:   - had prosecuted the guy.

THE COURT:   Um-hmm.

MR. GEORGE:   There was no inquiry as to the deliberative process of the Sentencing Review Committee at that time.  And I would have had the same kind of questions then as are being now about -

THE COURT:   Um-hmm.

MR. GEORGE:   - talking about what happens in one of these meetings.

THE COURT:   Okay.  So you didn't know about the escape in the Concession Committee meeting.  And your answer was, we knew about it because we're the DA's Office, not just the Krasner Administration, but all other DA's Office.  So -

MR. GEORGE:   Yes.

THE COURT:   - my question is, why didn't you explain that to me, when I asked you the question?

MR. GEORGE:   I didn't understand that this Court wanted an inquiry into the deliberative processes.  And as I

said, I would have been uncomfortable.

I'm pretty far down on the ladder in terms of whether or not I should be discussing the deliberative processes of a Committee chaired by the First Assistants and attended by the District Attorney.  I -- that's -

THE COURT:   Okay.

MR. GEORGE:   In other words, I would have had to say, look, I need permission from somebody, before I start talking about the internal -

THE COURT:   I understand.

MR. GEORGE:   - functioning of -

THE COURT:   I understand your answer.

MR. GEORGE:   - some Committee that I'm just a member of.

THE COURT:   I understand your answer.  Was Mr. -- when you learned, vis-à-vis the AG's filing, that there had been an escape, do you know if Mr. Krasner was advised that there was an escape?

MR. GEORGE:   I do not.  But I did not advise him, to my memory.

THE COURT:   Okay.  Did you have any part in the process of deciding that Mr. Kaufman should file the Concessions and other Pleadings, or was that above your -

MR. GEORGE:   No, I would have been part of informing Mr. Kaufman of the Committee's decision.  I don't remember

specifically doing that in this case.  But I do remember that that's what happened in those cases that -- where I would inform him, the Committee has decided this-or-that, with respect to a case.

THE COURT:  Okay.

(Asides)

THE COURT:  All right.  I think Ms. Winkelman answered most of the questions I had for you and her jointly so.  Thank you.

MR. GEORGE:  Okay.

MR. RUDOVSKY:  And we have no questions.

THE COURT:  Okay.

MR. RUDOVSKY:  Thank you.

THE COURT:  And of course, Mr. Rudovsky, if you want to, I didn't give you the chance to ask Ms. Winkelman questions.  But if -

MR. RUDOVSKY:  Yeah, I -

THE COURT:  - you wanted to do that, you have that absolute right.

MR. RUDOVSKY:  I understand that and we -

THE COURT:  Yeah, okay.

MR. RUDOVSKY:  - had no questions -

THE COURT:  Great.

MR. RUDOVSKY:  - for her.

THE COURT:  All right.  Then, I want to ask

Mr. Kaufman a couple questions, if I may.

(Asides)

THE COURT:   Mr. Kaufman, I don't know whether this is necessary.  I'll say the same thing to you I said to Ms. Winkelman and to Mr. George.

This is -- I understand this is difficult and it's not something that I relish doing, or take any join it.  It's caused me quite a bit of angst.  So -

MR. KAUFMAN:   Appreciate that, Your Honor.

THE COURT:   Okay.  I wanted to mostly ask you questions about your Affidavit.  So, does he have a copy? Could someone give him a copy?  I think it'd be easier.

MR. RUDOVSKY:   Yes, I -

MR. BARKER:   I -

MR. RUDOVSKY:   - will.

THE COURT:   Yeah, thank you.

MR. BARKER:   - brought a copy.

MR. RUDOVSKY:   Yeah.

MR. BARKER:   I'll give him.

MR. RUDOVSKY:   Okay.

THE COURT:   Okay.

(Asides)

THE COURT:   You were -

MR. KAUFMAN:   I have -

THE COURT:   - at the pertinent time Head of the

Federal Habeas Unit for the District Attorney's Office?

MR. KAUFMAN:  That's correct, Your Honor, Supervisor of the Federal Litigation Unit.

THE COURT:  Got it; okay.  I assume you're familiar with Rule 11 of the Federal Rules of Civil Procedure?

MR. KAUFMAN:  Yes, Your Honor.

THE COURT:  Okay.  When your Affidavit indicates at paragraph 11, you were -- and I'm going to paraphrase, and then I'll read directly -- you were told, it says, I think, by Mr. George, the Committee had made a financial decision.

And it's unclear you directed you.  It looks like Mr. George.  I don't know that that's of any great consequences.  But someone -- it appears to be Mr. George -- directed you to file the Concession.  And you say, in paragraph 11:

"At the time I filed the Notice of Concession, I was not personally aware of Wharton's attempted escape in 1986, or other negative Prison adjustment evidence noted by the Attorney General.

"Because I had no authority to unilaterally reconsider a change in the decision of the Committee or concede death penalty relief, I did not conduct any independent investigation or evaluation of the case before filing the Notice."

I don't want to read Rule 11 verbatim.  But it -- I

think it says that someone who files something has to do some type of investigation. So, did you have any concerns about being asked to file a Concession in a death penalty case without ever having received the basis for that instruction?

MR. KAUFMAN: Well, my read on the Rule, Your Honor, is that it requires a reasonable investigation under the circumstances. And I would submit that, under these circumstances here, where I had assumed that there had been a reasonable and diligent investigation by the Capital Case Review Committee, I was not familiar with all the details of how that Committee operated.

But it was certainly my understanding that they had investigated and reviewed it. So, it's my -- it was my thought that that was reasonable under these circumstances that I didn't have to do a second investigation beyond which had already taken place by a Committee of my Superiors.

(Asides)

THE COURT: I think I have exactly what you said right. But let me make sure I understand it.

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Your view is that because your Supervisors had done an investigation, that complied with your requirements as the Submitter that you conduct a reasonable inquiry, under the circumstances?

MR. KAUFMAN: Under these circumstances where you

O'CONNOR LEGAL, MEDICAL & MEDIA SERVICES LLC
603.865.1255 • 888.524.5596
www.oconnorlmms.com

have a Notice Pleading, not a -- just essentially alleging that the Office is conceding on the issue, yes -

THE COURT:   Right.

MR. KAUFMAN:   - Your Honor.

THE COURT:   Right; but you've filed other documents. I mean, you filed a Brief where you laid out certain reasons for the concession, after I pressed your Office for that, right?

MR. KAUFMAN:   Your Honor, I -

MR. RUDOVSKY:   I object, again.  We've had testimony on this.  I -

THE COURT:   Um-hmm.

MR. RUDOVSKY:   - think it misrepresents that Brief. You asked two specific questions.  They answered them.  In background, they gave some information about the case, kind of in a procedural history and -

THE COURT:   Um-hmm.

MR. RUDOVSKY:   - what was on the record.  But, again, it goes to our main point.  There was nothing in your Order to which that Brief was responsive to that asked for any facts of any kind.

THE COURT:   Okay.  So, I'll adopt Mr. Rudovsky's characterization.  You filed a subsequent brief, I think, on April 3rd, where I think Mr. Rudovsky's word was you supplied me with further information.

And so, the point I'm trying to -- or the question I'm trying to ask is:  on one hand, you're filing a Concession and you're claiming, well, that was enough under Rule 11.  But yet, you follow up with a more fulsome explanation?

MR. KAUFMAN:  We -- Your Honor, the -- your Briefing Order asked for briefing on two specific legal issues.  It didn't ask for a fulsome explanation.

THE COURT:  I didn't say that I asked for a fulsome explanation.

MR. RUDOVSKY:  Judge -

MR. KAUFMAN:  You did that -

THE COURT:  I said you provided -

MR. KAUFMAN:  - in your Opinion.

THE COURT:  - more information.

MR. RUDOVSKY:  Judge, I would -

MR. KAUFMAN:  Yeah, I -

MR. RUDOVSKY:  - point to your Opinion in this case.

THE COURT:  Yeah, you've made that point.

MR. RUDOVSKY:  But -

THE COURT:  Yeah.

MR. RUDOVSKY:  - we're using the term "fulsome".

THE COURT:  Yeah.

MR. RUDOVSKY:  You used the -- you said, I asked for a full -- with respect to this Order, you characterized it as asking for a fulsome explanation -

THE COURT:   No.

MR. RUDOVSKY:   - of the District -

THE COURT:   If I did, I misspoke.   He supplied more information than was in the Concession.

MR. RUDOVSKY:   And it was -

THE COURT:   Can we agree on that?

MR. RUDOVSKY:   - totally background and had nothing to do with the points -

THE COURT:   No.

MR. RUDOVSKY:   - one way or the other.

THE COURT:   Yeah, I'm going to disagree with that, because it says -- and Mr. Kaufman wrote this -- he lays out on paragraph 3 a whole recitation of what Mr. Cannon talked about. And I'm going to read it.

MR. RUDOVSKY:   Right.

THE COURT:   Mr. Cannon said -- you told me Mr. Cannon's not operating under any strategy or tactic, when I did not investigate and present evidence of Mr. Wharton's Prison adjustment.

So, anyway, in my discussion with Mr. Rudovsky, I lost track of my point. So, let me move onto the next question, okay?

MR. RUDOVSKY:   Yeah.

THE COURT:   Which was, I thought, making sure you and I were on the same page, that I understood your answer,

which was you believed a reasonable investigation had been conducted, because your Supervisors told you they had done that, is that fair?

MR. KAUFMAN:   That's fair, Your Honor.

THE COURT:   Okay.

MR. KAUFMAN:   They had done that through the mechanism of the Capital Case Review Committee, yes.

THE COURT:   Understood.  When did you become aware that Mr. Wharton had escaped?

MR. KAUFMAN:   I became aware, Your Honor, upon the filing of the Attorney General's Brief in, I believe it was April of 2019.

(Asides)

THE COURT:   I appreciate your statement in paragraph 12 of your Affidavit, where you say, although it is not -- it was not my intention, it is now apparent to me the admittedly vague communication with the victims' family language was amenable to interpretation that the victims' family agreed with the concession of the penalty phase.

And I don't say I appreciate it because you're agreeing with me that I think it was vague, and I do.  I appreciate your candor.  So, when you saw the concession, why didn't you, since your name was on it, take steps to make it clearer, since you now acknowledge it was vague?

MR. KAUFMAN:   Take steps in 2022, when I filed -

THE COURT: Yeah.

MR. KAUFMAN: - this Affidavit?

THE COURT: When you filed the Concession, yes.

MR. KAUFMAN: To -

MR. RUDOVSKY: No, the -

MR. KAUFMAN: - file a new -

MR. RUDOVSKY: No, the question, I think, was when you filed that Notice of Concession. I would object to that, because the Notice of Concession was simply a statement of the position of the Office. The views of the victims, pro or con, had nothing to do -

THE COURT: Yeah.

MR. RUDOVSKY: - with -

THE COURT: That's in the Affidavit. I -

MR. RUDOVSKY: Right.

THE COURT: - passed over that. I don't want -

MR. RUDOVSKY: No, but -

THE COURT: - to ask him a -

MR. RUDOVSKY: - I -

THE COURT: -- question about that.

MR. RUDOVSKY: - thought you were now asking why he didn't -

THE COURT: No, he's -

MR. RUDOVSKY: - with the Notice -

THE COURT: I'm asking him.

MR. RUDOVSKY:   - of Concession -

THE COURT:   He's saying -

MR. RUDOVSKY:   - talk about the victims.

MR. KAUFMAN:   You -

THE COURT:   No.

MR. KAUFMAN:   Your Honor -

THE COURT:   That's not -

MR. KAUFMAN:   - I -

THE COURT:   No, I -

MR. KAUFMAN:   I'm sorry.

THE COURT:   Let me re-ask the question.

MR. RUDOVSKY:   Okay.

MR. KAUFMAN:   Yeah.

THE COURT:   Let me re-ask the question.

MR. KAUFMAN:   Okay.

THE COURT:   Okay.  You acknowledge in your Affidavit that the concession was worded in a vague way.  And you concede that it lacked clarity.  These are your words, in your Affidavit.

MR. KAUFMAN:   Yes, Your Honor.

THE COURT:   So my question is, why didn't you take the time on such an important matter, when you drafted the concession, to make it not vague and more clear?

MR. KAUFMAN:   In all honesty, Your Honor, it did not occur to me that it would be construed in the fashion it was by

Your Honor, in your May Opinion.  I could honestly say I -- it was not intended to, and I did not think it would be read to say that the victims' family conceded.

It would be awfully difficult to make such a representation.  The victims' family involves numerous members. The idea that they would all universally have the same view is probably farfetched.

THE COURT:   Well, it's not -

MR. KAUFMAN:   And in any event, it was not -

THE COURT:   Excuse me.

MR. KAUFMAN:   - my -

THE COURT:   Excuse me.  It's not farfetched, because now we know that they do oppose the position taken by the District Attorney's Office, especially I mean I -- okay.

Mr. Rudovsky is standing to disagree with me.  So let's read what the victims did say.

MR. RUDOVSKY:   Your Honor, we have a record of what the victims say after-the-fact.  We have what the Victim's Advocate in the Office said they said that they would talk about this.  It was never communicated to her before.

And I go back to my primary point.  Whether they were in favor of the death penalty, or they would favor the concession, was completely irrelevant to -- hear me out -- to the Notice that we're conceding.  That was a legal issue.

Around the country, District Attorneys are told by

victims more often than this case, where the District Attorney decides not to go for the death penalty the victims wanted, where victims' families say, don't ask for the death penalty, Mr. District Attorney.  Mr. District Attorney says -

THE COURT:  I'm not -

MR. RUDOVSKY:  - to them -

THE COURT:  - quibbling -

MR. RUDOVSKY:  - you know what?

THE COURT:  - with that -

MR. RUDOVSKY:  I'm -

THE COURT:  - point.

MR. RUDOVSKY:  - going to do it.

THE COURT:  I'm not disagreeing with you.

MR. RUDOVSKY:  And -

THE COURT:  The ultimate decision, no matter what the victim said, is the District Attorney's, agree.

MR. RUDOVSKY:  - which is why the Notice -

THE COURT:  Agree.

MR. RUDOVSKY:  - of Concession, which was limited to a specific legal issue in the case -

THE COURT:  We're not talking -

MR. RUDOVSKY:  - was to a -

THE COURT:  - about that.

MR. RUDOVSKY:  - Sixth Amendment violation.

THE COURT:  We're talking past each other now and

I'm going to interrupt you.  I'm talking -- we're talking about, I agree.  The ultimate decision is the District Attorney's, no matter what the victims say.

What we're talking about is a communication communicated to me, which I have concerns was not communicated in a clear way about the victims' position, and confirmed, confirmed by Mr. Kaufman who said the communication was vague and lacked clarity.

MR. RUDOVSKY:   Yeah.

THE COURT:   That's -

MR. RUDOVSKY:   Okay.

THE COURT:   - what I'm asking him about.

MR. RUDOVSKY:   And we agree.  And the Office, by its -- has already said on several occasions in briefing that, in retrospect, there should have been -

THE COURT:   Okay.  So my -

MR. RUDOVSKY:   - more contact -

THE COURT:   - question -

MR. RUDOVSKY:   - with them.

THE COURT:   - is, why didn't you take the time to be more clear in such an important matter?

MR. KAUFMAN:   I did not think it was amenable.  It did not occur to me that it was amenable to the interpretation that the victims' family agreed.

In retrospect, in light of your Opinion, obviously it

was amenable to that interpretation.  And I apologize.

THE COURT:  Well, I'm not saying, I -- maybe I'm wrong.  But you've said, it's now apparent to me the admittedly vague communication was amenable to the interpretation that the victims' family agreed with the concession.

MR. KAUFMAN:  Right.

THE COURT:  Your Affidavit doesn't say, based on your Opinion that it's possible.  You've said it.  It's amenable to a vague interpretation.

MR. KAUFMAN:  A hundred percent.

THE COURT:  Paragraph 14, you requested permission to stop working on the case.  Why?

MR. KAUFMAN:  Well, as I put out in the Affidavit, it looked like it was evolving to a situation where there was going to be advocacy -- active advocacy on behalf -- effectively on behalf of Mr. Wharton.

And they said I had a choice in the matter.  It was my preference to work on other matters, where I was kind of on the more traditional side of the V in advocating against granting of relief.  And my Supervisors permitted me to do that, to beg off the case.

THE COURT:  Because I appreciate your candor in that answer, I'm not going to press you for further details, regarding that topic.

(Asides)

THE COURT:  I think I asked you this.  I'm sure I did.  But just to make sure, you learned about the escape when you read the -- well, did you read the AG's filings?  Is that when you learned about the escape?

MR. KAUFMAN:  I don't specifically recall.  I certainly read it at some point.  But I might have initially been informed of it because someone else had it and told me about it very soon after it was filed.

THE COURT:  Um-hmm.

MR. KAUFMAN:  But, yeah, I do have a distinct memory of only at that point, subsequent to the filing, was when I first found out about the escape.

THE COURT:  Um-hmm; did you approach whoever you report to and say -- I'm going to withdraw that question.

(Asides)

THE COURT:  Did you have direct communications with Ms. Wanes, before you drafted the Concession?

MR. KAUFMAN:  Yes, Your Honor.

THE COURT:  Could you relay those communications, what was said?

MR. KAUFMAN:  I don't specifically recall what was said.  The import of what was said was that there was communication with the victims' family.

But I do not recall the specific conversation.  I don't recall whether -- sometimes we would email.  Other times,

it would be an in-person conversation.

But I would always, before filing one of these Notices, I would always check in with her.  Paul would tell me that the Committee's made a decision.  And he would say, check in with Heather to make sure we're okay on the victim's family notification piece of it.

THE COURT:   And you did that?

MR. KAUFMAN:   Yes, Your Honor.

THE COURT:   But you don't recall what she said to you?

MR. KAUFMAN:   I don't recall the specifics of what she said to me.  Yes, Your Honor.

THE COURT:   Okay.  Did you make any inquiries as to whether -- understanding Mr. Rudovsky's position that the victim's views don't control the DA's ultimate decision on how to present to the Court.  But did you ask her the -- is the family onboard with the concession, or anything like that?

MR. KAUFMAN:   I don't recall, Your Honor.  Sometimes there was conversations, like speaking generically.  Sometimes there was conversations like that that I would have with her.  I just don't recall what transpired between us in this particular case.

(Asides)

THE COURT:   Paragraph 11, you indicate you were unaware of the escape.  And you say, or other additional

negative Prison adjustment evidence.

And that, we all know now, is Mr. Wharton fashioned, on two occasions, escape implements, while he was on death row. You're now aware of that?

MR. KAUFMAN:   Yes, Your Honor.

THE COURT:   And you weren't aware of that.   No one told you that.   You didn't do any investigation to find out, like the AG's Office did, about those incidents before you signed the Concession?

MR. KAUFMAN:   Correct, Your Honor.

THE COURT:   Okay.   Who drafted the Notice of Concession?

MR. KAUFMAN:   I did, Your Honor.

THE COURT:   Did Mr. George, Ms. Winkelman, or Mr. Krasner approve it, before you signed it?

MR. KAUFMAN:   I don't believe so.   I don't have a specific recollection.   But I don't believe so.   That was not the practice.

(Asides)

THE COURT:   I don't have any more questions, Mr. Kaufman.

MR. KAUFMAN:   Okay.

THE COURT:   I think I may have asked you this.   Did you read the Third Circuit's Opinion on the issue we're here about, at any point in time?

MR. KAUFMAN:  Yes, I'm sure, Your Honor.

THE COURT:  When they say we must also take account of anti-mitigation evidence, in light of that Directive from the Third Circuit, did you say to any of your Supervisors, have we done that?  Have we taken into account any anti-mitigation evidence?  Have we done a investigation into that?

MR. KAUFMAN:  I did not, Your Honor.

THE COURT:  Okay.  Excuse me one second.

(Asides)

THE COURT:  Okay.  I think I'm -- those are the questions I have.  So can we take just another five-minute break?  Let's do that.  Okay?  Thank you.

(Recess at 11:06 a.m., until 11:11 a.m.)

THE COURT:  Everyone could sit down.  All right.  I don't have any further questions of Mr. Kaufman.  But I think I have, I think, maybe a final -- well, every time Lawyer says -- and I'm a Lawyer -- I only have one more question, that that rule's always broken.

So, I have a question for Mr. Rudovsky.  And I'm referring to the Proposed Order that was submitted, the one that I've talked about that says, and upon careful and independent review of the Parties' submissions.

Actually, I wanted to ask Mr. Kaufman about that, sorry.  Who prepared this Order?  Do you want to see it?

MR. KAUFMAN:  No, I think I know what you're talking

about, Your Honor.

THE COURT:    Okay.  I'm happy to show it to you.

MR. KAUFMAN:    Okay, yes.  Thank you.

THE COURT:    Yeah, just let him eyeball it real quick.

(Asides)

MR. KAUFMAN:    I believe, Your Honor, that this was drafted by Defense Counsel and approved by me.

THE COURT:    Okay, thanks.  Submitted by you and, you're right, Defense Counsel.  So my question is, on the part that says, upon careful and independent review of the Parties' submissions, when you submitted this to me, did you have any concerns that there hadn't been a full review of -- I keep harping on, but I think it's important -- the Third Circuit's edict that we take into account anti-mitigation efforts?

MR. KAUFMAN:    I did not, Your Honor.  And I would just note, in particular, that I, at that point, was not aware of the escape.

THE COURT:    Okay.  So, thank you.  So, Mr. Rudovsky, staying on this Order, does your Client believe, had I signed this Order, do you believe that the -- given the magnitude of the case, the fact that a jury had reached its verdict.

The Pennsylvania Supreme Court had affirmed and, very recently, the Supreme Court said that there must be a review by a Judge through advocacy, before this type of relief is

granted.

Given all of that, does your Client have any concern that I would sign, and you asked me to sign an Order, without any explanation to the public at all as to why I had -- and I didn't sign it.  But if I did, doesn't -- does your Client believe that the public deserves any explanation from me, from me?

MR. RUDOVSKY:   I think as our Client has said and we've said, if the Court did not think there was enough information on the record, it could order a full hearing, which it did.

If it was satisfied based on the representations that were on the record already about Mr. Cannon, and all the information that both sides had at that time, that the District Attorney had given you all that information and had decided to concede the issue.  I don't think it would have been inappropriate for you to sign that.

You looked further.  That's fine.  And you eventually had a hearing.  If I was drafting that, I might draft it differently.  But the way it was drafted -- I'm not trying to avoid the question -- simply gave you the choice.

Lawyers propose Orders all the time.  Judges sometimes reject them.  Judges edit them.  Judges reject them. Based on the positions of both sides -- obviously Mr. Wharton on their Advocate -

THE COURT:   Who were completely aligned?

MR. RUDOVSKY:   - was saying this is the reason why there was ineffectiveness.  Everybody agreed Mr. Cannon was ineffective on the performance prong.

The only question was prejudice.  And based on the record that had been developed to-date, with Experts and everything else, they said you have enough to make that decision.

Your point at that, when it was remanded, what you've -- which I understand -- what you've focused on with all three witnesses, that you must now, right, provide all the information.

When that case gets remanded, it's like any other issue before a Federal Judge in the District Court.  It's kind of like we do it over now, right?

There's no bar on either side changing its position at that point, making different arguments, deciding what evidence to present.  And I've said kind of ad nauseum at this point, the District Attorney, the Solicitor General on remand, Supreme Court remands a case to the Circuit.

New Administration comes in.  They change their position, perfectly appropriate.

THE COURT:   But the Supreme -- the -

MR. RUDOVSKY:   And -

THE COURT:   - Supreme Court -

MR. RUDOVSKY:   - that's what the -

THE COURT:   - disagrees -

MR. RUDOVSKY:   And that's what this Office -

THE COURT:   - with -

MR. RUDOVSKY:   - did here.

THE COURT:   - that position.  The Supreme Court said -- I don't want to, okay, read it again.  But Commonwealth v. Brown, the Pennsylvania Supreme Court said, simply because there's a new Administration doesn't mean you can undo jury -

MR. RUDOVSKY:   And I -

THE COURT:   - verdicts.

MR. RUDOVSKY:   And we agree 100 percent with that. You can't just come to us and say, we don't like the death penalty, reverse the conviction.  Give us a legal reason.

The legal reason here was we had ineffective assistance of Counsel.  What this Court quarrels with is whether that concession was proper.

Our view is, after reviewing everything that was relevant and known to that Committee, they made a reasonable decision, which cannot be questioned by this Court.  You can reject it and have a hearing.  You weren't bound by it.  You're supposed to give it some deference.

But that's why I suggest that what was done was not inappropriate, and certainly not sanctionable.  I mean, we're -

THE COURT:   Yeah.

MR. RUDOVSKY:   - talking about a couple levels here of -

THE COURT:   You've taken my question to -- as a good Advocate would -- to argument on a different point.  But -- and I promise I'm not trying to put words in your mouth.

MR. RUDOVSKY:   No, I -

THE COURT:   I -

MR. RUDOVSKY:   - understand.

THE COURT:   - understand you to say that, had I signed the Order, which your Client asked me to sign saying I had done an independent and careful review, you're -- let me just -

MR. RUDOVSKY:   Right, yeah.

THE COURT:   - finish my question.

MR. RUDOVSKY:   Um-hmm.

THE COURT:   That you don't think it was incumbent on me to give the public an explanation as to why I was taking a very significant verdict off the table.  Public didn't deserve any explanation -

MR. RUDOVSKY:   Right.

THE COURT:   - at all.

MR. RUDOVSKY:   Because all that's represented, if you had signed that, is -

THE COURT:   Yes.

MR. RUDOVSKY:   - I have done an independent review of what's been submitted to me so far.

THE COURT:   And I'm asking you, does the public deserve to know what that review was?  What's the basis?

MR. RUDOVSKY:   You could do that in explaining why you're signing -

THE COURT:   I'm asking -

MR. RUDOVSKY:   - the Order.

THE COURT:   - you.  Do you think the public deserves to know that?

MR. RUDOVSKY:   I don't think the public has a right to know that.  You issue the Order.  Sometimes Judges write Opinions.  Sometimes they just issue Orders.  Sometimes they give explanations.  Sometimes you have dissents, where that's -

THE COURT:   This is -

MR. RUDOVSKY:   - up to you.

THE COURT:   - a death penalty case.

MR. RUDOVSKY:   Yeah.

THE COURT:   There's nothing more important that we do.

MR. RUDOVSKY:   Exactly, and which is why it was perfectly appropriate of you for -- to have a full hearing, write 30 pages on the issue, which you did.  Other Judges have simply accepted it and signed it, and in death penalty cases.

THE COURT:   Okay.  Thank you.  Does the

Attorney General's Office wish to add anything to the conversation?

MR. BARKER:  No, Your Honor.  I think you've developed your record.

THE COURT:  Okay.  And how about Counsel for Mr. Wharton?

MS. MCHUGH:  No, Your Honor.

THE COURT:  Okay, all right.  Then, I will conclude the hearing.  And say to the Lawyers, particularly Counsel for the District Attorney's Office, I appreciate the way you've conducted yourself in a -- in dignified matter.  This -

MR. RUDOVSKY:  I appreciate the Court's questions today.

THE COURT:  Yes.

MR. RUDOVSKY:  If I could just inquire, if the -- I don't know what your next step is going to be.  I assume you're going to make some Decision on where we go from here in an Opinion, or however you proceed.  If there are any issues you want additional briefing on -

THE COURT:  Yeah.

MR. RUDOVSKY:  - we're happy to do that.

THE COURT:  Yeah, sure.  I appreciate the input.  And more input -- the more input, the better, ironically.  And so, I don't know where we're going to go from here.

I mean, I want to digest what was said.  But we will

stay tuned.

MR. RUDOVSKY:   Very well.

THE COURT:   Okay.  All right.

MR. RUDOVSKY:   Thank you very much.

THE COURT:   Thank you.

(Proceedings concluded at 11:21 a.m.)

# C E R T I F I C A T I O N

I, <u>VICTORIA O'CONNOR</u>, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____          ____June 24, 2022_____

Victoria O'Connor, CET                                    Date

O'CONNOR LEGAL, MEDICAL & MEDIA SERVICES LLC
603.865.1255 • 888.524.5596
www.oconnorlmms.com